TARA K. MCGRATH
United States Attorney
NICHOLAS W. PILCHAK
California Bar No. 331711
JANAKI G. CHOPRA
California Bar No. 272246
ERIC R. OLAH
California Bar No. 295513
Assistant U.S. Attorneys
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-7540
Email: eric.olah@usdoj.gov

Attorneys for the United States

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KARIM ARABI (1),<br><br>Defendant. | Case No.:  22-CR-1152-BAS<br>Date:  December 4, 2023<br>Time:  2:45 p.m.<br><br>Honorable Cynthia Bashant<br><br>**THE UNITED STATES' RESPONSE IN OPPOSITION TO DR. ARABI'S MOTION TO DISMISS (ECF 194)** |

Defendant Karim Arabi's motion to dismiss mounts a spirited challenge to a hypothetical indictment that does not exist. Straining to recharacterize this straightforward property rights fraud case as one charging deprivation of an intangible right to honest services or accurate information, Dr. Arabi overlooks dispositive language in the Superseding Indictment and misreads plainly distinguishable case law. In the real Superseding Indictment, the "core property interest" was not the information defendants diligently worked to conceal, but rather the millions of dollars they duped Qualcomm into paying for technology it already effectively owned. Because the Superseding Indictment properly charges the conspiracy and substantive wire fraud offenses, the Court should deny Dr. Arabi's motion to dismiss.

# I.

# ARGUMENT

**A.   The Superseding Indictment Sufficiently Charges a Conspiracy to Commit Wire Fraud and Substantive Wire Fraud Counts.**

At the outset, Dr. Arabi's motion fails to cite the operative statute or the corresponding jury instructions.  The wire fraud statute prohibits devising "any scheme or artifice to defraud, or **for obtaining money or property**" by specified means.  18 U.S.C. § 1343 (emphasis added).  Consistent with the statutory language, the Ninth Circuit's model jury instructions refer to "money or property" in defining the first two elements of wire fraud.  *See* Ninth Circuit Model Criminal Jury Instruction No. 15.35 (2022 ed., updated Mar. 2023) (defining the first element as knowing participation in "a scheme or plan to defraud, or a scheme or plan for obtaining money or property by" specified means, and explaining that the second element requires statements or omissions to have "a natural tendency to influence, or were capable of influencing, a person to part with money or property").

The charges in the Superseding Indictment track the statutory language and specifically allege that the object of the wire fraud conspiracy and scheme was to obtain "money and property."  ECF 9 at 4, 17; *see also* ECF 9 at 4 ("It was the purpose of the conspiracy that defendants . . . would and did fraudulently obtain tens of millions of dollars from Victim Company by selling it valuable DFT technology"), 16 ("On or about October 30, 2015, defendants . . . caused Victim Company to issue a combination of wire transfers totaling over $150 million (USD) to themselves, their associates, and entities that they controlled"), and 20 (table specifying the charged wires and value, including Count 2, which charges Dr. Arabi and Sheida with wire fraud based on the $91,854,370.93 of fraud proceeds wired to a Canadian bank); *cf. United States v. Forrester*, 616 F.3d 929, 941 (9th Cir. 2010) (affirming denial of motion to dismiss and finding indictment sufficient in part because it "track[ed] the language of the conspiracy statute").

**B.     The Motion Fails Because of Qualcomm's Rights to the Property.**

Dr. Arabi's motion for dismissal is a non-starter unless it can somehow unravel these straightforward facts, as pled in the Superseding Indictment: Dr. Arabi and his accomplices schemed to deceive Qualcomm into paying over $150 million for technology to which it had an obvious legal claim. For this purpose, Dr. Arabi relies upon his separate motion for declaratory judgment that his IP Agreement with Qualcomm—assigning to the company his rights in relevant inventions created while employed there—is illegal and unenforceable. *See* ECF 190. As explained in the concurrently-filed response in opposition to that motion, ECF 196, this claim is procedurally, legally, and factually unfounded. But unless that motion succeeds, the request to dismiss is unintelligible, because the Superseding Indictment clearly pleads an elementary property rights fraud.

Nevertheless, Dr. Arabi confidently asserts that even "[t]aking every fact in the [Superseding Indictment] as true, it amounts to a core allegation that Qualcomm was deprived of accurate information allowing it to make informed business decisions." ECF 194-1 at 13. Leave aside the fact that the Superseding Indictment nowhere uses this language or charging theory, which Dr. Arabi has simply grafted onto it in an effort to invoke more favorable case law applicable to other fraud theories. Even conceptually, Dr. Arabi's argument is unpersuasive because *every* fraud, inasmuch as it is an effort to deceive the victim, can be reconceived as an effort to deprive the victim of accurate information. *See* Ninth Circuit Model Criminal Jury Instruction No. 15.35, Wire Fraud (2022 ed., updated Mar. 2023) (requiring false or fraudulent pretenses, representations, promises, or omitted facts—including "[d]eceitful statements of half-truths"—and the intent to deceive and cheat). The crucial test, for purposes of the charges in this case, is whether the deceit sought to induce the victim to part with money or property. Dr. Arabi's fraud certainly did, and this point distinguishes virtually every case upon which he seeks to rely.

**C.     Dr. Arabi Misplaces Reliance on Distinguishable Cases.**

Dr. Arabi's motion spends many pages building up an impressive argument that the Supreme Court and the federal Courts of Appeal have narrowed the construction of charging theories not at issue in his case. Although the Superseding Indictment never alleges that Dr. Arabi or his co-conspirators deprived Qualcomm of its intangible right to honest services, or the right to accurate business information, Dr. Arabi's motion explores case after case winnowing down those charging theories. Yet the plain text of the Superseding Indictment distinguishes this case from each of the authorities Dr. Arabi relies on in his motion.

**1.     *Yates* is inapplicable because the Superseding Indictment charges a conspiracy and scheme to obtain money and property.**

Dr. Arabi first places great weight on *United States v. Yates*, overlooking that the indictment in that case "specified only one" purpose of the charged bank fraud conspiracy, which "was to conceal the true financial condition of the Bank and to create a better financial picture of the Bank" for the board and regulators. 16 F.4th 256, 264-65 (9th Cir. 2021). The opinion emphasized that sole alleged purpose, which prosecutors stood by through closing argument. *Id.* at 265 ("In pretrial proceedings, the government reiterated that 'the primary purpose of the conspiracy . . . was to conceal the information.' [¶] That theory was also the first one the government advanced in closing argument.").

As Dr. Arabi belabors in his motion to dismiss, the Ninth Circuit determined in *Yates* that the "accurate-information theory is legally insufficient" because it is not a "cognizable property interest." But the opinion confirms that a victim's *money* remains a sufficient property interest for purpose of the fraud statutes. For example, "[i]f obtaining a new job or a higher salary is the object of a defendant's fraudulent scheme, then the deprivation of that salary can in some circumstances support a fraud conviction." *Id.* at 266 (citations omitted). That is, "if an employer offers a raise or a

bonus tied to some specific performance metric, an employee who lies about having achieved that metric has deprived the employer of something of value." *Id.*[1]

Unlike in *Yates*, here the Superseding Indictment does not advance an "accurate-information theory" and is clear as to the object of the conspiracy and the substantive wire fraud scheme: to obtain money from the victim. *Yates* (and other cases discussed below) confirms that such an object is a sufficient deprivation for purposes of the charged conspiracy wire fraud offenses.

### 2. The money Qualcomm *paid* distinguishes this case from *Bruchhausen*.

Dr. Arabi similarly fails to appreciate the material differences between his fraud and that in *United States v. Bruchhausen*, 977 F.2d 464 (9th Cir. 1992), in which defendants defrauded a *seller* of property. Specifically, Bruchhausen and his co-schemers lied to American manufacturers in claiming that the equipment they sold would be used in the United States when in fact it was diverted to the Soviet Bloc. *Id.* at 466.

As with *Yates*, the dispositive differences between this case and *Bruchhausen* are evident from the charging documents. The indictment in *Bruchhausen* alleged the defendants' objectives were to defraud (1) the manufacturers "of their property and their right to make business decisions based on truthful information" and (2) the United States "of their right to conduct their affairs free from" fraud. *Id.* at 467. While the Ninth Circuit found insufficient property rights for purposes of the wire fraud statute, the conclusion was based on facts absent here, namely:

/ /

---

[1] The Ninth Circuit identified and distinguished the above circumstances before rejecting the argument that the defendants' continued receipt of "existing salary" was sufficient for purposes of the fraud statutes. *See id.* ("there is a difference between a scheme whose object is to obtain a new or higher salary and a scheme whose object is to deceive an employer while continuing to draw an existing salary—essentially, avoiding being fired"). Here, of course, Dr. Arabi is not charged with defrauding Qualcomm into paying his continued salary.

> The manufacturers received the full sale price for their products; ***they clearly suffered no monetary loss***. While they may have been deceived into entering sales that they had the right to refuse, ***their actual loss was in control over the destination of their products after sale***. It is difficult to discern why they had a property right to such post-sale control.

*Id.* (emphasis added). That rationale has no application in this case, where the victim is a buyer that paid $150 million, not a seller that "received the full sale price" and "clearly suffered no monetary loss." As is obvious from the face of the Superseding Indictment, Qualcomm's loss here is not the control of the product after the sale, but the $150 million it paid to acquire the technology.

Notably, the Ninth Circuit itself distinguished *Bruchhausen* in a relevant opinion mentioned nowhere in Dr. Arabi's motion. In *United States v. Ali*, 620 F.3d 1062, 1064 (9th Cir. 2010), the panel affirmed the conspiracy, mail fraud, and wire fraud convictions of defendants that "purchased Microsoft software at discounted prices then resold the software for a profit." The opinion explained why *Bruchhausen* was "substantially different from the case at bar":

> There, the defendants paid full price for the firearms and did not use the misrepresentations in order to obtain a different price. Here, Microsoft's loss was not the lost ability to control the downstream disposition of its products, but lost revenue when the products were sold at a discount as a result of the fraud. Thus, Microsoft's right to receive full payment for its product mirrors the loss of taxes due in *Pasquantino* and not a mere loss of control as in *Bruchhausen*.

*Id.* at 1068.

Dr. Arabi's fraud in this case is much closer to the scheme in *Ali* than the "no monetary loss" fraud in *Bruchhausen*. Here, the fraud was concealing Dr. Arabi's role with the objective of—to quote *Ali*—"obtain[ing] a different price" from the victim. But more egregious than the fraud in *Ali*, here the victim did not just lose "revenue" as a result; it lost the entirety of the $150 million it paid for technology that it unknowingly owned.

Dr. Arabi offers a clever argument that his accomplices increased the value of the initial patents that he invented, ECF 194-1 at 14, which is addressed more fully below, but this still would not take his case outside the umbrella of *Ali*, where Microsoft was defrauded of its "right to receive full payment." That is, even if Dr. Arabi could show that Qualcomm should fairly have paid *some* unknown fraction of the full Abreezio purchase price—which if even relevant is plainly a factual issue for trial or sentencing—Qualcomm was *still* defrauded out of its ability to offset that price with whatever amount was attributable to the original inventions created by Dr. Arabi and legally owned by Qualcomm.[2] There is simply no way to disentangle these facts and conclude, as Dr. Arabi's motion gamely presumes, that this is a pure legal issue ripe for resolution at the motions phase.

### 3.    Dr. Arabi's district court authority is not persuasive.

The Superseding Indictment in this case also distinguishes it from *United States v. Guertin*, 581 F. Supp. 3d 90 (D.D.C. 2022). While the district court in *Guertin* did in fact dismiss the wire fraud charge, it did so because the indictment alleged the defendant engaged in a scheme to "unlawfully enrich himself by maintaining his State Department employment and salary." *Id.* (block quoting the indictment). According to the court, "a scheme to 'maintain' something is not synonymous with a scheme to 'obtain' the same thing," and the wire fraud statute only prohibits the latter. *Id.* at 92. Thus, "[b]ecause the Indictment alleges that Guertin sought to "maintain," not "obtain" a salary, it does not state an offense within the plain meaning of § 1343." *Id.* at 94. The Superseding Indictment in this case suffers no such defect; the charged object is Qualcomm's $150 million purchase price for Abreezio, not the salary it was paying Dr. Arabi at the time.

Dr. Arabi's best case is *United States v. Smith*, an unpublished order from the District of Guam. No. 1:17-CR-00020, 2022 WL 2103063 (D. Guam June 3, 2022)

---

[2] This is in addition, perhaps, to Dr. Arabi's ongoing efforts to develop that technology and the company that commercialized it.

(unpublished). In *Smith*, the district judge found that while the government had properly charged wire fraud, the issue was whether it at trial "proved *property* wire fraud." 2022 WL 2103063, *7. In addition to the different procedural posture, Dr. Arabi's motion fails to acknowledge distinguishing facts.

Like the salary "maintaining" the court found insufficient in *Guertin*, the defendant in *Smith* had originally received the subject housing assistance payments lawfully, but those payments became unlawful under federal regulations when he became legal counsel for the entity that issued the payments. That fact was dispositive:

> It is from this change in Smith's circumstances that the Government contends deprived GHURA and HUD of a fair value because Smith and/or his designee was no longer "eligible." The Government asserts that full compliance with the HAP contract's provisions, including its conflict-of-interest provisions, was a key and "essential aspect of the bargain" such that GHURA or HUD did not get what it paid for.

*Id.* at *8. But that "compliance," according to the judge, was not a property interest for purposes of the wire fraud statute because the information was "not of economic value as it would not have informed the Government on any decision based on pecuniary interests, but rather one that was merely regulatory." *Id.*

Further distinguishing *Smith* from this case, the order noted:

> the Government did not present any evidence establishing that GHURA would have paid less to a different landlord, or that Smith intended to obtain HAP payments higher than the value of the rental units provided, or that Smith intended to deprive GHURA of money by having it pay HUD back with its non-federal funds, or some other pecuniary interest. But the Government proceeded on none of those theories, and instead proceeded on an intangible theory involving nondisclosure of eligibility/non-eligibility based on a conflict of interest.

*Id.* at *9.

//

//

Unlike in *Smith*, here the Superseding Indictment charges, and the United States intends to prove at trial, that Dr. Arabi and his co-conspirators defrauded Qualcomm out of money that it would not otherwise have paid.[3]

**D.     Conspiracies and Schemes to Steal Money Remain Subject to Prosecution.**

Finally, Dr. Arabi contends "the Supreme Court's reasoning in *Ciminelli*" and other recent cases indicates the Superseding Indictment in this case "stretch[es] the federal fraud statutes beyond their allowed use." ECF No. 194-1 at 13-14. The Court should not be persuaded by Dr. Arabi's summary of the cited cases. Briefly:

- The conviction in *Ciminelli v. United States* was based on a theory not asserted here (the deprivation of "potentially valuable economic information"), and the Supreme Court reaffirmed "that money or property" remains a proper object of wire fraud. 598 U.S. 306, 308, 312 (2023).
- The Supreme Court remanded in *Percoco v. United States* because the Second Circuit applied the wrong "test for determining whether a private person may be convicted of honest-services fraud"—a subset of wire fraud not alleged in this case. 598 U.S. 319, 322 (2023).
- In *Kelly v. United States*, the Supreme Court explained that the fraud statutes require "property" to be "an 'object of the fraud,'" and that the "loss to the victim" must be more than "an incidental byproduct of the scheme." 140 S.Ct. 1565, 1573, 1574 (2020) (the property fraud statutes "bar only schemes for

---

[3] Further, as the court observed in *Smith*, depriving a contracting party of the "essential aspect of the bargain" *is* a sufficient deprivation for purposes of the fraud statutes in several other circuits. *See* 2022 WL 2103063, *8-9 (summarizing cases in the Seventh, Eighth, and Tenth Circuit). For example, the Seventh Circuit has upheld a fraud conviction where a white defendant lied about the ownership of his businesses, pretending they were owned by his mother and a Black man to satisfy minority and female-owned contracting set-asides. *United States v. Leahy*, 464 F.3d 773 (7th Cir. 2006). Here, defendants lied about an essential aspect of the bargain, which impacted Qualcomm's valuation of the deal. Such lies are sufficient for purposes of the wire fraud conspiracy and substantive wire fraud counts under the well-established rules of the Seventh, Eighth, and Tenth Circuits.

obtaining property"). The Supreme Court concluded that requirement was not met where defendants, for "a political reason," closed two lanes of a bridge during morning rush hour on four days. *Id.* at 1568. Notably, the majority opinion explains the defendants "did not walk away with" or otherwise "take the lanes" from the victim. *Id.* at 1573. And to the extent the lane closures implicated "labor costs," those were "an incidental (even if foreseen) byproduct" and "[n]either defendant sought to obtain the services that the employees provided." *Id.* at 1574.

Unlike the scheme in *Kelly*, which "did not aim to obtain money or property," here the Superseding Indictment charges Dr. Arabi with conspiring and scheming to defraud Qualcomm of money and property—to wit, the $150 million it paid.

Contrary to Dr. Arabi's suggestion of a sea change in the enforceability of the federal fraud statutes, courts around the country continue to affirm convictions after *Ciminelli*, *Percoco*, and *Kelly*. For example:

- In *United States v. Porat*, the Third Circuit quoted *Ciminelli* and other cases cited in Dr. Arabi's brief, and affirmed conspiracy and wire fraud convictions based on the defendant relaying "knowingly false, inflated rankings to students for the purpose of enticing his victims to pay tuition money." 76 F. 4th 213, 219 (3d Cir. 2023). The Third Circuit rejected the defendant's "attempt to redirect the focus on the rankings" he used because "money was an object of his scheme." *Id.* at 220. In other words, he "was not convicted on the theory that he deprived students of rankings; he was convicted for depriving them of *tuition money*." *Id.* at 219.[4]

---

[4] The Court should also note the Third Circuit's rejection of the defendant's argument that "there was no fraud here because the victims received a [business school] education, which was the 'full benefit of their bargain' or '*exactly* what they paid for.'" *Id.* at 220. The panel rejected the argument because the defendant "lie[d] about the nature of the bargain itself," which "impacted students' valuation of the bargain[.]" *Id.* at 220-21.

- In *United States v. Greenlaw*, the Fifth Circuit affirmed convictions for conspiracy to commit wire fraud and other offenses, explaining the defendants "signed all of the SEC filings which concealed the true source of UDF III's funds and misrepresented the funds' performance. Based on this avalanche of evidence, a rational trier of fact could infer that [defendants] participated in a scheme to obtain something of value—namely, money." 84 F. 4th 325, 345 (5th Cir. 2023). And while the Government "argued that [defendants] deprived UDF investors of accurate information," the Fifth Circuit agreed that "the accurate information theory was subsidiary to its trial theory," and that the "the foremost scheme alleged here was for the Appellants to obtain money from investors[.]" *Id.* at 346-47.

- In *United States v. Griffin*, the Seventh Circuit rejected a claim that the Government failed to prove a deprivation "of a protectable money or property interest" because "the Government's allegations focused explicitly on the defendants' attempts to deprive the SBA of loan guarantees and *the millions of dollars the SBA lost paying out* on these loan guarantees." 76 F. 4th 724, 737, 738 (7th Cir. 2023) (emphasis added) (further noting those allegations were "explicit in the indictment" and the "Government's opening and closing statements").

- In *United States v. Kousisis*, the Third Circuit summarily distinguished *Ciminelli* and affirmed wire fraud convictions based on "the actual money paid as a result of Appellants' fraudulent scheme." 82 F. 4th 230, 240, 241, n.63 (3d Cir. 2023) (explaining the appellants "set out to obtain millions of dollars that they would not have received but for their fraudulent misrepresentations," and that the victim's "dollars establish the requisite property interest here").

*See also United States v. Jesenik*, No. 3:20-cr-228-SI, 2023 WL 3455638, *2, *3 (D. Or. May 15, 2023) (unpub.) (distinguishing *Yates* and *Ciminelli*, explaining the latter

"did not involve a victim parting with money based on material misrepresentations or half-truths made with an intent to defraud, which is a classic and well-recognized scheme to deprive a person of a traditional property interest, namely money"). All of these cases show that Dr. Arabi's overbroad reading of the caselaw criticizing "accurate information" fraud theories is wrong—because each of these cases could easily be recharacterized as an attempt to deprive the victim of such accurate information. In rejecting that recharacterization, these authorities show that garden-variety deprivation-of-property fraud cases like Dr. Arabi's are alive and well.

### E. Dr. Arabi's Factual Points are Jury Questions.

Seeking to shore up these obvious legal shortcomings, Dr. Arabi's motion concludes with a shotgun blast of factual assertions that cannot possibly be resolved at the motions phase. With zero evidentiary support, Dr. Arabi claims that "the original idea for the DFT technology . . . did not function and was largely abandoned by Abreezio," that "the bulk of the approximately $180 million purchase price for Abreezio was paid in consideration for products developed by Invionics and not for the patent that the SI alleges that Dr. Arabi invented," that "Qualcomm paid fair market value for the product," and that "[t]he original provisional patents were worthless." ECF 194-1 at 14, 15. Dr. Arabi's motion does not grapple with the undisputed facts undermining his unsupported assertions—like why, for example, Sheida was paid $92 million for her share of Abreezio, which she earned solely by contributing the supposedly "worthless" patents. But more fundamentally, he does not explain how the Court can resolve at this phase whether these factual claims are accurate. In truth, it cannot, and therefore the Court cannot consider them in ruling on Dr. Arabi's motion.

//
//
//
//
//

## II.

## CONCLUSION

Consistent with the text of the wire fraud statute, the Superseding Indictment charges a wire fraud conspiracy and scheme to obtain property and money from the victim. Contrary to Dr. Arabi's suggestion, Qualcomm had a "cognizable property interest" in the $150 million it paid, such that Dr. Arabi remains subject to prosecution for conspiracy to commit wire and substantive wire fraud.

The Court should deny Dr. Arabi's motion to dismiss.

DATED: November 27, 2023

TARA K. MCGRATH
United States Attorney

*/s/ Eric R. Olah*
NICHOLAS W. PILCHAK
JANAKI G. CHOPRA
ERIC R. OLAH
Assistant U.S. Attorneys