UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. KARIM ARABI, Defendant. | Case No. 22-cr-1152-BAS<br>March 11, 2025<br>Jury Trial, Day 2 |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CYNTHIA A. BASHANT
CHIEF DISTRICT JUDGE

VOLUME 2, PAGES 225 - 451

APPEARANCES:

FOR PLAINTIFF: UNITED STATES ATTORNEY'S OFFICE
880 Front Street, Suite 6293
San Diego, California 92101
*By: NICHOLAS W. PILCHAK, AUSA*
*JANAKI G. CHOPRA, AUSA*
*ERIC R. OLAH, AUSA*

FOR DEFENDANT: BIENERT KATZMAN LITTRELL WILLIAMS, LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
*By: WHITNEY Z. BERNSTEIN, Esq.*
*REBECCA S. ROBERTS, Esq.*
*RYAN V. FRASER, Esq.*

REPORTED BY:

ANNE MARIE ROLDAN, RMR, CRR, CSR 13095
U.S. OFFICIAL COURT REPORTER
U.S. District Court Clerk's Office
333 West Broadway, Suite 420
San Diego, California 92101

Reported stenographically; transcribed with CAT software.

# I N D E X

***

## E X A M I N A T I O N S


| WITNESS | VOL. | PAGE | LINE |
|---|---|---|---|
| *FOR THE GOVERNMENT:* | | | |
| JAMES THOMPSON | | | |
| Direct by Mr. Olah | 2 | 259 | 10 |
| Cross by Ms. Bernstein | 2 | 292 | 23 |
| Redirect by Mr. Olah | 2 | 350 | 5 |
| Recross by Ms. Bernstein | 2 | 360 | 21 |
| RAJESH PANKAJ | | | |
| Direct by Ms. Chopra | 2 | 368 | 25 |
| Cross by Ms. Bernstein | 2 | 381 | 9 |
| Redirect by Ms. Chopra | 2 | 404 | 10 |
| Recross by Ms. Bernstein | 2 | 406 | 9 |
| JOHN ROBERTS | | | |
| Direct by Mr. Pilchak | 2 | 407 | 6 |

# E X H I B I T S


| ADMITTED | VOL. | PAGE | LINE |
|---|---|---|---|
| **GOVERNMENT EXHIBITS** | | | |
| Ex. 50 | 2 | 276 | 2 |
| Ex. 118 | 2 | 441 | 18 |
| Ex. 122 | 2 | 430 | 6 |
| Ex. 123 | 2 | 430 | 15 |
| Ex. 598 | 2 | 338 | 14 |
| Ex. 776 | 2 | 271 | 8 |
| **DEFENSE EXHIBITS** | | | |
| Ex. 869 | 2 | 426 | 9 |
| Ex. 870 | 2 | 426 | 25 |
| Ex. 2177 | 2 | 319 | 11 |
| Ex. 2265 | 2 | 385 | 11 |
| Ex. 2679 | 2 | 284 | 12 |
| Ex. 2750 | 2 | 340 | 16 |
| Ex. 2960 | 2 | 314 | 2 |
| Ex. 3001 | 2 | 344 | 4 |
| Ex. 3229 | 2 | 337 | 16 |
| Ex. 3231 | 2 | 330 | 1 |

***<u>TUESDAY, MARCH 11, 2025, 9:00 A.M.</u>***

***

***THE COURT:*** Good morning, everyone. Thank you for being so prompt. I need you all to stand and be sworn as jurors.

***THE CLERK:*** Please raise your right hand.

***(Jury panel duly sworn.)***

***THE CLERK:*** Thank you. You may lower your hands and be seated.

***THE COURT:*** Okay. Good morning. You are now the jurors in the case. And we have -- with four alternates. And I want to take a few minutes before we do opening statements to tell you something about your duties as jurors and to give you some preliminary instructions.

At the end of the trial, I will give you more detailed, written instructions that will control your deliberations. You'll have copies of those instructions back in the jury room so you don't need to take everything down right now.

I apologize in advance. I always feel a little sheepish when I have educators on my jury, because the law requires that I read these instructions to you. And I understand that's not the best way to receive information. I'll try to do it as animatedly as possible.

When you deliberate, it will be your duty to weigh and to evaluate all the evidence received in the case, and in that

process, to decide the facts.

To the facts as you find them, you will apply the law as I give it to you, whether you agree with the law or not. You must decide the case solely on the evidence and the law before you.

Perform these duties fairly and impartially. You should not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.

Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion or biases, including unconscious biases. Unconscious biases are stereotypes, attitudes or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention. Like conscious bias, unconscious bias can affect how we evaluate information and make decisions.

Please do not take anything I may say or do during the trial as indicating what I think about the evidence or what your verdict should be. That is entirely up to you.

This is a criminal case brought by the United States Government. The Government charges the Defendant with conspiracy to commit wire fraud, wire fraud, conspiracy to launder monetary instruments, and money laundering.

The Indictment is not evidence and does not prove

anything. The Defendant has pleaded not guilty to the charges and is presumed innocent unless and until the Government proves the Defendant guilty beyond a reasonable doubt.

In addition, the Defendant has the right to remain silent and never has to prove innocence or present any evidence.

A separate crime is charged in each count. The charges have been joined for trial. You must decide each crime charged against the Defendant separately. Your verdict on any count should not control your verdict on any other count.

The evidence you are to consider in deciding what the facts are consists of, one, the sworn testimony of any witness; two, the exhibits that are received in evidence; and three, any facts to which the parties agree. The following things are not evidence, and you must not consider them as evidence in deciding the facts of this case:

One, statements and arguments of the attorneys;

Two, questions and objections of the attorneys;

Three, testimony that I instruct you to disregard;

And four, anything you may see or hear when the Court is not in session, even if what you see or hear is done or said by one of the parties or by one of the witnesses.

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence. That is it is

proof of one or more facts from which one could find another fact.

For example, if the question of fact in a given case is whether or not an individual was swimming, testimony by a witness that he saw the individual jump into the swimming pool and swim would be direct evidence of such fact.

However, if a witness testified that he arrived at the pool only to find the individual standing by the pool in a wet bathing suit with a puddle of water at his feet and wet footsteps leading to the edge of the pool, that would be circumstantial evidence of the fact that the individual was swimming.

There may we a different explanation as to why the individual is wet and there are wet marks at his feet. Therefore, before you decide that a fact has been proved by circumstantial evidence, you must consider all the evidence in light of reason, experience, and common sense.

But you are to consider both direct and circumstantial evidence. Either can be used to prove any fact. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

There are Rules of Evidence that control what can be received in evidence. When a lawyer asked a question or offers an exhibit in evidence, and the lawyer on the other side thinks

it's not permitted by the Rules of Evidence, that lawyer may object.

If I overrule the objection, the question may be answered or the exhibit received. If I sustain the objection, the question cannot be answered or the exhibit cannot be received. Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore the evidence. That means that when you are deciding the case, you must not consider the evidence that I told you to disregard.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it. In considering the testimony of any witness, you may take into account:

One, the witness's opportunity and ability to see or hear or knowing things testified to;

Two, the witness's memory;

Three, the witness's manner while testifying;

Four, the witness's interest in the outcome of the case, if any;

Five, the witness's bias or prejudice, if any;

Six, whether other evidence contradicted the witness's

testimony;

Seven, the reasonableness of the witness's testimony in light of all the evidence;

And eight, any other facts that bear on believability.

Sometimes witnesses may say something that is not consistent with something else they said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

You must avoid bias, conscious or unconscious, based on a witness's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances in your determination of credibility.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it. What is important is how believable the witnesses are and

how much weight you think their testimony deserves.

At the end of the trial, you will have to make your decision based on what you recall of the evidence. You will not have a written transcript of the trial, so I urge you to pay close attention to the testimony as it is given. If at any time you have difficulty hearing or seeing a witness or seeing an exhibit, let me know right away so I can correct the problem.

If you wish, you may take notes to help you remember the evidence. If you do take notes, please keep them to yourself until you and your fellow jurors go back into the jury room to decide the case.

Do not let note-taking distract you from being attentive. When you leave for breaks or at the end of the day, you can just leave your notebooks on the seat here in the jury box. No one will read your notes.

Whether or not you take notes, you should rely on your own memory of the evidence. Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors.

During the trial, I may need to take up legal matters with the attorneys privately, either by having a conference here at the bench -- some of you saw us do that yesterday -- when the jury is present here in the courtroom, or when necessary, by calling a recess. That's a break.

Please understand that while you are waiting, we are

working. The purpose of these conferences is not to keep relevant information from you but to decide how certain evidence is to be treated under the Rules of Evidence and to avoid confusion and error.

My commitment to you is to try to keep those conferences to a minimum. I'm going to try and keep you working and busy the whole time you're here, and then send you home and try and do the conferences at the end of the day or during the lunch break. So I may not always grant an attorney's request for a conference. Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or what your verdict should be.

As I mentioned before, our usual court schedule is 9:00 to 4:00 with about a one-hour break for lunch and a brief recess in the mid-morning and mid-afternoon. This gives us time to discuss matters outside your presence without making you wait in the hall while we do so. As I mentioned before, we will not be in session on Fridays.

I always tell people good reading material is usually helpful while you're on jury service. Over the 25 years I've been a juror -- I've been a judge, I've seen that people now have phones to keep them occupied, so you don't always need to carry around your reading material with you. But my commitment to you is I'll always try to be on time, and I ask the same of you and the attorneys and parties in the case.

We may have some variations in the schedule. I know, for example, that we will not be in session on Thursday April 3rd. That's a long time in the future. We'll only be in session three days that week. I will remind you of that modification as the date approaches, and if there are any other variations, I'll try and give you as much notice as possible.

There was a question the other day about potential Government shutdown as things start percolating. We will still be going. We don't pay attention to Government shutdowns, so don't worry about that. The trial will keep going regardless of what is happening in the background.

I believe you have been given telephone numbers. If you have not, you will be given a telephone number for the courtroom, with an email address for our Courtroom Deputy. This can be used by you if you suddenly become ill or some emergency prevents you from coming to court. The Courtroom Deputy will convey the message to me.

You may also use that number for any family member or employer who needs to contact you in case of an emergency, since we do ask that you turn your cell phones off during the trial. The problem is even the buzzing if it's a constant buzzing can be very distracting to jurors, so we do ask that you turn off your cell phones while you're in court.

I get asked a lot of questions about food and beverages. I don't have a problem with you bringing to the

courtroom any nonalcoholic drink that is in a container with a top or a lid on it.

I do ask that you not bring food or gum into the courtroom. I think all of San Diego has this problem. We have a terrible ant problem in the courthouse, and even one little crumb of food, they end up coming out of the woodwork. We'll give you breaks. You can eat your food outside the courtroom. There is water by the side of the jury box. Help yourself to water if you need it.

And, finally, I would like to move to the next phase of trial. First, each side may make an opening statement. An opening statement is not evidence. It is simply an outline to help you understand what the party expects the evidence will show. A party is not required to make an opening statement.

The Government will then present evidence and counsel for the Defendant may cross-examine. Then if the Defendant chooses to offer evidence, counsel for the Government may cross-examine.

After the evidence has been presented, I will instruct you on the law that applies to the case, and the attorneys will make closing arguments. After that, you will go into the jury room to deliberate on your verdict.

Are we all set up with our --

***JUROR:*** Judge, I know a couple of us have back troubles.

***THE COURT:*** Absolutely no problem. Absolutely no problem.

***JUROR:*** Should we just stand over there?

***THE COURT:*** Well, if you are in the back row, you can just stand where you are. You're also free to kind of walk over there if that make it's easier. That area is all yours. You make yourself at home. If you're in the front, maybe over there. Some people asked me -- while she's setting it up, I'll explain.

Some people ask me about the children's corner over there. I have calendars on Friday, and people often bring young children to court that can be a little disruptive, so we've tried to put some books and coloring and different things to entertain the children so that they can go over to that corner and hopefully behave themselves in court. So that's why I've got that over there. You can move that out of the way and make yourself at home on either side as long as you can see and hear what's going on.

***JUROR:*** Thank you.

***THE COURT:*** How are we doing, Lindsey?

***THE CLERK:*** It's plugged in.

***THE COURT:*** We have fabulous electronics that work some of the time, so anyway...

Does the Government wish to make an opening statement at this time?

***MS. CHOPRA:*** Yes, Your Honor.

***THE COURT:*** Okay.

***MS. CHOPRA:*** All right. Does this work? Okay. Great.

A dirty secret. $180 million stolen because of that dirty secret. A secret created by this defendant, Dr. Karim Arabi. A secret kept from his own employer, Qualcomm. A secret that defrauded Qualcomm out of $180 million. A secret that the evidence in this case will prove to you that the Defendant, Dr. Karim Arabi, is guilty of the crimes charged.

The crimes charged in this case are wire fraud conspiracy, wire fraud, and money laundering. So what was the dirty secret? It was that Abreezio, a company purchased by Qualcomm, was secretly created and built by none other than Qualcomm's very own employee, Dr. Arabi.

You'll hear in this trial that in October of 2015, Qualcomm bought Abreezio for $180 million. You'll hear that Qualcomm thought it was purchasing Abreezio's technology created by outside inventors. Technology that related directly to Qualcomm's business, and technology that just so happened to perfectly fit and solve a problem that Qualcomm had been trying to solve.

You'll hear that because of this, the moment it heard about Abreezio's technology, Qualcomm jumped at the chance to buy Abreezio, because it could save the company, Qualcomm, millions of dollars.

But you'll hear that Abreezio and its core technology were created by an insider, by Dr. Arabi. And you'll hear that Dr. Arabi conspired with other people to hide his role in Abreezio and its technology to cheat Qualcomm out of $180 million. The dirty secret was an inside job to cheat Qualcomm.

So let's talk about the evidence that you'll hear in this case. Throughout this trial, you'll hear a lot about who Dr. Arabi is. You'll hear he has a Ph.D. in electrical engineering. Former colleagues will tell you that he is an expert in a subset of electrical engineering known as Design For Test, or DFT.

Those same former colleagues and a former supervisor from Qualcomm will tell you that Dr. Arabi is widely considered a visionary in his field. And you'll hear that during the critical portion of this case of the conspiracy, from 2014 to 2015, Dr. Arabi was employed at Qualcomm as a Vice President in its corporate Research and Development, or R&D, department.

Now, several Qualcomm employees, current and former, including a former Qualcomm Chief Technology Officer, CTO, will take the stand. They'll tell you about Qualcomm's business. They'll tell you that Qualcomm is a tech company, and that because of that, its technology and patents are incredibly important to the success of the company.

The Qualcomm witnesses will also talk about something

that you'll hear about throughout this trial, and that's an Invention Assign Agreement. You'll hear that that Agreement is an agreement between Qualcomm and its employees. And it basically says that anything an employee invents while at Qualcomm and that relates to Qualcomm's business belongs to Qualcomm.

Witnesses will tell you that this is pretty common in the tech industry, and that Dr. Arabi signed one of those when he worked at Qualcomm.

These Qualcomm witnesses will also talk to you about the R&D department, the Research and Development department, at Qualcomm. You'll hear that that department is pretty respected within Qualcomm and that its engineers are incredibly talented. And that's because, as you'll hear, it's those engineers' entire job to create and develop ideas to advance Qualcomm's technology. During 2014 and 2015, Dr. Arabi was a vice president in that very department.

So let's talk about Abreezio. You'll hear probably more than you'll care to hear about Abreezio's technology during this case. You'll hear from current and former Qualcomm employees, and you'll hear from an expert, Dennis Sylvester, a professor of Electrical Engineering from the University of Michigan.

These witnesses will tell you that Abreezio's core technology was basically about testing microchips and managing

their power use. And you'll hear that last part is pretty important, because it's what determines, for example, whether your cell phone will last all day on a single charge.

So who were the inventors behind Abreezio? Well, during this trial, you'll hear what Qualcomm was told during the acquisition and what the evidence will show was the reality. What Qualcomm was told was that someone named Sheida Alan invented the Qualcomm -- I'm sorry -- the Abreezio technology, and that it was later improved by other people, including someone named Brad Quinton.

You'll hear that Qualcomm was told that Sheida Alan was a sort of reclusive inventor who didn't care to come forward, and so other people were in charge of pitching Abreezio, people like the CTO, Brad Quinton, who is pictured on the top left; the CEO, Sanjiv Taneja, who is pictured on the bottom right; and that there were also investors who were involved in pitching Abreezio, including someone named Akbar Shokouhi, who is on the bottom left.

But the evidence in this case will show you that Qualcomm was not told the truth about Abreezio and its inventors. In fact, the evidence in this case will show that you the truth was that Dr. Arabi himself was behind Abreezio the entire time, that he was the master puppeteer pulling the strings of Abreezio while it was being pitched to Qualcomm by these individuals.

You'll hear that Sheida Alan's former name is actually Sheida Arabi, and that she is Dr. Arabi's younger sister living in Canada, and an accomplice to his crimes. You'll also hear that Dr. Arabi had Sheida change her name from Arabi to Alan, making it harder for Qualcomm to figure out during the acquisition that the two were related.

So what evidence will you learn during this trial that will prove to you that Abreezio was Dr. Arabi's creation? You'll hear that he picked the company name, Abreezio. You'll hear that he picked the CEO, Sanjiv Taneja. You'll hear that he picked the CTO, Brad Quinton. You'll hear that he even picked Sheida's fake job title as a Chief Architect.

He sent everyone's compensation and employment terms. He filed the first two provisional patents for Abreezio. You'll hear he refined the technology. He weighed in on marketing pitches. He weighed in on the due diligence. And he even weighed in on small things like the office furniture, company laptops, and product names.

And finally, you'll hear that he participated in conference calls related to Abreezio from -- in 2015. For example, you'll see an email like this *(indicating)*, from January of 2015 from Dr. Arabi to Brad Quinton, Akbar Shokouhi, and Sanjiv Taneja, subject line "Trementa Operation Meeting."

Now, you'll hear during this trial that Trementa was sort of a precursor to Abreezio. And in this email, you see

that Dr. Arabi sets up the first phone call for the operations and says that they need to start working on the technical work and IP. He was behind the creation of Abreezio through and through.

Now, besides learning evidence through this trial that Dr. Arabi created Abreezio, you'll hear plenty of evidence that he also was the driving force behind the Abreezio technology.

You'll see evidence that the original provisional patents actually had Sheida's name on them, for her involvement, as you'll hear, in the patents started there and ended there. And in fact, the evidence you'll see will prove to you that Dr. Arabi's fingerprints are all over the patented technologies for Abreezio.

For example, you'll hear that he filed the provisional patent applications. He wrote both provisional patents' descriptions. He wrote the very first description of one of the provisional patent's tech. He offered solutions to early tech problems. And Brad Quinton, the CTO of Abreezio, even called it Dr. Arabi's technology in an early email.

You'll see this email from early December of 2014, from Brad Quinton to others at Invionics, which you'll hear is Brad Quinton's company. In this email, Brad Quinton sets up a meeting with Dr. Arabi, Karim, with the Invionics guys, and says, "I'd like you to attend as Karim will be going over his idea/patent application."

Now, within two weeks of that email, that was early December of 2014, you'll see another set of emails between Dr. Arabi and Sheida in the middle of 2014, where Dr. Arabi tells Sheida to file a provisional patent application that he called "her provisional patent application."

In her response, you'll see this from Sheida Arabi to Dr. Arabi: "Hi. What do I need to send? I don't have any idea."

And this will make sense as you hear the evidence and the testimony during this trial, because you'll see that Sheida's background, which at this time, she was barely a grad student, and her focus was inkjet printing, did not fit Abreezio's technology. And, in fact, Dr. Arabi's expertise and background, which you'll hear was in electrical engineering, fit Abreezio's tech to a tee. Through and through, he was the driving force behind Abreezio, not Sheida.

Now, you might hear from this trial some nitty-gritty information about the patents in this case from the Defense, maybe an effort to distance Dr. Arabi from the technology. You may hear about whether the patents were good patents, whether they were valid patents, whether they were improved on over time, or whether the patents that Qualcomm bought in 2015, October of 2015, were even the same ones that were discussed here by Dr. Arabi in 2014.

The evidence will show you that the patents were

refined and improved over time. But the evidence will also absolutely show you that the patents Qualcomm bought in October of 2015 were an evolution of these patents discussed by Dr. Arabi, that Brad Quinton called Dr. Arabi's --

***MS. ROBERTS:*** Objection. Vouching.

***THE COURT:*** Overruled.

***MS. CHOPRA:*** -- invention. And that Dr. Arabi himself had a hand from 2014 to 2015 in refining and improving the technology.

The evidence in this case will show you what's obvious and simple: That Dr. Arabi was the driving force, the master puppeteer behind Abreezio, and he concealed himself to his own employer, Qualcomm, to cheat it out of $180 million.

So how did he do his coverup? Well, we just talked about how you'll hear evidence that the original patents were in Sheida's name. But the coverup doesn't just stop there. You'll hear during this trial that Dr. Arabi created not one, but two fake email addresses in his own younger sister's name that he used to talk to people at Abreezio to conceal his own involvement.

You'll also hear that his co-conspirators, Sanjiv Taneja, the CEO of Abreezio, and Akbar Shokouhi, an investor in Abreezio, called Dr. Arabi "Sheida" and became the face of Abreezio to hide Dr. Arabi's involvement.

Those two co-conspirators will take the stand during

this trial. They'll get up and tell you that they, just like Dr. Arabi, were charged in this case with the same crimes as Dr. Arabi. They'll tell you that they pleaded guilty and that they're cooperating with the United States.

And they'll tell you that as part of their -- as part of their plea, they admitted to conspiring with Dr. Arabi to conceal Dr. Arabi's role in Abreezio from Qualcomm to defraud Qualcomm out of $180 million.

They'll tell you that they have never met the real Sheida and, in fact, that Dr. Arabi was behind the scenes running the show the entire time, and that the name of the game was to conceal Dr. Arabi at all costs.

For example, you'll see text messages like this one on your screen from May of 2015. Text messages like this that you'll see will show the conspirators' efforts to hide Karim. And sometimes the conspirators messed up.

Like in this example, Mr. Shokouhi texts with Dr. Arabi, and you'll see Dr. Arabi is wondering why he's getting these text messages. And Akbar Shokouhi quickly says, "Sorry, wrong person."

In the same way, you'll see this text message in September of 2015 between Sanjiv Taneja and Akbar Shokouhi. And in this, Mr. Shokouhi messed up again and named Karim by his true name, Dr. Arabi. And Mr. Taneja quickly corrects him and says, "You meant this message for someone else."

And Akbar Shokouhi says, "Sorry, wrong person." You'll see this throughout this trial.

Beyond this, you'll hear that Dr. Arabi orchestrated this whole thing with the help of a dirty Qualcomm insider, someone named Ziad Mansour, pictured here on the right. You'll hear that Ziad Mansour was a Senior Vice President at Qualcomm at the time, in 2014/2015, and he helped rush Abreezio through due diligence in just a few short months to get acquired for $180 million.

Now, you'll hear that because Qualcomm didn't know all of this information -- it didn't know that Dr. Arabi had a hand in inventing the core technology, it didn't know that Dr. Arabi had a hand in refining the technology and improving it between 2014 and 2015, it didn't know that Dr. Arabi was behind the marketing pitches and the due diligence responses, and it didn't know that Dr. Arabi had created Abreezio.

And because Qualcomm didn't have this essential information, you'll hear, because it didn't have this material information, it was tricked into parting with $180 million to the conspirators.

And Dr. Arabi's coverup didn't just end there. You'll hear that after 2015, Qualcomm did its own digging. And during its own digging, it figured out the dirty secret that Dr. Arabi had kept. And because of that, in 2017, Qualcomm sued Dr. Arabi and Sheida in a civil lawsuit.

You'll hear evidence that even during that civil lawsuit, Dr. Arabi kept up the gig. You'll hear lies during that lawsuit, all in an effort to continue to conceal his involvement in Abreezio to be able to keep as much of the money as possible.

So what happened to the money? Well, you'll hear that Qualcomm paid $150 million upfront in October of 2015, and held back $30 million to be paid at a later time. You'll hear that Sheida, as a supposed reclusive inventor, received more than half, $92 million roundabout, of that money.

So what did Sheida do with that money? Well, you'll see plenty of evidence that Sheida shared it with her big brother, Dr. Arabi. You'll hear that the two of them took some of that money and created a real estate empire in Canada. And you'll even see communications between Dr. Arabi and bankers and lawyers in Canada to set up that real estate empire.

You'll also hear that some of that money was wired to Dr. Arabi and Sheida's brother in Norway to buy Norwegian real estate. And finally, you'll hear that a chunk of that money, about $4 million, was sent directly from one of Sheida's companies in Canada to one of Dr. Arabi's companies in San Diego.

In the end, although this case involves patents and electrical engineering, technology, it's actually very simple. It was a dirty secret designed to hide an inside job. The

evidence will show you during this trial that Dr. Arabi hid his role in Abreezio and its technology from his own employer, Qualcomm, to cheat it out of $180 million.

And based on that evidence, at the end of this trial, the United States will ask you to find Dr. Arabi guilty on all counts. Thank you.

***THE COURT:*** Thank you. Does the Defense wish to make an opening statement at this time?

***MS. ROBERTS:*** I do, your Honor.

***THE COURT:*** Okay.

***MS. ROBERTS:*** Hi, all. I'm Rebecca Roberts. And with my colleagues -- Whitney Bernstein, Ryan Fraser, and Leah Thompson, who just stepped out -- we represent Karim Arabi.

Karim's younger sister Sheida, who was 17 years younger than him, had an idea that would make microchips better. And this team of engineers, a very talented team of engineers, they called themselves "Invionics." They're located up in Vancouver, Canada.

They came in to build technology around that idea, and they abandoned it because it wasn't going to work. And they went on to build and come up with a whole slew of new inventions and ideas. And they built products that had value to Qualcomm, so Qualcomm paid money for it.

But Qualcomm, as you will hear, did not buy what it already owned. And Karim did not intend for Qualcomm to lose

money. And Qualcomm didn't lose money.

Now, Karim could have sent Qualcomm a memo that disclosed that he was involved in Abreezio, and that Ms. Alan was his sister. And he didn't. And for that, he got civilly sued by Qualcomm in 2017 for the same exact allegations that are at issue here.

And that case, it settled in 2018, seven years ago. And Ms. Alan returned half of the proceeds that she received from Qualcomm. And Qualcomm got to keep the tech, this tech that it really wanted, that saves it tons of money, that's still in use today. It's still on your iPhones today.

But that wasn't enough for Qualcomm. Qualcomm wanted its pound of flesh. It wanted to punish Dr. Arabi. And so it pestered the U.S. Government for years to bring criminal charges. So why are we here?

The Government's theory is that Karim tricked his employer into buying technology that were based in two provisional patent applications that listed his sister as a coinventor. But let's talk about Ms. Alan, Karim's younger sister, 17 years younger.

Ms. Alan was no dumb bunny. She was a talented engineer in her own right. She didn't -- she wasn't interested in business, but she was smart. And the family is Kurdish.

And Sheida, following in her -- the footsteps of her older brother, left Iran and came to Canada to study in the same

field as her brother, electrical engineering and computer science, which are tough -- they're tough fields of industry for women, and particular women of Middle Eastern descent.

And that's why you'll hear evidence of why Sheida changed her name from "Arabi" to "Alan." It wasn't some elaborate ruse to dupe Qualcomm.

Now, you will also hear evidence that Karim cared for his little sister, who was halfway across the world from home and who struggled with English. And he helped her apply for graduate student programs in Canada and to study with the same critically acclaimed DFT professor that mentored Karim. This is what any big brother would do for his little sister.

Now, this talk about the provisional patent applications, first of all, they're not actually applications for patents. They're just placeholders. They're stakes in time so that if the inventor who is listed on the patent decides at some point to seek protection from the United States Patent and Trademark Office, they can then file what's known as a non-provisional patent, which is a -- it's actually an application for a patent. So what we're talking about here are just placeholders.

So in addition, you will also hear evidence that just because a person helps another person draft a provisional application or file one does not make them an invention -- does not make them an inventor. It happens all the time. Lawyers

will draft provisional applications or other agents will. It's just part of the -- how the process is done.

Now, this talk about the concepts that were in the patent applications, you will hear evidence that they were simple, they were naïve, reflective of the work of a grad student. And you'll also hear evidence that the concepts were not new. They were not novel. They already existed in the public domain, meaning that the public owned them, that nobody can own them, not Qualcomm, not Abreezio, not Sheida.

So -- and let us talk about Invionics. Invionics is this team of engineers up in Canada that comes into Abreezio, and they were hired initially to build software around the concepts that Abreezio had. And these guys, they came in real early, and they took a look at the ideas in the provisional patent applications, and they said, Look, they're not going to work. They're not practical. They're not practical to use in a software tool that we want to build.

And so they abandoned the concepts within these provisional patent applications and went and created a whole host of new inventions and ideas. And they went on to file an additional 13 provisional applications, which, again, are just the placeholders, and then 13 non-provisional patent applications, which are, again, applications for actual patents, and a number of which actually became patents, only one of which listed Ms. Alan as the inventor -- as a coinventor, not even an

inventor.

They also went on to build software. They built a software tool called DFTBreez. It was an actual product that Qualcomm evaluated, and that it in particular wanted, because -- because it was not already in existence, they could install it across their product line and realize an immediate savings.

One way to look at this about kind of what Abreezio -- oh, the other thing I want to make a point about Invionics is that you will hear from Invionics that they understood that Sheida was the inventor of the concepts in the two provisional patents. And it was consistent -- this idea was consistent with what they understood about the patents, because, again, they considered the concepts within the applications to be simple and naïve and reflective of a person that didn't have much experience working in silicon.

Now, one way to look at this is as if you're building a house. And if Sheida's ideas were the initial brick to build the house, and it's a certain type of material that was used, but when the contractors came in, the builders came in and they looked at that material that they were going to use, they said, Well, that material is not going to be any good. It's not going to hold up the foundation the house. And so they got rid of that material, came up with new material, and then they actually built the house, which is what Qualcomm bought.

Now let's talk about Qualcomm. Qualcomm is an

incredibly sophisticated company. It is currently valuated at $152 billion. It knows technology, it knows what tech it wants, and it knows how to evaluate it.

Qualcomm sells microchips. Microchips are used to power most anything. They're in your cell phones. They're in your laptop. They're in your cars. They're in your kitchen appliances. You name it.

So Qualcomm designs these chips. And then they send them out to foundries which manufactures the chips. And then the chips are sent back to Qualcomm, which has to test the chips before it passes it on to its customers.

Now, in order -- before they pass them on to their customers, they've got to make sure that they're working properly, because they don't want to pass on faulty chips. And it costs Qualcomm money to test those chips. So if you can shorten the time to test those chips, you're going to save Qualcomm a lot of money. And that's what Abreezio's products were designed to do. And also to increase the power of chips, making them more powerful.

So Qualcomm and its staff, its engineers, its executives, its lawyers, it evaluated Abreezio's products over several months, from March to October, which is actually a long period of due diligence. And they determined that the technology had real value to it, that it wanted the technology. And it evaluated the technology to be worth anywhere between

266 million and $358 million.

And it also determined that it didn't want its competitors to get the technology. And you will hear evidence that Qualcomm already had low-power tech. And it was concerned that if its competitors got Abreezio's low-power tech, then they would lose their competitive advantage. So for this reason, Qualcomm paid 150 million for Abreezio. It got the tech, the products, and the people it wanted at the price it set.

Now, in addition to buying the tech and the products, it also wanted the engineers. And so one of the key terms you'll hear in the Purchase Agreement was that the team of engineers, the engineers that were located in Canada, would come and work at Qualcomm and install Abreezio's products across its product line.

And those engineers, they were designated as the key employees. And if they didn't come, the deal would have likely fallen through. But they did come, and Qualcomm opened a whole new division up in Vancouver, Canada just for these guys. And they came to work and they installed Abreezio's products across -- the Abreezio tools across Qualcomm's product line. Qualcomm got the tech, the products, and the people it wanted at the price it set.

Now, you'll hear evidence that Dr. Arabi was involved in Abreezio and helped set it up and, you know, was behind the scenes of its formation, and that he sent emails from his

sister's account. We don't dispute this.

And you will also hear evidence that Sheida, Ms. Alan, received the lion's share of the proceeds from the sale of Abreezio. We don't dispute this either.

But you will hear evidence that it's not uncommon for the founding shareholders, particularly in startup companies, to receive windfalls that are not necessarily proportional to the contribution to the company.

And you will hear evidence that the others -- that the flip side is true, that it's not uncommon for other contributors, like the Invionics engineers, to be compensated in other ways, whether it's wages, cash compensation, or licensing agreements.

So the Government has also alleged money laundering allegations against Sheida and Karim. And Judge Bashant will instruct you that money laundering is not a crime unless there's an underlying crime committed. So if there was no underlying crime that you find, which is wire fraud here, then there's no money laundering.

But regardless, it's not that Sheida was sending wads of cash to Karim after the Abreezio deal closed. And it's not like he was out buying Ferraris or mega yachts or anything like that. These were business-to-business loans. Because Karim had started a new startup company, and Sheida, as a sister, invested in it.

And this company had a bright and promising future before Qualcomm started raising holy hell and he got arrested. And it would have sold really good product, but it was basically destroyed in the wake of this litigation.

***MS. CHOPRA:*** Objection, your Honor.

***THE COURT:*** Sustained.

***MS. ROBERTS:*** So the judge will instruct you on the underlying crimes, the charges, the wire fraud, conspiracy to commit wire fraud, each which has very specific elements that the Government must prove beyond a reasonable doubt.

And she will also instruct you that Karim is presumed innocent. So for now, it's -- this case can be fairly technical. We ask you just to pay attention and keep in mind that the ideas in these provisional applications, they weren't new. They weren't novel. They didn't really belong to anybody.

And while Qualcomm may complain that it didn't have all the accurate information about Karim's involvement in Abreezio, it cannot complain that it bought something it already owned.

Qualcomm got the technology, the products, and the people it wanted at the price it set. And for those reasons, we think at the end of this case, you will find our client not guilty.

***THE COURT:*** Okay. Thank you.

Government, you may call your first witness.

***MR. PILCHAK:*** Thank you, Your Honor. The United States

calls James Thompson.

***(Witness duly sworn.)***

***THE CLERK:*** Thank you. You may lower your hand. Please take the stand.

Please state and spell your first and last name for the record.

***THE WITNESS:*** My name is James Thompson. J-a-m-e-s, T-h-o-m-p-s-o-n.

***THE COURT:*** Thank you. Mr. Olah.

***DIRECT EXAMINATION***

***BY MR. OLAH:***

***Q.*** Mr. Thompson, good morning.

***A.*** **Good morning.**

***Q.*** Did you recently retire?

***A.*** **Yes, about a month ago.**

***Q.*** And when you retired, you probably had dreams of hikes and fly-fishing and testifying in Federal Court?

***A.*** **I wasn't planning on testifying.**

***Q.*** Two of those three, maybe.

Where did you work prior to retiring?

***A.*** **Qualcomm.**

***Q.*** How long were you working at Qualcomm before you retired?

***A.*** **Thirty-three years.**

***Q.*** Did you earn any degrees before you started working at

Qualcomm over 33 years ago?
**A. Yes. I got a Bachelor's, Master's, and a Ph.D. at the University of Wisconsin.**
*Q.* And in what field were those degrees in?
**A. Electrical engineering.**
*Q.* What was your title when you first started at Qualcomm?
**A. Senior Engineer.**
*Q.* Did you at one point run Qualcomm's Chip Division?
**A. I was Head of Engineering for the Chip Division for probably more than 20 years, say.**
*Q.* Okay. And did you eventually become Qualcomm's Chief Technology Officer?
**A. Yeah. About eight years ago, I was named Chief Technology Officer, yeah.**
*Q.* And did you hold that title up until your retirement a few weeks ago?
**A. Yes.**
*Q.* Can we refer to that title as CTO just for efficiency's sake?
**A. That's typically what it's called, yeah.**
*Q.* Can you -- without getting into super great detail, can you tell this jury what Qualcomm is, what it does at a high level?
**A. So Qualcomm is a technology company. Its focus is really semiconductor versus -- when you hear about technology companies, you know, you think of Google, a software company,**

**Amazon software company, Meta software company. So it's a semiconductor company mostly.**

**It's fairly large. Not large like those previous companies I talked about, but it's probably 45,000 people, I would say. I don't know the exact number, but that's kind of the scale of it.**

**We are -- like I said, most of our revenue comes through semiconductor, but we're also an intellectual property licensor. So in other words, we develop technology, and then we -- we -- for a license fee, we allow other companies to use it.**

**And that, if -- if -- I'm sure all of you have cell phones. And so if you look at 5G, for example --**

***MS. BERNSTEIN:*** Objection, your Honor. Narration.

***THE COURT:*** Sustained, I think, at this point.

***BY MR. OLAH:***

***Q.*** Okay. Just to break down the first part of that, I think what you were saying, Mr. Thompson, is that Qualcomm, unlike Google and some other big companies, is focused on a physical product?

***A.*** **A physical product and licensing of technology. Those are our two main businesses, so semiconductor and licensing of technology.**

***Q.*** And you mentioned that Qualcomm, you believe, has about 45,000 employees today; is that right?

***A.*** **Roughly, yes.**

***Q.*** Ballpark, you haven't hand-counted them?

**A. No, yeah, I haven't looked at that for more than a couple years. But it's in that -- in that neighborhood, yeah.**

*Q.* And about how many employees did it have when you started over 33 years ago?

**A. I would guess it was around 600 people, so it was pretty small company at the time.**

*Q.* Where was Qualcomm founded?

**A. San Diego.**

*Q.* And for your 33 years, was that spent here in San Diego?

**A. Yes.**

*Q.* Is its headquarters here in San Diego?

**A. Yes.**

*Q.* As a CTO, did you have an office here in San Diego?

**A. Yes.**

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** I'll allow it. Overruled.

***BY MR. OLAH:***

*Q.* Mr. Thompson, if a Qualcomm employee invents technology related to Qualcomm's business, who owns that technology?

***MS. BERNSTEIN:*** Objection. Leading. Lack of foundation.

***THE COURT:*** Overruled.

***THE WITNESS:*** Qualcomm owns it. Employees, when they take a job at Qualcomm, you sign an agreement that Qualcomm owns intellectual property that you develop at Qualcomm. And it's

not just intellectual property. It's also confidential information, things like that, things that are not patented, as well.

***BY MR. OLAH:***

***Q.*** Mr. Thompson, you mentioned you spent eight years as a CTO.

Can you give the jury an overview of what responsibilities fell on you as a CTO at Qualcomm?

***A.*** **Yeah. So the -- the engineering is a pretty big part of Qualcomm, so it's probably 30,000 employees. So my group was about 30,000 people.**

**And it spread out. The biggest concentration was here in San Diego, but it's really all over the world. Our business is all over the world. We sell all over the world. And so I was responsible for the organization, so defining what is done in what location and by who.**

**So that was -- I would call it the primary responsibility. And then making sure products get developed on time. And then also, from a technology perspective, making sure that we're working on the right sets of technologies ahead of time so that we have them when they are required for a particular product.**

**And from a product point of view, cell phones would be the largest revenue. So if you have a cell phone in your pocket --**

***MS. BERNSTEIN:*** Objection. Narration.

***THE COURT:*** Overruled.

***THE WITNESS:*** If you have a cell phone in your pocket,

then it has our technology in it. We also do technology and chips for cars, and virtual reality headsets, and all sorts of different things.

***BY MR. OLAH:***

***Q.*** Mr. Thompson, you mentioned roughly 30,000 engineers at Qualcomm. Is that what I heard?

***A.*** **Full-time employees, and then there's other contractors. So maybe 35 if you include the contractors, yeah.**

***Q.*** Those employees working to improve Qualcomm's products, is that a fair summary of what they're doing?

***A.*** **Yeah, develop and improve and -- yeah.**

***Q.*** In addition to such employees, does Qualcomm sometimes acquire outside or other companies?

***A.*** **Yes, yeah.**

***Q.*** Why would they do that?

***A.*** **So there's -- there's, I would say, three different types of acquisitions. There are -- like, if you're buying a business, so that's one type of acquisition.**

**Another acquisition might be there's a specific technology that we don't have much experience with, and we want to bring in a technology from the outside.**

**And then there's also acquisitions, where we're buying something where another maybe small company, startup company, is ahead of us, and we just want to accelerate our development in that that area.**

**So in other words, we could do it, but instead of, let's say, it taking us two years, we can buy a company, and then we can get it right away. So it's really just accelerating our ability to integrate something into a product.**

***Q.*** I'm going to jump ahead of my outline a little bit here.
Are you familiar with the acquisition of Abreezio?

***A.*** **Yes.**

***Q.*** Using those three categories that you just provided for the jury, how would you describe the Abreezio acquisition?

***A.*** **That was the last example that I gave, where they -- they had something that we could certainly do ourselves. We had some efforts going on within the company to do those things, but they were maybe a couple of years to a year ahead of us, and in a very narrow kind of specific thing that allowed us -- that allows us to accelerate -- move faster. So that's basically what the acquisition was about.**

***Q.*** And, Mr. Thompson, setting Abreezio aside and just focusing on the category or the bucket that you just put it in, is there any sort of process that Qualcomm goes through when it wants to make such an acquisition?

***A.*** **Yeah, there is. And it depends on what type of acquisition. But I'll just limit what I say to the type of acquisition that Abreezio was.**

**So Abreezio was really about providing, like I said, an acceleration of a fairly narrow technology that we could bring**

into our products and help make our products a little bit cheaper and -- essentially it was making them cheaper, and improving the power consumption of those products.

And so those types of acquisitions tend to be driven by engineering, because they're very, I would say, narrow. And there's a specific set of engineers that understand how to take this technology and integrate it into our product.

And so the way it works is that engineering will identify something, a company that has something that's of relevance to us, typically a small company, startup company. And then we have the opportunity to either license that from them or we could buy the company. In the case of Abreezio, we decided we wanted to buy the company.

And so once we make that decision, then we have enough engineering understanding to say, yes, we think this is relevant to us, then we bring in a business team that is -- is -- their sole function is to acquire companies. So they understand all the legal issues, the patent issues, how to valuate a company.

And so, then, once they come in, then they start the valuation process with engineering, and then we come up with a kind of rough this is what we think it's worth to us.

And then once that happens, then we also -- and we start negotiating with the company, then we also bring in our legal team and our HR team, legal team to look at their patents, look at their contracts with other companies, and then HR really

**to -- how is it that we -- you know, when somebody comes into the company, what do you pay them, you know. So things like that.**

*Q.* Mr. Thompson, you just identified, if I got this total right, a business team, a legal team, a patent team, and HR; right?

***A.*** **Yeah, that's right.**

*Q.* When you say "bring those in," are those already units within Qualcomm?

***A.*** **Yeah. They're functions within the company, yes.**

*Q.* So -- and all four of those, in your experience, get involved when you're valuating a potential tech company acquisition; is that right?

***A.*** **That's right.**

*Q.* Okay. And did those four entities get involved when Qualcomm was examining whether to evaluate -- or to acquire, rather, Abreezio?

***A.*** **Yes.**

*Q.* Okay.

Mr. Thompson, did you ever work with a Dr. Karim Arabi?

***A.*** **Yes.**

*Q.* Did he have two different stints at Qualcomm?

***A.*** **Yes.**

*Q.* Do you recall what tiles or what units he was working in during those different stints?

**A. Well, at -- I think when he left the first time, he was a Vice President. And then he came back and then was promoted to Senior Vice President. And he was working in what we call Corporate R&D.**

*Q.* And can you tell the jury a little bit about what Corporate R&D is?

**A. Yeah. So the majority of our employees, those 30,000 people I mentioned, work on products. So but we set aside a group that's -- that's, let's say, 500 people, so it's -- that sounds like a lot, but small relative to the rest of the organization, that have the ability or their job function is to look ahead and do development of things that they think will help us five years from now or four years from now, but fairly far in the future. And that's what Corporate R&D does.**

*Q.* And Dr. Arabi was a member of the Corporate R&D department in that second stint; is that right?

**A. Yes.**

*Q.* Did you, as CTO, interact with Dr. Arabi on some occasion?

**A. Not a lot. I certainly knew him, very sharp guy. So I knew him, yeah.**

*Q.* Do you see Dr. Arabi here in the courtroom today?

**A. Yes, I do.**

*Q.* Can you please identify him by where he is located and what he's wearing in the courtroom?

**A. The second seat in with a blue jacket and a -- looks like a**

**gray tie and a striped shirt.**

***MR. OLAH:*** Your Honor, may the record reflect that the witness has identified Dr. Arabi?

***THE COURT:*** Yes, the record may so reflect.

***BY MR. OLAH:***

***Q.*** Mr. Thompson, are you familiar with Rapid Bridge?

***A.*** **Yes.**

***Q.*** What is Rapid Bridge?

***A.*** **Rapid Bridge is a company that we bought, I don't remember exactly, they could be 15 years ago. I don't remember the exact time. But it's a company that had kind of two pieces to it. One piece was a contracting piece, where we hired temporary labor to work on certain phases of products. And they were very good.**

**And then we also -- they also had something that was called -- we called it CPR -- don't worry about what that means. But it's a technology that you embed within a chip to help lower the power consumption, and it really helps with manufacturing, because the manufacturing variability, it -- it could sense the variations in the product from manufacturing, because everything moves around, you know, no product is exactly the same. And it was something that helped improve our products, so we bought the company.**

***Q.*** With that something being the CPR that you described; right?

***A.*** **That's right.**

***Q.*** Okay. And was CPR being used by Qualcomm in 2015?
***A.*** **Yes.**
***Q.*** Okay. Are you familiar with Abreezio -- you're familiar with the acquisition of Abreezio; right?
***A.*** **Yes.**
***Q.*** How did you first learn of Abreezio?
***A.*** **The Head of our Chip Development, the hardware piece of the Chip Development, Ziad Mansour, came to me and said that we have this company we're looking at, and they have actually two things. It was a technology that helped improve CPR, or what we just talked about from Rapid Bridge, and also some capability that would help improve our test.**
**In manufacturing, test is also something that costs -- we spend a lot of money on. And so test is something that's pretty complicated, and it helped us there as well.**
***Q.*** You mentioned Mr. Mansour was the Head of Chip Development.
Did I write that down right?
***A.*** **Yeah. He was the hardware -- the Chip Design Lead, the overall lead for that -- that group.**
***Q.*** And it's your testimony that he was the one that brought Abreezio to your attention?
***A.*** **Yes.**
***Q.*** Was that within Mr. Mansour's role, to identify potential acquisition?
***A.*** **Yes.**

***MR. OLAH:*** If we could please show the witness only United States Exhibit No. 776.

Your Honor, I'm told there would be no objection to a motion to admit this photograph.

***THE COURT:*** Okay. It may be admitted.

***MR. OLAH:*** Thank you.

***THE COURT:*** You may show it to the jury.

***(Exhibit 776 admitted.)***

***BY MR. OLAH:***

***Q.*** Mr. Thompson, who is in this exhibit?

***A.*** **That's Ziad Mansour.**

***Q.*** The individual you identified as bringing Abreezio to your attention; is that right?

***A.*** **Yes.**

***Q.*** How would you describe Mr. Mansour's level of enthusiasm or advocacy or interest, I guess, in whether Qualcomm should acquire Abreezio?

***A.*** **I would say extreme.**

***Q.*** Did that extreme support ever wane during the diligence period?

***A.*** **No.**

***Q.*** You mentioned -- I'll skip that. Sorry.

Did Mr. Mansour ever say whether other competitors were looking at Abreezio?

***A.*** **Yeah. He -- he had said -- at the time, our main**

**competitors were MediaTek and Intel, and so he had mentioned that they were looking at them as well.**

***Q.*** Would that be relevant information to you as the CTO?

***A.*** **Yeah, because it -- it kind of puts a timeline on things. If someone else is looking at them, then we have to act faster than maybe we would want to.**

***Q.*** Did you just rely on Mr. Mansour's support for this technology or was there some process that was followed?

***A.*** **So it was really his team that was responsible for providing the technical analysis. So there -- so there were people on his team that came in and presented how this would benefit us.**

***Q.*** And when you say "his team," are you referring to Mr. Mansour's team within Qualcomm?

***A.*** **Yes.**

***Q.*** And were they the engineers that were tasked with evaluating the technical soundness of --

***MS. BERNSTEIN:*** Objection. Leading.

***BY MR. OLAH:***

***Q.*** -- Abreezio?

***THE COURT:*** I'll allow it. Overruled.

***THE WITNESS:*** Yes.

***BY MR. OLAH:***

***Q.*** You indicated that Mr. Mansour was your source of information on Abreezio, right?

***A.*** **Yes.**

**Q.** Do you know how Ziad Mansour learned of Abreezio?
**A. I don't.**
**Q.** Did he ever say to you that, Hey, this is actually Dr. Karim Arabi's company?
**A. No.**
**Q.** Did he ever say to you that this is actually Dr. Karim Arabi's sister's company?
***MS. BERNSTEIN:*** Objection. Leading.
***THE COURT:*** Overruled.
***THE WITNESS:*** No.
***BY MR. OLAH:***
**Q.** Again --
**A. Oh --**
**Q.** -- did Ziad Mansour ever tell you that Abreezio was Dr. Karim Arabi's sister's company?
**A. No.**
**Q.** Did Ziad Mansour ever tell you that he had attended lunch meetings with Sanjiv Taneja and Mr. -- or Dr. Karim Arabi regarding Abreezio?
***MS. BERNSTEIN:*** Objection. Leading.
***THE COURT:*** Overruled.
***THE WITNESS:*** No.
***BY MR. OLAH:***
**Q.** Did you ever know Mr. Mansour to go by the name "Mitch"?
**A. No.**

*Q.* How did you refer to him at work?
**A. "Ziad."**
*Q.* Is Qualcomm a first-name kind of company?
**A. Yes.**
*Q.* There, you're not Mr. Thompson, even as CTO, you're Jim?
**A. That's right.**
*Q.* How did you refer to Dr. Arabi at work?
**A. "Karim."**
*Q.* Did you ever know Dr. Arabi to go by the name "Sheida" at Qualcomm?
**A. No.**
*Q.* I believe you mentioned Ziad's team examined Abreezio's technology.
Do I have that right?
**A. Yes.**
*Q.* Who else at Qualcomm was examining Abreezio in some fashion?
**A. In the beginning, it was -- I believe it was Ziad and Farsheed -- I don't know his last name. But he was one of the -- one of the engineers that worked for Ziad.**
**And then eventually, there were a few other people that were brought in, including Esin. I'll just say his -- I can't pronounce his last name. I don't want to mispronounce it.**
*Q.* At the risk of a leading objection, can I suggest maybe it's Terzioglu?
**A. It is, yes. I don't know if that's actually the right**

**pronunciation, but that's close.**

*Q.* Neither do I.

So Mr. Terzioglu -- actually, let's just call him Esin. I think that's easier for the court reporter, as well.

***A.* Yes.**

*Q.* Esin was involved in evaluating Abreezio's technology at Qualcomm?

***A.* Yes. He came in, I believe, later, but he was -- he was involved.**

*Q.* Was Esin's involvement something you wanted?

***A.* Yes.**

*Q.* Why?

***A.* Because Esin, his group was responsible for implementing CPR, that technology that I mentioned from Rapid Bridge, within the chips. And he was actually working on improving it, of course, and so it was important to evaluate Abreezio in comparison to what we thought we could get done in the next year, because they were working on it.**

*Q.* You said Esin is part of this team.

Did you trust and respect his take on the technology?

***A.* Yeah. Esin is a very smart guy, yeah.**

*Q.* And he's an engineer; is that right?

***A.* Yeah. He -- he has a Ph.D. in Electrical Engineering from Stanford.**

*Q.* Setting the engineers aside -- and I know that's hard to do

at Qualcomm, because it's a lot of engineers -- was Corporate Development department involved in the Abreezio evaluation?

***A.*** **Yeah. The -- I guess I don't remember the exact name of it, but I believe that's the group that Duane Nelles was head of the group that spearheaded all the acquisitions and did negotiations and did valuations and things like that. But they were involved, yeah.**

***Q.*** And I think I heard you earlier in your testimony use the word "valuation."

***A.*** **Valuation, yes.**

***Q.*** Is that what the Corporate Development department does is figure out what the right price for this is?

***A.*** **Yeah. So we work with them, and they -- we try to explain to them how much money this will save us, save us in terms of the test cost and -- and chip -- a piece of silicon, you pay by the square millimeter, the size. And so if we can make it a little bit smaller, it becomes cheaper.**

**And then what they do is they take all the chips that this could apply to, and then understand how much cheaper can we make the chip and how much cheaper will tests be for that chip. And then they translated that into a value for the company.**

***MR. OLAH:*** Your Honor, at this time, I'd like to show the witness and move to admit United States Exhibit No. 50.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No, your Honor.

***THE COURT:*** It may be admitted and shown.

***(Exhibit 50 admitted.)***

***MR. OLAH:*** Thank you, Your Honor.

***THE WITNESS:*** That's good.

***BY MR. OLAH:***

***Q.*** If you need your reading glasses, now would be a good time to get them out.

***A.*** **No, I've got them, but it's big enough.**

***Q.*** Mr. Thompson, what are we looking at on this bottom half of Exhibit 50 that's been enlarged on the monitors?

***A.*** **Okay. Let me -- give me a chance to read it. So, yes, the --**

***Q.*** Let me break down the questions a few more.

***A.*** **Yes.**

***Q.*** First off, the "From" line indicates "Nelles III, Duane."

Is that the Duane Nelles you were referring to a moment ago?

***A.*** **Yes.**

***Q.*** Was he running the Corporate Development department at Qualcomm?

***A.*** **Yes.**

***Q.*** And what's the date of this email?

***A.*** **It's June 21st, 2015.**

***Q.*** And do you recognize the recipients of this email on the "To" line?

***A.*** **Yes.**

*Q.* Who is Mr. Hiten Somwal?
**A. He and Malik, the next one, are part of his team, that -- the business team. And then, of course, Ziad we mentioned. And, yeah.**
*Q.* And then the CC line, is that you? Are you Jim Thompson?
**A. That's me on the CC line, yeah.**
*Q.* The subject indicates -- the subject line of the email is Windansea meetings.
What does "Windansea" refer to?
**A. They typically, for an acquisition, come up with a code name because we don't want -- we don't want the name of the company we're pursuing to spread through the company. So we -- so they -- Duane's team typically comes up with a code name, and that's the code name for Abreezio.**
*Q.* Okay. So when we see an email with Windansea on it, that's relating to the potential Abreezio acquisition; is that right?
**A. Yes.**
*Q.* Okay. And the last sentence of this email, you let me know if I get it right, "Given the current situation with Newport and the likeness with Rapid Bridge, I want to make sure Malik is closely involved."
Did I read that right?
**A. Yes.**
*Q.* Okay. Can you explain to the jury what "the likeness with Rapid Bridge" refers to?

**A. Yeah. So one of the -- one of the technologies, it actually was called TruSens, I believe, was the term that Abreezio used, was very complementary to CPR, which was our Rapid Bridge technology that we had acquired a number of years before. So it fit in almost perfectly with it. And so Malik was -- Duane wanted him involved because he had done the -- the -- spent a lot of time with Rapid Bridge.**

***Q.*** And just so I understand, Rapid Bridge is similar to Abreezio?

**A. Yes.**

***Q.*** The technology is.

**A. The technology. The Abreezio technology applied directly to CPR.**

***Q.*** Okay. Did Mr. Mansour respond to Mr. Nelles's email?

***MS. BERNSTEIN:*** Objection. Lack of foundation.

***THE COURT:*** If you know. Overruled.

***THE WITNESS:*** I guess I'd have to see the email. I don't remember. That was a long time ago.

***MR. OLAH:*** Can we call out the top half of the admitted exhibit, please?

***BY MR. OLAH:***

***Q.*** Mr. Thompson, were you able to see those two emails?

**A. Yeah.**

***Q.*** Okay. And are there two emails from Mr. Mansour shown here?

**A. Yes.**

***Q.*** And is he responding to the other four people that were on the prior message from Mr. Nelles?

***A.*** **Yes.**

***Q.*** Okay. And the bottom one is dated what?

***A.*** **Bottom one is June 21st, 2015.**

***Q.*** And when he writes, "Esin, Farsheed, and I are planning on going up there," what is he referring to?

***MS. BERNSTEIN:*** Objection.

***THE COURT:*** Overruled.

***THE WITNESS:*** They're going up -- the Rapid Bridge had offices in the Bay Area. And so they were going up to meet with, I assume -- I shouldn't assume -- but they're meeting with some of the people at Rapid Bridge.

***BY MR. OLAH:***

***Q.*** Rapid Bridge or Abreezio?

***A.*** **I'm sorry. Abreezio, yes. Sorry, I'm -- I got confused.**

***Q.*** And looking at that second sentence, so Mr. Mansour -- so first off, Mr. Mansour is saying "Esin, Farsheed, and I."

Esin and Farsheed, if I understood your testimony earlier, are engineers; is that right?

***A.*** **Yes.**

***Q.*** Okay. And they're going up there to meet with folks at Abreezio; is that right?

***A.*** **That's right.**

***Q.*** What does Mr. Mansour mean by, "I think that gives us good

coverage on engineering side"?

***MS. BERNSTEIN:*** Objection.

***THE COURT:*** Overruled.

***THE WITNESS:*** He's just saying that between Farsheed and Esin, they will have a pretty good ability to understand the technology that -- that Abreezio is working on.

***BY MR. OLAH:***

***Q.*** And did Mr. Mansour send a follow-up email just a few minutes later?

***A.*** **Yes.**

***Q.*** You let me know if I get this right. "Also, this meeting is all about the business side. We have already done as much as we can on the technical side."

Did I read that right?

***A.*** **Yes.**

***Q.*** What does it mean to "have already done as much as we can on the technical side"?

***MS. BERNSTEIN:*** Objection, your Honor. Lack of foundation. This is someone else's email.

***THE COURT:*** Overruled.

***THE WITNESS:*** Ziad is saying that, Hey, we've looked at this super closely, and we understand it completely, is kind of what he's saying there.

***BY MR. OLAH:***

***Q.*** And that was in June of 2015 he was taking that position?

***A.*** **Yes.**
***Q.*** From your perspective, was the technical side fully vetted as of June 21st of 2015?
***A.*** **You know, at the time, I believed so.**
***Q.*** Did Qualcomm nonetheless continue to examine Abreezio's technology?
***A.*** **Yeah, we did.**
***THE COURT:*** Mr. Olah, would now be an okay time for a break?
***MR. OLAH:*** Absolutely, your Honor.
***THE COURT:*** Okay. Why don't we take our 15-minute recess. Ladies and gentlemen, you're reminded you're not to discuss the case with anyone. You're not to do any research about the case. And we will see you back in 15 minutes.
***(Jury out at 10:32 a.m.)***
***THE COURT:*** And you're excused as well, sir. Fifteen minutes. You can step down. You can stay in the courtroom or not.
***MS. BERNSTEIN:*** Can you ask the witness to not speak with the jurors or the --
***THE COURT:*** Yes. I will order that you not speak with the jurors.
Anything we need to take up outside the presence of the jury?
***MR. OLAH:*** Nothing from the Government, your Honor.

***MS. BERNSTEIN:*** If I can just check my handy list, your Honor. Oh, I did have just one suggestion, which was that in a, like, lengthy trial, some very lengthy trials I've done before, the judge has not told the alternates who is going to be first, who is second, who's third, who's fourth, so that they all pay attention. And then when it comes time --

***THE COURT:*** We've already crossed that bridge, so...

***MS. BERNSTEIN:*** Okay. I don't know if the Court wanted to --

***THE COURT:*** No. I told them already who was first, second, third, fourth.

***MS. BERNSTEIN:*** Okay. That's it for us.

***THE COURT:*** Okay. Thank you.

***MR. PILCHAK:*** Thank you, Your Honor.

***THE COURT:*** They all seem to be paying attention.

***(Recess taken.)***

***THE COURT:*** Okay. We are back on the record. All jurors are present. The lawyers and Dr. Arabi are present. You're reminded you're still under oath to tell the truth.

Mr. Olah.

***MR. OLAH:*** Thank you, Your Honor.

***BY MR. OLAH:***

***Q.*** Mr. Thompson, did Qualcomm end up acquiring Abreezio?

***A.*** **Yes.**

***Q.*** Did you, as CTO, approve of the acquisition?

***A.*** **Yes.**
***Q.*** Including the sale price?
***A.*** **Yes.**
***Q.*** Do you recall what the sale price was of Abreezio?
***A.*** **I think it was $180 million.**
***MR. OLAH:*** I'd like to show exhibit -- Defense Exhibit 2679 at this time. Your Honor, the Government would move to admit that exhibit.
***THE COURT:*** Any objection.
***MS. BERNSTEIN:*** No, Your Honor.
***THE COURT:*** 2679 may be admitted.
***(Exhibit 2679 admitted.)***
***MR. OLAH:*** Thank you, Your Honor. And Alex, if we could pull up that bottom one, as you're doing. Thank you.
***BY MR. OLAH:***
***Q.*** Mr. Thompson, can you take a minute to read this email that's been called out on the monitors?
***A.*** **Yeah.**
***Q.*** Mr. Thompson, you've read that email?
***A.*** **Yes.**
***Q.*** Do you recall that email?
***A.*** **Yes.**
***Q.*** Is that an email that you sent?
***A.*** **I did, yes.**
***Q.*** On what date?

**A. It's October 21st, 2015.**

Q. And who did you send this email to?

**A. To Esin and to Ziad.**

Q. And Esin -- well, let me ask you this:

Did Esin and Ziad work together?

**A. Yeah. Esin worked for -- he reported to Ziad, yes.**

Q. And I believe your testimony earlier was that Esin was part of the technical evaluation of Abreezio's technology; is that right?

**A. Yes.**

Q. Okay. And it was Ziad that was championing Abreezio's technology; is that right?

**A. That's right.**

Q. What's the subject line of this email you sent?

**A. It's "Final Acquisition Approval."**

Q. And part of your email, the middle there, says, "Be prepared to discuss in detail."

What are you getting at in this email?

**A. So I was getting, I would say, information from various people, I think including Esin, that things were not panning out as originally described. So -- so the technology, it wasn't fitting the financial model. So the improvements that we were going to get weren't as good as what we thought back in June, say.**

Q. And this was the -- that data or that input you're talking

about, is that coming from the engineers at Qualcomm that are vetting this technology?
***A.*** **Yes.**
***Q.*** Okay. And you, as the CTO, want to discuss this with Esin and Ziad, is that what this -- am I reading this email right?
***A.*** **That's right.**
***Q.*** And you ended your email, "If the numbers don't work, this is our last chance to walk away."
Is that right?
***A.*** **That's right.**
***Q.*** Did Qualcomm walk away from this deal?
***A.*** **No, we went through with it.**
***Q.*** Do you know how many days or weeks after this email the deal closed?
***A.*** **Gosh, it would have been -- it might have been a month or so that we actually agreed. I don't know when it actually closed. I can't remember that. But we -- probably a month after this, we had an agreement on price and all that, I would guess, yeah.**
***Q.*** Understood. Understood.
***MR. OLAH:*** If we could call out the next email up, I believe it's -- perfect.
***BY MR. OLAH:***
***Q.*** Mr. Thompson, again, take a minute just to refresh yourself on this email as well.
***THE COURT:*** Is this all 2679?

***MR. OLAH:*** Correct. We're calling out three emails within that one exhibit. Thank you, Your Honor.

***THE COURT:*** Thank you.

***THE WITNESS:*** Okay.

***BY MR. OLAH:***

***Q.*** Mr. Thompson, who sent this email?

***A.*** **Esin did.**

***Q.*** And who received this email?

***A.*** **I received it, and Ziad received it.**

***Q.*** And is this a response to the email of yours that we just looked at a moment ago?

***A.*** **That's the same subject as the original email that I sent, yeah.**

***Q.*** And sparing the jury the three paragraphs, what is Esin relaying to you and Ziad in this email?

***A.*** **Okay. So one is that the -- some of the savings is not what was originally advertised. But it -- he's ultimately recommending that we pursue it.**

***Q.*** "He" being Esin?

***A.*** **Esin, yes.**

***Q.*** And is that captured in that first sentence of the third paragraph, "I believe that this is a good technology for sensors and DFT and we should acquire"?

***A.*** **Yes.**

***Q.*** Okay. And your understanding is this is Esin's "I support

this acquisition"?

**A. Yes.**

***Q.*** Okay. Did Mr. Mansour respond to Esin's email?

**A. I believe so.**

***MR. OLAH:*** If we could call out the top email in the same exhibit.

***BY MR. OLAH:***

***Q.*** Mr. Thompson, what are we looking at with this called-out email?

**A. This is Ziad responding to Esin, it looks like. And then he's -- he's saying that we're going to get some savings, two or three, and he's saying that that's what was used in the evaluation, you know, the -- I mentioned before, Duane Nelles and his team put together a financial model. And so that's what was used in the financial model.**

**And then another point is that he's claiming that it's two or three better than what we expect our improved results will be in a year or so. That's what he's implying there.**

***Q.*** And is it your understanding that Ziad Mansour is also supporting the acquisition of Abreezio's technology?

**A. Yes.**

***MR. OLAH:*** You can pull that email down. Thank you, Alex.

***BY MR. OLAH:***

***Q.*** Mr. Thompson, I want to ask you about Akbar Shokouhi.

Do you recognize that name?

*A.* **Yes.**

*Q.* Who is Akbar Shokouhi?

*A.* **So he came to Qualcomm, I believe it was through the Rapid Bridge acquisition. He was responsible for the -- I think, if you remember the -- they did two things. They had the CPR technology, and then they were also supplying contractors to us.**

**He was responsible for the contractor side of -- of that acquisition. And then he came into Qualcomm, and then he was responsible for the overall hiring of contractors for some of our jobs that kind of went up and down in terms -- with time in terms of the number of people that we needed.**

*Q.* Do you recall about when Qualcomm acquired Rapid Bridge?

*A.* **You mean the -- the date, roughly?**

*Q.* Do you have a year? I'm asking if you even recall it. If the answer is no, we can ask the next question.

*A.* **You know, 2012 -- that's a guess. It's quite a while ago, and so it's hard to remember exactly.**

*Q.* And assuming 2012 is right, is that when Akbar Shokouhi would have joined Qualcomm?

*A.* **Yes.**

*Q.* Was Mr. Shokouhi fired from Qualcomm?

*A.* **Yes.**

*Q.* Why was Mr. Shokouhi fired from Qualcomm?

*A.* **So he -- I mentioned he was responsible for hiring**

**contractors. And so -- and these are very kind of highly paid, highly skilled contractors. And we use them for what's called physical design of our chips. Primarily, that's what they were doing, and some tests.**

**And they would come in and we would -- we would see a big need, a big peak of need. And then we would go to contract companies and bring in, you know, it could be a hundred people or something like that to work on something.**

**And Akbar was -- shifted most of his hiring over to a new company. And it turned out that he actually owned the new company. And it was -- he put it in his wife's name so that we wouldn't notice that we were hiring from his company. So he essentially created a company that he could hire people from, and so he would get the profits of the -- you know, the contract company.**

***Q.*** Did Qualcomm eventually learn of that arrangement?

***A.*** **Yes.**

***Q.*** Did it take action?

***A.*** **Yes.**

***Q.*** Did HR interview Mr. Shokouhi?

***A.*** **Yeah. HR interviewed him, yes.**

***Q.*** And did Qualcomm fire Mr. Shokouhi in part because of his interview with HR?

***A.*** **Yeah. Yeah, he was fired. I fired him.**

***Q.*** Prior to Qualcomm acquiring Abreezio, did you know of any

involvement of Akbar Shokouhi in Abreezio?
***A.*** **I did not.**
***Q.*** Is that information that you would have wanted to know?
***A.*** **Yes.**
***Q.*** Why would you have wanted to know if Akbar Shokouhi was at all involved in Abreezio?
***A.*** **Well, it would have been, I would say, suspicious.**
***Q.*** Because it was an employee that --
***A.*** **It was an employee of Qualcomm.**
***Q.*** Previously?
***A.*** **Yes.**
***Q.*** That you personally had fired?
***A.*** **That's right.**
***Q.*** Similarly, prior to the acquisition, of Abreezio, that is, did you have any knowledge of Dr. Karim Arabi's involvement in Abreezio?
***A.*** **No.**
***Q.*** And I asked some very specific questions earlier about what Mr. Mansour did or did not represent to you. I'm going to ask more generally.
Did anyone ever report to you that Abreezio was Dr. Karim Arabi's sister's company?
***A.*** **No.**
***Q.*** Did anyone report to you that Abreezio's technology originated or was created by Dr. Karim Arabi's sister?

***A.*** **No.**
***Q.*** And, again, Mr. Mansour did not tell you that?
***A.*** **No.**
***Q.*** Did Dr. Arabi ever tell you those things?
***A.*** **No.**
***Q.*** Did you, at the time, have any knowledge that Dr. Arabi filed Abreezio's first two provisional patent applications?
***A.*** **No.**
***Q.*** Did you have any knowledge that he chose the CEO and CTO of Abreezio?
***A.*** **No.**
***Q.*** Did you have any knowledge that Dr. Arabi picked the name Abreezio?
***MS. BERNSTEIN:*** Objection. Assumes facts not in evidence.
***THE COURT:*** It's also been asked and answered. Sustained. He said had he no knowledge that Dr. Karim Arabi was involved in any way in Abreezio.
***MR. OLAH:*** Fair enough. I probably should have started with specific before getting general.
***BY MR. OLAH:***
***Q.*** Mr. Thompson, would you -- excuse me.
Would you personally, as the CTO vetting this deal and giving the stamp of approval, would have wanted to know if Dr. Arabi was at all involved in Abreezio in any way?

***A.*** **Yes.**
***Q.*** Why?
***A.*** **He was an employee of Qualcomm.**
***Q.*** And why does that matter?
***A.*** **Well, if -- the agree -- the agreement that you sign when you start working for Qualcomm -- and this is true of every technology company -- is that anything that you develop while you're at the company that's relevant to the company is owned by the company. So it's owned by Qualcomm. So anything that he would have developed as an employee of Qualcomm would be owned by Qualcomm.**
***Q.*** And if Qualcomm were apprised of any involvement by Dr. Arabi and Abreezio, would it have investigated those facts?
***A.*** **Yes.**
***Q.*** And might that have affected the price it was willing to pay to acquire Abreezio?
***A.*** **Yeah. We would have paid zero for it.**
***Q.*** Because it could have been Qualcomm's property?
***A.*** **Yes.**
***MR. OLAH:*** No further questions at this time, Your Honor.
***THE COURT:*** Cross-exam?
///
///
///

***CROSS-EXAMINATION***

***BY MS. BERNSTEIN:***

***Q.*** Good morning, Mr. Thompson.
***A.*** **Good morning.**
***Q.*** Other than passing each other in the hall today, have we ever spoken before?
***A.*** **No.**
***Q.*** And you know that we represent Dr. Karim Arabi?
***A.*** **Yes.**
***Q.*** You flew out here for testimony today?
***A.*** **Yes.**
***Q.*** And you've met with the Government prior to your testimony today?
***A.*** **Yes. Well, on video, but yeah.**
***Q.*** How many times have you met with them?
***A.*** **Once when they were investigating the case, they asked me some questions. And then maybe three weeks ago, they had a video call with me to say what my role was in the testimony.**
***Q.*** And when you met with the Government, you had counsel with you those couple of times as well? You had attorneys?
***A.*** **There was the -- yeah, Qualcomm attorneys, yeah.**
***Q.*** And when did you leave Qualcomm?
***A.*** **I retired a month ago.**
***Q.*** February.
***A.*** **February 8th, I think it was, was my last day, yep.**

***Q.*** Last year, in 2024, you were Qualcomm's largest individual shareholder; is that right?
***A.*** **Could be.**
***Q.*** You don't know?
***A.*** **I don't know.**
***Q.*** Okay.
***MS. BERNSTEIN:*** I'd like to show the witness what's been marked as Defense 3224.
***BY MS. BERNSTEIN:***
***Q.*** And do you recognize this as an SEC filing by Qualcomm?
***A.*** **I've never seen it before. It doesn't mean anything to me.**
***MS. BERNSTEIN:*** Okay. Let's go to page 55 of this, please.
***JUROR:*** Your Honor, are we supposed to see it?
***THE COURT:*** Not yet. It hasn't been admitted into evidence yet. Thank you.
***BY MS. BERNSTEIN:***
***Q.*** Do you see this on your screen?
***A.*** **Yes.**
***Q.*** And do you see that is this a -- it's from the 2025 proxy statement of Qualcomm laying out stock ownership of certain beneficial owners and management?
***A.*** **Yes.**
***Q.*** Do you see your name there?
***A.*** **Yes.**

***Q.*** And then you can carry over to see the number of shares that you have and the amount of your beneficial ownership?
***A.*** **Yeah, I see that.**
***Q.*** So would you agree that you're Qualcomm's largest individual shareholder in 2024?
***A.*** **Yes, of employees. So is this only employees and Board members, so it's not -- there are other -- like, our founders have -- you know, Irwin Jacobs. Probably everybody knows who Irwin Jacobs is.**
***Q.*** He has more than you?
***A.*** **I'm sure has a lot more than me.**
***Q.*** Sure.
In 2023 and 2024, your salary was $900,000 a year.
***MR. OLAH:*** Your Honor, I'm going to object on relevance. That's nine years after the conspiracy.
***THE COURT:*** Sustained.
***MS. BERNSTEIN:*** Your Honor, can I make a sidebar proffer?
***THE COURT:*** Not right now. Move on.
***BY MS. BERNSTEIN:***
***Q.*** You receive over $10 million of stock awards from Qualcomm?
***A.*** **Over what -- can you be more specific?**
***Q.*** Per year.
***A.*** **Could be over the last few years, yeah, sure.**
***Q.*** Well, let's do it this way.

You make quite a bit of money as CTO of Qualcomm; fair to say?
**A. Yes.**
***Q.*** And can you ballpark that for us?
***MR. OLAH:*** I'm going to object, Your Honor. I'm not sure of the relevance of Mr. Thompson's income in this trial.
***THE COURT:*** Sustained.
***BY MS. BERNSTEIN:***
***Q.*** Most of it comes from shares; is that right?
**A. Yeah, I would say the bulk of the -- my income comes with shares, and those shares, depending on how the company does, I could get those shares or I could get zero. And sometimes -- quite a few times, I've gotten zero, so...**
***Q.*** And that's been the arrangement for how many years at Qualcomm for your personal salary?
**A. Can you explain? I'm not sure, "the arrangement." What do you mean?**
***Q.*** That you get a flat salary plus stock options and stock awards.
**A. Yeah. That's how pretty much everybody gets paid.**
***Q.*** So for 33 years, your income has depended on the livelihood of Qualcomm stock?
**A. Yes.**
***Q.*** Now, you testified about being the ultimate decision-maker as to whether Qualcomm should purchase Abreezio; correct?

***A.*** **Yes.**

***Q.*** And you've relied on the evaluation of technology that had been done by others, not yourself personally, correct?

***A.*** **That's right.**

***Q.*** The Design Department was led by Ziad Mansour?

***A.*** **Yes, that's correct.**

***Q.*** And that -- he was -- him and his department were involved in the technical evaluation of Abreezio?

***A.*** **Yes.**

***Q.*** And the Product Test Department was led by Mike Campbell?

***A.*** **Yes.**

***Q.*** And he and his team were also involved in the product test analysis here, particularly on the DFT side.

***A.*** **That's correct.**

***Q.*** And Mike Campbell is not on Ziad Mansour's team; is that right?

***A.*** **No.**

***Q.*** And Mike Campbell and Ziad Mansour are actually horizontal in an org chart; is that right?

***A.*** **They're peers, yes.**

***Q.*** They're peers with separate divisions and separate departments?

***A.*** **Separate departments, not divisions, but separate departments.**

***Q.*** Separate teams?

***A.*** **Yes.**
***Q.*** They both reported to you?
***A.*** **I think at that time, yes. I'm not a hundred percent sure, because Mike -- we moved Mike over to Operations. That's a common way of organizing test. Mike is responsible for test.**
***Q.*** Okay. And then the other employees who primarily evaluated the low-power concepts, you mentioned Farsheed, and I think you said you didn't remember his last name.
***A.*** **I don't.**
***Q.*** Does "Mahmoudi" remind you? No?
***A.*** **I don't think I ever knew his last name.**
***Q.*** Okay. But someone named Farsheed who was an engineer was sort of maybe the driver of the Design department?
***A.*** **I believe so. That's what I remember, yeah.**
***Q.*** And Esin was also on the evaluation?
***A.*** **Yes.**
***Q.*** And you had, in fact, wanted Esin on there?
***A.*** **Yes.**
***Q.*** Okay. And then the employees who primarily evaluated the DFT concepts included Joseph Fang?
***A.*** **I don't remember Joseph.**
***Q.*** Okay. Guaro Vagara *[ph]*?
***A.*** **I don't remember that name.**
***Q.*** Saad Elhosni?
***A.*** **I remember Saad. I believe Saad was the lead.**

***Q.*** And the Qualcomm employees that evaluated both of the technologies included Jim Willmore?
***A.*** **I don't remember Jim being involved, but...**
***Q.*** Do you remember that Mohamed Allam was one of those people that evaluated both technologies?
***A.*** **I do remember that. But -- yeah, like I said, Saad was the one that was the one I knew reasonably well, and so he had the most -- call it credibility with me from the test side.**
***Q.*** And you also testified that there was a team of lawyers that typically evaluate patents and acquisitions.
***A.*** **Yeah. The lawyers evaluate patents and also contracts with other companies, yeah.**
***Q.*** And do you know if that happened here?
***A.*** **I wasn't involved in it, but it happens. It's something that is part of the process, so I would assume it was done.**
***Q.*** Standard process to evaluate patents.
***A.*** **That's right.**
***Q.*** And when all of these people are working on the technical analysis, then it joins up with Duane Nelles's team to sort of put a price tag on it, is that a very simplistic but fair, accurate representation?
***A.*** **Yeah. We work together to -- they own the pricing and the negotiation -- or the value to us. They work closely with us in kind of coming up with an evaluation. And then Duane's team is responsible for negotiating the contract -- or the acquisition.**

*Q.* And the sale price? Duane's team negotiates the sale price?
***A.*** **That's right.**
*Q.* With input from you?
***A.*** **Yeah, that's right.**
*Q.* But the deal is signed off on by the executives.
***A.*** **That's right.**
*Q.* So there's a lot of people that are involved in this.
***A.*** **Yes.**
*Q.* Okay. And Karim Arabi worked in Corporate Research and Development at Qualcomm at the time.
***A.*** **That's correct.**
*Q.* And I think you testified that he was a Senior Vice President.
***A.*** **I believe he was. That -- it's my memory, yes.**
*Q.* So would it surprise that you he, in fact, was not?
***A.*** **Then he would have been a vice president, yeah.**
*Q.* And he was not involved in the due diligence of Abreezio's technology.
***A.*** **No.**
*Q.* He was not involved in the acquisition of Abreezio's technology.
***A.*** **No.**
*Q.* As far as you know, he had nothing to do inside Qualcomm with Abreezio's analysis and acquisition.
***A.*** **That's what I believed at the time, yes.**

*Q.* Has that changed?
**A. Yes.**
*Q.* He had involvement in Qualcomm in evaluating the technology or suggesting the acquisition?
**A. We -- no, no, no, not suggesting the acquisition. But he -- he was involved in developing the technology.**
*Q.* That's your view.
**A. That's my understanding.**
*Q.* But I just want to be clear on what his role was at Qualcomm at the time.
**A. He was not involved at all at Qualcomm that was -- no visibility to me that he was involved.**
*Q.* And not only no visibility to you, but this case has been investigated for a decade; right?
**A. It is a decade since it happened. I don't know investigations and --**
*Q.* And you've certainly not learned that Dr. Arabi was involved in Qualcomm in the due diligence of Abreezio or in analyzing whether or not it should be acquired?
**A. He was not part of the team that came to me to recommend that we purchase Abreezio.**
*Q.* Yeah. And I appreciate that you're being careful with how you answer the question. I guess I want to get a little bit more broad.
Not only did he not come to you, but you're very familiar

with this acquisition, where Qualcomm alleges it went awry, the referrals to the U.S. Attorney's Office, the prosecution.

You've known about all of this since 2015; correct?

*A.* **Not 2015, no.**

*Q.* Since 2017, excuse me.

*A.* **Probably 2017.**

*Q.* '16, I'm sorry.

*A.* **Could be '16. I can't remember. But '17 is what I have in my head.**

*Q.* '17 is when the lawsuit is initiated.

*A.* **Okay.**

*Q.* I'm asking you. I'm sorry.

*A.* **Oh, I don't know exactly when the lawsuit --**

*Q.* Okay. Do you remember that the investigation started in 2016?

*A.* **I don't -- I was not involved. I was brought -- I think it was around '17 that it was brought to me that this is something, that there was some evidence, and they were pursuing it.**

*Q.* Okay. Well, we don't need to split hairs about the dates.

We can all agree it's been a pretty substantial amount of time since this was initially investigated, correct?

*A.* **Yes.**

*Q.* Okay. And in that time, no one has said to you, you have not learned Karim was involved in Qualcomm with suggesting that Abreezio be acquired.

***A.*** **No, he was not. He himself was not, no.**

***Q.*** Thank you.

We spoke about Rapid Bridge, and I want to go back to that and ask you some questions.

***MS. BERNSTEIN:*** I'm sorry, if the Court can just -- I don't have my watch on, remind me when it's a breaking point?

***THE COURT:*** Okay.

***MS. BERNSTEIN:*** Thank you.

***BY MS. BERNSTEIN:***

***Q.*** Qualcomm is in the chip business; correct?

***A.*** **Yes.**

***Q.*** And as CTO, you're responsible for constantly improving, anticipating Qualcomm's technologies?

***A.*** **Yes.**

***Q.*** And you were quite good at your job.

***A.*** **I -- I'd like to think so.**

***Q.*** You were -- you had a long tenure with the company at a very high position.

***A.*** **Yes.**

***Q.*** Okay. And in 2011, a company called Rapid Bridge was acquired?

***A.*** **Yeah. Like I said before, I think I said I thought it was around 2012, but 2011, yeah.**

***Q.*** And that was someone named Tayebi's company?

***A.*** **Yes.**

*Q.* And what was his full name?
***A.*** **Maas -- I think it was Maasih Tayebi.**
*Q.* And who did you know him as? What's his reputation?
***A.*** **Smart guy.**
*Q.* Entrepreneur?
***A.*** **Entrepreneur.**
*Q.* Involved in a lot of startups?
***A.*** **Yeah.**
*Q.* That get acquired?
***A.*** **Yeah.**
*Q.* And Ziad Mansour brought the Rapid Bridge deal to Qualcomm, I think you said.
***A.*** **Yes.**
*Q.* It also involved Shokouhi?
***A.*** **Could you go the first name? That would help.**
*Q.* Akbar Shokouhi?
***A.*** **Akbar, yes, yeah.**
*Q.* And Ziad's role at Qualcomm in 2014 -- excuse me -- 2011 was what?
***A.*** **He was Head of Chip Development.**
*Q.* So bringing Rapid Bridge technology to you was his job.
***A.*** **Yeah.**
*Q.* And I think you testified that the Rapid Bridge technology Qualcomm acquired lowered power consumption and manufacturing variability.

**A. Yeah. It was lower power consumption. It also -- essentially, we took margin out of the system, which allowed to us make the chip a little smaller and the power to be a little bit lower, because we could measure specifically that chip and actually how it aged as well. So that -- that's what -- the main technology that they brought to us.**

Q. Yeah. And I appreciate that, because I think for a lot of us that don't know chips, that's really helpful.

The point is that it saved power and cost; correct?

**A. Yes.**

Q. And that was a really big deal to Qualcomm.

**A. Yes.**

Q. Qualcomm's competitors did not have similar technology to this.

**A. I -- I don't know what they had or not.**

Q. Well, the acquisition of Rapid Bridge and its CPR technology really distinguished Qualcomm; is that right?

**A. Yeah. I mean, it definitely was a good thing. It's not -- there's so many different things that you need to be good at to distinguish yourself, so this alone did not. But it definitely, like I said, improved our costs by a few percent, improved power by -- I can't remember how many percent -- but a noticeable amount, yeah, sure.**

Q. I'm sorry, I didn't mean to cut you off.

**A. No, go ahead.**

*Q.* And when you say it was a small percent, I just want to make clear or have you clarify, how many chips a year does Qualcomm manufacture?
***A.*** **So we manufacture -- total chips is about -- it's over 10 billion, so it's a lot. But this technology only applies to a certain type of chip, which is our kind of the bigger digital chips that we do, which I'd have to guess. But we probably make, you know, hundreds of millions of them, yeah.**
*Q.* So a few percentage points is not much, but over hundreds of millions of chips, that's quite a significant cost savings for the company.
***A.*** **That's why we're interested in these types of technologies. Because of the scale of our business, small improvements lead to, you know, a lot of cost savings potentially, yeah.**
*Q.* And Qualcomm acquired Rapid Bridge for about 320 million.
***A.*** **I don't remember that one, but that sounds right.**
*Q.* Okay. Do you remember a company called Endura?
***A.*** **Yes.**
*Q.* And in 2014, Qualcomm began exploring the possibility of acquiring Endura?
***A.*** **Yes.**
*Q.* And this was another Tayebi company?
***A.*** **Yes.**
*Q.* Endura used similar concepts to Rapid Bridge?
***A.*** **I would say actually, no. But the way to evaluate its -- to**

**understand its value to us, in other words, you can translate the margin savings, you know, into dollars. And so in that sense, it was the same -- a very similar financial model. The technology was very different, though.**

***Q.*** The Endura technology purported to improve the power and the cost of the chips generally, correct?

***A.*** **Yes.**

***Q.*** And Mansour, Ziad Mansour, brought that acquisition to you as well, that potential acquisition?

***A.*** **Yes.**

***Q.*** You were super excited about it?

***A.*** **In the beginning, yes.**

***Q.*** And were there discussions to acquire Endura for about $700 million?

***A.*** **Yes, but we were never on board with -- that's what they were asking. We were never on board with that.**

***Q.*** What was the prices that were negotiated on Qualcomm's side?

***A.*** **I think, if I remember right, we were offering -- or initially, when we were opening up the discussion, it was around 300 million, something like that.**

***Q.*** And you had a Qualcomm team perform due diligence on the Endura technology.

***A.*** **I did.**

***Q.*** Because it's important to find out if technology is going to deliver on what it's promised to do.

***A.*** **Right.**

***Q.*** Especially at those numbers.

***A.*** **Yes.**

***Q.*** And eventually, you were told that the technology for Endura wouldn't work.

***A.*** **Maybe more specifically, I was skeptical, and I brought in a separate team to look at it that was a different group than Ziad. Ziad was the primary driver of this. And I brought in a separate team and a specific individual to do the analysis. And then he basically showed that -- that it was not -- it would not -- it wasn't that it didn't work at all, but it would not deliver what was being claimed by the other team.**

***Q.*** And that deal ended without an acquisition.

***A.*** **That's right.**

***Q.*** I want to talk about Abreezio. You testified that Ziad Mansour also brought Abreezio.

***A.*** **Yes.**

***Q.*** And like these technologies, promised to improve the power and the cost of the chips.

***A.*** **Yes.**

***Q.*** It also was a very good fit with Rapid Bridge's technology that was already being deployed across Qualcomm products.

***A.*** **Yeah. The -- the -- I think it was TruSens technology was a perfect fit for the Rapid Bridge technology. And then if you looked at the -- the -- I think it might have been TruTest, the**

**DFT, the design-for-test technology, was also something that fit directly into our methodology, the way we did things. So it was an easy integration.**

*Q.* And it would have given Qualcomm -- it did give Qualcomm quite a substantial advantage over its competitors that did not have the Rapid Bridge technology that it built upon.

***A.* That's what we believed, yes.**

*Q.* And I think you said Qualcomm has 45 -- about 45,000 employees is your best guess?

***A.* Yeah.**

*Q.* And some of those brainstorm ideas to help Qualcomm in the industry.

***A.* Yes.**

*Q.* Some bring those ideas to life.

***A.* Yes.**

*Q.* And a lot of innovation is actually accomplished -- well, let me withdraw that.

Qualcomm is a massive company; fair to say?

***A.* Yeah, it's big. Yeah.**

*Q.* And when you're a massive company, a lot of innovation is actually accomplished by acquiring smaller companies, I think you said, although I'm not sure if I'm accurately characterizing that.

***A.* Yeah. That's true, yes.**

*Q.* And those smaller companies bring their products and their

people to Qualcomm.
***A.*** **Yes.**
***Q.*** Typically in an acquisition.
***A.*** **Yes.**
***Q.*** And I think you've said that it's particularly important when you're acquiring a company to get its people so that they can, in fact, know the tech to deploy it across Qualcomm's products.
***A.*** **Yes.**
***Q.*** And that happened in Abreezio as well?
***A.*** **Yes.**
***Q.*** Okay. Developed products are far more valuable than an idea, would you agree?
***A.*** **Yes.**
***Q.*** Because anyone can have an idea.
***A.*** **I just want to be clear, though, that in this case, we're not talking about products, we're talking about a technology that plugs in, so --**
***Q.*** Software --
***A.*** **-- that's a different --**
***Q.*** -- and hardware.
***A.*** **-- products are different types of acquisitions, so this is not one of those.**
***Q.*** Thank you for being specific.
This is more software and hardware?

***A.*** **Yeah, hardware that's very specific to our chip -- a very narrow piece of the chip that is a technology.**
***Q.*** And you testified that Abreezio had the two different technologies and softwares/hardwares, TruTest and TruSens; correct?
***A.*** **That's correct.**
***Q.*** And for ease of memory, TruTest is the DFT, the Design For Test; is that right?
***A.*** **Yes.**
***Q.*** And TruSens is the power side?
***A.*** **Yes.**
***Q.*** And TruSens was the primary technology that Qualcomm wanted?
***A.*** **It was both. Yeah, it was both.**

***MS. BERNSTEIN:*** Your Honor, I'm at a good breaking point.

***THE COURT:*** Okay. Let's go ahead and take an early lunch break, ladies and gentlemen. If you could be back at 12:25. You're reminded you're not to discuss the case with anyone, or do any research about the case, or look up anything about the case, and we'll see you back at 12:25.

***(Jury out at 11:27 a.m.)***

***MR. OLAH:*** Your Honor, is the witness ordered to return at 12:25 as well?

***THE COURT:*** Yes, please. Thank you. You can just pull that door behind you, sir. Thank you.

We're now outside the presence of the jury. Any issues we need to take up?

***MR. OLAH:*** Go ahead.

***MS. BERNSTEIN:*** None for us.

***MR. OLAH:*** Nothing from the Government.

***THE COURT:*** Okay. One-hour break. Thank you.

***(Lunch recess taken.)***

***(Lunch recess taken.)***

***THE COURT:*** Okay. We are back on the record. All jurors are present. All lawyers are present. And Dr. Arabi is present.

Sir, you're reminded you're still under oath to tell the truth.

Counsel?

***BY MS. BERNSTEIN:***

***Q.*** Good afternoon. I want to show you what's been marked as Defense Exhibit 2960.

***MS. THOMPSON:*** One second.

***BY MS. BERNSTEIN:***

***Q.*** And do you see that this is an email chain from -- to you -- from and to you?

***A.*** **Mm-hmm.**

***MS. BERNSTEIN:*** Any objection from the Government?

***MR. OLAH:*** No.

***MS. BERNSTEIN:*** We'd move to admit 2960.

***THE COURT:*** It may be admitted.

***(Exhibit 2960 admitted.)***

***MS. BERNSTEIN:*** Can you publish? Thank you.

***BY MS. BERNSTEIN:***

***Q.*** So the date of this email is May 22nd of 2015?

***A.*** **May 22nd, yeah.**

***MS. BERNSTEIN:*** Can we go to the next page, please?

***BY MS. BERNSTEIN:***

***Q.*** So you can see some of --

***A.*** **Is this part of the --**

***Q.*** It is. You can go back to the first page. I don't know if you have the ability to swipe and change pages. But in any event --

***THE COURT:*** I don't think so. I think you have to do it for him, but I'm not positive.

***BY MS. BERNSTEIN:***

***Q.*** So when you print email chains, sometimes the most recent one is on top and the original is on the bottom.

***A.*** **Right.**

***Q.*** So I'm going to ask to move to the second page of this so you can see the original email.

***A.*** **Yep.**

***Q.*** If you want to jump back to the first page so you can confirm that, in fact, you sent this original mail.

Do you see at the bottom?

***A.*** **Yes.**
***Q.*** So would you agree that it's from Jim Thompson and that is you?
***A.*** **Yes.**
***Q.*** Next page, please.
So this is on May 22nd of 2015. And the title of the email is -- excuse me. The subject of the email is "Another Hot Acquisition."
Do you see that?
***A.*** **Yes.**
***Q.*** What is a hot acquisition?
***A.*** **It just means we want to move quickly because we think there might be some other company pursuing it as well.**
***Q.*** And you say in the first line of this email, "I'd like to aggressively pursue the acquisition of Abreezio"?
***A.*** **Yes.**
***Q.*** Is hot acquisition an industry term or just a colloquialism?
***A.*** **Colloquial, yeah.**
***Q.*** And you wanted to aggressively pursue the hot acquisition of Abreezio because it "had a couple of technologies that are very interesting."
Do you see where it says that?
***A.*** **Yes.**
***Q.*** Okay. And the first point in this email is that DFT Technology -- "DFT Technology that could reduce test costs by

approximately 200 million per year, rough guess."

**A. Yes. And DFT is design for test.**

*Q.* And I want to be clear, the 200 million per year, rough guess, that's the approximate; correct?

**A. Yeah.**

*Q.* Okay. And that was an annual savings or a lifetime savings?

**A. That was the annual savings. It's slightly subtle here in that we're working on the same thing. This could be introduced earlier. Our view was this could solve that problem sooner. So in the time that we didn't have it, then this would be an incremental improvement of 200 million per year.**

**And then in the time that we would have it, you know, if we would have developed it ourselves, then it would be 0 savings. That's just the subtlety.**

*Q.* And that 200 million rough guess was for the DFT technology alone; correct?

**A. Yes.**

*Q.* And I think we established right before lunch that there were the two technologies Abreezio was bringing, DFT technology which was caused TruTest, and low-power technology which was called TruSens?

**A. Yes.**

*Q.* Okay. 200 million is more than Qualcomm paid for Abreezio; right?

**A. Yes.**

*Q.* Qualcomm paid 150 million?
**A. I thought it was 180, but I don't remember exactly.**
*Q.* The sale price was for 180. Correct?
**A. That's what I thought it was, yes.**
*Q.* And was that with a holdback provision, so Qualcomm did not actually pay some of that money?
**A. I don't know --**
*Q.* You don't know?
**A. -- about the details of that.**
*Q.* And you know Qualcomm got $47 million from Sheida Alan in a civil case about this dispute?
**A. I don't -- I'm not aware of that. I mean, I'm aware that there was a civil case but not any numbers.**
*Q.* But the 200 million estimated savings was simply for DFT and was more than the sale price?
**A. That was the estimate based on what we knew at the time. It didn't come out to be that, but that's what we estimated at the time.**
*Q.* You also thought that the sensor technology that Abreezio was offering was interesting?
**A. Yes.**
*Q.* Because it was going to enhance CPR, which was the Rapid Bridge technology; correct?
**A. Yeah. It fit in with that design approach very well.**
*Q.* Well, enhance is I think the word you use here; right?

"Sensor technology that could enhance our existing CPR technology."

***A.*** **Yes. It was really -- think of it as there's a sensor, and it was a better sensor, more accurate.**

***Q.*** And you thought it could be -- if you look to the second to last line, you thought it could be incorporated and exploited very quickly into Qualcomm's roadmap?

***A.*** **Right. That's because it fit so perfectly -- in both cases, the DFT and the sensor technology fit in perfectly with our design approach. And so it could be dropped in -- our belief was -- my belief at the time was that it could be introduced fairly easily. It wasn't a big disruption to anything.**

***Q.*** With a low execution risk?

***A.*** **Yes.**

***Q.*** And you understood that Intel and MTK were looking as well?

***A.*** **That's what I was told, yes.**

***Q.*** Did you have reason to disbelieve that?

***A.*** **No.**

***Q.*** And MTK is MediaTek?

***A.*** **MediaTek, yes.**

***Q.*** And those are some Qualcomm competitors?

***A.*** **Yes.**

***Q.*** And that's why you wanted to move fast on this one?

***A.*** **Yes.**

***Q.*** I want to show you what's been marked as Defense

Exhibit 2177, please.

And do you recognize this as a May 22, 2015, same date, email chain to and from you?

**A. Yes.**

***MS. BERNSTEIN:*** And can you please jump to the -- any objection to publishing?

***MR. OLAH:*** No.

***MS. BERNSTEIN:*** Move to admit 2177, please.

***MR. OLAH:*** No objection, your Honor.

***THE COURT:*** It may be admitted.

***(Exhibit 2177 admitted.)***

***MS. BERNSTEIN:*** Can you go back to the first page, please?

***BY MS. BERNSTEIN:***

***Q.*** So part of the reason you were excited about this hot acquisition is because you had seen a due diligence -- or excuse me -- you had seen an evaluation and a technical due diligence of Abreezio's technology.

**A. Yes. Ziad -- as I said before, Ziad was part of my staff, and he organized a due diligence -- you know, a technical evaluation of the technology.**

***Q.*** And you had reviewed that, and then you forward that to some other individuals in this exhibit that we're looking at?

**A. Yes.**

***Q.*** Is that right?

**A. Yes.**
*Q.* And the other people that you're sending this to -- Andy Oberst, he was the senior VP of strategy and corporate development at Qualcomm at the time?
**A. Yes.**
*Q.* And Cristiano Amon is the president and CEO of Qualcomm.
**A. Today is he. At the time I believe he was the president of Qualcomm, but I'm not -- I don't remember for sure. He might have actually been the head of QCT, president of QCT. I think that was it.**
*Q.* And QCT is Qualcomm Technologies?
**A. Yes. QCT is the semiconductor portion of Qualcomm, yeah.**
*Q.* And the next individual, was that another senior director at Qualcomm?
**A. Murthy Renduchintala, is that the name you're talking about?**
*Q.* Yes.
**A. Yes. I think at time he and Cristiano were co-presidents of QCT, the semiconductor group, I believe.**
*Q.* And Duane Nelles, I think you testified that he was in charge of the business side of this acquisition?
**A. Yeah, that's right.**
*Q.* So you're forwarding them the Abreezio technical evaluation PowerPoint.
***MS. BERNSTEIN:*** Can we go to the first page of that, please?

***BY MS. BERNSTEIN:***

***Q.*** This was the PowerPoint that you forwarded to them?

***A.*** **Yes.**

***MS. BERNSTEIN:*** Can you go back to the email, please?

***BY MS. BERNSTEIN:***

***Q.*** They're asking you for the information that Qualcomm has on the company so that they can get a biz model prepared; is that right?

***A.*** **Yes. The individuals that were forwarding the information to are -- other than Duane, they were not putting together a business analysis. They are the ones financially responsible for the division. And so, you know, we're putting-- getting them in the loop essentially.**

***Q.*** They're going to task someone else with doing the business model?

***A.*** **Yes.**

***Q.*** And biz model stands for business model; is that --

***A.*** **Business model would be Duane.**

***Q.*** And as you forward this, you say it's not as concise -- "Probably not as concise as needed, but the team can work on this next week." Correct, at the top of this?

***A.*** **Yeah, because it's a big long PowerPoint presentation that's got a lot of technical details that probably nobody on that "To" list, other than me, is going to understand.**

***Q.*** It's a 92-page PowerPoint?

**A. I don't remember, but it was a lot, yeah.**

***MS. BERNSTEIN:*** We will not go through all 92 pages. But can we please go to page 7 of this?

***BY MS. BERNSTEIN::***

***Q.*** And that is the DFT executive summary.

Do you see that slide?

***A.*** **Yes.**

***Q.*** Do you see the first bullet point where it talks about the DFT test quality, the cost -- "enables cost-effective DFT test quality"?

***A.*** **Yes.**

***Q.*** And it was going to provide Qualcomm with an annual savings of approximately 226 million in production test costs?

***A.*** **Yes.**

***Q.*** And that was just annual savings for one year?

***A.*** **Yes.**

***Q.*** And then at the bottom, the first bullet point in the darker blue, that the technology was straightforward to integrate.

***A.*** **Yes.**

***Q.*** And Qualcomm had a need for this technology; correct?

***A.*** **Yes.**

***MS. BERNSTEIN:*** Can we go to page 20, please?

***BY MS. BERNSTEIN:***

***Q.*** And here, as it's explained, that would have -- that Qualcomm had a strong need for innovation in DFT to improve test

quality for FinFET and multi-patterning technology due to delay defect surge.

Can you translate that for us?

*A.* **So with the newer -- okay. FinFET, it's a type of transistor. It was a brand-new type of transistor. So the faults that we would find in our production runs would be different than with previous types of transistors, the plainer transistors.**

**And there's a need to understand -- to detect these delay faults. Delay faults will result in a chip. If you run it too fast, you would have an error, a bit error or bit errors, and then -- just think of it as your computer would blue screen. Right? So you have to be able to characterize that very carefully, much more carefully than with previous production technologies.**

**And so that was something that we could do with existing approaches that we had, but they were pretty expensive and that was something we were concerned about. And so we were looking for ways of reducing the memory and then reducing the time that it would take to do the test and get the -- the appropriate test coverage.**

**So that's -- that's really what it -- that meant.**

*Q.* Okay. Thank you.

Was FinFET unique to Qualcomm?

*A.* **No.**

*Q.* FinFET is something that all semiconductor companies, most semiconductor companies, had at the time?
**A. Yeah. That's -- well, it was -- I shouldn't say that.**
**It was a new leading-edge -- what we call, process technology. So it's a semiconductor manufacturing technology that was new to the industry. And so the whole industry was kind of discovering, you know, what it meant to go into volume production with this technology.**
**And part of that was that we had these what are called delay faults that we needed to detect. And there were more of them than we had in the past.**
*Q.* But that problem was across the industry for anyone who was using FinFET at the time?
**A. It -- yeah. Yeah, I would say so.**
*Q.* And so the total opportunity to reduce test cost of around 226 million per year while increasing quality was a big benefit to Qualcomm at the time?
**A. Yes.**
*Q.* And you also wanted this hot acquisition because, in addition to that 226 million per year cost savings, the TruSens technology would have also benefited Qualcomm?
**A. That was our belief at the time, yes.**
***MS. BERNSTEIN:*** Can we go to page 49, please.
***BY MS. BERNSTEIN::***
*Q.* And I don't want to get too technical here, but in the

middle of this it's sort of discussing -- well, let me back up.
    This is the executive summary part of the deck about the TruSens technology; correct?
**A. Yes.**
*Q.* And this is essentially explaining the estimated power savings in the middle of the page?
**A. Yes.**
*Q.* I recognize that this is very technical. So if this 10,000-foot explanation is inaccurate, please correct me.
    But would you agree that the power savings that Qualcomm was estimating from Abreezio's TruSens technology would have -- was significant because it would have led to immense cost savings for Qualcomm?
**A. Say that again. I didn't quite follow.**
*Q.* No problem. That was poorly phrased.
    But would you agree that the significance of this is in the cost savings?
**A. It's both power and cost. But cost is -- we looked at that as -- when we talk about the business model that I mentioned, it really came down to cost savings. That's how we evaluated it.**
*Q.* And power savings is also significant to Qualcomm?
**A. It is, yes.**
*Q.* Because power savings is what allows the iPhone to last longer; is that right?
**A. Yes.**

*Q.* And so if my iPhone has a Qualcomm chip in it, and another iPhone -- or another type of phone does not have a Qualcomm chip in it, if Qualcomm has this power savings as compared between two equal devices, Qualcomm's will be superior; is that right?
***A.*** **Yeah. That's one of the measures that our customers use. It's features, performance, and power.**
*Q.* So ultimately, it's a cost savings and a profit margin benefit to Qualcomm.
***A.*** **Ultimately, yes. That's -- that's what we're looking at, yeah.**
*Q.* You never saw the provisional patent applications that Qualcomm and the Government now contend were created by Dr. Arabi.
***A.*** **No.**
*Q.* You wanted this hot acquisition for the interesting technologies that we just reviewed.
***A.*** **Yeah, for ultimately for cost savings is what I was looking at.**
*Q.* For the about 200 million, give or take, cost savings?
***A.*** **Roughly, yeah, that's what we were looking at.**
*Q.* For just one year for the DFT technology?
***A.*** **Yes.**
*Q.* And you knew that other companies were also evaluating Abreezio?
***A.*** **I wouldn't say I knew, but I was told by Ziad that there**

**were other -- you know, Intel and MediaTek, who were our competitors.**

*Q.* Intel is a large semiconductor company?

***A.* Yes.**

*Q.* And MediaTek touts itself as a global leader in semiconductor solutions?

***A.* I don't know what they -- I know a lot about MediaTek, but I don't know what they say about themselves.**

*Q.* What's on their homepage.

You're also aware that Mav was evaluating Abreezio? What is Mav? Were you aware that Mav was evaluating Abreezio?

***A.* Okay. So "Mav" is the code name for Apple. Apple asks us to refer to them as Mav rather than Apple, for whatever reason. And we were called "Eureka."**

*Q.* Okay.

***A.* Anyways.**

*Q.* So you knew that Apple was also evaluating Abreezio?

***A.* Again, honestly, I don't remember that.**

*Q.* Okay.

***A.* But I would have been told by Ziad.**

*Q.* Okay. You had wondered if Qualcomm could have just created this technology in-house to accomplish what Abreezio was offering?

***A.* Yeah. I mean, we could have. It's -- this was -- again, it's something that we could have done. But the way I looked at**

**this acquisition is they had it in hand and it was easy to integrate. So, therefore, we could -- we could get the savings sooner, so that 200-million-dollar, let's say, savings per year, we could get that maybe a year sooner.**

***Q.*** But if there's also an external company that has the technology that Qualcomm does not acquire, one of those competitors can acquire it; correct?

***A.* Sure, yeah.**

***Q.*** We talked about Esin.

Can you pronounce his last name again for us, please?

***A.* I'd have to look at it. "Terzioglu."**

***Q.*** I'm going to refer to him as "Esin."

***A.* Yes, please.**

***Q.*** You'll know who I'm speaking about.

You had actually asked Esin to be involved in the due diligence; correct?

***A.* Yes.**

***Q.*** And that was because you trusted his judgment?

***A.* Yes. And he -- it was odd, I thought it odd, that he wasn't in the beginning because we were looking at enhancing a technology. That was that CPR that we mentioned. We were looking at enhancing that technology with TruSens.**

**And so the fact -- he was working on enhancing it himself. So it seemed like he should be part of this when we're deciding is this going to be better than what he was already doing.**

*Q.* And he is a very good technical person?
**A. Yes, very smart guy.**
*Q.* And you had asked him whether the Abreezio low-power technology could do -- could improve or enhance the Rapid Bridge technology he was working with?
**A. Yeah. Ultimately, it was not how much better it was than -- was then our technology today, but it was -- Esin was working on something that would be available in a year. So how much better would it be than what he would complete within a year. Because that's really what you're competing against. TruSens was competing with his internal development.**
*Q.* I want to show you what's been marked as Defense Exhibit 3231.
You might recognize this as mostly what we just saw in your direct testimony with the Government. And we can go to the next page if that's helpful, too.
**A. Who wrote this one? You have to go back.**
***MS. BERNSTEIN:*** Can you go back to page 1, please?
***THE WITNESS:*** I guess Duane wrote it. Yes, go back.
***MS. BERNSTEIN:*** Any objection?
***MR. OLAH:*** No, just move in, and I'll say no objection.
***MS. BERNSTEIN:*** We move to admit 3231, please.
***THE COURT:*** Any objection?
***MR. OLAH:*** No, your Honor.
***THE COURT:*** It may be admitted.

***(Exhibit 3231 admitted.)***

***BY MS. BERNSTEIN:***

***Q.*** So what we're looking at here is the --

***MS. BERNSTEIN:*** Can you go back one page, please?

***BY MS. BERNSTEIN:***

***Q.*** -- the email from Duane --

***A.*** **Mm-hmm.**

***MS. BERNSTEIN:*** Next page, please.

***BY MS. BERNSTEIN:***

***Q.*** -- to the individuals Mr. Somwal, Mr. Khan, and Mr. Mansour, copying you that Mr. Olah reviewed with you on your direct testimony?

***A.*** **Yes.**

***MS. BERNSTEIN:*** Can you go back, please, to the first page?

***BY MS. BERNSTEIN:***

***Q.*** And he asked you some questions about what it meant when Ziad said "Duane, Esin, Farsheed, and I are planning to go up there. I think that gives us good coverage on engineering side."

***A.*** **Yes.**

***Q.*** And he'd also reviewed with you that it -- Ziad had also said "This meeting is all about the business side. We have already done as much as we can on the technical side."

***A.*** **Yes.**

***Q.*** So this was as of June 21 of 2015.
And Esin had completely evaluated the technology to your mind at that point?
***A.*** **I would say no. So I think that statement is a little odd.**
***Q.*** But you'd put -- sorry. Go ahead.
***A.*** **I'm just saying that statement is probably not correct, that engineering did as much as they could.**
***Q.*** You had put Esin in the mix.
You had chosen Esin to be in the mix of this evaluation by June of 2015?
***A.*** **Yes. I -- okay. So maybe back up.**
**I'm only inferring that because I see him on the email. In the beginning he wasn't, and so then I said, hey, can he be -- I want him involved. So I assume at this point he was involved.**
***Q.*** Okay. And Duane emails you after Ziad and asks you if you're looking to have any additional eyes on this from engineering, or are you okay with the group from engineering that has seen this so far.
***A.*** **Yeah.**
***Q.*** And you say I'll have to get back to you?
***A.*** **Yes.**
***Q.*** Did you get back to him?
***A.*** **I assume so, but I -- I assume what I would have done is talked to Ziad and say do you -- do you think you have the right team involved. And then I'm sure I just talked to Duane.**

**Rather than emailing him, I just saw him in the hall and talked to him.**

***Q.*** Okay. And so Esin was an important part of this team, from your perspective, for you to trust what they were telling you?

***A.*** **Yes.**

***MS. BERNSTEIN:*** And can we please go back to 2679.

***BY MS. BERNSTEIN:***

***Q.*** And so this is the email that Mr. Olah reviewed with you from October of 2015.

***MS. BERNSTEIN:*** I'm sorry, we'll figure out how to get a better view of this so you can read what it says here.

***BY MS. BERNSTEIN:***

***Q.*** We're going to have some technical difficulties removing this sticker, but do you remember this from when Mr. Olah showed it to you?

***A.*** **Yes, I remember this.**

***Q.*** So you had asked Esin whether Qualcomm could do -- you had asked Esin whether Qualcomm could be reaching these power savings, these die level savings; correct?

***A.*** **Yes.**

***Q.*** Can you explain to us before I launch into more questions the difference between voltage savings and die level savings?

***A.*** **Voltage is really power, and then -- that's power savings. And then die area is dollar savings. And they're somewhat interchangeable. You can get less voltage savings and then more**

**die savings. So there's some relationship between them.**

**One thing you'll notice, though, is that the 5 percent voltage savings is a lot different than what was originally presented in the -- the technical evaluation. It's a lot lower.**

***Q.*** So as of October of 2015 --

***A.*** **Yeah, yeah.**

***Q.*** -- weeks before the deal closes, there was, to your mind, more accurate numbers?

***A.*** **Well, they were much lower. And that's why in the email below I was saying, hey, I'm a little concerned. Because we keep evaluate -- looking -- the longer we look at this, the less savings we're actually getting.**

***Q.*** Because Qualcomm had actually done this evaluation over and over and over again with lots of teams?

***A.*** **I wouldn't say over and over again. We're getting deeper into the technology and -- and how it actually would be implemented.**

***Q.*** And there was something called on site demonstrations that was done by Abreezio as well?

***A.*** **I don't remember that, but that's typical of what we do.**

***Q.*** Where they are showing their product on your platform so that you can see how it would run, essentially?

***A.*** **It's not a product by the way, it's a technology. But yes, they demonstrate it.**

***Q.*** And as we discussed on direct testimony, I think Esin

eventually says here "I believe is this a good technology for sensors for DFT and we should acquire."
***A.*** **Yes.**
***Q.*** When they're talking about the 2 to 3 percent is what was used in the evaluation, that means that the numbers as of October 21st of 2015 were based on that 2 to 3 percent assumption; correct?
***A.*** **For the CPR side of it, yes. That's -- that's specifically referring to CPR.**
***Q.*** For the power savings side.
***A.*** **Power and die side savings.**
***Q.*** This is the TruSens technology. This is separate from --
***A.*** **Yes, that was referring to the TruSens technology, yes. Sorry.**
***Q.*** So these estimations are separate and apart from the 226 million annual savings on the DFT side?
***A.*** **Yes.**
***Q.*** And the 2 to 3 percent assumption was conservative, correct?
***A.*** **That's what Ziad said, yes. It's in the email. He said it's conservative.**
***Q.*** Well, Qualcomm had the CPR technology.
***A.*** **Yeah.**
***Q.*** And then Qualcomm had improved CPR.
***A.*** **Right.**
***Q.*** And improved-improved CPR.

**A. Okay. So what all that means is that there's a plan to continually -- continual improvement of our technology. And that was already part of Esin's plan. And then the question was, is could this TruSens technology from Abreezio be brought in and make it even better. That -- that was the question. And then the 2 percent is really about is it better than what we have already in the plan in the future.**

Q. The 2 percent is -- is it better than the improved-improved where you think CPR is going?

**A. I don't know what improved-improved means. But in the future, it all -- exactly what it means. But essentially he is just talking about we have a plan in the future, and we are continuing to improve. And where he thinks that this is going to intersect, he thinks it might be 2 percent better. That's -- I think that's what it's saying.**

Q. And if it didn't improve-improve, and it just improved once, he thought that they should easily get 3 to 4 percent savings.

**A. Are you talking about Ziad?**

Q. Correct?

**A. Yeah. Ziad is saying that he thinks that we're going to get 3 or 4 percent, that's right. And so he is kind of saying Esin, you're lowballing this. And he is Esin's boss, essentially. And so he is telling Esin, no, I think it's not 2 percent or 2 or 3 percent; it's 3 or 4 percent.**

Q. But the evaluation was done based on the more conservative

2 or 3 percent --
**A. That's what Ziad said. I don't recall that actually, but that's what's in the email, yeah.**
*Q.* And Esin, in fact, also kept you in the loop about Abreezio?
**A. He did.**
*Q.* He didn't --
**A. I would ask him directly questions, because I was trying to make sure that he wasn't being influenced, say.**
*Q.* And even after the acquisition of Abreezio, he kept you in the loop about its implementation?
**A. Yeah. Yeah.**
*Q.* And --
***MS. BERNSTEIN:*** You can take this down.
***BY MS. BERNSTEIN:***
*Q.* Do you recall that in 2016 he told you it was fully deployed across one of the chips?
**A. I don't recall that, but it certainly could be. I don't recall.**
***MS. BERNSTEIN:*** Can we put up Exhibit 3229, please.
***BY MS. BERNSTEIN:***
*Q.* Okay. Does that remind you that as of 2016 he advised you that it was deployed across chips?
**A. This looks like DFT is deployed.**
*Q.* Okay. So a different part of the technology had been deployed?

**A. Yes. And that was the one that was more straightforward, yeah.**

*Q.* And this was in as of January 30th of 2015?

**A. Let's see. What's the date? Yes, January 2016.**

*Q.* I'm sorry, 2016.

***THE COURT:*** Did you want to move it into evidence?

***MS. BERNSTEIN:*** Yeah. Any objection?

***MR. PILCHAK:*** Your Honor, there's a pretrial ruling about the post-acquisition value, and I think this is getting right up against that line, if not crossing it. It would be a relevance objection.

***THE COURT:*** I'll allow it.

***MS. BERNSTEIN:*** Move to admit 3229.

***THE COURT:*** That's what I just said I would admit.

***MS. BERNSTEIN:*** I'm sorry.

***(Exhibit 3229 admitted.)***

***BY MS. BERNSTEIN:***

*Q.* If we could do the questions again because the jury didn't have the benefit of having this in front of them.

Can you explain what this is saying about the deployment of DFT Abreezio technology in January of 2016?

**A. It's the -- it's saying the current view is that we should target complete deployment of the DFT technology for all Naz -- or Napali blocks. And that's one of the chips we were working on. So from a DFT perspective, it was -- it was being deployed**

**pretty broadly.**
*Q.* And this is three months after the acquisition of Abreezio?
***A.*** **Yes.**
*Q.* Okay. I want to go back to the acquisition of Abreezio and the due diligence process there.
***MS. BERNSTEIN:*** Can you please bring up Exhibit 598. Any objection from the Government?
***MR. OLAH:*** Is it just the one page?
***(Counsel confer.)***
***MS. BERNSTEIN:*** Move to admit 598.
***THE COURT:*** Any objection?
***MR. OLAH:*** No, your Honor.
***THE COURT:*** 598 may be admitted.
***(Exhibit 598 admitted.)***
***BY MS. BERNSTEIN:***
*Q.* And I apologize for the way these are coming across. When you print the emails, it kind of disjoints it. So if we could just jump to the second page. So you can see it appears to be coming from Duane. And then go back to the first page.
When you're ready, Mr. Thompson.
***A.*** **So read the -- it's a little odd. I'm reading the last paragraph.**
***MS. THOMPSON:*** I will go back.
***THE WITNESS:*** So you want me to read the bottom one from Duane?

***BY MS. BERNSTEIN:***

***Q.*** Yeah. I have a question -- my question about that is: Is this Duane giving an update about the status and the negotiations of Windansea?

***A.*** **Yes. That -- I remember this email, yeah.**

***Q.*** And Windansea you testified was the internal code name for the Abreezio acquisition?

***A.*** **Yes.**

***Q.*** And then the second email in this chain is a further update?

***A.*** **Yes.**

***Q.*** And this is where Duane is advising that Qualcomm -- the belief at Abreezio was that Qualcomm had been slow on the opportunity because it had taken over three months.

Do you see that?

***A.*** **Yeah, yep.**

***Q.*** And that they had advised Duane, who was relaying that there were offers above 300 million?

***A.*** **Yes.**

***Q.*** And so Duane thought in his -- that 200 million could work to sort of close this deal.

***A.*** **Yes.**

***Q.*** And he is asking you and others "Do we have your support to see if we can close a deal at 200 million?"

***A.*** **Yes.**

***Q.*** And you say "I support 200 million."

***A.*** **Yes.**

***Q.*** Okay. And then in October -- I'm sorry.

***MS. BERNSTEIN:*** Could we put that back up again?

***BY MS. BERNSTEIN:***

***Q.*** And that was August 27th of 2015?

***A.*** **Yes.**

***Q.*** Okay. But the deal closes in October of 2015, correct?

***A.*** **I don't remember exactly when it closed. But that sounds right.**

***Q.*** Okay.

***MS. BERNSTEIN:*** Can we please put up 2750.

Move to admit 2750.

***THE COURT:*** Any objection?

***MR. OLAH:*** No, your Honor.

***THE COURT:*** It may be admitted.

***(Exhibit 2750 admitted.)***

***BY MS. BERNSTEIN:***

***Q.*** So is this an email from October 28th of 2015 where you're being asked to approve, sign, and close the hot acquisition that you'd acquired -- that you'd identified?

***A.*** **Yeah. This is to close on the Abreezio acquisition, yes.**

***Q.*** And this is being sent from Duane to a number of people, correct?

***A.*** **Yes.**

***Q.*** Paul Jacobs, what was his role?

**A. At the time, he was CEO.**

*Q.* Steve Mollenkopf?

**A. Yeah. He was the next CEO. There was a transition there, so I don't exactly remember what he was. He might have been president of the company at that time. I'm not a hundred percent sure. Just because of the timing, yeah.**

*Q.* Sanjay Mehta?

**A. He was the financial -- the lead financial person for the semiconductor group.**

*Q.* And I think you testified that Murthy was co-president of QCT?

**A. Yes.**

*Q.* Cristiano was co-president of QCT, now CEO of Qualcomm?

**A. Yes.**

*Q.* What about Derek Aberle?

**A. This is where it gets confusing. He was president of the company at one time, but I don't know what his role was then. I think he might have been head of -- head of our licensing group at time. But I'm not a hundred percent sure because there's -- there's all these people. I remember what they did, but exactly at this date, I don't remember.**

*Q.* Is it fair so say this email from Duane was sent to Qualcomm's C-suite of executives?

**A. Yeah.**

*Q.* And you were also asked for your approval, or you're copied

on this; correct?
***A.*** **Yes.**
***Q.*** This is summarizing the final numbers as of October 2015?
***A.*** **Yes. Duane is trying to summarize the -- you know, why it is we would buy this company. So it's a -- mostly about the financial model, but some details on the technology, why.**
***Q.*** And he says "No major issues were identified during due diligence that would cause us concern, nor alter our deal thesis."
Do you see that?
***A.*** **Yes.**
***Q.*** "There is no change to the valuation deal model shared either -- earlier."
***A.*** **That's right.**
***MS. BERNSTEIN:*** Can you go to the next page?
***BY MS. BERNSTEIN:***
***Q.*** And so the recap of the value to Qualcomm is that it was estimated to be between 266 million and 358 million?
***A.*** **Yes.**
***Q.*** And the purchase price was 180-million stock acquisition?
***A.*** **Oh, you just highlighted something that was confusing something else. Something got highlighted.**
***Q.*** Yeah, we'll re-highlight that.
***MS. THOMPSON:*** I'm sorry.
///

***BY MS. BERNSTEIN:***
***Q.*** This was the value to Qualcomm, was 266 million to 358 million?
***A.*** **Yes.**
***Q.*** And the purchase price was $180 million stock acquisition?
***A.*** **Yes.**
***Q.*** Which after -- the net after tax cost -- after tax cash cost was 155 million to Qualcomm?
***A.*** **Yes. That's what that line says, yes.**
***Q.*** This deal was for Abreezio's TruSens technology?
***A.*** **TruSens and TruTest.**
***Q.*** And its key employees?
***A.*** **Yes.**
***Q.*** And do you remember who those key employees were?
***A.*** **I don't.**
***Q.*** Do you recall --
***MS. BERNSTEIN:*** Thank you.
***BY MS. BERNSTEIN:***
***Q.*** Do you recall a July 2015 PowerPoint presentation about the Windansea acquisition?
***A.*** **July -- you'd have to show it to me.**
***MS. BERNSTEIN:*** Can we put up 3001?
***THE WITNESS:*** I have to look at the content. This doesn't ring a bell. But I'm sure I -- you know, very likely I saw this.

***MS. BERNSTEIN:*** Move to admit 3001.

***MR. OLAH:*** No objection, your Honor.

***THE COURT:*** It may be admitted.

***(Exhibit 3001 admitted.)***

***MS. BERNSTEIN:*** Can we go to page 3 of this, please.

***BY MS. BERNSTEIN:***

***Q.*** So this was July of 2015.

And as of July of 2015, this was about the second round of evaluation of Abreezio?

***A.*** **Yeah, that's about right, yes.**

***Q.*** And there was a sense in Qualcomm at time that the TruSens and TruTest technologies would improve and enable cost savings?

***A.*** **Yes.**

***Q.*** And that it could be integrated in less than six months?

***A.*** **Yes.**

***Q.*** There's some of the numbers we've seen, other exhibits, about the estimated 2 to 3 percent die area savings?

***A.*** **Yes, 2 to 3 percent.**

**By the way, the -- it says the integration would be 6 to 12 months, not 6 months --**

***Q.*** I'm sorry. Thank you.

***A.*** **-- just for clarification.**

***MS. BERNSTEIN:*** Can we go to page 4, please?

***BY MS. BERNSTEIN:***

***Q.*** So it says "The company had signed a DA to merge with

Invionics, which allowed the team to join Abreezio."

What does that mean, if you know?

**A. A DA? Definitive agreement. Okay. I don't know what Invionics is. I don't recall what that is, "to allow the team to join Abreezio." I don't remember that.**

***Q.*** Okay. So do you recall how many employees came over when Qualcomm acquired Abreezio?

**A. Not exactly, but it was 15, some relatively small number of employees, if I remember right.**

***Q.*** Okay. And that was the core team that was needed to deploy it across Qualcomm's products?

**A. Yes.**

***MS. BERNSTEIN:*** You can take this down. Thank you.

***BY MS. BERNSTEIN:***

***Q.*** I want to go back to some testimony you had earlier about the individuals that were involved in the due diligence. And I think I recall that you had said that Michael Campbell's team was in charge of product test. Is that right?

**A. Yes.**

***Q.*** Do you recall the specific individuals on his team?

**A. Just Saad. He was the lead, and he was somebody that I knew. And there were people from his team that were involved in looking at the TruTest side of it.**

***Q.*** Pranjal Shrivastava?

**A. I'm not going to remember the names.**

*Q.* You're not going to remember --

***A.* I knew Saad reasonably well, so he is the person that did most of the talking.**

*Q.* Do you remember Mike Ellison from the test department?

***A.* I know Mike, yeah, Michael Ellison.**

*Q.* Do you remember Glenn Kim from the test department?

***A.* Yes.**

*Q.* Kaveh Kohani from the test department?

***A.* Yes.**

*Q.* Sergio Myer from the test department?

***A.* I don't recall that name.**

*Q.* Michael Messerli from the test department?

***A.* I recognize the name, but I can't put a face to it.**

*Q.* Sajjad Pagarkar from the test department, does that sounds familiar, even if I mispronounced it?

***A.* No, it doesn't.**

*Q.* And those were all individuals that were also working on the due diligence -- on the technical evaluation due diligence of Abreezio?

***A.* Like I said, for me it was -- Saad was the primary on this from what I remember. And so I didn't spend time with -- a number of people you mentioned I know reasonably well, but they were not presenting to me.**

*Q.* Okay. But they were not on Ziad's team; correct?

***A.* Those were -- those people were on Mike Campbell's team,**

**yeah.**

***Q.*** I want to talk about Akbar Shokouhi for a moment.

***A.*** **Okay.**

***Q.*** When Mr. Olah questioned you, you indicated that you had fired him; correct?

***A.*** **Yes.**

***Q.*** And what year was that?

***A.*** **I don't recall. It would have been probably '13, 2013, I'm guessing. Maybe '14. I'm not sure.**

***Q.*** And when you fired him, was that in person?

***A.*** **Yes, it was. Yeah.**

***Q.*** Was HR there?

***A.*** **Yes.**

***Q.*** And did you send an email recapping this?

***A.*** **I doubt it. I don't recall, but it's something that HR was there, and -- and they would have taken it from there and then I would have had nothing to do with it after that.**

***Q.*** Would they have documented it?

***A.*** **HR would have, yeah, sure.**

***Q.*** Okay. In November of 2016, you learned that one of your employees, Kevork Kechichian, was being investigated. Is that right?

***A.*** **I know he was investigated at one point for something, but I don't recall when. But...**

***Q.*** He was being investigated for inappropriate conduct with

women who worked at Qualcomm?

***A.*** **Yeah, and it didn't go anywhere. It was -- yeah.**

***Q.*** He'd had affairs with women at Qualcomm?

***MR. OLAH:*** I'm going to object on relevance, your Honor.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** While he was under this investigation is when he first relayed allegations that there was something about the Abreezio transaction?

***A.*** **I'm not aware of the timing of those two things.**

***Q.*** You're aware that HR opened an investigation into the Abreezio transaction?

***A.*** **Yes.**

***Q.*** And that that investigation went on until at least the summer of 2017?

***A.*** **I -- I don't know the timeline. But that sounds reasonable.**

***Q.*** You're aware that the civil suit that Qualcomm brought against Karim and his sister and another individual, Sanjiv Taneja, was in October of 2017?

***A.*** **I don't -- again, I don't remember the specific dates, but I do remember that it did occur, yeah.**

***Q.*** Do you remember that Mr. Taneja settled that lawsuit with Qualcomm?

***A.*** **I -- I don't know the details of any of the settlements. I**

**was not involved in the civil litigation.**

***Q.*** Okay. You know that Qualcomm made criminal referrals after the civil litigation to the U.S. Attorney's Office?

***A.*** **I just presumed they did because we -- because we're here. Yeah.**

***Q.*** You don't know how many referrals or how many times they tried to send it to the U.S. Attorney's Office?

***A.*** **No.**

***Q.*** Qualcomm still has this technology that it acquired from the Abreezio deal?

***A.*** **I believe the DFT technology, TruTest, was used to enhance, you know, the test methodology. I believe the TruSens technology was kind of a bust, didn't -- it didn't work out.**

***MS. BERNSTEIN:*** Thank you. Can I just have one moment?

***THE COURT:*** Sure.

***(Pause.)***

***MS. BERNSTEIN:*** No further questions. Thank you, Mr. Thompson.

***THE COURT:*** Anything further?

***MR. OLAH:*** Brief redirect, Your Honor?

***THE COURT:*** Sure.

***MR. OLAH:*** Thank you.

If we could pull up Defense Exhibit 2177. And all the exhibits I intend to reference were admitted on cross-examination.

***THE COURT:*** Thank you.

***MR. OLAH:*** If we could go to page 22, please, calling out that last bullet point and the three subpoints underneath it.

***REDIRECT EXAMINATION***

***BY MR. OLAH:***

***Q.*** Mr. Thompson, do you recall being shown this exhibit on cross-examination? Perhaps I should have shown you page 1.

***A.*** **You showed me page 1. This is one of the PowerPoints that -- or this is a PDF. Yeah.**

***Q.*** And is it a correct understanding that this is an email and then an attachment to that email?

***A.*** **Yes.**

***Q.*** Okay. And the attachment is something that Qualcomm created based on its, I guess, preliminary review of Abreezio?

***A.*** **Yeah. The date on this is May 22nd, so this would have been fairly early on. Yeah.**

***MR. OLAH:*** Could we now go to page 22 of this exhibit, calling out that third bullet point and the subpoints?

***BY MR. OLAH:***

***Q.*** Mr. Thompson, if you could take a minute to read these, I'd appreciate it.

***A.*** **Okay.**

***Q.*** Mr. Thompson, what are IPs as used in this slide? What does

IP refer to generally?

***A.*** **IP is intellectual property. It's typically what we refer to as a piece of technology or a collection of technologies.**

***Q.*** And what does that first sub-bullet point mean, "Working around their technology, even in possible" -- I'm assuming that should be if -- "would most probably collide with some of their IPs."

What does that mean?

***A.*** **It's just saying that they have a good patent.**

***Q.*** "They" in this case being?

***A.*** **Abreezio.**

***Q.*** Okay. Was there an understanding at Qualcomm that Abreezio owned the IP it was trying to sell to Qualcomm?

***A.*** **Yes. That was my understanding at least.**

***Q.*** Was there any thought that perhaps Qualcomm owned this IP?

***A.*** **So from my perspective, it was something that -- I just thought of it in terms of did it fit in with what we were doing. And it did, it fit in almost perfectly. And -- and so that's why we could introduce it -- we thought at the time we could introduce it fairly quickly. I didn't get involved in patents or reviewing patents, so I can't comment on that.**

***MR. OLAH:*** Okay. We can take that down for a moment.

***BY MR. OLAH:***

***Q.*** On cross, you were asked about an email that referenced Intel and MediaTek.

Do you recall that email?
*A.* **Yes.**
*Q.* And I believe the statement you made was that you were told that Abreezio was in talks or in communication with those two companies; is that right?
*A.* **That's right.**
*Q.* Who told you that?
*A.* **Ziad.**
*Q.* And "Ziad" being Ziad Mansour?
*A.* **Yes.**
*Q.* Who I believe you testified was kind of advocating for Abreezio throughout the transition period or the acquisition period; is that right?
*A.* **That's right.**
*Q.* You were asked -- you testified to the fit, that Abreezio had technology that would fit at Qualcomm; is that right?
*A.* **Yes.**
*Q.* Is that fit -- I'm just trying to pair that with something else you said, and let me do that in a moment.
You said Qualcomm would benefit from this acquisition faster than its competitors; is that right?
*A.* **Yes.**
*Q.* Why would they benefit -- why would Qualcomm benefit faster than, say, Intel or MediaTek?
*A.* **Because it was -- it was tailored really to fit with our**

**both test methodology and the CPR that -- we've talked about that technology for reducing voltage and making the chip a little smaller.**

*Q.* The "it" in that sentence refers to Abreezio's technology?

***A.*** **Abreezio's technology was tailor-fit for our, you know, both test and design approach.**

*Q.* You were asked on cross about whether you knew Rapid Bridge to be acquired by Qualcomm?

***A.*** **Yes.**

*Q.* And I believe you testified that the 320-million price range sounded about right for that acquisition?

***A.*** **Yeah, yes.**

*Q.* Do you know how many employees Qualcomm got from Rapid Bridge when it acquired Rapid Bridge for $320 million?

***A.*** **I don't, but it would have -- because they had a contract team, you know, we employed contractors from them, quite a few. I would guess it would be in the hundred range. But I -- I don't -- I don't really recall.**

*Q.* That's fair. And I appreciate you identifying the limits of your knowledge here.

***A.*** **Yeah.**

*Q.* If we could -- well, I should ask, when acquiring Abreezio, did Qualcomm get some employees as well?

***A.*** **Yes.**

*Q.* Do you know off the top of your head how many employees from

Abreezio that Qualcomm acquired?

**A. I think I -- in cross-examination, I said roughly 15.**

***Q.*** Okay.

***MR. OLAH:*** If we could show Defense Exhibit -- that's been admitted -- Number 2750.

***BY MR. OLAH:***

***Q.*** Mr. Thompson, can you see the call out on your screen from page 1 of Exhibit 2750?

**A. Yes.**

***Q.*** It says "Target Overview, Abreezio, LLC."

Do you see that?

**A. Yes.**

***Q.*** That first bullet point indicates Abreezio was formed in February of 2015. Is that right?

**A. Yes.**

***Q.*** The second bullet point indicates how many employees Abreezio has?

**A. Yes.**

***Q.*** How many?

**A. Eleven employees plus four temps. So 11 regular full-time employees plus -- so 15. So I was pretty close.**

***Q.*** Got it.

***MR. OLAH:*** We can take that call out down but leave the exhibit up.

///

***BY MR. OLAH:***

***Q.*** Mr. Thompson, as you sit here today, earlier you testified to the three types or categories of acquisitions that Qualcomm might go through; is that right?

***A.*** **Yes.**

***Q.*** As you sit here today, did Qualcomm acquire Abreezio for its employees or for its technology?

***A.*** **Well, really it was -- it was an acceleration of our technologies, things that we could do but we believed that we could do it quicker with Abreezio. And we needed those employees, you know, from Abreezio to -- to come with the acquisition so that they could implement what they had done in our products.**

***Q.*** As in you have this technology that appears to fit; right?

***A.*** **Yes.**

***Q.*** And you need some employees to, in fact, make it fit?

***A.*** **Yeah, work with our existing employees to -- to get it integrated into our products going forward from there.**

***Q.*** Returning to Exhibit 2750, I want to call out the same sentence that Ms. Bernstein did.

Do you recall being shown this sentence or two -- it's two sentences -- on cross-examination?

***A.*** **Yes.**

***Q.*** "No major issues were identified during diligence that would cause us concern nor alter our deal thesis." Is that right?

**A. That's right.**

*Q.* You were also asked later in your cross-examination if Qualcomm investigated this acquisition after the fact.

**A. Yes.**

*Q.* Did Qualcomm have any reason to suspect Dr. Arabi was involved in Abreezio when it was sending this email that no major issues were identified during diligence?

**A. We did not.**

*Q.* When -- when -- well, was it after the acquisition Qualcomm learned that Dr. Arabi was, in fact, involved with Abreezio?

**A. Just as a rough guess, me, I learned that maybe a year later. Kind of -- or maybe -- maybe more, maybe a year and a half later, something like that. I'm not a hundred percent sure, though. But it's not right after.**

*Q.* Using the language from the exhibit that's on the screen, "major issues," if Qualcomm had learned that Dr. Arabi was involved in Abreezio prior to acquisition, would that be considered a major issue?

**A. That would have been a very major issue.**

*Q.* For the reason you described earlier on direct exam?

**A. Yes.**

*Q.* Which is that Qualcomm may have actually owned the property that Abreezio was selling to it?

**A. That's right.**

*Q.* I want to ask you briefly about Endura.

Do you remember being asked about Endura on cross-examination?
**A. Yes.**
*Q.* I believe you testified that the price tag for Endura when it came in the door was $700 million. Is that right?
**A. 700 million, yes.**
*Q.* But Qualcomm did not acquire Endura for $700 million?
**A. That's right.**
*Q.* I believe you testified that you had someone look at Endura's technology?
**A. Yeah. I -- I was skeptical of what I was being presented. And I asked, I would say repeatedly, to have another team be brought in, very specific people be brought in to do an independent evaluation of Endura and it didn't happen. And finally I did it myself.**
**I went with -- I went over to those teams, and I said, "I want you involved. I want you to do this analysis. I'm concerned about this. Can you provide me your technical view of this" --**
*Q.* And --
**A. -- "and Endura"**
*Q.* And the teams that you went to, to vet Endura, were those teams that reported to Ziad?
**A. No.**
*Q.* And those teams came back and said -- they gave you an

honest assessment of the technology?
**A. Yes.**
*Q.* And based on that, Qualcomm did not acquire Endura?
**A. That's right.**
*Q.* Let's talk about the Abreezio vetting, if you will.
I believe you identified Farsheed as being an engineer who looked at Abreezio's technology?
**A. Yes.**
*Q.* Who did he report to?
**A. He was in Ziad's group. I'm not a hundred percent sure who he reported to. I don't believe he reported to Ziad but he was in his group.**
*Q.* There would be a wrung on the ladder. There could be someone in between Farsheed and Mr. Mansour on top?
**A. Yeah, I believe so. I don't know who, though.**
*Q.* And this isn't a test on your memory of the org chart ten years ago.
**A. Yeah.**
*Q.* So your understanding was Farsheed was underneath Ziad on the org chart?
**A. Yes.**
*Q.* What about Mohamed Allam?
**A. You know what, I don't -- I just -- I can't picture his face, so I'm having trouble.**
*Q.* That's fine.

***A.*** **Yeah.**
***Q.*** You've been asked a few questions about Esin; right?
***A.*** **Yes.**
***Q.*** And Esin was certainly involved in the technical diligence of Abreezio. Is that right?
***A.*** **That's right.**
***Q.*** And it was at your request that he look at the technology?
***A.*** **Yes.**
***Q.*** You testified on cross that -- I believe you testified on cross-examination that Ziad was Esin's boss?
***A.*** **Yes.**
***Q.*** You also testified on cross-examination that Saad Elhosni was not on Ziad's team. Do I have that right?
***A.*** **Yeah. He was on Mike Campbell's team, yeah.**
***Q.*** Is Saad Elhosni related to Ziad Mansour?
***A.*** **I don't know.**
***Q.*** You were asked a few questions about your income on cross-examination, right?
***A.*** **Yes.**
***Q.*** Do you know what Dr. Arabi's salary was in 2015?
***A.*** **I don't.**
***Q.*** Do you have a ballpark of what a VP of -- in Corporate R&D would be getting in 2015?
And if you don't even have a ballpark, just say so.
***A.*** **No, I probably have a ballpark. If you include, you know,**

**salary, stock, bonus, all that kind of stuff, it's probably in the high hundreds.**

*Q.* What does that mean? 190- or you're saying --

***A.*** **No, I'm sorry. Something short of a million dollars, but, you know, in that range.**

*Q.* As in 800- to 900,000?

***A.*** **Yeah, could be.**

*Q.* That would be the approximate salary, the ballpark salary, that he got for being a VP in Corporate R&D.; is that right?

***A.*** **That would just be a guess, but it's probably not too far off.**

*Q.* Great.

And what is Corporate R&D's function within Qualcomm?

***A.*** **It's to develop technologies for the future, things that -- to try to anticipate the needs of the product teams and also develop IP to license to other companies.**

***MR. OLAH:*** Nothing further, your Honor. Thank you.

***THE COURT:*** May this witness be excused?

***MS. BERNSTEIN:*** Very briefly.

***RECROSS-EXAMINATION***

***BY MS. BERNSTEIN:***

*Q.* I'll be short. I think you just said that Abreezio's technology was tailored to Qualcomm? Is that what you said?

***A.*** **That was the appearance, is that -- what I mean by that is**

**it fit in very well with our -- both our test methodology and the CPR technology that we've talked about.**

***Q.*** Didn't we talk this afternoon about how the technology was extremely beneficial to anyone running FinFET?

***A.*** **Again, it's -- it has to fit into how you do things within your company. And it -- and that's what -- that's what I'm describing, is that even though it was solving a problem associated with FinFET going from plainer transistors to FinFET transistors, it fit directly so you could just, for lack of another way to describe it, just plug it into our existing approach. And it works.**

**And everybody -- everybody in the industry does it differently. So -- so it's not like you could go to any other company and know that it's going to plug in. That's my point.**

***Q.*** So you don't know how Abreezio plugged into Apple?

***A.*** **No.**

***Q.*** Or Intel?

***A.*** **No.**

***Q.*** Or MediaTek?

***A.*** **No.**

***Q.*** Okay. You also said that you did not get involved with reviewing the patents that Abreezio had when Mr. Olah questioned you about Abreezio's IP?

***A.*** **That's right.**

***Q.*** Because there was an entire team at Qualcomm that would

review patents during acquisitions.

**A. We have a -- as part of our legal team, we have people that review patents. And that's part of their job.**

*Q.* Attorneys, technical folk who badger people with questions; right?

**A. Generally speaking, technical people that got a legal degree after that.**

*Q.* That's part of the typical analysis when you're acquiring a company?

**A. Yeah, understanding the strength of the patents, the -- you know, how well were they written and how much did they cover.**

*Q.* Someone from Qualcomm will sit down with someone from the company to go over the claims and the strength and the writings that you're describing?

**A. You know, I've never been involved in that. But my guess is they would sit down with people from our company, Qualcomm, and understand the strength -- to try to understand the strength of the patent.**

*Q.* And there's patent applications as well as granted patents, correct?

**A. Yes.**

*Q.* At the time of the Abreezio acquisition, there were no granted patents. They were all pending applications?

**A. I'm not aware of the state of any of the patents.**

*Q.* But it's particularly important to analyze the patents of an

acquiring company when someone from the acquiring company is affiliated with a university; correct?
**A. If it was developed at the university. Okay. So I don't really know a lot about patent law, or almost nothing about it.**
*Q.* That makes two of us.
**A. I'm making sure if there was somebody else in developing the technology, that's something that our legal team would want to know. Because if somebody else has rights to those patents, then we don't necessarily get it all. That's -- that's the extent of my knowledge.**
*Q.* And that's particularly important when one of the inventors is affiliated with a university where a university might come back and claim some of the IP?
**A. Like I said, if anybody has claim to some amount of that -- the patent, we have to understand that. The legal team, that's one of the things that they do, is they try to understand does the company own it entirely or not.**
*Q.* And there was no analysis of Abreezio's patents as part of this acquisition?
**A. I -- like I said, it's the legal team that does this. I'm not involved in that at all.**
*Q.* And you never saw any?
**A. No.**
*Q.* And when Mr. Olah just asked you if the Government's and Qualcomm's theory that Karim created these provisional patent

applications would have been a major change, I want to clarify would that have changed the promise of the technology?

**A. Well, no. I mean, obviously if we knew everyone who was involved, then we would have -- from a technical perspective, we could have gotten more information. Right?**

**But generally speaking, that would have been a giant red flag to have somebody who developed this technology inside the company then start a company outside of Qualcomm and then sell it back to the -- to Qualcomm. That would have been a big red flag. That's what I meant by a red flag.**

***Q.*** Sure.

If someone had invented the technology; right?

**A. If someone internal to Qualcomm invents something and then forms a company outside the Qualcomm and then sells it back to Qualcomm, that is a concern. That would be a giant red flag, because we have these agreements.**

**I think we talked about that we have -- and every tech company has it -- when you work for a tech company, anything you invent while working for that tech company that's relevant to the company is owned by the company. In this case it would have been owned by Qualcomm.**

***Q.*** If it's invented by someone, is your understanding?

**A. Yeah. If it's invented by someone who is working at Qualcomm. If you work at Qualcomm and you invent something as part of your job that's relevant to the company, the company**

**owns it. And they pay you a salary and bonus and -- you know, people get paid pretty well to do that.**

*Q.* And the agreements that you're referencing are quite a bit more nuanced than that. Is that right?

***A.*** **Which agreements?**

*Q.* These contracts that you're referencing by which the company would own something an employee invented on the clock with company resources.

***A.*** **Yeah. There's -- there's an agreement. I don't recall what it's called. But every employee signs an agreement that basically says anything that they invent that's relative -- that's relevant to the company. So if you invent, you know, a fancy -- like a new screwdriver or something like that, that doesn't matter. Right? That's different.**

**But if you invent something that's related to Qualcomm's business, whether it's a patent or it's confidential -- so we don't patent everything we do. There's confidential information. There's various things that you can do that Qualcomm owns.**

**And I'm sure there's a lot of legal language around that that I don't understand, but that's just generally the -- you know, the principle behind it, is we're paying someone to invent, and, therefore, everything that they invent, we own.**

*Q.* That they invent?

***A.*** **Yeah, that's right.**

*Q.* And you're not an attorney, and you haven't litigated these contracts; right?
**A. No.**
*Q.* The promise and the capabilities of the TruSens and TruTest technologies would not have changed even if Dr. Arabi had been involved in Abreezio not as its inventor?
**A. It's kind of confusing. And I'm not sure what you're asking.**
*Q.* If Dr. Arabi was involved in Abreezio's business formation and running the business but did not, in fact, invent the technology, would that have had any bearing on the promise and the capabilities and the cost savings projected and ultimately realized by Qualcomm from this technology?
**A. Well, just from the start, if we have an ex-employee involved, then we know it. And it's something that's so specific to what we're doing, that would be a red flag again.**
*Q.* I understand that. But my question is about the capabilities. We've spent a lot of time going through the 2 to 3 percent die savings, 4 to 5 percent improved CPR.
Would those numbers -- those numbers were fixed from the evaluation, the very thorough evaluation that dozens of people at Qualcomm had touched; correct?
**A. Okay. So the CPR specifically was -- I think the claim was 2 to 3 percent. That was in the -- the business analysis. And in fact, it didn't turn out. We didn't get that. So just to be**

**clear, we did not get the 2 or 3 percent.**

***Q.*** You did realize more than $226 million in savings from the DFT technology?

***A.*** **No. If I remember, it rolled out a little slower, and we got maybe 100 million out of it.**

***Q.*** Annual?

***A.*** **Yeah, yes. And remember the value is not -- getting a $100 million, you don't get that to infinite because there is internal work that would have achieved the same thing in a certain period of time. So the -- we ended up getting -- if -- this is my recollection, is that we got about 100 million or so that -- you know, within about a year, year and a half or something like that in test savings, yeah.**

***Q.*** DFT and TruSens technologies, in fact, resulted in cost savings to Qualcomm chips?

***MR. OLAH:*** Your Honor, I'm going to make the same objection as earlier. Relevance as to the post-acquisition value of the technology.

***MS. BERNSTEIN:*** I'm just trying to clean up where we went.

***THE COURT:*** Sustained.

***MS. BERNSTEIN:*** Okay. One moment, please.

***(Pause.)***

***MS. BERNSTEIN:*** Thank you, Mr. Thompson. No further questions. Thank you.

***THE COURT:*** May this witness be excused?

***MR. OLAH:*** Yes, your Honor. And --

***MS. BERNSTEIN:*** This witness is on the Defense's witness list as well.

***THE COURT:*** Okay. Thank you, sir.

***MR. OLAH:*** Your Honor, may he return to his out-of-state home?

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No objection to that, your Honor.

***THE WITNESS:*** Thank you.

***THE COURT:*** Thank you, sir.

***MR. OLAH:*** Your Honor, the United States calls Rajesh Pankaj.

***THE CLERK:*** Please come forward, sir. Raise your right hand.

***(Witness duly sworn.)***

***THE CLERK:*** Thank you. You may lower your hand. Please take the stand. You may be seated.

Please state and spell your first and last name for the record.

***THE WITNESS:*** My name is Rajesh Pankaj. First name is spelled R-a-j-e-s-h. Last name is spelled P-a-n-k-a-j.

***THE COURT:*** Thank you.

Counsel?

///

***DIRECT EXAMINATION***

***BY MS. CHOPRA:***

***Q.*** Good afternoon, Mr. Pankaj.

***A.*** **Hello.**

***Q.*** What's your educational background?

***A.*** **I have a Ph.D. from MIT in engineering and computer science. I received that in 1992. Before that, I did my undergraduate from India from Institute of Technology at Kanpur.**

***Q.*** Where do you currently work?

***A.*** **I currently work at a company called Interdigital.**

***Q.*** Have you previously worked at Qualcomm?

***A.*** **Yes, I have. I was employed there between 1997 and 2022, and I was also an intern there when I was a grad student in 1988.**

***Q.*** So you had a long stretch at Qualcomm.

***A.*** **Yes, I did.**

***Q.*** During that position -- during that time, did you hold one position or multiple positions?

***A.*** **Multiple positions.**

***Q.*** What positions generally did you hold at Qualcomm?

***A.*** **When I started in 1997, I was -- the name of the title was senior staff engineer, which is an individual contributor engineering role. I progressed to a manager, then director, then vice president, and then senior vice president. So when I left Qualcomm I was -- my title was senior vice president of**

**engineering.**

*Q.* As the senior vice president of engineering, what were some of your responsibilities, generally speaking?

***A.*** **I was head of an organization called Corporate Research and Development. And this organization's responsibility was to do forward-looking research that could help Qualcomm's business going forward in the media.**

*Q.* Approximately how many people were under you when you were a senior vice president?

***A.*** **When I first became senior vice president, I was not heading the entire group. But once I became the head of the entire group, it varied, but about a thousand people roughly all over the world, including, of course -- majority were in the U.S. but there also -- I had a team in Europe, multiple places, Lebanon, Austria. I had a team in Korea and China and a team in India.**

*Q.* In the 2014/2015 time frame, what position did you have at that time?

***A.*** **I was senior vice president and I was the head of Corporate R&D.**

*Q.* So let's talk about Corporate R&D just a little bit.

***A.*** **Sure.**

*Q.* I think you mentioned that that department is forward-looking. Is that right?

***A.*** **Yes.**

*Q.* Can you explain a little bit more to the jury what that

department does?

***A.*** **So think about Qualcomm's business. Qualcomm develops chips on communication and different computing technologies. And there are certain chips that are already in the market and certain things that are already in market.**

**So for example, think about right now you use a smartphone that has 5G, but at some point there will be a 6G. So go back to 2014, everybody used 4G at that time but there was no 5G. There were part of the team that worked on 5G and did research and design on what 5G should look like. This is the work that went on in other companies also. But that was one the roles.**

**Similarly, there were Qualcomm worked on software, hardware, and there were different projects that were looking at different aspects of these -- these capability that chips have, and we looked at what those capabilities could be improved to three to five years or even longer, longer term, and we worked on those capabilities.**

**We weren't always successful in coming up with an idea that led to fruition, but we tried to come up with new ways to do things that improved the capabilities of the chip and the system.**

***Q.*** And Qualcomm as a company has a lot of engineers; right?

***A.*** **Yes.**

***Q.*** Is there anything that sets apart the engineers in the R&D department from the rest of Qualcomm?

**A. Well, R&D by its nature requires looking at topics that are forward-looking, as I said. So you would typically find more engineers with advanced degrees. So Ph.D. and master's compared to the rest of the company. The rest of the company also had engineers with Ph.D.s and master's, don't get me wrong, but there were proportionally more in Corporate R&D.**

**And then the other aspect would be that I would think that, of course, engineers who were there were typically interested in working on things that are more forward-looking as opposed to working on products, which would be, you know -- and so -- there are many people with different interests, and so people who have interest in more forward-looking technology would typically be more interested in being in -- part of Corporate R&D.**

***Q.*** While at Qualcomm, did you know someone named Karim Arabi?

***A.*** **Yes.**

***Q.*** When did you first meet him, approximately?

***A.*** **Karim was hired as the VP for running the ASIC group in Corporate R&D. And when he was first hired in the Corporate R&D to be the VP of the ASIC group, that's when I first met him.**

***Q.*** You mentioned ASIC just now.

***A.*** **Yes.**

***Q.*** Could you explain to the jury and anyone who is not an engineer here what that means?

***A.*** **Sure. ASIC stands for Application Specific and Integrated Circuit. All we need to think about is the chip. So the chip**

itself, the hardware of the chip, that is called the ASIC. Then on top of that you run algorithms and software and that. But the part of the hardware with the chip, that is the hardware, that is ASIC.

*Q.* Have you heard of something called design for test?

**A.** Yes.

*Q.* Is that sometimes called "DFT" for short?

**A.** Yeah. Acronyms come very easily to us. We come up with all of them. If you just tell me DFT, I can think of three other ways to expand it. But yes, that's sometimes called DFT.

*Q.* Would you be able to explain to the jury in basic terms what DFT is?

**A.** Okay. And now this is not my area of expertise, I have to tell you, because, you know, ASIC -- I come from more algorithm background, so ASIC is not something -- think about design for test as something like this. All of these systems are super complicated. Okay? So if you can design these systems in such a way that you can easily test when there is a problem, that would be considered design for test. I'll give you an example.

Say, you know, you think of a car, you press the gas, it goes. That's the input-output behavior of the car. That's a black box. You don't -- you know, but if you really want to figure out how to car works and something goes wrong how to fix it, you need to have other ways to know what's going on when you press the gas.

**So it's the same sort of stuff. How do you understand what is happening, the intermediate steps, so that if something is wrong in the functionality of the chip, you can test for that. Again, that is my understanding of that. I am sure there is a lot more detail people who are in ASIC engineering would be able to tell you.**

***Q.*** Now going back to Dr. Arabi, I think you said you first met him in 2012; is that right?

***A.*** **Around that time, yeah. When he joined Corporate R&D, yeah.**

***Q.*** Okay. And what was Dr. Arabi's position at Qualcomm, if you know?

***A.*** **Yeah, he was -- I mentioned earlier he was -- when he joined Corporate R&D, he was VP of engineering for that particular department, the ASIC department, the chip department, yeah.**

***Q.*** And did you become his supervisor at some point?

***A.*** **At some point, yeah. When he was first hired, both he and I reported to Matt Grob, who was the CTO of the company, and he was also the head of Corporate R&D. Or he was not the CEO at that time, I'm sorry. He was the head of Corporate R&D, but he became CTO a couple of years later. And when he became the CTO, he asked me to take the lead of the -- of the Corporate R&D division. And at that point I became Karim's manager.**

***Q.*** So were you his direct supervisor like one level above him?

***A.*** **Yes.**

***Q.*** How long were you his supervisor at Qualcomm?

***A.*** **Like of anybody?**
***Q.*** No, of Dr. Arabi.
***A.*** **Oh, I don't know the exact number of years, but probably four or five years. Something like that. Maybe a little more, yeah.**
***Q.*** During the time that you were his supervisor, how often would you interact with him?
***A.*** **Pretty often. Wouldn't say every day, but a few times a week, yeah.**
***Q.*** And was it your responsibility as a supervisor to evaluate his work and anything he was working on?
***A.*** **Yes. That was one of the responsibilities of the supervisor is to give an annual review, make sure they get the appropriate compensation and so on. So yes, it was my job to do that.**
***Q.*** Okay. So based on your role as a supervisor for a few years, how did you find his work and his work product, Dr. Arabi's?
***A.*** **He was an excellent engineer, an excellent VP of his department. And I don't remember the exact ratings that I gave him, but I won't be surprised if he got top ratings pretty much every year.**
***Q.*** And since you were a supervisor who reviewed his work, do you know if he had any field of expertise?
***A.*** **I mean, the area of chip design as a whole was his area of expertise. There are a lot of things that he taught me while he**

**was working for me because I was not an expert on that. I would go and ask him, you know, to explain the work that he and his team were doing.**

**And so a lot of things relate to hardware, a lot of things about chip design. You know, something called 3D chips, I didn't know anything about it. He explained to me what that was and so on and so forth. So there were a number of things like that.**

*Q.* Does that include DFT?

***A.*** **That was one of the topics, yes.**

*Q.* And ASIC?

***A.*** **ASIC as a whole, yeah. ASIC was a -- I would consider that an umbrella term that included a number of subtopics.**

*Q.* During your time as Qualcomm when you knew Dr. Arabi, do you know if he was involved with any startups outside of Qualcomm?

***A.*** **I didn't remember at that time. But during my conversation with -- with the FBI, when they showed me that there was an email that he had sent that said that he was involved in a startup.**

**But again, only in the sense that he had ownership stake in that startup that we should be find interesting. But again, that's the only thing that I know about. I didn't know specifically if he was involved in any of the startups.**

*Q.* As a senior vice president at Qualcomm and a supervisor of at least a thousand people, have you had instances where's one

of your employees has come to you and said, hey, I developed something, hey, I'm part of a company, should I report it up? Has that happened to you?
**A. Can you repeat your question again?**
***Q.*** So as the senior vice president at Qualcomm and a supervisor of many people, at least a thousand, it sounds like, has one of your employees come to you and said, hey, I invented something or started a new company, what do you think about it, is it a conflict? Have you had that situation come up?
**A. So if we invented anything at Qualcomm, then we were supposed to -- Qualcomm was supposed to own it. So I couldn't -- so somebody would come and say that I invented something and I am starting a new company based on that, that just won't be allowed. That wouldn't make sense.**
**The closest thing that would have happened is that somebody came and said, hey, I have some friends who are working on a company, and they're asking me to give advice. And then I would ask them to just make sure that they're -- that the topic that this company is working on is different than us, that there's no conflict.**
***Q.*** And why would that matter as an adviser to make sure that there's no conflict?
**A. Well, so as I said before, I mean, all of our understanding was that if we are -- if we come up with an idea while we are working on -- while we're working for Qualcomm, then those ideas**

**were owned by Qualcomm. So if you file a patent, the patent will be owned by Qualcomm.**

**So the concern comes from the fact that if I'm advising another company and they happen to be working in an area that Qualcomm would be interested in working on, and I -- in our conversation I came up with some idea that now, you know, it was disclosed to them, then that will be the one that will cause conflict. So the biggest thing is to try to understand -- is to make sure that the companies were working on different things.**

***Q.*** And if someone were to be in that position, where they were asked to be an advisor of a potentially competing company, do you know what that employee at Qualcomm should do?

***A.*** **Yeah. Typically, you know, if somebody in my team did, they would come and ask me. And if they did, I would generally -- since I don't know all the laws, I'm not a lawyer, I'm an engineer, I would ask them to talk to -- to talk to the lawyers in the company.**

**Typically, during the time that I was heading Corporate R&D, there was one particular lawyer who was -- who would be considered division counsel, somebody who helped us. So we'd go to him or her, whoever the person happened to be, and say, hey, can you look into this one and try to give us advice and, you know, go talk to who in the legal department you need to talk to to figure out if there is a conflict or not.**

***Q.*** And you mentioned an agreement that Qualcomm employees agree

to or sign.

Is that called an Invention Assignment Agreement?

**A. I don't remember the name of that agreement.**

Q. It's just something that you signed?

**A. So I think you're talking about -- about two different things. One thing that happens is that -- like when I first joined Qualcomm, at that time, I basically signed an agreement that said that I'm agreeing that all of my ideas will be Qualcomm's ideas.**

**And then when I did that, then they also said, hey, if you're already working on something, list it here so that we know that's excluded from this agreement.**

**So when I first joined, I had worked as a professor for a few years before that. So I listed all the papers, everything that I had worked on before. That's excluded. That's my work from before Qualcomm. Anything do I from this point on would be owned by Qualcomm. So that's one thing.**

**The other thing, I think the name of the -- can you repeat the name of the document that I -- the signed agreement?**

Q. The one I said was the Invention Assignment Agreement.

**A. I think that one was the one that I signed when I applied for a patent and then the patent gets assigned to Qualcomm. So we sign that, hey, this thing belongs to Qualcomm, although I'm the inventor. So there are two different forms.**

Q. While at Qualcomm, did you hear about a company called

Abreezio?

**A. I did not, not while I was there. Actually, sorry. I misspoke.**

**I did not hear about it until significantly later, much later. You know, after Karim had already left the company, I was told that there was -- that Qualcomm was trying to acquire -- or acquired the company Abreezio and there was an issue with that.**

***Q.*** So being Dr. Arabi's boss at one point, Dr. Arabi didn't come to you and say, hey, I'm part of this new startup. Is that right?

**A. Not that I can recall. Not that I remember.**

***Q.*** All right. Do you have any patents to your name?

**A. Yes.**

***Q.*** Approximately how many?

**A. About 30 U.S. patents. And I pause because sometimes people talk about worldwide patents. So when you file a patent in the U.S. it becomes -- you know, later on you file for patents in different countries. If you add everything, it adds up to a few hundred, but it's 30 U.S. patents. That's what I like to say.**

***Q.*** Did you apply for any of those patents while you were working at Qualcomm?

**A. I think all of my patents were filed while I was working at Qualcomm.**

***Q.*** And so those patents have your name on them as at least one

of the inventors. Is that right?
**A. Yes, I'm one of the inventors.**
**Q.** Who owns those patents that you applied for while at Qualcomm?
**A. Qualcomm does.**
***MR. PILCHAK:*** Nothing further, your Honor.
***THE COURT:*** Cross-exam?

***CROSS-EXAMINATION***

***BY MS. BERNSTEIN:***
**Q.** Good afternoon.
**A. Good afternoon.**
**Q.** Mr. Pankaj, you didn't work on the Abreezio due diligence at Qualcomm?
**A. I did not.**
**Q.** You were not involved in evaluating or demo'ing Abreezio's technology and products?
**A. I was not.**
**Q.** You don't know much about Abreezio's technology?
**A. I do not.**
**Q.** You did not interview Abreezio's key employees?
**A. I did not.**
**Q.** You do not know Abreezio's key employees?
**A. I do not know Abreezio's employees.**
**Q.** You were not a part of the decision at Qualcomm to acquire

Abreezio?

**A. I was not part of that decision, no.**

***Q.*** You didn't even hear the name Abreezio until after Karim had left Qualcomm?

**A. That is correct.**

***Q.*** You live in Pennsylvania?

**A. Now I live in Pennsylvania, yes. At the time I lived in California.**

***Q.*** Given all of this, do you know why the Government called you as a witness and flew you out here today?

***MS. CHOPRA:*** Objection. Relevance, your Honor.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** You testified that you supervised a thousand people all over the world, including Dr. Arabi?

**A. Yes.**

***Q.*** And I think you told us that you don't quite remember what marks you gave him, but you wouldn't be surprised if they were the highest ones?

**A. Yes.**

***Q.*** Could you explain that for a moment, for people who are unfamiliar with Qualcomm's one to seven scale?

**A. Yeah. The scale actually changes over a period of time. Sometimes one to seven, sometimes one to five. I think most of the time Karim worked for me it was one to seven.**

**Basically, six and seven are the highest marks. Seven was given to only about 5 percent or maybe 10 percent of the employees. Other people got lower marks than that. It was unusual for people to get very low marks, because most people were very good. So they wouldn't go like one or two.**

**But three, four, five, six, seven was used quite commonly. And six and seven were considered very high marks.**

*Q.* And people were acutely aware of the marks that they got because it affected their bonuses. Is that right?

*A.* **The marks impacted their bonus, their raises, their stock grants. So their compensation and possibly for promotion in the future, all of those.**

*Q.* And let me actually back up for a moment.

Were you part of recruiting Karim to come back to Qualcomm?

*A.* **Honestly, I thought I was, but I don't remember for sure, yeah.**

*Q.* You know he took a pay cut from his job at Dialogue Semiconductor when he returned to Qualcomm?

*A.* **I did not know that fact. But he might have mentioned that to me.**

*Q.* You were working in the San Diego office of Qualcomm, right?

*A.* **Yes.**

*Q.* As was Karim?

*A.* **Yes.**

*Q.* So though you supervised so many people in offices all over

the world, you guys interacted quite frequently?
**A. Yes. Also he was my direct report and he -- he, you know, managed a large number of people who were part of the organization. So yes, I interacted with him quite a lot.**
*Q.* You had one-on-ones once a week about?
**A. Yeah, at least.**
*Q.* And you have a pretty good sense of his work ethic?
**A. As it showed up in the work with me, yeah. I can't comment about that in general.**
*Q.* And you weren't close friends outside of work?
**A. We were not close friends. No, just busy.**
*Q.* And you thought he was an excellent engineer?
**A. I still think he is an excellent engineer.**
*Q.* Would it surprise you to learn that you gave him sevens two years in a row?
**A. No, it doesn't surprise me at all.**
*Q.* And that was reserved for 5 percent of people at the company?
**A. Top 5 to 7 percent, yeah.**
*Q.* And the year prior to that you gave him a six?
**A. That sounds about right. He was a very good engineer and a very good lead for that particular group.**
*Q.* And he was very successful for Qualcomm as well; correct?
**A. I mean, successful in the sense that he did his work well and clearly he was -- he was able to drive good result products.**

***MS. BERNSTEIN:*** I want to show you what's been marked as Exhibit 2265.

***BY MS. BERNSTEIN:***

***Q.*** So if you can take a moment to look at this and see it's an email from you in 2015. And you don't need to read the whole thing, but just once you have some familiarity, if you can --

***A.*** **Sure, yeah.**

***MS. BERNSTEIN:*** Move to admit 2265.

***MS. CHOPRA:*** No objection, your Honor.

***THE COURT:*** It may be admitted.

***(Exhibit 2265 admitted.)***

***MS. BERNSTEIN:*** Can you go to the next page, please? I'm sorry. Let me stay on this page for a moment. I apologize.

***BY MS. BERNSTEIN:***

***Q.*** The subject of this email is "Karim Arabi"?

***A.*** **Yeah.**

***Q.*** And this is from you to Ziad Mansour on October 19th of 2015?

***A.*** **Yes.**

***Q.*** And you start by saying that you're trying to make a case for Karim's promotion to SVP of engineering?

***A.*** **Yes.**

***Q.*** That's senior vice president of engineering?

***A.*** **Yes.**

***Q.*** And so here's -- you're narrating -- here's the narrative

for his recent accomplishments and some work history?

**A. Yes.**

*Q.* And the final paragraph of the email -- if we can go to the next page, please -- you say "Karim is leading a large team and driving innovation in multiple areas related to ASIC technology. Some of their effort has already delivered gains to our products and we expect that they will continue to do so. Others have enabled a wide variety of new business opportunities for Qualcomm."

**A. Yep.**

*Q.* Karim was successful for Qualcomm, in your view?

**A. Yeah.**

*Q.* And he was managing a large team very well?

**A. Yes.**

*Q.* And he was busy?

**A. Yes.**

*Q.* And when he was managing the team, he wasn't doing hands-on engineering work?

**A. At VP level, it's hard for you to do hands-on engineering work. But he -- but it's not -- so here's what ends up happening. If you are a VP level person, you could be -- there would be one topic maybe that you're very interested in and you may work on that, but others you may supervise other people. I did that as VP also. If there was something that was really interesting to me, I may invest some time on that myself.**

*Q.* Was Karim doing any hands-on work, as far as you know, when you met with him one-on-one?

***A.*** **Maybe some. But I don't -- I can't tell you specifically which, because we -- when we talk about things, I was trying to understand more in terms of what his team was doing, not necessarily trying to about pick out what he was doing or what his team was doing. Because as -- in his position, it was more important that his team delivers as opposed to what himself personally.**

*Q.* And Karim did not ultimately get promoted to SVP of engineering before he left Qualcomm. Is that right?

***A.*** **He did not. Yeah, he did not.**

*Q.* And he left to do a startup?

***A.*** **That was my understanding. That's what he told me.**

*Q.* Was Karim ever considered for CTO, or the Chief Technology Officer, of Qualcomm, as far as you know?

***A.*** **The CTO position is at the EVP level, which is higher than SVP. So for him to be considered for the EVP CTO level, I would assume he would have to be SVP first. So my assumption is no. I certainly did not consider it, but it was not within my -- within my scope of work to figure out who would be the CTO. That was above my level.**

***MS. BERNSTEIN:*** Can we go back to that exhibit for a moment, please.

***MS. THOMPSON:*** What was the exhibit number?

***MS. BERNSTEIN:*** 2265.

***BY MS. BERNSTEIN:***

***Q.*** There's a lot in here where you are narrating Karim's recent accomplishments and his work history and his achievements. And these don't focus on any DFT projects. Is that right? I know there's a lot here.

***A.*** **I have to look at it.**

***Q.*** Take your time, yeah.

***A.*** **It doesn't seem to.**

***Q.*** I'm sorry. Can you say that again?

***A.*** **It doesn't seem to, no.**

***Q.*** Okay. Thank you.

In Corporate Research and Development, or as a Corporate Research and Development executive, you typically don't have access to details of unpublished information about projects that Qualcomm is doing. Is that right?

***A.*** **I'm confused. The project that my team is doing, I have all the -- access to all of their documents.**

***Q.*** The QCT projects you wouldn't necessarily have access to. Is that right?

***A.*** **Depends. Some QCT I may, some I may not, depending upon the relationship I have with that particular team. Because Corporate R&D typically work with QCT, so sometimes the project would be in something we would have access to, sometimes it would not.**

*Q.* I want to slow down because there's so many acronyms again.
But QCT is the division of Qualcomm that developed products. Is that a fair description?
***A.*** **So QCT is the chip division of Qualcomm. Qualcomm has -- makes money in two different ways. It makes chips and software and also through product licensing. That is the commercial unit of Qualcomm that makes chips.**
*Q.* Thank you.
***A.*** **And Corporate R&D work with QCT and also with other arms of Qualcomm.**
*Q.* And by virtue of being in Corporate R&D you don't have unfettered access to every QCT project that's going on.
Would you agree?
***A.*** **Generally, I will agree that you don't have unfettered access because there will be parts of QCT design document that may not have -- that you may not have access to. We had access to quite a few documents. Again, I don't know specifically. If ask you about one, again, I may not remember, but yeah.**
*Q.* Okay. That's fine. We can move on.
You talked about patents for a moment with Ms. Chopra, and I think you said you're on about 30 U.S. patents.
Did I hear that right?
***A.*** **Yes.**
*Q.* Are you on any other patents?
***A.*** **I believe total -- the only patent that I'm on are owned by**

**Qualcomm.**

*Q.* Any patents, period, regardless of owner.

***THE COURT:*** Sorry, what's your question?

***BY MS. BERNSTEIN:***

*Q.* I thought I had -- are you on hundreds of overseas patents as well?

***A.* Yeah. But generally -- okay. I have -- patents, sometimes people talk about patent families, which is an invention that could -- typically since you are in the U.S., you file a U.S. patent first. After that patent is issued, there's an international process, and, oftentimes, companies decide to file that same invention as a different patent in different countries. And so that's why within that family there may be 100 patents.**

*Q.* And a patent gives the owner exclusive rights to that invention or IP?

***A.* Patent gives you -- the owner of the patent has the exclusive right to practice that particular invention unless they decide to license it to somebody or sell it to somebody, yes.**

*Q.* And generally speaking, you would agree that you cannot get a patent in the U.S. if the ideas are not novel?

***A.* The ideas need to be novel for you to get a U.S. patent, yeah.**

*Q.* And so if the ideas are already out there in publications or

another patent or out in the world, it's not novel?

**A. It's not novel. Again, you asked a little tricky question because here's the thing -- and now we're getting into an area that's a little bit outside my expertise, but I will still try to explain.**

**So I, as an engineer, will write a disclosure. I have an invention, I write a disclosure and I'll give it to the patent attorney who will write the patent on that with a description, claims, everything, file the patent, work with the USPTO, U.S. Patent and Trademark Office, to get that patent issued.**

**Sometimes it does happen that a patent -- an idea that is not novel gets a patent issued. So USPTO may issue a patent. Ultimately, there's a core challenge to that patent, and that's to decide whether it's actually a novel idea or not. So there are patents that get invalidated.**

**But as I said, this is outside my area. Not only do I not know about it because with Qualcomm and my current employer, if I have these kind of issues, I talk to the lawyers and they will help me with these things sometimes. This is not my area of expertise.**

***Q.*** Thank you.

I want to give a more concrete example of a patent -- of that process that you described while you were at Qualcomm.

***MS. BERNSTEIN:*** I want to show what's been marked as Exhibit 3104.

*(Pause.)*

***MS. BERNSTEIN:*** Can we go back to 3104, please.

***BY MS. BERNSTEIN:***

***Q.*** Do you see this email?

***A.*** **Yes.**

***Q.*** And this is related to formal documents for a signature of a patent?

***A.*** **Yes.**

***Q.*** And this is sent to you from someone at Qualcomm?

***A.*** **Yes.**

***MS. BERNSTEIN:*** I would move to admit this, your Honor.

***MS. CHOPRA:*** Your Honor, we'd object as to relevance. It looks like this is from February of 2017.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** Okay. Let's go back to the general process you were scribing.

You write a disclosure and you give it to a patent attorney?

***A.*** **Yes.**

***Q.*** And then the patent attorney puts the patent application together and files it?

***A.*** **Generally, yes.**

***Q.*** Does that make the patent attorney an inventor on the patent?

***A.*** **No.**

*Q.* Because they're just assisting in the filing process and the application process?

***A.*** **Yes. The invention is done by the engineers. That's the part of the disclosure. Patent attorney's job is to take that disclosure, convert that into a patent that is actually legally -- you know, fulfills all the requirement of a patent. I don't know what those requirements are, but I read patents all title.**

*Q.* I'm sorry, you read patents all the time?

***A.*** **Yeah, because I have to as part of my job.**

*Q.* You mentioned that a patent can be invalidated -- a granted patent by the USPTO can be invalidated in a court proceeding.

Is another way to invalidate the patent because the inventors are inaccurately listed?

***A.*** **I do not know all the reasons why patent can be invalidated. That is not my area of expertise.**

*Q.* Do you know whether companies that apply for patents have a duty of candor and disclosure to the U.S. patent office?

***A.*** **I do not know.**

***MS. CHOPRA:*** Objection. Foundation, your Honor.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

*Q.* You do not know?

***THE COURT:*** Sustained.

***MS. BERNSTEIN:*** Can I please show you what's been

marked as Exhibit 3104A.

I'm sorry, go back to 3104.

***THE COURT:*** Would now be an okay time to take a break?

***MS. BERNSTEIN:*** Sure, your Honor.

***THE COURT:*** Okay. Let's take a 15-minute recess, ladies and gentlemen.

You're reminded you're not to discuss the case or to look up anything about the case. And we'll see you back in 15 minutes. And you're excused as well for 15 minutes. Thank you, sir.

***(Jury out at 2:19 p.m.)***

***THE COURT:*** We're now outside the presence of the jury. Any issues we need to take up?

***MS. CHOPRA:*** No, your Honor. Thank you.

***MS. BERNSTEIN:*** No, your Honor.

***THE COURT:*** Okay. Fifteen minutes.

***(Recess taken.)***

***THE COURT:*** Okay. We are back on the record. All jurors are present. All lawyers are present. Dr. Arabi is present.

Dr. Pankaj, you're reminded you're still under oath to tell the truth.

Counsel?

***BY MS. BERNSTEIN:***

***Q.*** Dr. Pankaj, I think right before we took a break, I had

asked you whether you were familiar with the duty of candor when you were on a patent application that Qualcomm brings to the U.S. Patent and Trademark Office.

Do you remember that?

***A.*** **You said something like that, yes.**

***Q.*** Are you familiar with the duty of candor when Qualcomm brings a patent application that you're on to the U.S. --

***A.*** **No, this is -- I'm not a patent attorney. I do not know what are the different things that attorneys are required to do.**

***Q.*** Does Qualcomm typically advise you of this duty of disclosure when they file patents in your name?

***A.*** **They might. I do not remember.**

***Q.*** Okay. So can I show you what's been marked as 3104. And can you -- you can just take a moment to look at the first page of this. And then I'm going to skip to the third page.

Do you see that this was an email that you received?

***A.*** **Yeah.**

***Q.*** Okay. Can you go to page 3, please.

And do you see this memorandum, "Duty of Disclosure"?

***A.*** **Yes.**

***Q.*** Does this remind you that Qualcomm advises you about your duty of disclosure when they file patents?

***A.*** **Oh, okay. Yeah, it does.**

***MS. BERNSTEIN:*** Okay. Move to admit.

***MS. CHOPRA:*** Your Honor, this is the same objection.

Relevance.

***THE COURT:*** Same ruling.

***MS. BERNSTEIN:*** Okay.

***BY MS. BERNSTEIN:***

***Q.*** Do you remember --

***MS. BERNSTEIN:*** Please go to page 3.

***BY MS. BERNSTEIN:***

***Q.*** Do you recall that Qualcomm advises you specifically that material information must be disclosed when it becomes available even if it's between the filing date of the prior application?

***A.*** **Yes. I mean, it says that in the document. But generally, we were told that, yes.**

***Q.*** Do you recall that Qualcomm deems material information that it interprets and advises you about to be whether there --

***MS. CHOPRA:*** Objection. This is not in evidence. And Counsel is reading from it.

***THE COURT:*** Sustained. You can ask him the question.

***BY MS. BERNSTEIN:***

***Q.*** Do you recall that Qualcomm advises you that material information that would have a bearing on it includes sort of what's referred to as prior art or anything that goes to novelty?

***A.*** **I do remember hearing something like that. I can't say that with certainty exactly what the wordings were.**

***Q.*** Can you look at what's in front of you? Does that help you

remember it?

**A. Yes.**

*Q.* And do you remember that Qualcomm also advises you that when it's making a patent application, failure to make a full disclosure can invalidate a patent?

**A. If it says here, then I'm sure it's true. I don't remember.**

***THE COURT:*** The question is not whether it's in there. The question is whether Qualcomm ever advised you of that fact.

***THE WITNESS:*** Can you repeat the sentence again?

***BY MS. BERNSTEIN:***

*Q.* Yeah. Just whether Qualcomm advised you that failure to make full disclosures can invalidate the patent.

**A. Yes.**

*Q.* Okay. And -- okay. That's all. Thank you.

Has Qualcomm contacted you to sign patents since your departure from Qualcomm?

**A. No, not -- not for me. Although it happens, yes.**

*Q.* Are you aware that they've done that, in fact, for Dr. Arabi?

**A. I did not know that, but it wouldn't surprise me.**

*Q.* It doesn't surprise you that even after someone has left Qualcomm, sometimes they are contacted because they have to be listed on a patent for it to be valid?

**A. If you invent something and you work at Qualcomm, you give the disclosure at the time it gets filed, typically you will be**

**contacted even if you've left Qualcomm.**
*Q.* Corporate Research and Development was never involved in the due diligence review of Abreezio; correct?
***A.*** **That is correct.**
*Q.* And Corporate Research and Development had no influence at all over Qualcomm's assessment of Abreezio?
***A.*** **That is an accurate statement, as far as I know, yeah.**
*Q.* Karim was also not asked to be a part of the team evaluating Abreezio?
***A.*** **I did not ask him. If somebody asked him, I do not know, but it could happen.**
*Q.* But as far as you know, it did not?
***A.*** **As far as I know, it did not.**
*Q.* And Karim did not manage the Abreezio team after they were acquired?
***A.*** **I have no understanding of that. I do not even know when Abreezio acquisition happened, so no.**
*Q.* Well, Karim left Qualcomm in 2016; correct?
***A.*** **Around that time. I don't remember the exact date.**
*Q.* And he departed from Corporate R&D?
***A.*** **Yes.**
*Q.* And you --
***A.*** **So -- yes, so that statement is correct. So because Abreezio was not acquired by Corporate R&D and he was in Corporate R&D there would be no reason for him to oversee those**

**people.**

***Q.*** I think you've mentioned that the sort of power efficiency is the bread and butter of semiconductor companies.

Do you agree with that?

***A.*** **I don't remember saying that today. I'm certainly have said that in the past. Power efficiency is pretty important particularly for a company that makes chips that goes in small devices that run on battery, yes.**

***Q.*** And anyone in this industry and field knows that that is a goal?

***A.*** **Anybody who is working on these chips that go in smartphones or battery-powered devices will know that that is an important thing, yes.**

***Q.*** Outside of Qualcomm, other companies as well?

***A.*** **Yes.**

***Q.*** Okay. In 2018, you were responsible for artificial intelligence research; is that right?

***A.*** **That is true.**

***MS. CHOPRA:*** Objection, your Honor. Relevance.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** You know that Qualcomm sees artificial intelligence as part of its future?

***MS. CHOPRA:*** Objection. Relevance.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** All right. In your experience at Qualcomm, Qualcomm's been sensitive to when senior employees leave and start chip design companies; correct?

***A.*** **Yes. I don't have any particular -- I mean, I would have to think about exactly what cases you're talking about. But yeah, I mean, if Qualcomm -- somebody leaves Qualcomm and starts a company, then Qualcomm would be sensitive to that.**

***Q.*** Well, what about Nirvana Systems, are you familiar with that?

***A.*** **I am familiar with Nirvana.**

***Q.*** This was an A.I. company formed in 2014 by ex-Qualcomm employees?

***A.*** **That is true.**

***Q.*** And that company was ultimately acquired by Intel?

***A.*** **That is true.**

***Q.*** And those -- that company, Qualcomm had a sensitivity to its formation; is that correct?

***A.*** **It was formed by some former employee of Qualcomm.**

***Q.*** And they were well aware of that?

***A.*** **Qualcomm was aware that they were -- those people formed that company after leaving, yes.**

***Q.*** Did they in any way harass those individuals?

***MS. CHOPRA:*** Objection. Relevance at this point.

***THE COURT:*** Sustained. Sustained.

***BY MS. BERNSTEIN:***

***Q.*** Okay. Let's talk about Wavious, LLC.
Do you remember that?
***A.*** **Say that name again.**
***Q.*** Wavious.
***A.*** **Don't remember.**
***Q.*** Are you familiar with Atlazo?
***A.*** **I believe that was Karim's company that he started after he left.**
***Q.*** And that was formed by not only Dr. Arabi but some other ex-Qualcomm employees?
***A.*** **Possibly, yeah. I don't remember the other names, but yeah.**
***Q.*** It was focused on A.I. technology and wearable health devices?
***A.*** **I don't know what Atlazo is focused on.**
***Q.*** Okay. Do you know that Atlazo was focused on a technology that is in the space Qualcomm itself is trying to get into?
***A.*** **I don't know what Atlazo is focused on or was focused on.**
***Q.*** I want to talk about the Invention Assignment Agreement that you discussed on your direct testimony.
***A.*** **Yes.**
***Q.*** Did you testify that you have one currently?
***A.*** **Do I have one active currently?**
***Q.*** An Invention Assignment Agreement with your current company. Was that your testimony?

**A. Oh, yes.**

*Q.* And you understand that to be legally enforceable?

**A. I have no understanding of whether it is legally enforceable or not.**

*Q.* Okay. To your knowledge, as of 2015, did -- Qualcomm did not have a policy or a rule requiring an employee to disclosed that they're the older brother of an inventor at a company being purchased?

**A. I'm not aware of any policy that Qualcomm had about my family member being an inventor of something.**

*Q.* Was a policy about that put into place by the time you left in 2022?

**A. I don't recall.**

*Q.* Are you aware that Qualcomm now asks potential acquisitions whether they are related to Qualcomm employees?

**A. I am not aware of Qualcomm policies of what they have right now.**

*Q.* In 2015, there was no requirement to formally disclose if an employee was advising a startup, not being paid, and not taking a formal position?

**A. As I mentioned before, typically when people advise, we did talk to lawyers at that time. But there was an actual policy with the company about that, I don't know. I wouldn't be able to say.**

*Q.* Well, if someone helped an EvoNexus incubator as a volunteer

and provided coaching to startups there, there was no requirement that they disclose every startup they spoke with or came across?

**A. No.**

*Q.* Qualcomm did have a policy requiring employees to disclose when they made a personal financial investment in a company; correct?

**A. I don't know.**

*Q.* Well, Karim disclosed to you at one point that he had made a personal seed investment in a power conversion company called Appulse Power.

Do you remember that?

**A. Appulse Power? I don't remember. But that could have happened. I don't remember that.**

*Q.* I want to show you Exhibit 3207.

**A. Oh, yeah. Okay.**

*Q.* Does this remind you that Karim had disclosed to you that he had made a personal seed investment in a power conversion company called Appulse Power?

**A. I did not remember this. This happened many years ago.**

*Q.* On April 1st of 2016.

**A. Yeah.**

*Q.* And you don't remember this because it was fairly unremarkable?

**A. Yeah.**

***MS. BERNSTEIN:*** Any objection to publishing this?

***MS. CHOPRA:*** Yes, we'd object on relevance. It's from April 2016.

***THE COURT:*** Sustained. Sustained.

***MS. BERNSTEIN:*** No further questions. Thank you, Dr. Pankaj.

***THE WITNESS:*** Thank you.

***MS. CHOPRA:*** Briefly, your Honor.

***THE COURT:*** Okay.

***REDIRECT EXAMINATION***

***BY MS. CHOPRA:***

***Q.*** Mr. Pankaj, I just have a couple of questions to follow up on. Focusing first on the R&D department that you were a part of, that you headed at Qualcomm.

I think you mentioned a couple times that part of the responsibilities there is to be forward-looking and to maybe come up with new ideas.

Is that right, generally?

***A.*** **Yes.**

***Q.*** And for the engineers that are part of that department, does their compensation, their salary and bonus, reflect the ideas that they may come up with that may be valuable to Qualcomm?

***A.*** **Yes.**

***Q.*** Okay. So is their compensation generally high because of

that?

**A. Well, not everybody is equally successful, but those who did a lot of inventions and came up with technology that was useful in the future, yes, their compensation would be higher.**

*Q.* And turning briefly to the patent process. And I understand you're not a patent attorney. Neither am I.

But it sounds like you have been on a number of patents. You said 30; right?

**A. Yes.**

*Q.* And you testified that you have worked with patent attorneys and/or agents for --

**A. Yes.**

*Q.* -- the filing?

**A. Yes.**

*Q.* Okay. In terms of filing a patent, have you ever had a fellow vice president at Qualcomm help you file a patent?

**A. Okay. I will have to -- I can't think of anything right now. So you mean that a fellow -- a vice president at Qualcomm was acting as an attorney or as a coinventor?**

*Q.* Well, instead of using a patent attorney or a patent agent, did you instead turn to a fellow vice president at Qualcomm and say, here, can you file this thing for me, I have this new invention?

**A. And that person is not a patent lawyer?**

*Q.* In this scenario, no.

**A. That doesn't seem to make sense. I wouldn't do that.**

***MS. CHOPRA:*** No further questions, your Honor.

***THE COURT:*** Anything further?

May this witness be excused?

***MS. BERNSTEIN:*** Just one question. One question, your Honor.

***THE COURT:*** Okay.

***RECROSS-EXAMINATION***

***BY MS. BERNSTEIN:***

***Q.*** I just want to follow up on that real quick.

Is that prohibited as far as you know?

**A. I don't know.**

***MS. BERNSTEIN:*** Thank you. No further questions.

***THE COURT:*** May this witness be excused?

***MS. CHOPRA:*** Yes, your Honor.

***THE COURT:*** Thank you, sir. You're excused.

***THE WITNESS:*** Thank you.

***THE COURT:*** You may call your next witness.

***MR. PILCHAK:*** Thank you, your Honor. The United States calls John Roberts.

***THE CLERK:*** Please raise your right hand.

***(Witness duly sworn.)***

***THE CLERK:*** Thank you. You may lower your hand and please take the stand. Please state and spell your first and

last name for the record.

***THE WITNESS:*** My name is John Roberts. J-o-h-n R-o-b-e-r-t-s.

***THE COURT:*** Thank you.

Mr. Pilchak.

***DIRECT EXAMINATION***

***BY MR. PILCHAK:***

***Q.*** Good afternoon, Mr. Roberts.

***A.*** **Good afternoon.**

***Q.*** What do you do for a living, please?

***A.*** **I currently work for the regulatory authority, also known as FINRA. We're an independent self-regulatory organization in the brokerage industry. We oversee brokerage firms and the registered reps who work for them.**

***Q.*** Are you an engineer?

***A.*** **I am not.**

***Q.*** Okay. Have you ever worked for Qualcomm?

***A.*** **I have not.**

***Q.*** Okay. What did you used to do for a living before you worked at FINRA?

***A.*** **Before I started at FINRA, I was an FBI agent for 23 years until I retired in April of 2023.**

***Q.*** Before your retirement in 2023, did you have a specialty at the FBI?

**A. Yes. Virtually my entire career was spent investigating complex financial crimes, things like investment fraud, Ponzi schemes, securities fraud, various corporate fraud matters.**

*Q.* And what is your educational background, please?

**A. I have a bachelor's degree in accounting and math.**

*Q.* And have you ever worked in the financial industry?

**A. I worked as a certified public accountant for five years prior to becoming an FBI agent.**

*Q.* Okay. I want to ask you about an investigation into the Abreezio transaction.

Are you familiar with that?

**A. I am.**

*Q.* Did you work on that investigation?

**A. I did.**

*Q.* What was your role on that case before you retired?

**A. I was the lead case agent when the investigation started, and I kept that role through the time that I worked at the FBI until my retirement.**

*Q.* And how did that investigation get started?

**A. So it was during the COVID epidemic. And we were -- the FBI or the U.S. Attorney's Office was contacted by an attorney who represented Qualcomm and they asked to present some information to us. I was contacted by the United States Attorney's Office to sit in on the presentation, which I did. And after that presentation, I opened a case at the FBI.**

*Q.* I think you said during the COVID epidemic.
Would that have been in the spring of 2020?
***A.*** **Yes.**
*Q.* If we back up, in front of that, do you know whether Qualcomm had ever tried to refer the matter for criminal investigation before that?
***A.*** **They did. They reached out to the FBI and U.S. Attorney's Office in 2018. A case was not opened at that time.**
*Q.* Was it approximately May of 2018?
***A.*** **Yes.**
*Q.* The meeting around that referral, were you present for it?
***A.*** **I was not.**
*Q.* Okay. Nevertheless, do you know what its outcome was? I think you just said it.
***A.*** **Yes, I was aware of the outcome, which is the FBI and the U.S. Attorney's Office did not open a matter at that time.**
*Q.* And do you know why not?
***A.*** **One of the main reasons was the squad that I worked on had been downsized. We were down to, I think, approximately six agents. The person who met with Qualcomm was retiring soon thereafter, and we just didn't really have the capacity to take that matter on at that time.**
*Q.* And was your squad at FBI the specialized squad that would have opened that matter if it had come in?
***A.*** **Yes.**

***Q.*** Got it.

Do you know whether Qualcomm was already engaged in a civil lawsuit against Dr. Arabi at that time?

***A.*** **They were.**

***Q.*** And that civil lawsuit, did that also include two other individuals?

***A.*** **It did.**

***Q.*** Okay. And were those Sheida Alan and Sanjiv Taneja?

***A.*** **Yes.**

***MR. PILCHAK:*** At this time, your Honor, we'd like to read one of the stipulations.

***THE COURT:*** Okay.

***MR. PILCHAK:*** So the parties have entered an agreement. I want to ask the Court to give a limiting instruction after the stipulation, if that's okay.

***THE COURT:*** Sure. Do you have a proposed limiting instruction?

***MR. PILCHAK:*** I think the parties have agreed.

***THE COURT:*** Okay. Got it.

***MR. PILCHAK:*** Great.

So at this time I'll read the stip with the Court's permission.

***MR. FRASER:*** Excuse me, we need a moment just to review this, please.

***MR. PILCHAK:*** Oh, sure.

***MR. FRASER:*** Thank you.

***THE COURT:*** I thought it was something you'd already agreed to.

***MR. FRASER:*** That's what I'm confirming, that it is -- I mean, I'll take Mr. Pilchak's representation on that, and if we find later there's an issue, we'll raise it. But I'm sure it's not an issue.

***MR. PILCHAK:*** Wonderful. Stipulation 1:

"The parties stipulate that on or about October 26, 2017, Qualcomm filed a civil lawsuit against Karim Arabi, Sheida Alan, and Sanjiv Taneja alleging civil fraud and related claims over the same business transaction at issue in this case.

"On or about January 16th of 2018, Sheida Alan filed counterclaims against Qualcomm alleging that Qualcomm failed to pay the holdback money required under the unit purchase agreement.

"On or about December 6th of 2018, the lawsuit between Dr. Arabi, Ms. Alan, and Qualcomm settled without either party admitting that any claim or counterclaim was valid or not valid. Each party to the settlement agreement was represented by counsel.

"Pursuant to the settlement agreement, Dr. Arabi and Ms. Alan agreed jointly and severally to pay Qualcomm $47 million. And Ms. Alan, in fact, paid Qualcomm this amount. Matters concerning the lawsuit concluded on or about April 1st

of 2021."

That concludes the first stip, your Honor.

***THE COURT:*** Okay. First of all, because it's a stipulation, ladies and gentlemen, you must accept that stipulation as true.

Second of all, you heard evidence about a civil lawsuit between Qualcomm, Karim Arabi, Sheida Alan, and Sanjiv Taneja. You may not consider the settlement agreement between these people or the fact of the settlement or this company, Qualcomm, as any indication of the validity of the claims or defenses in that suit or the validity of the charges against Dr. Arabi in matter.

In the settlement agreement, the parties expressly agreed that the settlement was not an admission by Dr. Arabi or Ms. Alan of the validity of Qualcomm's claims, nor a concession by Qualcomm as to the merits of its allegations. It is for you to decide the significance of these events, and you are not to infer from the fact of the settlement that Dr. Arabi admitted any of the facts alleged against him in this matter.

That -- those facts are a matter for you entirely to decide.

***MR. PILCHAK:*** Thank you, your Honor.

***BY MR. PILCHAK:***

***Q.*** All right. Mr. Roberts, back to you.

Do you have a practice of what you usually tell people like

Qualcomm that are trying to refer a matter to the FBI when the fat matter is not opened as a criminal investigation?

**A. Yes. What we'll tell them is that if additional information comes to light, they're always welcome to provide additional information as it comes in. The FBI has a website where anybody can submit a tip to us at any -- any point in time.**

***Q.*** I know you were not at this meeting in May of 2018.

But is that sort of your standard practice under these circumstances?

**A. Yes.**

***Q.*** Let me ask you a different question.

Understanding that you weren't at that meeting, as far as you know, did anyone explicitly tell Qualcomm or its lawyers to try to collect more information during the civil suit that could then be used in some future criminal investigation?

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** Also at this point he said he wasn't at the meeting and he doesn't know.

***MR. PILCHAK:*** So foundation.

***THE COURT:*** Sustained.

***MR. PILCHAK:*** Thanks, your Honor. I'll move along.

***BY MR. PILCHAK:***

***Q.*** I think you mentioned then that there was a second meeting with Qualcomm's representatives.

Can you remind us what sparked that meeting in the spring of

2020?
**A. Yes. Qualcomm, through their attorney, had re-approached the United States Attorney's Office to provide an update and additional information. And I think they wanted us to reconsider the matter.**
*Q.* Was that meeting on or about May 7th of 2020?
**A. Yes.**
*Q.* And when I say "meeting," did everybody get together in a small room and breathe really close on each other during the beginning of the COVID pandemic?
**A. It was during the time of remote work. The FBI got back to the office fairly quickly compared to everybody else. But at that point in time we were really not in the office. So it was like a Zoom-type teleconference.**
*Q.* And do you remember who was there?
**A. So I was there. Emily Alan, who was a prosecutor at the U.S. Attorney's Office, was there. Phil Halpern, who was an AUSA, Assistant United States Attorney, was there. Marshall Camp, who was an attorney with Heuston Hennigan and represented Qualcomm was there. And then Kevin Kelly, who was an attorney at Qualcomm was -- we were all present for this video conference.**
*Q.* And generally speaking, without getting into any of the specifics, what happened at the meeting?
**A. At the meeting, they had provided a letter that kind of**

**outlined the -- their thoughts on the matter. And then they had run through a PowerPoint presentation, which they ultimately gave us a copy of. And they explained the situation from their point of view.**

***Q.*** Did you create any records of this meeting, Mr. Roberts?

***A.*** **No. Just I had the letter and ultimately the PowerPoint.**

***Q.*** Why didn't you create any records?

***A.*** **There was nothing that was said at the meeting that hadn't already been documented in those two forms. If additional information had been presented, I could have written up and documented it.**

***Q.*** Got it.

What happened after that meeting?

***A.*** **After that meeting I spoke with the two prosecutors who were on the call, and we all agreed that, given the COVID situation, you know, the courts were closed, I had a lot of bandwidth at the time, and this seemed like a good -- I guess you could call it COVID case because it was document intensive and it was something that I could work on when we were restricted from really kind of going out and about like we normally would do.**

***Q.*** So did you rapidly open an investigation after that meeting?

***A.*** **Yes, I did.**

***Q.*** Was it about five days later? Six days later?

***A.*** **Yes. I ran the situation past my supervisor and then I had to send an email to our headquarters -- we have a point of**

**contact who oversaw my squad -- to get their buy in for us to open the matter.**

***Q.*** Got it.

So the investigation opens up, then, in the early months of COVID --

***MR. FRASER:*** Your Honor, motion to strike the testimony about buy in from supervisors into the investigation. It's hearsay.

***MR. PILCHAK:*** No objection to that.

***THE COURT:*** Okay. I'll strike that since there's no objection.

***MR. PILCHAK:*** Thank you, your Honor.

***BY MR. PILCHAK:***

***Q.*** What did you do first in the investigation?

***A.*** **So one of the first things we did was we sent a subpoena to Qualcomm to get the records that they had available to us. In speaking with them, it sounded like the documents were going to be voluminous. And when they provided them to us, they did not disappoint. There was a lot of records to go through based on what they had.**

**And then after that, we took additional steps. We served additional subpoenas. A subpoena is like a legal process to compel somebody to provide us records under the grand jury process. And so we served subpoenas on financial institutions, telephone companies.**

**We got some information from some email service providers. And so we started to try to expand the records that we had access to that were related to this investigation.**

*Q.* Let me go back to the first step, if I understood your testimony.

I think you said you had arranged to send a subpoena to Qualcomm; right?

***A.*** **Yes.**

*Q.* Why did you start with them?

***A.*** **Because they were the complaining party and they said that they had information that we wanted.**

*Q.* Did you work with representatives of Qualcomm or did members of your team work with Qualcomm reps to determine what records they had already collected and could be helpful to your investigation?

***A.*** **Yes, we did. You know, they were represented by counsel. The documents had been organized for the civil litigation, by the sounds of it. And so we worked with them to get the documents over to us in a format that then we could start going through.**

*Q.* Did you just subpoena the documents that Qualcomm identified or did you subpoena other documents as well?

***A.*** **We subpoenaed other documents. And then as the investigation progressed, we served additional subpoenas on Qualcomm to get more records.**

*Q.* Got it.
So it sounded like, then, apart from Qualcomm, you sent subpoenas out to other companies; right?
***A.*** **Yes.**
*Q.* A couple of other companies?
***A.*** **Yeah, quite a few other companies. Quite a few banks, quite a few financial institutions, quite a few telephone companies.**
*Q.* Did you also seek records overseas?
***A.*** **We did. We served legal process to get records outside the country, specifically to Canada. And then ultimately to Norway.**
*Q.* And how did you do that?
***A.*** **There is arrangements with all the different countries to get -- serve legal process over there. We call it an MLAT. And it's our government making a formal request to their government to obtain records. And it's a mutual treaty where they can also use the same process to get records from us that they might need in their investigations.**
*Q.* And in this case what kind of records were you trying to get from Canada?
***A.*** **From Canada we were trying to get additional financial records. We were trying to get real estate records because some real estate had been purchased with some of the funds from the purchase of Abreezio.**
***MR. FRASER:*** Objection. That's got to be stricken. He doesn't have personal knowledge of that.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** So you were trying to get records from Canada because?

***A.*** **Because the money that had been sent to Sheida Alan went to Canada, and we wanted to be able to trace and track that. We additionally got some of her education records.**

***Q.*** And was it easy or hard to get records from Canada in your experience?

***A.*** **It was a hard, slow process. It was -- that's how I would describe it.**

***Q.*** And when you say "slow," you mean it took a couple of weeks?

***A.*** **No, it took a couple years.**

***Q.*** Okay. Did you say Norway as well?

***A.*** **Yes.**

***Q.*** Why did you try to get records from Norway?

***A.*** **As we were tracing the funds, we discovered that money had been sent from Canada to Norway and additional real estate had been purchased there.**

***Q.*** So was one of the focuses on your investigation to try to follow the money in this case?

***A.*** **Exactly right.**

***Q.*** And when the money left the United States, that's what we're talking about, this foreign legal process to try to get other records from around the world?

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** Why did you send foreign legal process around the world?

***A.*** **We wanted to trace the money, which is a standard step in any financial crimes case. So the money started here at Qualcomm. When the Abreezio was purchased, the money got sent out. The money to Sheida Alan got sent to Canada. And then we tried to trace it on from there to see where it ultimately landed.**

***Q.*** I think you also mentioned email service providers.

What were you talking about there?

***A.*** **Yes. So there was -- when we were reviewing the information that had been provided by Qualcomm, we had a lot of emails that had been produced during the civil litigation. And so we identified or I identified a number of email accounts that appeared to contain communications related to the transaction.**

**And so we then reached out to the companies that supported those email accounts, places like Google and Yahoo! and Microsoft, and we got additional initial records related to those email accounts.**

***Q.*** And how did you get those records?

***A.*** **There's something called a 2703(d) order that is applied for, and a judge, federal judge, would sign off on it. Once we get that signed off on, then we serve it on these email service providers, and then they provide us with the information that we**

**ask for, which is specifically non- --**

***MR. FRASER:*** Objection. This is narration and argument from the witness stand.

***THE COURT:*** Overruled.

***THE WITNESS:*** It's not content, so it's what's considered to be header information. The "To," the "From," the date. So that kind of back and forth without actually getting the content of the emails.

***BY MR. PILCHAK:***

***Q.*** Did you stop there, or did you use that information for something else in your investigation?

***A.*** **No, the reason why we got this information through the 2703(d) order is because we ultimately wanted to try to get an email search warrant for these accounts that we identified, so that the information that was initially provided by the email service providers could be incorporated into an affidavit, which would support us seeking a search warrant to get the actual content that was in these email accounts.**

***Q.*** And did you get a series of warrants to search a number of email accounts?

***A.*** **We did.**

***Q.*** How many accounts would you say in total?

***A.*** **I believe it was initially approximately 14, and then we did an additional email account, after the initial batches of search warrants. So total approximately 15 email accounts.**

***Q.*** Let me ask you this, Mr. Roberts: If you already had what sounds like a large block of material from Qualcomm, didn't that include a bunch of emails?

***MR. FRASER:*** Objection. Leading. Argumentative.

***THE COURT:*** Overruled.

***MR. FRASER:*** Commenting on the volume evidence.

***THE COURT:*** Overruled.

***THE WITNESS:*** We did get quite a bit of email information from Qualcomm that was gathered during the civil litigation. But one of the reasons why we took this additional step of doing email search warrants was because the emails in the civil litigation were produced by the people, the parties of the litigation.

We wanted to go in and get the whole volume of what was available to us so that we could look through the raw data and make sure that we had a complete set of the emails that were potentially available to us.

***BY MR. PILCHAK:***

***Q.*** So if I'm following you, somebody who produced emails during the civil suit, if they held something back but then you went to their email provider and said with a warrant give us the entire account, what would you find out?

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** Overruled.

***THE WITNESS:*** We would find these additional emails

that were not produced in the civil discovery.

***BY MR. PILCHAK:***

***Q.*** And what about material that Qualcomm provided, would it also show you if material Qualcomm provided to you had been missing things?

***A.*** **Yes.**

***Q.*** Okay. In that respect, were the email search warrants a kind of corroboration of the materials that you provided -- been provided by Qualcomm?

***MR. FRASER:*** Objection. Argumentative.

***THE COURT:*** Overruled.

***THE WITNESS:*** They were a corroboration. So we were able to see that some of the emails that were produced during the civil litigation, we found those in the email accounts that we searched, but then we also found additional information on top of that.

***BY MR. PILCHAK:***

***Q.*** Got it.

So during the warrant search process, if I'm hearing you right, you found new things that hadn't been provided by Qualcomm in the beginning?

***A.*** **Correct.**

***Q.*** Okay. And let me ask you another question about Qualcomm. I think so far you've talked about grand jury subpoenas, MLATs to other countries, and then all of this legal process to get

email contents from the email providers. Right?
***A.*** **Yes.**
***Q.*** Did Qualcomm or Qualcomm personnel or Qualcomm's lawyers participate in any of those parts of your investigation?
***A.*** **No.**
***Q.*** Did they supervise or guide those parts?
***A.*** **No.**
***Q.*** Did they provide input to you about how to conduct those parts of your investigation?
***A.*** **No.**
***Q.*** Okay. I want to ask about a number of different categories of information that's relevant to those email searches we were just talking about. All right?
***A.*** **Yes.**
***Q.*** Did you find evidence that was relevant to your investigation?
***A.*** **Yes.**
***Q.*** For example, did you find correspondence between Dr. Karim Arabi sand someone named Brad Quinton?
***A.*** **I did.**
***MR. PILCHAK:*** Okay. Let's show the witness and the witness only, please, Exhibit 869. And if we could zoom in on the --
***BY MR. PILCHAK:***
***Q.*** Well, first, take notice of the letters at the bottom right,

Mr. Roberts.

***MR. PILCHAK:*** Let's zoom in on the top half there, just kind of the top half of the page. Perfect.

***BY MR. PILCHAK:***

***Q.*** Do you see that, Mr. Roberts?

***A.*** **I do.**

***Q.*** What is this document?

***A.*** **This is an email from Dr. Karim Arabi to a person called -- named Brad Quinton. And it's an email where they are confirming a meeting that they're going to be having at Sammy's, which is a restaurant.**

***Q.*** And do you understand that to be Dr. Arabi's work email account at Qualcomm?

***A.*** **It is.**

***Q.*** And you said it was to someone named Brad Quinton.

How do you know that's Brad Quinton's email account?

***A.*** **The Brad Quinton -- the Brad.Quinton@gmail.com account was one the emails that we got a search warrant for. So this is one of the records that came from that. We got some subscriber information from Google about the email account, and that helped us corroborate the fact that it was Brad Quinton's email account.**

***Q.*** Got it.

And where did you get this email specifically?

***A.*** **Of the -- we searched the Brad.Quinton@gmail.com email**

**account so we got it from that bucket of documents.**

***Q.*** So this email is from that very search.

Did you conduct that search?

***A.*** **Yes.**

***MR. PILCHAK:*** Okay. Move to admit 869, your Honor.

***THE COURT:*** Any objection?

***MR. FRASER:*** No, your Honor.

***THE COURT:*** It may be admitted.

***(Exhibit 869 admitted.)***

***BY MR. PILCHAK:***

***Q.*** Okay. So the jurors I think can see it on their screens now.

Mr. Roberts, those are the same two emails addresses on top that you were just talking about; is that right?

***A.*** **That's correct.**

***Q.*** And from your review of emails in this investigation -- let me just back up for a second.

Do you have a general sense of about how many emails you reviewed over the years that you worked on this investigation?

***A.*** **I think I had access to, like, hundreds of thousands of emails that came in through the civil litigation that we received from Qualcomm and then the search warrants that I did.**

***Q.*** Got it.

From your review of some set of those hundreds of thousands of emails, do you believe this is pretty much the last time that

Dr. Arabi corresponded with Brad Quinton from his work account?
***A.*** **That I saw, yes.**
***Q.*** And the date of this is October 9th of 2014; right?
***A.*** **That's correct.**
***Q.*** And what are they setting up?
***A.*** **They're setting up lunch at a restaurant called Sammy's here in San Diego.**
***Q.*** And we won't belabor this, but are the lower emails in this exhibit sort of dialing in the time and location of that lunch?
***A.*** **The logistics of the lunch, yes.**
***Q.*** Got it.
***MR. PILCHAK:*** Let's take that down.
***BY MR. PILCHAK:***
***Q.*** Did you find any evidence of what that meeting was about?
***A.*** **Yes.**
***MR. PILCHAK:*** Okay. Let's show the witness Exhibit 870, please. That's 870.
***BY MR. PILCHAK:***
***Q.*** Do you see that there, Mr. Roberts? Just kind of Zoom in on the top.
***A.*** **I do.**
***MR. PILCHAK:*** We'd move to admit 870.
***MR. FRASER:*** No objection.
***THE COURT:*** It may be admitted.
***(Exhibit 870 admitted.)***

***BY MR. PILCHAK:***

***Q.*** Who are the parties to this email, Mr. Roberts?

***A.*** **This appears to be an email from Brad Quinton to himself. It appears that he is sending an email from his Gmail account to his work account, because Invionics is the company that he worked at.**

***Q.*** Got it.

And what is the date of this email?

***A.*** **It's October 10th of 2014.**

***Q.*** Is that the day after that lunch at Sammy's?

***A.*** **It is.**

***Q.*** Okay. What is Brad saying here?

***A.*** **He writes out a list of actions for Karim, that would be Dr. Arabi. And he has some specific items that appear to be related to setting up a corporate structure.**

***Q.*** Got it. And I don't want to ask you about all of this.

But you see the words "cap table" there?

***A.*** **I do.**

***Q.*** You were a white-collar agent for a long time what. Is a cap table?

***A.*** **I believe it's a capitalization table. It's a table that charts out what owns what percentage of a company, usually through ownership of shares.**

***Q.*** Okay. And there's a reference there to "setup of Trementa infrastructure," although there might be a typo.

Did you see the word "Trementa" more than once in your review of emails?

**A. Yes, I did.**

***Q.*** All right. Did you, in fact, find some email correspondence spelling out a basic corporate plan that Mr. Quinton references in this email?

**A. I did.**

***MR. PILCHAK:*** Let's show the witness 122 and 123, please. So 122 is there on your screen, Mr. Roberts, if you can look quickly. And then let's show 123, I think is the attachment. It's an Excel file, so I don't know how this is going to go. There's a binder next to you but I think there's a placeholder in the binder, so give us one minute.

***THE WITNESS:*** Okay.

***MR. PILCHAK:*** Why don't you grab that binder next to you, the one that has the 100 series exhibits in there while they're looking at that. Hopefully, they're in order. And then just crack it open to 122 and I can ask you about that one first. This is going to be a participatory testimony.

***THE WITNESS:*** Yes, I have 122, with is an email.

***BY MR. PILCHAK:***

***Q.*** Great. And whose email is that?

**A. It's an email from Brad Quinton to Dr. Arabi at Karim_Arabi@hotmail.com.**

***Q.*** And is the subject of that email "Follow-up?"

**A. Yes.**

***MR. PILCHAK:*** We would move to admit 122, and I'll hold off on 123 for now.

***THE COURT:*** Any objection?

***MR. FRASER:*** No.

***BY MR. PILCHAK:***

***Q.*** Do you see Exhibit 123, Mr. Roberts?

**A. It is.**

***Q.*** Is this the attachment to that email?

**A. It is.**

***MR. PILCHAK:*** We move to admit 123 as well.

***THE COURT:*** Any objection to 123?

***MR. FRASER:*** No.

***THE COURT:*** 122 and 123 are admitted.

***(Exhibits 122 and 123 admitted.)***

***MR. PILCHAK:*** Let's take that down for a second now that they're both in. Let's go back to 122 if we can.

***BY MR. PILCHAK:***

***Q.*** This is a rather lengthy email; right, Mr. Roberts?

**A. It is.**

***MR. PILCHAK:*** Let's kind of zoom in on the top half there. Yeah, that's great. Perfect.

***BY MR. PILCHAK:***

***Q.*** Okay. So it's from Mr. Quinton to Dr. Arabi; correct?

**A. Yes.**

*Q.* And what is the attachment file name? Is that what we're seeing on the attachments line there?

***A.* It is. It says "Trementa Share Planning.xls, which is an Excel spreadsheet.**

*Q.* That's that same name Trementa in Brad's note to himself from ten days ago?

***A.* Correct.**

*Q.* And this then would be 11 days after the lunch at Sammy's?

***A.* Yes.**

*Q.* Okay. Now if we skip that beginning part, Mr. Quinton says "Let me summarize where I think we are."

Do you see that there?

***A.* I do.**

*Q.* And there's like 11-ish bullet points down there?

***A.* Yes.**

*Q.* Okay.

***A.* Ten.**

*Q.* Well, there's -- okay.

There's ten altogether?

***A.* Yes, plus some additional verbiage at the bottom of the email.**

*Q.* Good catch.

Let me ask you this: So the top one, I think you testified earlier that looked to you like Brad's work account at Invionics; right?

***A.*** **Yes.**
***Q.*** Whose email account is that underneath that it's going to?
***A.*** **Dr. Karim Arabi's.**
***Q.*** And how do you know that?
***A.*** **That's one of the emails that we did a search warrant for and got information on. And there was a number of items that came up that tied the email back to Dr. Arabi.**
***Q.*** Okay. So you executed a search warrant on that account?
***A.*** **Yes.**
***Q.*** Did you find this email in that account?
***A.*** **No.**
***Q.*** Hmm. Let me ask a different question.
When you say that's Dr. Arabi's email account, did he also admit to using that email account in some sworn discovery responses that you saw?
***A.*** **He did.**
***Q.*** Okay. The subject of this email is "Follow-up," right?
***A.*** **Yes.**
***Q.*** Does it appear to you to be a continuation of that kind of task list that Brad sent himself ten days earlier?
***A.*** **It does.**
***Q.*** And where we see this reference to Trementa, based on your review of documents, including this one, do you have an understanding of what Trementa is?
***A.*** **Yes. Trementa was a dormant corporate structure that Brad**

**Quinton had available to him. And it was the name of the company that he and Dr. Arabi had initially talked about working on together.**

*Q.* Okay. And it belonged entirely to Mr. Quinton, as far as you could tell?

***A.* That's correct.**

*Q.* Got it.

And if we could zoom in on Number 2 from the bullet list. I don't know if you can zoom or take that down again.

What were they planning to use Trementa for, if we look at Number 2?

***A.* They were going to adjust the ownership in the company so that Dr. Arabi or a family member had partial ownership in the structure for a nominal investment.**

*Q.* And what did "nominal investment" mean to you?

***A.* A small amount of money.**

*Q.* Does he reference how much Trementa is worth right now?

***A.* Yes, it's worth zero at the current point.**

*Q.* So nil is another way of saying zero?

***A.* Yes.**

*Q.* And then one of the things that Brad told himself to do in that list of tasks was cap table; right?

***A.* Correct.**

*Q.* Do you understand the attachment to this email to be a cap table?

**A. I do.**

***MR. PILCHAK:*** Can we look at that for a second, Exhibit 123. Let's zoom in on kind of that innermost box on the left, which I think is the most important for my next question.

***BY MR. PILCHAK:***

***Q.*** Do you see the November 14 box there?

**A. Yes.**

***Q.*** First of all, what's the title for this document?

**A. "Share Cap Projections."**

***MR. PILCHAK:*** Can we zoom in a little more, please. That's still kind of small.

***BY MR. PILCHAK:***

***Q.*** Okay. So in that first box, what do you understand that to be, Mr. Roberts?

**A. That's the initial capitalization table that they were discussing. So they were going to change the ownership in this entity called Trementa from just Brad Quinton to other individuals. And those other individuals would include -- so it would be Brad Quinton, some people he worked with at the company Invionics, and then the last person identified was Karim, who I believe to be Dr. Karim Arabi.**

***Q.*** So that's line 9 of the spreadsheet?

**A. Yes.**

***Q.*** And according to this cap table that Mr. Quinton sent around, what share percentage was Karim going to get in

Trementa?
**A. 66.7 percent of the company. He would get 50,000 of the total 75,000 shares.**
***MR. PILCHAK:*** Okay. Let's take that down for a second.
***BY MR. PILCHAK:***
***Q.*** Are you aware of what ultimately happened with Abreezio?
***A.*** **Yes. So there was an initial discussion of using this company Trementa. Eventually, it evolved into the final named company, which was Abreezio.**
***Q.*** And I'm going to have a whole lot more questions about that. But if we could just fast-forward to the end of that story.
Are you familiar with who owned which shares of Abreezio when it was finally sold to Qualcomm?
***A.*** **Yes.**
***Q.*** And did somebody own 60-some percent of Abreezio?
***A.*** **Yes.**
***Q.*** Who was that?
***A.*** **It was Sheida Arabi, also known as Sheida Alan, who was Dr. Arabi's sister.**
***Q.*** And was her slice of the Abreezio pie 64 percent?
***A.*** **Yes.**
***Q.*** As opposed to I think 66.7 percent in Exhibit 123?
***A.*** **That's correct.**
***Q.*** Okay. All right. Back to Exhibit 122. Let's look at line 5 if we can from this list.

***A.*** **Yes.**

***Q.*** All right. What is Mr. Quinton suggesting to Dr. Arabi that his role will be after making his initial investment?

***A.*** **So he would make an initial investment, and then he would provide technical direction as -- in his role as the inventor of the technology that they were discussing.**

***THE COURT:*** An "inventor" or "investor"?

***THE WITNESS:*** I'm sorry, "investor."

***BY MR. PILCHAK:***

***Q.*** Thank you.

And so during the life span of Abreezio, based on your investigation, did Dr. Arabi himself ever make any kind of cash or capital investment in Abreezio of any kind?

***A.*** **Not that we saw, no.**

***Q.*** Okay. Did you find evidence of him providing technical direction, though?

***A.*** **Yes.**

***Q.*** Got it.

Let's look at line 7. We just missed it in that blowup.

Okay. Do you see Item 7 there, Mr. Roberts?

***MR. FRASER:*** Objection. Motion strike that as an unhelpful opinion under 701. It's unnoticed as expert opinion.

***THE COURT:*** I'm not sure what you're objecting to, what opinion you're objecting to. The last question was -- look at line 7. Can we blow it up? I'm not sure --

***MR. FRASER:*** I thought I heard him say that he found evidence of technical assistance.

***THE COURT:*** No, that was the question. Did you find any evidence of him providing technical assistance? And he said yes.

***MR. FRASER:*** And that is objectionable under 401, 403, 602.

***THE COURT:*** Overruled.

***MR. FRASER:*** Especially 701 because it's unhelpful.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** I do want to be clear, Mr. Roberts. I don't want to overstep.

I think you testified you're not an engineer. Right?

***A.*** **Correct.**

***Q.*** But did you see Dr. Arabi participating in, for example, conference calls that appeared to you to concern technical subjects?

***A.*** **Yes.**

***Q.*** Did you see him sending emails that included, for example, electrical engineering schematics?

***A.*** **Yes.**

***Q.*** Now, you're not an electrical engineer?

***A.*** **No.**

***Q.*** So you might not have understood exactly how those

schematics worked?
**A. Correct.**
*Q.* But did they appear to you to be electrical engineering schematics?
**A. Yes.**
*Q.* And did at least one of them come from the defendant's email account?
**A. Yes.**
*Q.* Okay. So here we are at Item 7. And it talks in Mr. Quinton's email about contracts between Invionics and Trementa; right?
**A. That's correct.**
*Q.* What are those contracts going to clearly delineate?
**A. The IP ownership. IP standing for intellectual property.**
*Q.* And if we just focus on the end of Mr. Quinton's sentence, why would that be important?
**A. So that Trementa could be easily acquired. So another company could then purchase Trementa and the intellectual property that the corporate entity contained.**
*Q.* Okay. Let's take that down and look at 9. Making good progress.
Does Item 9 on this list talk about the primary goal of this placeholder company Trementa?
**A. Yes.**
*Q.* What is that?

**A. The primary goal is to develop a new technology to the point where the company has enough value where -- that it could be demonstrated to a large semiconductor company, including a company like -- and it's QCOM, which I believe to be the ticker symbol for the company Qualcomm.**

**Qualcomm is a publicly traded company, and if you're publicly traded, you have a four-letter code typically that identifies the stock for that company on the stock market if you're trying to place trades. And so the ticker symbol that you would be able to purchase shares of Qualcomm for is QCOM. Qualcomm.**

***Q.*** And so if I'm following correctly, all the way back in October of 2014, Mr. Quinton is talking about whatever new company he is going to set up with Dr. Arabi, marketing itself to large semiconductor companies like Qualcomm.

***A.*** **Yes.**

***MR. PILCHAK:*** We can take that down and take 122 down altogether.

***BY MR. PILCHAK:***

***Q.*** Over the course of your investigation, did you notice any similarities, not between Trementa, but between Abreezio and this plan that's outlaid in this email that we just looked at?

***MR. FRASER:*** Objection. Under 701, his opinions about that are not helpful to the jury. These things are for the jury to decide, not for this witness to --

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** Just factual similarities.

***A.*** **Yes.**

***Q.*** For example, we already talked about technical support. Did Abreezio market itself to Qualcomm?

***A.*** **It did.**

***Q.*** Did it market itself to some other large semiconductor companies as well?

***A.*** **Did.**

***Q.*** Was the majority owner of Abreezio Dr. Arabi's family member?

***A.*** **Yes.**

***Q.*** Was her share ownership off by 2-2/3 percentage points from the one that we just saw in this cap table?

***A.*** **Yes.**

***Q.*** Okay. The email that we were just looking at, Exhibit 122, it had, I think you said, a ten-point plan for Trementa; right?

***A.*** **Yes.**

***Q.*** In which one of those ten points did it mention Sheida Arabi and her new technology?

***A.*** **None of the points mention Sheida Arabi.**

***Q.*** Did any of the points talk about how Dr. Arabi was just helping his sister set up a business for her new invention?

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** Overruled.
***THE WITNESS:*** No.
***BY MR. PILCHAK:***
***Q.*** Were any of the ten points referencing Sheida, the sister, providing any kind of technical advice?
***A.*** **No.**
***MR. PILCHAK:*** Okay. Let's show the witness Exhibit 118, please. Zoom in on the top half of the page there.
***BY MR. PILCHAK:***
***Q.*** Is this another email between Brad Quinton and Karim Arabi?
***A.*** **Yes.**
***Q.*** Not Dr. Arabi's work email, though; right?
***A.*** **No, it was his Hotmail account.**
***MR. PILCHAK:*** Move to admit 118.
***THE COURT:*** Any objection?
***MR. FRASER:*** No.
***THE COURT:*** 118 may be admitted.
***(Exhibit 118 admitted.)***
***BY MR. PILCHAK:***
***Q.*** This is like a month and a half after the one we just looked at?
***A.*** **Yes.**
***Q.*** December 20, 2014?
***A.*** **Yes.**
***Q.*** And what is the subject of this email?

**A. "Trementa Corporate Structure Thoughts/Issues."**
Q. And is this from Mr. Quinton to Dr. Arabi?
**A. Yes.**
***MR. PILCHAK:*** Let's take that down and zoom in on the body of the email, please.
***BY MR. PILCHAK:***
Q. Okay. In that second paragraph there, what kind of issue is Mr. Quinton focused on?
**A. He is concerned about the appearance of the company from an investor/acquirer due diligence point of view.**
Q. Let me stop you there.
What is due diligence?
**A. Due diligence is the work a company would do when they're acquiring another company. So they just -- they would go into the company and review its financials, its technology. They would take steps to try to ensure they understand what it is that they are acquiring in the new company.**
Q. And based on your investigation and your review of extensive documents, did Qualcomm try to conduct due diligence in the Abreezio transaction?
**A. They did.**
Q. Was one the questions that they asked -- and I'm paraphrasing here -- please tell us who are the control persons in Abreezio?
**A. Yes.**

*Q.* Did they want to know about the investors in Abreezio?

***A.*** **Yes. They wanted a cap table.**

*Q.* And did they also have some follow-up questions about some of those investors?

***A.*** **Yes.**

*Q.* Got it.

So back to Brad's email here in December of 2014. Mr. Quinton suggests something called an independent investor in that second sentence of the paragraph we were just reading.

What do you understand that to mean?

***A.*** **What I mean -- what that means is having an independent person, somebody from the outside, inject additional capital into the company. So it's an independent investor not somebody directly related with the founders of the company.**

*Q.* And in your experience investigating white collar crimes, how can that help it?

***A.*** **It just shows that there's another independent set of eyes on the company and the corporate structure. And so he is pointing out the fact that having another independent investor would make the company appear better during the due diligence process.**

*Q.* Got it.

Did Abreezio actually add some people like that during its life span?

***A.*** **They did.**

***Q.*** Was one them Behrooz Abdi?

**A. Yes.**

***Q.*** We'll probably come back to him.

***MR. PILCHAK:*** And let me stop there, and we can take that down.

***THE COURT:*** Okay. At this point, Mr. Pilchak, there has been a request to end a little bit early today. So is now an okay breaking time?

***MR. PILCHAK:*** Any time is an okay breaking time, your Honor.

***THE COURT:*** Ladies and gentlemen, we are going to break early today. It's good for you because it's pouring rain out and the traffic is going to be really dreadful on the way home. So we will get you out before the traffic starts backing up from the people leaving from downtown.

But we will resume at 9:00 o'clock tomorrow morning. You are reminded that you are not to do any research about the case or discuss the case with anyone. And we will see you tomorrow morning at 9:00 o'clock.

And you are excused until 9:00 o'clock tomorrow morning.

***MR. OLAH:*** Your Honor, we have a question.

***JUROR:*** Leave these here?

***THE COURT:*** Leave the notebooks right there on your chair, and no one will look at them or take them.

***(Jury out at 3:32 p.m.)***

***THE COURT:*** We're now outside the presence of the jury. I had a couple of quick issues. One is, and I'm not entirely clear, one of the alternate jurors expressed some concerns to Lindsey about he felt he was being intimidated somehow. So I suggested that he write out whatever his concerns were and we can take a look at that. And so I don't know what it concerns.

I think it may have had to do with an audience member. And I -- this is just me reading between the lines. It may have been a little bit of paranoia on his part. But we'll take a look at what his concerns are.

***MS. BERNSTEIN:*** Your Honor, on that note, I'd advised the Government, as well as your courtroom deputy, that this morning -- it's the -- it's an older, white gentleman sitting in the front row. I don't believe he is an alternate. I think he has a blue coat on. But we were both getting the elevators at the same time and he pushed the button and I said I'm going to let you go up. It was an interaction. I just wanted to disclose it to the Court.

***THE COURT:*** I don't think that was the individual that was expressing concern. So I think this is something different.

***MS. BERNSTEIN:*** Okay.

***THE COURT:*** Second of all, can we get a defense witness -- exhibit list?

***MS. BERNSTEIN:*** Oh, of course.

***THE COURT:*** I've got the Government's. It just makes it easy for me to check them off. Instead, I've got my numbers scribbled over the pages. And if we have them in order I can check them off.

***MS. BERNSTEIN:*** Of course we will update that.

***THE COURT:*** Then the last thing is for all parties, I would appreciate it if you'd just do -- no speaking objections. I know the Evidence Code. You can just list the number. I know what that means, and you don't have to tell me the reasons why you think it applies. I can follow you.

***MR. PILCHAK:*** Just so I don't mess that up, your Honor, is it okay to say hearsay?

***THE COURT:*** Yes, that's fine.

***MR. PILCHAK:*** But nothing after that.

***THE COURT:*** Just a one word, hearsay, relevance, I'm fine with all of that, but I don't want an argument about it.

***MR. PILCHAK:*** Great. We had two things.

***THE COURT:*** Yes.

***MR. PILCHAK:*** Number one, I think we've been working very productively with the defense about providing advanced notice about our witnesses and then slightly less advanced notice about our exhibits. So we're batting about 72 hours, maybe slightly less, for witnesses hitting the stand, and then exhibits is a little tighter than that. I say that --

***THE COURT:*** It would be helpful to me to learn as well.

Because I have some documents produced from Qualcomm, and if I can just look at the ones that pertain to the witness that's going at that time, then that would make it a lot easier for me.

***MR. PILCHAK:*** We'll email Ms. Finch when we get back to the office. I'm noting that because we'll be asking for the same thing from the defense when it's their turn.

***THE COURT:*** For the same reason, it's also helpful to me to know. So that if there's a witness that's going to testify, that I have something from Qualcomm, I can read it and see what it looks like.

***MR. PILCHAK:*** Great. The other thing is the Court might remember, I don't want to say extensive, but some vigorous litigation about Endura in the *in limines* and the defense fought to keep them out. We had a lot of questions about Endura today, including showing Mr. Pankaj the disclosure email from Dr. Arabi.

***MS. BERNSTEIN:*** It had nothing to do with Endura.

***MR. PILCHAK:*** Sorry, that was a different disclosure email.

***MS. BERNSTEIN:*** Yeah.

***MR. PILCHAK:*** There was a bunch of questions about Endura though, so we're going to go back to our office and crunch whether we think the door has been opened on that. Obviously I need to look more closely at my notes because I got the disclosure thing incorrect just now. But we'll revisit that

with the Court tomorrow if we need to.

**MS. BERNSTEIN:** One comment from us, your Honor, is that late last night Qualcomm filed a motion at Docket 366.

**THE COURT:** I saw it. 8:00 o'clock seems to be the magic hour. Somewhere between 8:00 and 9:00, everyone wants to get my attention.

**MS. BERNSTEIN:** I don't think that the issues in there --

**THE COURT:** Are ripe yet.

**MS. BERNSTEIN:** -- are going to come up before quite some time.

**THE COURT:** I figured the same.

**MS. BERNSTEIN:** If it's okay with the Court that we don't respond to that in any rush.

**THE COURT:** At some point you will respond to it, and at some point I'll rule on it. I don't think we need to do that immediately. I've read the motion, so whenever you can get a response to me, I'll take a look at it.

**MS. BERNSTEIN:** I assure you I will be correcting the record, but if we don't have to do that very quickly, that would be great.

**THE COURT:** All right.

**MR. PILCHAK:** Thank you, your Honor.

***(The Court and Clerk conferred sotto voce.)***

**THE COURT:** She said that several of the exhibits from

the defense did not -- were not on her list. So anyway, it's helpful if we have a list.

***MS. BERNSTEIN:*** We will do that, your Honor. But I guess that does raise somewhat of a tricky issue with impeachment. We have things that we're kind of marking on the fly for impeachment.

***THE COURT:*** That's fine.

***MS. BERNSTEIN:*** Okay.

***THE COURT:*** It's just that you've got thousands of exhibits and if I have 2691, 3241, and they're all -- then I try and look and see if they've been admitted and I try and put them in order but they're not in order and it's hard -- right now I'm on top of it. But when we get to the point where I've got a hundred all listed in different order, it's very difficult for me to figure out whether I've admitted it or not.

***MS. BERNSTEIN:*** Yeah. We will work on a better system if we can.

***THE COURT:*** Okay.

***MS. BERNSTEIN:*** Thank you.

***THE COURT:*** Anything else?

***MR. PILCHAK:*** No, your Honor.

***MS. BERNSTEIN:*** No, your Honor.

***THE COURT:*** Great. 9:00 o'clock tomorrow.

***MS. BERNSTEIN:*** Sorry, your Honor. Mr. Fraser.

***MR. FRASER:*** I think there's a couple evidentiary

issues that could be recurring but discussing them I think involves some confidential defense strategy. I would ask if the Court would consider hearing us on a brief conference *ex parte* or in chambers on those. I think it could smooth the process.

***THE COURT:*** I'm not that comfortable with an *ex parte* disclosure in the middle of trial without knowing more about what I'm having an *ex parte* disclosure about. So if you want to file something under seal or request that it be filed under seal, I'll take a look at it and decide if I'm going to grant whether it be filed under seal. That's about all I can suggest.

***MR. FRASER:*** Thank you. If the Court decides to deny the request to consider it under seal, we would ask to return it.

***THE COURT:*** Okay.

***MR. FRASER:*** Thank you.

***THE COURT:*** Thank you.

***THE CLERK:*** This court is now in recess.

***(Proceedings adjourned at 3:38 p.m.)***

***

*REPORTER'S CERTIFICATE*

I, Anne Roldan, certify that I am a duly qualified and acting Official Court Reporter for the United States District Court, that the foregoing is a true and accurate transcript of the proceedings as taken by me in the above-entitled matter on March 11, 2025; and that the format used complies with the rules and requirements of the United States Judicial Conference.

Date: March 11, 2025

*Anne Roldan, RMR, CRR, CSR 13095*