UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 22-cr-1152-BAS |
| | ) | |
| Plaintiff, | ) | March 12, 2025 |
| vs. | ) | |
| | ) | Jury Trial, Day 3 |
| KARIM ARABI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CYNTHIA A. BASHANT
CHIEF DISTRICT JUDGE

VOLUME 3, PAGES 452 - 752

APPEARANCES:

FOR PLAINTIFF: UNITED STATES ATTORNEY'S OFFICE
880 Front Street, Suite 6293
San Diego, California 92101
By: *NICHOLAS W. PILCHAK, AUSA*
*JANAKI G. CHOPRA, AUSA*
*ERIC R. OLAH, AUSA*

FOR DEFENDANT: BIENERT KATZMAN LITTRELL WILLIAMS, LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
By: *WHITNEY Z. BERNSTEIN, Esq.*
*REBECCA S. ROBERTS, Esq.*
*RYAN V. FRASER, Esq.*

REPORTED BY:

ANNE MARIE ROLDAN, RMR, CRR, CSR 13095
U.S. OFFICIAL COURT REPORTER
U.S. District Court Clerk's Office
333 West Broadway, Suite 420
San Diego, California 92101

Reported stenographically; transcribed with CAT software.

# I N D E X

***

## E X A M I N A T I O N S


| WITNESS | VOL. | PAGE | LINE |
|---|---|---|---|
| *FOR THE GOVERNMENT:* | | | |
| JOHN ROBERTS | | | |
| Direct by Mr. Pilchak | 3 | 461 | 18 |
| Cross by MR. FRASER | 3 | 567 | 20 |
| Redirect by Mr. Pilchak | 3 | 618 | 18 |
| Recross by Mr. Fraser | 3 | 625 | 1 |
| Further Redirect by Mr. Pilchak | 3 | 720 | 18 |
| ESIN TERZIOGLU | | | |
| Direct by Mr. Pilchak | 3 | 627 | 7 |
| Cross by Ms. Roberts | 3 | 675 | 9 |
| Redirect by Mr. Pilchak | 3 | 696 | 5 |
| Recross by Ms. Roberts | 3 | 706 | 21 |
| HITEN SOMWAL | | | |
| Direct by Mr. Olah | 3 | 709 | 20 |


## E X H I B I T S


| ADMITTED | VOL. | PAGE | LINE |
|---|---|---|---|
| *FOR THE GOVERNMENT:* | | | |
| Ex. 1 | 3 | 553 | 2 |
| Ex. 2A | 3 | 556 | 9 |
| Ex. 3 | 3 | 553 | 8 |
| Ex. 3A | 3 | 556 | 9 |
| Ex. 4 | 3 | 476 | 1 |
| Ex. 5 | 3 | 476 | 1 |
| Ex. 5A | 3 | 481 | 4 |
| Ex. 67 | 3 | 715 | 3 |
| Ex. 75 | 3 | 715 | 3 |
| Ex. 76 | 3 | 715 | 3 |
| Ex. 91 | 3 | 531 | 18 |
| Ex. 92 | 3 | 531 | 18 |

# E X H I B I T S (CONT.)


| ADMITTED | VOL. | PAGE | LINE |
|---|---|---|---|
| Ex. 107 | 3 | 489 | 14 |
| Ex. 109 | 3 | 532 | 20 |
| Ex. 111 | 3 | 483 | 23 |
| Ex. 112 | 3 | 483 | 23 |
| Ex. 113 | 3 | 522 | 15 |
| Ex. 114 | 3 | 522 | 15 |
| Ex. 115 | 3 | 539 | 2 |
| Ex. 119 | 3 | 464 | 24 |
| Ex. 120 | 3 | 463 | 9 |
| Ex. 195 | 3 | 530 | 13 |
| Ex. 196 | 3 | 530 | 13 |
| Ex. 214 | 3 | 492 | 14 |
| Ex. 215 | 3 | 495 | 3 |
| Ex. 219 | 3 | 519 | 12 |
| Ex. 220 | 3 | 519 | 12 |
| Ex. 221 | 3 | 526 | 17 |
| Ex. 222 | 3 | 526 | 17 |
| Ex. 237 | 3 | 509 | 15 |
| Ex. 240 | 3 | 513 | 8 |
| Ex. 242 | 3 | 515 | 19 |
| Ex. 253 | 3 | 506 | 4 |
| Ex. 600 | 3 | 685 | 1 |
| Ex. 662 | 3 | 531 | 1 |
| Ex. 663 | 3 | 531 | 1 |
| Ex. 785 | 3 | 501 | 21 |
| Ex. 793 | 3 | 549 | 1 |
| Ex. 805 | 3 | 552 | 4 |
| Ex. 806 | 3 | 497 | 5 |
| Ex. 808 | 3 | 552 | 4 |
| Ex. 812 | 3 | 552 | 4 |
| Ex. 818 | 3 | 537 | 8 |
| Ex. 830 | 3 | 549 | 1 |
| Ex. 863 | 3 | 529 | 24 |
| Ex. 863A | 3 | 529 | 24 |
| Ex. 864 | 3 | 598 | 4 |
| Ex. 866 | 3 | 479 | 10 |
| *FOR THE DEFENSE:* | | | |
| Ex. 2183 | 3 | 615 | 25 |
| Ex. 2845 | 3 | 678 | 2 |
| Ex. 2877 | 3 | 656 | 12 |

***WEDNESDAY, MARCH 12, 2025, 9:00 A.M.***

***

***THE COURT:*** Good morning. We are outside the presence of the jury. I just wanted to let you know the note that we got from the alternate juror. He says, "I hope this email finds you well. I'm reaching out, I wanted to share some important details with you.

"As I mentioned, I learned today that the defendant is Iranian, which happens to be my own ethnicity. I also found out that there is involvement with individuals in Vancouver, Canada, where I have both family and a close friend. While I do not know the defendant personally and have no recollection of ever meeting him, I cannot be certain that he or someone connected to him may have crossed paths with me or my family at some point."

He then describes where his father works, what his father does. And then -- which is not engineering, by the way, and has nothing to do with what we're doing in this case.

"Additionally, I think it's worth noting that the dynamics within the Iranian community in Vancouver are quite different from those here, with stronger and more interconnected relationships, for better or for worse.

"Lastly, I noticed an individual in the courtroom

today, a young man, who at first glance, I would guess might also be Iranian. He initially sat on the defendant's side during the first testimony but later moved closer to the jury, sitting in the back row behind the Government attorneys. There were more empty seats behind the defendant than where he ended up. He had to pass four or five individuals to get to that empty seat.

"I can't say with certainty that this has any significance, but it stood out to me. I am aware that my mind may simply be overanalyzing things, and I certainly don't want to sound paranoid. However, these thoughts have been lingering, and since I have no one else I can discuss them with, I felt it was important to bring them to your attention.

"Please know that I remain fully committed to fulfilling my duty and will continue to do so as long as you find me fit to serve. Thank you very much for your understanding. And please don't hesitate to reach out."

So I just wanted to share that with you. I think at some point what I will do, if you are comfortable with it, is just say to the jurors -- and I usually do say it after the jury selection process, I just omitted it this time around -- that the jury selection process is sealed, that the jurors are

referred to only by their numbers, that their names are not public information, and that's for their own protection or something along those lines. I don't know if there's anything else you want me to say.

***MS. BERNSTEIN:*** Your Honor, I believe it makes sense to speak with him individually and just to confirm that this won't have a bearing on his ability to deliberate. This is the individual, if I'm recalling correctly, who had also sat in the first seat and said that he had anxiety sitting. So I -- if there's an issue, I'd rather know now as opposed to later.

***THE COURT:*** Okay.

***MR. PILCHAK:*** Your Honor, I have some facts just for the Court. I don't have a strong position on this. That doesn't sound unreasonable to me. But I'm 99 percent sure that the person is he referring to in the gallery yesterday who switched sides from the Defense to the Government side is one of my law students from California Western School of Law.

***THE COURT:*** Okay.

***MR. PILCHAK:*** And so I can -- well, I can't assure the Court -- he could be a secret assassin that I don't know about.

***THE COURT:*** Perhaps we can tell him that --

***MR. PILCHAK:*** I'm pretty confident he's not.

***THE COURT:*** -- that we looked into it, and it's a student, an intern who works with the Government's office or something like that.

***MR. PILCHAK:*** I don't think we need to say which side he works with, but he's a law student who's affiliated with one of the parties, and that is no -- or maybe not one of the parties, one of the law firms, just to neutral it up a little, unless Defense objects.

***MS. BERNSTEIN:*** An observing law student.

***MR. PILCHAK:*** Yeah. There you go.

***MS. BERNSTEIN:*** I mean, think I've noticed, Your Honor that there's plenty of people that are coming each day to observe the trial, and that I imagine will continue to happen as well. So if we can find out whether or not he can, in fact, deliberate and then try and put his mind at ease, I think that would be best.

***THE COURT:*** Okay. I'm not going to do that right now, but I will do that at some point during the day. The court reporter said she also blocks out the jurors' names in the transcripts, so that's something I had requested a long time ago. We have had issues -- that's why I always refer to them by numbers. We've had issues, not generally in a case of this type but in other case where jurors have been very nervous about serving because there are allegations of violence or that sort of thing.

***MS. BERNSTEIN:*** And I think Your Honor can also remind him that we did read the list of individuals, so that should give him some comfort. It sounds like he's not concerned that

he might have forgotten a relationship, but just that there might be some.

***THE COURT:*** Thank you. I think as you mentioned at the beginning and as he mentioned at the beginning, I think he's just very anxious about the whole thing.

Are we ready to bring the jury in?

***MR. FRASER:*** No, Your Honor.

***THE COURT:*** Go ahead.

***MR. FRASER:*** Did we finish that topic?

***THE COURT:*** Yes, we're done.

***MR. FRASER:*** Mr. Pilchak, and I appreciate this, brought it to my attention that there are certain exhibits -- it sounds like many exhibits that he intends to ask questions of John Roberts about. And John Roberts is not in here; right?

***MR. PILCHAK:*** No.

***MR. FRASER:*** And he intends, if I understand correctly, unless he's changed his mind, he does intend to have John Roberts describe some of the contents of those exhibits.

I object to their admission into evidence, and I understand the Government doesn't intend to admit them today. And since I think their admission is in dispute, I don't think the Government should go into the contents of the exhibits.

I think it's perfectly fine for Mr. Pilchak to have him identify those, for example, as documents that he got from a search warrant or a subpoena. But to actually describe their

contents when the question of their admissibility is still in doubt, I would object to that. I think it's better to discuss now before the jury hears it and it sort of can't be erased from their memory.

***THE COURT:*** We're kind of talking in a vacuum here. I don't really know what we're talking about.

But go ahead, Mr. Pilchak.

***MR. PILCHAK:*** So there's 28 emails and attachments that are relevant to our financial investigation. Mr. Roberts didn't take the lead in the financial investigation, but he sees them as part of his warrant search. And so I think both Mr. Fraser and I agree that I can show those 28 documents to the witness *en masse* to save time for the jury and say, Did you seize these during the warrant search.

I had suggested to Mr. Fraser maybe asking one or two more questions like, Do all of those that are correspondence involve either Sheida Alan or an email address that has Sheida's name in it, and do some of them involve Dr. Arabi, and just leaving it at that so the jury has some dim sense of what they are before we later seek to admit them through another witness maybe significantly down the road. But I don't think those are about the contents of the documents *per se*, but I'd defer to the Court on that.

***THE COURT:*** Yeah, I don't have a problem with that, so I'll allow him to at least ask, Are these documents you seized,

what email address are they associated with.

**MR. PILCHAK:** That's the idea.

**THE COURT:** Okay. Let's bring the jury in.

I am going to mark the email as an exhibit. I am going to black out the information he provided that identifies his father and where his father works, since I don't think that's really necessary.

**MR. PILCHAK:** That's fine, Your Honor.

**THE COURT:** And if we can bring the witness in as well.

**MR. PILCHAK:** Yes. We're doing that. Thank you.

**THE COURT:** Great.

***(Jury in at 9:06 a.m.)***

**THE COURT:** Okay. We are back on the record. All jurors are present. All lawyers are present. Dr. Arabi is present. You, sir, are reminded that you're still under oath to tell the truth.

Counsel?

***DIRECT EXAMINATION (CONT.)***

***BY MR. PILCHAK:***

***Q.*** Good morning, Mr. Roberts.

***A.*** **Good morning.**

***Q.*** If you remember at the end of the day yesterday when we were wrapping up, we were discussing some correspondence between Dr. Arabi and Brad Quinton.

Do you remember that?

**A. I do.**
*Q.* I think the last communication that we looked at was in December of 2014.
Does that seem right to you?
**A. Yes.**
*Q.* Roundabout the same time, in early December of 2014, was there evidence that you found of Dr. Arabi meeting with some people at Invionics at about that time?
**A. Yes.**
*Q.* And remind the jury, what is Invionics, please?
**A. Invionics was the company that Brad Quinton worked for and was part owner for up in Canada.**
***MR. PILCHAK:*** And can we show the witness Exhibit 120, please.
***BY MR. PILCHAK:***
*Q.* Do you see that on your screen there, Mr. Roberts?
**A. Yes.**
***MR. PILCHAK:*** Maybe we can zoom in on the top there, make it a little larger. Sorry. All the text that we can see, please. Great.
***BY MR. PILCHAK:***
*Q.* Do you see that there, Mr. Roberts?
**A. I do.**
*Q.* Is this some of that evidence that you were just talking about?

***A.*** **Yes.**

***Q.*** Is it an email from Brad Quinton to other individuals at Invionics?

***A.*** **It is.**

***MR. PILCHAK:*** Move to admit 120.

***THE COURT:*** Any objection?

***MR. FRASER:*** No, Your Honor.

***THE COURT:*** 120 may be admitted.

***(Exhibit 120 admitted.)***

***BY MR. PILCHAK:***

***Q.*** All right. So what is the jury looking at here, Mr. Roberts?

***A.*** **This is an email from Brad Quinton at his Invionics email address to other people who worked at Invionics, Andrew Hughes, Trent McClements, and Mike Lee.**

**And Mr. Quinton states that he has an online meeting set up with Karim, who I believe to be Karim Arabi, for December the 4th. He wanted the other individuals from Invionics to attend the meeting and stated that Karim was going to go over his idea/patent.**

***Q.*** Sorry, there was a bit of a noise.

His idea, slash, what?

***A.*** **Patent.**

***Q.*** Okay. Is there any reference in this invitation to "Sheida's idea"?

***A.*** **No.**
***Q.*** To "Sheida's patent"?
***A.*** **No.**
***Q.*** To "Sheida's new business"?
***A.*** **No.**
***Q.*** Okay. There was additional correspondence between Mr. Quinton and Dr. Arabi as well, wasn't there?
***A.*** **There was.**
***MR. PILCHAK:*** Let's show the witness and the witness only Exhibit 119. And if we could zoom in on the top half of the page, please.
***BY MR. PILCHAK:***
***Q.*** What is this, Mr. Roberts?
***A.*** **This is another email from Brad Quinton at his Invionics account to Karim Arabi at his Hotmail account.**
***Q.*** And it looks like the top message is six days after that meeting that we just saw the invitation for?
***A.*** **Yes, so on December 10th, 2014.**
***Q.*** Got it.
***MR. PILCHAK:*** So let's move to admit 119.
***THE COURT:*** Any objection?
***MR. FRASER:*** No.
***THE COURT:*** 119 may be admitted.
***(Exhibit 119 admitted.)***
***MR. PILCHAK:*** And zoom out please and go to the bottom

half, actually, of this first page.

***BY MR. PILCHAK:***

***Q.*** Is this an email chain with multiple messages, Mr. Roberts?

***A.*** **Yes. There's some back and forth between the two parties.**

***Q.*** Okay. What did Brad say in this December 8th message at the bottom of the first page that he and Jim spent a good day looking at?

***A.*** **They were taking a look at the corporate structure and he wanted to talk about it.**

***Q.*** And there's a reference to Trementa as well; right?

***A.*** **That's correct, the business name, Trementa.**

***Q.*** And what is this about someone that Dr. Arabi could trust?

***A.*** **They were looking for somebody they could trust to be added to the Board of Trementa, the Board of Directors.**

***Q.*** Sorry, we lost our zoom there.

And specifically, when they were looking for someone that they could trust, what did Mr. Quinton say about whether that person should be related to Dr. Arabi?

***A.*** **Someone who is not related to Mr. Arabi.**

***Q.*** Okay. And then the final sentence of that big paragraph is what, please?

***A.*** **"It would be really good to have an independent Board member outside of Invionics."**

***Q.*** Is that the same idea that we saw in some correspondence yesterday, that it would be helpful to have some independent

people in the business?

**A. Yes.**

*Q.* Yesterday, in the other correspondence, when Mr. Quinton was talking about that, what perspective did he say -- from what perspective did he say that would help the new business?

**A. It would help from the perspective of an outside acquirer looking to purchase Trementa, having an independent Board member would make the company look better from that perspective.**

*Q.* Got it.

***MR. PILCHAK:*** Let's zoom out from that part, please, and pick up the response from Dr. Arabi. I think it's the next message. Nope, sorry. If we go up, yeah, there it is. The next message up. Perfect.

***BY MR. PILCHAK:***

*Q.* Do you see that there, Mr. Roberts?

**A. I do.**

*Q.* Did Dr. Arabi actually suggest a real person as a candidate?

**A. He does.**

*Q.* Who is that?

**A. It's a Professor Bozena Kaminska from SFU, which is Simon Fraser University in Canada.**

*Q.* Did you identify Professor Kaminska as a real person who is a real professor at Simon Fraser?

**A. Yes, I did.**

*Q.* And what was her relationship to Dr. Arabi?

***A.*** **They had started a company together before, and she was currently supervising Dr. Arabi's sister related to her education.**

***Q.*** And so it's your understanding from reviewing records that Sheida Arabi -- at that time, her name was Sheida Arabi?

***A.*** **Yes.**

***Q.*** Was working at -- studying at Simon Fraser University?

***MR. FRASER:*** Objection. 602. Hearsay.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** Who does Dr. Arabi say is supervising his sister at that time?

***A.*** **He says Professor Bozena Kaminska is supervising his sister.**

***Q.*** And where was Bozena Kaminska?

***A.*** **She was at Simon Fraser University in Canada.**

***Q.*** Got it.

And what is that last sentence of the paragraph you were just alluding to?

***A.*** **"I was thinking of talking to her and changing my sister's MSC thesis to work on Trementa."**

***Q.*** And "Trementa" is not spelled quite right there; right?

***A.*** **Correct.**

***Q.*** So Dr. Arabi tells Mr. Quinton that he was going to talk to Bozena Kaminska?

***A.*** **Yes.**

***Q.*** And change whose thesis?
***A.*** **His sister's.**
***Q.*** What is an MSC?
***A.*** **I believe it's a Master's in Science.**
***Q.*** Does he say he's going to ask his sister if it would be okay to change her work?
***A.*** **No.**
***Q.*** What does he say he's going to do instead?
***MR. FRASER:*** Objection. I think the document does speak for itself.
***THE COURT:*** Sustained.
***BY MR. PILCHAK:***
***Q.*** When he says "change the thesis to work on Trementa," what had Mr. Quinton and Dr. Arabi been talking about with Trementa?
***MR. FRASER:*** Objection. 602. Hearsay.
***THE COURT:*** Overruled.
***THE WITNESS:*** They were talking about bringing in an independent Board member.
***BY MR. PILCHAK:***
***Q.*** Okay. And then earlier than that, had they discussed using Trementa as a vehicle for some new intellectual property?
***A.*** **Yes.**
***MR. PILCHAK:*** All right. Let's take that down.
***BY MR. PILCHAK:***
***Q.*** Do you know whether Bozena Kaminska was eventually placed on

a Technical Advisory Board for the new company, Abreezio, that Mr. Quinton served on?

***A.*** **She was.**

***Q.*** Did you see any evidence in your investigation that that Board actually did anything?

***MR. FRASER:*** Objection. Lacks foundation for personal knowledge.

***THE COURT:*** Overruled.

***THE WITNESS:*** No.

***BY MR. PILCHAK:***

***Q.*** What about Professor Kaminska specifically?

I think you said yesterday that you had access to hundreds of thousands of communications, and then you also reviewed business records as part of your investigation. Right?

***A.*** **Yes.**

***Q.*** You subpoenaed one business or more than one business for records about Abreezio?

***A.*** **Multiple.**

***Q.*** And based on your review of those business records and the thousands of communications, did you find any evidence that Professor Kaminska did anything for Abreezio at all?

***MR. FRASER:*** Objection. 701, 702.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** Factually, in the records that you reviewed, did you find

Professor Kaminska drawing a salary from Abreezio?

**A.** **No.**

***Q.*** Did you find time cards for her working at Abreezio?

**A.** **No.**

***Q.*** Did you find invoices to Abreezio for her services?

**A.** **No.**

***Q.*** Did you find any summary of the work that she had performed for Abreezio?

**A.** **No.**

***Q.*** Did you find any records of her meeting with people on Abreezio's behalf?

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** Overruled.

***THE WITNESS:*** No.

***BY MR. PILCHAK:***

***Q.*** Then I presume Professor Kaminska didn't receive any money as a result of the Abreezio purchase?

***MR. FRASER:*** Objection. Hearsay. Argumentative.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** Did Professor Kaminska receive any money as part of the Abreezio purchase?

***MR. FRASER:*** Objection. 601, 802.

***THE COURT:*** Sustained. Sustained.

///

***BY MR. PILCHAK:***
***Q.*** Did you review records about who was paid as part of the Abreezio purchase?
***A.*** **I did.**
***Q.*** Did those include wire transfer records reflecting who was paid what share of the $150 million that Qualcomm paid as part of the Abreezio transaction?
***A.*** **Yes.**
***Q.*** Did Professor Kaminska receive some of that money?
***A.*** **She did.**
***MR. FRASER:*** Objection. Lacks personal knowledge. Hearsay.
***THE COURT:*** Overruled.
***THE WITNESS:*** She did.
***BY MR. PILCHAK:***
***Q.*** How much was Professor Kaminska paid?
***A.*** **My recollection, it was approximately less than 300,000, like, 280-something thousand is my recollection.**
***Q.*** And did she receive that money based on shares that she was granted in Abreezio?
***A.*** **Yes.**
***MR. PILCHAK:*** Actually, can we get that last exhibit back up, please? So the last exhibit was 119, please. And let's pick up that top message from Brad, please. Thank you, Mr. Reyes.

***BY MR. PILCHAK:***

***Q.*** Okay. Is this a response from Brad Quinton in the same message chain?

***A.*** **Yes, it is.**

***Q.*** And it's a response, in part, to Dr. Arabi's suggestion about Professor Kaminska; right?

***A.*** **That's correct.**

***Q.*** What does Mr. Quinton say in the second sentence of that big paragraph on top?

***A.*** **That he would be careful about Mr. Arabi's sister working on Trementa while she was at SFU, Simon Fraser University, as the University could potentially claim ownership of the IP that was developed.**

***Q.*** Got it.

And do you remember yesterday in that October of 2014 email from Mr. Quinton where he had the 10-point plan for Trementa?

***A.*** **Yes.**

***Q.*** Was one of those points about keeping Trementa's IP clean so that it could be acquired by another company?

***A.*** **That's correct.**

***Q.*** Does that seem to be the same concern that Mr. Quinton is raising here?

***MR. FRASER:*** Objection. 701.

***THE COURT:*** Sustained.

***MR. PILCHAK:*** I'll withdraw that question, Mr. Roberts.

We can take that down.

***BY MR. PILCHAK:***

***Q.*** By the way, we were talking about Professor Kaminska a little bit.

Did you review correspondence between Dr. Arabi and Bozena Kaminska apart from his suggesting her to Mr. Quinton here?

***A.*** **Yes.**

***Q.*** Do you know from those records how Sheida Arabi and Bozena Kaminska came to be introduced?

***MR. FRASER:*** Objection. 602.

***THE COURT:*** Overruled.

***THE WITNESS:*** Through the emails that I reviewed, I saw that Dr. Arabi's sister was introduced to Professor Kaminska through -- through Dr. Arabi.

***BY MR. PILCHAK:***

***Q.*** So Dr. Arabi himself made the introduction?

***A.*** **Yes.**

***Q.*** Okay. Let me change topics just slightly, Mr. Roberts.

At about the same time that Dr. Arabi was exchanging these emails with Brad Quinton, did you find evidence that he was corresponding with his sister, Sheida Arabi, about some provisional patent applications?

***A.*** **I did.**

***MR. PILCHAK:*** First, let's show the witness Exhibit 4, please, and Exhibit 5.

And, Mr. Roberts, if you'd like to see both of them together, you can pull that binder next to you. Maybe not that one, probably the one that has the zero to 100 series.

On your screen, you can see four -- is that four or 14? I can't see the sticker. No, that should be good. Thank you. Sorry. We can zoom in on the top half of that, and then maybe you pull five in the binder, how about that. Great.

***THE COURT:*** So it is four you're --

***MR. PILCHAK:*** Four is on the screen for Mr. Roberts.

***THE COURT:*** Okay.

***MR. PILCHAK:*** And I believe the record can reflect he's looking at Exhibit 5 in his hard copy binder there.

***THE COURT:*** Thank you.

***THE WITNESS:*** Yes.

***BY MR. PILCHAK:***

***Q.*** Thank you, Mr. Roberts.

What are these two documents?

***A.*** **These two documents, the first one is an email, and the second one is an attachment to an email, which is a PowerPoint presentation.**

***Q.*** And the top email, is that sent from Dr. Arabi to an email address with Sheida's name on it?

***A.*** **It is.**

***Q.*** And we're going to have to keep careful track of this today, but did you review some records for this Sheida Arabi email

account?

***A.*** **I did. It's the email account, ArabiSheida@gmail.com.**

***Q.*** And who do you believe used that email account?

***A.*** **I believe Sheida Arabi used that email account.**

***Q.*** Did she identify it as hers in some civil discovery responses, for example?

***A.*** **Yes.**

***Q.*** Is it also subscribed to her?

***A.*** **Yes.**

***Q.*** Did you pull that subscriber information as part of your investigation?

***A.*** **Yes.**

***Q.*** And where did this email and the attachment specifically come from?

***A.*** **I don't recall, because we searched both of the email accounts. I don't specifically recall which one this came from.**

***Q.*** So you're saying you're not sure which email account it came from, but when you say you searched those accounts, do you understand this to be from a warrant search of one of these two email accounts?

***A.*** **Of one of the two accounts, yes.**

***MR. PILCHAK:*** Okay. Move to admit 4 and 5.

***THE COURT:*** Any objection?

***MR. FRASER:*** No.

***THE COURT:*** Four and 5 may be admitted.

***(Exhibits 4 and 5 admitted.)***

***BY MR. PILCHAK:***

***Q.*** So on the screen now, what are we looking at here, Mr. Roberts?

***A.*** **So this is an email from Dr. Arabi to his sister, Sheida Arabi. In the email, Dr. Arabi asked his sister if she got an email -- or to let him know if she gets an email about a provisional patent application.**

***Q.*** And, again, slight misspelling there, but that's how you understood it?

***A.*** **Yes.**

***Q.*** And you believe this is with an account actually used by Ms. Arabi herself?

***A.*** **Correct.**

***Q.*** The date of this email, is it right about the same time as that correspondence between Dr. Arabi and Mr. Quinton?

***A.*** **It is. It's December 15th, 2014.**

***Q.*** Got it.

And I think you mentioned an attachment; right?

***A.*** **Correct.**

***MR. PILCHAK:*** Can we see the first page of Exhibit 5, please?

If everyone could rotate their head 90 degrees. I hope everybody took some Tylenol this morning. Can we rotate that? It looks like my team's working on it.

How about this? Let's go to the document camera. Mr. Roberts, can you hand me the first page of the hard copy exhibit, please?

Permission to approach the witness, Your Honor?

***THE COURT:*** You may.

***MR. PILCHAK:*** While they're working on that, I'll work on this. And let's see what we can do here.

***THE COURT:*** There you go.

***BY MR. PILCHAK:***

***Q.*** Is this Exhibit 5, Mr. Roberts?

***A.*** **It is.**

***Q.*** There's kind of a lengthy title here; right?

***A.*** **Yes.**

***Q.*** And you understand this to be the attachment of that email we were just looking at?

***A.*** **Yes.**

***Q.*** Can you read the title of this PowerPoint to the jury, please?

***A.*** **"Circuitry and method for critical path timing speculation to enable process variation compensation via voltage scaling."**

***Q.*** Did you notice anything about the title of these slides?

***A.*** **Yes. The title of this slide matched to a patent that was ultimately filed.**

***Q.*** Over Sheida Arabi's name; right?

***A.*** **Correct.**

***Q.*** And does it match word-for-word to the title of that provisional patent application?
***A.*** **Yes.**
***Q.*** And this lists kind of a name under the title; right?
***A.*** **Yes.**
***Q.*** But it doesn't list the name Sheida Arabi, does it?
***A.*** **No. It says Shadi Arabi.**
***Q.*** Are you familiar with someone named Shadi Babataheri?
***A.*** **Yes.**
***Q.*** Who is Shadi Babataheri?
***A.*** **Dr. Arabi's wife.**
***Q.*** And I apologize if I'm saying that incorrectly.
Have you also seen documents referring to Dr. Arabi's wife as Shadi Arabi, however?
***A.*** **Yes.**
***Q.*** For example, is her name on the homeowner's insurance documents for Dr. Arabi's home as Shadi Arabi?
***A.*** **Yes.**
***MR. PILCHAK:*** That's Exhibit 866. Can we show the witness and the witness only that exhibit, please?
***BY MR. PILCHAK:***
***Q.*** Do you see that there?
***A.*** **Yes.**
***MR. PILCHAK:*** Let's go down two pages, I think it is. There we go, top of page 3.

***BY MR. PILCHAK:***

***Q.*** Do you see the two names there, Mr. Roberts?

***A.*** **I do. Karim Arabi and Shadi Arabi.**

***Q.*** Was this seized during a search of Dr. Arabi's residence?

***A.*** **Yes.**

***MR. PILCHAK:*** Move to admit 866.

***THE COURT:*** Any objection?

***MR. FRASER:*** No.

***THE COURT:*** It may be admitted.

***(Exhibit 866 admitted.)***

***MR. PILCHAK:*** All right. I don't know that we need to publish that.

***BY MR. PILCHAK:***

***Q.*** Let me go back to the slides, Mr. Roberts.

These are the slides you were just talking about; right?

***A.*** **Yes.**

***Q.*** So same first name as Dr. Arabi's wife?

***A.*** **Yes.**

***Q.*** Same last name that Dr. Arabi's wife has on some documents that you've reviewed?

***A.*** **Yes.**

***Q.*** Did you ever find any evidence of Dr. Arabi's wife being involved with voltage scaling technology?

***A.*** **No.**

***Q.*** Is she an engineer?

***A.*** **I don't know.**

***Q.*** Did she ever work at Qualcomm, as far as you know?

***MR. FRASER:*** Objection. Lacks foundation.

***THE COURT:*** Sustained.

***MR. PILCHAK:*** I'll withdraw that question.

***BY MR. PILCHAK:***

***Q.*** Do you know what metadata is?

***A.*** **Yes, I do.**

***Q.*** What is metadata?

***A.*** **Metadata is data associated with other data, for example, like, a Word document or a PowerPoint presentation. It is data that would have information such as when the date -- the document was created, who the author was, different things to help identify the uniqueness of the data.**

***Q.*** Have you yourself used programs like PowerPoint or Microsoft Word and seen how the metadata works when you used them?

***A.*** **Yes.**

***Q.*** Did you look at the metadata for this document?

***A.*** **Yes.**

***MR. PILCHAK:*** And let's show the witness and the witness only Exhibit 5A, please.

***BY MR. PILCHAK:***

***Q.*** Is this that metadata?

***A.*** **Yes, it is.**

***MR. PILCHAK:*** Move to admit 5A.

***THE COURT:*** Any objection?

***MR. FRASER:*** Nope.

***THE COURT:*** May be admitted.

***(Exhibit 5A admitted.)***

***BY MR. PILCHAK:***

***Q.*** All right. So before we zoom in, what is the jury looking at here, Mr. Roberts?

***A.*** **So this is the metadata for the PowerPoint presentation that we just looked at.**

***Q.*** And is this basically what you see when you click the info tab for using PowerPoint?

***A.*** **Correct.**

***MR. PILCHAK:*** Okay. Let's zoom in on the right-hand column there.

***BY MR. PILCHAK:***

***Q.*** This has something that's called properties.

Is that some of the metadata that you were just talking about?

***A.*** **It is.**

***Q.*** And I want to focus your attention on the related people part.

What is the jury seeing there?

***A.*** **They're seeing the person listed as the author and the person who last modified the document.**

***Q.*** Is either of those people Shadi Arabi?

***A.*** **No.**
***Q.*** Is either of those people Sheida Arabi?
***A.*** **No.**
***Q.*** Who is that person?
***A.*** **The person listed is Karim Arabi.**
***Q.*** Let's go up a little bit.
It has related dates; right?
***A.*** **Yes.**
***Q.*** What is the created date for this document?
***A.*** **The date the document was created was listed as December the 3rd, 2014 at 11:50 p.m.**
***Q.*** Is that the day before the December 4th meeting with the Invionics guys that Mr. Quinton set up?
***A.*** **Yes.**
***Q.*** And remind the jury, what was the subject of that meeting?
***A.*** **It was about Karim's patents and ideas.**
***Q.*** Got it.
***MR. PILCHAK:*** Let's take that down.
And let's go back to Exhibit 4, please.
***BY MR. PILCHAK:***
***Q.*** Exhibit 4 was the cover email for the slides; right, Mr. Roberts?
***A.*** **Yes.**
***MR. PILCHAK:*** And zoom in on the top half, please, Mr. Reyes.

***BY MR. PILCHAK:***
***Q.*** This is a two-part email; right?
***A.*** **Yes.**
***Q.*** The bottom is an email from who?
***A.*** **It's from Sheida Arabi to her brother, Karim Arabi.**
***Q.*** And does she reference a file that she attaches?
***A.*** **Yes.**
***Q.*** Did she attach an earlier draft of the slides that we were just looking at?
***A.*** **No.**
***Q.*** What was the file that she attached?
***A.*** **A presentation that she had -- was looking at.**
***Q.*** Can you look at Exhibits 111 and 112 in your binder, please?
***A.*** **Yes.**
***Q.*** Okay. Do you see those?
***A.*** **I do.**
***Q.*** Is that the root email and its attachment?
***A.*** **Yes.**
***MR. PILCHAK:*** Move to admit.
***THE COURT:*** Any objection?
***MR. FRASER:*** No.
***THE COURT:*** 111 and 112 may be admitted.
***(Exhibits 111 and 112 admitted.)***
***MR. PILCHAK:*** Thank you, Your Honor.
And let's show the witness on the screen Exhibit 112.

It's admitted, so we can show it to the jury, I think, with the Court's permission?

***THE COURT:*** Yes, you may.

***BY MR. PILCHAK:***

***Q.*** Is this the slide presentation that was attached to Sheida's email?

***A.*** **Yes, it is.**

***Q.*** Is this about critical path sensors or voltage scaling?

***A.*** **It is not.**

***Q.*** What is the title of this slide presentation?

***A.*** **Digital optical storage and their read mechanism.**

***Q.*** Do you know what Sheida Arabi was studying at Simon Fraser University?

***A.*** **Yes. She was studying --**

***MR. FRASER:*** Lacks personal knowledge. At this point, he just hasn't laid a foundation to know that.

***THE COURT:*** Sustained until you lay a foundation.

***BY MR. PILCHAK:***

***Q.*** Mr. Roberts, you've never attended Simon Fraser University; right?

***A.*** **I have not.**

***Q.*** You're not a professor there?

***A.*** **I am not.**

***Q.*** But did you request records from Simon Fraser University as part of your official investigation?

**A. Yes, through the MLAT that we send to Canada to get their records from Canada.**

*Q.* Did they come back properly certified?

**A. Yes.**

*Q.* Did you also seize more than one email involving Sheida Arabi or Sheida Alan where she discusses her activities at Simon Fraser University?

**A. Yes.**

*Q.* Did you review her transcript from Simon Fraser University?

**A. Yes.**

*Q.* Did you review information about courses that she took at Simon Fraser University?

**A. Yes.**

*Q.* Based on that information, what did you understand her field of study to be?

***MR. FRASER:*** Lacks personal knowledge.

***THE COURT:*** Overruled.

***THE WITNESS:*** She was studying digital optical storage involving nanotechnology and inkjet printing.

***BY MR. PILCHAK:***

*Q.* Now, you're not an engineer; right?

**A. I am not.**

*Q.* So you're probably not an expert in microchips?

**A. Correct.**

*Q.* You're probably also not an expert in inkjet printing?

**A.** **No.**

***Q.*** Maybe you've used an inkjet printer.

**A.** **I have.**

***Q.*** Okay. But it doesn't make you an expert in inkjet printing.

**A.** **No.**

***Q.*** Okay. Regardless, did you look through these slides and find whether there are any common terms with the other slides that we were just looking at about voltage scaling?

**A.** **Yes.**

***MR. FRASER:*** Objection. 701.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** Did you find any common terms in this slide deck versus the other slide deck that matched the provisional patent application that we were just looking at?

**A.** **No.**

***MR. PILCHAK:*** We can take that down.

***BY MR. PILCHAK:***

***Q.*** Okay. So we were just looking at an email -- if I remember, it's December 15th -- where Dr. Arabi sends the slide deck with his wife's name on the bottom to Sheida; right?

**A.** **Yes.**

***Q.*** In your review of emails as part of your investigation, before Dr. Arabi sent those slides to his sister, did you ever find any emails where Sheida was explaining that technology to

her brother?

***MR. FRASER:*** Objection. Foundation. 701.

***THE COURT:*** Overruled.

***THE WITNESS:*** No.

***BY MR. PILCHAK:***

***Q.*** Did you find an email where she gave him what seemed to be the raw material for that email?

***A.*** **No.**

***Q.*** And, again, you're not an engineer.

***A.*** **Correct.**

***Q.*** But could you have read such an email and found out do any of the words match up with the slides that we were just looking at?

***A.*** **Yes.**

***Q.*** Did you ever find such an email?

***A.*** **I did not.**

***Q.*** Did you find an email where she was asking her brother to prepare those slides on her behalf?

***A.*** **No.**

***Q.*** If I zoom out from that, though, have you seen other emails in which Ms. Arabi asked her brother for help?

***A.*** **Yes.**

***Q.*** Was there any distinction between those emails and the ones that I was just asking you about?

***A.*** **Yes.**

***Q.*** What is that?

***A.*** **She was asking for assistance with a submission regarding her English proficiency. She wanted her brother to take a look at it. And she would ask him some questions about her schooling and helping to facilitate the meeting with Professor Kaminska.**

***Q.*** Did you ever see any emails in which Sheida asked Dr. Arabi for translation help concerning Abreezio?

***A.*** **No.**

***Q.*** Concerning Trementa?

***A.*** **No.**

***Q.*** Did she ever ask her brother to translate an email to be sent to the Invionics guys?

***A.*** **No.**

***Q.*** Or Sanjiv Taneja?

***A.*** **No.**

***Q.*** We haven't gotten to him yet, so put a pin in him.

Okay. Did you find other evidence about Dr. Arabi and Sheida corresponding about filing two provisional patents?

***A.*** **Yes.**

***MR. PILCHAK:*** Let's show the witness Exhibit 107, please.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, Mr. Roberts?

***A.*** **Yes.**

***MR. PILCHAK:*** Let's zoom in on the top half so we don't

all get a headache.

***BY MR. PILCHAK:***

***Q.*** And, generally speaking, what is this?

***A.*** **Is this an email chain with correspondence between Sheida Arabi and Dr. Arabi regarding Thoughts to Paper and a provisional patent application.**

***Q.*** Involving the same two email addresses that we were just looking at?

***A.*** **Yes.**

***MR. PILCHAK:*** And we'd move to admit and publish.

***THE COURT:*** Any objection?

***MR. FRASER:*** No.

***THE COURT:*** 107 may be admitted and published.

***(Exhibit 107 admitted.)***

***BY MR. PILCHAK:***

***Q.*** Okay. Do you see -- first of all, this is -- what's the subject line of this email?

***A.*** **The subject is "Thoughts to paper, provisional patent application invoice."**

***Q.*** What is "Thoughts to paper" in?

***A.*** **Thoughts to Paper is a service that assists in filing provisional patent applications.**

***Q.*** And if we look at that middle message from Dr. Arabi to Sheida, what is he directing Sheida to do?

***A.*** **Dr. Arabi asked his sister to send an email to somebody at**

**Thoughts to Paper about the progress of a provisional patent application.**

*Q.* And in fairness, the email says "your provisional patent application;" right?

*A.* **Yes.**

*Q.* Meaning presumably Sheida's provisional patent application?

*A.* **Correct.**

*Q.* Okay. If we look at the top message, is that coming back from Sheida?

*A.* **Yes.**

*Q.* There's a word there that might not be super familiar in the salutation.

Did you see that word a lot -- well, more than once --

*A.* **Yes.**

*Q.* -- in correspondence from Sheida to Karim?

*A.* **Yes.**

*Q.* Did that seem to be a term that she used to refer to her brother?

*A.* **It did.**

*Q.* Okay. Does Sheida seem to be tracking on what Dr. Arabi is asking here?

*A.* **She does not.**

*Q.* Does she also mention something about which email address he should be using?

*A.* **Yes. She asks that -- says it would be better if he sent**

**her emails to her Simon Fraser University SFU email account because she checks that more regularly.**

***Q.*** Okay. And if we can for a moment, I'm just going to make a note to help us follow along.

So first we had -- was it ArabiSheida@gmail.com?

***A.*** **Yes.**

***Q.*** All one word; right?

***A.*** **Yes.**

***Q.*** And then what email account did she just suggest that her brother use?

***A.*** **Her Simon Fraser University email account.**

***Q.*** Is that SArabi@sfu.ca?

***A.*** **Yes.**

***MR. PILCHAK:*** I've used many sheets of paper. All right. So we'll come back to that.

***BY MR. PILCHAK:***

***Q.*** Those are the two that we have so far?

***A.*** **Yes.**

***Q.*** Did you review correspondence from Sheida at that SFU email account?

***A.*** **Yes.**

***Q.*** Did it seem to you that that was an account genuinely used by Sheida?

***A.*** **Yes.**

***Q.*** Got it.

***MR. PILCHAK:*** Let's show the witness Exhibit 214, please. And zoom in on the top half, please.

***BY MR. PILCHAK:***

***Q.*** Is this more correspondence about the Thoughts to Paper process?

***A.*** **Yes.**

***Q.*** Involving the same two email accounts and then an account for somebody named Phil W.?

***A.*** **Yes.**

***MR. PILCHAK:*** Move to admit.

***THE COURT:*** Any objection to 214?

***MR. FRASER:*** No.

***THE COURT:*** 214 may be admitted and published.

***(Exhibit 214 admitted.)***

***BY MR. PILCHAK:***

***Q.*** Okay. On the bottom here, I know we can't see that whole message, but it looks like the root message has a reference to Docusign.

Do you see that at the bottom?

***A.*** **I do.**

***Q.*** What is Docusign?

***A.*** **Docusign is a service that allows people to sign official documents electronically.**

***Q.*** So you don't have to be in the same room as the document?

***A.*** **Correct.**

***Q.*** Got it. And then it looks like -- well, let me ask you this.

How do you understand that block of header information right above the Docusign part?

***A.*** **So the email is from Arabi --**

***MR. FRASER:*** Objection. Relevance as to his understanding.

***THE COURT:*** Overruled.

***THE WITNESS:*** So it's an email from the ArabiSheida@gmail.com account to PhilW@ThoughtstoPaper.com with a copy to Karim_Arabi@Hotmail.com.

***BY MR. PILCHAK:***

***Q.*** Is there any text in that email?

***A.*** **There isn't. It's just the blank email message.**

***Q.*** Okay. There is text in that email on top, though; right?

***A.*** **There is.**

***Q.*** Who wrote that email?

***A.*** **Karim Arabi at his Karim_Arabi@Hotmail.com account.**

***Q.*** And that one is addressed to Phil; right?

***A.*** **Yes, and his sister.**

***Q.*** And based to -- I guess the salutation in the body of the email is to Phil; is that right?

***A.*** **Yes.**

***Q.*** Okay. And what is Dr. Arabi directing in that email, generally speaking?

***A.*** **He wanted to cancel the application and have his fees refunded to his credit card. It appeared that the patent wasn't filed within the timeframe that Dr. Arabi was looking for.**

***Q.*** Let me stop you there.

Does he sign that email Karim Arabi?

***A.*** **He does not.**

***Q.*** How does he sign that email?

***A.*** **Sheida Arabi.**

***Q.*** And does he list an email address for Sheida there?

***A.*** **Yes, ArabiSheida@gmail.com.**

***MR. PILCHAK:*** Okay. Let's show the witness and the witness only Exhibit 215, please. And zoom in on the top two-thirds, please. A little bit more. That's fine. Okay.

Thanks, Mr. Reyes.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, Mr. Roberts?

***A.*** **Yes.**

***Q.*** What is this?

***A.*** **This is the correspondence between Dr. Arabi and his sister, Sheida Arabi.**

***Q.*** Still about this Thoughts to Paper process?

***A.*** **Yes.**

***MR. PILCHAK:*** Move to admit 215.

***THE COURT:*** Any objection?

***MR. FRASER:*** No.

***THE COURT:*** 215 may be admitted and published to the jury.

***(Exhibit 215 admitted.)***

***BY MR. PILCHAK:***

***Q.*** And I don't think I flagged the date for the last one, Mr. Roberts, but the date of that last email, was it December 22nd?

***A.*** **Yes.**

***Q.*** What's the date of this email?

***A.*** **The next day, December 23rd, 2014.**

***Q.*** Got it. What is Dr. -- sorry -- what is Sheida asking her brother in the bottom message?

***A.*** **She indicates that she received an email, and she asked her brother to let her know what she should do about it.**

***Q.*** Does Dr. Arabi respond?

***A.*** **Yes.**

***Q.*** From his response, does it sound like Sheida is doing a good job keeping up with these emails?

***A.*** **No. He asked why it says "reminder" in the title of the email, and he asked if she had received the email before.**

***Q.*** And then does he kind of ghostwrite what she should tell Phil?

***MR. FRASER:*** Objection. 701 and 602.

***THE COURT:*** Sustained.

***MR. PILCHAK:*** Sorry. I'll withdraw that question.

***BY MR. PILCHAK:***

***Q.*** Does he write to Sheida, "Please reply to them with the following"?

***MR. FRASER:*** Objection. Speaks for itself.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** Who is Sheida supposed to be corresponding with at this time?

***A.*** **Phil from Thoughts to Paper.**

***Q.*** All right. So that's December 23rd; right?

***A.*** **Yes.**

***Q.*** At right --

***MR. PILCHAK:*** We can take that down.

***BY MR. PILCHAK:***

***Q.*** At right about the same time, was there a new Gmail account that was created in Sheida's name?

***A.*** **Yes.**

***MR. PILCHAK:*** And if we go to the lectern document camera -- well, actually, let's show the witness first Exhibit 806.

***BY MR. PILCHAK:***

***Q.*** Did you pull subscriber information for that new account?

***A.*** **Yes.**

***Q.*** Is this that subscriber information?

***A.*** **It is.**

***MR. PILCHAK:*** Move to admit 806.

***THE COURT:*** Any objection?

***MR. FRASER:*** No.

***THE COURT:*** 806 may be admitted and published.

***(Exhibit 806 admitted.)***

***BY MR. PILCHAK:***

***Q.*** What email account is this?

***A.*** **This is the email account Sheida.Arabi1@gmail.com.**

***Q.*** When was it created?

***A.*** **It was created on December 18th, 2014.**

***Q.*** Is that right in the middle of this provisional patent application process?

***A.*** **Yes.**

***MR. PILCHAK:*** And then if we can zoom in on just the top third of the document. That's perfect.

***BY MR. PILCHAK:***

***Q.*** There's something listed there called a terms of service IP. Do you know what that is?

***A.*** **I do.**

***Q.*** What is that?

***A.*** **So that is the IP address that is linked to the creation of the account. So it traces back who created the account, or at least the computer.**

***Q.*** And what is an IP address?

***A.*** **It's, like, a unique identifier for Internet traffic that**

**shows where the information was created.**

***Q.*** Is it sort of like a street address for a house?

***A.*** **Yes, but on electronic communications.**

***Q.*** So, like, a street address in cyberspace?

***A.*** **Yes.**

***Q.*** Got it.

And so this is the street address in cyberspace for whoever it is that created this email account?

***A.*** **Correct.**

***Q.*** Got it.

Did you search this email account with a search warrant?

***A.*** **Yes.**

***Q.*** When you did that, how many emails did it contain?

***A.*** **I had access to 135 emails in that account.**

***Q.*** 135 emails.

When did you search the account?

***A.*** **I searched the account in 2021.**

***Q.*** Okay. And so that's about -- 2021 -- seven years after it was created, maybe a little less?

***A.*** **Yes.**

***Q.*** And in seven years, the emails that you had access to when you searched it pursuant to the warrant were how many?

***A.*** **135.**

***MR. FRASER:*** Asked and answered.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** Did you review every one of those messages?

***A.*** **That I had access to, yes.**

***Q.*** Thank you.

What did you conclude from that review?

***MR. FRASER:*** Objection. 701. Lacks personal knowledge also.

***THE COURT:*** Sustained. I think it's a little broad.

***BY MR. PILCHAK:***

***Q.*** Did you draw any connection between the hundred-and-change messages that you found in that account and the purpose of the account's creation?

***MR. FRASER:*** Objection. 401, 403, 701.

***MR. PILCHAK:*** I'll ask a different question.

***THE COURT:*** Okay.

***BY MR. PILCHAK:***

***Q.*** Was there any connection between the account and the Abreezio transaction?

***MR. FRASER:*** Objection. 701 and 702, 403.

***THE COURT:*** I'll allow it.

***THE WITNESS:*** Yes.

***BY MR. PILCHAK:***

***Q.*** Did it appear to you that the account had been created for the purpose of assisting with the Abreezio transaction?

***MR. FRASER:*** Objection. 602, 701 and 702.

***THE COURT:*** I'll allow it.

***THE WITNESS:*** Yes.

***BY MR. PILCHAK:***

***Q.*** Meaning, yes, it did appear that it had been created for the transaction?

***A.*** **Correct.**

***Q.*** And did you draw that conclusion because most of the messages in the account somehow related to Abreezio?

***A.*** **Yes. Of the 135 emails that I had access to, we ended up seizing 129 of those emails as being related to our investigation.**

***Q.*** Got it.

Now, I think the jury still has the subscriber information on their screen.

Who is the name that this email account is subscribed to?

***A.*** **Sheida Arabi.**

***Q.*** Nevertheless, are you aware of evidence that Dr. Arabi drafted and sent emails from this account?

***MR. FRASER:*** Objection. Leading. 701 and 702, 403.

***THE COURT:*** Sustained on leading.

***BY MR. PILCHAK:***

***Q.*** Are you aware of any evidence where Dr. Arabi was asked, under penalty of perjury, whether he drafted and sent emails from this account?

***MR. FRASER:*** Objection. 401, 403, 701, and 702.

***THE COURT:*** Overruled.

***THE WITNESS:*** Could you repeat the question?

***MR. PILCHAK:*** Yeah. Why don't we just show the witness Exhibit 785. I think that may be faster at this point.

***BY MR. PILCHAK:***

***Q.*** Do you see that on your screen there, Mr. Roberts?

***A.*** **Yes.**

***Q.*** What do you understand 785 to be?

***MR. FRASER:*** Objection. 401, 403, 701.

***THE COURT:*** Overruled.

***THE WITNESS:*** They're Dr. Arabi's responses to a request from Qualcomm in the civil litigation.

***BY MR. PILCHAK:***

***Q.*** Were these responses made under penalty of perjury?

***A.*** **Yes.**

***MR. PILCHAK:*** We move to admit 785 as redacted and prepared.

***THE COURT:*** Any objection?

***MR. FRASER:*** No.

***THE COURT:*** It may be admitted.

***(Exhibit 785 admitted.)***

***MR. PILCHAK:*** Okay. So if we could just zoom in on the top half here, cut off that white space on the bottom.

***BY MR. PILCHAK:***

***Q.*** You said this is from the civil litigation that we were

talking about yesterday?

***A.*** **Yes.**

***Q.*** And just very generally, what was that civil litigation again?

***A.*** **It was in regards to Qualcomm's acquisition of the company Abreezio.**

***Q.*** Okay. And on the top here, there's a whole signature block for some law firm; right?

***A.*** **Yes.**

***Q.*** Whose lawyers were those?

***A.*** **Irell and Manella were the attorneys for Dr. Arabi and his sister, Sheida Arabi.**

***Q.*** At that time, it was Sheida Alan, though; right?

***A.*** **Yes.**

***Q.*** Okay. We'll get to that.

But you're saying in the civil litigation, they were both represented by the same law firm?

***A.*** **Yes.**

***Q.*** Okay. And I'm sorry if you already said it, but are these done under the penalty of perjury?

***A.*** **Yes.**

***MR. FRASER:*** Asked and answered.

***MR. PILCHAK:*** I just forgot. I'll withdraw the question.

Let's go down to -- actually, let's just look at the

last page. Might be the second-to-last page. I apologize. Let's just stop there if we have to scroll. Let's zoom in on the bottom of -- bottom half of this page, please.

***BY MR. PILCHAK:***

***Q.*** So this is page 10 as marked, so we can create some kind of a record here. And at the bottom, there's something called a "Request for an Admission."

What is a "Request for an Admission"?

***MR. FRASER:*** Objection. 602.

***THE COURT:*** Overruled.

***THE WITNESS:*** It's a question posed to the person involved in the litigation, so in this case, it was a question posed to Dr. Arabi.

***BY MR. PILCHAK:***

***Q.*** So he was asked to admit whether, on the indicated dates at the very bottom there for Number 21, he drafted and sent email from that account that we were just talking about?

***A.*** **Yes.**

***MR. PILCHAK:*** And let's scroll to the top of that next page.

***BY MR. PILCHAK:***

***Q.*** Is this his response on the top of page 11?

***A.*** **It is.**

***MR. PILCHAK:*** Let's zoom in, please, so we can all read that.

***BY MR. PILCHAK:***

***Q.*** There are some objections there; right?

***A.*** **Correct.**

***Q.*** After the objections, what did Dr. Arabi say?

***A.*** **Dr. Arabi admitted that from the period between December 18th, 2014 and October 30th, 2015, he drafted and sent one or more emails from the account Sheida.Arabi1@gmail.com.**

***Q.*** And that's that account that we were just talking about; right?

***A.*** **Yes.**

***Q.*** So if I switch over to the document camera so we can try to keep track of what we're doing here, you're saying that Dr. Arabi admitted that he sent some emails from this account.

***A.*** **Correct.**

***Q.*** Sheida.Arabi1@gmail.com.

***A.*** **Yes.**

***Q.*** You also mentioned an IP address; right?

***A.*** **Yes.**

***Q.*** Did you try to figure out whose IP address that was?

***A.*** **Yes.**

***Q.*** How did you do that? How did you try to do that?

***A.*** **So I found the service provider that was associated with that IP address, and I sent a subpoena to try to get records to see who was the person using it.**

***Q.*** And did they tell you whose address it was?

**A. They did not.**
*Q.* Why not?
**A. They no longer had the records.**
*Q.* Got it.
Do you think it's possible at the time that account was created in December of 2014, that Ms. Arabi just didn't know how to create a Gmail account?
**A. No.**
*Q.* Why do you say that?
**A. Because she had other accounts already that she was using.**
*Q.* Other Gmail accounts?
**A. Yes.**
*Q.* Got it.
Did you look to see whether that IP address showed up anywhere else?
**A. Yes.**
***MR. PILCHAK:*** Let's show the witness and the witness only -- hang on -- Exhibit 253, please.
***BY MR. PILCHAK:***
*Q.* Okay. What is Exhibit 253?
**A. It is a -- a part of a provisional patent application that was provided by Thoughts to Paper.**
*Q.* That same company that we were just talking about?
**A. Yes.**
***MR. PILCHAK:*** Okay. Move to admit 253.

***THE COURT:*** Any objection?

***MR. FRASER:*** No.

***THE COURT:*** 253 may be admitted.

***(Exhibit 253 admitted.)***

***MR. PILCHAK:*** Let's look down to page 3, please. And we're looking for a field called "Title of Invention," right in the middle of the page there. And, yeah, let's zoom in.

Thank you, Mr. Reyes.

***BY MR. PILCHAK:***

***Q.*** Do you see the invention title field there, Mr. Roberts?

***A.*** **I do.**

***Q.*** Is that the same title that we were just looking at on those slides?

***A.*** **Yes.**

***Q.*** And you testified, I think, that that title matches, word for word, an actual provisional patent application filed around this time; right?

***A.*** **Yes.**

***MR. PILCHAK:*** If we go back to page -- well, actually, let's stop here, because we were just talking IP addresses. Can we scoop up the IP address right there? It's right underneath that field. There you go.

***BY MR. PILCHAK:***

***Q.*** What do you notice about the IP address that's listed on the Thoughts to Paper records for this provisional patent

application we were just talking about?
**A. It's the same IP address that was used to create the Sheida.Arabi1@gmail.com email account.**
*Q.* Got it.
***MR. PILCHAK:*** Let's go back to the first page.
***BY MR. PILCHAK:***
*Q.* There's some contact information that's listed on the first page; right?
**A. Yes.**
***MR. PILCHAK:*** Let's do the bottom -- the whole bottom half of the page. A little higher, get that phone number. There you go.
***BY MR. PILCHAK:***
*Q.* All right. You see that there, Mr. Roberts?
**A. Yes.**
*Q.* So there's kind of two sets of contact information here; right?
**A. Yes.**
*Q.* On the bottom, there's a full legal name.
Whose legal name is there?
**A. Full legal name is Sheida Arabi.**
*Q.* And there's an email address; right? At the bottom?
**A. Yes.**
*Q.* Whose email address is that?
**A. Sheida Arabi's. It's the ArabiSheida@gmail.com address.**

***Q.*** But there's another email address that's listed above it; right?
***A.*** **Yes.**
***Q.*** Whose email address is that?
***A.*** **It's the Karim_Arabi@Hotmail.com email account that Dr. Arabi used.**
***Q.*** And it looks like there's two different phone numbers listed here, a phone number and an alternate phone number; right?
***A.*** **Yes.**
***Q.*** Are they two different phone numbers, though?
***A.*** **They're the same phone number.**
***Q.*** Do you know whose phone number that is?
***A.*** **Yes. It was Dr. Arabi's number.**
***Q.*** Not Sheida's number?
***A.*** **Correct.**

***MR. PILCHAK:*** Okay. Mr. Reyes, we can take that down. All right. We'll come back to that.

***BY MR. PILCHAK:***
***Q.*** I'd like to ask you some more questions about Brad Quinton, if that's okay?
***A.*** **Yes.**
***Q.*** Did you find other emails between Dr. Arabi and Brad Quinton about this corporate structure subject that we were talking about?
***A.*** **Yes.**

***Q.*** And did those continue into the new year in early 2015?

***A.*** **Yes.**

***MR. PILCHAK:*** Let's show the witness Exhibit 237, please.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, Mr. Roberts?

***A.*** **Yes.**

***Q.*** Is this another email that you seized during the warrant search?

***A.*** **Yes.**

***MR. PILCHAK:*** All right. Move to admit 237.

***THE COURT:*** Any objection?

***MR. FRASER:*** No.

***THE COURT:*** 237 may be admitted.

***(Exhibit 237 admitted.)***

***BY MR. PILCHAK:***

***Q.*** Is this a fairly lengthy correspondence chain between Mr. Quinton and Dr. Arabi about this Trementa concept that they had kicking around?

***A.*** **Yes.**

***MR. PILCHAK:*** All right. Let's zoom in on the bottom half of the page, please.

***BY MR. PILCHAK:***

***Q.*** So this email in the chain is from Mr. Quinton to Dr. Arabi; right?

***A.*** **Yes.**

***Q.*** And I might have got ahead of myself.

What's the date of this part of the correspondence?

***A.*** **December 14th, 2014.**

***Q.*** So still in the prior year?

***A.*** **Yes.**

***Q.*** Does he say that "We're making good progress" at the top there?

***A.*** **Yes.**

***Q.*** In that second paragraph that starts, "I spent all day yesterday," what does the second sentence say?

***A.*** **Basically, "I am very worried about one shareholder controlling more than 50 percent of Trementa for a number of reasons, but especially during due diligence in a QCOM acquisition scenario."**

***Q.*** And I think you said it yesterday, but what is the stock ticker for Qualcomm?

***A.*** **QCOM.**

***Q.*** And so at least as of December of 2014, Mr. Quinton and Dr. Arabi were talking about how to get through Qualcomm's due diligence?

***A.*** **Yes.**

***MR. PILCHAK:*** If we take that one down and then look at the top message, so get that whole top half of the page.

Thank you very much.

***BY MR. PILCHAK:***
***Q.*** Do you see that there, Mr. Roberts?
***A.*** **Yes.**
***Q.*** This one's in the new year, now; right?
***A.*** **Yes, January 6th, 2015.**
***Q.*** And if we look at that top paragraph from Dr. Arabi, what is the last sentence?
***A.*** **"Meanwhile, my sister filed two provisional patent applications, power/performance reduction and test time/quality reduction, to protect the main ideas in 2014."**
***Q.*** Got it.
Does Dr. Arabi say "her main ideas"?
***A.*** **No.**
***Q.*** And then there's kind of a numbered list underneath that; right?
***A.*** **Yes.**
***Q.*** The first point is talking about -- Dr. Arabi talks about "my sister."
Did you understand that to be a reference to Sheida?
***A.*** **Yes.**
***Q.*** And it says, "She will invest $19,300," I guess.
Is that how you read that?
***A.*** **Yes.**
***Q.*** Did you ever find any evidence of Sheida investing any cash in this enterprise at all?

***A.*** **No.**

***Q.*** And then if we skip to Number 3, does it talk about Invionics doing work in this company that Dr. Arabi's discussing?

***MR. FRASER:*** Objection. I think it does speak for itself.

***THE COURT:*** I'll allow it. Does it?

***THE WITNESS:*** Yes.

***BY MR. PILCHAK:***

***Q.*** And so there's that bracket there.

Does that even have an hourly rate for Invionics?

***A.*** **Yes.**

***MR. FRASER:*** Objection. Argumentative. Leading.

***THE COURT:*** Overruled.

***THE WITNESS:*** Fifty-five dollars an hour.

***BY MR. PILCHAK:***

***Q.*** Okay. And then there's reference in that same paragraph to "Brad joining as CEO."

Do you see that there?

***A.*** **Yes.**

***Q.*** Did Brad ultimately become the CEO of Abreezio?

***A.*** **He did not.**

***MR. PILCHAK:*** Let's take that down and show the witness 240, please.

///

***BY MR. PILCHAK:***

***Q.*** Is this another email between the same two gentlemen?

***A.*** **Yes.**

***MR. PILCHAK:*** Move to admit.

***THE COURT:*** Any objection?

***MR. FRASER:*** No.

***THE COURT:*** 240 may be admitted and published.

***(Exhibit 240 admitted.)***

***MR. PILCHAK:*** Let's pick up that middle email there.

***BY MR. PILCHAK:***

***Q.*** All right. Mr. Roberts, is this Brad writing to Dr. Arabi again?

***A.*** **Yes.**

***Q.*** You mentioned that Mr. Quinton did not actually become the CEO; right?

***A.*** **That is correct.**

***Q.*** In that first large paragraph there in the top half of this email, does Mr. Quinton kind of bow out of the race for CEO?

***MR. FRASER:*** Objection. Not helpful. The jury should read and consider these at the end of the case with all the evidence and make their own decision about what this --

***THE COURT:*** I'll allow it. And I would prefer no speaking objections. So overruled.

***THE WITNESS:*** Yes. He indicates that he does not have the time to be the CEO of the -- of the new company, Trementa.

***BY MR. PILCHAK:***

***Q.*** At the end of that next paragraph underneath it, does he suggest a role for himself?

***A.*** **Yes.**

***Q.*** What is that role?

***A.*** **He'd be willing to be the CTO, which would be the Chief Technical Officer, the VP of Engineering, or an Advisor. But one thing he was -- would be happy to be was the guy who delivered the technical pitch to Qualcomm. Qualcomm is identified, again, with the ticker symbol QCOM.**

***Q.*** And I think you just said this, but what was Mr. Quinton's ultimate position at Abreezio?

***A.*** **Chief Technology Officer.**

***Q.*** Did he also deliver some technical pitches to Qualcomm?

***A.*** **Yes.**

***MR. PILCHAK:*** Let's take that down and look at the top message from Dr. Arabi.

***BY MR. PILCHAK:***

***Q.*** Is this the response to Brad's message that we just saw?

***A.*** **Yes.**

***Q.*** Who's going to approach a potential candidate for CEO, according to Dr. Arabi's message?

***A.*** **Dr. Arabi is going to approach a potential CEO candidate.**

***Q.*** In this email or any of the other emails, does he say, "I'm going to discuss my candidate with Sheida"?

***A.*** **No.**

***Q.*** Does he say she had any ideas about CEO?

***A.*** **No.**

***Q.*** Did you find evidence of who ultimately did become the CEO?

***A.*** **Yes.**

***MR. PILCHAK:*** Let's show the witness 242, please.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, Mr. Roberts?

***A.*** **Yes.**

***Q.*** Is this another warrant-seized email from your investigation?

***A.*** **Yes.**

***Q.*** Between the same two gentlemen?

***A.*** **Correct.**

***MR. PILCHAK:*** Move to admit.

***THE COURT:*** Any objection?

***MR. FRASER:*** No.

***THE COURT:*** 242 may be admitted and published.

***(Exhibit 242 admitted.)***

***MR. PILCHAK:*** Let's take the top half of the page, please, for the zoom.

***BY MR. PILCHAK:***

***Q.*** All right. Do you see that there, Mr. Roberts?

***A.*** **Yes.**

***Q.*** Let's focus on Dr. Arabi's message on the bottom half.

What's the date of that message?
**A. The date of that message is January 21st, 2015.**
*Q.* And what does Dr. Arabi report about the CEO search?
**A. That he's closing in on an agreement with Sanjiv Taneja to be the CEO.**
*Q.* Any reference to any input from Sheida?
**A. No.**
*Q.* Who was the ultimate CEO of Abreezio?
**A. Sanjiv Taneja.**
*Q.* And what does Mr. Quinton say about Mr. Taneja in the top email?
**A. That it was great news, and that he looked Sanjiv Taneja up on LinkedIn and thought he looked like a great choice.**
***MR. PILCHAK:*** Okay. Let's take that down.
***BY MR. PILCHAK:***
*Q.* Did you ever find any emails in your investigation of Sheida soliciting anyone to come on board Abreezio?
**A. No.**
*Q.* Was there ever any evidence other than some of these accounts that we're going to talk about that were connected to Dr. Arabi in one way or another, was there any evidence of Sheida communicating with Mr. Quinton?
**A. No.**
*Q.* With Mr. Taneja?
**A. No.**

*Q.* With anyone at Abreezio?
**A. No.**
*Q.* From your review of emails and text messages, did you also find evidence that Dr. Arabi himself reached out to Sanjiv Taneja?
**A. Yes.**
*Q.* Was that in late 2014 and early 2015?
**A. Yes.**
*Q.* And the CEO of a company, what is their job, generally speaking?
**A. It's the Chief Executive Officer. It's the person at the top of the organization to run everything.**
*Q.* So we talked about -- a little bit about where these people, Mr. Taneja and Mr. Quinton, where they came from and who brought them in.
What about the terms of their employment, did you find evidence of who set those terms?
**A. Yes.**
*Q.* Who did that?
**A. Dr. Arabi.**
*Q.* What do you base that on?
**A. Emails that I reviewed.**
***MR. FRASER:*** Objection. Lacks personal knowledge. 701, unhelpful opinion.
***THE COURT:*** Overruled.

***BY MR. PILCHAK:***
***Q.*** Did you find any evidence of Sheida weighing in on that subject?
***A.*** **No.**
***Q.*** One moment, please.
Okay. We were talking about this Sheida.Arabi1@gmail account a moment ago.
***A.*** **Yes.**
***Q.*** Other than Dr. Arabi's own sworn admission that he drafted and sent at least one email from that account, did you find other evidence that he used this account with Sheida's name on it?
***A.*** **Yes.**
***Q.*** Was one example of that some emails about sensor diagrams?
***A.*** **Yes.**
***MR. PILCHAK:*** First, I'd like to show the witness 219 and 220. You might want to grab your 200 binder so you can look at both of them. Sorry. It's going to get a little bindery up there.
And we can put 219 maybe on the screen for the witness only. Zoom in on that top half.
***BY MR. PILCHAK:***
***Q.*** Thank you, Mr. Roberts. So 219 is on your screen, and if you can take a quick peek at 220, 2-2-0.
***A.*** **Yes, I have it here.**

***Q.*** All right. What are those documents, please?

***A.*** **The first is an email, and the second one is an attachment to that email.**

***Q.*** Okay. And it's from that email account that we were just talking about; right?

***A.*** **Yes.**

***Q.*** And who is it to?

***A.*** **It's to Sanjiv Taneja.**

***MR. PILCHAK:*** Move to admit 219 and 220.

***MR. FRASER:*** No objection.

***THE COURT:*** They both may be admitted and published.

***(Exhibits 219 and 220 admitted.)***

***MR. PILCHAK:*** Thank you, Your Honor.

***BY MR. PILCHAK:***

***Q.*** All right. So is this the cover email there, Mr. Roberts?

***A.*** **Yes.**

***Q.*** Great.

And, again, who are these parties to this email?

***A.*** **The email is from Sheida at Sheida.Arabi1@gmail.com, and it's to Sanjiv Taneja at Sanjiv@Abreezio.com.**

***Q.*** Is there any text in the body of this email?

***A.*** **No.**

***Q.*** But what is the subject of the email?

***A.*** **New sensor.**

***Q.*** Got it.

***MR. PILCHAK:*** And then can we show the attachment, 220?

***BY MR. PILCHAK:***

***Q.*** So this is the attachment called "NewSensor"?

***A.*** **Yes.**

***Q.*** All right. And this is attached to that email we were just looking at?

***A.*** **Correct.**

***Q.*** What is this, Mr. Roberts?

***A.*** **It appears to be --**

***MR. FRASER:*** Objection. Lacks foundation. 701, 702.

***THE COURT:*** Overruled.

***THE WITNESS:*** It appears to be an engineering drawing about a circuit for a new sensor.

***BY MR. PILCHAK:***

***Q.*** But, again, you're not an engineer.

***A.*** **No.**

***Q.*** So you're not really sure what sensor this is or what it relates to.

***MR. FRASER:*** Move to strike, since he doesn't --

***THE COURT:*** Overruled. And he hasn't answered yet.

Are you really sure what this sensor is or what it relates to?

***THE WITNESS:*** No. I know it was attached to the email and what it was labeled.

///

***BY MR. PILCHAK:***

***Q.*** Did you forward -- I'm sorry.

Did Mr. Taneja then forward this same diagram on to Brad Quinton in a different message?

***A.*** **Yes.**

***Q.*** All right. We might come back to that. Let me ask a different question, though.

Do you know whether this image or a copy of it was found on Dr. Arabi's laptop --

***A.*** **Yes.**

***Q.*** -- when agents -- sorry.

***A.*** **I'm sorry.**

***Q.*** -- when agents seized that laptop in August of 2022?

***A.*** **Yes.**

***Q.*** Okay. We'll come back to that.

So this is NewSensor; right?

***A.*** **Yes.**

***Q.*** Was there also an "OldSensor"?

***A.*** **Yes.**

***MR. PILCHAK:*** Let's look at Exhibit 113 and 114. Maybe we can do the same trick. I can't tell if we're saving time or not, but -- so you get 114, and then we'll put 113 on the screen.

My witnesses don't usually get such an upper body workout on the stand.

***BY MR. PILCHAK:***

***Q.*** Got it there?

***A.* I have 114 here.**

***Q.*** Great.

And you see 113 on the screen?

***A.* Yes.**

***Q.*** What are these?

***A.* It's an email and attachment.**

***Q.*** What is that subject?

***A.* The subject of the email is "OldSensor."**

***MR. PILCHAK:*** All right. Move to admit 113 and 114.

***THE COURT:*** Any objection?

***MR. FRASER:*** No.

***THE COURT:*** They both may be admitted and published.

***(Exhibits 113 and 114 admitted.)***

***BY MR. PILCHAK:***

***Q.*** Okay. So this email has the subject of "OldSensor;" right?

***A.* Yes.**

***Q.*** The last email had a subject of "NewSensor;" right?

***A.* Yes.**

***Q.*** But the last email was from the Sheida.Arabi1 account; right?

***A.* Yes.**

***Q.*** Whose account is this email from?

***A.* This email is from the Karim Arabi -- Karim.Arabi@gmail.com**

**account.**

***Q.*** And who is Dr. Arabi's Gmail account -- first of all, whose account do you understand that to be?

***A.*** **Dr. Arabi's.**

***Q.*** Did you pull subscriber information for that account?

***A.*** **I don't recall if I did or not.**

***Q.*** Okay. Did it appear to you to be used by Dr. Arabi?

***A.*** **Yes.**

***Q.*** Did you --

***MR. FRASER:*** Objection. The prior answer actually lacks foundation, it turns out.

***THE COURT:*** The prior answer is he did not recall whether he pulled subscriber information.

***MR. FRASER:*** The answer before that is the one that I mean. From his next answer, he said --

***THE COURT:*** Sustained. Sustained.

***BY MR. PILCHAK:***

***Q.*** Okay. Let me ask a different question, Mr. Roberts.

You've reviewed a lot of emails in your investigation?

***A.*** **Yes.**

***Q.*** Do you characterize this as a document-intensive case?

***A.*** **Yes.**

***Q.*** Did you ever find any examples of anyone else impersonating Dr. Arabi with email accounts with his name on them?

***A.*** **No.**

***Q.*** The accounts that you reviewed for Dr. Arabi that had his name on them, did they seem to be used by Dr. Arabi?

***A.*** **Yes.**

***MR. FRASER:*** Objection. 701.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** All right. So this one, if I'm following you, is about "Old sensor;" right?

***A.*** **Yes.**

***Q.*** And this email goes from Karim Arabi to which email account? I know we just lost it on the screen there, but you also have it in the binder.

***A.*** **To the Sheida.Arabi1@gmail.com account.**

***MR. FRASER:*** You know, I object to the diagram, other than sort of highlighting some orthographic similarities that show how there could be an auto correction problem with some of this, I don't know that this is helpful. So I would object under 403.

***THE COURT:*** Overruled. But I do think we should label them for the record so that since there's an objection, it's clear for the record what it is that we're talking about.

***MR. PILCHAK:*** Fair enough, Your Honor. And I appreciate that.

Can I ask my team for some stickers, and if you guys can slap our last exhibit numbers on those, I'll mark them for

the record.

***THE COURT:*** Thank you.

***BY MR. PILCHAK:***

***Q.*** Mr. Roberts, does it sometimes get a little confusing keeping track of which email account is doing what?

***A.*** **Yes. There's a lot of email accounts that are used.**

***Q.*** I know I was writing some notes here, but would it help you explain your testimony to the jury if I wrote down where these emails are going, just for a handful of them?

***A.*** **Yes.**

***Q.*** Great. Okay.

So, so far, we had "OldSensor" going from Dr. Arabi's account to Sheida.Arabi1; right?

***A.*** **Yes.**

***Q.*** Was that the end of where "OldSensor" went?

***A.*** **No.**

***MR. PILCHAK:*** And for the record, I'm going to mark this diagram that Mr. Roberts is using to help explain his testimony as 882 in our sequence. Great.

And then if we can just put up Exhibit 113 again. Sorry about that. There we go.

***BY MR. PILCHAK:***

***Q.*** What's the time of this email?

***A.*** **So it's March 3rd, 2015 at 1:55 p.m.**

***Q.*** Got it.

***MR. PILCHAK:*** Now let's show the witness and the witness only Exhibits 221 and 222. Would have been great if we could have gotten them all in one binder, huh?

***BY MR. PILCHAK:***

***Q.*** Do you see it there, Mr. Roberts?

***A.*** **Yes.**

***Q.*** Great.

What are these?

***A.*** **It's an email and an attachment.**

***Q.*** And is the subject line the same?

***A.*** **Yes, "OldSensor."**

***Q.*** And the same date as the one we were just looking at?

***A.*** **Yes, March 3rd, 2015.**

***MR. PILCHAK:*** Move to admit.

***MR. FRASER:*** No objection.

***THE COURT:*** It may be admitted and published.

***(Exhibits 221 and 222 admitted.)***

***BY MR. PILCHAK:***

***Q.*** So what's happening in this email?

***A.*** **So this is an email from the Sheida.Arabi1@gmail.com account to Sanjiv Taneja at Sanjiv@Abreezio.com, and it is forwarding on the same old sensor schematic picture.**

***Q.*** That same schematic that was attached to the other email?

***A.*** **Yes.**

***Q.*** What is the date and time of this email?

**A. So it's the same date, March 3rd, 2015. It's at 1:55 p.m. and 43 seconds.**

*Q.* And, I'm sorry, where does it go again?

**A. It goes to Sanjiv Taneja.**

*Q.* So if we go back to the notes, you're saying that intermediate account forwarded it roughly a minute later?

**A. Yes.**

*Q.* To Mr. Taneja?

**A. Correct.**

*Q.* What did you conclude from that?

**A. That most likely, somebody was sitting at a computer with both accounts available to them forwarding the information from one account to the intermediate account, and then on to Sanjiv Taneja.**

***MR. PILCHAK:*** Okay. So I'm going to take down 882. And just for the record, I'm going to put 883 back up there, which is the sticker I've put on this list of accounts with Sheida's name in them.

***MR. FRASER:*** I'll just make the same objection to 883.

***THE COURT:*** Objection is noted.

***BY MR. PILCHAK:***

*Q.* I apologize for this, Mr. Roberts, but can I show you -- well, let me ask some questions first.

In your investigation, did you encounter various emails concerning draft résumés or CVs with Dr. Arabi's name on them?

***MR. FRASER:*** Objection. Vague. Confusing.

***THE COURT:*** Overruled.

***THE WITNESS:*** Yes.

***BY MR. PILCHAK:***

***Q.*** Did you encounter the same thing with Sheida Arabi's name on them?

***A.*** **Yes.**

***Q.*** To be fair, some of them said Sheida Arabi and some of them said Sheida Alan; right?

***A.*** **Correct.**

***Q.*** Okay. What I'd like to do is have you take just a moment and look at some exhibits that I am going to share with you. We're going to start with 863 and 863A.

***MR. PILCHAK:*** Permission to approach, Your Honor?

***THE COURT:*** You may.

***BY MR. PILCHAK:***

***Q.*** So that was 863 and 863A.

***A.*** **Yes, I have them here.**

***Q.*** And then I'll ask you to look -- well, 863 and 863A, do those concern a January 2012 draft of a CV?

***A.*** **Yes.**

***Q.*** What is a CV, by the way?

***A.*** **It's Curriculum Vitae. It's another word usually used for "résumé."**

***Q.*** Okay. So those are basically equivalent, in your mind?

**A.** **Yes.**

***MR. FRASER:*** Objection. Just for the record, was the witness given something?

***MR. PILCHAK:*** Oh, sorry. I passed up a note of the next six documents I'd like to go through this process on just so that we can try to speed it up. I'm happy to --

***MR. FRASER:*** I would like to review the note.

***MR. PILCHAK:*** Oh, okay.

***THE COURT:*** At the break, I'll give you a chance to review the note.

***MR. PILCHAK:*** Thank you, Your Honor. Sorry about that.

It says 195, 196, 662, 663, and then 91 and 92, which are all the exhibits I'm trying to admit expeditiously.

***BY MR. PILCHAK:***

***Q.*** So first, 863 and 863A, are those the CVs that you were just talking about?

**A.** **Yes.**

***MR. PILCHAK:*** Move to admit those.

***THE COURT:*** Any objection?

***MR. FRASER:*** 863 and 863A?

***MR. PILCHAK:*** Correct.

***MR. FRASER:*** No objection.

***THE COURT:*** They may be admitted and published.

***(Exhibits 863 and 863A admitted.)***

***MR. PILCHAK:*** Thank you. I don't think we need to

publish at this time, Your Honor.

And then Exhibit 195 and 196, if you could.

***BY MR. PILCHAK:***

***Q.*** Are those also about CVs for Ms. Arabi?

***A.*** **Yes.**

***Q.*** Although at that time, it may have been Ms. Alan; correct?

***A.*** **No, it's still Sheida Arabi.**

***Q.*** Ah, thank you.

***MR. PILCHAK:*** We would move to admit 195 and 196.

***THE COURT:*** Any objection?

***MR. FRASER:*** No.

***THE COURT:*** May be admitted.

***(Exhibits 195 and 196 admitted.)***

***BY MR. PILCHAK:***

***Q.*** I'm sorry, these are all in different binders.
Can you look at 662 and 663, please?

***A.*** **Yes.**

***Q.*** Thank you for your patience.

***A.*** **Yes, I have them here.**

***Q.*** Are those also Sheida's CVs, supposedly?

***A.*** **Yes.**

***MR. PILCHAK:*** Move to admit 662 and 663.

***THE COURT:*** Any objection?

***MR. FRASER:*** No.

***THE COURT:*** May be admitted.

***(Exhibits 662 and 663 admitted.)***

***BY MR. PILCHAK:***

***Q.*** Last, but not least, 91 and 92.

And, Mr. Roberts, just for the jury's benefit, we will have some questions about these, but perhaps through another witness.

***A.*** **Okay.**

***Q.*** And, of course, they're in the bottom of the binder. So this one is 91 and 92. Oh, and they're also on your screen. Sorry about that. My intrepid team has done an incredible side-by-side with 91 and 92.

***A.*** **Yes, I have them in both locations.**

***Q.*** Is this another CV with Sheida's name on it?

***A.*** **Yes.**

***MR. PILCHAK:*** Okay. Move to admit 91 and 92.

***THE COURT:*** Any objection?

***MR. FRASER:*** No.

***THE COURT:*** Both may be admitted.

***(Exhibits 91 and 92 admitted.)***

***MR. PILCHAK:*** Great. Thank you.

***BY MR. PILCHAK:***

***Q.*** Now let's do something that will be a little more -- a little easier to follow along. Questions first.

In any of the résumés that you saw -- and I'll just say résumé instead of CV; is that okay?

***A.*** **Yes.**

**Q.** Sometimes when I say "CV" people don't know which two letters I'm using.

In any of the résumés with Sheida's name on them that you saw, did -- was she described as a "visionary tech executive"?

**A. No.**

***MR. PILCHAK:*** Let's show the witness and the witness only Exhibit 109.

***BY MR. PILCHAK:***

**Q.** Do you see that there, sir?

**A. I do.**

**Q.** What is this?

**A. It's a résumé for Karim Arabi.**

**Q.** And do you know whether this was sent on or about September 6th of 2016?

**A. Yes.**

***MR. PILCHAK:*** Move to admit 109.

***THE COURT:*** Any objection?

***MR. FRASER:*** No.

***THE COURT:*** 109 may be admitted.

***(Exhibit 109 admitted.)***

***MR. PILCHAK:*** Okay. Let's zoom in on the top half, please, Mr. Reyes.

***BY MR. PILCHAK:***

**Q.** So you said this is Dr. Arabi's résumé?

**A. Yes.**

**Q.** What email address does it have for him?

**A. Karim_Arabi@Hotmail.com.**

**Q.** Is that that same email account you testified was his, I think, first yesterday?

**A. Yes.**

**Q.** And the email forwarding this résumé was sent by Dr. Arabi; right?

**A. Yes.**

**Q.** Okay. And so in this résumé, how does Dr. Arabi describe himself on the first line?

**A. "Visionary and results-oriented technology executive."**

**Q.** And then there's a bunch of bullets under there?

**A. Yes.**

**Q.** Okay. What is the second-to-last bullet in that first group?

**A. "Broad expertise in all software and hardware aspects of AIC" -- "ASIC/SoC design and volume production."**

**Q.** Got it.

Does it list on this résumé Dr. Arabi's two stints at Qualcomm?

**A. Yes.**

**Q.** Where is the first stint there, if you can see it? Sorry. I meant to say the one that's on our screen right now. It's not first chronologically.

**A. Yes. From April 2013 through June of 2016.**

***Q.*** Got it.

And if I could ask you about the position that he had at that time.

***A.*** **Yes. He was the Head of the ASIC Department and Corporate R&D, which stands for Research and Development, at Qualcomm.**

***Q.*** And does it say that he "led new product research and development across all existing Qualcomm's product lines"?

***A.*** **Yes.**

***MR. PILCHAK:*** Let's take that down, please. And if we could zoom in on the part that has him as a VP of Engineering in Hardware Design on the bottom. Okay.

***BY MR. PILCHAK:***

***Q.*** Okay. So this picks up when he works at Dialog Semiconductor as well; right?

***A.*** **Yes. Yes.**

***Q.*** Was that for just a few months?

***A.*** **Yes, from September 2012 to April of 2013.**

***Q.*** But where was he before that?

***A.*** **He was at Qualcomm.**

***Q.*** And specifically, what team did he work on at Qualcomm?

***A.*** **He was the VP of Engineering for the Hardware VLSI Design Team, QCT.**

***Q.*** And that bullet right in the middle of that section, do you see a reference to "DFT"?

***A.*** **Yes.**

***Q.*** Okay. I didn't know that was working again.

And then so I've circled DFT in that block on the bottom.

Did you also see a reference to "low-power design"?

***A.*** **Yes.**

***Q.*** I apologize, my circling on these screens is terrible, but I've circled "low-power design" right next to "DFT."

***A.*** **Yes.**

***Q.*** Got it.

***MR. PILCHAK:*** Okay. I think we can take that down. I'm discovering I don't know how to erase those marks.

***THE COURT:*** That's because Lindsey has to do it. There you go.

***MR. PILCHAK:*** Thank you, Ms. Fincher. Wonderful.

One moment, please, Mr. Roberts.

We can take that down. Thank you, Mr. Reyes.

***BY MR. PILCHAK:***

***Q.*** So, Mr. Roberts, was Sheida.Arabi1@gmail.com the only email address under Sheida's name that you connected to Dr. Arabi in some way?

***A.*** **No.**

***Q.*** What was the other one, if you remember?

***A.*** **Sheida.Alan@gmail.com.**

***Q.*** Got it.

Now, this one has a different last name for Sheida; right?

***A.*** **Yes.**

***Q.*** And I apologize, I should have said this eons ago. But if I refer to Sheida in my questioning of you, I'm just trying to avoid getting it wrong.

Because it is your understanding she had two different legal names over time?

***A.*** **Yes, Sheida Arabi and Sheida Alan.**

***Q.*** Is it your understanding that she legally changed her name at one time?

***A.*** **Yes.**

***Q.*** Did you seek records about that from the authorities in Canada?

***A.*** **Yes.**

***Q.*** Did you use that official legal process that you were talking about yesterday?

***A.*** **Yes.**

***MR. PILCHAK:*** Can we show the witness Exhibit 818, please? Oh, I've got to do this. Sorry.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, Mr. Roberts?

***A.*** **Yes.**

***Q.*** What is this?

***A.*** **It's a Certificate of Change of Name from British Columbia, Canada.**

***Q.*** Is this one of those records that you received from the authorities in Canada?

**A. Yes.**

***MR. PILCHAK:*** Move to admit.

***THE COURT:*** Any objection?

***MR. FRASER:*** Undisputed stuff. Just 403, kind of cumulative. Takes time.

***THE COURT:*** Overruled. Overruled.

It may be admitted and displayed.

***(Exhibit 818 admitted.)***

***BY MR. PILCHAK:***

***Q.*** Okay. So what is the jury looking at there, Mr. Roberts?

**A. This is a name change form, changing Sheida Arabi's name to Sheida Alan. It was as of -- the registration date was July 14th, 2015, and it looks like it was effective July 15th, 2015.**

***Q.*** Got it.

And so just to make a hundred percent sure we're tracking, the original name is Sheida Arabi?

**A. Yes.**

***Q.*** And then on or about this date, she changes her name to Sheida Alan?

**A. Yes.**

***Q.*** And so the date that this is registered and effective is either the 14th or the 15th of July 2015; right?

**A. Yes.**

***Q.*** Do you know whether a non-provisional patent application was

filed listing an inventor as Sheida Alan just a few days before this?

**A. Yes.**

*Q.* Yes, it was?

**A. Yes.**

***MR. PILCHAK:*** Okay. Let's take that down, and I'll put my diagram that we've been working on, 883, back on the screen here.

***BY MR. PILCHAK:***

*Q.* Do you see that?

**A. Yes.**

*Q.* You were talking about this last email account that we've listed, Sheida.Alan@gmail.com.

Did you do some investigation of what that account was and where it came from?

**A. Yes.**

***MR. PILCHAK:*** Let's show the witness Exhibit 115, please.

***BY MR. PILCHAK:***

*Q.* What is this?

**A. It's Google subscriber information for the Sheida.Alan@gmail.com account.**

***MR. PILCHAK:*** Move to admit.

***THE COURT:*** Any objection?

***MR. FRASER:*** No objection.

***THE COURT:*** 115 may be admitted and published.

***(Exhibit 115 admitted.)***

***MR. PILCHAK:*** All right. And let's kind of zoom in on the top half there.

Thank you, Mr. Reyes.

***BY MR. PILCHAK:***

***Q.*** So what are we looking at here?

***A.*** **So this is the Google subscriber information for the Sheida.Alan@gmail.com account.**

***Q.*** And when was this created?

***A.*** **It was created on September 19th, 2015.**

***Q.*** And it's subscribed in the name Sheida Alan; right?

***A.*** **Yes.**

***Q.*** But what IP address was it created from?

***A.*** **It's the same IP address that was used to create the Sheida.Arabi1@gmail.com, and it was also used to file the provisional patent that we looked at earlier.**

***Q.*** If we go back to our list here, what conclusion did you draw from the fact that it was created at the same IP address?

***A.*** **That it was an email account that was used by Karim Arabi.**

***Q.*** Was Dr. Arabi asked whether he created that account?

***A.*** **Yes.**

***Q.*** In the same discovery responses that we were just looking at?

***A.*** **Yes.**

***MR. PILCHAK:*** Can we get 785 for the witness, please? It's already in evidence.

And let's go down to page 10. But it might not be page 10 in this version, so let's scroll. I apologize. It's Response to RFA 19. Actually, let's stop there. Go up a little bit more.

***BY MR. PILCHAK:***

***Q.*** Right on the screen there, which is the second-to-last page of 785, is this Dr. Arabi's verification?

***A.*** **Yes.**

***MR. PILCHAK:*** Let's zoom in on that language, please.

***BY MR. PILCHAK:***

***Q.*** What is Dr. Arabi verifying here?

***A.*** **That he had read the document, and that he was a party to the action, and that to his best of the knowledge, the foregoing document was true, and he signed it under the penalty of perjury.**

***MR. PILCHAK:*** Okay. Let's take that down and scroll up to the Responses to 19 and 20. I can't recall if they're on the same page. Had me nervous there for a second.

Okay. Let's take 19, first.

***BY MR. PILCHAK:***

***Q.*** What is Dr. Arabi being asked to admit, under penalty of perjury, in response to Request for Admission No. 19?

***A.*** **He was asked to admit that Dr. Arabi created the email**

**account Sheida.Alan@gmail.com.**

***Q.*** And there's some objections in the first paragraph there; right?

***A.*** **Yes.**

***Q.*** And then in the second paragraph, what does he respond in substance?

***A.*** **That he did not recall whether or not he assisted his sister, Sheida Alan, in creating the email account.**

***Q.*** And in fairness to Dr. Arabi, these requests were served a couple of years after that account was created; right?

***A.*** **Yeah, 2018.**

***Q.*** Thank you.

***MR. PILCHAK:*** Let's take that zoom down and look at 20.

***BY MR. PILCHAK:***

***Q.*** What is Dr. Arabi being asked to admit in Request No. 20?

***A.*** **He's being asked to admit that between September 19th, 2015 and October 30th, 2015, that Dr. Arabi drafted and sent emails from the Sheida.Alan@gmail.com email account.**

***Q.*** And did he admit this one?

***A.*** **He did not recall whether or not he assisted his sister by sending any emails from the email account.**

***MR. PILCHAK:*** Okay. Let's take that down.

***THE COURT:*** Would now be an okay time for a break?

***MR. PILCHAK:*** Any time's a good time for a break, Your Honor.

***THE COURT:*** Okay. Let's take a 15-minute recess, ladies and gentlemen. You're reminded you're not to look up anything about the case. You're not to do any research about the case. Excuse me, I'm going to ask Alternate No. 3 just to stick around. I had a couple of questions for him. Everyone else, you're excused for 15 minutes. And you, sir, are excused as well.

***THE WITNESS:*** Thank you.

***(Jury out at 10:28 a.m.)***

***THE COURT:*** I just wanted to tell you -- I got your note, and I wanted to tell you a couple of things. First of all, I want to make sure you know that all the jury selection process at the beginning is sealed. And any names that have been -- were referred to are blocked out, so it's not a public record. And that's why we refer to you as Alternate No. 3 or refer to you by your jury number as well.

In addition, I wanted to let you know that I made some inquiry, and it sounds like there was an individual that you were a little worried about. It sounds like that individual is a law student who is observing because they're just interested in the case. We have a lot of lawyers and law students who have been coming in to observe who have no relationship to the case or to anyone in the case. They're just interested because it's kind of an interesting case. It's a different sort of case than we see, but has no relationship to this case.

And it doesn't sound like -- at the beginning of the case, we ran a lot of names by you, and it doesn't sound like you recognize any of those names. Is that -- that's correct? He's nodding yes. Okay.

Do you still think you can be fair and impartial, or do you think that your concerns would make it difficult for you to be fair?

***ALTERNATE JUROR No. 3:*** I really don't know.

***THE COURT:*** Okay.

***ALTERNATE JUROR No. 3:*** Yeah.

***THE COURT:*** Do you think that you can listen to the evidence and listen to the law, follow the law as I give it to you, and not be swayed one way or the other by whatever anxiety you may feel as long as you know that everything is sealed and names are confidential?

***ALTERNATE JUROR No. 3:*** Yes.

***THE COURT:*** Do you think you can do that?

***ALTERNATE JUROR No. 3:*** Yes.

***THE COURT:*** Okay. Do you think that it will affect how you vote in the end?

***ALTERNATE JUROR No. 3:*** No. I mean, I'll just go based on the information.

***THE COURT:*** Okay. Thank you very much. I appreciate it.

***ALTERNATE JUROR No. 3:*** Thank you.

***(All jurors out at 10:30 a.m.)***

***THE COURT:*** Anything else we need to put on the record?

***MR. PILCHAK:*** Not for us, Your Honor.

***MR. FRASER:*** Yeah. I would just like to review that note.

***THE COURT:*** Yes.

***MR. PILCHAK:*** I'll grab it right now.

***THE COURT:*** Okay. It might help if -- I know, Mr. Pilchak, you're trying to move things forward quickly. It might help if you just, instead of giving a note to the witness, gave a note to Defense counsel, and if there's an agreement that there are six -- the next six exhibits everyone agrees can be admitted, then we can just admit them and we don't have to go through the whole get them out of binders.

***MR. PILCHAK:*** You're quite right, Your Honor. I apologize for that. I fronted the 28 exhibits I wanted to authenticate at once with Mr. Fraser and forgot about these eight, so my bad.

***THE COURT:*** Okay. That's fine. Okay.

We're in a 15-minute recess.

***(Recess taken.)***

***THE COURT:*** Back on the record. All lawyers are present. Dr. Arabi is present. And we're outside the presence of the jury.

***MR. FRASER:*** Thank you, Your Honor. I understand that

the Government will likely attempt to admit the notebook in the next segment of testimony, and this is an item that we've talked about in the motions *in limine*. And there's sort of a pending motion for reconsideration.

And just on the authentication, this witness certainly would not have personal knowledge of the origin of the document. And the Government is -- the relevance of the document depends on the contents of the original.

So I think the Best Evidence Rule is not satisfied. Also, it's not verified. So this is something that in a civil case, the non-verified response can't be used for anything, so it seems like --

***THE COURT:*** I'm not sure this is a witness who is going to know anything about where it came from.

***MR. PILCHAK:*** So what this witness will know, Your Honor, is that he received it back in response to his Grand Jury Subpoena to Qualcomm that said, Give us all the stuff from the civil discovery. And then he also received in response to subpoenas all of that lawyer correspondence that I know the Court has seen from our filings.

And so the way I would propose to do this is have him say, Did you get back this notebook in response to your Grand Jury Subpoena? He's not going to know who wrote the notebook, but he's going to be able to say it was produced in civil litigation.

He'll be able to say, I've seen discovery responses, including verified discovery responses that I think we're going to get into evidence, no problem, where both Dr. Arabi and Ms. Alan say, in substance, Don't worry about where this tech came from. We're going to produce to you contemporaneous handwritten notes of the research behind the notebook that they signed under penalty of perjury. He'll say this is the only notebook handwritten that he got back in response to his Subpoena that he's aware of.

And he can match the Bates number of this notebook to all of that attorney correspondence that the Court has seen. I recognize that attorney correspondence is probably hearsay, which is why we originally teed this up for the Court, if necessary, under Rule 104, where we can take it outside the presence of the jury, he could lay whatever foundation you want to see for those attorney emails, which clearly mesh with the notebook itself, to establish this is what the lawyers were tussling about, this is what Dr. Arabi's --

***THE COURT:*** I think what I'd like to do is take it up outside the presence of the jury. I do have a question. Is it possible that we could take that particular inquiry outside the presence of the jury at 3:45, and you can either not be present or be present and sit there? Would that be possible?

***MS. BERNSTEIN:*** Yes, Your Honor. Thank you.

***THE COURT:*** Okay. So maybe we can let the jury go

at 3:45 and take that particular part of the witness's testimony outside the presence of the jury so I can see whether the Government has established -- I'd just like to hear that portion of it.

***MR. PILCHAK:*** It's fine with us. It's not perfect for our proof, obviously, because we'd like to do it on direct. We just need to make sure that he's available subject to whatever recall the Court needs. I don't think he's going to run away.

***THE COURT:*** Okay. Let's do it that way. Let's not put it in right now, and then I'll let you recall him if I allow it in.

***MR. FRASER:*** Thank you, Your Honor.

***THE COURT:*** Okay.

***(Jury present at 10:51 a.m.)***

***THE COURT:*** And if we could have our witness as well.

Okay. We are back on the record. All jurors are present. All lawyers are present. Dr. Arabi is present. And you, sir, are reminded you're still under oath to tell the truth.

Mr. Pilchak.

***MR. PILCHAK:*** Thank you, Your Honor.

***BY MR. PILCHAK:***

***Q.*** Okay. Mr. Roberts, before the break -- in fact, a few minutes the break, you were testifying about some IP addresses.

Do you remember that?

***A.*** **Yes.**

***Q.*** Sorry, I meant to say email accounts, not IP addresses.

And one of the email accounts is this Sheida.Arabi1 account.

Do you remember that?

***A.*** **Yes.**

***Q.*** Did you see that on any of the actual provisional patent filings that you reviewed in this case?

***A.*** **I don't believe so, but I don't recall a hundred percent.**

***Q.*** Fair enough. Can you look at Exhibits 793 and 830? They're both at your elbow, there, so no binder work necessary this time. I pulled them out and put them up loosely. One should be 793 and one should be 830.

***A.*** **Yes.**

***Q.*** Are those both provisional patent applications that are relevant to your investigation?

***A.*** **Yes.**

***MR. PILCHAK:*** Move to admit.

***THE COURT:*** Any objection?

***MR. FRASER:*** 793 and 830?

***MR. PILCHAK:*** Correct.

***MR. FRASER:*** No.

***THE COURT:*** I thought you were listing objections, 793 and 830.

***MR. PILCHAK:*** Do they go that high?

***THE COURT:*** Admitted.

***(Exhibits 793 and 830 admitted.)***

***MR. PILCHAK:*** Thank you, Your Honor.

Let's start with 830, please. If we could show the witness just that full first page for 830.

***BY MR. PILCHAK:***

***Q.*** Is this a copy of the provisional patent application, one of them, that you were just talking about?

***A.*** **Yes.**

***MR. PILCHAK:*** If we'd just zoom in on the very bottom there, yeah, with the title. Perfect.

***BY MR. PILCHAK:***

***Q.*** Do you see the title at the top of this zoomed screen?

***A.*** **I do.**

***Q.*** Is that the same title that was on those slides we were talking about a little while ago?

***A.*** **It is.**

***MR. PILCHAK:*** All right. Let's zoom out from that. And can you take us to page 14 of 15, please?

***BY MR. PILCHAK:***

***Q.*** Is this an electronic acknowledgment receipt portion of the application?

***A.*** **Yes.**

***MR. PILCHAK:*** And if we zoom in on the correspondence address in the middle there.

///

***BY MR. PILCHAK:***

***Q.*** Do you see that it lists some information for Sheida Arabi?

***A.*** **I do.**

***Q.*** What email account is listed for Sheida Arabi?

***A.*** **Sheida.Arabi1@gmail.com.**

***Q.*** Got it.

And is there -- and if you look at Exhibit 793 at your elbow, page No. 15, so about halfway through the stack, is there a similar electronic acknowledgment receipt that has Sheida Arabi's name on it?

***A.*** **Yes, it does.**

***Q.*** And does it list the same email address that we were just talking about?

***A.*** **Sheida.Arabi1@gmail.com.**

***Q.*** Okay. So-- well, let me stop myself there.

All right. I think you can set those to the side, and we can take that down.

Gosh, I got so excited about provisional patents, I forgot, but I think right before the break, we were talking about this email address at the bottom, Sheida.Alan.

Do you remember that?

***A.*** **I do.**

***Q.*** Okay. Did you do a warrant search for that email account?

***A.*** **Yes.**

***Q.*** And how many emails would you say you reviewed from that

account?

**A. It was approximately 1,602.**

*Q.* Okay. And, again, you served that warrant five, five-and-a-half years after the account was created?

**A. Yes.**

*Q.* Got it.

Based on your review of those 1600-ish emails, who did you conclude used that account?

**A. It appeared to be that both Sheida Arabi and Karim Arabi used that account.**

*Q.* Did you notice anything about the timing of when the different individuals seemed to be using it?

**A. Yes. It appeared that Karim Arabi used it during the time of the -- after the account was originally created while certain real estate transactions were going on and this transaction with Abreezio was closing.**

*Q.* Got it. Thank you.

Mr. Roberts, I do need you to get one more binder out. I'm sorry. It's the 800 series.

And can I ask you to look at Exhibits 805, 808, and 812?

**A. Yes.**

*Q.* Are those all email subscriber information that you obtained during your investigation?

**A. They are.**

***MR. PILCHAK:*** Move to admit those three, Your Honor.

***THE COURT:*** Any objection?

***MR. FRASER:*** No, Your Honor.

***THE COURT:*** 805, 808, and 812 may all be admitted.

***(Exhibits 805, 808 and 812 admitted.)***

***BY MR. PILCHAK:***

***Q.*** Okay. Beyond the other evidence that we've already seen -- you can set those aside, Mr. Roberts. I'm sorry.

Beyond the evidence we've already seen, were there other documents that indicated to you that emails or records coming from this second Sheida.Alan@gmail.com account were actually authored by Karim Arabi and not Sheida Alan?

***A.*** **Yes.**

***MR. PILCHAK:*** If we could show the witness Exhibit 1. Bear with us, Mr. Roberts, maybe just a little longer.

All right. If we zoom in on the text there.

***BY MR. PILCHAK:***

***Q.*** Is this an email that you seized from your warrant searches in this case?

***A.*** **Yes, it is.**

***Q.*** And is it from that email account that we were just talking about to an account with Mr. Taneja's name in it?

***A.*** **Yes.**

***MR. PILCHAK:*** Move to admit.

***THE COURT:*** Any objection to one?

***MR. FRASER:*** No, Your Honor.

***THE COURT:*** It may be admitted.

***(Exhibit 1 admitted.)***

***MR. PILCHAK:*** And, I'm sorry, there's two attachments to this email as well. We move to admit Exhibits 2 and 3, which are the two attachments.

***MR. FRASER:*** No objection.

***THE COURT:*** Two and 3 may also be admitted.

***(Exhibits 2 and 3 admitted.)***

***MS. CHOPRA:*** Thank you, Your Honor.

***BY MR. PILCHAK:***

***Q.*** All right. So this email on top, Mr. Roberts, does it have any text in the body of the email?

***A.*** **It does not.**

***Q.*** But what is the subject of the email?

***A.*** **"Provisional patents."**

***Q.*** And what do you notice about the dates -- or the date of this email?

***A.*** **September 21st, 2015.**

***Q.*** How far in advance of the Abreezio deal closing is that?

***A.*** **It was very close to the close, which happened in October.**

***Q.*** Do you know if the closing was October 30th of 2015?

***A.*** **Yes.**

***Q.*** Okay. Who is the recipient of this email?

***A.*** **Sanjiv Taneja.**

***Q.*** And do you believe that to be a -- the person who was using

this email account?
***A.*** **Yes.**
***Q.*** Why do you say that?
***A.*** **I never saw any instances of anybody impersonating Sanjiv Taneja in any email correspondence.**
***Q.*** Is that account also subscribed to him?
***A.*** **Yes.**
***Q.*** Did you hit that account with an email search warrant as well?
***A.*** **Yes.**
***Q.*** Got it.
What are the two attachments to this email, do you know?
***A.*** **They were provisional patents, information about the technology covered by the patents.**
***MR. PILCHAK:*** Okay. Can we show the witness Exhibit 2, which is in evidence?
All right. Just zoom in on the top half, please.
***BY MR. PILCHAK:***
***Q.*** When you say information from the provisional patents, does this have the same title of invention as all the documents we've seen so far for one of the two provisional patents from December of 2014?
***A.*** **Yes.**
***Q.*** And just to be clear, were there two different provisional patents that were filed in December of 2014?

***A.*** **Yes.**
***Q.*** With Sheida Arabi's name on both of them?
***A.*** **Yes.**
***Q.*** As the only listed inventor?
***A.*** **Correct.**
***Q.*** And this -- does this relate to one of them?
***A.*** **Yes.**
***Q.*** Gotcha.
Is the second attachment to that email we were just looking at a similar document, but for the other provisional patent?
***A.*** **Yes.**
***Q.*** I'd like to ask you about the metadata for both of those documents.
Did you look at the metadata?
***A.*** **I did.**
***MR. PILCHAK:*** And if we could show the witness and the witness only Exhibit 2A, and I don't know, can we show 3A at the same time, side by side? I'm getting greedy now.
***BY MR. PILCHAK:***
***Q.*** Do you see 2A there, Mr. Roberts?
***A.*** **Yes.**
***Q.*** Okay. What is 2A?
***A.*** **2A is the metadata for the first document that we just looked at it.**
***Q.*** Got it.

And is there a similar document prepared as 3A for the metadata for the other document?

**A. Yes.**

***MR. PILCHAK:*** We would move to admit two and -- 2A and 3A.

***THE COURT:*** Any objection?

***MR. FRASER:*** No objection.

***THE COURT:*** 2A and 3A may be admitted.

***(Exhibits 2A and 3A admitted.)***

***BY MR. PILCHAK:***

***Q.*** Okay. Is the jury looking at something similar here to the metadata that we saw before, Mr. Roberts?

**A. Yes, they are.**

***MR. PILCHAK:*** Can we zoom in on the "Properties" column on the right-hand side?

***BY MR. PILCHAK:***

***Q.*** Does this also list the purported author of this document?

**A. It does.**

***Q.*** And who does it list as the person who created the description of the tech from the provisional patent application?

**A. Karim Arabi.**

***Q.*** And is the listed author of the other document in the metadata also Karim Arabi?

**A. Yes.**

***MR. PILCHAK:*** Okay. I think we can take that down.

***BY MR. PILCHAK:***

***Q.*** So on Exhibit 833 [sic] we have listed so far four email accounts with some version of Sheida's name in them; right?

***A.*** **Yes.**

***Q.*** How long did the company Abreezio exist, if you remember, between the time it was created and the time it was sold to Qualcomm?

***A.*** **Not very long at all. They were discussing the early form of the company Trementa in 2014, December 2014, and then the company ended up getting acquired as Abreezio in October of 2015.**

***Q.*** So less than a year.

***A.*** **Yes.**

***Q.*** $180 million.

During -- well, and Abreezio itself wasn't actually created in 2014, was it?

***A.*** **Correct. It was still under the Trementa umbrella at that point.**

***Q.*** When they actually created a company called Abreezio, that wasn't until February 2015; is that right?

***A.*** **Yes.**

***Q.*** Okay. So between February of 2015 and the end of October of 2015, that's how many months?

***A.*** **Eight.**

***Q.*** Eight months.

During that eight-month period, were there other email accounts associated with Abreezio that were created with Sheida's name in them?

**A. Yes.**

*Q.* Do you remember what those were?

**A. Sheida@Abreezio.com and SheidaAlan@Abreezio.com.**

*Q.* What do you remember about the timing when you started to see the second of those two?

**A. It was closer to the end of the transaction.**

*Q.* And I know my handwriting on the fly sometimes gets a little weird, but have I faithfully listed those two Abreezio email accounts in the middle of Exhibit 883?

**A. Yes.**

*Q.* And just for the record, I might have said 833 before, but this is 883. My bad.

Okay. So let me ask you about these.

What kinds of accounts were these?

**A. These were accounts that were created with the Abreezio name on it. They were created for a number of people who were associated with Abreezio.**

*Q.* So other people at Abreezio had these accounts?

**A. Yes.**

*Q.* Sanjiv Taneja?

**A. Yes.**

*Q.* Brad Quinton?

***A.*** **Yes.**
***Q.*** Akbar Shokouhi?
***A.*** **Yes.**
***Q.*** Karim Arabi?
***A.*** **No.**
***Q.*** Did anybody else's account list their last name like Sheida's second account listed her last name?
***A.*** **I don't believe so.**
***Q.*** Okay. Were these accounts hosted by Google?
***A.*** **Yes.**
***Q.*** At the end of Abreezio's life span, what happened to it?
***A.*** **Abreezio was acquired by Qualcomm, and the entity went away.**
***Q.*** Did Qualcomm basically acquire all of Abreezio's assets?
***A.*** **Yes.**
***Q.*** Down to, like, a toaster?
***A.*** **Yes.**
***Q.*** Okay. I'll stop myself there.
So all of the assets, did that include the contents of these email accounts?
***A.*** **Yes.**
***Q.*** So what was supposed to happen with the contents of these email accounts, according to the deal documents?
***A.*** **They were supposed to be turned over to Qualcomm.**
***Q.*** Do you know -- well, let me ask you this.
Did you request those documents in subpoenas that you caused

to be served on Qualcomm?

***A.*** **Yes.**

***Q.*** Did you receive the contents of those accounts?

***A.*** **No.**

***Q.*** What is your understanding as to why not?

***A.*** **That the account information --**

***MR. FRASER:*** Objection. Foundation.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** You didn't receive the contents?

***A.*** **No.**

***Q.*** And you asked for it?

***A.*** **Yes.**

***Q.*** Got it.

Did you see some emails involving those accounts, though, in emails that you obtained from other sources?

***A.*** **Yes.**

***Q.*** In response to other material that had been Grand Jury Subpoenaed?

***A.*** **Yes.**

***Q.*** And in emails that you received back on search warrant returns?

***A.*** **Yes.**

***Q.*** Let me ask a different question.

Do you know what a recovery email account is?

**A. Yes.**

***Q.*** Do you know what the recovery account was for Sheida@Abreezio.com?

**A. I believe it was Sheida --**

***MR. FRASER:*** Objection. The question was, do you know.

***BY MR. PILCHAK:***

***Q.*** Let's stop there.

Do you know?

***THE COURT:*** Do you know what the recovery account was for Sheida@Abreezio.com, yes or no?

***THE WITNESS:*** No. I would want to see a document to refresh my recollection, if you have one.

***MR. PILCHAK:*** Fair enough. Let me see if I can do that. But we'll have to table that for a moment.

Okay. One moment, please, Your Honor. I'm just adjusting my questions based on the sequencing from our discussion earlier.

***BY MR. PILCHAK:***

***Q.*** So you said the money laundering -- sorry. I apologize.

You said the Abreezio transaction was completed.

**A. Yes.**

***Q.*** How much did Qualcomm pay to buy Abreezio?

**A. Up front, they paid $150 million, and there was $30 million that was held back initially that was to be paid in the future.**

***Q.*** And out of the 150 million that was paid up front, how much

went to Dr. Arabi?

***A.*** **Zero went to him directly.**

***Q.*** Okay. How much was paid to Sheida Alan?

***A.*** **I believe it was 91 million and approximately 47,000 or 87,000 -- approximately $91 million.**

***Q.*** Got it.

And at that time, her legal name was Sheida Alan; right?

***A.*** **Yes.**

***Q.*** Have you reviewed, like, the wire details for that wire?

***A.*** **Yes.**

***Q.*** So it didn't say it was going to Sheida Arabi; right?

***A.*** **Correct.**

***Q.*** It said it was going to Sheida Alan?

***MR. FRASER:*** Asked and answered.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** Did your team investigate what happened with that money?

***A.*** **Yes.**

***Q.*** For example, was one of the things that did you was to try to find emails concerning financial transactions involving Dr. Arabi and his sister?

***A.*** **Yes.**

***Q.*** Did you also look for records of real estate transactions that were relevant to your investigation?

***A.*** **Yes.**

***Q.*** Did you find any?
***A.*** **Yes.**

***MR. PILCHAK:*** At this time -- oh, permission to approach, Your Honor. Again, to try to speed things up, I have 28 documents together that I've noticed to the Defense that I'd like to hand up to the witness so we can avoid this binder nonsense.

***THE COURT:*** Sure.

***MR. PILCHAK:*** And allow him to take a moment to look through.

***THE COURT:*** Sure. Are they --

***MR. PILCHAK:*** Stamped and numbered?

***THE COURT:*** -- stamped and numbered? Thank you.

***MR. PILCHAK:*** Yes. And I'll read -- while he's reviewing, I'll read the numbers into the record so we can all be sure we're looking at the same thing.

***THE COURT:*** Okay.

***MR. PILCHAK:*** So the exhibits I've just handed up are 246, 251 and '52, 274 to 281, 297 to 299, 302, 331, 335, 345, 347, 364, 371 and '72, 427, 433, 442 and '43, and 452 and '53.

***MR. FRASER:*** For the record, there are objections on hearsay, 403, 404, and relevance to these documents.

***THE COURT:*** Okay. I have not --

***MR. FRASER:*** I know they're not offered for admission yet, but --

***THE COURT:*** They have not been yet --

***MR. FRASER:*** -- there might be a batch admission and then it gets hard to track, so I just wanted to make sure that those objections are noted as to this set.

***MR. PILCHAK:*** Thank you, Your Honor. It's not my intent to offer them for admission at this time, just to have the witness describe where he found them.

***THE COURT:*** Okay.

***THE WITNESS:*** Okay. I've looked at them.

***BY MR. PILCHAK:***

***Q.*** You've had a moment to look those over?

***A.*** **Yes.**

***Q.*** Apologies for throwing 28 at you at once, but I appreciate you taking some time to give those a good look.

As to those documents, where did they come from?

***A.*** **They came from the email search warrants that we conducted.**

***Q.*** And are they correspondence and attachments to correspondence?

***A.*** **Yes.**

***Q.*** Do pretty much all of them involve an email account associated with Sheida?

***A.*** **Yes.**

***Q.*** Are there a handful that involve Dr. Arabi?

***A.*** **Correct.**

***MR. PILCHAK:*** Okay. At this time, Your Honor, I think

we can put those to the side and return to those later on.

But thank you for that, Mr. Roberts.

***THE COURT:*** Okay.

***BY MR. PILCHAK:***

***Q.*** So if I can take a step back, you have testified about a number of different steps that you took in your investigation; right, Mr. Roberts?

***A.*** **Yes.**

***Q.*** You subpoenaed records; right?

***A.*** **Yes.**

***Q.*** You did email search warrants?

***A.*** **Yes.**

***Q.*** I didn't ask you about interviews.

Did you interview anybody?

***A.*** **Yes.**

***Q.*** One person or a number of people?

***A.*** **A number of people.**

***Q.*** Got it.

At the conclusion of your investigation, by which I mean when charges were sought, did you seek charges?

***A.*** **Yes.**

***Q.*** And did you conduct what's sometimes called a takedown?

***A.*** **Yes.**

***Q.*** And that sounds like a little bit of a -- I was going to say kinetic. It sounds like an action word.

What does a "takedown" mean?

***MR. FRASER:*** We object under 403, 401.

***THE COURT:*** Overruled.

***MR. PILCHAK:*** Let me not -- I'll withdraw that word from my question.

***BY MR. PILCHAK:***

***Q.*** Did you seek to take anyone into custody?

***A.*** **Yes, we did.**

***Q.*** Who did you seek to take into custody?

***A.*** **Dr. Arabi, Akbar Shokouhi, here in San Diego; up in the Silicon Valley area, Sanjiv Taneja; and then through the MLAT assistance with Canada, Sheida Arabi, also known as Sheida Alan, up in Canada.**

***Q.*** And American law enforcement didn't do the Sheida Alan thing; right?

***A.*** **Correct. It was the Canadian authorities who did that.**

***Q.*** But as to the other three arrests, were those conducted by Federal law enforcement?

***MR. FRASER:*** Objection. Relevance. 403.

***THE COURT:*** I'll allow it. Overruled.

***THE WITNESS:*** Yes. It was -- they were conducted by the FBI, the U.S. Marshals, and the IRS Criminal Investigation Service.

***BY MR. PILCHAK:***

***Q.*** Did you also do a financial -- I'm trying not to say

takedown -- a financial wrap-up as well?

**A. Yes. We did seizures of the financial assets.**

***Q.*** Did those include assets for all of the individuals in the United States that you just mentioned?

**A. Yes.**

***MR. PILCHAK:*** One moment, please, Your Honor?

***THE COURT:*** Yes.

***(Pause.)***

***MR. PILCHAK:*** Subject to the Court's note earlier, no further questions for this witness.

***THE COURT:*** Okay. Cross-examination.

***MR. FRASER:*** Yes, Your Honor. We need a moment to get set up with some tech.

***THE COURT:*** Okay.

***MR. FRASER:*** Thanks for everyone's patience. Probably just need one or two minutes to set up here.

***THE COURT:*** Okay.

***(Pause.)***

***CROSS-EXAMINATION***

***BY MR. FRASER:***

***Q.*** Thanks, Mr. Roberts.

You started off yesterday by testifying you're familiar with the DOJ's investigation of the Abreezio acquisition.

**A. Yes.**

*Q.* And that's, like, an understatement; right?
***A.* Yes.**
*Q.* You're very familiar with it.
***A.* Very familiar with it.**
*Q.* You started on it in 2020.
***A.* Yes.**
*Q.* And you were on it for about three years.
***A.* Yes.**
*Q.* In 2023, the FBI ceased to be your employer.
***A.* Correct.**
*Q.* FBI let you go in 2023.
***A.* I retired in 2023.**
*Q.* Okay. And that was after you wrote numerous requests of different types for this investigation.
***A.* Yes.**
*Q.* So we covered subpoenas.
***A.* Yes.**
*Q.* Search warrant.
***A.* Yes.**
*Q.* You applied to extend the statute of limitations as well.
***A.* Yes.**
*Q.* And you made something called a BIDMAS request.
***A.* Yes.**
*Q.* What's a BIDMAS request?
***A.* BIDMAS is a system that the FBI has to ingest voluminous**

**amounts of data. And it's a review tool so that we can take the data, examine the data, and then we can kind of flag certain documents based on different criteria.**

*Q.* Thanks.

And that's because you got 500 gigabytes of data from Qualcomm.

*A.* **Yes.**

*Q.* And you've spent hundreds of hours working on this case.

*A.* **Yes.**

*Q.* And so have other agents.

*A.* **Yes.**

*Q.* A tremendous amount of taxpayer resources have gone into this.

*A.* **Yes.**

*Q.* And when agents work together, you don't want to waste each other's effort.

*A.* **Correct.**

*Q.* You want to have the benefit of each other's knowledge.

*A.* **Yes.**

*Q.* So you agents are supposed to share the important information that you have with each other.

*A.* **Yes.**

*Q.* And that can be done in a variety of ways.

*A.* **Yes.**

*Q.* And one of them is writing reports.

**A. Yes.**

Q. So when a new agent comes on to an investigation, they should make themselves familiar with the preexisting reports in the investigation.

**A. Yes.**

Q. So that all of that accumulated knowledge doesn't get lost.

**A. Correct.**

Q. That's what you yourself aim to do as an agent, when you were an agent. You're not anymore, but that's what you did.

**A. Yes.**

Q. And did you do that as you were preparing to testify in this trial? Did you review prior reports from the investigation?

**A. I did.**

Q. And you don't just work with other agents; you also work with prosecutors when you're in the FBI.

**A. Correct.**

Q. And you've worked closely with them in this case.

**A. Yes.**

Q. And there have been several different prosecutors that have worked on the case throughout its life span.

**A. Correct.**

Q. Some of them have left the U.S. Attorney's Office.

**A. Yes.**

Q. And even you are not with the FBI anymore.

**A. Correct.**

*Q.* But you've been working with Mr. Pilchak on this case so long that he called you J.R. at this point.
**A. Yes. Everybody at the FBI and U.S. Attorney's Office called J.R.**
*Q.* You and the prosecutors are a team.
**A. Yes.**
*Q.* How many times do you think you've talked about this case with Mr. Pilchak?
**A. I couldn't even hazard a guess, but when I was an agent and we were working on it, a lot.**
*Q.* And we, you and I, met yesterday at about 10:15 a.m.
**A. Yes. You made introductions out in the hallway.**
*Q.* You were just waiting in the hallway out there.
**A. Yes.**
*Q.* And I came up and introduced myself.
**A. Yes.**
*Q.* We shook hands.
**A. Yes.**
*Q.* And I said I thought it could be helpful to us both if we talked, but you politely refused.
**A. Yes. You said it would be mutually beneficial, and I decided to decline the offer to speak.**
*Q.* And yesterday in the afternoon, after another witness testified, you swore to tell the whole truth.
**A. Yes.**

***Q.*** Is it possible that that's not what happened yesterday?
***A.*** **No.**
***Q.*** The Government's reason for declining to prosecute this case is one of the first things you talked about.
***A.*** **Yes.**
***Q.*** You'd agree that's important?
***A.*** **Yes.**
***Q.*** And as we have covered, you should have reviewed any FBI reports from before your involvement in this case.
***A.*** **Yes.**
***Q.*** And so I just want to ask you and give you a fair chance here, is it possible you messed up yesterday on that part?
***A.*** **Not that I'm aware.**
***Q.*** It's not possible that you omitted something?
***A.*** **No.**
***Q.*** I'm showing you Defense Exhibit 2801, an FBI document from the SENTINEL FBI net online system titled, quote, "to document Qualcomm referral and case declination."
***A.*** **Yes.**
***Q.*** Do you see that in the "details" section?
***A.*** **I do.**

***MR. FRASER:*** Your Honor, may I approach the witness?

***THE COURT:*** You may.

***THE WITNESS:*** Thank you.

///

***BY MR. FRASER:***

***Q.*** This is an FBI internal document memorializing the initial case declination.

***A.*** **Yes.**

***Q.*** These are the notes of Special Agent Brigid Cook approved by Mark Kolenda, as you see on the bottom of the second page; yes?

***A.*** **Yes.**

***Q.*** On the first page, where I circled in red, it says why the case was declined, doesn't it?

***A.*** **Yes.**

***Q.*** Please read the sentence that I circled in red, beginning with "AUSA Beste declined prosecution at this time."

***MR. PILCHAK:*** Objection. Hearsay.

***THE COURT:*** Sustained.

***MR. FRASER:*** Your Honor, the Government introduced the issue --

***THE COURT:*** We're not going to argue in front of the jury. You can ask your next question.

***BY MR. FRASER:***

***Q.*** You're aware that the Government declined prosecution because it concluded there were adequate civil remedies.

***A.*** **That was one of the reasons listed, but there was an opportunity provided to Qualcomm to provide additional information at a future point.**

***Q.*** And when you testified about this yesterday, you didn't

mention the adequacy of civil remedies, did you?
***A.*** **I testified to the fact that there was civil litigation going on.**
***Q.*** Yeah. Did you mention the adequacy of civil remedies yesterday?
***A.*** **No.**
***Q.*** Before this was the Government's case, it was Qualcomm's case.
***A.*** **It was a civil case that Qualcomm was involved in. I was involved in a criminal investigation.**
***Q.*** And before that, it was Qualcomm's civil case.
***A.*** **Qualcomm had civil litigation ongoing, yes.**
***Q.*** Working on this, you were with the United States FBI.
***A.*** **Yes.**
***Q.*** But Qualcomm certainly has investigators of its own.
***A.*** **Yes.**
***Q.*** And they happen to include former FBI agents.
***A.*** **Yes.**
***Q.*** In fact, Qualcomm's current Global Security Manager before joining Qualcomm was an FBI agent.
***A.*** **I don't know who the current one is. If you give me the name, I can --**
***Q.*** Allan Vitkosky?
***A.*** **Al Vitkosky, yes, he was a supervisor in San Diego before going to Qualcomm.**

*Q.* Yeah, 23 years with the FBI, and since 2020 with Qualcomm. Does that sound right?
***A.*** **Approximately, yes.**
*Q.* And how is the pay at Qualcomm?
***A.*** **I don't know.**
*Q.* And the Federal Government employment, that's vulnerable to Government shutdowns?
***A.*** **Yes.**
*Q.* And it's even vulnerable when there's a change of administration?
***A.*** **Potentially.**
*Q.* And you yourself had to leave after 23 years.
***A.*** **I didn't have to leave after 23 years. I chose to leave after 23 years when I was eligible to retire because I got another job offer.**
*Q.* And now you're in private employment now.
***A.*** **Yes.**
*Q.* In addition to former FBI investigators, Qualcomm also has lawyers of its own.
***A.*** **Yes.**
*Q.* In-house lawyers.
***A.*** **Correct.**
*Q.* Outside lawyers.
***A.*** **Yes.**
*Q.* For certain matters, as this civil lawsuit, they had outside

counsel.
**A. Outside counsel, yes.**
*Q.* And it was Qualcomm's outside law firm that referred the case to the U.S. Attorney's Office.
**A. Yes.**
*Q.* And "referred" means that they brought it to the DOJ, meaning the Department of Justice, and they asked the United States Government to prosecute the case; is that right?
**A. They presented information. And they didn't ask necessarily to prosecute it, but they asked --**
*Q.* Were they --
**A. -- inquiring about an investigation.**
*Q.* Yeah, it wasn't just for fun to talk about it; right?
**A. No.**
*Q.* It was because they wanted the Government to prosecute the case criminally.
**A. They wanted us to investigate it. It's not their call to prosecute it or not.**
*Q.* Right. That's why they needed to convince you to prosecute the case.
**A. No, they didn't have to convince us to prosecute the case. They presented their evidence, and then the FBI and the U.S. Attorney's Office --**
*Q.* Who was it up to --
***THE COURT:*** Let him finish. Don't talk on top of each

other, please.

***BY MR. FRASER:***

***Q.*** Who was it up to, to decide whether to prosecute the case criminally?

***A.*** **The FBI looked at the matter internally and decided whether or not to open a matter, and then the U.S. Attorney's Office did similar calculations, and then we agreed together to open the case.**

***Q.*** And, now, Qualcomm's lead outside attorney in that case, that's a guy named Marshall Camp.

***A.*** **Yes.**

***Q.*** And Marshall Camp used to be an Assistant U.S. Attorney.

***A.*** **I don't know that. I never worked with him in that capacity.**

***Q.*** Well, would reviewing -- well, just a moment.

***MR. FRASER:*** Let's show -- just show the witness only Defense Exhibit 3233.

***BY MR. FRASER:***

***Q.*** These are the notes of an FBI agent from a May 11th, 2018 meeting.

Do you see at the top of the page the date, May 11th, 2018?

***A.*** **Yes.**

***Q.*** And just to the right of it, it says, "Bill/Marshall Camp," and then there's a line from Marshall Camp's name right above it that says, "Former AUSA."

Do you see that?

***MR. PILCHAK:*** Objection. Hearsay.

***THE COURT:*** Sustained.

***MR. PILCHAK:*** Move to strike.

***THE COURT:*** That last answer will be stricken.

***BY MR. FRASER:***

***Q.*** Does seeing this document refresh your recollection of whether Marshall Camp was a former AUSA?

***A.*** **It doesn't, but I certainly would take your word for it if he was.**

***Q.*** You don't dispute that Marshall Camp was a former AUSA?

***A.*** **Not if you're telling me he was.**

***Q.*** And you're saying that seeing this document doesn't refresh your recollection about that?

***A.*** **It does not.**

***Q.*** And you're not sure whether the FBI made a special note of the fact that Marshall Camp was a former AUSA even seeing this document?

***A.*** **I can read what the document says, and I have no reason to dispute it.**

***Q.*** Okay. And prosecutors -- excuse me.

It's not unusual for an AUSA to take private employment.

***A.*** **Not unusual at all.**

***Q.*** And former AUSA Marshall Camp and his private firm, they're the firm that represented Qualcomm when it sued Karim and Sheida

years before in 2018?
**A. Yes, Heuston Hennigan was the firm involved in the litigation on behalf of Qualcomm.**
*Q.* That's a sophisticated litigation firm.
**A. I believe so, yes.**
*Q.* And it was significant civil litigation.
**A. Yes. It was $150 million payout on a $180 million acquisition. I would call that significant.**
*Q.* And they spent a lot of resources litigating it civilly.
**A. I don't know what they spent, but it sounds expensive to me.**
*Q.* They spent enough resources on it that they had 500 gigabytes of data to give you.
**A. I don't remember the exact amount of gigabytes, but that sounds about right, yes. It was a lot of data. When we opened the case during COVID, I understood it to be a document-intensive case, which was one of the reasons why we thought to open it at that time.**
*Q.* You wrote a report noting that they turned over 500 gigabytes of data to you. That's your BIDMAS request.
**A. I don't specifically recall that being in there, but I don't also dispute it. It sounds correct.**
*Q.* Showing you Defense Exhibit 3228. Look at the top of the page.
**A. Yes.**
*Q.* You can see that it's an email sent from you. You're John

Roberts.
**A. Yes.**
Q. And at the -- and the last paragraph.
**A. Yes.**
Q. They turned over approximately 500 gigabytes of data.
**A. Yes.**
Q. And that's true.
**A. Yes.**
Q. And the civil case, of course, settled in 2018.
**A. Yes.**
Q. Seven years ago.
**A. Yes.**
Q. Qualcomm got millions of dollars from Karim and Sheida from that settlement.
**A. I believe it was approximately $47 million.**
Q. Thank you. $47 million --
**A. Yes.**
Q. -- they got from Karim and Sheida; yes?
**A. Yes.**
Q. And after Karim and Sheida settled with Qualcomm and paid Qualcomm millions -- they paid millions of dollars to Qualcomm, Qualcomm got to keep using Abreezio's technology.
**A. They owned it. I don't necessarily know if they used it, but I believe they did, yes. I believe it was incorporated into the Qualcomm chips.**

***Q.*** And some of that technology was called DFTBreez.

***A.*** **I remember True Breeze and --**

***Q.*** I think there was DFTBreez and True Breeze, and then at Qualcomm, it became Q Breeze; is that right?

***A.*** **That sounds familiar, yes.**

***Q.*** And Qualcomm still uses Q-Breez, as far as you know, having investigated this case for years.

***A.*** **I don't know what's on their chips currently. I know the technology changes. I have no reason to believe they don't use it, but I don't know for sure that they do.**

***Q.*** And this is a field where technological innovation happens fast.

***A.*** **Very fast.**

***Q.*** And Abreezio's technology that Qualcomm bought 10 years ago is still valuable.

***MR. PILCHAK:*** Objection. Foundation.

***THE COURT:*** Sustained.

***BY MR. FRASER:***

***Q.*** You haven't confirmed, then, that Qualcomm isn't still using the technology.

***A.*** **I have not.**

***Q.*** How many times did Qualcomm try to pitch this case to the U.S. Attorney's Office?

***A.*** **I don't know about the U.S. Attorney's Office. I know the FBI, we were involved in two pitches.**

*Q.* And the first was in May of 2018?
***A.* Yes.**
*Q.* The initial -- we talked about Marshall Camp, that was Qualcomm's attorney --
***A.* Yes.**
*Q.* -- who used to be an AUSA. And then there was Qualcomm's VP of Global Security.
He was involved also; right?
***A.* What was the name?**
*Q.* Stewart Roberts.
***A.* Yes. No relation, but, yes.**
*Q.* Thank you. That was going to be one of my questions.
***A.* Yes.**
*Q.* And he -- he is a former FBI agent, too.
***A.* Yes. He was here in San Diego in a number of positions, and then ultimately went to Qualcomm.**
*Q.* Okay. And so this former FBI agent who's now working for Qualcomm, he picks up the phone, I guess, or emails, and he says, We need to come in and talk to you about this case, FBI, in 2018.
***A.* I don't know exactly how that came to be, the logistics, but I know there was a meeting.**
*Q.* Okay. And Qualcomm -- so and Marshall Camp was involved in that as well at that time.
***A.* That's what I was told. I wasn't at the meeting, but that's**

**what I was told.**

***Q.*** Okay. And that is at the same time that Qualcomm was discussion -- excuse me -- discussing settling the civil case with Karim and Sheida.

***A.* I know the case settled. I don't know the exact dates of when settlement discussions were occurring.**

***Q.*** Okay. As far as you know, the civil settlement occurred in December of 2018.

***A.* Yes.**

***Q.*** Okay. And the settlement discussions obviously happened before then.

***A.* Correct.**

***Q.*** And the outreach from this former FBI agent on behalf of Qualcomm back to the FBI happened before the settlement was reached.

***A.* I know the meeting was in May. I don't know the logistics of how that meeting was set up.**

***Q.*** So that's May 2018?

***A.* Yes.**

***Q.*** And the settlement happened in December of 2018.

***A.* Yes.**

***Q.*** December is after May.

***A.* Correct.**

***Q.*** And the -- there were AUSAs who heard from Qualcomm and Qualcomm's attorneys in 2018.

**A. I know Assistant United States Attorney Eric Beste was involved in the conversation, but I don't know who reached out to who.**
*Q.* Okay. And Eric Beste is -- he was an AUSA, you testified?
**A. Yes.**
*Q.* And he's no longer a prosecutor.
**A. Private practice.**
*Q.* And he doesn't work for Qualcomm.
**A. Not that I know of.**
*Q.* And he declined to prosecute the case.
**A. At that time, yes.**
*Q.* And he's no longer with the U.S. Attorney's Office.
**A. Correct.**
*Q.* You're familiar with the Justice Manual?
**A. The Justice Manual?**
*Q.* The Department of Justice --
**A. No.**
*Q.* You're not familiar with the Justice Manual?
**A. Not under that name.**
*Q.* The Department of Justice has a manual of policies for how it handles investigations; correct?
**A. The FBI had something called the DIOG, which was the FBI's manual that we used.**
*Q.* The FBI has a manual -- and the FBI's part of the Department of Justice.

***A.*** **Yes.**

***Q.*** And all of the U.S. Attorney's Offices are also part of the Department of Justice.

***A.*** **Yes.**

***Q.*** And so some policies pertain just to the FBI.

***A.*** **Yes.**

***Q.*** And other policies might pertain to a particular U.S. Attorney's Office.

***A.*** **Yes.**

***Q.*** But there are also policies that pertain across the Department of Justice.

***A.*** **Potentially, I would think, yes.**

***Q.*** Okay. And those policies include a distinction that's made between the status of people in an investigation.

***MR. PILCHAK:*** Objection. Relevance and 403.

***THE COURT:*** Sustained.

***BY MR. FRASER:***

***Q.*** The Government sometimes calls people a "target" of an investigation.

***A.*** **I've heard that term used, yes.**

***Q.*** A target is a putative defendant.

***A.*** **Potentially, or also the term that I used more often was "subject," subject of the investigation.**

***Q.*** Okay. There's a subject of the investigation, but a subject is not necessarily someone that you intend to file charges

against; correct?
**A. That's the person being, I guess, investigated, was the way I looked at it.**
*Q.* Thank you.
So a subject is someone whose conduct is within the scope of an investigation.
**A. Yes.**
*Q.* A target is someone whose conduct is not only within the scope of the investigation, but they're actually being targeted to be charged.
**A. I think that's fair, yes.**
*Q.* And then there's another category that's called a "witness."
**A. Witness, yes.**
*Q.* Okay. Those are three different categories.
**A. Yes.**
*Q.* And it matters for how the Department of Justice treats the person.
**A. Yes.**
*Q.* And you know that Ziad Mansour worked on the Abreezio deal for Qualcomm.
**A. Yes.**
*Q.* And he attended early meetings on Abreezio where Karim Arabi was present.
**A. I don't know that. I know he was involved in the due diligence, but I don't know about his meetings with Karim Arabi.**

***Q.*** Okay. Showing you Defense Exhibit 3233. These are those May 11th, 2018 FBI notes.
Do you recall this document?
***A.*** **Yes.**
***Q.*** It's one of the documents that you reviewed when you came on the case.
***A.*** **I reviewed the report. I don't know that I reviewed the notes.**
***Q.*** Okay. But these are notes that predated your involvement, so you would have reviewed them when you came on the case.
***A.*** **If there was a report, I wouldn't necessarily have gone back and looked at the notes. I don't believe I reviewed the notes. I believe I reviewed the report.**
***Q.*** But it wouldn't surprise you to know that the notes state that Mansour was at --
***MR. PILCHAK:*** Objection.
***THE COURT:*** Sustained.
***BY MR. FRASER:***
***Q.*** -- early meetings.
***THE COURT:*** Sustained at this point. What's in the notes is hearsay, and he said he hasn't seen them.
***BY MR. FRASER:***
***Q.*** And you couldn't say that the Government didn't know in May 2018 that Mansour was at early meetings.
***MR. PILCHAK:*** Object to the form of the question.

***THE COURT:*** Sustained.

***BY MR. FRASER:***

***Q.*** You don't know that -- well, you know that the Government knew in May 2018 that Mansour was at some early meetings.

***A.*** **I don't know what everybody knew.**

***Q.*** You don't know what everybody knew.

***A.*** **No.**

***Q.*** You investigated this case really thoroughly; right?

***A.*** **Yes.**

***Q.*** And you don't know what the subjects knew at a given point in time?

***A.*** **No, I don't know what everybody knows at every point in time.**

***Q.*** You know that the Government has the burden of proof.

***A.*** **Yes.**

***Q.*** It's proof beyond a reasonable doubt.

***A.*** **Correct.**

***Q.*** And the level of proof that you need to be a subject is, like, miles below that.

***MR. PILCHAK:*** Objection. Relevance. 403.

***THE COURT:*** Sustained.

***BY MR. FRASER:***

***Q.*** You know you have the burden of proof.

***A.*** **Yes.**

***Q.*** And you have no idea whether the Government knew at a given

point in time whether a subject attended this meeting.

***THE COURT:*** I guess I'm having a problem with the word "the Government." Who are you referring to when you say "the Government"? Do you mean anyone ever in the Government or do you mean a particular person?

***MR. FRASER:*** Thank you, Your Honor.

***BY MR. FRASER:***

***Q.*** I mean -- I mean, you yourself, Mr. Roberts, and the other FBI agents that were collaborating with you on the investigation.

***A.*** **I can't speak for other people as to what they knew and when they knew it. I can only speak to what I knew.**

***Q.*** Were you the lead case agent on this case for three years?

***A.*** **Yes.**

***Q.*** You were.

Okay. And in this case, you talked about some documents from a business that's called Thoughts to Paper.

***A.*** **Yes.**

***Q.*** And Thoughts to Paper helps people with provisional patent applications.

***A.*** **Yes.**

***Q.*** And a provisional patent application is different from a provisional patent. That is, the application is different from the provisional patent itself.

***A.*** **It's the application, yes.**

***Q.*** Okay. And that, in turn, is also different from an actual patent.

***A.*** **Yes. There's different steps along the path.**

***Q.*** Okay. And there's this company called Thoughts to Paper that helps people put together a provisional patent application; right?

***A.*** **Yes. It helps them file it, is my understanding.**

***Q.*** And it's kind of a well-chosen name, isn't it, thoughts to Paper?

***A.*** **I suppose.**

***Q.*** Because, see, when you put thoughts to paper, that doesn't make you the inventor, does it?

***A.*** **Could mean you're the inventor, if it's your thoughts that you're putting on paper and it's a new thought, then that would be the basis for the patent.**

***Q.*** Do you imagine, then, that Thoughts to Paper engages in a lot of IP litigation with their clients?

***MR. PILCHAK:*** Objection. Foundation.

***THE COURT:*** Sustained.

***BY MR. FRASER:***

***Q.*** Thoughts to Paper is just trying to help people with administrative components of the application.

***A.*** **I don't know the entire scope of their business, but I know that they help file the provisional patents as one line of the business.**

*Q.* And that doesn't make them an inventor.
**A. No, Thoughts to Paper is not the inventor. They help people file the patents.**
*Q.* Okay. And you talked about Government Exhibits 2A and 3A.
**A. Yes.**
*Q.* Do you recall those exhibits?
**A. I do.**
*Q.* Okay. And this is where you found certain metadata.
**A. Yes.**
*Q.* And you found this metadata in Microsoft Office software.
**A. Correct. This one was a Word document, Microsoft Word.**
*Q.* Okay. And there's a user name associated with it, and the user name is Karim Arabi for those documents.
**A. Yes, the author is listed as Karim Arabi.**
*Q.* So when somebody edits a piece of software in a document like that, it can show up in the metadata.
**A. Yes.**
*Q.* And you -- you conclude Karim Arabi did not scrub any metadata from these documents.
**A. Not the data that's available to us. I don't know if there was other metadata that was scrubbed, but certainly not this metadata, no.**
*Q.* Okay. And you know that Karim didn't edit the Abreezio software.
**A. I don't understand the question.**

***Q.*** Karim Arabi didn't edit Abreezio's software.
Do you admit that?
***A.*** **No. I'm not sure I understand the question.**
***Q.*** Karim -- you found metadata for some Microsoft Office documents.
***A.*** **Yes.**
***Q.*** And it's your position that Karim Arabi edited those documents.
***A.*** **Can you repeat the question?**
***Q.*** You think they're significant because you think that they show that Karim edited those documents.
***A.*** **Yeah. He's listed as the author of those documents.**
***Q.*** He didn't edit, however, any software that Qualcomm bought from Abreezio.
***A.*** **I don't know what access he had to Abreezio's software and whether he edited it or not. I know he traveled to Canada. He had meetings with the folks associated with Abreezio. As to what he did or didn't do for the software, I would have no way of knowing every computer that he ever touched that he could have done something or not.**
***Q.*** These metadata documents, they're numbered in the first five exhibits in your testimony; correct?
***A.*** **I don't -- I don't know the order of the documents. I know we looked at many.**
***Q.*** Here's 3A on the screen in front of you.

**A. Yes.**
*Q.* Another one was 2A.
**A. Yep.**
*Q.* You didn't make them the first five exhibits because they're unimportant in your case.
***MR. PILCHAK:*** Objection. Relevance.
***THE COURT:*** Sustained.
***BY MR. FRASER:***
*Q.* You know that metadata can be an important piece of evidence in your investigation.
**A. It can be an important piece of evidence, yes.**
*Q.* And you didn't find -- you didn't even look for any metadata from software that Qualcomm acquired from Abreezio.
**A. No. We had the records that we had. I don't recall seeing any metadata associated with Abreezio's information.**
*Q.* And you got 500 gigabytes of data from Qualcomm without even asking for it.
***MR. PILCHAK:*** Objection. Misstates the testimony.
***THE WITNESS:*** We sent a Subpoena --
***THE COURT:*** Is that a question, Mr. Fraser? Did he get 500 gigabytes of data from Qualcomm without even asking for it, is that the question? What's the question?
***BY MR. FRASER:***
*Q.* Is it true that you got 500 gigabytes of data from Qualcomm because they were proffering it as part of their criminal

referral?

***THE COURT:*** Overruled. You may answer that question.

***THE WITNESS:*** No. They told us about what data was out there, and we sent a subpoena to them to get the data.

***BY MR. FRASER:***

***Q.*** Okay. Marshall Camp made a presentation to the U.S. Attorney's Office.

***A.*** **Yes. He made two presentations, 2018, and then in 2021.**

***Q.*** He made multiple presentations.

***A.*** **Yes, two.**

***Q.*** And he had a detailed PowerPoint in which he laid out Qualcomm's case.

***A.*** **Yes.**

***Q.*** He asked you once, Please prosecute this case?

***A.*** **Yes, the FBI. He didn't ask me personally.**

***Q.*** And the first time, the Government said, No, have you adequate civil remedies?

***A.*** **Among other things, yes.**

***Q.*** And he was settling the case at that time?

***A.*** **The settlement happened soon thereafter.**

***Q.*** And then he did settle the case.

***A.*** **In December of 2018.**

***Q.*** And Qualcomm got millions of dollars.

***A.*** **$47 million.**

***Q.*** $47 million is how much they got.

***THE COURT:*** Again, I'm going to ask to you try not to step on top of the witness. I'm watching the court reporter. She's having a really hard time getting down both of you at the same time.

***BY MR. FRASER:***

***Q.*** $47 million is how much Qualcomm got.

***A.*** **Yes.**

***Q.*** And then they were back again asking the Government again to please prosecute this criminal case.

***A.*** **Yes.**

***Q.*** You're not going to tell me that it would have been hard for you to get metadata from Qualcomm if you wanted it.

***A.*** **Yes. We could have asked them through subpoena for what we wanted.**

***Q.*** And you didn't.

***A.*** **I don't believe our subpoenas necessarily covered the metadata of the software. I'm not a software engineer, so I don't necessarily know how metadata works on software. I -- I'm a user of things like Microsoft Word and Microsoft Excel and PowerPoint, and I understand how metadata works for those programs, which I am familiar with. But obviously when you get to more complicated software engineering, I'm just not an expert or an engineer or software engineer.**

***Q.*** Thanks. And you have the burden of proof, again.

***A.*** **Yes.**

***Q.*** Let's talk about the agreement to acquire Abreezio.
***A.*** **Yes.**
***Q.*** So you're familiar with that.
***A.*** **Yes.**
***Q.*** And Qualcomm got -- Qualcomm had a written agreement to acquire Abreezio.
***A.*** **Yes.**
***Q.*** It's called a Unit Purchase Agreement.
***A.*** **Yes.**
***Q.*** And in this case, it's hundreds of pages long.
***A.*** **I haven't seen it in a while, but that sounds correct for a deal of this complexity.**

***MR. FRASER:*** Let's put up Exhibit 864, Government Exhibit 864.

***BY MR. FRASER:***
***Q.*** This is the Unit Purchase Agreement for Abreezio.
***A.*** **Yes.**
***Q.*** And this is the first page of it.
***A.*** **Yes.**
***Q.*** It says, "Closing date, October 30th, 2015."
***A.*** **Yes.**
***Q.*** And Qualcomm is the acquirer.
***A.*** **Yes.**
***Q.*** And above the closing date is "Cooley." That's Qualcomm's law firm in the acquisition.

**A. Yes.**
*Q.* This is the contract that was used for the acquisition.
**A. Yes.**
*Q.* Cooley is a large law firm that advises on lots of complex mergers and acquisitions.
**A. Yes, sophisticated law firm.**
*Q.* And so you reviewed this Unit Purchase Agreement.
**A. Yes.**
*Q.* It's -- it's very long.
**A. Yes.**
*Q.* But you considered in your investigation what was and what was not promised in the Unit Purchase Agreement.
**A. Yes. We considered the Agreement as a piece of evidence, yes.**
*Q.* Some things were -- and in this Unit Purchase Agreement, some things were promised, and other things were not promised.
**A. I believe so, yes. It depends on the specifics, but generally speaking, yes.**
*Q.* Okay. And, now, and it also has a number of defined terms.
**A. Yes.**
*Q.* Because contracts sometimes have a special meaning for a word that's different from everyday use.
***MR. PILCHAK:*** Your Honor, I'd just object. Are we going to admit the document if we're going deeper into it?
***THE COURT:*** Are you moving this --

***MR. FRASER:*** Sure. Yeah, let's move it into evidence.

***MR. PILCHAK:*** No objection.

***THE COURT:*** Okay. I will admit 864.

***(Exhibit 864 admitted.)***

***THE COURT:*** And do you want to take a lunch break? Were you requesting a lunch break at this time, Mr. Fraser?

***MR. FRASER:*** A lunch break is fine by me. If that's the Court's suggestion, I'll take you up on that, Your Honor.

***THE COURT:*** I think there was a request to break at this time.

***MR. FRASER:*** Sure.

***THE COURT:*** Let's go ahead and take a lunch break at this time. We can take an hour. If you could be back at 1:50, we will see you then. You're reminded you're not to discuss the case with anyone, and you're not to form any opinions about the case, and we'll see you back at 1:50.

***MR. OLAH:*** Your Honor, 1:50 or 12:50?

***THE COURT:*** I'm sorry, 12:50. Thank you. One hour. One hour for lunch. And you as well, sir, one hour.

***THE WITNESS:*** Thank you, Your Honor.

***(Jury out at 11:51 a.m.)***

***THE COURT:*** Okay. We're now outside the presence of the jury.

Any issues we need to take up?

***MR. PILCHAK:*** I just had one trailing objection from

the last round of questioning. I don't want to make a big deal about this, but we did strike from the record the Marshall Camp being an AUSA thing. It's not a big deal, but Mr. Fraser loaded that into two or three questions after that.

***THE COURT:*** Mr. Fraser, you are not testifying. And so when you say, "and Marshall Camp was an AUSA," after this witness said he didn't know, then you're testifying. And you're getting yourself subject to being called on the stand and asking, which would disqualify you as a lawyer in the case. So make sure you don't testify when you ask your questions.

***MR. FRASER:*** Thank you, Your Honor.

***THE COURT:*** Okay. We are in recess for 15 minutes.

***THE COURT REPORTER:*** You mean an hour?

***THE COURT:*** I'm sorry, one hour, whatever break we're on.

***(Lunch recess taken.)***

***THE COURT:*** Okay. We are back on the record. All jurors are present. All lawyers are present. Dr. Arabi is present.

And are you reminded you are still under oath to tell the truth.

Counsel?

***MR. FRASER:*** Thank you, your Honor.

***BY MR. FRASER:***

***Q.*** Before we took the lunch break, we were talking about the

Unit Purchase Agreement.

**A. Yes.**

***Q.*** Do you recall?

And generally, people use an acronym for that, UPA?

**A. Yes.**

***MR. FRASER:*** This -- and Leah, could you please put up Government Exhibit 864. Government Exhibit 864.

***THE COURT:*** And that may be published.

***MR. FRASER:*** Yes, this is in evidence.

***BY MR. FRASER:***

***Q.*** We covered this as the first page. It's got Cooley on it.

Cooley was Qualcomm's attorneys, correct, for the acquisition?

**A. Yes.**

***Q.*** And they're a sophisticated firm?

**A. Yes.**

***Q.*** They prepared the contract to acquire Abreezio?

**A. I don't know who prepared it.**

***Q.*** But you see that their name is on the first page of this document?

**A. Yes.**

***Q.*** No other law firm's name is on the first page of this document?

**A. No.**

***Q.*** And like any complex commercial contract, it has defined

terms?
**A. Yes.**
Q. Okay. And in your investigation, did you consider the defined terms in the UPA?
**A. I considered the document as one piece of the puzzle. But I didn't necessarily recall any of the definitions found in this Unit Purchase Agreement to be necessarily on point with what I was looking at.**
Q. Well, a contract consists of words, doesn't it?
**A. Yes.**
Q. And it's a legal document?
**A. Yes.**
Q. And in the law, the meaning of words is very important. You know that?
**A. Yes.**
Q. And you didn't think that the definitions of key terms in the UPA was something you needed to know?
**A. I reviewed the document, incorporated it into my investigation.**
Q. Okay. But you're not sure which terms were defined and which ones were not?
**A. No. It's been a while since I reviewed this document.**
Q. So you wouldn't know whether the term "consultant" is defined in the UPA?
**A. I do not know.**

*Q.* Or "employee"?
***A.* I do not know.**
*Q.* Or "independent contractor"?
***A.* I don't recall.**
*Q.* You wouldn't know that Qualcomm chose not to define those terms?
***A.* I don't know.**
*Q.* And this Unit Purchase Agreement, this is the closing document for the whole acquisition?
***A.* Closing document for the acquisition.**
*Q.* And that didn't just happen overnight?
***A.* No.**
*Q.* This is like 600 pages long?
***A.* Substantial document, yes.**
*Q.* The lawyers worked hard on this?
***A.* I'm sure they did. I don't know. I wasn't there.**
*Q.* And Qualcomm had a due diligence process?
***A.* Yes.**
*Q.* And the due diligence process occurred before Qualcomm signed the UPA?
***A.* Yes.**
*Q.* The due diligence process started around March 2015?
***A.* I believe that is correct, yes.**
*Q.* And it lasted until at least -- well, here it is, October 30th, 2015?

***A.*** **Yeah. I assume the due diligence went up right to the end of the acquisition period.**

***Q.*** So that's -- October is the tenth month. It's the end of the month. That's like -- ten minus three is seven, but you've got to count every month.

So that's like eight months of due diligence; right?

***A.*** **Sure, approximately.**

***Q.*** And Qualcomm, in that due diligence process, it had plenty of smart people working on it?

***A.*** **I believe so, yes.**

***MR. FRASER:*** Okay. And let's take a look at Section 3.34 of the Unit Purchase Agreement. This is within Government Exhibit 864. It's on page -- here it is. Thank you, Leah.

***BY MR. FRASER:***

***Q.*** Do you see this paragraph that's called out, Mr. Roberts?

***A.*** **Yes.**

***Q.*** Could you please read that aloud for us?

***A.*** **Sure. "3.34, Exclusivity of Representations and Warranties:**

**"Except as expressly set forth in this Section 3, neither target nor any person on behalf of target has made, nor are any of them making, any representation or warranty, written or oral, express or implied, at law or in equity, including with respect to merchantability or fitness for any particular purpose**

**in respect of target or target business, including any representations or warranties about the accuracy or completeness of any information or documents previously provided and any other such representations and warranties are hereby expressly disclaimed.**

*Q.* Thank you.

You're not a lawyer yourself?

***A.* I am not.**

*Q.* You're a CPA?

***A.* I was a CPA.**

*Q.* You were a CPA.

But you were not a mergers and acquisitions investment banker?

***A.* No.**

*Q.* Do you understand this paragraph?

***A.* I mean, no, not really.**

*Q.* Okay. Not every mergers and acquisition contract has language like this?

***A.* I know every agreement can be different, and this may or may not be included in others, I suppose.**

*Q.* Some -- so is it okay if I, instead of saying mergers and acquisitions, if I just say M&A?

***A.* Yes.**

*Q.* And we understand that means mergers and acquisitions.

So other mergers and acquisitions contracts, they might have

something that's called a full disclosure provision. Correct? You know that?

**A. I don't know that.**

*Q.* You don't know that?

Do you know what a 10b-5 provision is?

**A. I know it has something to do with the securities law, but I'm not -- and it has something to do with fraud, but I don't know all the specifics.**

*Q.* So you won't know whether that's in this UPA?

**A. No.**

*Q.* Interesting.

***THE COURT:*** Let's not editorialize, Counsel. Just ask your question.

***MR. FRASER:*** Okay.

***BY MR. FRASER:***

*Q.* As far as you know, this is saying if it's not in the contract, it's not promised.

**A. It's one portion of the contract. I mean, the contract has lots of different parts, so I don't know if other sections make other claims. I don't fully remember every aspect of this contract.**

*Q.* What does the word "exclusivity" mean to you? Does it mean there's nothing else?

**A. Yes.**

*Q.* Okay. Another thing that the UPA covers is key employees;

correct?
***A.*** **I believe so, yes.**
***Q.*** You're not sure?
***A.*** **I don't recall the agreement. It's been a while since I reviewed it.**
***Q.*** Okay. All right. Let's look at page -- yeah, here it is, page 128.
This is part of the UPA. Do you agree?
***A.*** **Yes.**
***Q.*** And it's Schedule 1.1A.
What does it say right under Schedule 1.1A?
***A.*** **"Key employees."**
***Q.*** And do you see a list there?
***A.*** **I do.**
***Q.*** Could you please read the names?
***A.*** **"Andrew Hughes, Bradley Quinton, Michael Lee, Trent McClements."**
***Q.*** Is Sheida one of those names?
***A.*** **No.**
***Q.*** Okay. And all those people, they came on board at Qualcomm after the acquisition, the ones who are named here?
***A.*** **Yes.**
***Q.*** And all those guys came on board and they helped implement Abreezio's technology at Qualcomm?
***A.*** **I believe so. I don't know what each of them specifically**

**did, but I know they came over as part of the deal.**

***Q.*** Okay. Thank you.

Referring back to something that you testified about with Mr. Pilchak is, you know, you did a lot of work coming on to this case within a few days.

***A.*** **Yes.**

***Q.*** You came on to it in -- in May of 2020; right?

***A.*** **Yes.**

***Q.*** And when that happened, you saw some correspondence from Marshall Camp?

***A.*** **Yes.**

***MR. FRASER:*** Okay. Let's show Defense Exhibit 3236 to just Mr. Roberts.

***BY MR. FRASER:***

***Q.*** Is this an email from -- just to orient you at the top, you can see it's an email from Marshall Camp?

***A.*** **Yes.**

***Q.*** Qualcomm's attorney?

***A.*** **Yes.**

***Q.*** Specifically -- specifically, Qualcomm's attorney for the civil litigation?

***A.*** **Yes.**

***Q.*** And it was sent to an AUSA?

***A.*** **Yes.**

***Q.*** Phil Halpern?

**A. Yes.**

*Q.* On Friday, March 8th, 2020?

**A. Yes.**

*Q.* Okay. And then -- and you recall this correspondence?

**A. I wasn't copied on it, but I may have been -- like, had some portion of this forwarded to me later. But I don't specifically recall.**

*Q.* Do you recall that Marshall Camp suggested --

***MR. PILCHAK:*** Objection. Hearsay and foundation.

***MR. FRASER:*** I haven't finished the question yet.

***THE COURT:*** Well, if you're going to be reading from the memo, it's sustained.

***BY MR. FRASER:***

*Q.* Do you recall that Marshall Camp suggested that the Government obtain particular materials?

**A. I recall him having suggestions.**

*Q.* And those suggestions -- first of all, do you have any reason to doubt that the document in front of you is an authentic email from Marshall Camp to Phil Halpern?

**A. No.**

*Q.* And it says that here it is, Marshall Camp and he's got a list of seven things that the Government -- that he says would be pertinent materials --

**A. Yes.**

*Q.* -- correct?

Okay. And the number one thing is --

***MR. PILCHAK:*** Same objection.

***THE COURT:*** Same ruling.

***MR. FRASER:*** I would admit this into evidence for the effect on the listener. He's testified that he took into account the information that Qualcomm provided --

***THE COURT:*** We're not going to argue it.

***MR. FRASER:*** Oh.

***THE COURT:*** No. I don't think he testified that.

***MR. FRASER:*** Okay.

***BY MR. FRASER:***

***Q.*** Did you take into account in your investigation the information that Qualcomm provided, or did you ignore it?

***A.*** **We took it into account.**

***MR. FRASER:*** I offer Defense Exhibit 3236 into evidence for the effect on the listener.

***THE COURT:*** No. Overruled.

***BY MR. FRASER:***

***Q.*** Marshall Camp suggested that you consider all documents filed with the San Diego Superior Court with the civil lawsuit?

***MR. PILCHAK:*** Same objection.

***THE COURT:*** Same ruling.

***BY MR. FRASER:***

***Q.*** Without regard to what's in this document, you understand that that happened, that Marshall Camp suggested that the

Government obtain all the documents filed in the state court in the civil litigation?

**A. Yes.**

***Q.*** And you understand, likewise, that he suggested that the Government obtain all documents, records and ESI produced by any party in connection with the civil action.

That happened too; right?

**A. Yes.**

***Q.*** And likewise, he suggested that the Government obtain all discovery responses served by any party in connection with the civil action.

He suggested you get that stuff, too; right?

**A. I believe so. I have to see the subpoena that we served to be sure.**

***Q.*** That is where we're going next.

**A. Okay.**

***Q.*** But Number 4 is that he suggested --

***THE COURT:*** We're not going to read this document into evidence, Counsel. Can you ask him generally about what he knows?

***BY MR. FRASER:***

***Q.*** Okay. So more generally, you got the 500 gigs from Qualcomm?

**A. Yes.**

***Q.*** You got the list of stuff that you ought to be looking at?

***A.*** **A list?**

***Q.*** I'm trying to be general, but I'm -- it's not unrelated to what we were just talking about.

He suggested various things that you all ought to consider in your investigation?

***THE COURT:*** Are you asking whether Marshall Camp suggested to Agent Roberts that he do certain things? Is that what you're asking? I'm not clear what you're asking.

***MR. FRASER:*** I'm asking whether Marshall Camp suggested -- whether he gave a detailed list of things that the Government should obtain for its investigation.

***THE COURT:*** If you know, you may answer that.

***THE WITNESS:*** I know, generally speaking, that he provided suggestions as to what was available to us that we could obtain. And then obviously if we obtained it, I would look at it.

***BY MR. FRASER:***

***Q.*** Okay. And you mentioned that you wanted to see the subpoena request, correct?

***A.*** **That is ultimately what we requested, so that would help refresh my recollection --**

***Q.*** That's --

***THE COURT:*** You can't talk at the same time.

***BY MR. FRASER:***

***Q.*** I think we can make it a lot shorter. Because what I was

getting to is the Government ended up subpoenaing everything that Marshall Camp suggested more or less verbatim. Correct?

***A.*** **Among other things. We added to that list.**

***Q.*** So it's a "yes"?

***A.*** **Yes. We -- we took his recommendations as to what was available because he was the attorney on the civil matter, knew what was available, knew how it was collated. And so we took his suggestions because he had familiarity with what was available to make our initial request.**

***Q.*** Thank you.

***A.*** **And we added additional items to that initial request.**

***Q.*** Thank you. There's no question pending now.

I have a -- I would like to show you Defense Exhibit 3238.

Do you recognize this document as a subpoena from the investigation in this case?

It's signed by -- well, it's signed by the clerk of this court, but at the bottom you can see that the AUSA requesting it is Meghan Heesch; correct?

***A.*** **Yes.**

***Q.*** She's one of the AUSAs who was on the case in early days but later left the U.S. Attorney's Office; correct?

***A.*** **Yes.**

***Q.*** And the date on this is May 14th, 2020?

***A.*** **Yes.**

***Q.*** And let's look at page 2 -- excuse me -- page 3,

Attachment A.

And you see a list here; correct?

***A.*** **Yes, a list of ten items.**

***Q.*** Okay. And this list includes Marshall Camp's suggestions; correct?

***A.*** **His suggestions were incorporated into the request.**

***Q.*** Thank you.

***MR. FRASER:*** I'll move to -- thank you.

***BY MR. FRASER:***

***Q.*** You testified that you looked at the Board of Abreezio; correct?

***A.*** **Yes.**

***Q.*** Board members.

Okay. And Bozena Kaminska was a board member; correct?

***A.*** **Yes, I think a technical advisory board.**

***Q.*** And you found out who she was; correct?

***A.*** **Yes.**

***Q.*** She is on the faculty of Simon Fraser University?

***A.*** **Yes.**

***Q.*** And she is an expert in various industrial technologies?

***A.*** **Yes.**

***Q.*** Including Design For Test or DFT technology?

***A.*** **I believe she had some experience in that field, yes.**

***Q.*** Thank you.

And you testified also about Sheida's name change?

***A.*** **Yes.**
***Q.*** And you noted that she did that through a legal process in Canada; correct?
***A.*** **Yes, in July of 2015.**
***Q.*** That's when she completed the process?
***A.*** **Yes.**
***Q.*** And your investigation doesn't show when she initiated the process, does it?
***A.*** **I don't know that we have information of when it was initiated.**
***Q.*** And it's not an overnight process, is it?
***A.*** **I don't know how long it takes, but I would assume it's not an overnight process.**
***Q.*** Okay. And that's -- that covers that.
And then you testified also about some Thoughts to Paper documents on direct.
Do you recall that?
***A.*** **Yes.**
***Q.*** And your point seems to be that you didn't think Sheida was proactive enough with Thoughts to Paper to be a true inventor.
I guess that's what you were getting at, right?
***A.*** **No. I think what I was getting at was it appeared that Dr. Arabi was the one that was actually submitting these patents.**
***Q.*** Okay. And that's your conclusion.

But you also found that Sheida did directly meet and discuss her ideas with Thoughts to Paper; correct?

***A.*** **She submitted some emails.**

***Q.*** I would like to show you Defense Exhibit 2183.

This is an email dated 2014, correct?

***A.*** **Yes.**

***Q.*** It's from Thoughts to Paper?

***A.*** **Yes.**

***Q.*** And it's to Sheida and Karim?

***A.*** **Yes.**

***Q.*** And you reviewed this document?

***A.*** **I presume so.**

***Q.*** It was part of your investigation?

***A.*** **Yes.**

***MR. FRASER:*** I offer Defense Exhibit 2183 into evidence.

***THE COURT:*** Any objection?

***MR. PILCHAK:*** Hearsay, your Honor.

***MR. FRASER:*** Well --

***THE COURT:*** Wait, let me read it.

***MR. FRASER:*** I'm offering it for the effect on the listener and for impeachment.

***THE COURT:*** I'll allow it.

***MR. FRASER:*** Thank you.

***(Exhibit 2183 admitted.)***

***MR. FRASER:*** Publish it, please, to the jury. Can you highlight, Leah, please, the second sentence.

***BY MR. FRASER:***

***Q.*** And the second sentence is "It was a pleasure speaking with you over the phone today." Correct?

***A.*** **Yes.**

***MR. FRASER:*** And get rid of the call out box, please.

***BY MR. FRASER:***

***Q.*** And it says "Hi Sheida" at the top; right?

***A.*** **Correct.**

***Q.*** Thank you.

As the lead case agent, you had to consider the case holistically, correct, like every potential issue in the case; right?

***A.*** **Yes.**

***Q.*** And the fact that the Government bears the burden of proof beyond a reasonable doubt on every single element of any charge that it would bring; correct?

***A.*** **Yes.**

***Q.*** And beyond reasonable doubt is the heaviest burden that exists in the legal system?

***A.*** **Yes.**

***Q.*** You understand that?

***A.*** **Yes.**

***Q.*** And so you anticipated defenses when you were preparing your

investigation, correct?
**A. I don't know that I anticipated defenses. We did the investigation and evaluated the evidence.**
Q. Okay. And did you review any filings made by the defense in this case?
**A. I don't believe I did.**
Q. You didn't review our filings?
**A. I don't think so.**
Q. Did you and Mr. Pilchak discuss our theories of defense when you prepared to testify?
**A. We did -- so I met with the Government, and we did discuss some areas of cross-examination that may come up, yes.**
Q. Okay. And so you know we contend that Abreezio did provide value to Qualcomm?
**A. I take your assertion at its face.**
Q. And you have done no quantitative analysis to refute that?
**A. No. I'm not an engineer, so I don't know the impact necessarily that the Abreezio technology had on the Qualcomm's chip ultimately.**
Q. Were you aware that Qualcomm saved at least about $100 million in the first year to year and a half alone from the technology that it got from Abreezio?
**A. I know I spoke with Jim Thompson, who was the chief technology officer at the time, and he indicated that the technology was incorporated and that it had benefits.**

**But when they roll out new chips, there's a lot of changes that can happen all at once and so sometimes it can be hard to break out which change has the most impact. But my general recollection -- it's been a while since I spoke to him -- was that it appeared that there was some benefit to the technology.**

***Q.*** It appears there was some benefit? That's what you got from your conversation with Mr. Thompson?

***A.*** **That's my recollection, yes.**

***Q.*** But it wouldn't surprise you then -- I guess you wouldn't care -- if his testimony was that Qualcomm saved $100 million in the first year to year and a half of the time after the acquisition.

Would you care about that if he said it under oath?

***A.*** **No, I'm not sure I would.**

***MR. FRASER:*** Thank you. No further questions.

***THE COURT:*** Redirect?

***MR. PILCHAK:*** Thank you, your Honor.

***REDIRECT EXAMINATION***

***BY MR. PILCHAK:***

***Q.*** Good afternoon, Mr. Roberts.

***A.*** **Good afternoon.**

***Q.*** You were asked some questions on cross-examination about the initiation of this investigation; right?

***A.*** **Yes.**

*Q.* And I think around those questions you were asked are there ex-FBI who work at Qualcomm; right?
**A. Yes.**
*Q.* And you said yes.
I want to ask you this, though: Can anybody who believes they've been the victim of a crime report that crime to the FBI?
**A. Yes.**
*Q.* So anyone who thinks that somebody might have stolen $150 million from them, for example, could report a crime to the FBI?
**A. Yes. We have an open-door policy. You can come and knock on our door and visit with us. We have a website where you can submit complaints. You can contact attorneys. There are multiple ways for you, for people, citizens, to get information to us to complain about various crimes.**
*Q.* Are there any rules or priorities that disqualify people reporting a crime if they are a corporation instead of a person?
**A. No. Everybody is entitled to the same protections under the law.**
*Q.* Is anybody disqualified because they have ex-FBI working on their staff?
**A. No.**
*Q.* Is anybody disqualified because they've already filed a civil suit about the thing that they'd like to complain to the FBI about?

**A. No. We look at matters from the criminal context, not from the civil context.**

*Q.* Although to be fair, is that a factor you would consider when deciding whether to open?

**A. Yes.**

*Q.* You were asked, I think, two different batches of questions about Thoughts to Paper; right?

**A. Yes.**

*Q.* And I think in the first batch of questions you were asked if somebody at Thoughts to Paper helps with a patent application, does that make them the inventor?

**A. I remember the question.**

*Q.* Okay. Did Dr. Arabi work at Thoughts to Paper?

**A. He did not.**

*Q.* Who was the person who worked at Thoughts to Paper that you saw in the evidence you reviewed?

**A. Some guy named Phil.**

*Q.* Was it Phil Wilson?

**A. Yes.**

*Q.* Do you know whether Phil had a Ph.D. in electrical engineering?

**A. I don't.**

*Q.* Do you know whether he described himself as a visionary tech executive?

**A. I don't.**

*Q.* You were shown the Unit Purchase Agreement just a moment ago, I think.
***A.* Yes.**
*Q.* Quite a long document?
***A.* Yes.**
*Q.* Doesn't sound like you've reviewed it super recently?
***A.* No.**
*Q.* One of the questions you were asked is there's a law firm on the cover of it; right?
***A.* Yes.**
*Q.* That was Cooley?
***A.* Yes.**
*Q.* Is that one of these great big law firms?
***A.* Yes.**
*Q.* Do you know whether the Abreezio guys were represented by counsel as well?
***A.* Yes, I believe they were.**
*Q.* Do you remember what firm they had?
***A.* I don't.**
*Q.* Have you heard of the firm Procopio?
***A.* Yes.**
*Q.* Do you remember now whether that was the one?
***A.* Yes.**
*Q.* Without showing you the UPA or any paragraphs that are down in the middle of it, do you recall whether in the Unit Purchase

Agreement the people who signed for Abreezio promised that they really owned the things that they were selling to Qualcomm?
**A. Yes.**
*Q.* Yes, they did promise that?
**A. Yes, they did promise that.**
*Q.* All right. You were also asked -- I apologize.
You were asked about whether Marshall Camp suggested some things that you might want to subpoena from Qualcomm; right?
**A. Yes.**
*Q.* And I want to make sure you had the chance to answer that question completely.
Why did you pay attention to and incorporate his suggestions in what was ultimately included in the grand jury subpoena?
**A. Because he was working on the civil litigation, had he access to these records and knew how they were organized. He knew which different kind of categories there were. It's not unusual when we talk to somebody reporting a crime to us that we get an understanding from them what do you have, what can we get access to, what can we request, so we understand at least initially what the universe of documents may be.**
*Q.* In this case, did you feel limited to only requesting the things that Mr. Camp told you were available?
**A. No. We added additional items to the initial subpoena, and then we issued more subpoenas in the future. We also reached out and requested the ability to talk to some folks who worked**

**at Qualcomm and didn't feel limited in any way.**

*Q.* And did you in fact, interview people at Qualcomm?

***A.*** **Yes.**

*Q.* You mentioned Jim Thompson a minute ago. He was in the C-suite at Qualcomm; right?

***A.*** **Yes, the chief technology officer at top of the company.**

*Q.* And was he made available for you to talk to?

***A.*** **Was.**

*Q.* Any problems with that?

***A.*** **No.**

*Q.* Was he the only person you interviewed at Qualcomm?

***A.*** **No. We spoke to Stewart Roberts, who was a former FBI agent who worked in the security department that was brought up earlier. We also spoke to individuals who were in the human resources department. There might have been others and there might have been others after I left the FBI that I'm not aware of.**

***MR. PILCHAK:*** Great. One moment, please, your Honor.

***(Pause.)***

***BY MR. PILCHAK:***

*Q.* You were asked a little bit about the interface between the FBI and the U.S. Attorney's Office and Qualcomm; right?

***A.*** **Yes.**

*Q.* At the end of the investigation, at least the part that you participated in, when charges were returned and there were those

arrests that you talked about on direct examination, right before that happened, do you remember gathering up all the evidence in the case and presenting it to Qualcomm or their lawyers?

***A.*** **No.**

***Q.*** Did you ask Qualcomm for input about who you should seek charges against?

***A.*** **No.**

***Q.*** As far as you know, did they provide any input about who should or shouldn't be charged in this case?

***A.*** **No.**

***Q.*** And in fact, were charges only returned only against the people who were included in Qualcomm's civil suit?

***A.*** **No.**

***Q.*** Who else was charged?

***A.*** **I'm trying to think. Akbar Shokouhi, I think. I don't recall if he was -- he was not in the lawsuit, so we charged Akbar Shokouhi. And ultimately Brad Quinton was charged, and I don't believe he was party to the lawsuit.**

***Q.*** Fair enough.

***MR. PILCHAK:*** No further questions for this witness, your Honor.

***THE COURT:*** Anything further at this time?

***MR. FRASER:*** Yes, your Honor. Thank you.

***RECROSS-EXAMINATION***

***BY MR. FRASER:***

***Q.*** You had testified -- when I was asking -- you recall when I was asking you about the metadata that you investigated?

***A.*** **Yes.**

***Q.*** And you looked at metadata from certain Microsoft Office documents?

***A.*** **Yes.**

***Q.*** And that's -- that's at a level of technology that you understand well?

***A.*** **Yes.**

***Q.*** You didn't seek metadata from anything that wasn't a Microsoft Office document. That's -- that's, I think what you were trying to explain. Is that right?

***A.*** **I think we also looked at Adobe Acrobat files, PDFs, which is not Microsoft. I might have looked at some of those.**

***Q.*** But none of the software tools of Abreezio?

***A.*** **No.**

***Q.*** And Abreezio had lots of documents in addition to just software. They had some Microsoft Office documents of their own?

***A.*** **Presumably.**

***Q.*** And you obtained them?

***A.*** **Yes, some of them.**

***Q.*** And they don't have metadata from Karim Arabi on them?

**A. I don't know that I looked at every single one, but I don't recall any instances where they were.**

***Q.*** The Government might have forgotten to show that if it exists?

**A. I don't know what the Government forgot to show. I know I don't recall any metadata from Invionics that Karim Arabi was the author of.**

***MR. FRASER:*** Thank you. No further questions.

***THE COURT:*** Okay. Subject to recall, is there anything further?

***MR. PILCHAK:*** Subject to the Court's note earlier, no.

***THE COURT:*** Okay. If you could stick around, we may need you a little bit more later.

***THE WITNESS:*** Yes, your Honor. Thank you.

***THE COURT:*** Thank you. You may call your next witness.

***MR. PILCHAK:*** Thank you, your Honor. The United States calls Esin Terzioglu.

***THE CLERK:*** Please stand here and raise your right hand.

***(Witness duly sworn.)***

***THE CLERK:*** Thank you. You may lower your hand. Please take the stand. Please state and spell your first and last name for the record.

***THE WITNESS:*** First name, Esin, E-s-i-n.

***THE CLERK:*** Pull that microphone a little bit closer to

you.

***THE WITNESS:*** Last name, Terzioglu, T-e-r-z-i-o-g-l-u.

***THE COURT:*** Could you pronounce that one more time?

***THE WITNESS:*** "Terzioglu."

***THE COURT:*** Thank you.

***DIRECT EXAMINATION***

***BY MR. PILCHAK:***

***Q.*** Good afternoon, Mr. Terzioglu. The other witnesses have had some trouble with that, so I appreciate your saying it twice for us.

Did you used to work at Qualcomm, sir?

***A.*** **Yes, I did.**

***Q.*** Do you still work there today?

***A.*** **No.**

***Q.*** Where do you work today?

***A.*** **I work at Apple.**

***Q.*** Very good.

Let me ask you some questions about your educational background. Can you walk the jury through what education you've had after high school?

***A.*** **Sure.**

**I received my bachelor's of science in electrical engineering from University of Rochester in New York. And then I finished my master's and Ph.D. again in electrical engineering**

**from Stanford University.**

*Q.* And when you say "electrical engineering," did you have a specialty or subspecialty when you did your Ph.D. work?

***A.* Yes. My specialty has been in silicon design mainly and associated areas.**

*Q.* When you say "silicon design," are you referring to chips or microchips?

***A.* That's correct, chips.**

*Q.* Okay. And you said you work at Apple today?

***A.* I do.**

*Q.* What is your job title at Apple?

***A.* I'm a vice president.**

*Q.* And where did you work, if we go all the way back to 2015?

***A.* 2015, I was employed at Qualcomm.**

*Q.* And what was your job title at Qualcomm at that time?

***A.* I was vice president of engineering.**

*Q.* Is that the same post that you have now? I don't mean to ask a rude question.

***A.* Feels higher at Apple.**

*Q.* Remember you're under oath, sir.

Okay. Fair enough. In 2015, at Qualcomm, when you were a vice president, who was your immediate supervisor?

***A.* It was Ziad Mansour.**

*Q.* And what kind of work did you do at that time, meaning 2015?

***A.* I was managing what I would call the technology team. So I**

**was the, I would say, glue between the actual manufacturing of silicon, which is typically in Asia, and the teams that actually put together the chips.**

**So I came up with -- or my team and I worked on building intellectual property like designs that would go into the chips, as well as the design methodologies and things like that.**

*Q.* Fair enough.

When you say you're on the tech team, you have to understand I'm not an engineer. I think many of the jurors are probably not engineers either. It sounds to us like everybody at Qualcomm is on the tech team.

What was special about your tech team? And I think you said just part of it right there.

***A.*** **So my team and I were experts in linking the silicon manufacturing to actual design.**

*Q.* Okay.

***A.*** **So I would say at a lower level, we had to know physics, a lot of engineering that enables practical building of chips.**

*Q.* Got it.

So if I'm hearing you right, there's a side of the house that does design work, and there's a side of the house that works on fabrication or building the chips?

***A.*** **And that's outside, yeah.**

*Q.* Somebody outside of Qualcomm does the building?

***A.*** **That's correct.**

*Q.* And then you talked about your position as kind of a glue between those two things.
***A.* That's how I would look at it, yeah.**
*Q.* And that, again, is what you were doing in 2015?
***A.* Correct.**
*Q.* Let me ask you a question about your time at Qualcomm.
If you invented something while you worked at Qualcomm that related to its business, who would own the rights to that thing?
***A.* Qualcomm.**
*Q.* And why is that?
***A.* That's part of the paperwork that, you know, we fill out when you get employed at Qualcomm. And a lot of the tech companies require you to basically sign away any intellectual output that's related to your job.**
*Q.* And is that signing away done in exchange for your salary?
***A.* In exchange of your employment at the company, yes.**
*Q.* And you said it's true at a lot of tech companies.
Without getting into the details, do you have a similar agreement right now at Apple?
***A.* Every tech job I held had a similar agreement.**
*Q.* Fair enough.
And I think we might have gone a bit fast in your background. You talked about your educational background. And when you say every job that you've held, we're talking right now about Qualcomm. You mentioned you work at Apple today.

Have you ever worked at any other tech companies?
**A. I worked at another company in Orange County called Broadcom.**
*Q.* Is that another large tech company?
**A. It is now, yeah.**
*Q.* When you worked there, how big was it?
**A. It was relatively small when I joined Broadcom, but we had similar agreements.**
*Q.* The jury's heard testimony that there are, I don't know, 40,000 people who work at Qualcomm today.
Do you have a sense of how big Broadcom was when you were there?
**A. When I joined Broadcom, we were probably around 400. When I left, we were probably around 6,000.**
*Q.* Okay. And how many people work at Apple, if you know?
**A. I actually don't know.**
*Q.* Fair enough.
**A. I think it's over 150,000.**
*Q.* Let me ask a different question.
Focusing in on your time at Qualcomm, were there rules at that company around your ability to work with outside companies doing business with Qualcomm?
**A. Yes. There are ethics rules, and there are rules that govern managing conflicts of interest.**
*Q.* Okay. And would those cover businesses that were, for

example, trying to sell themselves to Qualcomm?
**A. It would.**
Q. Are those kinds of rules common in the tech industry in your experience as well?
**A. Yes.**
Q. Let me ask you about someone named Karim Arabi.
Do you know somebody by that name?
**A. Yes, I do.**
Q. When did you meet him?
**A. When I joined Qualcomm in around 2009.**
Q. Okay. So are you saying you joined Qualcomm in about '09?
**A. Yes.**
Q. I should have said this earlier. When did you leave Qualcomm?
**A. 2017.**
Q. And did you make the transition to Apple then?
**A. Correct.**
Q. And you've been at Apple then since 2017?
**A. Correct.**
Q. Got it.
How did it come about that you met Dr. Arabi?
**A. We worked in the same organization that basically designed the VLSI chips, digital chips for QCT Qualcomm, CDMA technologies.**
Q. And what does VLSI mean to you? If you can explain it in

layperson terms.

***A.*** **VLSI stands for very large scale integration. It refers to largely integrated microchips that contain a lot of components, typically transistors. A modern chip will have billions of transistors.**

***Q.*** So if I smash own my cell phone, and if I see a chip inside of here, it's going to look like a gray rectangle; right?

***A.*** **Yes.**

***Q.*** But you are telling me that on the rectangle are billions of what?

***A.*** **Transistors.**

***Q.*** Again, real quick, what's a transistor?

***A.*** **A transistor is -- essentially it's a switch that's used to build circuits.**

***Q.*** And by combining those switches, can you perform computations on a microchip?

***A.*** **That's correct. Yeah, that's what it's used for.**

***Q.*** Gotcha.

By the way, do you see Dr. Arabi in the courtroom today?

***A.*** **Yeah.**

***Q.*** And where is he sitting, please?

***A.*** **Sitting over there.**

***MR. PILCHAK:*** I'd just ask the record to reflect he's identified the defendant.

***THE COURT:*** The record may so reflect.

***BY MR. PILCHAK:***

***Q.*** What was Dr. Arabi's area of expertise in, if you know, when you met him in 2009?

***A.*** **If I may refer to -- Karim was working in the DFT EDA area, Electronic Design Automation tools, Design For Test. Those were his scope of responsibilities when he was in Ziad's organization. But then he left the company, and then he came back, but then he took different role.**

***Q.*** I want to do that one piece at a time, if that's okay.

***A.*** **Yeah.**

***Q.*** When you're talking about the first chunk of Dr. Arabi's career -- is it okay if I call him "Dr. Arabi"?

***A.*** **Sure. I'll call him "Dr. Arabi" as well.**

***Q.*** I've heard Qualcomm is a first-name place; is that true?

***A.*** **It is. I mean, we're colleagues.**

***Q.*** And if you say "Karim," we'll know who you mean.

***A.*** **Okay.**

***Q.*** So you said the first chunk of Dr. Arabi's career at Qualcomm, you considered him an expert in -- and then you said two things. One was DFT; right?

***A.*** **Mm-hmm.**

***Q.*** The jury's already heard some testimony about what DFT is.

And then you said something else, EDA.

What is that?

***A.*** **EDA is electronic design automation. It refers to software**

**tools that are used to build these -- put together these complex designs and chips.**

*Q.* Is it a little bit like computer-aided design?

***A.*** **That's what it is, yes.**

*Q.* Okay. DFT, I just said the jury's heard some testimony about it.

But could you explain DFT briefly in your own words?

***A.*** **Design For Test is basically these billions of transistors on a piece of silicon. Not all of them function to the specs, and you want to be able to identify what those are and take action before you get the chip in products or customers' hands.**

*Q.* And DFT helps you do that?

***A.*** **That's correct.**

*Q.* Can it be valuable to companies that make a lot of chips?

***A.*** **Absolutely, yeah. It's very important.**

*Q.* Was it valuable to Qualcomm?

***A.*** **Yes, it was.**

*Q.* You mentioned someone named Ziad Mansour; right?

***A.*** **I did.**

*Q.* Who is he?

***A.*** **Ziad was my immediate manager most of the time I was at Qualcomm. He was -- he was a senior VP, senior vice president, manager responsible for the VLSI organization.**

*Q.* Got it.

Is that an important position at Qualcomm?

**A. Very much so.**
Q. And why do you say that?
**A. He was responsible for executing the chip roadmap that drove a lot of the revenues, actually.**
Q. And this is probably going to seem a silly question to you, and maybe at some point in the trial, were chips pretty important to Qualcomm?
**A. Yes.**
Q. Okay. Kind of like Tostitos.
Anyway, you mentioned Ziad as your immediate supervisor. Did Dr. Arabi ever report directly to Ziad as well?
**A. He did, yes.**
Q. Was that at the same time, meaning did you have Ziad as your supervisor at the same time that Dr. Arabi did?
**A. I'm not sure about that, because when I joined I was reporting to someone who reported to Ziad.**
Q. Okay.
**A. And by the time Karim, Dr. Arabi, left, I don't know that I was reporting to Ziad or not. I just don't remember. This was probably like ten years ago.**
Q. And if we're trying to imagine where you and Dr. Arabi are on the org charts at Qualcomm, should the jury think you as one superior to the other or kind of like peers?
**A. I would say we were peers.**
Q. Got it.

For example, you were never Dr. Arabi's supervisor?

*A.* **No, I was not.**

*Q.* Was he ever your supervisor?

*A.* **No.**

*Q.* Okay. And then I skipped around a little bit.

You mentioned there was a second piece to Dr. Arabi's career at Qualcomm after that VLSI thing you were just talking about.

*A.* **Yes.**

*Q.* What was that second piece and when did it happen, if you remember?

*A.* **I'm not sure about the timelines. But Dr. Arabi left Qualcomm -- I don't remember exactly when, to be honest.**

*Q.* Fair enough.

*A.* **And he was -- and then he came back. Again, I don't recall the timelines. Maybe a year or two later. And he joined Qualcomm research organization.**

*Q.* Do you remember the name of that organization?

*A.* **No.**

*Q.* What did it do, though, in substance?

*A.* **They did -- outside of product execution, they looked at research topics. A lot of it was forward-looking, developing technologies for the future that was not in immediate -- immediate roadmap, I guess.**

*Q.* Developing future technologies for Qualcomm?

*A.* **That's correct.**

*Q.* Got it.
Now I want to shift gears and ask you about a company called Abreezio. Have you heard that name before?
*A.* **Yes.**
*Q.* What is Abreezio?
*A.* **Abreezio was a startup that I was asked to evaluate in terms of their technology.**
*Q.* Mm-hmm.
*A.* **And we ended up acquiring that company.**
*Q.* Got it.
When did you first learn of Abreezio?
*A.* **This was in around May of 2015. I was asked by my manager at the time, Ziad Mansour, to give him an assessment of the technology for this company. And he told me that they were -- they had been evaluating it for potential acquisition.**
*Q.* And do you know if anyone told Ziad to have you pulled in?
*A.* **No, I don't know.**
*Q.* Do you know whether Jim Thompson ever requested that you be involved?
*A.* **I don't know.**
*Q.* Okay. Sitting here today, do you know how many different products Abreezio had when it was pitching itself to Qualcomm?
*A.* **I remember two distinct technologies. One was related to DFT, and the other one was related to what I would call voltage management on a chip, AVS technology or adaptive voltage**

**scaling.**

***Q.*** So AVS, in your view, stands for adaptive voltage scaling?

***A.*** **There are many different names for it. But yeah, basically you control the voltage depending on how the chip comes out of the manufacturing line or the environmental conditions, and this allows you to more efficiently use power and manage the chip.**

***Q.*** And why would that be important?

***A.*** **Oh, that's super important. You can -- you know, you can trade off voltage margins for power is one of them, and you could also use that to potentially save area. And Qualcomm and a lot of, you know, large tech companies, they spend billions on buying wafers. So if you can shave off a few percent of that, it adds up to a lot of money.**

***Q.*** When you say "wafers," I think cookies. But I think you're talking about something else.

***MS. ROBERTS:*** Objection, your Honor.

***THE COURT:*** Overruled.

***MR. PILCHAK:*** I can withdraw.

***BY MR. PILCHAK:***

***Q.*** What did you mean when you say "wafers"?

***A.*** **Wafers are silicon wafers. They're flat sheets. They look like plates. And each one goes through machines, manufacturing process, and you print chips, individual chips on them. Many of them in parallel so that it makes the manufacturing process more effective or more efficient.**

***Q.*** And the cost of those sheets, is that a big cost driver for a company like Qualcomm?

***A.*** **Absolutely, yeah.**

***Q.*** Are you familiar with a different company, putting Abreezio to the side, called Rapid Bridge?

***A.*** **Yes, I am.**

***Q.*** What is Rapid Bridge?

***A.*** **Rapid Bridge was another startup. A few years before Abreezio, it was, again, evaluated by Qualcomm, again Ziad's team, and we ended up acquiring them.**

***Q.*** And do you remember what one of Rapid Bridge's products was?

***A.*** **Yeah. They also had AVS technology.**

***THE COURT:*** Also had what?

***THE WITNESS:*** The voltage management technology, voltage scaling.

***THE COURT:*** Okay.

***BY MR. PILCHAK:***

***Q.*** Do you remember what their voltage scaling product was called?

***A.*** **It was called CPR, core power reduction, I guess is what it stands for.**

***Q.*** Was there any similarity between CPR, the old product from Rapid Bridge, and the new AVS product from Abreezio?

***A.*** **In the sense that they both tried to manage voltage on a chip, there was similar sort of attacking the similar problem.**

**In terms of similarities, the specifics of the technology were different.**

*Q.* Was there a potential, at least in your view, that Abreezio's AVS product could piggyback on top of CPR and make it better?

**A. That's correct. And when we looked at it, in fact, that was the assessment. It was basically we could use the entire infrastructure that we had built to integrate Rapid Bridge into Qualcomm products, and -- and insert Abreezio sensors, which appeared to be more accurate.**

*Q.* And so was one of the questions -- I'm getting ahead of myself -- but was one of the questions during evaluation of Abreezio whether its product could beat or outperform what you already had in the stable?

**A. That was one of the big debates, yes.**

*Q.* Okay. So it sounds like you yourself, then, had a role with the Abreezio technical diligence?

**A. I did have a role in that.**

*Q.* Was it just you or were there other people involved, too?

**A. It was -- so when I was called into -- to look at it, there was already some assessment had been going on. So we continued that.**

*Q.* And who had been doing assessments before you came in?

**A. At least I had two names that Ziad gave me. In fact, he gave me their names so I could get an update on where they were**

**so we could continue from there.**

*Q.* And who --

***A.*** **One was Saad, I think, Elhosni. The other may have been Farsheed Mahmoudi.**

*Q.* And so your impression was that both of those gentlemen already looking at Abreezio before you?

***A.*** **That's correct.**

*Q.* Were they both looking at this AVS thing or did they cover the two different products?

***A.*** **Saad's core expertise, again, my recollection, he was DFT person. And Farsheed was more general technologist, specifically for power delivery, so he was looking at the AVS aspects.**

*Q.* Got it.

What was your involvement in the evaluation?

***A.*** **So after Ziad asked me, I think it was an email, I contacted Saad. Farsheed was on my team already. I don't think Saad was. So I gathered the information they had or whatever assessments they had built up, run an assessment, and pulled in some people to continue the evaluation.**

*Q.* When you say "run an assessment," do you mean you had a test chip down there at the shop and your running Abreezio's test chip?

***A.*** **No. I looked at the material that was generated by our engineers, Qualcomm engineers, just to get an idea what their**

**initial assessment was and what to do next.**
*Q.* Got it.
And when you say materials that were provided, are those kind of like simulations or models?
***A.*** **These were mainly like PowerPoint slides.**
*Q.* Okay. Is it easier or harder to do an accurate evaluation of a product if you don't have a test chip to test on?
***A.*** **Depends on the technology. Typically, in my business where we deal with technology and there's a lot of unknowns and uncertainties, even the models you get, what the technology should look like may be inaccurate. So it can be extremely difficult to assess exactly what that specific technology is going to do once you manufacture it.**
*Q.* So there might be downsides to skipping a test chip?
***A.*** **There may be, yeah.**
*Q.* Are there reasons to maybe go forward without one, though?
***A.*** **There are.**
*Q.* Like what might those be?
***A.*** **Sometimes you want to accelerate the schedule, and you may take your risk in terms of putting on a product as a test feature, and turn it on or not, depending on how it works or doesn't work.**
*Q.* And when you say "accelerate the schedule," this microchip business is a competitive field; right?
***A.*** **Absolutely, yeah.**

***Q.*** Is time a factor in determining who is going to come out on top?

***A.*** **Absolutely. We had new chips every year, year after year. And there was an expectation of year-over-year improvements in cost, efficiency of the design, power every year. And timelines for development is multiple years. So you have multiple projects in the pipe you have to juggle. It's a brutal business.**

***Q.*** If you don't improve year over year, can someone else eat your lunch sometimes?

***MS. ROBERTS:*** Objection, your Honor.

***THE COURT:*** Sustained. I don't know what that means.

***MR. PILCHAK:*** I think it's about the wafers. I'll withdraw that one.

***BY MR. PILCHAK:***

***Q.*** Let me ask you this: There's two products at Abreezio, right, the AVS and the DFT?

***A.*** **Correct.**

***Q.*** Sensors and test?

***A.*** **Correct.**

***Q.*** Was one of those products easier to assess than the other?

***A.*** **In my experience, at least from the assessment that we did, DFT is more straightforward. It was digital, more predictable, so we assessed that relatively easily. And it had a lot of value. So that was clear.**

**Value in terms of technology, not dollars.**

**For AVS, it was more difficult because you get into the accuracy of the models, how they would behave, and you're trying to squeeze margins. It's more tricky to assess the value of that. And I ended up giving a range, actually.**

*Q.* So not a specific amount?

***A.* Not a specific number. I was not comfortable with that. When the team came to me and they were showing, as I recall, 5 percent improvement, I was uncomfortable with that, given the implications for the company. So I gave -- I ended up giving a range.**

**There were a lot of debates and passionate discussions. But my -- my input in the end was a fraction of that. And it was a -- it was a wide range that I gave.**

*Q.* And when you say you were uncomfortable giving a specific number, I think we're going to come back to this in a moment, but why were you uncomfortable?

***A.* Because I didn't feel confident with all the unknowns to give a specific number, because I knew that this number was going to be used to evaluate, you know, potentially a big financial investment for Qualcomm, and I was going to be responsible at least part of the input. So I wanted to give something that was reliable.**

*Q.* You mentioned risk earlier.

Did you feel it was too risky to put your name on one

specific number?
**A. Absolutely, yeah. That's how I felt.**
***Q.*** And then you said what you ultimately settled on was a wide range, why did you characterize it that way?
**A. As I recall, I gave a range of ten millivolts to 40 millivolts. And that translates to roughly 1 to 4 percent. 1 percent would be trivial, to be honest. 4 percent would be more interesting. So if you took the full range, I was not really making a clear statement on my opinion of the technology.**
***Q.*** Okay. And it's hard for a layperson like me to understand what a millivolt is.
But is it correct to say that 40 millivolts at the high end of your range is four times higher than ten millivolts at the lower end?
**A. That's correct.**
***Q.*** And you said at the lower end of the range you would characterize that kind of improvement as what?
**A. Trivial.**
***Q.*** Meaning not interesting?
**A. Not very interesting, yeah.**
***Q.*** What about the top end of that range?
**A. Top end of the range, it's -- it's reasonable enough that you know that you will come out on top by the time you're done implementing it on a product.**
***Q.*** Okay.

***A.*** **And also I want to point out the percentages are for voltage. The power is the square of that. So the difference is even bigger.**

***Q.*** So if you square these raw numbers, the range gets even wider?

***A.*** **Yeah. It would be like 1 percent to 8 percent or something like that.**

***Q.*** Okay. I'm not good at squares.

Okay. So you mentioned Saad was involved in the diligence, and you mentioned Farsheed was involved in the diligence; right?

***A.*** **Correct.**

***Q.*** Do you know someone named Kevork Kechichian?

***A.*** **Yeah, I do.**

***Q.*** Was Kevork involved in the technical diligence?

***A.*** **I don't think so, not to my knowledge.**

***Q.*** And do you know whose decision it would have been whether to bring Kevork in or not?

***A.*** **Ziad's.**

***Q.*** Okay. And when you say you were involved in the evaluation, did you roll up your sleeves and run the models yourself, or did you sort of supervise these other people who were involved?

***A.*** **I -- this was a, I guess, small part of my job, so I had to run the organization on a day-to-day and execute a roadmap. So I had what I identified as technical experts in my organization to do this day-to-day activity, and I periodically reviewed**

**their output and gave direction. That was my role in it.**
*Q.* Okay. And if that was your level of involvement -- and Ziad was your supervisor, did I hear that right?
***A.*** **That's correct.**
*Q.* What was Mr. Mansour's involvement in the diligence?
***A.*** **So -- well, I was rolling up to Ziad what we were finding. And my understanding is Ziad was also working with corporate to take the technical input and convert it into some sort of a decision.**
*Q.* When you say "corporate," who do you mean?
***A.*** **These are, you know, strategy, finance, people who write the check.**
***MR. PILCHAK:*** At this point we can show the witness Defense Exhibit 2679. I think it's already in evidence, so it should be okay to publish unless anybody disagrees. And let's zoom in on the bottom message from Mr. Thompson.
I meant the bottom message from Mr. Thompson. My team thinks I'm screwing up the last name starting with "T."
***BY MR. PILCHAK:***
*Q.* That bottom one is from Mr. Thompson; right?
***A.*** **That's correct. That's from Jim.**
*Q.* This is about final acquisition approval.
Do you see that there?
***A.*** **Mm-hmm.**
*Q.* And the date is October 21st of 2015?

**A. Correct.**

*Q.* Do you remember whether the Abreezio deal closed on October 30th of 2015?

**A. I don't remember the exact date, but it was around that time.**

*Q.* And when this says "Final acquisition approval," does that suggest to you it's relatively close to the end of the rainbow there?

**A. That's correct.**

*Q.* Okay. Who is Mr. Thompson writing to?

**A. He is writing to me and Ziad.**

*Q.* And his second sentence says "Esin said we would not get the die savings advertised in the deal model."

Esin there is you; right?

**A. Yeah, that's me.**

*Q.* Do you remember making a statement like that to Mr. Thompson?

**A. Yes.**

*Q.* Is that consistent with the uncomfortableness that you mentioned a moment ago?

**A. Yes.**

***MR. PILCHAK:*** Okay. And then take that down, please. The middle message from you, let's zoom in on that.

***BY MR. PILCHAK:***

*Q.* Do you respond to Mr. Thompson here?

**A. Yes, that's me.**
Q. And again, Mr. Mansour is on this email; right?
**A. That's correct.**
Q. So you said Mr. Mansour was your boss; right?
**A. Yes.**
Q. Who was Jim Thompson?
**A. Jim Thompson was Ziad's boss.**
Q. So your boss's boss?
**A. That's correct.**
Q. So you're telling your boss's boss that you think maybe the numbers for Abreezio are too optimistic?
**A. That's correct.**
Q. Is that what you're saying in substance in this email, or is there more to it?
**A. So my recollection is there was a meeting where we were discussing the upcoming events, I guess, and Abreezio was one of them. And there were statements made that implied that 5 percent was used as the technical metric. And also, you -- you have to convert this voltage to silicon area, which converts to dollars. And there was some assumptions made when the already optimistic 5 percent was converted to an optimistic conversion to dollars.**
**And when I noticed it at that meeting, I cautioned Jim that his assumptions were -- at least what he was seeing were inaccurate driven by input to him by others, I guess. So that**

**was my statement. I just wanted him to know that what he was talking about in terms of the value of the technology in the deal was -- was not accurate and we were, you know, right at the eve of pulling the trigger.**

***Q.*** Right.

Right at the eve of closing the deal.

***A.*** **Yeah.**

***Q.*** And you were worried that his numbers were too rosy?

***A.*** **Yeah.**

***Q.*** Where did he get his numbers?

***A.*** **I don't know. But it looked like the original assessment of 5 percent was what was -- was mentioned. So at that point, to be honest, I was not even sure whether my technical input was incorporated into the deal model because I had no access to the deal model.**

***Q.*** What do you mean you had no access to the deal model?

***A.*** **I hadn't seen like how they took the technical input and converted it to value the company. Eventually, somebody had to value the company.**

***Q.*** Right.

Who did have input to the deal model?

***A.*** **I actually don't know. Ziad was involved in that. Jim was certainly involved. And somebody from corporate was running the numbers. I think Hiten. But I didn't have access to the spreadsheets and numbers.**

*Q.* Fair enough.
And I see that 5 percent number that you've mentioned a couple of times in this email here; right?
***A.*** **Yes.**
*Q.* And in that second paragraph you say you're not sure they'll be able to deploy all of the 5 percent?
***A.*** **Yes.**
*Q.* Did you give a range in this email to Jim and Ziad? And I'll direct your --
***A.*** **I don't see it on this email specifically, no.**
*Q.* What did you mean in the last sentence of that first paragraph?
***A.*** **So that last sentence, what it says is even if you got 5 percent voltage improvement from this technology, which I disputed that, but if you did, you would convert that 5 percent in voltage to 2 to 3 percent in area.**
*Q.* Got it.
***A.*** **There was a direct one-to-one conversion, I guess, that was mentioned, which I was trying to correct that. But I also didn't want to contradict my colleagues in a meeting in front of the big boss. So I told him afterwards.**
*Q.* When you say your colleagues, did that include your supervisor, Ziad Mansour?
***A.*** **Yeah.**
*Q.* Did that guy sign your performance reviews?

**A. He did, yes.**

*Q.* And I do have to ask you, though: The first sentence of that last paragraph says "I believe that this is a good technology for sensors and DFT, and we should acquire."

Do you see that there?

**A. Yeah.**

*Q.* Why did you write that if you were worried that the numbers were too rosy?

**A. Because I thought it was a good technology. But the numbers that were mentioned were inaccurate with respect to my assessment. My assessment was it is what it was. DFT was very valuable to the company, and there was test time reduction or improvement in coverage of faults. So that was very straightforward.**

**Although the dollar value assigned may be lower, but that was a good technology. And AVS is where the -- the dispute was. I still thought that it was a good technology. But, you know, there's a price for everything. I had no access to the deal model, so I couldn't say -- you know, giving a car analogy, a $20,000 car may be a good car, but if you're asked to pay a 100,000, maybe it's not a good car. So it was something like that.**

***MR. PILCHAK:*** Okay. Let's take that down and if we can zoom in on the top message from Mr. Mansour.

///

***BY MR. PILCHAK:***

***Q.*** Did he reply in this same email chain?

***A.*** **Yeah, this appears to be.**

***Q.*** Is he agreeing with what you said or saying something else?

***A.*** **He is saying something else.**

***Q.*** What is he saying? How did you understand it?

***A.*** **He is saying that, I guess irrespective of what I said, he used 2 to 3 percent in the M&A, merger and acquisition evaluation. So my assumption is 2 to 3 percent, which implies 5 percent voltage, 2 to 3 percent silicon area, was used in evaluating the value of the company.**

***Q.*** Did you interpret this as Mr. Mansour overriding what you had said underneath?

***A.*** **Absolutely, yeah. This was clear from this email. He overrode me, yeah.**

***Q.*** And he had the power to do that?

***A.*** **Yeah.**

***MR. PILCHAK:*** Let's take that down.

***BY MR. PILCHAK:***

***Q.*** Irrespective of -- you can take that down, too.

When you said, Mr. Terzioglu, that the dollar value assigned would be lower, what did you mean by that?

***A.*** **I mean, the value -- again, my understanding is the model has technical inputs. And depending on how much die area you project to save, you assess the value of the company**

**accordingly. So if it's more, you can pay more.**

**You can take -- for instance, like from Rapid Bridge experience, you can estimate how much silicon area you will save over the next three years or four years, depending on how you want to do your model, and amortize that savings.**

**And then you take a fraction of it, pay the company, and then a fraction of it goes to savings of the company. That's the value that you split. That's my understanding of how this works.**

***Q.*** Okay. If we forget about the email that we were just looking at about the final acquisition approval involving you and Mr. Thompson and Mr. Mansour, generally speaking, what was Mr. Mansour's take on Abreezio's tech? Was he for it or against it?

***A.*** **He was definitely for it.**

***Q.*** Why do you say that?

***A.*** **I mean, you can see from the email. He was -- he was worried about competition. And this is, like I said, brutal business. Year over year you have to find something to improve your design, and Ziad was always looking for the next improvement in the organization.**

***Q.*** Got it.

***MR. PILCHAK:*** Can we show the witness and only the witness 2877? It's a defense exhibit. And let's zoom in on just the top there so we can see it. I don't believe this is in

evidence.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, Mr. Terzioglu?

***A.*** **Yeah.**

***Q.*** Is this an email exchange between you and Mr. Mansour?

***A.*** **Correct, private email.**

***MR. PILCHAK:*** Okay. We would move to admit 2877 from the defense list.

***THE COURT:*** Any objection?

***MS. ROBERTS:*** No objection, your Honor.

***THE COURT:*** 2877 may be admitted.

***(Exhibit 2877 admitted.)***

***BY MR. PILCHAK:***

***Q.*** Thank you. And let's take that down, the zoom, and look at the bottom message on the first page. Oh, boy. We have a little bit of a sticker issue there. I apologize for that.

What is -- understanding that we can't read about 10 percent of the words in that last paragraph, do you see the second paragraph on the bottom there, Mr. Terzioglu?

***A.*** **Yes.**

***Q.*** Hang on one second. We're working on that sticker. I don't know if we have one with no sticker.

Let me ask some questions while we're working on that.

What is this about, when it says "Review Windansea business case"?

**A. We would -- a lot of times this is true for tech companies -- give code names so that if you're speaking in public, people don't know what you're talking about. So Windansea was a code name for Abreezio, I believe.**

Q. Got it.

And when it says "business case," what does that mean?

**A. It's talking about the technical input that would shape the dollar value of the company.**

Q. The dollar value that would influence whether or not Qualcomm is going to acquire it?

**A. I would say a dollar value that if Qualcomm decided to acquire, that they would pay.**

Q. Right.

Okay. And when it says "minus others," do you have a memory of whether is this part of a longer correspondence and Ziad knocked off the other people to talk to you privately?

**A. That's correct.**

Q. Okay. What did he want to talk to you privately about?

**A. So after I started looking at the Abreezio technology, one of the things that I noticed was the compare point for existing Qualcomm technology from Rapid Bridge was a little bit backwards-looking. We had enhancements and improvement coming for that technology as well that we had been working on.**

Q. Okay.

**A. So I pulled in the people who were working on that. And the**

**comparison from the initial point, which was 5 percent, started to shift around because we were comparing what Qualcomm would be at --**

*Q.* Yeah.

*A.* **-- by the time Abreezio would come online and that's how the difference shrank. And Ziad was wanting to dig into the details of that analysis.**

*Q.* Got it.

And so when you say "a gap," you're comparing two different products or techniques; right?

*A.* **Correct.**

*Q.* The one from Abreezio?

*A.* **One is from Abreezio, yes.**

*Q.* And the old one from Rapid Bridge?

*A.* **The CPR, yes.**

*Q.* And the question is if -- to use an easy example, if these two coffee cups are in a race to the end of the podium here, if this is the new one from Abreezio, and this is the old one from Rapid Bridge behind it, the question is how far apart are they; right?

*A.* **That's correct.**

*Q.* Because the farther this one gets out in front, the more valuable it is?

*A.* **Correct.**

*Q.* But if the coffee cup behind it starts to catch up because

you're improving it --
**A. Yes.**
*Q.* -- then that gap might shrink?
**A. That's correct.**
*Q.* Is that what you observed happening with CPR at Qualcomm?
**A. That's exactly what it was. My -- I guess my contention was that we should compare to where each technology will be at -- projected to be at, at a given time.**
*Q.* Okay. And you felt that maybe that hadn't been done before you provided some input?
**A. That's correct.**
*Q.* Let me ask you this: In this message that we have up on the screen here from Mr. Mansour, he is proposing a deeper dive into the TruSens technology.
I don't remember if you said it already. What is TruSens?
**A. TruSens is the Abreezio sense technology.**
*Q.* That's that AVS tech that you've been talking about?
**A. That's correct.**
*Q.* And in the second paragraph, he is talking about having Farsheed and Mohamed be the two reviewers; right?
**A. Correct.**
*Q.* Farsheed, I'm sure is that same Farsheed you were already talking about; correct?
**A. Yes.**
*Q.* Who is Mohamed?

***A.*** **Mohamed is -- we had a lot of Mohameds, so I'm trying to -- Mohamed, I believe, was Mohamed Allam.**

***Q.*** And who is Mr. Allam?

***A.*** **Mohamed Allam was someone who worked for me at the time, and he was in charge of technology similar to this TruSens. And my memory is a little bit fuzzy, but Farsheed might have been reporting to Mohammed in my organization, but I'm not quite sure. So maybe that's why I pulled in Mohamed. I can't be sure.**

***Q.*** If you go far enough up Mr. Mohamed's chain, would you eventually get to Ziad?

***A.*** **Yeah.**

***Q.*** Got it.

So if I'm understanding this right, Mr. Mansour says bring in those two guys for a pro and against opinion.

What did that mean to you?

***A.*** **So Farsheed was involved in the original assessment that reported this 5 percent. And Mohamed was in charge of -- Mohamed was working on CPR at the time, I believe. But again, my memory is a little bit fuzzy.**

***Q.*** That's the existing product at Qualcomm?

***A.*** **Yes.**

***Q.*** Is it your sense when Ziad says a pro and against, that Farsheed would be the pro and Mohamed potentially would be the skeptical guy who would give it a kick in the tires?

**A. That's my -- yeah, that would be my understanding. That's what he was implying.**

Q. Do you know whether Mr. Mohamed -- Mr. Allam was fully brought in to do that over the course of the diligence?

**A. I actually don't remember Mohamed's involvement. I pulled him in to -- to update the internal technology projections. But I don't know to what extent he was directly exposed to what Abreezio was able to do or not. He was just bringing in the know-how from the internal technology. So I don't remember his exposure to Abreezio.**

Q. And when you say is he working on the internal technology, you mean CPR?

**A. That's correct.**

Q. The old coffee cup that Qualcomm already had?

**A. Yes.**

Q. You're not sure if he was exposed to the new coffee cup that Abreezio was selling?

**A. That's correct.**

Q. Okay. Where Mr. Mansour says that we have a credibility issue here, what does that mean?

**A. So we reported -- or at least there was a -- there was a number that was rolled up, 5 percent, and I advocated changing that number.**

Q. But that doesn't say anything to me about credibility.
What does credibility mean?

**A. Credibility means we already told the management 5 percent is what we're going to achieve with this company. And now we're coming back and saying, oh, just kidding, this is -- it could be useless, it could be maybe useful.**

**So he was -- he felt -- felt uncomfortable changing direction.**

***Q.*** He might have been worried about losing some face?

***A.*** **I mean, that's -- I think that's what he meant by credibility, yeah.**

***MR. PILCHAK:*** Okay. Let's take that down. Just the zoom, please, and then let's take the middle message from Mr. Terzioglu.

***BY MR. PILCHAK:***

***Q.*** Do you agree to an in-depth review here in this email?

***A.*** **Yeah.**

***Q.*** And I should have been clear, if I didn't already say it. The last message that we were looking at was October 21st of 2015. And I think you said relatively close to the deal closing; right?

***A.*** **That's correct.**

***Q.*** This is like three and a half months before that; is that true?

***A.*** **Yeah, this is in July.**

***Q.*** So at this time, the diligence is still ongoing in some respect?

**A. That's correct.**

Q. And then you say in that second box there, "The latest development is that improved CPR does not leave much margin left to claim."

What does that mean?

**A. So -- let me read this carefully.**

**Yeah. So the assessment that was done by our colleagues, the original assessment that was done by our colleagues before I got involved is still valid.**

Q. Mm-hmm.

**A. What was not accounted for was the reference point, which Qualcomm -- Qualcomm's technology would improve as well. And the way to look at that is Abreezio TruSens technology used embedded circuits as a sensor. So this is like as good as you can get mimicking the circuits because you're using the actual circuits.**

**CPR would use separate models or sensor kit that would try to model the actual circuits, and we had discovered that there were -- there were gaps in this -- in this replica circuits or models that would lead to systematic offsets.**

**And around this time, maybe a little bit before this time frame, we came up with ideas to make the replica or the models of the circuits look a lot more like the circuits. We were able to decompose a lot of the miscorrelation and model them in the replica circuits so we were able to actually make replicas that**

**looked more similar to the actual.**

**So based on all this, what I was telling Ziad here is once we got rid of the major known mismatches, you can use the exact circuit, but it's not going to be -- the similarity is so close with the models, with the replica circuits, it's not going to get any better, or the difference is shrinking.**

***Q.*** Okay. So to return to my silly coffee cup example, because I'm not sure I understand 110 percent of what you said, are you saying the older existing coffee cup at Qualcomm was catching up to the newer better coffee cup from Abreezio?

***A.*** **Correct. We could achieve similar results with a different technology.**

***Q.*** Got it.

And the last sentence here talks about "The reference point has moved with the latest R&D effort we put on improving CPR."

What was an R&D effort?

***A.*** **That's the research and development effort that I referred to where we actually looked -- we took a very systematic look at the replica circuits and why we had these miscorrelations. And we were able to identify parameters that were not modeled and model them.**

***Q.*** Without asking about the technical details, I want to ask about the organizational part of that.

When you say "R&D," do you mean R&D like where Dr. Karim Arabi was working or just R&D that you were using?

**A. No, this is in my organization.**

***MR. PILCHAK:*** Let's take that down.

***THE COURT:*** Would now be a good time for a break?

***MR. PILCHAK:*** Can I do the top part first?

***THE COURT:*** No, that's fine.

***MR. PILCHAK:*** We'll do this quickly.

***BY MR. PILCHAK:***

***Q.*** Does Mr. Mansour respond to this email on top here?

**A. Yeah.**

***Q.*** And there, what is he saying in substance?

**A. He is saying that he is skeptical that we would improve.**

***Q.*** And so he is saying maybe he doesn't think this old coffee cup caught up quite as much as you did?

**A. He was skeptical about that, yeah.**

***Q.*** I'm sorry to keep going to the coffee cups. I hope that doesn't insult you.

**A. That's a good analogy.**

***Q.*** And then at the end he says, "If it's equal to CPR" -- that's Abreezio's product -- "and can provide better sensing for ten and beyond, then we need to figure out how to justify the price." Right?

**A. Yes.**

***Q.*** What did you understand him to mean when he said "We need to figure out how to justify the price"?

**A. So I'll try to explain this without getting too technical.**

What Ziad -- what Ziad was worried about was -- "10" here refers to the 10-nanometer technology that was coming up. It's a 10-nanometer technology that was coming up. And as you get smaller and smaller technology line widths, it becomes actually more and more difficult to model things.

And Ziad -- Ziad's implication here was, yeah, CPR improves maybe in the current technology, but as we progress in technology, because Abreezio uses the exact circuits instead of replicas, maybe our replica technology or improvements will not keep up.

*Q.* Ah.

*A.* So maybe you may be telling me in this technology the difference is less, but maybe in the future, 10 nanometers and beyond is what he is saying, maybe the -- excuse me -- maybe the value is there. He was trying to justify, you know, the value in the future is better although the data showed something else.

But he was -- my takeaway from this, and that was -- you know, Ziad was sort of a strategic thinker, that he was more worried about the long-term strategy than having a specific number right how. He was basically saying we can go with the numbers that we simulated today. We don't do the deal, maybe you'll be in trouble next year.

*Q.* Yeah. And so when he says "justify the price," is that the price of Abreezio?

*A.* I believe he is talking about this 5 percent and 2 and

**3 percent numbers. He is saying those numbers will come back maybe in advanced technologies.**

***MR. PILCHAK:*** Got it. I think we can stop there, your Honor. Thank you.

***THE COURT:*** Great. Let's take a 15-minute recess.

Ladies and gentlemen, you're reminded you're not to research anything about the case or talk about the case. And we'll see you back in 15 minutes.

And you are excused for 15 minutes as well. Thank you, sir.

***(Jury out at 2:16 p.m.)***

***THE COURT:*** And if could you pull that door shut, that would be great. Thank you.

We're now outside the presence of the jury.

Any issues we need to take up?

***MR. PILCHAK:*** No, your Honor.

***THE COURT:*** Okay. Fifteen minutes.

***MR. PILCHAK:*** Thank you.

***THE COURT:*** Thank you.

***(Recess taken.)***

***THE COURT:*** We are back on the record outside of the jury in the presence of Dr. Arabi.

***MR. PILCHAK:*** Thank you, your Honor. I think this is a quick one. The defense, and we thank them for this, handed us an exhibit in hard copy just now, but the version we received I

think was missing the attachment.

I think they intend to show the witness the one-year review preliminary results for Abreezio for the purpose of locking in the -- maybe I should let Ms. Roberts do this.

***MS. ROBERTS:*** This is a report that Mr. Terzioglu prepared one year after the anniversary of the product. And we're not intending to show it for the value that was saved but just to point out the fact that the TruSens power actually was showing the high end of the results for the -- on the voltage, the 48 milliwatts. And that was the number that Ziad Mansour had recommended that was included in the PowerPoint presentation.

So not to show the value, but just to show the fact that the product actually attained the results that had been anticipated. And it's a report that he prepared.

***THE COURT:*** And I don't know that you need to admit that to do that. If he doesn't remember the answer to the question, you can show it to him to refresh his recollection. If it's only for the limited purpose, then all the other stuff in there isn't relevant. I think you can ask him that. If he can't remember, you can show it to him so you can establish that.

***MS. ROBERTS:*** Okay. Thank you, your Honor.

***THE COURT:*** Okay. Let's go ahead and bring the jury in.

***(Jury in at 2:36 p.m.)***

***THE COURT:*** Okay. We are back on the record. All jurors are present. The lawyers are present. Dr. Arabi is present.

And you, sir, are reminded you're still under oath to tell the truth.

Mr. Pilchak?

***MR. PILCHAK:*** Thank you, your Honor.

***BY MR. PILCHAK:***

***Q.*** Mr. Terzioglu, before the break, we were talking a little bit about the performance numbers for Abreezio's products; right?

***A.*** **Yes.**

***Q.*** I want to put those to the side for the moment and ask you about patents.

Are you familiar with patents in general?

***A.*** **Yes.**

***Q.*** Well, are you a lawyer yourself?

***A.*** **I am not a lawyer, no. I'm an engineer.**

***Q.*** But as an engineer you have some familiarity with patents?

***A.*** **I do, yeah.**

***Q.*** Do you know whether Abreezio had some patent applications pending at the time that it was marketing itself to Qualcomm?

***A.*** **I don't have a recollection of that. Although my assumption was that they did.**

*Q.* Why do you assume that?
**A. Startups usually have intellectual property.**
*Q.* Where startups have intellectual property, is that often an important part of what Qualcomm is buying when it acquires them?
**A. That's correct.**
*Q.* Why do you say that?
**A. The intellectual value is either their trade secrets or how they do things, or ideas protected by patents. And I have -- I had not looked at specifically their patent applications, but it was discussed that they had intellectual property.**
*Q.* It was discussed Inside Qualcomm?
**A. It was discussed in the reviews.**
*Q.* Okay. Did anybody at the reviews ever say we think some of these patents are garbage?
**A. I don't recall.**
*Q.* Did they ever say we think some of these patents are nothing more than prior art?
**A. Yeah, I don't remember specifically an assessment. There may have been emails going back and forth, but I don't --**
*Q.* Do you know what prior art is?
**A. Prior art just means somebody invented it before you, before you filed the patent, so your patent is not new.**
*Q.* Out of luck.
**A. Yeah.**
*Q.* Okay. Did you have an opinion on whether Abreezio's

technology was prior art or not?

**A. No.**

*Q.* No, it wasn't or no, you didn't have an opinion?

**A. I did not have an opinion. And we were told by the -- in general, the engineers who work on technology development are discouraged from looking at patents.**

*Q.* Okay. If Dr. Arabi had been involved in developing Abreezio's technology, what should he have done in your view?

**A. File patents.**

*Q.* Do you hold any patents yourself, by which I mean is your name on any patents?

**A. Yes. I'm -- yes, I have patents under my name, yes.**

*Q.* As in you are listed as an inventor or coinventor for those patents?

**A. Correct.**

*Q.* How many patents, would you say?

**A. Probably over 200.**

*Q.* Okay. And do you own the rights to the inventions in those patents?

**A. None of them.**

*Q.* Why not?

**A. Because I was employed at various different companies, and they have the rights. Although I am the inventor, the company has the intellectual rights to it.**

*Q.* Is that by virtue of one of those agreements that you were

talking about earlier that you sign at the beginning of your job?

***A.*** **Correct.**

***Q.*** And by the way, was that just Qualcomm where you invented those things?

***A.*** **No. Throughout my career, every company I worked for, I have patents, except Apple.**

***Q.*** Okay. And when you said a moment ago that if Dr. Arabi had been involved in creating or developing Abreezio's technology, he should have filed a patent, what did you mean by that?

***A.*** **So if he was employed at Qualcomm and you have an idea, you file a patent, and Qualcomm has the right.**

***Q.*** Did Qualcomm eventually acquire Abreezio?

***A.*** **They did.**

***Q.*** And after the acquisition, did you ever hear of any concerns about Abreezio?

***A.*** **Yes.**

***MS. ROBERTS:*** Objection, your Honor. Preliminary rulings.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** Did anyone raise any concerns about Abreezio with you?

***A.*** **Yes.**

***Q.*** Who was that person?

***A.*** **In a private conversation, one of my employees, Mohamed**

**Allam.**

*Q.* And what was the context for that conversation?

***A.*** **It was a -- it was a private conversation between the two of us. And he -- out of the blue, he just made a -- made a statement.**

*Q.* And when was that, if you remember?

***A.*** **This was after the deal closed. It was probably in 2016.**

*Q.* You're a little fuzzy on the date, though?

***A.*** **I am.**

*Q.* And what were the concerns that Mr. Allam raised to you?

***A.*** **He said something to the effect that Abreezio IP was conceived at Qualcomm.**

*Q.* Was that the first time that you'd heard anything like that?

***A.*** **Yeah.**

*Q.* Did he suggest anything about who at Qualcomm might have conceived it?

***A.*** **I don't remember if he mentioned a specific name.**

*Q.* What was your reaction to him saying that?

***A.*** **I was shocked, and I was angry as well.**

*Q.* Why were you shocked and angry?

***A.*** **Because the implication was really big. He didn't provide any evidence. And I was angry because put me in a position that would be potentially a no-win situation later, which I'm here today.**

*Q.* What do you mean by "no-win situation?"

*A.* Eventually when Qualcomm security called me and they raided Abreezio offices, I was faced with the decision to betray privacy of a conversation between an employee and a person that I valued. And I believe in doing the right thing and reporting a concern.

But it was a no-win because when he told me, my advice to him was to call the ethics line at Qualcomm and report it and give whatever evidence he had. And when Qualcomm security called me later, sometime later, to me, I had no choice but to tell them about this conversation because Mohamed may have filed an ethics report and may have even stated that he talked to me about it. So I was in a no win situation. I had to betray the privacy of the conversation.

*Q.* What is the ethics hotline at Qualcomm?

*A.* There's a number where you can call and report anonymously complaints about ethics violations. It can be a range of things. I've never called it myself, but people do.

*Q.* And why didn't you call it on this occasion?

*A.* He did not provide any evidence. And I didn't feel that personally I had enough reason to take action because I told him that he should do it. And I didn't ask what evidence he had. I didn't want to know at that point. It was -- I felt that it would be propagating potential rumors.

So if he had any evidence, then he would go and report it to the ethics line, and that's -- I felt that was the extent of my

**responsibility at the time, until, of course, Qualcomm security called me. And then I was faced with the consequence of that conversation as a -- as a big dilemma. And I still feel really, really badly about that, even today.**

***MR. PILCHAK:*** One moment, please, your Honor.

No further questions at this time.

***THE COURT:*** Cross-exam?

***CROSS-EXAMINATION***

***BY MS. ROBERTS:***

***Q.*** Hello, Mr. Terzioglu. How are you?

***A.*** **Hello.**

***Q.*** So my understanding is that Farsheed Mahmoudi was working on the Abreezio transaction underneath you when he worked on the low power elements of it?

***A.*** **Correct.**

***Q.*** And Saad Elhosni was evaluating the DFT --

***A.*** **Correct.**

***Q.*** -- aspects of the evaluation?

***A.*** **Correct.**

***Q.*** And you consider them both to be -- or you considered -- you deferred to Mr. Mahmoudi's judgment.

Do you think he knew what he was doing as far as evaluating --

***A.*** **He was an expert on --**

***Q. He was an expert on --***

***(Reporter interruption.)***

***THE COURT:*** What did you think of Mr. Mahmoudi? Did you trust his judgment?

***THE WITNESS:*** You're asking about Mahmoudi?

***BY MS. ROBERTS:***

***Q.*** Yeah, Mahmoudi.

***A.*** **I did. I trusted his judgment, and I respected him as a technical leader in the organization.**

***Q.*** Okay. And what about Saad Elhosni?

***A.*** **I knew him less well, but I also trusted his judgment on topics related to DFT.**

***Q.*** Okay. So Ziad Mansour was your head over the due diligence; correct?

***A.*** **Yes.**

***Q.*** Did you ever feel any pressure from Ziad to push the Abreezio deal through?

***A.*** **No. The -- I think the pressure was a -- an honest technical disagreement on how we evaluated it --**

***Q.*** Mm-hmm.

***A.*** **-- and whether CPR would improve as much as we projected. I think that was his objection. I did not feel any pressure to change the Abreezio evaluation itself because that always stayed constant. Even what was done before I was pulled in and what was done after I was pulled in, that stayed constant. What**

**changed was the what we compared it to at Qualcomm.**

*Q.* So when you say the valuation always stayed constant, you're talking about the assessed valuation of the two sides of it, so the DFT?

*A.* **I'm talking about D -- well, DFT was always -- I think it was clear. I don't think we had any technical debates on that.**

**When I say Abreezio evaluation remained constant is the TruSens technology, the AVS technology, the assessment, the absolute assessment of that technology remained constant throughout this process. What changed was what we compared it to at Qualcomm.**

*Q.* Right.

So you were comparing it to CPR and improved CPR?

*A.* **That's correct.**

***MS. ROBERTS:*** Okay. So I'm going to pull up Exhibit 2845.

Has this been admitted?

***THE CLERK:*** No.

***BY MS. ROBERTS:***

*Q.* Mr. Terzioglu, have you seen this email before?

*A.* **Yeah.**

*Q.* Okay.

***MS. ROBERTS:*** Move to admit.

***THE COURT:*** Any objection?

***MR. PILCHAK:*** No, your Honor.

***THE COURT:*** 2845 may be admitted.

***(Exhibit 2845 admitted.)***

***BY MS. ROBERTS:***

***Q.*** Mr. Terzioglu, if you could scroll down to the bottom of the email, which is actually on the second --

***MS. ROBERTS:*** Leah, can you scroll down to the second part? And go back one more page. Oh, okay.

Go back to the first part of the email.

***MS. THOMPSON:*** I'm sorry?

***MS. ROBERTS:*** Do we have that first part from Hiten? There.

***BY MS. ROBERTS:***

***Q.*** So the first part of this email is from -- okay.

So look at the top part of this email. It's sent on July 30th, 2015. And it's from Hiten Somwal.

***A.*** **June 30th.**

***Q.*** I'm sorry, June 30th, 2015.

***A.*** **Okay.**

***Q.*** And it's from Hiten?

***A.*** **Yeah.**

***Q.*** And it's to -- to Mahmoudi, Mansour, Bhargava, Jim Wilmore, Saad Elhosni, Duane Nelles. And it's scheduling a meeting to discuss the presentation.

Do you remember that?

***A.*** **Mm-hmm.**

*Q.* Now, are all these individuals, do you recall if they were involved in the due diligence of Abreezio?
**A. Largely. Some of them are there for exposure and because of their positions in the company. But there are people, a mix of technical team, and it looks like business team as well.**
*Q.* Okay. And Hiten Somwal was on the business team?
**A. Hiten was -- yeah, it was business.**
*Q.* Do you recall if he kind of was in charge of the -- the valuation model?
**A. I think he was in charge of the deal model, yeah.**
*Q.* Okay. So he would with work with the engineers, the DFT engineers and the low power to assess what the technology was and then Hiten would assign a valuation to what the tech was worth?
**A. Honestly, I'm not quite sure how they came up with the numbers. It was a combination of technology in terms of how much silicon we're going to save but also strategic value. So it wasn't just like physical dollars saved. It was also strategically how important this is.**
**So that value was generated as a combination of those inputs. Technical inputs came. Some of it at least came from my team and myself. Strategic input obviously came from Ziad, maybe Jim and others, and that's how they came up with the value.**
**But I did not have direct exposure to what the model --**

**exactly how much dollars it assigned to strategic, how much dollars it assigned to actual projected savings.**

***Q.*** What was your understanding of the strategic value of acquiring Abreezio for Qualcomm?

***A.*** **I think we discussed earlier the strategic value was they had a better -- at least on the AVS side. On the DFT side it was clear. On the AVS side it looked like they had a better way to model the circuits, how they would behave, and we call critical paths, how we would determine the behavior of the chip.**

**And those models were exactly the circuits themselves, so you would never have this issue of whether your replica circuits, the model circuits, would match the actual circuits or not. So that kind of eliminated that and that was a strategic value. Even if we assessed in a certain way in a specific technology, next time you migrate to a new one, things may change again. So there was a strategic value there.**

***Q.*** Since Qualcomm had CPR already, was it concerned about its competitors acquiring a technology that was similar to CPR?

***A.*** **Certainly, that was a concern that I had personally, and I discussed with my management, including Jim, that it was a -- there's -- one aspect of it was specific numbers that we were generating in the existing technology, but there was a strategic value as well.**

***Q.*** So your concern was that if a competitor like Apple or Intel got ahold of Abreezio's AVS technology, then they could catch

up, essentially, with Qualcomm?
**A. Yeah, yeah.**
*Q.* Do you think that was a motivating factor for why Qualcomm wanted to purchase Abreezio?
**A. You know, I don't know the specific reasons why they went through with the acquisition. We provided our input. There were strategic discussions as well.**
*Q.* Mm-hmm.
**A. A combination of those drove the decision.**
*Q.* Could we go back to this email.
So Mr. -- if you look, again, at the initial part of the email from Hiten, Kevork Kechichian is on that thread.
**A. Yes.**
*Q.* Do you recall now whether he was part of the diligence team?
**A. So Kevork was in charge of the organization that actually delivered the chip design. So he was like doing integration of the final chip. So he had a clear interest in being in the loop because ultimately it would get integrated on, quote/unquote, his chip.**
*Q.* Okay.
**A. So he was included. I don't recall him being involved in the technical aspect of the evaluation before this.**
**Also, summer of 2015 or fall of 2015, I recall an organizational change where Kevork and I started to report to Jim, and Ziad was moved to do something else. So he may have**

**been, again, in a position that he was responsible for part of what Ziad was doing. So he had to be --**

*Q.* So he didn't work for Mike Campbell's group?

***A.* No.**

*Q.* Okay. Do you remember if Mike Campbell's group was involved in evaluating the Abreezio technology?

***A.* They may have been involved in DFT because ultimately they would run -- they're the test organization, for product tests. So they would, you know, run the tests and identify defective parts and so forth. I don't recall specifically who from Mike Campbell's organization, but it looks like Jim -- Jim Wilmore may have been from his org.**

*Q.* Okay. Excuse me.

What about Bhargava? Is he also --

***A.* I don't remember.**

*Q.* If you go up to this latter part of this email on July 5th, they send you an initial -- Hiten serves on the -- it says July 5th. Go back one more.

So it sends a -- he circulates an early draft of the Windansea deck; right?

Do you recall that this was a deck that the team was preparing to present to the executives roughly in July?

***A.* Correct.**

*Q.* Okay. Did you -- did you remember -- do you recall reviewing that deck?

**A. I don't recall reviewing it. But I probably did.**

Q. Okay. Do you recall having any input in the slides on that deck?

**A. My recollection is at least the technical input on that -- on that deck was different than what we had recommended.**

Q. Okay. So if you scroll up to the later part of the conversation.

So the chain -- it starts off with Hiten and the team. And then you ask to change to margin savings on the slide. And then the communication between you and Farsheed breaks out, and then you and Farsheed have a separate conversation about the difference between the CPR.

**A. Correct.**

Q. Right?

Do you recall this conversation?

**A. Yeah. So I was -- I was pushing to update the numbers in the deck because I believed that the CPR would improve and the -- and the difference would shrink. And I wanted that to be intellected accurately when they presented it to Jim.**

Q. Okay. And so -- so Farsheed was suggesting between 25 and 30 millivolts? He thought that was in the range?

**A. Yeah. I think -- yeah. It's 25 to 30. In the end we ended up with 10 to 40, is what I recall.**

Q. Okay. And you were -- you agreed with that assessment, the 10 to 40 millivolts?

***A.*** **Ten to 40 was what I felt comfortable with at the time, yeah.**

***Q.*** Okay. And so the ten -- 10 was on the low end, and, like, 40 was on the high end?

***A.*** **Correct.**

***Q.*** And 40 was also where kind of Ziad Mansour was?

***A.*** **That's correct, yeah.**

***MS. ROBERTS:*** Okay. Can you pull up exhibit -- Government's Exhibit 600.

This has been admitted, hasn't it?

***MS. THOMPSON:*** No.

***MS. ROBERTS:*** 600's been admitted?

***THE CLERK:*** No.

***THE COURT:*** 600 has not yet been admitted.

***BY MS. ROBERTS:***

***Q.*** Have you seen this document before?

***A.*** **Yeah.**

***Q.*** Yeah?

***MS. ROBERTS:*** Move to admit.

***THE COURT:*** Any objection?

***MR. PILCHAK:*** How many pages is it, please?

***MS. ROBERTS:*** This is a short one.

***MR. PILCHAK:*** No objection.

***MS. ROBERTS:*** Okay.

***THE COURT:*** Okay. It may be admitted.

***(Exhibit 600 admitted.)***

***BY MS. ROBERTS:***

***Q.*** So Mr. Terzioglu, this is a PowerPoint on the Windansea acquisition, which is Abreezio, from August 14th, 2015 --

***A.*** **Right.**

***Q.*** -- correct?

If you go to the slide -- second slide, and if you look at the first bullet point, it says "Abreezio's TruSens and TruTest technologies enable improvements in PPA and significant digital test savings. Less upfront investments and other options can be integrated in less than six months."

So one of the benefits of the technology is that it could come up pretty quickly on to Qualcomm's product line?

***A.*** **Correct.**

***Q.*** Is that consistent with your recollection?

***A.*** **Yeah.**

***Q.*** Okay. And then you see the second one. It says "The key value drivers for the technology is an estimated two to three die area savings."

So that was within the range that you thought it should be; correct?

***A.*** **No, these are the numbers that I was objecting to.**

***Q.*** But the 18 percent power savings would have been within the ten to 40 percent range.

***A.*** **These numbers were off from my projection at the time. And**

**this led to my private conversation after with Jim and Ziad that was presented earlier.**

*Q.* Okay. If you go down to the third point, it says "Not acquiring the technology would result in a loss of competitive advantage for Qualcomm products."

And then it reads "TruSens' ability to significantly improve correlation to critical path potentially allows a competitor to match and exceed Qualcomm's internal efforts."

Do you recall that?

***A.* Yeah.**

*Q.* That's consistent with the idea that if -- if Abreezio is acquired by a competitor, they could catch up into what Qualcomm's current competitive advantage was.

***A.* That's correct. This is the strategic value that I was talking about earlier, and discussed internally as well at Qualcomm at the time.**

*Q.* Okay. Then good you go down to the lower point, it says "Seeking approval of initial offer up to 125 million and ability to negotiate up to 200 million."

Do you recall that was discussed with the team?

***A.* I actually don't remember these numbers. But it may have been.**

*Q.* Okay. And then you see right down below it says potential value is a higher range. It's a between 260 million and 360 million. So the offer price of around, you know, between 125

and 200 million seems to be considerably less for what they saw the value was, even if the numbers were a bit off on the dye savings.

Would you agree?

***A.*** **That -- that's -- typically the price that they would want to pay would be less than the perceived value to the company, so there was value add to the acquired company. So this is consistent, yes.**

***Q.*** Okay. If you go to the next slide, it says -- if you look at the first paragraph, it says "Company: Abreezio Technologies. Company has signed a DA to merge with Invionics, which will allow the team to join Abreezio."

Were you familiar with the company Invionics?

***A.*** **I'm not familiar with them, no.**

***Q.*** Do you know Brad Quinton?

***A.*** **I do know Brad, yes.**

***Q.*** And Andrew Hughes?

***A.*** **I don't remember Andrew, actually, but I remember Brad. He ended up reporting into my org.**

***Q.*** Do you recall if as part of the -- the Abreezio acquisition that Qualcomm designated certain individuals as key employees?

***A.*** **Correct.**

***Q.*** And do you remember who those key employees were?

***A.*** **I don't remember the exact list. But Brad was one of them.**

***Q.*** Brad.

Do you think there were other engineers that worked with Brad?
**A. There probably were. I just don't remember the list.**
*Q.* Do you recall if they were up in Canada?
**A. Yes, they were from Canada.**
*Q.* And did Qualcomm open like a whole new division for those employees?
**A. Correct. We opened an office for them, or took over whatever their existing facilities and we had an office up there, yeah.**
*Q.* Okay. So after the -- okay. Sorry. I'll slow down.
If we go back, if you look at the third bullet point here, it says "There's a standalone business plan model based on IP licensing model."
Did you understand that Abreezio also had a model where it would just be an independent company and just license its technology?
**A. That's what that means, yes.**
*Q.* Okay. So it didn't just have to sell its tech to a company like Apple or Qualcomm. It could be a standalone company.
**A. Yes. They were -- it appears that they were planning on licensing this technology to anybody who wanted it and make money from licensing fees and royalties.**
*Q.* And then it says the patents -- it said "Filed ten provisional patent applications."

Is a provisional patent application like an application for an actual patent, or is it just a placeholder?

**A. Provisional is like a reservation.**

*Q.* Right.

**A. You claim your date, priority date, and then you have the right to sort of -- when you file the actual application, there are some laws that you can modify some of the information in there. So typically when you come up with an idea, you file a provisional first to claim the date, and then you can come back with the actual patent application later.**

**So at this point in time it looked like Abreezio was a relatively young company, so they didn't get around to or maybe they didn't have the money, I don't know, but they didn't get around to filing actual patents. They had provisionals sitting at placeholders.**

*Q.* Okay. So it's not an actual application for a patent for protection from the PTO?

**A. That's correct. And you could even withdraw. That's what it says.**

*Q.* Okay. Do you know if Qualcomm had reviewed Abreezio's patents, patent applications, the provisional patent applications, during due diligence?

**A. My working assumption is they did. But the engineers were discouraged from looking at other companies' patents so that there was no contamination.**

*Q.* Okay. So within another division of Qualcomm --
***A.*** **That's correct.**
*Q.* -- but you don't know if it actually happened?
***A.*** **I don't know. I don't know. My team probably -- myself or engineering team that especially worked on internal CPR, I wouldn't have wanted them to look at any patents like that.**
*Q.* Okay. Do you know if Abreezio had software, the tool, TruTest or DFTBreez?
***A.*** **They did, but I just haven't -- I didn't see it. But there was some tooling software that went along with their technology.**
*Q.* Okay. And software is -- it's built on source code; is that correct?
***A.*** **Correct.**
*Q.* All right. And as an engineer, you're familiar with source code?
***A.*** **Yeah.**
*Q.* And source code for software would -- would basically indicate who designed it or invented it?
***A.*** **So source code is typically -- nowadays with A.I. maybe different. But typically it's written by a person, and it's understandable by a person, and it has comments and so on in it. So it is readable.**
**And there is a tool that converts that to -- a compiler tool that converts to machine language, and then a person wouldn't be able to really understand the machine language.**

*Q.* But if you looked at the source code, you'd be able to determine who entered the certain commits at what particular time?

***A.*** **Typically, the development environments in software keep track of that. But it really depends on how the source code was developed.**

*Q.* Okay. But the authors for the source code, they're essentially assigned a user address, and so if a certain engineer made like an adjustment to the source code or wrote the code, then it would be reflective of his or her name?

***A.*** **If they use a tool like Git or something that keeps track of the versions and controls the environment, yes.**

*Q.* Mm-hmm.

***A.*** **But at startups, you know, it really depends on how they develop their -- develop their source code. If they use the version control environment, yes.**

*Q.* Okay. And are you -- do you know if Abreezio's source code was evaluated by Qualcomm during the due diligence?

***A.*** **I don't know.**

*Q.* Okay. Would it have been another team?

***A.*** **I don't know that we evaluated it.**

*Q.* So after the Abreezio transaction closed, did Brad Quinton and his team come to work for you?

***A.*** **They did.**

*Q.* What did you think of Brad?

***A.*** **Brad was a great engineer. He -- very knowledgeable. And I put him in charge of integrating Abreezio technology, working with the corresponding Qualcomm teams to integrate the Abreezio technology into Qualcomm products as quickly as possible.**

***Q.*** Okay. You're talking about the DFT Abreezio product?

***A.*** **Both.**

***Q.*** Both?

***A.*** **Yes.**

***Q.*** So both the DFTBreez and the TruSens?

***A.*** **Correct.**

***Q.*** And so Brad worked on both of those components?

***A.*** **Brad was the -- our point of contact for both of those.**

***Q.*** Okay. And did Brad's team -- do you recall whether he had a team that worked with him?

***A.*** **He had a small team.**

***Q.*** How many employees would you say?

***A.*** **It was single digits. Just maybe close to ten. I don't remember exactly. But mostly they were in Canada.**

***Q.*** Okay.

***A.*** **One or two may have been in another location. I don't recall.**

**But Brad had a small team.**

***Q.*** Okay. And then approximately how long after the Abreezio was purchased do you think the DFT product was in operation on Qualcomm's products?

***MR. PILCHAK:*** Objection. 403.

***THE COURT:*** Overruled.

***THE WITNESS:*** This is fuzzy. It was a while ago. But it was quick.

***MS. ROBERTS:*** Mm-hmm.

***THE WITNESS:*** I remember when we did the year anniversary, which we do assessment of evaluating the value of the company that we acquired, we did that for Rapid Bridge and others as well. By that time I believe we had some sort of either test or some product test to look in on both DFT and AVS.

***BY MS. ROBERTS:***

***Q.*** So within a year of acquiring the technology, you had successfully deployed both products?

***A.*** **We had silicon. I just don't remember whether they were intended for immediate production or they were sort of phased before we included them in the -- in production silicon. Unfortunately, shortly after the first-year anniversary, I ended up leaving Qualcomm.**

***Q.*** Okay. Do you recall -- in your -- you said you did a year -- a one-year anniversary report.

Do you recall whether you reported that the TruSens was within the perimeters of 10 to 40 millivolts perimeters? Do you recall whether or not it was actually hitting that mark?

***A.*** **Yeah, it was in that window.**

***Q.*** Okay.

***A.*** **Again, this is a complex technical topic. So we were looking at the same silicon, and there were differing opinions how much voltage we were -- savings we were seeing. At the time, I recall we were seeing somewhere in that range, ten to 40, maybe in the middle of that range.**
***Q.*** Right.
***A.*** **But there were claims that it was at the lower end of that range, and there were claims that it was at the higher end of that range, and that was a raging technical debate. That's my recollection.**
***Q.*** So but it was in the range, and so it was basically meeting the expectations that it had through its initial assessment?
***A.*** **Yeah. So the -- the one-year -- at the one-year anniversary, I felt that the technology was successful in terms of being integrated into Qualcomm ecosystem.**
**Beyond that, what happened with it, I don't know. I left. Whether they continued to improve and deploy the technology or maybe they assigned other priorities, I wouldn't know what happened after that.**
***Q.*** Okay. In sometime in 2017, did you learn that Qualcomm was conducting an internal investigation into Abreezio?
***A.*** **Correct.**
***Q.*** How did you first hear about it?
***A.*** **I -- so I was completely kept out of the -- I was in the dark about it, and I received a phone call from Brad --**

*Q.* Mm-hmm.
***A.*** **-- who was panicking. It was a -- I don't know. It was like a morning. And he said Qualcomm security is raiding our offices. What is going on? I didn't know what was going on.**
**So I called Jim, who was my supervisor at the time. Jim Thompson. And he said there's an investigation into Abreezio. He didn't specify what. And he said please cooperate.**
*Q.* Okay. Do you recall -- how did you feel about the fact that Brad was upset? Were you concerned that he might leave the company?
***A.*** **Yeah. I was -- he was spooked. I -- I was worried about him. I mean, just personally, I knew him. He was panicking, so I was concerned about his personal well-being. But also, he -- he was an employee that I valued highly.**
*Q.* Mm-hmm.
***A.*** **And I didn't want to lose him.**
*Q.* Right.
So if he were to leave or if the Invionics team were to leave, that would have been a severe detriment to Qualcomm?
***A.*** **I think the chances of the acquisition not being successful would be a lot higher if they left, yeah.**
*Q.* Okay. Were you interviewed by Qualcomm's attorneys at a later point?
***A.*** **I don't recall being interviewed by attorneys. I thought I had a phone call with Qualcomm security.**

**Q.** Okay.

***MS. ROBERTS:*** I think that's all I have, your Honor.

***THE COURT:*** Okay. Anything further?

***MR. PILCHAK:*** Yes, your Honor. Thank you.

***REDIRECT EXAMINATION***

***BY MR. PILCHAK:***

***Q.*** Mr. Terzioglu, just a few more questions.

First, you were talking about Farsheed on cross-examination just now. I think you said you respected Mr. Mahmoudi. Is that right?

***A.*** **Correct.**

***Q.*** Did you feel that his background made him a perfect fit to do the evaluation of Abreezio?

***A.*** **Not a perfect fit, no.**

***Q.*** Why do you say that?

***A.*** **So his background was more power, power delivery and analog digital -- excuse me -- analog RF circuits. Abreezio TruSens required a specific -- more specific technical expertise or exposure that he didn't have directly.**

**However, I had a dilemma because I didn't want to put the internal R&D team on evaluating a startup's technology that we may end up not acquiring and then getting into trouble with contamination.**

***Q.*** Okay. What do you mean "contamination"?

**A. So invariably that engineer would be exposed to their technology, and then he would have to continue working on the internal development and he may get inspired by what he saw. So that -- I didn't want that to happen. A similar reason why we don't have the engineers look at patents.**

*Q.* If that happened, then Qualcomm could get sued?

**A. Absolutely.**

*Q.* And that could be a problem?

**A. I think so, yeah.**

*Q.* And so you're saying someone with a slightly different background than Mr. Mahmoudi might have been a better fit for the Abreezio diligence?

**A. If I had a free choice, I would have picked somebody else, yeah.**

*Q.* When you say if you had a free choice, who picked Mr. Mahmoudi initially to look at Abreezio?

**A. I actually don't know. He was already there when Ziad contacted me to take a look at the evaluation.**

*Q.* So Ziad brought you in?

**A. Yes.**

*Q.* And Farsheed was already there?

**A. Correct.**

*Q.* Okay. You were asked some questions on cross about whether Qualcomm, or I guess you too, were concerned about the competition acquiring Abreezio.

Do you remember that?
*A.* **Yes.**
*Q.* And then I had my silly coffee cup analogy about the coffee cups racing to the front of the podium. And you said on direct examination one of the most important questions for diligence was the gap between the coffee cups; right?
*A.* **Mm-hmm.**
*Q.* How much better the performance of this new product was than the product that Qualcomm was continuously improving that it already had.
*A.* **Mm-hmm.**
*Q.* I want to ask you about this older coffee cup that Qualcomm already had.
*A.* **Mm-hmm.**
*Q.* The performance numbers for that product, meaning how close to the front of the podium it was, did Qualcomm publicize those numbers?
*A.* **Publicize them to whom?**
*Q.* To the world.
*A.* **No.**
*Q.* Did they publish them in a trade journal or an academic journal?
*A.* **Not to my knowledge.**
*Q.* Did they tell the competition in this brutally competitive industry here's how well our coffee cup is doing right now?

**A. No.**

*Q.* You're shaking your head.

**A. Sorry, no. You would see that in a product.**

*Q.* Okay.

**A. They don't -- typically, you don't want to spill your trade secrets. Sometimes companies do publications, but not things that would be at forefront of, you know, their product differentiation.**

*Q.* Let me ask a different question.

Abreezio coming in and trying to sell Qualcomm this newer coffee cup, would it help them in pitching their coffee cup to Qualcomm to know where the old one is positioned?

**A. Absolutely, yes.**

*Q.* So if they knew the performance numbers for this existing technology, they would know kind of what bar their product would have to clear?

**A. That's correct, yes.**

*Q.* Okay. I think you said one of the values to Abreezio's product was that it could be integrated quickly with Qualcomm's stuff; right?

**A. Yes.**

*Q.* I mean, this might be obvious, but what do you mean by that?

**A. So on the DFT side it was largely a tooling and digital methodology topic, which usually is quicker. You can integrate it into your products a lot faster than something that requires**

**a test chip, and looking at the test chip is also maybe revising your design.**

***Q.*** And was part of the reason that it could be integrated quickly was because it was a good fit with Qualcomm's existing technology?

***A.*** **For DFT, yes. For AVS, because we already had CPR, what that means is on your chip, silicon chip, you have all the plumbing to look at the sensors, read out the data, and then take some action. So all those piping and plumbing was already in place on the chip.**

***Q.*** Okay.

***A.*** **All we had to do was-- I mean, I don't want to make it sound like trivial, but what we needed to do was replace the existing sensors with these better sensors, and the rest of the system including tooling and integration was there. And that was part of the reason why this was integrated quickly.**

***Q.*** Got it.

***A.*** **Because we spent the time doing the work for CPR.**

***MR. PILCHAK:*** Okay. Can we show the witness Exhibit 600, which was just admitted in evidence.

Oh, I blew it again.

***BY MR. PILCHAK:***

***Q.*** This is that slide deck you were testifying about; right? Do you remember that, Mr. Terzioglu?

***A.*** **Yes.**

***Q.*** Okay. And one of the things I think you said on cross was that the numbers in the slide deck were not quite right in your view, and they led to a conversation that you had with somebody.
Do you remember that?
***A.*** **Yes.**
***Q.*** What did you mean by that?
***A.*** **So I believe it was Slide 2.**
***Q.*** Can we look at Slide 2, please. Some people think it's 3. Let's look at 2 first. No, it's definitely 3.
This one.?
***A.*** **Yeah. So I disagreed with the second pager bullet, "Key value drivers for target's technology."**
***Q.*** Okay. And without diving head first into the weeds on that again, what conversation did this spark?
***A.*** **So when I saw these numbers, it was clear that the CPR -- next gen CPR implements were not -- although it was stated as such in this bullet, or sub-bullet, it was not reflected in the numbers.**
***Q.*** So you thought these numbers were too rosy?
***A.*** **Yeah.**
***Q.*** Okay. Let's look at page 4.
This has some facts describing Abreezio; right?
***A.*** **Yeah.**
***Q.*** Do you have any idea where these facts came from?
***A.*** **I don't know.**

***Q.*** If you don't know firsthand, would it be your expectation they would have come from the Abreezio guys?
***A.*** **Yeah. It was interaction between Abreezio business and management team and our corporate, would be my assumption.**
***Q.*** Okay. If we focus on the first cluster of bullets there, it looks like it makes a pretty detailed effort to run down the roster of Abreezio; right?
***A.*** **Mm-hmm.**
***Q.*** Do any of those bullets say that one of the people working with Abreezio is a current vice president of research and development at Qualcomm?
***A.*** **No, I was not aware of that.**
***Q.*** Okay. And so according to this slide, it hadn't come up so far when Abreezio was talking to Qualcomm?
***A.*** **No.**
***MS. ROBERTS:*** That assumes facts not in evidence.
***THE COURT:*** Overruled.
***BY MR. PILCHAK:***
***Q.*** The middle cluster of bullets there talks about investments; right?
***A.*** **Yeah.**
***Q.*** Do you see where it says $1.7 million Angel funded?
***A.*** **Yes.**
***Q.*** Does the bullet go on to say that that angel was in part Akbar Shokouhi?

***MS. ROBERTS:*** Objection.

***THE WITNESS:*** No.

***MS. ROBERTS:*** Assumes facts not in evidence.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** And then finally you were asked some questions about the patents that are referenced in that last little bullet at the bottom; right?

***A.*** **Mm-hmm.**

***Q.*** Does it say that two of those provisional patent applications were filed by the sister of a vice president of research and development at Qualcomm?

***A.*** **No.**

***MR. PILCHAK:*** All right. We can take that down.

***BY MR. PILCHAK:***

***Q.*** You were asked some questions about source code on cross-examination; right?

***A.*** **Yeah.**

***Q.*** And it seems like you have some understanding of what source code is; right?

***A.*** **Yeah.**

***Q.*** That makes one of us.

But you mentioned something about a record of who is keying in the code; is that right?

***A.*** **Yeah.**

*Q.* And you said maybe not all systems create those kind of records?

***A.*** **It really depends on how the source code is developed in a multi-development -- developer environment. You don't want people clobbering each other's efforts. So there are strict -- there are tools that strictly control versions and who made what change, and it's kept. And then if somebody actually clobbers your inputs, you can go back. You can go back one version, two versions, whatever.**

**So but not all -- modern software development follows that flow. And there are many, many of those, GitHub, many tools that would allow you to do that.**

*Q.* So it's certainly possible that a tool would record that information?

***A.*** **It would record it when you're doing proper software development. But I have seen developments where they don't use those sorts of tools or they don't use them properly, and, you know, information is lost, which is not good.**

*Q.* So it's very possible, but it's not guaranteed?

***A.*** **That's how I would say it, yeah.**

*Q.* Okay. Let me ask a different question. If we put the source code to one side -- sorry.

If we put the tool that you use to create the source code to one side, I want to ask you a conceptual question about source code.

In your experience with source code, if someone's creating software to implement an invention, is the person who keys in the source code in the software development tool always the same person as the one who had the idea that's being implemented?

***A.*** **Not always.**

***Q.*** Sometimes it's different people?

***A.*** **Yeah, a lot of the times it's multiple people.**

***Q.*** Okay. You were also asked about what happened with the products from Abreezio after the acquisition.

***A.*** **(***Nods head.)*

***Q.*** Do you know if Abreezio's AVS product went into production?

***A.*** **I don't know.**

***Q.*** Like was it put on billions and billions of chips that Qualcomm made?

***A.*** **So my experience goes to about a year or so after they were acquired. We had some silicon that showed the promise of the technology. Then I left, and whoever got in charge, I don't know what priority calls they made. My assessment was that it was a good technology.**

***Q.*** And when you say some silicon was made, I wasn't sure if you were saying millions of chips that went in actual cell phones.

***A.*** **No, just maybe a few just to demonstrate.**

***Q.*** Okay. The last thing I wanted to ask you about is you used a colorful word on cross-examination. You said in 2017 when Brad Quinton reached out to you, he was panicking; right?

**A. Yeah.**
*Q.* Because his offices had been searched by Qualcomm corporate security?
**A. Correct.**
*Q.* What do you mean panicking?
**A. I mean, the tone in his voice when he called me, it was -- that's the only way to describe it. He was panicking. And I would -- you know, anyone would panic if security showed up and they said step aside we need to take over the office.**
*Q.* Okay.
**A. I was shocked.**
*Q.* Because at that time you didn't know anything about any connection between Abreezio and anyone at Qualcomm before it was purchased?
**A. No idea.**
***MR. PILCHAK:*** One moment, please, your Honor.
No further questions.
***THE COURT:*** May this witness be excused?
***MS. ROBERTS:*** Just a few -- brief cross.

***RECROSS-EXAMINATION***

***BY MS. ROBERTS:***
*Q.* So you were asked about the CPR internal numbers.
Those numbers, they're published internally with Qualcomm; is that right?

*A.* **Yes.**

*Q.* Okay. So it's not just one group that would have access to it?

*A.* **It would be a small group of people who would know that technically. But I don't think there was any mechanisms in place to contain that kind of information.**

*Q.* Okay. And those numbers change over time. They're pretty fluid. It's not like they're static.

So when you talk about CPR, improved CPR, improved-improved CPR, it's a constant state of flux, too, right, it's not just a set standard?

*A.* **Yeah. I would say it would get updated every year or so, maybe two years. It was just depending on the technology. And even between chips, the numbers varied slightly. Even within the same chip, depending on which block you were looking at, whether it was a general computer or graphics or modem, it would fluctuate.**

*Q.* Mm-hmm.

*A.* **But, you know, key people who were in the design and productization would have access to those numbers.**

*Q.* Okay. Is it possible to disable CPR in a Qualcomm product and you can measure the specification, sort of like reverse engineer the CPR?

*A.* **You know, that's a good question. I don't know. We would fuse -- a lot of the times we would fuse the voltages because**

**you could have a hacker trying to attack by varying the voltage or whatever. That's actually a serious concern.**

**So I don't have direct information how we locked up the chips on the products. So I don't know whether you could, you know, disable it or not. That, I don't have that specific information.**

***Q.*** Okay. And going back to the source code. You need a Git tool, right, to create the source code?

***A.*** **Any kind of version control environment, yeah.**

***Q.*** Okay. And within the Git tool, you would be able to see who the contributors are who edit the source code?

***A.*** **Typically, that's the case. At least the usernames, yeah.**

***Q.*** And you'd also be able to see which ideas are implemented in the software to the extent there's like different concepts, like programming for sensors?

***A.*** **It would be more difficult to discern who wrote what concept. It would be multiple engineers. It depends. I don't want to -- I don't know the specifics of how it was developed. Typically, you would have one engineer implement one block, but sometimes you could have collaboration.**

***Q.*** Mm-hmm.

***A.*** **I don't know the specifics with Abreezio, so I don't want to comment.**

***Q.*** Okay.

***MS. ROBERTS:*** Okay. No further questions, your Honor.

***THE COURT:*** May this witness be excused?

***MR. PILCHAK:*** Yes, your Honor.

***THE COURT:*** Thank you, sir.

Government.

***MR. OLAH:*** Do we have time for another witness, to start one at least?

***THE COURT:*** Let start one.

***MR. OLAH:*** Great.

The United States calls Mr. Hiten Somwal.

***THE CLERK:*** Please stand here and raise your right hand.

***(Witness duly sworn.)***

***THE CLERK:*** Thank you. You may lower your hand. Please take the stand. Please state and spell your first and last name for the record.

***THE WITNESS:*** My first name is Hiten, that's H-i-t-e-n, and my last name is Somwal, S-o-m-w-a-l.

***THE COURT:*** Thank you.

Counsel.

***DIRECT EXAMINATION***

***BY MR. OLAH:***

***Q.*** Mr. Somwal, good afternoon.

Where do you work?

***A.*** **I work at Qualcomm.**

***Q.*** In what department do you work at Qualcomm?

**A. I work in corporate development team at Qualcomm.**
*Q.* How long have you worked in the corporate development team at Qualcomm?
**A. At the corporate development team, maybe a little bit over ten years.**
*Q.* Did you work in a different department before that?
**A. I did. I did. I used to work in the strategic finance team before that.**
*Q.* And in which department were you working back in 2015?
**A. In the corporate development team.**
*Q.* Okay. Where you are ten years later.
**A. Yes, where I am currently.**
*Q.* Got it.
Can you give this jury an overview of what the corporate development team does within Qualcomm?
**A. Sure.**
**The corporate development team at Qualcomm supports our business and product teams when they go out to acquire companies, and we help them with negotiations, as well as coordinating the various function and diligence teams, diligence as well as implementation efforts.**
*Q.* You mentioned mergers and acquisitions.
Is that the bread and butter of the corporate development team?
**A. Correct. That's one of the -- one of our main functions.**

*Q.* Within the mergers and acquisitions framework, what is it that corporate development does?
***A.*** **So we -- so we will help our -- you know, the business teams and the product teams who want to go out and do an acquisition, maybe acquire a company or an asset. We'll help them with negotiations, negotiating the deal, as well as running the mergers and acquisitions process, which is primarily coordinating all of our subject matter experts, the team subject matter experts in various functions on diligence as well as taking it through integrating the technology into the company.**
*Q.* Is corporate development responsible for evaluating the soundness of the technology?
***A.*** **No, we are not. We typically rely on our engineering teams for that.**
*Q.* And we've heard Qualcomm has a good number of engineers on hand?
***A.*** **Yeah, yeah, quite a few.**
*Q.* Do you recognize the name Duane Nelles?
***A.*** **Yes. He was my boss at the time.**
*Q.* Back in 2015?
***A.*** **Yes.**
*Q.* Did he recently retire?
***A.*** **He did, yes.**
*Q.* Do you recognize the name Malik Khan?
***A.*** **Yes. He was one of my colleagues in the team. Yeah.**

***Q.*** When you say "the team," is that the corporate development team?

***A.*** **Corporate development team, yes, that's correct.**

***Q.*** Mr. Somwal, are you personally familiar with Qualcomm's acquisition of Abreezio?

***A.*** **I am, yes.**

***Q.*** Did you have any involvement in that acquisition?

***A.*** **Yes. I was leading the diligence and coordinating the -- all of our teams on the diligence and integration efforts.**

***Q.*** Were Mr. Nelles and Mr. Khan also involved in the Abreezio acquisition?

***A.*** **Yes. They were, yes.**

***Q.*** Do you recognize the name Ziad Mansour?

***A.*** **Yes, I do.**

***Q.*** Who is Mr. Mansour?

***A.*** **Mr. Mansour was a senior in the organization who was championing this deal, and he was also the owner of this transaction.**

***Q.*** When you say "owner of the transaction," that's -- what does that mean?

***A.*** **That means he is the one who is essentially championing the deal. He is the one who's -- who's responsible for then integrating the technology. Typically at Qualcomm all acquisitions require an internal senior leader to champion the deal and to then take it through post close and basically**

**integrate the acquisition.**
*Q.* And Mr. Mansour was the champion or owner of the Abreezio acquisition?
*A.* **Correct.**
*Q.* He is the senior guy at Qualcomm saying let's go get this company?
*A.* **Correct.**
*Q.* Okay. Had Mr. Mansour -- first off, is he an engineer?
*A.* **Yes.**
*Q.* Outside of the corporate development department?
*A.* **Correct.**
*Q.* Had Mr. Mansour and his team started any technical diligence before you were brought in?
*A.* **Yeah. That is -- that is my understanding. I was not involved in it, but my understanding was they were evaluating the technology from a licensing perspective.**
*Q.* And how would you describe Mr. Mansour's level of support for the Abreezio acquisition?
*A.* **It was very strong. He -- he -- he wanted to -- he was very keen on acquiring the company. It was very important to his -- his product roadmap.**
*Q.* And did his support ever wane throughout the diligence process?
*A.* **No.**
***(Pause.)***

***MR. OLAH:*** If we could please show the witness only Exhibit No. 67.

***BY MR. OLAH:***

***Q.*** Mr. Somwal, are you able to read that, or do we need to blow that up and make it a little more legible?

***A.*** **Yeah, I don't mind. I'm able to see it, yes.**

***Q.*** My first question is: Do you recognize that exhibit?

***A.*** **I do, yes.**

***Q.*** Is it a set of emails?

***A.*** **It is.**

***Q.*** Okay. If we could also show the witness Exhibit No. 75.

Are you able to see that exhibit as well, Mr. Somwal?

***A.*** **I am.**

***Q.*** Do you recognize it as an email as well?

***A.*** **I do.**

***Q.*** And if we could show the witness Exhibit 76 as well.

Are you able to see Exhibit 76, Mr. Somwal?

***A.*** **I am.**

***Q.*** Are each of those exhibits correspondence between you and Mr. Mansour and sometimes other individuals as well?

***A.*** **Correct, yeah. These are -- these are emails with me, yes.**

***MR. OLAH:*** Your Honor, at this time, the United States would move to admit Exhibit 67, 75, and 76.

***THE COURT:*** Any objection?

***MS. ROBERTS:*** No objection.

***THE COURT:*** They may be admitted.

***MR. OLAH:*** Thank you, your Honor.

***(Exhibits 67, 75, and 76 admitted.)***

***MR. OLAH:*** If we could go back to Exhibit 67, starting at the bottom, if you could call that out for the witness.

***BY MR. OLAH:***

***Q.*** Mr. Somwal, can you see that called-out text?

***A.*** **I do.**

***Q.*** Okay. Starting just top to bottom of the call-out, who is sending this email?

***A.*** **This email is from the CEO of the company Abreezio. And he is sending it to me, Malik, and Mr. Mansour.**

***Q.*** Okay. And that CEO of Abreezio, is his name Sanjiv Taneja?

***A.*** **That is correct.**

***Q.*** And what's the date of this email?

***A.*** **The date of this email is June 5th.**

***Q.*** And what's the subject line?

***A.*** **"Follow-up from Qualcomm Abreezio meeting, June 2nd."**

***Q.*** And does Mr. Taneja's -- the body of his email reference a prior meeting?

***A.*** **Yes.**

***Q.*** Do you recall attending in-person meetings with Mr. Taneja or anyone else on behalf of Abreezio?

***A.*** **Yes.**

***Q.*** And what -- what's the content of those meetings? What was

the point of Mr. Taneja meeting with you and others at Qualcomm?
**A. From what I -- from what I recall, that particular meeting I think he gave us an introduction to the company and the technology.**
***Q.*** Okay. And in this email did he send some PowerPoint or other document summarizing Abreezio's technology?
**A. Correct.**
***Q.*** If we could turn to page 2 of this same exhibit.
Does this email state "We have also shared or perspective of the commercial benefits that would accrue to Qualcomm for the use of Abreezio's technologies"?
**A. Correct.**
***Q.*** And is that part of the diligence or something that the corporate development team is interested in?
**A. It is, yes. But for many different reasons, but yes.**
***Q.*** Because I think what you just testified to earlier was that part of what your team does is help with negotiations; right?
**A. Correct.**
***Q.*** Including identifying a fair or accurate price for some technology?
**A. Correct.**
***MR. OLAH:*** If we could go back to page 1. Sorry, Alex.
***BY MR. OLAH:***
***Q.*** Did Mr. Khan send a follow-up email to the one we were just looking at?

**A. Yes. This is an email dated June 16th -- 15th. Sorry.**

Q. Okay. And the body of that email starts with "QC only"; is that right?

**A. Correct.**

Q. What does that mean?

**A. That means this is not to be forwarded to anyone outside of Qualcomm.**

Q. And looking at the folks copied and addressed in this email, was Mr. Taneja dropped from it?

**A. Correct.**

Q. Why would someone from corporate development want to drop the outside company from a communication?

**A. For many different reasons. But to kind of discuss things in private.**

Q. Okay. And in this email is Mr. Khan -- first of all, who does he address it to?

**A. Mr. Khan has addressed this email to Mr. Mansour.**

Q. Who you've identified as the deal's sponsor or champion?

**A. Correct.**

Q. Looking at those -- first off, what is Mr. Khan doing generally in this email?

**A. Mr. Khan is trying to understand from Mr. Mansour if he knows how the -- how the company has been able to articulate the value to Qualcomm.**

Q. And if you could, could you read the last two questions that

Mr. Khan ends his email with?
***A.*** **So the last two questions, the first one is "Are they shooting in the dark?" And then the second question is "Are their claims of their technology versus RB Tech" -- which I'm assuming means Rapid Bridge -- "accurate based on our understanding of Rapid Bridge technology?"**
***Q.*** So Mr. Khan is posing these questions about, you know, is this information accurate and are they, quote, "shooting in the dark"?
***A.*** **Correct.**
***Q.*** Okay. Did Mr. Mansour respond to Mr. Khan's email?
***A.*** **Yes, he did.**
***Q.*** Could you please re-read for the jury Mr. Mansour's response.
***A.*** **Sure.**
**"Malik, I am not sure how they know so much about Rapid Bridge technology. Having said that, their assessment is very close to our assessment. As such, their claims are pretty accurate. They know their stuff. Mr. Mansour."**
***Q.*** And can you tell the jury what it means that their assessment -- which first off, is that Abreezio's assessment?
***A.*** **Correct.**
***Q.*** What does it mean for Abreezio's assessment to be, quote, very close to our assessment?
***MS. ROBERTS:*** Objection. Lack of foundation and

hearsay.

***THE COURT:*** Overruled.

***BY MR. OLAH:***

***Q.*** Mr. Somwal, as someone copied on this email, what does it mean when Mr. Mansour says, quote, "Their assessment is very close to our assessment"?

***A.*** **My -- my understanding is like Mr. Mansour is saying that they -- that they have a very good sense of what the value of this technology is to Qualcomm.**

***Q.*** And again, the "they" being Abreezio --

***A.*** **Abreezio, yes.**

***Q.*** -- has a good sense of the technological value?

***A.*** **Correct.**

***THE COURT:*** I'm going to stop you now. We do have to break. We have some matters we have to take up outside the presence of the jury, so I'm going to send you home for the day so that we can deal with those before we come back tomorrow. So I am going to let you go.

I am going to order that you be back at 9:00 o'clock tomorrow morning, and I am going to order that you continue to not look up anything about the case, not talk to anyone about the case. And we will see you tomorrow morning at 9:00 o'clock. And same thing for you, sorry, we need you back at 9:00 o'clock tomorrow.

***THE WITNESS:*** Thank you.

***(Jury out at 3:47 p.m.)***

***THE COURT:*** Okay. We're now outside the presence of the jury. Can we bring Agent Roberts in?

***MR. PILCHAK:*** We can, your Honor. I believe he is outside. Is it possible for a point of personal privilege to get a two-minute break?

***THE COURT:*** Sure. We can take a few-minute break.

***(Recess taken.)***

***THE COURT:*** Okay. We are back on the record outside the presence of the jury. I just wanted to take testimony on the issue of the notebook.

***MR. PILCHAK:*** Thank you, your Honor.

***MR. FRASER:*** Mr. Roberts is under oath; correct?

***THE COURT:*** Yes. You are still under oath to tell the truth.

***THE WITNESS:*** Yes, your Honor.

***MR. PILCHAK:*** Thank you, your Honor.

***DIRECT EXAMINATION***

***BY MR. PILCHAK:***

***Q.*** Mr. Roberts, are you familiar with a scanned copy of a handwritten notebook from your investigation?

**A. I amount.**

***MR. PILCHAK:*** Can we show the witness Exhibit 794, 792. Just do all the 790s until we get it. 792? All right. It should be on your screen in a minute there.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, Mr. Roberts?

***A.*** **I do.**

***Q.*** Did you testify earlier today -- gosh, maybe it was yesterday -- that a grand jury subpoena was served on Qualcomm right out of the gate at the beginning of this investigation?

***A.*** **Yes.**

***Q.*** Did it request a number of different categories of things?

***A.*** **It did.**

***Q.*** Was one of those things all documents, records, and ESI produced by any party in connection with the civil action?

***A.*** **Yes.**

***Q.*** Was Exhibit 792 one of the things that you received back in response to that subpoena?

***A.*** **Yes.**

***Q.*** If you look at the lower right of Exhibit 792, do you see some numbers down there?

***A.*** **I do.**

***Q.*** And those numbers are preceded by some letters; right?

***A.*** **Yes.**

***Q.*** And the first four letters are Alan, A-l-a-n?

***A.*** **Yes.**

***Q.*** What do those numbers mean to you?

***A.*** **Those are the Bates numbers that indicate that the documents were produced on behalf of Sheida Alan.**

***Q.*** In the civil litigation?
***A.*** **Yes.**
***Q.*** Between her and Qualcomm?
***A.*** **Yes.**
***Q.*** And some other people.
And so you didn't put those numbers on there in your criminal investigation.
***A.*** **No, that's how they arrived.**
***Q.*** Got it.
And 792, I know you're just looking at one page on your screen there.
Is it your understanding this is like an 85-page document?
***A.*** **Yes.**
***Q.*** If we flip to page 2, do you see a handwritten name there?
***A.*** **I do.**
***Q.*** Whose name is that?
***A.*** **Sheida Arabi.**
***Q.*** Okay. Let's show the witness -- well, first of all, let's go back to the first page and note those numbers in the lower right.
They end in 41070; right?
***A.*** **Yes.**
***Q.*** All right. I'm going to write that down because I won't be able to remember that.
***MR. PILCHAK:*** And let me show you Exhibit 1070. And

zoom in on all the available text, please, to cut off that white space on the bottom.

***BY MR. PILCHAK:***

***Q.*** What is this, Mr. Roberts?

***A.*** **Is this an email between attorneys. Tony Rowles from Irell & Manella sent in an email to Marshall Camp from Heuston Hennigan, among other people, providing indication that there's documents that are coming with the Bates ranges.**

***MR. PILCHAK:*** Your Honor, for purpose of this hearing, I don't intend to introduce or admit any of these documents. I'm just going to show them to the Court.

Would you like me to admit them for any purpose?

***THE COURT:*** No.

***MR. PILCHAK:*** Okay. Great. I'm not seeking to admit them in the record for the jury to review.

***THE COURT:*** Okay.

***MR. PILCHAK:*** I just haven't done as many 104 hearings as I should have.

***BY MR. PILCHAK:***

***Q.*** So what's the subject line of this email?

***A.*** **Subject line is "Qualcomm v. Arabi, *et al.* Document Production."**

***Q.*** And do you see two Bates ranges that are down there in the body of the email?

***A.*** **Yes.**

***Q.*** The first one is a Bates range for Alan documents; right?
***A.*** **Correct.**
***Q.*** And the Bates range, the number or the range of numbers there, does it include a document stamped with 41070?
***A.*** **Yes.**
***Q.*** So do you understand this to be the production email for that notebook that we were just looking at?
***A.*** **Yes.**
***Q.*** And are there also documents being produced in this very same message by Mr. Rowles for Dr. Arabi?
***A.*** **Yes.**
***Q.*** Why do you say that?
***A.*** **Because of the second group of Bates numbers that start with Arabi, and then followed by the range. My understanding is the Arabi documents were the ones that were produced on behalf of Dr. Arabi as part of the civil litigation.**
***Q.*** And you testified earlier today that the law firm of Irell & Manella jointly represented both Ms. Alan and Dr. Arabi for the civil suit; right?
***A.*** **Yes.**
***Q.*** Is this email consistent with that?
***A.*** **Yes.**
***MR. PILCHAK:*** Let's show the witness Exhibit 1071, please.
///

***BY MR. PILCHAK:***

***Q.*** Do you see that there, Mr. Roberts?

***A.*** **I do.**

***Q.*** Let's -- we don't need to zoom in.

Can you sort of read it?

***A.*** **Yes.**

***Q.*** Was there some tussling by email between the civil lawyers about that notebook that we were just talking about?

***A.*** **There were. There was an attempt to get the physical copy of the notebook.**

***Q.*** Okay. And in addition to that, were there some clarifying questions about where the actual notebook was?

***A.*** **Yes.**

***MR. PILCHAK:*** Can we go to page 2? Okay. And zoom in on the top half of this page.

***BY MR. PILCHAK:***

***Q.*** Is this an email from Qualcomm's lawyer, Marshall Camp?

***A.*** **Yes.**

***Q.*** And then there are two numbers paragraphs here; right?

***A.*** **Yes.**

***Q.*** Is the second one about that notebook that you were just talking about, Exhibit 792?

***A.*** **Yes.**

***Q.*** How do you know that?

***A.*** **I know that because the number of pages on the notebook was**

**250, which matched the cover of the original notebook. There's a Bates number that's referenced that's part of the range of the notebook entailed and the Bates number matches up and the length of the notebook matched as well. There was 83 loose-leaf pages plus two additional pages for the front and back cover, which gets you to the 85 total pages.**

***Q.*** Got it. Thank you for that last bit because I got worried I counted the pages wrong.

So among other things, the unique Bates number matches between this email correspondence and that notebook that we were all just looking at?

***A.*** **Yes.**

***Q.*** Is Mr. Camp asking here what the explanation is for the difference between 250 pages that the cover of Exhibit 792 promises should be in this notebook and the 83 or 85 pages that were actually produced?

***A.*** **Yes. He is asking about the remaining pages that are missing from that page count.**

***Q.*** And does he also reference some comment from Irell & Manella suggesting that the physical notebook was in the law firm's possession?

***A.*** **Yes.**

***Q.*** And what does he ask Irell & Manella to do in that last sentence there?

***A.*** **"If not, kindly reproduce the notebook in its entirety,**

**including blank pages, if any."**

***MR. PILCHAK:*** Can we see the next message up, please. Sorry, we've got to go to the prior page.

***THE COURT:*** Is this all still 1070?

***MR. PILCHAK:*** 1071, your Honor. I apologize. 1070 was the clean production email.

***THE COURT:*** Okay.

***MR. PILCHAK:*** And now in 1071 there's the tussling.

***THE COURT:*** Got it.

***MR. PILCHAK:*** Bottom email, please, Mr. Mayberry.

***BY MR. PILCHAK:***

***Q.*** It looks like there's a follow-up message from Mr. Camp trying to get an answer to his original message?

***A.*** **Yes.**

***Q.*** And I should have noted the date. I apologize. I got off and running a little fast here. Hang on one second.

These emails are in the end or late August of 2018; right?

***A.*** **Yes.**

***Q.*** We'll come back to that. I apologize. Let's take that down and look at the top message.

In this message, is it a response from Mr. Rowles?

***A.*** **Yes.**

***Q.*** I want to skip that first part and ask you about paragraph 2.

What does Mr. Rowles say he is sending back to

Marshall Camp?

***A.*** **He is sending back a scanned copy of the entire physical notebook that they have in their possession, including blank pages that they scanned. And they noted for the sake of clarity that some of the sheets had apparently been torn out from the notebook and discarded long before -- according to Mr. Rowles, long before the litigation, which he noted was obviously routine for student notebooks.**

**So there was 142 pages that were scanned, which were the loose-leaf pages, and then there were an additional four pages scanned, which were the front and the back of the front cover and the back cover.**

***Q.*** Got it.

***A.*** **A total of 146.**

***Q.*** Have you reviewed a 140-odd page version of the notebook?

***A.*** **I have.**

***MR. PILCHAK:*** Let's show the Exhibit 1072 to the witness, please.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, sir?

***A.*** **Yes.**

***Q.*** Does this just on the cover appear to you, without getting into the contents, to be the same kind of notebook that was in 792 in black and white?

***A.*** **Yes.**

*Q.* But this one has more pages, doesn't it?

***A.*** **This one has blank pages in addition to the pages that have writing on it.**

*Q.* Can we just go down to page 2, though.

It's got the same Sheida Arabi notation there?

***A.*** **Yes.**

*Q.* And because is this a color scan, you can see the actual -- I don't know what you call that -- yellow or manila back cover through those holes there?

***A.*** **Yes.**

*Q.* You're not a forensic document examiner, are you?

***A.*** **No.**

*Q.* But does that lead you to believe that maybe Irell & Manella did have the physical notebook in its possession?

***A.*** **That's what appears to me, yes.**

*Q.* Looks like a pretty good scan. Okay.

And this is -- I counted 146 pages.

How many pages did you get from this one?

***A.*** **So it's 146. So it's 142 pages of loose-leaf, the lined paper, plus two pages for the front cover, front and back, and two pages for the back cover, front and back.**

*Q.* That's where I went wrong, the back cover. Great.

***MR. PILCHAK:*** Let's take that down. And let's show the witness 1073.

///

***BY MR. PILCHAK:***

***Q.*** I don't know where to begin with this email.

Is this further correspondence between Mr. Camp and the lawyer for Dr. Arabi?

***A.*** **Yes.**

***Q.*** Let's go to page 2, please.

This is in the first half of September of 2018; right?

***A.*** **Yes.**

***Q.*** So after the messages that we were just talking about?

***A.*** **Yes.**

***MR. PILCHAK:*** Actually, let's go to page 3. Sorry, Mr. Mayberry. Yeah, let's zoom in on that top message, please, the small one.

***BY MR. PILCHAK:***

***Q.*** I know we cut off the header there, Mr. Roberts, but do you understand this to be an email from Marshall Camp?

***A.*** **Yes.**

***Q.*** And he is saying here -- what is he requesting in that first sentence?

***A.*** **He is trying to get confirmation that the law firm and the clients contend that the notebook was authentic and that the text it contains was created on the dates that were indicated.**

***MR. PILCHAK:*** Okay. Let's take that down. Now let's go up one page. It's tough to get that bottom one. They couldn't make that button any smaller. Let's just get that tiny

little message at the -- no, take it back. Take it back.

***BY MR. PILCHAK:***

***Q.*** Without belaboring the details for the Court, is there extensive additional skirmishing between Mr. Camp and Mr. Jablon about whether the notebook is accurate or not?

***A.*** **Yes.**

***Q.*** But that's the question that Mr. Camp was pressing; right?

***A.*** **Yes.**

***Q.*** And, again, without descending all the way into the details, did Mr. Jablon have some kind of explanation for where the notebook came from?

***A.*** **Yes.**

***Q.*** And I don't want to focus on Mr. Jablon's explanation. Let's take that down, please.

Was the notebook also -- actually, before I get to that, did Marshall Camp and his colleague, Padraic Foran, try to conduct an actual forensic examination of the notebook?

***A.*** **They wanted to, but they, as far as I know, never got the physical copy.**

***MR. PILCHAK:*** Let's show the witness 1075, please. Zoom in on the bottom email, please. Perfect.

***BY MR. PILCHAK:***

***Q.*** Is this an email from Mr. Foran?

***A.*** **Yes.**

***Q.*** To those same lawyers at Irell & Manella we were talking

about earlier?
*A.* **Yes.**
*Q.* And what is Mr. Foran asking for here?
*A.* **He is asking for proposed dates when they can examine the original notebook.**
*Q.* Got it.
And when he says "examine," does he mean he's going to look at it?
*A.* **No. They were planning on hiring a forensic document examiner.**
*Q.* And there's a bunch of stuff there about electrostatic something that I don't know what that is.
But let me ask you this: Are they attempting to conduct an examination of the physical notebook itself?
*A.* **Yes.**
*Q.* There was a best evidence challenge in this litigation where Dr. Arabi's lawyers said they would really need to access the physical notebook itself.
But is that the same thing that Qualcomm's lawyers were trying to do here?
*A.* **Yes.**
*Q.* Did you ever see a report of a forensic document examiner of the physical notebook?
*A.* **No.**
*Q.* Did you ever see any lawyer correspondence in which

Dr. Arabi's lawyers agreed to make the notebook available for that purpose?

**A. No.**

*Q.* This email is dated September 7th of 2018; right?

**A. Yes.**

*Q.* Do you know whether six or eight weeks later, Dr. Arabi's lawyers settled the civil lawsuit?

**A. Yes.**

*Q.* Yes, they did?

**A. Yes, they did.**

*Q.* Okay. And I don't mean to say that they entered the full settlement agreement. But did they enter an agreement in principle for roughly $45 million to settle the suit?

**A. Yes.**

***MR. PILCHAK:*** Okay. Let's take that down. Just a few more documents, your Honor, and I think we'll be all done.

***BY MR. PILCHAK:***

*Q.* First of all, was the notebook referenced in some discovery responses that were signed under penalty of perjury in the civil suit?

**A. Yes.**

***MR. PILCHAK:*** Mr. Mayberry, I blew it on this part. Can you help me out with the exhibit numbers for the discovery responses.

Let me start -- can I see your list? Thanks.

I think what I want is the RFA responses from Dr. Arabi that we used earlier today with Mr. Roberts. So that would be 785.

***BY MR. PILCHAK:***

***Q.*** So these are dated -- and I apologize for bouncing around chronologically.

These responses are dated May 21st of 2018; right?

***A.*** **Yes.**

***Q.*** On that date, if we go down to the substantive responses, so a couple of pages down. More. Stop. More, please. And no, more. There we go.

Dr. Arabi -- and so we're looking at page 13 now of Exhibit 785.

Dr. Arabi was asked to admit that he was the inventor of the two provisional patent applications' technology; right?

***A.*** **Yes.**

***Q.*** And then he denied that on May 21st of 2018, didn't he?

***A.*** **Yes.**

***MR. PILCHAK:*** Let's look at 782. Should have put more confidence into that question. I think it's 782. This might go faster, your Honor, if I can get my seven series binder. Can somebody grab that for me?

***MR. FRASER:*** I'm not sure that there's a dispute about the facts that you're going over right now. I think this is essentially a legal dispute about admissibility. It's a complex issue. I mean --

***THE COURT:*** Well, I wanted him to lay a foundation to see if he could lay one or not before I admitted the documents. So that's why I asked him to lay a foundation if he could.

***MR. FRASER:*** Very appropriate there. I was just noting there are some special issues on this which we briefed repeatedly because it came up in the *in lims* and then came up again with supplemental filings. And this is, I think, unlike -- this is an unusual item of possible evidence. It's coming up in the context -- well, maybe this is not the time for argument.

***THE COURT:*** Yes. Let me finish hearing what there is and I'll let you talk about it.

And just so everyone knows, when you talk into the microphone, not only can we hear it in court, but it goes back to my chambers. So my staff all hears what you're talking about. So a lot of times they're back there giggling, oh, someone just said "oh, shit," or they're not happy with what the witness is saying. So just be careful.

***MR. PILCHAK:*** I would never say that, your Honor. This is good. I have a binder now. I was able to use that time to locate the binder. And I can tell now that 782 is the wrong document.

***(Pause.)***

***MR. PILCHAK:*** I apologize, your Honor. Bear with me just one moment.

***THE COURT:*** Sure.

***MR. PILCHAK:*** Well, I can tell the Court -- I know you don't have this -- but it's Exhibit 13 to ECF 319.

***(Counsel confer.)***

***MR. PILCHAK:*** Oh, yes. Thank you, Mr. Olah. All right. Sometimes it takes a team, your Honor. 788, please. And if we could flip down to page 3. Great. So let's zoom in on kind of the center part of the page, the response to Request for Admission No. 27, the whole thing. So from the bold down to the next bold. Perfect. Thank you, Mr. Mayberry.

***BY MR. PILCHAK:***

***Q.*** So in this form interrogatory response -- and first of all, are these also under oath, Mr. Roberts?

***A.*** **Yes.**

***Q.*** Is Mr. Arabi or Dr. Arabi asked to provide documents supporting his denial of that request to admit that he invented the technology?

***A.*** **Yes.**

***Q.*** And -- sorry. That's the wrong one. We actually need 28. So 28 down underneath.

It says, "He did not contribute to the conception of the invention claimed by that provisional patent application."

And then if we go to the next page, does Dr. Arabi list some documents that support that position?

***A.*** **Yes.**

*Q.* Let's take that big paragraph in the middle of the page, please, starting at line 6. That's fine.
Does Dr. Arabi list a series of documents here?
***A.*** **Yes.**
*Q.* And eight of them are identified by Bates number?
***A.*** **Yes.**
*Q.* What does he refer to after he lists off all the Bates numbers?
***A.*** **The other thing that he references is a contemporary notebook that was kept by Ms. Alan, which was in -- he notes was in the possession of Ms. Alan's counsel and would be produced, it says.**
*Q.* Now, all that correspondence that we were looking at was referencing a notebook that was in the possession of Ms. Alan's counsel; right?
***A.*** **Yes.**
*Q.* Did you ever find another notebook that was in possession of Ms. Alan's counsel?
***A.*** **No. That was the only notebook that I saw.**
*Q.* And when Dr. Arabi here says, look, this is the notebook that was a contemporary notebook kept by Ms. Alan, were there dates on some pages of Exhibit 792?
***A.*** **Yes.**
*Q.* Did those dates line up with the periods that Ms. Alan claimed that she had invented the technology in the provisional

patents?

**A. Yes.**

*Q.* And so did you conclude that it was a contemporary notebook kept -- purportedly kept by Ms. Alan?

**A. It appeared to be. But then there was a response to an interrogatory where she indicated that some of the notes she copied into the notebook from other notes that she had taken along -- along the way.**

*Q.* Okay. And I'll ask you about that in a moment.

***MR. PILCHAK:*** Let's go to that now. That's Exhibit 1074, please.

Now, I should note for the Court that this one is unverified.

***BY MR. PILCHAK:***

*Q.* But is this a response by Sheida Alan through the same law firm that we were talking about before?

**A. Yes.**

*Q.* And this response is around about October 22nd, 2018; right?

**A. Yes.**

*Q.* Is this eight day before there was a term sheet in which Dr. Arabi and his sister agreed to settle the civil lawsuit for $45 million?

**A. Yes.**

***MR. PILCHAK:*** Let's go down to the response to -- I didn't write it down so we'll have to page down. I think we

took out all the irrelevant pages. Stop there.

***BY MR. PILCHAK:***

***Q.*** Is this interrogatory -- let's actually go to the prior page.

What is Special Interrogatory 38 asking?

***MR. PILCHAK:*** And can we blow that up, please?

***THE WITNESS:*** It was asking to describe the circumstances under which the notebook was created, including who created it, when, and why.

***BY MR. PILCHAK:***

***Q.*** And do you understand that, the notebook, to be a reference to Exhibit 792?

**A. Yes.**

***MR. PILCHAK:*** And let go to the next page, please, which is page 4 in this document. There are some objections. And then if we can pick up the bottom two-thirds of the page, starting with "the notebook" in all caps. Maybe I can just give the Court a moment to read that.

***(Pause.)***

***THE COURT:*** I've read it.

***MR. PILCHAK:*** Thank you, your Honor.

***BY MR. PILCHAK:***

***Q.*** And again, this unverified interrogatory response was prepared eight days before the civil lawsuit was settled?

**A. Yes.**

***MR. PILCHAK:*** At this time, we'd move to admit 792 as a co-conspirator statement.

***THE COURT:*** Was there any cross-examination?

***MR. PILCHAK:*** Would you like the podium?

***THE COURT:*** He is moving to admit the notebook in. So do you have any cross-examination of this witness on the issue of authentication?

***MR. FRASER:*** No.

***THE COURT:*** Now we'll listen to argument. Go ahead, Counsel.

***MR. PILCHAK:*** Would you like the podium?

***MR. FRASER:*** No, it's okay. Thanks.

***MR. PILCHAK:*** Can we excuse the witness, your Honor?

***THE COURT:*** Sure. You are excused.

***MR. PILCHAK:*** Thanks, Mr. Roberts.

***MR. FRASER:*** Recalling our briefing on this, all of this is happening within the context of civil litigation in State Court. And an unverified response to discovery under *Appleton v. Superior Court*, which is a California state case, is tantamount to no response at all.

***THE COURT:*** What about -- what about -- let's back up a little bit. This is not -- what if I don't rely on the unverified response at all?

What I rely on is just that this is what was produced by her lawyers as a document in the civil litigation and

Dr. Arabi, in a verified response, said that as proof that he was not the inventor, there was a contemporary notebook kept by Ms. Alan, and that's what I'm relying on.

***MR. FRASER:*** That's an excellent question, your Honor. And I think what we have to keep in mind is everything that's happening in this whole course of interactions is informed by the rules of California civil discovery that cover all of it.

And under those rules, in order for the statement or the act of production to be attributed to the client, it has to be verified by the client. That's -- I am not a common California civil practitioner, so I may be coming at it from a similar angle as the Court in terms of this being new and unfamiliar. And I do think -- I think it makes a world of difference.

And I see Mr. Pilchak's point, that it could seem like if we were not in that context, this is, you know, an agent's act on behalf of the principal. But all of that changes because of the California rules that govern what Irell & Manella is doing on behalf of their clients.

This is an interesting situation. I don't hear that the Government is claiming that the crime-fraud exception applies to the privilege that exists between Sheida and Karim in this context.

And if the crime-fraud -- so in other words, by that view of Irell & Manella's actions, if you also believe that the

Government contends, which is that this is fraud by Karim and Sheida, then Irell & Manella are then not in on the fraud, but then for the same reason they're not actually acting as agents of Karim and Sheida. It has to be verified by them because it's being offered in the context of civil discovery, and that's what the rules say would be required there.

I think this is a situation where the due process clause comes into play to keep this out. Because you're using -- you have a party who is being brought into a civil case, and they're communicating with their attorneys and letting their attorneys act on their behalf under a certain understanding of the way that those actions are going to be used, and then it gets taken out of context if it's used in the criminal case, where, theoretically, the highest protections should apply to a defendant. And if we were in a civil case, it clearly couldn't be used.

So I think there's just no way to take that out of it, the fact that in order for the statement to be attributed to the client in the context of a formal civil discovery response, it has to be verified.

***THE COURT:*** So you're really not raising an authentication objection.

***MR. FRASER:*** It is an authentication objection.

***THE COURT:*** Because I don't think there is any problem with authentication. I'll be honest with you, authentication

has a very low bar, and I think that the Government has authenticated the document. The question is and what you're raising is whether this is the statement of a co-conspirator or whether it's hearsay.

***MR. FRASER:*** Well, it's very -- it's nuanced.

So I think authentic -- the first step in an authentication analysis is -- the ultimate question is has the Government offered evidence sufficient to support a finding that the item of evidence is what the Government claims it to be. I mean, is it -- is there ESSF that it is what the proponent claims that it is.

In general, that would be a low standard. But I don't see how you can extricate the fact that this isn't just happening on the street or in normal interaction. This is happening within the context of the California civil rules of discovery.

***THE COURT:*** Let me hear from Mr. Pilchak, because I go back to my original thing. I think that there is no question that this -- there's at least enough evidence that this is what it purports to be.

But then the question is what does it purport to be, and is it hearsay? Because in order for it not to be hearsay, you have to show that it's the statement of a co-conspirator and what is the evidence that this is either a statement of Dr. Arabi or a statement of Sheida Arabi?

***MR. PILCHAK:*** Okay. Your Honor.

***THE COURT:*** And I think that's a little bit more nuanced than authentication. Authentication isn't really a very nuanced evaluation. It doesn't look like it is what it says it is and I think they've established that. I wasn't sure they could establish that, but I think they have done that.

So the question now is what is it, and how is it not hearsay?

***MR. PILCHAK:*** Sure, your Honor.

So first of all, I certainly agree with the Court that authenticity is a low bar, and we've established that this is a document produced by Sheida Alan through her lawyers in the civil litigation. Moreover, it's a document I think we just established that Dr. Arabi relied upon as part of his defense in the civil suit.

The next step is to show that it was fraudulent and misleading, and that it was part of the conspiracy to cover up the Abreezio fraud. We can do that several ways. The simplest way will be through the testimony of Professor Sylvester on Monday who will come in and say -- and I don't even know if this requires an expert.

But he will say, look, there's this page in a notebook that's in a section dated in 2012, I forget what month, and it copies almost verbatim language from a journal article that is not published until December 2015, which raises the very strong

inference that this notebook was cooked up after the fact to create a false basis for where this technology came from, when the real Sheida Alan had no real research notes or notebook of any kind to produce to explain where she got the provisional patent ideas that grew and blossomed into a $180 million Abreezio.

So that's the Government's argument. And as to whether the special rules of California discovery in state court apply to this, your Honor, if it's a part of a fraud, I get my lawyer to generate some fraudulent letter that furthers my fraud conspiracy, it doesn't matter whether that letter is admissible under the California Rules of Evidence for binding party admissions in civil suits. That can be my statement or my co-conspirator's statement as part of my fraud conspiracy.

I think Mr. Fraser is just asking the wrong question. He also referenced the crime-fraud exception. I think that may be a question for another day, your Honor, but right now I think the Court can handily conclude there is no allegation that this notebook is privileged.

And my friends on the Defense are very familiar with the rules of privilege waiver, and I think they, in another context, would be the first to point out that when this notebook is produced to Ms. Alan and Dr. Arabi's adversaries, even if it was privileged, which I can't begin to imagine how it could be, that privilege would have been waived.

So there's no privilege. There's no need for crime fraud. There's no need for the California Rules of -- I'm afraid I don't know what they're called -- admissibility from discovery responses.

I think the only thing the Court needs to be satisfied about is, is this notebook a good copy of the notebook that was produced in civil discovery. I think the Court is satisfied of that. And then is it a co-conspirator statement? What he intends to do -- and this is no secret. It's in Professor Sylvester's report that we produced to the defense months ago.

We are going to show that part of the notebook was plagiarized from something three years after the fact, and there may be other evidence to suggest that the notebook itself is a fraud and that's a co-conspirator statement. Because at the time that this notebook was produced, Sheida Alan was still actively counterclaiming to get her last $19 million or whatever it was out of Qualcomm that she said they owed her under the holdback provision.

So she's still trying to deceive Qualcomm to get their money as part of the fraud conspiracy. And so this is absolutely a co-conspirator statement in furtherance of that conspiracy.

***THE COURT:*** Mr. Fraser?

***MR. FRASER:*** Yes, your Honor.

So what the evidence contends that this is, is an

active fraud by Karim and Sheida. And they have not -- they haven't -- they don't have --

***THE COURT:*** And by Dr. Arabi. Because they're claiming that his -- in his verified responses he said here's my proof that it was my sister who did this, not me.

***MR. FRASER:*** But they don't have a link to an actual statement by Dr. Arabi that connects to that PDF. The thing that we're talking about is a PDF, and they don't have that link.

***THE COURT:*** Yeah, but what they've got is a statement from Dr. Arabi that's verified that says my proof that I was not the inventor of these patents is a contemporary notebook that was produced or will be produced by my attorneys that was kept by my sister. And the Government then wants to put in the only contemporary notebook that was produced that he is referencing as evidence that he was trying to defraud Qualcomm.

***MR. FRASER:*** I think the Government would need to show what the thing was that Dr. Arabi was shown at the time that he signed the verification for that interrogatory response.

***THE COURT:*** I don't agree. I think he references a contemporary notebook.

***MR. FRASER:*** Ms. Bernstein brings to my attention there's no Bates stamps.

***THE COURT:*** In the RFA.

***MS. BERNSTEIN:*** Yeah. So I guess, your Honor, it just

sounded like -- and I apologize because the document is not up. But is this a really important link that I think is missing. Because in that interrogatory, he is -- sure.

He said -- well -- I don't need the notebook. In the interrogatory he says, you know, it's the typical form RFAs, why did you everything in evidence that supports your answer. And he says Bates No. 1, Bates No. 2, Bates No. 3, Bates number -- and a notebook. And Mr. Pilchak took pains earlier to go through what the range of the notebook was, that at first it was 80-some-odd, then it was 140-some-odd. It wasn't in the notebook at these pages.

So we're still kind of in this world where it's not connected and he wants to introduce it to say that for Dr. Sylvester to be able -- and I don't know who else, but at least for Dr. Sylvester on Monday to be able to talk about how a statement in there was plagiarized, and we don't know whose statement that is.

***THE COURT:*** I mean, it was produced by Dr. Arabi and Sheida as part of the civil discovery. I think it's sufficient. I'm going to allow it in.

Okay. I don't know if you want to do -- go back to -- who are we listening to -- Mr. Somwal or finish up with Mr. Roberts tomorrow morning, whatever you want to do.

***MR. PILCHAK:*** Oh, yeah. We'll have to think about that, your Honor. Is that okay?

***THE COURT:*** That's fine.

***MR. PILCHAK:*** Thank you.

***THE COURT:*** Okay. Thank you. They go on a separate exhibit list, so we know they're being referenced but they're not in evidence.

***MR. PILCHAK:*** Correct, your Honor.

***THE CLERK:*** Not on the trial exhibit list. 782 is in, though.

***THE COURT:*** 792 will be admitted once the Government moves it into evidence in front of the jury.

***MR. PILCHAK:*** Perfect. Thank you.

***MS. BERNSTEIN:*** Your Honor, I'm sorry. We had -- I think it might be relevant to bring this up, given that Mr. Somwal took the stand.

Your Honor is in receipt of Qualcomm's *in camera* submission --

***THE COURT:*** I am.

***MS. BERNSTEIN:*** -- which related to Mr. Somwal, who is on the stand, Mr. Fang -- who I understand is coming tomorrow?

***THE COURT:*** Possibly, he said.

***MS. BERNSTEIN:*** And then two other individuals who I don't think are immediately in that circle when you're batting next, whatever that thing is called.

So I don't know if the Court's had a chance to review all that.

***THE COURT:*** I have. And so here's my thought, is I'm kind of doing it again. A lot of it depends upon whether it's impeaching or not. So until I hear -- I don't think we've heard very much from Mr. Somwal yet. There hasn't been anything other than I work for Qualcomm, which is not -- or kind of the basics of working for Qualcomm, which isn't -- there is nothing impeaching in what Qualcomm said as far as what he's said so far.

But I think I will look at it, and if there is anything that either, you know, obviously if it's *Brady* or if it's something that says Dr. Arabi never did this, that would -- I would turn over. And if it's impeaching, then I'll let you know. And I'll turn it over to both sides.

***MS. BERNSTEIN:*** And I'm -- for Mr. Thompson who's already left the stand, I understand that Qualcomm maintained they had absolutely nothing related to him.

***THE COURT:*** Nothing. I only got it from five witnesses, I believe, maybe six. But no one who's testified so far other than Somwal. Somwal is the first one that set my little alarm bells off.

***MR. PILCHAK:*** Thank you, your Honor. I did have one unrelated issue if we're done with that.

***THE COURT:*** Yes.

***MR. PILCHAK:*** We had a little colloquy with Alternate Juror No. 3. I needed to talk with my team about that. That

struck a note of fear in our heart, the way that he answered one of the questions. If you recall the first time you asked him could you still be fair and impartial, there was like a lengthy pause before he said I think I hope so. And then you did rehabilitate him a little bit.

But we're really concerned about that in particular because, I think when he first raised the issue with Ms. Fincher yesterday in the hallway, another alternate juror who was coming behind him seemed to overhear part of. We're just concerned with him potentially spreading these concerns around to anyone else, and we're concerned about his ability to render a fair verdict in this case if he is concerned about a tight-knit community and potential issues or ramifications from his vote. So I think at this time we would ask you to consider excusing him. And I don't know if the defense is okay with that.

***MS. BERNSTEIN:*** Your Honor, I think we'd probably object to that. If the Court -- we would have no objection if the Court wants to inquire further, although I don't think that's necessary.

***THE COURT:*** No, but what I will do is admonish him not to -- I mean, I admonish them all not to talk to each other about the case. So I think that sort of covers talking to their fellow jurors about any concerns they have about the case, I think. So at this point, I'm not inclined to do anything further unless he sends us any more notes, which he may do.

***MR. PILCHAK:*** Okay. Thank you, your Honor.

***THE COURT:*** Okay. Thank you.

***(Proceedings adjourned at 4:31 p.m.)***

***

*REPORTER'S CERTIFICATE*

I, Anne Roldan, certify that I am a duly qualified and acting Official Court Reporter for the United States District Court, that the foregoing is a true and accurate transcript of the proceedings as taken by me in the above-entitled matter on March 12, 2025; and that the format used complies with the rules and requirements of the United States Judicial Conference.

Date: March 12, 2025

*Anne Roldan, RMR, CRR, CSR 13095*