UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) | Case No. 22-cr-1152-BAS |
| vs. | ) | March 17, 2025 |
| KARIM ARABI, Defendant. | ) | Jury Trial, Day 5 |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CYNTHIA A. BASHANT
CHIEF DISTRICT JUDGE

VOLUME 5, PAGES 989 - 1246

APPEARANCES:

FOR PLAINTIFF: UNITED STATES ATTORNEY'S OFFICE
880 Front Street, Suite 6293
San Diego, California 92101
*By: NICHOLAS W. PILCHAK, AUSA*
*JANAKI G. CHOPRA, AUSA*
*ERIC R. OLAH, AUSA*

FOR DEFENDANT: BIENERT KATZMAN LITTRELL WILLIAMS, LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
*By: WHITNEY Z. BERNSTEIN, Esq.*
*REBECCA S. ROBERTS, Esq.*
*RYAN V. FRASER, Esq.*

REPORTED BY:

ANNE MARIE ROLDAN, RMR, CRR, CSR 13095
U.S. OFFICIAL COURT REPORTER
U.S. District Court Clerk's Office
333 West Broadway, Suite 420
San Diego, California 92101

Reported stenographically; transcribed with CAT software.

# I N D E X

***

## E X A M I N A T I O N S


| WITNESS | VOL. | PAGE | LINE |
|---|---|---|---|
| *FOR THE GOVERNMENT:* | | | |
| ALI AKBAR SHOKOUHI | | | |
| Direct by Ms. Chopra ........................ | 5 | 999 | 23 |
| Cross by Mr. Fraser ......................... | 5 | 1035 | 10 |
| Redirect by Ms. Chopra ...................... | 5 | 1060 | 2 |
| Recross by Mr. Fraser ....................... | 5 | 1062 | 12 |
| DENNIS SYLVESTER | | | |
| Direct by Mr. Pilchak ....................... | 5 | 1069 | 6 |
| Cross by Ms. Bernstein ...................... | 5 | 1174 | 23 |

# E X H I B I T S


| ADMITTED | VOL. | PAGE | LINE |
|---|---|---|---|
| Ex. 13 | 5 | 1005 | 12 |
| Ex. 15 | 5 | 1007 | 7 |
| Ex. 16 | 5 | 1019 | 11 |
| Ex. 17 | 5 | 1011 | 16 |
| Ex. 21 | 5 | 1028 | 5 |
| Ex. 706 | 5 | 1014 | 1 |
| Ex. 831 | 5 | 1117 | 22 |
| Ex. 860A | 5 | 1206 | 11 |
| Ex. 871 | 5 | 1124 | 11 |
| Ex. 874 | 5 | 1121 | 4 |
| Ex. 877 | 5 | 1131 | 11 |
| Ex. 892 | 5 | 1170 | 7 |
| Ex. 901 | 5 | 1030 | 3 |
| Ex. 2624 | 5 | 1229 | 17 |
| Ex. 3031 | 5 | 1157 | 5 |
| Ex. 3249 | 5 | 1062 | 25 |
| Ex. 3250 | 5 | 1188 | 15 |
| Ex. 3251 | 5 | 1187 | 13 |
| Ex. 3255 | 5 | 1224 | 11 |
| Ex. 3256 | 5 | 1217 | 22 |
| Ex. 3257 | 5 | 1242 | 5 |
| Ex. 3259 | 5 | 1237 | 4 |

***MONDAY, MARCH 17, 2025, 9:00 A.M.***

***

***THE COURT:*** Good morning. We are back on the record outside the presence of the jury. Dr. Arabi and all the lawyers are present.

Counsel?

***MR. PILCHAK:*** Thank you, Your Honor. We had two quick things, if it's all right.

***THE COURT:*** Sure.

***MR. PILCHAK:*** First, we intend to call Professor Dennis Sylvester today to testify. It's not our intent to explicitly offer him as an expert on the record. I understand that's not the Court's practice, but we wanted to make sure the Court had satisfied itself based on the pretrial showings of his backgrounds and qualifications, and if the Court has an issue with us eliciting opinion testimony from him, when I switch to that part of my outline, I can say we're prepared to proceed under Rule 702 as a signal to the Court, or whatever the Court would like.

***THE COURT:*** That's fine.

***MR. PILCHAK:*** Okay. Thank you.

***THE COURT:*** I just don't think it's appropriate, and I have told counsel before to say in front of the jury, I'm proffering this witness as an expert witness. Will the Court approve him as an expert witness? Because I think that sort of

gets me involved in front of the jury.

**MR. PILCHAK:** That's fine, Your Honor.

And then, second, we would like Professor Sylvester to be able to use this wonderful chart over here. Is it okay if we move that next to the stand and have him do it from there?

**THE COURT:** That's fine.

**MR. PILCHAK:** Thank you.

**THE COURT:** Anything else?

**MR. FRASER:** Yes, Your Honor. The Court may recall from the motions *in limine* that we had moved to preclude text messages that the Government received directly from Sanjiv Taneja. That was our motion *in limine* No. 4.

**THE COURT:** Okay.

**MR. FRASER:** This is different from the text message evidence that the Court typically receives, where it may come from a subpoena return or search warrant.

In this instance, these are printouts that the cooperating witness, Sanjiv Taneja, simply delivered to the Government. And so we categorically object to their admission under Rule 901 and 1002, because the Government has not shown that they haven't been altered.

**THE COURT:** I thought I denied that in this motion *in limine*.

**MR. FRASER:** You -- you did.

**THE COURT:** Okay.

***MR. FRASER:*** And you indicated, Your Honor, that it was a tentative ruling. And for efficiency's sake, and to avoid lengthy discussion with the jury present, I wanted to renew our objection to those exhibits and ask is the Court willing to consider a continuing objection on behalf of Dr. Arabi to all of the Sanjiv Taneja text messages, which are indicated on the Government's exhibit list with an ST prefix --

***THE COURT:*** Absolutely, although I did say that the Government would be required to authenticate the -- the messages before they put them into evidence. So if you feel that the Government has failed to authenticate, feel free to -- I may keep it out.

***MR. FRASER:*** Okay.

***THE COURT:*** So feel free to object on the record. Otherwise, you may have a standing objection to, in general, even if they authenticate it -- you know, I don't know what they're going to say about it.

***MR. FRASER:*** My understanding is the Government intends to refer to and potentially admit them through Akbar Shokouhi, whose on the witness stand from Thursday afternoon into today. You know, he's not even the one who delivered them to the Government, so I will have that objection.

***THE COURT:*** Okay. I think you need to make the objection on the record if you feel that the Government has failed to authenticate some exhibit, because I can't operate in

a vacuum. I haven't heard what they've offered in the way of authentication, why Shokouhi would know about these exhibits. I don't know the answer to that.

**MR. PILCHAK:** Thank you, Your Honor. Just two minor points for the record. One, Mr. Taneja did not deliver any of these text messages directly to the Government. He produced them to Qualcomm in the civil litigation, and then we subpoenaed them from Qualcomm. Kind of neither here nor there.

And then the second point is not every document with an ST Bates stamp on it is a text message. The Court will rapidly appreciate, once we start introducing these, they look a distinctive way and you can readily identify them. But just to be clear, not every ST-prefixed document is a text message.

**THE COURT:** Okay. That's fine. Until I hear the testimony, I really can't rule as to whether the Government has authenticated the documents or not.

**MR. FRASER:** Understood. And on Thursday, Mr. Shokouhi testified to his coming to the United States as a refugee. We have not received his application for a visa to come to the United States as a refugee. And that followed up, the Government's disclosure deadline for statements under Section 3500 was February 10th.

I followed up with the Government and received from the Government a -- what the Government calls a T-file, which is a temporary version of an A-File, as I understand it, an A-File

being the full USCIS file that the Government has for someone who's come to the United States initially as an alien. They don't have, the Government says -- I guess they've lost Mr. Shokouhi's A-File. But I don't know why -- and in any event, what we received does not contain any application for a visa by Mr. Shokouhi.

So I wanted to put that on the record, and ask the Government to explain why they don't have the visa application. I think I'm entitled to it under Section 3500 and Rule 26.2.

***MS. CHOPRA:*** Your Honor, Counsel is correct. Over the weekend, I believe it was on Saturday, we received an email requesting Mr. Shokouhi's A-File. We turned over, as Counsel said, a T-file, which is a temporary file. The information we received from CBP is that they could not locate the A-File, so what they had in their records was a T-file.

We don't have more information on where the A-File is. We don't -- we're not the custodians in our office of the A-File. And so we have produced a T-file, which has about 20 pages. It doesn't have perhaps what Counsel is looking for, which would be an asylum application or a refugee application from when Mr. Shokouhi was in India and applying to come here, I suppose. But those are all the records the Government has at this point.

***THE COURT:*** Will you continue to engage with CBP and see if you can find if there's anything else out there?

***MS. CHOPRA:*** Yes, Your Honor.

***THE COURT:*** Okay.

***MR. FRASER:*** I would move for production of that visa application. I do make that motion.

***THE COURT:*** Okay.

***MS. CHOPRA:*** Thank you, Your Honor.

***THE COURT:*** Okay. Are we ready to bring the jury in?

***MS. BERNSTEIN:*** I assume we're going to have a break before Dr. Sylvester goes, but I did just have two points to raise. Would you prefer I do that later or now?

***THE COURT:*** You can do it now. I don't know how much more we have of Shokouhi. I would assume that we would not get to Sylvester until the first break, but I don't know how much more we've got of Shokouhi.

***MS. BERNSTEIN:*** Then two quick points, Your Honor. One is that understanding the Court's preference for the Government to not proffer him as an expert, we did have a motion *in limine* to preclude him or to request a *Daubert* hearing on that, particularly in light of a disclosure we got from the Government at some point since Thursday, that he does not have experience -- he is not an expert in DFT. And as the Court can appreciate at this point as well, is this a case about DFT. And, in fact, as our motion's laid out, this indictment is entirely about DFT.

So while the case has expanded, we brought a Bill of

Particulars to find out about he expansion, and the case has expanded quite beyond the scope of DFT, the fact that the Government's expert is an admitted non-DFT expert is something that we would renew our motion *in limine* to preclude him or to request a *Daubert* hearing before he offers any expert opinion on the topic.

***THE COURT:*** Okay. That will be denied. And I'll see what he's going to proffer in the way of an expert opinion and whether he has expertise in that area.

***MS. BERNSTEIN:*** And then the second point I just wanted to raise, Your Honor, is that the Government also sent some disclosures. I believe that they were yesterday, but I think all of our days blur together, so it's been some point since Thursday. And the disclosures, I believe there were six enumerated points. Some were more substantial than others.

But the disclosure deadline, as the Court well knows, was November 14th for the initial expert reports and December 5th for the rebuttal opinions, and so we don't believe it would be proper for him to testify to anything beyond what was contained in his reports.

***THE COURT:*** I think that's appropriate. Anything -- I've got the reports in front of me, so I'm inclined to keep him on whatever was disclosed.

***MR. PILCHAK:*** Yes, Your Honor. The purpose of these disclosures is to satisfy our discovery obligations, and, in

fact, to go above and beyond them. It's not to seek to expand the scope of his original reports that were filed on time.

***THE COURT:*** Yeah. We'll stick with the original reports as far as the scope of his testimony.

***MS. BERNSTEIN:*** Thank you, Your Honor.

***THE COURT:*** Okay. Can we bring the jury in?

***(Jury in at 9:08 a.m.)***

***THE COURT:*** Okay. If we can bring our witness in.

We are back on the record.

Good morning, ladies and gentlemen. I hope you had a nice weekend. All jurors are present. The lawyers are present. Dr. Arabi is present. And I believe we are bringing our witness back to the witness stand.

***MS. CHOPRA:*** Yes, Your Honor.

***(Witness present.)***

***THE COURT:*** Okay. Come on forward, sir, up to the witness stand. Hopefully, it's up in the right place today. Yes. Come on up and have a seat. And you're reminded you're still under oath to tell the truth.

***THE WITNESS:*** Good morning.

***THE COURT:*** Have a seat.

Ms. Chopra?

///

///

///

***DIRECT EXAMINATION***

***BY MS. CHOPRA:***

***Q.*** Good morning, Mr. Shokouhi.

***A.*** **Good morning, ma'am.**

***Q.*** We left off on Thursday afternoon discussing a series of meetings that you had with Dr. Arabi.

Do you recall that?

***A.*** **Yes, ma'am.**

***Q.*** And I want to clarify one thing for the jury about those meetings that we've already discussed.

Was Sheida Alan or Sheida Arabi at any of those meetings that we discussed on Thursday?

***A.*** **No.**

***Q.*** Was she ever at any meetings you had about Abreezio?

***A.*** **No.**

***Q.*** As far as you know, was she ever on a phone call you had pertaining to Abreezio?

***A.*** **No.**

***Q.*** Was she ever on a text thread, as far as you know, pertaining to Abreezio?

***A.*** **No.**

***Q.*** And what about any emails?

***A.*** **No.**

***Q.*** Okay. As far as you know, have you ever spoken to a Sheida Alan or Sheida Arabi?

**A. No, ma'am.**
Q. Have you ever met Sheida Alan or Sheida Arabi?
**A. No, ma'am.**
Q. Okay. And so moving on from those meetings -- and to get the timeframe right, were those meetings between the fall of 2014 to early 2015? The meetings we discussed on Thursday, were they between fall 2014 and early 2015?
**A. Yes.**
Q. So after those meetings, you said that your company decided to invest in Abreezio; is that right?
***MR. FRASER:*** Objection. Leading.
***THE COURT:*** Sustained.
***BY MS. CHOPRA:***
Q. Did your company decide to invest in Abreezio after those meetings?
**A. In early January 2015, yes.**
Q. Okay. And how much money did you put in?
**A. $500,000.**
Q. Okay. And for what percentage share of Abreezio?
**A. 10 percent.**
Q. Okay. After your company invested in Abreezio, did you continue talking with Abreezio personnel by phone or email in the months that follows?
**A. Yes.**
Q. Okay. Did you have an Abreezio email address?

***A.*** **Yes, I did.**
***Q.*** Who else, if you know, had an Abreezio email address?
***MR. FRASER:*** Objection. 602.
***THE COURT:*** Overruled.
***THE WITNESS:*** Sanjiv Taneja. Everybody who worked at Abreezio, they had an Abreezio email.
***BY MS. CHOPRA:***
***Q.*** Okay. What about Dr. Arabi?
***A.*** **No.**
***Q.*** What about Sheida Alan or Sheida Arabi?
***A.*** **Yes.**
***Q.*** Did you ever communicate with the Sheida@Abreezio email account?
***A.*** **Yes.**
***Q.*** And in your communications with that email account, who did you believe you were corresponding with?
***A.*** **With Dr. Arabi.**
***Q.*** Why do you say that?
***A.*** **Because when we communicate, the result of the email, he showed up or he was on the call.**
***Q.*** So you would communicate with the Sheida email address; is that right?
***A.*** **Correct.**
***Q.*** And then was there some follow-up call or meeting, is that what you're saying?

**A. Yes, ma'am.**

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** Overruled. I'll allow it.

***BY MS. CHOPRA:***

***Q.*** And then just to clarify, who did you say would show up for those calls or meetings?

**A. Dr. Arabi.**

***Q.*** Not Sheida?

**A. No Sheida.**

***Q.*** In your communications regarding Abreezio, did you sometimes refer to Dr. Arabi as "Sheida"?

**A. Yes.**

***Q.*** Did Dr. Arabi ask you to do that?

**A. It was common between people who work at Abreezio to call him Sheida and not Karim.**

***Q.*** Who told you, if anyone, to call Dr. Arabi "Sheida"?

**A. First, I was told by Sanjiv Taneja.**

***Q.*** And then did others at Abreezio, as far as you know, also call Dr. Arabi "Sheida"?

**A. Mostly I heard from Sanjiv Taneja, the CEO.**

***Q.*** Okay. What about Behrooz Abdi?

**A. He used an email, but I never saw him tell me in front of me he's Sheida. But communication by email always was Sheida.**

***Q.*** Okay. So would you say it was understood, at least with you, that when you used the word "Sheida" or the name "Sheida,"

you were referring to Dr. Arabi in your Abreezio communications?

***A.*** **Correct.**

***MS. CHOPRA:*** Okay. I'd like to show the witness what's been marked as Exhibit 13, if we can zoom in on the text part.

***BY MS. CHOPRA:***

***Q.*** Mr. Shokouhi, do you see this in front of you?

***A.*** **Yes. Yes, ma'am.**

***Q.*** I see you're covering your eye.

Have you recently had a series of ailments that affects your eye?

***A.*** **Yes, ma'am. I had a stroke, and unfortunately, I lost most of the vision in my left eye.**

***Q.*** Well, take your time.

But do you see this text thread in front of you?

***A.*** **Yes. It is a text exchange between me and Sanjiv Taneja. Yes, ma'am.**

***Q.*** Okay. And before we read any substance, because the jury can't see it yet, what's the date that you see for this text thread on the right-hand side?

***A.*** **It says July 2015.**

***Q.*** Okay. And then I see Akbar Shokouhi.

Is this your phone number ending in 0690?

***A.*** **Yes.**

***Q.*** Okay. And who is the other party to this text thread?

***A.*** **Sanjiv Taneja.**

***Q.*** Do you recognize that as his phone number?

***A.*** **Yes, that's his phone number. I don't remember it right now, but that's -- that's a communication between me and him, yes.**

***Q.*** Okay. And so do you recognize this as a text thread between you and Mr. Taneja?

***A.*** **Correct, ma'am.**

***MS. CHOPRA:*** Move to admit Exhibit 13.

***THE COURT:*** Any objection?

***MR. FRASER:*** 901, 1002. Motion *In Limine* No. 4.

***THE COURT:*** Overruled. Thirteen may be admitted.

***(Exhibit 13 admitted.)***

***BY MS. CHOPRA:***

***Q.*** All right. So at the -- there's only three texts in this; is that correct?

***A.*** **Correct.**

***Q.*** Okay. And at the top, the first text, it says, "quick chat?"

Does that mean that Sanjiv wants to talk to you?

***A.*** **Yes.**

***Q.*** And then right below that, can you read what you responded with?

***A.*** **Yes. "On the phone with Sheida."**

***Q.*** And then what is Sanjiv's response?

***A.*** **"Just spoke to Sheida. Quick chat?"**

***Q.*** So when you say "on the phone with Sheida," who are you referring to as Sheida?
***A.*** **Dr. Arabi.**
***Q.*** So to be clear, you were not on the phone with the real Sheida at this time, in July of 2015.
***A.*** **Correct, ma'am.**
***MS. CHOPRA:*** And then if we could move on to Exhibit 15, please.
***BY MS. CHOPRA:***
***Q.*** Can you see that, Mr. Shokouhi?
***A.*** **Can you make it a little bit -- large as possible?**
***MS. CHOPRA:*** The top half, yeah.
***BY MS. CHOPRA:***
***Q.*** Is that better?
***A.*** **Thank you so much. Yes.**
***Q.*** Okay. And so without reading the contents again, who was this -- well, first of all, is this a text thread?
***A.*** **It is a text exchange between Sanjiv and myself.**
***Q.*** And what's the date of this text thread?
***A.*** **It is September 2015.**
***Q.*** Okay. And once again, do you recognize your phone number and Mr. Taneja's phone number?
***A.*** **Correct.**
***Q.*** And do you recognize this as a text communication between the two of you?

**A. Yes, ma'am.**

***MS. CHOPRA:*** Move to admit Exhibit 15, Your Honor.

***MR. FRASER:*** Objection.

***THE COURT:*** Any objection?

***MR. FRASER:*** Yes. 901, 1002, motion *in Limine* No. 4.

***THE COURT:*** Overruled. It may be admitted.

***(Exhibit 15 admitted.)***

***BY MS. CHOPRA:***

***Q.*** So what we have here, Mr. Shokouhi, is the top half that you've been looking at.

So in this message, at the beginning of the top, does Mr. Taneja want to talk to you again and have a quick chat?

**A. Yes.**

***Q.*** Okay. And to be clear, so when you're talking in this text thread with Mr. Taneja, are you talking about Abreezio?

**A. Yes.**

***Q.*** Okay. And then if we go two down to your first text message, it says "I'll find out tomorrow."

Can you read that text message?

**A. Yes. It says, "Quick chat?" And says, "No update, I assume?"**

**And then I said, "I'll find out tomorrow." And then I continue, "Where is Karim now?" I'm questioning.**

***Q.*** And then pause there.

**A. Sure.**

***Q.*** What is Mr. Taneja's response when you say "Where is Karim now?"
***A.*** **It says, "You meant this message for someone else."**
***Q.*** Okay. What did that mean to you in this text thread?
***A.*** **Yes, it means because we were using "Sheida," and as a habit, I made a mistake and used Karim's name. And he quickly meant, "You meant this message for somebody else." I'm supposed not to use Karim. I'm supposed to use "Sanjiv"** ***[sic].*** **Because of habit, I made a mistake and I used "Karim."**
***Q.*** So did you slip up in this text thread?
***A.*** **Correct.**
***Q.*** And then did Mr. Taneja correct you right away?
***A.*** **Yes.**
***Q.*** So what were you supposed to say instead of Karim?
***A.*** **Sheida.**
***Q.*** And was that in your effort to hide Karim -- or Dr. Arabi's role in your Abreezio communications?
***A.*** **Correct.**
***MS. CHOPRA:*** Can we zoom out from that? And then the second half, can we zoom in where it says "four-way sync-up"?
***BY MS. CHOPRA:***
***Q.*** Do you see this part where Mr. Taneja says "Four-way sync-up?"
***A.*** **Yes, ma'am.**
***Q.*** Does a four-way sync-up mean there's a four-person meeting

or phone call?
**A. Yes.**
*Q.* Do you recall who would be part of this four-person meeting or phone call?
**A. I don't remember now who was the fourth one on this right now.**
*Q.* Okay. Would it be at least you and Mr. Taneja?
***MR. FRASER:*** Objection. Leading. 6002.
***THE COURT:*** Sustained.
***BY MS. CHOPRA:***
*Q.* Would Sheida be a part of this four-way sync-up?
***MR. FRASER:*** Objection. 602.
***THE COURT:*** Sustained.
***BY MS. CHOPRA:***
*Q.* Did you talk to Sheida at this time?
**A. I assume, yeah, a four-way would be Sanjiv, myself --**
***THE COURT:*** The question is not who the four-way was. The question was, Did you talk to Sheida at this time?
***THE WITNESS:*** I don't recall. I don't remember it, who was all four. But if I -- my guess, it's Sheida and Sanjiv and myself was main three person. Fourth one, I don't remember.
***BY MS. CHOPRA:***
*Q.* When you say "Sheida, myself, and Sanjiv" --
**A. I'm sorry. Dr. Arabi.**
*Q.* Not Sheida?

**A. Sheida never -- as I mentioned before, I never talked, I never met, I never saw her. I never texted her. I never emailed.**

Q. Okay. And even on the stand right now, you're conflating Sheida and Dr. Arabi, it sounds like?

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** Sustained.

***MS. CHOPRA:*** I'll withdraw that.

We can move on to Exhibit 17.

***BY MS. CHOPRA:***

Q. Do you see this text thread in front of you?

**A. Yes.**

Q. Without reading the substance, what date is this text thread?

**A. October 2015.**

Q. And is it October 29th, in fact, of 2015?

**A. Yes.**

Q. Do you see yourself and your phone number in this text thread?

**A. Yes, I do, ma'am.**

Q. There's another phone number here in this text thread ending in 9395.

Do you happen to recognize that phone number?

**A. I remember that. I believe that is -- I can check with my phone, but I think that's Behrooz Abdi, I believe.**

***Q.*** Okay. So it's a text between you and Mr. Abdi?

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** Overruled.

***THE WITNESS:*** Yes.

***BY MS. CHOPRA:***

***Q.*** Let me just clarify, is it a text between you and Mr. Abdi, then?

**A. Yes.**

***MS. CHOPRA:*** Your Honor, move to admit Exhibit 17.

***THE COURT:*** Any objection?

***MR. FRASER:*** Same objections. I would ask to make it a standing objection, too.

***THE COURT:*** You may.

***MR. FRASER:*** Thank you, Your Honor.

***THE COURT:*** And it will be admitted.

***(Exhibit 17 admitted.)***

***BY MS. CHOPRA:***

***Q.*** Okay. Now, once again, do you see three text messages here, Mr. Shokouhi?

**A. Yes, I do.**

***Q.*** Okay. And in the first text message here, are you setting up a conference call?

**A. Yes.**

***Q.*** And then the last text message, can you read that for us, please, the third one?

***A.*** **"Sheida and I are on the call."**

***Q.*** By "Sheida," who are you referring to?

***A.*** **Dr. Arabi.**

***Q.*** Not the real Sheida?

***A.*** **No.**

***Q.*** Why is Mr. Abdi invited to this conference call?

***MR. FRASER:*** Objection. 602.

***THE COURT:*** Overruled. If you know.

***THE WITNESS:*** I don't remember it, what was the content, but probably about Abreezio.

***MR. FRASER:*** I would renew the objection.

***THE COURT:*** Sustained.

***THE WITNESS:*** I don't recall the detail of that meeting right now.

***BY MS. CHOPRA:***

***Q.*** Generally speaking, was Mr. Abdi involved in some of the Abreezio communications, as far as you know?

***A.*** **Of course. He was Chairman of the Board.**

***MS. CHOPRA:*** Okay. Can we move on to Exhibit 706? And then can you try to zoom in on all the text, see how big that gets?

***BY MS. CHOPRA:***

***Q.*** Mr. Shokouhi, can you read this or is it too small for you?

***A.*** **Too small, I'm sorry.**

***MS. CHOPRA:*** Okay. I'm sorry. Can you do half, then?

***THE WITNESS:*** Thank you.

***BY MS. CHOPRA:***

***Q.*** Mr. Shokouhi, is this another text thread?

***A.*** **Yes.**

***Q.*** Okay. Do you see your name and phone number on this text thread?

***A.*** **Yes, ma'am.**

***Q.*** Do you see anyone else -- without reading the content -- anyone else on this text thread?

***A.*** **Yes.**

***Q.*** Who else do you see, without reading content?

***A.*** **I see Sanjiv Taneja. I see Karim.**

***Q.*** Are those the three?

***A.*** **I see Brad's name in the content, but the text thread, I see just three.**

***Q.*** Okay. And what's the date of these text messages?

***A.*** **This is May 29th, 2015.**

***Q.*** Now, do you recognize this as a text communication between you, Mr. Taneja, and Dr. Arabi at that time?

***A.*** **Yes, ma'am.**

***MS. CHOPRA:*** Move to admit 706, Your Honor.

***THE COURT:*** Other than the previously mentioned objections, any other objections?

***MR. FRASER:*** No, Your Honor.

***THE COURT:*** Okay. It will be admitted.

***(Exhibit 706 admitted.)***

***BY MS. CHOPRA:***

***Q.*** All right. So in the beginning of this text thread, are you asking to have a conversation with Mr. Taneja?

***A.*** **Yes.**

***Q.*** And is it about some email that Brad sent to you?

***A.*** **Yes. If I remember correctly, yes.**

***Q.*** Who is Brad in this conversation?

***A.*** **Brad Quinton was the CTO of Abreezio.**

***Q.*** Do you recall this text thread being something relating to Abreezio?

***A.*** **Yes.**

***Q.*** And then I want to skip down to the fourth text message that says "Karim" with the question marks.

Do you see that?

***A.*** **Yes.**

***Q.*** Okay. And then what is your response to the question marks below? If you can read it.

***A.*** **Sure. One second.**

***MR. FRASER:*** Objection. I think the exhibit speaks for itself.

***THE COURT:*** Sustained.

***BY MS. CHOPRA:***

***Q.*** At the very bottom, do you see a text message from Dr. Arabi that says, "Why am I getting these texts?"

*A.* **Yes.**

*Q.* Okay. What's your understanding of why you received such a text message?

***MR. FRASER:*** Objection. 602, 802.

***THE COURT:*** Sustained.

***BY MS. CHOPRA:***

*Q.* Did you intend to put Dr. Arabi on this text thread?

*A.* **Yes, because he -- he was running the company, and he needed to know what everything was, decision-making -- making the decision about everything in the company. So naturally, we go to him on big decision. So -- but he didn't like to put his name there, so get involved. So you see his name, why I'm getting this message, that was the reason.**

*Q.* So to be clear --

*A.* **He didn't like it.**

*Q.* -- so you made a mistake --

*A.* **Yes.**

*Q.* -- you believe, by putting him on this text thread?

*A.* **Yes.**

*Q.* Okay. And why was that a mistake?

*A.* **Because probably have to use Sheida or don't use his name correctly, because we're trying to hide his name from Qualcomm, that he is involved with Abreezio.**

***MS. CHOPRA:*** Okay. We can take that -- actually, can we zoom in on the last two text messages here, please -- I'm

sorry, last three. I apologize.

***BY MS. CHOPRA:***

***Q.*** And, in fact, in the first two text messages we see here, do you try to correct your mistake?

**A. Yeah. Because I got call from Sanjiv that this is wrong. I say, Okay, wrong person. Sorry, I made a mistake. I don't use it again. Because we are used to call him Karim all the time, and all of a sudden, change to Sheida. You made a mistake. Once in a while, you forget.**

***MS. CHOPRA:*** We can take that down. Thank you.

***BY MS. CHOPRA:***

***Q.*** Let's switch gears a little bit to Behrooz Abdi. I know we've mentioned him a couple of times.

Can you tell the jury who Behrooz Abdi is?

**A. Sure, ma'am. Behrooz Abdi is my partner in business. I have two technology businesses in San Diego, and he is my partner in Encore Semi and TechVC, and Kronos in San Diego. That's how I know him from, where we started these two businesses.**

***Q.*** And I think you've mentioned it, but what role did Mr. Abdi have in Abreezio?

**A. After he -- we invested -- after he did due diligence in Abreezio and invested in Abreezio, later, he got proposal from Abreezio to become Chairman of the Board of Abreezio.**

***Q.*** And did he, in fact, become the Chairman?

***A.*** **I'm sorry?**

***Q.*** Did he, in fact, become the Chairman of Abreezio?

***A.*** **Yes, he become the Chairman of Abreezio, yes.**

***Q.*** Did Mr. Abdi also receive money from the Abreezio acquisition?

***A.*** **Yes, ma'am.**

***Q.*** Do you know how much?

***A.*** **In two parts. Can I explain both or -- yes.**

**He, as investment in TechVC or Encore Semi, got 10 percent. He had 15 percent of that 10 percent. Also, he got 1 percent as the Chairman of the Board from Abreezio.**

***Q.*** Switching gears a little bit now to a different person, Ziad Mansour --

***A.*** **Yes.**

***Q.*** -- did you know Mr. Mansour?

***A.*** **Yes.**

***Q.*** Did you meet him at Qualcomm?

***A.*** **Yes -- not when I -- before I even joined Qualcomm.**

***Q.*** And he was, in fact, in at least one or two meetings that you discussed on Thursday; is that right?

***A.*** **Yes, ma'am.**

***Q.*** Okay. Do you know what role Mr. Mansour had, beyond those two meetings that you talked about, in the Abreezio acquisition?

***MR. FRASER:*** Objection. 602.

***THE COURT:*** Overruled.

***THE WITNESS:*** Yes.

***BY MS. CHOPRA:***

***Q.*** What role is that?

***A.*** **There is a group in Qualcomm called QCT, Qualcomm Chip Technology, and big group under that called SoC, System on the Chip that design all the chip. And all the acquisition of new IP or technology or new company comes, goes through Ziad's group.**

**So as Abreezio, due diligence went under Ziad's group.**

***MS. CHOPRA:*** Can we show Mr. Shokouhi Exhibit 16, please?

***BY MS. CHOPRA:***

***Q.*** I apologize. It's long, Mr. Shokouhi.

***A.*** **No worries.**

***MS. CHOPRA:*** Let's zoom in on the top half. Actually, can you do the bottom half -- I'm sorry -- first?

***BY MS. CHOPRA:***

***Q.*** Okay. This is the bottom half of Exhibit 16.

Do you see your name and phone number in this text thread?

***A.*** **It's at the bottom, yeah.**

***Q.*** Now, are there other people in this text thread with you?

***A.*** **Yes. I see Sanjiv. I see -- I think the top number is Behrooz.**

***Q.*** Okay.

***A.*** **Yes, ma'am.**

***Q.*** And what's the date of these text messages?

***A.*** **September 8, 2015.**

***MS. CHOPRA:*** Your Honor, move to admit Exhibit 16.

***THE COURT:*** Other than previously mentioned objections, any other objections?

***MR. FRASER:*** Yes. The rising tone in Mr. Shokouhi's voice indicates he doesn't know the date. I would move to -- so I renew those objections and --

***THE WITNESS:*** 9/8/2015, I see that.

***THE COURT:*** Overruled. It may be admitted.

***(Exhibit 16 admitted.)***

***BY MS. CHOPRA:***

***Q.*** And to be clear, Mr. Shokouhi, is it hard for you to read this right now, given your medical condition?

***A.*** **No. No, I can read this right now.**

***Q.*** Okay. Thank you.

***MS. CHOPRA:*** All right. Can we zoom out and go to the top half?

***BY MS. CHOPRA:***

***Q.*** All right. Do you see this, Mr. Shokouhi, in front of you?

***A.*** **Yes.**

***Q.*** Okay. Here, do you see Mr. Taneja talking about a quick sync that he had with you?

***A.*** **Yes.**

***Q.*** Would this be in connection with the Abreezio deal?

***A.*** **Yes, ma'am.**
***Q.*** Okay. And then to be clear, as someone who is on this thread, is Mr. Taneja talking to Mr. Abdi, at least in the top part of this text thread?
***A.*** **Yes.**
***Q.*** Okay.
***MS. CHOPRA:*** And then if we can zoom in on the bottom half, please.
***BY MS. CHOPRA:***
***Q.*** Okay. And then later on in the text thread, are you and Mr. Taneja setting up a conference call?
***A.*** **Correct.**
***Q.*** Okay. I want to focus in on the last text message here.
Do you see that?
***A.*** **Yes, ma'am.**
***Q.*** And you say -- correct me if I'm wrong here. You say, "I will be talking to Sheida in 15 minutes."
Is that right?
***A.*** **Yes, ma'am.**
***Q.*** Who is Sheida in that text message that you sent?
***A.*** **Dr. Arabi.**
***Q.*** Okay. Not the real Sheida?
***A.*** **No.**
***Q.*** And then moving to the second sentence, you say, "I talked to Mitch and may see him soon."

Do you see that?

**A. Yes, ma'am.**

***Q.*** Who is Mitch?

**A. Mitch is Ziad Mansour.**

***Q.*** Why do you call him "Mitch" in this text message?

**A. That's a name he used for coffee for stuff like that, but I give him --**

***THE COURT:*** That's the name he used for what?

***THE WITNESS:*** He used among us when we get coffee, so that was his coffee name, or just want to say for the record. But so I -- I meant that's Ziad Mansour. So I was referring to I'm talking to Ziad Mansour. Yes.

***BY MS. CHOPRA:***

***Q.*** Okay. Why did you call him "Mitch" in this text conversation with Mr. Taneja and Mr. Abdi?

**A. So if you look at the date, it's -- it was end of M&A. And we didn't want to use -- and he set up the department doing M&A. We didn't want to use his name because he was doing M&A, so we used "Mitch."**

***Q.*** Okay. So when you say "M&A," is that Mergers & Acquisitions?

**A. Yes, Mergers & Acquisitions. I'm sorry.**

***Q.*** And you said that M&A.

Is that the M&A for Abreezio?

**A. Yes, it was.**

*Q.* Why wouldn't you want to use his name towards the end of M&A for Abreezio?

**A. Because when somebody is head of that department doing due diligence to buying a company, it's big conflict of interest. He should not be talking to us. He should not be noted with us. He should focus on the company to see if this company is good to buy for Qualcomm or not. He should not be talking to people who are selling the company to Qualcomm. He should not be talking to any party member. In my opinion, it's a big conflict of interest.**

*Q.* So you used "Mitch," here at least, to hide Mr. Mansour's involvement?

**A. Correct.**

***MS. CHOPRA:*** We can take that down. Thank you.

***BY MS. CHOPRA:***

*Q.* Turning to a slightly different topic, were you involved in pitching Abreezio to other companies besides Qualcomm?

**A. Yes.**

*Q.* Which companies?

**A. The one I was involved was Apple and Intel.**

*Q.* Why did you go to other companies like Apple and Intel?

**A. Usually when you have IP company, you don't pitch to one person. You pitch to as much company you have to see who is going to buy the company. So maybe one person doesn't buy it, you go to other company and see maybe you buy more, you create**

**competitor to see who pay more and who has a better chance to buy your company. It's normal.**

*Q.* Okay. It's part of an effort to maybe get the price as high as you want to?

***A.*** **This is why, and who is interested, yes.**

*Q.* Okay. How -- well, did you sit down with people at Apple and Intel in this process?

***A.*** **I did.**

*Q.* How did those pitches go?

***A.*** **With -- we have two meeting with Intel. Unfortunately, that didn't go well because it was -- they didn't take us to Intel. They -- the guy wanted to meet in the restaurant next to his house, and he listen to pitch and had dinner, and he didn't take us to Intel.**

**So it didn't go anywhere, honestly. And we pushed to take us to -- in front of technical people to see it, but he just listened to it at dinner and it didn't go anywhere. We pushed and sent email forward. It didn't go anywhere with Intel.**

*Q.* What about Apple?

***A.*** **Apple, it went really well. I think they were happy. They were very impressed with technology. But they want to have follow-up, they want to have NDA, but we didn't follow up with them.**

*Q.* And an NDA is what?

***A.*** **NDA, nondisclosure agreement that they --**

*Q.* Thank you. And you said "we."
Who was at or involved in these pitches that you had with Apple and Intel?
***A.*** **I did introduction to Intel, but Sanjiv Taneja was with me, because I'm not that technical. I am businessman. I have connection. But Sanjiv goes and present to them. At Apple, we went through Sanjiv, Brad Quinton, and all his engineers. Brad and his engineers presented to Apple.**
*Q.* Was Dr. Arabi at any of these pitches?
***A.*** **No.**
*Q.* Was Sheida Arabia or Sheida Alan at any of these pitches?
***A.*** **No, ma'am.**
*Q.* So what happened with these other companies? Why didn't you pursue them more?
***A.*** **Which company?**
*Q.* Either -- well, I guess, Apple. You said it went well.
Why didn't you pursue it more?
***A.*** **Apple want to sign an NDA and continue more. I talked to Dr. Arabi. I said, They want to continue more, but -- because I had really good relationship with Apple. And Dr. Arabi said, We are very close with Apple.**
**I said, If we signed an NDA with Apple, we have to let them continue, and same continue with Qualcomm, to do due diligence and then come with offer and we see which one is better. He said, Whoever comes with good offer faster, sooner, Qualcomm is**

**very close, but they are starting now. Whoever comes after, we sell to them.**

**I said, I have very good relationship with them. I cannot sign NDA. And he said, Oh, Qualcomm offer, that doesn't look good for me. We have to wait and see who come. Otherwise, I'm not going to sign NDA and tomorrow say, Okay, we are gone. So based on that conversation with Mr. Arabi, so we end up not signing NDA with them.**

***Q.*** A want to make sure I got part of what you're saying.

Did Dr. Arabi tell you that they were very close to a deal with Qualcomm or Apple?

***A.*** **No, they are much closer with Qualcomm.**

***Q.*** Okay.

***A.*** **Apple is at the beginning of the road right now. So whoever comes with offer, we close it. But I said, We have to give chance to Apple to get there and see which one is better. So that's why we didn't sign with Apple, didn't sign NDA with Apple.**

***Q.*** So in the end, was it Dr. Arabi's call of who you went with in terms of, at least, Qualcomm and Apple?

***A.*** **I can say so, yes, because that's what he said, We can sign NDA, but we're not going to wait. And I said, I have relationship. My reputation is on the line. If we sign and don't go with them, don't allow them to do due diligence and do the meeting and see the technology, so it's not good for any of**

**us. Yes.**
*Q.* Okay. All right. Turning back to Qualcomm, were you involved in any of the pitches Abreezio did to Qualcomm?
***A.* No, ma'am.**
*Q.* Why not?
***A.* Two reasons. Because they had a lot of relationship with Qualcomm. They didn't need my introduction.**
**Second, the way I left Qualcomm, based on conflict of interest I had, it wasn't right for me to go and pitch them. So I stay away from pitching Abreezio to Qualcomm. So they had a lot of people to do that, so they didn't need me.**
*Q.* Okay. And I think on Thursday, you did testify that you were terminated from Qualcomm; is that right?
***A.* Yes, ma'am.**
*Q.* Okay. So --
***A.* As I said, that's the reason, too.**
*Q.* Okay. So were you also concealing your role in Abreezio --
***A.* Correct.**
*Q.* -- because of that prior termination?
***A.* Correct.**
*Q.* Okay. All right. Do you know if Sheida was ever involved in the pitches to Qualcomm?
***A.* I don't know.**
*Q.* Looking at the acquisition, as far as you know, was there anything unusual to you about the Abreezio acquisition?

**A. Yes.**
*Q.* What?
**A. To my experience, I never seen company go and sell that fast, less than a year. I never seen, never heard a company get sold that fast.**
**I, as investor, was happy to get return on my investment that quick, but I never heard anything get sold that fast.**
*Q.* And that's from your experience in the business world?
**A. Yes.**
***MS. CHOPRA:*** I'd like to show the witness Exhibit 21, please. Can we zoom in on all the text, if possible?
***BY MS. CHOPRA:***
*Q.* All right. Mr. Shokouhi, can you read this?
**A. Yes.**
*Q.* Is this an email chain?
**A. Yes.**
*Q.* Are you on this email chain?
**A. I am.**
*Q.* Are you AkbarShokouhi@gmail.com?
**A. Yes, ma'am.**
*Q.* Okay. And who are the other -- without reading content, who are the other people on this email chain?
**A. It's from Sheida Alan to Sanjiv and Behrooz Abdi.**
*Q.* And what's the date?
**A. It is October 30th, 2015, ma'am.**

***MS. CHOPRA:*** Move to admit Exhibit 21, Your Honor.

***THE COURT:*** Any objection?

***MR. FRASER:*** No, Your Honor.

***THE COURT:*** It may be admitted.

***(Exhibit 21 admitted.)***

***BY MS. CHOPRA:***

***Q.*** Now, what was the date of the Abreezio acquisition?

***A.*** **It was end of October, early November.**

***Q.*** Okay. So around the time of this email?

***A.*** **Yes.**

***Q.*** Okay. I see at the topmost email, I believe it says from Sheida.Alan@gmail.com.

Do you see that?

***A.*** **Yes.**

***Q.*** Who did you understand the sender of that email to be?

***A.*** **Dr. Arabi.**

***Q.*** Not the real Sheida?

***A.*** **No.**

***Q.*** Why is that?

***A.*** **She never had any communication with Sheida.**

***Q.*** And in the body of this email, it says, in part, "Congrats, indeed. Congratulations."

What were the congratulations for?

***A.*** **For the acquisition of Abreezio, for selling Abreezio to Qualcomm.**

***Q.*** So in this email, Dr. Arabi was emailing you and others to congratulate you all on the acquisition?
***A.*** **Yes.**
***Q.*** And you don't believe the real Sheida was on this email chain?
***A.*** **I'm sorry?**
***Q.*** You don't believe the real Sheida was on this email chain?
***A.*** **No.**
***MS. CHOPRA:*** And can we turn to Exhibit 22, please?
***BY MS. CHOPRA:***
***Q.*** Do you see this email in front of you, Mr. Shokouhi?
***A.*** **Yes.**
***Q.*** Are you also on this email chain?
***A.*** **Yes, ma'am.**
***Q.*** Who is this email chain with, without reading content?
***A.*** **Behrooz Abdi.**
***Q.*** Okay. Now, in this email chain, do you see the part towards the bottom where Mr. Abdi says, "Do you want to meet with Karim for a little celebration?"
***A.*** **Yes.**
***Q.*** What was that celebration for?
***A.*** **For Abreezio acquisition.**
***MS. CHOPRA:*** Oh, I'm sorry. Your Honor, move to admit 22. Thank you.
***THE COURT:*** Any objection?

***MR. FRASER:*** Hearsay. 901.

***THE COURT:*** Overruled. It may be admitted.

***(Exhibit 901 admitted.)***

***MS. CHOPRA:*** I apologize.

***BY MS. CHOPRA:***

***Q.*** All right. So the bottom, it says, "Do you want to meet with Karim for a little celebration."

Do you see that?

**A. Yes, ma'am.**

***Q.*** Why is Mr. Abdi asking to meet with you and Karim for a celebration?

***MR. FRASER:*** Objection. 602.

***THE COURT:*** Sustained.

***BY MS. CHOPRA:***

***Q.*** Why do you believe that you're invited to a celebration with Dr. Arabi?

**A. Because Mr. Abdi and myself were investor, and Abreezio was sold, and they wanted me to meet Karim and celebrate the acquisition.**

***MS. CHOPRA:*** So -- we can take that down. Thank you.

***BY MS. CHOPRA:***

***Q.*** As part of the Abreezio acquisition, did you receive money?

**A. Yes, ma'am.**

***Q.*** How much did you receive?

**A. I accept 10 percent part of my company investment, and from**

**that 10 percent, I own -- which was 15 million, I own 65 percent. And also, one of my company that I own hundred percent, I got 7 percent of that, which is, like, around nine and a half million, something there.**

***Q.*** So you got 65 percent of 15 million?

***A.*** **Yes.**

***Q.*** And then an additional few million on top of that?

***A.*** **Seven million -- 7 percent of that 150 million, yes.**

***Q.*** Do you know who got the bulk of the money from the Abreezio acquisition?

***A.*** **Karim, which was under Sheida Alan.**

***Q.*** Sheida got it?

***A.*** **Yes.**

***Q.*** As part of your role in the Abreezio acquisition, were you also indicted in this very case?

***A.*** **Yes, ma'am.**

***Q.*** What were you charged with in the Indictment?

***MR. FRASER:*** Objection. 403.

***THE COURT:*** Overruled.

***THE WITNESS:*** Yes. I was charged with conspiracy of wiring fraud, wiring, and also, money laundering.

***BY MS. CHOPRA:***

***Q.*** Did you plead guilty?

***A.*** **Yes, I did.**

***MR. FRASER:*** Objection. 802, 60 -- excuse me -- 802

and 403.

***THE COURT:*** Overruled.

***BY MS. CHOPRA:***

***Q.*** What did you plead guilty to?

***A.*** **I plead guilty to money laundering charge.**

***Q.*** And as part of your plea, did you agree to cooperate with the United States?

***A.*** **Yes.**

***Q.*** As part of your plea, did you also agree to forfeit or give back some money?

***A.*** **Yes, I did, ma'am.**

***Q.*** Approximately how much?

***MR. FRASER:*** Objection. 401, 403.

***THE COURT:*** Overruled.

***THE WITNESS:*** Around 16 million.

***BY MS. CHOPRA:***

***Q.*** Okay. As part of your plea, based on your understanding, what was promised to you by the Government?

***A.*** **Nothing.**

***Q.*** Well, do you --

***A.*** **They -- I'm sorry -- they dropped two charges, but they kept one charge. They dropped two of the charges. I'm sorry.**

***Q.*** So dismissal of some of the charges?

***A.*** **Yes, two. They dismissed two of the charges.**

***Q.*** As part of your Indictment, was there a lien put on your

house?

***A.*** **Yes, they did.**

***Q.*** What's your understanding of the lien on your house based on your plea?

***A.*** **I cannot sell my house until I satisfy the $16 million.**

***Q.*** And you can pay that in cash if you wanted to?

***A.*** **Yes.**

***Q.*** Have you been sentenced yet?

***A.*** **Not yet.**

***Q.*** Okay. Have any promises been made to you by the Government based on your -- for your sentencing?

***A.*** **No.**

***Q.*** Okay. As part of your guilty plea, did you admit to conspiring with Dr. Arabi to hide your role and his role in Abreezio to Qualcomm?

***MR. FRASER:*** Objection. 802, 401, 403.

***THE COURT:*** Overruled.

***THE WITNESS:*** Yes.

***BY MS. CHOPRA:***

***Q.*** Okay. Turning now to a different year, we're going to fast-forward a little bit.

Did you keep in touch with Dr. Arabi after the acquisition of Abreezio?

***MR. FRASER:*** Judge -- Your Honor, excuse me, Sixth Amendment objection as well to the last testimony.

***THE COURT:*** Overruled.

***BY MS. CHOPRA:***

***Q.*** Did you keep in touch with Dr. Arabi after the acquisition of Abreezio?

***A.*** **Yes.**

***Q.*** Do you recall a meeting in about 2017 with Dr. Arabi?

***A.*** **Yes.**

***Q.*** Okay. What was the purpose of that meeting?

***A.*** **To inform that Qualcomm is complaining about the acquisition and not paying the holdback, and they're questioning Dr. Arabi, informing what was going on.**

***Q.*** Is there anything notable from that meeting that stands out in your mind?

***A.*** **He just came to meet with me in one of the coffee shops where we met, and said, Qualcomm is questioning the technology, who the technology belongs to. They ask me a lot of questions about this acquisition of Abreezio, and they don't want to pay the holdback money.**

***Q.*** Okay. Did he seem worried to you?

***A.*** **Yes.**

***Q.*** Did he take a phone call while you were at this meeting with him?

***A.*** **Yes.**

***Q.*** Who was that phone call with, if you know?

***A.*** **I think it was -- he was talking to Sanjiv Taneja.**

***Q.*** Okay. Was there anything notable about that phone call that you overheard?
***A.*** **He was talking a lot, but I heard something about deleting some emails.**
***Q.*** You heard Dr. Arabi talking about deleting some emails?
***A.*** **Yes.**
***MS. CHOPRA:*** No further questions, Your Honor.
***THE COURT:*** Cross-exam?

***CROSS-EXAMINATION***

***BY MR. FRASER:***
***Q.*** Good morning, Mr. Shokouhi.
***A.*** **Good morning, sir.**
***Q.*** Before testifying last week and today for the Government, the FBI and the U.S. Attorney's Office interviewed you; correct?
***A.*** **I'm sorry?**
***Q.*** Before your testimony last week and today, the FBI and the U.S. Attorney's Office interviewed you; correct?
***A.*** **Yes, sir.**
***Q.*** Multiple times; correct?
***A.*** **Yes, sir.**
***Q.*** It was twice in October 2023?
***A.*** **2023, yes, if I remember correctly, yes.**
***Q.*** And in February of this year?
***A.*** **Yes.**

***Q.*** And then there was a call by your attorney to their office after that in February?
***A.*** **I'm sure that they talked, so, yes.**
***Q.*** And you spoke with the FBI and U.S. Attorney's Office again on March 7th, 2025?
***A.*** **Yes.**
***Q.*** So it sounds like that's at least four times that you or your attorneys spoke with the FBI and U.S. Attorney's Office; right?
***A.*** **Yes, sir.**
***Q.*** Were there other occasions that I haven't mentioned when you spoke with the FBI?
***A.*** **No.**
***Q.*** Or with the U.S. Attorney's Office?
***A.*** **No, sir.**
***Q.*** And you were in custody in this matter?
***A.*** **I'm sorry?**
***Q.*** Were you arrested?
***A.*** **Yes, sir.**
***Q.*** And when you were in jail, did you place phone calls?
***A.*** **I talked to once -- my attorney called me just once.**

***MR. FRASER:*** Thank you, Your Honor. At this time, I move for production of Mr. Shokouhi's visa application and jail calls.

***THE COURT:*** Well, you can't have jail calls with his

attorney. Those would be attorney-client privileged. And that's who said he talked to from the jail. So denied. And we already discussed the other issue.

***BY MR. FRASER:***

***Q.*** Did you speak with anyone other than your attorney from jail?

***A.*** **No, sir.**

***Q.*** So your first meeting with the FBI, that was in October of 2023; correct?

***A.*** **I believe so. I don't remember exactly, but I believe so, yeah.**

***Q.*** And you've continued meeting with the FBI and U.S. Attorney's Office all the way up until about, what, 10 days ago; correct?

***A.*** **Correct.**

***Q.*** That's multiple interviews over the course of more than a year; correct?

***A.*** **Correct.**

***Q.*** You've met with the Government every single time that they've asked to you meet with them; correct?

***A.*** **Correct.**

***Q.*** You never turned them down.

***A.*** **Correct.**

***Q.*** Did you ever reach out to me or any other attorney for Karim to speak with us so that we could interview you?

**A. No.**
*Q.* And you mentioned you're represented by attorneys in this case.
**A. Yes. I have attorney, yes.**
*Q.* Yes.
And so you understand that means that I can't contact you directly; correct?
**A. I don't know the rule and regulation. You can talk to my attorney or me, I don't know.**
*Q.* Did your attorneys tell you that they refused my request to meet with you in preparation for your testimony?
**A. I don't know.**
*Q.* You're not sure whether your attorneys told you that?
**A. You talked to me? I'm not sure what the question is.**
*Q.* Did your attorneys tell you that they refused my request to speak to you in preparation for your testimony?
**A. I don't recall. If they did, I don't remember right now.**
*Q.* You testified that you don't have an agreement with the Government concerning your sentencing on direct.
Do you recall that?
**A. I'm sorry, repeat that?**
*Q.* On direct, you testified that you don't have an agreement with the Government concerning your sentencing; is that --
**A. No, I don't. Regarding sentencing, no.**
*Q.* And you are awaiting sentencing currently?

**A.** **Correct.**
**Q.** You have pled guilty to a felony.
**A.** **Correct.**
**Q.** You've never been sentenced to prison before.
**A.** **No.**
**Q.** You're an accomplished businessman.
**A.** **You can say so. I don't -- I don't count myself accomplished businessman. But it's a way to go yet, but --**
**Q.** Well, you were arrested, and promptly thereafter, released on bail in this case; correct?
**A.** **Yes.**
**Q.** And you have a nice home?
**A.** **Yes.**
**Q.** A nice car?
**A.** **You can say so.**
**Q.** A comfortable bed?
**A.** **Yes.**
**Q.** And you have your own shower.
**A.** **Yes.**
**Q.** In prison, you would lose access to all of those things; correct?
**A.** **Correct.**
**Q.** And you understand prison is a terrible place.
**A.** **Yes.**
**Q.** And you have signed two agreements with the Government;

correct?

***A.*** **I'm sorry?**

***Q.*** You've signed two agreements with the Government; correct?

***A.*** **I'm not sure what two agreement is.**

***Q.*** Well, you have a Plea Agreement; correct?

***A.*** **Yes.**

***Q.*** And that Plea Agreement is a public document; correct?

***A.*** **Correct.**

***Q.*** And you also have a Cooperation Addendum; correct?

***A.*** **Correct.**

***Q.*** And the Cooperation Addendum is not a public document, is it?

***A.*** **I am not sure about that.**

***Q.*** The Cooperation Addendum is filed under seal; is that correct?

***A.*** **My lawyer knows that. I'm not lawyer. I don't know all the details.**

***Q.*** Okay. And the Cooperation Addendum says you're going to cooperate and try to help the Government prosecute other people other than yourself; correct?

***A.*** **Right.**

***Q.*** And here you are testifying for the Government in Karim Arabi's trial; correct?

***A.*** **Correct.**

***Q.*** And you signed that agreement?

**A. Yes.**
Q. And so did the prosecutor in this case; correct?
**A. I'm sorry?**
Q. So did a prosecutor in this case; correct?
**A. Can you repeat that? I'm sorry. I'm not familiar -- I'm not lawyer, so I have to ask you to repeat the question. I'm sorry.**
Q. You've signed a Cooperation Addendum to your Plea Agreement.
**A. Yes, sir.**
Q. That's a separate document from your Plea Agreement.
**A. Sure.**
Q. And you're not sure whether that part is public?
**A. I'm not sure.**
Q. But you are sure that a prosecutor signed it; correct? You wouldn't have an important agreement with the Government if they didn't sign, would you?
**A. I sign and Government didn't sign, that's what you're saying?**
Q. No, no.
Both of you signed; correct?
**A. Yes, yes.**
Q. Was that a "yes"?
**A. I'm sure if I signed, they signed two agreement, we sign. I don't know all these terms. Sorry.**
***MR. FRASER:*** Let's show the witness Defense

Exhibit 3249. And please zoom in at the top. Can you please zoom in at the top half of the document?

***BY MR. FRASER:***

***Q.*** This -- I'm showing you a document. At the top, it states "Addendum to Plea Agreement."

Do you see that?

***A.*** **Yes.**

***Q.*** Underneath that, it states *United States v. Ali Akbar Shokouhi*.

Do you see that?

***A.*** **Yes.**

***Q.*** And it says, "Defendant understands and agrees that this Addendum will be submitted to the Court under seal."

Do you see that?

***A.*** **Yes.**

***Q.*** This is your Cooperation Addendum with the Government; correct?

***A.*** **Correct.**

***Q.*** And it was to be submitted under seal; correct?

***A.*** **Correct.**

***Q.*** "Under seal" means not a public document; correct?

***A.*** **Correct, okay.**

***Q.*** And going ahead to page 4 of this, at the bottom of page -- actually, before we go to page 4, do you see the bottom of the first page there?

*Q.* And it's dated October 2nd, 2023 --
***A.*** **Yes.**
*Q.* -- correct?
And to the right of that is your signature?
***A.*** **Yes.**
*Q.* And below that is your attorney's signature; correct?
***A.*** **Yes.**
*Q.* And now moving ahead to page 4 of the Cooperation Addendum at the bottom, there as well, there are three signatures; correct?
***A.*** **Correct.**
*Q.* Your signature at the top?
***A.*** **Yes.**
*Q.* Your attorney's signature under that?
***A.*** **Yes.**
*Q.* And the prosecutor's signature under that?
***A.*** **Correct, sir.**
*Q.* The prosecutor who signed this document is Nick Pilchak; correct?
***A.*** **Correct.**
*Q.* And he's here in court today, isn't he?
***A.*** **Correct.**
*Q.* And he's listening to your testimony; correct?
***A.*** **Yes.**

***MR. FRASER:*** And let's go to page 3 of the Cooperation Addendum, paragraph H.

***BY MR. FRASER:***

***Q.*** This is part of your sealed Cooperation Addendum with the Government; correct?

***A.*** **Yes.**

***Q.*** It states, "If the Government determines that Defendant has provided substantial assistance and has fully complied with this Plea Agreement, it will file a motion for a downward departure, under 18 USC Section 3553 or Section 5K1.1 of the Sentencing Guidelines."

That's part of your agreement with the Government; correct?

***A.*** **Correct.**

***Q.*** And you spoke with your attorney before you signed this agreement; correct?

***A.*** **Yes.**

***Q.*** You understand that the United States Sentencing Guidelines will apply at your sentencing; correct?

***A.*** **Correct.**

***Q.*** And they -- the judge must take them into account in sentencing you; correct?

***A.*** **Correct.**

***Q.*** And the judge also can take into account a Government recommendation concerning your sentence; correct?

***A.*** **Correct.**

***Q.*** And here, the Government has agreed, if you provide the Government substantial assistance, to file a motion to shorten your sentence under Section 5K1.1; correct?
***A.*** **Correct.**
***Q.*** You're relying on the Government's recommendation at your sentencing; correct?
***A.*** **I'm hoping.**
***Q.*** You're hoping.
And you understand that Section 5K1.1 of the Guidelines will apply to your sentence?
***A.*** **Correct.**
***Q.*** And you understand that when the Government makes that motion, they're going to make a recommendation to the Court about how much time should be taken off of your sentence; correct?
***A.*** **I'm hoping they do.**
***Q.*** And you understand that they've specifically agreed to make such a motion if you comply with the Plea Agreement; correct?
***A.*** **I'm hoping so.**
***Q.*** And they're going to make that -- I mean, you're hoping so or did they make that agreement?
***A.*** **So when I talked to them, they said if I cooperate, I'm hoping for reduction in my sentencing. The Government, under any circumstances, they didn't tell me that they going to reduct *[sic]* -- they're going to do anything. But I'm hoping**

**with cooperation with the U.S. Government, I get reduction in my sentencing. That's where I am today, I'm hoping. That's all.**

***Q.*** Thank you.

And because you're hoping that, you got it into a written agreement with the Government; correct?

***A.*** **Yes.**

***Q.*** And you understand there are various factors the Government will consider in make its sentencing recommendation; correct?

***A.*** **Yes.**

***Q.*** One of those factors is the value to their case of your testimony; correct?

***A.*** **Yes.**

***Q.*** And specifically, their case against Karim Arabi; correct?

***A.*** **Correct.**

***MR. FRASER:*** Thank you. We can take this down.

***BY MR. FRASER:***

***Q.*** And on direct, shifting gears, you testified about some text messages that the Government showed you in some exhibits; correct?

***A.*** **Correct.**

***Q.*** The Government showed you an exchange of text messages in Exhibit 706, and 15, and 17; correct?

***A.*** **Correct.**

***Q.*** And those text messages were at least 10 years ago; correct?

***A.*** **Yes.**

*Q.* Or they are almost 10 years ago --
**A. Yes.**
*Q.* -- and in some cases, a little less than 10 years ago, but approximately 10 years ago and longer ago; correct?
**A. Yes, sir.**
*Q.* And since then, you've had a stroke; correct?
**A. Yes.**
*Q.* You didn't get a chance to compare the text messages that the Government showed you with your own phone records; correct?
**A. Those are my phone records. I don't have those, but those are records.**
*Q.* Okay. And so you don't remember whether every single text message that was in that conversation was part of those text messages, do you?
**A. Sir, for the record, let me correct yourself, and for audience here. I have kidney transplant and my hemoglobin dropped and blood cell drops, and when blood doesn't get to every part of the body and didn't get to my nerve in my eyes, and that stroke happened just in my left eye and impacted my vision. It didn't impact my brain. So it just -- medically, I want to say it.**
**So only one brain -- nerve brain in my eye impacted, and impacted my left vision. It didn't impact my brain. It didn't impact my memory that much that we -- if you go there, I'd like to make that clear --**

***Q.*** Thank you.
***A.*** **-- that I lost my memory.**
***Q.*** Thank you. And I'm sorry --
***A.*** **For the record.**
***Q.*** I understand. Thank you. And I'm sorry that you experienced that.
***A.*** **Thank you so much.**
***Q.*** Even without the brain injury, it's hard to know 10 years after the fact --
***A.*** **I understand. I understand.**
***Q.*** -- whether a text message conversation is complete --
***A.*** **Yes.**
***Q.*** -- right?
And so you can't be certain that the text conversations that you testified to on direct are complete, can you?
***A.*** **But if --**
***Q.*** Are you certain that they're complete?
***A.*** **If I -- if I don't remember text, you're asking me? But when you see the text, those are my phone, those are my number, those are texts, those are facts. I can't deny it. I'm here to tell the truth, regardless of what happened to me, regardless if I -- nobody wants to go to jail. I hope nobody goes to jail. It's not a good place anybody want to go. But I'm here in court with --**
***Q.*** Thank you. Mr. Shokouhi, I have a different question.

***A.*** **Yes.**
***Q.*** You recognize some of the text messages that were in the Government's exhibits --
***A.*** **Yes.**
***Q.*** -- but you're not sure whether -- you can't -- you have no way to be sure that there aren't some other messages that are missing from those conversations, do you?
***A.*** **Maybe if there is -- those other texts are not here, I cannot speak to those.**
***Q.*** Okay. So without seeing other text messages, you can't be certain whether those conversations are complete, can you?
***A.*** **Yeah. But these are the chain of text. I see this is complete. And from beginning to the end, I cannot deny those, at least.**
***Q.*** At least those that are in there --
***A.*** **Yes.**
***Q.*** -- you remember those occurring?
***A.*** **Yes.**
***Q.*** You're not sure if there were other ones?
***A.*** **If there is other one, you can show me. We can talk about it.**
***Q.*** You testified about contact between Ziad Mansour and Abreezio; correct?
***A.*** **Correct.**
***Q.*** And in an M&A transaction, there's an acquirer; correct?

**A. Correct.**
Q. And there's a target; correct?
**A. Correct.**
Q. And it's complete -- it's normal that the target must communicate with the acquirer during due diligence; correct?
**A. When they do due diligence with people who are technical. When they do the technology due diligence, yes.**
Q. And let's talk about your observations of the development of Abreezio's technology.
You first became involved in Abreezio around September 2014; correct?
**A. Fall of 2014, yes.**
Q. And September is in the fall of 2014; correct?
**A. Yes.**
Q. And the acquisition happened October 30th, 2015, correct?
**A. Yes.**
Q. Over a year later; correct?
**A. Yes.**
Q. About 13 months later?
**A. Yes.**
Q. Over those 13 months, you were having multiple meetings per month about Abreezio; correct?
**A. Yes.**
Q. Over those 13 months, Abreezio's technology developed; right?

**A. Yes.**
*Q.* You testified on direct that Karim said at an initial meeting that the Canadian, Brad Quinton, would be developing the technology.
Do you recall?
**A. Correct.**
*Q.* And that is what you observed to happen as Abreezio developed; correct?
**A. Yes.**
*Q.* Abreezio's technological development was led by Brad Quinton; correct?
**A. The development of the technology led by Brad and team.**
*Q.* Yes.
And Mr. Quinton is Canadian?
**A. Yes.**
*Q.* You saw that he was an impressive engineer; correct?
**A. Sir, for the record, I wasn't involved in any technology meeting. But I was -- one in Apple, he was very impressive, yes. I said that for the record.**
*Q.* And Quinton had help from four or five other Canadian engineers; correct?
**A. Correct.**
*Q.* And you also testified that the Canadian engineers were very good, very capable of developing the technology.
Do you recall?

**A. Yes.**
*Q.* And you observed that to be true as their work progressed; correct?
**A. Yes.**
*Q.* And so during your involvement, it was Quinton and a Canadian team of engineers developing Abreezio's technology; isn't that true?
**A. Developing it, yes.**
*Q.* Yes.
And you mentioned that Abreezio pitched to companies other than Qualcomm.
**A. Correct.**
*Q.* Including Intel.
**A. Yes.**
*Q.* And Apple.
**A. Yes.**
*Q.* And Abreezio's discussions with Qualcomm were going on at the same time; correct?
**A. Yes.**
*Q.* The discussions with Qualcomm progressed faster, further than the discussions with other potential acquirers; correct?
**A. Correct.**
*Q.* You hid your involvement in Abreezio from Qualcomm; correct?
**A. Correct.**
*Q.* You didn't hide it from Apple.

**A. No.**
Q. You attended a presentation to Apple.
**A. Correct.**
Q. Mr. Quinton made the presentation.
**A. Correct.**
Q. And it was impressive.
**A. Yes.**
Q. The Apple pitch was impressive because it had the -- excuse me -- because of Mr. Quinton's participation.
**A. Mr. Quinton and his team, yes.**
Q. Mr. Quinton and his team were presenting there because they were the key tech team at Abreezio; correct?
**A. Yes.**
Q. And Mr. Arabi was not at that meeting, was he?
**A. No.**
Q. Let's talk about your relationship with Ziad Mansour.
Isn't it true that already by 2014, before Abreezio, you and he had become friends?
**A. Good friends, yes.**
Q. And isn't it true that your relationship with Mr. Mansour was closer than your relationship with Karim?
**A. Yes.**
Q. And there were some -- shifting gears -- there were some video conference meetings before the acquisition between Abreezio and Qualcomm; correct?

**A. I'm sorry, what?**
Q. Before the acquisition, there were discussions between Abreezio and Qualcomm.
**A. Video conferencing?**
Q. Just before we get to that -- before the acquisition, there were conversations between Abreezio's team and Qualcomm's team; correct?
**A. I'm -- I'm sure. Okay. I --**
Q. There were phone calls?
**A. I don't remember. I wasn't part of it.**
Q. Okay. You -- someone worked for you named Angeline Trang; correct?
**A. Yes.**
Q. And she worked for your company Encore Semi?
**A. Yes.**
Q. And she, at one point, was meeting with Qualcomm's team; correct?
**A. Yes, at one point. Not at the beginning, in the middle of Abreezio.**
Q. And you learned that she showed up in a conversation with Qualcomm showing as Encore Semi; correct?
**A. Yes.**
Q. And that was before the acquisition?
**A. Yes.**
Q. And you were involved in Qualcomm's acquisition of Rapid

Bridge years before Abreezio; correct?
**A. Not involved. I was VP. I wasn't involved in acquisition, no.**
Q. Okay. You're aware of that acquisition.
**A. Yes.**
Q. And Mr. Mansour advocated within Qualcomm to acquire Rapid Bridge.
**A. That was his department. Again, acquisition went through his department.**
Q. And he advocated to acquire Rapid Bridge.
**A. It went to his department, and they recommended, yes.**
Q. And Rapid Bridge was a successful acquisition for Qualcomm.
**A. Correct.**
Q. And Mr. Mansour advocated within Qualcomm to acquire Abreezio.
**A. Correct. I'm not aware of detail of that acquisition because I wasn't CEO. I wasn't involved at all in M&A and that department.**
Q. Okay.
**A. On the acquisition.**
Q. Okay. Abreezio and Rapid Bridge both had technology that Qualcomm acquired.
**A. Yes.**
Q. And Mr. Mansour was involved in those acquisitions.
**A. Correct.**

*Q.* And he advocated them; correct?
**A. I'm sure, yeah.**
*Q.* And --
**A. Due diligence.**
*Q.* And each of those companies provided valuable technology to Qualcomm; correct?
**A. Sure.**
*Q.* And Mr. Mansour observed repeatedly that Karim was involved with Abreezio; correct?
**A. I'm sorry?**
*Q.* Mr. Mansour observed that Karim was involved with the company that became Abreezio; correct?
**A. Yes.**
*Q.* And learned that Sheida was his sister.
**A. Yes.**
*Q.* And he knew those things before the acquisition.
**A. Yes.**
*Q.* And he knew those things before the acquisition while he was a Senior Vice President of Qualcomm.
**A. Yes.**
*Q.* You did not offer to pay Mr. Mansour any bribe or kickback, did you?
**A. No.**
*Q.* You never heard of Karim doing so?
**A. I don't know, no.**

***Q.*** You attended meetings with Mansour repeatedly?
***A.*** **On and off. Not repeatedly, on and off.**
***Q.*** Well, multiple meetings; correct?
***A.*** **Yes, yes, yes.**
***Q.*** More than one?
***A.*** **Yes.**
***Q.*** And you'd had month after month of meetings with Abreezio's team; correct?
***A.*** **I was helping them with operations. So I meet with Sanjiv most of the time, and operation team whenever they needed operation. I was in charge of operation, yes.**
***Q.*** And there were multiple -- you attended multiple meetings about Abreezio each month; correct?
***A.*** **Yes.**
***Q.*** Some with Sanjiv Taneja?
***A.*** **Yes.**
***Q.*** Some with Karim?
***A.*** **Mostly Sanjiv Taneja, and two or three times with Karim, yes.**
***Q.*** Okay. And you never heard of anyone else offering or paying Mr. Mansour a kickback --
***A.*** **I don't know, no.**
***Q.*** -- correct?
Shifting gears, Mr. Shokouhi, the words Persia and Iran, they refer to essentially the same territory but at different

points in time; correct?
***A.*** **Yes.**
***Q.*** You are from Iran; correct?
***A.*** **Yes, I am.**
***Q.*** Okay. And people at Qualcomm understood that Karim came from Iran; correct?
***A.*** **Yes.**
***Q.*** And at Qualcomm, sometimes people encounter language that indicates hostility towards people from Iran; correct?
***A.*** **I didn't feel that, honestly.**
***Q.*** Okay. You did hear the phrase "Persian Mafia," correct?
***A.*** **I heard that.**
***Q.*** And that's an offensive term, don't you think?
***A.*** **"Mafia" is offensive term, yes.**
***Q.*** Okay.
***A.*** **In general.**
***Q.*** Did you consider yourself Persian?
***A.*** **Yes, of course.**
***Q.*** Are you part of the Mafia?
***A.*** **No.**
***Q.*** Did you observe any group or activity at Qualcomm that deserves to be call a Persian Mafia?
***A.*** **I heard Persian Mafia mostly outside when my kids was going to school. We were in black suit at a school event, they called us Mafia. But I heard also once, I heard in Qualcomm some**

**people called Persian Mafia. But I never heard anybody call me, "You are Persian Mafia," at Qualcomm. But I heard some people call them "Persian Mafia." But I -- toward me, I never heard somebody tell me, or I never against me in Qualcomm, honestly.**

***Q.*** Is Ziad --

***A.*** **We have a lot of Persian people work for Qualcomm, a lot. Today, they work at Qualcomm. So --**

***Q.*** Mr. Shokouhi, I'll ask you a question now.

***A.*** **Yes. I'm sorry.**

***Q.*** Is Ziad Mansour Persian?

***A.*** **No.**

***Q.*** Is Kevork Kechichian Persian?

***A.*** **No.**

***Q.*** And Karim, he never mentioned to you that he thought he was under Federal investigation, did he?

***A.*** **I'm sorry?**

***Q.*** Karim never mentioned to you that he thought he was under Federal investigation, did he?

***A.*** **No.**

***Q.*** And he never directed you about how to answer Qualcomm's questions regarding Abreezio, did he?

***A.*** **No. He was in the lawsuit and Qualcomm and he settled, but never Federal.**

***MR. FRASER:*** No further questions. Thank you.

***THE COURT:*** Anything further?

**MS. CHOPRA:** Yes, Your Honor.

**REDIRECT EXAMINATION**

**BY MS. CHOPRA:**

**Q.** Mr. Shokouhi, on cross-examination, you were asked about your meetings with the Government.
Do you recall that?
**A. Yes.**
**Q.** Okay. And we did meet several times; is that right?
**A. Yes.**
**Q.** Okay. But between your testimony on Thursday and today, did we talk at all?
**A. No.**
**Q.** And did you talk to anyone on my team between Thursday and today?
**A. No.**
**Q.** You were just asked about Persians at Qualcomm.
Do you recall that?
**A. Yes.**
**Q.** Did you feel, as a Persian, that you were treated fairly at Qualcomm?
**A. Yes, I did.**
**Q.** You were also asked about the text messages that we admitted during your direct examination.
Do you recall that?

**A. I'm sorry, can you repeat that?**

Q. Do you recall testifying on cross-examination about the text messages that we reviewed earlier today?

**A. Yes.**

Q. Okay. When we were reviewing those, you and I, did you see anything that appeared incorrect to you in those text messages?

**A. No.**

Q. Okay. And, finally, you went over with Mr. Fraser your Cooperation Agreement.

Do you recall that?

**A. Yes.**

Q. Okay. Can you tell us what happens to your agreements with the Government if you're not truthful?

**A. No idea. Because I plead guilty and two of my three charges dropped. And I'm here to tell the truth. And whatever consequence of that truth, I accept it.**

**I -- just for record, I have done everything right in my life except two times, one at Qualcomm, and one with this case. I really want to tell the truth just for my own sake, for my sanity, to tell the truth. And I've been having doing everything right in my life.**

**I want to tell this to for me, for my family, for my friends, that I have done two mistake. I want to get off my chest I won't do again, the person I was before, and I want to move on with my life.**

***Q.*** Okay.
***A.*** **I want to tell the truth. That's it. That's all it is.**
***Q.*** Thank you for that.
But what's your understanding of what happens to any promises that have been made to you if you're not truthful?
***A.*** **If I say something wrong, and the agreement would be turned off and I -- even those -- all three charges will be back, and I don't have even those privileges.**
***MS. CHOPRA:*** No further questions, Your Honor.
***THE COURT:*** Anything further?

***RECROSS-EXAMINATION***

***BY MR. FRASER:***
***Q.*** Mr. Shokouhi, I would like to show you again Defense Exhibit 3249.
This is the Cooperation Addendum we were discussing?
***A.*** **Yes.**
***Q.*** This is your Cooperation Addendum; correct?
***A.*** **Yes.**
***MR. FRASER:*** I move to admit Defense Exhibit 3249 into evidence.
***THE COURT:*** Any objection?
***MS. CHOPRA:*** No objection, Your Honor.
***THE COURT:*** It may be admitted.
***(Exhibit 3249 admitted.)***

***BY MR. FRASER:***

***Q.*** You understood that the Government would rely on your assistance in this case; correct?

**A. Yes. I signed the plea and I'm here to tell the truth, yes.**

***Q.*** So you understood that the Government would rely on your assistance in this case?

**A. Yes. I am here. I signed this to come here and tell the truth, yes.**

***Q.*** And that includes your testimony in its case prosecuting Karim; correct?

**A. Yes.**

***MR. FRASER:*** Thank you. No further questions.

***THE COURT:*** Okay. Anything further from the Government?

***MS. CHOPRA:*** Nothing further, Your Honor.

***THE COURT:*** Thank you, sir. You're excused.

***THE WITNESS:*** Thank you so much, Your Honor.

***THE COURT:*** Okay. Let's go ahead and take a 15-minute recess, ladies and gentlemen. You're reminded you're not to do any research about the case. You're not to talk to anyone about the case. And we'll see you back in 15 minutes.

***(Jury out at 10:30 a.m.)***

***THE COURT:*** Thank you. We're now outside the presence of the jury.

Any issues we need to take up before we take a break?

***MR. FRASER:*** One on our side, briefly, Your Honor. Mr. Shokouhi testified that the acquisition happened fast. And that was based, he said, on his experience as a business person. He was not -- wasn't noticed as an expert witness, and that is an opinion that requires specialized knowledge. And so it does come under Rule 702. I move to strike that opinion.

***THE COURT:*** Ms. Chopra?

***MS. CHOPRA:*** Yes, Your Honor. I think his lay testimony, he was involved in the acquisition, so in his view, his involvement, it seemed fast to him. I think that's appropriate and not expert testimony.

***THE COURT:*** Okay. I'll deny the request to strike.

***MR. PILCHAK:*** I had two other things, Your Honor.

***THE COURT:*** Sure.

***MR. PILCHAK:*** We object to live motions to produce evidence in front of the jury, especially when the Court's already ruled on them. It implies that we're hiding something from the Defense, and I think there's no purpose to raise it in front of the jury. We can easily address those on breaks.

***THE COURT:*** I agree.

***MR. PILCHAK:*** I also object to the Defense's, I don't know, seven or eight or nine references to the 5K Addendum being under seal. I don't understand the purpose of that. I think the Defense is aware, just like everyone in this room is, that 5K Addendums are always filed under seal. And so now I think we

need to figure out do we need to elicit testimony from our case agent that that's routine practice? Again to suggest that nothing is being hidden from anyone, that's just what happens.

***THE COURT:*** Given the fact that it was then admitted into evidence, I don't think there's any suggestion that anything is being hidden. They got it.

***MR. PILCHAK:*** So it does say "sealed" all over it. It's admitted in evidence now, but the jury will see that it says "sealed."

***THE COURT:*** I think the jury can infer why you might want to seal a Cooperation Agreement from the public.

***MR. PILCHAK:*** Very well. Thank you, Your Honor.

***MR. FRASER:*** I appreciate -- I think it's helpful to have a discussion about the motion for production under Jencks.

I just want to make sure that I'm not -- when would the Court like me to make that motion, understanding the rule being what it is? But the Court made a ruling that it was due by February 10th. So if we are all in agreement that we can make that motion before the direct testimony is finished, I'll -- I would love that.

***THE COURT:*** Okay. But in this particular case, you made the motion before the witness was on the witness stand and then said it again in front of the jury. So I tend to agree with Mr. Pilchak that we discussed it. I was aware of the issue. You requested. The Government said, We've given you

everything we can find. We'll have a continuing duty, if we find anything, we'll disclose it. We can't find anything right now. And then for you to then bring it up in front of the jury, I think it's inappropriate.

***MR. FRASER:*** I will be sensitive to that, Your Honor. Just so that the Court understands, I -- I actually did not hear a ruling on the -- I know that the Court heard the motion, but I did not hear a ruling on it. But I -- I won't do that again.

***THE COURT:*** Okay. And I am ordering that if the Government gets any additional information from the CBP officers with respect to his A-File or his visa application, they turn over anything additional that they are able to glean.

***MS. CHOPRA:*** Yes, Your Honor.

***MR. FRASER:*** May we have the same order as to the witnesses who have testified previously? Because I've tried to confirm that we received all of the Jencks Section 3500 Rule 26.2 materials, and I haven't received a complete response from the Government about that. I'm a little bit concerned.

***THE COURT:*** Well, when you say Jencks material, it has to be something that is about which they testified. So it's not every statement that the witness ever made in the ether.

***MR. FRASER:*** I agree.

***THE COURT:*** It's what they testified about. And I don't remember, although I may be mistaken, any other witness talking about visa applications or anything to do with that sort

of thing.

***MR. FRASER:*** Yeah. My concern is broader than that, as to -- so we had, for example, with John Roberts, he testified about his entire investigation. And we have very scant set of statements from him. It seems incomplete.

***THE COURT:*** Okay.

***MR. FRASER:*** I'm concerned --

***THE COURT:*** Certainly, the Government -- if there are any statements that Mr. Roberts or any other witness made that the Government has copies of that pertain to anything that they testified about, the Government has an obligation to turn it over.

***MR. PILCHAK:*** Yes, Your Honor. Thank you.

***MS. BERNSTEIN:*** And, Your Honor, just from a timing perspective, do I understand that the Court wants a break at -- we're going to take lunch at 12:30. Might we turn this break, then, into a meaningful one?

***THE COURT:*** Thirty minutes -- it's now going to be 35 because we've discussed already. That's a long break to take for the jury since I just sent them out for 15 minutes.

***MS. BERNSTEIN:*** This is my witness coming up, Your Honor, and so I am concerned, both that it's going to be difficult for me to leave the room and difficult for me to be distracted. I can -- I'm not sure how to handle this.

***THE COURT:*** Can you make it until 12:30?

***MS. BERNSTEIN:*** I can try. That would be five hours, and I certainly don't want to risk derailing this trial with a bout of mastitis. But I would -- so I would prefer if I could take a break now and do it as quickly as possible, or maybe we could break at 12:00 and have a slightly longer lunch?

***THE COURT:*** How about 12:15 and have a slightly longer lunch?

***MS. BERNSTEIN:*** Okay. I will do my best.

***THE COURT:*** Okay. We'll take a quick 10-minute recess now.

***MR. PILCHAK:*** Thank you, Your Honor.

***(Recess taken.)***

***THE COURT:*** We are back on the record. All jurors are present. Dr. Arabi is present. And all the attorneys are present.

Mr. Pilchak?

***MR. PILCHAK:*** Thank you, Your Honor.

The United States calls Dennis Sylvester.

***THE CLERK:*** Please stand here and raise your right hand.

***(Witness duly sworn.)***

***THE CLERK:*** Thank you. You may lower your hand. Please take the stand.

Please state and spell your first and last name for the record.

***THE WITNESS:*** My name is Dennis Sylvester. It's D-e-n-n-i-s, S-y-l-v-e-s-t-e-r.

***THE COURT:*** Thank you.

Counsel?

***MR. PILCHAK:*** Thank you, Your Honor.

***DIRECT EXAMINATION***

***BY MR. PILCHAK:***

***Q.*** Good morning, Professor Sylvester.
***A.*** **Good morning.**
***Q.*** What do you do for a living, please?
***A.*** **I'm a professor.**
***Q.*** Where are you a professor?
***A.*** **University of Michigan.**
***Q.*** Have you been retained to provide testimony in this case?
***A.*** **Yes.**
***Q.*** I want to ask you some questions about your background and education.

First, can you describe to the jury the educational credentials that you have?
***A.*** **Sure. So I received my undergraduate degree from the University of Michigan in 1995 in Electrical Engineering. And then I went to University of California Berkeley for graduate studies in Electrical Engineering, and I received my Master's in 1997 and my Ph.D. in 1999.**

***Q.*** And so all of those degrees are in Electrical Engineering?
***A.*** **Correct.**
***Q.*** I'd like to ask you some questions about your professional experience, starting with your days as a Ph.D. student.
Did you work at any private companies when you were getting your Ph.D.?
***A.*** **Yeah. I worked part time and during summers at Hewlett-Packard Laboratories in Palo Alto.**
***Q.*** And very generally, what did you do for them?
***A.*** **I was working on test chip design to measure sort of parasitics in their chips to understand that better.**
***Q.*** Okay. Maybe we'll bracket that for right now.
Did you work anywhere else at around this time, and specifically at a company called Synopsys?
***A.*** **Yeah, after I graduated.**
***Q.*** What did you do after you got your Ph.D. and went to work at Synopsys?
***A.*** **I was working on basically approaches on how to design integrated circuits, which I'll define later, with lower power consumption.**
***Q.*** And what does that mean, "lower power consumption"?
***A.*** **Basically means it draws less current to do the job that it's trying to do.**
***Q.*** And if I understood you right a moment ago, you no longer work in industry; correct?

*A.* **Correct.**
*Q.* What is your current position, specifically?
*A.* **I'm a professor. I have a longer title, but I don't know if we need to use it, but it's a Professor of Electrical Engineering -- well, Professor of Electrical and Computer Engineering, actually.**
*Q.* And how long have you been a Professor of Electrical and Computer Engineering at the University of Michigan?
*A.* **I started in 2000, so this would be 25 years.**
*Q.* All at the same institution?
*A.* **Yes.**
*Q.* Okay. Have you previously served in any leadership roles in your department?
*A.* **Yeah. I was the Senior Associate Chair for five years, which is sort of like the lieutenant to the Chair. And then I was the Interim Department Chair for a year. And then I'll be taking that title permanently starting in July, so Department Chair.**
*Q.* So the Incoming Department Chair in the future?
*A.* **Correct.**
*Q.* And you had served as the Head of the department for how long?
*A.* **That was just over a year.**
*Q.* Got it.
Have you authored any scholarly papers?

***A.*** **Yes.**
***Q.*** And are those papers mostly peer-reviewed?
***A.*** **Yeah, pretty much all of them.**
***Q.*** And what does that mean for the jury, anyone who is not familiar with "peer review"?
***A.*** **Peer review, you write a paper, you think it's a good idea, and you send it into a conference or a journal. And then they have a bunch of other people that do research in that same field review it anonymously, so I don't know who they are. And then they decide whether, in fact, they think it's a good idea and they accept the paper, or they think it's a bad idea and they reject it, and then I have to go back to the drawing board.**
***Q.*** And roughly how many papers are you on?
***A.*** **I think it's 570-something.**
***Q.*** Over the course of your career?
***A.*** **Yes.**
***Q.*** Do you serve as an editor for any publications?
***A.*** **Yes.**
***Q.*** And what are those?
***A.*** **So right now, I'm the Editor-in-Chief of the *IEEE*, which is my professional society, *Journal of Solid-State Circuits*, which is the leading journal in circuit design. And so Editor-in-Chief basically is in charge of the entire *Journal*.**
***Q.*** Are you a fellow in any professional organizations?
***A.*** **Yes.**

*Q.* What are those?
***A.*** **So I'm a fellow of the professional society I just mentioned, the IEEE, which stands for Institute of Electrical and Electronics Engineers. So we call it the IEEE. So I'm a fellow of that society or that organization. I'm a fellow of the National Academy of Inventors.**
*Q.* And when were you named a fellow in those organizations?
***A.*** **The IEEE was somewhere around 2011, and the National Academy of Inventors was, I think, two years ago.**
*Q.* Okay. You mentioned you've been a professor for going on 25 years now?
***A.*** **Yes.**
*Q.* Have you taught coursework in the field of Integrated Circuit Design?
***A.*** **Yes.**
*Q.* How many courses would you say you've taught in that?
***A.*** **Well, when you're the Chair, you don't teach as often. But before that, I used to teach one course every semester, so two courses a year, so I've taught, you know, 20 -- 40 classes or more, yeah.**
*Q.* And I apologize if I already asked this, but are those courses focused in Integrated Circuit Design?
***A.*** **Yes.**
*Q.* Do any of those cover a specific topic I want to ask you more about later called DFT?

**A. Yes. Several of them, yeah.**
Q. So you've taught in the area of DFT yourself?
**A. I have.**
Q. Have you also studied in that area?
**A. Yeah. I studied when I was a student, and then, you know, you study when you teach to make sure you know the material really well.**
Q. Okay. In your work as a professor, do you supervise graduate students?
**A. Yes.**
Q. How many Ph.D. candidates specifically would you say that you've supervised over the course of your career?
**A. Around 50.**
Q. And does that supervision of those 50 students involve overseeing their research?
**A. Yes.**
Q. Do you personally hold any patents, Professor?
**A. Yes.**
Q. How many patents are you yourself on?
**A. I think the number is 53 right now.**
Q. Okay. And very generally, without getting into the specifics, in what areas are those patents?
**A. They're all in Integrated Circuit Design. A lot of them are in low-power design. Some are in high-performance circuit design. So, yeah.**

*Q.* Okay. And I'll have more questions about some of those concepts in a moment, but I just want to get through your background for now.

Those patents, are any of them licensed to companies in the private sector?

***A.*** **Yes.**

*Q.* And do you have a special connection to any of those companies?

***A.*** **Yeah. A couple of them, I cofounded.**

*Q.* And can you tell the jury about two companies in particular that you cofounded?

***A.*** **Sure. So one company is called Ambiq, A-m-b-i-q, and it's based in Austin. And that company designs energy-efficient chips for wearables, mostly, but other applications as well.**

**And then the second company is called CubeWorks. And that company is -- designs and builds really, really tiny sort of millimeter-scale computing systems, sort of microsystems.**

*Q.* And when was CubeWorks founded, please?

***A.*** **That's a good question. I think it's around 2014.**

*Q.* Okay. Are both of those companies still active today?

***A.*** **Yes.**

*Q.* Are you being paid for your work in this case?

***A.*** **Yes.**

*Q.* How much?

***A.*** **$550 hourly.**

***Q.*** And do you have a rough sense of your total billings to this point?

***A.*** **I did look at that. I think the total billings to this point is 48,000, roughly.**

***Q.*** Got it.

***MR. PILCHAK:*** Your Honor, at this time, we'd proceed under Rule 702 unless the Court has anything further.

***THE COURT:*** You may.

***MR. PILCHAK:*** Thank you.

***BY MR. PILCHAK:***

***Q.*** I'd like to ask you some questions about the field that you've been talking about, Professor. You said "integrated circuits" now a couple of times.

Can you just tell the jury, what is an integrated circuit?

***A.*** **Yeah. Sorry for putting the cart before the horse.**

**So integrated circuits implies there's a piece of a semiconductor material, typically silicon, so we just call it silicon. And on that piece of silicon, we embed many transistors, wires, other components, and then connect them all together to perform some function.**

***Q.*** And what is a transistor, please?

***A.*** **So a transistor you can think of as a switch, an electrical switch. You can control whether it's conducting electricity or current, or not conducting by applying a voltage to it, a so-called gate.**

*Q.* And when we talk about integrated circuits, might the layperson know them as chips or microchips?
***A.*** **Yes.**
*Q.* So can we think of those as kind of the same time?
***A.*** **Yes.**
*Q.* If I say "microchips" instead of "integrated circuits," will that be okay?
***A.*** **Sure.**
*Q.* Got it.
You mentioned components on chips, like, transistors or gates.
How big are these things that we're talking about?
***A.*** **Transistors are tiny. You can't see them. They're so -- printed so small. Some of the dimensions today might be tens of nanometers on a side for an individual transistor.**
*Q.* How big is a nanometer?
***A.*** **A nanometer is one billionth of a meter. So a human hair is about 100 microns in width. So 100 microns, a micron is one millionth of a meter. So a nanometer is a thousand times smaller than that. So these transistors are, you know, tens of thousands of times smaller than a human hair in the small dimension.**
*Q.* Okay. Are you familiar with something call a processor or a microprocessor?
***A.*** **Yes.**

*Q.* What is that?
***A.*** **Microprocessor, you can think of, or processor is sort of, like, the brain of a computing system, maybe a larger computing system, like, a phone or a laptop. It executes code or programs, and sort of just runs the show for the entire system, typically.**
*Q.* So there would be transistors inside of a microprocessor?
***A.*** **Yeah. Today, billions of transistors in these processors.**
*Q.* And by arranging those transistors in specific ways, is it possible to use them to do the computations that we're all relying on the processor for?
***A.*** **Exactly.**
*Q.* Let me ask you about the processor.
I assume if I smashed open my cell phone right now, there would be more than one chip inside of it; right?
***A.*** **Yes.**
*Q.* Can you compare the microprocessor inside my phone to the other chips in terms of sophistication or value?
***A.*** **Yeah. So I mentioned there's billions of transistors on the processor. You know, you'd find a memory chip in there that also has many transistors in it, but is a simpler design in some ways. You also have chips that interface the sensors, and those are much smaller, you know, chips. So in terms of value, cost of the chip, it's typically the highest.**
*Q.* Meaning the most expensive piece of hardware inside the

phone?
*A.* **Right.**
*Q.* Got it.
Are you familiar with something called a clock?
*A.* **Yes.**
*Q.* We have a clock in the courtroom, but are you talking about something else.
*A.* **Yeah. In terms of processor, it's different, yeah.**
*Q.* Yeah. What is a clock in terms of a processor?
*A.* **So a clock is a signal that runs across the entire chip that is used to synchronize the activities that are happening as the processor tries to operate.**
*Q.* And, I'm sorry, did you just say the word "synchronize"?
*A.* **Yes.**
*Q.* What does that mean in the context of a microchip?
*A.* **So, you know, when you're running a program or executing code, computer code, there's a lot of things happening, and you want things to happen in a certain sequence. And so the synchronization makes sure that these things are adhered to, that you're operating these things properly in sequence.**
*Q.* So if I'm following you, when you say a lot of things are happening on the chip at the same time, is the chip trying to do one calculation at a time or does it do more than one thing simultaneously?
*A.* **So in order to try to make things run fast -- we all like to**

have our things run fast, our computers run fast -- you know, the designers use this technique called pipelining, where they break up a big chunk of work into a lot of small chunks of work, and then they start to break it down that way. And I have an analogy for that.

*Q.* Yes. What's your analogy?

*A.* So it's a lot like an assembly line, when you're building, like, a car, let's say. So if you want to build a car, it's a complex, sequenced -- complex sequence of tasks.

And so if you start building one car and you wait until you've built the car completely and then you produce that car, and now you start the next one, it's not very efficient. So we use assembly lines, right, where, for instance, a chassis can roll into the plant, and the first station of that assembly line, for instance, puts in the electrical system that is needed for the car into the chassis.

And then when it's done with that, it hands it off to the next station, which then proceeds to, say, put in the power train, while another chassis rolls into that station and they can continue putting in the electrical system; right? And so now, all the different stations can be occupied or used at all times. That's the idea.

*Q.* And a little bit like a real assembly line, the purpose of that is efficiency?

*A.* Yeah. So now the cars are rolling off the assembly line a

**lot faster, you know, because basically each station is fully occupied, you're utilizing the hardware better.**

***Q.*** Did you prepare an illustration of one phase of that complex process that might help demonstrate it to the jury?

***A.*** **Yeah.**

***MR. PILCHAK:*** Let me just show the witness on the screen there Exhibit 872.

***BY MR. PILCHAK:***

***Q.*** Do you see that?

***A.*** **Yes.**

***Q.*** Is that the illustration that you had prepared prior to today?

***A.*** **Yes, that's right.**

***Q.*** Would you be able to draw that on the board conveniently located to your left there to sort of illustrate to the jury this process that you're talking about, with the Court's permission?

***THE COURT:*** Yeah. We're going to need to put a lapel mic on him, however, if he's going to talk from down there, because our court reporter won't be able to hear him.

***MR. PILCHAK:*** I'd like to do that, if possible. Professor, Ms. Fincher is coming over with your mic now.

***BY MR. PILCHAK:***

***Q.*** In the interim, what will you be illustrating when we're talking or thinking about this assembly line?

***A.*** **Well, I'm going to talk a little bit about, to continue the analogy, how we can visualize some of the lingo on this image that I guess not everybody can see right now. But -- and then I'll talk a little bit about the clock and a little bit about the importance of how fast the clock runs.**

***Q.*** Got it.

And would that help you explain your testimony?

***A.*** **Yes.**

***Q.*** Wonderful.

***THE COURT:*** And for the record, we should label this as well.

***MR. PILCHAK:*** Certainly. So what's on the screen right now is Exhibit 872. If we could get a sticker 872A for the thing that Professor Sylvester is about to create.

***THE COURT:*** Perfect.

***MR. PILCHAK:*** Thank you, Mr. Mayberry.

***THE COURT:*** So wait for a question before testifying to anything. Wait for Mr. Pilchak to ask you a question. And for the record, he's drawing something on 872A.

***MR. PILCHAK:*** And also for the record, while Professor Sylvester is doing that, if any of the jurors can't see what he's drawing, to the extent that they can see it around him right now, please let us know. That will be an important part of his testimony.

***THE WITNESS:*** Okay. So --

***THE COURT:*** Wait for a question.

***BY MR. PILCHAK:***

***Q.*** So I notice that you've drawn a line across the bottom there, Professor, that says "clock."

What does that represent?

***A.*** **So this is that synchronizing signal that runs all over. I've shown it to connect to these two particular things *(indicating)*, but there's thousands and thousands of things that it will actually connect to.**

***Q.*** And so is it right to think of this as one stage of the assembly line?

***A.*** **Yeah. So I wrote "tasks/stage." It's basically some unit of work that's happening on the processor. You can think of it, like, adding two numbers together, or multiplying, or doing some other function.**

***Q.*** And what are the boxes on either side of that stage?

***A.*** **Yeah. I wrote this "FF," which is -- we don't really need to know what that mean. It stands for flip-flop. It's what I think of when I see this, but you can think of it as a door. Okay?**

**So the way to continue the analogy is that this is this the data coming in. Okay? And the flip-flop is like a door. It's closed. Okay? Now, it opens briefly to let the information get in so it can be worked on.**

**In the analogy, basically this is a door between the**

**stations of the assembly line. And so the chassis is sitting here waiting for the door to open. When the door opens, the chassis can move in, and then the door closes, and then it can have its work done.**

**Then when the work is done, the door, which is -- both of these are doors -- the door opens again. It can pass through the next stage of the assembly line. It closes. The new one rolls in ready to be worked on. That's the idea.**

***Q.*** Got it. And those doors, they connect to that clock line on the bottom.

Are the timing of the doors opening and closing controlled by the clock?

***A.*** **Yes.**

***Q.*** And I think you said there's a lot of things happening in this assembly line factory at the same time; right?

***A.*** **Right.**

***Q.*** Have you also created some kind of a visual representation of the clock period that you can show the jury?

***A.*** **Yeah. So the clock signal, just looks something like this *(indicating)*. It's a periodic signal. So this is the clock and these are considered to be voltage levels. So, like, low voltage, high voltage.**

**So that's how we do digital chips, zeros and ones. Okay? So this is like a zero or low voltage. This is a high voltage. And it's periodic. So basically, it repeats itself. And is**

**this the period of the clock *(indicating)*.**

**Sorry. My handwriting's not as good as it should be.**

**This is a period of the clock, so how frequently the clock ticks. So like the clock on the wall that Counsel referred to is sort of one second every second. That's one hertz, one over one second.**

**The period here for processors is much, much faster.**

***Q.*** And when you say "much faster," how fast are we talking in real terms?

***A.*** **So the clock period is typically less than a nanosecond in most modern processors today.**

***Q.*** And if a nanometer is a billionth of a meter, what is a nanosecond?

***A.*** **A billionth of a second.**

***Q.*** So fair to say, very fast?

***A.*** **Yeah. So the clock is switching, you know, many billions of times per second.**

***Q.*** And you mentioned synchronizing earlier.

Is it important for the chip to keep all of these different pieces of work synchronized while it's going on?

***A.*** **Yeah. It's very important, because, again, thinking about the assembly line, right, if you've got some chassis sitting here getting something done to it, and you're working on the electrical system, if the door opens too early, for instance, and then it's pushed through, right, and this is not done,**

**right, or likewise, this is just not done in time, the door opens, you push through a chassis that's not ready yet, and you're going to have a big problem with the assembly line. Right? So it's the same concept in chips.**

***Q.*** Got it.

With real assembly lines, sometimes the people who own the assembly line want them to go faster.

Is it true for this, too, that for efficiency's sake, we want to get this time as tight as possible?

***A.*** **Yes. Yes. So the time it takes to complete this task here *(indicating)*, for instance, has to be less than the clock period, because that's the time you've allotted in this station, right, to do the job.**

**And, again, if you finish the job and it's ready and the door opens here, okay, and then you pass it on, that's great. Everything is good.**

**But if you just run it really, really slow so everything is definitely going to be done, you have -- you know, this station is done early, and then you're sitting there waiting for the door to open. It's not very efficient; right? So you kind of want to have it just finish, then pass it on to the next stage.**

***Q.*** So is there a little balance here between getting things to run as fast as we can but making sure that we have enough time for the slowest task that needs to happen in the middle there to be done?

**A. Yeah. That's exactly the issue.**
***Q.*** Okay. Let's put a pin in that and maybe we'll come back to that in a minute. I think you can take your seat again.
Is there anything else we need to know about this diagram?
**A. I don't think so.**
***MR. PILCHAK:*** All right. And permission to approach, Your Honor?
***THE COURT:*** You may. And if you can then take his lapel mic back so we don't have feedback between the two microphones.
***MR. PILCHAK:*** Thank you, Your Honor.
So the board is now 872A, just for the record.
***BY MR. PILCHAK:***
***Q.*** All right, Professor.
In the context of a microchip, are you familiar with something called a path?
**A. Yes.**
***Q.*** What is a path?
**A. A path is a route that data takes through the chip, or you can think of it as through the stage, for instance, that I drew that little oval, that the data can take -- I showed it very simplistically, but, in fact, there's many routes that the data can take to get from the first door to the second door, basically.**
***Q.*** And when you say "routes," are these physical routes that

are laid out on the chip?
**A. Yeah. Actually, we call them routes. They're wires connected to gates, which are basically they do functions, and then they go to the next one and the next one. So, yeah, they're routes.**
Q. Okay. Are you familiar with something called a critical path?
**A. Yes.**
Q. What is that?
**A. So critical path we define as the slowest path to get from the first door to the second door, for instance, in this analogy. Right? So that's the longest time it can possibly take you to do that job. Sometimes it's you can do things faster, some paths are faster. But some are slower and we want to find the slowest one. That's the critical path.**
Q. Got it.
Did you prepare a diagram that would help you illustrate a critical path to the jury?
**A. Yes.**
***MR. PILCHAK:*** If we can show the witness 872, please -- sorry -- 873.
***BY MR. PILCHAK:***
Q. Is this that diagram, Professor?
**A. Yes.**
***MR. PILCHAK:*** All right. Permission to publish,

Your Honor, as a demonstrative only.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** Not to publishing, Your Honor.

***THE COURT:*** Okay. And, ladies and gentlemen, when he says he's publishing as a demonstrative only, what that means is we're showing it to you so -- to help the witness explain what he's testifying about. But it's not an exhibit that you're going to have back in the jury room with you when you're deliberating. It's just something that's being used to try to help explain the witness's testimony.

So you may.

***BY MR. PILCHAK:***

***Q.*** All right. Do you see that there, Professor?

***A.*** **I do.**

***Q.*** What is the jury looking at here in terms of that path concept that you just described?

***A.*** **Yes. It's a little more detailed than the drawing I put on the easel here. But what you have on the far left and the far right are a bunch of these doors, right, the FFs that -- I used the same terminology here. And in the middle, you've got all these shapes, and these shapes represent different types of logic gates. It doesn't really matter what they are here.**

**But what you can see that the lines represent -- I think I can write on this. So, like, this line *(indicating)*, and these sort of, you know, lines are wires connecting the gates together**

**electrically. So, you know, sending one signal from the output of the gate to the next gate.**

**Anyway, what you can see here is that you can draw a path through lots of different -- in a lot of different ways from the left side to the right side. So if you just go along the top, I can draw across this, so it goes through that triangle image, and then it goes through --**

***THE COURT REPORTER:*** Can you slow down?

***THE WITNESS:*** I'm sorry. Sorry. Sorry.

It goes through the first object, which is a gate. And then it has -- it goes through the second object, which is another gate. And then it goes to the third, and then it goes to the next door and waits for it to open, as we talked about.

But if you see the path in red at the bottom, it's a longer path with bigger gates and, you know, things like that. So you can identify what is the slowest path that I can walk through this circuit. And, again, this is an oversimplified one. They look much more complicated in reality.

***BY MR. PILCHAK:***

***Q.*** And Professor, why would someone want to identify the slowest path?

***A.*** **Well, that tells you how rapidly you can open the doors; right? It tells you, you know, when everything is guaranteed to be done so that when you -- when the clock transitions again, you can actually go ahead and be confident that the data is**

**complete and I can hand it to the next stage of the so-called pipeline or assembly line.**

***Q.*** Because otherwise, if you open the doors on the right and all the data isn't ready, your process might fail?

***A.*** **That's right.**

***Q.*** Okay. Is it easy to identify the critical path on a microchip with billions of transistors?

***A.*** **No.**

***Q.*** Why is it not easy?

***A.*** **Well, there are a very large number of paths. And many of them are very close to each other in terms of how long they might be. We have very sophisticated software tools that are used to try to determine what the slowest paths or the critical paths are. But you'll find that there's many that are very close to each other. That's one issue.**

***Q.*** And I was going to ask about that.

Is there only one critical path on any given chip?

***A.*** **No. And then even a path that, you know, let's say, for instance, you expect a certain task to take a certain amount of time, and there's another path that's just a little bit faster, when you actually manufacture millions of chips, sometimes that slightly faster path will actually be a little bit slower than first one.**

***Q.*** And is that because of something called process variations?

***A.*** **Right. So process variation refers to the idea that we**

**process these chips, we manufacture these chips, it's not perfect.**

**So even though we have nominally identical chips -- and, again, you're making millions of these, in many cases -- they're all subtly different in terms of their performance, because the transistors may be a few nanometers different, and that makes a big difference.**

***Q.*** Because these things are so tiny?

***A.*** **Right.**

***MR. PILCHAK:*** I think we can take that image down. Thank you.

***BY MR. PILCHAK:***

***Q.*** Let me ask you, Professor, do chip manufacturers test chips for these issues, among others?

***A.*** **Yes.**

***MR. PILCHAK:*** And maybe we can take the annotations off as well, Ms. Fincher.

Oh, pause for one moment, Ms. Fincher. Defense has requested that we capture a copy of 873A with the annotations, but I'm getting a head shake from Ms. Fincher.

So just for the record, Professor Sylvester has drawn a line from the kind of top left center to the right left center to illustrate one path, and then kind of a half of a T-shaped line on the right-hand side to illustrate another, as compared to the critical path in the last diagram.

Anything else?

***MS. BERNSTEIN:*** No.

***MR. PILCHAK:*** Okay. Thank you, Ms. Fincher.

***BY MR. PILCHAK:***

***Q.*** How do you test microchips, professor?

***A.* In its simplest form, you could say that when a chip comes off the manufacturing line, so to speak, you can try to execute a test program on it. And that test program can give you information as to whether the chip works functionally, how fast it might work, and whether there's any sort of defects or problems with the chip.**

***Q.*** And I think you've already alluded to this, but when a company is trying to manufacture a thousand or a million chips that are identical, are they all going to behave the same way when they're produced in the real world?

***A.* Not exactly the same, no.**

***Q.*** And does that matter?

***A.* Well, it matters, you know, if you want to extract the highest performance possible or be as efficient as possible with all of your chips.**

***Q.*** And how long does it take to test chips, if we have to think about that?

***A.* It depends on the complexity of the design, but the types of chips we're talking about in this case, for instance, typically might take on the order of, like, five seconds total time.**

***Q.*** That sounds pretty fast to me.
Does it matter to a manufacturer, though, to spend five seconds per chip?
***A.*** **Yeah. So, again, we have millions of chips, so it adds up. And also the way it works is that typically, you're paying per unit time for how much -- the cost to test depends on the time it takes to test linearly.**
***Q.*** And so is that another way of saying that time equals money for testing?
***A.*** **Right.**
***Q.*** And so if we zoom out from any one microchip, in your experience, is test time, to test the chips after they're built, is that expensive?
***A.*** **Yeah. I mean, it's fairly expensive. It's not as much as the silicon costs** *per se*, **but it's an important factor and companies want to minimize it.**
***Q.*** Got it.
Are you familiar with something called DFT, or Design For Test?
***A.*** **Yes.**
***Q.*** What is that?
***A.*** **Design For Test, because companies want to reduce the amount of time it takes to test their chips, but they also want to thoroughly test them and make sure that they're working properly, they put in a little bit of extra hardware, or they**

**put in some techniques into the design that are there solely to help them test it more efficiently or more thoroughly.**

*Q.* So it's something that you build on the chip before you produce it that's not for performance; it's just for test?

*A.* **Right. So it's mainly pretty much used at the very beginning when the chip is first brought up during test. It's not used in the field when a consumer like me or you buy it and then use it in our phones, for instance.**

*Q.* Do you have an analogy for that one?

*A.* **I've been thinking about one. I think it's continuing on the car theme --**

***MS. BERNSTEIN:*** Objection, Your Honor. Beyond the scope.

***THE COURT:*** Overruled.

***THE WITNESS:*** When you talk about cars, you think about lemons; right? You don't want -- the car manufacturer doesn't want to put out a lemon or a car that sells that's not going to work right. But they don't have time to drive cars around for thousands of miles to really thoroughly exhaustively test it in hot climates, cold climates, everything like that.

So imagine a car comes off the assembly line that we're talking about here, and the engineer can get in it, push a test mode, okay, kind of like sport mode or Eco mode. They have a special test mode they go into.

It basically stress tests the car. They drive it

around the block. And from that very quick test, they can realize, Hey, this car is working just fine, we can sell it; or it's not, and we're not going to sell this car, we're going to save ourselves the headache. Right? So something like that.

And that test mode will never be used in the field. It's disabled or just not used by the consumer. Something like that. But the issue there is that the manufacturer has had to add that mode in and add that into the car. It costs them money to do it, but it brings them value.

***BY MR. PILCHAK:***

***Q.*** Okay. And a concept like that, something that's created just for purposes of testing, does that relate to optimizing the speed of that process and the reliability of that process?

***A.*** **Can you rephrase? I'm not sure what you mean by that.**

***Q.*** Sure.

Is the point of having DFT to speed up the testing?

***A.*** **Oh, to speed up the testing, sure. Speed up the testing or to make it, you know, you feel more confident that it's a thorough test.**

***Q.*** Got it.

So both speed and thoroughness?

***A.*** **Right.**

***Q.*** Okay. Switching gears a little bit, are you familiar with something called Low Power Design?

***A.*** **Yes.**

*Q.* What is that?

**A. You know, chips consume power. So, for instance, battery in your smartphone, you're drawing energy from the battery to do the functions. And we want to reduce the power it draws, and so, you know, that's the state -- that's Low Power Design.**

*Q.* And why does that matter for something like a cell phone?

**A. Well, if I can perform the same functionality and performance and I can do it with less power, then I can get longer battery life and everything else is just as good. So that's a plus from a consumer perspective.**

*Q.* Going back to the car example, would that be like getting better mileage out of your car with the same performance on the road?

**A. Exactly.**

*Q.* Are you familiar with something called AVS?

**A. Yes.**

*Q.* What is that?

**A. So AVS stands for Adaptive Voltage Scaling. And the voltage scaling part of the word -- of that phrase is saying that we want to change the voltage use to power the chip. Okay? And the voltage has a very strong impact on both the power and the performance or speed of the chip.**

**And we can use that voltage to try to trade those two things off.**

*Q.* And let me jump in there.

When you say voltage is related to performance, you mean as voltage goes up, what happens to performance?

**A. Performance goes up, because the transistors can conduct more current or electricity and be faster.**

*Q.* But as voltage goes up, what happens to power use and battery life?

**A. Power use grows dramatically up, and then battery life goes down.**

*Q.* Got it.

So you could increase the power on a device to make it perform better, but you would lose something in the battery department?

**A. Sure.**

*Q.* And conversely, you could save power, but that might affect performance.

**A. Typically, yes.**

*Q.* Okay. And so going back to AVS, is that a technique to try to manage this tradeoff?

**A. Yeah.**

*Q.* How so?

**A. So AVS is a concept -- a pretty advanced concept where a company will have a performance target; right? They want to produce, you know, cars at a certain rate. Or in the processor world, they want to have a certain clock speed. And they want to use a voltage that's as low as possible to still meet that**

**performance. Because if the voltage goes any lower, they won't meet that performance. But if the voltage is higher than that, they're wasting power.**

***Q.*** And is that technique particularly helpful because of the chip variability you talked about earlier, meaning all the chips don't come off the assembly line exactly the same?

***A.*** **Right. So, you know, some chips, because they came off the line maybe a little bit faster or a little bit slower, they may require a slightly higher or lower voltage to meet the same performance. And that's what Adaptive Voltage Scaling is trying to do, find the lowest voltage to achieve performance in each individual chip.**

***Q.*** Okay. Are you familiar with something called Binning?

***A.*** **Yes.**

***Q.*** What is that?

***A.*** **Binning is the idea where, as I just mentioned, some chips come out a little bit faster, some come out a little bit slower. And you can imagine bins that you can toss the chips into -- not literally, perhaps -- but you can toss them into where you say, I've measured the performance, tested it, right, of this chip.**

**It's a fast chip, I'll put it into the fast bin. This one, I'll put into the slow bin. This one, I'll put into the typical bin. And then each of those might have a different voltage assigned to it or some other properties assigned to it.**

***Q.*** And are there only certain kinds of chip manufacturers that

use that technique?

**A. Yeah. It's a sophisticated technique. It increases cost of testing, because you have to do a lot more, you know, analysis. So if you're building a pretty basic low-end, very cheap 2-cent, 5-cent chip, which some chips sell for 5 cents, you're not going to be able to do that.**

***Q.*** Is Qualcomm the kind of company that manufactures sophisticated chips that could benefit from that?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** I'll allow it.

***THE WITNESS:*** Sorry. Can you repeat?

***BY MR. PILCHAK:***

***Q.*** Is Qualcomm the kind of sophisticated chip manufacturer that could benefit from Binning?

***A.*** **Yes.**

***Q.*** Now, I'd like to ask you about Abreezio.

Are you familiar with a company called Abreezio?

***A.*** **Yes.**

***Q.*** For your work in this case, did you make an effort to understand and analyze Abreezio's technology?

***A.*** **Yes.**

***Q.*** Just in terms of the steps you took, how did you go about doing that?

***A.*** **So I analyzed a lot of documents and materials. They included patent portfolio, provisional patent applications,**

**non-provisionals, issued patents that Abreezio had worked on.**

**I had a lot of corporate overview, and sort of slide decks that they had prepared about what their capabilities were that they were trying to present themselves as.**

**I looked at Qualcomm internal documents, analyzing how Abreezio technology could help their own products. I looked at a software development kit for one of their products. I looked at internal emails, particularly from Qualcomm about the company, things like that.**

***Q.*** And second-to-last, you mentioned something called a software development kit.

What is that?

***A.*** **It's just basically, like, a manual that is describing a piece of software that can be used for something and trying to essentially show people how to use it, or what's under the hood, to some extent, and describe its features.**

***Q.*** And we're going to talk about Abreezio's different products here in just one second, but did that software development kit tie back to one product in particular?

***A.*** **Yeah, one of them.**

***Q.*** Was it TruSens?

***A.*** **Yes, TruSens.**

***Q.*** Did you feel that the materials you reviewed gave you a sufficient basis to understand what Abreezio was offering?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Overruled.

***THE WITNESS:*** Yeah, it did.

***BY MR. PILCHAK:***

***Q.*** Before I go any further with that, did you review the source code for the software?

***A.*** **No.**

***Q.*** What is source code?

***A.*** **Source code is basically the -- for a software program or a tool, it's the actual code that's been written that executes to run that software.**

***Q.*** And why did you feel that you sufficiently understood Abreezio's products if you hadn't looked at the source code?

***A.*** **So I looked at a lot of documents. I mean, it wasn't, like, 10 or 20 documents. This was hundreds of documents. And I saw a lot of consistency in the story, across both the Abreezio side and the Qualcomm side, the internal, the external-facing documents, about the nature of the products, the advantages of the products, the benefits of the products to Qualcomm. So it was all consistent. And so that gave me confidence in my conclusions.**

***Q.*** And how many products, at a high level, did Abreezio have?

***A.*** **I would characterize it as two main product lines.**

***Q.*** And if I can sort of follow along with your testimony here, what was the first product, please?

***A.*** **So TruSens, as we just mentioned, is one.**

***THE CLERK:*** Do you want this for the jury?

***MR. PILCHAK:*** Yes, with the Court's permission.

***THE COURT:*** Okay. It depends on what you're going to write on there. But show me what's currently on there.

***MR. PILCHAK:*** If I only write the things that Professor Sylvester says in response my questions, would it be agreeable to publish this to the jury to help them follow along?

***BY MR. PILCHAK:***

***Q.*** And let me ask, Professor Sylvester, would it help you explain to the jury your testimony and keep track of the different concepts if we kind of kept a list here?

***A.*** **Sure, that would be good.**

***MS. BERNSTEIN:*** Your Honor, I think I'll just object. I'm not sure that it's helpful to write down words.

***MR. PILCHAK:*** We can skip it, Your Honor.

***THE COURT:*** Okay. I think that would be best.

***MR. PILCHAK:*** Very good.

***BY MR. PILCHAK:***

***Q.*** So the first product was called TruSens; right?

***A.*** **Yes.**

***Q.*** We talked about a couple of different technologies when we were doing general background on the field and how the field works; right?

***A.*** **Mm-hmm.**

***Q.*** What kind of technology was TruSens?

**A. TruSens was basically related to Adaptive Voltage Scaling, which we talked about a few minutes ago, the AVS.**
Q. So TruSens was an AVS product?
**A. Yeah.**
Q. And was there a particular name for the software or the subproduct for TruSens that Abreezio had that you saw?
**A. I mean, they used other terms sometimes, less often. CoolBreez was one of them.**
Q. CoolBreez, is that C-o-o-l-B-r-e-e-z?
**A. Correct.**
Q. Okay. And you saw that as being associated with TruSens?
**A. Yes.**
Q. Was there a second major product that Abreezio had?
**A. Yes, TruTest.**
Q. Okay. So one is TruSens, and that was an AVS or a sensor technology?
**A. Mm-hmm.**
Q. And one is TruTest.
This might be obvious, but what kind of technology was that?
**A. It was a Design For Test, or DFT, technology like we just talked about a minute ago.**
Q. And was there a breeze kind of name for that subproduct that you saw?
**A. Yeah. They also used the term DFTBreez as part of that.**
Q. Got it.

So if we think of TruTest, it's a DFT product, you just said?

**A. TruTest is a DFT product, yes.**

*Q.* And if we see DFTBreez, your testimony is that that's associated with this TruTest family?

**A. Yes.**

*Q.* Okay. Let me ask you about TruSens first.

What issue was TruSens trying to address?

**A. So we talked a lot in the background about critical paths, about process variation, and how it was hard to identify the true critical paths. You need to know basically how quickly you can open those doors, right, and still get the correct information or chassis pushed through; right?**

**And so this is -- the problem it was trying to solve was how do I know how fast I can run the chip without failing, or how low I can bring the voltage, basically, without failing at a given frequency. So it was then Adaptive Voltage Scaling-related.**

*Q.* I don't know that we've used the word "margin" so far, but that concept of getting those as tight as possible, is that related to an idea called "margin"?

**A. Yeah. So margin is exactly -- again, pointing to the figure I drew over here -- as that chassis completes this task, for instance, let's say it's having the electrical system put in, how soon or how much time before the door opens did I finish the**

**job.**

**And if that's, like, a little bit of time, it's a little bit of margin; if it's a long time and I'm waiting a long time, that's a lot of margin. Of course, if I don't even complete my task, then I have no margin. That's not good. So that's margin.**

*Q.* So that's the issue.

What was the solution to that issue that TruSens came up with?

***A.*** **So their solution was essentially to monitor along these critical paths how much margin there really is, and then use that information to try to control essentially what the voltage is, or equivalently, you know, how to open the doors at the right time.**

*Q.* And what specific hardware did TruSens use to tackle that problem?

***A.*** **So they had these sensors, so they call them timing margin sensors, or different things that they would use to basically detect how much margin there was in the real system.**

*Q.* And then based on those measurements, would they adjust the voltage up and down?

***A.*** **Correct.**

*Q.* Okay. Are you familiar with a provisional patent application that was submitted on December 22nd of 2014?

***A.*** **Yes.**

***MR. PILCHAK:*** And if we could show the witness Exhibit 830, please.

***BY MR. PILCHAK:***

***Q.*** Do you see it on your screen there?

***A.*** **Yes.**

***MR. PILCHAK:*** Maybe we can zoom in on the top half because it's pretty tiny. Oh, and I'm told this is in evidence already.

Let's do the bottom half, actually. Sorry.

***THE COURT:*** It is.

***MR. PILCHAK:*** Thank you, Your Honor.

Can we get the inventors, too? I'm sorry. Thanks.

***BY MR. PILCHAK:***

***Q.*** Is this the bottom half of the first page of that provisional patent application you were just talking about?

***A.*** **Yes.**

***Q.*** And there's a title here for the invention.

Do you see that?

***A.*** **Yes.**

***Q.*** I'm going to go slow, but I'm going to read it because it's important.

Is the title "Circuitry and method for critical path timing speculation to enable process variation compensation via voltage scaling"?

***A.*** **Yes.**

*Q.* Okay. And who is the inventor who's listed on this provisional patent application?
***A.*** **Sheida Arabi.**
*Q.* Is she the only inventor listed?
***A.*** **Yes.**
*Q.* For example, is Bozena Kaminska listed?
***A.*** **No.**
*Q.* Do you have an understanding of who that is, by the way?
***A.*** **I do.**
*Q.* Who is that?
***A.*** **She's a professor in Simon Fraser University, I believe.**
*Q.* Okay. Did she have any kind of a relationship to Sheida or to Dr. Arabi, as far as you know?
***A.*** **I think -- I think they do, yeah.**
*Q.* Let me stop you there, then.
My next question is, based on your review of all the things that you've just described, is Abreezio's TruSens product largely based on the technology described in this provisional patent application with Sheida's name on it?
***A.*** **Yes.**
*Q.* Why do you say that?
***A.*** **So the materials I looked at as I -- as I mentioned, going through the list, they all pointed to specific advantages and features of the TruSens approach that Abreezio was pitching to Qualcomm. And the techniques or the advantages and the**

**approaches all echoed very closely what was laid out in this provisional.**

***Q.*** So you saw a consistency between the documents describing Abreezio's technology and what you read in this provisional patent application?

***A.*** **Yes.**

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** Is the foundation of this patent application sensor design?

***A.*** **Yes. Sensor design for a specific purpose, yeah.**

***Q.*** And is that purpose measuring actual critical paths?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** What is the purpose of the sensor design laid out in this provisional patent application?

***A.*** **To measure timing margin on critical paths and use that to set the voltage appropriately.**

***Q.*** And is it your understanding that that's what the TruSens product, as marketed to Qualcomm, actually did?

***A.*** **Yes.**

***Q.*** By the way, are you familiar with the difference between a provisional patent application and a non-provisional patent application?

**A. Yes.**

***MR. PILCHAK:*** At this time, Your Honor, I'd like to read Stipulation 4 that the parties have agreed to, to the jury.

***THE COURT:*** Okay. You may do so.

And just to remind you, ladies and gentlemen, when there's a stipulation between the parties, that means the parties have agreed that those facts are true and you must accept them as true.

***MR. PILCHAK:*** Thank you, Your Honor.

"The parties stipulate that getting a patent is a multistep process that can include preparing and submitting a provisional patent application, preparing and submitting a patent application, and receiving approval for the patent claims deemed allowable by a patent examiner at the U.S. Patent and Trademark Office.

"Provisional patent applications are filed with the USPTO, or the Patent and Trademark Office, but are not examined by the PTO. They can be filed by anyone who pays the filing fee. There is no specific form that these applications must take.

"The claims in a non-provisional patent application are examined by the USPTO. Non-provisional patent applications get a priority date from the earliest provisional patent application referenced."

///

***BY MR. PILCHAK:***

***Q.*** Did you hear that, Professor Sylvester?

***A.*** **Yes.**

***Q.*** Do you agree with those facts as stipulated?

***A.*** **I do.**

***Q.*** Is there a clarification, though, to 4(c) about the priority -- well, let me get to that in one moment.

It sounds like, then, that provisional patent applications, like the one that we were just looking at, are actually filed with the PTO; right?

***A.*** **Yes.**

***Q.*** And if I say "PTO," do you understand that to mean the U.S. Patent and Trademark Office?

***A.*** **Yes.**

***Q.*** Does anybody review them there, though?

***A.*** **No.**

***Q.*** And can you get an issued patent just on the strength of a provisional patent application?

***A.*** **No.**

***Q.*** Why would anybody bother, then?

***A.*** **It's important for getting your foot in the door, so to speak, colloquially. You know, you want to get a date down on a possible -- on an invention that you're planning to later file a full application and then convert to a full U.S. patent.**

***Q.*** And why would it matter to get your foot in the door?

***A.*** **Well, dates matter on inventions. You know, if somebody comes in after me and tries to say they invented the same thing, and I have a provisional that's earlier dated, I can prove that I invented it first. If I don't have that, then I can't prove that.**

***Q.*** And maybe I should have said this first, but what is the point of even having a patent?

***A.*** **To protect your intellectual property.**

***Q.*** To be able to say that it's yours and potentially prevent other people from using it if they try to steal it?

***A.*** **Yeah, or receive royalties from that or -- yeah.**

***Q.*** Okay. And so this concept of getting a provisional so you have your foot in the door, is that related to something called a priority date?

***A.*** **Yes.**

***Q.*** What is a priority date?

***A.*** **Well, for a patent, an issued patent, what you'll find typically is there will be a date at the top that says that's the date the patent was issued. But if you look back, it will say the priority date is earlier than that, and it will stem back all the way to the first provisional that was filed that related to the final, issued patent. And it could be quite some time. So it can give you a -- you know, a better, you know, head start on essentially asserting your patent and saying I invented this.**

*Q.* Okay. So if I invent a new tissue box and I file a non-provisional application today for the tissue box, but I have a provisional that went in 12 months ago, I can claim that older date 12 months ago as the date that I invented the tissue?

**A. As long as it's relevant to the non-provisional and it's within 12 months, yeah.**

*Q.* Okay. And if in the last six months Mr. Olah comes along and files his own provisional that says he invented the same tissue box, I could box him out -- no pun intended -- and defend my own tissue box that went in before his.

**A. Correct.**

*Q.* Okay. So that was a little bit about TruSens before we got to the patent process; right?

**A. Yes.**

*Q.* Let me ask you about TruTest.

Kind of the same question, what issue was TruTest trying to address?

**A. Well, we talked about testing of chips, and that it's, you know, necessary. And the more complex the chip, the more complex the testing process, and time is money, so it's expensive. And so you want to reduce the time it takes to test your chip, but still be confident that the test is proven it works. So TruTest was aimed at basically reducing the amount of time it takes to thoroughly test your chips.**

*Q.* And you mentioned earlier that time is money; right?

***A.*** **Yes.**
***Q.*** So getting that time down would have a financial benefit?
***A.*** **Correct.**
***Q.*** So that's the issue that TruTest is trying to solve.
At a high level, how did it go about trying to solve that issue?
***A.*** **Well, they had sort of three different subproducts underneath that, I would say, that they were pitching.**
***Q.*** And, again, at a high level, what were those products?
***A.*** **Do you want me to go one by one or just sort of generalize?**
***Q.*** Let's do one by one.
***A.*** **Okay. So the first one they referred to -- well, the first one had to do with -- I'm trying to see how to summarize this succinctly.**
**Certain types of tests, you want to see how fast the chip will run effectively. And that's sometimes called Fmax Test, so maximum frequency testing. And the Abreezio folks said, We can use the timing sensor to give us the ability to test maximum frequency intrinsically, so therefore, that helps there. So that was sort of that first product.**
***Q.*** And so can we think of the first product as an Fmax or FTP product?
***A.*** **They called it FTP. So you could think of it like that. It has to do with, yeah, frequency testing.**
***Q.*** Got it. So Product No. 1, FTP.

**A.** **Okay.**
**Q.** What about Product No. 2?
**A.** **Product No. 2 they referred to as TTP. The first T would be for transition. And when chips fail, there's a lot of different ways it can fail. This gets into the weeds a little bit, but one of the ways that they test it is they want to look for specific gates, and they want to look at the output of the gate and see if the transition from low to high or high to low, right, is really, really slow, which is going to cause everything to fail. And so they're looking for transition faults or errors, and that's what they focused on in the second product.**
**Q.** Got it. So Product 1, FTP.
**A.** **Yeah.**
**Q.** Product 2, TTP.
**A.** **Right.**
**Q.** And what about the third product?
**A.** **Third one was called PCR, which stood for Pin Count Reduction. And that one was a fair bit different from the first two. It had to do with basically how can I reduce the number of connections that a chip has to the outside world.**
**And the reason why that's useful is because if I can reduce that, I might be able to save on costs of the chip. So a different technique.**
**Q.** So third product now, PCR.

*A.* **Right.**

*Q.* Thinking of it in terms of those three products, did any of TruSens -- sorry -- TruTest's products incorporate the sensor design from the Abreezio TruSens product?

*A.* **Yes, some did.**

*Q.* Which ones?

*A.* **So the first one was really fully reliant on using the sensor that we talked about already to reduce test cost. So that FTP, as you said, that one really relied on the sensor.**

*Q.* And that's the sensor from the provisional patent application that we were looking at a moment ago?

*A.* **Right.**

*Q.* What about the TTP product, did that leverage the sensors, in part?

*A.* **Yeah, in part. The TTP had a lot of other techniques going that were unrelated. But if you read the inventions, the patents and the patent filings related to the TTP technology, they all point back to the same types of sensors that were in the original provisional as a supplemental or augmenting technique.**

*Q.* Okay. So that second one relies, maybe in part on the sensors, but not as heavily as the first one?

*A.* **Sure.**

*Q.* And what about that last one, did that have anything to do with the sensors from TruSens?

**A. No.**

***Q.*** Okay.

***MR. PILCHAK:*** Let's show the witness 831 while we're checking on that.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, Professor Sylvester?

**A. Yes.**

***MR. PILCHAK:*** And if we can zoom in on the center there with the date and the application number.

***BY MR. PILCHAK:***

***Q.*** What is this?

**A. So this is a second provisional application filed in December of 2014.**

***Q.*** And you see the application number listed there?

**A. Yeah. It has the same last three digits, unfortunately, as the other one.**

***Q.*** Go figure.

**A. But it's the 097072.**

***MR. PILCHAK:*** Okay. Move to admit 831.

***MS. BERNSTEIN:*** No objection.

***THE COURT:*** It may be admitted.

***(Exhibit 831 admitted.)***

***MR. PILCHAK:*** Let's take that down, just the zoom. And then if we can go to page 19, please. And just zoom in again from the inventor to the bottom. Thank you, Mr. Reyes.

***BY MR. PILCHAK:***

***Q.*** All right. So what is the title of this invention, Professor?

***A.*** **This one is "Timing fault coverage enhancement through test point insertion."**

***Q.*** And who is the inventor listed here?

***A.*** **Sheida Arabi.**

***Q.*** Once again, she's the only inventor?

***A.*** **Correct.**

***Q.*** No Bozena Kaminska?

***A.*** **Correct.**

***Q.*** Have you reviewed this provisional patent application?

***A.*** **Yes.**

***Q.*** And I think I forgot to ask, did you review the other one too --

***A.*** **Yes.**

***Q.*** -- as part of your work in this case?

***A.*** **Yes.**

***Q.*** The TruTest product family that you were just testifying about, based on your analysis, did TruTest rely on the inventions and concepts that are in this provisional patent application?

***A.*** **Parts of TruTest, yes, the ones that we talked about earlier.**

***Q.*** So not all of it?

**A. Not all. Not PCR, for instance.**

Q. Okay. And is this application for a DFT technology?

**A. Yes.**

Q. Did you try to determine whether the ideas in this application relate, in part, to that first provisional application that went in six days earlier?

**A. Sure. I saw commonalities, yeah.**

Q. What are those commonalities?

**A. Well, they both use the same sensor design. So the sensor was the crux of the previous provisional. It's also very critical to this provisional.**

Q. So there is overlap as to the sensors?

**A. Right.**

Q. Did you notice any figures that were in common between the provisional patent applications?

**A. Yeah. Yeah, they had some overlap.**

Q. Got it.

If we take that down, did you review just those two patent filings for Abreezio or did you review others?

**A. Others, as well.**

Q. And based on your analysis, did Abreezio file any non-provisional patent applications that resulted in official issued patents?

**A. Yes.**

Q. Did any of those -- just focusing on the applications, did

any of the applications have Sheida's name on them?

***A.*** **Yes.**

***Q.*** How many, if you remember?

***A.*** **Two, I believe. Yeah.**

***Q.*** And did both of those result in issued patents or just one?

***A.*** **Just one.**

***Q.*** So what does that mean for how many Abreezio patents, if we can think of all of the patent applications that were filed in connection with Abreezio that way, how many of the Abreezio-issued patents have Sheida's name on them?

***A.*** **Well, just one issued patent has her name on it.**

***Q.*** Okay. Did you do any analysis of whether Abreezio's patent applications were related to the two original provisionals that we were just talking about?

***A.*** **I did.**

***MR. PILCHAK:*** First, I'd hike to show the witness Exhibit 874, please. I don't think this one is in. Just zoom in on the top half, perhaps.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, Professor?

***A.*** **Yes.**

***Q.*** Is this one of those later applications and collections of patent documents related to the Abreezio applications?

***A.*** **Yes.**

***MR. PILCHAK:*** Move to admit 874.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No objection, Your Honor.

***THE COURT:*** It may be admitted.

***(Exhibit 874 admitted.)***

***BY MR. PILCHAK:***

***Q.*** Okay. You see where there's a patent number in the top middle there?

***A.*** **Yes.**

***Q.*** What does that mean to you?

***A.*** **Well, that means there's an issued patent, because it has a formal patent number. That number is in the ballpark of patent numbers that I'm used to seeing, 10 million or so.**

***Q.*** So looks like a patent number to you?

***A.*** **Yes.**

***Q.*** Is there also an application number here on the top left?

***A.*** **Yeah.**

***Q.*** What does that mean?

***A.*** **That's the application number of the non-provisional application that was filed to -- to get this patent issued.**

***MR. PILCHAK:*** And I've just circled those two numbers, but, Ms. Fincher, if could you take those down. And let's bring the zoom down and zoom in on the bottom half, please, Mr. Reyes.

***BY MR. PILCHAK:***

***Q.*** Does this list the inventors on the first page of 874?

***A.*** **Yes, it does.**

***Q.*** Do you see Sheida's name there?
***A.*** **I do.**
***Q.*** The last documents that we looked at said Sheida Arabi; right?
***A.*** **They did, yeah.**
***Q.*** What is Sheida's name in this document?
***A.*** **Sheida Alan -- or Alan.**
***Q.*** Okay. I think you said a moment ago that non-provisional patent applications, the kind that you can get a real patent off of, sometimes will refer back to earlier provisionals; right?
***A.*** **Right.**
***Q.*** Does this application refer back to provisional patents?
***A.*** **Yes.**
***Q.*** Does it refer back to one of the patent -- non -- let me stop myself.
Does it refer back to one of the provisional patent applications with Sheida's name on it that we were just looking at?
***A.*** **Yeah, the 095,072, the first one we talked about.**
***Q.*** Exhibit 830. Okay.
And so, again, what would be the benefit of doing that, in terms of this priority date concept that you had mentioned?
***A.*** **Well, so this patent, if you look at the top, it said something like September of 2017 or October of 2017 is the issued date for the patent. But if it was ever litigated,**

**meaning, you know, people were trying to invalidate the patent or something, they would have to go back before the priority date, which is December 22nd, 2014, and find, you know, prior art. So it gives an initial date for the ideas that were in this patent.**

***Q.*** Okay. And, again, if I'm following your testimony, this is an issued patent; right?

***A.*** **Mm-hmm.**

***Q.*** That was issued on the back of a non-provisional application; right?

***A.*** **Right.**

***Q.*** And that non-provisional application referred back to a provisional application that happened first.

***A.*** **Yeah. I think more than one in this case, but, yeah.**

***Q.*** Fair enough.

And all three of those documents that I just gestured in the air to had Sheida's name on them in some form; right?

***A.*** **Yes.**

***Q.*** Did you try to do an analysis of any other patent filings in the Abreezio family that were related to Sheida's -- to the patents that had Sheida's name on them?

***A.*** **Yes.**

***MR. PILCHAK:*** All right. Let me take that down. And let's show the witness 871. I don't think this is in, either.

///

***BY MR. PILCHAK:***

***Q.*** Is this another patent package, Professor?

***A.*** **Yes.**

***Q.*** And is this a provisional patent application?

***A.*** **Yeah, it's a provisional.**

***Q.*** Okay.

***MR. PILCHAK:*** Move to admit 871.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No objection, Your Honor.

***THE COURT:*** 871 may be admitted.

***(Exhibit 871 admitted.)***

***MR. PILCHAK:*** Okay. Let's zoom in on the top half, please.

***BY MR. PILCHAK:***

***Q.*** And I should have been clearer, Professor, we're just looking at the first page of these packets here; right?

***A.*** **Right.**

***Q.*** But is it your understanding that there's dozens of pages in most of these that we haven't leafed through for purposes of your testimony today?

***A.*** **Yes.**

***Q.*** But you've reviewed the packages yourself; right?

***A.*** **Correct.**

***Q.*** All right. So for this application, when did the application go in?

***A.*** **April 13th of 2015.**

***Q.*** And I've circled that date in the middle there.

Is that how you determined that?

***A.*** **Yes.**

***Q.*** And there an application number here, too.

Do you see that?

***A.*** **Mm-hmm.**

***Q.*** Can we refer to that as the 4/12 application?

***A.*** **Sure.**

***Q.*** And then what is this part over here where it says "first named applicant"?

***A.*** **Well, that's just the inventor name, first inventor name listed. There could be multiple names. They just put one there.**

***Q.*** Okay. And then there's kind of an address block here on the left.

Do you see that?

***A.*** **Yes.**

***Q.*** Whose name is listed there?

***A.*** **Sanjiv Taneja.**

***Q.*** And what do you understand to be the significance of that?

***A.*** **He was the CEO of Abreezio.**

***Q.*** Okay.

***MR. PILCHAK:*** And just for the record, I've circled or highlighted the last four things that I talked about, but maybe

we can take those down.

Let's come out of the zoom, Mr. Reyes, and then go to page 9, please.

***BY MR. PILCHAK:***

***Q.*** Did you look at the list of inventors on this document?

***A.*** **Yes.**

***MR. PILCHAK:*** Can we zoom in on the inventors and applications there in the middle, Mr. Reyes?

***BY MR. PILCHAK:***

***Q.*** What names do you notice here?

***A.*** **Bradley Quinton, Andrew Hughes, Trent McClements, and Sanjiv Taneja.**

***Q.*** Do you see Sheida's name?

***A.*** **No.**

***Q.*** Even though Sheida's name is not listed on this application, did you look to see whether there were any similarities between the information in this document and the information in one of those original provisionals that did have Sheida's name on it?

***A.*** **I did.**

***Q.*** What did you find?

***A.*** **I found significant overlap in the two provisionals.**

***Q.*** And when you say "significant overlap," what do you mean?

***A.*** **I found much of it was copied word-for-word. I found the figures, although redrawn, were essentially very familiar. I think there was only one paragraph that was substantially**

**different between the two.**

*Q.* And when you say there was a lot of overlap, I want to ask you about some sections in particular.

Are you familiar with the "Background" section of a patent?

*A.* **Sure.**

*Q.* A patent application, I mean.

***MR. PILCHAK:*** Maybe let's go to page 25 of this document, if we could. Hopefully I've written that down correctly. Yeah. And can you pick up the "Title" and the "Background" section there?

***BY MR. PILCHAK:***

*Q.* Is this the "Background" section that you just understood me to be asking about?

*A.* **Yes.**

*Q.* Did you compare this Background section to the Background section of the application that had Sheida's name on it?

*A.* **I did.**

*Q.* What did you notice?

*A.* **They're identical.**

*Q.* And when you say "identical," you mean word-for-word?

*A.* **Yeah, word-for-word, including, like, typographical-type of issues, grammatical issues.**

*Q.* Okay. So if there was a typo in Sheida's provisional, you also saw that typo here in this one?

*A.* **Mm-hmm.**

***Q.*** The application that did not have Sheida's name on it?
***A.*** **Right.**
***Q.*** Did you notice the same thing in any other sections?
***A.*** **Yes.**
***MR. PILCHAK:*** Let's take that down, please.
***BY MR. PILCHAK:***
***Q.*** What about the "Summary of the Invention" section?
***A.*** **Yes.**
***MR. PILCHAK:*** Can we go to the next page of this document, please? I guess it's called "Summary of the Current Invention" there.
***BY MR. PILCHAK:***
***Q.*** Do you see that?
***A.*** **I do.**
***Q.*** What did you notice about this?
***A.*** **This is also word-for-word the same as Sheida's first provisional application.**
***Q.*** What's the point of this section in an application, by the way?
***A.*** **I mean, as the title implies, it's supposed to capture the essence of the invention and describe is succinctly, what is it; right? What are we talking about here? What's the innovation?**
***Q.*** And have you seen a demonstrative that would help you explain what you mean by "identical" to the jury?
***A.*** **Yes.**

***MR. PILCHAK:*** I'd like to show the witness and only the witness Exhibit 1076 -- yes, 1076.

***BY MR. PILCHAK:***

***Q.*** Do you see that there on your screen?

**A. I do.**

***Q.*** What is this?

**A. It's just a copy of the Summary of the Current Invention from the first provisional in December of 2014 by Sheida Arabi, and then in the April provisional application that we were just talking about.**

***Q.*** And would this help you illustrate to the jury what you mean by "identical"?

**A. Yeah. I think it's pretty clear. I mean, it's the same.**

***Q.*** Let me stop you there.

***MR. PILCHAK:*** Your Honor, we'd ask permission to publish.

***THE COURT:*** As a demonstrative?

***MR. PILCHAK:*** Yes, demonstrative.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** That's fine, Your Honor.

***THE COURT:*** You may do so.

And, again, this won't go back in the jury room. This is just to help you understand what he's explaining.

***BY MR. PILCHAK:***

***Q.*** And so when you say "identical" there, Professor, you mean,

again, a word-for-word copy?
**A. Yes.**
*Q.* And I think these exhibits are in evidence now, but is it 830, the exhibit on the left, that had Sheida on the application?
**A. Right. That's Sheida's provisional from December of 2014.**
*Q.* And remind us, was Sheida on Exhibit 871?
**A. No, she was not listed as an inventor on that.**
*Q.* But otherwise, they're identical?
**A. Yes.**
*Q.* At least as to this language?
**A. Yes.**
*Q.* Did you find other similarities in the suite of patents like this?
**A. I did.**
***MR. PILCHAK:*** Let's show the witness Exhibit 877, please. Oh, I've got to switch the --
***BY MR. PILCHAK:***
*Q.* One moment, Professor. All right.
Do you see that there?
**A. Yes.**
***MR. PILCHAK:*** Let's zoom in on the top half.
***BY MR. PILCHAK:***
*Q.* Is this another patent application in the suite of Abreezio patents?

***A.*** **Yes.**
***Q.*** And this is a non-provisional application; right?
***A.*** **Correct, with the issued patent number.**
***Q.*** Okay. And you can tell by the issued patent in the center there?
***A.*** **Mm-hmm.**

***MR. PILCHAK:*** Move to admit 877, please.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No objection, Your Honor.

***THE COURT:*** 877 may be admitted.

***(Exhibit 877 admitted.)***

***BY MR. PILCHAK:***

***Q.*** Okay. So the jury can see that now.
Again, just like the last one, we see the issued patent number in the center; right?
***A.*** **Yes.**
***Q.*** The application number on the left?
***A.*** **Yes.**

***MR. PILCHAK:*** Let's take that down, please, and zoom in on the bottom half where we can see the applicants.

***BY MR. PILCHAK:***

***Q.*** All right. Who are the applicants for this patent?
***A.*** **These are all Abreezio employees, Quinton, McClements, Hughes, and Taneja.**
***Q.*** And so Sheida's name is not on this application?

**A. Correct.**
*Q.* And this might be obvious, but if her name is not on the application, can we infer that her name will also not be listed as an inventor on the issued patent?
**A. That's right.**
***MR. PILCHAK:*** All right. Let's take that down.
***BY MR. PILCHAK:***
*Q.* Did you notice anything about the figures in this application specifically?
**A. I did.**
***MR. PILCHAK:*** Let's go to page 97, please.
Bear with us one second, Professor.
***THE WITNESS:*** Sure.
***BY MR. PILCHAK:***
*Q.* All right. Do you see that there?
**A. Yes.**
***MR. PILCHAK:*** Maybe we can just zoom in to make the text a little larger. We don't need all that white space.
***BY MR. PILCHAK:***
*Q.* Is this one of the figures from that application?
**A. Yes, it is.**
*Q.* What did you notice about this figure?
**A. Well, it's a flowchart, you know, describing steps that need to be taken as part of the patent or the invention. And it mapped extremely closely to the Summary of the Current Invention**

**that was in Sheida's original provisional.**

***Q.*** How similar are they?

***A.*** **I think I have a figure that shows how similar they are. It might be easier to do it that way.**

***MR. PILCHAK:*** I'd like to show the witness and the witness only Exhibit 1077, please. Actually, can you guys pull up 1077? Thank you, Mr. Reyes.

***BY MR. PILCHAK:***

***Q.*** Is that the image that you were talking about, Professor?

***A.*** **Yes.**

***Q.*** Would this help you explain what you mean by "similarities"?

***A.*** **Yeah. So --**

***Q.*** Hang on.

***MR. PILCHAK:*** We'd ask for permission to publish this to the jury as a demonstrative, Your Honor.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No objection, Your Honor.

***THE COURT:*** I'll allow it, again, as a demonstrative only.

***MR. PILCHAK:*** In this one, if we zoom in, we're going to screw it up a little. Can everybody read that okay? Let us know if you can't.

***BY MR. PILCHAK:***

***Q.*** All right. Professor, what are we looking at there?

***A.*** **Well, the left side is the figure taken from the issued**

patent without Sheida's name on it, and so that's Figure 7.

And then on the far right, we see the prose from the Summary of the Current Invention, which we saw a few minutes ago side by side with another provisional. But is this taken from the 095072 December of 2014 provisional.

And you can see that I've pulled out the appropriate words, you know, from each step. This basically on the right is describing step by step some sort of flowchart; right? And each step maps directly to one of the boxes at the left.

***MR. PILCHAK:*** So can we just do the yellow one?

***BY MR. PILCHAK:***

***Q.*** What do you mean, they map over?

***A.*** Well, so, you know, it says here in the box labeled 202 -- because everything gets labeled in patent drawings -- it says, "Perform static timing analysis on every clock domain in each voltage island."

Doesn't really matter exactly what that means, but just think about those words.

And then if you look at the yellow taken from the paragraph, which is Sheida's Summary of Current Invention, she wrote, "Static timing analysis should be performed on every clock domain within a voltage island."

And then you can go down by -- each sentence essentially maps to one of the boxes in Figure 7 of the issued Abreezio patent.

***Q.*** And did you notice a striking similarity for each box?
***A.*** **I did.**
***MR. PILCHAK:*** If I could go to the document camera for a moment.
***BY MR. PILCHAK:***
***Q.*** This is the same document that we were just looking at; right?
***A.*** **Yes.**
***Q.*** And if I draw a line here between Figure 7 and these colored boxes, is that a line between the two different applications that we were just talking about?
***A.*** **Yeah. I mean, the boxes in the middle with the colors are just, you know, are not as part of the application. The provisional is on the far right, and then the final issued patent is on the far left. The middle is just to visualize the relationship.**
***Q.*** Thanks. I'll draw two lines, then.
So which side, left or right, is Sheida's filing, supposedly?
***MS. BERNSTEIN:*** Objection. Asked and answered.
***THE COURT:*** I'll allow it.
***THE WITNESS:*** Sheida's work is on the right.
***BY MR. PILCHAK:***
***Q.*** All right. So this part *(indicating)* is taken verbatim from the provisional application with Sheida's name on it?

***A.*** **Yes.**
***Q.*** And then is Sheida's name on the filing that has Figure 7 in it?
***A.*** **Not the one we just discussed.**
***Q.*** Okay. Did you notice any other similarities?
***A.*** **Yes, I did.**
***MR. PILCHAK:*** I think we just admitted Exhibit 877 in evidence, but anybody is welcome to tell me if I got that wrong. I'm going to show the witness Figure 3 from 877, which I wrote the page down somewhere. I think this is page 93 out of 877.
***BY MR. PILCHAK:***
***Q.*** Do you see that there, Professor?
***A.*** **Yes.**
***Q.*** And without diving into the messy details, can you give us one sentence on what we're looking at in Figure 3?
***A.*** **One sentence. Okay. This is the fun stuff; right?**
***Q.*** Sorry.
***A.*** **This is a critical path monitor, a sensor -- basically, a critical path monitor.**
***Q.*** Okay. And did you notice anything about that in Figure 6 in Exhibit 830?
***A.*** **Yeah. So assuming Exhibit 830 was the original provisional by Sheida Arabi?**
***Q.*** Yeah. I blew it on that. Sorry.
The original provisional on this technology with Sheida's

name on it.
**A. Okay. Yeah, no, I saw an equivalent circuit diagram in her provisional.**
*Q.* And I'm going to put on the screen here Exhibit 830, page 11, which is labeled as Figure 6. I've just folded it in half to get rid of the other diagram on this page.
Do you see that there?
**A. Yes.**
*Q.* Is this the diagram from the patent with Sheida's name on it that you were talking about?
**A. Yes.**
*Q.* And so looking with your experience and training comparing -- oh, boy -- comparing Figure 6 to Figure 3, what did you notice?
**A. Yeah. So it's a bit detailed, obviously, and I'm not asking to analyze the circuits here. But I -- what I'm getting at here is if you look at the dotted line boxes at the top right of each of these figures --**
*Q.* And let me stop you there.
**A. I can -- well, I guess I can't point right now.**
*Q.* Your screen doesn't work?
**A. Well, does it? Okay. There we are.**
*Q.* And for the record, he has circled the dotted line boxes in the upper right of each figure.
**A. So these two circled regions in the two different documents**

**are equivalent from a circuit perspective. They're the same circuit. And I know it's not easy to discern that, but you see things like -- you see some of the notation is identical, as well.**

**And the notation is not standardized, necessarily. So, for instance, it says early capture, early capture, previous state, previous state, things like that.**

**And so basically, the innovation here, the rest of the non-circled part is actually standard baseline stuff. It's not invented; it's not new. The things in the circle -- the two red circles are what's new and being contributed here, and they're the same.**

***Q.*** And Figure 6 on the top here is from that original provisional patent with Sheida's name on it?

***A.*** **Correct.**

***Q.*** And was Sheida's name on the application that Figure 3 on the bottom is taken from?

***A.*** **No.**

***MR. PILCHAK:*** All right. I think we can take those annotations down.

***BY MR. PILCHAK:***

***Q.*** By the way, you mentioned that there was an actual patent that issued on the 446 application, which was Exhibit 877. I apologize for all the numbers.

Is that right?

**A. Is that the one that led to 672 patent? Or can you remind me?**

***MR. PILCHAK:*** Can we get 877 back up? There we go. And zoom in on the top.

***THE WITNESS:*** 038.

***BY MR. PILCHAK:***

***Q.*** 038?

***A.*** **Yes.**

***Q.*** All right. So this resulted in an issued patent; right?

***A.*** **It did.**

***Q.*** Was Figure 7 that we were talking about just a moment ago, that's the vertical flowchart; right?

***A.*** **Right.**

***Q.*** Was Figure 7 important in any way to the issued patent -- or significant, I should say?

***A.*** **It was, yeah.**

***Q.*** How so?

***A.*** **Well, for a couple reasons, but one of the reasons was it actually appeared on the cover, front page of the patent, the issued patent. And that's a representative drawing that is supposed to be indicative of the invention.**

***Q.*** And what does that mean, "indicative of the invention"?

***A.*** **Well, "representative" is the more common word. It's supposed to, you know, succinctly and readily capture the essence of the patent. It's chosen by either the patent**

**examiner, him or herself, or by the inventors, or both, perhaps.**

***Q.*** And when you say the "patent examiner," you mean the person inside the guts of the Patent and Trademark Office who's evaluating all this stuff?

***A.*** **Correct.**

***Q.*** Okay. Did Figure 7 show up as a cover drawing for anything else?

***A.*** **Yeah, it did.**

***Q.*** For what?

***A.*** **The issued 672 patent -- which I don't know, I can't remember if we've talked about at this point -- but it is the one issued patent from the Abreezio portfolio that does have Sheida's name on it.**

***Q.*** Got it.

***THE COURT:*** Would now be a good breaking point?

***MR. PILCHAK:*** Yes, Your Honor.

***THE COURT:*** Okay. Let's go ahead and take a lunch break. We're going to take a little bit longer lunch break today. We're going to go until 1:30. If you can be back at 1:30. You are reminded you're not to discuss the case or do any research about the case. And we'll see you back at 1:30. Thank you very much.

***(Jury out at 12:08 p.m.)***

***THE COURT:*** Okay. We're now outside the presence of the jury.

I just wanted to let you know two jurors expressed two different things to Lindsey. One of them said she needs to go to a parent-teacher conference at 3:15, either tomorrow or next Thursday. I haven't responded yet, but I'm just giving you that information. We can decide what we want to do about that.

***MS. BERNSTEIN:*** Is it an alternate or a juror?

***THE COURT:*** A juror.

The second thing is one of the jurors -- and I'm not sure which one, whether it was an alternate or a regular juror -- said to Lindsey that he or she was having difficulty following all the names in the case and wasn't sure what to do about that. So I suggested that any concerns or questions, the juror write on a piece of paper and we can address that concern at that point in time. So I just wanted to make you aware of all of that.

***MR. PILCHAK:*** Thank you, Your Honor.

***THE COURT:*** Okay. Break until 1:30. Anything else?

***MR. PILCHAK:*** No, Your Honor.

***THE COURT:*** Thank you.

***(Lunch recess taken.)***

***(Lunch recess taken.)***

***THE COURT:*** Okay. We are back on the record outside the presence of the jury. This is a jury that likes notes.

So the first juror who expressed concern about the names says he is no longer having difficulty following the

names, so he is not going to write a name. He is following things much better today. So that's good.

Juror No. 9 said she has a parent-teacher conference either tomorrow or March 27th. She needs to be excused by 3:00 o'clock to get there in time, preferably the 27th. Frankly, that would be my preference as well. I thought maybe we could stay a little bit later Monday, Tuesday, Wednesday, maybe go to 4:15 and make up a little extra time there if that was suitable. But that's kind of my thought on that.

***MR. PILCHAK:*** I don't know if you want --

***THE COURT:*** Any objection to that proposal?

***MR. PILCHAK:*** The proposal is the 27th instead of tomorrow?

***THE COURT:*** Yes.

***MR. PILCHAK:*** We were looking at our stack of witnesses tomorrow, and we would actually suggest we end early tomorrow.

***MS. BERNSTEIN:*** We do not have a preference, so whatever works for the Court.

***THE COURT:*** All right. So we will end early tomorrow.

***MR. PILCHAK:*** Thank you, your Honor. That's expected -- it would be roughly 3:15 p.m. tomorrow.

***THE COURT:*** 3:00 o'clock tomorrow. She has to be there at 3:15, so we would end by 3:00.

***MR. FRASER:*** Thank you.

***THE COURT:*** The other note we got is from Juror No. 5.

She says, "Alternate No. 1 has pink" -- pink -- "pink eye," I think. Has pink something and, in parentheses, pink eye on his left eye and the issue of continually blowing his nose.

So I thought that I would -- we got some masks, I believe. I would just suggest to the jury when they come in that if anybody feels the need to wear a mask, I wanted to let them know that they are certainly welcome to do so. And if anyone feels sick or feels like they have a cold, I would certainly encourage them to wear one, unless anyone has any more suggestions.

***MS. BERNSTEIN:*** We can put some more hand sanitizer on the wall if that would make them feel better too.

***MR. PILCHAK:*** No objection.

***THE COURT:*** That's it. None of it has to do with the actual substance of the case.

***MS. BERNSTEIN:*** Your Honor, I do have two points about some things that Dr. Sylvester has said so far.

I wanted to renew my objection to some of his testimony about the DFT analogy he provided with a lemon that is no where in his reports. And I think, as the Court understands, the lack of DFT analysis is very critical. So to supplement something that we had not seen before.

There is that, and then there was something else he said when Mr. Pilchak was doing this comparison of the figures and the things. He said at one point it was copied

word-for-word, only one paragraph I think was different. And that of course was the disclosure we got yesterday and that, again, was not in his reports. That's different than what he put in his reports, so I wanted to move to strike both of those things.

***THE COURT:*** I think he covers -- I looked at his reports. He covers that. He covers DFT. I don't think it's anything that was a surprise to anyone. So I will deny that.

***MS. BERNSTEIN:*** And going forward, I understand that there is not going to be a great deal more of direct, but I understand the Court also doesn't want me to engage in this speaking colloquy.

Is it sufficient to wait until the end, or if I need to move to strike something in the middle, how would the Court like for us to signal that?

***THE COURT:*** You can certainly move to strike. You can wait until the end. It's your preference. You can raise the objection at the time before the question is answered, if you want to keep it out. But just -- I just don't want you to go into great detail as to the reason for your objection. You can say "Objection. Beyond the scope," or "Objection. Outside the outline" or you can quote the expert witness code section. Anything -- I just don't want you to argue it.

***MS. BERNSTEIN:*** Okay. Thank you.

***MR. PILCHAK:*** Your Honor, no one was asking me

necessarily, but I would prefer objections during the testimony when they can still be cured, if necessary.

***MS. BERNSTEIN:*** I would be happy to interrupt his testimony on direct.

***THE COURT:*** Either one. I can certainly give you time at the end -- the other thing is, although I am limiting speaking objections, I have no problem with you making a stronger record for the -- for appeal, or, you know, to outline why you think that is the case. So if you want to go into greater detail -- I just don't want you arguing in front of the jury.

***MS. BERNSTEIN:*** We have one more point for the record, I guess.

***MR. FRASER:*** Just going back to the Jencks discussion related to Mr. Shokouhi and the call which he said was to his attorney. Especially as a former federal defender, I'm aware when you place a call from jail, unless it's on a special line, it's recorded, and there is notice to the caller that it's recorded. It comes on there. So it's possible that that call was privileged, but more likely it wouldn't have been. Normally, an inmate doesn't have an opportunity to arrange for a privileged call within the time that Mr. Shokouhi was in custody. I think it's unlikely that his call would be privileged.

***THE COURT:*** Let me ask you this: When you were a

federal defender, if the Government had asked for a phone call that you made that was being recorded, would you have objected --

***MR. FRASER:*** Well --

***THE COURT:*** -- or would you have screamed that's attorney-client privilege, I'm talking to my client?

He has no other reason to call his attorney except to ask his attorney something. We don't know what the call is about. It's attorney-client privilege. You know, whether he knows he is being recorded or not, there is no reason to call the attorney except to tell the attorney something like probably get me out of here, when is my bail coming through. I don't know. We can speculate.

***MR. PILCHAK:*** I'll just say we make efforts at the U.S. Attorney's Office not to collect calls with attorneys, whatever the announcement policy is about them being recorded or not. We try to take steps to avoid it. It doesn't always work perfectly but that's our goal.

***THE COURT:*** Anyway, I'm not going to order that a call with an attorney be turned over.

***MS. BERNSTEIN:*** We just want to make sure that our expert is admitted into the telephonic courtroom.

***THE CLERK:*** I will admit him now since this was not in front of the jury.

***THE COURT:*** Okay. Let's admit him, and let's bring the

jury in.

***(Jury in at 1:37 p.m.)***

***THE COURT:*** Before we continue with the testimony, we had a couple concerns expressed. One is that there was a request that we end early, and so tomorrow we will end at 3:00 o'clock. Just to give you a heads up, instead of going until 4:00, we'll end at 3:00 o'clock tomorrow.

And then there were also some health concerns expressed. Let me tell you, first of all, because we did an enormous, as you might imagine, view of the Court during COVID, we brought in people to take a look at the filters, we have HEPA filters in all the courtrooms. The area is all filtered. But we also have masks. I believe we -- we have masks down here. If anyone -- they're in that box there.

If anyone would like to wear a mask, you are free to wear a mask in court. If you are not feeling well, I strongly encourage you to wear a mask.

We also have hand sanitizer over about by the water there. We'll get another couple things of hand sanitizer for people. So feel free to use the hand sanitizer if you need to use that as well.

Okay. We are back on the record. All jurors are present. The attorneys are present. Dr. Arabi is present. And you're reminded, sir, that you're still under oath to tell the truth.

***THE WITNESS:*** Thank you.

***THE COURT:*** Lindsey is going to put the hand sanitizer out for all of you. And I encourage you to use that.

Okay. Mr. Pilchak.

***MR. PILCHAK:*** Thank you, your Honor.

***BY MR. PILCHAK:***

***Q.*** Good afternoon, Professor.

***A.*** **Good afternoon.**

***Q.*** I want to follow up on the testimony from this morning in kind of a different area, if that's okay.

***A.*** **Okay.**

***Q.*** As part of your review of the provisional patent applications, did you look at information about the background of two people in particular?

***A.*** **Yes.**

***Q.*** Was that Sheida Arabi and Karim Arabi?

***A.*** **Correct.**

***Q.*** Let me ask some questions about Sheida first.

First of all, what did you understand her field of study at Simon Fraser University to be?

***A.*** **Inkjet printing technology.**

***Q.*** And in your opinion and in your experience in the field, is inkjet printing related in any way to the technology in those two provisional patents from December of 2014?

***A.*** **No.**

**Q.** Have you yourself studied inkjet printing as part of your own career in integrated circuits?
**A. I have not.**
**Q.** You mentioned this morning that you've supervised something like 50 Ph.D. candidates, right?
**A. Right.**
**Q.** Did any of them to study inkjet printing under your supervision as part of their work in integrated circuits?
**A. Not that I'm aware of.**
**Q.** Did you review some transcripts with Sheida's name on them from her undergraduate institutions?
**A. Yes.**
**Q.** Did you look at the coursework that were on those transcripts?
**A. I did.**
**Q.** What did you notice about the relevance of her courses to the technology in those two provisional patents with her name on them?
**A. I noticed a few courses that were, you know, intro to electronics and some other things that were relevant to the material.**
**Q.** In particular, was there one course called VLSI or something very close to that?
**A. Yes.**
**Q.** What is VLSI?

**A. VLSI stands for very large scale integration. It basically means the study of large digital chips.**

Q. And is that pretty relevant to what we're talking about with Abreezio's technology?

**A. It is.**

Q. How many more courses like the VLSI courses were on her transcript in that specific field?

**A. Well, I mean, it's hard to answer. I mean, there was the basic intro to electronics type courses that would have preceded that, but nothing beyond the VLSI course I saw.**

Q. Did you notice anything about the grades in the courses on Sheida's transcripts that were potentially relevant to Abreezio?

**A. Yeah. I noticed they were all lower than her overall grade point.**

Q. So whatever her average grade was across the transcript, the most relevant courses were higher or lower than that average?

**A. They were all lower.**

Q. Let me zoom out from Sheida in particular for a moment and just ask you, in your opinion, is it theoretically possible for a graduate student to come up with the ideas that are in the two provisional patent applications with Sheida's name on them?

**A. Theoretically, yes.**

Q. Is it likely, though, in your experience?

**A. I mean, unlikely, especially an early-stage graduate student without the proper preparation.**

***Q.*** Is that what you understood Sheida to be?

**A. Yes.**

***Q.*** This field that we're talking about, that the two provisionals are filed in, is it a complex field?

**A. Yes.**

***Q.*** Is it sophisticated?

**A. Yes, I would say so.**

***Q.*** Is it fast moving?

**A. Yes.**

***Q.*** And now I want to focus on Sheida herself based on what you understood about her background.

Do you believe it's plausible that she herself invented the technology that's in the two provisional patents?

***MS. BERNSTEIN:*** Objection. 702.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** Do you think that her background is consistent with the subjects that someone would have to know in order to come up with the inventions that are in those provisional patents?

***MS. BERNSTEIN:*** Objection. 702.

***THE COURT:*** Overruled.

***THE WITNESS:*** I think it was insufficient background.

***BY MR. PILCHAK:***

***Q.*** What do you mean by that?

**A. It means that, you know, someone who would be writing those**

**provisionals would need a lot more experience, either through graduate coursework, performing their own research, having experience in the industry, or other knowledge deeper than an undergraduate course or two would offer you.**

*Q.* Okay. And Sheida did have graduate coursework, though; right?

***A.*** **She did.**

*Q.* But it's your testimony that, as far as you could tell, that's focused on inkjet printing?

***A.*** **No. I believe I looked at her graduate courses at the time of the provisional filings, and there were some courses but they weren't at all related. They were in different topics.**

*Q.* I see.

What about Dr. Karim Arabi? Did you look at his background as well?

***A.*** **Yes.**

*Q.* What did you rely on to assess his background?

***A.*** **I relied on a résumé that I received. I relied on public information, such as a list of his publications, his self-reported biography that he would include in publications, things like that.**

*Q.* Did you look at records of remarks that he made or speeches that he delivered?

***A.*** **Yeah. Keynote speech that he gave, you know, like I said, publications.**

***Q.*** And I want to come back to that in a moment.

***MR. PILCHAK:*** But can we show the witness Exhibit 109. I'm very confident this is already in evidence.

If we could just zoom in on the top half there. All right.

***BY MR. PILCHAK:***

***Q.*** Is this the résumé that you reviewed, Dr. Sylvester?

***A.*** **I believe so, yes.**

***Q.*** Do you recall whether this is from approximately 2016?

***A.*** **It was undated. All I know is the latest dates that you can see on the résumé.**

***Q.*** Okay. And is it your testimony that some of the experience that's in this résumé is relevant to the subjects in the two provisional patent applications?

***A.*** **Yes.**

***Q.*** So for example, if we take that down and zoom in on the bottom half of this first page, do you see the section at the bottom there on VP of engineering?

***A.*** **Yes.**

***Q.*** And there it says hardware VLSI design team; right?

***A.*** **Correct.**

***Q.*** You've never worked at Qualcomm; right?

***A.*** **No, I have not.**

***Q.*** Do you have a working understanding of what a VLSI design team might do?

***A.*** **I believe so, yeah.**
***Q.*** And that's the same four letters that we were just talking about that Sheida took an undergraduate course in; right?
***A.*** **Correct.**
***Q.*** But here, Dr. Karim Arabi is reporting that he worked in that field for five years?
***A.*** **Yes.**
***Q.*** And then if we look at the fourth bullet where it says "Led research and development activities," do you see that there?
***A.*** **Yes.**
***Q.*** Are any of those subject areas directly relevant to the technologies that are in the two provisional patents?
***A.*** **Definitely.**
***Q.*** Which?
***A.*** **Well, as we talked about, DFT and low power design are the two big ones.**
***Q.*** Okay. And you see those listed there?
***A.*** **Yes.**
***Q.*** What is the last line of that section?
***A.*** **Involved in mergers and acquisitions.**
***Q.*** Okay. I think we can take that down.
You also mentioned going through Dr. Arabi's publications. So I assume he is published?
***A.*** **Yes.**
***Q.*** How did you find out what he had published?

**A. Go online and go to Google scholar page. He has a Google Scholar page that lists a lot of his publications, for instance.**

Q. What is a Google Scholar page?

**A. Oh, it's sort of -- it's just a list of publications and also tells you how many times each work was cited by other -- by anyone. So giving you an idea of how much, you know, maybe impact or how well known the work is in the field.**

Q. Can you tell the jury, when you looked at Dr. Arabi's Google Scholar page, was there any publications that were relevant to the Abreezio technology?

**A. Yeah. It also includes patents and so it had papers and patents in there. I definitely saw a lot of testing related things and some low power related things, yes.**

Q. Did you also mention that you'd seen Dr. Arabi act as a keynote speaker?

**A. Yeah.**

Q. What is a keynote speaker?

**A. So keynote, at a conference, there's a lot of talks by maybe Ph.D. students about their research. We talked about earlier how that works with the peer-review process. But then there are special invited talks by people well known in the field that give the keynote speeches. And maybe there's one to three of those depending on the size of the conference, so they are very prestigious.**

Q. So there could be a lot of talks.

Is that your experience?

***A.*** **Yeah, there could b e 200, but only maybe one to three may be keynote.**

***Q.*** Okay. As far as you could tell, did Dr. Arabi also have hands-on work in the relevant subfield?

***A.*** **Yes.**

***Q.*** Did that include his Ph.D. thesis, when he was getting his Ph.D.?

***A.*** **His Ph.D. topic title had to do with testing of -- I believe it was analog and mixed signal circuits, so yeah, testing.**

***Q.*** So that's a "yes"?

***A.*** **Yes.**

***Q.*** Okay. And you mentioned test a couple of times.

As far as you could tell, did Dr. Arabi have expertise in low power as well as test, or just test?

***A.*** **Both. I mean, you saw the résumé. It lists that he led a team that dealt with low power. He also gave keynotes at low power conferences.**

***MR. PILCHAK:*** And can we show the witness and the witness only Exhibit 3031, please. This is a defense exhibit.

***BY MR. PILCHAK:***

***Q.*** Do you see that there?

***A.*** **Yes.**

***Q.*** Is this one of the keynotes that you mentioned?

***A.*** **Yes.**

***MR. PILCHAK:*** Move to admit 3031.

***THE COURT:*** Any objection?

***MS. CHOPRA:*** No, your Honor.

3031 may be admitted.

***(Exhibit 3031 admitted.)***

***BY MR. PILCHAK:***

***Q.*** Okay. So what is this, Professor?

***A.*** **So it's one of the keynote talks that he gave, and you can read the title. You know, it's about low power design techniques in mobile processors. So Qualcomm's main business is in mobile processors. And so this is about how to incorporate low power design techniques into their products.**

***Q.*** And you've reviewed this presentation?

***A.*** **Yes.**

***MR. PILCHAK:*** Can we do a zoom on the lower left there where it has the copyright. We don't need the whole thing, just the beginning.

***BY MR. PILCHAK:***

***Q.*** What is the date that this presentation is copyrighted?

***A.*** **2014.**

***Q.*** Did you also conduct a search of the patent registry for some of the people relevant to Abreezio?

***A.*** **I did.**

***Q.*** And this is probably obvious at this point, but what is the patent registry?

**A. I just went to the USPTO, who we talked about before, the U.S. Patent and Trademark Office, and they keep a database of all the patent applications and issued patents, and you can search by the inventor name and identify how many patents a person has and so on.**

*Q.* Did you run such a search for Dr. Arabi?

**A. Yes.**

*Q.* And how many patents, including patent applications, did Dr. Arabi have?

**A. It was somewhere over 50, low fifties, I believe.**

*Q.* So comparable to yourself?

**A. Right.**

*Q.* How many of those related to testing integrated circuits, if you remember?

**A. I think it was at least ten.**

*Q.* And I want to ask you about the timing of those applications. Okay?

**A. Okay.**

*Q.* Did you have a sense of when most of those applications were filed?

**A. Yeah. They were all prior to 2014. Some of them stretching as far back as when he was a Ph.D. student working on tests and filing patents from that.**

*Q.* Did you conduct a similar search for Sheida Alan?

**A. I did.**

***Q.*** Did you also search the name Sheida Arabi?

***A.*** **I believe so, yeah.**

***Q.*** And what did you find when you searched Sheida's names?

***A.*** **I just found the one issued patent, which is the '672 patent, as we're referring to it here. It's one of the Abreezio technology portfolio.**

***Q.*** So were talking about two provisional patent applications earlier; right?

***A.*** **Right.**

***Q.*** But you also said you can't get an issued patent just on the back of a provisional; right?

***A.*** **Right.**

***Q.*** So you're saying downstream or later from those two provisional filings, there was only the one issued patent with Sheida's name on it?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** How many issued patents were there downstream of the two December 2014 provisionals with Sheida's name on it?

***A.*** **One issued patent.**

***Q.*** Got it.

So comparing Dr. Arabi's background to Sheida's background, which background was better suited to someone who could create the technology in the Abreezio provisional patents from December

of 2014?

**MS. BERNSTEIN:** Objection. 702.

**THE COURT:** Sustained.

***BY MR. PILCHAK:***

***Q.*** Did Sheida have any hands-on experience with the technology that was in the Abreezio patents that you could tell?

**MS. BERNSTEIN:** Objection. 602.

**THE COURT:** Overruled.

That you could tell.

**THE WITNESS:** Not from the materials I looked at.

***BY MR. PILCHAK:***

***Q.*** Did she ever work at a company that worked in that field?

**A. No, not that I saw.**

***Q.*** Was she ever paid to do research and development in that field as far as you could tell?

**A. No.**

***Q.*** Okay. It sounds like you reviewed a number of documents about Abreezio and its products.

Is that fair?

**A. Yes.**

***Q.*** Other than the provisional patent applications that we were talking about a minute ago, did any of the Abreezio documents appear to you to be authored by Sheida?

**MS. BERNSTEIN:** Objection. 702.

**THE COURT:** Sustained.

***BY MR. PILCHAK:***

***Q.*** Let me ask a different question.

Did you review any materials -- and focusing specifically on research materials -- that appeared on their face to be created by Sheida?

***MS. BERNSTEIN:*** Objection. 702.

***THE COURT:*** I'll allow it.

***THE WITNESS:*** Yeah. I saw a research notebook that was, you know, labeled as Sheida Arabi's research notebook.

***MR. PILCHAK:*** And let's show the witness Exhibit 792 please, which is already in evidence.

***BY MR. PILCHAK:***

***Q.*** Do you see that on your screen there, Professor?

***A.*** **Yes.**

***Q.*** Is this the notebook that you're talking about?

***A.*** **Well, if the second page has her name on it, then probably. But otherwise --**

***Q.*** Let's go to the second page.

***A.*** **Yes.**

***Q.*** Does this appear to be the notebook?

***A.*** **It does appear to be, yes.**

***Q.*** What is a research notebook by the way?

***A.*** **So it's something that a researcher might keep to document their thoughts on a topic as they're developing ideas, collecting information, you know, throwing down ideas that they**

**might try to, you know, eventually expand into a project or an invention.**
*Q.* And why might that be useful?
***A.* Well, other -- you know, just keeping notes in general is a good way to remember things. That's one. But research notebooks can also be used to document, you know, first dates of invention. So you can use it to kind of figure out when an idea was formed and you might be able to use that to put your foot in the door, so to speak, with that provisional.**
*Q.* The same concept you were testifying about before the lunch break.
***A.* Right.**
*Q.* This notebook, is it about 85 pages, give or take, do you recall?
***A.* Yes.**
*Q.* And do you recall whether this notebook has a whole series of dates in it?
***A.* A whole series of what?**
*Q.* Dates.
***A.* Oh, yes.**
*Q.* Let's go to page 4, please.
Is this the first dated page in the notebook as far as you remember.
***A.* Yes.**
*Q.* What does the date appear to be there?

***A.*** **September is that a 14 -- 17th, perhaps, 2012.**

***Q.*** Okay. That's a very good zoom. Thank you for that.

And then the dates in the notebook, do they run from September 17th of 2012 out to January 14th of 2014?

***A.*** **That sounds correct.**

***Q.*** Let me ask a different more general question.

What did you notice about the progression of the subjects in the notebook?

***A.*** **Yeah. So what I noticed was -- and you can see on the first page here -- in September, middle of September 2012, these notes are very basic. So they're very, you know, textbook, introductory electronics, and circuit design concept, definitions, *per se*. So it starts with things that are, you know, very, very basic.**

**And then as I read through the material of the notebook, within a matter of months, it was on to very, very advanced topics that would be taught in an advanced graduate class.**

***Q.*** And when you say in a matter of months, that's relying on these handwritten dates in here?

***A.*** **Right.**

***Q.*** Okay. So it starts with basic subjects.

***A.*** **Yes.**

***Q.*** How would you characterize how complex the subjects were at the end?

***A.*** **Like I said, you know, things that were part of the**

**published literature that you could innovate on, and the ideas were state of the art, leading edge. So that's how I would qualify that.**

***Q.*** And so in a few months it went from the basics to the state of the art?

***A.*** **Right.**

***Q.*** Can you give an example of that at just a high level?

***A.*** **State of the art? I mean, I think the topic that I most recall seeing, which was about two and a half months after the date shown here on this first page, was on a topic of adaptive guardbanding.**

**We haven't used the term "guardbanding" here in this testimony, but it's very similar to margin, as we talked about before. And adaptive, we have used that term in the context of AVS, so it's very similar to that. It's how to essentially do that door closing just to the right level and using -- using feedback and sensors to do that. So those concepts.**

***Q.*** And so the pace at which, according to the dates in the notebook, it moves from the textbook basics to an advanced --

***MS. BERNSTEIN:*** Objection. Leading, narrative.

***THE COURT:*** I haven't heard the question yet.

The pace at which it moves --

***BY MR. PILCHAK:***

***Q.*** The pace at which it moves from the basics to the advanced topic, did that seem plausible to you?

***THE COURT:*** Overruled.

***THE WITNESS:*** No, it doesn't, based on my teachings of students on these topics over the years.

***BY MR. PILCHAK:***

***Q.*** How long does it typically take your students to make that connection?

***A.*** **Yeah. So these topics for the first few pages shown here will be things we teach in the very early stages of a junior level class, you know, and then the adaptive guardbanding topic we just talked about, I would usually teach as an advanced graduate course a couple of years later.**

***Q.*** So we're talking about with your students a separation of years?

***A.*** **Yeah.**

***Q.*** And what was the separation in the notebook?

***A.*** **About two and a half months.**

***Q.*** Did you find any passages in the notebook that seemed to correspond to the ideas in the provisional patent applications?

***A.*** **I did.**

***MR. PILCHAK:*** Let's look at page 60 of this exhibit, please.

***BY MR. PILCHAK:***

***Q.*** Is this the beginning of that passage?

***A.*** **Yes, it appears to be.**

***Q.*** And which provisional does this relate to, if you remember?

**A. This will relate to the first one.**
Q. Okay. And there's a date in the upper left there. Can we zoom in on that?
When was this page supposedly written?
**A. February 18th, 2013.**
Q. The passage that you're talking about that corresponds to the provisional, does that run from February here to March of 2013?
**A. Yes.**
Q. According to the dates in the notebook; right?
**A. Right.**
Q. And what was the overlap between the substance of what's here and what's in the provisional? Is there a pretty good fit there?
**A. Yeah, quite good.**
Q. So remind us, when was that provisional patent application filed?
**A. December 22nd, 2014.**
Q. And so how many months is that after this date of passage?
**A. After this one, it's about 22 months, almost two years.**
Q. The jury's already heard testimony that the microchip industry is brutally competitive.
Is it common, in your experience, for someone with a valuable invention in this space to wait 24 months before filing on it?

**A. No.**
Q. Why not?
**A. So when you have an idea, you have something that could be valuable or patentable, especially if it's in a well-studied field that is actively being worked on, you'd want to get your foot in the door; right?**
**You'd want to get a provisional filed as soon as possible so you would not have to worry about later people scooping you or, you know, getting that same idea later but getting the credit for it, things like that.**
Q. And what do you mean by "scooped"?
**A. Yeah, that just means that you're thinking about something, maybe I'm thinking about an idea with my students and we're kind ever working on it, but then a paper comes out with the same idea and we just got unlucky because now the idea is already out there and we can't publish it because it's a duplicate now at that point.**
Q. Somebody else could get their foot in the door first?
**A. Right.**
Q. Did you notice anything else that made you question the accuracy of the dates in the notebook?
**A. Yeah. There was another thing I noticed with respect to -- actually, it was with respect to the adaptive guardbanding discussion we just talked about, one of the more advanced concepts in the notebook. And some of the wording, I noticed it**

**was kind of curious. And so I actually found what seemed like there was a document well after the dates provided in the notebook that was eerily similar.**

***Q.*** And let's show the witness page 36 of this exhibit, please. Just kind of zoom in on the top half of the page there.

Is this the page that you're talking about, Professor?

***A.*** **Yes.**

***Q.*** And you see the word "guardband" there at the beginning?

***A.*** **Right.**

***Q.*** Let's take that down.

This page is not dated; right?

***A.*** **Not that one, no.**

***Q.*** But if we scroll up two pages earlier, if you could, Mr. Mayberry, is there a date on the page 2 pages earlier?

***A.*** **December 4, 2012.**

***Q.*** Okay.

***MR. PILCHAK:*** And if we scroll down -- I think it's six pages until you hit the next date, Mr. Mayberry. A little bit more. There we go.

***BY MR. PILCHAK:***

***Q.*** So now we're looking --

***MR. PILCHAK:*** Give me a little bit more, Mr. Mayberry.

***BY MR. PILCHAK:***

***Q.*** We're looking at page 4110.

What's the date in the upper right there?

**A. December 21st, 2012.**

*Q.* So when you look at those two dates, December 4 and December 21 of 2012, what did you conclude about when the page on guardbanding was supposedly written?

**A. Somewhere between those dates.**

*Q.* Because that's your experience with research notebooks?

**A. Yep.**

*Q.* And you said that this language -- if we could go back to page 36, please -- was eerily similar to something else; right?

**A. Yeah.**

***MR. PILCHAK:*** Let's show the witness exhibit -- and the witness only, please, Exhibit 892.

***BY MR. PILCHAK:***

*Q.* Do you see that there, sir?

**A. Yes.**

*Q.* What is this?

**A. So this is a published paper, like a research paper, on the topic of adaptive guardbanding.**

*Q.* Is this the one with the eerie similarity?

**A. Yes.**

*Q.* Where did you get this one?

**A. This one was published in a big conference called MICRO, I believe. So just -- you can download this off the web.**

*Q.* So it was publicly available?

**A. Correct.**

***Q.*** At least if you're an academic with the right subscriptions?

**A. Yeah.**

***MR. PILCHAK:*** Move to admit 892, your Honor.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No, your Honor.

***THE COURT:*** It may be admitted.

***(Exhibit 892 admitted.)***

***MR. PILCHAK:*** All right. Let's zoom in -- I think it's in the block of very small text in the lower left there. Can we get that paragraph at the bottom?

***BY MR. PILCHAK:***

***Q.*** What does this say about when this was published?

**A. Early December 2015.**

***Q.*** Okay. Was that the dates in the notebook that we were just looking at?

**A. No, no. That was in December of 2012.**

***Q.*** Okay. So dates don't match.

Did you notice anything about the language? Did that match?

**A. Yes.**

***MR. PILCHAK:*** And permission to approach, your Honor?

***THE COURT:*** You may.

***MR. PILCHAK:*** We can zoom out of this on the screen. And just for the record, I've handed the witness a copy of page 36 of that notebook that we were just looking at.

///

***BY MR. PILCHAK:***

***Q.*** Bear with me for one moment, Professor.

This is Exhibit 892 on the screen there. Do you see that?

***A.*** **Yes.**

***Q.*** And you have in your hand page 36 from the handwritten notebook?

***A.*** **Yes.**

***Q.*** Can I ask you to read the page beginning -- read the sentence, rather, beginning "Guardband circuits" at the top.

***A.*** **Sure.**

**"Guardband: Circuits manufacturers commonly apply operating guardband to ensure that microprocessor operate reliably over various loads and environmental conditions."**

***Q.*** Okay. What about that next sentence beginning "Traditionally"?

***A.*** **"Traditionally, guardband is a static margin added to the lowest voltage at which the circuit operates correctly under stressed conditions. Problem with traditional guardband is that always put over provisions voltage and wastes a lot of energy."**

***Q.*** Okay. And let me ask to you read the final sentence that you can see on that page which begins "With increasing."

***A.*** **Okay. "With increasing the number of active cores, the benefits of adaptive guardbanding diminish dependent upon the workload running."**

***Q.*** Okay. Now, if I direct your attention back to 892 on the

monitor here, I've highlighted three sentences.

Do you see that?

**A. Yes.**

*Q.* The language in those sentences does not word-for-word match what's on that page of the notebook; right?

**A. Not quite.**

*Q.* Did you notice some eerie similarities?

**A. Yeah, just a lot of the -- you know, some of the words being used. Over provisions and diminish, and, you know, sort of words that are not necessarily common and have lots of synonyms. So it was surprising to see it that close to being word-for-word.**

*Q.* And that article was published when?

**A. About three years after the dates listed in the notebook here for this entry.**

*Q.* And what is this page -- if I put up page 36 of Exhibit 792 again, what subject is this page about again?

**A. So this is about adaptive guardbanding, which relates to the AVS topic that we discussed this morning.**

*Q.* Okay. I'll take that down.

Professor Sylvester, do some chip companies publish information about their technology in publicly available journals?

**A. Yes.**

*Q.* Does Qualcomm do that?

**A. To some extent.**

Q. Does it do it as much as other large chip companies?

**A. Not really.**

Q. And why do you say that?

**A. I just notice a lot more papers from some of their competitors than they typically put out.**

Q. For this case, did you make an effort specifically to look around the time of the Abreezio marketing at whether and how much Qualcomm was publishing in this area?

**A. Yeah. I looked at -- the biggest conference in this field is held every February in San Francisco. I attend it every year. And I looked at the 2015 version of that conference, which was right in the middle of everything happening here, and I noticed there's about 200 papers there.**

**I noticed there were two Qualcomm papers there, but there were more than ten from, you know, Intel, Samsung. There were close to ten by a couple other competitors, MediaTek and so on and so forth. So just, you know, just different levels of publication.**

Q. And so that's about publishing generally. Let me zoom in a little bit and ask you about the kinds of things that might be published.

In your experience, even if a company does publish some information about their proprietary technology, is it common that they disclose what their performance figures are?

**A. Not entirely. They don't want to disclose everything.**

**Q.** And what do you understand me to say -- to mean when I say "performance figures"?

**A. You know, numbers. You know, for instance, some of the details on exactly how well a certain technique works in products. That's something that even if you publish on the technique you might not want to disclose the full details of how much it really helped you.**

***MS. BERNSTEIN:*** Your Honor, objection. Beyond the scope.

***THE COURT:*** Sustained.

***MR. PILCHAK:*** One moment, please, your Honor.

***BY MR. PILCHAK:***

**Q.** Professor Sylvester, based on your analysis of the records and the patent filings in this case, do you believe that Abreezio's products were reliant on the concepts in the two provisional patents with Sheida's name on them?

**A. Yes.**

***MR. PILCHAK:*** No further questions, your Honor.

***THE COURT:*** Cross-exam?

***MS. BERNSTEIN:*** Yes, your Honor.

***CROSS-EXAMINATION***

***BY MS. BERNSTEIN:***

**Q.** Good afternoon, Professor Sylvester. If you'll just give

one second for us to get set up, please.

***A.*** **Sure.**

***Q.*** Okay. So you testified that you've been retained by the Government for this case?

***A.*** **Correct.**

***Q.*** And did you also provide opinions to Qualcomm during its civil case against Dr. Arabi?

***A.*** **No.**

***Q.*** You're being paid $550 an hour for this case?

***A.*** **Correct.**

***Q.*** You've spent just under 90 hours so far?

***A.*** **Yes.**

***Q.*** And in that time you reviewed 26 provisional patent applications, non-provisional patent applications, and granted patents?

***A.*** **I didn't count the number, but I'll believe you. Sure.**

***Q.*** Well, I'm asking you.

You know Abreezio had 26 patent applications; correct?

***A.*** **I don't know the total. I don't know the actual number. So I just reviewed what was relevant to the case.**

***Q.*** You did not review all of them?

***A.*** **I reviewed -- I mean, I didn't know there were 26. But yeah, I reviewed them.**

***Q.*** You did review all of them or you did not review all of them?

**A. I reviewed all of them in different levels of depth depending on how relevant it was to what I was asked to do.**

Q. Okay. And that's separate and apart from the hundreds of other documents that you reviewed?

**A. Yes.**

Q. You also had -- you wrote two pretty lengthy reports in this matter?

**A. I did.**

Q. You've met with the Government a number of times?

**A. Yeah. On conference calls, yes.**

Q. More than ten? Less than ten times?

**A. I'd say around that number, ten.**

Q. You prepared your testimony today?

**A. Yes.**

Q. You've also reviewed corporate slide decks from Qualcomm?

**A. Yes.**

Q. You did all of this in under 90 hours?

**A. That's what I billed. I haven't billed for this month yet. So there's a bunch of hours there, but yeah.**

Q. Okay. Are you being paid by Qualcomm?

**A. Paid by Qualcomm? No.**

Q. You're being paid with taxpayer dollars for this review?

**A. That's my understanding.**

Q. And you have extensive experience in the field of integrated circuits and low power design techniques; correct?

**A. Yes.**
*Q.* You have extensive experience with patents as well?
**A. Yes.**
*Q.* And here you were asked to provide your opinion about whether two provisional patents filed in December 2014 were central to the technology portfolio of Abreezio and whether those patents played a significant role in Qualcomm's decision to acquire Abreezio in 2015.
**A. Correct.**
*Q.* And in that vein you have provided an opinion on the value of Abreezio's technology to Qualcomm; correct?
**A. Yes.**
*Q.* Specifically, whether the provisional patent applications from 2014 contributed to that value?
**A. Correct.**
*Q.* In your view, is the state of the art and its development relevant to the value of a patent?
**A. State of the art and its development? So how the state of the art is progressing? Is that what you're asking?**
*Q.* I'm asking, in your view, is the state of the art and its development relevant to the value of a patent?
**A. Sure.**
*Q.* Is that a "yes"?
**A. Yes.**
*Q.* You did not include any analysis on prior art or the state

of art in your expert reports, did you?
**A. I did in the sense that it was embedded in the documents that I looked at.**
*Q.* I'm sorry?
**A. Well, the state of the art is captured in the documents I looked at.**
*Q.* Did you include any analysis in any of your expert reports about a comparison of prior art or state of art with the provisional patent applications you were asked to analyze?
**A. So like do a patent validity analysis?**
*Q.* Any analysis whatsoever about the prior art and the state of the art as compared to the provisional patent applications you were asked to analyze.
**A. Well, yeah. It's inherent in what I looked at. The state of the art, Qualcomm was aware of that. It was in their materials that I looked at.**
*Q.* My question, sir, is whether you did any analysis -- in any of the time you spent, the documents you produced, the reports you produced, your preparation for testimony today, did you do any analysis of the prior art and the state of the art, as compared to the provisional patent applications from 2014 that you were asked to analyze?
**A. I mean, there was evidence in the materials I looked at. I didn't go beyond that and do my own prior art analysis, no, if that's what you're asking.**

***Q.*** So you agree that the value of a patent is dependent on the state of the art and its development; correct?
***A.*** **Yes.**
***Q.*** And you did not use this as a criteria when analyzing whether the provisional patents here were valuable to Qualcomm?
***A.*** **No, that's not correct.**
***Q.*** That's not correct?
***A.*** **No.**
***Q.*** Can you -- do you have a copy of your reports up there? If you don't, I'd be happy to provide them to you.
***A.*** **I probably do back here.**
***Q.*** Give me one second. We'll provide it to you.
***A.*** **Sure.**
***MS. BERNSTEIN:*** Permission to approach, your Honor?
***THE COURT:*** You may.
***THE WITNESS:*** Thank you.
***BY MS. BERNSTEIN:***
***Q.*** And please direct us to where the analysis about the prior art and the state of the art, as compared to Ms. Alan's provisional patent applications, where your analysis is about that to assess whether they were valuable to Qualcomm.
***A.*** **Okay. Give me a minute to go through. It's easier when you can Control F on your PDFs.**
**So I talk about core power reduction in my reports. I think that you're aware of that. That is called CPR. That was the**

**state of the art. That was Qualcomm's technology. And they were using -- they were comparing to CPR explicitly to determine how valuable TruSens mostly was.**

*Q.* Is that the extent of the analysis that you did between Ms. Alan's provisional patent applications and the state of the art as of 2014?

***A.*** **Well, there were other analyses as well on TruTest. You know, the current standard of what Qualcomm was doing applying their own state of the art techniques, how much advantage TruTest could give, all the internal analysis.**

*Q.* Please direct us to where in any of your reports you did an analysis of the prior art and the state of the art as compared to Ms. Alan's provisional patent applications to assess the value of Ms. Alan's provisional patent applications to Qualcomm. And you can refer to it by paragraph number if you'd like.

***A.*** **Okay. Thirty-five, last sentence. That's one example.**

*Q.* And your testimony --

***A.*** **Thirty-four also.**

*Q.* Thank you. I'll take them in turn.

Your testimony is that the last sentence of paragraph 35 is a comparison between prior art and state of the art as compared to Ms. Alan's provisional patent application? I want to be really clear.

***A.*** **I'm saying that the last sentence of 35 explains that the current state of the art as Qualcomm is applying it compared to**

**what TruSens could offer, and as I've already testified in the direct, TruSens was built on the provisional from Sheida. And, therefore, it is a comparison, yes.**

*Q.* I anticipated some areas of friction, but this was not one of them. So I do want to understand.

My question is whether you did an analysis of the prior art looking at publications, prior patents, any of the hundreds of documents you looked at. Because you yourself have said that the value of a patent is dependent on prior art and the state of art.

Is that correct?

*A.* **Yes.**

*Q.* And you did or did not do that type of an analysis on Ms. Alan's provisional patent applications?

*A.* **I think you're asking if I went and tried to determine whether the patent should be valid or not.**

*Q.* That's not my question.

*A.* **Okay.**

*Q.* No. My question is whether you did an analysis of the state of the prior art, whether you looked at publications and other patents and what was out in the public domain, what was already out there in the world, the state of the art, in order to establish the value of two provisional patent applications filed by Ms. Alan in December of 2014, given that you have said that the state of the art and comparison to prior art is part of the

criteria for assessing the value of a provisional patent application.

Did you or did you not undertake that type of a comparative analysis here?

**A. I did.**

*Q.* And as proof of that, you're directing me to the final sentence of paragraph 35 and portion of paragraph 34?

**A. For example, I also, in the rebuttal report, you know, in response to your expert's report that did do a lot of prior art analysis, I did respond on some of those. And I think, you know, the key point there was that the patent was issued, the patent is valid until proven otherwise. And so --**

*Q.* Professor Sylvester, you will have plenty of time to say what you need. And Mr. Pilchak will get a chance --

***THE COURT:*** Just ask your question, Counsel.

***BY MS. BERNSTEIN:***

*Q.* So I'd like you to answer the questions I'm asking you.

**A. Okay.**

*Q.* Which is where, in any of these reports, can you show me an analysis of the state of the prior art and the state of the art as compared to Ms. Alan's provisional patent applications?

**A. Well, I've given you examples already, and I talk about background. For instance, Sections 23 through 27, paragraphs 23 through 27 talk about state of the art in terms of adaptive voltage scaling.**

***Q.*** And I'm looking at those right in front of me. I don't see a single description anywhere in here of a --

***THE COURT:*** Are you testifying, Counsel, or are you asking him?

***BY MS. BERNSTEIN:***

***Q.*** I'm asking if you can please direct me to a single description anywhere in here of a prior patent, a prior publication, of something else that was out there in the world at that time.

***A.*** **Well, I didn't point to those. But they are in the -- they are in the patents.**

***Q.*** You just testified and directed me to paragraphs 23 to 27.

***A.*** **Yeah. It's the state of the art.**

***Q.*** So can you please tell me what in here -- and you can highlight it. I'm happy to bring you a highlight.

Where in here, please show me, where you did an analysis of the state of the prior art, publications, patents, what was out there and known to the world as compared to Ms. Alan's two provisional patent applications.

***A.*** **Well, as I mentioned, a lot of the references to the Q. Karbi [ph] materials, for instance, that are listed in a lot of the paragraphs, those are explanatory for how Qualcomm was doing things. To me that's state of the art.**

***MS. BERNSTEIN:*** Your Honor, may I give the witness a highlighter?

***THE COURT:*** You may.

***BY MS. BERNSTEIN:***

***Q.*** That's one of my favorite highlighters.

**A. I won't lose it.**

***Q.*** Thank you.

But if you can please use that to mark where you did a comparison of the state of the prior art and a state -- an analysis of a review of the publications, the patents, the information that was out there in the world as compared to the ideas contained in Ms. Alan's provisional patent applications as of December of 2014.

**A. Okay. I'm highlighting a middle sentence in paragraph 35 which quotes from Qualcomm's evaluation of the technology executive summary that explains the advantages of Abreezio's technology with respect to the state of the art.**

***Q.*** So you reviewed a Qualcomm document, but you yourself did not compare Ms. Alan's provisional patent applications from December of 2014 with patents, publications, speeches, conferences, lectures, ideas that were out in the world. Is that correct?

**A. Other than to look at the ones that your expert, you know, raised in his report.**

***Q.*** So once the defense expert did that comparison, you did respond to that.

Is that your testimony?

***A.*** **Well, I didn't necessarily respond in full to each one and say this paper versus this paper. That wasn't part of my task.**
***Q.*** You don't think that's important?
***A.*** **No. I think it's less important than what I just described.**
***Q.*** And you yourself have said, and I quote, that the value of a patent is dependent on the state of the art and its developments; correct?
***A.*** **Yes.**
***Q.*** And other than referring me to a piece of discovery in this case, you didn't undertake any independent analysis of that for this case?
***A.*** **No.**
***Q.*** Okay. I'm going to --
***MS. BERNSTEIN:*** Permission to approach and get my highlighter back?
***THE COURT:*** You may.
***MS. BERNSTEIN:*** Thank you.
***BY MS. BERNSTEIN:***
***Q.*** Would you agree that graduate students in electrical and computer engineering do research in areas that are covered by the provisional patent applications that Ms. Alan submitted in December of 2014?
***A.*** **Yes.**
***Q.*** And you're an expert in low power designs; correct?
***A.*** **Yes.**

***Q.*** And in voltage scaling techniques?
***A.*** **Yes.**
***Q.*** And you've researched and published in those areas?
***A.*** **Yes.**
***Q.*** And you have done research and publication with some of your students. Is that correct?
***A.*** **Yes.**
***Q.*** I want to show you what's being marked as Exhibit 3251.
Do you recognize this paper?
***A.*** **Yeah, I do.**
***Q.*** Are you an author of this paper?
***A.*** **I am.**
***Q.*** And does this paper contain novel ideas and research?
***A.*** **Yeah, I mean, it was accepted by peer review, so I guess so.**
***Q.*** And is this a paper that addresses issues around voltage scaling?
***A.*** **Right.**
***Q.*** And you would agree that one of Ms. Alan's provisional patent applications -- I believe it's Exhibit 830, "The circuitry and method for critical path timing speculation to enable process variation compensation via voltage scaling" -- also refers to voltage scaling?
***A.*** **Yeah.**
***Q.*** And this paper that we're looking at, was that published before or after Ms. Alan's provisional patent application was

published -- was submitted? Excuse me.
**A. Before.**
*Q.* Okay. And would you read the name of the first author there?
**A. Read it, you mean?**
*Q.* Yes.
**A. Dongsuk Jeon.**
*Q.* Do you recognize that name?
**A. Yeah. He was one of my Ph.D. students.**

***MS. BERNSTEIN:*** Move to admit 3251.

***MR. PILCHAK:*** No objection.

***THE COURT:*** Okay. It may be admitted.

***(Exhibit 3251 admitted.)***

***BY MS. BERNSTEIN:***

*Q.* I also want to show you what's been marked as 3250.
Do you recognize this paper?
**A. Yes.**
*Q.* And you're an author of this paper as well?
**A. Correct.**
*Q.* And this was published in January of 2013; correct?
**A. Yes.**
*Q.* And is that before or after the provisional patent application about low power voltage scaling was submitted?
**A. Before.**
*Q.* And you would agree that your paper here also addresses

issues of voltage scaling?
**A. Yes.**
***Q.*** And issues of timing speculation?
**A. Yes.**
***Q.*** And those are also concepts that are addressed in Ms. Alan's first provisional patent application?
**A. Yes.**
***Q.*** And the first author here, can you read that name?
**A. Matthew Fojtik.**
***Q.*** And do you recall who he was?
**A. Sure. He is one of my graduate students.**
***Q.*** Move to admit 3250, please.
***MR. PILCHAK:*** No objection.
***THE COURT:*** 3250 may be admitted.
***(Exhibit 3250 admitted.)***
***BY MS. BERNSTEIN:***
***Q.*** Having read the bios on the paper, it appears that some of the other co-authors were also graduate students. Would you agree?
**A. Yes.**
***Q.*** So it's common for graduate students in electrical and computer engineering to research and write papers?
**A. Yeah. My Ph.D. students really need to write papers in order to graduate, yes.**
***Q.*** And there's many citations in the paper.

Is it standard practice in research papers to cite references?

***A.*** **Yes.**

***Q.*** And can you tell me how many papers are cited in this paper?

***A.*** **I would have to go to the last page.**

***Q.*** Would it help you if I handed you a physical copy of this?

***A.*** **Sure. That would be good. Or I could just look. I just saw the number.**

***Q.*** If we go to the next page, you can give us the answer.

***A.*** **Yeah, 21 papers are referenced.**

***Q.*** And how did all of the authors know about these references? Is there somewhere that they can find prior research?

***A.*** **Yeah. Well, some of these are textbooks, actually, the last two. But we use different web repositories for papers that are published, yeah.**

***Q.*** So in your experience, graduate students commonly have access to previously published papers?

***A.*** **Yes.**

***Q.*** And some of these papers are also available to the public on the Internet without going through a database or library?

***A.*** **Some are, yeah.**

***Q.*** And in your experience, is it common for graduate students to read and review academic papers?

***A.*** **It should be.**

***Q.*** So in general, graduate students would have access to

academic papers about timing speculation and voltage scaling?

**A. Yes.**

*Q.* And Ms. Alan would be no different; correct?

**A. Presumably.**

*Q.* I want to go to the first page of this exhibit, please. And in the second column, do you see where it says "They also move metastability issues" -- can we call that out, please?

**A. I see it, yes.**

*Q.* We're going to make that bigger for you.

Is it a correct translation of this that in situ or non-replica sensors suffer from practical issues that make them impractical for commercial applications?

**A. I -- can you repeat it? I was looking at this wall of text.**

*Q.* Would you like it smaller? Would that be easier?

**A. No, no, no, it's fine. I didn't see that here, so I wanted to hear what you said.**

*Q.* The question is whether it's an accurate translation of this to say that in situ or non-replica sensors suffer from practical issues that make them not suitable for commercial application.

**A. You said in situ or replica; right?**

*Q.* Non-replica sensors.

**A. Oh, non-replica sensors.**

*Q.* Sorry. I misspoke?

**A. I think this is saying at that time there had been no commercial implementations of non-replica in situ sensors**

**because of these challenges, yes.**
*Q.* And Ms. Alan's non-replica sensor ideas would have had similar practicality issues at this time?
***A.* Not necessarily all of these, but yeah. Some, yes.**
*Q.* Okay. Thank you.
You never asked to speak with any of Ms. Alan's electrical engineering academic advisors, did you?
***A.* No, I did not.**
*Q.* You never spoke with her professors?
***A.* No.**
*Q.* Anyone she worked with in her labs?
***A.* I did not.**
*Q.* Professor Kaminska?
***A.* No.**
*Q.* Professor Ivanov?
***A.* No.**
*Q.* I want to talk about the Abreezio technologies.
Your testimony was that Abreezio had two primary technologies; correct?
***A.* Yes.**
*Q.* TruSens, which was a concept?
***A.* I mean, I don't know what you mean by "concept" versus like a product family or -- can you rephrase, perhaps?**
*Q.* Sure.
TruSens was related to low power?

**A. Yes.**
Q. And TruSens was the concept whereas CoolBreez was the software product?
**A. Yeah. You could say that, yeah. It was usually referred to by just TruSens in most of the materials I saw, but yeah.**
Q. But TruSens was the concept and the actual product was CoolBreez?
**A. I mean, it's hard to say exactly. I mean, Qualcomm was evaluating TruSens. That's typically what they referred to. But sometimes CoolBreez was used in the Abreezio, you know, notation.**
Q. And CoolBreez as a software product would have had source code; correct?
**A. Yes, it would.**
Q. And you testified that you did not review that?
**A. Correct.**
Q. And the other concept primary technology that Abreezio had was called TruTest; correct?
**A. Yes.**
Q. And TruTest was the DFT concept, whereas DFTBreez was the software product?
**A. Okay, sure.**
Q. Is that accurate?
**A. I would say accurate, yeah.**
Q. And so the software product, DFTBreez, would have had source

code. Is that correct?
**A. Right.**
*Q.* And you didn't review that source code either; right?
**A. Correct.**
*Q.* And source code would tell us two things: The ideas and concepts that are enabled -- that are embedded in the software as one. Correct?
**A. Yes.**
*Q.* And who and when the software was developed, the code, the keystrokes; correct?
**A. Like who wrote it and things like that, you mean?**
*Q.* Correct.
**A. Yeah, usually it would be annotated.**
*Q.* Did you run the actual DFTBreez and CoolBreez products?
**A. No.**
*Q.* Did you talk to the engineers who created the DFTBreez and CoolBreez products?
**A. No.**
*Q.* How did you conclude that it relied on sensors?
**A. Based on all the materials from both Abreezio and Qualcomm that I saw stating that it was using sensors.**
*Q.* But you didn't look at the source code to see whether it was or not?
**A. I mean, I -- I did not look at the source code, no.**
*Q.* And you testified that there were three DFT products. There

was -- if I'm remembering correctly, I think you said FTP, TTP, and PCR. Is that right?

***A.*** **Yes.**

***Q.*** And you know that Abreezio only commercialized TTP in its DFTBreez software; correct?

***A.*** **Well, commercialized usually means put up for sale. So I don't know what -- if they commercialized anything.**

**Are you saying they only implemented that? Can you rephrase?**

***Q.*** I'm asking you -- because you testified to three types of DFT software, DFT components; correct?

***A.*** **Yes.**

***Q.*** And in fact, only one of those was put into the DFT software.

You knew that; right?

***A.*** **I don't know that that's true from what I saw, no.**

***Q.*** Because you didn't look at the source code?

***A.*** **I did not look at the source code.**

***Q.*** And the source code would tell you which, if any, of the three concepts were put into the actual software product?

***A.*** **Yeah, the source code would have that information.**

***Q.*** That feels pretty relevant, where your testimony, I think had been, that FTP was directly based on Ms. Alan's provisional patents, TTP was based on some other technology, and PCR had nothing to do with Ms. Alan's provisional patents.

Was that your testimony?
**A. Can you repeat? Sorry.**
*Q.* I think you had said -- and please correct me where I'm wrong -- that FTP was directly based on Ms. Alan's provisional patents; TTP was based on other technology; and PCR was based on completely unrelated provisional patent applications and ideas.
**A. A slight modification. The first and third were correct. The second one I said was supplemented. It was based on other technologies but supplemented or augmented, perhaps, by the sensors ideas in the provisionals.**
*Q.* So the TTP is the one that's actually -- your testimony is that it was a mixed bag, if that's a fair characterization?
**A. Yeah.**
*Q.* So that make it's seemingly all the more critical to look at the source code to see what actually went into the software product that Qualcomm purchased.
Would you agree?
**A. I think I know what Qualcomm wanted. What source code they got, I don't know. But I know that what they wanted to buy. That's what I got out of the materials.**
*Q.* Do you know what they were demoed on site?
**A. The FPGA demos?**
*Q.* Do you know that only TTP was evaluated and demoed on site?
**A. Of the DFTBreez, are you saying?**
*Q.* Correct.

***A.*** **Yeah, yeah.**
***Q.*** And so, as amongst this mixed bag of TTP, source code would tell us what concepts and whether Ms. Alan's sensor concept was embedded in there; correct?
***A.*** **Yeah, possibly.**
***Q.*** Okay. Mr. Pilchak talked to you about your experience, and we have a copy of your résumé, of course.
And it's 77 pages single spaced?
***A.*** **Yeah, I'm not sure.**
***Q.*** Fair to say you've done a lot?
***A.*** **Well, all those papers are listed in there. So most of that is just a list of papers.**
***Q.*** You've published more than 550 papers?
***A.*** **Right.**
***Q.*** And how many years have you taught for? Twenty-five?
***A.*** **Yeah.**
***Q.*** How many courses have you taught over those 25 years?
***A.*** **I'd say around 40.**
***Q.*** Around 40 courses.
And that's all in integrated circuit design, low power techniques, adoptive design, memory design?
***A.*** **Yes.**
***Q.*** You've never published any papers on DFT?
***A.*** **Not directly on DFT.**
***Q.*** And you do not teach directly on DFT?

**A. That's not true.**
Q. What courses do you teach directly on DFT?
**A. VLSI Design I, VLSI Design II. Both those courses I have lectures on DFT concepts.**
Q. So they're embedded in a larger course?
**A. Yeah.**
Q. And I think you testified that the last time had you studied DFT was when you were a student in 1999?
**A. That's when I originally studied it. But then as I said, I think, in the testimony, whenever I teach a topic, I investigate it further to learn more about it. So I continue -- continue learning.**
Q. And yet it's not amongst the prolific writing you appear to engage in.
**A. Yeah, I don't publish research in that topic.**
Q. You agree -- I want to talk about the provisional patents for a moment, the provisional patent applications.
Let me back up. In general, would you agree that the claims section of a patent is where the details of an invention's novelty are claimed?
**A. Yes.**
Q. And you have not performed any technical novelty analysis any of the claims of any of the patent applications at issue in this case?
**A. That's correct.**

*Q.* You've not compared and cross-examined the claims in Ms. Alan's provisional patent applications with the claims in the rest of Abreezio's 26 patent applications to see if the claims are related.

**A. I wouldn't say that's completely true. Can you repeat again so I can be sure?**

*Q.* My question is whether you've compared and cross-examined the claims in Ms. Alan's provisional patent applications with the claims in the rest of Abreezio's 26 patent applications to see if the claims are related.

**A. Yeah, I did some of that. I didn't do it exhaustively. But I can see commonalities in the claim language of a few of them, yes.**

*Q.* You didn't put that in your reports, did you?

**A. I talked a lot about the commonalities of the provisionals of Sheida to some of the applications and issued patents from Abreezio's portfolio. I talked about it in various ways. I don't know if I was looking specifically at this claim language versus this claim language. Perhaps not.**

*Q.* But you do agree that the claims, as you just said, are where the details of an invention's novelty are claimed?

**A. Yes, I do.**

*Q.* And before I forget, I think you had mentioned in one of your reports -- your rebuttal report that you had made a typographical error related to some of the patents.

Do you remember that?

**A. Yeah, numbering.**

*Q.* Okay. I want to talk for a moment about Ms. Alan's DFT provisional patent application.

**A. Okay.**

*Q.* It's Exhibit 831, please.

And this claim is timing fault coverage enhancement. We can go to the next page.

Does this claim timing fault coverage enhancement?

**A. Through test point insertion, yes.**

*Q.* And that's by using a functional test method for delay fault testing?

**A. Yeah. It's by inserting, you know, sensors to, you know, improve testability.**

*Q.* Is that a functional test method?

**A. Yeah. These are functional or delay fault testing. I mean, there's multiple topics covered in here. You can see in the background she's talking about multiple different types of faults, which are errors or, you know --**

*Q.* Okay. And then the critical path, as I think you went through, is the functional path. Is that right?

**A. So functional test is basically proving that the chip works. And then you want to prove that it works at a certain speed, right, as a certain voltage. And then you want to look for delay faults, which are basically what I talked about earlier**

**with transitions that are too slow or entire paths that are too slow, and there's different lingo for each of these.**

*Q.* Okay. And I don't want to get into the details for the moment, but is it -- is it fair to say that is this a functional test method for delay fault testing?

*A.* **Yes. So you could test path delay faults here.**

*Q.* Okay. Thank you.

And then this provisional patent application, as you testified, was incorporated into a non-provisional patent application?

*A.* **It was.**

*Q.* And that's the necessary step work to apply for a patent from the USPTO?

*A.* **Correct.**

*Q.* And you understand that that -- the non-provisional patent application was rejected by the USPTO; correct?

*A.* **Yes.**

*Q.* For lack of novelty?

*A.* **Yes.**

*Q.* Abreezio did have granted two other DFT patent applications; correct?

*A.* **Yes.**

*Q.* And they do not claim the date of Sheida's provisional patent applications as the priority date or the stake in the ground?

**A. Correct.**
Q. They don't reference her provisional patent applications?
**A. No, they do not.**
Q. And they describe a scan test based methodology?
**A. Yeah, at least one of them does. Possibly both of them do, yeah.**
Q. And that's different than a functional test methodology?
**A. Yeah. The scan-based work was different than this, yes.**
Q. And I want to bring up, please, Exhibit 831, which is the DFT provisional patent application.
Now, I know you're not a DFT expert, but you've reviewed this patent application; correct?
**A. Yes.**
Q. And you agree that others have highlighted the same or similar designs before the date that this was filed on December 28th of 2014?
**A. You're saying was there prior art in this area?**
Q. Yes.
**A. Yeah. I mean, you mentioned that the application that was filed, the patent examiner brought up some prior art that was relevant. So that's an example; right?**
***MS. BERNSTEIN:*** Let's go to Exhibit 3201, please -- 3021. Excuse me.
Oh, no, I'm sorry. That's okay.
///

***BY MS. BERNSTEIN:***

***Q.*** And do you see what's on your screen as 3021?

***A.*** **Yes.**

***Q.*** And are these examples of others highlighting the same or similar designs before the date that Ms. Alan's provisional patent application was filed?

***A.*** **Similar designs, yeah. Same conceptual area, yeah.**

***Q.*** Okay. I think we spoke for a moment when we were looking at one of your prior papers about how Ms. Alan's provisional patent application invention would not have been practical to implement in high speed chips. Is that right?

***A.*** **I said that there was no implementations to that point.**

***Q.*** They were not suitable for commercial application because they were impractical and costly. Is that right?

***A.*** **They -- they hadn't been commercialized yet. That's what I -- that's what my conclusion was.**

***Q.*** Well, an added delay, as Ms. Alan proposed, makes it impractical and costly to implement in high speed chips; correct?

***A.*** **And added delay from the sensor?**

***Q.*** Correct.

***A.*** **Yeah, that's one drawback, yeah.**

***Q.*** Because too much delay can make a problem?

***A.*** **Sure.**

***Q.*** And too little delay can also make a problem?

**A. Yes, it can, yeah.**

*Q.* So you have to be very specific about how much delay to add?

**A. I mean, that's a very open-ended topic. I mean, it's hard to answer that question.**

*Q.* Well, over millions of delay paths and millions of locations, that becomes somewhat impractical and costly.

Would you agree?

**A. I mean, I need more context on that topic.**

***MS. BERNSTEIN:*** Okay. Can we please bring up 3250. And can we go back to the -- where it says "The testability issues."

***BY MS. BERNSTEIN:***

*Q.* Does this address some of the practical issues that make non-replica sensors not suitable for commercial applications, as you previously testified?

**A. Does what address? You said "Does this address."**

*Q.* This paragraph that you wrote.

**A. Yes. So this paragraph talks about the trade off, for instance, between things that go too fast, like you were saying, right, causing problems, but we're really looking for things that are too slow.**

**So it's a very complicated to describe, clearly, maybe, perhaps, to the jury, but, in general, yes, we -- you know, very fast paths. It's shown in some of the figures I've shown earlier. They're problematic and very slow paths are**

**problematic. So at that sense, at a high level, what you're saying is valid, yes.**

*Q.* Okay. Thank you.

I would like to talk about the notebook for a moment. And I'd like to bring up exhibit -- well, let me ask you first.

It's a study notebook. Is that correct?

*A.* **A research notebook. That's what I would --**

*Q.* I'm sorry?

*A.* **That's what I referred to it as, a research notebook, in my report.**

*Q.* Well, none of the notes in it are actually novel; right?

*A.* **It's unclear, you know. I think that, you know, it's -- the provisional patent was based on some of the ideas there. So, you know, they were claiming there's a link there to think it was novel; right?**

*Q.* Well, no, I'm asking you. I mean, all of the notes, it sounded like from your testimony -- and we can go through it -- all of the notes were taken from prior art in and existing publications.

*A.* **Yeah. Most of it was citing previous work and talking about it or not citing previous work and talking about it.**

*Q.* So that's not a research notebook; right? That's more of a study notebook.

*A.* **Well, there needs to be both; right? My students, if they keep a notebook, and some do, some don't, they're going to put**

**down -- they're going to put down, you know, essentially state of the art and there then they can build on that, right, and maybe tinker with ideas in the same notebook.**

***Q.*** Okay. And you talked about scooping, which is when all of the concepts there have been researched by someone else; right?

***A.*** **Yeah, someone comes out ahead of you on an idea that you are working on.**

***Q.*** And that probably afflicted much of this study or research notebook as all of the notes were from existing publications?

***A.*** **Well, yeah. She wasn't trying to publish those prior artworks, as far as I understand.**

***Q.*** I want to show you what's Exhibit 860. 860A, excuse me. And this is a lengthy document, so I just want to pass you up a hard copy.

***A.*** **Okay.**

***MS. BERNSTEIN:*** Permission to approach, your Honor?

***THE COURT:*** You may.

***BY MS. BERNSTEIN:***

***Q.*** Have you seen this before?

***A.*** **The first page here in this or what's on the screen?**

***Q.*** The second page, which I think will then sync up with what's on the screen.

***A.*** **It looks like the cover of the research notebook we talked about earlier.**

***MS. BERNSTEIN:*** We can go to the next page, please.

***BY MS. BERNSTEIN:***

***Q.*** Does that give you some confirmation?

***A.*** **Yes.**

***Q.*** Okay.

***MS. BERNSTEIN:*** Move to admit 860.

***MR. PILCHAK:*** 860A, your Honor.

***MS. BERNSTEIN:*** 860A, excuse me.

***THE COURT:*** Any objection?

***MR. PILCHAK:*** No, your Honor.

***THE COURT:*** 860A may be admitted.

***(Exhibit 860A admitted.)***

***BY MS. BERNSTEIN:***

***Q.*** So this is the complete notebook. Is that fair?

***A.*** **Well, I'd have to look through it.**

***Q.*** Well, let me ask you a different question.

The Government showed you a notebook that was Ms. Alan's notebook. And every single page had something written on it; correct, all consecutively?

***A.*** **There might have been a blank page or two in the middle somewhere, like -- the last ten pages were unrelated to the technology than the rest of it. So there may have been a gap there. I can't recall.**

***Q.*** Well, you know that in fact in the actual notebook many of the pages had been torn out and discarded long before you saw the notebook?

**A. I mean, I didn't see those. So I didn't look at those.**
*Q.* The Government never shared the complete copy with you?
**A. I got a file which had all the contents as far as I understand.**
*Q.* Would it matter to you to know that there -- this is 142 pages.
Would it matter to you to know that there was a lot more there?
**A. Blank pages?**
*Q.* Blank pages, other pages. Would it matter to you to see the complete notebook --
**A. Yeah, if there was content on the other pages, sure. But if there was no content, then not really.**
*Q.* Okay. Well, let's talk about the page that you reviewed. And I think if you go to page 41, please.
This is the page that you reviewed that you testified about previously?
**A. Correct.**
*Q.* And this page is not dated; correct?
**A. Correct.**
*Q.* And can we go to the page just below before it, please.
**A. Sure.**
*Q.* Are they in the same color font even?
**A. You'd have to flip back.**
**No. This looks black. The other looks blue.**

*Q.* Okay. And this page 41 is located amongst eight undated pages that are prior to and after it?
**A. Yeah. I think I see seven pages, but yeah.**
*Q.* In fact, there are 70 undated pages in the notebook?
**A. Possibly, yeah. I didn't count them.**
*Q.* And the notebook also has unrelated personal notes on three pages?
**A. I did see some of that, yeah.**
*Q.* Let's go to page 3, please.
That's certainly not related to any studies of a graduate student; correct?
**A. Not that I would think.**
*Q.* Let's go to page 17.
These are some unrelated personal notes as well?
**A. You mean at the bottom?**
*Q.* Yes.
**A. Yeah, I guess so. I can't read that.**
*Q.* Let's go to page 143, please.
Same with this?
**A. Yes.**
*Q.* And on page 7, for example, this notebook discusses clock skew. Can you go to page 7?
Do you see that?
**A. I do.**
*Q.* Would you agree that that's a discussion of clock skew?

**A. The second line there, clock skew, clock must arrive at all flip-flop in time to load data.**

Q. Yes.

And that's actually discussed again on pages 85 and 86. Can we go there, please.

Do you see that?

**A. Yes.**

Q. So does that suggest that Ms. Alan got back to this at a much later time once she found some more detailed references?

**A. Well, the first page that show it is sort of very, very basic and not even completely accurate definition of clock skew, I would say. This is getting into more details of how clock skew impacts performance. So it's a more -- a little bit more advanced, yeah.**

Q. And these are roughly 80 pages apart in the notebook?

**A. Yeah. I guess if you say so. 73, I think, to 7.**

Q. Seven to page 85.

**A. Okay. Yeah.**

Q. Would you agree that taking notes does not mean that a note taker fully understands the concepts?

**A. Yeah, that can be true, sure.**

Q. Okay. And also in this notebook, there's at least nine pages that have materials copied from references with the references cited; correct?

**A. Yes.**

*Q.* And in fact, almost everything in this notebook is either a review of existing materials or depictions of relevant prior art.
**A. Yeah. Most of it is prior art, you know, going from fundamentals to prior art, but not necessarily all of it.**
*Q.* That's consistent with the provisional patent application which was also prior art; correct?
**A. Which provisional?**
*Q.* Either of them.
**A. Either? No, I wouldn't say that. I mean, there's a patent issued on the back of one of those. So it's -- in that sense it's novel or the patent examiner said it was novel.**
*Q.* And we'll talk about that in a moment.
How about -- I think it's Exhibit 83 -- the DFT patent, would you agree that that one was prior art, the one that additional piggybacks got rejected for lack of novelty?
**A. I think -- no, I wouldn't fully agree with that, not just based on a rejected patent application.**
*Q.* Well, you didn't look at a comparison of those patents and prior art; right?
**A. No. So I can't say for certain it was not prior art, because it wasn't issued. But there's -- every other patent was originally rejected as well and then claims are changed and it's accepted. So that's a common practice.**
*Q.* Well, while we're on the topic, let's look at 3203, and then

we'll come back to this notebook.

***THE COURT:*** I'm looking for a good time to break. Would now be okay?

***MS. BERNSTEIN:*** Sure.

***THE COURT:*** Let's take a 15-minute recess. Ladies and gentlemen, you're reminded you're not to discuss the case. You're not to do any research about the case. And we'll see you in 15 minutes.

***(Jury out at 2:59 p.m.)***

***THE COURT:*** We're now outside the presence of the jury. Any issues we need to take up?

***MR. PILCHAK:*** No for us.

***MS. BERNSTEIN:*** It's very hot in this courtroom, but no issues to take up.

***THE COURT:*** Okay.

***MR. PILCHAK:*** Thank you, your Honor.

***THE COURT:*** Okay. We'll take a 15-minute recess.

***(Recess taken.)***

***THE COURT:*** Okay. We are back on the record. All jurors are present. Dr. Arabi is present. And all lawyers are present.

You're reminded you're still under oath to tell the truth.

Ms. Bernstein?

***MS. BERNSTEIN:*** Thank you.

***BY MS. BERNSTEIN:***

***Q.*** Professor Sylvester, right before we broke, I think we your talking about how one of the provisional patent applications was rejected because of prior art.

Do you remember that question?

***A.*** **Yes.**

***Q.*** And we should step back for a moment.

Is prior art any publicly available information about an invention that exists before the effective filing date of the patent application, so it's used to determine if it's novel and non-obvious?

***A.*** **Yes.**

***Q.*** And you did recall that one of the provisional patent applications was rejected because of prior art? Excuse me, the one that piggybacked on it was rejected because of prior art?

***A.*** **Yeah, the non-provisional that was filed following the DFT provisional from Sheida was rejected under certain prior art and then eventually abandoned.**

***Q.*** Okay. Thank you.

I want to get back to the notebook for a moment. So we're in Exhibit 860A.

And you were talking to Mr. Pilchak about how the notebook had copied from a 2015 source; correct?

***A.*** **Right.**

***Q.*** And is it possible that Ms. Alan continued to study the

topic?

***A.*** **I can't -- I don't know evidence on that.**

***Q.*** Well, you know that she sought out Ph.D. programs in the topic?

***A.*** **On chip design?**

***Q.*** After Abreezio's success.

***A.*** **No.**

***Q.*** You didn't know that?

Would it have mattered to your analysis to know that?

***A.*** **Well, no, because I was looking at what was happening pre-acquisition.**

***Q.*** But when she includes a source from 2015, is it possible that that's because she had continued to study the topic after Abreezio's success while she was seeking out Ph.D. programs in the topic?

***A.*** **I mean, the dates don't line up?**

***Q.*** Let's go to page 41, please.

There's no date on this, is there?

***A.*** **No date on this page, no.**

***Q.*** So what dates don't line up?

***A.*** **The dates of the pages around it.**

***Q.*** The dates of some prior entries; correct?

***A.*** **And later entries, yes.**

***Q.*** And later entries.

***A.*** **Yeah.**

**Q.** And I think we've established that is this somewhat of a sloppy notebook. Is that correct?
**A. Yeah, you could say that.**
**Q.** And is it correct that the guardband topics in this later paper would have probably solved some of the vulnerability issues that the in-situ sensors that Ms. Alan proposed had?
**A. I'd have to re-read everything to talk about that. So I can't answer that.**
**Q.** Okay. I want to talk for a moment about Ms. Alan's provisional patent application related to low power.
Is it correct that that provisional patent application was not about replica critical paths?
**A. Correct.**
**Q.** And the idea of using a replica critical path was already very well known by December of 2014; correct?
**A. Yes, I would say so.**
**Q.** You yourself had published on it?
**A. Yes.**
**Q.** And your paper referred to at least seven other papers on the topic?
**A. Possibly, yes.**
**Q.** In fact, the idea of a replica critical path was so common by 2014 that I think you had referred to it as, quote, traditional. Is that right?
**A. Yeah, that's possible, I would say.**

***MS. BERNSTEIN:*** We'll show 3250, please. And can you please call out the third sentence of the introduction to this paper by Professor Sylvester.

***BY MS. BERNSTEIN:***

***Q.*** Do you see where it says "Traditional approaches to reduce margining at run time"?

***A.*** **Yes.**

***Q.*** So you agree that mimicking critical path delays with canary circuitry and using error prediction was a very common and traditional approach at that point?

***A.*** **Yes.**

***Q.*** And this paper references seven other papers; correct?

***A.*** **On that specific sentence, yes.**

***Q.*** Okay. And we can hop to the end if that would be helpful.

But do you recall that the earliest of those seven papers was published in November of 2000?

***A.*** **I'm looking at it now. Yeah. I know the first author, yes, Tom Baird. Yeah, sure. That was the earliest work really that worked on this.**

***Q.*** So that was 13 years before your paper was published; correct?

***A.*** **Before this paper was published, yeah, approximately 13.**

***Q.*** And about 14 years before Ms. Alan's provisional patent was submitted?

***A.*** **Yes, on replicas, yes.**

***MS. BERNSTEIN:*** And can we please go to Exhibit 830, Ms. Alan's provisional patent application.

***BY MS. BERNSTEIN:***

***Q.*** I want you to -- thank you -- read the second paragraph of the section entitled "Prior Art."

***A.*** **Mm-hmm.**

***Q.*** So you would agree that this provisional patent application that references canary critical path replica concepts was quite well known?

***A.*** **Yeah, that's what it's saying here. This is prior work.**

***Q.*** And, again, this provisional patent application is not about a replica of critical path?

***A.*** **No, it's not proposing a replica. It's using it as background, basically.**

***Q.*** Okay. And would you agree that what was demonstrated to Qualcomm by Abreezio on March 20th of 2015 and April 15th of 2015 was a replica of critical path?

***A.*** **Not according to the slides that I reviewed.**

***Q.*** You reviewed slides of the on-site demonstrations from March 20th of 2015 and April 15th of 2015?

***A.*** **I reviewed slides describing the potential gains of the technique.**

***Q.*** From different dates, correct?

***A.*** **Different dates, yeah.**

***Q.*** And they were not about what was demonstrated to Qualcomm by

Abreezio on March 20th of 2015 or April 15th of 2015?
**A. Well, if it was after that, then it would include information from the demonstration.**
***Q.*** So would you agree that what was demonstrated to Qualcomm on those two dates by Abreezio was a replica of critical path?
**A. I don't have information about that, no.**
***Q.*** Okay. You would agree that Abreezio's technology was valuable beyond Qualcomm?
**A. Yes.**
***Q.*** And I want to show you Exhibit 3256.
Is this one of your papers?
**A. Yes, it is.**
***Q.*** And this was published in June of 2004?
**A. That's right.**
***Q.*** And this is about dynamic voltage scaling?
**A. Correct.**
***Q.*** And this discusses --
***MS. BERNSTEIN:*** Well, can we call out table -- admit 3256, please?
***MR. PILCHAK:*** No objection.
***THE COURT:*** 3256 may be admitted.
***(Exhibit 3256 admitted.)***
***MS. BERNSTEIN:*** And can we please call out Table 1 and make that easier to read.
///

***BY MS. BERNSTEIN:***

***Q.*** So would you agree that in 2004, ten years before the provisional patent applications were filed, at least IBM, Transmeta, and Intel had commercial products that were using voltage scaling?

***A.*** **Yes.**

***Q.*** And would you also agree that it was public knowledge that IBM, Transmeta and Intel were using voltage scaling?

***A.*** **Yes.**

***Q.*** And in your report had you claimed that Qualcomm was one of only a small number of companies in 2015 that was actively using advanced adaptive design techniques?

***A.*** **Yes.**

***Q.*** But this is a 2004, ten years before, with three other companies. Is that right?

***A.*** **Yes.**

***Q.*** Okay. Thank you.

You reviewed -- thank you.

You reviewed documents that showed that Abreezio had a standalone business model that was applicable to the semiconductor industry?

***A.*** **Can you repeat?**

***Q.*** Did you review documents that showed that Abreezio had a standalone business model that was applicable to the semiconductor industry?

**A. It sounds reminiscent of some of the company overview slides that they used to pitch themselves.**

***MS. BERNSTEIN:*** Can we show Government Exhibit 600, please? I'm not sure if this is in evidence, but I'd move to admit it.

***THE COURT:*** Any objection to 600 coming in?

***MS. BERNSTEIN:*** I'm being told it's in evidence.

***THE COURT:*** It's in.

***BY MS. BERNSTEIN:***

***Q.*** Can we look at Slide 4, please.

Does this refresh your memory that Abreezio had a standalone business model applicable to the semiconductor industry?

***A.*** **Okay. Yeah, it says standalone business plan based on an IP licensing model.**

***Q.*** Okay. And you've reviewed documents that show that Abreezio had value to Apple, MediaTek, and Intel, for example?

***A.*** **I remember Intel, Samsung, and MediaTek in particular. I don't know if Apple was mentioned in them or not.**

***Q.*** Let's go to Slide 6, please.

Are you aware of what Mav is?

***A.*** **Mav? I don't use that term, no.**

***Q.*** Are you aware that it is apparently a code name for Apple inside of Qualcomm?

***A.*** **Okay.**

***Q.*** And that Apple calls Qualcomm Eureka?

***A.*** **No.**
***Q.*** Okay. But you've reviewed documents that Qualcomm thought that not acquiring Abreezio would result in a loss of competitive advantage?
***A.*** **Yes.**
***Q.*** And can we go to Slide 3.
And that's Bullet Point 3 from this slide; correct?
***A.*** **Yes.**
***Q.*** And you've reviewed several documents that show that five months -- after five months of extensive evaluations by many teams at Qualcomm, Qualcomm believed that Abreezio's technology was even more applicable to other companies than to itself; correct?
***A.*** **Perhaps more valuable.**
***Q.*** Let's go to Slide 6.
And is that what the bullet points on the bottom are suggesting, that Qualcomm believes that the Abreezio technology would be even more applicable to companies that did not have what Qualcomm already had?
***A.*** **Yes. So the second bullet of the bottom three, for instance, says that if someone was doing less advanced things than Qualcomm already was, that the benefit would be larger.**
***Q.*** And for example, if you just jump up and look at the line next to Intel, the potential savings could have been very significant there, estimated at half a billion to a billion per

year. Is that right?
**A. Yeah. Intel is a big company.**
*Q.* And this technology was going to provide quite a bit of savings?
**A. According to the slide, yes.**
*Q.* Well, these slides are what you referenced throughout your reports.
You have no reason to doubt their accuracy, do you?
**A. No, I believe they're accurate.**
*Q.* So you agree that Abreezio wasn't just targeted to Qualcomm?
**A. Just targeted to -- you mean their technology -- can I rephrase? Sorry.**
*Q.* You would agree that the Abreezio technology was not simply targeted to Qualcomm, it was quite valuable to at least three companies you're aware of on the screen?
**A. Yeah. These other companies could benefit from their technology, yes.**
*Q.* I want to talk about Ms. Alan's circuit diagram.
Do you agree that the core of that circuit diagram is very common?
**A. What do you mean by "core"?**
*Q.* That the main concept of her diagram is not novel at all.
**A. I think there was related work around that time. I do.**
*Q.* Let's look at Exhibit 3252, please.
Is this another one of your 550 papers?

***A.*** **Yes.**

***Q.*** And this looks like it's from -- can you tell me the date of this one?

***A.*** **That conference is held early in the year, so maybe February of '05, March, maybe.**

***MS. BERNSTEIN:*** And the last section of the introduction section, can we please call that out?

***BY MS. BERNSTEIN:***

***Q.*** So does this paper that you authored in 2005 concern voltage scaling as well?

***A.*** **Voltage scaling, yes.**

***Q.*** And you would agree that Ms. Alan's provisional patent application proposed a method to detect delay errors from voltage scaling?

***A.*** **Timing margin. Timing margin is different than delay errors.**

***MS. BERNSTEIN:*** Can we go to Exhibit 830, please. And can we look at Figure 2 of this paper, please.

***BY MS. BERNSTEIN:***

***Q.*** Does Figure 2 of this paper suggest using an XOR gate?

***A.*** **Yes.**

***Q.*** And let's go to 3250 from your paper. Figure 17, please, from this paper.

And does this circuit as well use an XOR gate?

***A.*** **Yes, it does.**

*Q.* So is it common to use an XOR gate like the one that was in your paper and in Ms. Alan's paper to detect or predict timing errors in voltage scaling applications?

***A.*** **Yeah, it was a -- yeah, XORs are good at comparing numbers or bits.**

*Q.* So you don't believe that Ms. Alan's use of an XOR gate to compare signals in her provisional patent application is novel, do you?

***A.*** **Not by itself, no.**

*Q.* Do you agree -- I think we spoke briefly, but would you agree that the inventions in Ms. Alan's first provisional patent application were flawed and could not have worked?

***A.*** **I've never tried to commercialize those, so it would be hard for me to say whether they can't work. Yeah.**

*Q.* Let's go to Exhibit 3255.

Do you recognize this paper?

***A.*** **Yes.**

*Q.* And you're an author; correct?

***A.*** **Correct.**

*Q.* And when was this paper published?

***A.*** **2010.**

*Q.* And can you read, skipping ahead, the first section of paragraph -- excuse me -- the first paragraph of Section 7? We'll call that out.

***A.*** **Do you want me to read -- oh.**

***Q.*** Once you've read it, just let me know.

**A. Okay.**

***THE COURT:*** Read it to yourself.

***THE WITNESS:*** Yes.

Okay. Got it.

***MS. BERNSTEIN:*** And I'm sorry, let me move to admit 3255.

***THE COURT:*** Any objection?

***MR. PILCHAK:*** No, your Honor.

***THE COURT:*** 3255 may be admitted.

***(Exhibit 3255 admitted.)***

***BY MS. BERNSTEIN:***

***Q.*** And this section of the paper addresses voltage scaling; right?

**A. Yes.**

***Q.*** And can we go to the second and the third sentences, if you can focus on those.

**A. Okay.**

***Q.*** That that -- "Often this has been achieved using so-called canary circuits. These circuits employ specialized structures that predict the delay failure of a pipeline using a critical path replica, ring oscillator, or canary flip-flop"?

**A. Yes.**

***Q.*** And provisional patent -- the first provisional patent application of Ms. Alan's proposed these critical path replicas;

correct?

**A. No. She talked about replicas as background, but then proposed an in situ approach.**

*Q.* I'm sorry, she -- your testimony is that her first provisional patent application did not propose critical path replicas?

**A. Did not propose replicas, no.**

*Q.* In situ?

**A. She was proposing in situ, which means the actual paths.**

*Q.* And let's look at the first sentence of the second paragraph here, please.

"A second category of adaptive designs has been based upon directly monitoring the variation-constrained logic using in situ circuitry."

Is that what you just mentioned, the same word?

**A. Yes.**

*Q.* Can you briefly explain what "in situ" means in this case?

**A. It's like in place. So it's using the real data path that's executing the code. And you're directly monitoring that to see whether there's errors or how much timing margin you have as opposed to creating a copy of it and then analyzing that copy.**

*Q.* And so that's different than a replica path?

**A. Well, in situ is different than replica, yes.**

*Q.* And is it correct that in this paper of yours you highlight issues with in situ circuitry?

**A. Well, with Razor, for instance, yes, which is a different idea, yeah.**

*Q.* Incidentally, in this paper you rely on and reference one of Mr. Minoj Sachdev's papers about sensors and adaptive voltage scaling. Is that right?

**A. Yeah, I reference a lot of relevance work, so yeah, quite likely.**

***MS. BERNSTEIN:*** Let's look at reference 45, please. Reference 42, please, can we call that out?

***BY MS. BERNSTEIN:***

*Q.* And M. Sachdev is actually the defense expert in this case; correct?

**A. Yes.**

*Q.* And you've read his report in this case; correct?

**A. Yes.**

*Q.* And do you agree with his assertion that the Abreezio internal report correctly pointed out that in situ sensors, like those proposed by Ms. Alan in her provisional patent application, suffer from a critical flaw for AVS application?

**A. I don't fully agree, no.**

*Q.* Isn't that the same issue that was highlighted in your paper that we're looking at?

**A. Not really. Because as I mentioned, Razor is a different technique than what Sheida proposed.**

*Q.* So this paper talks about the worst-case vector recognition

for in-situ sensors, correct?
**A. Worst case? Sorry?**
*Q.* Vector recognition.
**A. Recognition?**
*Q.* Yeah. Let's call that out, please.
**A. Yeah, call that out.**
***MS. BERNSTEIN:*** It's the second sentence, the second paragraph of Section 7, please. I'm sorry, the third paragraph. The third paragraph, please, of Section 7.
***BY MS. BERNSTEIN:***
*Q.* Do you see in the middle where it says, "We propose to resolve this by using in situ delay monitoring combined with worst-case vector recognition and control"?
**A. Yes.**
*Q.* So why would you need to recognize the worst-case vector, if that wasn't necessary and there were no issues?
**A. Well, this is one of the challenges with the in situ approaches, including Sheida's. And Abreezio was aware of this, but there are workarounds. One workaround we tried to develop in this paper, and there could be others as well.**
*Q.* Well, and actually, by 2016, there -- there still had not been an implementation of an in situ non-replica sensor to commercial high-speed chips; correct?
**A. Not that I know of.**
*Q.* You read Dr. Sachdev's expert report?

*A.* **Yes.**
*Q.* And you're aware that he highlighted critical flaws with the provisional patent application that were referenced in an internal Abreezio report from March of 2015 that had also concluded that that provisional patent application was flawed?
*A.* **I read that report., yes.**
*Q.* You reviewed the internal Abreezio report?
*A.* **Yes.**
*Q.* And in fact, I had emailed you about that; correct?
*A.* **You did.**
*Q.* Twice?
*A.* **Yes.**
*Q.* And you agree that it was correctly pointed out in the internal Abreezio report that in situ sensors, including those proposed by Ms. Alan's provisional patent application, suffer from a critical flaw for AVS application?
*A.* **I wouldn't characterize it that way.**
*Q.* You didn't say anything differently in your rebuttal report, did you?
*A.* **No, I didn't talk to that in my rebuttal, no.**
*Q.* You understand that the Invionics engineers that were working for Abreezio determined that Ms. Alan's provisional patent applications could not work as intended?
*A.* **It's possible.**
*Q.* Well, you read their internal report from March of 2015;

right?
**A. Yeah. I just re-read it this morning actually.**
***Q.*** And so you understand it was their conclusion that Ms. Alan's provisional patent applications could not work as intended.
**A. Actually, the conclusions don't say that. Can you put it up?**
***Q.*** Sure.
I'm showing you 2624. And this is the -- is this a copy of the Abreezio internal report you reviewed?
**A. Looks like it, yes.**
***MS. BERNSTEIN:*** And I apologize, I'm not keeping great track on what's in and what's out. But move to admit.
***THE COURT:*** Any objection?
***MR. PILCHAK:*** No, your Honor.
***THE COURT:*** 2624 may be admitted.
***(Exhibit 2624 admitted.)***
***BY MS. BERNSTEIN:***
***Q.*** And was there somewhere in here --
**A. The last page, under "Conclusions." Well, before the definitions.**
***FEMALE SPEAKER:*** I apologize.
***THE WITNESS:*** Section 7, perhaps. Yes. And there's more on the next page.
***MS. BERNSTEIN:*** We'll go to the next page for you.

***THE WITNESS:*** So basically, the conclusion shows that here's what you need to do to make this work, and it says if they can not be met or they are too burdensome, so on and so forth, then there are some alternatives. That's what it says. It doesn't say this can't be done.

***BY MS. BERNSTEIN:***

***Q.*** Well, the provisional patent applications as proposed were -- needed to be changed in order to work.

Is that what that says?

***A.*** **No. Like Bullets 1, 2, 3, and 4 just provide constraints on the system, basically guidance on how to design the system.**

***MS. BERNSTEIN:*** Can we go back to the page just before this, please.

***BY MS. BERNSTEIN:***

***Q.*** So this is saying, "In order to create a critical path sensor that accurately detects all marginal circuit path events, the following conditions must be meant."

Let's jump to the next page, please.

And so if those condition can not be met or are too burdensome, then there are some alternatives?

***A.*** **Right.**

***Q.*** And so your understanding is that Ms. Alan's provisional patent application could meet all of the necessary conditions for it to work based on this internal report saying the contrary?

**A. It just lists a bunch of issues. It doesn't say they can't be resolved, and there's no conclusion that says it can't be done.**

***Q.*** But as they existed at that moment in time, they needed work. Is that right?

**A. Sure. Yeah, they need work.**

***Q.*** And you agree that if the engineers working for Abreezio understood that they needed work, they would have been motivated to do this work to find workable concepts that were implementable?

**A. Yeah, I believe so.**

***Q.*** Yeah. Thank you.

***MS. BERNSTEIN:*** My colleague is directing me to the first sentence here. Can we just call out that bottom paragraph, please.

***BY MS. BERNSTEIN:***

***Q.*** So I just want to be crystal clear that the internal report from Abreezio in March of 2015 was saying that "The alternatives are to either rely exclusively on critical path replica circuits or perform statistical-based analysis to show that the critical path sensors will eventually detect issues over sufficient clock cycles"; correct?

**A. Yes, that's what it says.**

***Q.*** Okay. Thank you.

Would you agree that there is a criteria for inventorship on

patents?
**A. Yes.**
*Q.* And that authorship is not the same thing as inventorship?
**A. Authorship of a patent?**
*Q.* Correct.
**A. I only think about it in terms of inventor lists.**
*Q.* So would you agree that there is a distinction between authoring a patent and inventing the invention in a patent?
**A. I guess could you define authoring a patent for me? I know what inventing is.**
*Q.* Well, what's inventing to you?
**A. Inventing is playing a role in the creation of the ideas that form the creative element of the patent. You're involved in the idea that's actually being patented.**
*Q.* And that's not just your idea.
You recognize that there is an authoritative body that also defines inventorship; correct?
**A. Sure.**
*Q.* I want to talk for a moment about Exhibit 3255. And the first author here is Ronald Dreslinski; correct?
**A. Yes.**
*Q.* And this was a graduate student at the time?
**A. It's hard to say. I have to look at his bio. He transitioned from graduate student to post doc.**
*Q.* We can jump to the last page, please.

**A. Yes. Ph.D. student, yes.**
*Q.* And you authored other papers in this same area with Ron Dreslinski?
**A. Yes, I did.**
*Q.* And can you look at reference 24, please.
This is another paper that you two authored together, among -- with others?
**A. Yes.**
*Q.* "An energy efficient parallel architecture using near threshold operations."
Sounds complex.
**A. Yeah, that's a paper of mine.**
*Q.* How long does it take to write a paper like this?
**A. It can vary. Sometimes the work might take up to a year of time from the graduate student. Sometimes it might be a few months. It depends on the topic.**
*Q.* I want to go to the first page of this paper, please.
When was this submitted for publication?
**A. It looks like the manuscript was received in May of 2009 down at the bottom left.**
*Q.* So is it safe to say that you were probably working on this for some period of time before this was submitted?
I think you just said papers can take up to a year.
**A. Yeah. This was an invited paper, so it's a little bit unusual. But yeah, we probably worked on it, you know, three,**

**four months.**

*Q.* And I want to look at a patent at Exhibit 3259, please.

Are you listed as an inventor on this patent? We can blow that up.

*A.* **Yes, I am.**

*Q.* And can you look at the last sentence of the abstract on the first page?

*A.* **Sure.**

*Q.* And is this an invention that focused on voltage scaling?

*A.* **Yes.**

*Q.* And looking at the left-hand side of the first page, can you confirm that this application was submitted in February of 2009?

*A.* **That looks right, yes.**

*Q.* And is Michael -- the fifth inventor down, that name, Michael?

*A.* **"Witkowski."**

*Q.* Witkowski.

That's an inventor on this patent?

*A.* **Yes.**

*Q.* And David Blaau is an inventor on this patent?

*A.* **Yes.**

*Q.* And going back to your paper at Exhibit 3255, is Michael Witkowski an author on that paper as well?

*A.* **Yes, he is.**

*Q.* And David Blaau is also an author on that paper?

***A.*** **Yes.**
***Q.*** And was Ronald Dreslinski listed as an inventor on the patent?
***A.*** **You'd have to flip back over to show me the full list.**
***Q.*** Sure. We'll go back to 3259.
***A.*** **No, not on this one.**
***Q.*** So Ronald Dreslinski, who you had worked with in low power as early as 2007, and with whom you coauthored the near threshold paper in the spring of 2009, is not an inventor on the patent application that you also worked on with the other coauthors of that paper in the spring of 2009?
***A.*** **Yeah. This work was from a different topic. I mean, he wasn't involved in it.**
***Q.*** They both involved voltage scaling; right?
***A.*** **Sure.**
***Q.*** But he wasn't an inventor of this patent?
***A.*** **No.**
***Q.*** So simply working together on similar problems is not sufficient to make someone an inventor?
***A.*** **Not on similar problems, no.**
***Q.*** Would discussing existing techniques in the area be sufficient to make someone an inventor?
***A.*** **Discussing existing techniques?**
***Q.*** Correct.
***A.*** **To be an inventor on a patent, it shouldn't.**

*Q.* To be an inventor on a patent, a person has to have contributed to the invention?

**A. Correct.**

*Q.* And the invention itself must be novel?

**A. For the patent to be issued, yes.**

*Q.* So an inventor on an issued patent has to have made a novel contribution to an invention; correct?

**A. Yes.**

*Q.* I want to talk now about Abreezio's margin numbers.

You agree that these numbers were known prior to 2014?

**A. Can you specify what you mean by "Abreezio's margin numbers"?**

*Q.* Yeah. Let's look at Exhibit 3259, please.

And that is the patent we were just looking at, right, from 2009?

**A. Oh, yes.**

*Q.* Can we please go to page 8 of this patent.

And do you see toward the -- can you call out the part toward the bottom of Column 5.

This talks about normal engineering practice is to design such integrated circuits with --

***THE COURT:*** I'm going to stop you for a minute. This isn't in evidence yet. Did you want to admit --

***MS. BERNSTEIN:*** I thought this had been admitted? If it has not, I seek to admit.

***THE COURT:*** Any objection?

***MR. PILCHAK:*** No, your Honor.

***THE COURT:*** 3259 may be admitted.

***(Exhibit 3259 admitted.)***

***MS. BERNSTEIN:*** My apologies.

***THE COURT:*** No, that's okay.

***BY MS. BERNSTEIN:***

***Q.*** So do you see here that this patent of yours talks about "a large; e.g., 30 percent, operating margin to ensure that the timing requirements of the critical path are always met despite any individual manufacturing variation or variation due to environment at parameters"?

***A.*** **Yes.**

***Q.*** How did you know that the typical margin is 30 percent?

***A.*** **I believe I've seen -- I have a friend from IBM back in this time frame, and he had some published data where he talked about the amount of variation there was on some of their chips. You know, rough numbers. And typically if you add it all it up was something maybe in this ballpark.**

***Q.*** So that kind of information is not considered proprietary?

***A.*** **I mean, exact numbers and more detailed things could certainly be. But this number, IBM published something on -- related to it, yes.**

***Q.*** So this type of a range is not considered proprietary?

***A.*** **Yeah, like a rough number like this, not necessarily.**

***Q.*** And you've said that you believe that Abreezio sought the disclosure of proprietary information because an estimate for standalone processes, which reflected the CPR approach, included a quantitative assessment of the benefits?
***A.*** **Yes.**
***Q.*** Can you explain why Abreezio suggesting a 30 percent operating margin -- excuse me -- why Abreezio suggesting a 30 to 50 percent operating margin was proprietary, but your quote of a 30 percent operating margin is not proprietary?
***A.*** **Well, I base that on a request for information from inside Qualcomm.**
***Q.*** I'm sorry. Are you aware that there was a request for information inside Qualcomm? You reviewed something about that?
***A.*** **Yeah.**
***Q.*** What was that?
***A.*** **That was a text message.**
***Q.*** And the -- there was a response about the operating margin that was being used inside Qualcomm?
***A.*** **I don't know if I saw a response. I saw the question. I would have to look back at my notes to see if I had a response document. But certainly the question was posed and then information was put into the slides that was, you know, relevant.**
***Q.*** And what was relevant was that Abreezio identified a 30 to 50 percent operating margin; correct?

**A. I'd have to look at the document to see the exact number.**

*Q.* But your same identification is not proprietary and that one is?

**A. Mine was based on public information.**

*Q.* Was that one based on public information?

**A. Not that I know of.**

*Q.* Did you search the state of the public information that was available at that time to know any and all places that that operating margin was published and out there into the world?

**A. I did some searches, but I can't claim that I exhaustively searched.**

*Q.* And you didn't put those in your reports, did you?

***THE COURT:*** I'm going to slow you down because my court reporter is way behind. You're talking very fast.

***MS. BERNSTEIN:*** My apologies.

***THE COURT:*** Okay. Go ahead.

***BY MS. BERNSTEIN:***

*Q.* You said you did some searches; correct?

**A. Yes.**

*Q.* You did not put those in your reports?

**A. I didn't say -- I did some searches. No, I didn't say that. But it was, you know, part of that paragraph on that topic in the report.**

*Q.* Well, you simply assert that Abreezio had proprietary information with a 30 percent operating margin, though you

yourself also had a 30 percent operating margin that you found in published literature at the time; correct?

**A. I did.**

*Q.* Whether the ideas that someone claimed to invent have been published before is pretty critical to a patent's validity; correct?

**A. Yes.**

*Q.* You've filed many patents?

**A. Yes.**

*Q.* And you've acted as an expert witness in patent infringement cases?

**A. Yes.**

*Q.* And you've had occasion to review responses from the USPTO to file patent applications?

**A. Yes.**

*Q.* And in that context, can you tell us what "anticipated by other work" means?

**A. Yeah. Anticipated means that, you know, basically it may not necessarily be exactly verbatim from a prior source, but it's, you know, sort of, you know, easily inferred by someone of skill in the art that knows this field. They could easily take a previous prior art and then basically come up with your invention.**

*Q.* So for a patent claim to be granted, it must be non-obvious based on prior art?

**A. Correct.**
*Q.* And, therefore, in the patent context, an invention has to be non-obvious based on prior art?
**A. Right.**
*Q.* So if the provisional patent applications were obvious, based on prior art, they would not qualify as an invention?
**A. Yeah. If they were filed for a patent application, they would -- you know, if they were obvious, they wouldn't be granted or issued a patent.**
*Q.* Okay. And patents can be different even where they share identical text; right?
**A. Sure.**
*Q.* Are all the patents that you've filed in your career for voltage scaling applications?
**A. No.**
*Q.* You've filed patents in other areas as well?
**A. Yes.**
***MS. BERNSTEIN:*** Let's look at Exhibit 3257.
***THE COURT:*** Which is not in evidence.
***MS. BERNSTEIN:*** I'm sorry?
***THE COURT:*** Which is not in evidence.
***MS. BERNSTEIN:*** Yeah.
***BY MS. BERNSTEIN:***
*Q.* This is a patent. You're an inventor on this patent?
**A. Yes.**

***MS. BERNSTEIN:*** Move to admit.

***THE COURT:*** Any objection?

***MR. PILCHAK:*** No, your Honor.

***THE COURT:*** 3257 may be admitted.

***(Exhibit 3257 admitted.)***

***BY MS. BERNSTEIN:***

***Q.*** And this patent was filed in July of 2009?

***A.*** **Yes.**

***Q.*** And that's different than the date of the patent; correct?

***A.*** **Right. The date of the issue is at the top right.**

***Q.*** But it was filed in July of 2009?

***A.*** **Right.**

***MS. BERNSTEIN:*** And can we go to the sentence starting on line 21, "The background of the invention" section.

Sorry. If you could just bear with us for one moment.

Your Honor, would this be a good breaking point for today?

***THE COURT:*** Sure. We can break now.

Ladies and gentlemen, you're reminded you're not to do any research about the case. Don't talk to anyone about the case.

And we'll see you tomorrow morning at 9:00 o'clock. Thank you very much.

***(Jury out at 3:59 p.m.)***

***THE COURT:*** And you're ordered back tomorrow morning at

9:00 o'clock.

***THE WITNESS:*** All right. Thank you.

***THE COURT:*** Thank you. We're now outside the presence of the jury.

Any issues we need to take up?

***MR. PILCHAK:*** We had two, your Honor.

One is one of our witnesses, the lawyers would like to just very briefly address the Court about the subpoenas that he's received. I think she's here right now. Feel free to step up and address the Court. You can use the mic if you'd like.

***MS. SHEN:*** Good afternoon, your Honor. I am Sheila Shen from Holland & Knight. I represent non-party witness Daniel Hoggar.

I understand that the parties in this case do not have an agreement as to how to handle witness recall, and I would respectfully ask the Court to urge the parties to complete all examination of Mr. Hoggar in the first instance.

Both Mr. Hoggar and I have traveled from New York. We've been in San Diego for several days now. Of course there's a substantial financial burden on Mr. Hoggar who is paying for his attorney's fees individually. So that is the only request I have.

***THE COURT:*** And we discussed this with respect to another witness. I really would like to excuse witnesses, particularly a witness who is traveling from New York. But just

for my own perspective, I don't want to call witnesses in one case and then recall them in the defense case.

So when Mr. Hoggar does testify, I would like to have you exhaust all questions so that we can let him go and excuse him.

***MS. BERNSTEIN:*** Your Honor, as we have said, that is obviously our intention as well. But since we are week one into the Government's estimated four-week long case, we simply don't know what's going to arise hereafter to sort of agree, but we're certainly not holding anything back.

***THE COURT:*** I am not going to order Mr. Hoggar to stick around. And if it becomes necessary, we can have a discussion about how to handle it. So I'll excuse him at this moment.

***MS. SHEN:*** Thank you, your Honor.

***MR. PILCHAK:*** Thank you, your Honor.

The second thing, we anticipate calling Kevork Kechichian tomorrow. I am mindful of the Court's ruling *in limine* that we're not going to be exploring much of the post acquisition valuation of Abreezio.

The difficulty with Mr. Kechichian is most of his testimony is kind of post facto about after the acquisition and how everything came to light. And I think the natural springboard for his explanation of why he was looking at anything or why people were worked up when he talked with them, is that one of the two of Abreezio's products wasn't working,

and that was causing some consternation.

I just wanted to advise the Court I'm going to try to use careful questioning with Mr. Kechichian to stay away from fronting the issue that there was a problem with one of the two products because I think that might open a door for the defense where they would say, great, now we have to get into valuation potentially a year or more after the fact. But I wanted the Court to be alert to that. I'll be alert to that. I'm sure the defense can as well with objections, if necessary, to try to keep that cabined. So I just want to put that marker down.

***THE COURT:*** Okay. Anything else?

***MS. BERNSTEIN:*** Nothing from us, your Honor.

***MR. PILCHAK:*** Thank you, your Honor.

***THE COURT:*** Okay. We'll see you tomorrow morning at 9:00 o'clock. Thank you.

***(Proceedings adjourned at 4:03 p.m.)***

***

///

///

///

///

///

///

///

///

*REPORTER'S CERTIFICATE*

I, Anne Roldan, certify that I am a duly qualified and acting Official Court Reporter for the United States District Court, that the foregoing is a true and accurate transcript of the proceedings as taken by me in the above-entitled matter on March 17, 2025; and that the format used complies with the rules and requirements of the United States Judicial Conference.

Date: March 17, 2025

*Anne Roldan, RMR, CRR, CSR 13095*