UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. KARIM ARABI, Defendant. | Case No. 22-cr-1152-BAS<br>March 18, 2025<br>Jury Trial, Day 6 |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CYNTHIA A. BASHANT
CHIEF DISTRICT JUDGE

PAGES 1247 - 1463

APPEARANCES:

FOR PLAINTIFF: UNITED STATES ATTORNEY'S OFFICE
880 Front Street, Suite 6293
San Diego, California 92101
*By: NICHOLAS W. PILCHAK, AUSA*
*JANAKI G. CHOPRA, AUSA*
*ERIC R. OLAH, AUSA*

FOR DEFENDANT: BIENERT KATZMAN LITTRELL WILLIAMS, LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
*By: WHITNEY Z. BERNSTEIN, Esq.*
*REBECCA S. ROBERTS, Esq.*
*RYAN V. FRASER, Esq.*

REPORTED BY:

ANNE MARIE ROLDAN, RMR, CRR, CSR 13095
U.S. OFFICIAL COURT REPORTER
U.S. District Court Clerk's Office
333 West Broadway, Suite 420
San Diego, California 92101

Reported stenographically; transcribed with CAT software.

# I N D E X

***

## E X A M I N A T I O N S


| WITNESS | VOL. | PAGE | LINE |
|---|---|---|---|
| *FOR THE GOVERNMENT:* | | | |
| DENNIS SYLVESTER | | | |
| Cross by Ms. Bernstein | 6 | 1250 | 13 |
| Redirect by Mr. Pilchak | 6 | 1279 | 14 |
| Recross by Ms. Bernstein | 6 | 1300 | 9 |
| DANIEL HOGGAR | | | |
| Direct by Mr. Olah | 6 | 1308 | 5 |
| Cross by Mr. Fraser | 6 | 1323 | 12 |
| Redirect by Mr. Olah | 6 | 1337 | 5 |
| KEVORK KECHICHIAN | | | |
| Direct by Mr. Pilchak | 6 | 1340 | 4 |
| Cross by Mr. Fraser | 6 | 1398 | 3 |
| Redirect by Mr. Pilchak | 6 | 1435 | 7 |
| Recross by Mr. Fraser | 6 | 1439 | 23 |
| Re-Redirect by Mr. Pilchak | 6 | 1443 | 6 |
| Re-Recross by Mr. Fraser | 6 | 1444 | 1 |
| FARSHEED MAHMOUDI | | | |
| Direct by Ms. Chopra | 6 | 1445 | 12 |

# E X H I B I T S


| ADMITTED | VOL. | PAGE | LINE |
|---|---|---|---|
| Ex. 59 | 6 | 1457 | 24 |
| Ex. 893 | 6 | 1460 | 19 |
| Ex. 2198 | 6 | 1420 | 10 |
| Ex. 2264 | 6 | 1335 | 6 |
| Ex. 2833 | 6 | 1356 | 22 |
| Ex. 3118 | 6 | 1273 | 19 |
| Ex. 3203 | 6 | 1270 | 16 |
| Ex. 3258 | 6 | 1252 | 18 |
| Ex. 3260 | 6 | 1253 | 19 |
| Ex. 3276 | 6 | 1399 | 18 |

***TUESDAY, MARCH 18, 2025, 9:00 A.M.***

***

***THE COURT:*** Okay. We are back on the record. All jurors are present. Dr. Arabi and all the lawyers are present. You, sir, are reminded you're still under oath to tell the truth.

***THE WITNESS:*** Okay.

***THE COURT:*** Counsel?

***MS. BERNSTEIN:*** Thank you.

And can we clear the marks that I put on the screen? Thank you.

***CROSS-EXAMINATION***

***BY MS. BERNSTEIN:***

***Q.*** Good morning, Professor Sylvester.

**A. Good morning.**

***Q.*** Did you speak with the Government since you to the off the witness stand yesterday?

**A. Just to get this bottle of water.**

***Q.*** And when we left off yesterday, if you recall, we were discussing how patents can be different, even where they share some identical text.

Do you remember that?

**A. Yes.**

***Q.*** Okay. So I want to show you your patent from 2009. It's

Exhibit 3257.

***MS. BERNSTEIN:*** We believe this one was already admitted into evidence at the end of yesterday and can be published. If not, I move to admit.

***BY MS. BERNSTEIN:***

***Q.*** So can you look at the -- we'll jump to the "Background" section, the "Background of the Invention" section.

And do you see the sentence starting on line 21?

***A.*** **Column 1 or 2?**

***Q.*** I believe it's in Column 1. It starts with "a crossbar circuit." We'll call it out for you.

***A.*** **Okay.**

***(Pause.)***

***BY MS. BERNSTEIN:***

***Q.*** We're trying to enlarge the font that says, "A crossbar circuit is a switch infrastructure for connecting multiple inputs to multiple outputs in a matrix manner."

Do you see that?

***A.*** **Yeah, in the beginning of Section 2, it looks like right now, description of the prior art, maybe line 16, Column 1.**

***Q.*** Okay. Do you see that there?

***A.*** **Yes.**

***Q.*** Okay. "A crossbar circuit is a switch infrastructure for connecting multiple inputs to multiple outputs in a matrix manner."

Okay. Now, I want to look at Exhibit 3258. And I think you should have this up there with you.

Do you recognize this?

***THE COURT:*** This has not been admitted into evidence.

***MS. BERNSTEIN:*** Okay. Thank you, Your Honor.

***BY MS. BERNSTEIN:***

***Q.*** Do you recognize this patent?

***A.*** **Yeah. This is another patent in the family of patents on this topic.**

***Q.*** And you are one of the inventors here?

***A.*** **Yes.**

***Q.*** And when was this one filed?

***A.*** **Looks like August of 2011.**

***MS. BERNSTEIN:*** Move to admit.

***THE COURT:*** Any objection?

***MR. PILCHAK:*** No, Your Honor.

***THE COURT:*** 3258 may be admitted.

***(Exhibit 3258 admitted.)***

***MS. BERNSTEIN:*** Can we go to the "Background" section of this patent as well?

***BY MS. BERNSTEIN:***

***Q.*** So, I'm sorry, you said this was 2011.

The other one was 2009; correct? The one we just looked at?

***A.*** **Yeah, could be. I think that makes sense, yeah.**

***Q.*** We can go back and check in a moment.

***MS. BERNSTEIN:*** And can we please call out the sentence starting with the background?

***BY MS. BERNSTEIN:***

***Q.*** "A crossbar circuit is a switch infrastructure for connecting multiple inputs to multiple outputs in a matrix manner."

That's the same as what we just saw; right?

***A.*** **Yes.**

***Q.*** Okay. Let's look at Exhibit 3260, please.

And are you an inventor of this patent?

***A.*** **Yes.**

***Q.*** And when was this one filed?

***A.*** **November 2010.**

***Q.*** Okay. Thank you.

***MS. BERNSTEIN:*** Move to admit.

***THE COURT:*** Any objection?

***MR. PILCHAK:*** No, Your Honor.

***THE COURT:*** 3260 may be admitted.

***(Exhibit 3260 admitted.)***

***MS. BERNSTEIN:*** And can we go as well to the "Background" section of this patent?

***BY MS. BERNSTEIN:***

***Q.*** And, again, we see, "A crossbar circuit is a switch infrastructure for connecting multiple inputs to multiple outputs in a matrix manner."

Right?

***A.*** **Correct.**

***Q.*** So that sentence was the same across all three patents.

***A.*** **Yes.**

***Q.*** Okay. And, actually, looking at all three patents, the entire first paragraph is the same; right?

***MS. BERNSTEIN:*** We'll zoom back out and do them in reverse order. So we'll enlarge this one.

***BY MS. BERNSTEIN:***

***Q.*** This is the 2010 patent.

Do you see that?

***A.*** **Yes.**

***MS. BERNSTEIN:*** Okay. Now we'll go back to the 2011 patent, please.

***BY MS. BERNSTEIN:***

***Q.*** Is that the exact same paragraph?

***A.*** **I can't read that fast, but probably. Yeah, I would say it looks the same.**

***MS. BERNSTEIN:*** Okay. Let's go look at the 2009 patent, please.

***BY MS. BERNSTEIN:***

***Q.*** And does that look the same?

***A.*** **It does.**

***MS. BERNSTEIN:*** Let's actually look at Exhibit 3273.

///

***BY MS. BERNSTEIN:***

***Q.*** Is this a better visual for you?

***A.*** **Sure. Yep.**

***MS. BERNSTEIN:*** Move to admit, just as a demonstrative.

***THE COURT:*** Admitting or using it as a demonstrative?

***MS. BERNSTEIN:*** I'm sorry. Move to publish.

***THE COURT:*** Any objection to publication?

***MR. PILCHAK:*** Not to publication, Your Honor.

***THE COURT:*** Okay. It will be used as a demonstrative, not admitted into the jury room.

***BY MS. BERNSTEIN:***

***Q.*** So this is a 2010 filing, a 2009 filing, and a 2011 filing, and the first paragraph is all the same?

***A.*** **Correct.**

***Q.*** And so three patents with different claims can still have the exact same language in them.

***A.*** **I mean, in part, sure. That's what you're showing here, yes.**

***Q.*** Well, these are your three patents that have the exact same language in them; correct?

***A.*** **The same paragraph, yes, that's correct.**

***Q.*** Well, in fact, over seven paragraphs of each of these patents are completely identical.

***A.*** **Could be.**

***Q.*** Do you have copies of these three patents?

**A. In this binder, you mean, or --**

***THE COURT:*** I'm not sure. Does he have them at home or does he have them here on the witness stand?

***MS. BERNSTEIN:*** They're on the witness stand up there with you. And if you don't, we will pass it up.

***THE WITNESS:*** This is just a notebook.

***MS. BERNSTEIN:*** Permission to approach, Your Honor?

***THE COURT:*** You may.

***THE WITNESS:*** Thank you.

***BY MS. BERNSTEIN:***

***Q.*** So the exhibits we're looking at are 3258, 3257, and 3260. And if you can take a moment to look at the "Background" sections of all three of those patents, please.

**A. The third one is 3260?**

***Q.*** That's the 2010 filing, yes.

***MS. BERNSTEIN:*** I'm going to switch to the ELMO for a moment, please.

***BY MS. BERNSTEIN:***

***Q.*** This is 3257.

And this is the "Background" section?

**A. Yes, yeah. "Background of the Invention," yes.**

***Q.*** And so if we look at paragraph 1, 2, 3, 4, 5, 6, 7, essentially the whole first page.

**A. Yes. This is the "Background," yep. It's the same.**

***Q.*** I'm going to switch to 3258.

And then the "Background" section of 3258, 1, 2, 3, 4, 5, 6, 7, do those look the same to you?

***A.*** **They do.**

***Q.*** And now I'm going to show you 3260. Here's the "Background" section again, 1, 2, 3, 4, 5, 6, 7.

Would you agree that in these three patents of yours, filed in three separate years, there is identical text across at least seven paragraphs?

***A.*** **Yes.**

***Q.*** So there's no problem with cutting and pasting between patents as long as the claims are different; correct?

***A.*** **Well, the claims need to be different, yes.**

***Q.*** Because as you've said, the invention lies in the claim.

***A.*** **Correct.**

***Q.*** The name of the game is the claim.

Have you heard that?

***A.*** **Sure.**

***Q.*** And because it's not the figures, it's not the background section, it's the claim is where the novelty in the invention lies.

***A.*** **True.**

***Q.*** And from Abreezio's 26 patent applications, you indicated a handful of similarities between other sections of the applications; right?

***A.*** **Other sections? Sorry. Can you --**

*Q.* Not the "Claims" section, the other parts of the patents.
**A. Oh, true.**
*Q.* And each patent had tens of pages of descriptions.
**A. Some of the provisionals were much shorter than that, yeah.**
*Q.* But the non-provisional applications had tens of pages of descriptions?
**A. I would say in that order, yes.**
*Q.* And over ten figures?
**A. Around there, usually, yeah.**
*Q.* And I think you spoke about these three patents being in a patent family, because patent families or patent portfolios are targeted at the same problem; right?
**A. Well, in this case, I mentioned it because, if you see the top of the page, it says it's a "continuation in part," which is a special type of patent family, which I don't think Abreezio used. But, yeah.**
*Q.* But things that are in a patent portfolio are targeted at the same type of problem?
**A. Yeah, I would say so. Yeah.**
*Q.* It's why they're called a patent portfolio; correct?
**A. In part, yeah.**
*Q.* Self-driving cars, for example, may have the same general language, but the specifics about how to make them drive without crashing into people or pets or other cars, that's the real invention.

***A.*** **Right.**

***Q.*** And so invention descriptions would have same generic language often, as the problems are the same, but the invention lies in the specific solution.

***A.*** **When you mean "description," are you referring to a specific part of the patent or --**

***Q.*** Be it the "Background of the Invention" section or a different part of the patent, a part that is not the claims. The invention lies in the claims, and that's where it's more specific.

Would you agree?

***A.*** **I think the different sections have different importances, so I would rephrase that a little bit. The claims are the most important, as you said.**

***Q.*** And so here, your testimony on direct was that despite technical differences between the provisional patent applications and the non-provisional patent applications, having the same "Summary of the Invention" section is somehow nefarious?

***MR. PILCHAK:*** Objection. Misstates the testimony.

***THE COURT:*** Sustained. I'm not sure what you mean by "nefarious."

***BY MS. BERNSTEIN:***

***Q.*** Your direct testimony focused on -- in part, focused on some questions about how there was an overlap and a similarity.

And we saw highlighting and we saw diagrams about an overlap between non-provisional patent applications and Ms. Alan's provisional patent applications; correct?

***A.*** **Right.**

***Q.*** And the implication, surely, was that there was something wrong with that; correct?

***A.*** **I'm just looking at the -- at the information. I'm not drawing my own conclusions about the implications.**

***Q.*** Okay. Because there's nothing wrong with the fact that you did it in at least these three patents; right?

***A.*** **Yeah, in the "Background" section here. Yeah, it was -- it was fine. Same author list -- same inventor list, I should say.**

***Q.*** And you've already testified that you did not analyze the publicly available information about the inventions that existed before the filing date to see whether any of what the applications proposed were novel and not obvious; correct?

***A.*** **Correct.**

***Q.*** I want to switch topics.

Would you agree that Qualcomm published their sensor-based AVS and DVS solutions widely?

***A.*** **I mean, I think that people were aware they used them, yes, if that's what you mean.**

***Q.*** Okay. And, in fact, some of those people were graduate students because they taught it in courses; is that right?

***A.*** **Can you be more specific?**

***Q.*** Yes.

***MS. BERNSTEIN:*** Can we please pull up Exhibit 3254?

***BY MS. BERNSTEIN:***

***Q.*** And, I'm sorry, actually, before, we do this, you yourself teach Electrical and Computer Engineering, and some of your courses, in fact, cover low power techniques for integrated circuits?

***A.*** **Yes.**

***Q.*** Okay. And that's not unique to the University of Michigan, is it?

***A.*** **I don't think so.**

***MS. BERNSTEIN:*** Can we please pull up 3254?

***BY MS. BERNSTEIN:***

***Q.*** This was referenced by the defense expert in his report.
Did you review this?

***A.*** **I recall the reference to this, yes.**

***MS. BERNSTEIN:*** Okay. Move to admit this.

***THE COURT:*** Any objection to 3254?

***MR. PILCHAK:*** Objection. Foundation.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** Was this something that you reviewed after a defense expert highlighted it in his report?

***A.*** **I don't believe I looked at these slides.**

***Q.*** You didn't look at a reference that he put in to refute one

of the points you made?

***A.*** **No.**

***Q.*** Okay. Well, let's do that now.

Do you see that this PowerPoint is about low power implementation?

***A.*** **Yes.**

***Q.*** And this is being presented at a University of California San Diego course?

***A.*** **Correct.**

***Q.*** And do you see the name of the presenter down in the bottom right?

***A.*** **Yes.**

***Q.*** And is that Sorin Dobre of Qualcomm?

***A.*** **Yes.**

***Q.*** And is this from a winter 2010 course?

***A.*** **Correct.**

***Q.*** So 10 years -- excuse me -- four years before the provisional patent applications were filed?

***A.*** **Yes.**

***Q.*** So in four years before Ms. Alan filed her provisional patent applications, Qualcomm was making presentations at a university in courses about low power implementation.

***A.*** **Yeah.**

***MS. BERNSTEIN:*** And can we go to Slide 18 of this, please?

***MR. PILCHAK:*** Your Honor, I'd object to any further reading of the document. It's not in evidence.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** Is this an explanation of --

***MR. PILCHAK:*** Objection.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** Were students at the University of California in San Diego learning about how Qualcomm builds their voltage scaling systems in the winter of 2010?

***A.*** **I can't say that, no.**

***Q.*** Because you didn't review some of the defense expert's points that were put in specifically to refute things you had said? You couldn't be bothered to do that?

***MR. PILCHAK:*** Objection. Argumentative.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** Did you review those?

***A.*** **The slides?**

***Q.*** The slides that he had referenced.

***A.*** **No.**

***Q.*** Okay. Would you agree that if someone from Qualcomm is presenting at the University of California San Diego in a course about low power implementation in a discussion about how to do

adaptive voltage scaling with replica of critical paths in at least the winter of 2010, it was not confidential that Qualcomm used voltage scaling techniques?

***A.*** **I mean, that doesn't necessarily mean that; right? I mean, I could invite a speaker from Intel to talk about a topic, but it doesn't admit that Intel uses that technique. It's just maybe they're knowledgeable about that technique; right?**

***Q.*** And about the specifics of implementation of that technique?

***A.*** **I mean, what's public domain, sure.**

***Q.*** Okay. Thank you.

***MS. BERNSTEIN:*** We can take this down.

***BY MS. BERNSTEIN:***

***Q.*** In your testimony yesterday, you provided an opinion on the value that Qualcomm assigned to Abreezio's technology; is that correct?

***A.*** **Like, monetarily or --**

***Q.*** You thought it was valuable. That was the gist of your testimony.

***A.*** **Yeah, I would say that. Yes.**

***Q.*** Did you participate in Qualcomm's assessment of Abreezio's value?

***A.*** **Not personally at the time, no.**

***Q.*** And, I'm sorry, your testimony really focused on which parts of it were valuable to Qualcomm; right? That was what you were hired to do? That's what your reports and your testimony were

about, in part?
**A. In part.**
*Q.* And you said you did not participate in Qualcomm's assessment of Abreezio's value back in 2010?
**A. No.**
*Q.* Did you speak with any of the Qualcomm team that had assessed Abreezio's value in 2010?
**A. No.**
*Q.* You simply reviewed selective exhibits from Qualcomm about its valuation of Abreezio's technologies?
**A. Yeah, exactly. Yeah.**
*Q.* You did not author those exhibits or slide decks?
**A. No.**
*Q.* And you didn't speak with the authors of those exhibits or slide decks?
**A. No.**
*Q.* Do you have experience with mergers and acquisitions in a large company like Qualcomm?
**A. No.**
*Q.* And you'd explained that the bulk of the economic value of the acquisition was expected to arise from area reduction of Qualcomm products.
Do you remember that?
**A. Yes.**
*Q.* So adding a sensor was going to reduce the area of the

product?
*A.* **Yes.**
*Q.* It would decrease the area, not increase the area?
*A.* **In whole, yes, it would reduce the area, improve performance, have advantages, yes.**
*Q.* But doesn't adding something in -- adding something should take more area; right?
*A.* **Adding something, but it has other benefits that reduce the area.**
*Q.* So the idea that the bulk of the economic value was expected to arise from area reduction is not actually supported by a technical analysis in your report; is that right?
*A.* **It's straight from the Qualcomm due diligence slides.**
*Q.* Straight from their slides? You didn't do a technical analysis of it?
*A.* **No.**
*Q.* And you didn't do a review of the source code of the software products which would show the ideas and concepts that were, in fact, matched to the software that Abreezio commercialized and demoed and that Qualcomm bought?
*A.* **I did not review the source code.**
*Q.* And your assessment about where the bulk of economic value is coming from is also not based on a review of the prior art in this area.
*A.* **It's based on the materials I reviewed.**

***Q.*** Which did not include any prior art.
***A.*** **Other than the CPR technology of Qualcomm.**
***Q.*** Other than a Qualcomm internal document that Qualcomm gave the Government and the Government gave you?
***A.*** **That's correct.**
***Q.*** And, in fact, you didn't review Ms. Alan's provisional patent applications for functionality, either; correct?
***A.*** **Did I simulate them or build them, you mean?**
***Q.*** Did you do any type of review for functionality?
***A.*** **No.**
***Q.*** You have experience, as you've testified, reading and reviewing research papers.
***A.*** **Yes.**
***Q.*** And specifically those around low power and voltage scaling.
***A.*** **In part, yes.**
***Q.*** And you testified that you're Editor-in-Chief of the *IEEE Journal of Solid State Circuits*?
***A.*** **Correct.**
***Q.*** And that's a very prestigious position.
***A.*** **It is.**
***Q.*** And in that role, in part, you weigh in on which papers are published and you organize peer reviews.
***A.*** **Yes.**
***Q.*** So it's safe to say that you have experienced reviewing material to see if it meets the criteria for the *IEEE Journal of*

*Solid State Circuits*?
***A.*** **Yes.**
***Q.*** And to be published, the publication considers original works that enhance the existing body of knowledge.
***A.*** **Correct.**
***Q.*** Can you briefly explain what's required to enhance the existing body of knowledge?
***A.*** **Some new information, revelation, idea. Could be a negative result where prior work is shown that it doesn't work as well as what was thought. It could be a number of things. But it's supposed to be things that are not commonly known in the field by the -- by the leading-edge researchers already.**
***Q.*** And so would a reviewer consider other related papers and publications to decide if the paper was containing new information, ideas, or revelations that were not commonly known already?
***A.*** **I'm sorry. Can you repeat?**
***Q.*** Would a reviewer of a submitted paper therefore need to review other related papers and publications in order to assess whether the submitting paper contained new information or ideas or revelations that were not commonly known?
***A.*** **Yeah, usually, they do.**
***Q.*** Because experimental verification is required?
***A.*** **Well, in the journal that I edit, we do require experimental verification by the authors, yes.**

*Q.* So it's safe to say that you have extensive experience reviewing technical material to judge its novelty and correctness.

**A. Yes.**

*Q.* Because experimental verification is what sort of assesses the correctness of the proposal; is that right?

**A. For these journal papers, yes.**

*Q.* Okay. And what was your impression of the provisional patent applications when you used that same lens to review them here?

**A. My impression was it was a crowded field. And, you know, based on the documents that I read, Qualcomm was very impressed by it.**

*Q.* Did the -- did you do any sort of experimental verification on these provisional patent applications?

**A. No. That would have taken far more than 90 hours.**

*Q.* So you're not actually able to determine whether Ms. Alan's ideas in the provisional patent applications worked or not.

**A. Well, I can only draw on my experience in the field and the other materials I looked at. But I didn't verify them myself, simulation or building things, no.**

*Q.* Or compare them to other papers or publications to assess whether there was any new idea or information or revelation that was not commonly known?

**A. No, I didn't do that.**

***Q.*** We talked a little bit yesterday about the Patent and Trademark Office's rejection of Abreezio's patent application ending in 434 that had piggybacked off of one of Ms. Alan's DFT provisional patent applications.

Do you remember that?

***A.*** **Yeah, I do.**

***MS. BERNSTEIN:*** Okay. I want to show you Exhibit 3203. Move to admit.

***MR. PILCHAK:*** No objection.

***MS. BERNSTEIN:*** Move to admit, Your Honor.

***THE COURT:*** 3203?

***MS. BERNSTEIN:*** Yes.

***THE COURT:*** And there's no objection?

***MR. PILCHAK:*** Correct.

***THE COURT:*** It may be admitted.

***(Exhibit 3203 admitted.)***

***MS. BERNSTEIN:*** Okay. Let's go to page 4 of this, please.

***BY MS. BERNSTEIN:***

***Q.*** So Abreezio's patent application that had sort of piggybacked off of Ms. Alan's provisional patent application was rejected for a lack of novelty.

Do you see that?

***A.*** **I do.**

***Q.*** And, in fact, the leading reason for a patent to be rejected

is because of a lack of novelty.

Would you agree?

A. **Yes.**

Q. How much time do you and your coinventors and graduate students typically spend researching the existence of novelty in prior art between the inception of an idea and the filing of a patent application?

A. **That's a great question. Different people have different philosophies on that, how hard to look through the prior art versus constraining your thinking on innovating. So, you know, I would say not a lot of time.**

Q. But you don't want to waste weeks or months of time on an idea if someone else already scooped it; right?

A. **Correct.**

Q. If it's already out there in the world and therefore can't be owned by anyone.

A. **True.**

Q. So whether you spend a large amount of time or a little amount of time, it's a pretty rookie mistake to not research prior art before submitting a provisional patent application.

A. **Well, I think most patents are originally rejected, and then claims are changed and then they get through, potentially. So it's not uncommon for a patent to originally be rejected based on some prior art that the inventors hadn't found.**

Q. But you don't submit your applications blindly, do you? You

do some inquiry.
*A.* **Yes.**
*Q.* And you testified earlier that you believe that Dr. Arabi is an expert in low power and in DFT; is that correct?
*A.* **Yes.**
*Q.* And you testified that he attended conferences.
*A.* **Yes, spoke at conferences, I mentioned, I think.**
*Q.* He even made the keynote at conferences.
*A.* **Correct.**
*Q.* Is it reasonable to expect, then, that Dr. Arabi had an understanding of the latest developments and techniques in low power and DFT areas?
*A.* **I mean, I would think largely, yes.**
*Q.* And we just looked at one of the provisional patent applications -- later application being rejected for a lack of novelty.
*A.* **Yes.**
*Q.* And we've also discussed that Ms. Alan's low power provisional patent application was burdened with significant issues, that if left unresolved, would prevent it from working as intended.
*A.* **That's correct.**
*Q.* Would you expect that a DFT expert who regularly attends conferences and gives keynotes would know what was novel?
*A.* **I don't know all the prior art in my area of research. It's**

**impossible to know everything. So I think he would be well aware generally, but maybe not of every little past piece of work.**

***Q.*** Would you expect a low power expert to be aware of the requirements for a correctly functioning low power system?

***A.*** **I think to a degree. The devil is in the details once you start trying to implement it.**

***MS. BERNSTEIN:*** I want to talk about a paper that's at 3118, please.

***BY MS. BERNSTEIN:***

***Q.*** This was referenced in the defense expert's report and rebuttal.

Did you review this?

***A.*** **I did.**

***MS. BERNSTEIN:*** Move to admit.

***THE COURT:*** Any objection to 3118?

***MR. PILCHAK:*** No, Your Honor.

***THE COURT:*** 3118 may be admitted.

***(Exhibit 3118 admitted.)***

***BY MS. BERNSTEIN:***

***Q.*** And can you tell me when this patent was granted?

***A.*** **2008, October.**

***Q.*** That's the date up there in the corner; correct?

***A.*** **Yes.**

***Q.*** And when was it first published?

***A.*** **Well, filed, or --**
***Q.*** Yeah, the prior publication date.
***A.*** **Oh, the prior publication date, looks like November of 2005.**
***Q.*** And who is the assignee on this patent?
***A.*** **Qualcomm.**
***Q.*** And it's your understanding that once a patent application is published, it's available to the public?
***A.*** **Yeah, after some -- yeah, when it's published, yes.**
***Q.*** So as of at least November 10th of 2005, the details of this Qualcomm patent application were available to anyone who was interested?
***A.*** **That's true.**
***Q.*** And you would agree that, in the patent context, a published patent is part of the prior art?
***A.*** **Yes.**
***Q.*** Can you read the first two sentences of the abstract? We'll call that out.
***A.*** **"Methods and apparatus" --**
***Q.*** Read it to yourself. I'm sorry.
***A.*** **Okay.**
***Q.*** Would you agree that this patent is about voltage scaling?
***A.*** **Yes.**

***MS. BERNSTEIN:*** And can we go back to the patent?

***BY MS. BERNSTEIN:***
***Q.*** And do you see where it says, The measurement of actual

activity and delay of a critical path -- I'm sorry.

Do you see where it says, "The measurement of the actual activity and delay of a critical path"? We can --

***A.*** **Yeah. "Used to measure the actual activity and delay of a critical path within a microprocessor core," yes.**

***MS. BERNSTEIN:*** And can we please pull up Exhibit 830? That's Ms. Alan's provisional patent application. And can we please go to the last sentence of the first paragraph on page 2.

***BY MS. BERNSTEIN:***

***Q.*** Do you see where it says, "A unique feature of this invention is to monitor actual critical paths"?

***A.*** **Yes.**

***Q.*** So would you agree that both Ms. Alan's provisional patent application and Qualcomm's granted 2008 patent purport to measure the actual critical path?

***A.*** **Yes.**

***Q.*** Did you do a detailed analysis of the 2008 granted patent after it was brought to your attention in the defense report?

***A.*** **Yeah. I mean, I looked at it, yeah.**

***Q.*** Did you consider other existing Qualcomm patents when you were assessing the value of Abreezio to Qualcomm?

***A.*** **No. I mean, other than the fact that it's baked into Qualcomm's own assessments, but I did not myself look at Qualcomm prior patents.**

***Q.*** Do you think that a company's currently-granted patents are

relevant to their valuation of IP that they're seeking to acquire?

***A.*** **Yes.**

***Q.*** And if a company like Qualcomm already had a granted patent on a topic, another patent for the same technology filed at a later date is not too valuable?

***A.*** **I wouldn't say that, necessarily.**

***Q.*** You think there's a lot of value in a later patent -- provisional patent application when the company already had a granted patent on that same topic from 2008?

***A.*** **If the first patent didn't work.**

***Q.*** Did you do a comparison between the two patents to understand what was being proposed that was different?

***A.*** **I saw differences, yeah.**

***Q.*** You didn't include those in your reports, did you?

***A.*** **I mean, no, I didn't. And I didn't talk about it in direct, either.**

***Q.*** Okay. And amongst the hundreds of Qualcomm documents that you reviewed, did you see any analysis by Qualcomm of Abreezio's patents as compared to their own patent positions?

***A.*** **No. They didn't specifically call it out, from what I saw.**

***Q.*** And you didn't do that analysis, either.

***A.*** **Correct.**

***MS. BERNSTEIN:*** Just one moment, please.

***(Pause.)***

***BY MS. BERNSTEIN:***

***Q.*** You cannot be certain that Sheida's two provisional patent applications filed in December of 2014 were central to the technology portfolio of Abreezio, can you?

***A.*** **"Certain," meaning 100 percent certain, correct.**

***Q.*** Nor can you be certain that Sheida's two provisional patent applications filed in December of 2014 played any role, let alone a significant one, in Qualcomm's decision to acquire Abreezio in 2015.

***A.*** **I mean, that was my conclusion, but certainty, you know, is always a tricky thing; right?**

***Q.*** I mean, Qualcomm can't even find someone to say this.

***MR. PILCHAK:*** Objection.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** Did you review anything where even someone at Qualcomm is able to make this assessment with certainty?

***A.*** **The assessment that the provisionals were the basis for the acquisition, or what's the -- what assertion?**

***Q.*** Were central to the technology of Abreezio or played any role, let alone a significant one, in Qualcomm's decision to acquire Abreezio.

***A.*** **I'm certain that the monitoring of actual critical paths, that concept, was central to the decision to acquire Abreezio, based on the materials I looked at.**

*Q.* But not Ms. Alan's two provisional patent applications filed in December of 2014.

***A.* Well, that -- that concept came from the first low power provisional. There's a direct line there.**

*Q.* Well, that's been your testimony. But given all of the papers and the patents that we've discussed already on which you yourself are an author and an inventor, and given the extensive set of papers that were referenced in the defense expert's report and rebuttal, you would agree that there's been significant published work in the area of voltage scaling and low power.

***A.* Yes.**

*Q.* And as we discussed, you don't disagree with the defense expert's assertions that the provisional patent application related to low power as it was conceived and filed, without more work, was not commercially viable for voltage scaling applications.

***A.* I don't disagree with that, yes.**

*Q.* And you also agree that the non-provisional version of Ms. Alan's DFT patent was rejected for lack of novelty by the USPTO.

***A.* Correct.**

*Q.* And you understand that Abreezio developed extensive software.

***A.* Yes.**

**Q.** And you know that that software was evaluated in detail by Qualcomm.
**A. Yes.**
**Q.** And you were not part of the Qualcomm due diligence team.
**A. Correct.**
**Q.** You did not interview the due diligence team.
**A. I did not.**
**Q.** And you did not view the source code for any of Abreezio's software.
**A. Correct.**
***MS. BERNSTEIN:*** Thank you. No further questions.
***THE COURT:*** Mr. Pilchak?
***MR. PILCHAK:*** Thank you, Your Honor.

***REDIRECT EXAMINATION***

***BY MR. PILCHAK:***
**Q.** Good morning, Professor Sylvester.
**A. Good morning.**
**Q.** There were a lot of questions yesterday afternoon and this morning about whether you're really an expert in DFT and about whether the analysis that you testified to was sound.
I do have to ask you, is the Prosecution in this case the only party that tried to hire you as an expert?
**A. No.**
**Q.** What do you mean?

**A. I was approached by the Defense to also serve as an expert for them later.**

*Q.* You were asked about whether you did an analysis of the state of the art; right?

**A. Right.**

*Q.* Was it part of your goal to do a complete exhaustive review of the entire literature in the relevant field for Abreezio's patent applications?

**A. No.**

*Q.* What were you focused on?

**A. I was really focused on the path, if there was one, between the two provisional patents filed in December 2014 by Sheida Arabi and the technologies that Abreezio marketed to Qualcomm, pitched to Qualcomm as their special sauce, so to speak, and led to the acquisition.**

*Q.* And did you find a connection there?

**A. Sure, yeah.**

*Q.* All right. Speaking of prior art, is it your understanding that the Patent and Trademark Office looks at prior art when they're examining a patent application?

**A. Extensively.**

*Q.* Is that a major part of what they do?

**A. Yes.**

*Q.* And you testified just now about one of the patent applications being rejected by the Patent and Trademark Office

for lack of novelty; right?

**A. Right.**

***MR. PILCHAK:*** Can we get on the screen, please, Defense Exhibit 3203 that was just admitted?

***BY MR. PILCHAK:***

***Q.*** Do you see that there, sir?

**A. Yes.**

***Q.*** You were just testifying about this, right?

**A. Yes, I was.**

***MR. PILCHAK:*** Let's go down to page 9, please. I think it's the last page of the document. And zoom in on the available text in the top third there.

***BY MR. PILCHAK:***

***Q.*** Professor Sylvester, what is the date that the Patent and Trademark Office rejected this application?

**A. The non-final rejection here was March 9th, 2017.**

***Q.*** Do you remember when Qualcomm bought Abreezio?

**A. I think the deal closed somewhere around October 30th, 2015, I think.**

***Q.*** And do you understand whether, as part of that deal, Qualcomm was purchasing all of the pending patent applications that Abreezio had at that time?

**A. They were.**

***Q.*** So comparing those dates, are we to understand that Abreezio sold this patent application to Qualcomm, and that it was later

rejected by the Patent and Trademark Office?

***A.*** **Right.**

***MR. PILCHAK:*** We can take that down.

***BY MR. PILCHAK:***

***Q.*** As to the other patent applications, I think you testified yesterday that a number of them did result in issued patents; right?

***A.*** **Yes.**

***Q.*** As to the patents that did issue from the U.S. Patent and Trademark Office, would they have been granted after that kind of extensive prior art analysis that you were just talking about?

***A.*** **Yes, that's right.**

***Q.*** Did you yourself have any reason to question whether the conclusions that the Patent and Trademark Office reached in that analysis in issuing the patents was correct?

***A.*** **No.**

***Q.*** You were shown a number of your published papers on cross-examination. I think it was all yesterday afternoon.

Do you recall that?

***A.*** **Yes.**

***MR. PILCHAK:*** Can we pull up Defense Exhibit 3250? And let's just zoom in on the title and the by line there at the very top.

///

***BY MR. PILCHAK:***

***Q.*** This is one of your papers, right, Professor?

***A.*** **Yes.**

***Q.*** And you're listed at the end there as a fellow of IEEE?

***A.*** **Correct.**

***Q.*** Okay. And you testified about at least some of these other names here, right, including Matthew Fojtik.

Am I saying that right?

***A.*** **Yes, you are.**

***Q.*** And who is Matthew Fojtik, again?

***A.*** **A former Ph.D. student of mine.**

***Q.*** Are there any former Ph.D. students on the by line here?

***A.*** **Sure, David Fick, Yejoong Kim, and Nate Pinckney were all Ph.D. students at Michigan.**

***Q.*** And if I could ask, were they all real Ph.D. students who were really getting Ph.D.s from you in a real program at this time?

***A.*** **Some of them could have been post-docs at this time. They might have finished their degrees by this time. I can't remember the exact dates. But, yes, they all finished their Ph.D.s at Michigan.**

***Q.*** Okay. And they were all in a real program that they were actually enrolled in?

***A.*** **Correct.**

***Q.*** Where are any of them people who hadn't been enrolled at the

University of Michigan yet, but you knew their brother pretty well, so you let them get on the paper with you?
**A. No.**
Q. You were asked about the claims analysis.
And do you know what a claims analysis is?
**A. Yes.**
Q. What is that?
**A. It's typically something that you see in a patent invalidity case, you know, where you go claim by claim through a patent that's perhaps already issued and compare it to prior state of the art, and try to demonstrate whether it's obvious and therefore should not have been issued. That sort of thing.**
Q. And so in a case like that, the question at the heart of the case is whether it's a good patent or not a good patent.
**A. Well, that -- I mean, whether it's -- should have been issued or not issued, I guess is how I'd say it.**
Q. All right. Did you do a claims analysis here?
**A. No.**
Q. But you did testify on direct examination that you found some striking similarities between some of the patent applications and other patent applications; right?
**A. Correct.**
Q. And we looked at some of those on your direct testimony?
**A. Yes.**
Q. I want to ask you about that.

***MR. PILCHAK:*** Can we pull up Exhibit 830, please? And let's go to page 25. Sorry. I'm looking for the "Summary of the Current Invention." I thought it was 25 out of 38. No, it's a 15-page document, that can't be right. Can you scroll back until we reach the "Summary of the Current Invention"?

Keep going. A little bit more. Let's stop there, please. If we just zoom in on the bottom of this page, which is the page ending in 1347.

***BY MR. PILCHAK:***

***Q.*** Do you see the half of a paragraph there, "Summary of the Current Invention," Professor?

***A.*** **Yes.**

***Q.*** Again, for the jury's benefit, what is the purpose of this section?

***A.*** **It's just to provide a, you know, high-level description of what the core idea of the invention is.**

***Q.*** And so this is not a list of claims; right?

***A.*** **No.**

***Q.*** But I think it was your testimony that this paragraph, the "Summary of the Current Invention," matched word-for-word a non-provisional application that was filed separately; right? Or was it a separate provisional? I apologize.

***A.*** **A separate provisional, 412.**

***Q.*** Okay. Let me stop there.

***MR. PILCHAK:*** We can take that down.

***BY MR. PILCHAK:***

***Q.*** I want to ask by comparing some of your patents, and you were shown a number of them just now; right?

***A.*** **I was.**

***MR. PILCHAK:*** Let's not pull out all three of them, but let's just look at Exhibit 3257. And if we could go to page 29, please. Oh, good, I got it right this time. And can you zoom in on the "Background of the Invention" part there? Just pick up the top 25 percent on the left. Yeah, perfect.

Thank you, Mr. Mayberry.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, Professor?

***A.*** **Yes.**

***Q.*** There were a lot of questions about whether the "Background of the Invention" section matched from one to the other of your patent applications; right?

***A.*** **Yes.**

***Q.*** What is the purpose of the "Background of the Invention" section?

***A.*** **Well, the bulk of that section here is this Section 2, "Description of the prior art." So it's talking about the lay of the land, so to speak, in that area or field of work. In this case, it's crossbar circuits.**

***Q.*** And you mentioned something about there being a family of patents here.

What did you mean by that?

***A.*** **Well, the top of this section here shows that, "This application is a continuation, in part, of another application which had already been issued as a U.S. patent, and the entire contents of which is hereby incorporated by reference."**

**So it's sort of a way of building a patent on top of another one to try to keep legal costs down, if they're related. But the next patent, like this one, needs to have additional novelty and new, you know, different claims and things like that.**

***Q.*** And what is a "continuation, in part," if you didn't already say it?

***A.*** **Well, it's just a way of linking together patents that are -- you're filing on a similar related topic, as you come up with more ideas on that same topic and you want to sort of almost not quite amend the previous application, but supplement.**

***Q.*** And in this case, do you recall whether you took any of the inventors from the prior filings and excluded them from the later patents, even though you had copied from their work earlier?

***A.*** **No. I think the first patent in this whole family might have had one name on it. But the later -- that didn't appear on the later ones because the later ones started to bring in a new concept called arbitration. It's beyond the scope of this trial. But, you know, that that person didn't work on.**

***Q.*** Got it.

When you did these later filings, were you trying to hide anything about the trail of who had been involved in inventing the concept?

***A.*** **No.**

***MR. PILCHAK:*** All right. I think we can take that down.

Let's show the witness Exhibit 860A. And I apologize, Your Honor, I need one of my binders for this, so if you'd bear with me one moment.

***THE COURT:*** Okay.

***(Pause.)***

***MR. PILCHAK:*** Permission to approach, Your Honor?

***THE COURT:*** You may.

***BY MR. PILCHAK:***

***Q.*** I'm giving you a hard -- sorry about all the binders.

I'm giving you a hard copy of Exhibit 860A. And you can find it on the side tab there, if you flip to those. There's also -- the first page is on your screen, but it's a lengthy document. Take your time.

***A.*** **Okay. Got it.**

***Q.*** All right. Good.

You were provided in your work in this case with an 85-page scanned version of the research notebook; right?

***A.*** **Yes.**

***Q.*** And you were asked some questions on cross about this longer

version of the notebook that you see there in hard copy; right?
**A. I was.**
Q. All right. I want to ask you some questions about that.
First of all, you had some chance to review this document yesterday; right? I see you leafing through it now. I know you probably haven't looked at every one of the 146 pages yet.
**A. No, I have not.**
Q. Based on your review yesterday, though, and we don't need to sit here while you look at all of the page, but did you notice any pages in the longer version yesterday where you said, Oh, my goodness, there's writing on this page that I haven't seen in the other version that I've been provided?
**A. No. I think the only pages I was shown by counsel yesterday that I hadn't seen were one or two of the ones with just little -- maybe it was Arabic, I don't know -- written in the corner. But I'd seen the other pages that we talked about.**
Q. Okay. Did you notice some extra pages in this version, though, that you hadn't seen before?
**A. I see a blank page here and there.**
Q. Okay.
**A. Certainly kind of intermittent, and then perhaps at the end.**
Q. Sure. And let me -- I'd like to go through that in a bit of order. I put a sticky note at the page ending in 3339.
Can you flip to that first sticky note?
**A. Yes.**

*Q.* And then hopefully that's the page on the adaptive guardband topic that you testified about.
Do you remember that?
***A.* Yes.**
*Q.* So this is the one that you testified about the similarities with the published journal article yesterday; right?
***A.* Correct.**
*Q.* What I'd like you to do with that hard copy is kind of flip around to the adjacent pages, a few pages before it and a few pages after, especially involving those dates that you testified about yesterday, if you remember that.
***A.* Okay.**
*Q.* And then if you could flip to the date after the passage on adaptive guardband in Exhibit 860A.
***A.* Sorry, flip to the next sticky note, you're saying?**
*Q.* No, just a few pages after that first sticky note until you hit the next date that you testified about. I believe it's in December of 2012.
Do you see that there?
***A.* Yes.**
*Q.* And having had a chance to look at Exhibit 860A now, and those pages around the page that you testified to yesterday in the other version of the notebook, does anything about that change your impression of when that adaptive guardband page was supposedly written, just according to the dates that are in the

notebook?
**A. No. It just kind of reinforces, because the guardband page, as we discussed, follows pretty directly from the material on the previous page, for instance, conceptually.**
*Q.* And so those pages there are laid out in the same order that you saw in the other notebook?
**A. Yes.**
*Q.* All right. Now, let's flip to the second sticky note, and that is at the page with a Bates number ending in 3386.
**A. Yes.**
*Q.* Do you see that there?
**A. Yes.**
*Q.* Can you read to the jury what's on that page?
**A. It's blank.**
*Q.* Okay. And then just take a moment to leaf quickly from that page to the third sticky note, which is 3432, and tell us what you find in those pages, generally speaking.
**A. Read this page?**
*Q.* Well, the question is, are the pages between stickies two and three entirely blank? Sorry. We blew it on that one.
**A. I'm leafing through, but I'm not paging through every one, to save the time of the Court, but they all look blank to me.**
*Q.* Okay. And there's a number of pages there, it looks like; right?
**A. Yeah, dozens.**

***Q.*** Does that seem to account for a large part of the difference in page count between the version that you saw and the version that you're leafing through now?
***A.*** **Yeah. A fair bit, yeah.**
***Q.*** Okay. And then at that third sticky note, if you can just look at the text for the section that begins there, after the large block of blank pages.
Yesterday you testified that there was a part of the notebook at the end that seemed irrelevant to Abreezio; right?
***A.*** **Correct.**
***Q.*** Is this that part of the notebook?
***A.*** **Yes, that's right.**
***Q.*** Okay. So if I'm understanding correctly, there's a block of text at the beginning that's generally -- I know you didn't look at every page -- generally similar to what you were testifying about yesterday, notes related to the concepts underlying Abreezio; right?
***A.*** **Mm-hmm.**
***Q.*** And then there's a -- sorry, did you say "yes"?
***A.*** **Yes.**
***Q.*** And then there's a large block of blank pages.
***A.*** **Correct.**
***Q.*** And then there's the irrelevant part at the end.
***A.*** **Right.**
***Q.*** Okay. I think you can -- I would say set it aside. There's

nowhere to put it at this point, but can you ignore that now.
You were also asked some questions about whether you were aware that Sheida sought out Ph.D. programs in DFT.
Do you remember those questions?
**A. I do.**
Q. Do you know, sitting here today, whether Sheida actually got a Ph.D.?
**A. I referred to her as Ms. Arabi in my report, so I hope I didn't shortchange her if she's a doctor, but I don't think she did.**
Q. Okay. As far as you know?
**A. As far as I know.**
Q. Maybe that wasn't a major point of your analysis.
**A. Right.**
Q. And I guess while I'm asking about that, did the facts that you were looking at, did you generally cabin yourself to facts before Qualcomm bought Abreezio?
**A. I did.**
Q. Okay. I want to ask you about the timing of some of the requests that you were asked about yesterday, though.
You were asked, I think, were you aware that Sheida made an application for a Ph.D. program to such-and-such professor; right?
**A. Mm-hmm.**
Q. You have to say "yes" or "no."

**A. Yeah, I do remember that.**

*Q.* You remember those questions?

**A. Yeah.**

*Q.* Do you know whether all of those requests from Sheida were after Qualcomm learned of issues with the Abreezio deal and tried to interview Dr. Arabi about them?

**A. I don't know.**

*Q.* Okay. Changing topics a little bit, you were asked a lot of questions about voltage scaling patents; right?

**A. Yes.**

*Q.* I think including maybe a patent or two that you have; is that correct?

**A. Correct.**

*Q.* If someone -- here's the question.

If someone gets a patent in the area of voltage scaling, does that mean that no one else can ever get a patent in that area?

**A. No.**

*Q.* So if someone makes further refinements in the field, those might be patentable?

**A. Yes.**

***MR. PILCHAK:*** Okay. Can we show the witness 3118? And just zoom in on the top half of the page there.

***BY MR. PILCHAK:***

*Q.* This is that Qualcomm patent that you were just shown.

Do you remember that?
**A. Yes.**
*Q.* And this was issued in 2008?
**A. Correct.**
*Q.* Applied for earlier, it looks like maybe all the way back in '04?
**A. Mm-hmm.**
*Q.* Again, you have to say "yes" or "no."
**A. Yes, sorry.**
*Q.* Sorry.
You've reviewed this patent; right?
**A. Yeah, I did.**
*Q.* Is this the same thing as Abreezio's technology?
**A. It's not the same thing.**
*Q.* If you could explain it in layperson terms as best you can, how are they different?
**A. It's hard to -- it's hard to do that without going back through it right now, since I haven't looked at this patent in a couple of months.**
*Q.* Fair enough.
**A. But it's different, and I think -- in some ways. And I think that evidence of that is, for instance, the issued patent with Sheida's name on it, 672, I believe we're referring to it as, it was issued in light of prior art such as this work and others; right?**

***Q.*** And you testified that the PTO would examine prior art before issuing a patent.
***A.*** **Correct.**
***Q.*** And you've never worked at the PTO; right?
***A.*** **I have not.**
***Q.*** And you certainly didn't work on the examination of the 672 patent.
***A.*** **No.**
***Q.*** But would it be your expectation that looking at this patent would be the kind of thing that they would look at before they would issue a new patent in the same area?
***A.*** **Right, correct.**
***MR. PILCHAK:*** Okay. Can we pull up 3259, please, while we're talking about patents?
Just one moment, Professor. Thank you.
***THE WITNESS:*** Sure.
***MR. PILCHAK:*** Thank you, Mr. Mayberry. And let's zoom in on the top half of the page, please.
***BY MR. PILCHAK:***
***Q.*** This is one of your patents; right, Professor?
***A.*** **Yes.**
***Q.*** Okay. Who are the assignees who are listed there?
***A.*** **So there are two. One is the Regents of the University of Michigan, which is basically where -- you know, my bosses, I guess you might say. And then ARM Limited, which is a company**

**based in England.**

***Q.*** And why are the Regents of the University of Michigan listed here?

***A.*** **Oh, well, you know, I invented this -- along with my coinventors, we invented this as part of funded research at the University of Michigan. So as part of our basically employment there, the Regents own this intellectual property.**

***Q.*** And so when you invented this, the University of Michigan was aware of it, and they had rights in it based on your agreement?

***A.*** **Yes. So we filed it with the Technology Transfer Office at the University and then went through that process.**

***MR. PILCHAK:*** Okay. Let's take that down.

***BY MR. PILCHAK:***

***Q.*** You were asked on cross-examination about the difference between authorship and inventorship; right?

***A.*** **Yes.**

***Q.*** And I think you testified that those can be two different things; is that fair?

***A.*** **Yeah. I was confused, if I recall, from the question, because it seemed like it was asking about patent authorship and patent inventorship. But I think maybe if you're just talking about paper authorship, like, research paper authorship, and patent authorship, then that makes more sense to me.**

***Q.*** Well, what does patent authorship mean to you?

**A. Not much.**

Q. So here's the question I want to ask. Maybe I'll muddy it up a little bit.

In your view, as someone who's on a number of patents and has been a researcher for a long time, if you help someone write something down, is it possible that you're still not an inventor because you're just helping them write things down?

**A. Sure. If it's sort of clerical work, you're just helping sort of transcribe ideas and things like that, but not contributing to the ideas, sure.**

Q. Okay. You were also asked about source code; right?

**A. I was.**

Q. Does a similar concept apply to source code? And here's what I mean by that.

If someone is sitting at a computer keying in source code, does that necessarily make them the one and only inventor of whatever they're keying into the machine?

**A. Not if they're maybe implementing an idea in code, you know, that's written out, and they're just basically translating it into executable program code.**

Q. That's my question. Let's say Mr. Mayberry has a fabulous idea for a new technology, but he's not a coder, but I am, so I create the code to implement his idea.

**A. Right.**

Q. Does that mean that he's not an inventor?

**A. No, that should not mean that.**
*Q.* And is that true, even if the source code itself says Mr. Pilchak was the one who pumped in all of these ideas?
**A. Well, I mean, if the ideas came from Mr. Mayberry, then he should be credited.**
*Q.* You were also asked about whether discussing techniques with an inventor makes someone else who discusses the techniques also an inventor.
**A. Mm-hmm, yeah.**
*Q.* What was your answer to that?
**A. So you're asking in discussing techniques? I mean, it depends on the nature of the discussions; right?**
*Q.* Right.
**A. So, you know, if I have an idea, and I'm talking it over with someone, and they say, Yeah, that's a great idea, then, no, they didn't really contribute much. But if they say, Well, what if you improved it. There's a problem, and what if we add this to the idea, then it can -- then a mutual or joint inventorship makes sense in that case.**
*Q.* What if they create drawings for the new idea?
**A. So they basically take your idea and then just draw out what you said?**
*Q.* No. They modify the idea and create their own new drawings.
**A. Oh, they modify the idea. Well, if they modify the idea, then there's innovation there; right? So...**

***Q.*** So, then, they would be considered an inventor as well?

***A.*** **Sure, if they've supplemented the idea and brought new ideas.**

***MR. PILCHAK:*** One moment, please, Your Honor.

No further questions. Thank you.

***THE COURT:*** Anything further?

***MS. BERNSTEIN:*** Briefly, Your Honor.

***RECROSS-EXAMINATION***

***BY MS. BERNSTEIN:***

***Q.*** Professor Sylvester, Mr. Pilchak asked you about -- that one of my colleague had contacted you at some point last summer; is that correct?

***A.*** **I don't remember the timing. I think it was later, perhaps. But, yeah, it was last year.**

***Q.*** And it was one email and it never went anywhere; is that right?

***A.*** **I didn't respond because I'd already been retained, so I didn't want to -- I didn't know if it was appropriate for me to respond to that or not.**

***Q.*** Retained by the Government; correct?

***A.*** **Correct.**

***Q.*** He just asked you -- Mr. Pilchak just asked you some questions about a claim analysis.

Remember that?

***A.*** **Yes.**

***Q.*** And a claim analysis is essentially whether a claim should or should not issue; correct?

***A.*** **Right.**

***Q.*** And we know that you did not do a claims analysis of Ms. Alan's 2014 provisional patent applications; correct?

***A.*** **Correct.**

***Q.*** And Qualcomm did not do one either; correct?

***MR. PILCHAK:*** Objection. Foundation.

***THE COURT:*** Overruled.

***THE WITNESS:*** Not that I'm aware of.

***BY MS. BERNSTEIN:***

***Q.*** Qualcomm has a department that does this?

***A.*** **I assume, but I don't know for certain.**

***Q.*** You didn't see any review here; correct?

***A.*** **Correct.**

***Q.*** You did see a review of the technology.

***A.*** **Yes.**

***Q.*** And whether the technology demos worked, in Qualcomm's mind?

***A.*** **Yeah. I mean, I think whether Qualcomm felt the technology was sound, yes, that was embedded in the materials I looked at.**

***Q.*** The technology that they were sold.

***A.*** **Yes.**

***Q.*** And you saw a Qualcomm analysis of whether what they were sold was worth every penny and more that they paid for it.

**A. I'm sorry, can you repeat?**
Q. You also saw -- you did see some analysis by Qualcomm, not of a claims analysis; correct?
**A. Right.**
Q. But of the technology?
**A. Yes.**
Q. And of whether that technology was worth every penny and more that they paid for it.
**A. Well, I don't know if it was worth it. I just know what they valued it at, yeah.**
Q. Okay. And Mr. Pilchak asked you about the DFT rejection letter, and pointed out that Qualcomm purchased pending applications from Abreezio; correct?
**A. Right.**
Q. Qualcomm took ownership of those applications; correct?
**A. Yes.**
Q. And, in fact, Qualcomm fixed what needed to be fixed in those applications; correct?
**A. Yeah. In many cases that I saw, they did, yes.**
Q. You see Qualcomm updating its patents to add inventor names that it thought should be there; correct?
**A. On the patents associated with the Abreezio portfolio, is what that you're referring to?**
Q. Correct.
**A. It's possible. I didn't see evidence that they were adding**

**names.**

***MS. BERNSTEIN:*** Can we pull up Exhibit 2863, please?

***BY MS. BERNSTEIN:***

***Q.*** Did you see this, where Qualcomm does later update its Abreezio patents to add inventor names that it thought needed to be there?

***A.*** **I see that. The 625 patent is a little bit outside the purview of the ones we've been talking about, so...**

***Q.*** You had not reviewed this?

***A.*** **I don't remember seeing this specific edition in 2017 or whenever this was put forward.**

***Q.*** In your review preparing for this case to render opinions, do you recall reviewing Qualcomm's petition to correct inventorship pursuant to a variety of statutes for one of the Abreezio patents?

***A.*** **I didn't look at this file, as far as I recall.**

***Q.*** Do you recall looking at anything that Qualcomm filed to correct the inventorship to change Ms. Alan's name to Mr. -- to Dr. Arabi's name?

***A.*** **To Dr. Arabi's name? I remember they -- changing her name. She changed her name from Arabi to Alan, and I remember there were things filed to change the name there.**

***Q.*** Well, what we were just looking at on the screen is Qualcomm correcting its inventorship; correct?

***A.*** **Yeah.**

*Q.* And Qualcomm sued Dr. Arabi and Ms. Alan in 2017, alleging the same thing here, that he actually invented those two provisional patent applications that have Ms. Alan's name on them.
You knew that; right?
***A.*** **I'm perfectly aware of that. It was well after the situation that we're talking about here, so I didn't look much at that.**
*Q.* But did you see Qualcomm file a petition to correct inventorship, given what Qualcomm and the Government have been maintaining and what you yourself have been claiming?
***A.*** **No.**
*Q.* Okay. I want to talk about the Henderson patent for a moment.
The concepts that were central, that you consider central to Ms. Alan's provisional patent application, was already in Qualcomm's 2008 Henderson patent that we've looked at.
Do you disagree with that?
***A.*** **They were addressing very similar problems. Is that what you mean?**
*Q.* My question is whether the concepts that you considered central to Ms. Alan's provisional patent application are, in fact, already in Qualcomm's 2008 Henderson patent?
***A.*** **The monitoring of actual critical paths; correct?**
*Q.* Correct.

**A. Yes. It's in their abstract, yes.**

*Q.* And you said on redirect with Mr. Pilchak that the review of prior art was not your goal here.

**A. Correct.**

*Q.* Your goal, as you laid it out, was whether two provisional patents filed in December of 2014 were central to the technology portfolio of Abreezio, and whether these patents played a significant role in Qualcomm's decision to acquire Abreezio in 2015; right?

**A. That's right.**

*Q.* And as you've testified here and elsewhere, the state of the art and its development is relevant to the value of the patent.

**A. Yes.**

*Q.* And you did not do any state of the art analysis of the two provisional patent applications here.

**A. I think we discussed this yesterday at length. State of the art includes Qualcomm's current state of the art in the techniques, you know, CPR, so --**

*Q.* Right.

You looked at an internal Qualcomm document about its relevant -- its related technology, but did you not do any analysis of the prior art because that was not your goal; correct?

**A. Yes.**

*Q.* Okay. And he asked you just now about the source code and

whether -- I think the example given was if Mr. Mayberry, who is a coinventor of yours --

***A.*** **In that example --**

***Q.*** I'm trying to use his hypothetical.

***A.*** **Yeah, hypothetically.**

***MALE SPEAKER:*** I'm Mr. Mayberry.

***MS. BERNSTEIN:*** Oh, I'm sorry.

***BY MS. BERNSTEIN:***

***Q.*** Mr. Mayberry had an idea, his great idea. So Mr. Mayberry has an idea, but he doesn't know how to code.

***A.*** **Right.**

***Q.*** And so Mr. Pilchak does the coding.

***A.*** **Right.**

***Q.*** And the source code would show what was coded in; right?

***A.*** **Right.**

***Q.*** And it would show that it was Mr. Pilchak who did the keystrokes.

***A.*** **Right.**

***Q.*** It would show the time of it; right?

***A.*** **Yes.**

***Q.*** But it wouldn't say, This is Mr. Mayberry's idea, correct?

***A.*** **Unless he commented that in the code or something like that. But, yeah, it generally wouldn't.**

***Q.*** But the code would be for what the idea is; right?

***A.*** **Yeah. It should be an implementation in C, or whatever**

**language, of his idea.**

***Q.*** So we'd be able to look at the source code and we would know that Mr. Pilchak keyed it in, sure, but we would know what he keyed in, and then we could analyze what that idea was and if it, in fact, made it into the product that was central to Qualcomm's decision to purchase Abreezio; right?

***A.*** **Yeah.**

***MS. BERNSTEIN:*** Thank you. No further questions.

***THE COURT:*** May this witness be excused?

***MR. PILCHAK:*** Yes, Your Honor.

***THE COURT:*** Thank you, sir.

***MR. OLAH:*** Your Honor, at this time, the United States calls Daniel Hoggar.

***MR. PILCHAK:*** Your Honor, could I clean up the witness stand a bit?

***THE COURT:*** Sure.

***MR. PILCHAK:*** Thank you.

***(Pause.)***

***THE COURT:*** Come on forward, sir.

***THE CLERK:*** Please raise your right hand.

***(Witness duly sworn.)***

***THE CLERK:*** Thank you. You can lower your hand and take the stand.

Please state and spell your first and last name for the record.

***THE WITNESS:*** Daniel Hoggar, D-a-n-i-e-l, Hoggar, H-o-g-g-a-r.

***THE COURT:*** Thank you.

Counsel?

***DIRECT EXAMINATION***

***BY MR. OLAH:***

***Q.*** Mr. Hoggar, good morning.

***A.*** **Good morning.**

***Q.*** Can you do me a favor and pull that microphone a little bit closer to you, if it moves? Or if it doesn't -- there you go.

***A.*** **Yep. Is that better?**

***Q.*** Mr. Hoggar, are you an engineer?

***A.*** **Yes, I am.**

***Q.*** Do you hold a Bachelor's in Engineering?

***A.*** **I do.**

***Q.*** From what university?

***A.*** **The University of Nottingham in the United Kingdom.**

***Q.*** What year did you graduate with that Bachelor's of Engineering?

***A.*** **1995, I believe.**

***Q.*** Okay. Have you worked as an engineer for the last 30 years since getting that degree?

***A.*** **That's correct.**

***Q.*** Are you currently employed as an engineer?

**A. Yes, I am.**
*Q.* What kind of engineering do you do, sir?
**A. I'm currently employed as a software engineer.**
*Q.* Are you familiar with an applications engineer?
**A. Yes, I am. It's -- basically involves integrating software applications into third-party flows.**
*Q.* And have you at one time yourself worked as an applications engineer?
**A. Yes, I have, a few times during my career.**
*Q.* So you're currently a software engineer. At one point, you were an applications engineer.
Have you ever been any other kind of engineer?
**A. ASIC design engineer. They're all very related.**
*Q.* ASIC being A-S-I-C?
**A. That's correct.**
*Q.* Mr. Hoggar, are you familiar with a company named Abreezio?
**A. Yes. I was a contractor to them.**
*Q.* How did you first learn of Abreezio?
**A. A former colleague reached out me and mentioned it.**
*Q.* Who was that former colleague?
**A. Mr. Brad Quinton.**
*Q.* And was it in February 2015, about, that he reached out to you?
**A. Yes, about that time, give or take a month.**
*Q.* Fair enough. We're talking about events 10 years ago.

***A.*** **Yep.**
***Q.*** But you do recall it was Mr. Quinton that reached out to you?
***A.*** **Yes.**
***Q.*** Do you know why Mr. Quinton reached out to you?
***A.*** **I had worked with him in a similar applications engineering role at another startup.**
***Q.*** What was Mr. Quinton looking from you with respect to Abreezio?
***A.*** **To perform an applications engineering role.**
***Q.*** And were you the only applications engineer available to Mr. Quinton?
***A.*** **No. I was in the United States. Mr. Quinton and his development team were in Vancouver.**
***Q.*** You were in the United States.
Where were you living at the time?
***A.*** **At the time, I was in San Diego County, North County.**
***Q.*** And was your location part of the reason that Mr. Quinton had reached out to you about Abreezio?
***A.*** **Yes, I believe so.**
***Q.*** Okay. He knew that you were in San Diego.
***A.*** **Yes, he did.**
***Q.*** Got it.
Do you know what Mr. Quinton's role at Abreezio was?
***A.*** **He was the CTO.**

*Q.* Did he tell you that?
**A. Yes, he did. I believe he did.**
*Q.* So you get a call or an email, do you recall which?
**A. It would have been an email.**
*Q.* Okay. And Mr. Quinton's reaching out to you because Abreezio needs an applications engineer.
Do I have that right?
**A. In California or somewhere in the United States, yes, I believe so.**
*Q.* Okay. Did you get the job just based on your conversation with Mr. Quinton or did you have to interview?
**A. I had an interview with other Abreezio staff.**
*Q.* Do you recall who at Abreezio you interviewed with?
**A. I interviewed with Mr. Sanjiv Taneja, who I believe was the CEO. And a Mr. Akbar Shokouhi, which I believe he was either a backer or an investor of the company.**
*Q.* Did you interview with anyone else?
**A. Not that I recall, no.**
*Q.* Sometimes in interviews, they give you a chance to ask questions as an applicant.
Did you do any learning of Abreezio in these different meetings with Mr. Taneja and Mr. Shokouhi and Mr. Quinton?
**A. To be honest, being 10 years ago, I don't even recall the topic of the interview.**
*Q.* Okay. Let me ask you this, a more concrete question, did

anyone ever mention Abreezio's, quote, chief architect?

***MR. FRASER:*** Objection. 602, 401, 403.

***THE COURT:*** Overruled.

***BY MR. OLAH:***

***Q.*** I'll ask the question again.

In your various meetings with these folks at Abreezio, did anyone ever mention Abreezio's chief architect?

***A.*** **No, they did not.**

***Q.*** Did you get the job with Abreezio?

***A.*** **Yes, as a contractor.**

***Q.*** Okay. And was there some discussion about whether you'd join as a contractor or an employee?

***A.*** **Yes, there was.**

***Q.*** Notwithstanding the contractor status, did you have an at-Abreezio email address?

***A.*** **Yes, I did.**

***Q.*** Roughly how long after your discussion with Mr. Quinton did you start working as a contractor for Abreezio?

***A.*** **I believe it was perhaps a month or two later. It was in the spring.**

***Q.*** Spring of 2015?

***A.*** **I couldn't tell you the year, but it was the spring of one year about 10 years, yes.**

***Q.*** Very well.

To your knowledge, were you one of the first Abreezio

employees or contractors brought on board?

**A. They had a full development team as contractors in Vancouver. I would have been one of the first engineering hires or contractors in the United States.**

*Q.* And what did you understand your job to be with Abreezio as a contractor?

**A. To integrate their technology into customer flows, debug issues, feedback results or issues to the R&D team in Vancouver.**

*Q.* This jury has no doubt heard more terminology than they probably care for, but I'm going to ask, you because you've used the term twice.

What's a "customer flow"?

**A. So the target market for this product would be kind of a semiconductor company. And they have their own flows using multiple third-party tools. And the tool that Abreezio developed would have fit into that flow. And there's always teething problems, things crash, things don't work as expected, so it's some effort to debug issues and resolve those issues, if that makes any more sense.**

*Q.* You mentioned integrating the technology.

Did Abreezio have technology? Did it have products when you came on board?

**A. Yes, it did.**

*Q.* And as I understood your description just now, your job is to debug, integrate, evaluate, and fix the technology; is that

right?
***A.*** **To be part of that flow, yes.**
***Q.*** Okay. What was the state of the technology or Abreezio's products when you came on board in the spring of 2015?
***A.*** **It was at the state ready to do initial customer engagements. You could run it in a flow. It was still, you know, in the early stages where we might hit crashes, might not get the exact results we want.**
***Q.*** So --
***A.*** **But it was ready to be evaluated.**
***Q.*** Evaluated by potential customers?
***A.*** **Correct.**
***Q.*** Okay. And your job, as I understand it -- and correct me if I'm wrong -- is to improve the technology, get rid of those bugs, prevent some of those crashes you're talking about?
***A.*** **As part of a wider team, yes.**
***Q.*** Okay. And the wider team would include those folks up in Canada?
***A.*** **Yes. That would be the entire wider team, yes.**
***Q.*** Okay. That's the whole.
It's you in San Diego and then a couple of engineers in Canada?
***A.*** **At the time when I started, I believe there were some additional hires in the United States after the fact.**
***Q.*** Did you work on Abreezio's DFT technology, its sensor

technology, or both?

***A.*** **I believe I worked on both at some point during the six or so months that I was contracted to Abreezio.**

***Q.*** Did you consider Abreezio's technology to generally be good?

***A.*** **Yes.**

***Q.*** Do you believe that your efforts and the folks in Canada made the technology better?

***A.*** **Yes, I do.**

***Q.*** Did Qualcomm end up acquiring Abreezio?

***A.*** **That's correct.**

***Q.*** Do you recall about when?

***A.*** **It would have been in the fall, early fall, I believe.**

***Q.*** The fall of the same year that you started working for Abreezio; is that right?

***A.*** **That's correct.**

***Q.*** How would you describe the state of the technology in the fall of 2015?

***A.*** **It was improved from the state of the technology in the spring of 2015, if we agree that's the year.**

***Q.*** You say "improved."

That was your job as an applications engineer; is that right?

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** I'll allow it. Overruled.

***THE WITNESS:*** Yes, in conjunction with the R&D team in

Vancouver. That's correct.

***BY MR. OLAH:***

***Q.*** Okay. I'd like to drill down a little bit on the quality of the improvement.

Was Abreezio working with entirely different technology come the fall of 2015?

***A.*** **No. It was -- it was constant improvement of existing technology.**

***Q.*** Okay.

***A.*** **To improve results.**

***THE COURT:*** Would now be an okay time for a break?

***MR. OLAH:*** Of course, Your Honor.

***THE COURT:*** Okay. Ladies and gentlemen, let's take a 15-minute recess. You're reminded you're not to discuss the case, do any research about the case. And we'll see you back in 15 minutes.

***THE WITNESS:*** Do I stay here, Your Honor?

***THE COURT:*** No. You have a 15-minute recess, as well. Thank you. You can step down.

***THE WITNESS:*** Thank you.

***(Jury out at 10:30 a.m.)***

***THE COURT:*** Okay. We're now outside the presence of the jury.

Any issues we need to take up?

***MR. PILCHAK:*** I just had one thing I wanted to put on

the record.

**THE COURT:** Yes.

**MR. PILCHAK:** There was a bit of cross-examination about Professor Sylvester's opinion on the value that Qualcomm assigned to Abreezio. I don't remember eliciting any of that on direct. I know it's in his report, for sure, but a couple of times, he was asked, Did you testify about this, and I think he said yes. I just want to say for the record, I don't remember asking about that. And I'm not asking for any relief; I just wanted to put it on the record.

**THE COURT:** Okay. Anything further we need to put on the record?

**MR. PILCHAK:** Thank you, Your Honor.

**THE COURT:** Okay. Fifteen minutes.

***(Recess taken.)***

**THE COURT:** We are back on the record. All jurors are present. Dr. Arabi is present. The lawyers are present. And you, sir, are reminded you're still under oath to tell the truth.

**THE WITNESS:** Understood, Your Honor.

**THE COURT:** Counsel?

**MR. OLAH:** Thank you, Your Honor.

***BY MR. OLAH:***

***Q.*** Mr. Hoggar, welcome back.

Your efforts to improve Abreezio's technology would have

benefited any customer interested in Abreezio's products; is that right?
**A. That's correct.**
***Q.*** And those customers would have benefited whether they licensed or whether they acquired Abreezio's technology; right?
**A. Yes, that's correct.**
***Q.*** That said, did you report to any specific customer's work site?
**A. Yes. I was reporting to Qualcomm for an initial evaluation.**
***Q.*** Do you recall how far into your Abreezio contractor job you were then reporting at Qualcomm's work site?
**A. Not directly. I'd imagine it was a month or two.**
***Q.*** Okay. So you'd had about a month or two working at Abreezio before you started going to Qualcomm's work site?
***MR. FRASER:*** Objection. Asked and answered. Leading.
***THE COURT:*** Overruled.
Is that correct?
***THE WITNESS:*** Yes, that sounds right. Yes.
***BY MR. OLAH:***
***Q.*** And I believe you testified earlier that Mr. Quinton called you, in part, because he needed an applications engineer in San Diego; is that right?
**A. In the United States, I would say. I was -- predominantly, most semiconductor companies are in California, whether it be Northern California or Southern California.**

***Q.*** To your knowledge, is Qualcomm the largest semiconductor company in San Diego?

***A.*** **Yes, that would be true.**

***Q.*** Okay. And when we say you were reporting to Qualcomm's work site, was that their San Diego campus?

***A.*** **Correct.**

***Q.*** Did you write emails summarizing the progress you were making on Abreezio's technology?

***A.*** **Yes, I would have done.**

***Q.*** Who would you send those emails to?

***A.*** **I imagine the Abreezio team, including Mr. Taneja and Mr. Quinton, among others.**

***Q.*** Did you send those emails to Dr. Karim Arabi?

***A.*** **No, I didn't.**

***Q.*** Did you send them to Ms. Sheida Alan or Sheida Arabi?

***A.*** **No, I didn't.**

***Q.*** Okay. Prior to Qualcomm's acquisition, did you know Dr. Arabi to have been involved with Abreezio?

***A.*** **No, I didn't.**

***Q.*** Okay. I believe you testified before the break that you interviewed with Mr. Taneja and Mr. Shokouhi; is that right?

***A.*** **That's correct.**

***Q.*** Do you know if either of those individuals spoke with Dr. Arabi about your hiring?

***MR. FRASER:*** Objection. 602.

***THE COURT:*** Overruled.

***BY MR. OLAH:***

***Q.*** The question is whether you knew -- do you know.

***THE COURT:*** If you know.

***THE WITNESS:*** No, I don't know.

***MR. OLAH:*** Okay. Your Honor, at this time, I'd like to show the witness and the witness only Exhibit No. 30.

***BY MR. OLAH:***

***Q.*** Mr. Hoggar, it is important that you be able to read this.

Are you able to see it now that it's been called out on the screen?

***A.*** **Yes, I can read it now.**

***Q.*** Okay. And is it two emails that are listed here?

***A.*** **Just give me one second, please.**

***(Pause.)***

***THE WITNESS:*** Yes.

***BY MR. OLAH:***

***Q.*** Okay.

***A.*** **I believe the question was -- sorry, repeat the question again.**

***Q.*** I'll ask the question because I've forgotten it as well.

So you are Mr. Hoggar; is that right?

***A.*** **That's correct.**

***Q.*** And first name, Daniel, last name, Hoggar, is that the subject line of this email?

**A. Correct.**

***Q.*** Okay. And is there a reference to a Dan with AE responsibilities here?

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** Sustained.

***MR. FRASER:*** And document -- yeah.

***BY MR. OLAH:***

***Q.*** Mr. Hoggar, are you included on these emails?

**A. No, I am not.**

***Q.*** Okay. You've testified that it was Mr. Shokouhi and Mr. Taneja that you interviewed with; is that right?

***MR. FRASER:*** Objection. Leading. Asked and answered.

***THE COURT:*** Sustained.

***BY MR. OLAH:***

***Q.*** Mr. Hoggar, do you have any reason to believe or to -- do you know why, rather, anyone would have been informing Mr. Arabi about your hiring?

***MR. FRASER:*** Objection. 602, 802.

***THE COURT:*** Overruled.

***THE WITNESS:*** I'm sorry, can you repeat the question?

***BY MR. OLAH:***

***Q.*** Of course.

Do you know why anyone would have been relaying your hiring to Dr. Karim Arabi?

**A. No.**

***MR. OLAH:*** I'd like to now show the witness and the witness only Exhibit No. 33. And if we could please call out the bottom half of the email. Thank you.

***BY MR. OLAH:***

***Q.*** Mr. Hoggar, are you able to see that email?

***A.*** **Yes, I am.**

***Q.*** Is that an email that you authored?

***A.*** **It looks like something I would have written, correct.**

***Q.*** I asked you prior to the break, I believe, about the Abreezio.com email address.

Were you Dan@Abreezio.com?

***A.*** **Yes. I thought it was Daniel@Abreezio, but this makes sense, too. There were no other Dans or Daniels at the company.**

***Q.*** Got it.

And is this one of the status reports that you had authored in your time at Abreezio?

***A.*** **It looks like it, yes.**

***Q.*** If we could zoom -- actually, we can leave it at that.

Is this one -- based on the address, who did you send this email to?

***A.*** **In the zoomed-in section, it just says "Hi, Sanjiv." I don't see an email address, but I assume that it obviously went to Sanjiv Taneja.**

***Q.*** And Mr. Taneja was one who did receive some of your weekly or your status reports; is that right?

**A. Absolutely. He would have received all of them, I assume.**

**Q.** Is there any reason, to your knowledge, that Mr. Taneja would forward these types of reports to Dr. Karim Arabi?

***MR. FRASER:*** Objection. Calls for speculation. 602.

***THE COURT:*** Overruled.

***THE WITNESS:*** No, I'm not aware of why that would happen.

***MR. OLAH:*** No further questions at this time, Your Honor.

***THE COURT:*** Cross-exam?

***CROSS-EXAMINATION***

***BY MR. FRASER:***

**Q.** Good morning, Mr. Hoggar.

**A. Good morning, sir.**

**Q.** You have been involved in testing chips; correct?

**A. In some capacity, yes.**

**Q.** And there are multiple ways that one can test a chip; correct?

**A. Correct.**

**Q.** One way would be with a physical sensor; correct?

**A. A physical tester?**

**Q.** Correct.

**A. Yes.**

**Q.** Another way would be using scan mode on the chip; correct?

**A. That's going outside of my purview. My experience with testing would be post-silicon validation and functional behavior.**

*Q.* You did demo with Qualcomm on site using DFTBreez TTP; correct?

**A. I don't believe I did the demo. I was present in the meeting where others did the demo.**

*Q.* Okay. And you began your work with Abreezio February 2015, approximately; correct?

**A. Approximately. It was in the spring. I thought it might have been more, like, March/April, but ballpark figure, yes.**

*Q.* The -- Qualcomm acquired Abreezio October 30th of 2015; correct?

**A. That sounds about right.**

*Q.* That's about eight to nine months after you began your work.

**A. Correct.**

*Q.* While you were working on Abreezio, you got to work with Brad Quinton; correct?

**A. He was the CTO, yes.**

*Q.* Brad Quinton is one of the people you worked with on Abreezio; correct?

**A. Yes.**

*Q.* And some other Canadian engineers, as well; correct?

**A. That's correct.**

*Q.* They were some of the best engineers you ever worked with;

isn't that true?
**A. Yes, I would say that's true.**
*Q.* And they had an existing product called Invio; correct?
**A. That's correct.**
*Q.* Invio was very useful in developing -- Invio was very useful in developing Abreezio's technology, was it not?
**A. Yes, that's correct.**
*Q.* Let's talk about these points in some more detail.
We mentioned there were other Canadian engineers besides Bradley Quinton.
Did that include Trent McClements?
**A. Yes.**
*Q.* And Andrew Hughes?
**A. Yes.**
*Q.* Before Abreezio, then, you worked with those three: Brad Quinton, Trent McClements, and Andrew Hughes; correct?
**A. Yes, that's correct.**
*Q.* And your work with them before Abreezio, that was at a company called Veridae.
**A. That's correct.**
*Q.* These are all Canadian engineers, the three of these guys?
**A. They're based in Canada. I'm not sure what their citizenship status is.**
*Q.* Based in Vancouver, correct?
**A. Correct.**

*Q.* British Columbia, not Washington, United States?
***A.*** **Correct.**
*Q.* And you observed them to be capable technological problem solvers.
***A.*** **Absolutely.**
*Q.* Capable of inventing technology as they solved problems.
***A.*** **Yes.**
*Q.* They had a deep understanding of DFT; correct?
***A.*** **I'm not sure, but it's not something they couldn't have been able to get a deep understanding of.**
*Q.* Okay. And they were also able to work with electronic design automation, that's EDA; correct?
***A.*** **Yes. That would be the field that we're all in.**
*Q.* You had prior experience with them in a company called Veridae.
***A.*** **That's correct.**
*Q.* And Veridae itself was based on inventions by Brad Quinton.
***A.*** **That's correct.**
*Q.* And Andrew Hughes, as well; correct?
***A.*** **The invention, I believe, came from Mr. Quinton's Ph.D. thesis, and I suspect Andrew Hughes worked significantly on foundations of that thesis, yes.**
*Q.* And that technology was a useful starting-off point for Abreezio; correct?
***A.*** **No. That would be unrelated.**

*Q.* Invio, however, is a software platform that the Canadian engineers had from Invionics; correct?
**A. Yes, but Invio was not at Veridae Systems. If we're talking about Veridae Systems, that was a separate product.**
*Q.* Thank you.
Karim Arabi was not part of Veridae.
**A. No, he was not.**
*Q.* Neither was Sheida.
**A. No.**
*Q.* Going back to Invio, I understand it wasn't at Veridae, but it was at Invionics; correct?
**A. That's correct.**
*Q.* And Invionics is the company of Brad Quinton, Andrew Hughes, and Trent McClements; correct?
**A. And others, yes.**
*Q.* And others.
And Invio was well-suited to what Abreezio wanted to develop; correct?
**A. It was a starting point to develop the Abreezio application on top of.**
*Q.* Invio helped accelerate the development of Abreezio's technology; correct?
**A. That's correct.**
*Q.* Karim Arabi was not part of Invionics, was he?
**A. Not that I'm aware of, no.**

***Q.*** Nor Sheida?
***A.*** **No.**
***Q.*** Let's talk again about Qualcomm's evaluation of Abreezio. That's what your work related to that you've testified about; correct?
***A.*** **That's correct.**
***Q.*** And you participated in Qualcomm's evaluation of specifically DFTBreez; correct?
***A.*** **Yes, that's correct.**
***Q.*** Qualcomm evaluated DFTBreez; yes?
***A.*** **Yes.**
***Q.*** And did so carefully; correct?
***A.*** **I'm not sure. I was the one doing the hands-on work of the evaluation, and I provided the results to the management of Abreezio, who communicated anything that they desired with Qualcomm, yes.**
***Q.*** And regularly, you provided detailed reports on what you were doing; correct?
***A.*** **Correct.**
***Q.*** Qualcomm wanted to know the cost-saving potential of DFTBreez; correct?
***A.*** **I'm not sure what Qualcomm wanted to know, but that sounds reasonable.**
***Q.*** You -- you yourself were evaluating the cost-saving potential of DFTBreez; correct?

***A.*** **I was evaluating the functional capabilities of DFTBreez. I left the cost-saving capabilities to management and executives with more finance knowledge than me.**

***Q.*** Fair enough. But it's reasonable to expect that, to the extent DFTBreez did what it was supposed to, it would save cost to the --

***A.*** **Absolutely, yes. Yes, that's true.**

***Q.*** -- acquiring company.

And DFTBreez worked as advertised.

***A.*** **Yes.**

***Q.*** You showed its potential with tests that you ran; correct?

***A.*** **That's correct.**

***Q.*** It wasn't a perfect fit when you arrived at Qualcomm; correct?

***A.*** **It could do with improvement.**

***Q.*** And it did get improved.

***A.*** **That's correct.**

***Q.*** You worked on some of that yourself.

***A.*** **In conjunction with the team in Vancouver, yes.**

***Q.*** In conjunction with the team in Vancouver being, for example, Trent McClements.

***A.*** **That's correct.**

***Q.*** Brad Quinton.

***A.*** **That's correct.**

***Q.*** A few questions for comparison with other technology.

DFTBreez was the focus of Qualcomm's evaluation and your testing from August to September, roughly, 2015; correct?

***MR. OLAH:*** Objection. Personal knowledge, Your Honor.

***THE COURT:*** If you know.

***THE WITNESS:*** In conjunction with, I believe, the other products, yes.

***BY MR. FRASER:***

***Q.*** Okay. DFTBreez, did it use sensors?

***A.*** **No, I don't believe so.**

***Q.*** DFTBreez, was it concerned with measuring the critical path?

***A.*** **No.**

***Q.*** You were working on testing DFTBreez with Trent McClements; correct?

***A.*** **He was involved, yes.**

***Q.*** And Andrew Hughes, likewise, was involved; correct?

***A.*** **Yes, he was.**

***Q.*** He helped invent new solutions in that process; correct?

***A.*** **I believe so, yes.**

***Q.*** During the testing of DFTBreez in fall of 2015, Andrew Hughes invented changes to the DFTBreez software to accommodate Qualcomm's design; correct?

***A.*** **He improved the technology. I'm not sure what your definition of invention would be, though.**

***Q.*** I see.

***MR. FRASER:*** I would like to show you Defense

Exhibit 2540 at Slide 33.

***THE WITNESS:*** I see it.

***BY MR. FRASER:***

***Q.*** You see it.

At the top --

***THE COURT:*** It has been admitted, just for the record. It has.

***MR. FRASER:*** It has been admitted. Thank you, Your Honor.

***THE COURT:*** Yes.

***MR. FRASER:*** Thanks. Let's ensure that the jury can see it, then. Thank you.

***BY MR. FRASER:***

***Q.*** At the top, it says "DFTBreez-TTP demo tool flow;" correct?

**A. Yes, it does.**

***Q.*** And this is Andrew Hughes' invention diagrammed here; correct?

**A. I've never seen this slide before, as far as I recall.**

***Q.*** Okay. But regardless of the slide, DFTBreez-TTP is an invention of this Invionics team that you were working with; correct?

**A. Yes. It's one of the products of Abreezio, yes.**

***Q.*** Okay. And it's a product that you demoed on site at Qualcomm in summer of 2015; correct?

**A. Not me personally, but I was involved with the evaluation on**

**site at Qualcomm, and others presented it to Qualcomm themselves.**

***Q.*** Okay.

***A.*** **To the best of my recollection.**

***Q.*** Understood. Thank you.

And that was not a scan-based tool, was it?

***A.*** **I believe it was.**

***Q.*** Excuse me, I said the opposite of what I meant.

***A.*** **Yes, yes.**

***Q.*** It was a scan-based tool?

***A.*** **Yes. To my recollection, it reordered scan chains.**

***Q.*** Thank you.

So not sensor-based?

***A.*** **That's correct. I believe that was the TruSens tool.**

***MR. FRASER:*** Okay. We can take this down. Thank you.

***BY MR. FRASER:***

***Q.*** And in your work with Qualcomm, you saw that other companies besides Qualcomm were interested in acquiring Abreezio's technology.

***A.*** **I wasn't privy to that, but there would be no reason why they wouldn't.**

***MR. FRASER:*** Let's show the witness, please, Defense Exhibit 2212.

***BY MR. FRASER:***

***Q.*** This appears to be an email dated May 1st.

Are you used to American date format already?
**A. Yes. I've been here since 1999.**
*Q.* Okay. Fair enough.
So this would be an email dated May 1st, 2015; correct?
**A. Correct, yes.**
*Q.* Okay. And this is an email sent to you.
**A. Yep.**
*Q.* It indicates interest by Broadcom; correct?
**A. It indicates Broadcom as a potential target. I don't know whether the -- there was interest *per se*.**
*Q.* Okay. Also, Apple is mentioned there?
**A. Correct.**
*Q.* So is Nvidia?
**A. Yep.**
*Q.* Cisco?
**A. Correct.**
*Q.* Does this refresh your recollection concerning other potential acquirers of Abreezio in 2015?
**A. I would not have read this as potential acquirers. I would have read it as potential software licensees.**
*Q.* Okay. They could be licensees.
Some of these companies also acquire --
**A. Absolutely.**
*Q.* -- startups; correct?
**A. Yep.**

***Q.*** So they could be licensees.
You testified that they could be licensees; correct?
***A.*** **That is my -- when I would receive this email in May, I'm assuming these are customers who we'd go in and perform an evaluation to see if they would license our software.**
***Q.*** Okay. Similarly, these companies could be an acquirer in an actual M&A transaction; right?
***A.*** **Yes.**
***MR. FRASER:*** Okay. And let's show the witness, please, Exhibit 2264.
***BY MR. FRASER:***
***Q.*** This is an email you received in August of 2015; correct?
***A.*** **Yes, it appears so.**
***Q.*** And at the bottom, you can see that it was sent from an email address at the domain Cisco.com; correct?
***A.*** **Correct.**
***Q.*** And it indicates that Cisco was interested in access to some of Abreezio's technology; correct?
***A.*** **Yes, it does.**
***Q.*** And that's in August of 2015?
***A.*** **July 31st, I see here. Sorry.**
***Q.*** Yes. The bottom -- so the last day of July, and then there's an ongoing discussion into August of 2015; correct?
***A.*** **Correct. The email from Cisco dated July 31st, and then August 17th, an internal conversation amongst Abreezio staff.**

***MR. FRASER:*** Move to admit Defense Exhibit 2264 into evidence.

***THE COURT:*** Any objection?

***MR. OLAH:*** No, Your Honor.

***THE COURT:*** 2264 may be admitted.

***(Exhibit 2264 admitted.)***

***BY MR. FRASER:***

***Q.*** When a company that is interested in a startup seeks exclusive access -- you're familiar with that phrase, "exclusive access"?

***A.*** **I know what it means in English. I'm not sure what it may mean in the context of this.**

***Q.*** Okay. So it would mean to the exclusion of other potential licensees or acquirers; correct?

***A.*** **Yes. That would seem to be the gist, yeah.**

***Q.*** And that could -- that indicates interest in an M&A transaction; correct?

***A.*** **Potentially. I mean, it says, "What are your business model terms for exclusive access," so I guess there could be other ways outside of an M&A that one could perform that.**

***Q.*** Okay. Thank you. One moment, please.

***(Pause.)***

***BY MR. FRASER:***

***Q.*** Thank you, Mr. Hoggar.

Shifting gears, you became -- you worked with Sanjiv Taneja.

**A. At Abreezio, correct, yes.**
*Q.* That was in 2015.
**A. Correct.**
*Q.* And you were familiar with his reputation; correct?
**A. Not widely, no.**
*Q.* You had heard about his work with another company called Cadence; correct?
**A. I knew he was an employee of Cadence, correct.**
*Q.* And you had heard that he had a reputation for being a snake; correct?
**A. I had had someone tell that to me, correct.**
*Q.* And when people call someone a "snake," it's generally not because they have a reputation for truthfulness; correct?
**A. I would read it as a political operator, personally.**
*Q.* Okay. And that was Sanjiv Taneja's reputation, it was for being a snake, at least with some people he had worked with; correct?
**A. That's what I had heard, correct.**
*Q.* And Taneja didn't make good on his word to pay you timely, either; correct?
**A. That's correct.**
*Q.* In contrast, you are aware of Andrew Hughes having a reputation for truthfulness; correct?
**A. Absolutely, I would assume so.**
*Q.* And the same for Trent McClements?

**A. Yes, I believe so. I have no reason to think otherwise.**

***MR. FRASER:*** Thank you. No further questions.

***THE COURT:*** Anything further?

***MR. OLAH:*** Brief redirect, Your Honor.

***REDIRECT EXAMINATION***

***BY MR. OLAH:***

***Q.*** Mr. Hoggar, do you know who hired Sanjiv Taneja?

**A. No, I don't.**

***Q.*** You don't know.

You were asked about Invio -- Invionics' platform conveniently titled Invio; is that right?

**A. That's correct.**

***Q.*** The work you did for Abreezio, were you debugging the Invio software or were you debugging Abreezio's products?

**A. It would have been predominantly Abreezio's products, but it was built on top of Invio, so it doesn't preclude there being a potential issue with Invio.**

***Q.*** On cross just now, you were shown one email that I think mentioned Apple, Broadcom, and a few other companies; is that right?

**A. That's correct.**

***Q.*** Okay. Your testimony on direct was that you reported to Qualcomm's work site about a month after starting for Abreezio; is that right?

***A.*** **About that, yes.**
***Q.*** I'm not trying to glue you down to a month, but a month, maybe two months afterwards?
***A.*** **Yes, that seems reasonable.**
***Q.*** And you -- did you help prepare Abreezio's technology for a Qualcomm evaluation?
***A.*** **Could you repeat the phrasing of that question?**
***Q.*** Yeah. Did you help prepare Abreezio's technology for a Qualcomm evaluation of that technology?
***A.*** **Yes, but it was more about actually integrating the Abreezio technology within a Qualcomm flow versus preparing beforehand.**
***Q.*** I think I understand the distinction. Let me ask you this question:
You did that while reporting to Qualcomm's work site here in San Diego; is that right?
***A.*** **That's correct.**
***Q.*** Did you ever report to Apple's work site as an Abreezio contractor?
***A.*** **No, I did not.**
***Q.*** Did you ever report to a Broadcom work site as an Abreezio contractor?
***A.*** **No, I did not.**
***Q.*** Did you ever report to a MediaTek work site as an Abreezio contractor?
***A.*** **No, I did not. I just want to clarify that we may have had**

**meetings there, but I didn't go on site to perform evaluations.**

*Q.* Like you did at Qualcomm?

***A.*** **Correct.**

*Q.* Okay. And instead of me listing the other however many are in that email, did you report to any other work site as an independent contractor to -- to see if this technology would fit?

***A.*** **To perform an evaluation, no, not to my recollection.**

***MR. OLAH:*** No further questions, Your Honor.

***THE COURT:*** Anything further?

***MR. FRASER:*** No, Your Honor.

***THE COURT:*** May this witness be excused?

***MR. OLAH:*** Yes, for the Government, Your Honor.

***MS. BERNSTEIN:*** Yes, Your Honor.

***THE COURT:*** Thank you, sir. You're excused.

***THE WITNESS:*** Thank you, Your Honor.

***MR. PILCHAK:*** Your Honor, at this time, the United States calls Kevork Kechichian.

***THE CLERK:*** Good morning. Please stand here, raise your right hand.

***(Witness duly sworn.)***

***THE CLERK:*** Thank you. You may lower your hand. Please take the stand.

Please state and spell your first and last name for the record.

***THE WITNESS:*** My name is Kevork Kechichian.

***MR. PILCHAK:*** Can you spell that last name, please?

***THE WITNESS:*** Yes, of course. K-e-c-h-i-c-h-i-a-n.

***DIRECT EXAMINATION***

***BY MR. PILCHAK:***

***Q.*** Good morning, Mr. Kechichian.

***A.*** **Good morning.**

***Q.*** What do you do for a living, please?

***A.*** **I am -- I'm an engineer by training in semiconductors and electronics.**

***Q.*** And where do you work today?

***A.*** **Currently, I work for a company called ARM Semiconductors.**

***Q.*** A-R-M?

***A.*** **A-R-M.**

***Q.*** What do you do for Arm?

***A.*** **I'm an executive there. I manage large teams that are in development, and part of corporate strategy, also.**

***Q.*** And what is development and corporate strategy, just very briefly?

***A.*** **So development is really, you know, taking specification from customers -- in this case, we call them partners -- and going through the engineering development phase, basically developing the chips, and then taking them ultimately to high-volume production.**

**So most of our products are in AI servers, cell phones, all, you know, day-to-day use or, you know, the lately AI stuff.**

*Q.* Did you previously work at Qualcomm?

***A.*** **Yes, I did.**

*Q.* When was that?

***A.*** **2007 to 2019.**

*Q.* I want to ask a few questions about your background.

Can you go through your education after high school?

***A.*** **Yes. I went to -- I went to engineering school, did double-E, Electrical Engineering. So I had a Bachelor from the American University of Beirut. And then my family and I, my parents and my brother, emigrated to Montreal, and I did a Master's there, again, in Electrical Engineering.**

*Q.* And is master's your highest degree?

***A.*** **That's correct.**

*Q.* And then your work history, have you ever worked at a company called PMC Sierra?

***A.*** **I did.**

*Q.* What kind of company was that?

***A.*** **That was mostly on the networking side of things. This was, you know, late '90s, early 2000s.**

*Q.* Do you know someone named Karim Arabi?

***A.*** **Yes, I do.**

*Q.* When did you first meet Dr. Arabi?

***A.*** **I met him at PMC Sierra. I don't recall very -- you know,**

**the details of it, but I recall meeting him and some other colleagues that we end up eventually working at Qualcomm together at PMC Sierra.**

*Q.* Okay. And so Dr. Arabi was both a colleague at PMC and then a colleague at Qualcomm?

***A.*** **That's right.**

*Q.* What was your relationship with Dr. Arabi like at Qualcomm, if I can focus on that part of your career?

***A.*** **Yeah, we were peers at Qualcomm reporting to the same manager.**

*Q.* Who was that manager?

***A.*** **Ziad Mansour.**

*Q.* And did you have any role in Dr. Arabi's intake at Qualcomm?

***A.*** **I don't recall if I interviewed him, but definitely during the early phases, on-boarding and things like that.**

*Q.* So you were there first and then Dr. Arabi arrived subsequently?

***A.*** **That's correct.**

*Q.* What was Dr. Arabi's technical specialty?

***A.*** **It was mostly in testing, analog testing, digital testing. That was his background. And I believe that was his degree, also.**

*Q.* And when you say "testing," you mean testing of microchips?

***A.*** **That's correct.**

*Q.* Was he good at that subspecialty?

**A. Well, back then, he was considered as one of the few experts in this area.**

*Q.* One of the few experts at Qualcomm?

**A. No, globally.**

*Q.* Remind me, when did you leave Qualcomm?

**A. April 2019.**

*Q.* And why did you leave?

**A. I had a better opportunity at -- at NXP, a European-based company.**

*Q.* So it was Qualcomm to NXP, and then NXP to ARM, where you are now?

**A. That's correct.**

*Q.* I want to focus your attention now on the year 2015; is that okay?

**A. Okay.**

*Q.* Was your supervisor in the beginning part of 2015 that same person you just mentioned, Ziad Mansour?

**A. I believe so.**

*Q.* When you say you believe so, was there a transition that year?

**A. That there was a transition, so I don't remember if the transition was 2015 or late 2014. I don't remember exactly the date, but there was clearly a transition.**

*Q.* And what was the transition?

**A. The transition was there were two people in Ziad's**

**organization reporting to Ziad that eventually took over that team from Ziad.**

*Q.* And who are those people?

***A.* One of them is Esin Terzioglu, and the other one was me.**

*Q.* And so you and Mr. Terzioglu took over Ziad's responsibility?

***A.* That's correct.**

*Q.* What happened to Ziad?

***A.* Ziad was put on a separate track for -- he was managing a CPU team that we had in Austin, Texas.**

*Q.* Okay. And when you took over Mr. Mansour's responsibilities, together with Esin, who did you report to?

***A.* I report to Jim Thompson, who was Head of Engineering and eventually became CTO of the company.**

*Q.* Head of Engineering, was that a pretty high position?

***A.* Well, all the engineers at Qualcomm reported to him.**

*Q.* And then you reported to him; right?

***A.* That's correct.**

*Q.* So fair to say that you were pretty high up the org chart as well?

***A.* You could say that.**

*Q.* Did you work directly with Dr. Arabi at Qualcomm?

***A.* Yes.**

*Q.* And what kind of work did you do with Dr. Arabi, just very generally speaking?

**A. So his role was what we call the design enablement and electronic design automation, where they develop the tools to make, you know, my team's life easy and more productive.**

Q. And when you say your team, how was your team different from guys like Dr. Arabi who designed things?

**A. So my team did most of the design, and his team was developing -- if you look at all the tools and workflows that make, first of all, my development work much easier, but also enabled us to do high-volume kind of development.**

Q. High volume, that means a lot of chips?

**A. That's correct.**

Q. Was there any relationship between Dr. Arabi and Ziad Mansour?

**A. Besides the professional one, I was unaware of anything.**

Q. How would you describe their professional relationship?

**A. Well, Dr. Arabi is very professional, or at least he was back then, in his conduct with his peers, his superiors.**

Q. And so were they just coworkers or were you aware of any closer relationship than that?

**A. Well, I mean, there was an inner circle group of us who used to go out, you know, regularly together, you know, during the weekday and things like that.**

Q. And was Mr. Mansour in that inner circle?

**A. That's correct.**

Q. And Dr. Arabi as well?

***A.*** **Actually, Mr. Mansour was the one who started it, the whole thing; right? And Karim would join us every once in a while.**
***Q.*** Okay. Was there a time when Dr. Arabi left Qualcomm for a brief period?
***A.*** **Yes.**
***Q.*** Where did he go?
***A.*** **I believe the company's name was Dialog. That's what I recall.**
***Q.*** And how long was he at Dialog, if you know?
***A.*** **Maybe a couple of years. I don't remember the exact --**
***MR. FRASER:*** Objection. I would move to strike since he doesn't remember.
***THE COURT:*** Sustained. It will be stricken.
***MR. PILCHAK:*** Thank you, Your Honor.
***BY MR. PILCHAK:***
***Q.*** What did Dr. Arabi do when he came back from Dialog to Qualcomm?
***A.*** **He came back into an organization called Corporate Research & Development at Qualcomm.**
***Q.*** And --
***A.*** **So I believe he was Head of Engineering there.**
***Q.*** And what is Corporate Research & Development responsible for at Qualcomm?
***A.*** **They do advanced technologies, like, incubation kind of startup thinking, new technologies that would take maybe three**

**to five years to mature.**
***Q.*** So not things that can be implemented tomorrow, perhaps?
***A.*** **That's correct.**
***Q.*** Okay. You mentioned some people who would socialize together outside of work from Qualcomm.
Did you ever socialize with someone named Akbar Shokouhi?
***A.*** **That's correct.**
***Q.*** Who is that person?
***A.*** **Akbar was -- so I met Akbar initially when he was part of QThink, a services company. They basically provided resources for Qualcomm. And then eventually, that company got acquired by Qualcomm.**
***Q.*** So he worked for an outside business --
***A.*** **That's correct.**
***Q.*** -- that Qualcomm bought.
***A.*** **That's correct.**
***Q.*** And then did he have a role inside of Qualcomm after the company got purchased?
***A.*** **Yes. He was VP of Operations for a while at Qualcomm.**
***Q.*** Okay. And I'm smiling, Mr. Kechichian, because you have to wait until I finish my question before you start your answer. Otherwise, it's very hard to make a record of what we're saying. So thank you for that.
Any memory of how long Mr. Shokouhi was at Qualcomm?
***A.*** **I would say two or three years.**

***MR. FRASER:*** Objection. 602. I'd move to strike.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** Do you know why he left?

***MR. FRASER:*** Objection. 602, 802.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** Do you know?

***A.*** **There was a conflict of interest that he didn't disclose.**

***Q.*** And what was the conflict of interest?

***A.*** **One of the services company that Qualcomm was using for acquiring engineers on a temporary basis was owned by him, and he was the one actually making decision which company should, you know, we basically go and acquire engineers from, and he didn't disclose his ownership.**

***Q.*** And when Qualcomm found out about it, what did they do?

***A.*** **They terminated him.**

***Q.*** Do you know whether, as part of that process, Mr. Mansour played a role at all?

***A.*** **I don't -- I don't remember exactly what --**

***MR. FRASER:*** Objection. 602 to further testimony, since he said he doesn't --

***THE COURT:*** Overruled. The question is if you know. Do you know?

***THE WITNESS:*** No, I don't know.

***BY MR. PILCHAK:***

***Q.*** I want to ask you now about a company called Abreezio.
Do you know a company by that name?

***A.*** **Yes.**

***Q.*** What was Abreezio?

***A.*** **Abreezio was a startup that Qualcomm acquired eventually.**

***Q.*** And was the acquisition in the fall of 2015?

***A.*** **I believe so.**

***Q.*** How many products did Abreezio have?

***A.*** **They had two parts of a technology that were loosely related together.**

***Q.*** And what were those two parts?

***A.*** **One of them was the testing, what we call the Design For Test domain, so DFT. And then the other one was a sensor technology that would basically make the chip operation better or more predictable.**

***Q.*** So a DFT product and a sensor product?

***A.*** **That's correct.**

***Q.*** Without asking about the ultimate outcome of either product, do you have a sense of which product seemed more valuable to Qualcomm when it was looking at those two ideas?

***A.*** **From the valuation perspective, it was definitely the sensor product that would be -- would be more valuable to Qualcomm.**

***Q.*** And, again, focusing on the front end of this process, why do you say that was the impression?

**A. Because that would give a competitive edge or a revenue kind of factor to Qualcomm or any company it acquires, having that technology.**

*Q.* So potentially a lot of savings?

**A. That's correct.**

*Q.* Did you have any role in the evaluation of Abreezio?

**A. No.**

*Q.* Did anybody ask you to take a look, though?

**A. For valuation perspective, yes, I did have a role.**

*Q.* What was that role?

**A. I had a prior experience in valuating a similar startup.**

*Q.* What company was that?

**A. That was Rapid Bridge.**

*Q.* And was their product known as CPR?

**A. That's correct.**

*Q.* Did Qualcomm acquire Rapid Bridge?

**A. Yes, it did.**

*Q.* Did CPR turn out to be valuable?

**A. Very valuable.**

*Q.* And you had a role in that evaluation?

**A. That's correct.**

*Q.* So what was the ask of you when Abreezio came around?

**A. So the ask for me, from the M&A team, was to look at the financials and whether the multipliers justified what the technology was about.**

***Q.*** And what is a multiplier?
***A.*** **I don't recall the exact numbers, but I believe they would be in the hundreds of millions.**
***Q.*** Yeah, I don't mean the exact numbers.
I mean, like, the concept of a multiplier, what does that mean?
***A.*** **Oh, it means that, you know, how much you pay for a particular technology versus how much potentially savings or competitive advantage it gives you.**
***Q.*** So would an example be if we get this new technology and we can save a dollar a chip, and then we make a million chips, that's a million dollars?
***A.*** **That's roughly correct.**
***Q.*** So the multiplier would be the one dollar?
***A.*** **That's right.**
***Q.*** And then the business guys just tell you how many chips are coming and you can do the math?
***A.*** **Yeah. So the key is how many -- how many chips Qualcomm sells is a known entity, and we have a trajectory of that, so we knew those numbers fairly accurately. The key value in that is to evaluate how much the savings would be.**
***Q.*** Okay. Who asked you to take a look? I think you said it was Corporate Development?
***A.*** **Corporate Development, yes.**
***Q.*** Was there a human being at Corporate Development?

**A. Yes, there was.**
*Q.* Who was that human being?
**A. Duane Nelles.**
*Q.* Who is Mr. Nelles?
**A. Mr. Nelles was the head of the M&A group at that point.**
*Q.* And M&A, what does that stand for?
**A. Mergers & Acquisitions.**
*Q.* So if Qualcomm is thinking about buying a company, the M&A group would be involved?
**A. Absolutely.**
*Q.* You said you had some role in the evaluation.
Did you feel that you rolled up your sleeves and did a full technical diligence of Abreezio, or did you do something else?
**A. No, it was -- it was cursory, because I had -- I had two colleagues, and they're both high-title executives at Qualcomm who were looking into it, and they were more than capable of doing that evaluation.**
*Q.* And who were these -- did you say high-titled colleagues?
**A. High title, yes.**
*Q.* Does that mean high up on the org chart?
**A. That's right.**
*Q.* Okay. Who were these high-title colleagues who were already involved?
**A. Ziad Mansour and Esin Terzioglu.**
*Q.* And you felt that those two gentlemen were capable of

managing the diligence?
**A. Yes, as they have done multiple time before. And Esin is an expert in this field.**
***Q.*** I have to ask you, though, if they're high-title people, high up the org chart, did you understand that they were going to roll up their sleeves and sit at the computer doing the work, or would they bring someone on to do it?
***MR. FRASER:*** Objection. 602, 403, 401.
***THE COURT:*** Overruled.
***MR. PILCHAK:*** You can answer.
***THE WITNESS:*** No. The way it works is each -- each acquisition has a technical investigator that's high titled, and they would potentially rely on their team of experts to do the evaluation. They scrutinize it. That's how it works.
***BY MR. PILCHAK:***
***Q.*** And what was the team that Esin and Ziad brought on board to evaluate the technology?
**A. A group of experts within their organizations.**
***Q.*** Are you familiar with someone named Saad Elhosni?
**A. Yes.**
***Q.*** Was he involved?
**A. He was involved.**
***Q.*** Did you have a high confidence level in Mr. Elhosni's technical review?
**A. He was --**

***MR. FRASER:*** Objection. 701.

***THE COURT:*** Overruled.

***THE WITNESS:*** He was an expert in digital -- Design For Test, not the sensor part.

***BY MR. PILCHAK:***

***Q.*** And did you have a lot of confidence in the outcome of Mr. Elhosni's work?

***A.*** **Some confidence.**

***Q.*** Any reservation?

***A.*** **He was, I would say, at best, average. However, the evaluation he did was not very complicated, so it was fairly straightforward.**

***Q.*** And then as to the team for the sensor side of the house, did you know anything about who was involved in that?

***A.*** **Vaguely remember a couple of names, but not -- not --**

***Q.*** Fair enough.

***A.*** **-- not very precise.**

***Q.*** Let me ask you this, and I want to focus your attention.

Before the acquisition, did you have any concerns about Abreezio's technology?

***A.*** **It seemed very similar to what Rapid Bridge had done.**

***Q.*** Okay.

***A.*** **And we had matured that technology quite a bit to be able to find something that suddenly would do a -- would give us multipliers of it.**

***Q.*** And what does it mean, that you matured the technology from Rapid Bridge?

***A.*** **For any technology that's coming out of incubation, right, a startup, there's a period where the acquiring company would stand -- would stay -- would spend with their own experts to make the technology ready for prime time, if you would like, and ready for high volume.**

**In Qualcomm's case, really, you know, some of the products would ship in the 800, 900 million units, so it just -- any mistake or any lack of attention would amplify it to that degree. So it took -- it takes time to mature those technologies to that level of, you know, robustness.**

***Q.*** And so if I'm hearing you right, when Qualcomm buys a new product, it doesn't just plug it in and walk away; it does something to it after it buys it?

***A.*** **Yeah, always. Always. That's industry standard.**

***Q.*** Is that time- and labor-intensive?

***A.*** **That is correct.**

***Q.*** Did it take a lot of time and effort to get Rapid Bridge's product, as you say, ready for prime time?

***A.*** **It took roughly six to nine months with the top experts back then that were part of my team to -- to take that to prime time.**

***Q.*** Okay.

***MR. PILCHAK:*** I'd like to show the witness Defense Exhibit 2833, if I can. I don't think this is in evidence.

Mr. Kechichian, there should be an email on your screen there.

Can we zoom in on just the top half, perhaps?

***BY MR. PILCHAK:***

***Q.*** This is an email chain.

Do you see that?

***A.*** **Yes.**

***Q.*** Can you read the screen okay?

***A.*** **Yes.**

***Q.*** If we go to the second message down -- there's a number of people on this message, but that second message down is from you; right?

***A.*** **That's correct.**

***Q.*** Is that your Qualcomm email address there?

***A.*** **It is.**

***Q.*** And then there's a response from someone on top named Esin.

Is that the same Esin we were just talking about?

***A.*** **That's right.**

***MR. PILCHAK:*** Move to admit.

***MR. FRASER:*** Objection. Hearsay.

***THE COURT:*** Overruled.

***(Exhibit 2833 admitted.)***

***MR. PILCHAK:*** Okay. Let's take down that zoom, and let's look at the bottom half from -- the message from Farsheed to the bottom. Nope, sorry. That's the message from Hiten.

One more message up, please. It's from here *(indicating)* to the bottom.

Thank you, Mr. Mayberry.

***BY MR. PILCHAK:***

*Q.* Do you see that there, Mr. Kechichian?

*A.* **Yes.**

*Q.* So first of all, the very bottom slug of text there is from someone named Hiten Somwal.

Do you see that?

*A.* **Yes.**

*Q.* Who is Hiten?

*A.* **Hiten used to work for -- for Duane, part of the M&A team.**

*Q.* So he's one of those business deal guys?

*A.* **That's correct.**

*Q.* And it looks like there's maybe an invitation there, because it has a conference room listed.

Is that how you understand that?

*A.* **That's correct.**

*Q.* What is the subject line of that invitation? It's kind of in the middle at the bottom.

*A.* **Yeah.**

*Q.* What does that say?

*A.* **It says, "Review Windnsea business case."**

*Q.* What is Windnsea?

*A.* **I believe it was a code name given for -- for the**

**acquisition. We all had code names given to all acquisitions.**

*Q.* So the companies get acquisitions -- get code names?

***A.*** **Correct.**

*Q.* Got it.

And then if we go up, there's a message from Farsheed Mahmoudi.

Do you see that?

***A.*** **Yes.**

*Q.* Who was Farsheed?

***A.*** **Farsheed was part of Esin's organization, and I believe he was the one leading the reviews of the due diligence.**

*Q.* Do you recall whether he was on the sensor side or the test side?

***A.*** **I believe Farsheed was on the -- on the sensor side.**

*Q.* Okay. And then it says -- it looks like Mr. Mahmoudi is proposing moving the meeting; right?

***A.*** **Yeah, it looks like that.**

***MR. PILCHAK:*** Let's take that down and pick up the same zoom that we had before, the top two messages.

***BY MR. PILCHAK:***

*Q.* Did you reply to Mr. Mahmoudi's email by emailing the entire group?

***A.*** **Are you referring for this particular email?**

*Q.* Just the bottom email there. That's an email from you.

***A.*** **Yeah, I usually do reply all.**

*Q.* Okay. And when you wrote, "Which way is the adjustment going, higher or lower," what did you mean?
***A.*** **This was, I believe, referring to the valuation of it.**
*Q.* So you were asking whether the valuation was going higher or lower?
***A.*** **That's correct.**
*Q.* Why were you asking that?
***A.*** **I mean, from my point of view, I mean, today, was really questioning the value of it, because what I recall, it came quite high initially.**
*Q.* And so you were trying to ask a skeptical question here?
***A.*** **Looks like it.**
*Q.* To kick the tires?
***A.*** **Well, it was more than kick the tires because we had formulas. We had, you know, previous models. Everything in our industry is based on, you know, previous models, previous experience, what we've seen before, what we can accomplish. So it's a fairly -- I wouldn't say complex, but it has many parts of the equation.**
*Q.* And how did you understand Mr. Terzioglu's response on top?
***A.*** **Basically, he was saying that there were shortcomings on the previous technology, and this will close that gap.**
*Q.* And so when he says "improved CPR," that's Qualcomm's existing technology?
***A.*** **That's correct.**

***Q.*** And when he says, "Close the gap with what Abreezio has in TruSens," what did he mean by that, as far as you could tell?

***A.*** **It means we had -- we had made really good improvements on what the technology itself was.**

***Q.*** Was that what you were just testifying about, that you had worked -- or Qualcomm had worked to mature CPR so it would get better and better?

***A.*** **That's correct.**

***MR. PILCHAK:*** Let's take that down. And you can take that down as well.

***BY MR. PILCHAK:***

***Q.*** Did you share any of the concerns that you had about Abreezio with Mr. Mansour?

***A.*** **Yes.**

***Q.*** What did he say when you did that?

***A.*** **Well --**

***MR. FRASER:*** Objection. Hearsay.

***THE COURT:*** Overruled.

***THE WITNESS:*** -- there was a part that was during the due diligence that, you know, the same concern I talked about right now, that this is technology we've seen, looks very similar to what we've seen. How much more improvement can we get out of it? So those were the early days without me looking at it very closely.

///

***BY MR. PILCHAK:***

***Q.*** Right. And that's the part that I want to focus your testimony on, is during the evaluation, before the acquisition, when you talked to Ziad, you raised the same concerns?

***A.*** **That's right.**

***Q.*** What did Mr. Mansour do when you said that?

***A.*** **He referred to Esin's basically statement, saying this is -- this is CPR on steroids, CPR 2.0, things like that.**

***Q.*** What was CPR on steroids?

***A.*** **Basically, it means it's an improved version of the technology we already have.**

***Q.*** Abreezio is CPR on steroids?

***A.*** **Correct.**

***Q.*** Did you feel Ziad was taking your concerns seriously?

***A.*** **I didn't think otherwise back then, because we had -- I mean, we -- he was my boss for a good part of, you know, seven, eight years. So I didn't think of it at that point.**

***Q.*** Did you have a good relationship with Ziad at the time?

***A.*** **It wasn't as good as how it started, because we had, you know -- obviously we had differences how to run the organization, strategy, things like that.**

***Q.*** And did your relationship with Ziad change further over time?

***A.*** **Yeah, it did.**

***Q.*** Why?

**A. Like I said, we had our differences in opinion on how things should be run.**

***Q.*** Were you surprised by the speed at which Abreezio developed its technology?

***A.*** **I --**

***MR. FRASER:*** Objection. 701.

***THE COURT:*** Overruled.

***THE WITNESS:*** I didn't know how long it took them to develop the technology, particularly for Abreezio's perspective.

***BY MR. PILCHAK:***

***Q.*** So they could have been developing it for years before they --

***A.*** **That's right.**

***Q.*** -- before they brought it to Qualcomm?

***A.*** **Yes.**

***Q.*** Okay. But from the time that they pulled the curtain back and showed it to Qualcomm, the space of time between then and when the evaluation was done and the acquisition happened, were you surprise by how long that time was?

***A.*** **I don't recall how long it took.**

***Q.*** Okay. In the year 2015, how many people -- generally speaking, not a number -- how many people outside of Qualcomm were aware of the specific challenges Qualcomm was facing in this area of technology?

***MR. FRASER:*** Objection. 602.

***THE COURT:*** If you know. Overruled.

***THE WITNESS:*** No, I don't know exact numbers.

***BY MR. PILCHAK:***

***Q.*** Yeah, and I'm not trying to ask about exact numbers.

I'm trying to ask, was it widely known what was going on inside Qualcomm, and the stumbling blocks or challenges that Qualcomm had in the area of technology addressed by Abreezio?

***MR. FRASER:*** Objection. Calls for speculation.

***THE COURT:*** Overruled. If you know.

***THE WITNESS:*** These were very specific problems. First of all, they were problems that Qualcomm -- challenges that Qualcomm faced, and there was part of it that you can say -- classify it as general class of problems that any chip company would have.

***BY MR. PILCHAK:***

***Q.*** Was there also a group of more specific problems that Qualcomm knew that Qualcomm had?

***MR. FRASER:*** Objection. Vague. Confusing.

***THE COURT:*** Overruled.

***THE WITNESS:*** There were very specifically power consumption related, how hot the chip would get. There were very specifically defective -- defect-related aspects, which impacts yield. I would say those were, at least from my view at that point, was very specific to Qualcomm.

///

***BY MR. PILCHAK:***

***Q.*** And let me ask you this.

For example, you were talking about the existing product already on the shelf when Abreezio came along; right?

***A.*** **Mm-hmm.**

***Q.*** And that product was called what?

***A.*** **CPR.**

***Q.*** Would Qualcomm publicize the specific performance numbers it was getting from CPR as it got them?

***A.*** **Absolutely not.**

***Q.*** When you say "absolutely not," why do you say that?

***A.*** **Because they're a class of problems that were -- you know, people would patent, and there were class of problems that you keep it as a trade secret.**

***Q.*** And my goal is not to ask about trade secrets specifically.

I'm just trying to find out, was it something that Qualcomm tried to keep confidential?

***A.*** **Yes, it did.**

***Q.*** What would Qualcomm's interests be in keeping it confidential?

***A.*** **It's a competitive edge.**

***Q.*** Let me just ask, yes or no, did you have any post-acquisition involvement with Abreezio's technology?

***A.*** **Yes.**

***Q.*** And without asking you about how the products turned out,

what was that involvement from a process perspective? Like, what were you trying to do with Abreezio's products?

**A. So organizationally, the way it works is usually the technology is brought in by the investigator, and they're responsible to take it all the way to realization within Qualcomm. In this case, Esin left, and I inherited the other half of the team, so it was my responsibility to make this work.**

*Q.* Okay. And so did you say "the investigator"?

**A. From which perspective?**

*Q.* Sorry, I thought your last answer included the word "investigator." It would be the responsibility of --

**A. Yes, yes, yes. Whoever was the technology investigator for a particular startup would make sure that it takes it to -- they take it to completion.**

*Q.* And I just wanted to ask you, what is an investigator?

**A. Basically, the lead who does the due diligence.**

*Q.* Okay. And so because Esin had a role evaluating the tech before Abreezio was bought, it should have been his baby when the company came in?

**A. That's correct.**

*Q.* But it wasn't his baby.

**A. He wasn't there.**

*Q.* Whose baby was it?

**A. It turned to be my baby.**

*Q.* And so was it your team's responsibility to on-board the

tech and see if it worked?

**A. That's correct.**

***Q.*** Okay. I want to fast-forward in time now a little bit.

***MR. PILCHAK:*** Actually, one moment, please, Your Honor.

***(Pause.)***

***BY MR. PILCHAK:***

***Q.*** I want to fast-forward in time a little bit.

Again, without asking about how that on-boarding process worked or how the technology was integrated, did you ever learn of any concerns about the Abreezio deal?

***MR. FRASER:*** Objection. 602, 403.

***THE COURT:*** Overruled.

***THE WITNESS:*** There were general concerns, again, about the technology, but nothing further than that at that point.

***BY MR. PILCHAK:***

***Q.*** At some point, did someone raise a concern with you about the deal or the diligence process itself?

**A. There were questions during the due diligence itself that, you know, they asked specifically for me to be involved. But beyond that, nothing -- nothing until further.**

***Q.*** Yeah. And I'm trying to ask about that further period.

Did you speak with somebody named Mohamed Allam?

**A. Yes.**

***Q.*** Did he raise anything with you by way of a concern about the diligence process?

***MR. FRASER:*** Objection. 802.

***THE COURT:*** Overruled.

***THE WITNESS:*** Yes, he did.

***BY MR. PILCHAK:***

***Q.*** What did he say about the process itself, not focusing on whatever happened with the tech?

***MR. FRASER:*** Objection. 802.

***THE COURT:*** Overruled.

***THE WITNESS:*** It was mostly about how the meetings were conducted, and, you know, how people were asked not to forward emails, not to publish data.

***BY MR. PILCHAK:***

***Q.*** How were the meetings conducted, according to Mr. Allam?

***MR. FRASER:*** Objection. 802.

***THE COURT:*** Overruled.

***THE WITNESS:*** I don't recall exactly the words he used or how he discovered, but the general feeling was it wasn't very open, that there were lots of effort from Ziad Mansour to skew things to a more positive way.

***BY MR. PILCHAK:***

***Q.*** To skew things?

***A.*** **Yeah, to make them look more positive than they were.**

***Q.*** And what did you say about emails?

***MR. FRASER:*** Objection. Leading.

***THE WITNESS:*** Sorry, emails?

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** I think you mentioned something about Mr. Allam mentioning forwarding emails or sending.

***A.*** **Yes. They didn't want, you know, wide distribution on emails. They had to be distributed -- presentations to be widely available.**

***Q.*** Do you remember about what time, even generally, Mr. Allam shared those facts are you?

***A.*** **No, I don't recall.**

***Q.*** Do you remember what you did with that investigation -- or information?

***A.*** **Sorry, I couldn't hear you.**

***Q.*** What did you do with the facts that Mr. Allam mentioned to you?

***A.*** **Well, I mean, it added up to already a list of worries that, you know, myself and some other people had.**

***Q.*** Okay. Did you later mention those worries to Qualcomm's Human Resources or Employee Relations Department?

***A.*** **Eventually, I did.**

***Q.*** Was that in the context of a different conversation that you had with them?

***A.*** **It was. That's not the normal route usually you take to raise issues.**

***Q.*** Why didn't you normally -- why didn't you raise the issue in

the normal fashion?
**A. It was triggered by, you know, another set of events.**
Q. Okay. Very generally, what were those other events?
**A. There was an anonymous letter accusing me of misconduct that arrived very -- at least in my view, in a timing, very suspicious way. And eventually, I made the connection, at least in my mind, between the -- you know, that letter and what was going on with the investigation.**
Q. Sorry, what was that connection?
**A. Well, first of all, I mean, the acquisition accusations were serious enough that would have ended my career. I would have been unemployable.**
Q. And so that's the context that you were talking with HR?
**A. That's correct.**
Q. And you said you found the timing of the accusations suspicious?
**A. Well, initially, I mean, when I was -- when I was faced with it, I didn't think much about it, because when I talked to my boss, he said executive gets all kinds of letters, anonymous letters like that, people trying to do -- you know, whatever the motivation is, I can't speculate. So I didn't make much of it.**
**And I kept on asking the representative that -- the ER representative, Can I see the letter? What's in the content? He had described the content. He said, I can't show you the letter, but he described the content. And that's when I made**

**the connection, that there was -- the two were somehow related, at least in my mind.**

*Q.* And I'm still not sure why you made that connection.

***A.*** **Because there was information -- like I said, this type of misconduct can end someone's career. Like, you'd be unemployable. So I should be, you know, doing car wash or something.**

**But the content was only known by Ziad, and this was around the time that I had started already the internal -- I was making noise that, you know, there's something wrong with the technology, we can't make it work, you know, maybe the context of the value is not as high as it should have been, things like that; right?**

*Q.* And I just want to focus specifically on the timing, maybe, rather than the content of what you were doing or telling people.

You're saying you had already started to take some steps to look into Abreezio when ER approached you about this separate and very serious thing?

***A.*** **So the way it works -- the answer is, yes. But the way it works --**

***THE COURT:*** If the answer's yes, I'm going to let him ask the next question.

***THE WITNESS:*** Okay. Thank you.

///

***BY MR. PILCHAK:***

***Q.*** So you started asking some questions about Abreezio first.

***A.*** **It was in the context of we acquired the technology, and I have to make it work now. My team has to make it work, so --**

***Q.*** Let me jump in again, if I can. I just want to ask about the chronology.

So as your responsibility for working with the technology, it caused you to ask some questions about Abreezio?

***A.*** **That's correct.**

***Q.*** And after you started asking those questions, you learned that there were these serious allegations against you?

***A.*** **That's correct.**

***Q.*** And because of the contents of the allegations being things you thought Mr. Mansour would know, and maybe only Mr. Mansour, you connected those facts, in your mind?

***MR. FRASER:*** Objection. 701 and leading.

***THE COURT:*** Leading. Sustained.

***BY MR. PILCHAK:***

***Q.*** Is that why you connected those facts in your mind?

***A.*** **That's correct.**

***Q.*** After the meeting with Employee Relations, did you continue to look into Abreezio to some extent?

***A.*** **Well, we had to continue the -- this phase of the investigation to see if -- what value we can extract from it.**

***Q.*** Okay. Did there come a time, several months down the road,

when you had a conversation with Dr. Arabi about Abreezio?
***A.*** **Yes.**
***Q.*** When was that, if you remember?
***A.*** **I don't remember the date, but what I remember was I had no -- no knowledge of his connection to the startup.**
***Q.*** Before you had this conversation with him?
***A.*** **Right.**
***Q.*** What was the occasion for your meeting with Dr. Arabi?
***A.*** **I believe it was in the context of he was part of an incubator, I think it was EvoNexus, so it was in that context that -- at least the first meeting was.**
***Q.*** So you were having a conversation with him about something totally unrelated to Abreezio?
***A.*** **That's correct.**
***Q.*** However, did you go into that conversation with the intent of talking to Dr. Arabi about Abreezio?
***A.*** **Yes.**
***MR. FRASER:*** Objection. Leading.
***THE COURT:*** I'll allow it.
***BY MR. PILCHAK:***
***Q.*** Why did you have that intention?
***A.*** **Because it was something we discussed with Employee Relations to pursue.**
***Q.*** And so what was Employee Relations asking you to do at this meeting?

**A. They did ask me to meet with him.**
Q. They asked you to meet with Dr. Arabi?
**A. Right.**
Q. Did you do that?
**A. Pardon?**
Q. Did you do that?
**A. Yes.**
Q. And why did you do that?
**A. Because I was curious of where this would lead eventually.**
Q. Were you also trying to assist ER or HR with their investigation?
**A. Yes.**
Q. And I probably used both acronyms. When I say "HR," I mean Human Resources.
Is that basically --
**A. Yes.**
Q. Is that basically what we're talking about?
**A. Yes.**
Q. When you say "ER," what do you mean?
**A. It's Employee Relations.**
Q. Is that the same thing as HR?
**A. So ER is part of HR, organizationally. However, ER is an organization you don't want to be dealing with.**
Q. Why do you say that?
**A. So if you're the one being investigated by ER, you know, the**

**outcome usually is not favorable.**

***Q.*** I see.

And so it sounds like you were being investigated by ER, or at least they were asking you about some serious accusations; right?

***A.*** **Initially, yes. It usually takes two weeks for the investigation to complete internal.**

***Q.*** And that's what I wanted to ask.

At the time that you agreed to have this meeting with Dr. Arabi, in part because ER asked you to, was ER still looking at you about that other serious thing?

***A.*** **I don't recall the exact dates.**

***Q.*** Do you have a memory of that's why you met with Dr. Arabi, because you were worried about ER coming after you?

***A.*** **No. I was highly motivated --**

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** I couldn't hear your answer, I'm sorry.

***A.*** **I was highly motivated to find out what's going on.**

***Q.*** Okay. And just yes or no, if I can, were you motivated because you were working with Abreezio's technology on a regular basis?

***A.*** **Yes.**

***Q.*** Okay. So you have this meeting with Dr. Arabi.

Did you believe, going into the meeting, that Dr. Arabi was involved with Abreezio in any way?
***A.*** **I might have had some hints, but I wasn't sure.**
***Q.*** And at the meeting, were you the only person who was going to meet with Dr. Arabi? By which I mean, you were the only one who Dr. Arabi intended to meet with?
***A.*** **Meeting directly, yes, I was the only person.**
***Q.*** But was anybody from ER also there?
***A.*** **Yes.**
***Q.*** And was that part of ER's plan for the meeting?
***A.*** **Strategy, yes.**
***Q.*** Where did the meeting take place?
***A.*** **Karl Strauss in -- near Qualcomm's offices.**
***Q.*** And so for anyone unfamiliar with Karl Strauss, is that a restaurant near --
***A.*** **That's a brewery.**
***Q.*** Okay. Were you going there for a meal?
***A.*** **I mean, that was our usual hangouts in general. It was near the office, so Qualcomm people usually hang out there. We used to call it Building K, affectionately, so...**
***Q.*** Why is it known as Building K?
***A.*** **Because Qualcomm's campus, all the buildings were letters. And K was the missing letter, and Karl Strauss, I mean, fit kind of -- yeah.**
***Q.*** So you had a code name for Karl Strauss.

***A.*** **We did. Actually, when they renovated, they put Building K as a sign, yeah.**

***Q.*** Okay. And so HR -- sorry -- ER was also going to this meeting with Dr. Arabi at Building K.

***A.*** **That's correct.**

***Q.*** Do you know why they were going, what was their purpose?

***A.*** **They want to listen in.**

***Q.*** Did Dr. Arabi know that ER was there?

***A.*** **No.**

***Q.*** Did you tell him at the beginning of the sit-down, Hey, there's --

***A.*** **No.**

***Q.*** Why didn't you tell him?

***A.*** **I didn't see it necessary for him to change his behavior.**

***Q.*** What do you mean, "change his behavior"?

***A.*** **Influence what he's going to say.**

***Q.*** Okay. And I think I asked, but I'm not sure if you answered, were you going to sit down for a meal with Dr. Arabi?

***A.*** **We sat at the bar.**

***Q.*** Was it for lunch?

***A.*** **No. It was dinnertime, after work.**

***Q.*** And did you have dinner?

***A.*** **I don't recall. I mean, we probably have a beer or two and some bites to eat.**

***Q.*** Were you concerned by the number of beers that Dr. Arabi had

that he was talking too loosely?
**A. No, no. He was never a drinker, in my opinion, back then, at least.**
*Q.* Okay. How long was your meeting with Dr. Arabi?
**A. Maybe an hour plus.**
*Q.* And how did the meeting start? Did you ask about Abreezio immediately?
**A. No. We were talking about startups and incubation and potential new companies to bring in.**
*Q.* Did it eventually change subjects to Abreezio, though?
**A. I believe so.**
*Q.* Who brought up Abreezio, you?
**A. I did.**
*Q.* Again, you have to wait until I get to the end of my question.
**A.** (*Nods head.*)
*Q.* When you brought up Abreezio, how did Dr. Arabi react?
**A. I think he was a bit surprised that it came. That's -- that's how I recall. And I recall he could have been also reluctant to discuss it.**
*Q.* Why do you say that?
**A. That's the memory I have. I don't -- I mean, I don't -- back then, I didn't know his involvement or how much detail he had in there.**
*Q.* Did you discuss --

***MR. FRASER:*** Objection. 701, 403. And I would move to strike.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** Did you discuss with Dr. Arabi whether he was involved in Abreezio?

***A.*** **I don't recall.**

***Q.*** Did he -- do you remember him denying being involved in the company?

***MR. FRASER:*** Objection. He doesn't recall.

***THE COURT:*** Overruled.

***THE WITNESS:*** What I found out in that meeting was -- you know, I had concerns about the so-called Chief Technologist of that company.

***BY MR. PILCHAK:***

***Q.*** Who was that?

***A.*** **I believe the name was Sheida Alan.**

***Q.*** And why did you have concerns about that person?

***A.*** **Because usually, when there's an invention of this level and size and scope, you look for a track record from the person.**

***Q.*** Why would you do that?

***A.*** **That's usually -- I mean, unless there's a divine kind of enlightenment, you know, people have track record. They publish papers. They have previous companies they work with. So I was looking for that, and that was the biggest mystery of who this**

**person was with nothing in their name.**

***Q.*** So you weren't able to find anything about the Chief Technologist?

***A.*** **Or whatever the title was. I didn't even know the gender back then.**

***Q.*** So you weren't sure if Sheida was a man or a woman?

***A.*** **That's correct.**

***Q.*** Did you ask Dr. Arabi about Sheida?

***A.*** **I don't know if I asked or he volunteered, but I -- I found out that it was his sister.**

***Q.*** You found out -- you found out because he told you that?

***A.*** **He told me that, yeah.**

***Q.*** What was your reaction when he said that?

***A.*** **I was -- I was pretty shocked, actually.**

***MR. PILCHAK:*** Your Honor, are we taking a 12:00 o'clock break today?

***THE COURT:*** Sure. Is now a good time?

***MR. PILCHAK:*** It's fine for me.

***THE COURT:*** Okay. Ladies and gentlemen, we'll take an hour lunch. If you could be back in one hour. You're reminded you're not to discuss the case or do any research about the case. And we'll see you back at 1:00 o'clock. And you, as well. Thank you, sir.

***(Jury out at 12:01 p.m.)***

***THE COURT:*** Okay. We're now outside the presence --

***MR. PILCHAK:*** The witness is still here. He's leaving.

***THE COURT:*** We're now outside the presence of the jury. Any issues we need to take up?

***MR. PILCHAK:*** Not for us, Your Honor.

***MS. BERNSTEIN:*** Your Honor, some of the testimony that's -- excuse me. I'm sorry.

Some of the testimony that has come in, and I appreciate Mr. Pilchak's attempts to navigate around it, but at least twice, I heard him say that he had post-acquisition concerns about the technology being good, that he was already making noises that the technology didn't work, they can't make it work, and the value was too high. And obviously, that is critical that we have the ability to respond to that.

So I just want to flag that, because I know the Court has been trying to put parameters on it. We will not expand beyond there, but we do need the ability to rebut that testimony.

***MR. PILCHAK:*** I think limited reasonable cross, of course, is appropriate, Your Honor. We're doing our very best to navigate that with this witness.

***MS. BERNSTEIN:*** And I did not mean to imply anything otherwise.

***MR. PILCHAK:*** Of course.

***THE COURT:*** Okay. And I will allow a limited -- I think you have to be able to address that. That's what he said.

***MR. FRASER:*** Thank you, Your Honor.

***MS. BERNSTEIN:*** Thank you, Your Honor.

***MR. PILCHAK:*** Thank you, Your Honor.

***THE COURT:*** Thank you.

***(Lunch recess taken.)***

***THE COURT:*** Okay. Good afternoon, ladies and gentlemen. We are back on the record. All jurors are present. Dr. Arabi is present. All the lawyers are present.

And you, sir, are reminded that you are still under oath to tell the truth.

Mr. Pilchak.

***MR. PILCHAK:*** Thank you, your Honor.

***BY MR. PILCHAK:***

***Q.*** Good afternoon, Mr. Kechichian.

***A.*** **Good afternoon.**

***Q.*** This morning in your testimony you mentioned an interview between you and ER where they confronted you about some accusations; right?

***A.*** **Yes.**

***Q.*** At the beginning of that interview, were you initially truthful with them?

***A.*** **No. I denied everything.**

***Q.*** So at the beginning of the interview you denied the things that they mentioned to you?

***A.*** **That's right.**

*Q.* At the end of the interview, did you change that?
**A. Yes.**
*Q.* What did you do at the end of the interview?
**A. I was completely open about what happened. And the facts and the accusations and --**
*Q.* So you were open and transparent with them at the end of the interview?
**A. That's correct, yeah.**
*Q.* You mentioned that you worked at Qualcomm until 2019; right?
**A. That's correct.**
*Q.* So did you get fired as a result of the interview with ER?
**A. No. I left on my own.**
*Q.* What happened with the thing that ER was looking into with you?
**A. They concluded in two weeks that the accusations were baseless.**
***MR. FRASER:*** Objection. 602.
***THE COURT:*** Sustained.
***BY MR. PILCHAK:***
*Q.* Did anything happen to you as a result of ER's looking into that?
**A. No.**
*Q.* Okay. I want to return to this meeting at Building K that you had with Dr. Arabi. Okay?
I think this morning I asked a couple of questions like how

did Dr. Arabi react when you raised the subject of Abreezio. Right? Do you remember that question?

**A. Yes.**

*Q.* I think your first answer was you don't recall.

**A. I don't recall the details. But I kind of remember the phases he went through.**

*Q.* And it's been a long time since that interview; right?

**A. Yes.**

*Q.* Do you do -- well, I say "interview," but the dinner meeting with Dr. Arabi.

Did you do anything right after the dinner meeting to sort of make a record of what happened?

**A. Yeah. I sent notes.**

*Q.* And might it refresh your memory about Dr. Arabi's reaction if you looked at a copy of your notes?

**A. Might.**

***MR. PILCHAK:*** Can we show the witness Exhibit 1049 there on the screen, only the witness.

***MR. FRASER:*** Objection. Improper refreshment.

***THE COURT:*** Overruled.

***MR. PILCHAK:*** Zoom in on the top half, please.

***BY MR. PILCHAK:***

*Q.* This is an email dated May 22nd, 2017; right?

**A. Yep.**

*Q.* Who sent this email?

**A. I did.**
Q. And who did you send it to?
**A. To the ER that was on my case, the ER person, Anthony.**
Q. Is that Anthony Schmidt?
**A. Yes.**
Q. And there's a section there about Karim.
Do you see that?
**A. Yes.**
Q. If I direct your attention to -- one, two, three, four, five, six -- the seventh bullet, do you see that there --
**A. Mm-hmm.**
Q. -- started "Discussing Abreezio."
**A. Yes.**
Q. Does that refresh your memory about Dr. Arabi's reaction?
**A. Vaguely, yes.**
Q. And what is the recollection that you have when you look at that?
**A. I remember him being surprised at why I bring it up.**
Q. And then I also asked you this morning whether Dr. Arabi denied being involved in Abreezio. And my memory is you said you didn't recall that as well. Right?
**A. Yeah. I mean, up to this point I was not aware of any of his involvement. And...**
Q. Okay. And I have a similar question to my question just a moment ago. If you look at that next bullet there, which I

guess is the eighth bullet that starts with "He," do you see that?

***A.*** **Yep.**

***Q.*** Does that refresh your memory as to whether Dr. Arabi admitted being involved in Abreezio?

***A.*** **Yeah. I mean, obviously these notes were taken maybe an hour after --**

***Q.*** Okay.

***A.*** **-- the meeting.**

***Q.*** I don't want to ask you about the notes, though. I want to ask, when you look at the notes that were taken maybe an hour after the conversation, does it refresh a memory in you about what Dr. Arabi said?

***A.*** **It does. I mean, these are my notes. So I'm assuming --**

***Q.*** And what is your memory of what Dr. Arabi said about his involvement in Abreezio?

***A.*** **Well, I remember him talking about his sister specifically.**

***Q.*** And what about his own involvement?

***A.*** **I don't -- I don't recall anything particular about his involvement.**

***Q.*** Okay. Do you remember him talking about his sister's background and whether it was level relevant to Abreezio?

***A.*** **I remember something about the recent she had done on color printers, but I don't know if he mentioned that or we eventually found out. I don't recall.**

***MR. PILCHAK:*** Okay. And let's take that off the screen, please.

***BY MR. PILCHAK:***

***Q.*** In your experience as an engineer -- how long have you been an engineer?

***A.*** **Thirty-six years now.**

***Q.*** Sorry, six years?

***A.*** **Thirty-six.**

***Q.*** Thirty-six, okay. I missed part of the number.

In your 36 years as an engineer, in your experience is inkjet printing relevant to the two technology areas that Abreezio had products in?

***A.*** **No.**

***Q.*** Is it relevant at all?

***A.*** **No.**

***Q.*** Do you remember approximately when this meeting with Dr. Arabi was? I apologize if I didn't ask you that previously.

***A.*** **No, I don't recall.**

***Q.*** Apologies.

Did he -- so I think right before the break this morning, you had mentioned you were very surprised to hear that the technologist involved in Abreezio was Dr. Arabi's sister. Is that right?

***A.*** **At that meeting I found out, yes.**

***Q.*** And what was your reaction to finding out?

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** What was your reaction?

***A.*** **First of all, I didn't know how to react. I was asking questions about, like, her background, things like that, right, how can she have an insight about a technology like this.**

***Q.*** Were you expecting when you went into that meeting that the principal technologist or chief technologist of Abreezio was Dr. Arabi's sister?

***A.*** **No.**

***MR. FRASER:*** Objection. Misstates the record.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** Why were you not expecting that?

***A.*** **How would you make that connection at all?**

***Q.*** Okay.

***A.*** **I mean, it's -- I guess it's possible, but not probable. So...**

***Q.*** Okay. Did you discuss with Dr. Arabi whether he got anything from the Abreezio deal?

***A.*** **No.**

***Q.*** Did he mention anything about kickbacks?

***A.*** **No.**

***Q.*** Did he mention anything about whether he should have

disclosed to the company that the tech came from his sister?

**A. Very vaguely. I can't -- I can't recall a hundred percent.**

*Q.* Do you remember asking him anything about getting his sister involved in Abreezio's technology?

***MR. FRASER:*** Objection. 602. He's testified he doesn't.

***THE COURT:*** Overruled.

***THE WITNESS:*** I didn't understand the question.

***BY MR. PILCHAK:***

*Q.* The question is: Do you remember discussing with Dr. Arabi at this Building K meeting whether you could get his sister involved in Abreezio's technology inside Qualcomm?

**A. Oh, yes. Yes.**

*Q.* And what did Dr. Arabi say when you mentioned that?

**A. What I recall was -- actually, the answer was no, and I don't remember the excuse. But I remember things along the lines that she had to change her name, she was having issues with her boyfriend or husband, some issues like that.**

**But what I found it odd was usually the technologists who are proud inventors and, you know, sell, you know, a piece of IP to companies like Qualcomm are happy to be involved and take it to fruition. So I was -- it was odd to me that -- it was odd to me that we never talked to her at all during the due diligence. We being Qualcomm. It was odd to me that she never wanted to be -- to be involved.**

**At that point I -- obviously it was a surprise to me as well that, you know, it was Karim's sister.**

*Q.* And at this point were you effectively asking to be put in touch with Dr. Arabi's sister?

***A.*** **I didn't ask to be in touch, but I wanted her involvement. I don't remember the exact conversation, but, you know, you have a piece of technology that you develop. You're supposedly proud about it, right? You want to make sure that it goes all the way to the end. Right?**

*Q.* Yep.

***A.*** **And with the way Qualcomm structures deals, usually inventors and directors and principals of a company come join Qualcomm and they get a bigger and bigger piece of equity with milestones. So this was very odd.**

**I mean, my whole 35 years of doing acquisitions and being involved, usually -- you know, not usually. This was the only case. Most of the time people want to join the acquiring company, and they don't join because, you know, the company asked them not to join. This was -- I found it completely bizarre.**

*Q.* In this conversation with Dr. Arabi, was he agreeable to connecting his sister with somebody at Qualcomm?

***A.*** **I don't believe so.**

*Q.* Why do you say that?

***A.*** **Well, the somebody would have been me.**

*Q.* And that didn't happen?

**A. No.**

*Q.* Did you discuss Abreezio's technology with Dr. Arabi at this meeting?

**A. Not necessarily. But obviously, he was -- he was either a part or he knew about the CPR technology. I forget the timelines. But he knew about the CPR technology. Some of his team members were -- this is the previous acquisition. Some of his team members were involved with my team members back then to mature the technology.**

**So he was very well familiar with that kind of a technology. But my whole concern was, you know, we need to talk to the inventors. Because we were talking about the other person, right, the DFT person. We were talking to him regularly.**

*Q.* And who was the DFT person?

**A. I believe his name was Brad Quinton.**

*Q.* Okay. Who was he?

**A. He was the one -- there were some, you know, mergers, acquisitions that happened with Abreezio. But he was the one with the testing technology. And he was based in Vancouver.**

*Q.* Okay. Did you also meet with Ziad around the same time?

**A. I met with Ziad, but I don't know what, like, the sequence of events were, like whether I met Ziad before or after.**

*Q.* Let me ask you this: Do you remember whether it seemed to you like Ziad had been alerted that you wanted to talk to him

about this?

***A.*** **Oh, yes. Ziad reached out. I think -- I'm just speculating here.**

***Q.*** Don't speculate.

***THE COURT:*** Don't speculate.

***THE WITNESS:*** Yeah.

***BY MR. PILCHAK:***

***Q.*** Would it refresh your memory about the sequence of events to look at your notes again?

***A.*** **Just let me answer this one first. I remember specifically that Ziad reached out.**

***Q.*** And do you remember when?

***A.*** **Multiple texts. But I don't remember if it was right after this meeting or if it happened much later.**

***MR. PILCHAK:*** Can we show the witness 1049. And just zoom in on the top half.

***BY MR. PILCHAK:***

***Q.*** Do you see the date of that first series of bullets there?

***A.*** **The email date?**

***Q.*** No, not the email date. Above the series of bullets, there's kind of a little header there with a date.

Do you see that?

Sorry. Here (*indicating*).

***A.*** **Yes, thank you.**

***MR. PILCHAK:*** And can we go down to the second page,

please. And then blow up the top half of this page, please. Thank you.

***BY MR. PILCHAK:***

***Q.*** I'm going to make a second circle so it gets messy.

But do you see the date here?

***A.*** **Yes.**

***Q.*** Does that refresh your memory on the sequence of events?

***A.*** **It was the next day.**

***Q.*** Does it refresh your memory?

***A.*** **Yeah. I know it happened right after, but I wasn't sure was it, like, 24 hours later or was it much longer.**

***MR. PILCHAK:*** Okay. And so we can take that down, please. And can you take the annotations off, please.

I just circled the date above the series of bullets for the record.

***BY MR. PILCHAK:***

***Q.*** Mr. Kechichian, what was the occasion for your conversation with Ziad? How did that happen?

***A.*** **He reached out. That's what I remember very, very specifically.**

***Q.*** Do you have an understanding of why he reached out?

***A.*** **He wanted to talk about this.**

***Q.*** About Abreezio?

***A.*** **Yes.**

***Q.*** What did he tell you about Abreezio?

**A. He was in full panic mode.**
Q. What do you mean "full panic"?
**A. He was just panicking.**
Q. Okay.
**A. He was obviously worried. I've seen Ziad in that mode before, so I'm like, okay, another episode is happening. That's part of his personality. But this was different. There was real concern.**
Q. So he seemed upset to you?
**A. He was very upset.**
Q. Did you ask Ziad how serious this was?
**A. Probably came up part of -- part of the conversation.**
Q. And what did he --
**A. Because things were unfolding very, very rapidly at this point. I mean, we're talking 24 hours. I think we're -- at least I was discovering things that I didn't expect. Ziad's involvement I knew, because he was the one, the investigator -- like I said, he was the one who did the due diligence. He was the one who recommended the technology to the executives at Qualcomm.**

***THE COURT:*** I'm going to stop you for a minute. Wait for the next question.

***BY MR. PILCHAK:***
Q. And so you were aware of Mr. Mansour's involvement in the technical evaluation of Abreezio?

***A.*** **That's correct.**

***Q.*** In this conversation with Mr. Mansour -- and I should have asked this sooner -- did you also have this meeting with Mr. Mansour in connection with ER?

***A.*** **No. I think this was triggered. I remember that he wanted to meet.**

***Q.*** So ER wasn't, like, sitting around for this or listening in?

***A.*** **No, no.**

***Q.*** Did Mr. Mansour mention a money trail at this meeting?

***A.*** **He did.**

***Q.*** What did he say about that?

***A.*** **He said you can check my bank accounts. And by "you" --**

***MR. FRASER:*** Objection. 802.

***THE COURT:*** Overruled.

***THE WITNESS:*** And by "you," he didn't mean me personally, although I would have loved to. But he meant that whoever was looking into this can check the money trail, that there was no funds transferred to his account.

***BY MR. PILCHAK:***

***Q.*** Did he mention Akbar Shokouhi?

***A.*** **I can't remember. Eventually, we figured out who was involved. But I don't remember the exact sequence of events.**

***MR. PILCHAK:*** Can we show the witness 1040, page 2, again.

Oh, sorry. I meant 1049. My bad. Thank you. Page 2.

And then zoom in on that group of bullets in the middle. Right there. Nope, sorry. The group of bullets in the middle. Thank you, Mr. Reyes.

***BY MR. PILCHAK:***

***Q.*** Do you see that on your screen there, sir?

***A.*** **Yep.**

***Q.*** If we go down to the sixth bullet, beginning "He claimed."

***A.*** **I see that.**

***Q.*** Let's take that down.

Does that refresh your memory about what he said about Akbar?

***A.*** **Yeah.**

***Q.*** What did Mr. Mansour say?

***A.*** **That Akbar was involved. I didn't know the -- I mean, obviously he mentioned -- he mentioned the amounts that Akbar invested.**

***Q.*** But did Ziad say that Ziad knew that Akbar had invested?

***A.*** **Early on -- at that point, I don't recall. Later on I discovered that he knew for sure.**

***MR. FRASER:*** Objection. 602. 802.

***THE COURT:*** Sustained on the last answer. The last answer will be stricken.

***BY MR. PILCHAK:***

***Q.*** Let me ask a different question, Mr. Kechichian.

Did the topic of Dr. Arabi's sister come up in this

conversation with Ziad?

***A.*** **I don't recall exactly. But it must have because for me it was -- it was just --**

***MR. FRASER:*** Objection. 602.

***THE COURT:*** Overruled.

***THE WITNESS:*** I was still on the shock of what I've heard from Karim.

***BY MR. PILCHAK:***

***Q.*** You were still on what?

***A.*** **Shocked.**

***Q.*** Oh.

***A.*** **So I'm assuming it came up. I mean, you've got to refer to my notes again.**

***Q.*** Do you have any memory of what Mr. Mansour said?

***A.*** **No.**

***Q.*** Okay. Let me ask you, did you meet with or speak with Ziad more than once about this Abreezio situation?

***A.*** **I remember one more time for sure.**

***Q.*** And in one of those two conversations, did you ask Mr. Mansour whether Dr. Arabi's sister had any papers or publications on the technology?

***A.*** **I don't recall specifically, but it was part of the questioning. I kept on asking anyone who would listen to me about this, so I assume I did.**

***Q.*** Why would you ask that question?

***A.*** **Because that establishes credibility and some reference point for us to build on -- build upon.**

***MR. FRASER:*** Objection. Rule 16(a)(1)(G) and 702.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** Did Mr. Mansour ever admit to you that Dr. Arabi's sister benefited from the Abreezio transaction?

***A.*** **I don't recall.**

***Q.*** At the time -- now I want to rewind the tape.

At the time that Abreezio was being reviewed in the Qualcomm diligence process, did you have any idea that Dr. Arabi's sister was involved in the company?

***A.*** **No, I didn't.**

***Q.*** Did you have any reason to believe that Dr. Arabi himself was involved in Abreezio?

***A.*** **No.**

***Q.*** What would you have done if you had known that?

***A.*** **During the first part, you mean, the due diligence part?**

***Q.*** Before the acquisition.

***A.*** **Before the acquisition, I would have asked Karim about it, just as simple as that. We were colleagues for a long time. And, you know --**

***MR. PILCHAK:*** One moment, please, your Honor.

***(Pause.)***

***MR. PILCHAK:*** No further questions. Thank you.

***THE COURT:*** Cross-exam?

***CROSS-EXAMINATION***

***BY MR. FRASER:***

***Q.*** Good afternoon, Mr. Kechichian.

***A.*** **Good afternoon.**

***Q.*** You testified on direct about the Abreezio acquisition eventually becoming your baby.

Do you recall that?

***A.*** **Yes.**

***Q.*** Because of Esin Terzioglu having left --

***A.*** **Correct.**

***Q.*** -- that was the reason?

But in -- the acquisition of Abreezio occurred at the end of October of 2015; correct?

***A.*** **That's what I saw in the documents. I don't recall exactly.**

***Q.*** Okay. And you have no reason to doubt those documents that you saw.

***A.*** **No, no reason to doubt.**

***Q.*** So the acquisition happened at the end of October 2015; correct?

***A.*** **Right.**

***Q.*** And in May 2017, Esin Terzioglu was still with Qualcomm, was he not?

***A.*** **I don't remember.**

**MS. ROBERTS:** I would like to show the witness Defense Exhibit 3276.

**BY MR. FRASER:**

***Q.*** This is an email from Hiten Somwal to you and Esin Terzioglu on April 18th, 2017.

Do you see that at the top?

***A.*** **Mm-hmm.**

**THE COURT:** That's a "yes"?

**THE WITNESS:** Yes. Sorry, your Honor.

**THE COURT:** No, that's okay.

**THE WITNESS:** Yes, I can see that.

**MR. FRASER:** Move to admit Exhibit 3276 into evidence.

**THE COURT:** Any objection?

**MR. PILCHAK:** Just the email?

**MR. FRASER:** At this point just this email, yes.

**MR. PILCHAK:** No objection.

**THE COURT:** 3276 may be admitted.

***(Exhibit 3276 admitted.)***

**BY MS. BERNSTEIN:**

***Q.*** April 18th, 2017, is, what, about 18 months after the acquisition of Abreezio?

***A.*** **That's right.**

***Q.*** Esin Terzioglu was still with Qualcomm at that time; correct?

***A.*** **If he has a Qualcomm email, the answer is yes.**

***Q.*** Thank you.

***MR. FRASER:*** And I would like to show the witness Defense Exhibit 2833. Just showing the witness only.

***BY MR. FRASER:***

***Q.*** This is a document that you testified to on direct.

It's dated July 6th, 2015; correct?

***THE COURT:*** It is in evidence.

***MR. FRASER:*** Yes. I understand. Thank you.

***THE COURT:*** Okay.

***BY MR. FRASER:***

***Q.*** This document -- this Defense Exhibit 2833 --

***A.*** **Yes.**

***Q.*** -- the date is July 6th, 2015; correct?

***A.*** **Yes.**

***Q.*** And it talks about it says -- this is from Esin Terzioglu.

Actually, let's show it to the jury.

It talks about at the top -- Esin Terzioglu is writing "Although the Abreezio analysis is unchanged, our internal solution has dramatically improved recently."

Do you see that?

***A.*** **Mm-hmm, yes.**

***MR. FRASER:*** Okay. And now I would like to show you Government Exhibit 600.

***BY MR. FRASER:***

***Q.*** This is a presentation from Qualcomm dated August 14th,

2015; correct?

**A. Looks like it.**

***THE COURT:*** And it is also in evidence.

***MR. FRASER:*** Yes, this is in evidence.

***BY MR. FRASER:***

***Q.*** And this document is titled "Windansea Acquisition." Correct?

**A. Yes.**

***Q.*** And this -- so this is from about a month and a half later than Defense Exhibit 2833. Correct?

**A. The one you showed just before?**

***Q.*** Yes.

**A. Where I read the date? Yes.**

***Q.*** Yes?

**A. Yes.**

***MR. FRASER:*** Okay. Let's go ahead to the next slide. Next slide. Next slide -- oh, excuse me. Back up one.

***BY MR. FRASER:***

***Q.*** This is a slide from the same presentation dated August 14th, 2015; correct?

**A. It -- vaguely, yes. I mean, I'm assuming it's part of the same deck.**

***Q.*** Yes.

And at the bottom it states "Potential value to QC 260 million to 360 million." Correct?

**A. Yes, it says that.**
Q. And this document is from about six weeks after Defense Exhibit 2833; correct?
**A. Yes.**
**MR. FRASER:** Okay. We can take that down. Thank you.
**BY MR. FRASER:**
Q. You testified also on direct about Saad Elhosni's involvement with the sensor evaluation in the due diligence process.
Do you recall that?
**A. I testified about the testing, not the sensor.**
Q. Okay. Saad Elhosni was part of the testing; correct?
**A. Correct.**
Q. Mike Campbell was also involved; correct?
**A. Correct.**
Q. And he's another VP at Qualcomm from that same time; correct?
**A. Senior VP, yes.**
Q. Senior VP Mike Campbell?
**A. Yes.**
Q. And you're aware that there was of course a written contract for the acquisition of Abreezio. Correct?
**A. Sorry, what was that?**
Q. When Qualcomm acquired Abreezio, it had a written contract for that transaction. Correct?

***A.*** **I'm assuming. There's a number of documents that go through. I don't remember specifically what kind of documents.**

***Q.*** Well, Qualcomm wouldn't acquire a company and pay over $100 million for it based on just an oral understanding; right?

***A.*** **Oh, yes. There were documents, but could be multiple documents.**

***Q.*** Well, there's a final document in a merger it's called a "Unit Purchase Agreement"; correct?

***A.*** **If you say so.**

***Q.*** You're not sure whether there's a final written agreement in an M&A transaction?

***A.*** **There is a final agreement, but I'm not sure what type of document because there are multiple documents.**

***Q.*** Okay.

***A.*** **I'm sure there's a document that executives signed.**

***Q.*** Thank you.

***MR. FRASER:*** Let's show the witness --

***THE WITNESS:*** You're welcome.

***MR. FRASER:*** -- Government Exhibit 864.

This is in evidence.

***BY MR. FRASER:***

***Q.*** Government Exhibit 864 is titled "Closing Documents Related to the Unit Purchase Agreement by and among Qualcomm Technologies Inc., Abreezio LLC, the members of Abreezio LLC," and so on. And it's dated October 30th, 2015. Correct?

**A. Yes. I can see that.**
Q. This is a Unit Purchase Agreement for the acquisition of Abreezio; correct?
**A. It says so on the page.**
Q. Okay. And in this transaction, particular key employees were identified to join Qualcomm from Abreezio; correct?
**A. I would assume so.**
Q. And those key employees included Brad Quinton; correct?
**A. That's right.**
Q. They included Trent McClements; correct?
**A. I remember those two names specifically, yes.**
Q. And Andrew Hughes?
**A. I don't recall.**
Q. Okay. This is a Schedule 1.1(a) from the Unit Purchase Agreement titled "Key Employees."
Do you see that?
**A. Yes.**
Q. And there's a list with four names there. Correct?
**A. Yes. I can see four names.**
Q. You testified already that Brad Quinton and Trent McClements were key employees. So was Andrew Hughes.
You see that; correct?
**A. Yeah, I can see four names there.**
Q. And the other is Michael Lee; correct?
**A. Yes.**

*Q.* Not Sheida?
**A. No.**
*Q.* We can take that down.
You testified about Mohamed Allam.
**A. Yes, I did.**
*Q.* Do you consider him an honest person?
**A. I've known his work as an engineer, and it's solid.**
*Q.* My question is do you consider him an honest person.
**A. Usually dealing with the work settings, I assume he is honest. I mean, there is no -- otherwise, we can't function in our organization.**
*Q.* Shifting gears, Mr. Kechichian.
You have described yourself as vindictive; true?
**A. In certain occasions, yes.**
*Q.* And you described yourself as vindictive in your assistance of Qualcomm's investigation because you were mad at Ziad Mansour; correct?
**A. Yes.**
*Q.* And you had an -- you've mentioned you had an uncomfortable meeting with ER at Qualcomm; correct?
**A. Yes, I did.**
*Q.* That was November 2nd, 2016?
**A. That aligns with my recollection.**
*Q.* That was a bad day at work for you. Correct?
**A. You can say that.**

***Q.*** You were questioned by Qualcomm about an anonymous concern that day?

***A.*** **That's right.**

***Q.*** For about two and a half hours?

***A.*** **It was long. So I don't recall. But it was long.**

***MR. FRASER:*** Your Honor, may I approach the witness?

***THE COURT:*** You may.

***MR. FRASER:*** I'm handing you what's been premarked as Defense Exhibit 2904.

***BY MR. FRASER:***

***Q.*** The first line, it says, "Conversation with Kevork Kechichian, 11/2/2016, 9:00 to 11:25 a.m. in Kevork's office."

Do you see that?

***A.*** **Yes.**

***Q.*** And at the bottom it says "Qualcomm Confidential."

Do you see that?

***A.*** **Yes.**

***Q.*** This is Qualcomm's record of its interview with you that day; correct?

***MR. PILCHAK:*** Objection. Foundation.

***THE COURT:*** Sustained.

***BY MR. FRASER:***

***Q.*** Does seeing this document refresh your recollection on your meeting lasting from 9:00 a.m. until about 11:25 a.m. on November 2nd, 2016?

**A. Yes. I can read that.**
*Q.* And the anonymous concern was that you were alleged to have been involved in several relationships with other Qualcomm employees; correct?
**A. That's correct.**
*Q.* The relationships with other Qualcomm employees were relationships that you were not supposed to have; correct?
**A. I can't characterize like that.**
*Q.* Well, you testified that you could lose your job because of that investigation, did you not?
**A. It wasn't the relationship. It was the context of which the relationship occurred.**
*Q.* Okay. So taking into account the context of which the relationship occurred, you weren't supposed to have the relationship, were you?
**A. No. It wasn't like that.**
*Q.* The allegation that was being investigated was true. You had had particular relationships that Qualcomm was investigating?
**A. That was true.**
*Q.* And you didn't want Qualcomm to know about those relationships?
**A. No, I didn't.**
*Q.* And responding to the allegation, initially you denied it?
**A. That's correct.**

*Q.* And you didn't just say I deny that allegation, did you?

***A.* I don't remember what I said, but I denied it.**

*Q.* You said a little bit more than I deny the allegation. You said part of this role is your reputation.

This is what you said speaking to Qualcomm's investigator, isn't it?

***A.* Could be. That was a long time ago.**

*Q.* Part of what you said was "Integrity is my bond"?

***A.* Yes.**

*Q.* Part of what you said to the investigator when you were denying the allegation was "That is all I have"?

***A.* Yeah. I mean, I don't recall the conversation. Maybe if you have a document I can read and remember.**

*Q.* Yes, yes. Please take a look at Defense Exhibit 2904.

***A.* Yes.**

*Q.* And in the fifth paragraph -- I'm not counting the heading as a paragraph. It says -- it begins with "Part of this role."

Do you see that?

***A.* Yeah, okay.**

*Q.* And does this refresh your recollection?

***A.* I mean, these are notes taken right after. Must have been what I said.**

*Q.* Okay. So you did, in fact, say part of this role is your reputation.

That's what you said when you began to deny the allegation;

right?
**A. That's correct.**
*Q.* You said "Integrity is my bond."
You said that as well, didn't you?
**A. Yes. I was very eloquent apparently.**
*Q.* You are well spoken.
You said "That is all I have"?
**A. Okay.**
*Q.* You did say that?
**A. That's what it says here. I don't know -- I don't remember the conversation.**
*Q.* Well, take a look and see if the document refreshes you.
**A. Okay. Yeah, it says here third sentence -- or second sentence.**
*Q.* Okay. You said "I can't understand why someone would say this about me."
You said that, too?
**A. Okay.**
*Q.* Yes?
**A. It says here I said it. I don't remember. Like what more do you want me to say?**
*Q.* You don't deny saying that?
**A. No, I don't deny saying it. But I don't remember saying it either. I have no doubt in questioning the validity of this document --**

***Q.*** Okay.
***A.*** **-- let me put it that way.**
***Q.*** And it's in there, and so far as you know, you did say it?
***A.*** **Yeah.**
***Q.*** In that interview, you were asked about your relationship with a woman named Janice?
***MR. PILCHAK:*** Objection. 403.
***THE COURT:*** Sustained.
***BY MR. FRASER:***
***Q.*** You were asked about your relationship with a woman that was your recruiter?
***A.*** **Yes.**
***Q.*** And you talked about your relationship with her?
***A.*** **Yes.**
***Q.*** You said there was no sexual relationship whatsoever?
***A.*** **That was part of the denial.**
***Q.*** And you denied it -- you didn't just deny it and move on. You expounded on the denial, didn't you?
***A.*** **I don't remember.**
***Q.*** Take a look at Defense Exhibit 2904 and the third, fourth, fifth, sixth, seventh, and eighth paragraphs of that document.
***A.*** **Yes. I can see that.**
***Q.*** You see that --
***A.*** **Yes, I can see that.**
***Q.*** You said quite a bit about the relationship with this

person, didn't you?

**A. Yep.**

*Q.* And you said "We don't get carried away."

That's one of the things you said?

**A. Yes. It seems like it.**

*Q.* You said it was strictly professional.

**A. You mean -- which part?**

*Q.* Your relationship with this woman who was your recruiter.

**A. The issue at hand was if I exerted any due -- or force -- that was the insinuation -- because of my position. And if I had forced her into a situation she does not want to be. That was the -- I mean, the context is not clear here. But that was the letter about the whole thing.**

*Q.* So your lies related to forcing her into a relationship with you?

**A. No. It was general denial.**

*Q.* A general denial with a lot of specific denials; correct?

**A. There was -- as you mentioned, there was like two and a half hours of interview. So I didn't know how --**

*Q.* A lot of it was you giving details.

**A. I don't recall, but here is the document.**

*Q.* And there's several paragraphs with details you provided about your relationship with that person; correct?

**A. Which part of the -- you're talking about the denial or you're talking about letter?**

*Q.* Yeah, take -- I'll refer you again to the third, fourth, fifth, sixth, seventh, and eighth paragraph on that page. And it's talking about the same person; correct?
***A.* Correct.**
*Q.* And that's you talking about your relationship with her; correct?
***A.* Correct.**
*Q.* And you claimed that it was a strictly professional relationship?
***A.* Yes.**
*Q.* You didn't say anything about forcing her to do anything there, did you?
***A.* No.**
*Q.* But you said that the relationship was strictly professional?
***A.* That's correct.**
*Q.* Okay. That's not the only woman that you talked about in that interview, is it?
***A.* That's correct.**
*Q.* There's another one. This person -- I'll refer to -- so let's call the first one J.A. so that it's convenient.
Is that okay with you?
***A.* Okay with me.**
*Q.* The first one is J.A. --
***A.* Mm-hmm.**

*Q.* -- and now the second one I'm going to call K.D. if that's okay with you.
***A.* It's okay.**
*Q.* Okay. With respect to K.D., you said you were really good friends?
***A.* That's correct.**
*Q.* You said but there's no interest for a sexual relationship?
***A.* It seems like it.**
*Q.* No advances. You said that?
***A.* If it says here. I don't remember the conversation, but yes.**
*Q.* You said you're just really good friends?
***A.* We still are to this day, by the way.**
*Q.* Okay. And then there was a third woman, I'll call the third woman E.L.
Is that okay?
***A.* That's okay.**
*Q.* E.L., you disclosed that you were in a relationship?
***A.* That's correct.**
*Q.* Okay. But you didn't initially disclose that you were in a relationship with J.A. or K.D.?
***A.* That's correct.**
*Q.* And it took you quite a while to come clean in this interview, didn't it?
***A.* I don't recall the exact timeline.**

*Q.* Okay. If you look at the fourth page, please look at the fourth page of Defense Exhibit 2904. Near the bottom, the heading admittance. Let me know when you're there.

***A.*** **Yes.**

*Q.* And you see a time there?

***A.*** **Yes.**

*Q.* Does that refresh your recollection of the --

***A.*** **No, I remember this part, except it's a bit overdramatic. But sure.**

*Q.* Okay. So you admitted it around 10:25 a.m.; correct?

***A.*** **I don't remember the time, but I remember admitting -- admitting it.**

*Q.* Okay. And it wasn't -- the interview was like two and a half hours long; correct?

***A.*** **That's what it says at the heading of page 1.**

*Q.* And you don't dispute that, do you?

***A.*** **No.**

*Q.* And it took you over an hour before you came clean; correct?

***A.*** **Correct.**

*Q.* Like an hour and a half; correct?

***A.*** **Yes. That's grade one math.**

*Q.* Okay. Around that time in the interview, it became a little bit emotional for you; correct?

***A.*** **It did.**

*Q.* And you used some colorful language when you became

emotional at that time?
**A. It could be.**
*Q.* You became upset?
**A. I assume so, yes.**
*Q.* You know that you became upset during that interview.
**A. Yeah, I was upset because there were not only my life involved, but there were three other people who were involved.**
*Q.* Okay. And you became angry?
**A. Could be. How can you tell a difference between upset and angry? I didn't break things.**
*Q.* Well, upset -- upset could be sad; correct?
**A. I don't know. I'm not a psychologist. I expect you have some degree in psychology?**
*Q.* Well, what you said was "Fucker, fucker," referring to Ziad.
You said that, didn't you?
**A. Do you have a recollection of which time I said that?**
*Q.* So you said it more than once?
**A. No. Do you have the time when I said it? Because there's context --**
*Q.* It's right above 10:25 a.m. in the document, if you want to look at page 4. And let me know if that refreshes you.
Do you see that?
**A. Which document? Sorry. Okay. There you go.**
*Q.* I only gave you one document.
**A. Never mind. I got it. What paragraph, I meant to ask?**

*Q.* It's above 10:25 a.m. It's --
***A.* Yeah, this sounds familiar.**
*Q.* Sounds familiar?
***A.* Yeah, yeah.**
*Q.* You used the F word referring to Mr. Mansour?
***A.* Yes.**
*Q.* And then you used it like repeatedly; correct?
***A.* Could be.**
*Q.* You called him a motherfucker, didn't you?
***A.* I don't remember. I typically don't use that one.**
*Q.* Well, take -- take a look at that same paragraph, the second line of it under Ziad.
You see the first word in that line?
***A.* I mean, it could be.**
*Q.* Does it say "motherfucker"?
***A.* Yeah, it says that.**
*Q.* Okay. And you slammed your fist down on the chair arms?
***A.* Could be.**
*Q.* And you said I'm sorry, I'm just very upset by all of this?
***A.* I was upset. I remember being upset.**
*Q.* Okay. After that, the investigator let you know that they would need to take an image of your computer.
Do you remember that?
***A.* Yes.**
*Q.* And he said that they would need to take image of your

phone?

**A. That's right.**

*Q.* That was quite a moment, wasn't it?

**A. I thought it was part of the course of the investigation.**

*Q.* And that part of the course of the investigation caused you to sweat?

**A. I don't know. When you're upset, you sweat.**

*Q.* It caused to you shake?

**A. Honestly, I think this is a bit of drama over here. But I don't know when shaking or sweating happened, but...**

*Q.* Okay. Well, right after he let you know that he was going to need to image your -- by the way, image means take a forensic download of your -- your devices; correct?

**A. Yes.**

*Q.* Okay. And once that came up, you -- you admitted that you did have relationships --

**A. That's correct.**

*Q.* -- with the two women whose relationships you had denied?

**A. That's correct.**

*Q.* One of the relationships happened before you were divorced; correct?

**A. That's correct.**

*Q.* And the other --

***MR. PILCHAK:*** Objection. 403.

***THE COURT:*** Sustained. Sustained. 403.

***MR. FRASER:*** Okay.

***BY MR. FRASER:***

***Q.*** Now, you testified -- you stated that --

You talked about who would have known about those relationships; correct?

***A.*** **That's correct.**

***Q.*** One person was Ziad; correct?

***A.*** **That's correct.**

***Q.*** But by this time in November of 2016, your ex-wife knew about the relationship with the one person, didn't she?

***A.*** **That's correct.**

***Q.*** Okay. So Ziad was not the only person who knew about these relationships?

***A.*** **My ex-wife. We're still separated. We're not divorced yet. She knew about it in 2011, not 2016.**

***Q.*** Okay. So as of -- as of late 2016, she knew about it?

***A.*** **Yes.**

***Q.*** And after that interview, November 2nd, 2016, you vindictively assisted Qualcomm in investigating Ziad Mansour?

***A.*** **There was an evaluation already going on. This triggered -- this accelerated it.**

***Q.*** You assisted, yes?

***A.*** **This accelerated it, yes.**

***Q.*** Out of a vindictive motive against Ziad Mansour?

***A.*** **That's correct.**

***Q.*** Okay. But you admitted that the test -- so in November 2016, that's -- well, it's a little bit over a year after the acquisition; correct?

***A.*** **That's correct.**

***Q.*** And you admitted around that same time that the test aspect of Abreezio was panning out well?

***A.*** **In context, that's a technology you can license for a few million a year, not pay 180 million for it.**

***Q.*** Excuse me. You acknowledged that the test aspect was panning out well in November 2016; yes or no?

***A.*** **Compared to the claims, yes.**

***Q.*** And going to the due diligence process, due diligence is the review by an acquirer of a target before buying; correct?

***A.*** **That's correct.**

***Q.*** And you had some insight into the due diligence process for the Abreezio deal; right?

***A.*** **I don't know what "some insight" means.**

***Q.*** Okay. You were advised about what Qualcomm's team was finding about Abreezio while due diligence was happening; correct?

***A.*** **On the periphery, yes.**

***Q.*** Okay. And I'd like to show you Defense Exhibit 2198.

And you see the -- at the top it's an email from Saad Elhosni to, among other people, you. And it's dated July 14th, 2015. Correct?

**A. Yes.**
*Q.* And below that, there's another email also from Saad Elhosni, also to you the prior day. Correct?
**A. Correct.**
***MR. FRASER:*** And I'll move this Defense Exhibit 2198 into evidence.
***THE COURT:*** Any objection?
***MR. PILCHAK:*** No, your Honor.
***THE COURT:*** 2198 may be admitted.
***(Exhibit 2198 admitted.)***
***BY MR. FRASER:***
*Q.* And Mr. Elhosni advised you --
***MR. FRASER:*** Let's do a call-out, please, for the third bullet solid point above "Key Assumptions."
***BY MR. FRASER:***
*Q.* This email was from Saad Elhosni about Abreezio's technology; correct?
**A. This was -- I believe it was about the testing technology.**
*Q.* Okay. And it -- he stated that it would be straightforward to integrate; correct?
**A. Yes.**
***MR. FRASER:*** Okay. We can get rid of the call-out, please. And if we zoom in on the -- basically the middle of the page as a call-out, please.
///

***BY MR. FRASER:***

***Q.*** And he estimated that it would provide Qualcomm with annual savings of about $87.3 million in production test costs; correct?

***A.*** **Yes. That was the forecast.**

***MR. FRASER:*** Okay. And we can take that down. Thank you.

***BY MR. FRASER:***

***Q.*** And you were advised as of the fall of 2015 -- so that's right before the acquisition -- fall of 2015 is when the acquisition happened; right?

***A.*** **Vaguely, I recall.**

***Q.*** October 30th, 2015?

***A.*** **Vaguely 2015. I recall the end of 2015, yes. I say "vaguely" because, if I may --**

***Q.*** I'll show you Government Exhibit 864.

Again, the UPA for the acquisition of Abreezio, do you see that?

***A.*** **Yes.**

***Q.*** Closing date, October 30th, 2015. Correct?

***A.*** **Yes. I can see that.**

***Q.*** Okay. And you were advised in late September that Qualcomm had beaten the technical diligence horse to death?

***A.*** **I don't know if I used those terms.**

***MR. FRASER:*** Okay. Let's show Defense Exhibit 2175.

***THE WITNESS:*** Okay.

***BY MR. FRASER:***

***Q.*** And directing your attention to the bottom of the document. You see an email from Hiten Somwal with the date September 22nd, 2015. Correct?

***A.*** **Yes.**

***Q.*** And you are a recipient of this email?

***A.*** **Yes.**

***MR. FRASER:*** I'll move Defense Exhibit 2175 into evidence.

***MR. PILCHAK:*** It's already in.

***THE COURT:*** I think it was in evidence.

***MR. FRASER:*** Okay. Thank you.

***BY MR. FRASER:***

***Q.*** Mr. Somwal states, "I think we can beaten this; i.e., technical diligence, horse to death in the last three to four months."

Do you see that?

***A.*** **Yes. The horse he's referring to is the testing part.**

***Q.*** Thank you.

And you received -- we already talked about how --

***MR. FRASER:*** You can take this down. Thank you.

***BY MR. FRASER:***

***Q.*** We talked about how you received the Windansea acquisition valuation deck that was dated August 14th, 2015 --

***MR. FRASER:*** Let's go ahead and put that up. It's Government Exhibit 600. And go ahead to Slide 5, please.

***BY MR. FRASER:***

***Q.*** -- identifying hundreds of millions of dollars of value to Qualcomm; correct?

Do you see total value to QC near the bottom there?

***A.*** **That's right. Yeah, I can see that.**

***Q.*** Thank you.

That was Qualcomm's assessment; correct?

***A.*** **That's correct.**

***Q.*** And all that was before the acquisition; correct?

***A.*** **That's correct.**

***Q.*** Now let's talk about the revised assessment as of March 2017. Let's show Defense Exhibit 3276.

This is -- 3276 here is an email, and we've talked about it, it was dated April 18th, 2017. It's from Hiten Somwal to you and other people.

Do you see that at the top?

***A.*** **Yes.**

***Q.*** And you received this email?

***A.*** **Yes.**

***MR. FRASER:*** I move to admit the attach -- and it had an --

***BY MR. FRASER:***

***Q.*** Do you see underneath the subject line it says --

**A. Yes, I can see that.**

***Q.*** Okay. It had an attachment; yes?

**A. Yes.**

***MR. FRASER:*** Okay. Can we delete the circling that I just did? Thanks.

Let's go ahead to the next page of this document to show the attachment.

***MR. PILCHAK:*** I don't think the attachment is in.

***THE COURT:*** The attachment is not in evidence. Only the email is in evidence.

***MR. FRASER:*** At this point, let's not show it to the jury then and let's show the next slide to the witness.

***BY MR. FRASER:***

***Q.*** This is a presentation with the same title as the attachment; correct?

**A. I'm assuming. I don't remember it. But...**

***Q.*** Okay. You received in spring of 2017 a preliminary results review of Abreezio; correct?

**A. Correct.**

***Q.*** Yes?

**A. I don't remember the date, but this is part of the usual process we do at Qualcomm.**

***MR. FRASER:*** Okay. And this is a -- let's just flip ahead a couple of sides so that he can take a look. Let's see the next slide, for example. Let him see that.

***BY MR. FRASER:***

***Q.*** This is an executive summary slide.

Do you see that?

***A.*** **Yes. I can see that.**

***Q.*** Let's see the next slide for him.

Capsule value, capture dashboard. Do you see that?

***A.*** **Okay.**

***Q.*** This is the kind of assessment that Qualcomm does; correct?

***A.*** **That's the usual process, yes.**

***Q.*** And this is what you received in spring of 2017; correct?

***A.*** **That's correct.**

***MR. FRASER:*** I move to admit 3276 including the attachment.

***MR. PILCHAK:*** Object based on the Court's pretrial ruling.

***MR. FRASER:*** Impeachment.

***THE COURT:*** I'll allow you to ask him questions about it. I will not -- at this point I don't believe it should be admitted into evidence.

***BY MR. FRASER:***

***Q.*** Let's go to the second slide of this PowerPoint.

And this is the executive summary of the presentation; correct?

***A.*** **Yes.**

***Q.*** And directing your attention to the last bullet point that

is not indented.

***A.*** **Yes.**

***Q.*** Okay.

***FEMALE SPEAKER:*** Sorry.

***MR. FRASER:*** No worries.

***BY MR. FRASER:***

***Q.*** The updated valuation of Abreezio in March 2017 was 254 million at the low end -- excuse me.

Just 254 million versus 312 million for the acquisition model with no terminal value included. Correct?

***A.*** **That's what it says.**

***Q.*** That was Qualcomm's assessment in March of 2017; yes?

***A.*** **That's what it says in the document.**

***Q.*** And you received this document?

***A.*** **I did.**

***Q.*** And so you don't deny that that was Qualcomm's valuation, what, 14 -- no -- you're good with the simple math. If it was October 30th, 2015, when the acquisition happened, now we're in middle of March 2017, about 16 months after the acquisition; correct?

***A.*** **That's correct.**

***Q.*** Okay.

***THE COURT:*** Would now be an okay time to break?

***MR. FRASER:*** Okay.

***THE COURT:*** Or --

***MR. FRASER:*** Yeah. It is a fine time for a break, your Honor.

***THE COURT:*** Okay. 15-minute recess, ladies and gentlemen. You're reminded you're not to discuss the case or do any research about the case.

And we'll see you back in 15 minutes.

And a 15-minute break for you, too, sir.

***THE WITNESS:*** Thank you, ma'am.

***(Jury out at 2:01 p.m.)***

***THE COURT:*** Okay. You're excused, too, sir. Thank you. We're now outside the presence of the jury. Any issues we need to take up?

He's locked out, Lindsey. Oh, that was the little door for the disabled.

Any issues we need to take up outside the presence of the jury?

***MR. PILCHAK:*** No, your Honor.

***MR. FRASER:*** I think that the exhibit should be admitted for impeachment.

***THE COURT:*** There's a lot of irrelevant stuff. You got in what you wanted, which is basically the value of it. I think the rest of it is irrelevant, and we kind of discussed in advance why. I think they opened the door to the fact that it was valuable, and you got a chance to impeach him on that.

***MR. FRASER:*** There is a little bit more -- more than

just valuation. I think that shows that it did work, which was kind of a doubt expressed.

***THE COURT:*** You can ask him that.

***MR. FRASER:*** Okay.

***MR. PILCHAK:*** Your Honor, just to be clear, if Mr. Fraser presses the point that the test product worked, I think on redirect I'm entitled to ask whether the sensor product worked if this witness knows.

***THE COURT:*** That's fine. Okay. We'll take a 15-minute recess.

***(Recess taken.)***

***THE COURT:*** Okay. We are back on the record. All jurors are present. Dr. Arabi and the attorneys are present.

And you, sir, are reminded you're still under oath to tell the truth.

Counsel?

***MR. FRASER:*** Thank you, your Honor.

***BY MR. FRASER:***

***Q.*** Returning to showing the witness Defense Exhibit 3276, page 3 of 9. Directing your attention to the second from last not indented bullet point.

There was a significant benefit that was achieved, but not yet quantified. That was an increase in test coverage, which was not possible with traditional approaches.

That's what was found as of March 2017; correct?

**A. That seems right, yeah.**

*Q.* Okay. And we talked about the valuation as of March 2017 becoming $254 million.

Do you recall that?

**A. That's correct.**

*Q.* And that valuation was lower because -- simply because of less volume of the chip production.

That's what this indicates, isn't it?

**A. No, that's not correct.**

*Q.* It states, "Valuation" -- directing your attention to the last bullet point.

"Valuation is lower as volume contribution from new chip starts is significantly lower in FY '17 and '18. FY" -- pause for a moment.

FY stands for fiscal year; correct?

**A. That's correct.**

*Q.* So the volume is lower in fiscal year 2017 and 2018.

That's the explanation of the reduced valuation as with pre-acquisition projection; correct?

**A. Yes and no.**

*Q.* Okay. Let's go ahead to Slide 6.

***MR. FRASER:*** Yeah, one more.

***BY MR. FRASER:***

*Q.* This is part of Abreezio's March 2017 analysis and specifically a financial summary.

Do you see that?
***A.*** **Yes. Yes, I can see that.**
***Q.*** And this -- this is where Qualcomm analyzed the impact of Abreezio's technology on something called EBIT; correct?
***A.*** **That seems like it, yes.**
***Q.*** EBIT stands for earnings before interest and taxes; correct?
***A.*** **That's correct.**
***Q.*** And people talk about multiples of EBIT; correct?
***A.*** **That's correct.**
***Q.*** In valuing companies?
***A.*** **That's correct.**
***Q.*** And even more commonly, people talk about multiples of another metric called EBITDA; correct?
***A.*** **That's correct.**
***Q.*** EBITDA is the same as EBIT except you're adding back depreciation and amortization; correct?
***A.*** **That's correct.**
***Q.*** So EBITDA is typically going to be a bigger number than EBIT, isn't it?
***A.*** **Typically, for proven companies and profitability, yes.**
***Q.*** Okay. So --
***A.*** **This is still PowerPoint --**
***Q.*** So depreciation refers to the useful life of assets of a business decreasing over time; correct?
***A.*** **It refers to actual physical assets, equipment, not IP.**

**This is IP.**

*Q.* Okay. There's --

***A.*** **So there's no dying here.**

*Q.* So if there's -- so then it wouldn't have an impact. If the depreciation is 0, and there's no amortization, then EBITDA will be equal to EBIT; correct?

***A.*** **I'm not an economist, but sure.**

*Q.* Well, this goes to valuation, and valuation is something you looked at; correct?

***A.*** **That's correct.**

*Q.* Okay. And Qualcomm is a publicly traded company; correct?

***A.*** **That's correct.**

*Q.* That means people can buy stock and sell stock in Qualcomm?

***A.*** **That's the definition, yes.**

*Q.* Yes. And people who decide whether to invest consider at a given time whether -- how stock is trading as a multiple of EBITDA; correct?

***MR. PILCHAK:*** Objection. Foundation, relevance and 403.

***THE COURT:*** Sustained.

***BY MR. FRASER:***

*Q.* Okay. You see -- this document has projections for EBIT in future years, does it not?

***A.*** **Yes.**

*Q.* Based on the data available in early 2017; correct?

***A.*** **Yes.**
***Q.*** On the left it shows the acquisition model as of two days before the acquisition; correct?
***A.*** **Where am I looking at?**
***Q.*** On the left under acquisition model.
***A.*** **On the left, yes.**
***Q.*** And then in the middle it says "Updated Model, Date: March 10, 2017."
Do you see that?
***A.*** **Yes.**
***Q.*** And the updated model projected --
***MR. PILCHAK:*** Objection. 403.
***THE COURT:*** Sustained.
***BY MR. FRASER:***
***Q.*** Okay. The projection showed hundreds of millions of dollars --
***MR. PILCHAK:*** Same objection.
***BY MR. FRASER:***
***Q.*** -- in increased EBIT for multiple future years based on Abreezio's technology; correct?
***THE COURT:*** I'll allow it.
***THE WITNESS:*** Assuming it worked.
***BY MR. FRASER:***
***Q.*** Well, there's assumptions, and then there are projections that are based on data; correct?

**A. The data here is assumptions. There's nothing on reality here, period.**

*Q.* This -- so Qualcomm had owned Abreezio for about 16 months when it prepared this document. Isn't that true?

**A. That's true.**

*Q.* And based on 16 months of observation of the performance of Abreezio, projected an increase in EBIT of over $100 million in three different years each. Isn't that true?

**A. The real issue is the question --**

*Q.* Is that true?

**A. Yeah, it's -- no.**

*Q.* Thank you.

**A. It's not true.**

*Q.* Okay. I'm directing your attention to the very middle of the page.

Under "Updated Model," there are four rows of numbers. Do you see that?

**A. Yes.**

*Q.* The last row is EBIT; correct?

**A. Yes.**

*Q.* Under 2019E, it says 114, doesn't it?

**A. Yes.**

*Q.* And if you look up, you can see that the Number 114 has particular units, doesn't it? And the units are hundreds of millions -- excuse me.

The units are millions of dollars. It says in dollar, capital M, and it means millions, doesn't it?

***A.*** **What am I looking at again?**

***Q.*** Right there. Thank you.

***A.*** **Oh, okay. Yes, in million, yes.**

***Q.*** Okay. So the 114 means $114 million, doesn't it?

***A.*** **Yes.**

***Q.*** And that's for 2019, for example?

***A.*** **For example, yes.**

***Q.*** And then for 2020, it's $145 million?

***A.*** **Yes.**

***Q.*** And so that means -- so when you consider the effect -- when you consider multiples at which Qualcomm trades as a stock, the impact could be ten times greater when it comes to the enterprise value of Qualcomm.

***MR. PILCHAK:*** Objection. Foundation and 403.

***THE COURT:*** Sustained.

***BY MR. FRASER:***

***Q.*** Okay. Stocks trade as multiples of EBIT or EBITDA; correct?

***MR. PILCHAK:*** Objection. Foundation.

***THE COURT:*** Sustained.

***BY MR. FRASER:***

***Q.*** The impact on the value from increases in EBIT can be orders of magnitude larger --

***MR. PILCHAK:*** Same objection.

***BY MR. FRASER:***

***Q.*** -- than just the increase in earnings. Isn't that true?

***THE COURT:*** Same ruling and also 403 at this point.

***MR. FRASER:*** Okay. No further questions at this time.

***THE COURT:*** Redirect?

***MR. PILCHAK:*** Thank you, your Honor.

***REDIRECT EXAMINATION***

***BY MR. PILCHAK:***

***Q.*** Mr. Kechichian, you were asked some questions about why you believed the information that ER approached you with might have come from Ziad Mansour.

Do you remember those questions on cross-examination?

***A.*** **Yes, I do.**

***Q.*** And one of the things that you were asked is whether other people besides Ziad knew at least some of that information; right?

***A.*** **That's right.**

***Q.*** And one of those people I think was your former wife who you're separated from?

***A.*** **That's correct.**

***Q.*** Does that individual have any relationship with Ziad or anyone close to Ziad?

***A.*** **Yes. The wives were friends.**

***Q.*** Ah. You were also asked questions about whether you felt

that you could describe yourself as vindictive in assisting ER with their investigation because you had some feelings about Ziad Mansour; right?
**A. The question was whether I was vindictive or not.**
Q. Right.
And would you describe yourself that way as to Mr. Mansour?
**A. It wasn't the person. It was the implications which touched my livelihood, my kids' lives, and so on and so on.**
Q. And you had some strong feelings about that?
**A. Absolutely.**
Q. Did you have any strong feelings about Dr. Arabi?
**A. At the -- no.**
Q. Right when Mr. Fraser left off with his questions, he was asking you a lot of questions about a slide presentation from March of 2017; right?
**A. Yes.**
Q. And you were shown a table that --
**A. Yes.**
Q. -- you didn't prepare?
**A. That's correct.**
Q. Did you focus on that at the time, meaning in March of 2017?
**A. One thing I remember from that conversation was, first of all, the volumes were lower. And if I may give a bit of context.**
Q. Why were the volumes lower?

**A. Because we don't take a new technology and apply it to the totality of all the volume at Qualcomm. Because at any point in time we have about 40 products in high volume production. So the reason the volume got lower was because the technology was not proven.**

**And the second most important thing, why the shift right in time happened, because back then the leadership couldn't make it work.**

Q. And when you say "a shift right in time," you mean a delay?

**A. A delay, yes.**

Q. And why was that delay?

**A. Because the technology -- and that was my predecessor trying to make the technology work. And because he couldn't make it work, I couldn't make it work, the timeline got shifted, the volumes got lesser and lesser.**

Q. Which technology specifically are you talking about?

**A. The sensor technology.**

Q. And I think you testified on direct that during the evaluation of Abreezio, Qualcomm thought the sensor technology was where the most value lay.

**A. I would -- from what I recall, that was probably, you know, 80 percent of the value of the company, even more.**

Q. And then when Qualcomm bought Abreezio, what happened with that technology?

**A. Didn't go anywhere.**

***Q.*** You were asked a number of questions about your interview with ER where they confronted you about those accusations. Right?
***A.*** **Yes.**
***Q.*** Did you come clean at the end of that interview and tell ER the truth?
***A.*** **Yes.**
***Q.*** Did you -- I guess a different question.
Did you instead at any point break off the interview and tell ER, if you have questions for me, send them to me in writing?
***A.*** **I don't recall.**
***Q.*** You don't remember doing that?
***A.*** **No, I don't. I mean, it was -- it was pretty, you know, putting it as a bad day at work was --**
***Q.*** An understatement?
***A.*** **Yeah, yeah.**
***Q.*** Nevertheless, you didn't walk out of the meeting; right?
***A.*** **Oh, no.**
***Q.*** And you didn't tell ER I can't talk to you anymore. Send me questions in writing?
***A.*** **Nope, absolutely not.**
***Q.*** If they wanted to meet again with you, would you have met with them?
***A.*** **Yes.**

***Q.*** You were concerned, though, when ER said that they would look at your phone and your computer; right?

***A.*** **Yes.**

***Q.*** Is that because you were worried about some of the information on those devices that they might find?

***A.*** **Well, there was lots of personal information on the phone, not the computer, that I thought it was not related to that particular issue and they would have access to it.**

***Q.*** And because you were worried about that, did you pick up the phone and call your administrative assistant and tell her to delete your computer?

***A.*** **No.**

***Q.*** Did you tell her to delete your phone?

***A.*** **No.**

***Q.*** Did you reach out to the other people who were involved in the facts that ER was asking about and ask them to delete their files?

***A.*** **No.**

***MR. PILCHAK:*** One moment, your Honor.

No further questions.

***THE COURT:*** Anything further?

***MR. FRASER:*** Yes, your Honor.

///

///

///

***RECROSS-EXAMINATION***

***BY MR. FRASER:***

***Q.*** Mr. Kechichian, you testified just now that the volume was lower because the tech from Abreezio was not proven.

Do you recall?

***A.*** **More or less, yes.**

***MR. FRASER:*** Okay. Let's take a look at Defense Exhibit 3276, which I renew my motion to admit into evidence as impeachment of that opinion.

***MR. PILCHAK:*** Same objection.

***THE COURT:*** Same ruling.

***BY MR. FRASER:***

***Q.*** Please take a look at the -- let's look at the executive summary. And let's do a call-out of the fourth major bullet point, including it's two subsidiary bullet points.

In the middle of the executive summary, it states that based on preliminary results in silicon, the saving's potentially in line with original assumptions.

That's what this states, doesn't it?

***A.*** **It states like that, yes.**

***Q.*** And this was Qualcomm's assessment 16 months after the acquisition, wasn't it?

***A.*** **These were the same authors who did the due diligence on the acquisition.**

***Q.*** And you talked about the sensors. TruSens, it says right

here, "Approximately 40 MV power savings in test ship in line with original expectations," doesn't it?

**A. It's still PowerPoint. No actual --**

***Q.*** Is that what it says?

**A. It doesn't say that. But I'm not the author of this document.**

***Q.*** Okay.

**A. But they were trying to save face.**

***THE COURT:*** Just wait for the question.

***THE WITNESS:*** Okay.

***BY MR. FRASER:***

***Q.*** It says in the first -- you see the major bullet point there that's called out; correct?

**A. Yes.**

***Q.*** And you see that there are two subsidiary bullet points under that; correct?

**A. Correct.**

***Q.*** They're indented?

**A. Yes.**

***Q.*** And the first one begins with the phrase "TruSens"; correct?

**A. That's correct.**

***Q.*** And the words immediately following -- first, there's a squiggly line which means approximately; correct?

**A. That's right.**

***Q.*** And it says "40 MV power savings in test chip frenzy,"

doesn't it?
**A. Yes.**
*Q.* And then it says "in line with original expectations," doesn't it?
**A. That's right.**
*Q.* And then the next subsidiary bullet point, it begins with the phrase "TruTest," doesn't it?
**A. That's right.**
*Q.* It says "DFT pattern count reduction in Napali V1 GPU."
It starts with that phrase; correct?
**A. That's right.**
*Q.* And then there are numbers --
**A. Yes.**
*Q.* -- correct?
And the numbers are approximately 61 percent versus 52 to 64 percent at acquisition time; correct?
**A. That's right.**
*Q.* And 61 percent is closer to the high end of that range, isn't it, then the low end? It's first grade math; right?
**A. That's right. You're talking about the DFT; right?**
*Q.* Yeah.
**A. Yes.**
*Q.* Closer to the high end of the range estimated at acquisition time; correct?
**A. That's right.**

***MR. FRASER:*** Thank you. No further questions.

***THE COURT:*** May this witness be excused?

***MR. PILCHAK:*** Just two or three more, your Honor.

***THE COURT:*** Okay. You're on re-redirect.

***MR. PILCHAK:*** I understand.

### *RE-REDIRECT EXAMINATION*

***BY MR. PILCHAK:***

***Q.*** That slide you were just looking at, Mr. Kechichian, the language you were being read said preliminary results; right?

***A.*** **That's correct.**

***Q.*** Was it referring to a test chip?

***A.*** **Yes.**

***Q.*** Is a test chip the same thing as actually commercializing the technology on millions of chips that Qualcomm manufactures?

***A.*** **Not really, no.**

***Q.*** And when you were asked about those numbers, you pointed out that it's the same authors who approved the technology in diligence; right?

***A.*** **That's right.**

***Q.*** Why did you say that?

***A.*** **Because this document was prepared by a combination of Ziad and Esin, who did the due diligence.**

***MR. PILCHAK:*** No further questions.

***THE COURT:*** May this witness be excused?

***RE-RECROSS-EXAMINATION***

***BY MR. FRASER:***

***Q.*** Let's go back to Defense Exhibit 3276. This is the email chain to which was attached the PowerPoint that I've asked you questions about; correct?

***A.*** **That's correct.**

***Q.*** And we've called out an email exchange.

And do you see that in front of you?

***A.*** **Yes, I can see that.**

***Q.*** And the lower of the two emails is an email from you, sir, isn't it?

***A.*** **That's right.**

***Q.*** And it's dated March 30th, 2017. Correct?

***A.*** **That's correct.**

***Q.*** And what you wrote was "Hiten, thanks for pulling together the messaging"; correct?

***A.*** **That's correct.**

***MR. FRASER:*** No further questions.

***THE COURT:*** May this witness be excused?

***MR. PILCHAK:*** Yes, your Honor. Thank you.

***THE COURT:*** Thank you, sir.

***THE WITNESS:*** Thank you.

***THE COURT:*** You may call your next witness.

***MS. CHOPRA:*** The United States calls Farsheed Mahmoudi.

***THE CLERK:*** Please raise your right hand.

***(Witness duly sworn.)***

***THE CLERK:*** Thank you. You may be seated. Please state and spell your first and last name for the record.

***THE WITNESS:*** Sure. My name is Farsheed Mahmoudi. First name is spelled F, as in Frank; A, as in apple; R, as in Roger; S, as in Sam; H, as in Henry; E, as in Edward; E, as in Edward; and D, as in David.

***THE COURT:*** Thank you.

***THE WITNESS:*** Last name is spelled M, as in Mark; A, as in apple; H, as in Henry; M, as in Mark; O; U, as in umbrella; D, as in David; I as in India.

***DIRECT EXAMINATION***

***BY MS. CHOPRA:***

***Q.*** Good afternoon, Mr. Mahmoudi.

***A.*** **Good afternoon.**

***Q.*** What do you do for a living?

***A.*** **I'm an electrical engineer.**

***Q.*** Where do you currently work?

***A.*** **A company called TSMC.**

***Q.*** Where is that located?

***A.*** **It is headquartered in Taiwan, but my office is in Austin, Texas.**

***Q.*** Do you live in Austin, Texas?

***A.*** **I do.**

*Q.* Can you tell us what you do at TSMC?
**A. Well, electrical engineering work. Specifically, circuit design.**
*Q.* What's your educational background after high school?
**A. I have a Ph.D. in electrical engineering.**
*Q.* From where?
**A. University of Toronto in Canada.**
*Q.* Do you also have a bachelor's in engineering?
**A. Yes, bachelor's and master's. Both of them are in electrical engineering.**
*Q.* And did you focus your studies on any specific type of electrical engineering?
**A. Well, it's been a very broad range. But I've done circuits for communications, both wire line and wireless communications, for power management, for SoC system on chip applications, sensor interfaces. So these are among some of the circuits that I've worked on.**
*Q.* At one point in your career did you work for Qualcomm?
**A. From 2012 to 2016.**
*Q.* You worked at Qualcomm then?
**A. Yes.**
*Q.* Okay. Did you have one position during that time at Qualcomm or more than one?
**A. Well, I got a promotion halfway through. So in that sense I had two.**

***Q.*** What were those two positions?

***A.*** **I was a staff engineer and then promoted to a senior staff engineer.**

***Q.*** Around the 2015 time frame, do you recall which position you were holding then?

***A.*** **I was a senior staff engineer.**

***Q.*** As a senior staff engineer, what were some of your responsibilities, generally speaking?

***A.*** **Again, circuit design, but I had a team of three people reporting to me at the time. So we were working on circuit design with that team as part of basically a broader team.**

***Q.*** In that 2015 time frame, who was your boss?

***A.*** **It was Mohamed Allam. My boss changed to Sam. I forget at what year it did, but I've had two bosses. One was Mohamed Allam. One was Sam. I forget his last name. His first name was Assam, but last name I forget. So one of these two guys.**

***Q.*** Do you know someone named Karim Arabi?

***A.*** **I do.**

***Q.*** When did you first meet him?

***A.*** **This goes back in Vancouver.**

***Q.*** Okay.

***A.*** **I was working for a company called PMC Sierra.**

***Q.*** When did you work there?

***A.*** **I worked there from 2005 through 2007 and then from 2009 through 2012.**

*Q.* Okay. What did you do there?
***A.* Same thing, circuit design and electrical engineer.**
*Q.* And did Dr. Arabi also work there?
***A.* Yes. He was working there. During the first time I was there, he was. The second time, I'm not sure which year he quit, but yes, the answer is yes.**
*Q.* Do you know which position he held there while you were also there?
***A.* I do not recall that, because we were on different teams, but yeah.**
*Q.* Okay. At some point did you end up overlapping at Qualcomm with Dr. Arabi?
***A.* That's correct, yes.**
*Q.* And when was that?
***A.* So when I joined Qualcomm in 2012, Mr. Arabi was there as well. And at some point he left the company. Again, I forget what month. But there was a period of overlap, correct.**
*Q.* Do you know what Dr. Arabi did at Qualcomm?
***A.* He was a VP of engineering at the time.**
*Q.* And at the time, what was he doing, if you know, around the 2015 time period?
***A.* Sorry. Could you repeat the question?**
*Q.* What was he doing around the 2015 time period?
***A.* 2015, I think at the time -- because he left Qualcomm and then he came back. I forget exactly the timing of it. So I**

**don't know if that would be 2015. But he actually joined a different department in Qualcomm, the research department.**

***Q.*** Okay. He joined the research department?

***A.*** **Yeah.**

***Q.*** And what does that department do?

***A.*** **That's research and development.**

***Q.*** What the name insinuates basically?

***A.*** **I think it was called Corporate R&D.**

***Q.*** How often would you interact with him, with Dr. Arabi, at Qualcomm?

***A.*** **So hard to say exactly how often. But I know that I would visit him every now and then to say hi in his office in Corporate R&D. But I want to say once every few months maybe.**

***Q.*** And what about while you were at PMC Sierra, did you two interact?

***A.*** **Well, Mr. Arabi was in a different department at the time. But the interaction was -- so we would go, say, skiing, not with him Mr. Arabi alone, with a group of people. I remember actually seeing Mr. Arabi there a couple of times, yes.**

***Q.*** Okay. Was your relationship with him mostly professional or also personal?

***A.*** **Well, again. On the professional side. So he was a different department. But personal -- well, we met a couple of times. Like I said we went skiing with a group of people from the company.**

*Q.* Okay.
***A.* And so that's the extent of the relationship.**
*Q.* Okay. Do you know if Dr. Arabi had any certain specialty in terms of engineering at Qualcomm?
***A.* Well, Dr. Arabi was a VP of engineering, again. So he was an electrical engineer. And so can you -- does that answer the question?**
*Q.* Do you know of any specific field within electrical engineering that was his focus?
***A.* So at the time this -- I forget what the group was called. But it was an SoC team working on SoC-related circuits.**
*Q.* Okay. While at Qualcomm, did you hear of a company named Abreezio?
***A.* Yes.**
*Q.* How did you hear of it?
***A.* Well, I was part of a team that was evaluating part of the offering of that -- of that company.**
*Q.* And do you recall when you heard about Abreezio?
***A.* Must have been around the 2015 time frame.**
*Q.* And I think you just said that you were part of the evaluation team. Is that right?
***A.* Yes.**
*Q.* How did you become involved in the evaluation of Abreezio?
***A.* Well, I was assigned that project, so I worked on it. And so that's how I got involved in that project.**

*Q.* Who assigned you to it?
***A.*** **I don't remember exactly who assigned me to it. But I'm sure it must have been through my chain of command, one of the persons in that chain of command.**
*Q.* Okay. Who was in your chain of command?
***A.*** **So my manager was Mohamed Allam, one level above at the time was Esin Terzioglu, and one level above was Ziad.**
*Q.* So someone in that chain --
***A.*** **Someone --**
*Q.* -- asked you?
***A.*** **-- yes.**
*Q.* Why were you asked?
***A.*** **Sorry?**
*Q.* Why were you asked?
***A.*** **Well, I mean, that's probably a question for the people that assigned me that. But in my team -- so one of the people in my team actually was working on a -- on a type of circuit which was called CPR. So the portion of that company that was being evaluated was relevant to that. So I'm assuming that's why it was assigned.**
*Q.* Okay. So was it your understanding that some part of Abreezio was relevant to the CPR technology?
***A.*** **Well, along the same line of thought, yes.**
*Q.* Okay. And can you explain at a very high level what the CPR technology was?

*A.* **I think it would stand for core power reduction. So it's a technology that tries to operate the processors on lower power.**

*Q.* And what's your understanding of the Abreezio technology?

*A.* **Well, the portion that I worked on, like I said, it's the same line of thought, so it's trying to basically reduce the power consumption of processors, the applications in general.**

*Q.* As far as you knew, were there two parts to the Abreezio technology, a test part and a sensor part?

*A.* **That is my understanding, yes.**

*Q.* Did you only work on the sensor part of it?

*A.* **I did.**

*Q.* Someone else did the test part?

*A.* **Correct.**

*Q.* Do you know who did the test part?

*A.* **I forget the name. It was a different person in the test department who did that.**

*Q.* And then so you mentioned CPR.

Was the Abreezio sensor part like a CPR 2.0? How would you characterize it?

*A.* **Not necessarily, no. Well, it's the same -- it's a circuit that's trying to reduce the power, a technology that tries to reduce the power consumption of an application. I'm not sure if I understand the question. If you're asking is it the same? No. But is it doing -- achieving the same purpose, yes.**

*Q.* Okay. Was it achieving the same purpose in a better way?

***A.*** **I believe so.**

***Q.*** All right. Do you recall approximately what time period in 2015 you were asked to do your evaluation?

***A.*** **I do not recall that. That was a while ago.**

***Q.*** Yeah, it was ten years ago. Okay.

In your evaluation, did you work with anybody else?

***A.*** **Yes, I did.**

***Q.*** Who?

***A.*** **Let me remember the name. So a couple of other people got involved to basically look at mainly the internal technology. Let me remember the names. I'm not good with names. I don't remember the names. But there were two gentlemen who actually were working on it, yeah.**

***Q.*** From within Qualcomm?

***A.*** **Yes.**

***Q.*** Were they your peers or subordinates to you?

***A.*** **Oh, no, peers.**

***Q.*** Peers, okay.

Do you recall how long your evaluation took?

***A.*** **It must have been months but I can't precisely tell you how many months or days.**

***Q.*** Okay. While you were doing the evaluation, did you interface at all with Abreezio principals?

***A.*** **There were a number of meetings, yes.**

***Q.*** Do you recall how many meetings? Maybe a ballpark estimate.

**A. I recall at least one -- two, two meetings.**
Q. Were they both in-person meetings?
**A. Yes.**
Q. Can you tell us who from Abreezio you met during these meetings?
**A. There were a couple of technical -- of the technical people there. So I guess last we talked I remember Brad was one of the gentlemen who showed up. There was another gentleman, but I forget the name. Like thin and tall, which I vividly remember because these guys were the ones answering the technical questions or getting engaged in the technical discussions. So these are the two -- these are more, but these are the two that I specifically remember.**
Q. By Brad, do you mean Brad Quinton?
**A. Yes.**
Q. Did you ever meet someone named Sanjiv Taneja?
**A. He was at least in one of the meetings, yes.**
Q. During these meetings that you recall, what did you discuss?
**A. I do not recall the details, but it was technical discussions trying to understand the technology.**
Q. Okay. At one point in the evaluation, did you travel to Vancouver?
**A. I never traveled to Vancouver for the evaluation, no.**
Q. Did you travel for another reason to meet Abreezio people?
**A. Well, I traveled -- used to travel to Vancouver often. And**

**I do not recall any meetings prior to that. But after, basically, the fact, I did travel to Vancouver and visit Abreezio's office in Vancouver, yes.**

*Q.* And by "after the fact," are you talking about after the acquisition?

***A.*** **Yes, yes.**

*Q.* Okay. At any point during the evaluation process that you were a part of, did you have an understanding of who invented the Abreezio technology?

***A.*** **Within that team?**

*Q.* Or just generally who invented it.

***A.*** **No, no. That discussion never came up.**

*Q.* Did you ever ask?

***A.*** **No.**

*Q.* Why wouldn't you ask?

***A.*** **Well, it was a technology offered by that company. So I assumed it's from them. So why would I ask?**

*Q.* You assumed it was someone within the company?

***A.*** **Yeah.**

*Q.* Okay. Did you ever talk to Dr. Arabi about Abreezio?

***A.*** **No.**

*Q.* Did you ever know whether Dr. Arabi was part of Abreezio before the acquisition?

***A.*** **No.**

*Q.* Do you know if Dr. Arabi's sister was involved in Abreezio?

***A.*** **I never knew there was a sister.**
***Q.*** Oh, okay. Have you heard the name Sheida Alan or Sheida Arabi?
***A.*** **After it was in the news, yes.**
***Q.*** But not before the acquisition?
***A.*** **No.**
***Q.*** So you said it took some amount of months for your evaluation.
Do you recall what the result of your technical evaluation was?
***A.*** **In terms of absolute and accurate numbers, no. But generally speaking, yes. So the technology was promising to basically achieve what it was supposed to do.**
***Q.*** Okay. I'd like to show you what's been marked as Exhibit 59. Mr. Mahmoudi, I realize this might be small.
Are you able to see this?
***A.*** **I can read it. It's a little bit out of focus, but I can read it.**
***Q.*** We can --
***A.*** **It's okay.**
***Q.*** Okay. And is there a second page. Can you scroll down so he can see the whole thing?
***A.*** **Please allow me, I'm a slow reader.**
***Q.*** Go ahead. I'm sorry.
***A.*** **Okay. Can you go back one page?**

**Okay.**

*Q.* Have you had a chance to review this?

***A.*** **Almost. So the bottom one is the older one? Please allow me to. Can you go back up again?**

**Okay.**

*Q.* So is that an email chain that you just reviewed at Exhibit 59?

***A.*** **It says 0059 at the top.**

*Q.* Yes. Is that an email chain?

***A.*** **It is.**

*Q.* Okay. Are you a participant in this email chain?

***A.*** **Yes, I am.**

*Q.* I see your email address must be Fmahmoudi@qualcomm?

***A.*** **Yes.**

*Q.* What's the -- and are these emails from June 25th to 26th of 2015?

***A.*** **They are, yes.**

*Q.* And do they concern the Abreezio evaluation?

***A.*** **Yes.**

***MS. CHOPRA:*** Move to admit Exhibit 59, your Honor.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** 106 objection.

***THE COURT:*** Overruled.

***(Exhibit 59 admitted.)***

///

***BY MS. CHOPRA:***

***Q.*** All right. If we can scroll to the bottom, it's in reverse chronological order.

At the bottom there, there's an email from you to what looks to be Ziad and Esin.

Do you see that?

***A.*** **Yes, I see it.**

***Q.*** And are you sending them a slide deck of a summary that you prepared?

***A.*** **Yes. That's what it looks like, yeah.**

***Q.*** Okay. At this point in your evaluation, do you recall what that side deck would have been about?

***A.*** **It must have been about the details of how those numbers were derived.**

***Q.*** Okay. The numbers that appear above at top?

***A.*** **Yes.**

***MS. CHOPRA:*** Okay. We can zoom out from there.

***THE WITNESS:*** Pardon me?

***MS. CHOPRA:*** Sorry.

***THE WITNESS:*** Oh.

***MS. CHOPRA:*** Okay. And if we can capture the next two emails above that, please. Thank you.

***BY MS. CHOPRA:***

***Q.*** Are these the numbers that you were talking about?

***A.*** **It must have been, yeah.**

*Q.* Okay. So here it looks like in response to your email -- and correct me if I'm wrong -- Esin says "Let's provide a range of 2 to 3 percent with no power savings and 10 to 18 percent power when no area."
Do you see that?
***A.*** **Yes, I see it.**
*Q.* What does that mean to you?
***A.*** **Well, the benefits achieved from that technology could be spent in different ways. So you can -- from a power performance and area perspective, you can use it to reduce power, reduce area, or improve performance. So this email seems to point to power and area.**
*Q.* Do you recall if your numbers were in line with what Esin was saying?
***A.*** **It must have been. I do not remember with the numbers inside that slide deck. But based on this, it must have been.**
*Q.* Okay. We can pull up Exhibit 893, please.
All right. Do you see the slide deck in front of you? This is just --
***A.*** **I do, yeah.**
*Q.* Does it have your name on it?
***A.*** **It does, yes.**
*Q.* And is it June 25th, 2015, the same date as the emails?
***A.*** **It is, yes.**
*Q.* And let's scroll -- there's six pages, I believe, to it?

***MS. CHOPRA:*** Can you scroll so Mr. Mahmoudi can see?

***THE WITNESS:*** If you want me to see those, it went too quickly.

***BY MS. CHOPRA:***

***Q.*** We can go back to any page would you like to review.

***A.*** **Well, let's see what --**

***THE COURT:*** The question is.

***THE WITNESS:*** -- you are asking, yeah.

***BY MS. CHOPRA:***

***Q.*** My first question is going to be: As you review this, did you prepare this slide deck.

***A.*** **My name is on it, it must have been, yeah. So I just -- yeah.**

***Q.*** Okay.

***A.*** **Probably.**

***MS. CHOPRA:*** Move to admit 893, your Honor.

***MS. BERNSTEIN:*** No objection.

***THE COURT:*** It may be admitted.

***(Exhibit 893 admitted.)***

***BY MS. CHOPRA:***

***Q.*** Okay. And I don't think we need to get into the nitty-gritty of what you wrote here. I just wanted to know whether some of the numbers that Esin was talking about in that email chain correspond with numbers that you have in this slide deck.

***A.*** **It should. But, again, it was too fast for me to confirm it.**

***Q.*** Is there a certain page we should go to?

***A.*** **If you want me to do it, we can go slower.**

***Q.*** Thank you.

***A.*** **Can you pause on this for a second?**

**Yes.**

***(Pause.)***

**Yeah. So these are voltage margin numbers. So to translate that to area, it's case sensitive depending on what technology you're considering to see how that voltage saving translates into area savings or even power savings.**

***MS. CHOPRA:*** Okay. If we can go back to Exhibit 59. And then back down to the second page. And then can you zoom in on the same two emails, please.

***BY MS. CHOPRA:***

***Q.*** All right. So above the email from Esin that we were just talking about, do you see that email from Ziad Mansour?

***A.*** **Yes, I see it.**

***Q.*** Okay. And does he propose to go with the higher numbers; in other words, the 3 percent and up to 18 percent?

***A.*** **Proposing to go -- can you go back down again?**

**Yes, that's what it appears.**

***Q.*** Okay. And then does he say "Proof is in the pudding"?

***A.*** **He does say that.**

*Q.* What did that mean to you?
**A. Well, the way I interpreted this, I always do, it's just based on the facts and the actual numbers. So when I saw that, I said that's within the range that we basically estimated. So that makes sense.**
*Q.* Okay.
***THE COURT:*** Would now be an okay time to break?
***MS. CHOPRA:*** Yes, your Honor.
***THE COURT:*** Okay. Let's break for the afternoon.
Ladies and gentlemen, if you could be back at 9:00 o'clock tomorrow morning. You're reminded you're not to discuss the case with anyone. You're not to do any research about the case, and we'll see you back tomorrow morning.
And you're excused until tomorrow morning at 9:00 o'clock. I'm going to order you back at 9:00 o'clock tomorrow.
***THE WITNESS:*** Tomorrow?
***THE COURT:*** Yes, thank you.
***THE WITNESS:*** I can go for the day?
***THE COURT:*** You can go for the day.
***THE WITNESS:*** Okay.
***(Jury out at 3:02 p.m.)***
***THE COURT:*** Okay. We're now outside the presence of the jury.
Any issues we need to take up?

**MS. CHOPRA:** No, your Honor.

**MS. BERNSTEIN:** No, your Honor.

**THE COURT:** I was going to raise we still do have the outstanding motion to quash the Nicholas Cole subpoena. I'm sort of -- I haven't looked recently to see if there had been any response but there wasn't when I last looked.

**MS. BERNSTEIN:** No need to look too hard for that, your Honor. If it's okay, we would file that over the weekend.

**THE COURT:** That's fine.

**MS. BERNSTEIN:** Thank you.

**THE COURT:** Okay. Thank you. We're in recess until 9:00 tomorrow.

***(Proceedings adjourned at 3:03 p.m.)***

***

*REPORTER'S CERTIFICATE*

I, Anne Roldan, certify that I am a duly qualified and acting Official Court Reporter for the United States District Court, that the foregoing is a true and accurate transcript of the proceedings as taken by me in the above-entitled matter on March 18, 2025; and that the format used complies with the rules and requirements of the United States Judicial Conference.

Date: March 18, 2025



*Anne Roldan, RMR, CRR, CSR 13095*