UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. KARIM ARABI, Defendant. | ) | Case No. 22-cr-1152-BAS<br>March 19, 2025<br>Jury Trial, Day 7 |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CYNTHIA A. BASHANT
CHIEF DISTRICT JUDGE

VOLUME 7, PAGES 1464 - 1756

APPEARANCES:

FOR PLAINTIFF: UNITED STATES ATTORNEY'S OFFICE
880 Front Street, Suite 6293
San Diego, California 92101
*By: NICHOLAS W. PILCHAK, AUSA*
*JANAKI G. CHOPRA, AUSA*
*ERIC R. OLAH, AUSA*

FOR DEFENDANT: BIENERT KATZMAN LITTRELL WILLIAMS, LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
*By: WHITNEY Z. BERNSTEIN, Esq.*
*REBECCA S. ROBERTS, Esq.*
*RYAN V. FRASER, Esq.*

REPORTED BY:

ANNE MARIE ROLDAN, RMR, CRR, CSR 13095
U.S. OFFICIAL COURT REPORTER
U.S. District Court Clerk's Office
333 West Broadway, Suite 420
San Diego, California 92101

Reported stenographically; transcribed with CAT software.

# I N D E X

***

## E X A M I N A T I O N S


| WITNESS | VOL. | PAGE | LINE |
|---|---|---|---|
| *FOR THE GOVERNMENT:* | | | |
| FARSHEED MAHMOUDI | | | |
| Direct by Ms. Chopra | 7 | 1472 | 4 |
| Cross by Ms. Bernstein | 7 | 1478 | 20 |
| Redirect by Ms. Chopra | 7 | 1505 | 22 |
| JOSEPH FANG | | | |
| Direct by Mr. Olah | 7 | 1509 | 17 |
| Cross by Ms. Bernstein | 7 | 1539 | 17 |
| Redirect by Mr. Olah | 7 | 1554 | 19 |
| SANJIV TANEJA | | | |
| Direct by Mr. Pilchak | 7 | 1555 | 25 |
| Direct by Mr. Rothstein | 7 | 1742 | 23 |
| Cross by Ms. Bernstein | 7 | 1745 | 21 |
| Redirect by Mr. Rothstein | 7 | 1751 | 22 |

# E X H I B I T S

| ADMITTED | VOL. | PAGE | LINE |
|---|---|---|---|
| Ex. 30 | 7 | 1657 | 3 |
| Ex. 33 | 7 | 1658 | 9 |
| Ex. 55 | 7 | 1473 | 9 |
| Ex. 58 | 7 | 1483 | 20 |
| Ex. 95 | 7 | 1609 | 9 |
| Ex. 226 | 7 | 1670 | 19 |
| Ex. 232 | 7 | 1683 | 20 |
| Ex. 233 | 7 | 1683 | 21 |
| Ex. 546 | 7 | 1725 | 7 |
| Ex. 547 | 7 | 1725 | 8 |
| Ex. 548 | 7 | 1725 | 8 |
| Ex. 625 | 7 | 1702 | 10 |
| Ex. 626 | 7 | 1702 | 11 |
| Ex. 631 | 7 | 1651 | 16 |
| Ex. 632 | 7 | 1651 | 16 |
| Ex. 633 | 7 | 1651 | 16 |
| Ex. 634 | 7 | 1651 | 16 |
| Ex. 635 | 7 | 1651 | 16 |
| Ex. 636 | 7 | 1614 | 1 |
| Ex. 637 | 7 | 1644 | 9 |
| Ex. 638 | 7 | 1644 | 10 |
| Ex. 639 | 7 | 1644 | 10 |
| Ex. 640 | 7 | 1644 | 10 |
| Ex. 641 | 7 | 1644 | 10 |
| Ex. 642 | 7 | 1644 | 10 |
| Ex. 643 | 7 | 1719 | 6 |
| Ex. 644 | 7 | 1719 | 7 |
| Ex. 647 | 7 | 1666 | 10 |
| Ex. 648 | 7 | 1666 | 11 |
| Ex. 649 | 7 | 1666 | 11 |
| Ex. 653 | 7 | 1618 | 8 |
| Ex. 654 | 7 | 1618 | 8 |
| Ex. 657 | 7 | 1699 | 19 |
| Ex. 672 | 7 | 1655 | 9 |
| Ex. 673 | 7 | 1655 | 10 |
| Ex. 674 | 7 | 1655 | 10 |
| Ex. 675 | 7 | 1655 | 10 |
| Ex. 676 | 7 | 1655 | 10 |
| Ex. 683 | 7 | 1706 | 21 |
| Ex. 684 | 7 | 1672 | 19 |
| Ex. 685 | 7 | 1672 | 20 |
| Ex. 689 | 7 | 1593 | 20 |
| Ex. 690 | 7 | 1593 | 20 |

# E X H I B I T S

| ADMITTED | VOL. | PAGE | LINE |
|---|---|---|---|
| Ex. 691 | 7 | 1593 | 20 |
| Ex. 693 | 7 | 1593 | 20 |
| Ex. 695 | 7 | 1716 | 24 |
| Ex. 698 | 7 | 1593 | 20 |
| Ex. 701 | 7 | 1593 | 20 |
| Ex. 702 | 7 | 1593 | 20 |
| Ex. 703 | 7 | 1593 | 20 |
| Ex. 704 | 7 | 1593 | 20 |
| Ex. 707 | 7 | 1593 | 20 |
| Ex. 708 | 7 | 1593 | 20 |
| Ex. 713 | 7 | 1581 | 10 |
| Ex. 714 | 7 | 1593 | 19 |
| Ex. 716 | 7 | 1593 | 20 |
| Ex. 717 | 7 | 1631 | 24 |
| Ex. 720 | 7 | 1593 | 20 |
| Ex. 721 | 7 | 1593 | 20 |
| Ex. 722 | 7 | 1593 | 20 |
| Ex. 723 | 7 | 1593 | 20 |
| Ex. 726 | 7 | 1593 | 20 |
| Ex. 727 | 7 | 1593 | 20 |
| Ex. 728 | 7 | 1593 | 20 |
| Ex. 729 | 7 | 1593 | 20 |
| Ex. 730 | 7 | 1593 | 20 |
| Ex. 731 | 7 | 1593 | 20 |
| Ex. 749 | 7 | 1603 | 24 |
| Ex. 750 | 7 | 1690 | 20 |
| Ex. 773 | 7 | 1637 | 7 |
| Ex. 846 | 7 | 1677 | 10 |
| Ex. 846A | 7 | 1677 | 11 |
| Ex. 851 | 7 | 1579 | 5 |
| Ex. 880 | 7 | 1593 | 20 |
| Ex. 2620 | 7 | 1502 | 2 |

***WEDNESDAY, MARCH 19, 2025, 9:00 A.M.***

***

***THE COURT:*** Okay. Good morning. We are back on the record outside the presence of the jury. Dr. Arabi is present and all lawyers are present.

Counsel?

***MR. PILCHAK:*** Good morning, Your Honor.

***THE COURT:*** Good morning.

***MR. PILCHAK:*** So the first thing that we wanted to mention to the Court is an apology for not mentioning this yesterday, but we intend to call witnesses Joseph Fang and Sanjiv Taneja, likely today, so we just wanted to flag that for the Court.

***THE COURT:*** Okay.

***MR. PILCHAK:*** The second thing is we have been engaged in meeting and conferring with the Defense, sending them the specific lists of exhibits that we intend to introduce through specific witnesses. Mr. Taneja's list was rather long, but we sent it to the Defense on Sunday, and we received some objections back yesterday evening after they digested our lengthy list. Some of those objections are authenticity objections based on comparing the documents that we have in civil discovery with other copies of those documents that I guess the Defense has received from parties to the civil litigation back in the day.

I'd like to address those, if the Defense wants to maintain that objection, outside the presence of the jury before we just stumble into it in front of the jury, because it may require some conference with the Court. I think it will be very brief, but I would prefer not to do it live, if the Court will indulge us.

***THE COURT:*** Do you want to give an offer of proof as to how you're going to establish authenticity of these documents?

***MR. PILCHAK:*** Yes. So there's only three documents so far that I'm aware of that the challenges raise to. All of them are communications with Sanjiv Taneja. It's my expectation that Mr. Taneja will say, These are real emails that I received. And I think that's sufficient.

***THE COURT:*** I think that's sufficient.

***MS. BERNSTEIN:*** So, Your Honor, the issue -- and I'm sorry, because we're having a bit of a mishap with some of the documents that we thought we had out here. But the issue is that the Government has three exhibits. I believe it's Exhibits six -- can you --

***MR. PILCHAK:*** It's 664, 670, and 672.

***MS. BERNSTEIN:*** And so as we are preparing our defense and as we are going through these exhibits, we are finding that not exactly the contents -- in one place, the content on Exhibit 672 -- but the time stamps are different.

I think that this is -- this is my best guess, but I

think it owes to the fact that, related to the civil litigation, these documents were produced natively, and we received them as PDFs. And so I don't know where that conversion occurred and I'm not casting aspersions on the Government. But I --

***THE COURT:*** Totally independent of where they came from, if Mr. Taneja looks at the exhibit and says, Yep, that's my email, yes, that's what I sent, yes, that's what I received, why is that not -- regardless of what the time stamps are, why is that not enough for authenticity?

***MS. BERNSTEIN:*** Because the time stamps are very significant, Your Honor. I mean, the chronology of when things are occurring, and the minutes that things are occurring, and what goes to someone first and what goes to someone second and third and forwards, that's very critical to this case. And there will be, I anticipate, quite a bit of testimony that's going to kind of narrow down to that issue.

And so for him to say, Yes, that's my document, I mean, if that's how the Court -- it seems like it is 1002 and a 1003 issue, where when the authenticity is called into question, the original needs to be produced. And we are calling into question the authenticity of these documents.

We've shared with the Government the versions that we have that show a disparity in the time stamps and that show a disparity in the content, for at least Exhibit 672.

***THE COURT:*** You're certainly welcome to show those

exhibits and those different time stamps to Mr. Taneja when you cross-examine him, and say, Isn't this correct, or is this correct, or ask him why the one that he says is his is not correct. But it seems to me that if he looks at it and says, This is the email I got, that's enough for authenticity.

***MS. BERNSTEIN:*** It imposes a pretty undue burden on us to now understand that there's an entire class of production that is potentially factually inaccurate. And so for us -- it just becomes a real issue, and so we would make an objection to the admission of those documents.

***THE COURT:*** Okay. Your objection is noted, but I think you'll have an opportunity to ask the witness about that. But I think if the witness says that's -- that's what I received and that's what it looked like, that's sufficient --

***MS. BERNSTEIN:*** Okay.

***THE COURT:*** -- for authenticity.

***MR. PILCHAK:*** Thank you, Your Honor.

***THE COURT:*** Okay. Are we ready to call the jury in?

***MR. PILCHAK:*** Yes.

***THE COURT:*** Okay.

***(Jury in at 9:02 a.m.)***

***THE COURT:*** Okay. Good morning, everyone. We are back on the record. All jurors are present. The lawyers and Dr. Arabi is present. And you, sir, are reminded you're still under oath to tell the truth.

***THE WITNESS:*** Correct.

***THE COURT:*** Have a seat.

Ms. Chopra?

***DIRECT EXAMINATION (CONT.)***

***BY MS. CHOPRA:***

***Q.*** Good morning, Mr. Mahmoudi.

***A.*** **Good morning.**

***Q.*** Yesterday, as we concluded, we were talking about your evaluation of the Abreezio technology.

Do you recall that?

***A.*** **I do, yeah.**

***Q.*** Okay.

***MS. CHOPRA:*** I'd like to pull up what's been marked as Exhibit 55.

***BY MS. CHOPRA:***

***Q.*** Mr. Mahmoudi, this is a single-page exhibit. If you could take a moment to review it to yourself.

***A.*** **Sure.**

***Q.*** Let me know when you've finished.

***A.*** **I've read it.**

***Q.*** Okay. Are you on this email chain that we're looking at right now?

***A.*** **Yes, I am.**

***Q.*** Okay. And is this from July of 2015?

**A. It is, yes.**

*Q.* Is this an email chain that you were on relating to the Abreezio evaluation?

**A. It is, correct.**

***MS. CHOPRA:*** Move to admit this document, Your Honor, 55.

***MS. BERNSTEIN:*** No objection.

***THE COURT:*** 55 may be admitted.

***(Exhibit 55 admitted.)***

***MS. CHOPRA:*** And can we first zoom in on the bottom email, please? Thank you, Alex.

***BY MS. CHOPRA:***

*Q.* Zooming in on this, is this an email that you sent to Esin?

**A. That is correct, yes.**

*Q.* Okay. I see in the subject line, "Windansea business case."

What was Windansea?

**A. I think that was the code name for the block that I was evaluating. I was part of the evaluation team.**

*Q.* For the Abreezio evaluation?

**A. Yes.**

*Q.* Okay. In this email, you mention someone named Pranjal.

Do you see that in there?

**A. I do, yes.**

*Q.* Who is Pranjal?

**A. Actually, this is one of the gentlemen that was doing the**

**evaluation of the promise of the internal technology.**

*Q.* Okay. Was he working alongside you?

***A.*** **He was working, yes.**

*Q.* Okay. And here -- and correct me if I'm wrong -- it looks like maybe you don't agree with Pranjal's proposal; is that right?

***A.*** **Yeah. That's what it seems like, yeah.**

*Q.* Do you recall why you didn't agree?

***A.*** **The details, I'm afraid not. But based on what I'm reading here, looks like the margin -- the voltage margin left -- the residue voltage margin after these techniques are applied, that's where the disagreement seems to be, how much that margin is.**

*Q.* Okay. And why is that margin important for you?

***A.*** **Again, back to power performance area, the higher voltage margin you have to accommodate, the worse the power would be.**

***MS. CHOPRA:*** Okay. And so if we zoom out of this one and go to the next email above -- the next two emails, please. Okay.

***BY MS. CHOPRA:***

*Q.* Okay. And then first, there's an email from Esin to you.

Do you see that?

***A.*** **Yes, I do.**

*Q.* It looks like Esin says he disagrees; is that right?

***A.*** **That is correct.**

***Q.*** Do you recall why Esin disagreed?
***A.*** **Looks like he had a talk after this. I do not recall that discussion. But he disagrees with that statement, obviously.**
***Q.*** Okay. And then above -- I'm reading from your email above that, and you say, "I do not believe the internal solution can perform as good as TruSens."
What do you mean there?
***A.*** **This must be regarding the voltage margin that you have to leave on the table after those techniques are applied.**
***Q.*** Okay. What's the internal solution you're referring to?
***A.*** **It is the CPR technology.**
***Q.*** Okay. So are you say anything in this that you don't believe that CPR performs as well as TruSens?
***A.*** **This one, if I recall correctly, was a -- the promise of the internal technology. So there was basically Pranjal, and another gentleman that I forget the name, they were working on evaluating the internal, basically, technology to see what the promise of that would be if certain improvements were done in that. So that's where the disagreement is in this one.**
***Q.*** Okay. Did you believe that TruSens was going to perform better than CPR?
***A.*** **Correct.**
***Q.*** That was the promise, anyway.
***A.*** **That was the promise, yes.**
***MS. CHOPRA:*** And we can zoom out from there. And then

can we zoom in on the topmost email, please? Thank you, Alex.

***BY MS. CHOPRA:***

***Q.*** Okay. And in this topmost email, are you telling Esin about -- well, are you talking about the conclusions, maybe changing between the two of you, about CPR and TruSens?

***A.*** **Yes, that's what it looks like. Like I said, I don't remember the details, but, yes, that's what the email seems to suggest.**

***Q.*** Okay. And so based on your evaluation, did you ultimately believe that the promise of TruSens was an improved solution to what CPR offered?

***A.*** **Yes.**

***MS. CHOPRA:*** We can take that down. Thank you.

***BY MS. CHOPRA:***

***Q.*** Switching gears just a little bit, can you remind us when you left Qualcomm?

***A.*** **Yes, 2016.**

***Q.*** Okay. Where did you go to work after you left Qualcomm?

***A.*** **I worked for a -- well, for a startup called Atlazo.**

***Q.*** Who founded that startup?

***A.*** **Dr. Arabi did.**

***Q.*** Why did you go work there?

***A.*** **Why did I go work there?**

***Q.*** Yeah.

***A.*** **So, well, I got out of Qualcomm for personal reasons. I**

**mean, if I have to elaborate on that, I will. And so I have -- I was dealing with some personal problems at the time. And joining a startup was actually the right solution for me at that point after I quit Qualcomm because of those personal problems.**

**And, yeah, so that's the short answer to your question.**

*Q.* Okay. Did you leave Qualcomm voluntarily or were you terminated?

***A.*** **Oh, voluntarily.**

*Q.* What did you do at Atlazo?

***A.*** **Circuit design, same thing as I was doing before.**

*Q.* Did you have a title there?

***A.*** **Yes.**

*Q.* What was it?

***A.*** **It was Chief Technology Architect.**

*Q.* Chief Technology Architect?

***A.*** **Yes.**

*Q.* What did that mean?

***A.*** **Well, I was the architect of the chips that we were designing for low power application, for very low power applications. So that's what basically defined the title.**

*Q.* Did you ever hear, going back to Abreezio, whether Abreezio had a Chief Architect?

***A.*** **No.**

*Q.* Do you have any idea of how Atlazo was funded as a startup?

***A.*** **I believe it was Angel funded. The seed funding, I think**

**came from -- my understanding, partially from Dr. Arabi and perhaps from other people. I don't know the details of who else it might have been from.**

***MS. BERNSTEIN:*** Objection. 602.

***THE COURT:*** Sustained.

***BY MS. CHOPRA:***

***Q.*** Is it your understanding that at least part of the money to fund Atlazo came from Dr. Arabi?

***MS. BERNSTEIN:*** Objection. 602.

***THE COURT:*** Overruled.

***THE WITNESS:*** That's my understanding, yes.

***BY MR. PILCHAK:***

***Q.*** Do you know, and only if you know, where Dr. Arabi received the money to fund Atlazo?

***A.*** **No.**

***MS. CHOPRA:*** No further questions, Your Honor.

***THE COURT:*** Cross-exam?

***MS. BERNSTEIN:*** Thank you, Your Honor.

***CROSS-EXAMINATION***

***BY MS. BERNSTEIN:***

***Q.*** Good morning, Mr. Mahmoudi.

***A.*** **Good morning.**

***Q.*** So yesterday and a little bit today, we talked about how you were assigned to evaluate Abreezio's TruSens technology.

**A. That is correct.**
Q. You were not working on CPR; correct?
**A. Well, one of the basically people reporting to me was working on CPR on my team.**
Q. But you were chosen because there was no risk of IP pollution; is that your understanding?
**A. Yes, must have been.**
Q. Can you explain briefly what IP pollution is?
**A. Well, my understanding of IP pollution is if you're working on a certain technology internally, and then a very similar technology comes in, you have to be careful so you actually keep these two separate so you don't unintentionally get polluted by the idea coming from a different party outside the company.**
Q. And ultimately, you saw a pretty solid demonstration of the TruSens technology in the FPGA demos?
**A. I think so. I vaguely remember that, but, yes.**
Q. And what do you remember the FPGA demos were?
**A. I really don't remember the details at this point.**
Q. Do you remember that that's where the folks from Abreezio came and actually showed the promise of the TruSens technology on a chip?
**A. Yes.**
Q. Okay. And did you ever feel any pressure to pad your numbers?
**A. No.**

***Q.*** And so by that, I mean, you evaluated the technology.
***A.*** **Correct.**
***Q.*** You saw demonstrations.
***A.*** **Correct.**
***Q.*** On-site and off-site, or just off-site?
***A.*** **Both.**
***Q.*** Okay. And then you would crunch the dye area and the reductions and the voltage and all the things you explained, and put out whatever the statistic you found to be; correct?
***A.*** **That is correct, yes.**
***Q.*** And you didn't inflate that number for any reason?
***A.*** **No. It's a range, because it's just the way estimates are, yes.**
***Q.*** And, in fact, you're just a very data-oriented person?
***A.*** **I am.**
***Q.*** And you're usually the more pessimistic person in terms of a promise of a new technology?
***A.*** **Realistic, as much as I can, considering all facts and all the data, yes.**
***Q.*** Would your colleagues characterize your realism as some pessimism?
***A.*** **Perhaps in some cases. The reason I'm hesitating to answer that, I mean, these things -- I'm realistic.**
***Q.*** You don't take an overly rosy view of numbers.
***A.*** **No, no. That's part of my definition of "realist."**

***Q.*** And in the past, when you've been asked to evaluate a potential acquisition, you've reported numbers that made the potential benefits so small that it wasn't even worth acquiring; correct?

***A.*** **Correct. That happened once, yes.**

***Q.*** And so here, in your analysis of Abreezio's TruSens technology, you used your expertise in the data to understand the tech and the promise of the tech?

***A.*** **That is correct.**

***Q.*** And the numbers are what the numbers are?

***A.*** **Correct.**

***MS. BERNSTEIN:*** I want to show you what's been marked as Exhibit 2175.

***BY MS. BERNSTEIN:***

***Q.*** Are you on this email, do you see at the top?

***A.*** **I am on this email, but I'm a slow reader.**

***Q.*** No problem.

***MS. BERNSTEIN:*** I'm not sure if this has been admitted.

***THE COURT:*** It has.

***MS. BERNSTEIN:*** Okay. Thank you.

***THE WITNESS:*** Okay.

***MS. BERNSTEIN:*** So can you zoom in on the bottom of that, the first email, please?

***BY MS. BERNSTEIN:***

***Q.*** And this is an email from Mr. Somwal.

Do you remember who he was relative to this deal?
***A.*** **He was involved. I don't recall exactly his role, but I remember that he was involved in it.**
***Q.*** Okay. And this is to you and some other people that were responsible for the technological analysis?
***A.*** **Yes.**
***Q.*** And he says, "I think we've beaten this, i.e., technical diligence, horse to death in the last three to four months."
***A.*** **Correct, that's what it says.**
***Q.*** And that's because you guys were doing an inordinate amount of evaluations of the technology during that timeframe?
***A.*** **That is correct.**
***Q.*** And so he's saying, "I just want to check to see if you wanted to conduct any additional diligence over the next few weeks."
***A.*** **Yes.**
***MS. BERNSTEIN:*** And can we go to the response, please?
***BY MS. BERNSTEIN:***
***Q.*** And you indicated that, as of September of 2015, you had no further questions at this level.
***A.*** **That is correct.**
***Q.*** And "at this level" meant related to the TruSens technology?
***A.*** **I believe so. That's what I was involved in, yes.**
***Q.*** You were not responsible for the DFT technology; correct?
***A.*** **No, I was not.**

***Q.*** And do you remember who was?

***A.*** **I forget the name of that gentleman, but --**

***MS. BERNSTEIN:*** Could I have the next email, please?

***BY MS. BERNSTEIN:***

***Q.*** Does this remind you that it was Mr. Elhosni?

***A.*** **Yes, but I think there was one more person perhaps on his team working on it as well. I don't remember the name.**

***Q.*** Okay. But similarly, it was reported that there were no further questions on the DFT front?

***A.*** **Yes.**

***Q.*** Okay. Also, there were a lot of checks in place.

You weren't the only person doing the TruSens technology evaluation; is that correct?

***A.*** **That's correct.**

***MS. BERNSTEIN:*** I want to show you Exhibit 58.

Move to admit if this is not admitted.

***THE COURT:*** Any objection?

***MS. CHOPRA:*** No objection, Your Honor.

***THE COURT:*** 58 may be admitted.

***(Exhibit 58 admitted.)***

***BY MS. BERNSTEIN:***

***Q.*** So I know there's a lot of font on this page, but my question is -- well, do you recall that this email is about an Abreezio trip report from what looks like June 23rd?

***A.*** **I do recall the trip, yes.**

***Q.*** And you see the lengthy number of people this email is being sent to?
***A.*** **The number of people, yes.**
***Q.*** Do you recall that all of those people were involved in some analysis of the Abreezio TruSens technology or DFT technology?
***A.*** **Please allow me to read it. It's large.**
***Q.*** Sure. We can make it bigger up at the top.
***A.*** **It's okay. I can read it.**
***Q.*** Okay.
***(Pause.)***
***THE WITNESS:*** I do not know or recall some of these people, but they are CC'd on this email, so...
***MS. BERNSTEIN:*** And the trip had been -- it looks like -- if we can zoom in on the trip report line with the QCT attendees. Thank you.
***BY MS. BERNSTEIN:***
***Q.*** Do you recall that those were all of the people that it looks like this trip occurred with to San Jose?
***A.*** **I recall some of them, but not some of the others.**
***Q.*** Do you have any reason to -- let me withdraw that.
This was June of 2015; correct?
***A.*** **That is correct, yes.**
***Q.*** That's a long time ago.
***A.*** **June 2015, yes.**
***Q.*** So have you -- you've lived a lot of life in the past

decade; is that correct?
**A. I have.**
*Q.* And so is it fair that your lack of memory perhaps of some of these attendees owes to that?
**A. I believe so, because I do not remember some of these people, at least three of them on it.**
*Q.* Do you have any reason to think that is this inaccurate in terms of who the attendees were?
**A. I would guess not, because if it was, somebody would have objected that, Hey, I wasn't there.**
*Q.* Sure.
And so if these are all of the people that went to the San Jose trip, this includes other individuals that were evaluating the technology?
**A. Like I said, some of them, I don't recall. But, yes, some of the other people are included. And -- oh, actually, wait. I think Hiten, but Hiten, I don't quite remember his role. He wasn't doing technical diligence. But, yeah, the other three people I just do not remember.**
*Q.* Well, you were reporting at that time to Mohamed Allam; is that correct?
**A. I think so. But like I said yesterday, I was also reporting to Sam after Mohamed. I don't remember when that transition happened. So it's either him or Sam.**
*Q.* And above them, above either Mohamed or Sam was Esin; is

that correct?
**A. Esin was above them, yeah.**
*Q.* And then Jim Thompson had actually picked Esin to participate in this evaluation?
**A. I'm not sure who picked him, but Jim Thompson was, I think, two layers above Esin.**
*Q.* And we looked at an email a couple moments ago with you and Esin talking about the numbers; right?
**A. Are you referring to the previous email? Yes.**
*Q.* Yeah. And Jim Willmore, who's on this, he was from -- him and some others are from the product test team.
Do you remember that?
**A. No. That's actually exactly one of the people that I don't recall.**
*Q.* Okay. But is it fair to say that there was more than just you evaluating Abreezio's TruSens technology?
**A. Yes.**
*Q.* Okay. And do you recall that Abreezio's TruSens technology was determined to provide Qualcomm a benefit and cost savings as compared to no CPR?
**A. Yes.**
*Q.* Well, let me back up.
What is CPR? Can you explain that briefly?
**A. It's a technology that helps reduce the energy, power consumption of application processers in general.**

***Q.*** And that was similar to the goal of TruSens; is that correct?
***A.*** **It was, yes, similar.**
***Q.*** And so the comparisons that were occurring was as between this outside technology and what the inside internal technology benefits could provide; correct?
***A.*** **That is correct.**
***Q.*** Okay. And do you recall that ultimately, the determination was that Qualcomm's Abreezio -- excuse me -- that Abreezio's technology would have provided Qualcomm a benefit and a cost savings as compared to no internal solution?
***A.*** **Correct.**
***Q.*** And as compared to regular CPR?
***A.*** **Yes.**
***Q.*** And then there was also a concept of improved CPR; right?
***A.*** **Correct.**
***Q.*** And what was improved CPR?
***A.*** **So that's what the two gentlemen, Pranjal being one of them, started evaluating, the promise of the internal technology to see what could be achieved if certain improvements were done to that technology.**
***Q.*** And what was improved-improved CPR?
***A.*** **I don't remember the details, but I know it was done in two steps. So assuming if certain improvement is done to the existing technology, you can get to a certain level. And then**

**if even more improvement is done, you can get to even better performance. So that was called improved-improved CPR.**

***Q.*** And those numbers were changing over time, the benefits of CPR or the range that CPR --

***A.*** **It's always a range in these estimates. And, yes.**

***Q.*** And the range is fluid?

***A.*** **It is, because it depends on a lot of assumptions, that I do not recall what they were. But generally speaking, in these type of works, you make certain assumptions, based on the facts and data, of course, and then you come up with an estimate.**

***MS. BERNSTEIN:*** Okay. I want to show you what's been marked as Exhibit 3277.

***BY MS. BERNSTEIN:***

***Q.*** Is this a PowerPoint by you from June 25th of 2015?

***A.*** **It is, yes.**

***MS. BERNSTEIN:*** Move to admit.

***THE COURT:*** Any objection?

***MS. CHOPRA:*** No, Your Honor. And I believe that we admitted this as 893. Whatever you want.

***MS. BERNSTEIN:*** We can --

***THE COURT:*** Let's not admit two exhibits that say the same thing. Let's see, 893, it was the slide deck attached to 59. Is that what you're -- that's the same thing?

***MS. BERNSTEIN:*** We can jump to 893. I mean, we'll see if there are differences that cause us to revert. Thank you.

***THE COURT:*** I actually don't have it admitted. Do you have 893 admitted?

***THE CLERK:*** Yes, Judge.

***THE COURT:*** Okay. Let's take a look at 893.

***BY MS. BERNSTEIN:***

***Q.*** And you let us know if you notice any differences, too, please, sir.

***A.*** **Looks like the one from yesterday, but let me see the rest.**

***MS. BERNSTEIN:*** So for purposes of going through this testimony, I'm going to show you 3277.

***THE COURT:*** Okay.

***MS. BERNSTEIN:*** And move to admit it, because I'm not sure that we have 893 cued up. Okay.

***BY MS. BERNSTEIN:***

***Q.*** So you understand that is this a PowerPoint you prepared in June of 2015?

***A.*** **I do.**

***MS. BERNSTEIN:*** I want to just jump to the last page, please.

***THE COURT:*** 3277 -- so you're moving to admit 3277 so that we have both 3277 and 893, and they're both the same, for the jury -- so the jury can understand when they get these exhibits back in the jury room.

***MS. BERNSTEIN:*** Yeah. Your Honor, I'm not entirely sure if they're both the same, but we can take a quick break or

we can just continue with the questioning, but we'd have to just show 3277.

***THE COURT:*** Any objection to 3277 coming into evidence?

***MS. CHOPRA:*** No objection.

***THE COURT:*** Okay. I will admit 3277, and at the next break, perhaps the two of you can look and we can inform the jury so they don't have to look at the two exhibits separately, whether they're --

***MS. BERNSTEIN:*** You know what, Your Honor? The Government will just pull up 893, please.

***THE COURT:*** Okay. Then we're not admitting 3277.

***MS. CHOPRA:*** Sorry about that.

***THE COURT:*** We'll pull up 893.

***BY MS. BERNSTEIN:***

***Q.*** Okay. Same PowerPoint?

**A. The first page looks the same, yeah.**

***Q.*** Okay. Thank you.

***MS. BERNSTEIN:*** Can we please go to the last page, Alex?

***BY MS. BERNSTEIN:***

***Q.*** And I'm sorry, the page we just looked at, is that -- there's the TruSens voltage margin area benefit analysis; right?

**A. Yes.**

***Q.*** Okay. And this is a summary of the technical analysis. We can go through each page if that would be helpful for you.

*A.* **I'm just reading the summary.**
*Q.* Okay.
*A.* **Okay.**
*Q.* So in June of 2015, the Abreezio TruSens technology was estimated to provide 2.5 to 3.2 area savings when compared to Improved CPR.
*A.* **Yes. That's what this says, yeah.**
*Q.* A comparison of the TruSens technology to Improved CPR -- well, Improved CPR is the improved internal version; correct?
*A.* **Correct.**
*Q.* And so a comparison of Abreezio's product to the improved version would show a smaller -- would theoretically show a smaller benefit.
*A.* **Correct.**
*Q.* Was Improved CPR actualized as of June of 2015?
*A.* **No, not that I know of.**
*Q.* So it was kind of a pie in the sky at that point?
*A.* **It was an estimate.**
*Q.* It was an estimate.
But the CPR technology that Qualcomm was deploying at that point in time was regular CPR, not Improved CPR?
*A.* **Correct.**
*Q.* Okay. And so the Abreezio TruSens technology, as compared to regular CPR, was estimated to provide an even greater area savings; correct? 4.3 to 5 percent?

**A. Yes. Based on this number, yes.**

*Q.* But the idea was that perhaps Qualcomm's internal technology would be continuously worked on and improve itself to the Improved CPR version, such that the Abreezio promise, as compared to the improved promise, that delta would shrink a little bit; correct?

**A. That is correct.**

*Q.* And so the 2.5 to 3.2 area savings estimate was a very conservative estimate of Abreezio's promise as compared to the internal product.

**A. It was a realistic estimate.**

*Q.* But Improved CPR wasn't being deployed at that point; right?

**A. The question is, it wasn't deployed at that point?**

*Q.* Was it or was it not?

**A. No, Improved CPR was not, no -- not deployed.**

*Q.* So this was an estimate based on a theoretical aspirational value of Improved CPR.

**A. Correct.**

***MS. BERNSTEIN:*** Thank you very much. I'm going to switch back over, and I want to pull up Exhibit 2833.

***BY MS. BERNSTEIN:***

*Q.* And do you see the second email -- second, and third, and bottom email are emails that you are on?

**A. Yes.**

***MS. BERNSTEIN:*** I think is this already in evidence, or

I would move to admit.

***MS. CHOPRA:*** No objection.

***THE COURT:*** 2833 may be admitted if it hasn't been already.

***MS. BERNSTEIN:*** Thank you.

***THE COURT:*** It has been.

***BY MS. BERNSTEIN:***

***Q.*** And so I think you said the CPR numbers were not fixed; right? They were fluid?

***A.*** **I'm sorry, can you repeat the question? I was reading this.**

***Q.*** Sure. And you can keep reading if you want.

***A.*** **I can only do one thing at a time. So I'll read this. Sorry. So allow me to read it.**

***Q.*** Of course. Please let me know when you're done.

***A.*** **Okay.**

***Q.*** So you had explained that the CPR numbers were fluid?

***A.*** **Sorry, do you want me to explain that?**

***Q.*** You had said that the CPR --

***A.*** **Yes.**

***Q.*** -- numbers were fluid.

And here, you also see that the internal solution had apparently dramatically improved recently.

***A.*** **This is the emails from Esin, yes.**

***Q.*** And the internal solutions dramatically improving, that's what was contemplated by Improved CPR?

**A. I think so, yes.**
Q. Okay. And also, do CPR benefits vary from block to block inside a chip?
**A. It does.**
Q. And from an older technology node targets to new technology node targets as process variations changed?
**A. That is correct. That's one of the reasons there is a range.**
Q. And so when this talks about how the internal solution had dramatically improved recently, as of July of 2015, was that going to have a bearing on the June of 2020 -- excuse me -- June of 2015 range you had provided?
**A. How do you mean? I don't understand the question.**
Q. So you had assumed that, as compared to Improved CPR, there was an estimated 2.5 to 3.2 area savings.
Do you remember that slide we just looked at?
**A. Yes.**
Q. And that was as of June 25th of 2015.
**A. Yes.**
Q. And so then there's apparently a dramatic recent improvement in the internal solution.
**A. So that's based on the promise, an estimate of the Improved CPR.**
Q. And so would that have an impact on this range, the 2.5 to 3.2 percent?

***A.*** **That was with Improved CPR?**

***Q.*** Correct.

***A.*** **No, it shouldn't.**

***Q.*** Okay. Thank you.

I want to ask you, is it common for Qualcomm to implement the ability to disable and enable a technology like CPR, so to run a chip with or without CPR in their devices for test and safety options?

***A.*** **Do you mean in customers' hands or internally?**

***Q.*** In customers' hands.

***A.*** **I don't have that information. But, yes, there are features that could be enabled and disabled per customers' choice or needs.**

***MS. BERNSTEIN:*** I want to show you Exhibit 3269, please. I know the font is really small.

***BY MS. BERNSTEIN:***

***Q.*** And does that indicate that a Qualcomm customer with access to a Qualcomm chip could turn on or off or enable and disable CPR to measure power savings benefits with or without CPR?

***MS. CHOPRA:*** Objection. Foundation.

***THE COURT:*** If you know.

***THE WITNESS:*** Well, of course. I mean, based on the highlighted line, it seems to suggest that this feature can be enabled or disabled. Like I said, I don't have that information. I cannot say with certitude if certain customers

enable or disable it. I just don't have that information.

***BY MS. BERNSTEIN:***

***Q.*** And this is a -- that's a Google Git from 2013?

***THE COURT:*** If you know. Do you know what this is?

***THE WITNESS:*** No. This is very -- it's a lot of text, so I have to --

***MS. BERNSTEIN:*** Sure. We can zoom in on the top there.

***THE WITNESS:*** Google Git, okay.

***THE COURT:*** Are you asking whether it says Google Git at top? I can take judicial notice that the document you've got says Google Git.

***BY MS. BERNSTEIN:***

***Q.*** I'm asking if you're familiar that this was publicly available information. This is published --

***A.* I was unaware that this -- I mean, based on this, seems to be publicly available. But, no, I was unaware.**

***MS. BERNSTEIN:*** We'll move to admit this so the jury can see what we're talking about.

***MS. CHOPRA:*** Objection. Foundation and relevance.

***THE COURT:*** Sustained.

***MS. BERNSTEIN:*** Under judicial notice, would the Court admit this so the jury can see it?

***THE COURT:*** No. The only judicial notice was that that's what it says on it. I don't know what it is or where it came from, and this witness doesn't seem to know.

***BY MS. BERNSTEIN:***

***Q.*** You would agree that it's publicly available, as of at least 2013, that someone can enable and disable CPR to measure power savings, a customer with a Qualcomm chip?

***A.*** **I do, based on this.**

***Q.*** Thank you.

I want to talk about Atlazo for a moment. Atlazo had a lot of promise.

***A.*** **It did.**

***Q.*** And what was the company going to do?

***A.*** **Well, it was a platform to enable energy-efficient operation for wearable and portable, very low-power devices.**

***Q.*** There was the ultra efficient PMIC portion?

***A.*** **That was part of the technology, yes.**

***Q.*** And low-power edge AI.

***A.*** **Correct.**

***Q.*** And AI is artificial intelligence?

***A.*** **That is correct.**

***Q.*** And you left Qualcomm to join Atlazo.

***A.*** **No. I left Qualcomm for personal reasons, and when I was ready to go back to work, I joined Atlazo.**

***Q.*** Okay. And the Atlazo -- at the time -- you worked there for six years; correct?

***A.*** **I think so. Almost six years, yeah.**

***Q.*** And Atlazo was the world leader in targeting the market for

small wearable chips with ultra low-power edge AI?

**A. At the time, it was.**

*Q.* Before the Government's actions in this case, did Atlazo have ongoing relationships with Dexcom, Medtronics, Boston Scientific, Google, Microsoft, Fossil, Cirrus Logic, ADI, and many other customers and partners?

**A. Perhaps even the list is probably longer. I don't recall all, but yes.**

*Q.* Qualcomm was aware of Atlazo?

**A. I assume so.**

*Q.* Qualcomm takes an interest when former employees start companies that compete in the space that they're in?

**A. Perhaps.**

*Q.* You don't have firsthand experience of that?

**A. I didn't feel any particular thing that would indicate there is a special interest from Qualcomm in Atlazo. Maybe there was; maybe there wasn't. I just don't know.**

*Q.* Well, Atlazo had joined EvoNexus Incubator in San Diego in late 2016.

**A. Correct.**

*Q.* And Qualcomm had a very close relationship with EvoNexus.

**A. That is correct.**

*Q.* And you left a very lucrative job at Qualcomm at the time.

**A. That is correct.**

*Q.* And when you joined Atlazo to help build it out, you took a

huge pay cut.
**A. I did.**
***Q.*** And that was, in part, because you thought it was an amazing concept with a lot of promise and potential?
**A. Yes, because it was.**
***Q.*** And you understood that even after Qualcomm's lawsuit in 2017, at one point, Atlazo had a customer interested for, I think you said, $60 million?
**A. That's the number that I recall. I didn't see that offer myself, but I heard that was the number, yes.**
***Q.*** And after the Government's suit -- the Government's prosecution here, did offers of that magnitude disappear?
***MS. CHOPRA:*** Objection. 403.
***THE COURT:*** Overruled.
***THE WITNESS:*** It did.
***BY MS. BERNSTEIN:***
***Q.*** No one wanted to risk Qualcomm sending the Federal Government after them?
**A. Perhaps that was the reason. But the fact is, it did.**
***Q.*** And you've said that this was one of the very few times in your life that you've cried.
**A. It was.**
***Q.*** And the prosecution here affected Dr. Arabi, of course; correct?
**A. Obviously, yeah.**

***Q.*** But it also affected 18 other members of our community and employees that had sacrificed their mental and physical health for the company?

***MS. CHOPRA:*** Objection. 403.

***THE COURT:*** Sustained. Wait, you don't have to answer.

***BY MS. BERNSTEIN:***

***Q.*** Did the prosecution's impact on Atlazo negatively affect you?

***A.*** **It did.**

***Q.*** And your coworkers?

***A.*** **I assume so.**

***Q.*** And did you -- how many coworkers did you have at the time?

***A.*** **I think there were 19 full time, 18.**

***Q.*** And you've told the Government all of this?

***A.*** **I brought up that it was heartbreaking that when this happened, six years of blood and sweat and hard work went down the drain. Yes, I shared that.**

***MS. BERNSTEIN:*** One moment, please.

***(Pause.)***

***MS. BERNSTEIN:*** I want to show you what's been marked as Exhibit 2620. The font is going to be quite small, so we will zoom in at the top, please, so can you see what this is.

Can we make that bigger?

***BY MS. BERNSTEIN:***

***Q.*** Are you able to read that?

**A. Yes.**
*Q.* I can hand you a hard copy if that would be easier.
**A. It's okay. I can read it. Thank you. Okay.**
*Q.* Is this an email from you, May 13th of 2015?
**A. It is.**
*Q.* And it's from you to Esin and Ziad?
**A. It is.**
*Q.* About the Abreezio TruSens evaluation?
**A. Yes.**
*Q.* With a corresponding PowerPoint?
**A. Yes.**

***MS. BERNSTEIN:*** Move to admit.

***THE COURT:*** I don't have a problem with admitting it, but it's like an eye test. I mean, you can show the jury. It's so small that no one's going to be able to read it even when you blow it up.

***MS. BERNSTEIN:*** Yes. Thank you, Your Honor.

***THE COURT:*** I feel like it's one of those bad eye tests where I think my glasses aren't working correctly. So we can show the jury, but I'm not sure it's very helpful.

***MS. BERNSTEIN:*** Well, we'll be jumping to a PowerPoint, which is in legible font.

***MS. CHOPRA:*** Your Honor, no objection.

***THE COURT:*** Okay. 2620 may be admitted. Maybe we can give a magnifying glass to the jury when they're back in

deliberations.

***(Exhibit 2620 admitted.)***

***BY MS. BERNSTEIN:***

***Q.*** There's a PowerPoint that accompanied your email?

**A. That's what the email says, yes, but I don't see the PowerPoint.**

***MS. BERNSTEIN:*** We'll show the first page of the PowerPoint, please.

***THE COURT:*** Any objection to this being admitted, the PowerPoint?

***MS. CHOPRA:*** No, Your Honor.

***THE COURT:*** Okay. And what is -- is it still part of 2620?

***MS. BERNSTEIN:*** Yes, Your Honor. Ours is a 15-page document.

***THE COURT:*** Okay. 2620 may be admitted, and the jury can see this.

***MS. BERNSTEIN:*** Thank you.

***BY MS. BERNSTEIN:***

***Q.*** Does this remind you that is this a PowerPoint that you put together to respond to some comments that Esin had had?

**A. Yes, that's what the title says.**

***MS. BERNSTEIN:*** Can we please jump to AI 36?

***BY MS. BERNSTEIN:***

***Q.*** And in the context of this PowerPoint, does "AI" mean action

item?

**A. It does.**

*Q.* This is AI 36. Why don't you take a moment and let me know once you've read this, please.

***(Pause.)***

***THE WITNESS:*** Okay.

***BY MS. BERNSTEIN:***

*Q.* And so the action item that you had been asked to -- the comment from Esin that you had been asked to address was whether there was any IP conflict with Razor?

**A. Yes.**

*Q.* And here, you're responding to that.

***MS. BERNSTEIN:*** And can we zoom in on the green box, please?

***BY MS. BERNSTEIN:***

*Q.* In the final line of this, you say that, "when the time comes, due diligence on all patents filed by Abreezio should obviously be done."

**A. That's what this says, yes.**

*Q.* And so was it your understanding that as of May 2015, there had not yet been any due diligence on Abreezio's patents?

**A. I don't recall, but that's what this seems to suggest.**

*Q.* And Qualcomm has a team that analyzes patents; correct?

**A. I think so.**

*Q.* And it was obvious to you that that would be done.

***A.*** **It should be, yes.**

***Q.*** Thank you.

Did you file patents while you were working at Qualcomm?

***A.*** **Sorry, are you asking if I filed any patents?**

***Q.*** Yes.

***A.*** **I did, yes.**

***Q.*** And who drafted those?

***A.*** **We just provide the idea. A team of attorneys draft that, and we review it, and they file it.**

***Q.*** Would they also draw the figures that went with your ideas?

***A.*** **They helped with making them suitable for the patent application, yes.**

***Q.*** Did they become inventors on the patent by virtue of doing that?

***A.*** **Oh, no, no.**

***Q.*** Did you also file patents while working at Atlazo?

***A.*** **Yes.**

***Q.*** And who drafted those and created those figures?

***A.*** **So, same thing. I mean, we hired, basically, an attorney to help us draft the patent and clean up the figures and file them.**

***Q.*** And those folks, of course, didn't become inventors?

***A.*** **No.**

***Q.*** And at the end of the day, do you recall that the model that the Abreezio due diligence came to in the fall of 2015 that preceded the purchase was a 2 to 3 percent area reduction

benefit for TruSens?

**A. Based on actually the recent sharings, yes, that was the number. But I don't remember the numbers from back then. It was a while ago.**

*Q.* Do you remember that that number was picked by Esin?

**A. That number was from -- within the range of the analysis that was done. I do not recall who picked it.**

*Q.* Was it you?

**A. But what I provided was a range, because that's what the analysis shows. But what was eventually used to move forward, I'm not sure who picked the number and what happened after that. I don't know.**

*Q.* And again, the 2 to 3 percent was a pessimistic view as compared to the promise of the internal technology for TruSens?

**A. It's a realistic view. We're going to stick to realistic.**

*Q.* It was not optimistic.

**A. No, no. It was realistic.**

***MS. BERNSTEIN:*** Thank you.

No further questions.

***THE COURT:*** Redirect?

***MS. CHOPRA:*** Briefly, Your Honor.

***REDIRECT EXAMINATION***

***BY MS. CHOPRA:***

*Q.* Mr. Mahmoudi, first turning to the patent question, how many

patents did you file while at Qualcomm?
**A. I don't remember the exact number, but 10 or -- around 10. I was coauthor on a lot of them, but around 10.**
*Q.* So when you're coauthor, are there other people that also contributed to the patent idea?
**A. Yes.**
*Q.* Okay. And are all those people listed on the patent application?
**A. They should be, yeah.**
*Q.* And so while you were at Qualcomm, were these patents you applied for granted?
**A. When I was there, some of them did, some of them were granted after I left.**
*Q.* Okay. Who owns those patents?
**A. Qualcomm. It's all assigned to Qualcomm.**
*Q.* Why?
**A. Well, at the time I filed them, I was working for Qualcomm, so it belongs to them.**
*Q.* At the time that you came up with the invention, you were working at Qualcomm, so they owned it?
**A. Yes.**
*Q.* And turning to Atlazo, was Atlazo's idea a competitor to Qualcomm in a sense?
**A. No.**
*Q.* Not really?

**A. It was a completely different world. I mean, we were targeting very, very low power, microwatts, nanowatts kind of applications.**

Q. Okay. So they weren't competitors?

**A. No. Not to my knowledge.**

Q. When you were employed at Atlazo, did you sign an Invention Assignment Agreement?

**A. Every patent that we filed, yes, that's part of the process. You sign an Assignment Agreement that is assigned to the company.**

Q. Okay. So everything that -- or anything that you invented while working at Dr. Arabi's company belonged to Atlazo.

**A. It does belong to Atlazo, yes.**

Q. And turning finally back to CPR, was CPR a technology that was unique to Qualcomm?

**A. I don't understand the question. Are you asking if that was unique to Qualcomm, meaning other companies did not have similar technologies? Is that what you're asking?**

Q. Well, maybe not the name CPR, maybe other companies -- well, did other companies have solutions that were similar to CPR?

**A. This is a worldwide problem. I'm going to assume, yes. I don't know for a fact, but it's fair to assume, yes.**

Q. And Qualcomm's version of addressing that solution was CPR; is that right?

**A. Correct.**

***Q.*** Okay. In terms of pain points that CPR might have had, did Qualcomm publicize those pain points to the world?
***A.*** **How do you mean by "pain points"?**
***Q.*** Any issues in the numbers with CPR, any problems the company came across, were those publicized to the world?
***A.*** **I do not know the answer to that question.**
***Q.*** When Qualcomm was working on improving CPR, were the numbers involved in that improvement closely held by Qualcomm?
***A.*** **I assume so. I mean, it was within the team, but if it was advertised out of -- without me knowing, I don't know that. But I assume, yes.**
***Q.*** Okay. And why do you assume that?
***A.*** **I mean, that's the way it is in all companies. I mean, when you work on something, you don't want to talk about it outside.**
***Q.*** Okay. Because the companies are competitive in their solutions?
***A.*** **I mean, like I said, this is a worldwide -- all companies in the world. I mean, everybody likes to operate their products at lower energy levels, so, yes.**

***MS. CHOPRA:*** No further questions, Your Honor.

***THE COURT:*** Anything further?

***MS. BERNSTEIN:*** Just one moment, Your Honor.

***(Pause.)***

***MS. BERNSTEIN:*** Nothing further, Your Honor. Thank you.

***THE COURT:*** Thank you, sir. You're excused.

***THE WITNESS:*** Thank you. Can I leave?

***THE COURT:*** You may leave. Thank you. You're excused.

***MR. OLAH:*** Your Honor, the United States calls Joseph Fang.

***THE CLERK:*** Please stand here, raise your right hand.

***(Witness duly sworn.)***

***THE CLERK:*** Thank you. You may lower your hand. Please take the stand.

Please state and spell your first and last name for the record.

***THE WITNESS:*** First name is Joseph, J-o-s-e-p-h, last name is Fang, F-a-n-g.

***THE COURT:*** Thank you.

Counsel?

***MR. OLAH:*** Thank you, Your Honor.

***DIRECT EXAMINATION***

***BY MR. OLAH:***

***Q.*** Mr. Fang, good morning.

***A.*** **Good morning.**

***Q.*** Are you an engineer?

***A.*** **Yes.**

***Q.*** Do you have a Bachelor's of Science in Engineering?

***A.*** **Bachelor of Applied Science.**

***THE COURT:*** I'm sorry, you need to talk into the microphone.

***THE WITNESS:*** Sorry.

I have a Bachelor of Applied Science degree.

***BY MR. OLAH:***

***Q.*** If it's more convenient, you can actually slide that microphone closer or you can scoot the chair up, either way.

***A.*** **Okay.**

***Q.*** Do you also have a Master's degree?

***A.*** **Yes.**

***Q.*** In what?

***A.*** **Master of Engineering.**

***Q.*** When did you earn that Master's degree?

***A.*** **Probably 2005.**

***Q.*** Twenty years ago?

***A.*** **Yes.**

***Q.*** Have you worked as an engineer for the last 20 years?

***A.*** **Yes.**

***Q.*** And where do you currently work?

***A.*** **I currently work at Apple.**

***Q.*** Did you previously work at PMC Sierra?

***A.*** **Yes, I have.**

***Q.*** What did you do at PMC Sierra?

***A.*** **I was a DFT engineer.**

***Q.*** For how many years were you at PMC?

***A.*** **I believe it was eight.**
***Q.*** Did you eventually leave and work somewhere else?
***A.*** **Yes.**
***Q.*** Where did you go?
***A.*** **I went to Qualcomm.**
***Q.*** Where was your physical work site within Qualcomm?
***A.*** **San Diego.**
***Q.*** Were you assigned to a specific department or team?
***A.*** **Yes.**
***Q.*** Which team?
***A.*** **The DFT team.**
***Q.*** And how long were you employed at Qualcomm?
***A.*** **I think it was 10 or 11 years.**
***Q.*** And where did you go after Qualcomm?
***A.*** **I went to Apple.**
***Q.*** Is that where you work today?
***A.*** **Yes.**
***Q.*** While you were at Qualcomm, what was your understanding of who owned intellectual property that you created?
***A.*** **If I created intellectual property, it would belong to Qualcomm.**
***Q.*** Is that the same rule you have at Apple now?
***A.*** **Yes.**
***Q.*** Okay. Did you ever meet Dr. Karim Arabi?
***A.*** **Yes.**

*Q.* Where did you first meet him?
**A. At PMC Sierra.**
*Q.* Did you work with him there?
**A. Yes.**
*Q.* Was he your supervisor?
**A. Yes.**
*Q.* Did he have any involvement in your hiring at Qualcomm?
**A. I believe he rooted for me.**
*Q.* What was the term there, I'm sorry?
**A. He rooted for me. He was advocating for me to join.**
*Q.* And was he at Qualcomm at that time?
**A. Yes.**
*Q.* So it was helpful to have an advocate inside of Qualcomm rooting for your admission?
**A. I think so.**
*Q.* What field is Dr. Arabi in?
**A. Karim is in a lot of fields, but DFT is one of them.**
*Q.* Okay. Is he an expert in DFT?
**A. Yes.**
*Q.* Do you know if he has a Ph.D.?
**A. Yes.**
*Q.* Do you know if he's given keynote speeches at industry conferences?
**A. Yes.**
*Q.* Did you at one point consider Dr. Arabi a mentor?

***A.*** **Yes.**

***Q.*** And once you joined Qualcomm, did you stay in touch with him?

***A.*** **Yes.**

***Q.*** Did you seek out career advice from him?

***A.*** **Yes.**

***Q.*** Do you know what Dr. Arabi's last title at Qualcomm was?

***A.*** **It was either Senior VP or VP of --**

***Q.*** Of which department, Mr. Fang?

***A.*** **Corporate R&D.**

***Q.*** What does Corporate R&D do at Qualcomm?

***A.*** **I believe they look at future-looking products for the company.**

***Q.*** Do they create technology that becomes products at Qualcomm?

***A.*** **Potentially, yes.**

***Q.*** Are you familiar with Abreezio?

***A.*** **Yes.**

***Q.*** Are you familiar with Qualcomm's acquisition of Abreezio?

***A.*** **Yes.**

***Q.*** Were you working at Qualcomm at the time of that acquisition?

***A.*** **Yes.**

***Q.*** I think a moment ago you said you were on the DFT team.
Did I hear that right?

***A.*** **Yes.**

*Q.* Is that the team you were on at the time of the acquisition?
***A.*** **Yes.**
*Q.* Were you in any way involved in the Abreezio acquisition?
***A.*** **Yes.**
*Q.* How?
***A.*** **I was -- I participated in the technical evaluation of the IP.**
*Q.* Of Abreezio?
***A.*** **Yes, of Abreezio.**
*Q.* Was it all of Abreezio's products or a particular one?
***A.*** **There was one particular one for scan testing.**
*Q.* And does that fall under the umbrella of DFT?
***A.*** **Yes.**
*Q.* Okay. And based on your role at Qualcomm, you were asked to look at this technology; is that right?
***A.*** **Yes.**
*Q.* Do you recall who asked to you look at this -- or be a part of this tech evaluation?
***A.*** **It may be Saad Elhosni.**
*Q.* Who is Saad Elhosni?
***A.*** **I was my direct manager at the time.**
*Q.* Okay. Did you attend a kickoff meeting?
***A.*** **Yes.**
*Q.* What's a kickoff meeting?
***A.*** **It's the first meeting that the -- that Abreezio or any**

**potential supplier would come and pitch their idea to describe what kind of things they can offer.**

*Q.* And you attended a kickoff meeting with Abreezio; is that right?

***A.* Yes.**

*Q.* Where was that meeting at?

***A.* It was at Qualcomm.**

*Q.* Was that in March of 2015?

***A.* I can't remember the date.**

*Q.* Do you recall who from Abreezio was present?

***A.* I remember Sanjiv Taneja.**

*Q.* Okay. And who is he in relation to Abreezio?

***A.* I'm not a hundred percent sure, but he was presenting during the meeting.**

*Q.* Is that all you recall from the Abreezio side?

***A.* Yeah.**

*Q.* Who from Qualcomm attended this kickoff meeting, if you recall?

***A.* So I was there, and Ziad Mansour is the one person I remember.**

*Q.* Might there have been other people from Qualcomm present?

***A.* Possibly.**

*Q.* But the one you recall is Ziad Mansour; is that right?

***A.* Yes.**

*Q.* Why do you recall his presence?

***A.*** **He was a Senior VP or Executive VP at Qualcomm at the time, so it's a pretty high title.**
***Q.*** Have you once referred to that title as "Big Boss"?
***A.*** **He's one of the big bosses, yes.**
***Q.*** Okay. And was his presence at a kickoff meeting noteworthy to you?
***A.*** **Yes.**
***Q.*** Do the big bosses usually attend kickoff meetings with startups?
***MS. BERNSTEIN:*** Objection. 602.
***THE COURT:*** Sustained.
***BY MR. OLAH:***
***Q.*** You've attended other kickoff meetings before, Mr. Fang?
***A.*** **Yes.**
***Q.*** Do Senior Vice Presidents usually attend those meetings?
***A.*** **I have not seen that case.**
***Q.*** And is that why you took note of Mr. Mansour's presence at the Abreezio kickoff meeting?
***A.*** **Yes.**
***Q.*** Did Dr. Arabi attend that kickoff meeting?
***A.*** **No.**
***Q.*** At that meeting, was there any mention of his relationship to Abreezio?
***A.*** **No.**
***Q.*** Was there any statement that this technology was created by

Dr. Karim Arabi?

***A.*** **No.**

***Q.*** Was there any mention that this technology was created by the sister of Dr. Karim Arabi?

***A.*** **No.**

***Q.*** At the time of this kickoff meeting, did you have any knowledge of Dr. Arabi being connected to Abreezio?

***A.*** **No.**

***Q.*** I think you testified a moment ago that you were involved in the technical evaluation; is that right?

***A.*** **Yes.**

***Q.*** Did that follow this kickoff meeting?

***A.*** **Yes.**

***Q.*** What was your -- what did you do to evaluate Abreezio's technology?

***A.*** **So they presented some ideas about how to improve the test. And based on that idea, created some mockup test cases to see if there's any merit to that idea.**

***Q.*** And you personally did those recreations; is that right?

***A.*** **Yes.**

***Q.*** What did you think of the idea that was being presented?

***A.*** **So my conclusion was that it's worth pursuing, or worth looking into further.**

***Q.*** And specifically, that Qualcomm should look into this idea further?

***A.*** **Yes.**
***Q.*** Is this a solution that Qualcomm could have come up with?
***MS. BERNSTEIN:*** Objection. 602.
***THE COURT:*** Sustained.
***BY MR. OLAH:***
***Q.*** When you say that you believe this was worth looking into, did you make that recommendation or endorsement to anyone?
***A.*** **Yes.**
***Q.*** To who?
***A.*** **Mainly to Saad Elhosni, because I need to report back the results.**
***Q.*** The guy who asked to you look at it; right?
***A.*** **Yes.**
***Q.*** Okay. Did Dr. Arabi ask you to give a positive review or give an endorsement to the technology?
***A.*** **I don't think so.**
***Q.*** Did he offer you money for a positive review?
***A.*** **No.**
***Q.*** Did anyone offer you money for a positive review?
***A.*** **No.**
***Q.*** Are you familiar with the term "sync-up"?
***A.*** **Sure, yeah.**
***Q.*** Is that a -- well, I thought it was your term, but if it's not, have you routinely gotten coffee with Dr. Arabi over the years?

***A.*** **Yeah, I've had coffee. Yes, I'm familiar with the term "sync-up."**

***Q.*** I'm just trying to speak the engineer lingo. I apologize if it's not your term. It's more natural not to use it.

Did you routinely meet with Dr. Arabi during your tenure at Qualcomm?

***A.*** **We -- we'd meet up from time to time just to catch up.**

***Q.*** Okay. Coffee, lunches, *et cetera*?

***A.*** **Yes.**

***Q.*** Okay. Did Dr. Arabi mention Abreezio at these meetings?

***A.*** **I had conversation with Karim about Abreezio, but I don't -- I can't recall who started it.**

***Q.*** Okay. What did Dr. Arabi say to you about Abreezio in these coffee and lunch meetings?

***A.*** **I think at some point, he mentioned he knew some investors from Abreezio.**

***Q.*** Did he appear interested in Abreezio's technology?

***A.*** **Sure, yes.**

***Q.*** Okay. Did he mention anything about his sister in connection with Abreezio in these lunch and coffee shop meetings?

***A.*** **No.**

***Q.*** Did you later learn of his sister?

***A.*** **Yes.**

***Q.*** That was after the acquisition?

***A.*** **After, the -- yes.**

***Q.*** Did you receive an email announcing Qualcomm's acquisition of Abreezio?

***A.*** **Yeah, probably.**

***Q.*** Okay.

***A.*** **Yes.**

***Q.*** Did you forward that email to anyone?

***A.*** **Forward, yes.**

***Q.*** Who did you forward that email announcing the acquisition to?

***A.*** **If this was the email about, you know, from Rakesh, I believe I forwarded it to Karim.**

***Q.*** Why would you forward an email announcing Abreezio's acquisition to Dr. Arabi?

***A.*** **Just because we had been talking about Abreezio, me and Karim. And I thought -- and there are people that comes from Abreezio that were our former colleagues. So, you know, it's like a natural excitement with that. Potentially some of these people we worked with are going to join us again. I believe that's the reason.**

***Q.*** Were these folks that you worked with at PMC Sierra?

***A.*** **Yes.**

***Q.*** Okay. And you mentioned that you had talked with Dr. Arabi about Abreezio.

Again, did he ever mention his involvement in Abreezio to

you?
***A.* No.**
***Q.*** Did he ever mention his sister's alleged involvement in Abreezio?
***A.* No.**
***Q.*** Subsequent to the acquisition, did Qualcomm's Employee Relations Department reach out to you?
***A.* Yes.**
***Q.*** Did you agree to talk to them?
***A.* Yes.**
***Q.*** Did you meet with them face-to-face?
***A.* Yes.**
***Q.*** Did you ask them, Hey, just send me whatever questions you have via email and I'll try to get you written responses to them?
***A.* I don't quite remember that.**
***Q.*** Okay. Do you recall meeting face-to-face with them?
***A.* Yes.**
***Q.*** Okay. After these meetings with Employee Relations, did you contact Dr. Arabi?
***A.* Yes.**
***Q.*** Why did you do that?
***A.* I was going to join Karim's startup company. After the conversation with Employee Relations people, I decided to not go forward with that.**

***Q.*** What was that startup company?
***A.*** **Atlazo.**
***Q.*** You were going to join Atlazo?
***A.*** **I was thinking to, yes.**
***Q.*** Did you have a -- an offer in hand from Dr. Arabi?
***A.*** **Yes.**
***Q.*** And you were inclined to accept that offer; is that right?
***A.*** **Before the conversation, yes.**
***Q.*** Do you have any knowledge of how Atlazo was funded?
***A.*** **No idea.**
***Q.*** Dr. Arabi never mentioned how Atlazo was funded to you?
***A.*** **No.**
***MS. BERNSTEIN:*** Objection. 602.
***THE COURT:*** Sustained.
***BY MR. OLAH:***
***Q.*** What was Dr. Arabi's response when you told him you had been contacted by Qualcomm's Employee Relations Department?
***A.*** **He seemed concerned.**
***Q.*** How so?
***A.*** **I'm not sure how to answer that.**
***MS. BERNSTEIN:*** Objection. 702, 701.
***THE COURT:*** Overruled.
***BY MR. OLAH:***
***Q.*** What about his response communicated concern to you?
***MS. BERNSTEIN:*** Objection. 701, 702.

***THE COURT:*** Overruled.

***THE WITNESS:*** Maybe his tone, his voice. I don't remember.

***MS. BERNSTEIN:*** Objection. 602. Move to strike.

***THE COURT:*** Overruled.

***BY MR. OLAH:***

***Q.*** Was Dr. Arabi working at Qualcomm at the time of this conversation?

***A.*** **No.**

***Q.*** Okay. He was at Atlazo at this point?

***A.*** **Yes.**

***MR. OLAH:*** No further questions at this time, Your Honor.

***THE COURT:*** Cross-exam?

***MS. BERNSTEIN:*** Your Honor, would this be a good time for a morning break?

***THE COURT:*** Sure. Let's take a 15-minute recess. Ladies and gentlemen, you're reminded you're not to discuss the case or do any research about the case. And we'll see you back in 15 minutes.

***(Jury out at 10:07 a.m.)***

***THE COURT:*** And you're excused for 15 minutes as well. Thank you, sir.

Okay. We're now outside the presence of the jury.

Any issues we need to take up?

***MS. BERNSTEIN:*** Your Honor, Mr. Fang was one of the individuals for whom you have *in camera* documents.

***THE COURT:*** I'm aware of that.

***MS. BERNSTEIN:*** So we wanted to know if there was anything we needed to be aware of in terms of impeachment.

***THE COURT:*** So far, no. Just for the record, I have three reports totaling eight pages. I'm reviewing it. I'll review it again. I'll mark it as Court's Exhibit 2C for identification. And if there's anything in there that looks like it is impeachment material, I will turn it over to both parties.

***MR. PILCHAK:*** Thank you, Your Honor.

***MS. BERNSTEIN:*** Thank you, Your Honor.

***MR. PILCHAK:*** One other thing. It may be that Mr. Taneja is the next witness, and we wanted to flag for the Court there is one defense exhibit that was marked as to Mr. Taneja. It's a series of emails from him to himself. I believe Mr. Taneja's lawyers have taken the position that those are privileged or work-product, and so I don't know if the Court is inclined to hear from them.

One of them at least is here and would be prepared to address that issue with the Court. I also think that's something -- I don't know whether the Defense intends to use it, but I think it would be good not to stumble into that in front of the jury if we can.

***THE COURT:*** Okay. Do you intend to use it?

***MS. BERNSTEIN:*** Yes. It was a Defense exhibit that was disclosed when exhibits were due back in January.

***THE COURT:*** Okay.

***MR. ROTHSTEIN:*** Good morning, Your Honor. Jimmy Rothstein on behalf of Mr. Sanjiv Taneja.

We asserted privilege over a November 2nd, 2017 email, and we understand Ms. Bernstein is intending to use that document. The request is simple. We request that the Court not allow the use of Mr. Taneja's privileged document in any circumstance.

I think a bit of background would be helpful to provide some context. Mr. Taneja met with his attorney in May 2017 to discuss a number of different issues. On October 30th, 2017, he was personally served with a civil complaint naming him as a defendant by Qualcomm, which the Court is familiar with.

And then on November 2nd, three days later, Mr. Taneja sent himself a series of emails -- this is what we claimed privilege over -- that, A, memorialize his discussions from his confidential meeting with his attorney; and B, outlines certain issues he intended to discuss with that very same attorney only a week later. And he did eventually meet with that attorney and discuss those issues.

This is the email that we asserted attorney-client privilege over. It was part of a return from a search warrant.

We're not entirely sure what exhibit number it is. We don't have access to Mr. Arabi's exhibit list. For the record, it's Bates No. TLSW 06000644 to 45.

And this type of document is right in the heartland of the attorney-client privilege. There are notes memorializing discussions from a confidential meeting with an attorney, and confidential notes Mr. Taneja intended to discuss and did discuss with this attorney.

Just in terms of steps taken, we first became aware of this document on February 25th of this year, less than a month ago. A few days later, we instructed the Government that we are asserting privilege requesting that they claw it back. And then on March 8th, shortly thereafter, we sent additional correspondence to both the Government and Ms. Bernstein flagging that we are assessing our privilege over the document and to essentially go hands-off.

And we cited applicable case law that says, "A party that inadvertently receives a privileged document cannot then unilaterally determine that the document is not privileged and then look at the document. Rather, if they contest the privilege claim, they must promptly seek guidance from the Court."

Actually, Ms. Bernstein, in claiming privilege over her own client's documents, cited that very same case law and language back to us.

The Government agreed not to use the document. Ms. Bernstein agreed to segregate the document, but indicated they didn't agree that it's privileged, and then indicated that they intend to use the document.

So this is really a simple issue, Your Honor. This is a privileged document. Both Ms. Bernstein and the Government, in our view, should not be allowed to view or use this document. And we ask the Court order that this document not be used during trial.

***THE COURT:*** Thank you.

Ms. Bernstein?

***MS. BERNSTEIN:*** Yeah. Your Honor, I was just going to respond to a few things, and then Mr. Fraser is going to respond to a few things.

I think everything that Mr. Rothstein said is accurate. We have not accessed the document since it has been identified to us. I think it was identified to us on the 8th. It was -- excuse me -- on the 9th. It was identified more generically in a way that we were not able to find it because we don't have Bates stamps. We were produced natives. Things only got Bates stamped --

***THE COURT:*** Okay. But you're saying on the 8th or 9th of March?

***MS. BERNSTEIN:*** We've segregated it, Your Honor, and we've not accessed it. And we did convey to them at that time

that it was something we did intend to use at the trial.

It is exculpatory. Every single part of it is exculpatory. That's why we thought it was produced to us, pursuant to the Government's *Brady* and *Giglio* and Rule 16 obligations, and Dr. Arabi's constitutional protections and due process rights.

We would be able to find it from where it's segregated to give it to the Court *in camera* if we think the Court should have a look at this. There is nothing about this, which is why we have it, that indicates any degree of privilege. We have not touched it since they made that assertion, but that assertion -- that's a document that we'd had for many years and did not -- there's nothing about it on its face that indicates privilege.

I don't -- we do disagree with the analysis that it is privileged, and we encourage the Court to look at it *in camera*. It is incredibly, incredibly exculpatory. It is also -- would be the basis for much of the impeachment of Mr. Taneja.

***MR. FRASER:*** If I may supplement briefly. The first and dispositive issue is whether it's *Brady* material. And for that, I cite *United States v. W.R. Grace*, 439 F.Supp.2d 1125, pages 1142 to 1143, District of Montana, 2006, in which the Court ruled that it was going to review the documents *in camera*, and regardless of the privilege claim being valid, if they were probative and exculpatory, in other words, *Brady* materials, they would be disclosed.

Because a criminal defendant's rights to defend himself trump that attorney-client privilege. And we've reached that critical moment in the trial. We didn't make a unilateral decision that these are not privileged documents. We've honored appropriately the claim of privilege by ceasing review once we received that. So at this point, it is necessary for the Court to make the decision.

But there is no reason to even analyze whether it's privileged if, as we contend, these documents are exculpatory. Because then *Brady* would win regardless of the privilege issue. That's Issue No. 1.

And then Issue No. 2 is, of course, are they privileged, which should not be accepted at face value. The privilege is -- it is, of course, Mr. Taneja's burden to establish that these documents are privileged. They are not in themselves attorney-client communications. And because it is -- these are apparently emails that he sent to himself.

Even -- I don't concede that they purely memorialize what his attorney told him or what he intended to tell his attorney. And that argument doesn't even show that each portion of the document was part of an attorney-client communication.

We would request, and we would need, if the Court decides to address the issue of whether the documents are privileged -- which, again, is only necessary if they're not *Brady* -- to cross-examine Mr. Taneja and the attorney about it.

Because we don't accept this privilege claim at face value, particularly where these are not even attorney communications in themselves.

**THE COURT:** So I have two thoughts and I wanted to ask you. First of all, do you have anything that is at the Circuit level that says that *Brady* trumps -- you know, I don't know what -- I haven't looked at that case. I don't know what the District of Montana cites as its authority for that. But do you have anything that would require me to -- I have a problem with that.

I mean, I know *Brady* is important, but if someone goes and talks to their lawyer and says initially, I didn't do it, I -- but they're talking to their lawyer about something, and then they work through things and then the -- they say something else to their lawyer and -- that's attorney-client privilege. I mean, it really is -- that's pretty sacrosanct.

So I have some -- I have to say, some skepticism that anything that is potentially *Brady* gets -- that you have to turn that over. The attorney -- you have to turn over notes of an attorney conversation that has to be -- I have a -- some issue with that.

**MR. FRASER:** We would welcome the opportunity to read and respond to any case that Mr. Taneja would like to cite to show that the privilege overcomes *Brady*. I am not sure whether the Ninth Circuit has addressed this, but this is a District

Court case that's been followed as well by other districts.

And if -- I don't have it in front of me in this moment, but I believe that SDNY, in a civil case, emphasize -- cited *W.R. Grace* as the rule for a criminal case when a criminal defendant -- when a criminal defendant is seeking documents that are arguably attorney-client privilege, or even if they are attorney-client privilege, he is entitled to them if they're *Brady*.

***THE COURT:*** The second question I have is -- I mean, I will look at the document *in camera*. If it is not, on its face, attorney-client privilege, if -- going to the second prong -- I realize you're not giving up on the *Brady* issue, but going to the second prong of privilege, if Mr. Taneja says, This is a summary of the conversation I had with my lawyer, isn't that attorney-client privilege?

In other words, if a client meets with a lawyer, and then the client goes home and wants to remember what he discussed with the lawyer, and so he summarizes what the conversation was with the lawyer, isn't that attorney-client privilege?

***MS. BERNSTEIN:*** Your Honor, if I may for a moment, because I had spent quite a bit of time with this document. That's -- perhaps in some hypothetical world. But we may not even get there, because that's not what this document is on its face.

And I also think that that highlights a pretty big problem, which is that his attorneys are coming in here and saying, This memorialized a conversation that we had, and that's what this is, and that's why it's privileged. And that's not on the record. That's not been sworn to in a declaration. That's not -- Mr. Taneja has not explained that.

***THE COURT:*** No. I'm saying if Mr. Taneja comes in and takes the witness stand and says, That's what this is, I had a meeting with my lawyer. I went home, wanted to remember everything I discussed, and I summarized this meeting in writing. Isn't that attorney-client privilege?

***MS. BERNSTEIN:*** I feel like we're being a little bit sandbagged if that's what happens in the next hour. Because I said to them specifically -- and I had my email -- I said to them specifically on Sunday, March 9th, before this trial started, We get it. We've put this document aside, and we do intend to use it. So you can bring whatever litigation you feel is necessary. Let me know if you'd like to talk further. And we've had no further discussions. We've had no follow-up.

And then they come in here today. We're scrambling to do a bunch of things, as the Court knows, with the press of this trial. This is a very critical issue. And so we have not had time to fully research it because we're not sure what we're even responding to.

I'm not sure if the hypothetical that the Court is

offering can even be made out. But if it can, I would need the opportunity to do some factual analysis as to whether, like, those things happened and can we cross-examine him about that.

Because I think, as the testimony is going to show, this is the Government's lead cooperator who's saying -- there's a lot of room for pushback there. And this is a very, very critical issue that I wish we could have adjudicated more than moments before he takes the stand. That was why we raised it.

***MR. FRASER:*** We are busy, but it's actually not at all our job. It is Mr. Taneja's job, as the privilege claimant, to raise this issue, and we demand an evidentiary hearing on the issue of whether the predicates for --

***THE COURT:*** I understand what you're demanding. I'm trying to figure out the parameters if we had such an evidentiary hearing.

***MR. FRASER:*** I think it's unnecessary, because the Court will see --

***THE COURT:*** You're saying, I demand an evidentiary hearing and I think it's unnecessary. So that's why I'm laughing.

***MR. FRASER:*** Yes, because, Number 1, is the material *Brady*? If the answer to that is yes, no evidentiary hearing.

***THE COURT:*** I understand.

***MR. FRASER:*** We get the stuff regardless of whether it's privileged.

***MS. BERNSTEIN:*** And I should add, Your Honor --

***THE COURT:*** Okay.

***MS. BERNSTEIN:*** -- the Court doesn't have a copy of it because we did do a transmission of our exhibits right before trial started and we were on notice, so you don't have anything for that.

We do have it segregated in our system and we can figure out the best way to give it to you for an *in camera* review.

***THE COURT:*** Okay.

***MR. PILCHAK:*** And, Your Honor, briefly, this is not the United States' fight, but I wanted to add two facts to the record that may be helpful to the Court. No. 1, when Ms. Bernstein says this document was produced years ago, it was first produced in November of 2022. For whichever way that cuts for the Court, I just want the Court to know this is not a document that was recently disclosed to anyone.

And the second thing I would just add, because I'm a lover of irony in all its forms, is that Dr. Arabi made a very similar privilege claim to a series of correspondence -- I think it's two emails between himself and Sheida Alan that are also, on their face, not privileged. They discussed the disposition of Sheida's real estate holdings at the time that Dr. Arabi and her are trying to pay back the $47 million they agreed to pay Qualcomm.

And they said to us on the prosecution side, even though they're not privileged on their face, they tie into a broader series of conversations with counsel that were happening then to negotiate with Qualcomm about this settlement. And so we said, The documents aren't privileged on their face, but we understand your claim. We're agreeing to take those out of our exhibit stack and we're not going to seek to use them at this trial, which is our position at present. And so it does just seem a bit ironic to us, the position that Dr. Arabi is taking as to this document.

***THE COURT:*** Okay. Let me hear from Mr. Taneja's counsel.

***MR. ROTHSTEIN:*** Yes. Thank you, Your Honor.

Two quick points. I just want to respond to Mr. Fraser and Ms. Bernstein. No. 1, it's not our burden. Once we have alerted them to our privilege claim, it's not our burden to then bring a motion, you know, protective order or what have you. We ultimately don't know what's going to happen at trial. We don't know how it's going to be used. And we think I think the FRA 502 which cites FRCP 26(b)(5)B -- I know it's a lot of numbers.

***THE COURT REPORTER:*** Can you repeat that?

***MR. ROTHSTEIN:*** Yeah. Let me slow it down. FRA 502, which cites Federal Rule of Civil Procedure 26(b)(5)(B). And I'm fully aware we don't have those rules in front of us, but I

will read it to you --

***THE COURT:*** Slowly.

***MR. ROTHSTEIN:*** -- slowly.

"After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the Court under seal for a determination of the claim."

The case law is clear that you go hands-off once there's a privilege claim, and that a party receiving the privilege claim who disputes the privilege does not get to act as the judge or the Court and unilaterally make a decision, you know what, this isn't privileged, someone hasn't brought a motion, I'm going to use it in trial. That's not what the case law says. That's not what the rules say.

And then I will quickly just cite a case again, Your Honor. You don't have this in front of you, but *ChriMar Systems, Inc. v. Cisco Systems, Inc.*, 2016, WL 1595785. This is the Northern District of California from 2016, addressing a very similar issue. And the Court found that, "So long as a defendant's emails describe confidential communications with his attorneys or are based on such communications, they may be protected by the attorney-client privilege."

And I submit to you, Your Honor, it is our view and Mr. Taneja's view that what he memorialized were from confidential communications with his attorney, and then notes that he made in anticipation of meeting with his attorney three days -- sorry -- he met a week after he was served with the Qualcomm complaint. And this is right around a critical time period.

And with that, Your Honor, unless you have any questions.

***THE COURT:*** Okay. I'll take the matter under submission. Why don't you give me a copy of whatever it is *in camera*, and I'll take a look at it. And we'll take a five-minute recess.

***MR. FRASER:*** A few points in reply. No. 1, I don't know what the first part -- like, why we're talking about this notion of unilaterally deciding it, because we didn't unilaterally decide it.

***THE COURT:*** I understand. You've made that record.

***MR. FRASER:*** And this question about irony and, you know, this *Cisco* case, of course, is a civil case. Of course it doesn't address *Brady*.

***THE COURT:*** Thank you. I'll take it under submission. If you could -- someone could submit it to me *in camera*, that would be great.

***MR. ROTHSTEIN:*** Thank you, Your Honor. Your Honor, I

actually may have a copy right now. May I approach?

***THE COURT:*** You can mark it as Court's Exhibit next in line under seal.

***MR. PILCHAK:*** Thank you, Your Honor.

***MR. ROTHSTEIN:*** May I approach, Your Honor?

***THE COURT:*** You may. Thank you.

And just for the record, since you were talking about the documents, when Mr. Taneja testifies, there are 40, 50, 67, 68, 69 pages from Qualcomm. And so I'm -- it's easy for me to do the analysis with respect to Mr. Fang, Mr. Nelles, and Mr. Somwal. It's a little more difficult with respect to Mr. Taneja, and so we may have to take a break and have him -- while I decide whether to turn those documents over.

***MR. PILCHAK:*** Yes.

***THE COURT:*** And then recall him.

***MS. BERNSTEIN:*** We appreciate that, Your Honor, because, of course, he cooperated in the civil case as well. So we do expect that there's -- we understand that there's an extraordinary amount of exculpatory impeachment information in there.

***MR. PILCHAK:*** I have no comment on that, because I don't know what's in that material. But I wanted the Court to know his testimony will be lengthy, I expect, and so I expect we'll have this evening for the Court to look at that as well.

***THE COURT:*** Thank you.

***MS. BERNSTEIN:*** I'm sorry. While we're putting things on the record or off the record, Your Honor, but I --

***THE COURT:*** Off the record or on the record, for Anne's sake?

***MS. BERNSTEIN:*** It can be off. I just want to talk about the breaks that we'll need today.

***THE COURT:*** Okay. Off the record.

***(Recess taken.)***

***THE COURT:*** Okay. We are back on the record. All jurors are present. The lawyers are present. Dr. Arabi is present. And you are reminded you're still under oath to tell the truth.

***THE WITNESS:*** *(Nods head.)*

***THE COURT:*** Counsel?

***MS. BERNSTEIN:*** Oh, I'm sorry. Thank you, Your Honor.

***CROSS-EXAMINATION***

***BY MS. BERNSTEIN:***

***Q.*** Good morning, Mr. Fang.

***A.*** **Good morning.**

***Q.*** You have not been charged with any crime relating to Abreezio; correct?

***A.*** **Correct.**

***Q.*** Because you did not commit any crime related to Abreezio.

***A.*** **Correct.**

***Q.*** But you asked the Government for immunity; correct?
***A.*** **Yes.**
***Q.*** And that would mean that the Government would agree to not charge you for anything related to Abreezio?
***A.*** **I believe so.**
***Q.*** And you were worried about that because even though you did nothing wrong, the Government has been aggressively pursuing Qualcomm's agenda here?
***A.*** **I'm not sure. Yeah, I'm not sure.**
***Q.*** You didn't ultimately get immunity; correct?
***A.*** **No, I didn't.**
***Q.*** And, again, because you did nothing wrong.
***A.*** **Right.**
***Q.*** You spoke with Dr. Arabi about Abreezio before Qualcomm acquired the company?
***A.*** **Yes.**
***Q.*** And Abreezio had DFT technology; correct?
***A.*** **Yes.**
***Q.*** And Dr. Arabi was a DFT expert?
***A.*** **Yes.**
***Q.*** And you were one of, if not the top DFT engineer at Qualcomm at that time?
***A.*** **I was one of the main guys, yes.**
***Q.*** And when you spoke with Dr. Arabi about Abreezio before Qualcomm's acquisition, he did not seem to know a lot about

Abreezio's technology; correct?

***A.*** **He didn't tell me anything about that.**

***Q.*** He told you that he knew people at the company, though?

***A.*** **He didn't have to. We knew some of the people that were ex-colleagues.**

***Q.*** And he had shared that with you.

***A.*** **Well, I'm not sure if he specifically said that, but we both know the names.**

***Q.*** Well, you were questioned by the Government in February of 2023 in this case; right?

***A.*** **February 2023. I'm sorry, can you remind me of when?**

***Q.*** When the FBI and the prosecutors -- the FBI, excuse me, questioned you.

***A.*** **There was a visit at my house by two FBI people. I don't know if that's the date.**

***Q.*** And they asked you questions?

***A.*** **Yes.**

***Q.*** And you answered those questions truthfully.

***A.*** **Yes.**

***Q.*** And you told them that Karim told you that he knew people at Abreezio prior to Qualcomm's acquisition?

***A.*** **I don't quite recall the conversation.**

***Q.*** But you were telling them the truth when you spoke with them; correct?

***A.*** **Yes.**

*Q.* Okay. And you mentioned that you've known Dr. Arabi since PMC Sierra; is that right?
***A.* Yes.**
*Q.* And what year was that?
***A.* 2000.**
*Q.* So you've known Dr. Arabi for over 20 years.
***A.* Yes.**
*Q.* Have you ever known him to be hands-on?
***A.* Yes.**
*Q.* And was that at PMC Sierra?
***A.* Yes.**
*Q.* When he would do coding and development?
***A.* Yes.**
*Q.* And when he was at Qualcomm, he was no longer hands-on.
***A.* Much less. I don't know if he still had some occasional opportunities to be hands-on.**
*Q.* You certainly never saw him or spoke with him about coding or sort of any of the day-to-day things that the engineers like yourself were doing.
***A.* Sure, yeah.**
*Q.* You respected him.
***A.* Yes.**
*Q.* And it's normal, in fact, when you find a mentor in this field, that you expect to follow them from one company to another?

**A. I'm not sure how to define "normal," but -- sure.**
Q. Have you seen it happen to other people?
**A. I can't recall off the top of my head.**
Q. If other people you know have followed their mentors to different companies?
**A. I can't recall specific cases, but that -- that would be possible.**
Q. Okay.
**A. Yeah.**
Q. I want to talk about Abreezio's technology and software, please.
You thought that Abreezio's technology was good?
**A. It was -- it's -- I mean, I was involved in the initial part of the evaluation where I just tested out the idea, and it looked promising. And that was pretty much the end of my involvement on the technical side.**
Q. You thought it was a simple idea based on a simple premise?
**A. The idea was simple, interestingly simple.**
Q. And you thought that there was real value in that simple idea.
**A. Yes.**
Q. But you didn't want to base your assessment entirely on Abreezio's presentations at the time.
**A. Correct.**
Q. You were curious if you could further convince yourself and

Mr. Elhosni by doing a very makeshift mockup trial attempt to replicate this technology?

***A.*** **Yes.**

***Q.*** And you didn't know much of the information needed, so you made a lot of guesses?

***A.*** **A lot of guesses, yes.**

***Q.*** And the results that you got from this makeshift replication were promising.

***A.*** **Yes.**

***Q.*** And that really convinced you as to the value of this technology.

***A.*** **Yes.**

***Q.*** And you could put together that makeshift mockup because it was such a simple idea; correct?

***A.*** **Yes. The idea, it was simple. There's an algorithm part of it that I had no idea about that I didn't know.**

***Q.*** And because you are a highly skilled and experienced top engineer; correct?

***A.*** **I'm pretty decent.**

***Q.*** But to make that technology functional and viable to successfully and accurately save test time would have required quite a bit more work.

***A.*** **Yes.**

***MS. BERNSTEIN:*** I want to show you what's been marked as Exhibit 2669.

***BY MS. BERNSTEIN:***

***Q.*** Do you see in the middle of the page that this an email from you?

***A.*** **Yes.**

***Q.*** On May 18th of 2017?

***A.*** **Yes, May 18th.**

***MS. BERNSTEIN:*** I want to blow up that box, please.

***BY MS. BERNSTEIN:***

***Q.*** And you explained then that if part of your thought process at the time had been that if you were able to spend your spare time playing with the idea and getting decent results on almost half of the test cases, a team of dedicated engineers working for months, years would surely produce what the Abreezio team was claiming.

Do you remember that?

***A.*** **I don't remember the specifics of the email, but it looks like I wrote that.**

***Q.*** And that even if not, the prospect of saving 30 percent test cost on half of the designs was still huge; correct?

***A.*** **Yes.**

***Q.*** Thank you.

You made your assessment of Abreezio's value in good faith?

***A.*** **Yes.**

***Q.*** And even as of 2017, you were convinced that Abreezio's technology was a good value for Qualcomm.

**A. Yes, sure.**

*Q.* Well, you told this to Qualcomm in 2017, didn't you?

**A. 2017. I did give this result to Saad Elhosni, and that was my stance at the time, that this was worth pursuing.**

**After that, I was no longer involved in the actual evaluation of the IP itself.**

***MS. BERNSTEIN:*** Let's pull up 2669 again, please. Can you go to the bottom part, please?

***BY MS. BERNSTEIN:***

*Q.* In 2017, you told Qualcomm, "I made a call in good faith. Even today, I'm convinced that the technology has good value to QCOM."

**A. Okay.**

*Q.* Is that a "yes"?

**A. Yes.**

*Q.* And QCOM is Qualcomm?

**A. Yes.**

*Q.* Do a lot of people refer to it as its stock market ticker symbol, QCOM?

**A. I think so.**

*Q.* And in addition --

***MS. BERNSTEIN:*** Thank you. We can take this down.

***BY MS. BERNSTEIN:***

*Q.* In addition to Abreezio's presentations and to the makeshift mockup trial attempt you created, you also worked with an

engineer named Daniel Hoggar?

***A.*** **I don't quite recall that person, but based on the email, it looks like, yeah.**

***Q.*** Do you remember that you worked with him to help him integrate Abreezio's products into Qualcomm's products?

***A.*** **There was one person that came over to take some test cases, our own test cases, and take it into Abreezio for something. And I believe that was Daniel.**

***Q.*** Do you remember that that was Daniel?

***A.*** **I believe it was Daniel.**

***Q.*** A lovely British man?

***A.*** **I don't recall his accent.**

***Q.*** And you worked with him to integrate Abreezio's products into Qualcomm's products because Abreezio didn't know Qualcomm's chip flow.

***A.*** **I wouldn't say integration. They were looking for test cases, like, designs that we have that they can run their IP -- run their IP, run their technology on. So I gave them, I think, a few of our existing circuits.**

***Q.*** Okay. So would you agree that when the Abreezio -- let me back way up.

The Abreezio team came on site to work with their products, testing it across Qualcomm's chip lines; correct?

***A.*** **Yes.**

***Q.*** And this was in August of 2015, approximately?

***A.*** **I don't remember the dates.**

***Q.*** Do you remember that they were on site for over 20 days?

***A.*** **I'm not sure.**

***MS. BERNSTEIN:*** Okay. I'm going to show you 2472.

***BY MS. BERNSTEIN:***

***Q.*** And we can make any portion of this larger, but once you've had a chance to review this --

***THE COURT:*** And this is in evidence.

***BY MS. BERNSTEIN:***

***Q.*** -- please let me know. Thank you.

***A.*** **Okay.**

***Q.*** And do you see in the middle --

***MS. BERNSTEIN:*** Let's blow up the August 18 email, please, for Mr. Fang.

***BY MS. BERNSTEIN:***

***Q.*** And this is you explaining a way to bypass scan compression and offering some code?

***A.*** **Yeah, looks like it.**

***Q.*** Are you helping them here with what's called pipe cleaning?

***A.*** **Sure.**

***Q.*** I am not an engineer, so you let me know.

***A.*** **It looks like he's running his IP through our test cases. And this is one to configure the circuit to better help, you know, his experiments. And he's looking for a way to configure the circuit in some way, so this is one of the bits, one of the**

**signals that we can turn on and off.**

***Q.*** Okay. Because there were things, in fact, a lot of things, that Abreezio did not know about how to sync up with Qualcomm's products.

***A.*** **Can you -- sorry, can you repeat that question?**

***Q.*** You're providing this to him because there were a lot of things that Abreezio did not know about how to sync up with Qualcomm's products.

***MR. OLAH:*** I'd object on foundation, Your Honor. He wasn't an Abreezio employee.

***THE COURT:*** Overruled.

***THE WITNESS:*** Yeah. They don't know much about Qualcomm design.

***BY MS. BERNSTEIN:***

***Q.*** And so you're writing this code to help them integrate into the Qualcomm products.

***A.*** **At that moment, it's not exactly integration. It's really just allowing, making sure that they can run their technology on our design.**

***Q.*** Okay. And this is -- do you call this code or do you call this script? What would you refer to this as?

***A.*** **Either way. I mean, I don't recall giving them this, but reading this, I kind of know what it's doing.**

***MS. BERNSTEIN:*** And can we get rid of the enlargement, please?

***BY MS. BERNSTEIN:***
***Q.*** To be clear, you were expected to provide this information to them; correct?
***A.*** **Yes.**
***Q.*** And your -- Saad was your supervisor at the time?
***A.*** **Yes.**
***Q.*** Saad is on this email as well?
***A.*** **Yes.**
***Q.*** And you had been discussing the specifics about this integration with them since March of 2015; is that -- withdrawn.
This email is from August of 2015; correct?
***A.*** **Yes.**
***Q.*** And you had been discussing the specifics about integration with them since March of 2015; correct?
***A.*** **I don't recall --**
***Q.*** Sure.
***MS. BERNSTEIN:*** We'll show you Exhibit 531, please.
***BY MS. BERNSTEIN:***
***Q.*** Does this remind you that you had been discussing specifics about integration with them since March of 2015?
***A.*** **Yes.**
***Q.*** And about how the code and the script could fit into Qualcomm's flow?
***A.*** **Yes.**
***Q.*** Abreezio --

**_MS. BERNSTEIN:_** Thank you. You can take this down.

**_BY MS. BERNSTEIN:_**

**_Q._** Abreezio's technology would have worked for other semiconductor companies as well; correct?

**_A._** **Yes.**

**_Q._** And you work at Apple right now.

**_A._** **Correct.**

**_Q._** It could have worked on Apple's products?

**_A._** **Yes.**

**_Q._** But Abreezio wasn't acquired by Apple, it was acquired by Qualcomm; right?

**_A._** **Right.**

**_Q._** I want to talk for a moment about -- I think you said something on direct examination to Mr. Olah that you understand that if you made something at Qualcomm, it was owned by Qualcomm.

Do you remember that testimony?

**_A._** **Yes.**

**_Q._** Is that what you said, or can you -- I'm not trying to put words in your mouth, if you can just repeat it.

**_A._** **Yes, that's what I said.**

**_Q._** Okay. And you understood that that was because you had an Invention Assignment Agreement with Qualcomm?

**_A._** **Again, the legal terminology, I'm not sure, but, yeah, usually if you're employed by somebody -- by a company, whatever**

**you invent in that company belongs to the company.**

***Q.*** Because you signed a contract with them to that effect.

***A.*** **Yes.**

***Q.*** And do you know whether that Invention Assignment Agreement is legally enforceable?

***A.*** **I have no idea.**

***Q.*** Have you heard of disputes with people and Qualcomm over the Invention Assignment Agreement?

***A.*** **Besides this trial, no.**

***Q.*** Have you ever checked with an attorney about the enforceability of that Invention Assignment Agreement that you signed?

***MR. OLAH:*** Objection. Relevance, Your Honor.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** Is it fair to say that you assume it's enforceable and you wouldn't want to challenge Qualcomm as a litigant?

***MR. OLAH:*** Objection. Relevance, Your Honor.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** All right. I want to talk about Atlazo for a moment.

You understand that Atlazo was a startup formed in 2016 by ex-Qualcomm employees?

***A.*** **I don't know about the year. I know it's a startup.**

***Q.*** And it was formed, in part, by Dr. Arabi, of course; right?

***A.*** **Yes.**
***Q.*** And it was a promising company?
***A.*** **I think so.**
***Q.*** Well, you were considering working for them.
Is that because you thought it was going to fail or you thought it was going to succeed?
***A.*** **I thought it has a good chance -- it has a chance of succeeding, yes.**
***Q.*** It was focused on Edge AI?
***A.*** **Mm-hmm, yes.**
***Q.*** And for small, battery-powered devices, like wearable health devices, like, pacemakers or glucose sensors?
***A.*** **That was my understanding.**
***Q.*** And Edge AI means that the artificial intelligence is on applications as opposed to being in the Cloud?
***A.*** **I'm not an expert in that, but, yeah, I would say so, in my opinion.**
***Q.*** Is that a space that would compete with Qualcomm's Artificial Intelligence Department and their attempts to enter that space?
***A.*** **I don't know.**
***Q.*** You're a very talented engineer, as we established; correct?
***A.*** **I didn't establish that. Sure.**
***Q.*** You've never gotten a negative review at PMC Sierra or at Qualcomm?

**A. That's true.**
Q. And you are respected by your colleagues and peers?
**A. I'd like to think so.**
Q. You were able to put together Abreezio's technology in a makeshift trial; correct?
**A. Part of it, yes.**
Q. Is it fair to say you're a talented engineer?
**A. Sure.**
Q. And that Qualcomm highly respected your talents?
**A. That's -- I'm not sure what Qualcomm thinks of me. But, yeah, the reviews were pretty good.**
Q. The reviews were pretty good?
**A. The performance reviews were not bad.**
Q. And you decided not to join Atlazo because of an interview that Qualcomm had with you?
**A. Yes.**

***MS. BERNSTEIN:*** No further questions.

***MR. OLAH:*** Very briefly, Your Honor.

***REDIRECT EXAMINATION***

***BY MR. OLAH:***

Q. You were asked about your integration discussions with the folks at Abreezio on cross.
Do you recall that?
**A. Yes.**

***Q.*** Did you have those discussions with your Qualcomm email address?

***A.*** **Yes.**

***Q.*** You didn't have those discussions via private text message, did you?

***A.*** **No.**

***MR. OLAH:*** No further questions, Your Honor.

***THE COURT:*** Anything further?

***MS. BERNSTEIN:*** Nothing further. Thank you.

***THE COURT:*** Thank you, sir.

Government may call your next witness.

***MR. PILCHAK:*** Thank you, Your Honor. The United States calls Sanjiv Taneja.

***THE CLERK:*** Please stand here and raise your right hand.

***(Witness duly sworn.)***

***THE CLERK:*** Thank you. You may lower your hand. Please take the stand. You may be seated.

***THE WITNESS:*** Thank you.

***THE CLERK:*** Please state and spell your first and last name for the record.

***THE WITNESS:*** Sanjiv Taneja. First name is spelled S-a-n-j-i-v; last name is spelled T-a-n-e-j-a.

***THE COURT:*** Thank you.

///

***DIRECT EXAMINATION***

***BY MR. PILCHAK:***

***Q.*** Good morning, Mr. Taneja.

***A.*** **Good morning, Mr. Pilchak.**

***Q.*** Were you involved with a company called Abreezio?

***A.*** **Yes, I was.**

***Q.*** What was your position with Abreezio?

***A.*** **CEO.**

***Q.*** Did you plead guilty to a crime in connection with your involvement with Abreezio?

***A.*** **Yes, I did.**

***Q.*** What crime did you plead guilty to?

***A.*** **Money laundering.**

***Q.*** And in your own words, what did you do to commit that crime?

***A.*** **I concealed Karim's role from Qualcomm. And as a result, the funds derived from the transaction were not legal. And I had transferred that money from one account to another.**

***Q.*** When you say "concealed" Karim, you mean Dr. Arabi?

***A.*** **Dr. Arabi.**

***Q.*** And when you say you've concealed him from Qualcomm, in connection with what?

***A.*** **In connection with the Abreezio acquisition.**

***Q.*** And are you here testifying today as part of a Cooperation Agreement following your guilty plea?

***A.*** **Yes, I am.**

*Q.* I want to ask you some questions about your background.
Are you employed currently?
**A. Yes, I am.**
*Q.* What do you do for a living?
**A. I am Senior Vice President of Engineering at Nityo Infotech.**
*Q.* Is that N-i-t-y-o?
**A. Yes.**
*Q.* What kind of company is that?
**A. It's a company that helps businesses leverage technologies, like artificial intelligence, information technologies, to solve clients' business problems.**
*Q.* And how many employees does it have?
**A. It's over 10,000.**
*Q.* What do you do for Nityo?
**A. Senior Vice President of Engineering.**
*Q.* I want to ask you some questions about your educational background.
Can you describe your educational background to the jury, please?
**A. Yes, I can. I have an undergraduate degree in Electrical Engineering from Indian Institute of Technology, Delhi, India. Following which I did a Master's in Computer Science from Ohio State University, Columbus, Ohio. And I have an MBA from New York University Stern School of Business.**
*Q.* Have you worked in the engineering field for your entire

career?
**A. Yes, I have.**
*Q.* Can you tell us briefly about your professional background and which major companies you've worked for?
**A. I worked for AT&T Bell Laboratories, right after my graduation from my Master's, and I was there for 13 years. The division of which I was part of at Bell Laboratories was acquired by Cadence Design Systems. And I joined Cadence in 1998. I was there until 2014.**
*Q.* What kind of company was Cadence?
**A. Cadence Design Systems develops highly specialized software and IP, intellectual property, that helps chip designers design complex chips.**
*Q.* And if I focus your attention on the year 2005, around about that time, what did you do at Cadence?
**A. In 2005, I had been promoted to Vice President of R&D for the DFT business.**
*Q.* And let's break that down.
What is R&D?
**A. Research and development.**
*Q.* And so what did that mean for you at Cadence?
**A. Setting the overall direction of the product line, driving new product features that will meet our customer requirements, and keeping our technology at the cutting edge.**
*Q.* And I think you said you were the Vice President of R&D for

something called DFT.

What does that mean to you?

*A.* **DFT stands for Design For Test. And in a very simple terms, one can think of it as specialized logic that is added to a chip to reduce the cost of test, to make the manufacturing test run faster, and provide higher-quality product to the end customer.**

***Q.*** And when you say that process can run faster, why would that be valuable or worthwhile?

*A.* **It's all about time to market in the technology industry. And it also maps into a lower cost. If you reduce the time to test, that cost to test the chip is directly a function of the time it takes to test it.**

***Q.*** And so from your testimony earlier, I assume you know someone named Karim Arabi.

*A.* **Yes, I do.**

***Q.*** When did you first meet Dr. Arabi?

*A.* **In late 2005 or early 2006.**

***Q.*** While you were at Cadence?

*A.* **While I was at Cadence.**

***Q.*** How did it come about that you met him when you were working there?

*A.* **So as VP of -- Vice President of R&D, my sales team would take me on customer visits. That was a common practice. And one of such customers was PMC Sierra. And on that customer visit is where I met Karim for the first time.**

***Q.*** And so was Karim working at PMC at that time?
***A.*** **Karim was working at PMC at that time.**
***Q.*** What was Dr. Arabi's position at PMC when you met him?
***A.*** **To the best of my recollection, it was he was heading Design For Test.**
***Q.*** And, again, this was all the way back in 2005; right?
***A.*** **Late 2005 or early 2006.**
***Q.*** Okay. Professionally, what was your impression of Dr. Arabi when you met him?
***A.*** **Dr. Arabi was a recognized expert in the field. He had numerous publications to his credit and he was fairly well-known in the industry.**
***Q.*** So that might be his reputation or what was on his résumé, but did you interact with him personally?
***A.*** **I did interact with him personally.**
***Q.*** When you interacted with him, did he seem like a good, knowledgeable, and capable engineer?
***A.*** **Absolutely.**
***Q.*** Would you describe him as successful in his field, even at that time, 20 years ago?
***MS. BERNSTEIN:*** Objection. Leading.
***THE WITNESS:*** Yes.
***THE COURT:*** Overruled. The answer may stand.
***BY MR. PILCHAK:***
***Q.*** So in 2005 or 2006, Dr. Arabi was at PMC Sierra?

**A. That's right.**
*Q.* Do you know if he later moved over to Qualcomm?
**A. Yes.**
*Q.* When was that, if you know?
**A. To the best of my recollection, I learned about it in 2008.**
*Q.* And specifically, what did he move over to do at Qualcomm?
**A. He was --**
***MS. BERNSTEIN:*** Objection. 602.
***THE WITNESS:*** -- Design For Test.
***THE COURT:*** Wait. When there's an objection, you need to wait. So objection to 602 overruled. You may answer.
***THE WITNESS:*** Design For Test.
***BY MR. PILCHAK:***
*Q.* The same thing that he'd been doing at PMC, very generally speaking?
**A. That's right.**
*Q.* Okay. You mentioned that you had worked at R&D at Cadence; right?
**A. Yes.**
*Q.* Do you know whether Dr. Arabi ever occupied a position in the R&D Department at Qualcomm?
**A. Yes.**
*Q.* And when did that come about, if you know?
**A. It was roughly in 2011 timeframe.**
*Q.* What did you believe his role was in R&D at Qualcomm? What

was he responsible for?
**A. He was Vice President of Qualcomm Research.**
*Q.* And any sense of what kind of research he was in charge of when he worked at the company?
**A. So he had responsibility, to the best of my knowledge, for the entire portfolio of Qualcomm technologies. That includes wireless, which includes chip design, testing, semiconductors.**
*Q.* Fair to call that a broad field?
**A. Broad field, yeah.**
*Q.* I apologize, I should have asked this earlier when we were talking about Dr. Arabi's reputation.
Are you familiar with something called a keynote speech or a keynote address?
**A. Yes, I am.**
*Q.* Do you know if Dr. Arabi has ever delivered any of those?
**A. Yes, he has.**
*Q.* And what's a keynote speech, in your own words?
**A. It's when someone well-recognized in the industry is invited to address a large audience on any range of technical topics. Generally speaking, they tend to be more around the emerging trends.**
*Q.* And so you're familiar, then, with a company called Abreezio?
**A. Yes, I am.**
*Q.* When did you first hear about Abreezio?

*A.* **In 2014.**
*Q.* Do you remember what time of year it was?
*A.* **So it was October through December. I had a series of meetings with Dr. Arabi in that timeframe.**
*Q.* And if I ask you about the time right before the first meeting, what was going on in your life professionally at that time?
*A.* **Professionally, I was -- I'd been laid off from Cadence.**
*Q.* How did that come about?
*A.* **So there was a change in executive management. And I had kind of anticipated it was coming. And after a very successful technology career, seemed like the world had come to an end, because I'd been trying to search for jobs, couldn't find anything at that time.**
*Q.* How long had you been at Cadence when you were laid off?
*A.* **Close to 16 years.**
*Q.* And you said you looked for work after that?
*A.* **Actually, I started the search even before. With the new executive management coming in, I had anticipated, and so I had started the search even before that.**
*Q.* Did you apply to Qualcomm?
*A.* **I did.**
*Q.* And did you ask anybody for help with your application to Qualcomm?
*A.* **Yes, I did.**

*Q.* Who did you ask?
**A. Dr. Arabi.**
*Q.* What did you ask him to do?
**A. I sent him my résumé and asked him if he can help me with a relevant job opening that will match with my skills and Qualcomm's needs.**
*Q.* Because you already knew Dr. Arabi from his days at PMC.
**A. That's right.**
*Q.* What did Dr. Arabi do with your résumé, if you know?
**A. He was supposed to forward it to Dr. Ziad Mansour.**
*Q.* And who is Ziad?
**A. He is a senior -- he was a Senior Vice President who was heading all of the function related to methodologies for chip design.**
*Q.* At Qualcomm?
**A. At Qualcomm.**
*Q.* Is a Senior Vice President at Qualcomm a fairly big deal?
**A. Oh, it is a big deal, very big deal.**
*Q.* Did Dr. Arabi have some kind of connection to Ziad or did they just work at the same company?
**A. They were -- they had a very close relationship.**
*Q.* Why do you say that?
**A. Because Dr. Arabi told me so.**
*Q.* How did he describe their relationship?
**A. Something which was more than just a business acquaintance.**

*Q.* Did you get a job offer from Qualcomm?
***A.*** **I did not.**
*Q.* So what did you try to do then, professionally speaking?
***A.*** **So professionally, I partnered with a professor at Stanford with the goal of forming a startup. We had revelation from two different customers that the idea was very sound and then we shopped it around to investors. But I was unsuccessful in raising funding, primarily because I didn't have experience and I was labeled as a big-company guy.**
*Q.* Because of your background?
***A.*** **Because of my background.**
*Q.* And I want to be clear for the jury's benefit, this startup that you're talking about with the Stanford professor, did it have anything to do with Abreezio?
***A.*** **It did not.**
*Q.* So that was a separate project that you were working on at about this time.
***A.*** **Correct.**
*Q.* You mentioned a series of meetings with Dr. Arabi; right?
***A.*** **Yes.**
*Q.* And I think you said the first one was in October of 2014?
***A.*** **That's right.**
*Q.* Why did you meet with Dr. Arabi in October of 2014?
***A.*** **So I wanted to explore if Qualcomm would be interested in funding the company.**

*Q.* Your startup?
**A. Yeah, the Stanford startup.**
*Q.* And why did you want to discuss that with Dr. Arabi specifically?
**A. He would have a very good perspective, and he would know the right people to talk to.**
*Q.* Because he'd been at Qualcomm for a while?
**A. Yes.**
*Q.* Did you also mention a concept to Dr. Arabi called an Advisory Board?
**A. I did.**
*Q.* What is an Advisory Board?
**A. Advisory Board in a startup would essentially mean a team of technologists who can provide technical input to the overall direction of the company.**
*Q.* So sort of strategy and guidance?
**A. Strategy and guidance, but not a governing body.**
*Q.* Why would you ask Dr. Arabi to be on the Advisory Board for your startup?
**A. He would have been very valuable, given his background.**
*Q.* Because he was a good engineer?
**A. He was a good engineer, very good engineer.**
*Q.* Because of his connections?
***MS. BERNSTEIN:*** Objection. Leading.
***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** Was there anything besides his quality as an engineer that would have made him a good member of an Advisory Board?

***A.*** **A startup, in order for it to be successful, you need to have a network with customers and investors, so I thought he would add value on those dimensions as well.**

***Q.*** Did Dr. Arabi wind up joining the Advisory Board for your startup?

***A.*** **The startup never took off the ground, but he expressed his willingness to join.**

***Q.*** At that same meeting, though, did Dr. Arabi himself mention anything about a different startup?

***A.*** **Yes, he did.**

***Q.*** What did he say?

***A.*** **He said he was himself looking at a startup idea in the area for Design For Test, in DFT. And he mentioned it was -- he was working with an engineering company in Canada.**

***Q.*** Did he tell you anything else about the startup at that time?

***A.*** **Not at that time.**

***Q.*** Was he asking you to do anything with that company at that time?

***A.*** **Not at that time.**

***Q.*** Did he tell you whose company it was at that time?

***A.*** **Not at that time, to the best of my recollection.**

*Q.* Did the subject come up again, though, at a later time?
***A.* It did.**
*Q.* Okay. And specifically, did you have a meeting with Dr. Arabi in the first half of December?
***A.* I did.**
*Q.* And we're talking about 2014 here; right?
***A.* That's right.**
*Q.* Where was that meeting?
***A.* That meeting was in Santa Clara.**
*Q.* And why was Dr. Arabi in Santa Clara, if you remember?
***A.* He was attending an awards dinner at an industrial event on the -- on behalf of Qualcomm.**
*Q.* Was Qualcomm giving an award or was Dr. Arabi getting an award?
***A.* Qualcomm was getting an award.**
*Q.* So I'm sorry if I missed it, why was Dr. Arabi there?
***A.* To represent Qualcomm.**
*Q.* I see.
At this meeting, did you discuss your startup?
***A.* I discussed my startup, yes.**
*Q.* Was it going anywhere at that point?
***A.* It was not.**
*Q.* Did you also discuss the startup that Dr. Arabi had mentioned previously?
***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Overruled.

***THE WITNESS:*** **Yes.**

***BY MR. PILCHAK:***

***Q.*** What did he tell you?

***A.*** **So he gave me, first of all, that his sister has developed some technology, and that she is looking to commercialize it, and gave me a very, very high-level description of what the technology was.**

***Q.*** Before I ask you about the technology that he described at a high level, did you know that Dr. Arabi had a sister before this meeting?

***A.*** **I did not.**

***Q.*** Did he mention anything at the meeting about his sister?

***A.*** **At this meeting, he -- he mentioned that she was a graduate student at a university in Canada.**

***Q.*** Did he mention anything about her advisor at that school?

***A.*** **I don't recall if it was at this meeting or a subsequent meeting.**

***Q.*** Did you later learn who her advisor was?

***A.*** **Yes.**

***Q.*** Who was that?

***A.*** **Professor Bozena Kaminska.**

***Q.*** And do you know whether Professor Kaminska had any connection to Dr. Arabi?

***A.*** **I did not.**

*Q.* Okay. So you said, I think, at this meeting -- which, again, we're in the first half of December 2014; right?
***A.* That's right.**
*Q.* At this meeting, Dr. Arabi described the tech to you generally; is that your testimony?
***A.* At a very high level, yeah.**
*Q.* And what did he say at a high level about the technology?
***A.* In high-level terms, these are the areas she has developed the idea, the technology -- the technology. And the two areas were the Design For Test and Adaptive Voltage Scaling.**
*Q.* So the first one is the DFT field you've been talking about before?
***A.* That's right.**
*Q.* Is that the same general field that Dr. Arabi had worked in for years?
***A.* That's correct.**
*Q.* And what is the other product in?
***A.* It is Adaptive Voltage Scaling. And in simple terms, it essentially means reducing the power consumption of chip on an individual chip basis.**
*Q.* Is that sometimes called AVS?
***A.* AVS.**
*Q.* So if I say AVS, you'll know what I'm talking about?
***A.* That's right.**
*Q.* You mentioned that Dr. Arabi had worked in the DFT field for

a while; right?
**A. That's right.**
*Q.* Do you know whether he also had experience or expertise in the AVS field, if there is such a thing?
**A. He seemed to know a lot about that space as well.**
*Q.* Based on your conversations with him?
**A. Based on subsequent conversations, yes.**
*Q.* Okay. And so at this meeting, just to be clear, who did Dr. Arabi tell you this -- these technology ideas were coming from?
**A. His sister's.**
*Q.* At a later time, did you have any reason to doubt that?
**A. At a later time, yes.**
*Q.* And we'll come back to that later on.
I want to ask you, was that the last December meeting in 2014 that you had with Dr. Arabi?
**A. No.**
*Q.* When was the next meeting?
**A. The second half, just around the holiday times, either before or after, in that -- roughly in that timeframe.**
*Q.* And where was that meeting?
**A. In -- also in Northern California, Los Gatos.**
*Q.* Okay. Did the technology come up again?
**A. Yes, it did.**
*Q.* At this meeting, did Dr. Arabi provide more details about

what he was talking about?

**A. Absolutely did.**

*Q.* What did he tell you?

**A. I learned about his sister's name. I learned a lot more about what the approach was on the DFT, as well as on the AVS. I learned a little bit about Professor Kaminska's background.**

*Q.* And what was Dr. Arabi's sister's name?

**A. Sheida Arabi.**

*Q.* When he described the technology to you, did he seem familiar with it?

**A. Yes.**

***MS. BERNSTEIN:*** Objection. 702.

***THE COURT:*** Overruled. The answer may stand.

***BY MR. PILCHAK:***

*Q.* You're an engineer; right?

**A. Yes.**

*Q.* Have you ever spoken with an engineer about -- sorry.

Have you ever spoken with a non-engineer about technology when they get the words wrong?

**A. Yes, I have.**

*Q.* When they seem like they don't know what they're talking about?

**A. Yeah.**

*Q.* Have you ever spoken with lawyers who don't seem like they know what they're talking about with technology sometimes?

**A. It happens.**
Q. Did Dr. Arabi seem like that when he was talking to you about Abreezio?
**A. Not at all.**
Q. Did Dr. Arabi say anything about his plans with respect to his own career and employment and the company that you were talking about?
**A. Yes.**
Q. What did he say?
**A. That he may join this -- leave Qualcomm and be part of the startup.**
Q. Did you have an understanding at that time why he couldn't work on the startup while staying at Qualcomm?
**A. Yes, I did.**
Q. And why not?
**A. That would be a conflict of interest.**
Q. What is a conflict of interest?
**A. Conflict of interest would basically mean that if you are working for a certain employer, you cannot carry out activities that may compete with the interest of the company that you are employed with.**
Q. And in your own career at different companies in the tech field, is that a pretty well-established rule?
**A. Yes.**
Q. Have you ever worked for a company that said, Forget about

conflicts of interest, go on and work for our competitors while we're paying you?

***A.*** **No.**

***Q.*** At this meeting in -- can we call it late December 2014?

***A.*** **Yes.**

***Q.*** At this late December 2014 meeting with Dr. Arabi, did his plans for the company sound serious, like they were actually going to happen?

***A.*** **At least I thought so.**

***Q.*** Did you offer to participate in any way?

***A.*** **Yes, I did.**

***Q.*** What did you offer to do?

***A.*** **I was looking for a job, so I asked him if there was any way I can help in a customer-facing role, I'd be happy to.**

***Q.*** And what does that mean, a customer-facing role?

***A.*** **So something -- in the industry terminology, call it business development, working with customers, driving the adoption of the technology with the customers.**

***Q.*** And if I understood you right a moment ago, you were still unemployed at this time.

***A.*** **I was.**

***Q.*** So your salary was zero.

***A.*** **That's right.**

***Q.*** What did Dr. Arabi say when you made this offer?

***A.*** **He said he will get back to me, that he was considering**

**bringing an outside CEO, but he needed to sort things out with the company in Canada.**

*Q.* What was the company in Canada?

***A.*** **It was called Invionics.**

*Q.* Were you familiar with it at that time?

***A.*** **I was not.**

*Q.* Did you learn much more about it later?

***A.*** **That's right.**

*Q.* And when he said had he to sort things out before he discussed who's going to be the CEO, he said he had to go to the guys in Canada or the company in Canada?

***A.*** **That's right.**

*Q.* Did he ever say he had to go to his sister and ask her?

***A.*** **No.**

*Q.* Was there a mention of a possibility of you being the CEO at that meeting or did that come up later?

***A.*** **There was a mention of my coming up as a CEO. I don't recall if it was at these late-December meeting or in the subsequent conversation.**

*Q.* But right around that time?

***A.*** **Yeah.**

*Q.* Now I want to move the chronology forward a little bit to January of 2015, early in the new year.

Okay?

***A.*** **Yes.**

***Q.*** Did you reach out to Dr. Arabi in January of '15?
***A.*** **I did.**
***Q.*** And what did he say about what was happening with the company at that time?
***A.*** **So he responded to my question by saying that things have been worked out and the Canadian company is okay in bringing an outside CEO.**
***Q.*** The Canadian company would be okay with bringing in a CEO from outside of whoever is working on the company right then?
***A.*** **That's right.**
***Q.*** All right.
***MR. PILCHAK:*** I'd like to show the witness and the witness only Exhibit 851, please. And just zoom in on the available text, if you could.
***BY MR. PILCHAK:***
***Q.*** Do you see that there, sir?
***A.*** **Yes, I do.**
***Q.*** What is this?
***A.*** **This is a text message from Karim to myself.**
***Q.*** And I don't want to you read any of the text that's in the text message, but what's the date of the message?
***A.*** **January 11th, 2015.**
***Q.*** Is this a message that you remember receiving?
***A.*** **Yes, I do.**
***Q.*** Is that your phone number on the bottom two messages there?

**A. It is.**
Q. Where it says "Sanjiv"?
**A. Yes.**
Q. And at the top, where it says "Karim," whose phone number is that?
**A. That is Karim's.**
Q. Does the message identify the sender as Karim?
**A. It does.**
Q. And if we take that down and look at the numbers at the bottom right, do you have an understanding of where this document came from?
**A. This was from a law firm.**
Q. Why did you need a law firm?
**A. This is in the -- when the civil suit was filed --**
Q. Okay.
**A. -- I had engaged a law firm.**
Q. And paraphrasing, the parties have stipulated that Qualcomm sued Dr. Arabi and Sheida Alan in October of 2017.
Did Qualcomm sue you in that same lawsuit?
**A. Yes, it did.**
Q. And so you brought on board a firm to represent you?
**A. That's right.**
Q. Did they collect documents from you and produce them in that lawsuit?
***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** Were there documents produced on your behalf in the lawsuit?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** I'll allow it.

***THE WITNESS:*** May I answer?

***MR. PILCHAK:*** Yes.

***THE WITNESS:*** Yes.

***BY MR. PILCHAK:***

***Q.*** Was this one of them?

***A.*** **This was one of them.**

***Q.*** And did there ever come point in the discovery process in that lawsuit where your laptop or cell phone was imaged or copied for that purpose?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** I'll allow it.

***THE WITNESS:*** Yes, it was.

***MR. PILCHAK:*** Let's take that down and zoom in on the text again.

***BY MR. PILCHAK:***

***Q.*** Just take a moment and look at the three messages here on the screen, Mr. Taneja.

***A.*** **Yes.**

***Q.*** Do these appear accurate to you, to the best of your memory?

***A.*** **They do.**

***MR. PILCHAK:*** Move to admit 851, please.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** 902, 1003, and Motion *In Limine* 4.

***THE COURT:*** Overruled. It may be admitted.

***(Exhibit 851 admitted.)***

***BY MR. PILCHAK:***

***Q.*** All right. So we can see the messages on the screen now, Mr. Taneja.

Do you see those messages?

***A.*** **Yes.**

***Q.*** All right. So who is the top message from, again?

***A.*** **From Karim.**

***Q.*** Does it literally say, "Hi Sanjiv, this is Karim"?

***A.*** **That's right.**

***Q.*** Why is he providing this number to you, if you look at that second sentence?

***A.*** **This is for -- specifically for any topic related to outside of Qualcomm. "Non-Q" is referring to anything ^^having to do with Qualcomm. So, for example, Abreezio, the company that became Abreezio.**

***Q.*** And so when he says, "Non-Q stuff," you understood him to mean non-Qualcomm stuff?

***A.*** **Non-Qualcomm stuff.**

***Q.*** Was that sometimes a shorthand that you used to refer to Qualcomm?

***A.*** **That's right.**
***Q.*** Did you ever also call it QCOM, Q-C-O-M?
***A.*** **Yes.**
***Q.*** Is that pretty common?
***A.*** **At least in my usage, yes.**
***Q.*** By the way, if we look at the top right corner, there's kind of a time stamp there.
Do you see that?
***A.*** **I do.**
***Q.*** Do you know for certain what time zone that is?
***A.*** **I do not know for certain.**
***Q.*** We'll come back to that in a moment.
So what was Dr. Arabi's final answer about the CEO position?
***A.*** **He was going to offer me a CEO role.**
***Q.*** And, sorry, who offered you a CEO role?
***A.*** **Karim.**
***Q.*** How did he offer you the CEO role?
***A.*** **It was through a text message.**
***MR. PILCHAK:*** Can we show the witness and the witness only Exhibit 713, please. And zoom in. Thank you.
***BY MR. PILCHAK:***
***Q.*** Is this another text series, Mr. Taneja?
***A.*** **That's right.**
***Q.*** Is it between you and Dr. Arabi at that same telephone number?

***A.*** **That's right.**

***Q.*** Is this a true and accurate copy of a conversation that you recall having with Dr. Arabi?

***A.*** **That's correct.**

***MR. PILCHAK:*** Move to admit 713.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** Same objections for the record, Your Honor, 902, 1003, motion *in limine* 4.

***THE COURT:*** Overruled. It may be admitted.

***(Exhibit 713 admitted.)***

***BY MR. PILCHAK:***

***Q.*** And Mr. Taneja, the first message here looks like it's dated about eight days after that last one.

Is that consistent with your memory?

***A.*** **That's right, roughly.**

***Q.*** And what, in substance, is Dr. Arabi telling you in that first message?

***A.*** **So essentially, he's making an offer with no cash, and that I will have a share, a 7 percent share of the company.**

***Q.*** And what is a 7 percent share of the company?

***A.*** **So, for example, if the company got valued at 100 million, my share would be 7 million.**

***Q.*** Got it.

That's assuming that the shares at the end of the road are the same as the shares at the beginning of the road; right?

**A. That's right.**

Q. You said you went to business school?

**A. I did.**

Q. Are you familiar with something called "dilution"?

**A. Yes.**

Q. What is "dilution"?

**A. So dilution basically means, if we take the same example, in the beginning, my share is 7 percent. Now, if an external investor comes in and puts in a certain amount of money, that money gets put at a certain valuation, they will get a portion of the company, so the existing holders of the company will be proportionately reduced.**

Q. Meaning your share could become less.

**A. That's right.**

Q. Okay. Going back to this text conversation, did you interpret this as an offer from Dr. Arabi?

**A. I did.**

Q. Did you make him a counteroffer or haggle about these numbers?

**A. I did not.**

Q. Why not?

**A. As I mentioned earlier, my self-confidence had been totally shattered. After having done an extensive job search, and having been turned down for funding of the Stanford idea, I really didn't have much of an option.**

*Q.* Did you feel that you were in a position to haggle with Dr. Arabi?
***A.* I was not in a position.**
*Q.* And, again, to be clear, who is this offer coming from?
***A.* From Karim, Dr. Arabi.**
*Q.* Did you ever discuss the 7 percent or haggle about it with anybody else?
***A.* No, I did not.**
*Q.* Was there anybody else that you could have haggled with, as far as you knew at this time?
***A.* I wasn't aware of one.**
*Q.* So did you accept this offer?
***A.* I did.**
*Q.* How did you accept this offer?
***A.* Also through text.**
*Q.* And after that, were you sort of off and running as the CEO of Abreezio?
***A.* That's right.**
*Q.* Had you ever been the CEO of a company before?
***A.* I had never been a CEO.**
*Q.* So how did you know what to do?
***A.* It was really learning on the job, and I was totally fresh. And, in fact, that was the reason why I had been turned down by several investors when I was shopping for the Stanford idea.**
*Q.* All right. So this is January the 19th of 2015; right?

***A.*** **That's right.**

***Q.*** After you came on board as the CEO of Abreezio, was there a whole series of meetings and discussions that went forward from that point?

***A.*** **That's correct.**

***MR. PILCHAK:*** Your Honor, are we planning to take a break at 11:30?

***THE COURT:*** Sure.

***MR. PILCHAK:*** I'm not asking for one. I'm just asking the Court.

***THE COURT:*** Okay. Are you ready to take a break now?

***MR. PILCHAK:*** I can either plow into the next series of meetings or we can stop at this point.

***THE COURT:*** Let's go ahead and take a lunch break at this time. One hour, ladies and gentlemen, if you could be back at 12:30. You're reminded you're not to discuss the case or do any research about the case, and we'll see you back at 12:30.

And you're ordered to be back at 12:30, sir, Mr. Taneja, 12:30. We'll see you then.

***(Jury out at 11:29 a.m.)***

***THE COURT:*** Okay. We're now outside the presence of the jury. I'm laughing because we have a juror question, a request for definition of the numbered objections, like 602, 402, 403.

***MS. BERNSTEIN:*** I would be very happy to provide

speaking objections if that's what the jury would like, Your Honor.

***THE COURT:*** When they come back, I will just instruct the jury that the reason I am -- the attorneys are using numbers is because whether an objection is made and the reason for the objection is not something that they are to consider, and that's why we use numbers. And they -- I'll use something along my rulings on objections before to remind them what that means, but that they shouldn't speculate as to the reason for an objection.

***MR. PILCHAK:*** Very good, Your Honor. I just want to note for the record, I'm pleased they're being so scrupulous about not Googling things. That's an easy one, so I'm glad they didn't do that.

***MS. BERNSTEIN:*** And I think we actually should address it, Your Honor, because there's 20 or so text messages, and of course, that's the objection to all of them. I will need to check with my colleagues, who are smarter than I am, as to whether I need to object for the record every single time or if a standing objection, with the Court's permission.

***THE COURT:*** I don't have a problem with a standing objection to any of the emails. The only problem I have is if the Government does not lay as scrupulous an authentication foundation, I may sustain the objection.

***MS. BERNSTEIN:*** Okay.

***THE COURT:*** So that's part of the reason that I sort of

want to hear it.

***MS. BERNSTEIN:*** That's fine, Your Honor.

***MR. PILCHAK:*** I appreciate that, Your Honor. I may have a fix for that, although, I don't know, maybe this will make things worse. We've prepared a batched set of the remaining texts to use with Mr. Taneja. We've discussed extensively with the Defense, I've taken two out of the stack that they have unique objections to on top of the pattern objections that we've heard to the first two.

But as to the rest, I think it's the same objection for all 25 of them. And so I'm going to have the witness batch authenticate them, if that's okay, and say, These all look like my text messages. We've laid foundation pretty well for the first two. And then the Defense can make the same objection for the record just once.

***THE COURT:*** For all 25 of them.

***MS. BERNSTEIN:*** That works.

***MR. PILCHAK:*** Thank you, Your Honor.

***THE COURT:*** For the record, I did mark the notes of the Fang interviews as Court's Exhibit 2C. I'm filing them under seal, and at this point, I don't find that there is anything impeaching there. So here's 2C.

***THE CLERK:*** Thank you, Judge.

***MS. BERNSTEIN:*** I'm sorry, and 2C is Mr. Fang's?

***THE COURT:*** 2C is Mr. Fang.

***MS. BERNSTEIN:*** Thank you.

***MR. PILCHAK:*** Thank you, Your Honor.

***THE COURT:*** The note for the juror has been listed as four, Court's Exhibit 4. Okay.

Anything else?

***MS. ROBERTS:*** Your Honor, previously, you'd asked for some circuit authority as to whether *Brady* trumps common-law privilege.

***THE COURT:*** Yes.

***MS. ROBERTS:*** Well, we did some very quick and dirty research, and we do find precedent in the Circuits where the Sixth Amendment Right to Confrontation clause trumps attorney-client common-law privilege. And I'll cite the Court to *Murdoch vs. Castro*, 35653699, pin site 703, Ninth Circuit, 2004. And it cites a bunch of other circuit cases, *United States v.* --

***THE COURT:*** Okay. So I'm concerned -- I didn't get the cite.

***MS. ROBERTS:*** Okay. It's --

***THE COURT:*** I have 3653699, but I don't know what you're citing to, what volume.

***MS. ROBERTS:*** Oh, you have a brief? It's a Ninth Circuit case, *Murdoch vs. Castro*.

***THE COURT:*** What's the cite?

***MS. ROBERTS:*** 365 F.3d 699, pin cite 703.

***THE COURT:*** Got it now.

***MS. ROBERTS:*** Ninth Circuit.

***THE COURT:*** Got it.

***MR. FRASER:*** At that's -- *Brady* also applies, so that's two constitutional provisions that call for disclosure even if they were privileged.

***MR. PILCHAK:*** And I just want to be clear for the record, I look forward to reading that case. We don't take a position on this. We're not urging the Court to find a privilege or discard it. We're happy the Court's reviewing it *in camera*.

***THE COURT:*** Okay.

***MR. PILCHAK:*** Thank you.

***MS. BERNSTEIN:*** And the only final thing I would say, Your Honor, is I know the witness is off the stand, but I believe his attorneys are still present in the courtroom. And just to, of course, remind everyone about the -- not to confer with the Government and that he is still under oath.

***THE COURT:*** Okay. Yes. And I'm sure the attorney knows that. You are not to confer with the Government or talk to any other witnesses about what they already testified to or what they're going to testify to in the future.

***MR. PILCHAK:*** Thank you, Your Honor.

***MS. BERNSTEIN:*** Thank you, Your Honor.

***THE COURT:*** Thank you.

***(Lunch recess taken.)***

***THE COURT:*** Okay. We are back on the record. All jurors are present. Dr. Arabi is present. All lawyers are present. You, sir, are reminded that you're still under oath to tell the truth.

***THE WITNESS:*** Yes.

***THE COURT:*** Counsel.

***MR. PILCHAK:*** Thank you, your Honor.

***BY MR. PILCHAK:***

***Q.*** Good afternoon, Mr. Taneja.

***A.*** **Good afternoon, Mr. Pilchak.**

***Q.*** When we left off, I think we were talking about the mid-July -- sorry -- mid-January time period in 2015.

Do you recall that?

***A.*** **Yes.**

***Q.*** Did you say that there was a whole series of meetings and conversations that continued after you were on board as the CEO of Abreezio?

***A.*** **That's correct.**

***Q.*** Was one of those meetings on January 23rd of 2015?

***A.*** **There was.**

***Q.*** Where did that meeting take place?

***A.*** **In San Diego.**

***Q.*** And where in San Diego specifically?

***A.*** **At a restaurant called club -- near a golf course.**

***Q.*** And do you recall which golf course?
***A.*** **Club Del Mar.**
***Q.*** Okay. Is that the Grand Del Mar?
***A.*** **Grand Del Mar probably.**
***Q.*** All right. Let's -- actually, in lieu of showing the witness one document at a time, there's a binder there in front of you. If you open that binder up and look to the sticky note that says "Text Messages," do you see that there?
***A.*** **I do.**
***Q.*** There are a number of exhibits that are included, and I'll read those into the record now. Go ahead and leaf through them as I'm reading these numbers and have a look at what they are.
The exhibits I'd like to reference are 714, 716, 689, 698, 690, 720, 721, 722, 704, 691, 702, 723, 701, 693, 707, 708, 727, 726, 728, 880, 729, 730, 731, and last but not least, 703.
***THE COURT:*** Probably have to go back over those again for the witness.
***MR. PILCHAK:*** Absolutely.
***THE COURT:*** So let's take them little by little, one by one.
***BY MR. PILCHAK:***
***Q.*** Well, Mr. Taneja, have you had a moment to look through the binder there?
***A.*** **Yes, I have.**
***THE COURT:*** And is that binder just the exhibits that

you just outlined?

***MR. PILCHAK:*** It is. It may also have 706, which is a previously admitted exhibit, and then also 699 and 881, which I don't intend to ask about right now.

***THE COURT:*** Okay. So if you could look through that binder of exhibits. And we'll give you plenty of time, as much time as you need.

***MR. PILCHAK:*** Thank you, your Honor.

***THE COURT:*** While the witness is doing that, I wanted to just address something with the jury. And I know it's frustrating, you hear these numbers during the objections a lot. And the reason the attorneys are using numbers to object to things is because the reason for the objections is not something you are supposed to consider. That's why we use numbers.

So you won't consider why I'm either allowing the document in or allowing the witness to answer or not allowing the document in or not allowing the witness to answer. All that matters is whether I'm allowing the answer or the exhibit in, not the reason for it being admitted.

So if I overrule the objection, the question may be answered or exhibit received, and you may consider it in your deliberations. However, you should not consider the fact that an objection was made or why the objection was made.

Similarly, if I sustain an objection, the question cannot be answered, and the exhibit cannot be received. When I

sustain an objection to a question, you must ignore the question, must not guess what the answer would have been, and you also must not consider why the objection was made or why I sustained the objection.

So you don't need to understand the numbers, is the bottom line.

***THE WITNESS:*** Yeah.

***BY MR. PILCHAK:***

***Q.*** Have you reached the end of that stack of documents, Mr. Taneja?

***A.*** **Yes.**

***Q.*** Thank you for your patience going through those. Hopefully, that will speed up the rest of the process and just make it a bit more efficient.

So I want to ask you some questions about those documents that I've just listed by number grouped together.

First of all, did you see all of those numbers in the binder that you just looked through?

***A.*** **Yes, I do.**

***Q.*** They're written on little tabs on the side?

***A.*** **Yes.**

***Q.*** Thank you.

What do all of those documents appear to be to you, taking them together?

***A.*** **Text messages that I am part of.**

***Q.*** So you're on each one of those conversations yourself?

***A.*** **Yes.**

***Q.*** Under the name Sanjiv with the same phone number we saw on the first two before lunch?

***A.*** **That's right.**

***Q.*** But there's other parties to those text messages; right?

***A.*** **Correct.**

***Q.*** But do they all seem to be accurate copies of conversations that you generally remember having around the dates that are on those texts?

***A.*** **Yes.**

***MR. PILCHAK:*** At this time we'd move to admit these documents, your Honor.

***THE COURT:*** Counsel?

***MS. BERNSTEIN:*** 902, 1003, Motion *In Limine* 4.

***THE COURT:*** Okay. That will be denied. They may be admitted.

***MR. PILCHAK:*** Thank you, your Honor.

***(Exhibits admitted.)***

***BY MR. PILCHAK:***

***Q.*** You can put the binder to the side now.

***MR. PILCHAK:*** If we can show the witness Exhibit 714 on the screen which was just admitted. And let's please zoom in on the top.

///

***BY MR. PILCHAK:***

***Q.*** Do you see that there, Mr. Taneja?

***A.*** **Yes, I do.**

***Q.*** Now, what is the date on this message?

***A.*** **January 22nd, 2015.**

***Q.*** And I know you testified you're not positive what time zone these are in. But if the time zone is ahead of ours, is it possible it's actually the day before?

***A.*** **Correct.**

***Q.*** Because if you subtract enough hours off of a 5:00 a.m. time, you can get back to the prior day?

***A.*** **That's right.**

***Q.*** Who is the top message from?

***A.*** **From Dr. Karim Arabi.**

***Q.*** And when he says Ziad is open on Friday, who is he talking about?

***A.*** **He is talking about Ziad Mansour, the senior vice president of Qualcomm.**

***Q.*** Is that the same person that you understood Dr. Arabi sent your résumé to when you were applying to the company?

***A.*** **Yes.**

***Q.*** And are you and Dr. Arabi arranging a meeting with Mr. Mansour in these text messages?

***A.*** **That's correct.**

***Q.*** Why were you arranging a meeting with Mr. Mansour?

**A. So Dr. Arabi had suggested that he will set up a meeting with Mr. Ziad Mansour so that we can introduce the new company technology to him.**

*Q.* What new company?

**A. His sister's company -- the ideas contained in his sister's.**

*Q.* Okay. Did that company eventually become Abreezio?

**A. Yes.**

*Q.* Was it named Abreezio on January 21st or January 22nd, though?

**A. No.**

*Q.* Okay. But if I slip up and call it Abreezio, will you know what I'm talking about?

**A. That's right.**

***MR. PILCHAK:*** Okay. Let's show the witness 716, please, which was just admitted. And just zoom in on all the text if you can.

***BY MR. PILCHAK:***

*Q.* Do you see that there, sir?

**A. I do.**

*Q.* At the top here, what is the gist of the message from Dr. Arabi to you dated January 23rd?

**A. It's giving the venue of the lunch meeting with Ziad.**

*Q.* Does that match your memory that it was at the Del Mar Grand?

**A. Absolutely does.**

*Q.* There's even a time for the meeting there.
Do you see that?
***A.* I see that.**
*Q.* And if we go about two-thirds of the way down, is there a message back from you about your arrival?
***A.* Yes.**
*Q.* And in response to that, what does Dr. Arabi indicate?
***A.* He says, "I'm on my way."**
*Q.* Did he attend this meeting as well?
***A.* He did.**
*Q.* And then you say in that bottom message, "Akbar is here." Right?
***A.* Yes.**
*Q.* Who is Akbar?
***A.* That's referring to Mr. Akbar Shokouhi. He was the investor in Abreezio.**
*Q.* Okay. At this time on January 23rd, had you ever met Akbar Shokouhi before?
***A.* No, I have not.**
*Q.* Who invited him to this meeting?
***A.* Dr. Karim Arabi.**
*Q.* For what purpose?
***A.* For the purposes of the introduction to Qualcomm and the investment in the company.**
*Q.* And so that was Mr. Shokouhi's potential role, was as an

investor?
**A. As an investor.**
*Q.* Had he already invested money at this time?
**A. Not to the best of my knowledge.**
*Q.* Okay. And so the meeting -- did the meeting actually happen as reported in these text messages?
**A. It did.**
***MR. PILCHAK:*** I think we can take those down.
***BY MR. PILCHAK:***
*Q.* So who all was present at the meeting?
**A. So Dr. Karim Arabi, Ziad, Akbar, myself.**
*Q.* Four people?
**A. Four people.**
*Q.* Got it.
And so this was the first time you were meeting Mr. Shokouhi?
**A. Correct.**
*Q.* Was this the first time you were meeting Mr. Mansour?
**A. Other than a quick hi and bye at a conference earlier that same year or year prior.**
*Q.* Okay.
**A. Or a couple of years prior.**
*Q.* So this was maybe your first conversation of substance with him.
**A. Correct.**

***Q.*** And what happened at the meeting?

***A.*** **So the meeting was intended to be giving a description of what this new company is all about, what new technologies Abreezio is bringing, and will they be relevant to Qualcomm. So the purpose was to establish if there is a good fit between Qualcomm's needs and what Abreezio offered.**

***Q.*** And who was there as kind of the Qualcomm representative?

***A.*** **Ziad.**

***Q.*** And who was there to explain what Abreezio had to see whether that puzzle piece fit with the Qualcomm puzzle piece?

***MS. BERNSTEIN:*** Objection. 602.

***THE COURT:*** Overruled.

***THE WITNESS:*** So it was a combination of myself and Dr. Arabi.

***BY MR. PILCHAK:***

***Q.*** And so who made an effort during the meeting to explain Abreezio's products or technology?

***A.*** **So I started off by introducing that I'm excited to be the CEO of Karim's sister's company. I gave an overview of the technology. And Dr. Arabi chimed in as the conversation went along.**

***Q.*** Did he once again seem familiar with the technology that Abreezio had in?

***A.*** **Very much.**

***Q.*** How did you learn about the technology that Abreezio had, by

the way, to be able to discuss it at this meeting?
**A. Through Dr. Arabi.**
*Q.* So he described it to you, and then you were able to describe it to Mr. Mansour?
**A. That's right.**
*Q.* Let me ask you about Mr. Shokouhi.
What was your impression of his take on the company and its technology?
**A. Seemed very positive.**
*Q.* Why do you say that?
**A. He was inclined to make an investment in the company.**
*Q.* According to what he said at that meeting?
**A. Yeah.**
*Q.* Did he -- I don't want to spoil the surprise. But did he later make an investment?
**A. He did.**
*Q.* Okay. Hopefully, we'll come back to that.
Let me ask you this: At this meeting at the Grand Del Mar, did it seem like this was the first time that Mr. Shokouhi was hearing about this new technology and the new company?
**A. No.**
*Q.* Why do you say that?
**A. He seemed familiar with the technology already.**
*Q.* Now, same question for Mr. Mansour, Ziad.
Did it seem like he was hearing about everything on the

Abreezio side for the first time?

***MS. BERNSTEIN:*** Objection. 602.

***THE COURT:*** Overruled.

***THE WITNESS:*** It did not seem like that to me.

***BY MR. PILCHAK:***

***Q.*** Why do you say that?

**A. Most of the time that Ziad spent was more in learning about my background instead of probing into the technology.**

***Q.*** What do you mean learning about your background?

**A. So what was my professional background, what specifically I did at Cadence, what did I do at Bell Laboratories.**

***Q.*** Did it feel to you a little bit like a job interview?

**A. It almost did, yeah.**

***Q.*** How would you characterize the relationship between Ziad, Akbar, and Dr. Arabi at the lunch?

**A. They all seemed very close to each other, very friendly relationship.**

***Q.*** Did it seem like they were meeting each other for the first time or having their first conversation of substance with each other?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Overruled.

***THE WITNESS:*** Not at all.

***BY MR. PILCHAK:***

***Q.*** Was there discussion of a dog and pony show?

**A. Yes.**
Q. What is a dog and pony show?
**A. So in the technology industry, if you are showcasing your technology, giving a demo of the product, informally it is also referred to as a dog and pony show. At least in my vernacular.**
Q. So kind of a demonstration?
**A. A kind of demonstration, yeah.**
Q. And what was the discussion of a dog and pony show at this lunch meeting?
**A. To arrange a meeting at Qualcomm in roughly about a certain time frame from that point, to the best of my recollection, a month from the day we met.**
Q. Was there any discussion at this meeting of doing a dog and pony show at other shops around town?
**A. Sorry, at other customers?**
Q. Yes.
**A. No.**
Q. And to be fair, Mr. Mansour was at this meeting; right?
**A. Correct.**
Q. Nobody was there from Intel?
**A. That's right.**
Q. Nobody was there from Broadcom?
**A. That's right.**
Q. Nobody was there from anyplace else?
**A. That's right.**

*Q.* But there was discussion of a dog and pony show at Qualcomm?

***A.*** **Correct.**

*Q.* Was there any kind of a plan for next steps or follow-up?

***A.*** **Yeah. So the general agreement was to come back to Ziad in about a month's time with a formal request to schedule the meeting.**

*Q.* And when you say "the general agreement," did Dr. Arabi participate in making that agreement?

***A.*** **Yes.**

*Q.* Was he involved at all in giving guidance about communicating with Ziad?

***A.*** **Yes, he was.**

*Q.* What did he say?

***A.*** **So he instructed me to write an email to Ziad and specifically asked me not to make a reference to this lunch meeting.**

*Q.* So in your email you couldn't refer to the meeting you'd already had?

***A.*** **Correct.**

*Q.* Did that strike you as odd at the time?

***A.*** **It did.**

*Q.* Why?

***A.*** **In a normal course, I would have started off my message by referring to a meeting that we had a month earlier and then talk about the specific days on which he and his team are available.**

***Q.*** And you'd worked in customer-facing roles before; right?
***A.*** **Yes.**
***Q.*** So you managed client relationships?
***A.*** **I did.**
***Q.*** Is that a common thing in sales and client relationships to do a call back to your last happy interaction with someone?
***A.*** **Yes.**
***Q.*** But here, you didn't -- well, did you do that?
***A.*** **I did not.**

***MR. PILCHAK:*** Let's show the witness and the witness only Exhibit 749, please.

***BY MR. PILCHAK:***
***Q.*** Is this an email chain --

***MR. PILCHAK:*** And zoom in on the top half, please.

***BY MR. PILCHAK:***
***Q.*** Down below there, is it between you and Mr. Mansour?
***A.*** **Correct.**
***Q.*** And on top between you and a different email address?
***A.*** **That's right.**

***MR. PILCHAK:*** Move to admit 749.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No objection.

***THE COURT:*** 749 may be admitted.

***(Exhibit 749 admitted.)***

///

***MR. PILCHAK:*** Let's go to the last page, please, and zoom in on that bottom message.

***BY MR. PILCHAK:***

***Q.*** So Mr. Taneja, we're going to talk more about specific email addresses.

But this bottom message is dated February 24th, right?

***A.*** **Correct.**

***Q.*** Is that almost exactly one month after your meeting at the Club Del Mar?

***A.*** **Yes.**

***Q.*** I probably messed that up.

The Club M at the Grand Del Mar? I don't know.

***A.*** **Yeah.**

***Q.*** Okay. Who are you writing this email to?

***A.*** **Ziad Mansour.**

***Q.*** Where did you write this email from?

***A.*** **From my Abreezio account.**

***Q.*** So by this time, a month later, there exists Abreezio email accounts?

***A.*** **That's right.**

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** Did you create Abreezio email accounts eventually?

***A.*** **Yes.**

***Q.*** I'll have more questions about that later.

Is this that initial email to Ziad that you were testifying about a moment ago?

***A.*** **Correct.**

***Q.*** Where in this email -- well, is there in this email any reference to that lunch meeting?

***A.*** **There isn't.**

***Q.*** In fact, where you say, "I would like to take this opportunity introduce Abreezio," hadn't you already introduced Abreezio?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** I'll allow it. Overruled.

***THE WITNESS:*** I had already introduced Abreezio to Ziad at the January lunch.

***BY MR. PILCHAK:***

***Q.*** Okay. And then it refer to an angel-funded Silicon Valley-based design IP startup; right?

***A.*** **Yes.**

***Q.*** There's a lot of unpack there.

But what does "angel-funded" mean?

***A.*** **So "angel" is referring to a class of investors who are not making big investments, relatively speaking, compared to what a traditional investor -- a venture capital firm would be considered more like a traditional investor. So they will write big-sized checks.**

**Angel investors write small-sized checks -- it's all relative by the way, when I say "small" -- in the early stage of the company formation.**

***Q.*** Got it.

So angels come in before the venture capital guys?

***A.*** **That's right.**

***Q.*** They write slightly smaller checks?

***MS. BERNSTEIN:*** Objection. Asked and answered.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** Is an angel investor usually an independent investor from the company but not --

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Overruled.

***THE WITNESS:*** Generally speaking, yeah.

***BY MR. PILCHAK:***

***Q.*** But not always?

***A.*** **Not always, yeah.**

***Q.*** Okay. Let's zoom out from that.

Then are there some follow-up message where's you try to get Mr. Mansour's attention over the next couple of days?

***A.*** **That's correct.**

***MR. PILCHAK:*** Let's go back to the first page.

***BY MR. PILCHAK:***

***Q.*** Eventually, is there a response from Ziad at the bottom of

that first page?

**A. There is.**

***MR. PILCHAK:*** Let's zoom in on that, please.

***BY MR. PILCHAK:***

***Q.*** When Ziad responds and says, "I am interested in hearing more about your technology," does Ziad mention the lunch?

**A. He does not.**

***MR. PILCHAK:*** And then if we can take that down and zoom in on the top two messages again, please.

***BY MR. PILCHAK:***

***Q.*** In the bottom half of the zoom here, do you all sort of settle on a meeting time and date?

**A. We do.**

***Q.*** And then what happens in that top message?

**A. I am forwarding that to Dr. Karim Arabi.**

***Q.*** But that email address doesn't say Karim Arabi, does it?

**A. It does not.**

***Q.*** What does that email address say?

**A. Sheida.arabi1@gmail.com.**

***Q.*** Why would you forward an email to Dr. Karim Arabi at an email address that says Sheida.arabi1@gmail.com?

**A. That were per his instructions earlier, that he has access to this email account.**

***Q.*** Per whose instructions?

**A. Dr. Karim Arabi's.**

***Q.*** And the date of this message is March 1st, 2015; right?
***A.*** **Correct.**
***Q.*** So by March 1st, 2015, you were aware that Dr. Arabi was using an email address with his sister's name on it?
***A.*** **Yes.**
***MS. BERNSTEIN:*** Objection. Asked and answered.
***THE COURT:*** Overruled.
***BY MR. PILCHAK:***
***Q.*** That was a "yes"?
***A.*** **Yes.**
***Q.*** Okay. We'll come back to that in a moment.
Let me ask you this: Did Dr. Arabi ever review your correspondence with Ziad Mansour?
***A.*** **Yes.**
***Q.*** And by "review," I mean review before you sent it.
***A.*** **Reviewed a draft.**
***Q.*** Right.
***MR. PILCHAK:*** Let's show the witness Exhibit 95, please. And the witness only. And just zoom in on the text, please.
***BY MR. PILCHAK:***
***Q.*** Is the subject of this email -- email "Please review"?
***A.*** **Yes.**
***Q.*** And is the bottom message from you at that same account we were just looking at?

**A. Correct.**
*Q.* And on the top, there's a reply from this Sheida.Arabi1 email account; right?
**A. That's correct.**
***MR. PILCHAK:*** Move to admit 95.
***THE COURT:*** Any objection?
***MS. BERNSTEIN:*** No objection, your Honor.
***THE COURT:*** Ninety-five may be admitted.
***(Exhibit 95 admitted.)***
***BY MR. PILCHAK:***
*Q.* Mr. Taneja, now that the jury can see it, what is this bottom email starting on March 4th, 2015?
**A. The draft for review, Mr. Pilchak? Is that the one?**
*Q.* Yes. So there's a numbered list of three numbers there; right?
**A. Yes.**
*Q.* And let's put those to the side for a moment. Let me ask you about the rest of the message that starts by saying "Ziad," comma.
What is that?
**A. Yeah, this is after the meeting was over. And I am thanking him for his very engaging meeting along with his team.**
*Q.* You're thanking Ziad?
**A. No. I'm having Dr. Arabi review this email I was going to send to Ziad.**

***Q.*** Okay. So is this a draft message to Mr. Mansour that you sent to Dr. Arabi?

***A.*** **That's correct.**

***Q.*** Did you send it to that Sheida account that you were just testifying about, if you look at the top of the message here?

***A.*** **I did.**

***Q.*** And did you in fact get feedback from that email account?

***A.*** **I did.**

***Q.*** Did whoever wrote from that email account, did they also respond to some of your numbered notes there in the bottom message?

***A.*** **Yes.**

***Q.*** Do you see the reference here to Saad, "Will Saad be the right person for biz"?

***A.*** **Correct.**

***Q.*** What does that mean?

***A.*** **That's referring to Mr. Saad Elhosni, senior director of DFT at Qualcomm at the time.**

***Q.*** Okay. And why were you asking about Saad?

***A.*** **Because Saad was responsible. He had a major role on the DFT side.**

***Q.*** And what is Sheida's at Sheida.arabi1@gmail.com reply about Saad?

***A.*** **It says, "It's a good idea to send an email to Saad too."**

***Q.*** Does it seem to you that the author of that email knew who

Saad Elhosni was?

**A. Yes.**

***Q.*** Did you have an understanding that Dr. Karim Arabi knew who Saad Elhosni was?

**A. Absolutely.**

***Q.*** Is that why you sent that question in the email at the bottom?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT REPORTER:*** I didn't hear your answer.

***THE WITNESS:*** That's right.

***BY MR. PILCHAK:***

***Q.*** Do you have any reason to expect that Sheida Arabi in Vancouver would know who Saad Elhosni was?

**A. No.**

***MR. PILCHAK:*** I think we can take that down and remove the annotations if you would, Ms. Fincher.

***BY MR. PILCHAK:***

***Q.*** So let me ask you some more questions about email accounts if I can. So we'll sort of take a break from going through the meetings and events, and I'll show you or ask you about some email accounts.

**A. Okay.**

***Q.*** If we can, I'd like to show the witness a demonstrative that we used earlier. We're going to discuss a number of accounts here, Mr. Taneja.

Would it help you to refer to a list of them to keep your testimony to the jury organized?

***A.*** **Yes.**

***MR. PILCHAK:*** So would the Court's permission, I'd like to show the witness Exhibit 883, which is a demonstrative we used previously to keep track of the email accounts.

***THE COURT:*** You may.

***MR. PILCHAK:*** Thank you, your Honor.

***BY MR. PILCHAK:***

***Q.*** Do you see a list of different accounts here with some version of Sheida's name in them, Mr. Taneja?

***A.*** **I do.**

***Q.*** The one that we were just talking about, I think, is this one here, the first one highlighted in pink.

Do you see that?

***A.*** **Correct.**

***Q.*** Where did you first get that email address?

***A.*** **From Dr. Karim Arabi.**

***Q.*** Let's show the witness Exhibit 689, which I think we just admitted in evidence. And if we could zoom in on all the available text, please.

Mr. Taneja, what's going on in these text messages?

***A.*** **This is about setting up email accounts, correspondence between myself and Dr. Karim Arabi.**

***Q.*** And I'll have a few more questions about the top part of

that chain.

But in the bottom part, are you asking for Sheida's email address in the third message from the bottom?

***A.*** **I am.**

***Q.*** And does Karim reply at the end?

***A.*** **Yes, he does.**

***Q.*** What email address does he give you?

***A.*** **Sheida.Arabi1@gmail.com.**

***Q.*** At the time that that text was sent, did you generally believe that that was a real email account used by the real Sheida Arabi?

***A.*** **Yes, I did.**

***Q.*** Did you later learn otherwise?

***A.*** **Correct, I did.**

***MR. PILCHAK:*** Let's take that down and show the witness and the witness only Exhibit 636. And just zoom in on the text there, please.

***BY MR. PILCHAK:***

***Q.*** Is this a February 28th email between you and that same Sheida address?

***A.*** **Correct.**

***MR. PILCHAK:*** Move to admit 636.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No, your Honor, no objection.

***THE COURT:*** 636 may be admitted.

*(Exhibit 636 admitted.)*

***BY MR. PILCHAK:***

***Q.*** Do you see the bottom message there, Mr. Taneja?

***A.*** **Yes, I do.**

***Q.*** Who is that from?

***A.*** **The bottom message is from me.**

***Q.*** And are you writing to the same Sheida.Arabi1 account?

***A.*** **Yes.**

***Q.*** What are you asking, generally speaking?

***A.*** **Setting up a dinner and setting up a date for the dinner in San Diego.**

***Q.*** With who?

***A.*** **With Dr. Karim Arabi and Brad.**

***Q.*** Is that Brad Quinton?

***A.*** **Brad Quinton.**

***Q.*** And who else would you meet with on Friday according to that first sentence?

***A.*** **Dr. Karim Arabi.**

***Q.*** Sorry, I'm talking about the end of this sentence here (*indicating*).

***A.*** **Oh, so there was a meeting with Ziad Mansour on the Friday of that week. And is this referring to a dinner sync up a day prior on Thursday.**

***Q.*** Thank you. I think I got a little lost there.

So a Friday meeting with Ziad and an evening dinner the

night before?

**A. Correct.**

*Q.* Got it.

Were you inviting Sheida to that dinner meeting the night before?

**A. I was inviting Karim.**

*Q.* And so by the date of this email, February 28th, who did you think was using this email account with Sheida's name on it?

**A. Dr. Karim Arabi.**

*Q.* How did you come to that realization?

**A. He explicitly told me.**

*Q.* Explicitly told you what?

**A. To use this email when communicating with him, Sheida.Arabi1@gmail.com.**

*Q.* I don't want to ask you for the contents of Dr. Arabi's head, but did you have any understanding of why he would do that?

**A. Initially, it was a little confusing. It came as a little bit of surprise, but it also came at the heels of something odd that had happened a few days prior to this.**

*Q.* Which --

**A. Which was the email to Ziad Mansour where I was instructed not to make a reference to the lunch meeting.**

*Q.* And so you put those two facts together yourself?

**A. No. He asked me to use the Sheida.Arabi1 Gmail to**

**communicate with him.**

***Q.*** And did that request seem strange to you at the time?

***A.*** **It did.**

***Q.*** Did you ever confront Dr. Arabi about it, though?

***A.*** **I did not.**

***Q.*** Why didn't you say -- well, anything? Why didn't you say anything to Dr. Arabi about that?

***A.*** **Well, first of all, he had -- he is the one who offered me the job. And for all intents and purposes, he was my boss. He could have fired me, for example. And given where I was, given the background that I described after being laid off from Cadence and my job search not resulting in anything at all, I wanted to cling on to the job.**

***MR. PILCHAK:*** Okay. Let's take that down. And I think we can remove the annotations as well. Thank you, Ms. Fincher.

Let's show the witness Exhibit 698 which has been admitted and zoom in on those texts, please.

***BY MR. PILCHAK:***

***Q.*** Is this another text communication between you and Dr. Arabi?

***A.*** **Yes.**

***Q.*** Would you sometimes text Dr. Arabi about emails that you had sent?

***A.*** **Yes.**

***Q.*** Why?

**A. Just to make sure that he had a chance to look at it.**

*Q.* Okay. And here where he said had not received it, is that an email that you were sending to one of the Sheida accounts?

**A. Correct.**

*Q.* And then what do you report in reply to that?

**A. I replied "Re-sent."**

*Q.* And "Thanks"?

**A. And "Thanks."**

*Q.* And what does Dr. Arabi say?

**A. "Got it."**

*Q.* Okay. So that's Exhibit 698.

Is there an email chain that corresponds to this?

**A. There is.**

***MR. PILCHAK:*** Let's show the witness Exhibit 653 and 654.

***BY MR. PILCHAK:***

*Q.* So you look at 653 on the board there. There's a binder behind you on top of that cart. If you grab that, that will have 654 in it.

See the tabs on the side there?

**A. Yes, I do.**

*Q.* All right. Do you see 653 on the screen first?

**A. Yes, I do.**

*Q.* Is that an email between you and two different accounts with Sheida's name on them?

**A. That's right.**
*Q.* And then is 654 the attachment to that email?
**A. Correct.**
***MR. PILCHAK:*** Move to admit 653 and '54.
***THE COURT:*** Any objection?
***MS. BERNSTEIN:*** No objection, your Honor.
***THE COURT:*** They both may be admitted.
***(Exhibits 653 and 654 admitted.)***
***BY MR. PILCHAK:***
*Q.* So first, let's just zoom in on kind of the middle from there to there (*indicating*).
Is this another draft email that you're trying to send to somebody before you send to the intended recipient?
***MS. BERNSTEIN:*** Objection. Leading.
***THE COURT:*** Sustained.
***BY MR. PILCHAK:***
*Q.* What is this?
**A. It's -- as the subject line says, this is a note I'm sending to Brad Quinton, please review.**
*Q.* But you're not sending this version of it to Brad, are you?
**A. No.**
*Q.* Who is this version trying to go to?
**A. To Dr. Karim Arabi.**
*Q.* But what email account is it going to?
**A. It's going to Sheida@abreezio.com.**

***Q.*** What email account is that?
***A.*** **That was Sheida's account with the Abreezio domain.**
***Q.*** I misplaced my pink highlighter.
So did you sometimes attempt to use that account to communicate with Dr. Arabi?
***A.*** **Yes.**
***Q.*** Why?
***A.*** **I don't know.**
***Q.*** Well, let me ask you this: Did you set up and activate that account in connection with Dr. Arabi?
***MS. BERNSTEIN:*** Objection. Leading.
***THE COURT:*** Overruled.
***THE WITNESS:*** Could you please repeat the question, Mr. Pilchak?
***BY MR. PILCHAK:***
***Q.*** We'll come back to that.
Let me ask you something about timing first. So let me take down Exhibit 883 for a moment.
A moment ago, we were looking at Exhibit 698, which I'll put on the camera there.
Do you see that?
***A.*** **Yes.**
***Q.*** These are the text messages about whether Dr. Arabi got the email that you were trying to send to him.
Is that fair to say?

***A.*** **Yes.**
***Q.*** What is the time of your message that you say "Re-sent, thanks"?
***A.*** **7:20 p.m.**
***Q.*** Where it says 19:20, you read that as 7:20 p.m.?
***A.*** **Got it.**
***Q.*** Are you familiar with military time?
***A.*** **Yes.**
***Q.*** All right. Now let's look at Exhibit 653, which I'll kind of smudge on to the screen here.
This is that email that we were just looking at; right?
***A.*** **Correct.**
***Q.*** What is the time stamp on this email?
***A.*** **12:20 p.m.**
***Q.*** How many hours ahead is 7:20 p.m. from 12:20 p.m.?
***A.*** **Seven hours.**
***Q.*** Do you know how far ahead UTC or Greenwich Mean Time is from Pacific Time?
***A.*** **Yes.**
***Q.*** How many hours?
***A.*** **To the best of my knowledge, seven hours.**
***Q.*** Does that depend, though, on whether it's Daylight Savings Time or not?
***A.*** **Correct.**
***Q.*** I have a real hard time with Daylight Savings Time. I can

never remember which half of the year it is, so I'm not going to ask you whether it was in force in March of 2015.

But do you understand the timing in the text messages to be seven or eight hours ahead of the emails by comparing them with this?

***A.*** **That's right.**

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** I'll allow it.

***BY MR. PILCHAK:***

***Q.*** Sorry. What did you say?

***A.*** **That's right.**

***MR. PILCHAK:*** Okay. Let's put 653 back up on the screen, please. Yeah, that's great.

***BY MR. PILCHAK:***

***Q.*** So we're looking at the top half of the bottom message here; right? And remind us what this is.

***A.*** **So this is a message I intend to send to Brad, and I am giving her the draft version, sending that to Dr. Karim Arabi.**

***Q.*** Why would -- you're the CEO of the company.

Why would you send a draft email to Brad Quinton over to Dr. Arabi?

***A.*** **Dr. Arabi pretty much had a say in every decision of the company.**

***Q.*** And so you wanted his input for this?

***A.*** **Yes.**

*Q.* All right. I think we'll come back to that one, too, but let's take that down.

You just testified a minute ago Abreezio got its own hosted email accounts at some time?

*A.* **Correct.**

*Q.* Whose idea was it to get those?

*A.* **My idea.**

*Q.* So that was your idea?

*A.* **To get the email accounts.**

*Q.* Why did you have that idea?

*A.* **It's a very common thing in a startup to have your -- to make it look professional, have your own company name as a domain.**

*Q.* Did you get a new Abreezio email account?

*A.* **I did.**

*Q.* Did Brad get a new Abreezio email account?

*A.* **Yes.**

*Q.* I don't think we said this so far.

What was Brad's role at the company? Was he just helping out?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Overruled.

***THE WITNESS:*** Brad was the CTO of the company.

***BY MR. PILCHAK:***

*Q.* What is a CTO?

**A. Chief Technology Officer.**
Q. How did that compare to your position?
**A. As the Chief Technology Officer, Brad was responsible for all the technology development, technology direction. My role as the CEO was more on the business and the strategy side of things.**
Q. That's great. But what I'm trying to get at is the seniority.
Were you senior to Brad or was Brad senior to you?
**A. I was senior to Brad.**
Q. So you weren't like peers or equals.
**A. No.**
Q. Okay. So you got an Abreezio email account?
**A. I did.**
Q. Brad got an Abreezio email account?
**A. Right.**
Q. Did Akbar?
**A. Akbar did as well.**
Q. Was he C something in the C-suite?
**A. No.**
Q. What was his position?
**A. He was an investor.**
Q. But even as an investor, he got an Abreezio account?
**A. Correct.**
Q. Did Dr. Arabi get an Abreezio email account?

**A. No.**
*Q.* Why not?
**A. He did offer an explanation which I don't remember.**
*Q.* He was involved in Abreezio's formation, wasn't he?
**A. Correct.**
***MR. PILCHAK:*** Let's bring back up 689, which is in evidence. And just zoom in on the top half -- actually, go back down to where it says -- oh, that's great. Thanks. That's fine.
***BY MR. PILCHAK:***
*Q.* Mr. Taneja, the top message is from you; right?
**A. Yes, it is.**
*Q.* What are you -- first of all, who are you writing to?
**A. To Dr. Karim Arabi.**
*Q.* And what are you asking him about?
**A. I am asking him that I am creating an ID for your sister with the specific email ID, Sheida@abreezio.com.**
*Q.* Were you asking for his permission?
**A. The message clearly says that, yes. "Sound okay?"**
*Q.* And was he okay with it?
**A. He says "Yes" in the text message response.**
*Q.* If we go down to the fourth message, what do you say about Karim's email address?
**A. I say that I'm assuming you will continue to use your Hotmail ID. Better for optics reasons.**

*Q.* Well, the text message says "O reasons."
**A. "O reasons," yeah.**
*Q.* Do you clarify what "optics" means there?
**A. Yeah, in the subsequent line, yeah.**
*Q.* Okay. And when you say Dr. Arabi would use his Hotmail ID, what did you mean by that?
**A. So Dr. Karim Arabi had an email with the Hotmail domain. So that's what I'm referring to.**
*Q.* Did that one have his name in it, though?
**A. It did.**
*Q.* As of February 3rd, 2015, when you were sending these text messages around, did you know that Dr. Arabi had any plans to use a Sheida email account to send emails as if he was Sheida?
**A. I did not.**
*Q.* That was something you came to later?
**A. Correct.**
*Q.* In the last text message that we can see there, you're talking about Sheida's current ID; right?
**A. Yes.**
*Q.* And it says something about an auto notification.
What is that?
**A. So when you set up a new email account on Google apps, it asks for the email to which this notification that a new account has been set up and you need -- is to be provided. So that's what it is referring to.**

***Q.*** And did you have experience with that yourself with your own new Abreezio account?

***A.*** **Yeah.**

***Q.*** Did you get like a link to set up the new account at your existing email?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** I'll allow it.

***THE WITNESS:*** Yes.

***BY MR. PILCHAK:***

***Q.*** What was your expectation of what would go to the account that Dr. Arabi provided here for Sheida?

***A.*** **The activation email.**

***MR. PILCHAK:*** And then if we can take that down and just zoom in on the bottom two text messages.

***BY MR. PILCHAK:***

***Q.*** Remind us what email address Dr. Arabi provides.

***A.*** **Sheida.Arabi1@gmail.com.**

***Q.*** Do you have a memory of whether you actually set this account up that way so that the new Abreezio account would fire a notification email back to Sheida.Arabi1?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Overruled.

***THE WITNESS:*** To the best of my recollection, yes.

***MR. PILCHAK:*** All right. Let's take that down and show the witness 690, which is also in evidence. And just zoom in on

the text, please. I lost the thread on 689. No, that's the wrong one.

***BY MR. PILCHAK:***

***Q.*** Was that dated February 3rd?

***THE COURT:*** I'm sorry, what's your question, Mr. Pilchak?

***MR. PILCHAK:*** I'll withdraw that question. Sorry.

***BY MR. PILCHAK:***

***Q.*** The day after Exhibit 689, did you exchange these text messages with Dr. Arabi?

***MS. BERNSTEIN:*** Objection. 602 as to date.

***THE COURT:*** Overruled.

***THE WITNESS:*** Yes.

***BY MR. PILCHAK:***

***Q.*** And just to be clear in response to the objection, is it possible that these actually were exchanged the same day because of the time difference that we noticed for the top two messages there?

***A.*** **Correct.**

***Q.*** All right. What is Dr. Arabi reporting to you in the top message?

***A.*** **That he is activated the Google account.**

***Q.*** And what did you understand him to mean? Which Google account?

***A.*** **The Sheida@abreezio.com.**

***Q.*** And I'll switch over to the camera here and put up Exhibit 883 again so we don't get lost.
That's this account, Sheida@abreezio.com?
***A.*** **Correct.**
***Q.*** And so Dr. Arabi reported to you by text message that he had done what with that account?
***A.*** **Activated.**
***Q.*** Okay. If we go back to Exhibit 690, under the messages about activating this new account in Sheida's name that Dr. Arabi sent you, what does he suggest on the third line there.
***A.*** **He is suggesting names for two initial products of Abreezio.**
***Q.*** Were those the first two names suggested for any of Abreezio's products?
***A.*** **To the best of my knowledge, yes.**
***Q.*** They weren't -- were they the final names, though?
***A.*** **They were not.**
***Q.*** Did you reply with a different idea down here at the second to the bottom?
***A.*** **Yes, I did.**
***Q.*** Did that one stick?
***A.*** **CoolBreez. There are a lot of "Breez" products. So we had DFTBreez. We had -- I think that's -- that did stick.**
***Q.*** Okay. Let's take that down. We'll go back to the camera and our list of email addresses.

The next one here is SheidaAlan@abreezio.com. At some point was this account created?

**A. It was.**

Q. Why was this account created?

**A. As per Karim's, Dr. Karim Arabi's, instructions.**

Q. Did you have an understanding as to why it was necessary to create a new email account for Sheida?

**A. It led to the last name change of Sheida -- of Sheida. Either it preceded or before. It was related to the name, the last name change.**

Q. So your understanding was that was connected somehow to Sheida changing her name?

**A. Correct.**

Q. If I refer to her as Sheida repeatedly, it's in part because she changed her name.

Is that agreeable to you?

**A. It's right.**

Q. Her name was originally Sheida Arabi.

What did she change it to?

**A. Sheida Alan.**

Q. Okay. And by the way, while we're talking about these at Abreezio.com accounts, do you know what was supposed to happen with the contents of those accounts when Abreezio was ultimately sold to Qualcomm?

**A. Qualcomm would own all the assets, including the email.**

***Q.*** So the emails that were kept in those accounts were supposed to go where?
***A.*** **To Qualcomm.**
***Q.*** Do you know whether that actually happened, though?
***A.*** **I do not know.**
***Q.*** All right. The last email address that's on this handwritten list here is Sheida.alan@gmail.com.
Are you familiar with that one?
***A.*** **Yes, I am.**
***Q.*** At least at some point in the Abreezio saga, did you use that email address also to try to communicate with Dr. Arabi?
***MS. BERNSTEIN:*** Objection to the characterization.
***THE COURT:*** Overruled.
***THE WITNESS:*** Yes, I did.
***BY MR. PILCHAK:***
***Q.*** And we might see that in a moment.
What about this, though? Before we take this down, there's two other email addresses that are listed here at the top.
Do you see those?
***A.*** **I do.**
***Q.*** Arabisheida@gmail.com, and Sarabi@sfu.ca.
Did you ever use these email accounts to communicate with -- did you ever write any emails to those accounts at all?
***A.*** **I did not, to the best of my recollection.**
***Q.*** Did Dr. Arabi ever give you those email addresses for

Sheida?

***A.*** **He did not.**

***Q.*** Okay. Let me ask you some more questions about the series of events with this new company. Okay?

***A.*** **Okay.**

***Q.*** Was there a meeting in San Jose in early February?

***A.*** **Yes.**

***Q.*** Specifically at a hotel up there?

***A.*** **Yes.**

***Q.*** Who was present for that meeting?

***A.*** **Dr. Karim Arabi, Brad Quinton, and myself.**

***Q.*** Was Mr. Shokouhi there?

***A.*** **He was planning to be there, but to the best of my recollection he could not make it due to a conflict schedule.**

***MR. PILCHAK:*** And if we can show the witness and the witness only Exhibit 717.

***BY MR. PILCHAK:***

***Q.*** Is this an email chain involving you, Mr. Taneja?

***A.*** **Yes.**

***MR. PILCHAK:*** Move to admit 717.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No objection, your Honor.

***THE COURT:*** 717 may be admitted.

***(Exhibit 717 admitted.)***

***MR. PILCHAK:*** Let's zoom in on that bottom email,

please, from the line to the end. All right.

***BY MR. PILCHAK:***

***Q.*** Did you write this meeting here? Sorry, write this email.

***A.*** **Yes, I did.**

***Q.*** I was reading and talking at the same time.

What is the subject of that email?

***A.*** **It says, "F2F team meeting on February 2."**

**"F2F" stands for face-to-face.**

***Q.*** And who is it to?

***A.*** **It is to Dr. Karim Arabi, Akbar Chicago, and Brad Quinton is CC'ed.**

***Q.*** And this is before the creation of those Abreezio email accounts; right?

***A.*** **That's correct.**

***Q.*** And do you see this is Dr. Arabi's Hotmail account here at the top?

***A.*** **Yes.**

***Q.*** If you look at the second paragraph in your email, who suggested that you have a working session?

***A.*** **Dr. Karim Arabi.**

***Q.*** And if you go down to -- bear with me -- where it says "Strategy discussion over dinner" --

***A.*** **Correct.**

***Q.*** -- what is the second bullet under that section?

***A.*** **"Discuss business strategy, customer engagement model with**

**Qualcomm plus others."**
*Q.* What is a "Customer engagement model with Qualcomm plus others"?
*A.* **Essentially referring to the -- several things. Customer engagement as in the overall strategy for demonstrating value to Qualcomm, what would be the licensing model, and not just Qualcomm, plus others, other customers.**
*Q.* And when you say "other customers," at this point had you met with someone like Ziad Mansour at any other company?
*A.* **Not at this time.**
*Q.* It also talks about a successful high value exit in 12 months.
Do you see that there?
*A.* **That's right.**
*Q.* What does that mean?
*A.* **To me it meant an exit, meaning the company is acquired in the 50 to $100 million range.**
*Q.* And so as early as January 27, 2015, you all were talking about an acquisition?
*A.* **Yes.**
*Q.* And 12 months after January of '15 would be January of '16; right?
*A.* **Yes.**
*Q.* Did the Abreezio acquisition actually happen faster than that?

**A.** **Yes.**

***MR. PILCHAK:*** All right. Let's take that down. And we can remove the annotations. Thank you.

***BY MR. PILCHAK:***

***Q.*** Mr. Taneja, did there come a time when you asked to meet with Sheida, the purported inventor of this technology?

***A.*** **Yes.**

***Q.*** Why did you ask that?

***A.*** **Well, Sheida was the founder of the company. She was also going to come on board as the chief architect, which is a very important role, like the key engineer who is driving the key technology direction, solving very complex problems. And in particular, I was very, very curious about what insights led Sheida to come up with two distinct ideas so I wanted to meet her. That was the first reason.**

**And the second reason is she was based in Vancouver, and so was Brad and his team. So as the CEO of the company, it was only natural to have the entire team in a face-to-face where we can all get to know each other and agree or disagree on the company strategy and then be all aligned with the execution.**

***Q.*** That seemed important to you?

***A.*** **Very, very important, yeah.**

***Q.*** So when did you first meet with Sheida?

***A.*** **I never met Sheida.**

***Q.*** Never?

**A. Never.**

Q. Did you ask Dr. Arabi to meet with Sheida?

**A. In this context, yes.**

Q. In what context?

**A. In this context of her being a face-to-face team meeting, including Invionics team.**

Q. How did Dr. Arabi respond to that request?

**A. He turned it down.**

Q. Did he say why he wasn't going to allow to you meet the founder of -- or the inventor of the technology in the company that you were the CEO of?

***MS. BERNSTEIN:*** Objection.

***THE WITNESS:*** He said --

***MS. BERNSTEIN:*** Objection. Argumentative.

***THE COURT:*** Overruled.

***THE WITNESS:*** He said they were not enough funds. Let's wait until we have some substantial funding into the company. Then we can do travel.

***BY MR. PILCHAK:***

Q. And I think you mentioned eventually Akbar Shokouhi did make an investment; right?

**A. He did.**

Q. How much was that investment?

**A. Half a million dollars.**

Q. And when Abreezio had Akbar's half a million dollars, did

you fly to Vancouver then?

**A. No, I did not.**

Q. At the time, did it seem strange to you that Dr. Arabi wouldn't let you meet -- or wouldn't arrange for you to meet with Sheida?

**A. Specifically in early February, it did not appear very strange. Startups have to be somewhat frugal. But as time rolled on, it became very odd.**

Q. All right. A minute ago, we were talking about investments.

Did there come a time when there was a sitdown with someone named Behrooz Abdi?

**A. Yes.**

Q. Do you recall if that was February 9th of 2015?

**A. Yes, I do recall.**

Q. What kind of a meeting was that?

**A. It was an investor meeting. So Dr. Karim Arabi set that meeting up, and he was present at the meeting along with Behrooz. And it was a meeting to pitch the company to a prospective investor.**

Q. And were you at the meeting as well?

**A. I was.**

***MR. PILCHAK:*** Can we show the witness Exhibit 773.

***BY MR. PILCHAK:***

Q. Do you see that there?

**A. I do.**

***Q.*** Who is this?
***A.*** **Behrooz Abdi.**
***MR. PILCHAK:*** Move to admit.
***THE COURT:*** Any objection?
***MS. BERNSTEIN:*** No, your Honor.
***THE COURT:*** It may be admitted.
***(Exhibit 773 admitted.)***
***BY MR. PILCHAK:***
***Q.*** And so again, for the jury, who is this, please?
***A.*** **Behrooz Abdi.**
***Q.*** And in what capacity was he meeting with you and Dr. Arabi about Abreezio?
***A.*** **As an investor.**
***Q.*** Did he have a role in a company called TechVC?
***A.*** **Yes. There was an investment company called TechVC?**
***Q.*** Do you know anything more about it other than it was an investment company?
***A.*** **At that time I did not.**
***Q.*** What was Dr. Arabi's relationship with Mr. Abdi, if you know?
***A.*** **Very close.**
***Q.*** Did it seem to you like they were meeting for the first time at this breakfast?
***A.*** **Not at all.**
***Q.*** Did they seem friendly?

**A. Yes.**

Q. What happened during the meeting?

**A. So the meeting started off with my introducing myself. And frankly, I was a little nervous pitching the company as a first time CEO to an investor fully knowing my past efforts had failed. So I went to do the meeting pitching the company. And after the meeting was done, I wasn't really sure how the meeting went.**

Q. And was there anything about Mr. Abdi's stature or reputation that made you nervous?

**A. That may have partly contributed to it. I was talking to someone who was industry luminary. He was a senior vice president of Qualcomm prior to the role he had at the time I met him as the CEO of a publicly listed company called InvenSense. So he was a big deal. And he had made several keynote presentations at industry events.**

Q. And so what happened during that meeting, generally speaking?

**A. So we talked about Abreezio, what the problem we are trying to address, and the size of the opportunity it represents, and why we think it will provide value that is differentiated over the competition.**

Q. Did Dr. Arabi participate in that conversation at all?

**A. Yes, he did.**

Q. Did Mr. Abdi later come on board as an investor in Abreezio?

***A.*** **He did.**
***Q.*** Did he take a formal position at the company?
***A.*** **He did.**
***Q.*** What was that position?
***A.*** **Chairman.**
***Q.*** Chairman of the board?
***A.*** **Chairman of the -- since Abreezio was an LLC, just to be very specific, it was called board of managers.**
***Q.*** I think we were talking earlier about a board of technical advisors.
This is a different board?
***A.*** **This is a different board. This is a governing body.**
***Q.*** So this board has real power?
***A.*** **Real power.**
***Q.*** And Mr. Abdi was the chairman?
***A.*** **Correct.**
***Q.*** Do you remember about when he came on board in that role?
***A.*** **In May 2014 -- 2015. Sorry.**
***Q.*** Okay. Was Mr. Abdi compensated for that or was he doing it for free?
***A.*** **He was compensated.**
***Q.*** How much?
***A.*** **To the best of my recollection, he got a 1.5 percent stake in the company.**
***Q.*** Okay. So a little less than a quarter of what you got?

**A. Yeah.**
Q. Who set those terms for Mr. Abdi? Did you decide that?
**A. Not at all.**
Q. Who decided that?
**A. Dr. Karim Arabi.**
Q. Did you have to communicate it to Mr. Abdi, though?
**A. I had to.**
Q. Did you ever create any records to document this meeting with Mr. Abdi in February of 2015?
**A. Yes.**
Q. Who told you to do that?
**A. Dr. Karim Arabi asked me to clear the paper trail.**

***MR. PILCHAK:*** Let's show the witness Exhibit 720, which is already in evidence. All right. Let's zoom in on the top half. That's perfect. Thank you.

***BY MR. PILCHAK:***
Q. Okay. First of all, where you say you're at the lobby there, what are you talking about?
**A. I'm talking about the hotel lobby where Dr. Karim Arabi had arranged this breakfast meeting with Behrooz.**
Q. So that's the day of the meeting?
**A. It's the day of the meeting, correct.**
Q. Was that meeting -- you said a breakfast meeting.
Was it in the morning?
**A. It was in the morning.**

*Q.* You didn't have breakfast at 3:30 in the afternoon.
**A. If you do the time zone adjustments, it will work out to be -- as you make the seven-hour difference, it will work out to around 8:30 --**
*Q.* Okay.
**A. -- a.m.**
*Q.* I'm terrible with time zones.
Okay. And then later on, a couple hours later on, do you thank Dr. Arabi for the meeting?
**A. I did.**
*Q.* And what was his response?
**A. His response was "Please send an email to Akbar and Brad letting them know that you had a meeting with Behrooz and he is on board with the investment. This is to capture the paper trail."**
*Q.* What did you understand Dr. Arabi to mean when he said "capture the paper trail"?
**A. At the time, I -- being a first time CEO, I just assumed it was protocol to document such meetings and to have it in an email form.**
*Q.* So could you prove that it happened?
**A. Yes.**
*Q.* And then there's a bottom message there from Dr. Arabi as well; right?
**A. That's right.**

***Q.*** Who does he suggest that you talk to before you send the email?
***A.*** **To Akbar Shokouhi.**
***Q.*** Why might it be a good idea to talk to Akbar before you send the paper trail email to Mr. Abdi?
***A.*** **I don't know.**
***Q.*** Was there any relationship between Akbar and Behrooz?
***A.*** **Yes.**
***Q.*** What do you mean?
***A.*** **Very, very close. Both on a personal level as well as the TechVC firm that you just alluded to a while ago. TechVC --**
***Q.*** Mm-hmm.
***A.*** **-- that was Akbar and Behrooz, both were part of that same professionally.**
***Q.*** So they were partners in the investment vehicle that put half a million dollars into Abreezio?
***A.*** **That's correct, yeah.**
***Q.*** By the way, did you follow these instructions from Dr. Arabi and send an email to Akbar and Brad about the meeting?
***A.*** **I sure did.**
***Q.*** All right. We can take that down.
So that was February 9th, 2015. Right?
***A.*** **Correct.**
***Q.*** After that meeting with Mr. Abdi and Dr. Arabi, did Abreezio create a series of employment agreements with some key people

including Sheida?

***A.*** **Yes.**

***Q.*** And including Mr. Quinton?

***A.*** **Correct.**

***Q.*** Okay. It's going to be binder time again. Can you look in that 600 binder at Exhibits 637 to 642.

***A.*** **Yes. I am at 637.**

***Q.*** And you're going to 642.

***A.*** **And go down to 642?**

***Q.*** Absolutely. Not just those two. All the intervening documents as well.

***A.*** **Okay. Yes.**

***Q.*** What are those, please?

***A.*** **So starting with the very first document --**

***Q.*** Yep.

***A.*** **-- it is an offer letter to Sheida as the chief architect.**

***Q.*** And let me stop you there.

The very first document, Exhibit 637, is that an email from you?

***A.*** **Yes, it is, the very first document. Sorry.**

***Q.*** Is the subject line "Legal docs for your signature"?

***A.*** **Correct.**

***Q.*** And then do you see where it says "Attachment," and it says "Abreezio Sheida documents"?

***A.*** **I do.**

***Q.*** Are all the rest of those exhibits I pointed you to different agreements -- well, under the offer letter, I guess, different agreements between Sheida and Abreezio?

***A.*** **Correct.**

***MR. PILCHAK:*** Move to admit 637 to 642.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** 106 for the record.

***THE COURT:*** Overruled. They may be admitted.

***(Exhibits 637-642 admitted.)***

***BY MR. PILCHAK:***

***Q.*** All right. Mr. Taneja, if you look at your screen there, is this that email that you were just looking at, 637?

***A.*** **Yes.**

***Q.*** Why were you sending legal docs to these two different Sheida accounts on February 21st?

***A.*** **As instructed by Dr. Karim Arabi.**

***Q.*** And that last larger paragraph on the bottom there, it says we're excited to have you on board as what at Abreezio?

***A.*** **Chief architect.**

***Q.*** What is a chief architect?

***A.*** **A simple way to think a chief architect is someone who is not just any engineer, but a key engineer for the company driving the technology direction, solving some of the most complex technical problems.**

***Q.*** And who picked that title for Sheida?

***A.*** **Dr. Karim Arabi.**
***Q.*** And then attached to 637, I think you said there's a number of documents; right?
***A.*** **Correct.**
***Q.*** And is there an offer letter?
***A.*** **There is.**
***Q.*** And some other legal documents?
***A.*** **There are.**
***Q.*** Where did those documents come from?
***A.*** **Dr. Karim Arabi.**
***Q.*** Did you write them yourself?
***A.*** **I did not.**
***Q.*** Do you know where Dr. Arabi got them from?
***A.*** **I have no idea.**
***MR. PILCHAK:*** Let's show the witness Exhibit 641, please. And just zoom in on the top half there. Thank you.
***BY MR. PILCHAK:***
***Q.*** Do you see that there, sir, on the screen?
***A.*** **I do.**
***Q.*** This says it's an at-will employment, confidential information, invention assignment, and arbitration agreement. Right?
***A.*** **Yes.**
***Q.*** Do you know what those things are? Are you familiar with those from your experience in the industry?

**A. Yes.**

**Q.** Again, you didn't write this; right?

**A. I did not write this.**

**Q.** But it's for Abreezio, which is listed as company. And then is it for Sheida because this was sent to her?

**A. That's correct.**

***MR. PILCHAK:*** Let's take that down and look at page 2. Nope, Exhibit 641, please, page 2. Thank you, Mr. Reyes. And paragraph B right in the middle there.

***BY MR. PILCHAK:***

**Q.** Is paragraph B about how Sheida is going to be bound to hold Abreezio's confidential information in the strictest confidence?

**A. Yes.**

**Q.** Is that kind of a standard confidentiality agreement, though, for a tech company?

**A. Yes.**

***MS. BERNSTEIN:*** Objection. 602, 702.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

**Q.** In your experience, having worked at tech companies over -- is it a couple of decades now?

**A. More than that. Almost four decades.**

**Q.** Have any of the companies that you've worked for been okay if you had wanted to spread around their confidential information publicly?

**A. Not at all.**

***Q.*** Have you had an agreement a lot like this at the different companies that you've worked for?

**A. Correct.**

***Q.*** Do you have an agreement a lot like this at the company that you work for right now?

**A. Correct.**

***Q.*** And if Sheida signed this document, she'd be bound to do the same thing for Abreezio; right?

**A. Correct.**

***MR. PILCHAK:*** Let's take that zoom down. And if you could remove the annotation, please. Let's go to page 3 and paragraph 4(a), right in the middle.

***BY MR. PILCHAK:***

***Q.*** This one is about ownership and assignment of inventions.

Do you see that?

**A. I do.**

***Q.*** There's a lot of words in that paragraph, and I'm not going to ask you to read them all because you might fall asleep.

But in general, who would own inventions by Sheida when she worked at Abreezio if she signed this agreement?

**A. Abreezio.**

***MS. BERNSTEIN:*** Objection. 602, 702.

***THE COURT:*** Overruled.

///

***BY MR. PILCHAK:***

***Q.*** I just want to ask you about the language in this agreement. You're not a lawyer; right?

***A.*** **I'm not.**

***Q.*** But when you read the language in this paragraph, does it assign -- or would it, if she signed it, assign Sheida's rights in anything she invented to the company?

***A.*** **Yes.**

***Q.*** And that company is what?

***A.*** **Abreezio.**

***MR. PILCHAK:*** All right. Let's take that down. And we can take that down, too.

***BY MR. PILCHAK:***

***Q.*** Mr. Taneja, did Dr. Arabi also weigh in on drafts of these employment documents and authorize you to send them out to the relevant people?

***A.*** **Correct.**

***MR. PILCHAK:*** Let's show the witness 721, which is already in evidence.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, sir?

***A.*** **I do.**

***Q.*** This is just Dr. Arabi asking you for a chat; right?

***A.*** **Correct.**

***Q.*** And the date there is February 22nd of 2015?

***A.*** **Correct.**
***Q.*** But it's very early on that day; right?
***A.*** **Except if you do the time zone adjustment.**
***Q.*** Ah, the time zone adjustment. So it might actually be the 21st. Got it.
***MR. PILCHAK:*** Let's take that down and then look at 722, also in evidence.
***BY MR. PILCHAK:***
***Q.*** Is this a longer text string; right?
***A.*** **Yes.**
***Q.*** This time are you asking Dr. Arabi for a quick chat?
***A.*** **Correct.**
***Q.*** On the fourth line there, where he says "Docs look good. let's circulate the final copy for signatures," generally, what kind of docs was he talking about, if you remember?
***A.*** **The documents related to the -- to the best of my recollection, they are referring to the documents we just talked about.**
***Q.*** The kinds of employment agreements --
***A.*** **Employment agreements.**
***Q.*** Confidential agreements?
***A.*** **Yeah.**
***Q.*** And invention assignment agreements?
***A.*** **Yeah.**
***Q.*** Where the -- two lines down it says "Let Brad know about PDF

signing within Mac."

Who wrote that text?

**A. Karim. Dr. Karim Arabi.**

***Q.*** And is "Brad" Brad Quinton?

**A. Correct.**

***Q.*** What did you understand him to mean when he said "PDF signing in Mac"?

**A. That the signature could be done on the PDF version of the document on -- online on a Mac.**

***Q.*** Okay. And was that somehow sometimes how documents were signed for Abreezio?

**A. Yes.**

***MR. PILCHAK:*** Let's take that down. Remove the annotations. Thank you. We can take that down as well.

***BY MR. PILCHAK:***

***Q.*** Binder time again, Mr. Taneja.

Actually, before you go to the binder, did you get back signed copies of those documents for Sheida that had some kind of Sheida signature at the bottom?

**A. Yes, I did.**

***Q.*** Please look at Exhibits 631 to 635 in that binder.

***THE COURT:*** While he's doing that, why don't we all stand up and stretch a little bit.

***(Pause.)***

***THE COURT:*** Did you have a chance to look at those?

***THE WITNESS:*** Yes, I did.

***THE COURT:*** Let's all have a seat.

Mr. Pilchak?

***BY MR. PILCHAK:***

***Q.*** Did you have a chance to look at those documents, Mr. Taneja?

***A.*** **Yes.**

***Q.*** And is this you sending -- sorry -- you receiving documents back from that Sheida.Arabi1 account?

***A.*** **Correct.**

***MR. PILCHAK:*** Move to admit 631 to 635.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No objection, your Honor.

***THE COURT:*** 631, 632, '33, '34, and '35 may be admitted.

***(Exhibits 631-635 admitted.)***

***MR. PILCHAK:*** All right. Thank you, Mr. Reyes.

***BY MR. PILCHAK:***

***Q.*** These are the documents coming back over signed.

Is that your testimony?

***A.*** **That's right.**

***Q.*** I don't think we need to belabor that. But I do want to ask before we take that down, one of the things is called a Unit Issuance Agreement; right?

***A.*** **Correct.**

***Q.*** Was Sheida issued units in Abreezio?
***A.*** **Yes.**
***Q.*** What does that mean to be issued units?
***A.*** **Officially assigning an ownership in the company.**
***Q.*** And if a company has shares, do you take ownership through shares?
***A.*** **Correct.**
***Q.*** How many shares did Sheida get?
***A.*** **To the best of my recollection, 64 percent.**
***Q.*** 64 percent.
That's more than half?
***A.*** **Yes.**
***Q.*** Why did she get so many shares?
***A.*** **As per Dr. Karim Arabi's instructions.**
***Q.*** So you didn't pick 64 percent?
***A.*** **Not at all.**
***Q.*** Do you know whether anybody else picked 64 percent?
***A.*** **Not to the best of my knowledge.**
***Q.*** Did Dr. Arabi, like, literally tell you she's getting 64 percent or did he just send you some documents with that number in it?
***A.*** **I don't recall.**
***Q.*** Okay. A different question, then.
In your experience and knowledge with Abreezio as the CEO, what did Sheida do to justify that 64 percent unit issuance?

**A. Sheida -- I will the question what did she do.**

Q. Okay.

**A. It's the justification part -- there were two parts to your question, I think.**

Q. Okay.

**A. So she contributed the two provisional patents.**

Q. And when you say contributed them, you mean that she assigned her rights in them to the company?

**A. She assigned the rights to the two provisional patents to the company.**

Q. So whatever she had -- whatever rights she had to own that stuff, she gave to Abreezio?

**A. That's correct.**

Q. Anything else?

**A. That's all.**

Q. Did she come to any of those meetings that you were talking about?

**A. Not at all.**

Q. Did she put in any hours refining the technology?

**A. No.**

Q. Did she invest anything?

**A. Not to the best my knowledge.**

Q. Was she owed any hourly wages?

**A. Not to the best of my knowledge.**

Q. Did she do anything to deserve cash compensation?

**A. Not to the best of my knowledge.**

***Q.*** Did she provide any goods or services other than the patent assignments?

**A. No.**

***Q.*** I think I just asked this one, but did she ever invest cash or securities or anything else valuable besides the intellectual property?

***MS. BERNSTEIN:*** Objection. Asked and answered.

***THE COURT:*** Overruled.

***THE WITNESS:*** Not to the best of my knowledge.

***BY MR. PILCHAK:***

***Q.*** Did she ever license anything to Abreezio other than giving the company her rights in the patents?

**A. No.**

***Q.*** Okay. Was there --

***MR. PILCHAK:*** We can take that down.

***BY MR. PILCHAK:***

***Q.*** Was there a similar package of documents for Brad Quinton?

**A. Yes, there was.**

***Q.*** And if you can get your binder out -- I think is this going to be the last time in this series -- look at Exhibit 672 to 676.

**A. Yes, I have looked.**

***Q.*** Okay. Is that a similar package of documents sent -- well, received back from Mr. Quinton?

**A. That's right.**

***MR. PILCHAK:*** Move to admit 672 to 676.

***THE COURT:*** Any objection to 672 through --

***MS. BERNSTEIN:*** Yes, your Honor. The objection to 672 is 902, 1003, and a 106 objection that I think has been cured. And no objection to the remainder.

***THE COURT:*** Okay. I will admit 672, '73, '74, '75, and '76.

***(Exhibits 672-676 admitted.)***

***MR. PILCHAK:*** Thank you, your Honor.

***BY MR. PILCHAK:***

***Q.*** Very quickly, Mr. Taneja, let's zoom in on that email to the top and we can be done with these legal documents.

Do you see that there, sir?

**A. I do.**

***Q.*** Who are these documents coming back from?

**A. Brad Quinton.**

***Q.*** And you recognize that email address as his email address?

**A. I do.**

***Q.*** What is Invionics, if we didn't already say it?

**A. Invionics is a company that Brad was the CEO of. So it was also in the same line of business --**

***Q.*** Okay.

**A. -- broadly speaking. Chip design automation software.**

***Q.*** For example, did they develop a tool called Invio that could

be used to develop chip design -- other chip design tools?

**A. Correct.**

***Q.*** All right. We can take that down.

I know the jury is secretly hoping we'll look at all the pages of these documents as well.

But let me just ask you, generally speaking, did Brad agree to the same things that Sheida agreed to in the documents we were just looking at?

**A. Yes.**

***Q.*** So for example, did he agree to hold Abreezio's confidences in the strictest confidence?

**A. Correct.**

***Q.*** And did he agree that anything that he invented while at Abreezio would belong to Abreezio?

**A. Correct.**

***Q.*** Okay. Did you also bring on board someone named Dan Hoggar at some point?

**A. Yes.**

***MR. PILCHAK:*** Can we show the witness Exhibit 30. Just the witness. And zoom in on the text, please.

***BY MR. PILCHAK:***

***Q.*** Is this an email chain involving you and others?

**A. That's right.**

***MR. PILCHAK:*** Move to admit 30.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No objection, your Honor.

***THE COURT:*** Thirty may be admitted.

***(Exhibit 30 admitted.)***

***BY MR. PILCHAK:***

***Q.*** Mr. Taneja, on the bottom here, there's a message from Akbar Shokouhi.

Do you see that?

***A.*** **I do.**

***Q.*** Is that Akbar's Abreezio account there?

***A.*** **Correct.**

***Q.*** And who is he writing to?

***A.*** **He is writing to me.**

***Q.*** Who he is talking about?

***A.*** **He is talking about Dan Hoggar.**

***Q.*** And then on the top, do you reply to Akbar's message?

***A.*** **I do.**

***Q.*** And who is on the CC line here?

***A.*** **Brad Quinton and Dr. Karim Arabi.**

***Q.*** Why is Dr. Karim Arabi on the CC line talking about hiring a contractor for Abreezio?

***A.*** **As I mentioned, virtually every decision had to be approved by Dr. Karim Arabi.**

***MR. PILCHAK:*** Let's take that down, please, and show the witness and the witness only Exhibit 33. Thank you, Ms. Fincher. You can take those marks off when you have a

moment.

***BY MR. PILCHAK:***

***Q.*** Is this another email chain involving you, Mr. Taneja?

***A.*** **Yes, it is.**

***MR. PILCHAK:*** Move to admit 33.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No objection, your Honor.

***THE COURT:*** Thirty-three may be admitted.

***(Exhibit 33 admitted.)***

***MR. PILCHAK:*** Let's pick up the top message and the message right underneath. Probably should have started at the bottom.

***BY MR. PILCHAK:***

***Q.*** Is the bottom message here, Mr. Taneja, some kind of report from somebody writing -- sorry -- somebody named Dan Hoggar?

***A.*** **Yes.**

***Q.*** Did Dan regularly write reports about what he was doing?

***A.*** **For certain period of time, yes.**

***Q.*** Is that part of his job?

***A.*** **Yes.**

***Q.*** Who is he writing a report to?

***A.*** **To me.**

***Q.*** So he wasn't writing to Dr. Arabi; right?

***A.*** **He was not.**

***MR. PILCHAK:*** Let's take that down. And then let's get

the top two messages. Thank you, Mr. Reyes.

***BY MR. PILCHAK:***

***Q.*** Mr. Taneja, that bottom message we're looking at now, do you reply to Mr. Hoggar?

***A.*** **Yes, I did.**

***Q.*** Do you copy Dr. Arabi?

***A.*** **I did not.**

***Q.*** Do you copy this Sheida Arabi email address that we see at the top?

***A.*** **I did not copy it on the reply to Dan Hoggar.**

***Q.*** But you forwarded the message to that account; right?

***A.*** **Correct.**

***Q.*** Why did you do that?

***A.*** **Again, Dr. Karim Arabi had to be on top of virtually everything that was going on in the company.**

***Q.*** And why did you drop Dan from that email to Dr. Arabi?

***A.*** **Again, per Dr. Karim Arabi's instructions not to reveal to Dan Hoggar that he was helping, he was involved.**

***Q.*** So is it fair to say that there are some people involved in Abreezio who know that Dr. Arabi's involved in Abreezio?

***A.*** **Correct.**

***MS. BERNSTEIN:*** Objection. 602.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** And there's some people who don't?

***MS. BERNSTEIN:*** Objection. 602.

***THE COURT:*** Overruled.

***THE WITNESS:*** That's right.

***BY MR. PILCHAK:***

***Q.*** As far as you know, sir; right?

***A.*** **Yeah, as far as I know.**

***Q.*** So as far as you know, for example, Akbar Shokouhi is aware that Dr. Arabi is involved in Abreezio?

***A.*** **Yes.**

***Q.*** What about Brad Quinton?

***A.*** **Yes, to the best of my knowledge.**

***Q.*** Any doubt about that?

***A.*** **Not at all. Hundred percent.**

***Q.*** Now let me ask you about this Dan Hoggar guy.

Did it seem to you like he was aware that Dr. Arabi was involved?

***A.*** **No, to the best of my knowledge.**

***Q.*** Did it seem to you like he was aware you were taking his weekly reports and flipping them to Dr. Arabi?

***A.*** **No.**

***MR. PILCHAK:*** All right. Let's take that down, and let's show the witness Exhibit 219. And just zoom in on the top there.

***BY MR. PILCHAK:***

***Q.*** Do you see that, sir?

***A.*** **I do.**

***Q.*** Can you hold that in your mind?

***MR. PILCHAK:*** And let's show the witness Exhibit 220.

***THE COURT:*** And both 219 and 220 are in evidence?

***MR. PILCHAK:*** Oh, thank you. I missed my own note there, your Honor. Never mind. We can all have a look at that.

***BY MR. PILCHAK:***

***Q.*** Mr. Taneja, let's zoom in again.

This is a message from the Sheida account that you testified you used to correspond with Dr. Arabi; right?

***A.*** **Correct.**

***Q.*** What's the date of this message?

***A.*** **March 3rd, 2015.**

***Q.*** And the subject line is "NewSensor," right?

***A.*** **Correct.**

***Q.*** Is that the same as the name of the attached file?

***A.*** **Yes.**

***Q.*** And if we go to 220, hopefully -- wait for it, there we go -- what is NewSensor?

***A.*** **So in very high-level terms, this is describing a sensor circuit which will address a very specific problem with the original idea outlined in the provisional patent.**

***Q.*** Okay. And you received this from an email account that you believed was used by who?

***A.*** **Dr. Karim Arabi.**

***Q.*** Sitting here today, do you believe that you ever received an email from that account from the real Sheida Arabi?

***A.*** **I don't believe so.**

***Q.*** Why do you say that?

***A.*** **I never communicated with Sheida from -- any emails actually look -- I believe that all of that was coming from Dr. Karim Arabi.**

***Q.*** Okay. So this in Exhibit 220 is NewSensor; right?

***A.*** **Yes.**

***Q.*** Was there also an OldSensor?

***A.*** **Correct.**

***MR. PILCHAK:*** Let's show the witness 221, which was previously admitted. And zoom in, please.

***BY MR. PILCHAK:***

***Q.*** Is this a companion email to the one we were just looking at?

***A.*** **Correct.**

***Q.*** From the same account to the same account?

***A.*** **Correct.**

***Q.*** And do you see where it says "OldSensor" here in the attachment line?

***A.*** **I do.**

***MR. PILCHAK:*** Let's look at 222, also in evidence.

***BY MR. PILCHAK:***

***Q.*** Is this the attached file in OldSensor?

*A.* **Yes.**

*Q.* So there's an OldSensor and a NewSensor.

First, what is OldSensor from?

*A.* **Is the question who I received it from?**

*Q.* No, sorry. That's a good question.

Who do you believe you received these documents from?

*A.* **From Dr. Karim Arabi.**

*Q.* Do you say that because of the email account you received them from?

*A.* **Yeah.**

*Q.* I want to be clear. You don't, for example, know Dr. Arabi's schematic drawing handwriting well enough to say is this Dr. Arabi?

*A.* **I do not.**

*Q.* But you believe that it's from him because of the email address that you received it from?

*A.* **Correct.**

*Q.* Does this email also tie into a larger conversation you were having with Dr. Arabi about this time?

*A.* **Yes.**

*Q.* What was that conversation about?

*A.* **It was about the different solutions to the issues that had been identified with the architecture of the sensor outlined in the provisional patent, the terminology that is going to be used, and so on.**

*Q.* And when you say "the provisional patent," you mean one of the provisional patents from December of 2014 that had Sheida's name on it?

***A.* Yes.**

*Q.* There were issues with that design?

***A.* There were issues addressed, outlined in a document by Brad Quinton.**

*Q.* And we'll see that in a moment, or I'll show you that in a moment.

Did you understand NewSensor, in the diagram we were looking at a moment ago, to be a proposed solution to some of those issues?

***A.* Correct.**

*Q.* And I skipped over this, but you said you believed this was Dr. Arabi creating these. Right?

***A.* He had the technical know-how and the expertise to do so. So he could have done it.**

*Q.* You believed he was capable of doing this?

***A.* Correct.**

*Q.* All right.

***THE COURT:*** Would now be an okay time to break?

***MR. PILCHAK:*** Absolutely, your Honor.

***THE COURT:*** Let's take a 15-minute recess, ladies and gentlemen. We'll see you back in 15 minutes. You're not to discuss the case or do any research about the case. And we'll

see you back.

You are excused for 15 minutes as well.

***(Jury out at 1:59 p.m.)***

***THE COURT:*** Pull the door shut, Mr. Olah. Thank you.

We're now outside the presence of the jury.

Any issues?

***MR. PILCHAK:*** The witness is still here, your Honor.

***THE COURT:*** The witness may be excused.

***MR. PILCHAK:*** Nothing for us.

***MS. BERNSTEIN:*** Nothing for us.

***THE COURT:*** Okay. Fifteen minutes. Thank you.

***(Recess taken.)***

***THE COURT:*** Okay. We are back on the record. All jurors are present. Dr. Arabi and the lawyers are present.

And you, sir, are reminded you're still under oath to tell the truth.

***THE WITNESS:*** Yes.

***THE COURT:*** Mr. Pilchak.

***BY MR. PILCHAK:***

***Q.*** Mr. Taneja, before the break, we were talking about emails and diagrams called OldSensor and NewSensor; right?

**A. Yes.**

***Q.*** If you could get that binder next to you and look at 647, 48, and 49.

**A. Yes, I have that.**

***Q.*** Is that an email with subject line "OldSensor" and then two attachments?

***A.*** **Correct.**

***MR. PILCHAK:*** Move to admit.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** This was 648?

***THE COURT:*** 647 with 648 and 649.

***MS. BERNSTEIN:*** No objection, your Honor.

***THE COURT:*** They may be admitted.

***(Exhibit 647-649 admitted.)***

***MR. PILCHAK:*** Let's zoom in to pick up the text there, please.

***BY MR. PILCHAK:***

***Q.*** On the bottom there's a blank email from Sheida with nothing in the body.

The subject line here is "OldSensor." Right, Mr. Taneja?

***A.*** **Yes.**

***Q.*** Do you understand that to be the OldSensor email from the Sheida account that we were just looking at?

***A.*** **I did.**

***Q.*** In response you write, "Got it. Thank you. Both old and new."

And there's a reference to Brad and a 4:30 discussion; right?

***A.*** **Correct.**

***Q.*** What 4:30 discussion?

***A.*** **So it was referring to a meeting that Brad, Dr. Karim Arabi, and myself were going to have to discuss these -- this topic.**

***Q.*** This topic being the issues with the technology in the first provisional patent from December of '14?

***A.*** **Correct.**

***Q.*** And then there's a second reference to two slides.

Do you see that?

***A.*** **Yes.**

***Q.*** And then on top, you say you're resending with minor mods.

Are those modifications?

***A.*** **Correct.**

***MR. PILCHAK:*** Let's look at Exhibit 648, please. I don't know, can we rotate our exhibits? Can't wait to find out. Oh, we don't need to.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, sir?

***A.*** **I do.**

***Q.*** What is this?

***A.*** **So this is a PowerPoint slide, essentially demonstrating -- the key message of this is what is the power savings; in other words, energy efficiency, that you can achieve with the TruSens approach compared to some other approaches.**

***Q.*** And what is the TruSens approach?

***A.*** **The TruSens approach is so instrument --**

*Q.* Let me stop you there. I'm not asking for the technical specifications. I'm just asking: Is TruSens the new product of Abreezio?
*A.* **Yes.**
*Q.* And in the previous email we were looking at, 647, did you ask Dr. Arabi how does the name TruSens sound?
*A.* **I did.**
*Q.* Had that name just been christened at this date, March 3rd, 2015?
*A.* **Correct.**
*Q.* The file name for this slide in 647 -- and I apologize if I just said 637, I meant 647 the whole time.
The file name for 648 and 649 is "Existing Approaches," right?
*A.* **Correct.**
*Q.* What does that mean in the context of this slide?
*A.* **The technical approach being forward in the industry to solve this specific technical problem.**
*Q.* So what they could already do?
*A.* **What they could already do, correct.**
*Q.* So with reference to this slide, if I circle the box at the upper right this, is what Abreezio was selling?
*A.* **That's right.**
*Q.* And if I circle these two other boxes, these are existing approaches?

**A. That's exactly right.**

**Q.** Which existing approach did you understand to be Qualcomm's existing approach?

**A. Standalone process sensors. Example, canary circuits.**

**Q.** So that's the middle box here that I've now circled twice?

**A. Yes.**

**Q.** Why were you trying to talk about that with Dr. Arabi?

**A. To get an idea of the value that TruSens was capable of delivering, would that be attractive to Qualcomm.**

**Q.** Because when you're selling this box at the upper right to Qualcomm, is it that what matters is the distance between that and the box that they already have?

**A. Yes.**

**Q.** And that might be a simplification and I apologize if it is. But is that basically true?

**A. Yeah, in simplified terms, correct.**

**Q.** Why were you asking Dr. Arabi about that?

**A. Dr. Arabi was working at Qualcomm.**

**Q.** Did he share information with you about Qualcomm's existing solutions?

**A. Yes.**

**Q.** When you asked him, was that just to save you the difficulty of searching for it on Google?

**A. Partly, yes. The information could have been derived from the information that was available on public sources.**

***Q.*** All of it?

***A.*** **It could be partially derived.**

***Q.*** Ah. Would it be more reliable if it came from Dr. Arabi?

***A.*** **It would be.**

***MR. PILCHAK:*** Let's take that down, please --

***MS. BERNSTEIN:*** Objection. Leading. Move to strike.

***THE COURT:*** Overruled.

***MR. PILCHAK:*** If we could show the witness Exhibit 226, please, and only the witness.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, sir?

***A.*** **Yes, I do.**

***Q.*** Is this another email in the OldSensor chain?

***A.*** **Yes.**

***MR. PILCHAK:*** Move to admit.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No objection, your Honor.

***THE COURT:*** 226 may be admitted.

***(Exhibit 226 admitted.)***

***BY MR. PILCHAK:***

***Q.*** So in the middle of this email, do we see below this line I've drawn at 3:02 p.m., that's the message chain we were looking at before; right?

***A.*** **Correct.**

***Q.*** Is there a response from Dr. Arabi above that?

***A.*** **There is.**

***Q.*** And you understood that to be Dr. Arabi; right?

***A.*** **Correct.**

***Q.*** Does he agree with your suggestion for the product name?

***A.*** **He does.**

***Q.*** And what does he say about -- remind us what canary and ring oscillators are, again in general terms?

***A.*** **So it's a very common way to instrument how fast the circuit is running.**

***Q.*** And that's part of the existing solution?

***A.*** **That's part of an existing approach.**

***Q.*** And so taking this email as a whole, is it fair to understand this as Dr. Arabi providing input on those slides?

***A.*** **Yes.**

***Q.*** And what were the slides for? I don't think I asked you.

***A.*** **This was in preparation for a meeting with Qualcomm.**

***Q.*** To market Abreezio to them?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** What was the purpose of that meeting with Qualcomm?

***A.*** **To discuss the needs of what Qualcomm had versus what we had to offer.**

***Q.*** Because Abreezio was going to volunteer its services to Qualcomm?

**A. No, to essentially get Qualcomm interested in engaging with Abreezio as a customer.**

*Q.* All right. Can you look at 684 and 685 in the binder, please.

**A. 684?**

*Q.* 684. Thank you.

***MR. PILCHAK:*** Ms. Fincher, if you could take the annotation down, please. Sorry for all the extra work.

***THE WITNESS:*** Yes, I'm there.

***BY MR. PILCHAK:***

*Q.* Great.

Is this an email from you and an attachment underneath?

**A. Yes.**

***MR. PILCHAK:*** All right. Move to admit 684 and 685.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** I'm sorry, your Honor. 684, no objections, your Honor.

***THE COURT:*** It may be admitted.

***(Exhibits 684-685 admitted.)***

***BY MR. PILCHAK:***

*Q.* Thank you.

All right. Mr. Taneja, is this the NewSensor email from Dr. Arabi on the bottom there?

**A. Yes.**

*Q.* Is it your understanding that's a sort of forwarded or

replicated copy of the email we were looking at a few minutes ago?
**A. Correct.**
*Q.* The reply on top is from you, though; right?
**A. That's right.**
*Q.* And who are you writing to? Is it Dr. Arabi or someone else?
**A. This one is to Brad Quinton.**
*Q.* And why were you sending the NewSensor diagram you got from Dr. Arabi to Brad Quinton?
**A. So that we can plan to file new patents covering this new approach.**
*Q.* New patents covering the new approach in NewSensor?
**A. In NewSensor.**
*Q.* And is that what's reflected in your email here?
**A. It is.**
*Q.* When you say "New Abreezio IP for the new simplified sensor," what are you talking about?
**A. So if you recall from the circuit diagrams we were seeing --**
*Q.* Yes.
**A. -- a few minutes ago, one of them was a simplified sensor that was also new intellectual property. It provided a certain benefit, as outlined here, that reduces the area. In other words, reduces indirectly the cost of the chip. And I was referring to file the new patents covering these new ideas.**

*Q.* Okay. And to be clear, the new ideas that you were proposing filing on are embodied in this diagram attached to this email?

***A.* That's right.**

*Q.* Let me ask you this: Where it says -- you're writing to Brad; right?

***A.* Yeah.**

*Q.* And it says "Per last night's discussion, and as per Sheida's email below."

Who did you mean when you said "Sheida"?

***A.* Dr. Karim Arabi.**

*Q.* Did you expect that Mr. Quinton would understand it that way, too?

***A.* Absolutely.**

*Q.* Why do you say that so certainly?

***A.* The discussion that we had was held amongst the three individuals. Brad Quinton, Dr. Karim Arabi, and myself. All the references in the email to these three individuals were Sheida, Brad Quinton, and myself.**

*Q.* So you had an expectation that Brad would know who you were talking about?

***A.* Absolutely.**

*Q.* Because there was no Sheida on that discussion?

***A.* Correct.**

*Q.* Okay. Did you sometimes refer to Dr. Arabi as Sheida in

your texts and emails?

**A. Yes, I did.**

*Q.* Why did you do that?

**A. Same as it was for the use of the email, his instructions.**

*Q.* After these sensor diagrams came around, was there a further conversation with Mr. Quinton and Dr. Arabi about how to go forward?

**A. I believe so.**

***MR. PILCHAK:*** Let's show the witness and the witness only Exhibit 653. Did we admit this already?

***THE COURT:*** It's already admitted.

***MR. PILCHAK:*** Great. Then we can show everyone.

Let's zoom in on the center of the page from that bottom email most of the way down. Just surprise me. There you go. Thank you.

***BY MR. PILCHAK:***

*Q.* So this is an email from you, Mr. Taneja; right?

**A. Correct.**

*Q.* What's the date on this one?

**A. March 10, 2015.**

*Q.* So about a week after those OldSensor, NewSensor emails we were just looking at?

**A. Yes.**

*Q.* And I think you testified already you were drafting a note to Brad, but Dr. Arabi was reviewing it; right?

**A. Correct.**

***Q.*** And when you say "A common terminology" -- blah, blah, blah -- "for the Friday review," what Friday review are you talking about?

**A. It was a review again with the three of us: Dr. Karim Arabi, Brad Quinton, and myself.**

***Q.*** Specifically about the problems that were addressed in OldSensor/NewSensor?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** I'll allow it.

***THE WITNESS:*** Yes.

***MR. PILCHAK:*** Let's take that down and show the witness and the witness only Exhibit 846. Just zoom in on the top half, please.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, sir?

**A. I do.**

***Q.*** Is this an email chain including you?

**A. It does, yes.**

***MR. PILCHAK:*** Move to admit.

***THE COURT:*** Just 846, not the attachments?

***MR. PILCHAK:*** Well, thank you, your Honor. 846A is the attachment. Can we show the witness 846A as well. Thank you, gentlemen.

///

***BY MR. PILCHAK:***

***Q.*** Do you see that there, sir?

***A.*** **I do.**

***Q.*** Do you understand this to be the attachment to that email we were just looking at?

***A.*** **Yes.**

***MR. PILCHAK:*** Move to admit both.

***MS. BERNSTEIN:*** No objection to 846 or 846A.

***THE COURT:*** They both may be admitted.

***(Exhibits 846 and 846A admitted.)***

***MR. PILCHAK:*** Let's go back to 846, please. The top half, please.

***BY MR. PILCHAK:***

***Q.*** All right. Do you see the subject of this email, Mr. Taneja?

***A.*** **I do.**

***Q.*** What is that?

***A.*** **"Sensor terminology, ongoing analysis this week."**

***Q.*** Sensor terminology was involved in that last email that you drafted to Mr. Quinton; right?

***A.*** **Yes.**

***Q.*** And then the bottom message here -- I apologize.

The date of this is Friday the 13th, isn't it?

***A.*** **Yes.**

***Q.*** Were you alarmed by that?

**A. No.**

Q. No, I'm just kidding.

It's three days after that other email we were looking at, isn't it?

**A. Yeah.**

Q. And the attachment here says "Abreezio Critical Path Sensor Analysis."

Is that what the attached document is, an analysis of issues with Abreezio's critical path sensor?

**A. Correct.**

Q. That's a lengthy document, isn't it?

**A. It is.**

Q. Like 18 or 19 pages?

**A. Yes.**

Q. Okay. Underneath your email, is there an email coming in from Mr. Quinton; right?

**A. That's right.**

Q. Was that document his document, the critical path sensor analysis?

**A. It was.**

Q. And when he sent it on Thursday the 12th, he said he would walk us through it tomorrow morning, didn't he?

**A. Yes.**

Q. Did that discussion happen on the 13th?

**A. To the best of my recollection, yeah.**

***Q.*** And who was participating in that conversation?

***A.*** **Brad Quinton, Dr. Karim Arabi, and myself.**

***Q.*** What about Sheida?

***A.*** **No Sheida.**

***Q.*** No Sheida.

And then on top here, are you forwarding Mr. Quinton's 18- or 19-page analysis over to Dr. Arabi?

***A.*** **Yes, I am.**

***Q.*** Why did you do that?

***A.*** **In an earlier email exchange where I had sent it to -- sent an email to Sheida@abreezio.com, as we saw in a text message exchange, he had not received it. In a different email, then I said I resent, and the resent was to the Sheida.Arabi11@gmail.com.**

***Q.*** So you wanted to be sure that Dr. Arabi received this analysis ahead of the call?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** You sent it to this email address in particular for what purpose?

***A.*** **So that Dr. Arabi can review it prior to the call and have a better context for the meeting.**

***MR. PILCHAK:*** Let's show the witness Exhibit 855, please. Just zoom in on the top half.

***BY MR. PILCHAK:***

***Q.*** Do you see this document there, sir?

***A.*** **I do.**

***Q.*** Is this an email that you received from a conference reservations line?

***A.*** **Yes.**

***Q.*** Is it dated March 12th, 2015?

***A.*** **Correct.**

***Q.*** Sorry?

***A.*** **Correct.**

***Q.*** And is it about a conference call scheduled for Friday the 13th?

***A.*** **Yes.**

***MR. PILCHAK:*** Move to admit 855.

***MS. BERNSTEIN:*** 802.

***MR. PILCHAK:*** Not for --

***THE COURT:*** Sustained.

***MR. PILCHAK:*** We wouldn't offer it for the truth, your Honor. We would just offer it for a single line down below that I believe is key to Mr. Taneja. I can lay a foundation for that if you'd like.

***THE COURT:*** Why don't you lay a foundation?

***MR. PILCHAK:*** Let's zoom out of that and take the bottom half, Mr. Taneja.

///

***BY MR. PILCHAK:***

***Q.*** Do you see the subject there, right in the middle of this?

***A.*** **Yeah, mm-hmm.**

***Q.*** Where it says "Critical path sensor analysis," do you think the conference company came up with that subject for this conference call?

***A.*** **No.**

***Q.*** Where do you think that came from?

***A.*** **When I scheduled the meeting using the Freeconference.com on their website, there I specified this subject.**

***Q.*** Okay.

***MR. PILCHAK:*** Move to admit not for the truth. Well, not for the truth as to the remainder.

***MS. BERNSTEIN:*** 802 for the record, your Honor.

***THE COURT:*** Sustained.

***MR. PILCHAK:*** Let's take that down. And if we could remove the annotation, please, Ms. Fincher.

If we could show the witness and the witness only Exhibit 230.

***BY MR. PILCHAK:***

***Q.*** Is this an ongoing email chain involving you, sir?

***A.*** **Yes, it is.**

***THE COURT:*** And it's admitted.

***MR. PILCHAK:*** Oh, yeah, I'm sorry. It's getting late, your Honor.

***THE COURT:*** I'm sorry. I have 830 is admitted. You're talking about 230.

***MR. PILCHAK:*** I have 230, but this looks a lot like the document we were just looking at.

***THE COURT:*** So you're talking about 230?

***MR. PILCHAK:*** Yeah. Let's stop talking about 230 because I think that's a duplicate of 846. I apologize to everyone.

***MS. BERNSTEIN:*** I'm not sure it's admitted but we have no objection to 230.

***MR. PILCHAK:*** Thank you, Ms. Bernstein.

***THE COURT:*** Are we moving 230 into evidence?

***MR. PILCHAK:*** No, we don't want to admit duplicates, your Honor. We have come too far. Let's take that down.

***BY MR. PILCHAK:***

***Q.*** Was there a discussion on Friday the 13th to the best of your memory about these sensor issues?

***A.*** **To the best of my memory, yes.**

***Q.*** And I think you already testified Dr. Arabi was on that call; right?

***A.*** **Yes.**

***Q.*** Do you remember him weighing in on the technical discussions, or did he just sort of sit and listen?

***A.*** **He weighed in on the technical discussions.**

***MR. PILCHAK:*** All right. Let's try again Exhibit 232,

please, for the witness only. 232. And zoom in on -- can we take all the text, please.

***BY MR. PILCHAK:***

***Q.*** Is this an email chain involving you, sir?

***A.*** **Yes.**

***Q.*** There is an attachment called "NewSensor."

***MR. PILCHAK:*** I guess, can we show that to the witness quickly? It's 233.

***BY MR. PILCHAK:***

***Q.*** Do you understand that to be the attachment to this email, sir?

***A.*** **Yes.**

***MR. PILCHAK:*** Move to --

***MS. BERNSTEIN:*** Objection. 602.

***MR. PILCHAK:*** Sorry?

***THE COURT:*** Overruled.

***MR. PILCHAK:*** Move to admit 232 and 233.

***MS. BERNSTEIN:*** No further objections.

***THE COURT:*** 232 and 233 may be admitted.

***(Exhibits 232 and 233 admitted.)***

***BY MR. PILCHAK:***

***Q.*** Let's go back to 232.

The subject line of this new email chain is "NewSensor IP"; right?

***A.*** **Yes.**

*Q.* And on the bottom there -- we don't need to zoom in -- do you see -- well, thank you anyway.

Do you see the same email from you about last night's discussion and the new Abreezio IP?

*A.* **Yes, I do.**

*Q.* The date of this top message, though, is March 19th, isn't it?

*A.* **Yes.**

*Q.* And you're writing to who?

*A.* **I'm writing to Brad and -- Brad Quinton and Andrew Hughes, and to Sheida Arabi, intended for Dr. Karim Arabi.**

*Q.* Okay. Who is Andrew Hughes?

*A.* **Andrew Hughes worked as an engineer for Brad Quinton at Invionics.**

*Q.* So in looking at his email address there, he's another Invionics guy?

*A.* **Yes.**

*Q.* And then Dr. Arabi is also on here under the Sheida account?

*A.* **Correct.**

*Q.* Okay. Then down in the message, you write to Brad and Andrew; right?

*A.* **Yes.**

*Q.* You didn't write Brad, Andrew, Karim?

*A.* **Correct.**

*Q.* You didn't write Brad, Andrew, Sheida?

***A.*** **Correct.**
***Q.*** But you do say "Per discussion with SA."
Who is SA?
***A.*** **That's referring to Dr. Karim Arabi.**
***Q.*** And you write "Per discussion with SA."
Was there a discussion with the real Sheida or was that with Dr. Arabi?
***A.*** **Dr. Arabi.**
***Q.*** What's all this language underneath about editing the hybrid document to include what's under here?
***A.*** **So in very simplistic terms, it's referring to a sensor architecture, which combines two different approaches, and that's why it's called hybrid. It's not a pure one kind but mix of the two. And it's pointing to some specific technical details that need to be captured.**
***Q.*** As part of the OldSensor/NewSensor discussion?
***A.*** **As part of the NewSensor for inclusion in the patent application.**
***Q.*** Okay. What patent application?
***A.*** **Corresponding to this NewSensor architecture.**
***Q.*** That had been under discussion among the people on this email?
***MS. BERNSTEIN:*** Objection. Leading.
***THE COURT:*** Overruled.
***THE WITNESS:*** Yes.

***MR. PILCHAK:*** We can take that down.

***BY MR. PILCHAK:***

***Q.*** Did Abreezio file more patent applications?

***A.*** **Yes.**

***Q.*** And when I say "more," I mean more than the two with Sheida's name on them from December of 2014.

***A.*** **That's correct.**

***Q.*** Tower how many more?

***A.*** **There was a total of -- to the best of my recollection, seven non-provisional patents applications. And I may be off on the -- this rough ballpark number is about a little over a dozen provisional patent applications.**

***Q.*** So a number of further applications?

***A.*** **Yes.**

***Q.*** What's the difference in your mind between a provisional and a non-provisional?

***A.*** **Well, again, I'm not a patent lawyer, but I have a very simplistic view of it. A provisional patent is a way to establish a priority date, so that by the time that you have filed the full-fledged -- so think of non-provisional as a full-fledged patent. This is just a sketch of the initial idea.**

***Q.*** Got it.

***A.*** **When you file that, you will still have that old priority date.**

***Q.*** And so can you get a real patent on the back of a

provisional application?
**A. You can.**
*Q.* You believe you can?
**A. Just on the provisional alone?**
*Q.* Yeah.
**A. Sorry. I didn't understand your question.**
**No.**
*Q.* Okay.
**A. That's why it's called provisional. Provisionals never make it to a regular issue of a patent. I'm sorry. I didn't --**
*Q.* That's all right. Let me ask some questions in a different area. I want to ask you some questions about Sheida Arabi, who then became Sheida Alan. Okay?
**A. Okay.**
*Q.* The real Sheida.
**A. Okay.**
*Q.* Okay. What did you understand Sheida's background to be? Not, you know, her personal background. I mean her professional or educational background.
**A. So she had an undergraduate degree in electrical computer engineering.**
*Q.* How did you know that?
**A. Dr. Karim Arabi told me that.**
*Q.* Okay.
**A. And she was pursuing her graduate studies in an area which**

**is also called nanotechnology for inkjet printing.**
*Q.* Okay. What is nanotechnology?
*A.* **It's referring to stuff which is subatomic.**
*Q.* Like smaller than atoms?
*A.* **Smaller than an atom.**
*Q.* Oh, wow. Okay. And when you say "inkjet printing," that's what we all think of like printing with inkjet printers?
*A.* **Yeah.**
*Q.* Is inkjet printing, including nanotechnological inkjet printing, is that at all related to Abreezio's technology --
*A.* **No.**
*Q.* -- in any way whatsoever?
*A.* **No.**
*Q.* Except maybe at the level that microchips contain things that are really small and nanotechnology is really small?
***MS. BERNSTEIN:*** Objection. Leading.
***THE COURT:*** Sustained.
***MR. PILCHAK:*** I withdraw that question.
***BY MR. PILCHAK:***
*Q.* Do any of the people who worked on Abreezio's technology, as far as you know -- well, who worked on Abreezio's technology? Is it the Invionics guys?
***MS. BERNSTEIN:*** Objection. Leading.
***THE COURT:*** Sustained.
///

***BY MR. PILCHAK:***

***Q.*** Who worked on Abreezio's technology?

***A.*** **May I go back to the previous question?**

***Q.*** The one about nanotechnology?

***A.*** **Yeah.**

***Q.*** Okay.

***A.*** **So just to clarify, Abreezio technology was in the area of design and test of semiconductors.**

***Q.*** Okay.

***A.*** **While there may be an overlap with the manufacturing of semiconductors with the inkjet technology we were just referring --**

***Q.*** The nanotechnological technology?

***A.*** **Yeah.**

***Q.*** Okay.

***A.*** **Abreezio was not in the manufacturing technology. So I just wanted to clarify that.**

***Q.*** Got it.

***A.*** **Sorry. So please, if you don't mind repeating the question.**

***Q.*** I kind of forgot about my question.

I think my question is, was there anyone who worked on Abreezio's technology, as far as you knew, who had a background in inkjet printing?

***A.*** **No.**

***Q.*** Did you ever seek out any employees to work at Abreezio who

were studying inkjet printing?

**A. No.**

***Q.*** Did Abreezio ever consider developing any products in the field of inkjet printing?

**A. No.**

***Q.*** I want to ask you some more questions about Abreezio itself.

**A. Yes.**

***Q.*** Who picked the name of the company?

**A. Dr. Karim Arabi.**

***MR. PILCHAK:*** Can we show the witness Exhibit 750, please. And just zoom in on the top half.

***BY MR. PILCHAK:***

***Q.*** Is this an email chain involving you, Dr. Arabi at his Hotmail account, and others?

**A. That's correct.**

***MR. PILCHAK:*** Move to admit.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No objection, your Honor.

***THE COURT:*** 650 may be admitted.

***(Exhibit 750 admitted.)***

***BY MR. PILCHAK:***

***Q.*** All right. Is the subject line of this email chain --

***THE CLERK:*** 650 or 750?

***THE COURT:*** I'm sorry. 750.

***MR. PILCHAK:*** 750 is what I'm moving to admit.

***MS. BERNSTEIN:*** I have no objection to 750.

***THE COURT:*** 750 is what I understood.

***MR. PILCHAK:*** Thank you, your Honor. All right.

***BY MR. PILCHAK:***

***Q.*** What's the subject line of this email, sir?

***A.*** **"Name."**

***MR. PILCHAK:*** And let's take that down, the zoom, please.

Sorry. And let's go to the very bottom of that first page there. That's fine.

***BY MR. PILCHAK:***

***Q.*** Do you see the bottom message here under the 5:30 a.m. line, sir?

***A.*** **I do.**

***Q.*** Who wrote that?

***A.*** **Dr. Karim Arabi.**

***Q.*** And does he say "Let's suggest some name"?

***A.*** **He does.**

***MR. PILCHAK:*** And let's take the zoom down and go to the top of the second page where I think the rest of the email is.

***BY MR. PILCHAK:***

***Q.*** Are there a couple of different names listed there?

***A.*** **There are more than a couple.**

***Q.*** What's the first one?

***A.*** **Abreezio.**

***Q.*** Do you notice anything in common about all those names?

***A.*** **They all start with an "A."**

***Q.*** Are you aware of any other companies that Dr. Arabi's been affiliated with?

***A.*** **Atlazo.**

***Q.*** Atlazo?

***A.*** **Atlazo.**

***Q.*** Are you familiar with Abacus Machines, LLC?

***A.*** **No.**

***Q.*** What about Avante North Ventures?

***A.*** **No.**

***Q.*** What about -- sorry. You just said Atlazo. Let me stop there.

Do you have any understanding of why a number of companies that Dr. Arabi is associated with begin with "A"?

***MS. BERNSTEIN:*** Objection. 403.

***THE COURT:*** Overruled.

***THE WITNESS:*** No, I don't.

***MR. PILCHAK:*** All right. Let's take this zoom down and go back to the first page just quickly. And if we zoom in on the top half here. All right.

***BY MR. PILCHAK:***

***Q.*** The bottom message that we can see now is from you; right?

***A.*** **Correct.**

***Q.*** Are you agreeing with the name Abreezio that Dr. Arabi had suggested?
***A.*** **Yes, I am.**
***Q.*** And when you talk about the historical connection to a similar sounding name in the last sentence of that message, well, almost the last sentence, were what are you talking about?
***A.*** **So if I can refer you to the very first line.**
***Q.*** Yes.
***A.*** **It says "The connection" -- is this the email from Dr. Arabi. The last part of that email says "The connection to Abrizio," A-b-r-i-z-i-o, "is no accident."**
***Q.*** What did you understand that to mean?
***A.*** **A premiumly valued company which had a high value exit.**
***Q.*** What is a premiumly valued company?
***A.*** **Hundreds of thousands of dollars. This was a company that was acquired.**
***Q.*** Okay. And so when he said the connection to that company is no accident, what did you understand him to mean?
***A.*** **That it's putting us in the association of companies which have been valued highly.**
***Q.*** Okay. And have you seen a different version of this email where this mark at the end of that line is a smiley face?
***A.*** **I do recall having seen that.**
***Q.*** Sadly not this version.

***MR. PILCHAK:*** Let's take that down, and you can remove

the annotation, please.

***BY MR. PILCHAK:***

***Q.*** Mr. Taneja, did you and the other people in Abreezio ever discuss using an existing company instead of making a brand-new one?

***A.*** **Yes, we did.**

***Q.*** What was the name of that existing company?

***A.*** **Trementa.**

***Q.*** Did you use Trementa, though?

***A.*** **We did not.**

***Q.*** Did Abreezio sort of take over for Trementa in your discussions?

***A.*** **As far as the naming is concern?**

***Q.*** Yeah. I mean, like did you build a new company named Abreezio instead of using this old one that was already on the shelf?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Overruled.

***THE WITNESS:*** Correct.

***BY MR. PILCHAK:***

***Q.*** I want to ask you about Invionics now for a moment.

Did Abreezio ever sign a contract with Invionics?

***A.*** **Yes.**

***Q.*** And whose company was Invionics again?

***A.*** **Brad Quinton was the CEO of the company.**

***Q.*** And there were other people who were like partners in it; right?
***A.*** **Right.**
***Q.*** Who drafted the Invionics contract, do you know?
***A.*** **I got the initial version of the contract from Dr. Karim Arabi.**
***Q.*** Did you kind of revise it or weigh in on it, though?
***A.*** **I had weighed in on some aspects of the provisions in that.**
***Q.*** Did Sheida ever weigh in on it?
***A.*** **No.**
***Q.*** Do you remember sitting here today roughly how much Invionics was paid under that contract?
***A.*** **For the statement of work? Just to clarify the question.**
***Q.*** Yeah.
***A.*** **So it was -- I'll give a range.**
***Q.*** Sure.
***A.*** **To the best of my recollection, somewhere in the $250,000 to $300,000.**
***Q.*** And what were they being paid for?
***A.*** **They were being paid for developing technology deliverables, which were all outlined in a statement of work contract.**
***Q.*** So they were working to develop Abreezio's products and tech?
***A.*** **That is correct.**
***MS. BERNSTEIN:*** Objection. Asked and answered and

leading.

***THE COURT:*** Overruled.

***MR. PILCHAK:*** Sorry.

***THE WITNESS:*** That's correct.

***BY MR. PILCHAK:***

***Q.*** Do you know if they had like an hourly rate for their work?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Overruled.

***THE WITNESS:*** To the best of my recollection, yes.

***BY MR. PILCHAK:***

***Q.*** What was that?

***A.* To the best of my recollection, roughly about hundred dollars.**

***Q.*** Per hour?

***A.* Per hour.**

***Q.*** Thank you, sir.

***A.* To the best of my recollection.**

***Q.*** Did you discuss with other people about being careful about mentioning Dr. Arabi's name in the context of Abreezio?

***A.* Yes, I did.**

***MR. PILCHAK:*** Let's show the witness 704, which is already in evidence. And zoom in on the text, please.

***BY MR. PILCHAK:***

***Q.*** Is this dated April 17th, right, sir?

***A.* Yes, it is.**

***Q.*** What is the urgent topic that you needed to speak to Mr. Quinton about in this text message?
**A. So Dr. Karim Arabi had called me saying that Trent needs to be informed that when he interacts with Qualcomm, he should not mention about Karim's involvement in Abreezio.**
***Q.*** Who is Trent?
**A. Okay. Trent Mc- -- I'm forgetting the last name correctly. It starts with an M-c. So he was also like Andrew, part of Invionics.**
***Q.*** And he was going to be interacting with Qualcomm? Why?
**A. He was one of the engineers assigned on the Abreezio statement of work.**
***Q.*** All right. And I think you mentioned he has to be careful not to mention Dr. Arabi's involvement; right?
**A. That's right.**
***Q.*** So if I'm following, did Trent know that Dr. Arabi was involved in Abreezio?
***MS. BERNSTEIN:*** Objection. 602.
***THE COURT:*** Sustained.
***BY MR. PILCHAK:***
***Q.*** Based on the facts that you were aware of, did you see Trent interact with Dr. Arabi or on communications involving Dr. Arabi?
**A. I was in a meeting with Dr. Arabi, Brad Quinton, Trent, and Akbar, to the best of my recollection, at a conference room at**

**the Encore Semiconductor in San Diego.**

*Q.* Okay. And just real quick, what is Encore Semiconductor?

***A.*** **Encore Semiconductor is a company which Akbar -- Mr. Akbar Shokouhi, was -- had a -- he was running the company or he was -- or was -- he had a major stake in the company --**

*Q.* Okay.

***A.*** **-- or the founder of the company.**

***MS. BERNSTEIN:*** Objection. 602.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

*Q.* And was that meeting that Dr. Arabi and Trent were both present for about Abreezio?

***A.*** **Yes.**

*Q.* And was that before these emails about how Trent has to be very careful?

***A.*** **To the best of my recollection, yes.**

*Q.* And I said it already, but what did Mr. Quinton say in response to your texts?

***A.*** **He says he just talked to Trent, and he understands.**

*Q.* And --

***A.*** **He will be very careful.**

*Q.* What did you understand that to mean?

***A.*** **Exactly that he understood not to share Dr. Karim Arabi's involvement.**

*Q.* And these are text messages. But in one it says

Mr. Quinton's telling you he'll call in a few minutes.
Do you remember having a phone call about this?
**A. I don't specifically remember. This is from ten years ago.**
***MR. PILCHAK:*** Fair enough. Let's take that down. And let's show the witness and the witness only Exhibit 657. And just zoom in on the text there.
***BY MR. PILCHAK:***
***Q.*** So those were dated April 17th; right, sir --
**A. Yes.**
***Q.*** -- the texts we were just looking at?
Is this email also from April 17th?
**A. Yes.**
***Q.*** And you're on this; right?
**A. Yes.**
***MR. PILCHAK:*** Move to admit.
***THE COURT:*** Any objection to 657?
***MS. BERNSTEIN:*** No objection, your Honor.
***THE COURT:*** It may be admitted.
***(Exhibit 657 admitted.)***
***BY MR. PILCHAK:***
***Q.*** Were you writing to Dr. Arabi in this email?
**A. I was writing to Dr. Karim Arabi, yes.**
***Q.*** And when you say you just concluded a call with Brad and explained the situation exactly as we discussed, what situation?
**A. Yes. This first of all triggers my memory we just concluded**

**a call. So it's referring to the same situation we just described about not sharing Dr. Karim Arabi's involvement.**

***MR. PILCHAK:*** All right. We can take that down.

***BY MR. PILCHAK:***

***Q.*** Did you ever have the experience when Dr. Arabi got upset because someone texted him directly about Abreezio business?

***A.*** **Yes.**

***MR. PILCHAK:*** Let's show the witness Exhibit 706. And zoom in on the -- sorry, this is already in evidence, I believe.

***THE COURT:*** It is.

***BY MR. PILCHAK:***

***Q.*** Can you see these texts here, sir?

***A.*** **I do.**

***Q.*** Now, the top three texts are between you and Akbar; right?

***A.*** **Correct.**

***Q.*** And it literally says Akbar Shokouhi.

Is that who you understood this to be?

***A.*** **That's right.**

***Q.*** The fourth line, though, is from Dr. Arabi, isn't it?

***A.*** **Correct.**

***Q.*** How did you understand the three question marks to mean when he sent it?

***A.*** **It was indicating that he was upset that Akbar was sending a message to that effect.**

***MS. BERNSTEIN:*** Objection. 602. Move to strike.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** And where Dr. Arabi says "Why am I getting these texts," question mark, did you understand that to the same effect?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** I'll allow it.

***THE WITNESS:*** Same effect.

***BY MR. PILCHAK:***

***Q.*** Mr. Shokouhi responded "Sorry, wrong person"; right?

***A.*** **Yes.**

***Q.*** You were a participant in this conversation.

Did you believe that Akbar had texted the wrong person?

***MS. BERNSTEIN:*** Objection. 602. 702.

***THE COURT:*** Overruled.

***THE WITNESS:*** No.

***BY MR. PILCHAK:***

***Q.*** Was this part of an ongoing conversation that you were having with Mr. Shokouhi and Dr. Arabi about Abreezio?

***A.*** **Correct.**

***Q.*** All right. Let's take that down.

After Sheida legally changed her name, did some of the documents for Abreezio need to be modified?

***A.*** **Yes.**

***Q.*** If you could look at Exhibit 625 and 626 in your binder, please. Also 625 is on your screen if that's easier.

**A. I am on 625.**

***Q.*** Is that an email from you?

**A. Yes.**

***Q.*** And do you understand 626 to be the attachment?

**A. Yes.**

***MR. PILCHAK:*** Move to admit 625 and 626.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No objection, your Honor.

***THE COURT:*** 625 and 626 may be admitted.

***(Exhibits 625 and 626 admitted.)***

***BY MR. PILCHAK:***

***Q.*** All right. Let's zoom in on the email, please.

This is from you to a different email account, Sheida.Alan@gmail.com; right?

**A. Yes.**

***Q.*** Did you understand that Dr. Arabi also used that email account?

**A. Yes.**

***Q.*** In the email, you write "Sorry for have mistyped your name in the attached document."

What did you mean by that?

**A. I didn't actually mean mistype. It was simply a -- not explicitly saying that now that you have a new last name and sign it with the new last name. So that's what I actually meant.**

***Q.*** And so by September 24th, 2015, what did you think that Sheida's real last name was?

***A.*** **Sheida Alan.**

***Q.*** All right. And the attachment to this document, does it now include a signature field for Sheida Alan?

***A.*** **Yes.**

***MR. PILCHAK:*** All right. We can take that down.

***BY MR. PILCHAK:***

***Q.*** Did you have a whole series of strategy and business calls about Abreezio?

***A.*** **Yes.**

***Q.*** Beginning from the company's earliest days?

***A.*** **Yeah.**

***Q.*** What kinds of things were discussed on those calls?

***A.*** **So the strategy topics would range anywhere from the engagement strategy with Qualcomm, the Invionics and Abreezio relationship. At one point Dr. Arabi made me aware that had he a verbal agreement with Brad Quinton that Invionics will be acquired by Abreezio.**

***Q.*** Let me jump in there.

These strategy and business calls that you had, did Sheida ever attend a single one of them?

***A.*** **No.**

***Q.*** Did Dr. Arabi ever attend?

***A.*** **Yes.**

***Q.*** More than once?
***A.*** **More than once.**
***Q.*** Much more than once?
***A.*** **Much more than once.**
***Q.*** Was he ever invited using any of these Sheida email accounts that you've been testifying about?
***A.*** **Yes.**
***Q.*** Did you also exchange text messages with him about Abreezio's formation and direction?
***A.*** **Yes.**

***MR. PILCHAK:*** Let's show the witness 691, which is already in evidence. And just zoom in on the top half, please.

***BY MR. PILCHAK:***
***Q.*** Is this an example of that?
***A.*** **Yes.**
***Q.*** For example, on the top text, are you asking Dr. Arabi to go over some marketing materials for Abreezio?
***A.*** **Correct.**

***MR. PILCHAK:*** And then let's take that zoom down and look at the bottom half. Thank you.

***BY MR. PILCHAK:***
***Q.*** If we look at the second text that we see here about your upbeat conversation with Brad, do you see that?
***A.*** **Yes.**
***Q.*** When you say "Brad is good with the offer," what are you

talking about?
**A. The offer for the CTO role.**
Q. When you say "the CTO role," though, look at the next text from Dr. Arabi when he says "Give the percentage 0.25 percent."
Is that what Brad received?
**A. No, sorry. I apologize. This is referring to the offer for Dan Hoggar.**
Q. And was that offer set by Dr. Arabi in this text message?
**A. It was.**
***MR. PILCHAK:*** All right. Let's take that down, please.
***BY MR. PILCHAK:***
Q. So is it fair to say Dr. Arabi was involved in some of the more substantial decisions about Abreezio's business?
**A. Yes.**
Q. Was he also involved in decision-making for smaller scale decisions, though?
**A. Yes.**
Q. Can you give us an example?
**A. Like when we picked out our office in Sunnyvale, all the furniture we got for the office.**
***MR. PILCHAK:*** Let's show the witness 702, please, which is already in evidence. And zoom in on -- there you go.
***BY MR. PILCHAK:***
Q. Do you see that there, sir?
**A. I do.**

***Q.*** Is this about the office space?

***A.*** **Yes.**

***Q.*** All right. And is there a response from Dr. Arabi five messages down?

***A.*** **Yes.**

***Q.*** What is he saying in substance?

***A.*** **Basically that furnishing would be quite expensive and look for unfurnished perhaps. It says "Not sure but should be also -- should be also considered."**

***Q.*** But he participated in that decision?

***A.*** **He participated in that decision.**

***MR. PILCHAK:*** Let's show the witness and the witness only Exhibit 683, please.

***BY MR. PILCHAK:***

***Q.*** Is this an email from you, sir?

***A.*** **Yes, it is.**

***MR. PILCHAK:*** Move to admit.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No, your Honor.

***THE COURT:*** 683 may be admitted.

***(Exhibit 683 admitted.)***

***MR. PILCHAK:*** Thank you.

***BY MR. PILCHAK:***

***Q.*** The jury can see here, this subject line of this email is "Abreezio Ops Meeting"; right, Mr. Taneja?

**A. Yes, it is.**
*Q.* And I got really lucky with the annotation here from the last exhibit.
Do you see 2(b) there in the middle?
**A. Yeah.**
*Q.* What is that about?
**A. So that's about the choice of what laptops to buy.**
*Q.* Who did you speak with about what laptops to buy?
**A. Dr. Karim Arabi.**
*Q.* Did he select the laptops that Abreezio would use?
**A. He basically said let's go with Macintoshes.**
*Q.* Okay.
***MR. PILCHAK:*** Let's take that down.
***BY MR. PILCHAK:***
*Q.* A while ago in your testimony, there was an email referencing a high value exit in 12 months; right?
**A. Mm-hmm, yes.**
*Q.* Was that one of Abreezio's goals?
**A. Yes.**
*Q.* Did it market itself to different companies over its life span?
**A. It did.**
*Q.* Not just Qualcomm; right?
**A. Correct.**
*Q.* But which company was first?

**A. Qualcomm.**
Q. We saw some correspondence about a March 4th meeting with Ziad; right?
**A. Yeah.**
Q. Was that the initial pitch to Qualcomm in your view?
**A. To the best of my recollection, that was the first one.**
Q. And had you presented to any other companies by this point?
**A. No, I had -- we had not.**
Q. Did you prepare slides for that meeting?
**A. Sorry, did we prepare slides for?**
Q. Slides for the March 4 meeting with Ziad.
**A. Yes.**
Q. Did Dr. Arabi provide input on those slides?
**A. Yes.**
***MR. PILCHAK:*** Let's show the witness 723, which is already in evidence.
***BY MR. PILCHAK:***
Q. Is this a text from you, sir?
**A. Yes, it is.**
Q. Who are you writing to?
**A. Dr. Karim Arabi.**
Q. Did you start the text "Karim"?
**A. Yes.**
Q. What are you asking Dr. Arabi in substance?
**A. So in substance I'm asking was there existing approach for**

**AVS, how much power reduction it can achieve. And based on that, we'll have a better idea on how to pitch our marketing presentation to Qualcomm.**

***Q.*** Why would that information help you calibrate your marketing presentation?

***A.*** **Well, the technology industry, and it's applicable here as well, if you are offering a new technology, it has to be far better than your existing approach in order for the customer to consider engaging in it.**

***Q.*** So this goes back to that slide we saw with the arrow that goes up?

***A.*** **That's correct.**

***Q.*** And the different boxes on the arrow?

***A.*** **That's right.**

***Q.*** When you say "What kinds of numbers is CPR showing on designs where it has worked," what do you mean by that?

***A.*** **So what I'm asking is the existing approach used at Qualcomm called CPR, what kind of power reduction has that produced.**

***Q.*** Because those were the numbers that Abreezio was going to have to beat?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** What would those numbers mean for Abreezio's offering?

***A.*** **We would have to be a lot better than that in order to**

**engage with Qualcomm as a prospective customer.**

*Q.* When you asked Dr. Arabi for this information, did you have an expectation that you could just look publicly and find it?

***A.*** **I think I mentioned earlier, so, for example, there are companies like TI and Broadcom. They had publicly made that available.**

*Q.* And it says right here TI's website has 64 percent; right?

***A.*** **Yeah.**

*Q.* Did Qualcomm's website have Qualcomm's numbers?

***A.*** **To the best of my recollection, back then, Qualcomm's website had the range of voltage reduction, which the CPR approach applies.**

*Q.* So why didn't you just put what was on Qualcomm's website?

***A.*** **Because as I said in the earlier response also, it would be -- it was partly available.**

*Q.* In response to this question, did Dr. Arabi actually give you information on this subject?

***A.*** **To the best of my recollection, yes.**

*Q.* Did you use it in your marketing?

***A.*** **I used it as one of the data points, since we had data points from other prospective customers as well.**

***MR. PILCHAK:*** Okay. Let's take that down. And let's put up Exhibit 67, which I have as previously admitted.

***THE COURT:*** Yes.

***MR. PILCHAK:*** And zoom in on the top down to those

bullets below. Thank you.

***BY MR. PILCHAK:***

***Q.*** This is already in evidence, Mr. Taneja.

And you're not on this email chain; right?

***A.*** **Correct.**

***Q.*** I'm just going to ask you some questions about whether you understand some of the language in here.

In that bottom message from Malik Khan -- by the way, do you know who that is?

***A.*** **No, I do not.**

***Q.*** Did you interface with someone at Qualcomm named Hiten ^social media although?

***A.*** **Yes, I did.**

***Q.*** Do you see his name here?

***A.*** **I do.**

***Q.*** And then Ziad responds on top; right?

***A.*** **Yes.**

***Q.*** And it lists some potential savings and benefits to Qualcomm down below, right, in the message from Mr. Khan?

***A.*** **It does.**

***MR. PILCHAK:*** And take that zoom down, please, because I missed part of it I want to ask about. The last question about Malik's sign-off there, please.

***BY MR. PILCHAK:***

***Q.*** With reference to those numbers, Mr. Khan asks "Are they

shooting in the dark? Are their claims of technology versus RB tech accurate?"

What is RB tech, do you know?

**A. In the very first sentence, Rapid Bridge.**

***Q.*** That's your understanding.

What's Rapid Bridge?

**A. Rapid Bridge was a startup which Qualcomm had acquired.**

***Q.*** And so was that Qualcomm's existing solution that you were trying to beat?

**A. Correct.**

***MR. PILCHAK:*** Let's take that down.

***BY MR. PILCHAK:***

***Q.*** And so when they say "Are Abreezio's numbers accurate," are they asking in part about the same estimate that you were trying to make with those numbers that you were asking for from Dr. Arabi?

***MS. BERNSTEIN:*** Objection. 602. 802.

***THE COURT:*** Overruled.

If you know.

***THE WITNESS:*** I do not know.

***MR. PILCHAK:*** We'll take that down.

***BY MR. PILCHAK:***

***Q.*** Did you talk to Dr. Arabi right before you went to see Mr. Mansour on March 4th?

**A. Yes.**

***MR. PILCHAK:*** Show the witness 701, which is already in evidence. Zoom in on the top, please. Thank you.

***BY MR. PILCHAK:***

***Q.*** Are you texting with Mr. Quinton here?

***A.*** **Yes.**

***Q.*** And you're referencing a meeting with Ziad next week on February 27th or 28th; right?

***A.*** **Correct.**

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** I'll allow it.

***BY MR. PILCHAK:***

***Q.*** At the bottom message, do you see a reference from Mr. Quinton to a Thursday evening meeting before the meeting with Ziad Friday morning?

***A.*** **That's right.**

***MR. PILCHAK:*** Let's take that down, please, the zoom only, and look at the bottom. Thanks.

***BY MR. PILCHAK:***

***Q.*** Do you see the last message from you, sir?

***A.*** **Yes.**

***Q.*** What's this about a dinner sync up with Karim and Akbar on Thursday evening?

***A.*** **So this is referring to the four of us -- Dr. Karim Arabi, Akbar, Brad Quinton, and myself -- having a sync-up meeting in prep for the meeting with Qualcomm on the following day.**

***Q.*** And the purpose of the sync up was to get ready for the meeting with Ziad?
***A.*** **Yes.**
***MS. BERNSTEIN:*** Objection. Leading.
***THE COURT:*** I'll allow it.
***BY MR. PILCHAK:***
***Q.*** Did Dr. Arabi attend the meeting with Ziad?
***A.*** **No.**
***Q.*** All right. Let's --
***A.*** **I'm sorry, Mr. Pilchak. You were referring to the meeting on Friday with Ziad?**
***Q.*** Yeah, the Friday, March 4th meeting.
***A.*** **Yeah, he did not attend that.**
***Q.*** Was that meeting at Qualcomm?
***A.*** **At Qualcomm.**
***Q.*** In a Qualcomm conference room?
***A.*** **To the best of my recollection, yes.**
***Q.*** Okay. By the way -- let's take that down -- did you ever exchange messages with Behrooz Abdi where you referred to Dr. Arabi as Sheida?
***A.*** **Yes.**
***MR. PILCHAK:*** Let's show the witness 707, which is already in evidence. And just zoom in on the text, please.
***BY MR. PILCHAK:***
***Q.*** Is this top text from you, sir?

**A. Yes, it is.**

**Q.** I think you testified earlier that Mr. Abdi came on board as chairman in May of 2015; right?

**A. Correct.**

**Q.** So this is the next month?

**A. That's right.**

**Q.** When you say you're wondering if Behrooz's schedule would permit a face-to-face meeting tomorrow with Sheida, what did you mean?

**A. So I was asking if he could set aside a time for a meeting amongst Dr. Karim Arabi, Behrooz, and myself.**

**Q.** Did you believe when you sent that that Behrooz would know who you meant by "Sheida"?

**A. Absolutely.**

**Q.** Why do you say that?

**A. Behrooz was very particular that Dr. Karim Arabi was always addressed as Sheida.**

**Q.** Was it your understanding that if Dr. Arabi appeared for this meeting, Behrooz wouldn't have been surprised?

***MS. BERNSTEIN:*** Objection. 602.

***THE COURT:*** Overruled.

***THE WITNESS:*** He would not have been surprised if Dr. Karim Arabi appeared. Is that the question?

***BY MR. PILCHAK:***

**Q.** That's the question.

Do you know if Behrooz ever met the real Sheida?
**MS. BERNSTEIN:** Objection. 602.
**THE COURT:** If you know.
Overruled.
**THE WITNESS:** Not to the best of my knowledge.
**BY MR. PILCHAK:**
**Q.** So you're not aware of a meeting between those two people?
**A.** **Correct.**
**MR. PILCHAK:** Let's take that down. Let's show the witness and the witness only Exhibit 695. I missed this one in my big list. Just zoom in on the top half, please.
**BY MR. PILCHAK:**
**Q.** Is this a text string involving you, sir?
**A.** **Yes, it is.**
**Q.** And looking at the first two text messages together, who do you understand the other party to this text to be?
**A.** **Behrooz and Dr. Karim Arabi.**
**Q.** Thank you.
**MR. PILCHAK:** Move to admit 695.
**THE COURT:** Any objection?
**MS. BERNSTEIN:** 902, 1003, and Motion *In Limine* 4.
**THE COURT:** Overruled.
It may be admitted.
***(Exhibit 695 admitted.)***
///

***BY MR. PILCHAK:***

***Q.*** All right. In this text string, the second message is from you; right?

***A.*** **That's right.**

***Q.*** And when you say "Sure, Behrooz," whose phone number do you understand this first phone number to be?

***A.*** **Behrooz Abdi.**

***Q.*** When you write "Sheida has a dinner meeting at 7:00," who were you referring to?

***A.*** **Dr. Karim Arabi.**

***Q.*** Why would Behrooz care when Karim had a dinner meeting?

***A.*** **Karim was going to be on the call.**

***Q.*** So you were trying to schedule a call around Dr. Arabi's availability?

***A.*** **That's right.**

***MS. BERNSTEIN:*** Objection. Leading. Move to strike.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** Let me ask you about this.

Can you interpret this bottom text message from you here when you say "Sheida suggested"?

***A.*** **Yes.**

***Q.*** Why did you say "him"?

***A.*** **Because I'm referring to Dr. Karim Arabi.**

***Q.*** Was it hard to keep it straight sometimes, that you were

supposed to call Dr. Arabi Sheida?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Overruled.

***THE WITNESS:*** Yes.

***BY MR. PILCHAK:***

***Q.*** Did other people slip up sometimes too, like Mr. Shokouhi in that text message we saw a few minutes ago?

***A.*** **Mr. Shokouhi did, but Behrooz, as I said, was very particular. He never did.**

***MR. PILCHAK:*** All right. Let's take that down. And please remove the annotations, Ms. Fincher.

Let's show the witness Exhibit 643.

***BY MR. PILCHAK:***

***Q.*** Is this an email from you, sir?

***A.*** **Yes, it is.**

***MR. PILCHAK:*** And let's show the witness Exhibit 644.

***BY MR. PILCHAK:***

***Q.*** Do you see there's an attachment there labeled "Company Overview"?

And at 644 we have a slide deck with title "Abreezio Company Overview."

Do you see that?

***A.*** **I do.**

***Q.*** Do you understand this to be the slides that were attached to that email?

**A. Correct.**

***MR. PILCHAK:*** Move to admit 643 and 644.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No objection, your Honor.

***THE COURT:*** 643 and 644 may be admitted.

***(Exhibits 643 and 644 admitted.)***

***MR. PILCHAK:*** Let's go back to '43 in the email, please. Thank you, Mr. Reyes.

***BY MR. PILCHAK:***

***Q.*** So the date of this is March 2nd, 2015; right?

**A. Correct.**

***Q.*** And it says "Draft for discussion."

Why are you sending this email to Dr. Arabi?

**A. To solicit his input.**

***Q.*** On what?

**A. On that presentation that was going to be made to Qualcomm.**

***Q.*** And so this is, what, two days before the meeting with Mr. Mansour?

**A. Correct.**

***Q.*** Is that the meeting that you're talking about?

**A. That's right.**

***MR. PILCHAK:*** Let's take this down and look at 644.

***BY MR. PILCHAK:***

***Q.*** This is that attachment that you just mentioned?

**A. That's correct.**

***Q.*** Is it a short slide deck about Abreezio for purposes of that meeting?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Sustained.

***MR. PILCHAK:*** I'll withdraw that question.

***BY MR. PILCHAK:***

***Q.*** Let me ask you a different question.

What's the date of this presentation?

***A.*** **March 4th, 2015.**

***Q.*** What was happening on March 4th, 2015?

***A.*** **As we just discussed, Abreezio was meeting with Qualcomm.**

***Q.*** And specifically with Ziad Mansour?

***A.*** **With Ziad Mansour.**

***Q.*** Let's go to page 3 of this exhibit, please.

Do you see that there, sir?

***A.*** **I do.**

***Q.*** Where it says Silicon Valley -- "Silicon Valley-based angel-funded startup," which were the angels who had funded Abreezio?

***A.*** **TechVC.**

***Q.*** Anywhere in this slide deck does it disclose that the angel is Akbar Shokouhi?

***A.*** **It does not.**

***Q.*** Did you know that Akbar Shokouhi had been terminated from Qualcomm for a conflict of interest?

**A. Not at that time.**

Q. It talks about groundbreaking technology.

Do you see that?

**A. Yes.**

Q. Anywhere in this slide deck does it disclose that the provisional patent applications filed for Abreezio's technology were nothing more than prior art?

**A. It does not.**

Q. Does it disclose that they were not novel?

**A. It does not.**

Q. Did you feel that the technology was nothing more than prior art?

**A. My assessment, there were two provisional patents. AVS, I was not really familiar with that field. So I did not have a good calibration.**

Q. Not your expertise?

**A. Not my expertise, yes.**

Q. Okay.

**A. On DFT, on the surface it appeared like a simple idea that had been applied for a different type of test. Just for -- let's call them A and B. In technical terms it is static and dynamic testing, DDF timing faults versus static faults. I know this may not mean much to the jury, but I'm just trying to highlight the distinction.**

**So the idea had been used in the static testing but had**

**never been applied, to the best of my knowledge. So I thought there was a novelty aspect to it.**

***Q.*** So you thought that Abreezio's DFT product was being applied in a new and defensible way?

***A.*** **Correct.**

***Q.*** There's also a note about multiple patents filed here; right?

***A.*** **Yes.**

***Q.*** And where it says "multiple patents filed," at this point all Abreezio had filed were two provisional patent applications; right?

***A.*** **That's correct, to the best of my knowledge.**

***Q.*** And I guess it wasn't even really Abreezio.

It was Sheida; right?

***A.*** **Right.**

***Q.*** Although, in your experience, as a tech executive who's been in the field for a while, do people sometimes say patents filed even as shorthand for provisional patent applications filed?

***MS. BERNSTEIN:*** Objection. 602, 702, 701.

***THE COURT:*** Overruled.

***THE WITNESS:*** Yeah, it varies from company to company. I've seen different terminologies being used by different companies.

***BY MR. PILCHAK:***

***Q.*** Okay. Anywhere in these slides that were prepared for the

meeting with Mr. Mansour, did it disclose that a Qualcomm vice president of research & development was an active member of the Abreezio team?

***A.*** **It was not.**

***Q.*** Why wasn't that in there?

***A.*** **As per Dr. Karim Arabi's instructions.**

***Q.*** In your view, would that have been a bad idea for Abreezio's prospects?

***A.*** **Yes, bad as -- how do you define "bad"?**

***Q.*** Bad --

***MS. BERNSTEIN:*** Objection. 602.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** Bad for the prospect of selling Abreezio later to Qualcomm for $180 million.

***A.*** **Absolutely.**

***MR. PILCHAK:*** We can take that down.

***BY MR. PILCHAK:***

***Q.*** The meeting with Ziad on March the 4th, who led the discussion for Abreezio?

***A.*** **For Abreezio, the discussion was primarily led by Brad Quinton.**

***Q.*** Did he seem to have a good technical grip on Abreezio's tech and products?

***A.*** **Yes, he did.**

*Q.* After the meeting with Ziad, did you have kind of a debrief with Dr. Arabi?

*A.* **Yes, I did.**

*Q.* And then later on after the meeting with Ziad, did you and others at Abreezio work on preparing additional provisional patent applications?

*A.* **Correct.**

*Q.* If you could -- well, this is not in your binder.

***MR. PILCHAK:*** Let's show the witness 546.

***BY MR. PILCHAK:***

*Q.* Is that an email from you, sir?

*A.* **Yes, it is.**

*Q.* And do you see where it says there's two attachments, Word documents?

*A.* **Right.**

*Q.* I want you to have a good look at those names and then take that down, and we'll look at 547.

Is this some draft language under a "Title of Invention" title?

*A.* **I see that, yeah.**

*Q.* And then 548, please.

Same thing, but different title?

*A.* **Correct.**

*Q.* When I say "same thing," I mean same general idea.

Do you understand 547 and 548 to be the attachments to that

email that you saw first at 546?

**A. Yes.**

***MR. PILCHAK:*** Move to admit all three of those documents: 546, '47, and '48.

***MS. BERNSTEIN:*** No objection, your Honor.

***THE COURT:*** They may be admitted.

***(Exhibits 546-548 admitted.)***

***BY MR. PILCHAK:***

***Q.*** Actually, before we do that, we're looking at one of the attachments here, right, Mr. Taneja?

**A. Yes.**

***Q.*** Without getting into any of the details about what's in this or the other attachment you just looked at, generally speaking, what are these documents?

**A. Applications for provisional patents.**

***Q.*** So this is the kind of thing that you might send to the patent and trademark office to try to get a priority date for a provisional patent application?

**A. Correct.**

***MR. PILCHAK:*** And now let's go to the email. Pick up all the text, please.

***BY MR. PILCHAK:***

***Q.*** The bottom message here, who is that from?

**A. From Bradley Quinton, Brad Quinton.**

***Q.*** And the subject line is what?

**A. "Provisional Patent No. 1 and No. 2."**
*Q.* So what did you understand Brad to be doing when he sent these documents to you?
**A. To review them. As it says, "Please find the attached first two provisional patents for your review."**
*Q.* And who did you forward them to?
**A. To Dr. Karim Arabi.**
*Q.* Why did you do that?
**A. As I mentioned earlier, virtually everything in the company had to be approved. Dr. Arabi had to weigh in to those.**
*Q.* Did he weigh in on these drafts?
**A. He weighed in on virtually everything.**
***MR. PILCHAK:*** All right. Let's take that down.
***BY MR. PILCHAK:***
*Q.* After the meeting with Ziad on March 4th, was there a second on-site pitch at Qualcomm on or about March 20?
**A. Yes. There was a second.**
*Q.* Were there slides for that meeting as well?
**A. There were.**
*Q.* Do you remember Dr. Arabi kind of providing input on those slides?
**A. Yes, I do.**
*Q.* Who attended that meeting on March 20th?
**A. So from Abreezio, it was Brad Quinton, Trent, and myself. From -- and maybe Dan. May have also been Dan. And from**

**Qualcomm, it was Ziad Mansour and several members, senior members, of his team.**

***Q.*** Okay.

***MR. PILCHAK:*** Let's show the witness 727, which is already in evidence. And zoom in on the top half there.

***BY MR. PILCHAK:***

***Q.*** The date of this is March 20th, but if you adjust for the time zone, per your prior testimony, it might actually be March 19th.

Is that fair?

***A.*** **Yes.**

***Q.*** So the -- is that the day before that meeting you were just testifying about?

***A.*** **That's exactly right.**

***Q.*** And when you text "Sent two slides," who were you texting that to?

***A.*** **Dr. Karim Arabi.**

***Q.*** And if we go down a couple of messages, you say "Just arrived at WB."

What's that?

***A.*** **WB is a building in one of the Qualcomm office campus in San Diego.**

***Q.*** Is that where this meeting was happening?

***A.*** **I'm not sure if that was where the meeting was happening. Possibly, yeah. I'm not sure.**

***Q.*** Why were you giving a blow-by-blow to Dr. Arabi of when you arrived?
***A.*** **He was going to meet up.**
***Q.*** After?
***A.*** **After the meeting.**
***Q.*** Okay. Then I guess if we go down, Dr. Arabi texts "Can you come to Morehouse Drive?"
What's Morehouse Drive?
***A.*** **So is this a location nearby where he wanted me to pick him up.**
***Q.*** So he was dialing in a location for you to meet him?
***A.*** **Sorry?**
***Q.*** He was telling you what location to meet him?
***A.*** **To meet him at, yes.**
***MR. PILCHAK:*** And we lost -- yeah. Let's pick up the bottom half there. Thank you, Mr. Reyes.
***BY MR. PILCHAK:***
***Q.*** Does Dr. Arabi write "To pick me up"?
***A.*** **Yes.**
***Q.*** Where will he be, according to this text?
***A.*** **On the sidewalk.**
***Q.*** Why couldn't you just meet him at his office?
***A.*** **Per Dr. Karim Arabi's instructions.**
***Q.*** He said don't come to my office?
***A.*** **It was understood.**

***Q.*** Why did you understand it that way?
***A.*** **Again, as I mentioned earlier, that would reveal Karim -- Dr. Karim Arabi's involvement with Abreezio.**
***Q.*** Did you also report to Dr. Arabi on how the meeting went?
***A.*** **Yes, I did.**
***MR. PILCHAK:*** Show the witness 726, which is in evidence. And pick up the text there.
***BY MR. PILCHAK:***
***Q.*** Is this your report to Dr. Arabi about the meeting?
***A.*** **Yes.**
***Q.*** And what did Ziad say about the tech according to your text?
***A.*** **This was great.**
***Q.*** Was that actually Mr. Mansour's reaction to the presentation?
***A.*** **I have no reason to believe this is not an accurate representation.**
***Q.*** Forget about the direct quote.
Did you have a memory generally of whether Mr. Mansour was in favor or against Abreezio's products as a --
***A.*** **Totally in favor.**
***Q.*** All right. Why do you say that?
***A.*** **Based on my recollection, based on how the meeting went, he showed a lot of enthusiasm to move forward with the next steps.**
***MR. PILCHAK:*** And let's show the witness Exhibit 728, please. This is already in evidence as well. And pick up all

that text, please.

***BY MR. PILCHAK:***

*Q.* This is dated March 21st; right?

***A.* Yes.**

*Q.* But again, if we rewind seven or eight hours that would put us back on March 20th.

Is that fair to say?

***A.* Correct.**

*Q.* What are you writing to Dr. Arabi in the top message?

***A.* So I'm thanking him for all the technical guidance that he provided which contributed to the success of the meeting with Qualcomm.**

*Q.* And so when -- this is going to sound silly, but when you say "Your technical prowess and genius," you're talking about Dr. Arabi's?

***A.* Absolutely.**

*Q.* Prowess and genius.

How did you understand his reply when he said "I am quite proud of my sister and what she accomplished"?

***A.* Yeah, so my interpretation was that I had not clarified -- let me just read what this --**

**My understanding was that he wanted to maintain this fiction that Sheida was contributing to this and that he was not involved.**

*Q.* So you didn't stick to the script?

**A. The -- in my own mind it took a while for the clarity to emerge in terms of -- yeah. But this was made very clear.**

***Q.*** Was there ever a time when Dr. Arabi kind of admonished you about sending messages like this?

**A. Yes.**

***Q.*** What did he say, if you remember?

**A. It was something to the effect don't send such messages.**

***MR. PILCHAK:*** Let's take that down.

***BY MR. PILCHAK:***

***Q.*** Was March 20 the last on-site meeting at Qualcomm?

**A. I don't believe so.**

***Q.*** Was there another meeting on April 15th of 2015?

**A. That sounds right.**

***MR. PILCHAK:*** Can we show the witness Exhibit 880, which I believe is already admitted. And zoom in on the top half, please.

***BY MR. PILCHAK:***

***Q.*** Where Dr. Arabi says "Have you landed," were you traveling to San Diego for the purpose of meeting with Qualcomm?

**A. Correct.**

***Q.*** I might not have asked this earlier.

But when I say "traveling to San Diego," where were you coming from? Where did you live at this time?

**A. I was coming from the San Jose airport.**

***Q.*** Okay. Do you still live in that area today?

**A. I live in Cupertino, yeah, in that area.**

*Q.* So you would have to travel for these Qualcomm meetings?

**A. That's right.**

*Q.* And Abreezio wasn't able to come up with the money for you to travel to Vancouver to meet Sheida, but were you reimbursed for these flights, or was this on your dime?

**A. I was reimbursed for these.**

*Q.* Okay. And do you, again, report to Karim when you arrive?

**A. Yes.**

*Q.* Who was at this meeting, if you remember?

**A. From Qualcomm?**

*Q.* Both sides, please, if you could.

**A. So to the best of my recollection, it was from our side -- from Abreezio's side it was Brad, myself, and Trent, and from the Qualcomm side it was pretty much a similar composition. I don't remember the exact specific individuals when we met the first time, when we met on March 20th with Ziad and his team.**

*Q.* Fair enough.

Fair to assume Dr. Arabi wasn't present for this one either?

**A. That's correct.**

*Q.* And did you text Dr. Arabi to let him know how this meeting went as well?

**A. I briefed him on all meetings, typically.**

***MR. PILCHAK:*** Can we show the witness 729, please. Just zoom in.

***BY MR. PILCHAK:***

***Q.*** Is this your general briefing?

***A.*** **Yes.**

***Q.*** All right. By the way, did Dr. Arabi ever ask you to communicate with him in some other method besides texts and standard phone calls?

***A.*** **Emails.**

***MR. PILCHAK:*** Well, let me show you Exhibit 730, which is already in evidence. And zoom in on the top, please.

***BY MR. PILCHAK:***

***Q.*** This is dated April 27th of 2015. Right?

***A.*** **Yes.**

***Q.*** Do you see the message from Dr. Arabi at the bottom?

***A.*** **Correct.**

***Q.*** What is FaceTime audio?

***A.*** **It's a feature on iPhones where you have the option of having a video call.**

***Q.*** And when it says "audio," can you do FaceTime without the video part?

***A.*** **You can.**

***Q.*** Did you follow Dr. Arabi's instruction and call him using FaceTime audio?

***A.*** **I -- to the best of my recollection, I believe I may have forwarded, though not consistently.**

***Q.*** Do you know why he asked you that?

**A. Not at that time.**

*Q.* Do you know -- I don't want to ask about anything you've learned since then.

But did you know around about that time that FaceTime audio was encrypted?

**A. I did not know that. I was told that it has better audio quality.**

*Q.* Who told you that?

**A. Akbar Shokouhi.**

*Q.* And so I think we left off around about April 15th with the meetings at Qualcomm; right?

**A. Correct.**

*Q.* Without doing every single meeting at Qualcomm, were there other meetings at Qualcomm that you attended?

**A. There were.**

*Q.* In general, did you prepare a whole series of marketing materials for Qualcomm for those various meetings?

**A. Depending -- depending on the goals of the meeting. Like if there was a meeting to discuss what's the plan for benchmarking the technology, it would be a very technical presentation.**

*Q.* Okay. So maybe not slides for all of them.

**A. Yeah.**

*Q.* And let me ask you about this.

I think you testified the first customer or potential customer Abreezio ever met with was Qualcomm; right?

**A. Correct.**
Q. But were there other meetings with other customers later?
**A. There were.**
Q. So other pitches, can we think of them that way?
**A. Yeah.**
Q. Did Abreezio ever actually -- I mean, this is probably a silly question.
Abreezio didn't sell itself to any other companies; right? It was acquired by Qualcomm?
**A. Correct.**
Q. So no other companies ever acquired Abreezio.
But let me ask a different question. There has been some testimony at this trial about licensing.
Do you know what licensing is?
**A. Yes.**
Q. Did any other company ever sign a licensing agreement with Abreezio?
**A. No.**
Q. Did Abreezio ever have any other revenue-paying customers who were paying royalties or hourly or licensing revenue to Abreezio?
**A. No.**
Q. Did Abreezio ever make a dollar of revenue?
**A. Outside of Qualcomm?**
Q. Right.

**A. No, to the best of my knowledge.**
*Q.* You were the CEO?
**A. Yeah, no.**
*Q.* All right.

***THE COURT:*** Would now be a good time to break?

***MR. PILCHAK:*** Of course, your Honor.

***THE COURT:*** Ladies and gentlemen, we have some issues that we need to take up outside your presence, so I think the best thing for us to do would be to send you home a little early, and that will give us a chance to work through some issues so we can finish hopefully with this witness tomorrow.

So I'm going to remind you that are you not to discuss the case or do any research. We'll see you back tomorrow morning at 9:00 o'clock. And I'm going to excuse you just a little early today.

And you are excused until 9:00 o'clock tomorrow morning, sir.

***THE WITNESS:*** Thank you.

***THE COURT:*** Thank you.

***(Jury out at 3:38 p.m.)***

***THE COURT:*** Thank you, sir.

Okay. We are now outside the presence of the jury. I have a couple of things.

Does anyone have anything before I have my things I want to say?

***MR. PILCHAK:*** Not for us.

***MS. BERNSTEIN:*** I don't think so, your Honor.

***THE COURT:*** Okay. With respect to the pages that Qualcomm turned over to me of the Taneja interviews, over Qualcomm's objection, I'm inclined to take -- to turn over the notes documenting their interviews with Taneja. There's a couple of reasons for that.

One is Taneja was not an employee of Qualcomm at the time. So this was not part of Qualcomm's internal investigation. So it's not an attorney-client privileged document.

All -- Number 2, all references to Qualcomm's attorneys', impressions of the witness, thoughts about what Taneja was saying, attorneys' comments on it have all been blocked out. So all that's remaining in the notes that I'm inclined to turn over would just be what the attorneys' summary is of what Taneja said during these various interviews.

There is material in the summaries that, in my opinion, could be construed as either exculpatory and/or impeaching information. I don't know if these statements are available to the attorneys in any other witnesses' statements by Mr. Taneja since I'm not privy to whatever the additional statements are.

So in an abundance of caution -- and, again, I understand Qualcomm is objecting to all of this -- I am inclined to disclose the notes to both sides, and that will give you both

a chance to review them over the evening.

***MR. PILCHAK:*** I have two thoughts about that, your Honor.

***THE COURT:*** Sure.

***MR. PILCHAK:*** Thought No. 1, just for my own edification, it's 67 pages?

***THE COURT:*** Yes.

***MR. PILCHAK:*** Great.

Thought No. 2, I --

***THE COURT:*** Although, I have to tell you, this is page 1 (*indicating*).

***MR. PILCHAK:*** I weep for the printer toner that went into that.

***THE COURT:*** Some of the pages are more detailed than others.

***MS. BERNSTEIN:*** Might be a faster read.

***THE COURT:*** It might be a faster read than it appears on the paper. I was able to read it -- I've read it multiple times.

***MR. PILCHAK:*** Good.

And the last thought is it would be my intent, unless the Court orders me not to do this, to share those statements with Mr. Taneja's attorneys who are sitting in the gallery here.

***THE COURT:*** I think that they should be turned over to Mr. Taneja's attorneys. And I know that would be -- I assume

that would be over the defense's objections. But I think they're entitled to copies of the documents as well.

***MS. BERNSTEIN:*** Yes. That would be over our objection. He is mid-testimony. He is under oath. He is a cooperator. He is -- I mean, I think a lot of this exchange indicates he knows where he's going. Mr. Pilchak leads him there. The objection is either sustained or not sustained. And when sustained, he feeds it right back to him. So certainly to give a cooperator mid-testimony while under oath evidence is over our strong objection.

***MR. PILCHAK:*** Your Honor, may I be heard of that?

***THE COURT:*** It's not evidence. It's just copies of the attorneys' summaries of his statement.

***MR. PILCHAK:*** And I just wanted to reiterate, we have no intention of meeting with Mr. Taneja in advance of his testimony tomorrow. And, for the record, I think this is the most minor point, but I will assume and assure and confirm that Mr. Taneja's attorneys will agree to be bound by the terms of the protective order that have applied to all of the discovery in this case. In fact, they're sitting right there.

***MR. HANNA:*** Yes, your Honor. We will be bound.

***THE COURT:*** And for the record, that was Nick Hanna appearing on behalf of Mr. Taneja.

Lindsey, if you could make copies for the parties.

Second thing I thought I might do is take a break at

this point, give Whitney a chance to do what she needs to do for the next half hour. Come back in half an hour, and we can discuss the remaining documents from -- wherever they are. They're here somewhere. The documents that Mr. Taneja's attorney are asserting as attorney-client privilege.

And I think because of that, I do think that Mr. Taneja should stick around until we have that discussion in case we need to put him on the stand to verify what these notes are that he sent. And I'm referring, just so you know, to the notes that Mr. Taneja sent to himself on November 2nd, 2017. Looks like they were all on November 2nd, 2017. There's just a couple of pages, and the attorneys have indicated they've segregated those documents as attorney-client privileged at the request of Mr. Taneja's attorney.

And so I -- that will give me -- half an hour will give me a chance to look some more at the case law and then we can then take argument on whether those should be turned over.

***MS. BERNSTEIN:*** Thank you, your Honor.

And Mr. Fraser filed a brief on our behalf to summarize that point, if your Honor has some time to review that.

***THE COURT:*** Okay. We'll take a half hour recess. We'll come back and I'll make a decision.

***MR. PILCHAK:*** 4:15, your Honor?

***THE COURT:*** 4:15. Is that about right?

***MS. BERNSTEIN:*** That's fine, yes. Thank you.

***(Recess taken.)***

***THE COURT:*** Okay. We are back on the record outside the presence of the jury. Dr. Arabi is present. The attorneys, including Mr. Hannah for Mr. Taneja, is -- are all present.

My preliminary thought is, Mr. Fraser, that I think you have things in the wrong order. I think the first thing I have to determine is whether this -- this document is privileged. And even if we do a balancing test, which I'm not sure is the right law, I don't think there's definitive law on the subject. There's law kind of going both ways.

I think the initial inquiry is whether it's privileged at all, and I can tell you that on its face it doesn't appear to be a memorialization of a discussion that Taneja had with his attorneys, which I know is the representation that was made this morning. That doesn't -- there's nothing in here that talks about this is what I talked to my attorneys about or this is what I'm going to talk to my attorneys about. So I think at this point there is nothing on its face that makes it appear to be privileged.

But if, Mr. Hanna, you want to put your client on the stand and establish a privilege, I'll certainly listen to what he has to say. It's just when I look at it here it doesn't appear to be attorney-client privileged. So that's sort of my initial.

And then if and when I find it's attorney-client

privilege, then we can discuss whether a balancing test is warranted or not and what -- we can go from there. But I think the very first thing I need to determine is whether it's privileged or not.

***MR. HANNA:*** Yes, your Honor. Nick Hanna for Mr. Taneja. I think a few short questions and we can establish that it's privileged and get over that hurdle.

Mr. Rothstein will take the lead on that.

***THE COURT:*** Okay.

***MR. ROTHSTEIN:*** Jimmy Rothstein, on behalf of Mr. Taneja. And we will call Mr. Taneja.

***THE COURT:*** Okay.

Okay. Mr. Taneja, I'm going to have you retake the witness stand. You are still under oath to tell the truth. This is a hearing outside the presence of the jury so we're going to have you take the witness stand. I'm going to let your attorney ask you a few questions. And if there are any follow-up questions from either of the attorneys on either the prosecution or the defense, I'll allow them to follow up. So have a seat.

Mr. Rothstein.

***MR. ROTHSTEIN:*** Thank you, your Honor.

///

///

///

***DIRECT EXAMINATION***

***BY MR. ROTHSTEIN:***

***Q.*** Good afternoon, Mr. Taneja.

***A.*** **Good afternoon.**

***Q.*** Did you meet with an attorney in May of 2017?

***A.*** **Yes, I did.**

***Q.*** And do you remember the name of that attorney?

***A.*** **Chris Kao.**

***Q.*** Do you remember the name of the law firm?

***A.*** **Kao, LLP.**

***Q.*** And why did you meet with Mr. Kao?

***A.*** **This is following my meeting with Karim in which I learned about the investigation that Qualcomm was conducting internally and -- even though there was no lawsuit at that time. And that was the context.**

***Q.*** Okay. And do you recall how long you met with him in May of 2017?

***A.*** **It was less than an hour, maybe. An initial complementary meeting.**

***Q.*** Now, was there a time when you were served with a complaint from Qualcomm?

***A.*** **Yes.**

***Q.*** And do you remember when that was?

***A.*** **To the best of my recollection, it was October 20th of 2017.**

***Q.*** Now, did you ever take notes of what was discussed with

Mr. Kao when you met with him in May of 2017?
**A. I took notes.**
Q. And when did you do that?
**A. I did this a few days after I learned about the lawsuit.**
Q. Would you have taken notes on November 2nd, 2017?
**A. Yes.**
Q. And how did you take those notes? Was it by hand? Was it on a computer?
**A. I composed an email to myself.**
Q. And you composed an email to yourself.
Did you send it to yourself?
**A. I sent it to myself, yes.**
Q. And did you make another meeting with Mr. Kao --
**A. Yes, I did.**
Q. -- at some point?
**A. A week later, November 9th.**
Q. Okay. And just to clarify, that was after you received the Qualcomm complaint --
**A. That's correct.**
Q. -- is that correct?
And what did you intend to do with the notes that you made on November 2nd, 2017?
**A. So in preparation for the November 9th meeting, I intended to use that as part of a defense strategy to discuss with the attorney.**

***Q.*** Okay. Did you -- when you met with the attorney, Mr. Kao, did you go over the notes that you made with him?
***A.*** **I referred to them in my discussion.**
***Q.*** And did you provide those notes to anyone else at any point?
***A.*** **I did not.**
***Q.*** And so it was your intention that they remain confidential between you and Mr. Kao at all times?
***A.*** **That's right.**

***MR. ROTHSTEIN:*** At this time, your Honor, no further questions.

***THE COURT:*** Okay. Any questions from the defense?

***MS. BERNSTEIN:*** Yes. I'm sorry. One moment, your Honor, because I missed something.

***THE COURT:*** Perhaps we should give Mr. Rothstein a seat at counsel table in case he has any objections, instead of in the back of the courtroom.

***MR. ROTHSTEIN:*** Thank you, your Honor.

***MR. HANNA:*** Brings back memories, your Honor, on this side of the table.

***CROSS-EXAMINATION***

***BY MS. BERNSTEIN:***
***Q.*** Good afternoon, Mr. Taneja.
***A.*** **Good afternoon.**
***Q.*** I'm sorry, can you pronounce your last name for me?

**A. "Taneja."**
*Q.* I'm sorry, I'm going to ask you some questions that Mr. Rothstein might have asked you because I didn't actually hear everything.
Is the attorney you said you engaged -- I'm sorry.
You didn't say you engaged an attorney.
Was the attorney you met for an initial complimentary one-hour meeting in May of '17 Chris Cow, like a milk, moo cow?
**A. K-a-o.**
*Q.* K-a-o. Thank you.
And you had a meeting sometime in May of 2017?
**A. Correct.**
*Q.* And how do you know that's the case?
**A. This was right after the -- my May meeting with Dr. Karim Arabi in San Diego.**
*Q.* Mr. Kao is in San Diego?
**A. No. Mr. Kao is in San Francisco.**
*Q.* Do you have --
**A. My --**
*Q.* Sorry. Go ahead, please.
**A. So I had met with Dr. Karim Arabi in May of 2017. And is this the same meeting where he had instructed me to delete the emails. And subsequently, I met with Mr. Chris Kao, a lawyer based in San Francisco.**
*Q.* Do you have text messages or emails corroborating that?

**A. I have emails.**

*Q.* You do have emails that show that you met with Mr. Kao or that you set this up, this complimentary meeting, in May of 2017?

**A. I have emails corresponding to the meetings that happened in November 9th after I got the lawsuit.**

*Q.* Oh, let me be clear. I'm talking about May of 2017 when you claim to have had this complimentary, less-than-one-hour initial complimentary meeting with Mr. Kao.

Do you have emails or text messages to corroborate that?

**A. I do not, to the best of my recollection.**

*Q.* We've seen a ton of your text messages and emails from back then, but you don't have text messages or emails about this?

***MR. ROTHSTEIN:*** Objection. Asked and answered.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

*Q.* And so May -- you meet in May; correct?

**A. Correct.**

*Q.* And to June to July to August to September to October to November -- you make notes of this meeting six months later?

**A. I was being hopeful that the internal investigation --**

*Q.* I appreciate that.

My question is, did you make notes of this meeting six months later? Is that your testimony?

**A. Correct. After hearing about -- understanding about the**

**lawsuit.**

***Q.*** You made notes six months later that you claim are exclusively based on a less-than-one-hour complimentary meeting?

***A.*** **And more to the additional points as part of a defense strategy to discuss with the lawyer in anticipation of the meeting coming up on November 9.**

***Q.*** Yeah, I saw you meeting with your attorneys in the hallway.

Did you discuss what the substance of your testimony right now is going to be with them?

***MR. ROTHSTEIN:*** Objection. That calls -- first of all, it's argumentative. And second of all, it calls for attorney-client privilege.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** How positive are you that you met with Chris Kao in May of 2017?

***A.*** **Absolutely hundred percent.**

***Q.*** A hundred percent positive?

***A.*** **Yes.**

***Q.*** And what was the date that you claim you met with Dr. Arabi?

***A.*** **It's somewhere in the discovery documents. And it is the latter half of May of -- somewhere in the May 18th to May 30th time frame. And the exact date can be obtained from the discovery documents.**

***Q.*** You don't remember?

***A.*** **I don't remember offhand.**
***Q.*** And these emails that you sent to yourself on November 2nd, there were three separate emails; correct?
***A.*** **Correct.**
***Q.*** And do you remember what time you sent those emails to yourself?
***A.*** **Those were -- by the way, I was in India at the time. So the time stamp may be referring to the local time zone. And in that email trail with my lawyer, I even point out the number he should call me, which is an Indian number with a 91 country code.**
***Q.*** I'm sorry, what email with your lawyer?
***A.*** **Sorry?**
***Q.*** What email with your lawyer?
***A.*** **For setting up the November 9th meeting.**
***Q.*** You've seen that email?
***A.*** **I have that email.**
***Q.*** Have you shared that email with anyone?
***A.*** **I have not.**
***Q.*** You've shared it with your counsel, no? With your counsel that's representing you here today or not?

***MR. ROTHSTEIN:*** Objection, your Honor. This is, again, intruding on attorney-client communication.

***THE COURT:*** Sustained.

///

***BY MS. BERNSTEIN:***

***Q.*** So let me be clear. You have an email setting up the November 9th meeting according to you, and you do not have an email setting up the May 2017 meeting; correct?

***A.*** **Correct.**

***Q.*** Okay. And you did not share your notes with your counsel on May -- excuse me -- on November 9th.

Is that what you said?

***MR. ROTHSTEIN:*** Same objection, your Honor.

***THE COURT:*** Overruled.

***THE WITNESS:*** I used the contents of that to have a discussion with the attorney.

***BY MS. BERNSTEIN:***

***Q.*** Can you please -- I'm going to ask you a question. I appreciate you providing an answer to the question that I ask.

You did not use -- you did not provide your notes to your attorney -- you did not provide your November 2nd notes to your attorney; is that correct?

***A.*** **That's correct, to the best of my recollection.**

***Q.*** Do you have any reason to doubt your recollection?

***A.*** **It's from seven years ago, eight years ago. But to the best of my recollection, I did not.**

***Q.*** And you were a defendant in this case in -- you were arrested in August of 2022; correct?

***A.*** **Correct.**

***Q.*** And you pled guilty in August of 2023?
***A.*** **July.**
***Q.*** July of 2023.
***A.*** **July/August time frame. I don't know the exact date.**
***Q.*** You had cooperated in the civil suit when you and Dr. Arabi and Ms. Alan were named as well; correct?

***MR. ROTHSTEIN:*** Objection, your Honor. Relevance.

***THE COURT:*** Sustained.

The only question is whether is this privileged or not.

***BY MS. BERNSTEIN:***

***Q.*** Well, had you been in a prior --

***MS. BERNSTEIN:*** I'd like to ask about his behavior once he is in a lawsuit, your Honor.

***THE COURT:*** Not unless it's his behavior in November of 2017. I think we have a very narrow issue here.

***MS. BERNSTEIN:*** Okay. Thank you very much.

***THE COURT:*** Do you have any questions, Mr. Pilchak?

***MR. PILCHAK:*** No, your Honor. Thank you.

***THE COURT:*** Okay. Mr. Rothstein.

***MR. ROTHSTEIN:*** One quick question.

***THE COURT:*** Sure.

***REDIRECT EXAMINATION***

***BY MR. ROTHSTEIN:***

***Q.*** Mr. Taneja, did you ever pay for Mr. Kao's services at any

point?

**A. I did.**

*Q.* Thank you.

And when was that?

**A. I'd have to look back at my records.**

*Q.* Did you pay him in May of 2017?

**A. I think I mentioned already it was a complimentary initial meeting.**

*Q.* Did you pay him in June of 2017?

**A. As I said, I can look up my records and get you an exact date.**

*Q.* Do you remember that perhaps you didn't pay him until after this November meeting?

**A. The May meeting was complimentary.**

*Q.* And then did you engage with him at any point before November 9th?

**A. November 2nd, November 3rd, I started email communication to set up the meeting which took place on November 9th. But nothing before the lawsuit was filed.**

*Q.* Before what lawsuit was filed?

**A. Before the civil complaint that Qualcomm had filed.**

***MR. ROTHSTEIN:*** Okay. Thank you.

***THE COURT:*** Okay. Thank you, sir. You may step down.

Mr. Rothstein, I don't see it. I mean, what I see is that he gets served with a lawsuit -- maybe he saw a lawyer in

May. I'm prepared to accept he saw a lawyer, had a complimentary discussion, was nervous about what was going on. Then he gets served with a lawsuit and he immediately scribbled down all his thoughts about the lawsuit.

But it's not attorney-client privilege that he's making notes about what he thinks about the claims. These aren't things that he turned over to his lawyer. There's nothing here that talks about what he discussed with his lawyer, what he told his lawyer, what his lawyer told him. I really just don't see that it's attorney-client privilege.

***MR. ROTHSTEIN:*** Understood, your Honor. I will just say that he did just testify that he did discuss the notes with his attorney. And he also testified that, you know, he discussed strategy with his attorney as well.

***THE COURT:*** Okay. At this point I find that they're not attorney-client privilege, just these two pages of notes dated November 2nd, 2017. There's three different sets of notes. So the defense may use those in their case if it becomes relevant. I don't know, you can ask him questions and see.

***MS. BERNSTEIN:*** Thank you, your Honor.

***THE COURT:*** Okay.

***MR. PILCHAK:*** Your Honor, just to be clear for the record, all parties can use them?

***THE COURT:*** Yes, all parties can use them.

***MR. PILCHAK:*** Thank you.

***MR. HANNA:*** Thank you, your Honor.

***MR. ROTHSTEIN:*** Thank you, your Honor.

***MS. BERNSTEIN:*** And I just want to clarify something because I think this had been -- Mr. Rothstein and I had gone back and forth a couple of times when I was seeking for some more identification of the emails so that we could segregate it. Because I think our version is three pages. So I have no reason to think that they're different. It's emails on November 2nd and --

***THE COURT:*** I have three emails on November 2nd, which is what I reviewed. One at 4:06:53. I don't know if that's local time or not.

***MS. BERNSTEIN:*** This is the same?

***THE COURT:*** One at 4:08. I'm sorry. There's a -- there's four. 4:06:53, 4:08, 4:03. The 4:03 is the last one.

***MS. BERNSTEIN:*** Thank you, your Honor. It is what we had identified as Defense Exhibit 2139. I just wanted to clarify the page numbers. Thank you.

***THE COURT:*** Thank you. We'll see you tomorrow morning at 9:00 o'clock.

***MS. BERNSTEIN:*** I'm sorry, your Honor. So I wanted to also raise the issue of these Qualcomm interviews that we just got.

***THE COURT:*** Yes.

***MS. BERNSTEIN:*** They're very dense. And I appreciate

that they might be able to be read very quickly, but it's information that we've been seeking for quite some time, particularly because there's so much here that causes us -- I mean, we need time to digest this, to confer with Dr. Arabi to --

***THE COURT:*** You're leaving at 4:30. Head for home.

***MS. BERNSTEIN:*** Your Honor, we do want to make a motion for a continuance. We don't think we will be able to adequately digest this information and represent Dr. Arabi without a continuance.

***THE COURT:*** You don't want a continuance, Ms. Bernstein. You don't.

***MS. BERNSTEIN:*** Just until Monday, your Honor. We're not asking to terminate this trial. We're just asking for a continuance until Monday.

***THE COURT:*** What I will do is if you would like to recall -- if we get through Mr. Taneja and you want to recall Mr. Taneja just to cover something that's in these areas, I'll allow you to do that.

But we're going to continue with the trial, and we're going to fill up the time. And so if you have -- if you get through all your cross-examination and we move on to another witness and you find that there's something in those documents that you want to recall Mr. Taneja to discuss, we can do that.

***MS. BERNSTEIN:*** Or would the Court be amenable to

pausing Mr. Taneja's testimony, taking other witnesses tomorrow, and resuming with him on Monday?

***MR. PILCHAK:*** We're considering that as well, your Honor, to the extent that it matters to the Court.

***THE COURT:*** You know, I don't have a problem as long as we fill up the time.

***MR. PILCHAK:*** Yes. We will work very hard to do that if that's where we land. And we're actively discussing that right now.

***THE COURT:*** Okay. All right. Thank you.

***(Proceedings adjourned at 4:36 p.m.)***

***

*REPORTER'S CERTIFICATE*

I, Anne Roldan, certify that I am a duly qualified and acting Official Court Reporter for the United States District Court, that the foregoing is a true and accurate transcript of the proceedings as taken by me in the above-entitled matter on March 19, 2025; and that the format used complies with the rules and requirements of the United States Judicial Conference.

Date: March 19, 2025

*Anne Roldan, RMR, CRR, CSR 13095*