UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. KARIM ARABI, Defendant. | Case No. 22-cr-1152-BAS<br>March 20, 2025<br>Jury Trial, Day 8 |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CYNTHIA A. BASHANT
CHIEF DISTRICT JUDGE

VOLUME 8, PAGES 1757 - 2003

APPEARANCES:

FOR PLAINTIFF: UNITED STATES ATTORNEY'S OFFICE
880 Front Street, Suite 6293
San Diego, California 92101
By: *NICHOLAS W. PILCHAK, AUSA*
*JANAKI G. CHOPRA, AUSA*
*ERIC R. OLAH, AUSA*

FOR DEFENDANT: BIENERT KATZMAN LITTRELL WILLIAMS, LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
By: *WHITNEY Z. BERNSTEIN, Esq.*
*REBECCA S. ROBERTS, Esq.*
*RYAN V. FRASER, Esq.*

REPORTED BY:

ANNE MARIE ROLDAN, RMR, CRR, CSR 13095
U.S. OFFICIAL COURT REPORTER
U.S. District Court Clerk's Office
333 West Broadway, Suite 420
San Diego, California 92101

Reported stenographically; transcribed with CAT software.

# I N D E X

***

## E X A M I N A T I O N S



| WITNESS | VOL. | PAGE | LINE |
|---|---|---|---|
| *FOR THE GOVERNMENT:* | | | |
| ENRIQUE RODRIGUEZ | | | |
| Direct by Mr. Olah | 8 | 1762 | 11 |
| DUANE NELLES | | | |
| Direct by Mr. Olah | 8 | 1770 | 18 |
| Cross by Ms. Roberts | 8 | 1815 | 9 |
| Redirect by Mr. Olah | 8 | 1874 | 18 |
| EDWARD PERKIS | | | |
| Direct by Mr. Pilchak | 8 | 1879 | 19 |
| KATIE WILSON | | | |
| Direct by Mr. Olah | 8 | 1883 | 10 |
| Cross by Ms. Bernstein | 8 | 1908 | 18 |
| Redirect by Mr. Olah | 8 | 1944 | 18 |
| Recross by Ms. Bernstein | 8 | 1947 | 1 |
| TERRENCE MYCKA | | | |
| Direct by Mr. Olah | 8 | 1951 | 25 |
| Cross by Mr. Fraser | 8 | 1980 | 21 |
| Redirect by Mr. Olah | 8 | 1996 | 12 |
| Recross by Mr. Fraser | 8 | 1997 | 3 |

# E X H I B I T S

| ADMITTED | VOL. | PAGE | LINE |
|---|---|---|---|
| Ex. 48 | 8 | 1780 | 15 |
| Ex. 49 | 8 | 1798 | 24 |
| Ex. 48 | 8 | 1780 | 15 |
| Ex. 49 | 8 | 1798 | 24 |
| Ex. 85 | 8 | 1887 | 13 |
| Ex. 537 | 8 | 1902 | 19 |
| Ex. 592 | 8 | 1824 | 16 |
| Ex. 599 | 8 | 1838 | 11 |
| Ex. 754 | 8 | 1957 | 18 |
| Ex. 755 | 8 | 1957 | 18 |
| Ex. 756 | 8 | 1957 | 18 |
| Ex. 757A | 8 | 1962 | 3 |
| Ex. 758A | 8 | 1962 | 3 |
| Ex. 759 | 8 | 1966 | 2 |
| Ex. 760 | 8 | 1966 | 2 |
| Ex. 761 | 8 | 1966 | 2 |
| Ex. 762 | 8 | 1966 | 2 |
| Ex. 763 | 8 | 1966 | 2 |
| Ex. 764A - 764MM | 8 | 1975 | 19 |
| Ex. 765 | 8 | 1966 | 2 |
| Ex. 766 | 8 | 1966 | 2 |
| Ex. 767 | 8 | 1966 | 2 |
| Ex. 790 | 8 | 1766 | 19 |
| Ex. 791 | 8 | 1766 | 20 |
| Ex. 2510 | 8 | 1860 | 15 |
| Ex. 2588 | 8 | 1855 | 22 |
| Ex. 2621 | 8 | 1826 | 25 |
| Ex. 2725 | 8 | 1833 | 25 |
| Ex. 2890 | 8 | 1851 | 8 |
| Ex. 2996 | 8 | 1829 | 23 |

***THURSDAY, MARCH 20, 2025, 9:00 A.M.***

***

**THE COURT:** Okay. We are back on the record outside the presence of the jury. Dr. Arabi is present and the lawyers are present.

Counsel?

**MR. PILCHAK:** Good morning, Your Honor. One thing we wanted to notify the Court about is following up on our conversation at the end of the day yesterday, we have elected to pause Mr. Taneja's testimony, and we have scrambled to assemble five other witnesses today, which we think is going to fill out the dance card pretty well. But if we wind up ending a little early with the five we have for today, we'd ask a little indulgence from the Court.

**THE COURT:** That's fine.

**MR. PILCHAK:** We also just, in the spirit of happy news, wanted to let the Court know we've reached a new stipulation with Defense which knocks one witness off our list, and we have elected to remove another witness from our witness list, so we're getting efficient.

**THE COURT:** Good.

**MR. PILCHAK:** And then the other thing is, because Mr. Taneja was mid-testimony yesterday, and then the jury broke early, and because he's not coming back this morning, we were wondering if the Court would inform the jury that we're going to

call another witness for scheduling reasons or something.

**THE COURT:** That's what I will do.

**MR. PILCHAK:** Thank you. That's it for us.

**THE COURT:** Okay. Anything else?

**MS. BERNSTEIN:** Nothing for us, Your Honor.

**THE COURT:** Okay. Whenever the jury is ready. I know we're a little early.

***(Pause.)***

**THE CLERK:** The jury is entering.

***(Jury in at 9:03 a.m.)***

**THE COURT:** Good morning, everyone. And can I tell you how much I appreciate you all being so prompt so that we can start right on time and get going with the trial? I really appreciate that.

We are back on the record. All jurors are present. Dr. Arabi is present. All the lawyers are present.

Just to let you know, I know we ended with Mr. Taneja's testimony. He is going to be back on the witness stand, but not today. To accommodate some other witnesses' schedules, we're going to take some witnesses out of order, and he'll be back on the witness stand next week. So we're going to take some witnesses out of order.

**MR. OLAH:** Starting with Customs and Border Protection Officer Enrique Rodriguez, Your Honor.

**THE CLERK:** Good morning. Please stand here and raise

your right hand.

*(Witness duly sworn.)*

***THE CLERK:*** Thank you. You may lower your hand. Please take the stand. Please state and spell your first and last name for the record.

***THE WITNESS:*** Enrique Rodriguez, E-n-r-i-q-u-e, last name Rodriguez, R-o-d-r-i-g-u-e-z.

***THE COURT:*** Thank you.

Mr. Olah?

***MR. OLAH:*** Thank you, Your Honor.

***DIRECT EXAMINATION***

***BY MR. OLAH:***

***Q.*** Good morning, Officer Rodriguez.

***A.*** **Good morning.**

***Q.*** Where do you work?

***A.*** **For U.S. Customs and Border Protection here in San Diego, California.**

***Q.*** Do you work at a Port of Entry?

***A.*** **I work at the San Ysidro Port of Entry.**

***Q.*** What's your title within Customs and Border Protection?

***A.*** **First Line Supervisor.**

***Q.*** Prior to becoming a Supervisor, did you work as an Officer?

***A.*** **Yes, I did.**

***Q.*** And is your title still Officer?

**A. Yes. It's still included in the title, correct, sir.**
*Q.* How long have you been an employee of Customs and Border Protection?
**A. Since 2009.**
*Q.* Are you familiar with the TECS, that's T-E-C-S, System?
**A. Yes, sir.**
*Q.* Is that a system that's maintained by DHS?
**A. That is correct, yes.**
*Q.* Can you give this jury an overview of what the TECS System is?
**A. It's a system of records. It basically keeps track of personal identifiable information of vehicles, merchandise, people going inbound, outbound, meaning entering the country and exiting the country.**
*Q.* I want to ask a few questions about the last piece of that.
Does TECS document entries of individuals into the United States?
**A. Yes, sir.**
*Q.* Does it sometimes capture individuals' outbound crossings or departures from the United States?
**A. That is correct, yes.**
*Q.* Would TECS records -- with respect to inbound and outbound crossings, what kind of information would be logged within the TECS System?
**A. Names, date of birth.**

*Q.* What about the location of the crossing?
***A.*** **Location of where -- correct, where they made entry, whether it's at a land border or at an airport.**
*Q.* What about would the date and time be documented as well?
***A.*** **Yes, sir.**
*Q.* Do you have access to the TECS System?
***A.*** **Yes, I do.**
*Q.* Do most, if not all, of CBP officers have access to the TECS System?
***A.*** **Yes.**
*Q.* Are you able to query individuals within the System?
***A.*** **Yes, I am.**
*Q.* What information would you enter to search for an individual's crossing records within TECS?
***A.*** **Typically, a name and date of birth.**
*Q.* You could use either or both of those; is that right?
***A.*** **That is correct.**
*Q.* And if they have any crossings into or out of the United States, would that be reflected within their TECS records?
***A.*** **Yes.**
*Q.* Do you use the database as an Officer with Customs and Border Protection?
***A.*** **Yes, I do.**
*Q.* Do you rely on the accuracy of those records?

**A. Yes, I do.**
***Q.*** And Officer Rodriguez, prior to testifying today, did you review a couple of crossing records relevant to this case?
**A. Yes.**
***MR. OLAH:*** If we could please show the witness and the witness only, let's start with Exhibit 790.
***BY MR. OLAH:***
***Q.*** Officer Rodriguez, I'm showing you an 18-page exhibit marked 790. And we're going to keep it on this first page here.
Is that one of the exhibits you reviewed prior to testifying today?
**A. Yes.**
***Q.*** And, generally speaking, what is Exhibit 790?
**A. It's a record of crossing for a Karim Arabi. And it's showing inbound and outbound crossings with the dates that they took place, and also the locations.**
***MR. OLAH:*** If we could show the witness Exhibit 791 as well.
***BY MR. OLAH:***
***Q.*** Officer Rodriguez, I'm showing you now a five-page exhibit. Let's start with page 1.
What are we looking at here?
**A. We're looking at a TECS record crossing for a Sheida Alan. And the same, it shows the date, and location, and whether it was inbound or outbound.**

***Q.*** Okay. And this page here is for first name Sheida, last name Alan; is that right?

**A. Alan, yes.**

***MR. OLAH:*** If we could go to page 3 of this exhibit for the witness -- page 4, I apologize.

***BY MR. OLAH:***

***Q.*** Looking at page 4 of the same exhibit, Exhibit 791, what is shown here?

**A. It's a TECS record crossing for a Sheida Arabi, and it shows the same information. Sheida Arabi.**

***Q.*** Okay. Are Exhibits 790 and 791 certified copies of TECS records for two different individuals?

**A. Yes.**

***MR. OLAH:*** Your Honor, at this time, I'd move to admit Exhibits 790 and 791.

***THE COURT:*** Any objection?

***MR. FRASER:*** No.

***THE COURT:*** They may be admitted.

***(Exhibits 790 and 791 admitted.)***

***MR. OLAH:*** And really quickly, just for the jury's benefit, if we could go back to 790, please.

***BY MR. OLAH:***

***Q.*** Officer Rodriguez, just sticking with this first page, I believe you can probably annotate if you want to touch that screen.

Can you direct the jury to the name of the individual whose records are shown here?
**A. Sure. The first name, Karim, and then Arabi in the back.**
Q. And, again, sticking on this first page, where are the records of crossings documented?
**A. Right below the name, you'll see where there's a subject -- well, there's a line with specific information where there's the last name, first name. It even provides the document number used, the date they made -- the entry was made or the exit was made out of the country.**
Q. Okay. And I think you're walking us through that table left to right.
Is there a column that is labeled "I/O"?
**A. Yes, there is.**
Q. What does "I/O" indicate?
**A. I stands for Inbound, O stands for Outbound.**
Q. Okay. And next to that I/O, what column do you see?
**A. Site.**
Q. What does that mean?
**A. That's the site location code, basically the -- the area where that entry or exit was made.**
Q. And I believe three columns to the right is "status."
Do you see that?
**A. Yes, sir.**
Q. What kind of information is communicated in the Status

column?

***A.*** **Whether or not they boarded the -- the flight.**

***Q.*** Okay. So it's possible that there's an entry noted and the individual just missed the flight?

***A.*** **Yes.**

***Q.*** Okay. And then those last two columns, what communication -- or what information is communicated in those columns?

***A.*** **That is the arriving location code with a departure location code next to it.**

***Q.*** And does it infuriate you as much as it does to me, that they have those two in the opposite order, arriving and then departing location?

***A.*** **Yeah.**

***Q.*** Okay. And these are the records, 790, for Karim Arabi; is that right?

***A.*** **That is correct.**

***MR. OLAH:*** If we could go to 791 quickly.

***BY MR. OLAH:***

***Q.*** Starting with page 1, whose crossing records are these?

***A.*** **Sheida Alan -- or Alan.**

***Q.*** And I'm not going to have you go through the same headers in the table, but is the same information captured for Ms. Alan with respect to her inbound and outbound crossings?

***A.*** **That is correct, sir.**

***MR. OLAH:*** If we could go to page 4.

***BY MR. OLAH:***

***Q.*** What are we looking at, at page 4?

***A.*** **The crossing history for a Sheida Arabi.**

***Q.*** Now, they've been -- well, these exhibits are redacted, at least the date of birth and some other information; is that right?

***A.*** **That is correct, yes.**

***Q.*** Did you review unredacted versions of these records?

***A.*** **Yes, I did.**

***Q.*** Did the date of births for Ms. Arabi and Ms. Alan, both with the first name Sheida, match?

***A.*** **Yes.**

***Q.*** Okay. And the records in 791, it indicates the encounter start date is what?

***A.*** **That would be January 1st, 2015.**

***Q.*** Did you review to see if Ms. Arabi, under the name Ms. Arabi or Ms. Alan, had crossings prior -- or in the year of 2014?

***A.*** **Yes.**

***Q.*** Did Sheida Arabi or Sheida Alan have any crossings in the year 2014?

***A.*** **No.**

***Q.*** Okay. So these records begin with any crossings she had in 2015; is that right?

***A.*** **That is correct.**

***MR. OLAH:*** No further questions at this time, Your Honor.

***THE COURT:*** Cross-exam?

***MR. FRASER:*** No questions.

***THE COURT:*** May this witness be excused?

***MR. OLAH:*** Yes, from the Government, Your Honor.

***THE COURT:*** Thank you, sir.

***THE WITNESS:*** Thank you.

***MR. OLAH:*** Your Honor, at this time, the United States calls Duane Nelles.

***(Witness present.)***

***THE CLERK:*** Please raise your right hand.

***(Witness duly sworn.)***

***THE CLERK:*** Thank you. Please take the stand. Please state and spell your first and last name for the record.

***THE WITNESS:*** Duane Nelles, D-u-a-n-e, Nelles, N-e-l-l-e-s.

***DIRECT EXAMINATION***

***BY MR. OLAH:***

***Q.*** Mr. Nelles, good morning.

***A.*** **Good morning.**

***Q.*** You seem to be the happiest person to have taken the witness stand in this trail.

Is that because you recently retired?

*A.* **I did.**
*Q.* How long ago did you retire?
*A.* **Two weeks ago.**
*Q.* And did you spend last week skiing?
*A.* **I did.**
*Q.* Where did you work prior to retiring?
*A.* **I worked at Qualcomm for the past 35 years, approximately.**
*Q.* Thirty-five years at Qualcomm.
What was your job when you started at Qualcomm approximately 35 years ago?
*A.* **I was a very proud stockroom clerk, and making $7 an hour and thought I was stealing from the company, almost.**
*Q.* Was that a job you held while you were in college?
*A.* **I was in college, that's correct.**
*Q.* What was your job as a -- was it stockroom manager?
*A.* **No. That would be a promotion. I was a lowly stockroom clerk.**
*Q.* What was your job? What were your responsibilities?
*A.* **I would provide chips to the people on the manufacturing line. So I would -- like, I'd provide the -- go select chips out of the bin, provided it to the people that needed to build the parts.**
*Q.* Is that the job you had when you retired about two weeks ago?
*A.* **No, a little different by then.**

*Q.* What were you doing when you retired?

***A.*** **I was a Senior Vice President of Corporate Development. So essentially, I was responsible for leading teams that were evaluating the purchase of companies, joint ventures, acquisitions and divestitures, partnerships, and such.**

*Q.* How long were you the Senior Vice President of that Corporate Development Team?

***A.*** **I was both a Vice President and a Senior Vice President during my tenure. I did that -- I was in that role for approximately 20 years, I would say.**

*Q.* Were you on the Corporate Development Team before taking the VP or Senior VP role?

***A.*** **I was promoted to Vice President in the Corporate Development role.**

*Q.* And spent 20 years on the Corporate Development Team?

***A.*** **Correct.**

*Q.* Got it.

Are you familiar with Invention Assignment Agreements?

***A.*** **I am.**

*Q.* What is an Invention Assignment Agreement?

***A.*** **My understanding is that when we work as employees for the company, that anything that we think about or invent would become assigned to the company while we're an employer -- an employee of the company.**

*Q.* Mr. Nelles, did you agree to such an Agreement with

Qualcomm?

**A. I believe that's a standard part of our Employment Agreement, yes.**

Q. Okay. You mentioned a moment ago that Corporate Development is involved when looking at a company to acquire; is that right?

**A. That's correct.**

Q. How many acquisitions were you a part of in your time at Qualcomm?

**A. I probably was part of completing over a hundred acquisitions.**

Q. Why do you say "completing"?

**A. We evaluate a number of different companies every year from people that come and suggest that we should buy them, and we evaluate whether or not they make sense. So I would say that there's far more that we don't go forward with than we do go forward with.**

Q. And can you give the jury an overview of why Qualcomm might seek to acquire another company?

**A. Sure. There can be a number of different reasons. But we try to get new technologies that can add on and enhance our technology portfolio, things that can improve our products going forward. We try to have smart people that can enhance our team. Those are important things.**

**And sometimes we buy companies that have established businesses. You know, they have revenue that they bring to the**

**company that we think that when we add their business alongside our business, we can make it even better. So there's a number of different ways that we think about acquisitions, but those are probably the primary reasons.**

*Q.* Are you familiar with the term "tech and team acquisition"?

***A.*** **Yes.**

*Q.* What does that mean?

***A.*** **Most of our acquisitions actually are tech and team. So we're focused on buying technologies and teams that really understand those technologies and bringing them on to the Qualcomm platform. And we -- you know, we think that when we do that, we can create a new business or enhance our existing business.**

*Q.* Mr. Nelles, if you can, scoot a little bit closer to that microphone.

***A.*** **Sure, sorry.**

*Q.* There you go. You're fine.

Is there any -- well, what does Qualcomm do when looking at a tech and team acquisition or a potential tech and team acquisition?

***A.*** **There's a -- you know, we try to out and have our Engineering leads, people that are experts in the specific domain, go and look at the technology that is being proposed for acquisition. We have them evaluate its quality, its ability to help enhance our products. So we're looking at that.**

**We meet with the Engineering leadership, if we can, that understands that technology so that they explain it to us. We get a sense of how strong they are, do they understand the technology, and will they fit in with Qualcomm culture.**

***Q.*** Does Corporate Development do the technical due diligence?

***A.*** **No. We manage the process. I would suggest that we are kind of like the air traffic control of the process. So we have experts in all different aspects of the business, from engineers to business unit leadership to HR to contract evaluators, each one of those people is responsible for diligencing their section and then providing information back to us.**

***Q.*** Is the Corporate Development Team, when looking at an acquisition, interested in whether the business owns intellectual property?

***A.*** **Of course.**

***Q.*** Why? Why is it interested in whether the business owns the IP?

***A.*** **Well, we want to make sure that if we acquire technology, that Qualcomm would then have the right to use the technology. So if we buy technology that is owned by somebody else, that somebody else could come to us and suggest that they own it and that we don't have the right to use it. So that would be one reason we would be concerned.**

***Q.*** Once the vetting is done, the air traffic control -- the plane lands, to use your air traffic control metaphor, who at

Qualcomm makes the decision whether to acquire a business?

*A.* **Well, we have a process where we ultimately have to take final approvals for all acquisitions up to our Executive Management Team, so, for instance, our CEO, our General Counsel, and our Chief Financial Officer. And depending on the size of the acquisition, we have to expand it to include other people. If it's a larger acquisition, our Board of Directors would also have to approve it.**

**But fundamentally, it's a group effort that comes together and says, Yes, we validated all the key assumptions, and we present that to our Management to make the final decision.**

*Q.* Did you and your Corporate Development Team evaluate a company known as Abreezio?

*A.* **We did.**

*Q.* What kind of -- was that an acquisition that was completed?

*A.* **Yes, it was.**

*Q.* How would you describe that acquisition? Was Qualcomm breaking into a business, was it a tech and team acquisition, or a third?

*A.* **It was a technology and team acquisition.**

*Q.* Who, if anyone, from your team did you assign to evaluate Abreezio?

*A.* **The main person assigned was Hiten Somwal.**

*Q.* You say "main."

Were there other folks involved?

***A.*** **I had another individual, I believe Malik Khan, but he, I believe, was secondary on this transaction. It was really --**

***Q.*** I didn't hear that term, second what?

***A.*** **He was secondary. I would say the day-to-day main person was Hiten.**

***Q.*** Okay. And what about yourself? Did you assist with this acquisition?

***A.*** **I did.**

***Q.*** Is it unusual to have three folks from your team working on a single acquisition?

***A.*** **No.**

***Q.*** You've done that with other acquisitions as well?

***A.*** **True, yes.**

***Q.*** Are you familiar with the term "sponsor"?

***A.*** **Yes.**

***Q.*** What does it mean to sponsor a deal?

***A.*** **Generally, we -- you know, because we're not experts in the corporate development area on all of these technologies that are being provided or suggested to go forward, we need to have someone from the Engineering side or the Business Side sponsor and say that, Yes, I vouch for this technology being important, this technology being of high quality, this business being important to us.**

**So we have generally an Engineering sponsor or a Business Unit sponsor that says, This is going to be on me. I'm going to**

**take this forward and be the responsible party to bring this company in and have it create value for Qualcomm long term. And they're the ones that get named in front of our Executive Management.**

*Q.* So nothing unusual about a deal having a sponsor within Qualcomm advocating for the acquisition; is that right?

***A.*** **Every deal should have a sponsor.**

*Q.* It would be weird if there wasn't one.

***A.*** **That's correct.**

*Q.* Got it.

Was anyone -- or, I guess, since they always have a sponsor, who at Qualcomm was the sponsor for Abreezio?

***A.*** **I would say Ziad Mansour.**

*Q.* And who is Ziad Mansour?

***A.*** **He was one of our Senior Engineers and Senior Vice President of Engineering.**

*Q.* How high up is that in Qualcomm's organizational hierarchy?

***A.*** **The next level is reporting to the CTO, so reporting to the executive management of the company. So there's CEO, CTO, CFO, you know, there's four or five of those C-level people, and he would be reporting to one of those four or five people -- well, to the CTO.**

*Q.* And we're going to look at some emails in a minute, but on a general level, how would you describe Mr. Mansour's sponsoring of Abreezio or level of enthusiasm for the acquisition?

**A. He was certainly excited by the -- by the opportunity, by what the technology could potentially do for -- for the company.**

***MR. OLAH:*** I'd like to show the witness and the witness only Exhibit 48. And if we can --

***BY MR. OLAH:***

***Q.*** Mr. Nelles, are you able to read that? If not, we can call out certain text so you can see it.

***MR. OLAH:*** Let's to that. Let's start with the bottom half.

***THE WITNESS:*** I've got the progressives on. Thank you.

***MS. ROBERTS:*** Objection. 106.

***THE COURT:*** Overruled. It hasn't been moved into evidence yet.

***MS. ROBERTS:*** Okay. Sorry.

***MR. OLAH:*** Getting there.

***BY MR. OLAH:***

***Q.*** Mr. Nelles, you were able to review the bottom half of that email; is that right?

**A. Yes.**

***MR. OLAH:*** Okay. If we could call out the top half for Mr. Nelles as well.

***THE WITNESS:*** I've reviewed.

***BY MR. OLAH:***

***Q.*** Okay. Mr. Nelles, is that an email thread that you're on?

**A. Yes, it is.**

*Q.* From what timeframe? Around what time, I should ask.
**A. End of May 2015.**
*Q.* And what generally is being discussed in this email exchange?
**A. We're talking about how Corporate Development should interact and how the Engineering Team should interact with the potential target.**
*Q.* Okay. And is this a fair and accurate copy of an email exchange that you had back in May of 2015?
**A. Yes.**
***MR. OLAH:*** Your Honor, at this time, I'd move to admit and publish to the jury Exhibit 48.
***MS. ROBERTS:*** Objection. 106.
***THE COURT:*** Overruled. It may be admitted.
***(Exhibit 48 admitted.)***
***MR. OLAH:*** Just to orient the jury, if we could call out that bottom half of the email again.
***BY MR. OLAH:***
*Q.* Mr. Nelles, starting with this bottom email, who is the sender of it?
**A. Ziad Mansour.**
*Q.* And what's the date?
**A. May 26, 2015.**
*Q.* And is that your name on the "to" line?
**A. It is.**

***Q.*** Okay. And what is Mr. Mansour saying in this bottom email, without reading it, if you can just summarize it for the jury?

***A.*** **This company is getting potential interest from VCs. Those are venture capitalists. Those are investors. And they are looking for a potential capital raise. And they would like, you know, us to comment on that, I believe.**

***Q.*** Did you respond to Mr. Mansour's email?

***A.*** **I did.**

***Q.*** Could you please read to the jury the first sentence of your response?

***A.*** **"I think our response should be that you are not the right person to be speaking to investors, especially of other companies."**

***Q.*** And then let's go with the next sentence as well.

***A.*** **"As one might expect, QC frowns on engineers doing this."**

***Q.*** First off, what's "QC"?

***A.*** **Qualcomm.**

***Q.*** What are you conveying to Mr. Mansour in your email?

***A.*** **That it's important that everyone sticks to their lanes, basically, and that Engineering is probably best focusing on engineering, and Qualcomm Corporate Development, the deal people, should be the people talking to the other company about financial and deal-type of aspects.**

***Q.*** Corporate Development should be handling that as opposed to an engineer like Ziad Mansour?

***A.*** **Correct.**

***MR. OLAH:*** If we could look at the top half of this thread. Thank you, Alex.

***BY MR. OLAH:***

***Q.*** Did Mr. Mansour respond to your email?

***A.*** **He did.**

***Q.*** And on that issue you were just talking about of staying in the lane, did he basically ask for guidance on how to go about communications with Abreezio?

***A.*** **Yes, he did.**

***Q.*** All right. And could you please read to the jury the second paragraph of Mr. Mansour's email?

***A.*** **"I really want to us expedite this opportunity. I want to get this technology on the November tape-outs. As such, let's figure out how to push this along. I know you guys are overloaded. I will be available to help you in any way you like."**

***Q.*** When Mr. Mansour refers to "you guys being overloaded," who are "you guys"?

***A.*** **It's the Corporate Development Team, I believe, is who he's referring to.**

***Q.*** And he's -- he's offering to assist your team, is that what that last sentence is?

***A.*** **Yes.**

***Q.*** And what does "November tape-outs" refer to?

**A. Those are kind of when the -- think of it as kind of like the new model year of a car comes out, the new chips will be rolling out in November. So everything gets finalized for the new model by November. So you -- you intercept that tape-out, that new model year by November, or you miss it and it has to go into the next model year.**

Q. And, generally speaking, is the goal to get acquired technology implemented sooner rather than later?

**A. Generally, yes.**

Q. Why is that the case?

**A. Generally, the technology that we will acquire will make a product better, will help us sell at a better price or reduce costs so we can be more cost competitive. Just a better product is always -- is always good to sell.**

Q. Could you look at the last sentence of Mr. Mansour's email for a moment? And let's just go ahead -- can you read that for the jury?

**A. I believe the first word is misspelled, but "It think we should meet Murthy and Cristiano this week to get their feedback and approval to proceed forward."**

Q. Do you know who "Murthy and Cristiano" is referring to?

**A. Yes. Those are Senior Engineering Lead, which is Murthy, and Cristiano, who was the -- I don't remember exact what their title was at this time. They've been promoted subsequently. But Murthy was Engineering Lead and -- for the semiconductor**

**unit. Cristiano was the Business Unit Lead for the semiconductor business unit. They might have already been promoted to be co-presidents of the -- of the business unit at that time. I don't know the exact sequencing.**

***Q.*** Do you know what their titles are currently at Qualcomm?

***A.*** **Murthy resigned and moved to Intel, and Cristiano is currently the CEO of Qualcomm.**

***Q.*** But even in May of 2015, were they higher-ups? Were they executives within Qualcomm?

***A.*** **Very high up.**

***Q.*** And in May of 2015, Mr. Mansour is seeking getting Abreezio on their radar and getting their approval to proceed forward; is that right?

***A.*** **He's seeking to get their approval to move forward, that's correct.**

***Q.*** Okay. Was May 2015 -- where was that on the timeline of the process? Was that early or late in the Abreezio diligence?

***A.*** **I believe that's still pretty early in the process here.**

***Q.*** Is it common for sponsors to seek high executives' approval early in the process?

***A.*** **It's not uncommon for engineers or sponsors to be excited about their -- their -- the project that they're working on. You know, projects can be kind of like opening a present on Christmas Day, so they like to get there as soon as possible.**

**So it's not uncommon for them to be pushing forward on a**

**deal, but this is a little early in the process still, so...**

***MR. OLAH:*** If we could show the witness and the jury what's been previously admitted as Exhibit 50. Calling out the bottom message there, please, Alex. Thank you.

***BY MR. OLAH:***

***Q.*** Mr. Nelles, take a moment to read that email to yourself.

***A.*** **I've read it.**

***Q.*** Is that an email you wrote and sent?

***A.*** **It is.**

***Q.*** The subject line is "Windansea meetings;" is that right?

***A.*** **That is correct.**

***Q.*** What does "Windansea" refer to?

***A.*** **That's the code name for this project.**

***Q.*** This project being?

***A.*** **The potential acquisition of Abreezio.**

***Q.*** Does Qualcomm's Corporate Development assign code names to acquisitions?

***A.*** **We do.**

***Q.*** For what reason?

***A.*** **We want to keep information private here so that people aren't aware of what projects we're working on if they're not involved in them. Just it's a sense of secrecy, basically. It's good for both the target company and it's good for those of us within the company.**

***Q.*** And in that first sentence there, what meetings are you

referring to?
**A. I believe this is a meeting with the company, with the target company, that we're going to be -- we're getting ready to go meet with the target company here.**
*Q.* Was that meeting at Qualcomm or was that at Abreezio's offices?
**A. I believe this was at Abreezio's offices.**
*Q.* Do you recall where those were?
**A. I believe it was rental offices up in the Bay Area. It was, like, a -- you know, those temporary office companies you can work from.**
*Q.* It wasn't like an Apple campus, where they purchase acres and acres of land?
**A. No, no.**
*Q.* And that last sentence there references a Malik.
Is that the same Malik that's in the "to" line?
**A. That is.**
*Q.* What were you proposing in that last sentence?
**A. You know, there's a number of transactions that we were evaluating or that we had completed that had similar types of characteristics to this acquisition. And Malik had worked on those other acquisitions, so I thought it was helpful to have Malik continue to be involved in this deal, because he could take some of the learnings and we could -- we could apply them across all three transactions.**

***Q.*** And you wanted him involved in the Abreezio or Windansea vetting?
***A.*** **Yes.**
***Q.*** Okay. Did Mr. Mansour respond to this email?
***A.*** **He did.**
***MR. OLAH:*** If we could call out those top two emails, please.
***BY MR. OLAH:***
***Q.*** Starting with the one on the bottom, what is Mr. Mansour's initial response?
***A.*** **He was suggesting that his -- his leadership team, under him in Engineering, is planning to go with him up to this meeting.**
***Q.*** And who does he identify?
***A.*** **Esin, Farsheed, and himself.**
***Q.*** Are you familiar with Esin and Farsheed?
***A.*** **Yes, I'm familiar with them.**
***Q.*** Are they Corporate Development folks or are they Engineers?
***A.*** **Engineers.**
***Q.*** Okay. And Mr. Mansour says, "I think that gives us good coverage on the engineering side;" is that right?
***A.*** **That's correct.**
***Q.*** Did Mr. Mansour send a follow-up a couple minutes later?
***A.*** **He did.**
***Q.*** What was his response, or what was his email a few minutes later?

**A. He was suggesting that the meeting is going to be less about the engineering and it's going to be more about the business aspects of the acquisition.**

***Q.*** Which is where you and your team come in; is that right?

**A. We would take a little bit more central role there, but we're obviously paying attention to what people say on the Engineering side as well.**

***Q.*** Got it.

What does Mr. Mansour mean when he says, in June of 2015, "We have already done as much as we can on the technical side"?

**A. I presume that to mean that he -- they have done all the diligence that they need with respect to vetting the quality of the engineering product or the technology, and potentially the team.**

***Q.*** Mr. Nelles, are you an engineer?

**A. I'm not.**

***Q.*** Do you rely or does Corporate Development rely on what the engineers report back on the tech diligence?

**A. Yes.**

***Q.*** And if Mr. Mansour says, "We've done as much as we can on the technical side," is it your position to second-guess that?

**A. No.**

***MR. OLAH:*** If we could show Exhibit 67, which I believe has also been previously admitted. Let's call out, on page 1, that very bottom email. Perfect. Thank you.

***BY MR. OLAH:***

***Q.*** Mr. Nelles, Are you able to review that bottommost email?

***A.*** **Yes.**

***Q.*** Who's the sender of this email?

***A.*** **Sanjiv Taneja.**

***Q.*** Do you know who Sanjiv Taneja is?

***A.*** **Yes.**

***Q.*** Who is he?

***A.*** **The lead for Abreezio, CEO.**

***Q.*** Did you interact with Mr. Taneja?

***A.*** **A bit. I mean, I interacted -- Hiten was probably more of the day-to-day type of interactions there. I interacted more with their Board member.**

***Q.*** Okay. And without reading it, what is Mr. Taneja conveying in this email?

***A.*** **You know, he was very happy about the meetings that happened between the two companies, thought it was productive sharing of information, and there's some follow-up action items that he'll -- he'll get some information back to us with.**

***Q.*** And just based on the call-out here, does he state, "I have attached herewith with an executive summary"?

***A.*** **Yes.**

***Q.*** Okay.

***MR. OLAH:*** Close this out.

///

***BY MR. OLAH:***
***Q.*** And I should note, if you can still see it, who did Mr. Taneja send that email to?
***A.*** **He sent that to Hiten, Malik, and Ziad.**
***MR. OLAH:*** And if we could go to the next message up, please. Perfect.
***BY MR. OLAH:***
***Q.*** Did Mr. Khan send a follow-up message?
***A.*** **He did.**
***Q.*** Who did Mr. Khan send his message to?
***A.*** **He sent it to Ziad.**
***Q.*** Copying who?
***A.*** **And then copied Hiten and myself.**
***Q.*** Is Mr. Taneja copied on this email response?
***A.*** **He is not.**
***Q.*** What's the very first line in the body of this email?
***A.*** **QC, Qualcomm, only.**
***Q.*** What does that mean?
***A.*** **Is this an internal discussion amongst the Qualcomm evaluation team here, and it's to be kept just amongst us.**
***Q.*** Why would Mr. Khan or anyone at Qualcomm want to have an internal discussion just amongst the Qualcomm team?
***A.*** **We'd want to evaluate or, you know, there's something that was of interest that we wanted to have a question about, just to talk amongst ourselves. We don't want the other side to hear**

**what we're thinking here** *per se*.

*Q.* Is one of the things that Corporate Development does, when doing due diligence and running that process, negotiating a price?

***A.*** **It is.**

*Q.* Is that an important part of what Corporate Development adds to the picture?

***A.*** **Of course.**

*Q.* Would it be helpful to have internal discussions about price without the other party being in the room for those discussions?

***A.*** **Obviously.**

*Q.* Why do you say "obviously"?

***A.*** **Well, I mean, we don't want the other side to know how we think about or how we evaluate or value their technology. We want to obviously get the lowest price possible.**

*Q.* And is there an assumption here that everyone with a Qualcomm address is on team Qualcomm?

***A.*** **Yes, of course.**

*Q.* If you could look at the last two questions before Mr. Khan signs off this email, what are those questions?

***A.*** **"Are they shooting in the dark?"**

**"Are their claims of their technology versus RB" -- that's Rapid Bridge -- "technology accurate based on our understanding of RB technology?"**

*Q.* What is Mr. Khan communicating with those questions, or what

is he asking with those questions?

***A.*** **How are -- you know, I think he's, like, how are they judging -- how are they providing information about the value? How do they know -- you know, how do they know the value to Qualcomm? Because this is what they're suggesting to us; right? And, you know, they're also making -- you know, what are they saying with respect to their technology, how it lines up with a previous company, Rapid Bridge, that we had acquired?**

***Q.*** Mr. Nelles, you were involved in a hundred successful acquisitions?

***A.*** **I've been on a hundred acquisitions. I hope they're all successful. But there might be a few that weren't the best.**

***Q.*** Petered out. I meant to say, compared to the ones that weren't ending in acquisitions.

All to say, you've looked at many a company; is that right?

***A.*** **Yes, hundreds of companies.**

***Q.*** Is it frequently the case that the company suggests Qualcomm's going to save a lot more money than Corporate Development concludes?

***A.*** **Of course.**

***Q.*** Again, why do you say "of course"?

***A.*** **Companies want to position themselves in the best possible way; right? They want to take the most favorable characteristics of their technology, say that it will provide the most value, and they take aggressive assumptions.**

*Q.* And what does Corporate Development do on its side?

**A. Well, we have to work with the various groups to evaluate what is the assumption that we feel comfortable with assigning to the deal. So we'll work with the Engineering Team to validate, you know, what is the cost reduction that will come from this? What is the performance improvement that will come with this?**

**We'll work with the business unit to understand what type of volume we should expect, when we could sell it, to whom we might be able to sell it to. And then we'll assign a business plan model to that.**

*Q.* Did Mr. Mansour respond to Mr. Khan's "QC only" email?

**A. I believe he did.**

***MR. OLAH:*** Could you call out the top third? Thank you.

***BY MR. OLAH:***

*Q.* Could you please read Mr. Mansour's response?

**A. "Malik, I am not sure how they know so much about Rapid Bridge technology. Having said that, their assessment is very close to our assessment. As such, their claims are pretty accurate. They know their stuff."**

*Q.* Mr. Nelles, what does that mean?

**A. The -- he is essentially trying to validate the assumptions that they put below and what they'd represented to us, probably in a meeting. He's saying that those -- those assumptions that**

**they have are -- we agree with them. They're very much in alignment with how we evaluate things.**

*Q.* Abreezio's savings estimate actually aligned with ours, is that what he's saying?

*A.* **Yep. And what -- and what they understand about our previous acquisition, Rapid Bridge.**

*Q.* Was that an acquisition that you were a part of?

*A.* **I was. Yes, I was.**

*Q.* Did you travel to San Jose in June of 2015?

*A.* **Yes.**

*Q.* For what reason?

*A.* **To meet with this company.**

*Q.* "This company" being Abreezio?

*A.* **Abreezio.**

*Q.* Who was at the meeting besides you on behalf of Qualcomm?

*A.* **I'm trying to remember. It was 10 years ago. But Hiten and potentially Malik, our Engineering Leadership Team here, and then a number of leadership team from Abreezio.**

*Q.* Do you remember anyone specifically from Abreezio that was there?

*A.* **Their CEO, and Behrooz Abdi was a Board member who I was familiar with.**

*Q.* Just to break that down, their CEO, is that Mr. Taneja?

*A.* **Yes.**

*Q.* And you mentioned Behrooz Abdi.

A. **Yes.**
Q. Who's that?
A. **He was a Board member and investor, I believe, of Abreezio. He was also a former COO of Qualcomm's Semiconductor Unit.**
Q. Is that another lofty title within Qualcomm?
A. **Yes.**
Q. Had he had success after having that title at Qualcomm?
A. **Yes. He left, and I believe he became CEO of a company. That company then was subsequently acquired, and I think it was acquired by Broadcom. So I think he did quite well from that. And then he had another CEO role, I believe.**
Q. Did he have a good reputation?
A. **Very good. He came from Motorola.**
Q. Going back to this meeting in June of 2015, was Akbar Shokouhi there?
A. **I don't recall.**
Q. Was Dr. Karim Arabi there?
A. **I don't believe so.**
Q. Was there, at this meeting, discussion about Abreezio's technology?
A. **Yes.**
Q. Necessarily so?
A. **Yes.**
Q. Okay. Was there any mention of Dr. Karim Arabi being involved in Abreezio's technology?

**A. No.**

*Q.* Was there any statement that his sister had created the technology that Abreezio was pitching?

**A. No.**

*Q.* And taking a step back from this particular meeting, at any time prior to the closing of the Abreezio deal, was there any knowledge that Dr. Arabi was in any way involved in Abreezio?

**A. No.**

*Q.* Did Qualcomm request from Abreezio a cap table?

**A. We did.**

*Q.* What's a cap table?

**A. A cap table is basically the listing out of all of the investors in the company. And it shows how the capitalization, how they raise money, and what percentage of the company each investor owns.**

*Q.* Is that an important part of Qualcomm's evaluation of a potential acquisition?

**A. It is.**

*Q.* Why?

**A. We want to know where the dollars are flowing. We want to see who is -- who is involved with the company. It's a -- it's important to see who we're dealing with. We also want to find out, you know, because we're doing tech and team deals, we want to understand how much money is going to the team. We want to retain the team. So if we make someone a lot of money, we don't**

**want them to walk out the door after the deal is closed. That's one reason we would want to know.**

*Q.* Did Abreezio provide a cap table?

***A.*** **Over time, they did. It was -- it wasn't a smooth trans -- a smooth documentation process, as I recall. But ultimately, they did.**

*Q.* Can you elaborate on that? What do you mean?

***A.*** **As I recall, they -- we asked for the cap table, and it took a long time for them to produce the cap table to us, or to produce one that was -- one with sufficient detail to it.**

*Q.* Did you personally review the cap table that they apparently ultimately provided?

***A.*** **I'm sure I did, you know, at least a high level. But the team probably spent much more time looking at it than I did.**

*Q.* Did Qualcomm have questions about the cap table?

***A.*** **I believe so.**

*Q.* Did you ask those questions of Mr. Abdi?

***A.*** **I did.**

*Q.* And did Mr. Abdi have responses for you?

***A.*** **Yes.**

***MR. OLAH:*** If we could show the witness and the witness only Exhibit 49, please. A lot of text. Let's call out that bottom one.

***BY MR. OLAH:***

*Q.* Mr. Nelles, take a moment to read this email, if you would.

**A. Okay.**

***MR. OLAH:*** If we could call out the top half for Mr. Nelles.

***BY MR. OLAH:***

***Q.*** And go ahead and read this once it's legible.

**A. Okay.**

***Q.*** Mr. Nelles, on a general level, what are we looking at in Exhibit 49?

**A. This is a conversation between me, as kind of the senior deal lead at Qualcomm, talking to Behrooz Abdi, who's kind of the more familiar party on their side, it seems, and Board representative.**

***Q.*** You say "conversation."

Is it an email conversation?

**A. An email conversation.**

***Q.*** Is it a fair and accurate copy of an email exchange you had with Mr. Abdi?

**A. Yes.**

***MR. OLAH:*** Your Honor, at this time, I move to admit and publish Exhibit 49.

***THE COURT:*** Any objection?

***MS. ROBERTS:*** No objection.

***THE COURT:*** 49 may be admitted.

***(Exhibit 49 admitted.)***

///

***BY MR. OLAH:***

***Q.*** In September of 2015, Mr. Nelles, were you interfacing with Mr. Abdi?

***A.*** **I was.**

***Q.*** Why not Mr. Somwal with Mr. Abdi?

***A.*** **I would say sometimes when it gets to the, you know, deeper into the conversation with a company, and we're talking about actual specifics to get a transaction completed, the more senior team starts to speak. And clearly, I was the more senior person from Qualcomm, and Mr. -- Mr. Abdi was kind of their senior representative from their side. In addition, I had a relationship, having worked with Behrooz.**

***Q.*** And in Exhibit 49, we're looking at an email; is that right?

***A.*** **Yes.**

***Q.*** Did you also -- I think you mentioned a moment ago you met with Mr. Abdi in June in San Jose; is that right?

***A.*** **Yes.**

***Q.*** In addition to the in-person meeting, this email, did you also have phone calls with Mr. Abdi?

***A.*** **I believe so.**

***Q.*** And in connection with the Abreezio acquisition; is that right?

***A.*** **Yes.**

***Q.*** Could you please --

***MR. OLAH:*** Well, actually, let's give the jury some

context. Let's call out that bottom half email again.

***BY MR. OLAH:***

***Q.*** Mr. Nelles, without reading this to the jury, what were you conveying to Mr. Abdi in this email?

***A.*** **I think we were saying, Look, we like your company. It's interesting to us. But the company was really not that organized, and we need to -- we need to really dig in here on a few areas. We need some clarity on some stuff here. And can you help get the company whipped into shape.**

***Q.*** And there's a -- in that second bullet point, there's a reference to the cap table; is that right?

***A.*** **Yes.**

***Q.*** Okay. And what was your observation of the cap table as relayed in this email?

***A.*** **It just wasn't -- it didn't add up. It was not clear to us what was going on there. So we needed to know the difference between different types of equity, you know, whether it's actual shares that had been issued, whether there were options to acquire shares. We need to know the vesting schedule for employees that were receiving shares. So we needed more details than they were providing.**

***Q.*** And you relayed these requests to Mr. Abdi?

***A.*** **I did.**

***MR. OLAH:*** If we could go to the top half of the email.

///

***BY MR. OLAH:***
***Q.*** Did Mr. Abdi respond?
***A.*** **He did.**
***Q.*** Okay. There's a reference to Sanjiv in that first sentence; is that right?
***A.*** **Yes.**
***Q.*** Okay. And Sanjiv is the -- who, again, at Abreezio?
***A.*** **CEO.**
***Q.*** Okay. So was it your understanding that Mr. Abdi and Mr. Taneja were working together?
***A.*** **Yes.**
***Q.*** Okay. Could you please read to the jury the two bullet points toward the bottom, the first one starting, "We'll try"?
***A.*** **"We'll try to get you more visibility into employee ownership."**
***Q.*** Let's pause there.
What does that mean?
***A.*** **As I suggested, one of the things we want to understand is what are the employees' ownership, so when we complete the transaction, what will employees be receiving if they were equity owners or if they have options in the company. So we wanted to understand, you know, what it meant to each of the employees that would be coming to Qualcomm in terms of their financial -- you know, the financial implications.**
**We also want to understand if all that money is received**

**upfront or if that would be over a certain number of years. So we just wanted more details on how the equity would be distributed to the employees.**

*Q.* Okay. And Mr. Abdi is saying he'll get you, quote, "more visibility;" is that right?

***A.* Yes.**

*Q.* And we don't need to read that third bullet point, but is there another reference to, quote, "get you guys more visibility here"?

***A.* In the third bullet point, you're saying?**

*Q.* Yes.

***A.* Yes.**

*Q.* Take your time.

***A.* Yes.**

*Q.* And following those bullet points, what is Mr. Abdi conveying in that penultimate paragraph?

***A.* That, look, you're dealing with a very new company. It's a startup. They -- they're focused basic on building the company and their technology, and they're -- they're more focused on that, and they're just kind of a little sloppy on some of the other stuff. And that they have -- he's also suggesting that, you know, they're getting tremendous traction, so they're focused on, you know, on those business opportunities in front of them.**

*Q.* For those that haven't been involved in hundreds of

acquisitions, what does "tremendous traction" mean?

**A. Tremendous traction is in the eye of the beholder. Tremendous traction, to a seller, is that they spoke to somebody who's interested in their company, potentially. It can be very minimal. It can also mean that they've got a great customer and a signed contract. It really can -- it can run the gamut in terms of what "tremendous traction" is.**

**So we have to judge what that really means.**

*Q.* Is it a common claim from companies that are looking to get acquired by Qualcomm?

**A. Of course.**

*Q.* Why is it a common claim?

**A. They want to position their company as having technology that others are validating, that is really going to make a big difference, and they want to create a feeding frenzy or a bidding war, if they can. And they, you know, our competitive juices get excited when we hear, Well, maybe one of our competitors were -- was going to buy this technology or have this technology and we might not have it.**

*Q.* These emails request visibility on Abreezio; is that right?

**A. Our request of Abreezio is to get more visibility, more details about their background, yes.**

*Q.* Did Mr. Abdi or Mr. Taneja provide additional clarity, additional visibility into the company?

**A. I believe they ultimately did, yes.**

***Q.*** Did Mr. Abdi, Mr. Taneja, or anyone on behalf of Abreezio ever identify the 64 percent owner of Abreezio shares being the sister of a Qualcomm Senior Vice President?

***A.*** **No.**

***MS. ROBERTS:*** Objection. Leading.

***THE COURT:*** Overruled.

***BY MR. OLAH:***

***Q.*** The answer was "no"?

***A.*** **No.**

***Q.*** Qualcomm never had that information?

***A.*** **No.**

***Q.*** As the corporate due diligence moved along, did you and your team, the Corporate Development Team, that is, provide updates to the Executive Team?

***A.*** **Yes.**

***Q.*** Who would have gotten those updates?

***A.*** **I would gather that those updates would include our Senior Engineering Lead, so our CTO, I assume would be briefed on this, on the progress. Our Finance leadership, our Strategy leadership, heads of the business unit, the Semiconductor Business Unit.**

***Q.*** Would the deal sponsor be included on those updates?

***A.*** **Yes.**

***Q.*** Would those updates include details on how much money Qualcomm was willing to pay to acquire Abreezio?

*A.* **Yes.**
*Q.* Did Qualcomm, in fact, acquire Abreezio?
*A.* **We did.**
*Q.* As part of the acquisition process, was a Unit Purchase Agreement created and signed?
*A.* **Yes.**
***MR. OLAH:*** If we could show the witness and the jury what's been previously admitted as Exhibit 864.
***BY MR. OLAH:***
*Q.* Mr. Nelles, what are we looking at on the first page of this very lengthy document?
*A.* **Yes. This is the title page, I guess, of our Unit Purchase Agreement. This is the definitive Purchase Agreement of Abreezio by Qualcomm.**
*Q.* Might there have been a term sheet that preceded this document?
*A.* **Yes.**
*Q.* What's a term sheet?
*A.* **A term sheet is our first kind of outlining of what we think the terms will be for the acquisition. So we would have conducted our preliminary diligence, and then we'll say, We are interested in buying you under these terms. It's a short-form agreement. It's generally non-binding in most aspects. And suggest that's maybe 10 pages of kind of outlining what the terms of the deal would be.**

**We would then, from the term sheet, have the opportunity to go into a period of further diligence with the company, as well as starting to develop this very long Agreement, which is the definitive Purchase Agreement. I don't know how long this one was, but they can be hundreds and hundreds of pages long. And this is the binding Agreement under which the purchase is actually completed.**

*Q.* At the risk of proposing a terrible metaphor, is a term sheet like an engagement and a UPA like marriage?

*A.* **Yes. I won't tell that to my wife.**

*Q.* You didn't have a 500-page document memorializing your union?

*A.* **Nope.**

*Q.* Is there a closing date specified on page 1 here?

*A.* **Yes, October 30th, 2015.**

*Q.* Thank you.

Does this document, maybe not on the first page here, does it identify what it is that Qualcomm acquires by way of the acquisition?

*A.* **Yes.**

*Q.* Down to the people?

*A.* **The people, the technology, the intellectual property, if there's trademarks and patents, and all of that type of aspects. Anything that we can identify that's part of this transaction, that we understand is part of this transaction, we try to**

**identify.**

*Q.* Does it include various representations and warranties?

***A.*** **Yes.**

*Q.* What does that mean?

***A.*** **We want the company to represent a number of things; that what they're selling to us is what is listed here; what they're selling to us, they own; what they are selling to us, they own free and clear; they have the right to sell what they're owning. There's a whole host of references and warranties, but those are some of the more fundamental ones.**

***MR. OLAH:*** I'd like to call out some pages here. If we could go to page 10.

***BY MR. OLAH:***

*Q.* Is this a recitals page?

***A.*** **Yes.**

*Q.* This is kind of like the intro to the contract?

***A.*** **Yes.**

*Q.* And yet we're on page 10; is that right?

***A.*** **Yes.**

***MR. OLAH:*** Can we call out paragraph C, please.

***BY MR. OLAH:***

*Q.* All right. I don't need to you read this to the jury, but can you tell us who "target" is in this contract?

***A.*** **That is Abreezio.**

*Q.* The target to be acquired by Qualcomm?

***A.*** **Correct.**
***Q.*** Who is the "acquiror" in this sentence and throughout the contract?
***A.*** **Qualcomm.**
***Q.*** All right. And I guess I will have you read this sentence.
What's being communicated with this sentence?
***A.*** **"Target and the members have made representations and warranties to acquiror with the intention that acquiror should rely upon such reps and warranties entering into this agreement."**
**So we're -- you know, they're going to tell us certain things, and we should rely on what they've told us in this agreement to be true.**
***Q.*** Is this a standard clause in Unit Purchase Agreements --
***A.*** **Yes.**
***Q.*** -- based on your experience?
***A.*** **Very standard.**
***MR. OLAH:*** If we could skip to page 31, calling out that full paragraph at the top, numbered ii.
***BY MR. OLAH:***
***Q.*** Can you please read to the jury the first sentence of this somewhat massive paragraph?
***A.*** **"Each item of target-registered intellectual property is subsisting and in good standing, valid, and enforceable."**
***Q.*** And can you read the next sentence as well? It's a little

longer.

***A.*** **"To target's knowledge, there are no facts, information, or circumstances, including any facts or information that would constitute prior art, that would render any of the target-registered intellectual property invalid or unenforceable, or would preclude the issuance or otherwise affect any pending application for any target-registered intellectual property."**

***Q.*** Is this one of the representations and warranties that Qualcomm relied on in entering this agreement?

***A.*** **Yes.**

***MR. OLAH:*** If we could go to page -- sticking with page 31. Excuse me. We'll go to -- can we click to the next page, please? There it is. Can we call out paragraph b(1)?

***BY MR. OLAH:***

***Q.*** Is this yet another representation and warranty made in the UPA?

***A.*** **It is.**

***Q.*** And can you read the first -- I'm going to spare your voice.

***A.*** **No, no, it's fine. "Target is the sole and exclusive owner of, and has good, valid, and marketable title to, free and clear of all encumbrances, all target-owned intellectual property, and all target technology, with certain exceptions."**

***Q.*** With exceptions spelled out that; is that right?

***A.*** **Correct.**

***Q.*** Mr. Nelles, generally speaking, what does that mean?

***A.*** **You own what you're selling to us.**

***Q.*** Does the Unit Purchase Agreement identify down to the patent applications what property is being sold?

***A.*** **Yes.**

***MR. OLAH:*** If we could skip to page 159, please.

***BY MR. OLAH:***

***Q.*** Mr. Nelles, is this a table identifying the various patent applications, and if they have patents, patents that Qualcomm is acquiring from Abreezio?

***A.*** **Yes.**

***MR. OLAH:*** If we could skip to the next page, please, page 160. And for the record, the page numbers I'm calling out are to the PDF. They don't necessarily align with the numbering on the page, because the Unit Purchase Agreement has many sets of numbers, page numbering.

And if we could call out in the middle there, Alex, the -- call out the middle here.

All that reading. Sorry, Mr. Nelles.

***THE WITNESS:*** No worries.

***BY MR. OLAH:***

***Q.*** Mr. Nelles, we've called out two rows on this table.

Are these two provisional patent applications?

***A.*** **Yes.**

***Q.*** At the time of the acquisition, who did they belong to?

***A.*** **They hadn't been issued. They're provisional.**

***Q.*** Got it.

But is Qualcomm purchasing these provisional patents and the technology therein with the Unit Purchase Agreement?

***A.*** **Yes.**

***Q.*** Okay. And the application number is specified?

***A.*** **Yes.**

***Q.*** Along with the filing date?

***A.*** **Yes.**

***Q.*** Okay. Does the Unit Purchase Agreement identify who is getting paid as a result of the acquisition?

***A.*** **Yes, it does.**

***MR. OLAH:*** If we could skip to page 134, calling out that top half.

***BY MR. OLAH:***

***Q.*** Mr. Nelles, can you see that information okay?

***A.*** **I can.**

***Q.*** Does this specify who gets paid as a result of this acquisition?

***A.*** **It does.**

***Q.*** Who is the first individual identified as someone getting paid?

***A.*** **Sheida Alan.**

***Q.*** What is her equity percentage?

***A.*** **64 percent.**

*Q.* What's her email address?
***A.*** **Sheida.Alan@gmail.com.**
*Q.* And is there a mailing address provided?
***A.*** **There is.**
*Q.* Is Akbar Shokouhi identified by name in this list?
***A.*** **I don't see his name.**

***MR. OLAH:*** If we could skip to page 141, please, calling out the bottom half, or third, however you want to show it.

***BY MR. OLAH:***
*Q.* Mr. Nelles, what information are we looking at here in the Unit Purchase Agreement?
***A.*** **This is the continuation of what you started on the last section. This is now saying how the -- what the actual dollars will be distributed and to the specific wiring instructions for how those dollars get sent to, in this case, Sheida Alan.**
*Q.* And does this call for Ms. Alan receiving just south of $92 million?
***A.*** **Yes.**
*Q.* What's the information next to that figure?
***A.*** **This is the wire instructions for her bank, presumably. So we would wire from Qualcomm $91.8 million to, it looks like, the CIBC branch and following information.**
*Q.* And what bank was that supposed to go to, the wire?
***A.*** **The bank is CIBC.**

***Q.*** Do you know where Qualcomm banks?

***A.*** **Qualcomm has bank accounts -- we're a global operation, so we bank around the world, and we have a number of bank partners.**

***Q.*** And this wire is going to Ms. Alan in Canada; is that right?

***A.*** **Yes.**

***Q.*** At a CIBC bank account number that's specified there?

***A.*** **Yes.**

***Q.*** Is the account name, the holder of the account, specified?

***A.*** **It appears that way.**

***Q.*** And what's it say next to "account type"?

***A.*** **"U.S. dollar personal account."**

***Q.*** So as part of this transaction, Qualcomm is agreeing to wire nearly $92 million to Ms. Alan's Canadian bank account?

***A.*** **Yes.**

***MR. OLAH:*** We can take that down. Thank you, Alex.

***BY MR. OLAH:***

***Q.*** A moment ago, we were looking at emails with Mr. Abdi talking about visibility; is that right?

***A.*** **Yes.**

***Q.*** Mr. Abdi provided some visibility; is that right?

***A.*** **I'd say yes.**

***Q.*** Okay. Did Mr. Abdi or Mr. Taneja ever mention any involvement of Dr. Arabi in Abreezio's technology?

***A.*** **No.**

***Q.*** Any involvement with Abreezio's corporate formation?

***A.*** **No.**

***Q.*** Did Mr. Mansour ever mention Dr. Arabi's involvement in Abreezio?

***A.*** **No.**

***Q.*** Not its technology or its corporate development?

***A.*** **No.**

***Q.*** Was there ever any mention that Abreezio's technology was in any way created by Dr. Arabi's sister?

***A.*** **No.**

***MR. OLAH:*** No further questions at this time, Your Honor.

***THE COURT:*** Should we go ahead and take a recess?

***MS. ROBERTS:*** Sure.

***THE COURT:*** Okay. 15-minute recess, ladies and gentlemen. You're reminded you're not to discuss the case or do any research about the case, and we'll see you back in 15 minutes. And you too, sir, are on a 15-minute recess.

***THE WITNESS:*** Sure.

***(Jury out at 10:10 a.m.)***

***THE COURT:*** Okay. We're now outside the presence of the jury. Just for the record, I have from Qualcomm, I would say, a two-and-a-quarter or less pages, a summary of a -- an interview with Mr. Nelles. I've marked it as Court's Exhibit 2B. So far, there's nothing impeachment or exculpatory.

Anything else?

***MS. BERNSTEIN:*** No, Your Honor.

***THE COURT:*** Okay. Fifteen minutes.

***(Recess taken.)***

***THE COURT:*** Okay. We are back on the record. All jurors are present. Dr. Arabi is present. The lawyers are present. And you, sir, are reminded you're still under oath to tell the truth.

Counsel?

***CROSS-EXAMINATION***

***BY MS. ROBERTS:***

***Q.*** Good morning, Mr. Nelles.

***A.*** **Good morning.**

***Q.*** Congrats on your retirement.

***A.*** **Thank you.**

***Q.*** So you worked in M&A.

***A.*** **I did.**

***Q.*** And you said you've done probably more than a hundred acquisitions, you've seen them through to their end throughout your career?

***A.*** **Yes, I have.**

***Q.*** So you do not do the technical due diligence.

***A.*** **I do not.**

***Q.*** But your team does the valuation models that decide what the value of the target acquisition would be worth to Qualcomm.

***A.*** **It is a combined effort. So we take inputs on the**

**assumptions from the various experts. So Engineering will provide inputs, Business will provide inputs. We'll then put together a model that will then provide a strawman for what the valuation should be, and then we share that with the group, and everyone kind of coalesces around what the number should be.**

*Q.* Okay. So a lot of the Qualcomm acquisitions are known as tuck-ins; is that right?

*A.* **Yes.**

*Q.* And it's my understanding that a tuck-in is when a larger company acquires and integrates smaller companies in its existing operation to fill in gaps in product or services, or to strengthen its core business.

Is that consistent with your understanding?

*A.* **That's a fair way to think about it, yes.**

*Q.* And so basically, they're buying tech that fits into Qualcomm's portfolio?

*A.* **Yes, into our portfolio, into our operations.**

*Q.* Okay. And then that's what Abreezio was? Abreezio was a tuck-in?

*A.* **I'd say that's a fair characterization, yes.**

*Q.* Okay. So it's not uncommon for startup companies or products -- to offer products and services that complement Qualcomm's business line or its competitors'.

*A.* **No. That's fair, yes.**

*Q.* When you worked at Qualcomm, would you say you did probably

about six to 10 deals a year, on average?

**A. That's a good -- good assumption, good baseline.**

*Q.* In, like, a busy year --

**A. Completed deals.**

*Q.* Completed --

**A. Completed transactions, correct.**

*Q.* Right. Okay.

And then maybe on a busy year, you'd do, like, more like 15?

**A. Yes, that's fair.**

*Q.* Okay. Would a large deal for Qualcomm be in, like, the three to $4 billion range?

**A. Yes. That's a large transaction. We did a handful of transactions in the two to $5 billion range. We tried to do one transaction that was held up in the $50 billion range. But most of our transactions are small tech and team deals that are in the hundreds of millions of dollars. So relative to the size of Qualcomm, not that large.**

*Q.* Okay. But you said small deals are kind of within the 10 to $100 million range?

**A. Yeah, the 10, 2, 300 million, somewhere in that, yeah, less than a billion dollars.**

*Q.* Right.

And so then Abreezio was kind of on the small-to-medium size deal at 150 million?

**A. It was a $180 million deal, yeah.**

*Q.* Okay. So kind of standard for Qualcomm.

***A.*** **Right.**

*Q.* So on the large deals, you know, the ones that are in the two to $4 billion, those companies have revenue, usually --

***A.*** **Not always. We completed a transaction, a very complex transaction, a couple of years ago where we bought an asset for $5 billion, and it didn't come with any revenue.**

*Q.* Okay. But sometimes they do?

***A.*** **But sometimes they do. You would generally think for larger-dollar purchases, that revenue would come with it, but that's -- you can't always assume that.**

*Q.* Okay. Now, you testified that Qualcomm takes kind of a consensus-based approach to due diligence; is that right?

***A.*** **We generally do, I would say, yes.**

*Q.* So it means the group as a whole decides whether to go forward with an acquisition.

***A.*** **Well, ultimately, there's a decider that goes up to the CEO or the Board level. But, you know, we generally, as a team, try to say, This our consensus view on what the deal is about and what it's valued. And sometimes there's people that disagree, but for the most part, we get to a joint agreement and then take it forward.**

*Q.* Right. So it's not just one person in -- within Qualcomm that decides we're going to do this deal. It's more collaborative within the due diligence evaluation.

**A. Well, to close a deal, it's -- you know, we have to go through multiple people. But, yes, there are sponsors and people that can be strong advocates for a deal that are experts in their area.**

*Q.* Now, on the Abreezio deal, there were actually three different divisions evaluating -- at least three different divisions that were evaluating Abreezio's technology and product; is that right?

You had Ziad Mansour, who had his Engineering Team; right?

**A. Okay.**

*Q.* And then there was Mike Campbell's group, and he does, like, products.

**A. Mm-hmm.**

*Q.* And then your group, right, because you're the Corporate M&A group.

**A. I don't know if I'd characterize it as three different divisions that are looking at it independently. I would say that my group works with all groups at the company to take in input from everyone to make sure that we understand it and properly evaluate it.**

**And then we have -- in this case, we had Engineering from Ziad's group, and then I think Mike Campbell was in the Test group. But they were all within the Senior-Senior Engineering leadership of the Semiconductor Division.**

*Q.* But had you a lot of input from a lot of players.

***A.*** **Yeah, there were a few. But I would say Ziad was the primary driver here on this transaction.**

***Q.*** So Ziad and Mike Campbell are peers, would you say?

***A.*** **At the time, they were senior -- I believe Mike was a Senior Vice President, Test Engineering, I believe, yes.**

***Q.*** And you were a peer, too, to Ziad?

***A.*** **In title. I mean, I'm a history major; I'm not an engineer.**

***Q.*** Of course.

***A.*** **So I am -- in terms of corporate title hierarchy, yes, I'm a Senior Vice President -- I was a Senior Vice President.**

***Q.*** Okay. And you would be a peer also to Mike Campbell.

***A.*** **In title.**

***Q.*** So when Mansour's group initially started the evaluation of Abreezio in the spring of 2015, he had a few engineers working for him to evaluate the product.

Is that your understanding?

***A.*** **That's my understanding.**

***Q.*** And it was Esin Terzioglu -- I apologize for the names.

***A.*** **Yes, I know Esin, yes.**

***Q.*** Esin and -- oh, I'm sorry -- it was Farsheed Mahmoudi.

***A.*** **I believe those were the names, yes.**

***Q.*** And Saad Elhosni?

***A.*** **I don't recall a Saad. But, yes, there were a few people that I believe were part of Ziad's team, and Ziad was coordinating.**

*Q.* Okay. And then also Joseph Fang on the DFT side.
***A.*** **This is now getting into the details. I don't remember exactly who. And I was dealing with the more senior-level deal aspects.**
*Q.* Sure.
***A.*** **So I would look to Ziad.**
*Q.* Okay. But then some additional engineers came in mid-summer, like, around the June area timeframe? Esin?
***A.*** **It's possible, yes. I assume that's the timing that they were coming in.**
*Q.* Yeah. And Mohamed Allam, do you recall?
***A.*** **I don't remember exactly who it is. You know, I would be looking to Ziad, my peer, as the deal sponsor. He would be the coordinator for the engineering, you know, readout for this.**
*Q.* Okay. So did you understand that Jim Thompson asked Esin and Mohamed to come in?
***A.*** **He may have. I don't get into all the -- all the details of how Jim's organization manages the diligence.**
*Q.* Okay. Now, so Mike Campbell's team was also evaluating the product; is that right?
***A.*** **I believe so, yes.**
*Q.* Okay. And his team works in product testing, how the product would work in silicon?
***A.*** **Yes.**
*Q.* And he had team members, too, that were evaluating the

products; is that right?
**A. I assume so, yes.**
*Q.* How about the name Jim Willmore?
**A. Possibly. Again, same answer as a minute ago. I don't know all the details of all the people that were working on this.**
*Q.* Okay. And what about Gaurav Bhargava?
**A. I assume so. I don't remember the details.**
*Q.* And incidentally, Mr. Bhargava is now in India?
**A. I don't know the individual.**
*Q.* Okay. And Mr. Willmore, he's -- he passed away?
**A. Again, I don't know all these individuals. I'm sad to hear, if that's true.**
*Q.* Yeah. I'm sad to hear that, too.
And then your team that was on the corporate side of it, you testified it was you and Malik Khan?
**A. Yes.**
*Q.* And then Hiten Somwal; correct?
**A. Yes. That's my direct reports on the Corporate Development Team, correct.**
*Q.* Right. And all of these divisions ultimately supported the Abreezio acquisition.
**A. All of them were part of the team that was evaluating the acquisition, yes.**
*Q.* There was also a Legal Department; right?
**A. You saw the 500-page D.A., so we had lots of lawyers.**

*Q.* So I assume all those lawyers looked at all the patent -- provisional patent and patent applications.

***A.*** **Well, there's an extent of what you can look at. You try to -- when you go through a diligence process for any company, you try to find the most important things that are driving value.**

**So we were probably most focused on the technology. But I assume we also had the licensing and IP, the patent experts. We had that group of people looking at the patents as well. But I don't know if they went into reading every single patent and every single provisional patent. Provisional patents are of lesser value because they're not yet issued.**

*Q.* Right, right. But you assumed that they would have made sure that all the assignments were in order and --

***A.*** **We try to do -- we try to do a good job of that, for sure.**

*Q.* Yeah. So at the start of the valuation of Abreezio, that initially was Mansour and his core team of engineers, and he was the main -- at that point, he was the main contact with Qualcomm and Abreezio; is that right?

***A.*** **That's my understanding.**

*Q.* But then roughly in March, you -- you asked him to remove himself from that position; is that right? That was the email --

***A.*** **I asked him to remove himself from the deal aspects, the transaction. So think of this as negotiating on financial terms**

**that, you know, how we might acquire the company, deal structure, legal aspects. But we certainly valued him as an integral part of the team in terms of evaluating the underlying technology and explaining its value or potential value to us as a company.**

***Q.*** Okay, yeah.

***MS. ROBERTS:*** Why don't we pull up Exhibit 592?

***THE CLERK:*** Sorry, which exhibit?

***MS. ROBERTS:*** 592.

***THE COURT:*** Which is not yet in evidence.

***MS. ROBERTS:*** The Government has no objection. It's just a later chain of the earlier email.

***THE COURT:*** Any objection to 592?

***MR. OLAH:*** No, Your Honor.

***THE COURT:*** 592 may be admitted.

***(Exhibit 592 admitted.)***

***BY MS. ROBERTS:***

***Q.*** Mr. Nelles, is this an email -- it's kind of just a later chain of the earlier one that the Government showed you previously.

***A.*** **Okay.**

***Q.*** And walked through about you asking -- or you asking Ziad not to be the point of contact with Abreezio and to introduce Hiten.

***A.*** **Correct, yes.**

*Q.* And Mansour responded that he was confused about this and expressed his desire to get the product out quickly so it could get on the tape-outs. And he asked you for advice on how to introduce him.
And if you look at the top of this email -- you drafted?
***A.*** **Yes. The blue section you're referring to?**
*Q.* Yes. So it's basically a ghost-written email for Ziad to send to Taneja --
***A.*** **Correct.**
*Q.* -- asking Hiten Somwal to be the point of contact.
***A.*** **Yes.**
*Q.* Okay. So from that point on, Hiten became the main point of contact between Qualcomm and Abreezio.
***A.*** **At that point, we were introducing Hiten as the person to be the main point of contact to run the diligence, kind of coordinate the process here. I was to be in the background-type of situation.**
*Q.* Okay.
***A.*** **But, you know, as you saw earlier or we discussed earlier, there are -- I became involved at certain later sections, as I was interfacing with certain people. So it wasn't that Hiten was the prime guy all the way through.**
*Q.* Kind of in the earlier, the middle stages of the due diligence.
***A.*** **That's fair. That's fair.**

***Q.*** But he was kind of the main point of contact.
***A.*** **Yes.**
***Q.*** Okay. Now, the Government had shown you some emails before where -- that seemed to indicate that the due diligence was wrapping up in, like, the May timeframe; right? Or that Ziad was trying to get it to wrap up in that timeframe; correct?
***A.*** **Yes.**
***Q.*** But the due diligence actually continued for another three months; is that right?
***A.*** **It did.**
***MS. ROBERTS:*** Yeah. Can I show you -- could we bring up Exhibit 2621? Is this one in?
***MR. OLAH:*** No.
***BY MS. ROBERTS:***
***Q.*** This is an email from June 2015 that you're on.
Do you recognize this email?
***A.*** **I recognize this email, yes.**
***MS. ROBERTS:*** Any objection?
***MR. OLAH:*** Move it. No objection. Go ahead.
***THE COURT:*** Are you moving it into evidence?
***MS. ROBERTS:*** Yes, I'm moving to move it in.
***THE COURT:*** Any objection from the Government?
***MR. OLAH:*** No, Your Honor.
***THE COURT:*** It may be admitted.
***(Exhibit 2621 admitted.)***

***BY MS. ROBERTS:***

***Q.*** Okay. So is this an email from Hiten to Farsheed, you, and Ziad.

***A.*** **Yes.**

***Q.*** And it reads, "Thanks. Needs to fully understand the implementation risks here and dig deeper to see if there's any real-world data. Sanjiv to me a couple of times that they are much more advanced in terms of implementation with other customers. In general, we should not try to give them impression that this is slam dunk. Hopefully, it's not too late for that."

And then lower down on the email --

***THE COURT:*** Are you asking if that's what it says or are you --

***MS. ROBERTS:*** Yes.

***BY MS. ROBERTS:***

***Q.*** Is that what it says?

***A.*** **It does say that.**

***Q.*** Do you recall that, too, the correspondence?

***A.*** **I don't recall 10 years ago. But, yes, what you're showing me does make sense, and I'm -- that's what's on the paper here or on the email here.**

***Q.*** In the lower part of the email, Farsheed writes that, "We've completed a fair amount of due diligence on the QC site, but we think adding an FPGA demo to the list would be good."

Do you recall whether an FPGA demo was done --
**A. I do not recall.**
Q. -- that summer?
**A. I don't recall.**
Q. Did you attend any FPGA demos?
**A. I generally don't. History major, not much help.**
Q. Okay. All right. So in late July -- I'm sorry -- in June, do you recall an on-site visit to Abreezio's office?
**A. At a high level, yes. We went to San Jose to visit their office and have lunch.**
Q. Okay. And do you recall who attended that meeting at Abreezio?
**A. I think we covered some of the names earlier, but it's the team from the Qualcomm engineering that we outlined, and then -- so probably Hiten and Malik or one of them came, and then, you know, CEO of Abreezio and Behrooz were the people I remember as well.**
Q. Okay. So from the Qualcomm side, do you remember whether Hiten attended?
**A. I don't remember exactly. I assume he did attend.**
Q. Okay.
**A. But it was either Hiten or Malik attended that meeting, or both.**
Q. Okay. And then also Farsheed?
**A. I'm assuming he attended as well, yes.**

*Q.* And Gaurav?
**A. I assume. I mean, I apologize, it's 10 years ago. I don't remember exactly who it was. I remember just having -- I was not involved in all the engineering-type of discussions. I was more focused on very high-level deal-type stuff, so meeting the CEO.**
*Q.* Okay.
**A. Meeting Behrooz, who I knew beforehand as a Qualcomm -- or a Qualcomm employee, talking about the deal aspects. That was what my focus was on and that's what I recollect.**
***MS. ROBERTS:*** Okay. I'd like to pull up 2996.
***BY MS. ROBERTS:***
*Q.* Mr. Nelles, have you seen this email before?
**A. I probably saw it before. It's been a while, though.**
*Q.* But you're on the correspondence?
**A. Yes, I'm on the email.**
*Q.* And it says you are an attendee at the Abreezio trip?
**A. Yes.**
***MS. ROBERTS:*** Move to admit.
***THE COURT:*** Any objection to 2996?
***MR. OLAH:*** No, Your Honor.
***THE COURT:*** It may be admitted.
***(Exhibit 2996 admitted.)***
***BY MS. ROBERTS:***
*Q.* So you can take a minute to read it. It's kind of long and

dense.

**A. Okay. Is there any focus area you want me to go?**

***Q.*** Well, just the general summary of what --

***THE COURT:*** Can you see it? Do we need to blow it up?

***THE WITNESS:*** It's fine. I'll just read through this one. Okay. At a high level, I understand.

***BY MS. ROBERTS:***

***Q.*** So you see at the top, it says "QC attendees," and it lists you and the other names we discussed.

**A. Yes.**

***Q.*** So it's members from both Ziad's team and also Mike Campbell's team.

**A. Makes sense, yes.**

***Q.*** And Jim Willmore was on Mike Campbell's team?

**A. I believe so.**

***Q.*** Okay. And so this is a report that Jim Willmore drafted up.

**A. Yes. He was the one that took this.**

***Q.*** Right.

**A. He was the one that sent this. I don't know if he was exclusively writing this or if he had taken input. Generally what happens when we go on these trips, we talk amongst ourselves as a group on how the meetings went, what our observations were, and then we kind of combine that into one email, if we can.**

***Q.*** Sure, yeah. That makes sense.

But essentially, this is a pretty glowing report that Jim wrote up about Abreezio, about its low power capabilities.

***A.*** **Yes.**

***Q.*** And how it's beneficial to Qualcomm and could replace CPR, which was the product it already had.

***A.*** **I don't know if it was replacing. Again, I'm not the expert. But it seems that it might be -- that it could be in addition to, and it could -- the way it's being represented, it could enhance.**

***Q.*** Right. Okay.

And then he provides some numbers down below for estimated savings. We can look at it, 90 percent reduction, characterization effort current associated with CPR, no calibration required, you know, all these numbers.

But, anyway, they seem to be pretty positive, glowing numbers about how good the products could be for Qualcomm.

***A.*** **It appears that way, yes.**

***MS. ROBERTS:*** And then go to the next page. If you'd highlight the lower paragraph that starts with "Abreezio."

***BY MS. ROBERTS:***

***Q.*** And it says, "Abreezio also has a method to increase TDF [sic] coverage more efficiently. They can do this by data mining the scan implementation and add HW to assist the controllability/observability of the cones' logic."

Did you understand this to be talking about the DFT

technology that Abreezio had?
**A. I believe that's probably what this is about. Again, I'm not the technical expert here.**
Q. Right.
So the first part of the email talks about the low power capabilities?
**A. Mm-hmm.**
Q. And the second part --
**A. Talks about the test aspects you're talking about, yes.**
Q. Okay. If we go back to the first page of this email, Jim writes, "PTE team, do not forward unless Mike/Mike approve."
So I'm assuming he means Mike Campbell?
**A. Yes.**
Q. Do you know who the other Mike is?
**A. Is it Mike Ellison there?**
Q. Meserli?
**A. No. I see Mike Campbell and Mike Ellison. Is that the Mike and Mike.**
Q. Yeah.
**A. So PTE -- Product Test Engineering -- Team, do not forward unless approved by the Senior -- I don't know. Maybe it's Mike Meserli. I don't know.**
Q. Okay. But, again, that's a separate division than Ziad's.
**A. Maybe it's just the nomenclature. We all worked -- there's the Semiconductor Division of Qualcomm. These are different**

**technical expertise areas. So they all work under the same division.**

**So but if you -- yes, if you're trying to characterize it as different technical aspects, someone might be a software engineer, someone might be a hardware engineer, someone might be a test engineer. They're all under the same division. But, yes, they're a different group of engineering, if that helps.**

***Q.*** Yeah, that makes sense.

Now, after this June 25th, 2015, meeting, do you recall that there were tasks assigned to other members of the team to further look at the products and do analysis?

***A.*** **I'm assuming that that's generally what would happen coming out of a meeting like this. It seems like every meeting we have with companies, there's always follow-on questions, and engineers are very inquisitive types.**

***MS. ROBERTS:*** Can you pull up 2725?

***BY MS. ROBERTS:***

***Q.*** Mr. Nelles, I'll have you look at this document.

Is this an email that you're on?

***A.*** **My name is there, yes.**

***MS. ROBERTS:*** Okay. Move to admit.

***THE COURT:*** Any objection to 2725?

***MR. OLAH:*** No, Your Honor.

***THE COURT:*** 2725 may be admitted.

***(Exhibit 2725 admitted.)***

***BY MS. ROBERTS:***

***Q.*** Okay. So this is an email to Farsheed, Ziad, Gaurav, Jim, Saad, you, Malik, Kevork.

Kevork was another engineer?

***A.*** **Yes. He was another engineer that worked in Ziad Mansour's organization.**

***Q.*** Okay. But he was brought in later too in the due diligence.

***A.*** **That is correct. He was not part of the initial diligence, as I recall.**

***Q.*** Yeah. And then Esin, who was brought in later?

***A.*** **I don't remember the exact timing, but I thought he was on relatively early.**

***Q.*** Okay. And then Glenn Kim, is he another engineer?

***A.*** **I assume. I don't recall all these people.**

***Q.*** Okay. And then it's basically actions and owners.

So it's assigning other responsibilities to various individuals to evaluate certain elements of the tech; correct?

***A.*** **That's what it says, yes.**

***Q.*** Okay. So it's going to "validate the target's ability to identify critical paths and improve correlation. Owner, Esin."

So I guess that's Esin's job?

***A.*** **Yes.**

***Q.*** "Data on improved CPR. We should investigate to see what levels of saving we are achieving."

Again, this was assigned to Esin?

*A.* **Yes.**
*Q.* That's what it says?
Okay. "Refine test time savings with PTE team's input."
And that's a reference to Mike Campbell's group?
*A.* **Yes.**
*Q.* Okay. And that's assigned to Saad and --
*A.* **Gaurav.**
*Q.* -- Gaurav.
"And what is everyone else in the industry doing to close AVS with sensors and where are they in terms of savings?"
What do you understand that to mean?
*A.* **I think they're to go and see if we understand what others in the industry, how they're making their chips, and what's the process that they're undergoing, and how does this -- how does this technology align with that.**
*Q.* Right. So what your competitors are doing.
*A.* **Mm-hmm.**
*Q.* Okay. And that's assigned to Esin and Farsheed.
*A.* **Yes.**
*Q.* Okay. Now, one of the issues driving the urgency of the deal was Qualcomm's desire to buy the tech to ensure that its competitors didn't get it?
*A.* **We -- we want to buy the technology so that we can implement the technology. In this case, if there are savings that are associated with it, or performance improvement so it makes our**

**product better. We don't buy technology to keep it away from somebody else.**

***Q.*** But it is a factor that's considered by Qualcomm.

***A.*** **No. We focus on competitive -- making sure our products are competitive. We don't buy for taking away from somebody else.**

***Q.*** Okay. So Qualcomm already had a low power product; right? CPR?

***A.*** **That's my understanding, yes.**

***Q.*** Which it had acquired from Rapid Bridge?

***A.*** **Yes.**

***Q.*** And so there was some concern that if the -- your competitors, like Apple, Intel, MetaTech --

***A.*** **MediaTek.**

***Q.*** -- MediaTek acquired Abreezio, their low power tech could catch up to Qualcomm's?

***A.*** **Potentially, yes.**

***Q.*** Yeah. And so one of the driving forces with acquisitions is Qualcomm can't be slow to acquire the tech.

***A.*** **Right. I mean, with acquisitions, when you're -- when a company is for sale and a company has technology that could be applicable to many different parties, presumably those other parties would find it of interest as well. So you're generally advantaged to move quickly to buy something.**

***Q.*** Right.

***A.*** **So we -- you know, if something is really good, and this was**

**a technology that applies across the semiconductor industry, we would be advantaged to trying to go fast, see if we could get the deal completed before others maybe woke up to the fact that it could help them, yes.**

***Q.*** Yeah, that makes sense.

Did you understand that Abreezio was pitching to other companies?

***A.*** **That was what was represented to us.**

***Q.*** And do you recall that your group did an analysis of the cost savings to its competitors would be?

***A.*** **That makes sense, that we would do something to kind of get a sense of what others -- I mean, as we think about the valuation and how we might bid for something, we would want to understand what the value is to us, what others might value it as, just to kind of understand what the competitive bidding environment could be, yes. That makes sense.**

***Q.*** So that's an analysis that the corporate group would do.

***A.*** **We might do the math.**

***Q.*** Okay.

***A.*** **But we are -- again, you know, we take input from the people who are experts in this area. So in this case, again, the engineers and the business leads would sit there and give us the assumptions, and then we would build that into a model.**

***Q.*** Okay.

***MS. ROBERTS:*** Can I show you Exhibit 0599? All right.

***BY MS. ROBERTS:***

***Q.*** All right. You can take a look at this email.

So this is an email from Hiten to you and others; right?

***A.*** **Yes.**

***Q.*** Okay. Do you recall receiving this email?

***A.*** **Inasmuch as it's 10 years ago, yes.**

***MS. ROBERTS:*** Move to admit.

***THE COURT:*** Any objection to 599?

***MR. OLAH:*** No, Your Honor.

***THE COURT:*** It may be admitted.

***(Exhibit 599 admitted.)***

***BY MS. ROBERTS:***

***Q.*** So if we look at the bottom part of this chain, Hiten writes to Ziad --

***MS. ROBERTS:*** Oh, sorry, can I look at the --

***FEMALE SPEAKER:*** Sorry.

***BY MS. ROBERTS:***

***Q.*** So Hiten writes to Ziad, Kevork, Farsheed, you, and Mr. Khan. And the email reads, "See the presentation for tomorrow's meeting with George and Derek."

Who's George? George Davis?

***A.*** **Yes, this is George Davis. At that time, George Davis was our Chief Financial Officer. And Derek Aberle was -- I believe at the time, he was President of the company.**

***Q.*** Okay. So you guys were working on a slide deck for these

guys?

***A.*** **Yes, for -- presumably for our senior executives to get them, you know, familiar with the potential acquisition.**

***Q.*** Okay. And Hiten writes, "I made the deck cleaner and more concise and added Slide 6 on target's alternatives."

Do you see that?

***A.*** **I do.**

***Q.*** It says, "I note that I am waiting for an average die area estimate for MTK."

MTK is --

***A.*** **MediaTek.**

***Q.*** "MediaTek and SS."

***A.*** **Samsung.**

***Q.*** Okay. "From our Competitive Intelligence Team."

What is the Competitive Intelligence Team?

***A.*** **We have a group of people at the company who look at what our -- our competitors and how they produce chips, and what their chip performance is relative to ours. So they're always looking in the market so that they can see what direction others are going and how our products stack up against theirs.**

***Q.*** Okay. So he was getting that information to compare it to the numbers that he had already come up with based on what he found that was publicly available.

***A.*** **Well, I assume what's happening here is that we're trying to get the size of the chips that our competitors are producing.**

**That's the die area; right? So we're sitting there saying, Okay, this die area, this technology had an ability to reduce the amount of die, you know, shrink the chips.**

**So we were trying to understand how much shrinkage against their chips they could expect. And then I assume you multiply that by a cost factor, and that could generate a value that the others might see from having this technology.**

***Q.*** Okay. That makes sense.

***MS. ROBERTS:*** Then let's pull up Exhibit 600. This has already been admitted into evidence.

***BY MS. ROBERTS:***

***Q.*** Do you recall that this is the slide deck that was shared with Qualcomm's executives around the August timeframe?

***A.*** **Yes. And we were not good at spellcheck.**

***MS. ROBERTS:*** Will you pull up Slide 3? We'll look at Bullet No. 3. Can you call that out?

***BY MS. ROBERTS:***

***Q.*** You can read that?

***THE COURT:*** Do you want him to read it to the jury?

***BY MS. ROBERTS:***

***Q.*** Yeah, why don't you read it to the jury.

***A.*** **"Not acquiring the technology would result in a loss of competitive advantage for Qualcomm products. TruSens' ability to significantly improve correlation to critical path potentially allows a competitor to match or exceed Qualcomm's**

**internal efforts. Could allow a solution without CPR to achieve the same total benefit as Qualcomm with CPR within six to 12 months."**

***Q.*** Okay. So the concern was that if your competitors obtained Abreezio's product, they could catch up to where Qualcomm already was with CPR.

***A.*** **That is one of the issues that -- yes, that's how we were evaluating the market.**

***Q.*** Okay.

***MS. ROBERTS:*** Can we pull up Slide 6?

***BY MS. ROBERTS:***

***Q.*** So this lists the various alternatives. It says, "Target's alternatives." So this is other ways that Abreezio could sell its business.

***A.*** **Correct.**

***Q.*** So is this the slide that Hiten was working on in the prior email?

***A.*** **I assume that this is Slide 6 that he's referring to, yes.**

***Q.*** Right. Okay.

So the top part says, "Pursue a licensing model."

***A.*** **Mm-hmm.**

***Q.*** Do you want to read the rest of it?

***THE COURT:*** Let's not read the exhibits that are already admitted into evidence. If you want to ask him a question about it.

***MS. ROBERTS:*** Okay.

***BY MS. ROBERTS:***

***Q.*** So, anyway, it says that one of Abreezio's opportunities was to create -- to stay a standalone business.

***A.*** **Yes. They could -- that's one option that they could pursue.**

***Q.*** Right. And that could be -- have potentially lucrative to them in an amount that's .4 to .7 billion a year.

Do you see that?

***A.*** **The opportunity is that large. But, yes, that doesn't necessarily mean that they would get all of that.**

***Q.*** Right. So but Abreezio --

***A.*** **As they stand to serve an addressable market.**

***Q.*** Okay. So Abreezio could just be its own company and then license its product.

***A.*** **Yes.**

***Q.*** And Qualcomm didn't want to just license Abreezio's product.

***A.*** **I think we explored that at one point with them.**

***Q.*** But you didn't want to do that because that would mean other competitors would also be able to license the product.

***A.*** **Well, it depends what the terms of the license are.**

***Q.*** Okay.

***A.*** **You could have an exclusive license, or you could have, you know, areas where you've got a time to market. And there's all sorts of different ways to structure.**

*Q.* Okay. But ultimately, Qualcomm decided that they didn't want to go with the licensing model.

**A. And as I recall, the company was definitely interested in selling the asset, not going down this path.**

*Q.* Okay.

**A. I think we offered that up to them as an option, and they -- they did not bite on that.**

*Q.* All right. And then so you go down to the second part, it says "Sells to a strategic."

And it has this Mav, which is Apple; right?

**A. Mav.**

*Q.* Mav?

**A. Mav, "Maverick." So at the time, we were not allowed to use the word "Apple."**

*Q.* Right. And so for Apple, it says, "Potential die area savings is 130 to 300 million a year."

**A. Mm-hmm.**

*Q.* That's the number that Hiten came up with.

**A. Well, I think that's -- you know, that's the math that Hiten came up with in conjunction with the analysis from various groups providing those inputs.**

*Q.* Sure, yeah. But it's his math.

And then MediaTek?

**A. Yes.**

*Q.* You have, "Potential die area savings of 60 to 130 million a

year."

***A.*** **Yes.**

***Q.*** Okay. And then you have Samsung, "potential die area savings of 90 to 175 million a year."

***A.*** **Yes.**

***Q.*** And then you have Intel, and it says "potential savings could be very significant, .5 billion to 1 billion a year."

***A.*** **Yes.**

***Q.*** So needless to say that Qualcomm thought that Intel could really benefit from this technology.

***A.*** **Yeah. I mean, this technology is about, you know, there's -- the more chips you produce, right, the more -- more you can apply the technology to. So at the time, just by math, Intel and Apple were larger, large providers of chips, so that's why they could see the biggest benefit.**

***Q.*** Okay. So the due diligence started in approximately March, and roughly in the late summer timeframe, your team felt pretty confident that the Abreezio products had been fully vetted by that time?

***A.*** **I believe that's the correct time period, yes.**

***Q.*** And --

***A.*** **And that was what was represented to us by the engineering leads; right? I mean, he -- Ziad, I think, said in that June email to us that they were largely completed.**

***Q.*** Right. But you continued on after that, because those

emails were from May, and the due diligence continued in June and July --

**A. Mm-hmm.**

*Q.* -- and thereafter.

**A. Yes.**

*Q.* And there was actually an on-site evaluation of Abreezio's software, DFTBreez?

**A. Okay. In June, you're referring to?**

*Q.* I think it's actually in August.

**A. Okay. Possible.**

*Q.* So it's several months later from those earlier emails --

**A. Mm-hmm.**

*Q.* -- with Ziad.

And Hiten had run valuation models, the math, that had determined that the tech had real value to Qualcomm.

**A. Yes. He ran models, yes.**

*Q.* In the range of 266 to 350 million?

**A. That sounds about in the range.**

*Q.* Okay.

***MS. ROBERTS:*** Can you pull up Exhibit 598?

***BY MS. ROBERTS:***

*Q.* Take a look at this email.

***MS. ROBERTS:*** Is this one in?

***THE COURT:*** Yes.

///

***BY MS. ROBERTS:***

***Q.*** It's already admitted, so if you could take a minute to read it. Sometimes it helps to read it from the bottom.

***A.*** **Yes.**

***Q.*** Yeah.

***A.*** **Okay.**

***Q.*** Okay. So the first part of this email, you're providing an update of the status with a, like, bunch of Qualcomm executives, Jim, Ziad, and Sanjay Mehta?

***A.*** **Sanjay Mehta, yes.**

***Q.*** Okay. Who's he?

***A.*** **He was the Senior Finance Lead for the Chip Division. So he was kind of the CFO of the Chip Division, and then we had a CFO of the entire corporation.**

***Q.*** Okay. And who is -- I'm not going to be able to pronounce his name.

***A.*** **Murthy Renduchintala.**

***Q.*** Yeah.

***A.*** **He was the -- either at the time, the Senior Engineering Lead for the Semiconductor Division, or he had been promoted to Co-president. I don't remember the exact sequence, but he was basically the Senior Engineering Lead in the Chip Division.**

***Q.*** Okay. And then Cristiano Amon is the current CEO?

***A.*** **Cristiano is the current CEO, but at the time, he was Head of either the Product Management -- so he was the business side**

**and Murthy was the engineering side. And then they both got promoted to be Co-presidents, but basically one was more specialized in business and one was more specialized in engineering.**

***Q.*** Okay. And so you're providing an update to these guys about the status of the negotiation. And you say, "Hiten initially extended a verbal offer of 125 million, and it was rejected. They had indicated expectations of a 300, but that wasn't going to work."

***MS. ROBERTS:*** And then if you go to the second page, I want to call out the "right now" paragraph.

***BY MS. ROBERTS:***

***Q.*** And you say, "Right now, our hope is to get the deal done especially relatively quickly."

What do you recall meaning big that?

***A.*** **I think this is, like, Hey, if I could go and tell them, hey, I'd like to bump my offer from 125 to 150, will that get the deal done real quick? I think that our answer to that is, no, that was not -- that was not in the cards, at least from the negotiation -- our view of the negotiation status.**

***Q.*** Okay. So it says, "The licensing option seems to be questionable at this point. Guys, how hard we want to pursue this?"

So this is a question you're asking the bigger team, do we want to keep going with this?

**A. Yeah.**

*Q.* And then you write, "As the valuation models provide margin to increase our offer. Plus, we are pretty conservative on our area savings and metric used to calculate savings in the margin."

So the valuation models provide margin to increase your offer.

So that means -- because you were currently valuating the company to be between 266 and 358 million?

**A. I believe that's the range, yes.**

*Q.* Correct?

**A. So we had our offer at 125 million relative to the value that it could be for us. There was headroom for us to increase our price.**

*Q.* Right. So you had margin to bump up your offer.

**A. That's correct.**

*Q.* Right. And then on the second sentence, you write, "We also assume that the internal next-gen solution will work with no risk."

Is that a reference to CPR?

**A. I believe so.**

*Q.* So you assumed CPR would work, even if it just worked the way it was supposed to, there was still value in acquiring Abreezio?

**A. I think that it's -- it's both -- yes, on that. And I**

**believe it's also that in conjunction together, things are better, so the ability to -- you know, you don't have the risk on the next generation of CPR having a risk. If that had risk, you would lower the value here, right, because they work together better. Does that make sense?**

***Q.*** Yeah. Yeah, that makes sense. Okay.

And then you offer to reach out to Behrooz again to see what his appetite is.

***MS. ROBERTS:*** And then could we go back to the first part of that email?

***BY MS. ROBERTS:***

***Q.*** If you look at the upper part of the email, it says, "Behrooz reached out last night. He" --

***THE COURT:*** Again, I don't want you to read the document into evidence, Counsel. If you have a question for the witness, you can ask the witness a question.

***MS. ROBERTS:*** Okay.

***BY MS. ROBERTS:***

***Q.*** In this email, Behrooz complains that Qualcomm has been slow to act on the deal, over three months. So, again, it's acknowledging it was kind of a long --

***THE COURT:*** Is that what you're asking the witness, if that's what it says?

***BY MS. ROBERTS:***

***Q.*** Is that what it says, that it was a long duration?

***A.*** **That is what Behrooz is saying.**

***Q.*** Right. And at the end of the email it says, "Can we close this deal at 200 million?"

So you're suggesting that the team approve -- approve up to 200 million to negotiate the deal with Abreezio?

***A.*** **Yes.**

***Q.*** Right?

And then Jim Thompson responds that he supports it?

***A.*** **That's correct.**

***Q.*** So at that point, you had authorization to negotiate the deal up to 200 million.

***A.*** **Yes.**

***Q.*** Okay. Now, in the fall of 2015, did you participate in a presentation to Qualcomm's Board about Qualcomm's M&A strategy, its overall strategy?

***A.*** **I don't remember exactly the timing, but, yes, that does make sense. That was a regular thing that I would do.**

***MS. ROBERTS:*** Okay. Can you pull up Exhibit 2890?

***BY MS. ROBERTS:***

***Q.*** This is an email that you're on and that you respond to?

***A.*** **Yes.**

***MS. ROBERTS:*** Move to admit.

***THE COURT:*** Any objection?

***MR. OLAH:*** Are we also going to be moving to admit the attachment?

***MS. ROBERTS:*** Yes.

***MR. OLAH:*** No objection, Your Honor.

***THE COURT:*** And is the attachment part of 2890 or is it a separate exhibit?

***MS. ROBERTS:*** I think it's part of the exhibit. It's a PowerPoint.

***THE COURT:*** Okay. 2890 may be admitted.

***(Exhibit 2890 admitted.)***

***BY MS. ROBERTS:***

***Q.*** Okay. So the first part of this email is from George Davis. He was the CFO?

***A.*** **Yes.**

***Q.*** Okay. And he's asking for edits from you and two other individuals?

***A.*** **Well, I think it was that we provided our draft to him, it appears. And then he made his edits on top of our draft submission to him.**

***Q.*** Okay. And then you forwarded it to your team to kind of provide comments?

***A.*** **Correct.**

***Q.*** Okay.

***MS. ROBERTS:*** And then we can go to the PowerPoint.

***BY MS. ROBERTS:***

***Q.*** So and the first page is sort of a basic agenda with the Board?

***A.*** **Yes.**
***Q.*** And if you look at "strategic initiatives," it talks about -- well, a couple of acquisitions. One is the Silanna acquisition.
Do you remember that one?
***A.*** **Yes.**
***Q.*** It was done around the same time as the Abreezio acquisition?
***A.*** **Yes.**
***Q.*** And then the Abreezio acquisition, and then also Project Eagle update.
***A.*** **Yes.**
***Q.*** Is that another company that Qualcomm was evaluating?
***A.*** **It was a complex carve-out of an asset from TDK. That was one of the $3 billion deals.**
***Q.*** Okay.
***MS. ROBERTS:*** Let's go to page 6 of the slide.
***BY MS. ROBERTS:***
***Q.*** So Project Emu -- well, Abreezio had the code name Windansea; right?
***A.*** **Yes.**
***Q.*** So Project Emu was the code name for the Silanna acquisition?
***A.*** **I think that's the one. It's been a while.**
***Q.*** Okay.

***MS. ROBERTS:*** If you'd pull up the slide before, so "strategic initiatives."

***BY MS. ROBERTS:***

***Q.*** Silanna acquisition?

***A.*** **Yes.**

***MS. ROBERTS:*** Okay. And can we go to the next one?

***BY MS. ROBERTS:***

***Q.*** It says "Emu"?

***A.*** **Okay.**

***Q.*** So I think that was part of the --

***A.*** **I'm trying to remember all those code names. There's lots of them.**

***Q.*** Right. And so the total offer for Emu, Silanna, is 150 million -- 165 million?

***A.*** **Yes.**

***Q.*** So roughly the ballpark of what Abreezio was?

***A.*** **Yes.**

***Q.*** Okay.

***MS. ROBERTS:*** If you go to page 9.

***BY MS. ROBERTS:***

***Q.*** Here's another evaluation summary. We've seen sort of similar evaluations by Abreezio?

***MR. OLAH:*** Your Honor, I'd make a 401 and 403 objection as to other acquisitions being considered.

***THE COURT:*** Sustained. Sustained.

***BY MS. ROBERTS:***

***Q.*** Do you recall whether this Silanna acquisition went forward?

***MR. OLAH:*** Same objection, Your Honor.

***THE COURT:*** Same ruling.

***MS. ROBERTS:*** Okay.

***BY MS. ROBERTS:***

***Q.*** Do you recall that Qualcomm valuated this company at 183 million?

***MR. OLAH:*** Same objection, Your Honor.

***THE COURT:*** Same ruling.

***BY MS. ROBERTS:***

***Q.*** Which made -- makes Abreezio look like a bargain.

***MR. OLAH:*** Same objection, Your Honor.

***THE COURT:*** Same ruling.

***MR. OLAH:*** Thank you.

***MS. ROBERTS:*** If you'd go to Slide 15.

***BY MS. ROBERTS:***

***Q.*** This lists a whole bunch of M&A pipeline deals that Qualcomm had in the pipeline; correct?

***A.*** **Yes.**

***Q.*** Okay. And these deal sizes are ranging anywhere between, you know, 40 million, and 35 billion?

***A.*** **Yeah. Quite a spread.**

***Q.*** Yeah. So it had a lot of, you know, work and stuff in the pipeline.

**A. Yes.**
*Q.* And significantly larger deals than Abreezio.
**A. Yes.**
***MS. ROBERTS:*** Let's go to Exhibit 2890.
***MALE SPEAKER:*** That's what's on.
***MS. ROBERTS:*** Oh, that's 2890? Let's go to 2588.
***BY MS. ROBERTS:***
*Q.* This is another email with another slide deck circulated to you, and you respond?
***MR. OLAH:*** Can I propose that we show him the slide deck? There's only an email that's on the screen now.
***MS. ROBERTS:*** Yeah, you can pull down for the --
***BY MS. ROBERTS:***
*Q.* So this says "strategic initiatives, Abreezio acquisition." So is this the PowerPoint that was submitted to the Board specifically on Abreezio at that September meeting.
**A. That's my understanding. That's my understanding.**
***MS. ROBERTS:*** Move to admit.
***THE COURT:*** Any objection?
***MR. OLAH:*** No, Your Honor.
***THE COURT:*** 2588 may be admitted.
***(Exhibit 2588 admitted.)***
***MS. ROBERTS:*** Okay. Can you pull up page 3?
***BY MS. ROBERTS:***
*Q.* And you can see at the bottom in bracket, the "seeking

Finance Committee approval to execute the transaction at a value not to exceed 200 million"?

**A. Yes, I see that.**

***Q.*** So you were essentially asking the Board to approve the deal at 200 million?

**A. Just to put a finer tip on that, we were asking the Finance Committee of the Board to do that. But, yes, that's a subset.**

***MS. ROBERTS:*** Okay. Can we go back to Slide 2? Maybe go forward. And then go forward another. Okay.

***BY MS. ROBERTS:***

***Q.*** This isn't the same slide we already looked at before, but it talks about the power performance savings, the key drivers --

**A. Mm-hmm.**

***Q.*** -- and also not acquiring this technology could result in a loss of a competitive advantage.

**A. Yes, I recall this.**

***Q.*** So this is all shared with the Finance Committee?

**A. Yes, I believe so.**

***MS. ROBERTS:*** Okay. And then if you go to Slide 6.

***BY MS. ROBERTS:***

***Q.*** Again, you have that total value to Qualcomm listed.

**A. Yes.**

***Q.*** Okay.

***MS. ROBERTS:*** And pull up Exhibit 2175. 2175. This has already been admitted.

***BY MS. ROBERTS:***

***Q.*** So this is another email that you're on. If you look at the bottom of the email from Hiten, it says, "We've beaten this technical" --

***MR. OLAH:*** Objection to misstating the evidence. I don't see Mr. Nelles' name on the email.

***MS. ROBERTS:*** Oh, I'm sorry. We'll withdraw that one.

Let's go back to 2588. Go to slide -- and then go to the PowerPoint, and you go to Slide 4.

***BY MS. ROBERTS:***

***Q.*** If you look at that first bullet point, it says, "Less upfront investments versus other options. Can be integrated in less than six months."

Do you recall why that's a good point for the transaction?

***A.*** **I guess the -- it seems like a reason for the transaction being supported, yes. If I have to spend less and I can implement it faster, that generally seems like a good deal.**

***Q.*** Okay. So it's better than developing the solution in-house because you can quickly integrate the technology?

***A.*** **That's one of the reasons that it could be a good investment, yes.**

***Q.*** And then if you look at the second benefit, you're going to -- Abreezio is going to -- or Qualcomm is going to benefit immediately from cost savings up to 100 million in the first fiscal year of '18?

**A. Yes.**

*Q.* And then another 150 million in fiscal year '19?

**A. Those were the assumptions we were working under, it appears.**

*Q.* So Qualcomm would have immediate benefits.

**A. Financial benefits, yes.**

*Q.* Yeah.

It also says on the lower part, "Stock purchase, but of the LLC, would allow for great use of offshore cash and generate significant tax shield benefit."

So Qualcomm could basically use offshore cash to purchase Abreezio and avoid tax implications?

**A. I think that there's a couple things that are working here. Again, I'm not the tax expert here. And tax law is always changing.**

***MR. OLAH:*** Given that first part, 602, Your Honor.

***THE COURT:*** Sustained.

***BY MS. ROBERTS:***

*Q.* There was an additional tax benefit here if they could purchase Abreezio, what it says on the slide?

**A. I believe there was something with respect to being an LLC that allowed to us get some sort of benefit. And I apologize, I'm not an expert on that. But there was some benefit there. And because Qualcomm had a bunch of money that was outside the United States, and this was, I think, being structured as a**

**Canadian company purchase, there was some ways for us to reduce taxes in a completely legal way.**

***Q.*** Okay. Let's -- so after this presentation, the Financial Committee approved the deal?

***A.*** **They did.**

***Q.*** Okay.

***MS. ROBERTS:*** Now let's go to Exhibit 2890.

***BY MS. ROBERTS:***

***Q.*** This is another email from George to you and Amanda Belcastro.

Who is she?

***A.*** **She's a person -- a Director, she's now a Vice President, but I think at this time, a finance staff, let's call it.**

***Q.*** And then Akash?

***A.*** **Akash Palkhiwala is -- today, is our Chief Financial Officer. At the time, he was a senior finance person in the Semiconductor Division.**

***Q.*** Okay.

***MS. ROBERTS:*** Move to admit.

***THE COURT:*** It's in already.

***MS. ROBERTS:*** Oh, it's in already?

***THE COURT:*** Yes.

***MS. ROBERTS:*** Okay. Oh, wait. I'm sorry. This is not the right exhibit. My apologies. I'm going to call up 2510.

///

***BY MS. ROBERTS:***

***Q.*** So this is an email from Hiten to you that reads, "Windansea due diligence update and approval, 10/25/15."

***A.*** **That's what it reads.**

***MS. ROBERTS:*** I'll move to admit.

***MR. OLAH:*** Can we show the witness some of the other 15 pages?

***BY MS. ROBERTS:***

***Q.*** Do you recognize this?

***A.*** **It seems like something we would put together, yes. It's been a long time. Sorry.**

***MR. OLAH:*** No objection to admission of this exhibit, Your Honor.

***THE COURT:*** 2510 may be admitted.

***(Exhibit 2510 admitted.)***

***BY MS. ROBERTS:***

***Q.*** So, like, right before the deal closed, towards the end of October --

***A.*** **Okay.**

***Q.*** -- Hiten Somwal sent you a final deck regarding the Windansea due diligence and approval?

***A.*** **That seems like a normal part of the process, yes.**

***Q.*** Okay. And if you go to Slide 3, we have the same language about all the great reasons why you should acquire --

***A.*** **Yes.**

***Q.*** -- Abreezio.

***MS. ROBERTS:*** If you go to page 6 -- Slide 6.

***BY MS. ROBERTS:***

***Q.*** And it breaks down the various due diligence actions that were done by various departments in Qualcomm.

***A.*** **Mm-hmm.**

***Q.*** And it sounds like everything's been kind of worked out. If you look at IPRs, it says "Working on cleaning up IP assignments. No other concerns identified."

So basically it sounds like Legal had reviewed all the assignments and didn't have a problem.

***A.*** **We -- you know, as we explained earlier, we have a number of different tracks. This is a good representation of some of the key tracks that are involved in a diligence. And we are saying at this time, that we're comfortable to move forward, basically. These tracks are saying that they're green, green to go. But, you know, to say that we've reviewed every single thing, that's -- that's probably a little too far. We did as best we can.**

***Q.*** Okay. And then it says, "Faculties will not renew the San Diego and San Jose leases, but we will keep the Vancouver lease, which has favorable terms."

Qualcomm intended to keep the Vancouver division of Abreezio?

***A.*** **There were a couple team members there that had expertise.**

**I don't remember if they were exclusively working on something different from this or whatnot. But those engineers, we were going to keep in that facility.**

**And it's also possible -- I don't know if it's true or not -- that we might have had other engineers in the region, that maybe we consolidated them into their facility. I don't recall facility decisions from that time.**

***Q.*** Okay. But the -- and it says, "Tax and payroll issues." It says, "Resolve tax issues with the Trementa acquisition structure. Target has abandoned the proposed transaction structure. QC will hire employees directly from Trementa."

Now, you had mentioned that there had been some issues when you were reviewing the -- Abreezio's setup that had some growing issues with, like, a startup would have on the structures. And then you worked with Behrooz Abdi to kind of work out those elements.

***MR. OLAH:*** I would object as vague.

***THE COURT:*** Sustained. And I'm not sure what the question is. What is the question?

***BY MS. ROBERTS:***

***Q.*** You previously testified that there were some issues with Abreezio's ownership interests.

***A.*** **I testified -- if I recall, I think you're referring to is about the cap table. There weren't necessarily problems. There was a situation of what was provided to us so that we could do**

**diligence wasn't sufficient. So we asked them to provide more details and to provide clarity, which they ultimately provided enough clarity for us to move forward on the cap table aspect.**

*Q.* Okay. So --

***A.* This is with respect, I think, to corporate structure and entities that they were buying, so that's a different category of diligence.**

*Q.* Okay. But there was also an issue about Invionics being able to come over to work for Qualcomm?

***A.* The issue might have been -- again, I don't remember all the details back and forth here on this. I wasn't into all the absolute details of this. But it was a situation where they might not have had the right corporate structure. It might not have been -- we might not have been able to buy that structure as is.**

**And then it looks like we then hired -- rather than maybe buy the company with the employees inside the company, maybe it looks like we just hired the employees directly from them. So this is all structuring issue-type of issues.**

*Q.* But the structuring issues had been resolved.

***A.* Yes. We had a path forward, it appeared. Clearly, we had a path forward.**

*Q.* Okay. And the key employees that were coming over from Abreezio, they were the Invionics group that was located in Vancouver?

**A. I think -- I think it was some of them and some of the San Jose employees, as well.**

***Q.*** Okay.

***MS. ROBERTS:*** Can you go to page 8?

***BY MS. ROBERTS:***

***Q.*** Look at the top. It says, "Summary of key findings," and it refers to ECCN EAR99 DFT EDA software.

That was one of the products that Abreezio was -- that Qualcomm was buying from --

**A. I think so. I don't remember all the titles.**

***Q.*** Okay. But it refers specifically to a software --

**A. That's what -- you know, it's in parenthetical, that's what it's saying, yes.**

***Q.*** And that due diligence has been completed on, that the product looks good.

**A. The diligence has been completed on that, yes.**

***Q.*** And this is the same product that Qualcomm evaluated on-site in the summer of 20 -- 2015?

**A. Yeah. But, remember -- I think we should be careful here. This section is dealing with export compliance portion of diligence. So there's a technical evaluation of the products, which would be under the engineering and business unit. This right here is the -- this right here is the export compliance aspect.**

**So we have certain laws that we have to follow related to**

**United States law on export compliance. And, for instance, it highlights here, this "Iranian require license prior to Qualcomm access." So this is what that page is dealing with right here.**

***Q.*** Okay.

***A.*** **It's their ability to -- those employees' ability to use and for Qualcomm to have our employees use this technology from -- and be compliant with export compliance rules.**

***Q.*** Okay.

***MS. ROBERTS:*** Can we go to Slide 12?

***BY MS. ROBERTS:***

***Q.*** And it says, "IT due diligence update." And then it says, "Summary of key findings." And it says, "Vancouver is the main R&D facility with a single-development server that is accessed remotely by San Diego." And then it talks about the engineering software and collaborative --

***MR. OLAH:*** Object to the reading of the slide, Your Honor.

***THE COURT:*** Sustained. What's the question?

***BY MS. ROBERTS:***

***Q.*** So this -- this slide indicates that the main R&D facility is in Vancouver; correct?

***A.*** **That's what it says.**

***MS. ROBERTS:*** Okay. Can we go to page 13?

***BY MS. ROBERTS:***

***Q.*** This talks about the leases again; right?

***A.*** **Yes.**

***Q.*** And it mentions that the target, which is Abreezio, and Trementa, sublease a portion of the space from Invionics; correct?

***A.*** **Yes. That's what it says, second line down.**

***Q.*** And Invionics is willing to assign the lease to Qualcomm Canada. So essentially, that division is going to become Qualcomm Canada.

***A.*** **I think we should -- it's -- again, that's a bridge too far. The company, the broader Abreezio, has a number of assets, including a lease in Canada. And Qualcomm has made a decision that it wants to take assignment of that lease here. And it could be used for anything. It doesn't necessarily have to be used for a particular division or product development. It could be used for anything. It's just a building.**

***Q.*** Right. But Qualcomm is taking over that lease.

***A.*** **We're willing to take assignment to that lease, yes.**

***Q.*** Okay. Now, you talked a bit about the Unit Purchase Agreement, which is 864.

***MS. ROBERTS:*** Can you pull that one back up?

***FEMALE SPEAKER:*** I'm sorry, which exhibit?

***MS. ROBERTS:*** 864. Can you go back to page 589 and 161 -- 159 to 161.

***BY MS. ROBERTS:***

***Q.*** This was the list of the IP, the patents that you were shown

earlier?

**A. Yes.**

*Q.* Okay.

***MS. ROBERTS:*** And if you scroll down, it's on page 10 and 11, and then 12.

***BY MS. ROBERTS:***

*Q.* So that's a list of all the provisional and non-provisional patent applications that Abreezio was offering?

**A. So I believe is this a disclosure schedule that the company provides to us as a purchaser. And they're saying these are all the patents and provisionals and all the stuff that we own, and they disclose it. So we're taking that, but that is all of them.**

*Q.* Right.

**A. But it's theoretically possible that they missed some, intentionally or unintentionally.**

*Q.* Okay. Do you recall there were 13 provisional patent applications?

**A. I don't recall what the exact numbers are.**

*Q.* Do you recall there were 13 non-provisional patents --

**A. No, I don't recall.**

*Q.* -- applications?

**A. I don't recall the specifics of that.**

*Q.* For a total of 26 --

**A. Okay.**

*Q.* -- applications in total?
***A.* I'll take your word for it. Okay.**
*Q.* And the ones that the Government pointed out to you before were just two?
***A.* That's what I recall, yes.**
*Q.* And just provisional patent applications.
***A.* Yes.**
*Q.* Okay. And the other column shows that none of these have actually issued.
***A.* At the time, that's what they're showing, yes.**
*Q.* Now, going back to some of the earlier slides, there was a reference to the fact that they hadn't actually issued -- that Abreezio didn't have any patents that were actually issued at the time.
***A.* Okay.**
*Q.* Do you remember that?
***A.* Okay.**
*Q.* And it was seen as a benefit, because they -- the point was that Qualcomm could decide later which of the IP would intend to pursue.
***A.* I don't remember the exact strategy at the time. But, generically, you know, that is -- that is something that could make sense; right? We could choose to -- where we wanted to expend our financial resources, so which patents we wanted to continue to prosecute, to make into full patents.**

**We could maybe update them. I'm not a patent lawyer, but maybe we could update them. Or maybe we decide not to make it public. You know, a patent is a very public document. So maybe we just wanted to keep it a trade secret. So, yes, there's different paths forward. So it is plausible that is there a benefit to them not having them been issued. But I'm not an expert here, so...**

***Q.*** Yeah. Because then Qualcomm, once it acquires a company, can decide which of the IP is actually worth pursuing and incurring costs to prosecute within the --

***A.*** **Yeah.**

***Q.*** -- application.

***A.*** **That could make sense, yes.**

***Q.*** And do you recall that only one patent was actually prosecuted that listed Ms. Alan as an inventor out of this entire portfolio of 26?

***A.*** **I don't follow -- we have hundreds of thousands of patents and there's a whole group that goes forward with that. That's not my role.**

***MS. ROBERTS:*** If you could go to page 166.

***BY MS. ROBERTS:***

***Q.*** This lists the target products?

***A.*** **It does list them.**

***Q.*** These are actual products that Qualcomm bought from Abreezio?

**A. Yes. That's what the company was disclosing to us.**
*Q.* So it's software and hardware?
**A. That's what it says, yes.**
*Q.* So not just the provisional patents.
**A. Correct.**
*Q.* Right?
**A. We're trying to buy all the assets and identify all the assets of the company as best we can.**
*Q.* Is it true that products don't necessarily need to be based on -- products can be based on prior art, because you want the product to be functional?
***MR. OLAH:*** Objection. Vague.
***THE COURT:*** Sustained.
***BY MS. ROBERTS:***
*Q.* Products have value to Qualcomm because they can result in cost savings.
**A. That could be one reason a product is valuable to Qualcomm, yes.**
*Q.* Or another reason would be that it could save low power.
**A. That could be a product attribute that could be positive to the products, yes.**
*Q.* So the value is derived from what the benefit that Qualcomm incurs from use of the actual product.
**A. Well, the value is ultimately what our customers will pay us for a product; right?**

*Q.* Right.
**A. And how much share we can generate, you know, market share we could generate, yes. So how many units we could sell. So if our product has attributes that are better, more competitive than our competitors, that's generally a good thing, yes.**
*Q.* Right.
So it doesn't necessarily have to be based on IP that is validated by the USPTO.
**A. No. But patents do provide a sense of security to our customers. If we are selling a product and we can tell our customers that Qualcomm invented or owned this product, and we have -- you know, they don't have the risk -- a customer doesn't have a risk of it being claimed as someone else's, that's really important.**
*Q.* But if a product was based entirely on prior art, which belongs to the public domain, and it worked and it had value to Qualcomm, there's still value to Qualcomm; right?
***MR. OLAH:*** Objection. Vague.
***THE COURT:*** Sustained.
***BY MS. ROBERTS:***
*Q.* If the product is based on IP that is a prior art, but the product still works, it still has value to Qualcomm.
**A. A product can work. That's true, based on that. But if that product -- if that product's technology is fundamentally owned by somebody else, that's a significant risk, and it would**

**be to Qualcomm.**

***MS. ROBERTS:*** If you go to page 128.

***BY MS. ROBERTS:***

***Q.*** Schedule I, it lists the key employees that were also part of the acquisition document.

***A.*** **Yes, it does.**

***Q.*** And there are four names here; right?

***A.*** **Yes.**

***Q.*** Andrew Hughes, Bradley Quinton, Michael Lee, Trent McClements?

***A.*** **Yes.**

***Q.*** These were the Canadian engineers from Invionics?

***A.*** **I believe that's the case, yes.**

***Q.*** Ms. Alan's not listed.

***A.*** **No.**

***Q.*** No. Qualcomm didn't consider her to be a key employee.

***A.*** **She was not made available to us and did not -- it was very clear from the beginning that she was not going to be part of the acquisition, so there's no sense --**

***Q.*** But she wasn't considered -- she wasn't important to Qualcomm to be able to install the Abreezio tools across Qualcomm's --

***A.*** **Well, we would have certainly liked to have had the purported inventor be part of the deal. That would be normal. But it was clear to us from the beginning that that was not**

**going to be the case. So these employees were the employees that were available to us. And we have an ability to make sure.**

**By the way, "key employees" has got a couple different terms, so you know. Often we name key employees for retention purposes. And these people have -- they might -- they might have different roles.**

**A CFO could be named a key employee because a CFO knows where things are. So the key employees can be not necessarily tied to just the engineering of the product we're doing, but to the overall business.**

***Q.*** But these -- these particular key employees were engineers, and they were the engineers that built the software.

***A.*** **That's my understanding, yes.**

***Q.*** Right. And so Qualcomm wanted the software product because it had value to have it installed across its product line.

***A.*** **I believe we wanted all of the assets of the company.**

***Q.*** Right.

But so you needed the key employees to be able to adapt Abreezio's tools to Qualcomm's chips?

***A.*** **I assume that that's what the engineering team was thinking.**

***Q.*** So that's why they're included as key employees in the Agreement.

***A.*** **One of the reasons why they're included, probably.**

***Q.*** Okay. So you had also -- the Government also asked you about a payment to Ms. Alan as a result of the acquisition, and

showed you where she was paid $91 million as part of the transaction; correct?
***A.*** **Yes, they did.**
***Q.*** Right.
And you're aware that Qualcomm civilly sued Karim Arabi and Ms. Alan back in 2017?
***A.*** **I am aware of that.**
***Q.*** And that case settled in 2018?
***A.*** **I understand that it settled.**
***Q.*** Yeah. And that Ms. Alan returned half of the proceeds she received?
***A.*** **I don't know the exact terms of what, but that makes sense.**
***Q.*** $47 million.
***A.*** **Okay.**
***MS. ROBERTS:*** No further questions.
***MR. OLAH:*** Briefly, Your Honor.
***THE COURT:*** Redirect.

***REDIRECT EXAMINATION***

***BY MR. OLAH:***
***Q.*** Mr. Nelles, you did something when answering a question. I think you drew a rectangle box with your fingers.
Did I see that right?
***A.*** **Yeah, now I have to remember.**
***Q.*** I'm not trying to make you self-conscious.

This was the box of Abreezio that Qualcomm acquired; right?
**A. Yes.**
Q. It got the whole box that you drew.
**A. That's correct.**
Q. Okay. I think you also were asked a few questions about licensing versus acquiring; is that right?
**A. Yes.**
Q. Which did Qualcomm do with Abreezio?
**A. We acquired.**
Q. And did I hear your testimony correctly, that Abreezio was interested in being acquired more so than being licensed?
**A. Yes. We tested that as a negotiating tactic to see what the art of the -- what type of options in that realm of the -- sorry, the fingers again -- what the options were. And they rejected licensing, and they wanted to move towards acquisition.**
Q. Was Ziad Mansour -- do you recall which path Ziad Mansour was advocating for?
**A. I believe he was advocating that we acquire this technology.**
Q. You were asked about an email in which you agreed you had ghost written, I guess would be the past tense for that, for Ziad; is that right?
**A. Yes.**
Q. You drafted an email for him to send on to the Abreezio folks; is that right?
**A. Yes.**

*Q.* Did you create -- did you instead create a fake email address and pretend to be Ziad and send that email yourself?
*A.* **No.**
*Q.* Okay. You mentioned it was -- that Qualcomm wanted to speak with the inventor of Abreezio's technology; is that right?
*A.* **Yes, I believe that's the case.**
*Q.* Was Qualcomm able to do that?
*A.* **No.**
*Q.* Did you know that -- did anyone -- let me rephrase.
I think you testified on direct that you did not know Karim Arabi to have any involvement in Abreezio's technology or corporate formation; is that right?
*A.* **That is correct.**
*Q.* Is that information Qualcomm would have wanted to know?
*A.* **Absolutely.**
*Q.* Why is that an absolutely?
*A.* **We want to make sure that we understand if there's any conflicts of interest. You know, if we're selling -- if we're buying a company, and one of our employees is associated with that company or might have information that is being shared with that company, that would be of absolute interest to us.**
*Q.* Would it possibly have affected the $180 million Qualcomm was willing to pay for Abreezio?
*A.* **Quite possibly.**
*Q.* You raised your eyebrows.

How low could that figure have gone if you had learned Dr. Arabi to be involved or an inventor of Abreezio's technology?

***A.*** **We would -- we would have to thoroughly diligence. We would go back -- it could be worth zero. I mean, we wouldn't want to pay anything if the asset we're buying is not of value or if it -- if it belonged to someone other than who they represented it belonged to.**

***Q.*** Just so I understand, it might be worth zero because Dr. Arabi had an Invention Assignment Agreement with Qualcomm?

***A.*** **Yes. If Qualcomm --**

***MS. ROBERTS:*** Objection. Argumentative.

***THE COURT:*** Overruled. You may answer.

***THE WITNESS:*** If Qualcomm owned the technology, we would not want to pay for the technology that we had owned. And an Invention Disclosure Agreement, if that means that if the technology was invented by an employee while they were an employee of Qualcomm, by definition, it is owned by Qualcomm.

***BY MR. OLAH:***

***Q.*** But, again, you were shown a bunch of due diligence slides including one from late October of 2015; is that right?

***A.*** **Yes.**

***Q.*** Did anyone at any point in the diligence flag Dr. Arabi's involvement or connection to Abreezio?

***A.*** **No.**

***Q.*** Is that part of the reason Qualcomm paid or agreed to pay $180 million to acquire Abreezio?

***A.*** **Yes. We believed that the company Abreezio was selling us the technology that they owned and they invented.**

***MS. CHOPRA:*** No further questions, Your Honor.

***THE COURT:*** Anything further?

***MS. ROBERTS:*** No, Your Honor.

***THE COURT:*** Okay. Thank you, sir. You're excused.

***THE WITNESS:*** Thank you.

***THE COURT:*** Okay. Ladies and gentlemen, let's take our lunch recess at this time. If you could be back in -- why don't we make it 1:00 o'clock. You're reminded you're not to discuss the case with anyone. You're not to do any research about the case. And we'll see you back at 1:00 o'clock.

***(Jury out at 11:52 a.m.)***

***THE COURT:*** Okay. We're now outside the presence of the jury.

I am finding that the Heuston Hennigan notes of the interview with Mr. Nelles is not impeachment material and should not be produced. So we'll just keep it and file it under seal. It's Court's Exhibit 2B.

Anything else we need to put on the record?

***MR. OLAH:*** No for the Government.

***MS. ROBERTS:*** No. Thank you.

***THE COURT:*** Okay. 1:00 o'clock. We'll see you then.

*(Lunch recess taken.)*

***THE COURT:*** Okay. We are back on the record. All jurors are present. Dr. Arabi is present. All attorneys are present.

Government may call your next witness.

***MR. PILCHAK:*** Thank you, your Honor. The United States calls Edward Perkis.

***THE CLERK:*** Good afternoon. Please stand here raise your right hand.

*(Witness duly sworn.)*

***THE CLERK:*** Thank you. You may lower your hand, please take the stand.

Please state and spell your first and last name for the record.

***THE WITNESS:*** Edward Perkis, E-d-w-a-r-d, P-e-r-k-i-s.

***THE COURT:*** Thank you.

Mr. Pilchak.

***MR. PILCHAK:*** Thank you, your Honor.

***DIRECT EXAMINATION***

***BY MR. PILCHAK:***

***Q.*** Good afternoon, Mr. Perkis.

***A.*** **Hello.**

***Q.*** Who do you work for?

***A.*** **I work for the Federal Deposit Insurance Corporation.**

*Q.* Is that sometimes known as the FDIC?
**A. Yes.**
*Q.* What is the FDIC?
**A. The FDIC insures deposits for federal- and state-chartered financial institutions up to $250,000. We're also one of the primary federal bank regulators.**
*Q.* Okay. So there's a regulation component?
**A. Yes.**
*Q.* And an insurance component?
**A. Yes.**
*Q.* And specifically, where do you insure these deposit accounts?
**A. At federal and state banks.**
*Q.* Banks or financial institutions?
**A. Yes.**
*Q.* Okay. And when you say insure them, that means if the bank loses the money, the FDIC covers the loss?
**A. If the bank fails and the insured -- the person's deposit is less than the $250,000 and the money cannot be collected from a sale of bank assets, then the FDIC pays it out of the deposit insurance fund.**
*Q.* Okay. And when you talk about a bank failure, quick history question, do you know when, about, the FDIC was created?
**A. 1933.**
*Q.* In response to any particular event in American history?

***A.*** **Yeah, the Great Depression.**
***Q.*** Does the FDIC maintain records of which banks it insures?
***A.*** **Yes.**
***Q.*** Have you had some experience with those records yourself?
***A.*** **Yes, I have.**
***Q.*** In your own experience with those records, are they reliable?
***A.*** **Yes.**
***Q.*** In connection with your testimony today, did you look at the records for one particular bank?
***A.*** **Yes, I did.**
***Q.*** What bank was that?
***A.*** **Bank of America.**
***Q.*** Are you familiar with Bank of America?
***A.*** **I am familiar with them, yes.**
***Q.*** Is it a fairly well-known bank?
***A.*** **Yes, fairly large.**
***Q.*** This is going to sound like a silly question, but do you know which country Bank of America primarily does business in?
***A.*** **The United States.**
***Q.*** What were you looking for when you looked in the records for Bank of America?
***A.*** **I looked to see if they were insured, when they had been insured, and whether their insurance was revoked or suspended because they had previously failed.**

***Q.*** Okay. And sometimes insurance can be revoked or suspended?
***A.*** **When the bank closes because of failure or sometimes just merger.**
***Q.*** Okay. And when you looked at Bank of America, are they insured by the FDIC?
***A.*** **Yes, they are.**
***Q.*** When were they first insured, do you know?
***A.*** **1934.**
***Q.*** So the year after the FDIC was created?
***A.*** **Yes.**
***Q.*** Do you know, who was the president then?
***A.*** **Roosevelt.**
***Q.*** Okay. Do you know whether since 1934 Bank of America has been continuously insured?
***A.*** **Yes, up to today, or yesterday when I checked.**
***Q.*** And hopefully all else is still going okay today.
***A.*** **I haven't heard anything today, so yeah, I assume.**
***Q.*** Okay. So continuously insured for the last 91 years?
***A.*** **Yes.**

***MR. PILCHAK:*** No further questions for this witness.

***THE COURT:*** Any cross-exam?

***MS. BERNSTEIN:*** No, your Honor.

***THE COURT:*** Thank you, sir.

***THE WITNESS:*** Thank you.

***MR. OLAH:*** Your Honor, the United States calls Katie

Wilson.

***THE CLERK:*** Please raise your right hand.

***(Witness duly sworn.)***

***THE CLERK:*** Thank you. You may lower your hand. Please take the stand.

Please state and spell your last name for the record.

***THE WITNESS:*** Katie Wilson, K-a-t-i-e, W-i-l-s-o-n.

***THE COURT:*** Thank you.

Mr. Olah.

***DIRECT EXAMINATION***

***BY MR. OLAH:***

***Q.*** Good afternoon.

***A.*** **Hello.**

***Q.*** Where do you work?

***A.*** **Qualcomm.**

***Q.*** Are you retired from Qualcomm yet?

***A.*** **I am not.**

***Q.*** My condolences. It sounds amazing.

How long have you been with Qualcomm?

***A.*** **About 18 years now.**

***Q.*** What is your title at Qualcomm?

***A.*** **Senior director of Employee Relations.**

***Q.*** Is Employee Relations a department within Qualcomm?

***A.*** **It is.**

**Q.** What does the Employee Relations department do?

**A. We oversee internal policies, partly kind of the culture of the company, ensuring employees feel safe raising concerns. And if there are concerns raised, we will do the internal investigations.**

**Sometimes we partnership with other groups, depending on the nature of it. We'll coach and counsel employees, managers, offer support through various employment matters that come up.**

**Q.** What were you doing before you joined Qualcomm?

**A. I was working at a small diversity and inclusion consulting firm.**

**Q.** That worked with various companies, I'm guessing?

**A. Yes.**

**Q.** What were you doing before doing DEI Consulting?

**A. I worked at Starbucks.**

**Q.** Do you have any degrees?

**A. I do.**

**Q.** In what?

**A. I have a Bachelor's of Science in International Business, a Bachelor's of Science in Psychology, and a Master's in Industrial Organizational Psychology.**

**Q.** Do you recognize the name Dr. Karim Arabi?

**A. I do.**

**Q.** Is he a former Qualcomm employee?

**A. He is.**

*Q.* Are you somewhat familiar with his employment history at Qualcomm?
***A.*** **Yes.**
*Q.* Did he have two stints at Qualcomm?
***A.*** **He did.**
*Q.* Do you recall the time frame of those employments with Qualcomm?
***A.*** **One was up until -- let's see. The first one, I can't remember the exact dates, but there were several years, and I think it ended around 2010 or '12, something like that. And then he had a gap of about a year or two. And then the second stint began in 2013 and ended in 2016.**
*Q.* He left in 2016 on that second time?
***A.*** **Yes. I believe it was July of 2016.**
*Q.* Does Qualcomm have a Code of Business Conduct?
***A.*** **We do.**
*Q.* Are employees required to acknowledge that Code?
***A.*** **Yes.**
*Q.* And did you look into whether Dr. Arabi had acknowledged that Code of Business Conduct?
***A.*** **Yes.**
*Q.* Did you conclude that he had?
***A.*** **He did.**
*Q.* Is that something Qualcomm does with employees when they either join or in his case rejoin the company?

**A. Yeah. They'll affirm that they have read and understand the Code of Business Conduct when they are hired or rehired, as well as we do it from time to time for current employees. And they reaffirm their understanding of the Code of Business Conduct.**

***Q.*** Does Qualcomm keep records of those acknowledgments you just referred to?

**A. Yes.**

***Q.*** Did you review acknowledgments prior to testifying today?

**A. I did.**

***Q.*** And did you find Dr. Arabi acknowledging Qualcomm's Code of Business Conduct?

**A. He did.**

***MR. OLAH:*** If we could please show the witness and the witness only at this point Exhibit 85.

***BY MR. OLAH:***

***Q.*** Ms. Wilson, can you see page 1 of Exhibit 85?

**A. Yes.**

***Q.*** Ms. Wilson, is that a 60-plus-page document?

**A. Yes.**

***Q.*** And did you track this down in your employment at Qualcomm?

**A. Yes.**

***Q.*** What is Exhibit No. 65 -- or 85? Excuse me.

**A. Yeah, sorry. This is the full acknowledgment version of the Code of Business Conduct that employees would have acknowledged, in this case, 2013, as that's the date on the exhibit.**

***Q.*** And having previously reviewed this exhibit, is this one that Dr. Arabi would have acknowledged?

***A.*** **Yes.**

***Q.*** Is it a fair and accurate copy of that code?

***A.*** **Yes.**

***MR. OLAH:*** Your Honor, that this time the Government would move to admit Exhibit 85 in evidence.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** 802.

***THE COURT:*** Overruled.

***MS. BERNSTEIN:*** To the 62-page document, your Honor?

***THE COURT:*** Overruled.

***(Exhibit 85 admitted.)***

***MR. OLAH:*** Could we now show the witness and the witness only Exhibit No. 77.

***THE CLERK:*** Seventy-seven is in evidence.

***THE COURT:*** Seventy-seven is in evidence.

***BY MR. OLAH:***

***Q.*** Great. We can pull that down.

Ms. Wilson, does Qualcomm have an invention disclosure requirement?

***A.*** **Yes.**

***Q.*** Does it have an invention assignment agreement?

***A.*** **Yes.**

***Q.*** Generally speaking, what do those agreements require

employees to do?

**A. It essentially says if you -- once you're employed by Qualcomm, and during the course of your employment with Qualcomm, if you invent anything, that that belongs to Qualcomm. Or if you think that it should not belong to Qualcomm, that you need to disclose that and have proper reviews and approval to have Qualcomm release those inventions to you as an individual rather than have Qualcomm own it.**

*Q.* Is the burden on the employee to identify inventions?

**A. Yes.**

*Q.* Are you familiar with Qualcomm's acquisition of Abreezio?

**A. I am.**

*Q.* What's your familiarity based on?

**A. I oversaw and participated in an internal investigation related to concerns raised about the Abreezio investigation and that it may have had ties to current Qualcomm employees.**

*Q.* And when you say Abreezio -- "Abreezio investigation," were you referring to the Abreezio acquisition?

**A. The Abreezio acquisition, yeah. And we investigated circumstances around that acquisition.**

*Q.* Let me ask a hopefully simpler question.

Were you at all involved with Abreezio or doing any sort of inquiry prior to Qualcomm acquiring Abreezio?

**A. No.**

*Q.* Your involvement came how many years later?

**A. I believe the Abreezio acquisition closed in the fall of 2015, around October, and I was not involved until late 2016.**
*Q.* And what was your involvement in late 2016?
**A. There were concerns raised that the primary inventions that we acquired as a company, that Qualcomm acquired as a company through the Abreezio acquisition, may have been created or partially created by a Qualcomm employee at the time of the purchase.**
*Q.* And is that something that made its way to you in Employee Relations?
**A. Yes.**
*Q.* Did Employee Relations do an investigation into those allegations?
**A. Yes.**
*Q.* Were you the lead on that investigation?
**A. Yes.**
*Q.* Did you have coworkers assisting you with it?
**A. Yes.**
*Q.* Who were those coworkers?
**A. Anthony Schmidt and Brian Gilbert primarily.**
*Q.* This jury has heard a lot about code names.
Did you have a code name for your investigation?
**A. We did.**
*Q.* What was the code name?
**A. Project Gopher.**

*Q.* Any significance to Project Gopher?
***A.*** **No. Every year we created a list of code names and that year happened to be animals, so Project Gopher was just letter G on the animal list.**
*Q.* The next one was H then?
***A.*** **It would have been.**
*Q.* Fascinating.
On a general level, what steps did Employee Relations take with respect to Project Gopher?
***A.*** **So we heard the concerns. And then one of the things that we have to do is assess the overall credibility of the concerns. And so we did some due diligence to understand, you know, the concerns essentially were that -- as I mentioned, someone at Qualcomm had created the primary technology that we were acquiring through Abreezio. And so if we bought that back, we would essentially be buying back Qualcomm's own technology that we shouldn't have had to purchase.**
**So we did some due diligence into just the credibility of the concerns looking at emails, communications between the parties, understanding a little bit more about the actual acquisition, talking to some members of the due diligence team, piecing together information and ultimately interviewing key members that were potentially involved with the acquisition or the technology.**
*Q.* Did you -- on that last bit, the interviews with folks, were

you involved in those interviews?
**A. Yes.**
*Q.* Was Ziad Mansour interviewed?
**A. Yes.**
*Q.* Who is Ziad Mansour?
**A. He was a former Qualcomm employee, and at the time he was a senior vice president of engineering.**
*Q.* When you say "at the time," is that at the time of the Abreezio acquisition or at the time of your interview or some other time?
**A. Both. So at the time of the Abreezio acquisition and at the time of my interview.**
*Q.* Did -- to your knowledge, did Dr. Arabi ever report to Ziad Mansour?
**A. In his first stint of employment, he did.**
*Q.* Are you aware of any relationship between Dr. Arabi and Ziad Mansour?
**A. My understanding is that they were friends outside of work and that they had worked together for a number of years.**
*Q.* And what do you understand to be Ziad Mansour's involvement with the Abreezio acquisition?
**A. He was the primary sponsor of the acquisition. So he was the one that essentially brought that to Qualcomm's attention, said I think we should acquire it. He would put together kind of the business rationale for why he thought Qualcomm should**

**ultimately acquire that company. And then he also oversaw the due diligence leading up to the close of that acquisition.**

***Q.*** Was it those facts or allegations at least that led you to want to interview Mr. Mansour?

***A.*** **Yes.**

***Q.*** Did you in fact interview him?

***A.*** **Yes.**

***Q.*** Was he fired subsequent to that interview?

***A.*** **He was.**

***Q.*** About how long afterwards?

***A.*** **It was about five or six months afterwards. He was on unpaid administrative leave after the interview while we concluded our investigation.**

***Q.*** Did you also want to talk to Dr. Arabi?

***A.*** **Yes.**

***Q.*** Did you ask Mr. Mansour for help putting you in touch with Dr. Arabi?

***A.*** **I did.**

***Q.*** Was Dr. Arabi an employee of Qualcomm at the time you were interviewing folks and doing the interviews in Project Gopher?

***A.*** **Not at the time.**

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Overruled.

***THE WITNESS:*** He was not at the time.

///

***BY MR. OLAH:***

***Q.*** Dr. Arabi was not an employee at the time?

Did you have Mr. Mansour assist with your attempts to reach Dr. Arabi?

***A.*** **I did.**

***Q.*** Can you tell the jury about your approach to Mr. Mansour about having him put you in contact with Dr. Arabi?

***A.*** **Yes. So we were interviewing Mr. Mansour, and as we were wrapping up our conversation with him, we said, hey, we'd like to talk to Dr. Arabi.**

***MS. BERNSTEIN:*** Objection. 802.

***THE COURT:*** Sustained.

***BY MR. OLAH:***

***Q.*** Let me ask you this: Did you approach this -- I'll break this down in multiple steps and we can avoid the part that got objected to.

Did you approach Mr. Mansour in hopes of him putting you in touch with Dr. Arabi?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Overruled.

***THE WITNESS:*** Yes.

***BY MR. OLAH:***

***Q.*** What did Mr. Mansour do as opposed to say, what did he do when you asked him -- when you made this request of him?

***A.*** **He said he would have to think about it. And then I pressed**

**a little bit more and said we really would like to talk to him today. And so he said, well, can I --**

***MS. BERNSTEIN:*** Objection. 802.

***THE COURT:*** Sustained.

***BY MR. OLAH:***

***Q.*** I'll ask actions here. I'm trying to avoid anything Mr. Mansour might have said in this conversation. Okay?

***A.*** **Okay.**

***Q.*** Did Mr. Mansour leave the room after you made this request?

***A.*** **Yes.**

***Q.*** What did you observe him do? Again, not what did he say, but what did you observe him do?

***A.*** **He used his phone to contact --**

***MS. BERNSTEIN:*** Objection. 602.

***THE COURT:*** Sustained.

***BY MR. OLAH:***

***Q.*** Did you see him use his phone?

***A.*** **Yes.**

***Q.*** Did you hear any word that he said on that phone?

***A.*** **No.**

***Q.*** Was -- did you observe him from afar?

***A.*** **Yes.**

***Q.*** Did Mr. Mansour return to the room you were speaking to him in?

***A.*** **Yes.**

**Q.** Was he amenable to placing a call to Dr. Arabi?
**A. Yes.**
**Q.** Did you, in fact, get Dr. Arabi on a phone call in May of 2017?
**A. Yes.**
**Q.** Was that with the assistance of Mr. Mansour?
**A. Yes.**
**Q.** Who, if anyone else, was in the room when you placed this call or when you got -- when you spoke with Dr. Arabi?
**A. Mr. Mansour stayed in the room, and I also had Anthony Schmidt and Sean McKenzie, who are two members of the Employee Relations team that were helping me take notes.**
**Q.** Did you personally take any notes on the call?
**A. I did not because I was focusing on the conversation with Mr. Arabi, or Dr. Arabi.**
**Q.** Did Mr. McKenzie or Mr. Schmidt take notes?
**A. Yes.**
**Q.** You said you weren't taking notes so you could focus on the call.
Did I hear that right?
**A. Yes.**
**Q.** Were you the primary one doing dialogue with Dr. Arabi during the conversation?
**A. Yes.**
**Q.** Did you audio record the phone call?

*A.* **No.**

*Q.* Why not?

*A.* **That's not what we do at Qualcomm when we have internal investigations. We feel like it creates an environment of ill-will sometimes. And so we wanted to have an open dialogue, and we were taking notes of the conversation instead.**

*Q.* As a matter of course at ER, you do not record employee or former employee interviews. Is that right?

*A.* **That's correct.**

*Q.* Okay. Getting to the substance of that call, did you ask Dr. Arabi about Abreezio?

*A.* **Yes.**

*Q.* And what did he say about his involvement in Abreezio?

*A.* **He said he was not involved.**

*Q.* Did he -- did you ask about his sister?

*A.* **I did.**

*Q.* What did Dr. Arabi say about his sister?

*A.* **At one point he said that she had -- she had created the technology and that she had licensed the technology to Abreezio, and then he also said that she was an investor in Abreezio.**

*Q.* You say "at one point."

Was that -- were those answers that you just relayed kind of throughout the conversation?

*A.* **Yeah. It changed a little bit throughout the conversation.**

*Q.* Did Dr. Arabi make any statements about disclosing to

Qualcomm his sister's connection to Abreezio?
A. **He did discuss that.**
Q. What did Dr. Arabi say on that topic?
A. **He said that he did not disclose the relationship that his sister had with Abreezio because he felt that it wasn't his immediate family and he didn't think he had a need to disclose that.**
Q. Did you ask if Dr. Arabi helped to further or advance Abreezio's technology?
A. **I did.**
Q. What did Dr. Arabi say in response?
A. **He said something to the effect of clearly not, or of course not. He was very definitive in saying he did not have any involvement.**
Q. Did he mention Sanjiv Taneja?
A. **He did.**
Q. What did Dr. Arabi in this phone call say about Sanjiv Taneja?
A. **He said that he had had a professional relationship with him over the years and that Sanjiv would reach out from time to time to get mentorship, coaching, discuss different projects that he was working on, and that Sanjiv was the CEO of Abreezio.**
Q. Did he say anything about the connection between Sanjiv Taneja and his sister?
A. **Yes.**

*Q.* Did he say anything about how those two people came to know each other?
**A. Yeah. He said that he was the one that connected them. Because of the technologies they were working on, he felt like it was a natural fit.**
*Q.* "He" being Dr. Arabi?
**A. Dr. Arabi said that, yes.**
*Q.* Just to clarify, said that he connected Sanjiv and Dr. Arabi's sister?
**A. Correct.**
*Q.* And instead of saying Dr. Arabi's sister over and over again, did he provide a name or do you know the name of the sister?
**A. Yeah. It was Sheida Alan, and she also went by Sheida Arabi.**
*Q.* For purpose of our conversation, can we refer to her simply as Sheida?
**A. Yeah.**
*Q.* Thank you.
Did Dr. Arabi in this telephone interview mention Brad Quinton?
**A. Yes.**
*Q.* What did Dr. Arabi say about Brad Quinton?
**A. He explained that they had had a relationship over the years. They had worked at a company together in the past, that**

**he talked to Brad from time to time. He would come to him with questions similar to Sanjiv about mentorship, different business ideas, but that he didn't -- didn't work with him other than that one stint at -- I can't remember the name of the company they worked together at previously. But they had worked together at the same company.**

***Q.*** And certainly not Abreezio; right?

***A.*** **No, not Abreezio.**

***Q.*** Did Dr. Arabi say how Mr. Quinton got involved Abreezio?

***A.*** **He said that there was a company that Mr. Quinton owned or had a part in previously that was called Invionics and that Invionics essentially merged or became Abreezio.**

***Q.*** Did he say anything about the relationship between Brad Quinton and Sanjiv Taneja?

***A.*** **He did.**

***Q.*** What did he say?

***A.*** **He said that it was possible he may have connected them. He wasn't sure the details of how they hooked up. But he knew that Mr. Quinton was working with Mr. Taneja.**

***Q.*** Did you ask Dr. Arabi a question about metadata?

***A.*** **Yes.**

***Q.*** Why did you ask -- well, what did Dr. Arabi say in response to your question about metadata?

***A.*** **He -- my recollection is he wasn't sure what I was asking about or why I needed to know that.**

*Q.* Okay. Did you ask if Dr. Arabi knew of investors in Abreezio?

***A.*** **Yes.**

*Q.* What did he say in response?

***A.*** **He said he knew a few -- who a few people were. He knew his sister was an investor. And he knew some of -- some of the other investors but that he wasn't intimately involved with it.**

*Q.* Did you ask if Dr. Arabi knew Akbar Shokouhi to be an investor?

***A.*** **I did.**

*Q.* What did he say?

***A.*** **He said that he knew of Akbar but that he tried not to deal with him too much outside of a business perspective.**

*Q.* Do you recall how long you spoke with Dr. Arabi on the phone that day?

***A.*** **It was probably somewhere between 30 and 60 minutes.**

*Q.* Was Ziad Mansour in the room the whole time?

***A.*** **Yes.**

*Q.* Did you attempt to get another interview with Dr. Arabi?

***A.*** **I did.**

*Q.* What did you do to arrange such an interview?

***A.*** **About a month after our initial conversation, I called him on his cell phone and asked if we could arrange a meeting. And then I followed up with an email to try to set up a date.**

*Q.* Did you want another telephone interview, or were you hoping

for a face-to-face interview?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Overruled.

***THE WITNESS:*** I was hoping for an in-person meeting with him.

***BY MR. OLAH:***

***Q.*** Why a preference for an in-person meeting?

***A.*** **One, I think that just helps the conversation move along in a little bit more of a collaborative manner. And, two, we had some documents and things that we wanted to be able to show him and get his perspective on.**

***Q.*** Were you ever able to get him in for an in-person meeting?

***A.*** **We were not.**

***Q.*** Were you ever able to get him on the phone again?

***A.*** **No.**

***Q.*** Did you receive an email from Dr. Arabi subsequent to your phone call?

***A.*** **Yes.**

***MR. OLAH:*** If we could show the witness an exhibit -- and the witness only, please, Exhibit 537. I believe this spans two pages. If we could show the witness page 2 rather. Oh, three pages. Excuse me. And page 3 as well for the witness.

***BY MR. OLAH:***

***Q.*** Ms. Wilson, do you recognize the three-page exhibit that is 537?

**A. I do.**

*Q.* What is it?

**A. It's an email that I sent after the quick phone call to Dr. Arabi where we went back and forth as I was trying to arrange a meeting with him.**

***MR. OLAH:*** If we could go back to page 1.

***BY MR. OLAH:***

*Q.* You mentioned your email.

Did Dr. Arabi respond to some of your emails?

**A. He did.**

*Q.* Is this a fair and accurate copy of your email exchange with Dr. Arabi?

**A. Yes.**

***MR. OLAH:*** Your Honor, at this time the Government would move to admit Exhibit 537.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** 802.

***THE COURT:*** Overruled. It may be admitted.

***(Exhibit 537 admitted.)***

***BY MR. OLAH:***

*Q.* Okay. Ms. Wilson, if we could actually call out just the header information in this one in the middle. A little further down. Thank you.

Instead of -- does this message we are looking at here, is it preceded by a back and forth with Dr. Arabi?

***A.*** **It is.**
***Q.*** Documenting your efforts to meet with him again?
***A.*** **Yes.**
***Q.*** And looking at the header information here, who sent this email?
***A.*** **Dr. Arabi sent this to me.**
***Q.*** From what email address?
***A.*** **Karim@atlazo.com.**
***Q.*** Okay. On what date did he send this email?
***A.*** **Thursday, June 22nd, 2017.**
***Q.*** Do you recognize the two Qualcomm.com email addresses?
***A.*** **Yes.**
***Q.*** One of them yours?
***A.*** **One of them is mine.**
***Q.*** What's the subject line?
***A.*** **"Re: Meeting."**
***MR. OLAH:*** If we could call out the body of the email that we're looking at.
***BY MR. OLAH:***
***Q.*** Okay. Very long paragraph. Right?
Ms. Wilson, what did Dr. Arabi claim in this first sentence?
***A.*** **He essentially was saying that -- he reiterated, as he discussed a month ago, that he did not have any financial interest in Abreezio and he had no meaningful involvement in the transaction between Qualcomm and Abreezio.**

*Q.* So just breaking down that first clause, does he reference your phone call with him a month prior?

**A. Yes.**

*Q.* Is that your recollection, that that interview that we were talking about moments ago preceded this email by about a month?

**A. It was about a month, yeah.**

*Q.* Okay. And is he basically restating his position that he did not have a financial interest in Abreezio?

**A. That's correct.**

*Q.* And again, is that what he told you back in your phone interview?

**A. Yes.**

*Q.* And the second sentence beginning "My younger sister Sheida," what does he claim?

**A. That she had a significant ownership stake in Abreezio, but his understanding was that her interest in Abreezio was disclosed to Qualcomm at the time of the acquisition.**

*Q.* Does he in the next sentence -- what's he claim in the third sentence, Ms. Wilson?

**A. That no one from Qualcomm ever asked him about his sister's involvement, about the transaction itself, or about any of the technology that Abreezio was bringing in.**

*Q.* Ms. Wilson, we were talking earlier about Qualcomm's Code of Business Conduct and other agreements.

Is it incumbent upon employees to report their connection?

**A. It is.**

Q. And here he is saying, well, nobody from Qualcomm ever asked me?

**A. That's correct.**

Q. Moving further down to the sentence beginning "I have already shared my recall."

Do you see that sentence?

**A. I do.**

Q. And can you read to yourself the one after it, too.

***(Pause.)***

**A. Okay.**

Q. Dr. Arabi, did he express interest in talking to you again?

**A. No.**

Q. And again, were you able to get Dr. Arabi on the phone after this email?

**A. No.**

Q. Looking to the sentence beginning "Especially," can you read that to yourself?

**A. Okay.**

Q. Does Dr. Arabi claim to know when his sister started working on the technology?

**A. Yes.**

Q. And what does he claim about that time period?

**A. He claims that he was working at another company, Dialog Semiconductor, and that he was traveling around the world.**

***Q.*** Is that the place he was employed in between his two stints at Qualcomm?

***A.*** **I believe so. That's --**

***MS. BERNSTEIN:*** Objection. 602.

***THE COURT:*** Sustained.

***BY MR. OLAH:***

***Q.*** And this next one, I'm going to ask you to read the last little clause up there, "As mentioned over the phone." And then we're going to call out -- the paragraph spills over to the next page, so bear with us.

Does he state "You are welcome to send me any" on this page?

***A.*** **Yes.**

***MR. OLAH:*** Page 2, please. Calling out. Thank you.

***BY MR. OLAH:***

***Q.*** Ms. Wilson, what was Dr. Arabi proposing in that penultimate sentence in this email?

***A.*** **He was asking me to send him written questions that he could respond to via email rather than meeting with him.**

***MS. BERNSTEIN:*** Objection. That's not what the document says.

***THE COURT:*** Overruled.

***BY MR. OLAH:***

***Q.*** You wanted to meet face-to-face with Dr. Arabi; right?

***A.*** **Yes.**

***Q.*** Was he willing to do that?

**A. No.**

*Q.* Was he willing to do another phone call with you?

**A. No.**

*Q.* Instead he proposed that you send him written questions and he send you written responses. Is that right?

**A. Correct.**

*Q.* Did you send him written questions?

**A. I did not.**

*Q.* I want to ask questions about both this email and your phone call with Dr. Arabi.

In either of those communications, did Dr. Arabi say that all he did was submit provisional patent applications on Sheida's behalf?

**A. No.**

*Q.* What was his claim about his involvement with Abreezio?

**A. He said he had none.**

*Q.* Did Dr. Arabi claim in either the phone call or in the email that Sheida's provisional patent applications were worthless and abandoned by the engineers at Invionics?

**A. No.**

*Q.* Did Dr. Arabi claim that Sheida had come up with one building material and Abreezio went with a completely different building material?

**A. No.**

*Q.* Did Dr. Arabi try to justify any involvement with Abreezio

based on some people at Qualcomm allegedly knowing about it?

**A. No.**

***Q.*** Did Dr. Arabi say that his involvement with Abreezio was fine because the technology that Qualcomm acquired ended up saving it money?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Sustained.

***BY MR. OLAH:***

***Q.*** You were never able to talk to Dr. Arabi again after the email?

***MS. BERNSTEIN:*** Objection. Asked and answered.

***THE COURT:*** Sustained.

***MR. OLAH:*** No further questions. Thank you, Ms. Wilson.

***THE COURT:*** Cross-exam?

***MS. BERNSTEIN:*** Thank you, your Honor.

***CROSS-EXAMINATION***

***BY MS. BERNSTEIN:***

***Q.*** Good afternoon, Ms. Wilson.

**A. Hello.**

***Q.*** You've been in HR, or is it ER at Qualcomm? What's the preferred term?

**A. I'm currently -- the department is Employee Relations or ER, but as part of the human resources or HR department overall.**

***Q.*** If I use them interchangeably, you will understand what I'm meaning or correct me if you don't?
***A.*** **Yes.**
***Q.*** Thank you.
So you've been the senior director of Employee Relations.
That's your current title?
***A.*** **Yes.**
***Q.*** And you've been in HR at Qualcomm for 18 years?
***A.*** **Yeah, in April it will be 18 years.**
***Q.*** And you've -- I think you said a master's in industrial or organizational psychology?
***A.*** **Yes.**
***Q.*** And have you completed certification programs for HR?
***A.*** **I've taken lots of trainings over the years.**
***Q.*** Do you have to -- do you take ongoing trainings?
***A.*** **Yes.**
***Q.*** Do you have some requirement you have to submit to every year to maintain sort of --
***A.*** **Not a specific requirement, no.**
***Q.*** So you just do ongoing certification programs for your own benefit to stay on top of things?
***A.*** **Trainings, yeah. Some of them may require certification, some of them may not.**
***Q.*** Do you attend HR conferences?
***A.*** **Yes.**

***Q.*** And do you otherwise stay up to date on the latest HR trends?
***A.*** **Yes.**
***Q.*** Have you reviewed numerous employee résumés throughout your career?
***A.*** **Yes.**
***Q.*** Approximately how many would you say?
***A.*** **Hundreds or thousands.**
***Q.*** Do you also interview employees for job positions?
***A.*** **From time to time.**
***Q.*** Approximately how many candidates have you interviewed in your career?
***A.*** **For hiring purposes, or what type of interviews?**
***Q.*** Yeah, for hiring purposes.
***A.*** **For hiring purposes --**
***Q.*** Do you do those interviews?
***A.*** **Yeah, when they're within my department or they're positions that relate to my team.**
***Q.*** And approximately how many candidates have you interviewed for positions in your career?
***MR. OLAH:*** 401, your Honor.
***THE COURT:*** Overruled.
***THE WITNESS:*** I wouldn't have a good guess at the number.
///

***BY MS. BERNSTEIN:***

***Q.*** Hundreds and thousands like the résumés, or a smaller yield?

***A.*** **It would be a smaller number than that.**

***Q.*** Is it fair to say that it's not uncommon for employees to exaggerate their qualifications or their backgrounds on résumés?

***A.*** **I would hope not.**

***Q.*** You would hope that they do not do that?

***A.*** **Correct.**

***Q.*** Are you familiar with the statistic that the percentage of employees that embellish, exaggerate, or outright lie is as high as 60 percent?

***MR. OLAH:*** 401, your Honor.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** In your experience, have you seen people embellish, exaggerate, or outright lie about their qualifications on their résumés?

***A.*** **From time to time.**

***Q.*** In 18 years, reviewing thousands of résumés?

***A.*** **From time to time.**

***Q.*** Do you think it's higher in other industries besides your own?

***A.*** **I wouldn't know.**

***Q.*** And the point of a résumé is to find a new job. Would you agree?

***A.*** **Most of the time.**
***Q.*** To put your best foot forward and show you're a good match for the position?
***A.*** **Yeah. You're trying to match to the position that you're being considered for.**
***Q.*** Have you noticed that people tend to exaggerate more about things that are verifiable such as the number of people they manage and the length of their employment at a previous job?
***A.*** **I don't know that I do.**
***MR. OLAH:*** 401, your Honor.
***THE COURT:*** Sustained.
***BY MS. BERNSTEIN:***
***Q.*** Lies alone are not illegal. Would you agree?
***A.*** **Unless they're breaking a law.**
***Q.*** Lies on a résumé are not illegal?
***A.*** **If it's fraud. I think it would depend on the circumstances.**
***Q.*** When you've reviewed résumés from time to time that have contained lies, have you referred those for criminal prosecution?
***MR. OLAH:*** 401 at this point, 403.
***THE COURT:*** Sustained.
***BY MS. BERNSTEIN:***
***Q.*** You conduct internal investigations?
***A.*** **Yes.**

***Q.*** How many have you conducted?

***A.*** **Hundreds.**

***Q.*** Into ethics violations?

***A.*** **That's one area.**

***Q.*** Employee relationships?

***A.*** **Employee relationships? Can you describe?**

***Q.*** Sure. Improper sexual relationships between employees, is that something you've conducted investigations into?

***A.*** **I have.**

***Q.*** More than one?

***A.*** **Yes.**

***Q.*** How many would you say?

***MR. OLAH:*** 401, 403, your Honor.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** How many witnesses do you interview per investigation on average?

***MR. OLAH:*** 401, 403, your Honor.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** If you interview someone and they are untruthful, does that have repercussions for their employment?

***A.*** **It can.**

***Q.*** And when you say "it can," what does it depend on?

***A.*** **A variety of things. We assess the overall credibility of**

**all that are involved in an investigation, including everyone that we interview. We look at different documentation. We understand what is likely to be the truth in an investigation and how forthcoming people are. If there's information that completely contradicts what they're saying, that could work against them in an investigation as we're just trying to determine what our appropriate actions to take at the conclusion of the investigation.**

***Q.*** And so when someone is not truthful, in what situations did that have repercussions for their employment?

***A.*** **It would depend on the situation. Qualcomm is a company that's really based on trust, and one of our values is do the right thing. And so when people are untruthful or non-cooperative in internal investigations, we take that very seriously.**

***Q.*** And as an HR person, in a company whose core value is one of trust, as you just said, you were aware of the class action that was filed against Qualcomm on behalf of approximately 3300 women, that was settled in July 26th of 2016?

***MS. CHOPRA:*** 401, 403, your Honor.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** As the senior director of Employee Relations, you know that Qualcomm has promised a series of changes to improve the way that they treat women at Qualcomm?

***MR. OLAH:*** 401 and 403, your Honor.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** Your job, you testified in part, is to ensure that employees feel safe; correct?

**A. Correct.**

***Q.*** And as part of your job, do you ever have to comply with class action settlement mandates?

**A. Sorry, can you say that one more time?**

***Q.*** As a part of your job in ensuring that Qualcomm employees feel safe at work, do you have to comply with class action settlement mandates?

***MR. OLAH:*** 401, 403, your Honor.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** You testified that your department first opened its investigation because a Qualcomm employee, Mr. Kechichian, came to you in late 2016. Is that right?

**A. He came to one of my employees, yeah.**

***Q.*** And I'm sorry, your understanding is that he came to one of your employees?

**A. Yes.**

***Q.*** And at the time your department was investigating Mr. Kechichian; correct?

**A. There was another investigation happening, yes.**

*Q.* Project Falcon?

***A.* It may have been called that. I can't remember the exact name.**

*Q.* You had received a tip that he was involved in several inappropriate relationships with other Qualcomm employees?

***A.* That was the allegation.**

*Q.* With as many as three different women?

***A.* That was the allegation, yeah.**

*Q.* Who were his subordinates?

***A.* Some were, some were not.**

*Q.* And you keep mentioning this was the allegation. He in fact admitted this, didn't he?

***A.* Throughout the course of the investigation, we did find that there was at least two relationships. A third one was non-confirmed.**

*Q.* And he admitted or denied that third relationship?

***A.* That one, I don't think he confirmed that, nor did the other person that was alleged to be in the relationship.**

*Q.* And it was during an interview as part of Project Falcon into these dalliances of Mr. Kechichian's that he first raised concerns about Abreezio. Is that right?

***A.* Yes.**

*Q.* And he at the time had indicated that he learned of this from another employee?

***A.* Yes.**

***Q.*** And do you remember that individual to have been Mohamed Allam?

***A.*** **Yes.**

***Q.*** And Mohamed Allam had blurted out these allegations to Mr. Kechichian?

***A.*** **I don't know the circumstances of how he spoke to Mr. Kechichian.**

***Q.*** That's what Mr. Kechichian told you; right?

***A.*** **I don't think I specifically talked to Mr. Kechichian about the concerns. It was more of my employee that was interviewing him.**

***Q.*** And your employees report to you?

***A.*** **Yes.**

***Q.*** And they provide you written reports of what they've been doing?

***A.*** **Yes.**

***Q.*** And you read those?

***A.*** **Yes.**

***Q.*** And you learned that Mr. Kechichian claimed that Mr. Allam blurted out these allegations?

***A.*** **I don't recall the word "blurted," but I do recall that that was relayed from Mr. Kechichian, that he had heard those allegations from Mr. Allam.**

***MS. BERNSTEIN:*** Okay. Well, we'll show you 3210, please, just to the witness.

*(Pause.)*

***MS. BERNSTEIN:*** We'll come back to that. One moment.

***BY MS. BERNSTEIN:***

***Q.*** So you learned that it was Mr. Allam, according to Mr. Kechichian, who made the allegations against Dr. Arabi and Mr. Mansour?

***A.*** **The allegations were about Abreezio?**

***Q.*** I'm sorry. Did you learn from Mr. Allam -- did you learn from Mr. Kechichian that Mr. Allam was the one who made these allegations?

***A.*** **Yes.**

***THE COURT:*** "These allegations," you're talking about allegations against Arabi and Mansour or allegations about Abreezio?

***MS. BERNSTEIN:*** Either. The allegations that we -- that Qualcomm litigated --

***THE COURT:*** I think that's what she was trying to clarify.

***BY MS. BERNSTEIN:***

***Q.*** Do you have clarity on my question?

***A.*** **Yes. So he -- my understanding is that Mr. Allam is the one that raised concerns about the Abreezio allegation to Mr. Kechichian.**

***Q.*** And when do you understand that to have actually occurred?

***A.*** **When Mr. Allam raised the concerns?**

*Q.* Yes.
***A.* I believe it was in the summer of 2016.**
*Q.* And when did Mr. Kechichian relay these concerns that Mr. Allam had allegedly blurted out to him in the summer of '16?
***A.* He raised them to his boss at the time, Jim Thompson, right away. And then ultimately they got raised to Employee Relations in the fall of 2016.**
*Q.* So I'm sorry, it's your testimony that Mr. Thompson, who was the CTO of Qualcomm, sat on these allegations for months?
***A.* No. He asked Mr. Kechichian to look into them.**
*Q.* Is he in the Employee Relations department?
***A.* No. He asked him to look into the due diligence and the details of the Abreezio acquisition.**
*Q.* And never mentioned anything about these claims to the employee relation department?
***A.* Who didn't?**
*Q.* Mr. Thompson.
Is that your testimony?
***A.* We heard about it in the fall of 2016.**
*Q.* Not from Mr. Thompson.
So is your testimony that Mr. Thompson learned about this in the summer of '16 and never said anything to anyone in the Employee Relations department?
***A.* In Employee Relations, no. I don't know if he said anything to anyone else.**

***Q.*** Well, you're in the employee relations department; right?

***A.*** **Yeah. I'm saying I don't know outside of employee relations if he raised anything to anyone else at the company.**

***Q.*** Okay. That wasn't my question. Let me clarify.

You testified that Mr. Allam allegedly raised these concerns to Mr. Kevork in the summer of '16; correct?

***A.*** **Correct.**

***Q.*** And it's your testimony that right away Mr. Kechichian went and told Mr. Thompson; correct?

***A.*** **That's my understanding.**

***Q.*** And Mr. Thompson never said anything to anyone in the employee relations department.

That's your testimony?

***A.*** **Not that I was aware. I was not leading the department at that time, so I was not aware of it.**

***Q.*** But you were the lead on this project, I think you just told Mr. Olah; right?

***A.*** **Once it was raised to my team to investigate. I was not the lead of employee relations at that time. I was the lead of a group within employee relations, and then I reported in to someone else. So it could have been related to someone that I wasn't aware of at that time.**

***Q.*** Okay. You're the lead of Project Gopher, yes or no?

***A.*** **I'm the lead of Project Gopher, which started in November.**

***Q.*** Which started in November when Mr. Kechichian is being

investigated for sexual dalliances with subordinates; correct?

**A. As a separate concern, yes.**

*Q.* Someone is interviewing him about Project Falcon; right?

**A. Correct.**

*Q.* And he says look over here; right?

**A. Yeah.**

*Q.* And then you become the lead on Project Gopher?

**A. Correct.**

*Q.* And it's your testimony that you have no idea about anything that happened prior to that moment in time.

Is that your testimony?

**A. About Project Gopher?**

*Q.* Correct.

**A. It didn't exist until that point in time.**

*Q.* About these allegations?

**A. No, I did not.**

*Q.* And you didn't go back in time to figure out what was known before November of 2016?

**A. Well, of course. That's part of an investigation. But we didn't --**

*Q.* And so is it your testimony that Mr. Thompson learned of these allegations in the summer of 2016, and the CTO of Qualcomm never whispered a word of this to anyone in the employee relations department?

**A. I don't believe he was CTO at that time. And I -- again, I**

**had one piece of employee relations at that time. But there was a broader department that I reported to. So I can't speak to if Mr. Thompson shared that with anyone else in employee relations other than what I'm aware of.**

***Q.*** But Ms. Wilson, surely you would have known that when you became lead on Project Gopher, right, and you researched its historical origins and what was known at what point in time?

***A.*** **Of course we would research that.**

***Q.*** And you, in fact, did that; right?

***A.*** **Yes.**

***Q.*** And so is it your testimony that Mr. Thompson learned of this in the summer of 2016 and never breathed a word of it to anyone?

***A.*** **I don't know that -- I can't say if Mr. Thompson spoke to other people. I can only know that he asked Mr. Kechichian to look into it. They worked with our IT security team to gather information about the due diligence of Abreezio.**

**And what we put together as part of that historical look-back and investigation when Project Gopher started was that Kevork, or Mr. Kechichian, and Mr. Thompson were looking into the due diligence. And then eventually it got brought to employee relations, we got involved and we took over the investigation at that point.**

***Q.*** And you looked into the credibility of concerns?

***A.*** **Absolutely.**

*Q.* Did you interview Mr. Thompson?
***A.*** **Yes.**
*Q.* Did you interview Esin Terzioglu?
***A.*** **Yes.**
*Q.* And did you learn about the ongoing conflict between Mr. Kechichian, Mr. Mansour, and Esin?
***A.*** **Which conflict are you referring to?**
*Q.* You learned about multiple ongoing conflicts between the three of them?
***A.*** **No. It was eight years ago. I'm trying to have you refresh my memory.**
*Q.* You learned that Mr. Kechichian blamed Ziad for the ER investigation?
***A.*** **Oh, yeah. I guess he did think that there was something potentially going on there.**
*Q.* And you learned that he also said he was vindictive and he wanted to get back at Mr. Mansour and Mr. Terzioglu by having Abreezio investigated?
***A.*** **Sorry. Who was vindictive?**
*Q.* Mr. Kechichian said he was vindictive, and you learned that he wanted to get back at Mr. Mansour and Mr. Terzioglu?
***A.*** **Mr. Kechichian said he himself was -- sorry. I'm just trying to follow. Who --**
*Q.* You testified that as part of your due diligence, you're looking into the credibility of the concerns; right?

**A. Yes.**

*Q.* The credibility of the witnesses that are making these allegations?

**A. Yes.**

*Q.* So I'm trying to ask you about their credibility.

**A. Okay.**

*Q.* And so Mr. Kechichian had an ongoing conflict with Mr. Mansour and Esin and others. You learned about this in your investigation into the credibility of these concerns; right?

**A. I don't know that I would say an ongoing conflict. I think that there was tense relationships from time to time.**

**And so one of the things that we looked into, as Mr. Kechichian raised concerns, because it could look a little odd of we're investigating you for something and then you raise concerns which might feel like, hey, we're trying to throw you off the trail of these concerns here.**

**But what I can tell you is that that's why Project Gopher opened, is there are two separate concerns. When we looked into the concerns that Mr. Kechichian brought up to us, separate from the investigation into his behavior, is that we found, hey, there probably is something worth looking into here.**

*Q.* Okay. We can talk about that.

But my question is, as part of evaluating the credibility of the witnesses and the concerns in your lead of Project Gopher, you learned about the ongoing conflict between Mr. Kechichian,

Mr. Mansour, Mr. Terzioglu, and others. Yes or no?

**A. I'm just having trouble trying to understand the ongoing conflict. What --**

Q. Did you learn about an ongoing conflict? It sounds like you didn't.

**A. They were having trouble getting along.**

Q. Okay. Would you describe anything else you learned?

**A. Not that I can recall.**

Q. So all you learned was that they were having trouble getting along.

**A. That's my recollection. But again, it was eight years ago.**

Q. Well, you've prepared for your testimony today; right?

**A. I have. But I --**

Q. You've refreshed a lot of documents?

**A. I did.**

Q. You've looked at all your notes from back then?

**A. Yes.**

Q. You've looked at your colleagues' notes from back then?

**A. Yes.**

Q. You've met with the Government a few times?

**A. Yes.**

Q. So you're refreshed to some extent; correct?

**A. On certain topics, yes.**

Q. Okay. And you, I think said, you did learn that Mr. Kevork blamed Mr. Mansour for his personal investigation,

Project Falcon?

***A.*** **Yes.**

***Q.*** And did you -- do you recall that Mr. Kechichian said that he was vindictive, that he himself was vindictive?

***A.*** **I don't recall that.**

***Q.*** And do you recall that Mr. Kechichian said he wanted to get back at Mr. Mansour and Mr. Kevork *[sic]* by investigating Abreezio?

***A.*** **I don't recall that.**

***Q.*** And do you recall that he was making noises about Abreezio's technology until results in the beginning of 2017 showed that it was performing exactly as expected?

***MR. OLAH:*** I'm going to object on a compound question there, your Honor.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** Do you recall that Mr. Kevork was complaining about Abreezio?

***A.*** **Yes.**

***Q.*** Do you recall that he stopped complaining about Abreezio's technology when he learned in the beginning of 2017 that it was performing as expected?

***A.*** **I don't recall the specifics.**

***Q.*** Would all of those things have been relevant to your investigation?

***A.*** **That he -- which things? Sorry.**

***Q.*** Whether he said he was vindictive, whether he said he wanted to get back at Esin and Ziad by investigating Abreezio, whether he stopped making complaints about Abreezio when he learned that the technology was performing as promised.

Would all of that have been relevant to your investigation and your assessment of the credibility of the concerns?

***A.*** **Absolutely.**

***Q.*** Because the motivations of the person making a claim matter.

***A.*** **Yeah, as part of the credibility analysis.**

***Q.*** And would inconsistencies in that person's story be taken into consideration?

***A.*** **Absolutely.**

***Q.*** Especially in an investigation built entirely around circumstantial evidence?

***A.*** **Yeah. We have to make determinations based on all the facts that we can gather.**

***Q.*** And after Mr. Kevork's -- excuse me -- Mr. Kechichian admitted to inappropriate romantic relationships with at least two individuals, was he terminated?

***A.*** **No.**

***Q.*** Once you opened an investigation into Qualcomm -- excuse me -- into Abreezio and Project Gopher, you began a forensic review of emails and chats of Dr. Arabi's personal cell phone; correct?

**A. Yes.**
Q. And that was in January and February of 2017?
**A. That sounds about right.**
Q. You reviewed text messages from his personal cell phone?
**A. It was connected through his computer. So we reviewed his computer, and he happened to have his text messages going through his computer. So we were able to access them.**
Q. So you reviewed his personal text messages?
**A. They were on his computer, yeah.**
Q. And you didn't segregate them?
**A. No, because they were on his Qualcomm machine.**
Q. Did you tell him that you were reviewing his personal phone?
**A. No.**
Q. Did you have any kind of subpoena to do that?
**A. No.**
Q. And despite all of this, you didn't find anything interesting on his phone, did you?
**A. There were some interesting conversations and things back and forth between former and current Qualcomm employees. So they were of interest. I don't remember the specific details.**
Q. So you did find things from his phone review?
**A. Yeah.**
Q. What did you do with those?
**A. They were part of the investigation.**
Q. So you logged those somewhere?

***A.*** **Our IT security team is the one that deals with all of that. I'm not sure of the ins and outs of how they catalog emails and text messages, those types of things. But they were captured as part of the investigation.**

***Q.*** And you provided those to Qualcomm's outside counsel at some point?

***A.*** **I would not have been involved with that. That's our internal counsel that works with our outside counsel.**

***Q.*** You provided them to your internal counsel?

***A.*** **They were part of the investigation documents, yes.**

***Q.*** And did you provide the investigation documents to your internal counsel?

***A.*** **Internal counsel is the one that helped -- like oversees the collection of those documents and guides IT security where to put that information. So I'm not involved in directing where the information goes. That's kind of a team within the legal department.**

***Q.*** Okay. But it's your testimony that you did find interesting things that you put those as part of the investigation, and that went where it went?

***A.*** **That was part of the investigation, yes.**

***Q.*** Dr. Arabi left Qualcomm in June of 2016 to form a startup company called Atlazo; correct?

***A.*** **That's my recollection, yeah.**

***Q.*** And it was enjoying success raising funds?

**A. I don't know.**

*Q.* Let's show you what's been marked as 3134.

Do you remember this article being discussed during approximately 2020 time frame?

**A. 2020?**

*Q.* I'm sorry, during the 2019 time frame.

**A. It's possible. Now that it's in front of me, it does look familiar. I don't recall the specifics around it. But it may have been discussed.**

*Q.* We can scroll. There's two more pages if that will help you.

Do you remember this image?

**A. I don't recall that image.**

***MS. BERNSTEIN:*** And I'm not sure how much text is on the last page, but we can go to that. Can we go back to the first page.

***BY MS. BERNSTEIN:***

*Q.* Does this refresh your memory that you knew that Dr. Arabi's startup company was enjoying success fund-raising?

**A. Yeah. It looks like it was.**

*Q.* And they were also -- his company was also getting talented engineers?

**A. Yes.**

*Q.* Some of whom had already left Qualcomm and took their talents to Atlazo by June of 2017?

***A.*** **Yes.**
***Q.*** And some of whom were still planning to do so?
***A.*** **That was our understanding, yeah.**
***Q.*** Thank you.
***MS. BERNSTEIN:*** Move to admit.
***MR. OLAH:*** 802, your Honor.
***THE COURT:*** Sustained.
***MS. BERNSTEIN:*** That's fine.
***BY MS. BERNSTEIN:***
***Q.*** Investigators reached out to Dr. Arabi in May of 2017 for the first time; correct?
***A.*** **I believe that's correct, yeah.**
***Q.*** And he had been no longer employed at Qualcomm for over a year, nearly a year?
***A.*** **Yeah, it was almost a year.**
***Q.*** And he was never a part of the due diligence team that evaluated the Abreezio products?
***A.*** **Correct.**
***Q.*** At the time that Abreezio was being acquired, he was in a different department, Corporate Research & Development?
***A.*** **Correct.**
***Q.*** And I think your testimony had been that he was not forthcoming to your mind in his interview with you. Is that right?
***A.*** **Yeah.**

*Q.* He was not under oath of course when he -- when you interviewed him, was he?
***A.* No.**
*Q.* And dishonesty to ER, while morally perhaps problematic, is not illegal. Would you agree?
***A.* Correct.**
*Q.* He also did -- do you remember Mr. Olah showed you the email exchange? We can pull it back up. It's 537.
Do you remember looking at this with Mr. Olah on direct?
***A.* Yes.**
*Q.* And Dr. Arabi does -- did say to you that he had voluntarily spoken to you and answered your questions; correct?
***A.* Yes.**
*Q.* And he invited you to send him any others that you had?
***A.* He did.**
*Q.* And you did not take him up on that offer?
***A.* That's correct.**
*Q.* And when you work in ER, you're aware under California law that any contract that restrains a person from engaging in a lawful business profession, trade, or business is void?
***MR. OLAH:*** 401, 403.
***THE COURT:*** Sustained.
***BY MS. BERNSTEIN:***
*Q.* You're aware that noncompetes are narrowly construed?
***MR. OLAH:*** Same objection.

***THE COURT:*** Same ruling.

***BY MS. BERNSTEIN:***

***Q.*** You're aware that your policies have to conform with California law?

***MR. OLAH:*** 401, 403.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** Do you have any awareness of whether or not your policies are vetted by your internal legal department?

***MR. OLAH:*** 401, 403, your Honor.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** Has Qualcomm changed its Code of Business Conduct since 2013?

***MR. OLAH:*** 401, 403, your Honor.

***THE COURT:*** I'll allow it.

***THE WITNESS:*** Code of Business Conduct is refreshed from time to time.

***BY MS. BERNSTEIN:***

***Q.*** And has it been refreshed after litigation in this case?

***A.*** **I don't know. The employee relations team doesn't own the Code of Business Conduct, but the compliance team does refresh it about every two years as kind of a normal schedule.**

***Q.*** When is the last time it was refreshed?

***A.*** **I believe it was last year.**

*Q.* After this case commenced? Would that timing be accurate?
**A. I don't know when this case commenced.**
*Q.* You don't know when this case commenced?
**A. With this specific -- are you talking about the investigation or are you talking about --**
*Q.* So you investigated Dr. Arabi starting in 2016, Project Gopher, in 2016; correct?
**A. Yes.**
*Q.* And then Qualcomm files a lawsuit against Dr. Arabi in 2017; correct?
**A. Yes.**
*Q.* And that lawsuit concludes by 2021, April-ish of 2021; correct?
**A. Maybe. I don't know the specific dates because that was more our legal team involved. I know it concluded at some point.**
*Q.* Well, you know that your outside counsel made referrals to the prosecutors to prosecute Dr. Arabi after the case had settled; right?
**A. I know that they shared information at some point. I don't know the timing of when one started and one ended.**
*Q.* Well, they were sharing that information to seek the Government to prosecute Dr. Arabi; right? You don't know why they were sharing that information?
**A. Well, that would make sense why they were sharing that**

**information. I wasn't involved in the conversations to make that decision.**

*Q.* But you were involved in the -- in preparing the presentation that went to the Government seeking prosecution of Dr. Arabi?

***A.*** **When the investigation took place, we wrapped up kind of all of our investigative details, and then there had been questions along the way, and I'm happy to answer those just like I am today. So I did, but I don't -- I don't know when it was formally referred.**

*Q.* At the time of Abreezio's purchase in 2015, Qualcomm's policy was if a Qualcomm employee is an active investor, he or she needs to disclose their interest; correct?

***A.*** **That sounds right.**

*Q.* And the policy at the time was that if they are a passive investor with less than five to 10 percent ownership, there is no requirement to disclose; correct?

***A.*** **Yes.**

*Q.* And at the time of the Abreezio acquisition in October of 2015, Qualcomm did not have a policy that said that you needed to disclose whether your sister has a financial interest in a transaction; correct?

***A.*** **Correct.**

*Q.* And you know that as part of the civil suit, Ms. Alan paid $47 million to Qualcomm?

**A. I know she paid something. I didn't -- I don't know the specific details of who paid what.**

*Q.* You didn't know that she paid 47 million-dollars to Qualcomm?

**A. I don't know if I ever was aware of the specific amount. I know there was a lot of money that was paid back.**

*Q.* Well, you're aware of how much money Ms. Alan received as part of the Abreezio transaction?

**A. Yeah. I think it was around 90 million, something like that.**

*Q.* And then you learned that she paid back 47 million, more than half?

**A. I know she paid something back. I don't --**

*Q.* You didn't know it was more than half?

**A. No.**

*Q.* Okay. And you knew that that was before -- that had all been taken care of before your department worked with outside counsel to ask the Government to prosecute Dr. Arabi; correct?

**A. Correct.**

*Q.* As part of your investigation in Project Gopher, did you ever look at a patent claims analysis that had been done prior to the acquisition of Abreezio?

**A. I don't recall the specifics.**

*Q.* Well, Qualcomm has a whole department that evaluates patents; right?

*A.* **Yes.**
*Q.* And one reason is to make sure that someone else won't come lay claim to a patent?
*A.* **Yeah.**
*Q.* And another reason is to evaluate the strength of a patent, particularly where it's an application?
*A.* **Yes.**
*Q.* And also particularly compare patents that are contemplated being acquired as compared to Qualcomm's own patent portfolio?
*A.* **Yes.**
*Q.* And you don't recall looking at a patent claims analysis here prior to the Abreezio acquisition?
*A.* **It's possible that it was part of the investigation. I don't remember the specific title of that right now.**
*Q.* But you did in fact see a document that compared claims between patents?
*A.* **There were so many things that we were looking at in that investigation. I don't recall that specific detail.**
*Q.* Well, do you recall that no patent analysis occurred here prior or post-acquisition?
*A.* **I don't remember.**
*Q.* In your investigation, did you undertake a patent claims analysis to see whether -- to analyze the provisional patent applications --
*A.* **Did I personally?**

*Q.* -- being put at issue, or did you ask anyone to do so on your behalf.

***A.*** **To look into patents?**

*Q.* To look into the two provisional patents that you were concerned about.

***A.*** **I personally certainly didn't. I'm not an engineer. I don't know anything about the technology. But I do recall that we enlisted other engineers to be able to look at Abreezio's technology and what it was bringing to the table in terms of what it was claimed to bring to the table.**

*Q.* That's different than the patents, though; right?

***A.*** **Maybe. I don't -- I'm not as familiar with patents as our patent department is.**

*Q.* Okay. You testified on direct about interviewing Ziad Mansour.

Do you remember that?

***A.*** **Yes.**

*Q.* And you learned that he thought that the technology was very good?

***A.*** **Yes.**

*Q.* That he thought the technology was saving Qualcomm billions of dollars?

***A.*** **I don't remember if he said billions, but he definitely thought there was monetary savings.**

*Q.* Can you quantify your memory of it?

***A.*** **I don't remember the specifics. But he was very, very high on the technology. He really believed in it.**

***Q.*** And he thought the due diligence was data driven?

***A.*** **He did believe that.**

***Q.*** He told you that he did everything by the book?

***A.*** **That sounds similar, yeah. He felt like the due diligence was solid.**

***Q.*** And he also explained to you that Qualcomm's pain points in the area were publicly known?

***A.*** **Yes.**

***Q.*** Because those pain points are to a certain extent widely known in the industry because they're every semiconductor chip company's problem; correct?

***A.*** **I don't know. I can't remember if he said that or not. And I'm not one to be able to comment on semiconductor chips. I work at Qualcomm but in HR.**

***Q.*** He told you that he thought that Brad Quinton and the Invionics team invented the technology?

***MR. OLAH:*** Your Honor, 802 as to what Ziad Mansour tells Ms. Wilson.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** Did you learn from your interview with Mr. Mansour that there was a belief that Brad Quinton and his team invented the technology?

***MR. OLAH:*** Your Honor, 802.

***THE COURT:*** Same ruling.

***BY MS. BERNSTEIN:***

***Q.*** Would it have mattered to you if someone you were investigating thought that Brad Quinton and his team invented the technology?

***A.*** **It would have been a point of data that we would consider in the investigation.**

***Q.*** Was it a point of data you considered in this investigation?

***A.*** **Yes.**

***Q.*** When this investigation started, do you recall being concerned that Mr. Quinton and his team might leave Qualcomm?

***A.*** **I think that concern was raised, yes.**

***Q.*** Because they were doing good work for Qualcomm at the time?

***A.*** **I think the management team was generally happy with them, yeah.**

***Q.*** You also interviewed Esin Terzioglu; correct?

***A.*** **Yes.**

***Q.*** And you were able to consider another data point that the value of the technology was above what Qualcomm paid for it?

***A.*** **Was above what Qualcomm paid for it? There was a variety of different valuations that we looked at. And I do think one area -- or one summary of that valuation showed it as performing better than expected. There were others that had different valuations and expectations.**

*Q.* But in 2017 when you interviewed Mr. Terzioglu, you learned that he did not have concerns about the technology?

**A. My recollection is he was generally happy with how things were turning out.**

*Q.* He was concerned as well that this investigation was going to cause the Invionics engineers to leave Qualcomm?

**A. He did have concerns that they needed the -- well, sorry. Let me back up. Invionics engineers or the Abreezio engineers?**

*Q.* The Abreezio engineers that were acquired as the key employees in the Unit Purchase Agreement in October of 2015.

**A. Okay. Yeah. So he -- he was worried about -- they were, you know, still newly acquired, and so he was worried about their integration into Qualcomm.**

**And so generally, there was some concern that any -- you know, any internal investigation is going to be somewhat disruptive when we're asking questions to people. And so I think they were generally concerned about the team and making sure that they continued to integrate into Qualcomm.**

*Q.* And they were concerned that if the team departed, this promising technology would fail?

**A. Yes.**

*Q.* You spoke with Mr. Mansour, and you directed him to call Dr. Arabi.

Was that your testimony or a fair summary of your testimony on direct?

***A.*** **Yes.**
***Q.*** Part of it.
Was he comfortable with that?
***A.*** **Mr. Mansour?**
***Q.*** Yes.
***THE COURT:*** Who was comfortable?
***BY MS. BERNSTEIN:***
***Q.*** Was Mr. Mansour comfortable with being directed to call Dr. Arabi, in your opinion?
***A.*** **He was a little taken aback by the request.**
***Q.*** Did you explain that it was suggested by the outside counsel you were working with?
***A.*** **Did I tell him that?**
***Q.*** Yes.
***A.*** **No.**
***Q.*** And I think you testified that you do not record calls as a matter of course to maintain an open dialogue. Is that right?
***A.*** **Yes.**
***Q.*** And when Mr. Mansour called Dr. Arabi, did you tell him that you were in the room to maintain that open dialogue?
***A.*** **Tell who that who was in?**
***Q.*** Dr. Arabi when he was on the phone.
***A.*** **Yeah.**
***Q.*** You told him that you were there with Mr. Mansour?
***A.*** **Mr. Mansour -- my recollection is Mr. Mansour is the one**

**that made the phone call.**

***Q.*** And shared that he was sitting in the room with the internal investigators at Qualcomm?

***A.*** **That's what I recall, yeah.**

***Q.*** And in your investigation, you learned that at least one senior vice president of Qualcomm indicated that he might have known Ms. Sheida Alan was Dr. Arabi's sister prior to the acquisition?

***A.*** **Sorry, who knew that?**

***Q.*** Your internal investigation learned that at least one senior vice president of Qualcomm might have known that Ms. Sheida Alan was Dr. Arabi's sister prior to the Abreezio acquisition?

***A.*** **I'm trying to remember. It's possible. I just don't remember the specifics right now.**

***Q.*** And all told, you've been investigating Dr. Arabi or participating in some form in this investigation for close to ten years. Is that right?

***A.*** **It's been about eight, yeah.**

***Q.*** Since 2016.

***A.*** **I guess, yeah, closer to -- yeah, time flies. Yeah.**

***Q.*** Is it fair to say that Qualcomm has invested quite a bit of time and resources into getting their pound of flesh here?

***MR. OLAH:*** Objection. Argumentative.

***THE COURT:*** Sustained.

///

***BY MS. BERNSTEIN:***

***Q.*** Is it fair to say that Qualcomm has invested a lot of time and resources into this investigation?

***A.*** **Yeah. It was a large acquisition.**

***Q.*** And you've in fact invested a lot of your own personal time into this over the past nine years?

***A.*** **I mean, my involvement really focused on the internal investigation that was back in 2016 and '17. I haven't had to spend a lot of time on it since we wrapped up the kind of internal personnel issues.**

***Q.*** It took up a lot of your time back then?

***A.*** **Yeah.**

***Q.*** And you've had ongoing meetings as we've established?

***A.*** **Yeah, from time to time.**

***MS. BERNSTEIN:*** No further questions.

***THE COURT:*** Redirect?

***MR. OLAH:*** Briefly, your Honor.

***REDIRECT EXAMINATION***

***BY MR. OLAH:***

***Q.*** Ms. Wilson, you were asked about Mr. Kevork Kechichian's credibility.

***A.*** **Mm-hmm.**

***Q.*** Did you consider that when you were investigating the Abreezio acquisition?

**A. Of course.**
*Q.* Did your investigation stop with Kevork Kechichian's allegation?
**A. No.**
*Q.* Did you conduct additional interviews?
**A. Yes.**
*Q.* Including with Dr. Arabi?
**A. Yes.**
*Q.* Did your investigation take into consideration Ziad Mansour's credibility?
**A. Yes.**
*Q.* And if he was that senior vice president that knew about Dr. Arabi's relation to Sheida Arabi, would that have mattered to your investigation?
**A. Yes.**
*Q.* You were asked about Qualcomm's policies on both direct and cross.

***MR. OLAH:*** I'd like to show the jury and the witness Exhibit 85, previously admitted, your Honor, page 17. And if we could call out that left side of the top half. Thank you, sir. All the way down.

***BY MR. OLAH:***
*Q.* Ms. Wilson, is this from the Code of Business Conduct that Dr. Arabi himself acknowledged?
**A. Yes.**

***Q.*** Does it state in part Qualcomm owns the rights to anything we developed while employed at Qualcomm?

***A.*** **Let me read it just to be sure.**

***Q.*** You can read it top to bottom. Don't let me put words in your mouth.

***A.*** **Thank you.**

***(Pause.)***

***A.*** **Okay. Can you ask your question one more time?**

***Q.*** Yeah. This policy make clear that Qualcomm owns technology created by its employees?

***A.*** **Yes.**

***Q.*** Is that widely understood within Qualcomm?

***A.*** **Yes.**

***MR. OLAH:*** You can take that down.

***BY MR. OLAH:***

***Q.*** When you got a chance to speak with Dr. Arabi, did he ever indicate any involvement with Abreezio?

***A.*** **No.**

***Q.*** He claimed that he put Sanjiv Taneja in touch with Sheida?

***A.*** **Correct.**

***Q.*** And then stepped away?

***A.*** **Yes.**

***MR. OLAH:*** Nothing further, your Honor.

***THE COURT:*** Anything further?

***RECROSS-EXAMINATION***

***BY MS. BERNSTEIN:***

***Q.*** You have the image that you just went over with Mr. Olah in your head still?

***A.*** **Yes.**

***MS. BERNSTEIN:*** Okay. So we're going to bring up Exhibit 3212, please. And we can go to the first page so you can recognize this first.

***BY MS. BERNSTEIN:***

***Q.*** Do you recognize this as the 2024 *Qualcomm Way?*

***A.*** **Yeah. The Code of Business Conduct, yes.**

***MR. OLAH:*** 401, 403, your Honor.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** Has the Code of Conduct changed over time?

***MR. OLAH:*** Asked and answered, your Honor.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** Is the language that Mr. Olah just showed you still in force today?

***MR. OLAH:*** 401, 403, your Honor.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** Are you familiar with the Code of Conduct as it exists today?

***MR. OLAH:*** 401, 403, your Honor.

***THE COURT:*** Sustained.

***MS. BERNSTEIN:*** No further questions, your Honor.

***THE COURT:*** May this witness be excused?

***MR. OLAH:*** Yes, for the Government.

***THE COURT:*** Thank you.

***THE WITNESS:*** Thank you.

***THE COURT:*** Should we take a 15-minute recess?

***MR. OLAH:*** That would be great, your Honor.

***THE COURT:*** Fifteen minutes, ladies and gentlemen. You're reminded you're not to discuss the case or do any research about the case. And we'll see you back in 15 minutes.

***(Jury out at 2:21 p.m.)***

***THE COURT:*** Okay. We're now outside the presence of the jury. My understanding is you have two more witnesses. Is that correct?

***MR. OLAH:*** We're down to one.

***THE COURT:*** Just one? I'm counting wrong. Okay. Who do we have left for today?

***MR. OLAH:*** Terrence Mycka, special agent with the FBI.

***THE COURT:*** And then just as far as timing, in general, so you'll put Mr. Taneja back on the stand on Monday. Is that the plan?

***MR. PILCHAK:*** That is, your Honor.

***THE COURT:*** What do you think the chances are that the

Government is going to finish with its case by the end of next week?

**MR. OLAH:** Very likely.

**MR. PILCHAK:** Pretty good.

**THE COURT:** Okay. Just so you have advanced notice.

**MS. BERNSTEIN:** Okay. We'll talk with them on the break about this. Thank you.

**THE COURT:** Anything else we need to put on the record? I just didn't want the defense to be flat-footed if they ended their case and make sure you're ready with your witnesses.

**MS. BERNSTEIN:** We appreciate that.

**MR. FRASER:** We do have a witness who is traveling and not available right now.

**MS. BERNSTEIN:** Yeah. We've been --

**MR. FRASER:** We will meet and confer.

**MS. BERNSTEIN:** We can go back on the record. We have been trying to figure out -- we do have out of town people as well, so we'll try and figure out the dates.

**THE COURT:** Okay. Fifteen minutes.

***(Recess taken.)***

**THE COURT:** We are back on the record outside the present of the jury. Dr. Arabi is present. All lawyers are present.

**MR. FRASER:** Thank you, your Honor.

Given Sanjiv Taneja's history of inconsistency in

statements and his bias, I foresee a need to recall, after his testimony, agents who are witnesses to his prior statements. That applies to Agent Mycka, who is about to testify. So I know in general the Court has expressed a strong preference to release them but I think --

***THE COURT:*** That's fine. I have less of a strong preference when it comes to law enforcement witnesses whose job includes, in part, testifying, as opposed to lay witnesses who are flying in from New York City.

***MR. FRASER:*** Thank you.

***MR. PILCHAK:*** Our only request, your Honor, we have no problem if it's evidentiarily appropriate to making him available to testify. But we would ask that he be relieved from the witness exclusion order after he testifies in our case-in-chief unless the Court feels very strongly about that.

***MR. FRASER:*** We would object to that.

***THE COURT:*** My concern is that I don't want him sitting through Taneja's testimony if the question is going to be something specific to what Taneja said.

***MR. PILCHAK:*** Can we just excuse him from Taneja's testimony, or do we need him excluded -- he is one of our case agents is the issue.

***MR. FRASER:*** You already have a case agent in the courtroom for the rest of it, don't you?

***MR. PILCHAK:*** Yes.

***THE COURT:*** I don't know that we need him in the courtroom.

Okay. Let's bring the jury in.

I am, just so you know, however, going to limit, if you recall him as a witness, limit him to rebuttal. So if there is something that -- you know, if you want him to explore something with respect to Taneja, you need to -- but if there is something that's already pending, you should deal with it now.

***MR. FRASER:*** Okay.

***(Jury in at 2:39 p.m.)***

***THE COURT:*** Okay. We are back on the record. All jurors are present. The lawyers and Dr. Arabi are present.

Government.

***MR. OLAH:*** Thank you, your Honor.

At this time the United States calls Terrence Mycka.

***THE CLERK:*** Good afternoon. Please stand here and raise your right hand.

***(Terrence Mycka duly sworn.)***

***THE CLERK:*** Thank you. Please take the stand.

Please state and spell your first and last name for the record.

***THE WITNESS:*** Terrence Mycka, T-e-r-r-e-n-c-e M-y-c-k-a.

***THE COURT:*** Thank you.

///

***DIRECT EXAMINATION***

***BY MR. OLAH:***

***Q.*** Good afternoon.

***A.*** **Good afternoon.**

***Q.*** Where do you work?

***A.*** **The Federal Bureau of Investigation.**

***Q.*** What do you do at the FBI?

***A.*** **I am a Special Agent.**

***Q.*** How long have you been a Special Agent with the FBI?

***A.*** **Approximately ten years.**

***Q.*** And what squad are you currently assigned to at the FBI?

***A.*** **I'm currently assigned to the complex financial crimes squad.**

***Q.*** Prior to being on the complex -- financial crimes?

***A.*** **Yes, or WC1.**

***Q.*** I was afraid I lost or swapped a word there.

What were you doing before that team?

***A.*** **I investigated health care fraud for about seven years.**

***Q.*** Are you familiar with the case United States vs. Arabi?

***A.*** **I am.**

***Q.*** Are you one of the case agents on that investigation?

***A.*** **Yes.**

***Q.*** Did you participate in a search of Dr. Arabi's residence?

***A.*** **Yes, I did.**

***Q.*** Did the FBI obtain a warrant to search that residence?

***A.*** **Yes.**

***Q.*** What was your role in relation to that search?

***A.*** **I was the search team leader that day.**

***Q.*** What is a search team leader?

***A.*** **The search team leader assigns the personnel that are going to be searching at the location, assigns them roles and responsibilities, briefs the team, and ensures that all of our search processes are being carried out and the search progresses.**

***Q.*** Prior to the search, do they think through logistics?

***A.*** **Yes.**

***Q.*** What about after the search, what kind of responsibilities do they have?

***A.*** **After the search, documenting the search in a report or a 302 is what we call it. And if you're the seizing agent, you transport evidence back to the office and provide it to our evidence team.**

***Q.*** Do you recall the date that you searched Dr. Arabi's residence?

***A.*** **Yes. August 9th, 2022.**

***Q.*** As part of that search, did the FBI seize physical documents from the residence?

***A.*** **Yes.**

***MR. OLAH:*** I'd like to show the witness what's been marked as Exhibit 836. It's not yet evidence so it should be

shown to the witness only.

***BY MR. OLAH:***

***Q.*** Agent Mycka, do you recognize 836?

***A.*** **I do.**

***Q.*** Generally, what is it?

***A.*** **It's a W-2 from the year 2015 from Qualcomm to Dr. Arabi.**

***Q.*** And are you familiar with this document?

***A.*** **I am.**

***Q.*** How so?

***A.*** **It was seized the day of the search, and I've reviewed it since then.**

***Q.*** Is this a fair and accurate copy of the W-2 seized from Dr. Arabi's residence?

***A.*** **Yes, it is.**

***MR. OLAH:*** Your Honor, move to admit Exhibit 836.

***MR. FRASER:*** 403 in part, your Honor.

***THE COURT:*** Sustained.

***MR. OLAH:*** Okay. Can I ask the witness about it at least, your Honor?

***THE COURT:*** I think we should take it up outside the presence of the jury. So why don't you move on and we'll discuss it.

***MR. OLAH:*** Of course, your Honor.

***BY MR. OLAH:***

***Q.*** Did you or the FBI seize a laptop from Dr. Arabi's

residence?
**A. Yes, we did.**
*Q.* What happened with the laptop from the time it was seized at the residence?
**A. It was taken to the regional computer forensics laboratory for it to be imaged.**
*Q.* And can you generally describe what it means to be imaged?
**A. The forensic examiners, known as the RCFL, they make a copy of the device.**
*Q.* Was this device successfully imaged?
**A. Yes.**
*Q.* Did you review files on the image of the device?
**A. Yes, I did.**
*Q.* Did you seize files from that image?
**A. Yes.**
*Q.* Can you give the jury an overview of the types of files that you seized?
**A. Sure. There were financial documents related to Dr. Arabi's companies, email communications. There were property records.**

***MR. OLAH:*** Your Honor, at this time, I'd like to read a joint stipulation to the jury.

***THE COURT:*** Okay. And again, ladies and gentlemen, if the parties stipulate to something, it means you must accept it as true.

***MR. OLAH:*** Thank you, your Honor.

The parties stipulate that Exhibits 754 to 767 are true and correct copy of documents found on Dr. Karim Arabi's laptop computer that agents seized from his residence on August 9th, 2022.

***BY MR. OLAH:***

***Q.*** Agent Mycka, prior to testifying today, did you review those exhibits I just referenced in the stipulation?

And for the record, that's 754 to 767.

***A.*** **Yes, I did.**

***MR. OLAH:*** I'd like to walk through those exhibits at this time, starting with 754, 755, and 756. If we could show each of those to the witness only, please.

***BY MR. OLAH:***

***Q.*** And can you go to 755, Agent Mycka? Can you see Exhibit 754?

***A.*** **I can see 754, yes.**

***Q.*** Thank you.

***MR. OLAH:*** We'll show 755 and 756, please.

***MR. FRASER:*** How many pages is 755?

***MR. OLAH:*** We can go back to 755, please. 755, for the record, is a seven-page document.

***BY MR. OLAH:***

***Q.*** Agent Mycka, do you recognize each of those exhibits?

***A.*** **Yes, I do.**

***Q.*** Is each a file that you found on Dr. Arabi's laptop?

**A. Yes.**

***Q.*** Are they true and correct copies of files found on the laptop?

**A. Yes.**

***MR. OLAH:*** Your Honor, at this time I'd move to admit and publish 754, 755, and 756.

***THE COURT:*** Any objection?

***MR. FRASER:*** 754, in part. Upper left corner of the first page.

***THE COURT:*** Let me see 754.

***MR. OLAH:*** Can you go to 754, please?

***MR. FRASER:*** 403.

***THE COURT:*** Overruled.

***MR. OLAH:*** Are those admitted, your Honor?

***THE COURT:*** They are admitted.

***MR. OLAH:*** Thank you. If we could please publish to the jury.

***(Exhibits 754-756 admitted.)***

***BY MR. OLAH:***

***Q.*** Agent Mycka, the jury can now see with you 754.

And just generally speaking, what are Exhibits 754, 755, and 756?

**A. Those three documents are documents related to real estate purchases or property purchases in Canada.**

***Q.*** Okay. And we've got 754 -- well, I should ask, why did you

seize documents related to real estate purchases in Canada?

**A. Well, it was in our search warrant attachment B, so we were able to seize real property records. But the -- through the course of the investigation, we learned that proceeds from the sale of Abreezio to Qualcomm that went to --**

***MR. FRASER:*** Objection. 602, 802.

***THE COURT:*** Overruled.

***MR. OLAH:*** You can continue your answer, Agent Mycka.

***THE WITNESS:*** Proceeds from the sale of Abreezio that went to Sheida Alan were used to purchase these properties.

***BY MR. OLAH:***

***Q.*** And you, as one of the case agents, was interested in those real estate transactions that followed?

**A. Yes.**

***MR. OLAH:*** Okay. If we could go to page 2, I believe, of 754.

***BY MR. OLAH:***

***Q.*** And is this a document relating to one of the properties in Canada?

**A. Yes, it is.**

***MR. OLAH:*** If we could go to Exhibit 755, page 2, please.

***BY MR. OLAH:***

***Q.*** What's the title on page 2, Agent Mycka?

**A. "Contract of Purchase and Sale."**

**Q.** Is there a date on this Contract of Purchase and Sale?
**A. Yes. It's February 28th, 2016.**
**Q.** And was that a few months after the Abreezio acquisition?
**A. Yes.**
**Q.** Who's the stated buyer on this Contract of Purchase and Sale?
**A. Sheida Alan.**
**Q.** And what's the property that's specified in this -- in this contract?
**A. It's 1421 Chartwell Drive.**
**Q.** In what city?
**A. West Vancouver.**
**Q.** Is there a purchase price specified?
**A. Yes.**
**Q.** What is that price?
**A. $5,200,000.**
**Q.** Was this the only Canadian property for which you found records on Dr. Arabi's laptop?
**A. No.**
**Q.** And to be clear, is his name listed on this Contract of Purchase and Sale?
**A. I did not see it.**
**Q.** The only buyer listed here is who?
**A. Sheida Alan.**
**Q.** If we could turn to Exhibit 756.

Agent Mycka, what are we looking at in this exhibit?

**A. This appears to be like a map of a lot for 1576 Errigal Place?**

***Q.*** And what's the relevance of a -- why did you seize a map related to 1576 Errigal Place?

**A. Because that was one of the properties that was purchased in Canada.**

***Q.*** Like 1421 Chartwell Drive?

**A. Yes.**

***MR. OLAH:*** We can take that down. Thank you.

***BY MR. OLAH:***

***Q.*** Agent Mycka, did you locate two files in Norwegian on the laptop?

**A. Yes.**

***Q.*** How is your Norwegian, Agent Mycka?

**A. It's not.**

***Q.*** It's not.

Have you been outside the airport in Norway?

**A. I have not, only in the airport.**

***Q.*** Were those Norwegian documents -- first off, did you seize some Norwegian documents from the laptop?

**A. Yes, we did.**

***Q.*** Were they subsequently translated into English?

**A. Yes.**

***Q.*** Is your English better than your Norwegian?

**A. Much better.**
*Q.* Great.
***MR. OLAH:*** Your Honor, I'd like to show the witness Exhibit 757A and 758A. And if we could show the witness, I believe it's five pages, but can you scroll, Dorian. Thank you.
***BY MR. OLAH:***
*Q.* Agent Mycka, are you able to see that document?
**A. I can, yes.**
*Q.* Okay. Agent Mycka, were you able to see the 15 pages that are Exhibit 757A?
**A. Yes.**
***MR. OLAH:*** If we could show the witness 758A, please. Can we scroll down as well.
***BY MR. OLAH:***
*Q.* Agent Mycka, were you able to see the 16 pages that is 758A?
**A. Yes.**
***MR. OLAH:*** Your Honor, at this time I'd like to read another stipulation into the record.
***THE COURT:*** Okay.
***MR. OLAH:*** "The parties stipulate that Exhibit 757A and 758A are accurate English translations of two Norwegian language documents that are marked Exhibits 757 and 758."
And, your Honor, at this time the United States would move into evidence 757A and 758A.
***THE COURT:*** Any objection?

***MR. FRASER:*** No objection, your Honor.

***THE COURT:*** 757A and 758A may be admitted.

***(Exhibits 757A and 758A admitted.)***

***BY MR. OLAH:***

***Q.*** And if we could go back to 757A, page 1, please.

Agent Mycka, keeping it on that first page, please. Agent Mycka, what are we looking at here?

***A.*** **It's a document that says "Acceptance Letter - Buyer."**

***Q.*** And is there a Norwegian-looking address there?

***A.*** **Yes, there is.**

***Q.*** And scroll on to page 2, please.

Is there a name in the top left --

***MR. OLAH:*** If we could call out basically the top half of this page, please.

***THE WITNESS:*** Yes.

***BY MR. OLAH:***

***Q.*** Whose name is on this document?

***A.*** **Mohammed Arabi.**

***Q.*** Are you familiar with the name Mohammed Arabi from the investigation?

***A.*** **Yes.**

***Q.*** Who is Mohammed Arabi?

***A.*** **That's Dr. Arabi's brother.**

***Q.*** Where does he reside?

***A.*** **In Norway.**

***Q.*** Is there a date on this page?
***A.*** **Yes.**
***Q.*** Is it a date in 2016?
***A.*** **Yes.**
***Q.*** And without going through the 15 pages, what do you understand this document to be?

***MR. FRASER:*** Objection. Relevance.

***THE COURT:*** Overruled.

***THE WITNESS:*** It's documenting the purchase of a property in Norway.

***BY MR. OLAH:***

***Q.*** And it's got Mohammed Arabi's name on it, you've testified; right?
***A.*** **Yes.**
***Q.*** Does it have Dr. Arabi's name on it?
***A.*** **Not that I saw.**
***Q.*** If we could turn to 758A, please, the second page.

Agent Mycka, what are we looking at on page -- on 758A? I'm sorry. We're really testing the Norwegian.

Agent Mycka, what are we looking at here?
***A.*** **This is another Acceptance Letter - Buyer document for a different Norwegian property.**
***Q.*** And turning to the next page, please.

***MR. OLAH:*** We can call out the top half.

///

***BY MR. OLAH:***

***Q.*** Whose name is on this letter?

***A.*** **Mohammed Arabi.**

***Q.*** Is Dr. Arabi's name within this document?

***A.*** **I didn't see it in there.**

***Q.*** What's this -- the date on this document, or what year?

***A.*** **2016.**

***Q.*** Okay. And given that the listed date is 08/23, does that give you some confidence that it's the month of August?

***A.*** **Yes.**

***Q.*** Okay. There's no 23rd month, to your knowledge?

***A.*** **Not that I'm aware of.**

***Q.*** Great.

Why did you seize this document?

***A.*** **Again, because it was a -- it documented the purchase of a property in Norway.**

***Q.*** A purchase subsequent to the Abreezio acquisition?

***A.*** **Yes, that's correct.**

***Q.*** And these are two documents that you found on whose computer?

***A.*** **Dr. Arabi's computer.**

***MR. OLAH:*** Okay. If we could turn to show the witness only at this time Exhibit 759 through 767.

***BY MR. OLAH:***

***Q.*** And I should ask, Agent Mycka, did you review these exhibits

prior to testifying?

**A. Yes, I did.**

***MR. OLAH:*** Okay. So if we could click through 759. It's a six-page exhibit. That's perfect, Dorian, just at that pace. Perfect.

If we could show him 760, please, 761, 762, 763. And I'll note for the record, 763 is a seven-page document. We can skip that and go to 764, Dorian.

Can we go to 765 then. And for the record, Exhibit 765 is a 19-page document.

If we could go to 766, a one-page document, I believe, and then 767.

***BY MR. OLAH:***

***Q.*** Agent Mycka, were you able to see all of those exhibits except for 764?

**A. Yes.**

***Q.*** We'll have to come back to that.

Is each a fair and accurate copy of a file found on Dr. Arabi's laptop?

**A. Yes.**

***MR. OLAH:*** Your Honor, I'd move to admit 759 through 763, 765, 766, and 767.

***THE COURT:*** Any objection?

***MR. FRASER:*** No, your Honor.

***THE COURT:*** Okay. 759 through 763 may be admitted, as

well as 765, 766, and 767.

***(Exhibits admitted.)***

***MR. OLAH:*** Thank you, your Honor.

Let's start with 759, please.

***BY MR. OLAH:***

***Q.*** Agent Mycka --

***MR. OLAH:*** And Dorian, if you can click through these as we go.

***BY MR. OLAH:***

***Q.*** What are these -- what are we looking at in Exhibit 759?

***A.*** **This document consists of six figures. They look to be like engineering schematics. I'm not an engineer. But this document, along with another, were included in the email communication that was found on Dr. Arabi's computer sent back from a company called Thoughts To Paper.**

***Q.*** Agent Mycka, are the six documents that are in Exhibit 759, do they appear in one of Sheida's provisional patent applications?

***A.*** **Yes.**

***MR. OLAH:*** Your Honor, what I'd like to do now is do a side by side with Exhibit 759 and some of the pages of Exhibit 830, with the Court's indulgence, previously admitted.

***THE COURT:*** You may.

***MR. OLAH:*** Thank you.

If we could put on the left side of the screen

Exhibit 759, page 1. And on the right side, Exhibit 830, page 9.

***BY MR. OLAH:***

***Q.*** Agent Mycka, looking at the left side, is that from the file found on -- uh oh, bear us with. Trick question.

***THE COURT:*** You're challenging your tech people.

***MR. OLAH:*** They are the best in the business.

***BY MR. OLAH:***

***Q.*** Agent Mycka, on the left side is what?

***A.*** **Figure 1 from the -- from Dr. Arabi's computer.**

***Q.*** Okay. And on the right side, what document is that from?

***A.*** **That's from the patent application.**

***Q.*** Okay. And you've made very clear, as most non-engineers have, that are you not an engineer. Is that right?

***A.*** **That's correct.**

***MR. FRASER:*** Objection. I think it was inadvertent, but the testimony did misstate the record as to patent application. It was actually provisional, was it not?

***THE COURT:*** That's fine.

***MR. FRASER:*** Well, it has some significance.

***MR. OLAH:*** We'll clarify the record. My apologies.

***BY MR. OLAH:***

***Q.*** Agent Mycka, on the right are we looking at one of Sheida's provisional patent applications?

***A.*** **Yes.**

*Q.* Did it contain various diagrams?
***A.* Yes, it did.**
*Q.* Okay. And does the diagram that's displayed on the top right appear to be the same diagram on the left?
***A.* It appears similar, yes.**
*Q.* If we could on the left side go to page 2 in Exhibit 759.
Agent Mycka, does the image on page 2 on the left side appear to match the one in the provisional patent application on the right side?
***A.* It does, yes.**
*Q.* And generally speaking, one's in color and one's not in color.
Is that fair?
***A.* Yes.**
*Q.* And on the right side, they manage to fit two diagrams on one page?
***A.* Yes.**
*Q.* If we could go on the left side to page 3 of the exhibit and on the right side, page 10.
Agent Mycka, do the images -- does the diagram on the left appear to match the diagram on the right?
***A.* It does, yes.**
*Q.* But to be fair, the Figure 3 annotation has a little more text on the right side. Is that right?
***A.* Yes. They look similar.**

***Q.*** Okay. Not identical, but similar?
***A.*** **Yes.**
***MR. OLAH:*** If we could on the left side now show the witness and the jury page 4, keeping page 10 up on the right side.
***BY MR. OLAH:***
***Q.*** Same question, Agent Mycka. Does the image on the left appear to match the one on the bottom right?
***A.*** **Yes.**
***Q.*** With additional text added to the Figure 4 description?
***A.*** **Yes.**
***MR. OLAH:*** Okay. On the left side, same exhibit, if we could go to page 5, and on the right side, page 11.
***BY MR. OLAH:***
***Q.*** Agent Mycka, same question. Does the image on the left appear to match the image on the right, top right, that is?
***A.*** **Yes, they appear to match.**
***Q.*** Okay. Same apparent diagram?
***A.*** **Mm-hmm, yes.**
***Q.*** And for the last time, if we could go to page 6 on the left.
Page 6 is now displayed on the left. Is that right, Agent Mycka?
***A.*** **Yes, that's correct.**
***Q.*** And I know it's getting old.
Is that the same image as the one on the bottom right?

**A. Yes, it appears to be.**

*Q.* And again, the images on the left were found on a laptop that you seized when?

**A. In August of 2022.**

*Q.* Okay. And they appear to match the diagrams that were in one of Sheida's provisional patent applications?

**A. Yes.**

***MR. OLAH:*** If we could turn to Exhibit 761.

***BY MR. OLAH:***

*Q.* Agent Mycka, did you find an exhibit titled OldSensor -- excuse me -- an image on Dr. Arabi's laptop entitled OldSensor.pdf?

**A. Yes.**

*Q.* Was that an image that you seized?

**A. Yes, it was.**

***MR. OLAH:*** And I believe this is a two-page exhibit. If we can show the witness and the jury both. I'm wrong. It's a one-page exhibit.

***BY MR. OLAH:***

*Q.* Why did you seize an OldSensor.pdf image from Dr. Arabi's laptop it?

**A. Appeared to be an engineering schematic relevant to the investigation.**

***MR. OLAH:*** Okay. And if we could do another side by side. I promise I'm not going to do too many of these, guys.

Keeping 761 on the left side and pulling up what's been admitted as Exhibit 222.

***BY MR. OLAH:***

***Q.*** Agent Mycka, the image on the left is from your review of the laptop?

***A.*** **Yes.**

***Q.*** And do you know what the source of the image on the right is?

***A.*** **I believe it's an email.**

***MR. FRASER:*** Objection. 602.

***THE COURT:*** If you know. Do you know?

***THE WITNESS:*** I do not know.

***BY MR. OLAH:***

***Q.*** Okay. Are you familiar with the Sheida.Arabi1 Gmail account?

***A.*** **Yes.**

***Q.*** Did agents seize emails from that account?

***A.*** **Yes, they did.**

***Q.*** And did that seizure include attachments to those emails?

***A.*** **Yes.**

***Q.*** Did you, prior to testifying, compare images that were found on Dr. Arabi's laptop with those that were seized pursuant to the email search warrants?

***A.*** **Yes.**

***MR. OLAH:*** Okay. We can take those down. Thank you.

***BY MR. OLAH:***

***Q.*** Did you -- we were just looking at an exhibit that was titled -- I keep saying exhibit. I apologize -- an image that was titled OldSensor.pdf. Is that right?

***A.*** **That's correct.**

***Q.*** Did you find on the laptop a document titled NewSensor.pdf?

***A.*** **Yes.**

***Q.*** Why did you seize the NewSensor.pdf image?

***A.*** **Again, it was an engineering schematic, seemed relevant to the investigation. Those documents, the OldSensor and the NewSensor, also on the computer, they were attachments to emails that we had seized as well.**

***MR. OLAH:*** Okay. If we could show Exhibit 763. It's been admitted.

***BY MR. OLAH:***

***Q.*** Agent Mycka, what are we looking at in Exhibit 763?

***A.*** **This is a description of -- for the provisional patent application.**

***Q.*** When you were looking at the image from the laptop, was it saved as a Microsoft Word file or some other file?

***A.*** **Microsoft Word.**

***Q.*** What's the title on page 1 that's displayed here?

***A.*** **"Circuitry and method for critical path timing speculation to enable process variation compensation via voltage scaling."**

***Q.*** Is that identical to the title on one of the provisional

patent applications filed in December of 2014?

**A. Yes.**

*Q.* Was it that provisional patent application that included the six diagrams we were looking at a moment ago?

**A. Yes.**

***MR. OLAH:*** I believe on 765 was admitted and 764 was not. Correct, your Honor?

***THE COURT:*** 764 was not.

***MR. OLAH:*** Okay. Let's go with Exhibit 765 at this time.

***BY MR. OLAH:***

*Q.* Agent Mycka, I am looking at page 1 of this.

***MR. OLAH:*** And if we could hover just a little bit lower, so I can get the exact page count. I believe it's a 19-page document. Oh, good, it matches.

***BY MR. OLAH:***

*Q.* Agent Mycka, we're look agent a 19-page document.

What is this?

**A. This is a scan of a notebook that -- again, I'm not an engineer, but it has a lot of the same terminology that we've seen through the non- -- the provisional patent applications. And it's just the words -- the terminology that we've encountered in the investigation.**

*Q.* And was -- are they handwritten notes in a notebook?

**A. Yes.**

***Q.*** And that was relevant to your investigation?
***A.*** **Yes.**
***Q.*** If we could show the witness -- I should ask: Did you previously review an Exhibit 764?
***A.*** **I did, yes.**
**Would you please refresh my memory?**
***Q.*** Yeah. So I believe -- well, did you review an exhibit that was labeled 764?
***A.*** **Yes, I did.**
***Q.*** Okay. And did that consist of 39 separate one-page files?
***A.*** **Yes.**
***Q.*** That had been smooshed into one PDF for exhibit purposes?
***A.*** **Yes.**
***Q.*** Okay. Were each of those one-page files found on Dr. Arabi's laptop?
***A.*** **Yes, they were.**
***Q.*** Okay. I don't want to click through 39 pages, so let's see if we can find you a binder.
***MR. OLAH:*** But I'll represent to the Court that they have been labeled Exhibits 764A through 764MM.
***THE COURT:*** Okay.
***BY MR. OLAH:***
***Q.*** And Agent Mycka, can you check in that binder behind you --
***A.*** **Sure.**
***Q.*** -- for the -- you're going to look for the 700 series, and

you're going to flip to 764, please. Thank you.

Agent Mycka, are you able to find the 764A through 764MM tabs?

***A.*** **Yes.**

***Q.*** Okay. Do me a favor, flip through all 39, and I'm going to ultimately ask you if those were the files you located on Dr. Arabi's computer.

***A.*** ***(Complies.)***

***Q.*** Agent Mycka, you've completed your review?

***A.*** **I have.**

***Q.*** Are each of Exhibits 764A through 764MM true and correct copies of files you found on Dr. Arabi's laptop?

***A.*** **Yes.**

***MR. OLAH:*** Your Honor, at this time we would move to admit Exhibits 764A through 764 MM.

***THE COURT:*** Any objection?

***MR. FRASER:*** No objection.

***THE COURT:*** All may be admitted.

***(Exhibits 764A-764MM admitted.)***

***BY MR. OLAH:***

***Q.*** And instead of going through all 39, let's just go with 764A, if we could. Agent Mycka, if we could show that to the jury.

Agent Mycka, what are we looking at here?

***A.*** **It is a notebook page with handwritten notes dated**

**December 4th, 2012.**

*Q.* And do the other exhibits in that 764 series resemble this one?

***A.*** **Yes, they do.**

*Q.* And by "resemble," are they handwritten notes with dates?

***A.*** **Yes, handwritten notes. There's dates on some pages. On others, there are no dates.**

*Q.* Very well.

If we could turn to Exhibit 767. I believe it's been admitted.

Agent Mycka, what are we looking at in Exhibit 767?

***A.*** **This is a document describing Sheida Alan's pursuit of her master's degree at Simon Fraser University. This document, I believe, was sent in December of 2015.**

*Q.* Was it saved to Dr. Arabi's laptop?

***A.*** **Yes.**

*Q.* Was it saved as a Word document?

***A.*** **I don't recall.**

*Q.* Does it describes Sheida Alan's educational studies?

***A.*** **Yes, it does.**

***MR. OLAH:*** If we could turn to Exhibit 766.

***BY MR. OLAH:***

*Q.* Agent Mycka, what are we looking at in this exhibit?

***A.*** **Is this a copy of a wire transfer from CIBC to Bank of America?**

***Q.*** Are you familiar with CIBC?

***A.*** **I believe it's the Canadian Imperial Bank of Canada.**

***Q.*** Might that second C be commerce?

***A.*** **Commerce, yeah. Sorry.**

***Q.*** You don't bank at CIBC, Agent Mycka?

***A.*** **No, I do not.**

***Q.*** And what is this record showing?

***A.*** **It's showing a wire transfer for 15 million -- a little over $15 million from Sheida Alan to Bank of America for -- the beneficiary is Qualcomm Technologies.**

***Q.*** Is Dr. Arabi's name on this document?

***A.*** **No.**

***Q.*** But was it saved to his laptop?

***A.*** **It was on his laptop, yes.**

***MR. OLAH:*** We can take that down. Thank you.

***BY MR. OLAH:***

***Q.*** Going back to your search of the residence, Agent Mycka, were there folks there other than Dr. Arabi?

***A.*** **Yes.**

***Q.*** Was his wife at the residence?

***A.*** **Yes, she was.**

***Q.*** Did you speak with her several times that morning?

***A.*** **I did.**

***Q.*** And did she provide you useful information?

***A.*** **Yes.**

***Q.*** Including who at the house used which devices?

***MR. FRASER:*** Objection. 602, 802.

***THE COURT:*** Sustained.

***BY MR. OLAH:***

***Q.*** Okay. Did you find -- or did you seize documents bearing the name Shadi Babataheri?

***A.*** **Yes, we did.**

***Q.*** And for the record, B-a-b-a-t-a-h-e-r-i.

Is that the name you recognize?

***A.*** **That sounds correct.**

***Q.*** Did you understand Dr. Arabi's name was Ms. Shadi Babataheri?

***A.*** **Yes.**

***Q.*** Did you find at least one physical document at the residence bearing the name Shadi Arabi?

***A.*** **Yes, we did.**

***Q.*** And did you seize that document?

***A.*** **Yes.**

***MR. OLAH:*** If we could please show the witness and the witness only Exhibit 866, page 3.

***THE COURT:*** Oh, it's been admitted.

***MR. OLAH:*** Oh, fantastic.

***BY MR. OLAH:***

***Q.*** Agent Mycka, this is a document you seized from the residence?

***A.*** **It is.**

***Q.*** And if we could call out -- what is this document?

***A.*** **It's a homeowner's renewal questionnaire for a homeowner's insurance policy.**

***Q.*** And who's identified as the insured?

***A.*** **Karim Arabi and Shadi Arabi.**

***Q.*** And there's an address beneath their names. Is that right?

***A.*** **Yes.**

***Q.*** Is that the residence you searched back in August of 2022?

***A.*** **Yes, it is.**

***Q.*** Why did you seize this document?

***A.*** **This is for dominion and control. So it's showing that -- who has, you know, control of the property that we were searching that day.**

***Q.*** Were you also interested in documentation around Shadi Arabi?

***A.*** **Yes.**

***MR. OLAH:*** I'd like to show you what's been admitted as Exhibit 5.

***BY MR. OLAH:***

***Q.*** Agent Mycka, do you recognize Exhibit 5?

***A.*** **I do.**

***Q.*** Was this an email that was sent in December of 2014?

***A.*** **Yes.**

***Q.*** Okay. And do you recognize the title of this cover page?

**A. I do, yes.**
*Q.* What's -- how do you recognize that title?
**A. It's for one of the provisional patents.**
*Q.* One of the provisional patent applications?
**A. The applications, yes, sorry.**
*Q.* And whose name appears beneath the title?
**A. Shadi Arabi.**
*Q.* Not Sheida Alan?
**A. Not Sheida Alan.**
*Q.* Not Sheida Arabi?
**A. Correct.**
*Q.* Shadi Arabi?
**A. Shadi Arabi, yes.**
*Q.* Who you understand to be who in relation to Dr. Arabi?
**A. Dr. Arabi's wife.**
*Q.* Okay.

***MR. OLAH:*** No further questions at this time, your Honor.

***THE COURT:*** Cross-exam?

***CROSS-EXAMINATION***

***BY MR. FRASER:***

*Q.* Good afternoon, Agent Mycka.
**A. Good afternoon.**
*Q.* You worked with other agents on the investigation of the

Abreezio acquisition?

***A.*** **Yes, I did.**

***Q.*** As part of a team of agents; correct?

***A.*** **That's correct.**

***Q.*** And you all share information with each other; correct?

***A.*** **Yes.**

***Q.*** Especially with the other FBI agents working on the case?

***A.*** **Yes.**

***Q.*** The FBI has a special communications system for communicating with each other?

More specifically, the FBI has a system called ECs, which stands for electronic communications?

***A.*** **That's a type of report, yes, sir.**

***Q.*** Okay. And you use that system; correct?

***A.*** **The system's called Sentinel. And so, yes, we put ECs and various reports and 302s, yes.**

***Q.*** And you wrote certain memorandums in the investigation and 302 reports; correct?

***A.*** **Yes, I did.**

***Q.*** Other information that you collected, you memorialized not in a 302 report; correct?

***A.*** **Yes.**

***Q.*** Does that include in ECs?

***A.*** **I've documented ECs to our case file, yes.**

***Q.*** Okay. And have you communicate -- do you use

Microsoft Teams?

**A. We do, but not on the system where we document our reports.**

***Q.*** Did you document anything about this investigation in Microsoft Teams, whether it's on a message board or chat component of Microsoft Teams?

**A. No.**

***Q.*** Okay. Did you do any text messaging with the other agents in the case?

**A. Yes.**

***Q.*** Okay. Did you leave any voicemails with the U.S. Attorney's Office about the case?

**A. I don't recall.**

***MS. ROBERTS:*** Your Honor, should we take a brief recess?

***THE COURT:*** Do we need to? Do you want to approach sidebar and let me know what the issue is?

***MR. FRASER:*** Yes, your Honor.

***THE COURT:*** Sure. Come on up. You may all stand while we're talking and stretch.

***(Sidebar conference; reported but not transcribed herein.)***

***BY MR. FRASER:***

***Q.*** Agent Mycka, you were the lead agent for the search of Dr. Arabi's residence. Is that correct?

**A. I was, yes.**

***Q.*** How many agents searched his home?

***A.*** **I think approximately 20.**
***Q.*** And this happened at about 6:00 a.m.?
***A.*** **Yes, it did.**
***Q.*** And Karim and his family, they were in their pajamas or just underwear that they'd slept in; correct?
***A.*** **Yes, that's correct.**
***Q.*** How many guns did you come to his house with?
***A.*** **I didn't count the guns. But I believe there were approximately 20 agents that were on the arrest team.**
***Q.*** Were they all armed?
***A.*** **Yes.**
***Q.*** How many guns were -- and there were -- there was likewise search warrant execution for Sanjiv Taneja; correct?
***A.*** **Yes, there was.**
***Q.*** And how many guns were used to arrest Mr. Taneja?
***A.*** **I wasn't at the arrest for Mr. Taneja.**
***Q.*** Is it possible that there were no guns in that arrest; correct?
***A.*** **I'm unaware.**
***Q.*** Did you encounter any physical resistance from Karim?
***A.*** **No.**
***Q.*** Or his children?
***A.*** **No.**
***Q.*** His wife?
***A.*** **No.**

***Q.*** Is it important for you to seek corroboration for what a cooperating defendant tells you?

***A.*** **Yes.**

***Q.*** Sanjiv Taneja is a cooperating defendant; correct?

***A.*** **He is.**

***Q.*** He pled guilty?

***A.*** **Yes.**

***Q.*** And he's attempting to assist the Government in this prosecution of Karim Arabi; correct?

***A.*** **Yes.**

***Q.*** On August 14th, 2023, he told you and Agent Chambers that he had provided copies of his text messages in the civil discovery; correct?

***A.*** **Yes.**

***Q.*** And he said that he didn't remember where the text messages came from, but he advised you and Agent Chambers that he would attempt to determine their origin. Isn't that true?

***A.*** **If you have a copy of the report to show me, just to refresh my memory. I don't recall offhand.**

***MR. FRASER:*** Okay. Let's show Agent Mycka Defense Exhibit 1035. Excuse me, Government Exhibit 1035 at page 19.

***BY MR. FRASER:***

***Q.*** And I would direct your attention, Agent Mycka, to the last paragraph. Let me know when you've -- and then let's also look at the top of the next page.

First of all, sorry, did you have a chance to finish looking at this page?

**A. I did, yes.**

*Q.* Thank you.

Let's look at the next page. And do you see -- let me know when you've finished the first paragraph there.

**A. Yes, I've finished.**

*Q.* Does that refresh your recollection?

**A. It does.**

*Q.* Okay. So returning to the question.

Taneja told you on August 14th, 2023, that he didn't remember where these text messages came from, but he said he would attempt to determine their origin. True?

**A. Yes, if that's in the report, yes.**

*Q.* I'm not asking what's in the report. I'm asking what he said to you.

Is that what he said to you?

**A. If that's what I documented in the report, yes, sir, that's -- that's what he said.**

*Q.* Do you agree that it is what you documented in the report?

**A. Yes.**

*Q.* So your answer to my question whether he told you that is a yes.

**A. Yes.**

*Q.* And he purported to give you his own text messages; correct?

**A. I believe we received those from his attorneys as part of his cooperation.**

Q. Okay. And these are the ones that he said he needed to determine their origin; correct?

**A. I believe so, yes.**

Q. Okay. We were just talking about what he told you on August 14th, 2023.

You saw him again ten days later; correct?

**A. Yes. That sounds about right.**

Q. Okay. And that's when he got you that info on the origin of the text messages?

**A. I don't recall getting the info on -- information on the origin of the text messages.**

Q. He didn't give it to you that day, did he?

**A. If you have a copy of the report that I could look at, that would be helpful. But if --**

Q. I do.

**A. Okay.**

Q. But it sound -- so you don't remember. Let's show you the report.

**A. I don't remember specifically getting the text messages from him.**

Q. So you don't remember whether you followed up to ensure that he did what he told you he was going to do?

**A. I don't -- no, I don't remember following up with him on**

**that.**

***MR. FRASER:*** Okay. Let's show Agent Mycka Defense Exhibit 3289 at page 20.

***BY MR. FRASER:***

***Q.*** This is -- let's actually pause here.

Looking at the first page, is this a 302 that you coauthored with Agent Chambers documenting the investigation on August 24th, 2023, and the follow-up interview of Sanjiv Taneja; correct?

***A.*** **Yes.**

***Q.*** Okay. So now let's go to page 20. Oh, sorry, page 16.

And this is where -- have you had an opportunity to read this page that's in front of you now, page 16?

***A.*** **I'm reading it right now.**

***Q.*** Okay. Let me know when you're done.

***A.*** **I'm done.**

***Q.*** He didn't get back to you with the information he'd promised, did he?

***A.*** **Mr. Taneja said he no longer had the phone that he used to communicate with during that time.**

***Q.*** My question is: Did he provide the information he'd promised?

***A.*** **No, he did not.**

***Q.*** And you never sought his text messages from a cell phone service provider, did you?

**A. Not that I can recall.**
Q. What you received is -- was a PDF that purported to be his complete text messages; correct?
**A. I believe that's correct.**
Q. And being a PDF, it's kind of like handing you a printout of a stack of papers printed with the test messages ostensibly; right?
**A. Yes.**
Q. So without the record from the cell phone service provider, you have no way to check for deletions and alterations; correct?
**A. That's correct.**
Q. Would you regard information related to a defendant that you're investigating to prosecute in that way that you would not obtain the records from the cell phone service provider?
**A. Would you please rephrase the question?**
Q. When you're investigating a defendant that you want to prosecute who's going to trial, would you fail to obtain the cell phone service records related to text messages proffered from that defendant?
**A. I'm sorry. Would I fail to obtain the text messages from the defendant?**
Q. That's the question.
**A. I would attempt to get the text messages from the defendant.**
Q. Thank you.
You testified on direct about certain exhibits from Karim's

laptop that you seized in August of 2022.

You recall that of course?

**A.** **Yes.**

***Q.*** And those were Exhibits 761 through 767, and there were some --

***THE COURT:*** You're asking if he remembers the numbers?

***MR. FRASER:*** No. It's preliminary to questions I want to ask him. I want to identify the specific exhibits that the subsequent questions will pertain to.

***THE COURT:*** Okay. You may have to show him. I'm not sure he's going to remember the numbers.

***MR. FRASER:*** Okay. Let's show the witness Government Exhibit 761, just show the witness only.

Now let's show the witness Government Exhibit 762.

Now let's show the witness Government Exhibit 763.

Now let's show the witness Government Exhibit 764A, because there is no 764 unadorned with a letter. Okay.

***BY MR. FRASER:***

***Q.*** And you recall that 764, it's going to be subsequent to letters, and you recall this exhibit; correct?

**A.** **Yes.**

***Q.*** Let's go to 765. Show him that, please.

You recall that?

**A.** **Yes.**

***Q.*** 766, please.

You recall this?
**A. Yes.**
*Q.* 767, please.
You recall this?
**A. Yes.**
*Q.* So the following questions will pertain to those documents.
**A. Okay.**
*Q.* These were exhibits that you got from Karim's laptop; correct?
**A. Yes.**
*Q.* Wasn't all that evidence part of the civil case?
**A. I don't know if all of that evidence was included within the civil case, but there is some overlap, yes.**
*Q.* Weren't Karim and Sheida represented by the same lawyer in that case?
**A. Yes. I believe they were.**
*Q.* A lawyer might discuss evidence with their client, no?
**A. They might.**
*Q.* And you know that attorneys send evidence to their clients to discuss it; right?
**A. Yes.**
*Q.* And the client might review it on a laptop?
**A. He could.**
*Q.* Another question about that laptop.
Karim and Sheida, of course they're siblings?

**A. Yes.**
Q. Sheida used that laptop, didn't she?
**A. I don't know that.**
Q. You don't know that?
**A. That Sheida used the laptop?**
Q. You don't know whether she used the laptop?
**A. I don't know that.**
Q. Karim traveled to Canada?
**A. I don't recall his travel records, but I'm sure Dr. Arabi has traveled to Canada.**
Q. That's where Sheida lives?
**A. Yes.**
Q. Ziad Mansour was a subject of the investigation; correct?
**A. Yes.**
Q. He worked for Qualcomm?
**A. Yes.**
Q. You reviewed his Qualcomm emails?
**A. I did not review his Qualcomm emails.**
Q. Okay. Did -- do you believe one of your colleagues did?
**A. I'm unsure if one of my colleagues reviewed his emails.**
Q. It's possible that your fellow agents failed to review Mansour's Qualcomm emails?
**A. I did not review Mansour's emails. I don't know about the other agents on the team.**
Q. You can't say that they did review them?

**A. I can't.**

*Q.* Okay. But you got his private emails?

**A. Excuse me?**

*Q.* You got Ziad Mansour's non-Qualcomm emails?

**A. I'm unaware if we got his personal emails as well.**

***MR. FRASER:*** Let's show the witness Defense Exhibit 3289. Oh, sorry. 3298. My colleague corrects me on the number there. Thank you.

***BY MR. FRASER:***

*Q.* Directing your attention to the bottom of the page.

This is a 302 report that you wrote; correct?

**A. It is.**

*Q.* Okay. And it says that you downloaded a production from Google for a particular email address; correct?

**A. Yes.**

*Q.* And that email address is Zman.goog.20xx@gmail.com; correct?

**A. It is, yes.**

*Q.* Ziad Mansour's private email address; correct?

**A. Yes.**

*Q.* Is this an email address that Akbar Shokouhi used to contact Mansour when he was trying to save his job at Qualcomm?

**A. I don't recall specifically if Mr. Shokouhi emailed this specific email address.**

*Q.* Okay. Do you recall an event where Akbar Shokouhi was contacting Mansour to try to protect his job at Qualcomm?

**A. I don't remember -- I don't recall Mr. Shokouhi contacting Mr. Mansour.**
*Q.* In any event, you got these emails from the Zman.goog email address; correct?
**A. For clarification, we -- this was a 2703(d), so we actually didn't get any content from Google for the production of this.**
*Q.* Oh, you didn't get his private emails?
**A. We did not.**
*Q.* So you didn't review them?
**A. We did not. We got the -- is this a 2703(d), so this is non-content information from his email account.**
*Q.* You have the burden of proof in this case?
**A. Yes.**
*Q.* Beyond a reasonable doubt?
**A. Yes.**
*Q.* You're looking for evidence to place Mansour in a conspiracy; correct?
**A. We were investigating Mr. Mansour.**
*Q.* Just randomly?
**A. As part of the conspiracy, yes.**
*Q.* Okay. And you didn't review his emails?
**A. I did not.**
*Q.* And you're not sure whether your colleagues did, either?
**A. No.**
*Q.* Materiality, that's an element of wire fraud; correct?

**A. Yes.**

*Q.* You have to prove what mattered to the bottom line to show materiality; correct?

***MR. OLAH:*** Objection. 602, your Honor.

***THE COURT:*** Sustained. The jury will be instructed on what needs to be proven in the case.

***MR. FRASER:*** Okay.

***BY MR. FRASER:***

*Q.* You testified on direct a little bit about Thoughts To Paper; correct?

**A. Yes.**

*Q.* Phil Wilson is somebody who worked at Thoughts To Paper; correct?

**A. Yes.**

*Q.* And he's on social media?

**A. I'm unaware of if Mr. Wilson is on social media.**

*Q.* You didn't check?

**A. I did not check, no.**

*Q.* He met with Sheida to help with her provisional patent documents. Isn't that true?

**A. I'm unaware if they've met.**

*Q.* You're in no position to say that that didn't happen?

**A. I'm unaware of them meeting in person.**

*Q.* Are you aware of them -- you're not aware of them meeting in person, and you failed to determine whether they met in person.

Is that correct?

**A. I -- I do not know if they met in person.**

Q. Nor do you know whether they had a video conference?

**A. I'm unaware if they had a video conference.**

Q. And you're unaware of whether they had a phone call?

**A. I am not aware if they had a phone call.**

Q. You interviewed him?

**A. Mr. Wilson? I did not interview him, no.**

Q. Do you believe that someone else on your team interviewed him?

**A. I'm aware that someone, I believe, reached out to Thoughts To Paper, yes.**

Q. Okay. Your investigation included the question of whether Karim Arabi developed Abreezio's technology; correct?

**A. Correct.**

Q. And some of Abreezio's technology is something called source code; correct?

**A. I've heard the term "source code," and I know that's important to the technology. I'm not an engineer, so I know source code may be part of the technology, but I'm not very technical when it comes to that stuff.**

Q. You didn't follow up on source code in your investigation?

**A. No, I did not.**

Q. You didn't attempt to obtain something called a Git Repository?

***A.*** **No.**

***Q.*** I asked you earlier to acknowledge, and you did acknowledge, that the Government has the burden of proof beyond a reasonable doubt.

There are lower standards of proof; correct?

***THE COURT:*** Counsel, I'll instruct the jury on the law that applies to the case.

***MR. FRASER:*** Thank you, your Honor.

No further questions.

***THE COURT:*** Redirect?

***MR. OLAH:*** Very briefly.

***REDIRECT EXAMINATION***

***BY MR. OLAH:***

***Q.*** Agent Mycka, you were asked if agents were armed when you executed a search warrant at Dr. Arabi's residence?

***A.*** **Yes.**

***Q.*** Would you ever execute a search warrant unarmed?

***A.*** **No.**

***Q.*** Have FBI agents in the last six, seven years died doing such activities?

***A.*** **Yes, they have.**

***MR. OLAH:*** No further questions, your Honor.

***THE COURT:*** May this witness be excused for now? I understand he may need to be recalled.

***MR. FRASER:*** Just a short recross.

***RECROSS-EXAMINATION***

***BY MR. FRASER:***

***Q.*** Sanjiv Taneja was arrested by John Roberts and one other law enforcement officer. Isn't that true?

**A. I'm unaware of the arrest operation for Mr. Taneja. I know that Mr. -- that Agent Roberts was involved with it, though.**

***MR. FRASER:*** Okay. No further questions.

***THE COURT:*** Thank you, sir.

***THE WITNESS:*** Thank you.

***THE COURT:*** Okay, ladies and gentlemen. We are going to take a break for the weekend. The good news is things are moving very quickly. I fully expect the Government to finish with their case-in-chief next week. So we are moving at least on schedule and probably ahead of schedule. So we're moving very quickly.

So you are reminded are you not to discuss the case with anyone. You're not to do any research about the case. We will see you on Monday morning at 9:00 o'clock. We'll see you then. Thank you.

***(Jury out at 3:47 p.m.)***

***THE COURT:*** And you're excused as well, sir. Thank you.

***THE WITNESS:*** Thank you, your Honor.

***THE COURT:*** Okay. We're now outside the presence of the jury.

Any issues we need to take up?

***MR. FRASER:*** I think there is an issue that would be prudent to take up, your Honor.

***THE COURT:*** And just so you know, we'll deal with Nicholas Cole first thing on Monday as well.

***MS. BERNSTEIN:*** We'll file that this weekend, your Honor.

***THE COURT:*** I do need to deal with that.

***MR. FRASER:*** The issue that I had in mind is the recordings of portions of the interview of Bozena Kaminska, which we have briefed, each side. You know, this is coming up somewhat soon, probably next week or the week after. It's a significant piece of evidence.

Maybe I would suggest, because it's briefed and I think it's a nuanced legal issue, Mr. Pilchak has briefed it in some detail, so have I --

***THE COURT:*** Remind me what the issue is.

***MR. FRASER:*** This is a witness that we don't have access to who has uniquely exculpatory statements relating to Sheida's studies in the DFT field.

***THE COURT:*** Oh, you want to put the evidence in evidence without her?

***MR. FRASER:*** Yeah. We can't get her. That's --

***THE COURT:*** No.

***MR. FRASER:*** Your Honor, did you review our brief on that?

***THE COURT:*** Does that have to do with -- I remember reading where you talked about the reliability and that it should be admitted under the, you know, catchall provisions of the hearsay. And I do not see that.

I mean, this is someone who may or may not be involved in the conspiracy. She -- he or she got $200,000 from the sale. I do not think that the residual exception applies to the statements of this witness. This is someone who I think only can be -- the statements only can be admitted if they're subject to cross-examination. So I just don't see that.

***MR. FRASER:*** Your Honor, I will -- it sounds like the Court has its mind pretty well made up. I'll just note -- and I think you probably remember this, but just to say it, the recording is one that was done by the FBI. And the points that your Honor has raised, of course the Government can bring those out in examining -- we would either introduce them through a stipulation.

But, you know, to the extent the Court believes they're co-conspirator statements, then, you know, the Government can bring its persuasive power to try to persuade the jury of that.

So I think -- I would urge the Court to consider

whether that is perhaps an issue that ought to be going to the weight rather than the admissibility of that evidence. Because we've got no other way to really show the jury that these studies are real. And I think your Honor has seen how forcefully the Government has attempted to attack the notion that her studies in that field were real. We ought to be able to respond.

***THE COURT:*** I just -- hearsay is hearsay is hearsay, and the residual exception is an unusual exception that applies in certain circumstances where it's clear that the witness has no motivation to lie, that there's a reliability to it. And I don't see that there is that in this case. So I'm not inclined to let it in under the residual exception.

Okay.

***MR. FRASER:*** May I just -- okay.

So even if it doesn't meet the residual exception, I would suggest we ought to be able to offer those statements for impeachment and the effect on the Government's investigation, because the statements were made to Agent Townsend. So this would be a non-truth of the matter purpose.

***THE COURT:*** Explain to me what the relevance of that is. The only relevance is that -- I don't know if it's a he or she.

***MR. PILCHAK:*** She.

***THE COURT:*** The relevance is that she somehow helped

Sheida to invent these things, that she was -- that Sheida was studying under the tutelage of this professor.

***MR. FRASER:*** Well, it would go to the bias of the Government's investigation under CoolBreez v. Whitley to show what they did and didn't do. And of course the Government can say that they looked into this enough, but we contend that they didn't, to disprove those studies. And the Kaminska statements to Agent Townsend give them abundant reason to believe that this was real.

And so if they're going to take the position that the studies were not real, they've got quite a bit of work to do to eliminate reasonable doubt on that. And respectfully, we don't think that they did that, and their failure to do that shows the bias of the investigation, which is, you know, something that is almost always relevant when it comes to an inquiry with a witness under the *Abel* case, the Supreme Court case from 1984. And this is an important part of our defense.

***MS. BERNSTEIN:*** Your Honor, the Government has very successfully, I think, painted a picture thus far that Ms. Alan did not have any background, any knowledge, any skill set, any intelligence in this area. And that's pretty important. And it goes to whether or not -- in fact, one of the core issues of this case is whether the provisional patents were within her purview of intelligent or not.

And the fact that she studied with someone who explains

that they did those studies, that she gave her papers, everything she explains in there, if the Court won't let that in, the fact that the Government didn't follow up on those things -- may be because they didn't believe them and that would be fine, but the fact that they didn't follow up on them does go to the weight of the case and does go to the lack of investigation, which is, of course, constitutionally something always that the defense is able to pursue as a defense in putting on their case.

***THE COURT:*** Yeah, I don't see it at this point. I'm not going to allow it in.

Okay. Stay in touch with each other so that we can move forward and not have to send the jury home, you know, in the middle of the week.

***MR. PILCHAK:*** Will do, your Honor.

***THE COURT:*** Okay. Thank you. We're in recess until Monday morning.

***(Proceedings adjourned at 3:54 p.m.)***

***

///

///

///

///

///

///

*REPORTER'S CERTIFICATE*

I, Anne Roldan, certify that I am a duly qualified and acting Official Court Reporter for the United States District Court, that the foregoing is a true and accurate transcript of the proceedings as taken by me in the above-entitled matter on March 20, 2025; and that the format used complies with the rules and requirements of the United States Judicial Conference.

Date: March 21, 2025

*Anne Roldan, RMR, CRR, CSR 13095*