UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. KARIM ARABI, Defendant. | Case No. 22-cr-1152-BAS<br>March 26, 2025<br>Jury Trial, Day 11 |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CYNTHIA A. BASHANT
CHIEF DISTRICT JUDGE

VOLUME 11, PAGES 2501 - 2782

APPEARANCES:

FOR PLAINTIFF: UNITED STATES ATTORNEY'S OFFICE
880 Front Street, Suite 6293
San Diego, California 92101
*By: NICHOLAS W. PILCHAK, AUSA*
*JANAKI G. CHOPRA, AUSA*
*ERIC R. OLAH, AUSA*

FOR DEFENDANT: BIENERT KATZMAN LITTRELL WILLIAMS, LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
*By: WHITNEY Z. BERNSTEIN, Esq.*
*REBECCA S. ROBERTS, Esq.*
*RYAN V. FRASER, Esq.*

REPORTED BY:

ANNE MARIE ROLDAN, RMR, CRR, CSR 13095
U.S. OFFICIAL COURT REPORTER
U.S. District Court Clerk's Office
333 West Broadway, Suite 420
San Diego, California 92101

Reported stenographically; transcribed with CAT software.

# I N D E X

***

## E X A M I N A T I O N S


| WITNESS | VOL. | PAGE | LINE |
|---|---|---|---|
| *FOR THE GOVERNMENT:* | | | |
| LEAH CHAMBERS | | | |
| Direct by Ms. Chopra | 11 | 2507 | 12 |
| Cross by Ms. Bernstein | 11 | 2526 | 21 |
| Redirect by Ms. Chopra | 11 | 2585 | 16 |
| Recross by Ms. Bernstein | 11 | 2594 | 11 |
| Re-Redirect by Ms. Chopra | 11 | 2601 | 2 |
| Re-Recross by Ms. Bernstein | 11 | 2602 | 15 |
| MOHAMED ALLAM | | | |
| Direct by Mr. Pilchak | 11 | 2604 | 10 |
| Cross by Mr. Fraser | 11 | 2672 | 1 |
| Redirect by Mr. Pilchak | 11 | 2702 | 18 |
| Recross by Mr. Fraser | 11 | 2712 | 14 |
| JOHN SHINDLEDECKER | | | |
| Direct by Mr. Pilchak | 11 | 2722 | 7 |

# E X H I B I T S

| ADMITTED | VOL. | PAGE | LINE |
|---|---|---|---|
| Ex. 56 | 11 | 2699 | 1 |
| Ex. 230 | 11 | 2523 | 13 |
| Ex. 231 | 11 | 2523 | 13 |
| Ex. 246 | 11 | 2758 | 21 |
| Ex. 259 | 11 | 2746 | 14 |
| Ex. 274 | 11 | 2733 | 1 |
| Ex. 275 | 11 | 2733 | 2 |
| Ex. 276 | 11 | 2733 | 2 |
| Ex. 277 | 11 | 2733 | 2 |
| Ex. 278 | 11 | 2733 | 2 |
| Ex. 279 | 11 | 2733 | 2 |
| Ex. 280 | 11 | 2733 | 2 |
| Ex. 281 | 11 | 2733 | 2 |
| Ex. 295 | 11 | 2765 | 17 |
| Ex. 298 | 11 | 2765 | 16 |
| Ex. 299 | 11 | 2765 | 17 |
| Ex. 347 | 11 | 2778 | 10 |
| Ex. 442 | 11 | 2754 | 15 |
| Ex. 443 | 11 | 2754 | 16 |
| Ex. 458 | 11 | 2749 | 9 |
| Ex. 459 | 11 | 2752 | 14 |
| Ex. 471 | 11 | 2728 | 15 |
| Ex. 472 | 11 | 2730 | 16 |
| Ex. 475 | 11 | 2736 | 22 |
| Ex. 491 | 11 | 2742 | 1 |
| Ex. 495 | 11 | 2742 | 1 |
| Ex. 496 | 11 | 2742 | 1 |
| Ex. 496 | 11 | 2751 | 1 |
| Ex. 509 | 11 | 2773 | 8 |
| Ex. 510 | 11 | 2773 | 9 |
| Ex. 511 | 11 | 2773 | 9 |
| Ex. 512 | 11 | 2773 | 9 |
| Ex. 513 | 11 | 2773 | 9 |
| Ex. 514 | 11 | 2773 | 9 |
| Ex. 515 | 11 | 2773 | 9 |
| Ex. 516 | 11 | 2773 | 9 |
| Ex. 518 | 11 | 2770 | 3 |
| Ex. 587 | 11 | 2514 | 8 |
| Ex. 789 | 11 | 2761 | 6 |
| Ex. 2259 | 11 | 2562 | 11 |

***WEDNESDAY, MARCH 26, 2025, 9:00 A.M.***

***

***THE COURT:*** We are back on the record outside the presence of the jury. Dr. Arabi and the lawyers are all present.

Counsel?

***MS. BERNSTEIN:*** Good morning, Your Honor. We understand the Government will be resting at some point today.

***THE COURT:*** Yes.

***MS. BERNSTEIN:*** I think the best guess right now is sometime after lunch, but he's things are, of course, fluid.

So we've conferred with them. This case moved a lot faster than we expected. The Government's case-in-chief estimate in their trial brief was four weeks. The Court knows that it allocated a great deal of time, and we're going to end in two and a half weeks. That has been in large part because I think we've been pretty collaborative trying to move things along with looking at objections, handling them efficiently, batch admitting documents, stipulating to obviate witnesses. But there are eight fewer witnesses than we had anticipated from the Government's case.

And our case, right now we have six witnesses that were either traveling internationally or out of state, and we can't get them here sooner. So what we have done is we have -- we've tried to fill as much as we can of whatever we have of today and

tomorrow with local witnesses. One person who we had anticipated testifying, the Government met with last night, and that person may no longer testify, but we'll clarify. There's also one person we had under a subpoena who is not here, so I'm not sure if that person is going to be showing up today.

So we have somewhere between four and six people testifying today, or perhaps five to seven. I've given them the precise numbers.

***THE COURT:*** Today and tomorrow.

***MS. BERNSTEIN:*** Today and tomorrow. I'm just not sure how voluminous any of that testimony will be, and so I wanted to flag for the Court that we might not be able to fill all of tomorrow.

***THE COURT:*** And then, you just -- after you get through the witnesses this week, you'll just have the six witnesses that are traveling internationally for next week?

***MS. BERNSTEIN:*** Yes. And -- not all -- they're all traveling -- either living internationally or traveling internationally now. Some of them will be back in the country and then traveling domestically, but they're not -- none of them are local.

***THE COURT:*** Okay. But it's just six left for next week.

***MS. BERNSTEIN:*** Yes. I can be more precise, but, yes, there's light at the end of this tunnel.

***THE COURT:*** All right. We'll see how it goes. Let's bring in the jury.

And just to let you know, and I'll let the jury know, too, I am flying out for my conference Wednesday afternoon, so my thought would be to go maybe 9:00 to 1:00 on Wednesday without a break for lunch. So let me talk to the jury about that and see if that works for everyone.

***(Jury in at 9:06 a.m.)***

***THE COURT:*** While everyone is getting settled in I wanted to give you some updates about the schedule. As I mentioned before, we will go until 3:00 o'clock tomorrow, so we'll quit a little early tomorrow. And then next week, we will be in session Monday, Tuesday, and then Wednesday, we are going to be in session from 9:00 to 1:00, and I'm going to go without a lunch break. So we'll take two 15-minute breaks to try and use that time as well as possible.

I'm going to order some snacks for the breaks so that you don't need to worry about -- I know that's kind of late to have a late lunch, but we'll go until 1:00 o'clock and then you'll be excused for the rest of the week. But we are moving very quickly. I think we are going to be far in front of our original time estimate, so things are moving quickly.

***JUROR:*** What is that schedule again?

***THE COURT:*** Sure. Tomorrow we will go no later than 3:00 o'clock. Next week, we will go normal times Monday

and Tuesday. Wednesday will be 9:00 to 1:00. And Thursday, you will be -- Thursday and Friday you will be off.

***JUROR:*** Thank you.

***THE COURT:*** Okay. Thank you.

You may recall your witness.

***MS. CHOPRA:*** Thank you, Your Honor.

The United States calls Agent Chambers again.

***THE COURT:*** Okay. And you are reminded you are still under oath to tell the truth.

***THE WITNESS:*** Yes, Your Honor.

***DIRECT EXAMINATION***

***BY MS. CHOPRA:***

***Q.*** Good morning, Agent Chambers.

***A.*** **Good morning, Ms. Chopra.**

***MS. CHOPRA:*** Can we please pull up Exhibit 149, which we admitted yesterday?

***BY MS. CHOPRA:***

***Q.*** Agent Chambers, do you recall this email from yesterday?

***A.*** **I do.**

***Q.*** What is the date of this email chain?

***A.*** **June 16th, 2014.**

***MS. CHOPRA:*** Okay. And can we turn to Exhibit 150, please, which was also admitted yesterday?

///

**BY MS. CHOPRA:**

**Q.** Do you recall this form?

**A. I do, yes.**

**Q.** And this is the English language requirement form for Sheida Arabi?

**A. Yes.**

**Q.** Okay. I just want to clarify the date of this form.

**MS. CHOPRA:** Can we go to the last page?

**BY MS. CHOPRA:**

**Q.** What is the date next to the signature?

**A. November 6, 2014.**

**Q.** So it was attached to an email that was June 16th, 2014.

Is it possible that the month and the date are interchanged here?

**A. Yes, it is possible.**

**Q.** Okay. So what would that be, then?

**A. June 11th, 2014.**

**MS. CHOPRA:** We can take that down.

**BY MS. CHOPRA:**

**Q.** At the end of yesterday, Agent Chambers, do you recall that we were discussing whether you had seen emails and text messages arranging conference calls between Abreezio personnel?

**A. Yes.**

**MS. CHOPRA:** And can we pull up 573, please, which was admitted yesterday?

***BY MS. CHOPRA:***

***Q.*** Is this one of the emails we looked at yesterday?

***A.*** **It is.**

***Q.*** Okay. And is this one of the conference calls that you saw being set up by email?

***A.*** **Yes.**

***Q.*** I think when I ended yesterday, I asked you, at least on the two emails we saw, which was 573 and 574, was Karim Arabi on those emails?

***A.*** **He was not.**

***Q.*** And who, in fact, is on this email that's in front of you?

***A.*** **It's an email address, Sheida.Alan@gmail.com.**

***Q.*** From Mr. Taneja?

***A.*** **Oh, correct, from Mr. Taneja.**

***MS. CHOPRA:*** Okay. Now, let's please turn to Exhibit 564, which I don't believe is in evidence.

***THE COURT:*** It is not.

***MS. CHOPRA:*** Can we blow up the available text, please? Thank you, Alex.

***BY MS. CHOPRA:***

***Q.*** Agent Chambers, do you see this exhibit in front of you?

***A.*** **I do.**

***Q.*** Is it a text chain?

***A.*** **It is.**

***Q.*** Who is the text chain between, without reading any content?

***A.*** **Mr. Taneja, Mr. Shokouhi, and Mr. Abdi.**
***Q.*** And I see the name Sanjiv and Akbar Shokouhi.
How do you know that Mr. Abdi is also on this?
***A.*** **I recognize his telephone number. The telephone number ending in 9395 is Mr. Abdi's number.**
***Q.*** What's the date of this text chain?
***A.*** **July 22nd, 2015.**
***MS. CHOPRA:*** Move to admit 564, Your Honor.
***MS. BERNSTEIN:*** 902, 1003, motion *in limine* 4.
***THE COURT:*** Sustained. Foundation.
***BY MS. CHOPRA:***
***Q.*** How did you obtain this text chain?
***A.*** **These text messages were obtained from the discovery we received from Qualcomm from their civil investigation.**
***MS. CHOPRA:*** If we can look at the Bates -- zoom out, please, Alex. We can look at the Bates at the bottom.
***BY MS. CHOPRA:***
***Q.*** Do you see that, Agent Chambers?
***A.*** **I do, yes.**
***Q.*** Does that inform you further of who produced this during the civil litigation?
***A.*** **Yes. They came from Mr. Taneja.**
***Q.*** And then you obtained this production from Qualcomm?
***A.*** **That's right.**
***MS. CHOPRA:*** Move to admit 564, Your Honor.

***MS. BERNSTEIN:*** 902, 1003, motion *in limine* 4.

***THE COURT:*** Same ruling.

***BY MS. CHOPRA:***

***Q.*** Okay. Did you review multiple text messages setting up phone calls, conference calls?

***A.*** **I did.**

***Q.*** Okay. And generally speaking, who were those conference calls set up between?

***A.*** **They were usually set up between Mr. Taneja, Mr. Shokouhi, sometimes Mr. Abdi, and then an invitation was often sent to a Sheida.Alan email address.**

***Q.*** And was this in the 2015 time period?

***A.*** **Yes.**

***Q.*** Okay. Did you ever see text messages setting up these conference calls with Dr. Arabi?

***A.*** **I don't believe so. There may have been one in the very beginning setting up a call, but as -- as things went on, the invitations went to the Sheida.Alan or Sheida.Arabi1 Gmail accounts.**

***Q.*** Have you reviewed Dr. Arabi's toll records in this case?

***A.*** **I have, yes.**

***Q.*** And how many pages of toll records, approximately, did you review?

***A.*** **I think there were just short of 500 pages of toll records for his calls.**

***Q.*** And did you -- in those toll records, did you see whether Dr. Arabi dialed in to any of the conference calls that you saw being set up by email and text message?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Overruled.

***THE WITNESS:*** I did.

***BY MS. CHOPRA:***

***Q.*** Did you make a chart reflecting those dial-ins?

**A. I did, yes.**

***MS. CHOPRA:*** Can we turn to Exhibit 587, please?

***BY MS. CHOPRA:***

***Q.*** Is this the chart that you created?

**A. It is.**

***MS. CHOPRA:*** One moment, Your Honor.

***BY MS. CHOPRA:***

***Q.*** Okay. And is this based on the toll records that you reviewed?

**A. Yes, it is.**

***Q.*** Okay. And these are Dr. Arabi's toll records?

**A. Yes.**

***Q.*** Is there multiple pages to this chart that you created?

**A. It should be two pages.**

***Q.*** Is this the second page in front of you now?

**A. Yes.**

***Q.*** In addition to reviewing the toll records for Dr. Arabi, did

you also cross-reference those toll records with emails or text messages that you saw in discovery in this case?

**A. I did, yes.**

*Q.* Why did you cross-reference?

**A. I wanted to see who was invited to the calls.**

*Q.* And did you also want to see who actually joined the calls?

**A. Yes.**

*Q.* And specifically, did you want to see if Dr. Arabi joined these various calls?

***MS. BERNSTEIN:*** Objection. Leading.

***THE WITNESS:*** Yes, I specifically looked for Dr. Arabi's calls.

***THE COURT:*** I'll allow it.

***THE WITNESS:*** I'm sorry. I specifically looked through Dr. Arabi's tolls for the numbers referenced in the emails and text messages setting up the conference calls.

***BY MS. CHOPRA:***

*Q.* And I see Bates numbers in reference to some of the communications.

Where did you receive the communications that you referenced?

**A. Some of them I received from email search warrants that we had completed, and then some of them were received, again, through the civil discovery that Qualcomm received and then provided to us.**

***MS. CHOPRA:*** Your Honor, at this time we'd move to admit 587 under 1006.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** Just a moment, Your Honor. I'm not sure if it includes -- yes. Objection as to a box in the middle that was just not admitted into evidence.

***THE COURT:*** Overruled.

***(Exhibit 587 admitted.)***

***BY MS. CHOPRA:***

***Q.*** Agent Chambers, is this the chart that we were just talking about?

***A.*** **It is.**

***Q.*** And I realize it's a lot of text.

In total -- you said there was two pages; is that right?

***A.*** **Yes, two pages.**

***Q.*** How many calls are listed on these two pages?

***A.*** **I think it was 41 calls.**

***Q.*** And these are conference calls?

***A.*** **Correct. It's the calls by Dr. Arabi into a conference line.**

***Q.*** Okay.

***MS. CHOPRA:*** Alex, could you zoom in on, for example, the first blue row that you see on page 1? That whole -- sorry, the light blue row. This one. Thank you. All right.

///

***BY MS. CHOPRA:***

***Q.*** All right. So looking specifically at this, Agent Chambers, looking left to right, what is the phone number on the left side?

***A.*** **The phone number, that is the conference call number that was provided in the email and text message.**

***Q.*** What's the date of this call?

***A.*** **March 16th, 2015 at -- well, the call came at 9:08 a.m. So some of the -- as we had discussed before, some of them are in UTC and you have to subtract seven or eight hours depending on the time of year.**

***Q.*** Okay. Did you end up doing that in this chart?

***A.*** **I did, yes.**

***Q.*** And when it says 9:08 a.m., is that the time that you saw Dr. Arabi calling in based on the toll records?

***A.*** **Correct.**

***Q.*** And then next to that, I see -- well, it looks like Bates numbers.

Are those the Bates numbers for the documents that you referenced?

***A.*** **Those are.**

***Q.*** And then working to the right of that, I see an email subject line.

***A.*** **Yes.**

***Q.*** What does that say?

**A. It says, "Call-in number for 9:00 a.m. call."**

***Q.*** And then after that, it says there's a text.
What does that say?

**A. There was a text from Mr. Taneja to Dr. Arabi that said, "Good morning, Karim. Call-in details for 9:00 a.m. in the next message."**

***Q.*** And then working to the right of that, what's in the next box where I see a list of names?

**A. So the first list of names -- Taneja, Sheida Arabi, and Brad Quinton -- were included on an email. And then the text message was between Mr. Taneja and Dr. Arabi.**

***Q.*** So there were two separate modes of invitations here, an email and a text message?

**A. Correct, to set up the call.**

***Q.*** And I think you mentioned a minute ago that at least maybe on a couple of these emails and texts, Dr. Arabi was specifically invited to join the call; is that right?

**A. Yes. At the beginning, yes.**

***Q.*** And is this one of those calls that he was specifically invited to join?

**A. It is.**

***MS. CHOPRA:*** Can we zoom out from that? Thank you, Alex. All right. And then can we please zoom in on these two blue rows right there?

///

***BY MS. CHOPRA:***

***Q.*** Okay. We've gone a few rows below.

On the left side, is that the conference call line at 7171?

***A.*** **Correct.**

***Q.*** What's the date of this -- of these two calls that we see?

***A.*** **The date was July 21st, 2015.**

***Q.*** And, again, have you converted the time that you saw to local time?

***A.*** **I have, yes, because Dr. Arabi's toll records were provided -- the times in that were provided in UTC.**

***MS. BERNSTEIN:*** Your Honor, objection. 902, 1003, motion *in limine* 4, because Your Honor kept out this Bates stamp.

***THE COURT:*** Overruled.

***BY MS. CHOPRA:***

***Q.*** It looks like there are two calls here.

Am I reading this right, Agent Chambers?

***A.*** **Yes. One at 9:36 p.m., and then that was just a 15-second call. And then another call-in at 9:37 p.m. that lasted for 48 minutes and 36 seconds.**

***Q.*** And skipping over the Bates stamp and going to the next column, I see a text from Taneja.

Can you explain that box?

***A.*** **Yes. There was a text from Taneja that said, "Let's target 10:00 p.m. Akbar, taking the liberty to use your**

**conference line."**

***Q.*** So was it your understanding that that was the invitation to the conference call?

***MS. BERNSTEIN:*** Objection. 702.

***THE COURT:*** Sustained. It's also leading.

***BY MS. CHOPRA:***

***Q.*** After that text between Taneja and Shokouhi, you have another box that has three names.

What are those three names?

***A.*** **Those were the individuals that were included on that text message setting up the call.**

***Q.*** Was Karim Arabi on that text chain?

***A.*** **He was not.**

***Q.*** Was Sheida on that text chain?

***A.*** **She was not.**

***Q.*** Does Karim Arabi call into this conference line?

***A.*** **He does.**

***MS. BERNSTEIN:*** Objection. Foundation.

***THE COURT:*** Overruled.

***THE WITNESS:*** Sorry. He does.

***BY MS. CHOPRA:***

***Q.*** So even though he wasn't on this text chain, your toll records show that he was on the call?

***MS. BERNSTEIN:*** Objection. Leading. Asked and answered.

***THE COURT:*** Sustained.

***BY MS. CHOPRA:***

*Q.* Do the toll records show that he was on the call?

**A. They did.**

***MS. CHOPRA:*** Okay. We can zoom out from there. And then finally -- if we can zoom in.

***BY MS. CHOPRA:***

*Q.* Going a few rows below, is this also, on the left-hand side, the conference call line that we've been talking about?

**A. It is.**

*Q.* What's the date of this phone call when converted to local time?

**A. August 24th, 2015, at 9:34 p.m.**

*Q.* How long did it last?

**A. Twenty-eight minutes and five seconds.**

*Q.* And what was the email subject line setting up this call?

**A. The subject said "Quick sync-up at 11:30."**

*Q.* Who were the individuals on the email or text chain that you referred to for this call?

**A. Mr. Taneja, Mr. Abdi, Mr. Shokouhi, and then a Sheida Alan email account.**

*Q.* Now, do you know if Sheida Alan herself, the real Sheida Alan, called in to this conference line for this phone call?

**A. I don't.**

*Q.* In any of the times that Sheida is listed on the invite, do

you know if she called in?
**A. I do not.**
Q. Why not?
**A. Because we had requested -- we were not able to obtain her toll records from Canada.**
Q. So she's on the invitation.
According to your toll records, did Dr. Arabi call into this conference line?
**A. Yes.**
Q. And so totaling up --
***MS. CHOPRA:*** You can zoom out from that. Thank you, Alex.
***BY MS. CHOPRA:***
Q. Totaling up the 41 calls that you have here on pages 1 and 2, do you know how many hours, just on these two pages, adding up the lengths of the calls, how many hours Dr. Arabi spent on these calls listed here?
**A. I do. It was just under 20 hours of phone calls.**
Q. Are there more calls that the toll records show Dr. Arabi was on that aren't listed in this chart?
**A. I mean, there were a lot of records. There were a lot of calls on the toll records.**
Q. Okay. Was there a call on March 13th, 2015, that you saw on Dr. Arabi's toll records?
**A. I did.**

*Q.* What did you see in the tolls on that day?

***A.*** **There was a -- like, almost two-and-a-half hour phone call between Dr. Arabi and Mr. Taneja.**

*Q.* Is there an email that we've seen during this trial that corresponds to a conversation on that day?

***A.*** **Yes.**

***MS. CHOPRA:*** Can we turn to Exhibit 230? Which I believe has been admitted.

***BY MS. CHOPRA:***

*Q.* Is this the email chain you were talking about that corresponds to March 13th of 2015?

***A.*** **Yes.**

***THE COURT:*** I do not have 230 in evidence.

***MS. CHOPRA:*** Oh, okay. I apologize, Your Honor.

***BY MS. CHOPRA:***

*Q.* Who was this email between, the top part?

***A.*** **Mr. Taneja and Sheida.Arabi1@gmail.com.**

*Q.* And what's the date?

***A.*** **March 13th, 2015.**

***MS. CHOPRA:*** If we can zoom out from that, please.

***BY MS. CHOPRA:***

*Q.* And is there an email chain below that -- below that with another individual?

***A.*** **Yes, with Bradley Quinton.**

***MS. CHOPRA:*** Can we go to the second page, please?

***BY MS. CHOPRA:***

***Q.*** Is the second page a continuation of the email chain?

***A.*** **It is.**

***Q.*** Okay. Is that email that we're looking at right now from Mr. Taneja?

***A.*** **Yes.**

***MS. CHOPRA:*** Your Honor, move to admit.

***MS. BERNSTEIN:*** Objection. Foundation.

***THE COURT:*** Sustained.

***BY MS. CHOPRA:***

***Q.*** Where is this -- how did you obtain this email?

***A.*** **This email was from a search warrant that we did on the email accounts.**

***MS. CHOPRA:*** Okay. And then can we -- is there an attachment to this email as well, if we go back to the first page?

***BY MS. CHOPRA:***

***Q.*** Do you see an attachment there, Agent Chambers?

***A.*** **I see the attachment listed in the email, yes.**

***MS. CHOPRA:*** Okay. Can we go to 231? Which likely has not been admitted.

***THE COURT:*** It has not.

***BY MS. CHOPRA:***

***Q.*** Is this the attachment to that email that we were just looking at?

**A. It is, yes.**

Q. This was also found through a search warrant that the FBI executed?

**A. Correct.**

Q. In connection with this case?

**A. Yes.**

***MS. CHOPRA:*** Your Honor, move to admit 230 and 231.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** How many pages is 231?

***MS. CHOPRA:*** Eighteen pages.

***MS. BERNSTEIN:*** Objection. Foundation.

***THE COURT:*** Overruled. 230 and 231 may be admitted.

***(Exhibit 230 and 231 admitted.)***

***MS. CHOPRA:*** Can we go back to 230, the email, please?

***BY MS. CHOPRA:***

Q. Agent Chambers, you had just talked about a phone call between Dr. Arabi and -- was it Mr. Taneja, on March 13th, 2015?

**A. Correct.**

Q. How long was that phone call?

**A. I think it was 150 minutes, somewhere around 150 minutes.**

Q. And the topmost email on this email chain is on what date?

**A. March 13th, 2015.**

Q. The same day as that lengthy phone call that you saw in the toll records?

**A. Yes.**

**MS. CHOPRA:** And if we can flip to the attachment, Alex, please. That's 231.

**BY MS. CHOPRA:**

**Q.** On that same day of that phone call, does Mr. Taneja send this attachment to the Sheida email account?

**A. He does.**

**Q.** All right.

**MS. CHOPRA:** We can take that down. Thank you, Alex.

**BY MS. CHOPRA:**

**Q.** All right. In reviewing text messages in this case, did you review at least one text chain where it appeared that Sheida was to arrive in the U.S. to attend a conference?

**A. I did, yes.**

**MS. CHOPRA:** Can we turn to Exhibit 707? Which I believe is not in evidence.

**THE CLERK:** It is.

**MS. CHOPRA:** It is in evidence. Okay. I apologize. Thank you.

**BY MS. CHOPRA:**

**Q.** Is this the text chain that you were talking about just now?

**A. It is.**

**Q.** And who was this text chain between?

**A. The two numbers I see on here are Mr. Taneja and Mr. Abdi.**

**Q.** Is Mr. Abdi the 9395 number?

**A. He is.**

*Q.* What's the date of this text chain?
***A.*** **June 8th, 2015.**
*Q.* In the topmost text from Mr. Taneja, does he reference that "Sheida can drive to SJ from 1:00 to 4:00 p.m."?
***A.*** **He does.**
*Q.* And does he also say that "Sheida arrived at SFO earlier this evening"?
***A.*** **He does.**
*Q.* For what kind of conference?
***A.*** **A design automation conference. Well, actually, it says "design automaton conference."**
*Q.* What is SFO?
***A.*** **SFO is San Francisco's airport.**
*Q.* In this investigation, have you looked at Sheida Arabi or Sheida Alan's border-crossing records?
***A.*** **I have.**
*Q.* Do those records indicate when she has crossed into the United States from Canada?
***A.*** **They do.**
*Q.* And in this June 2015 timeframe, when Sheida is supposed to attend this conference, did you see any inbound crossing from Canada to the United States by Sheida Arabi?
***A.*** **No, there was no inbound crossing.**
*Q.* How about by Sheida Alan?
***A.*** **No.**

***Q.*** Did she cross at all in the whole month of June 2015?
***A.*** **She did not.**
***Q.*** In this investigation, did you review certain emails of Dr. Arabi's?
***A.*** **I did --**
***Q.*** Did --
***A.*** **Yeah.**
***Q.*** I apologize, Agent Chambers.
Did you review certain emails of Dr. Arabi?
***A.*** **I did.**
***Q.*** Okay. Did any of those emails inform you about whether he traveled to the Bay Area around this time?
***A.*** **Yes.**
***Q.*** What did you learn?
***A.*** **There were -- in his Qualcomm emails, there were travel -- flight arrangements for a flight into San Francisco in this timeframe.**
***MS. CHOPRA:*** No further questions, Your Honor.
***THE COURT:*** Cross-exam?

***CROSS-EXAMINATION***

***BY MS. BERNSTEIN:***
***Q.*** Good morning, Agent Chambers.
***A.*** **Good morning, Ms. Bernstein.**
***Q.*** You've been sitting in this courtroom with us for the whole

trial; right?
**A. I have, yes.**
Q. You've heard all of the testimony.
**A. Yes.**
Q. You work with these prosecutors.
**A. I do.**
Q. Quite closely.
**A. Yes.**
Q. You sit with them here in court.
**A. Yes.**
Q. Up front, behind -- in front of the well, when some of your colleagues are often behind the well; correct?
**A. Correct.**
Q. You arrive in the mornings with them.
**A. I do.**
Q. You lunch with them.
**A. I do.**
Q. You leave with them.
**A. Yes.**
Q. You work with them in the evenings?
**A. Yes. During this trial, yes.**
Q. You guys are a team.
**A. Yeah.**
Q. Fair to say?
**A. Yeah.**

***Q.*** And you've been working closely -- well, this trial has been two and a half weeks; correct?
***A.*** **So far.**
***Q.*** And you've been working closely with them for a lot longer than that.
***A.*** **We did prepare for the trial.**
***Q.*** You've been on this case specifically since what year?
***A.*** **June 2021.**
***Q.*** And in the past three -- almost four years; is that fair?
***A.*** **Yes.**
***Q.*** In the past almost four years, you've spent hundreds of hours working on this case.
***A.*** **I would say that's correct.**
***Q.*** You've sat through dozens of witness interviews.
***A.*** **Yes.**
***Q.*** And prep sessions of the Government's witnesses.
***A.*** **Yes.**
***Q.*** How many interviews would you say you've sat through?
***A.*** **I know I took a count of how many people we interviewed, and it was around 45 people that we had interviewed. I don't know that I -- I wasn't personally at all of those interviews.**
***Q.*** You were at a lot of them; correct?
***A.*** **I was.**
***Q.*** And those 45 people, many of them had multiple interviews; correct?

**A. Some of them did.**
Q. I mean, Mr. Taneja alone had over 40 hours across eight interviews; right?
**A. A couple -- a few of them did have multiple interviews.**
Q. And these interviews are often days long or hours long?
**A. They can last all day, yes.**
Q. Sometimes you even travel to talk to people?
**A. Yes.**
Q. You take flights.
**A. Yes.**
Q. You can speak with anyone you'd like, really.
**A. I mean, I can attempt to speak to anyone within the U.S., yes. They don't have to speak to me.**
Q. Well, the FBI speaks to people in Canada, too; correct?
**A. I did travel to Canada and worked with the RCMP to try to interview some people this in this case, yes.**
Q. And the FBI, in fact, successfully interviewed some people in this case in Canada; right?
**A. Yes.**
Q. You also have -- in addition to sister law enforcement agencies in foreign countries that are also now working on this case about Qualcomm's claims, you have sister offices in other cities; right?
**A. We do.**
Q. And "sister office" is my term.

How do you understand that?

**A. We have field offices in -- I think it's 56 cities throughout the United States. And then we have smaller satellite offices called resident agencies. I have no idea how many of those there are. There's quite a few.**

*Q.* And you use -- you've asked people in this case for some of your satellite offices or field offices in other states to speak with someone that you want to question as well.

**A. Yes.**

*Q.* And when you travel, that's -- the taxpayers pay for that travel?

**A. The Department -- yes, the FBI pays for my travel.**

*Q.* You've also written dozens of reports for this case?

**A. I have.**

*Q.* Do you know how many -- the jury's heard about the term "FBI 302."

That's the summary of a witness interview; correct?

**A. It is, yes.**

*Q.* Do you know how many 302s you've written?

**A. I don't. Less than 50, around 50. I'm not sure.**

*Q.* You've also written search warrants for this case?

**A. I did not write any of the search warrants.**

*Q.* You personally didn't author the search warrants?

**A. I did not author the search the warrants, that I recall.**

*Q.* Your colleagues have.

**A. Correct.**
Q. There's also something called B-I-D-M-A-S; correct?
**A. BIDMAS, yes.**
Q. What is that?
**A. It's an FBI database where -- as I think retired Special Agent Roberts testify to, there was a lot of data that we received from Qualcomm and other sources in this investigation. So that's a database that our headquarters controls where we had put all of that information so we could search through it.**
Q. And you've also reviewed the FBI -- well, you've written and reviewed FBI electronic communications called ECs; correct?
**A. I have, yes.**
Q. Fair to say you reviewed hundreds of thousands of documents for this case in the past nearly four years?
**A. I don't know if hundreds of thousands, but a lot.**
Q. Well, did retired Agent Roberts -- I believe his testimony was that there was approximately 500 gigabytes.
Is that your memory?
**A. I think that's what he said, yes.**
Q. And that doesn't translate directly to documents, but that's an incredibly voluminous amount of documents; correct?
**A. It is.**
Q. And you guys have reviewed all of the discovery in this case.
**A. I think that our team has reviewed it, yes.**

***Q.*** You've attended many of the court hearings in this case.
***A.*** **I have.**
***Q.*** You've reviewed other law enforcement reports about this case, not just the FBI.
***A.*** **I have, yes.**
***Q.*** Agents, you all work together to share your important work with each other.
***A.*** **We do.**
***Q.*** In part, because someone like Mr. Roberts might leave; correct?
***A.*** **Yes. And we worked with other agencies on this case.**
***Q.*** And you don't reinvent the wheel when someone departs the case.
***A.*** **We try to be efficient with our investigation.**
***Q.*** And so you're familiar with what your colleagues have done as well.
***A.*** **I am.**
***Q.*** We heard --

***MS. BERNSTEIN:*** I suppose, for the record, we should make a *Jencks* motion.

***THE COURT:*** You've made it already. It's already been ruled on.

***MS. BERNSTEIN:*** Thank you.

***BY MS. BERNSTEIN:***

***Q.*** We have heard a stipulation in this case, which means that

the parties agree it's true; correct?

***A.*** **Correct.**

***Q.*** That this case is over the exact same allegations as in Qualcomm's civil litigation; correct?

***A.*** **It's similar allegations.**

***MS. BERNSTEIN:*** Can we pull up the stipulation? We'll come back to that in a moment.

***BY MS. BERNSTEIN:***

***Q.*** Qualcomm's civil suit was investigated and litigated from 2016 to 2021?

***A.*** **That sounds right.**

***Q.*** And this case was referred to the Government at least twice?

***A.*** **Yes.**

***Q.*** By Heuston Hennigan, Qualcomm's law firm; correct?

***A.*** **Correct.**

***Q.*** And they had referred it to the Government after they conducted an investigation; correct?

***A.*** **Yes. I don't know if they had finished their investigation by the time they referred it to us initially. That was in 2018 sometime.**

***Q.*** And the lawsuit started in 2017.

***A.*** **Correct.**

***Q.*** And at that time, the case was denied because there were -- the criminal prosecution was denied because there were adequate remedies at civil law?

***A.*** **We declined to open an investigation at that time, and I believe Agent -- former Agent Roberts testified that there were -- that was one of the reasons. But primarily, it was due to a lack of resources on the squad at the time.**

***Q.*** And then once COVID came around, you guys decided to review documents again?

***A.*** **They referred it to us again in 2020, and at that time, it was opened.**

***Q.*** And that was after not only Heuston Hennigan's investigation, but also Qualcomm's Employee Relations Department investigation; correct?

***A.*** **Correct. I believe that investigation happened first.**

***Q.*** And, in fact, a large majority of the documents in this case are from Qualcomm's lawsuit against Dr. Arabi.

***A.*** **There are -- they did provide us with a lot of documents, yes.**

***Q.*** Over 120,000 documents.

***A.*** **I'm not sure of the number.**

***Q.*** And a document, of course, as we've seen, can be hundreds of pages long.

It's not one page; correct? There's a distinction between documents and pages?

***A.*** **Yes.**

***Q.*** Let me withdraw that and do it more cleanly.

Is there a distinction between documents and pages?

**A. Yes.**

*Q.* And so would you agree that there's over 120,000 documents from Qualcomm?

**A. Again, I don't know the exact count. It was a large amount of data that they provided.**

*Q.* And we're not going to see hundreds of thousands of pages in this case, are we?

**A. No, we are not.**

*Q.* Just the trial exhibits.

**A. Yes. We tried to pare it down to the relevant documents.**

*Q.* To just the documents the Government wants to prove its case.

**A. The documents that we think that are evidence in this case that show what we're trying to prove.**

*Q.* And a lot of those are from the civil lawsuit when we look at the stamp on the bottom; correct?

**A. Yeah, some of them are.**

*Q.* Where Dr. Arabi's sister Sheida paid Qualcomm $47 million.

**A. She did.**

*Q.* And Qualcomm got to keep the technology.

**A. They did.**

*Q.* That it still uses today.

**A. I'm not sure. I believe so.**

*Q.* You've participated in a lot of witness interviews in this case; right?

***A.*** **I have, yes.**

***Q.*** And you understand that Qualcomm still uses the technology today.

***A.*** **I believe that they do, yes.**

***Q.*** You have no reason to believe those witnesses were lying, do you?

***A.*** **I don't.**

***Q.*** Okay. And particularly in a field where technological innovation happens quickly?

***A.*** **It does.**

***Q.*** But the Abreezio technology that Qualcomm bought 10 years ago is still valuable.

***MS. CHOPRA:*** Objection. Foundation, Your Honor.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** Do you know whether the Abreezio technology that Qualcomm bought 10 years ago is still valuable?

***A.*** **I'm not sure.**

***Q.*** And there's at least six main case agents from different agencies on this criminal case for some reason; correct?

***A.*** **We did work with other agencies. I don't know if there are six.**

***Q.*** Six --

***A.*** **Might be adding a couple.**

***Q.*** Six agents, main case agents.

**A. Over time, there were probably six agents assigned to the investigation from the -- the three different agencies.**
*Q.* The FBI?
**A. Yes.**
*Q.* The United States Marshals Service?
**A. Yes.**
*Q.* The IRS?
**A. Correct.**
*Q.* And I think we also heard from Border Patrol.
That's a different agency; right?
**A. Yes, but they were not part of our investigation. I think that was just to move in the border crossing records.**
*Q.* They became involved in this trial.
**A. We met with them briefly for their testimony.**
*Q.* And they testified?
**A. They did.**
*Q.* How many hours would you say you've spent on this case?
**A. I really couldn't make a guess.**
*Q.* Do you fill out time sheets or anything that relates to the case that you're working on?
**A. I don't fill it out. I don't fill it out for the case, no.**
*Q.* Do you have a way of totaling up a precise number?
**A. It would be -- no, I don't.**
*Q.* Is it fair to say you've invested a ton of time and resources into this case?

**A. I would say that's fair.**
Q. Let's talk about some of the things that you reviewed.
You reviewed what's called the UPA; correct?
**A. I did.**
Q. And that's the Unit Purchase Agreement?
**A. Yes.**
***MS. BERNSTEIN:*** And can we pull up 864?
***BY MS. BERNSTEIN:***
Q. And the jury's seen this a few times; right?
**A. They have.**
Q. This is a contract between Qualcomm and Abreezio?
**A. It is.**
Q. Drawn up by lawyers.
**A. Yes.**
Q. And do you know how many pages long this is?
**A. I've heard the number thrown around, that it's, like, 500 pages, but I don't know.**
Q. We will not go through the whole thing.
This defined who the key -- the Abreezio key employees were; correct?
**A. It did. I think it listed four employees.**
Q. And key employees are the people that Qualcomm wanted from Abreezio to come on board?
**A. That's right.**
Q. And do you remember who those key employees were?

**A. I believe it was Bradley Quinton, Trent McClements, Andrew Hughes, and I can't recall the fourth one.**
*Q.* And do you understand that those people, in fact, did go to Qualcomm as part of the acquisition?
**A. Yes.**
*Q.* To implement Abreezio's technology in ways that has saved over a hundred million dollars, as Mr. Thompson said, in the first year alone?
**A. I know that they were brought on to help implement the technology at Qualcomm.**
*Q.* Sheida was not a key employee; correct?
**A. She was not on that list, no.**
*Q.* I think you testified that the Government and you, with the FBI, have the power to subpoena records; correct?
**A. We do.**
*Q.* And that makes people give you things.
**A. It does.**
*Q.* You can get phone records?
**A. Yes.**
*Q.* From AT&T?
**A. Correct.**
*Q.* Verizon?
**A. Yeah.**
*Q.* T-Mobile?
**A. Yes.**

*Q.* Any carrier.
***A.* If the records still exist, yes.**
*Q.* How long do records exist?
***A.* You know what, I'm not sure on phone records. I know in this case, we were able to go back at least six years from the time we subpoenaed the records. I don't know what their retention policies are.**
*Q.* And you can also get text records, correct? Text, t-e-x-t, records; correct?
***A.* To obtain those, we would have to get a search warrant. You can't get those just from the phone carrier based on a subpoena.**
*Q.* And you guys get search warrants.
***A.* We do.**
*Q.* And that's a process where you get a separate type of order to compel someone to give you something; is that fair?
***A.* That's fair. The judge has to approve that.**
*Q.* And so you can subpoena text records from any carrier.
***A.* No, I can't subpoena text records.**
*Q.* I'm sorry.
You can apply for a search warrant for text records from any carrier.
***A.* Yes. But not from -- I'm sorry -- not from the carrier. The carrier doesn't maintain the content of the text messages. So I might have to get a search warrant for somebody's iCloud account if they were iMessages, or maybe get a search warrant**

**for the person's actual phone and seize that phone from them.**

*Q.* So if you issue a search warrant on Verizon for someone's account, you're not going to get the -- their text records?

***A.*** **I wouldn't get the content of their text messages.**

*Q.* Even though an individual can log into their account and see their text messages?

***A.*** **I don't know how that works. You know what, I'm not sure, I guess. I've not done it that way.**

*Q.* Okay. And we'll come back to that.

Emails, do you subpoena emails or do you get search warrants for emails?

***A.*** **We would get -- well, if we're trying to -- I guess we could subpoena somebody for their emails, but we would generally get a search warrant for their emails.**

*Q.* And you can get those from Hotmail?

***A.*** **Yes.**

*Q.* Gmail?

***A.*** **Correct.**

*Q.* Yahoo?

***A.*** **Yes.**

*Q.* Any domain?

***A.*** **Yes.**

*Q.* And --

***A.*** **Within the United States.**

*Q.* And the FBI has fairly extensive power.

***MS. CHOPRA:*** Objection. Vague, Your Honor.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** Would you agree that a defense attorney can't issue a subpoena for records?

***A.*** **I actually don't know what your powers are.**

***Q.*** As you've heard testimony about, you never got a complete record of Sanjiv Taneja's text messages; correct?

***A.*** **Correct.**

***Q.*** Even though that's a pretty critical part of this case; correct?

***A.*** **Yes. We would have liked to have obtained those.**

***Q.*** You just worked off what he gave you.

***A.*** **That was what was available to us.**

***Q.*** When he came to you as a cooperator.

***A.*** **Yes.**

***Q.*** And cooperators are working to get a reduction of their sentence.

***A.*** **Yes.**

***Q.*** Nothing is promised to them.

***A.*** **Correct.**

***Q.*** But they're told that as long as they're truthful and help the Government, they'll get what's called 5K; correct?

***A.*** **That's what they're hoping to get, yes.**

***Q.*** And 5K is cooperation assistance?

***A.*** **Yes.**
***Q.*** And the Federal system operates on Guidelines?
***A.*** **That's right.**
***Q.*** And the Guidelines are presumptively reasonable; is that right?
***A.*** **I believe so.**
***Q.*** They're not binding?
***A.*** **No.**
***Q.*** And that -- but they are objective; correct?
***A.*** **I'm not sure what you mean.**
***Q.*** They can be calculated.
***A.*** **Yes.**
***Q.*** And you start with a base number for an offense; correct?
***A.*** **Yes.**
***Q.*** It goes up for some reasons?
***A.*** **That's my experience, yes.**
***Q.*** It can go down for some reasons?
***A.*** **Yes.**
***Q.*** And then you land on a final number.
***A.*** **Yes.**
***Q.*** And then that number corresponds to a presumptively reasonable prison sentence range; correct?
***A.*** **It provides a number, a range of months in which you might expect the defendant to be sentenced.**
***Q.*** And one way -- when we talk about that starting number going

up and going down, one way it goes down is where defendants would like it to be -- down corresponds to less time; correct?

*A.* **Yes.**

*Q.* And one way that number goes down is through 5K.

*A.* **That's correct.**

*Q.* And that's the Substantial Assistance Motion.

*A.* **Yes.**

*Q.* And would you agree that someone who's cooperating seeking 5K is not unbiased?

*A.* **We only -- all we ever tell cooperators is that we want them to tell us the truth, but they certainly are motivated to assist in our investigation.**

*Q.* And Sanjiv was also a cooperator in the civil case; right?

*A.* **He was.**

*Q.* And he agreed to help Qualcomm there in exchange for them dismissing the case against him while they continued to pursue Karim.

*A.* **Yes. I wasn't involved in any of that at the time.**

*Q.* You've reviewed his Civil Settlement Agreement that I think we looked at yesterday.

*A.* **Yes.**

*Q.* And you know that, per that contract, if he didn't help them or if he wasn't truthful, they didn't have to dismiss his case.

*A.* **That's my understanding from what we saw yesterday.**

*Q.* And we all learned that apparently he lied and was not

truthful during those interviews.
**A. Yes. He was very upfront about that when asked.**
*Q.* When asked today about lies that he's maintained for seven years, he was upfront, that's your characterization?
**A. He was upfront about it yesterday, yes.**
*Q.* He wasn't upfront with Qualcomm.
**A. He was not.**
*Q.* After promising he would be.
**A. That seems to be the case.**
*Q.* And he wasn't unbiased in that case, either; correct?
**A. I don't believe -- no, he wasn't.**
*Q.* He had a lot on the line.
**A. He did.**
*Q.* And the text messages that we've seen so much of, those started in the civil case; is that your understanding?
**A. They were turned over in discovery during the civil case.**
*Q.* And at no point since this case was first referred to you or to the FBI in 2018 have you gotten his complete text records.
**A. No. We did ask him if he still had his -- the phone that he used at that time, or we would have liked to have gotten the laptop to make our own forensic image of that information, but he no longer had it in his possession.**
*Q.* You never sought a subpoena.
**A. For his phone?**
*Q.* Or his laptop.

**A. I don't believe we issued a subpoena for that information, no.**
Q. You never sought a search warrant.
**A. We had a search warrant for his email account, but we didn't get a search warrant for his phone.**
Q. You also just testified that you never got Sheida's phone records; correct?
**A. Correct. We attempted to, but they -- we never had the records at that time.**
Q. And when did you first attempt to?
**A. Well, the investigation started in 2020, so I -- I'm not sure. It would have been in one of the MLATs that we sent to Canada that we requested that information. So I think the first MLATs were sent in 2020.**
Q. Did you seek Mr. Taneja's phone records in 2020?
**A. Yes.**
Q. Through search warrants and subpoenas?
**A. Through a subpoena for his toll records.**
Q. You didn't subpoena his carrier?
**A. We did subpoena his carrier. I think he also had AT&T.**
Q. And you didn't issue a search warrant in 2020 when your investigation started?
**A. Just for his email account.**
Q. Not for his phone?
**A. We did not obtain his phone, no.**

***Q.*** And you'd agree that the text records we've seen here for Mr. Taneja are incomplete.

***A.*** **I would agree that they -- you are not able to tell exactly who was on the message if there's somebody who hasn't responded to the message.**

***Q.*** And you don't see continuous threads; correct?

***A.*** **Correct.**

***Q.*** We've seen a text message where Mr. Taneja is telling Karim that he found Intel's margins for power savings.

Remember that one?

***A.*** **I don't actually remember that one.**

***Q.*** It's the one that Mr. Taneja claims he pled to in his plea agreement, the 64 percent from TI.

***A.*** **Oh, yes.**

***Q.*** And he is asking Karim for Qualcomm's numbers to calibrate going in, or something to that effect.

***A.*** **Yes.**

***Q.*** We've not seen any response from Dr. Arabi.

***A.*** **I would have to see the text message again. Sorry.**

***Q.*** That's okay. We'll come back to that.

We've also heard a lot of testimony about Ziad Mansour; correct?

***A.*** **Yes.**

***Q.*** That he worked for Qualcomm?

***A.*** **He did.**

*Q.* That he was a Senior Vice President, which was a pretty high position.
***A.*** **Yes.**
*Q.* That he knew that Karim was involved with the business of Abreezio.
***A.*** **Yes.**
*Q.* And the Government never interviewed him.
***A.*** **We attempted to interview Mr. Mansour, and he -- I know we said that we could speak to anyone, but he did not agree to speak with us.**
*Q.* And you didn't issue him a subpoena.
***A.*** **I believe he obtained a lawyer, and at that point, generally the prosecutors would have conversations with the lawyer.**
*Q.* And prosecutors issue subpoenas to people who have lawyers all the time; correct?
***A.*** **They can.**
*Q.* And you didn't issue a subpoena to Mr. Mansour.
***A.*** **I don't believe that we did.**
*Q.* And Mr. Taneja claimed that Karim said he had to pay Mr. Mansour after the closing?
***A.*** **He did testify to that.**
*Q.* And he told you this.
***A.*** **He did, yes.**
*Q.* And you investigated that.
***A.*** **We did.**

*Q.* And you found no evidence of that.
***A.*** **We did not find any evidence of it.**
*Q.* And you never charged Mr. Mansour.
***A.*** **He was not charged in this investigation.**
*Q.* And he's never been arrested in this case.
***A.*** **No.**
*Q.* And you had investigated the claim that Mr. Taneja said Karim had to pay Mr. Mansour, correct, as you just said?
***A.*** **Yes.**
*Q.* And you didn't find anything.
***A.*** **Correct.**
*Q.* And yet Mr. Pilchak asked him about that yesterday; correct?
***A.*** **He did.**
*Q.* Knowing full well that you had investigated this and never found that to be substantiated?
***A.*** **We were not able to locate a payment to Mr. Mansour.**
*Q.* We've also heard a lot of testimony about the Abreezio software.
***A.*** **The software?**
*Q.* Correct.
***A.*** **Yes.**
*Q.* And that's DFTBreez and TruSens; correct?
***A.*** **Yes. We've heard some testimony about it.**
*Q.* And we've heard how this was vetted by Qualcomm for months.
***A.*** **Yes.**

*Q.* And there were on-site demonstrations for weeks.
***A.*** **On the software?**
*Q.* The technology, the software.
***A.*** **I sort of distinguish between the software and then the TruSens and TruTest, so if --**
*Q.* Okay. Well, both the software, TruSens, and TruTest were analyzed by Qualcomm's due diligence team over a period of many, many, many months.
***A.*** **They were, yes.**
*Q.* And a lot of the testimony, correct?
***A.*** **Yes.**
*Q.* And we also heard that there were on-site demonstrations for weeks, over 20 days, at least?
***A.*** **Yes, from Dan Hoggar.**
*Q.* And that Qualcomm thoroughly investigated the promise of the Abreezio products before entering into that UPA.
***A.*** **I believe that they did, yes.**
*Q.* And we've heard testimony about how valuable Qualcomm thought this software was?
***A.*** **We have, yes.**
*Q.* About how much money Abreezio was going to save a semiconductor company.
***A.*** **Yes.**
*Q.* How valuable Abreezio was to Qualcomm.
***A.*** **Yes, some of the testimony has talked about that.**

*Q.* And to its competitors, as well.
***A.*** **There was some testimony on that, yes.**
*Q.* And how Qualcomm's acquisition of Abreezio kept Abreezio out of the hands of its competitors.
***A.*** **I believe we did hear some testimony to that effect.**
*Q.* We've also heard a lot of testimony about who created the software, the two products you were describing; correct?
***A.*** **TruSens and TruTest.**
*Q.* Thank you.
***A.*** **Yes.**
*Q.* And about what ideas are embedded in it.
***A.*** **Yes.**
*Q.* Because that's pretty critical to the allegations here; correct?
***A.*** **About what ideas are included in it? I think what is critical is where the ideas came from initially.**
*Q.* Well, the Government's alleging that Karim, in fact, created Sheida's provisional patent applications; correct?
***A.*** **Correct.**
*Q.* And that the ideas in those provisional patent applications were allegedly put into Abreezio's products.
***A.*** **What is the question?**
*Q.* The Government is alleging that the ideas in the provisional patent applications were put into Abreezio's products.
***A.*** **I don't know if that's what we're alleging.**

*Q.* Well, the allegation is that Dr. Arabi, in fact, was the one who created Sheida's provisional patent applications; correct?
***A.* That's correct.**
*Q.* And that those provisional patent applications were Abreezio and what Qualcomm bought; right?
***A.* Correct. Part of what Abreezio was, yes.**
*Q.* And we've heard that source code would show two things: Who keyed in the scripts and when it was keyed in; correct?
***A.* We have heard that.**
*Q.* And that may not tell us what ideas are keyed in, you'd agree?
***A.* Correct.**
*Q.* But we've also heard that source code would show which ideas were put into the software that Qualcomm vetted and Qualcomm purchased; correct?
***A.* So I could be -- again, I think TruSens and TruTest are different from the software. And the source code may go with the software. But, again, I'm not an engineer, and I don't totally -- I don't know for sure.**
*Q.* Okay. But we have heard testimony, you'd agree, that source code would show which ideas were reflected -- source code is metadata; correct? Is that your understanding?
***A.* I think it was described that way. Again, I'm not an engineer. But I think the source code for the software would show who was inputting things as they went along and coded the**

**information.**

***Q.*** And it would show what things were inputted, right, which individual concepts? We've heard that testimony; correct?

***MS. CHOPRA:*** Objection. Foundation, Your Honor.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** You sought the source code for Abreezio's products?

***A.*** **I don't know that we did.**

***Q.*** You didn't?

***A.*** **I'm not sure that we did.**

***Q.*** Even though that's a critical part of this case that you've been investigating since 2020?

***A.*** **I don't know that it is.**

***Q.*** You don't know that it is.

***A.*** **No.**

***Q.*** We saw a lot of the records, charts, that you created; correct?

***A.*** **I created three charts, yes.**

***Q.*** And you'd agree that, at times, your work is not always accurate?

***A.*** **I mean, I am human.**

***Q.*** And you had found some mistakes in your summary chart of the calls and texts here at one point?

***A.*** **I don't recall that.**

***Q.*** Do you recall emailing the prosecutors that you had used a

different source, you were told to check it, and it didn't work, turned out it was incorrect?

**A. I'm not sure what you're talking about.**

***MS. BERNSTEIN:*** I'm just going to, if it's okay, just pass up to the witness what I'm marking as Defendant's Exhibit 4002.

Permission to approach, Your Honor?

***THE COURT:*** You may.

***THE WITNESS:*** Thank you. I do remember this.

***BY MS. BERNSTEIN:***

***Q.*** And at times, as you said, you're human, and things are not always precise.

**A. Correct.**

***Q.*** In your investigation you talked about Thoughts To Paper.

Do you remember that?

**A. Yes.**

***Q.*** And that was the patent authorship agency that had originally been engaged to file the provisional patent applications?

**A. That's right.**

***MS. BERNSTEIN:*** And I want to show you Exhibit 2183. I'm not sure if this is admitted.

***THE COURT:*** It has been.

***MS. BERNSTEIN:*** Okay. Then we can publish that.

///

***BY MS. BERNSTEIN:***
***Q.*** You reviewed this document as part of your investigation?
***A.*** **I did.**
***MS. BERNSTEIN:*** And can we zoom in?
***BY MS. BERNSTEIN:***
***Q.*** This is an email from Phil Wilson, Thoughts To Paper, to a Sheida email address and a Karim email address; correct?
***A.*** **Yes.**
***MS. BERNSTEIN:*** And can we zoom in on the first paragraph, please?
***BY MS. BERNSTEIN:***
***Q.*** And you reviewed this, and you know that Mr. Wilson said it was a pleasure speaking with you over the phone today to Sheida; correct?
***A.*** **Yes.**
***Q.*** And Mr. Wilson lives in Las Vegas?
***A.*** **I'm not sure where Mr. Wilson lives.**
***Q.*** You've never spoken with him?
***A.*** **I have not.**
***Q.*** Has anyone ever spoken with him?
***A.*** **I don't believe we interviewed him as a part of our investigation, no.**
***MS. BERNSTEIN:*** Thank you. You can take that down.
***BY MS. BERNSTEIN:***
***Q.*** Your investigation, of course, considered the agreement by

which Qualcomm would assert ownership if Karim invented technology; correct?

**A. Yes.**

***MS. BERNSTEIN:*** And I want to show you Exhibit 771.

***BY MS. BERNSTEIN:***

***Q.*** So according to this agreement, on its face, if an employee left Qualcomm and then later invented something in the next 12 months --

***MS. BERNSTEIN:*** Can we go to Section 1.5, please, actually, and zoom in. Let me start that question over.

***BY MS. BERNSTEIN:***

***Q.*** According to this agreement, on its face, if an employee left Qualcomm and then later invented something in the next 12 months after leaving Qualcomm, the agreement says that Qualcomm presumptively owns it; correct?

**A. That's what this says.**

***Q.*** And "presumptively" means that Qualcomm owns it unless the employee convinces Qualcomm otherwise?

***MS. CHOPRA:*** Objection. Foundation. Relevance.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** What does "presumptively" mean to you?

***MS. CHOPRA:*** Objection. Relevance.

***THE COURT:*** Sustained.

///

***BY MS. BERNSTEIN:***
***Q.*** You'd agree that this covers one year following termination of employment with the company; correct?
***A.*** **That's what it says.**
***Q.*** And the company, of course, is Qualcomm.
***A.*** **That's right.**
***Q.*** Okay.
***MS. BERNSTEIN:*** Thank you. You can take that down.
***BY MS. BERNSTEIN:***
***Q.*** Do you know what Dr. Arabi's wife's legal last name is?
***A.*** **I believe it's Babataheri.**
***Q.*** And, in fact, that's what's on her driver's license?
***A.*** **I haven't reviewed -- I didn't review her driver's license recently, so I'm not sure.**
***Q.*** It's what's on her banking cards?
***A.*** **I'm not sure.**
***Q.*** You have her driver's license and her banking cards in evidence -- in discovery, correct?
***A.*** **We do have it, yes. And I think that's correct.**
***Q.*** Let's go back for a moment to the text message when we were talking about how they're incomplete.
***A.*** **Okay.**
***Q.*** I had asked you about the text where Mr. Taneja was seeking information from Dr. Arabi.
***A.*** **Yes, I remember.**

***Q.*** And he claims Dr. Arabi gave him information orally; correct?
***A.*** **Yes.**
***MS. BERNSTEIN:*** Okay. So let's look at 723. I think you said you wanted to see that.
***THE WITNESS:*** Thank you.
***MS. BERNSTEIN:*** Actually, can we zoom out for a moment?
***BY MS. BERNSTEIN:***
***Q.*** So Exhibit 723 is a singular text message; correct?
***A.*** **Correct.**
***Q.*** We see no response.
***A.*** **Correct.**
***Q.*** And it's purportedly from February 26th of 2015.
***A.*** **Yes.**
***Q.*** And other evidence we've seen is that Sanjiv and Karim text messaged with each other far past February 27th of 2015.
***A.*** **The text messages between the two of them?**
***Q.*** Yes.
***A.*** **Yes.**
***Q.*** But we see no response, no continuation of a conversation here.
***A.*** **That's right.**
***Q.*** And so Karim here is asking -- excuse me.
Sanjiv here is asking Karim for --
***MS. BERNSTEIN:*** We can zoom in, please.

***BY MS. BERNSTEIN:***

***Q.*** -- is asking Karim, "What kind of numbers is CPR showing on designs where it worked."

Do you see that?

***A.*** **I do see that.**

***Q.*** And he testified that he found this publicly available 64 percent number with TI; right?

***A.*** **He did.**

***Q.*** And that his testimony was that Karim told him orally that Qualcomm's numbers were 65 percent?

***A.*** **He testified to some number. I can't remember precisely the number. But, yes.**

***Q.*** And, in fact, he didn't even use that number, and we went through all those slides where he used a 50 percent number?

***A.*** **Yes, I recall that.**

***Q.*** And then he ended up using a 35 percent number.

***A.*** **There was a range I think he used at some point.**

***Q.*** And the final slide had -- the latest version had 35 percent, which was in line with the industry and Dr. Sylvester's own patent?

***A.*** **I'm not sure.**

***Q.*** Okay. So here, where he is seeking the information, we didn't see any response from Dr. Arabi; correct?

***A.*** **Correct.**

***Q.*** It's possible that he said, I can't give that to you?

***MS. CHOPRA:*** Objection.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** We have no idea what he said, do we?

***A.*** **There was no response to the text message here.**

***Q.*** According to the sheet; right?

***MS. BERNSTEIN:*** You can zoom back out, please.

***THE WITNESS:*** Correct.

***BY MS. BERNSTEIN:***

***Q.*** But you don't know if there was a response to the text message.

***A.*** **These were the text messages that we received in civil discovery.**

***Q.*** From civil --

***A.*** **And we were unable to obtain copies on our own.**

***Q.*** You never sought copies on your own, I thought you testified.

***A.*** **We did ask Mr. Taneja if he was still in possession of the phone or his laptop from that time, and according to him and his attorneys, they were not able to provide that to us.**

***Q.*** And you have extensive subpoena and search warrant power that you never used to check what the civil cooperator and criminal cooperator were saying, particularly on a crucial point like this one.

***A.*** **I don't know what I would have issued a subpoena or search**

**warrant for at that time if it wasn't in their possession.**

***Q.*** Don't you think the jury deserves to see the complete accurate and unbiased text messages and what a response was to this?

***MS. CHOPRA:*** Objection. 403.

***THE COURT:*** Sustained.

***BY MR. FRASER:***

***Q.*** You investigated Sheida Alan quite a bit; correct?

***A.*** **As much as we could.**

***Q.*** You learned that she had an Associate's degree in Computer Software Engineering.

***A.*** **Yes. We did obtain her, I think, transcripts.**

***Q.*** You knew that she focused on software engineering and programming for her Associate's degree as well.

***A.*** **I believe that's correct.**

***Q.*** And that she went on to study Computer Hardware Engineering for her Bachelor's degree.

***A.*** **I might have to look at her résumé again to refresh my memory.**

***Q.*** Do you recall that she focused on electronics and VLSI and computer science when she was in school in Iran?

***A.*** **I don't recall what her focus was.**

***MS. BERNSTEIN:*** Can we pull up 2259, please? And can we just zoom in on the courses, please?

///

***BY MS. BERNSTEIN:***

***Q.*** And this is a transcript you have reviewed?

***A.*** **I have, yes. I haven't reviewed it recently, though, so thank you.**

***THE COURT:*** And just for the record, it is not in evidence.

***MS. BERNSTEIN:*** Oh, I'm sorry. Move to admit.

***THE COURT:*** Any objection to 2259?

***MS. CHOPRA:*** No objection, Your Honor.

***THE COURT:*** It may be admitted.

***(Exhibit 2259 admitted.)***

***BY MS. BERNSTEIN:***

***Q.*** And would you agree that she had focused on electronics and computer science, computer systems architecture, fundamentals of computer and programming?

***A.*** **I do see that here, some basic classes, yes.**

***MS. BERNSTEIN:*** Okay. Thank you.

***BY MS. BERNSTEIN:***

***Q.*** You also learned that she applied to several Master's of Applied Science degrees?

***A.*** **I just recall her applying to SFU.**

***Q.*** She also applied to the University of British Columbia?

***A.*** **I don't recall that.**

***Q.*** Do you recall that she received glowing recommendations from her professors in Iran in support of those applications?

**A. I don't recall that.**

***MS. BERNSTEIN:*** Let's look at 2548, please.

***THE COURT:*** Not in evidence, just for the record.

***BY MS. BERNSTEIN:***

***Q.*** Have you reviewed this?

**A. I'm just reviewing it.**

***Q.*** This was produced in the civil case?

**A. Yes.**

***Q.*** And then the Government received it early in its investigation?

**A. We did.**

***Q.*** Okay. Does this refresh your memory that she had received a glowing recommendation from a professor at Razi University?

**A. I see that now, yes.**

***MS. BERNSTEIN:*** Move to admit 2548.

***THE COURT:*** Any objection?

***MS. CHOPRA:*** Objection. Foundation and hearsay.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** Did you ever follow up with this professor?

**A. I did not. And a professor in Iran?**

***Q.*** A professor attesting to Sheida's skill and knowledge in the area you've been claiming she has no skill and knowledge in? Did you ever follow up with that person?

**A. I did not.**

*Q.* Did anyone?
**A. Not that I'm aware of.**
***MS. BERNSTEIN:*** Let's look at Exhibit 2211.
***BY MS. BERNSTEIN:***
*Q.* I'm sorry, before we get here, you would agree that that person had an email address; correct?
**A. I didn't notice it on the prior.**
***MS. BERNSTEIN:*** If we can go back to 2548 for a moment.
***THE WITNESS:*** I see it, yes.
***BY MS. BERNSTEIN:***
*Q.* And no emails were sent; correct?
**A. I did not email that person, no.**
***MS. BERNSTEIN:*** Okay. Let's look at 2211.
***BY MS. BERNSTEIN:***
*Q.* And this looks like it was obtained by the Government; correct?
**A. This was obtained via an MLAT, yes.**
*Q.* So you reviewed this.
**A. I did.**
*Q.* And does this refresh your memory that Dr. Mohamed Karkbanachi, in December of 2013, also attested to her --
***MS. CHOPRA:*** Objection. Hearsay.
***THE COURT:*** Sustained.
***BY MS. BERNSTEIN:***
*Q.* Did you follow up with this professor?

***A.*** **No. We have -- I can't just reach out to somebody in a different country. I have to go through different -- like, with Canada, we had to use an MLAT procedure. And I actually don't know what our process would be to obtain records or speak with somebody who is in Iran.**

***Q.*** You have to go through an MLAT procedure to send an email?

***A.*** **If I'm reaching out to someone in a different country, I do have to go through some sort of process. I can't just reach out to them.**

***Q.*** And here, you issued many MLATs, the Government collectively, your team did, as you've testified; correct?

***A.*** **We did.**

***Q.*** You never took whatever steps were necessary to interview this professor or speak with this person?

***A.*** **We did not.**

***Q.*** Even after receiving a document attesting to her abilities that you claim she does not have?

***A.*** **I'm not sure that this really speaks too specifically about her skills. We did not follow up on this.**

***Q.*** And would you think it would be relevant if she had the strong ability to --

***MS. CHOPRA:*** Objection. Hearsay.

***THE COURT:*** Sustained.

***MS. BERNSTEIN:*** I think I know the answer, but let's try 2262.

***BY MS. BERNSTEIN:***

***Q.*** Did you also learn that while in Iran, Sheida started and owned her very own company, a software company?

***A.*** **I don't recall that.**

***Q.*** Did you learn that she taught software and computer logic designs?

***A.*** **I think that might have been on her résumé.**

***Q.*** For several semesters while in Iran?

***A.*** **You know what, I'm not sure. I'd have to see the documents to refresh my recollection.**

***Q.*** You learned that she immigrated from Iran to Canada in 2011?

***A.*** **I know she immigrated to Canada. I'm not firm on the date.**

***Q.*** Your investigation told you that, beginning in September of 2022 -- 2012, excuse me -- she audited courses in semiconductors and VLSI?

***A.*** **I'm not sure where we -- where that was shown in our investigation.**

***Q.*** You learned that she didn't meet the language requirement to officially enroll; right?

***A.*** **I know that she had some issues with her English, yes.**

***Q.*** And that that delayed her official enrollment?

***A.*** **I'm not sure.**

***Q.*** You've looked at records.

***A.*** **I have reviewed -- I haven't reviewed these records too recently, so I apologize it's not fresh in my mind. If you'd**

**like to show me something, I'm happy to look at it.**

***Q.*** And I apologize because we don't have some of these keyed up, but we can try and come back to it.

You know that she applied to a number of graduate programs with professors; correct? In Canada?

***A.*** **I'm aware of her applying to SFU. I don't recall the other applications. I know we saw a British Columbia -- a recommendation letter for British Columbia, but...**

***MS. BERNSTEIN:*** Let's show you 2328.

***BY MS. BERNSTEIN:***

***Q.*** And does this refresh your memory that she also applied to the University of Calgary?

***A.*** **It does, yes. I don't know if she applied, but it says that she's interested in pursuing a degree.**

***Q.*** You reviewed this email before today.

***A.*** **I'm not sure that I have reviewed this email.**

***Q.*** The Government received it in the civil case from Qualcomm?

***A.*** **We did receive it. It looks like, based on the Bates stamp, that we received it in the civil case.**

***Q.*** And produced it to the Defense?

***A.*** **Yes.**

***MS. BERNSTEIN:*** Move to admit.

***THE COURT:*** Any objection?

***MS. CHOPRA:*** Objection. Hearsay, Your Honor.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** You testified that you knew she applied at SFU, and I want to clarify that.

Are you aware that she applied to many professors at SFU?

***A.*** **No.**

***MS. BERNSTEIN:*** Let's look at 2291.

***BY MS. BERNSTEIN:***

***Q.*** Is this another document you got in the civil case?

***A.*** **It is.**

***Q.*** From Qualcomm?

***A.*** **Correct. It was provided by Ms. Alan to Qualcomm during the civil case, it looks like, based on that Bates stamp.**

***Q.*** And provided by Qualcomm to the Government when it asked the Government to prosecute.

***A.*** **It was provided to us, yes, based on a subpoena we issued to Qualcomm.**

***Q.*** Does this refresh your memory that she had applied to a professor, Dr. R.C.N. D'arcy at SFU?

***A.*** **Again, I'm not sure I'd ever seen this particular document before, but it does look like she reaches out to another professor, yes.**

***Q.*** And do you know if any of your colleagues have seen this document before?

***A.*** **I am not sure. I would think that John Roberts probably reviewed this when the documents first came in, but I had not**

**reviewed a lot on this particular topic.**

***MS. BERNSTEIN:*** Let's go to 2153, please.

***BY MS. BERNSTEIN:***

***Q.*** And this is also from the civil case that was given to Qualcomm?

***A.*** **It is, yes, based on the Bates stamp.**

***Q.*** Does this refresh your memory that Sheida also applied to an SFU professor, John Jones, to pursue her Master's degree in Computer Engineering?

***A.*** **It looks like she did, yes.**

***MS. BERNSTEIN:*** Let's look at 2132.

***BY MS. BERNSTEIN:***

***Q.*** Does this refresh your memory -- I'm sorry.

This is also from the civil case; correct?

***A.*** **It is, yes.**

***Q.*** And Qualcomm gave this to the Government; correct?

***A.*** **They did, yes.**

***Q.*** And does it refresh your memory that Sheida also applied to a professor --

***A.*** **I'm not going to try it.**

***Q.*** -- to another professor at SFU?

***A.*** **Yes, it looks like she did.**

***Q.*** Thank you.

And, of course, as you've testified and we've heard evidence about, she ultimately studied under Professor Bozena Kaminska at

SFU; correct?
**A. She did.**
*Q.* And you know that Professor Kaminska has an extensive background in semiconductors and VLSI design and testing?
**A. I believe that she does.**
*Q.* And that through her discussions with Professor Kaminska, it was decided that she would pursue nanoelectronics instead, because that's where Professor Kaminska's funding was?
**A. That's right.**
*Q.* And you also learned that Professor Kaminska introduced her to other graduate students, including Kian Davoudi, at SFU to work on sensor projects; correct?
**A. I recognize the name.**
***MS. BERNSTEIN:*** We can pull up 2349.
***BY MS. BERNSTEIN:***
*Q.* This document was obtained through the Government's MLAT, as you described?
**A. That's right.**
*Q.* And I guess to be really clear, an MLAT is essentially a foreign subpoena.
Is that a fair and simple characterization for the jury?
**A. I guess that's fair.**
*Q.* And --
**A. Jump through a few more hoops, but, yes.**
*Q.* And this document was obtained through the Government's

MLAT; correct?

**A. It was.**

*Q.* And does this refresh your memory that Professor Kaminska introduced Sheida to other graduate students, including Kian Davoudi, to work on sensor projects?

***MS. CHOPRA:*** Objection. Hearsay.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

*Q.* In your investigation, did you learn that she had been -- that Professor Kaminska had introduced Sheida to other graduate students to work on sensor projects?

**A. I see Kian's --**

***THE COURT:*** We're not asking to you read what the document is. The question is whether that refreshes your recollection.

***THE WITNESS:*** Yes. But it looks like it's a pulse ox symmetry sensor. I'm not sure what that is.

***BY MS. BERNSTEIN:***

*Q.* None of us are engineers; correct?

**A. Correct.**

*Q.* And I think you testified that Sheida had decided to join Bozena's team in January of 2014; correct?

**A. The fall term of -- fall of 2014. I'm sorry, what was the question?**

*Q.* That she had decided to join her team in 2014 after she had

finished working on another project. I think we saw some emails about that yesterday.

Do you remember that?

**A. She wanted to join for the fall term of 2014. I think she first was introduced to Bozena in January of 2014.**

*Q.* And she wanted to join the courses, enroll in the university; correct?

**A. Yes.**

*Q.* And you can work with a professor even before you're technically enrolled in a university; correct?

**A. I'm not sure.**

*Q.* And you know that her Master's work was delayed because of this English issue?

**A. I believe that's correct. Or maybe Professor Kaminska's -- she was full, she couldn't accept new students at the time.**

*Q.* And do you recall also that Sheida had to get an English exemption?

**A. I saw that in the documents, yes.**

*Q.* And that that delayed her admission to SFU?

**A. I think that may have been one of the reasons.**

*Q.* And we've heard a lot of testimony about nanoelectronics, correct, or inkjet printing?

**A. Yes.**

*Q.* And despite -- your investigation has shown you that Ms. Alan had no background in inkjet printing; correct?

**A. I don't recall seeing that on her prior coursework on the transcript.**
Q. And despite no background in inkjet printing, she quickly ramped up to the topic and published a lot of papers in the area; correct?
**A. I'm not sure.**
Q. Her thesis was in the area.
**A. I believe so.**
***MS. BERNSTEIN:*** We'll show you 2730, please.
***BY MS. BERNSTEIN:***
Q. Do you recognize this document?
**A. I'm not sure that I have seen this document. It looks like it was produced in the civil.**
Q. Do you think it was perhaps produced by the Defense to --
**A. Oh, maybe. Yeah, I don't recognize that Bates stamp.**
Q. Would we provide documents periodically throughout the case to the Government to review as well?
**A. Apparently.**
Q. Did you ever review those?
**A. I'm not sure that I've ever seen this document.**
Q. This is her Master's thesis?
**A. It looks like it.**
Q. Do you know what "Structural Colour Images Inkjet Printed on Polymer Substrates Patterned with Nanostructural Pixels" is about?

***MS. CHOPRA:*** Objection. Hearsay and foundation.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** You reviewed other publications that Ms. Alan has been on?

***A.*** **A couple.**

***MS. BERNSTEIN:*** I'm only going to show you a couple in the interest of time. Let's start with 2912, please.

***BY MS. BERNSTEIN:***

***Q.*** Did you review this document from the civil case?

***A.*** **I have seen this document.**

***Q.*** And this is amongst -- do you know who all the individuals here are?

***A.*** **I've seen the names in the emails, but I -- I believe they were other students in Ms. Kaminska's program, but I can't say for sure.**

***Q.*** And Dr. Kaminska is on here?

***A.*** **She is.**

***Q.*** And Sheida's on this email as well?

***A.*** **She is.**

***Q.*** And they're talking about a --

***MS. CHOPRA:*** Objection. Foundation and hearsay.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** You're aware that one of the conference papers that Ms. Alan --

***MS. CHOPRA:*** Objection. Hearsay, Your Honor.

***BY MS. BERNSTEIN:***

***Q.*** You've reviewed this document?

***THE COURT:*** You may answer that question. Have you reviewed this document?

***THE WITNESS:*** Yes. It's familiar to me. I haven't reviewed it recently.

***BY MS. BERNSTEIN:***

***Q.*** And you're aware that one of papers that Ms. Alan was on with Professor Kaminska and other students was accepted for an IEEE conference with high scores?

***A.*** **It looks like it was on inkjet printing, yes. I don't know about the high scores. Let me see. The reviewers -- yes, the reviews were high.**

***MS. BERNSTEIN:*** And we can go to 2981, please.

***BY MS. BERNSTEIN:***

***Q.*** And do you remember reviewing this paper?

***A.*** **It looks very similar. I don't know if I've seen this exact paper, but it is similar to other papers I've reviewed with Sheida's name on them.**

***Q.*** And do you know what the topic of this paper is?

***MS. CHOPRA:*** Objection. Hearsay and foundation.

***THE COURT:*** Overruled.

***THE WITNESS:*** The topic appears to be "Inkjet Printed Optically Variable Devices on a Polymer Substrate Patterned with

Nanopillar Array Structural Pixels."

***BY MS. BERNSTEIN:***

***Q.*** Does that mean anything to you?

***A.*** **No.**

***Q.*** Is this the paper that was published in IEEE, do you know?

***A.*** **I'm not sure.**

***Q.*** And we've heard that IEEE is a very prestigious body in this field?

***A.*** **We have heard that.**

***Q.*** Are these the same authors as on the email we just looked at?

***A.*** **It looks like it, yes.**

***MS. BERNSTEIN:*** I want to show you 2241, please.

***BY MS. BERNSTEIN:***

***Q.*** Have you reviewed this paper?

***A.*** **This one also looks familiar, yes.**

***Q.*** Do you know where this one was published?

***A.*** **I don't know where it was published, no, or if it was published.**

***Q.*** And this is with the same people that we just saw on the IEEE paper?

***A.*** **It has the same names, yes.**

***MS. BERNSTEIN:*** And I'm going to show you 3149.

***BY MS. BERNSTEIN:***

***Q.*** Did you review this paper?

**A. I'm not sure.**
*Q.* Same authors?
**A. Same authors, same sort of topic, I believe.**
*Q.* You also learned that Sheida applied to be a teacher's assistant for computer engineering courses at SFU?
**A. I think that's what her résumé said.**
*Q.* I'm sorry?
**A. I think that was on her résumé.**
*Q.* And that Professor Kaminska had recommended her?
**A. I don't recall how she obtained the job.**
***MS. BERNSTEIN:*** We'll show you 2444.
***BY MS. BERNSTEIN:***
*Q.* Did you review this document from the civil case?
**A. Let me look at it.**
**I have seen this before.**
*Q.* Does this refresh your memory that Professor Kaminska recommended Sheida to be a teacher's assistant for two computer engineering courses at SFU?
***MS. CHOPRA:*** Objection. Hearsay.
***THE COURT:*** Sustained.
***BY MS. BERNSTEIN:***
*Q.* Do you recall that Professor Kaminska recommended Sheida for two computer engineering courses at SFU?
**A. It looks like --**
***MS. CHOPRA:*** Objection. Hearsay, Your Honor.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** The question is just if you recall, not reading what's on the screen.

***MS. BERNSTEIN:*** We can take it down, even.

***THE WITNESS:*** Okay. I don't recall. I'm sorry.

***BY MS. BERNSTEIN:***

***Q.*** Okay. Thank you.

You also learned that she applied for a Ph.D. program with Professor Ivanov in DFT?

***A.*** **Yes, subsequent to the acquisition with Abreezio. Yes.**

***Q.*** In November of 2016?

***A.*** **I saw an email, I think, to that effect.**

***Q.*** You know that Sheida taught Fundamentals of Digital Logic and Design at SFU from 2017 to 2020?

***A.*** **I'm not sure what she did following the acquisition.**

***Q.*** Do you know that she taught a microelectronics course following the acquisition?

***A.*** **I can't speak to what she did following the acquisition, no.**

***MS. BERNSTEIN:*** Let's put up 2025, please.

***BY MS. BERNSTEIN:***

***Q.*** Did you review this document?

***A.*** **I think I've seen this before, yes.**

***Q.*** Your investigation showed you that Sheida taught microelectronics courses after the acquisition?

***MS. CHOPRA:*** Objection. Relevance and hearsay.

***THE COURT:*** Overruled. Did your investigation show you that or not?

***THE WITNESS:*** I mean, based -- not my investigation. But based on this document, it looks like she did. Microelectronics --

***THE COURT:*** Just wait for the question.

***BY MS. BERNSTEIN:***

***Q.*** Do you know that she's currently teaching courses in electronics at a college in Vancouver?

***A.*** **I don't know what she's currently doing.**

***MS. BERNSTEIN:*** We'll show you 2136.

***BY MS. BERNSTEIN:***

***Q.*** Have you reviewed this document before?

***A.*** **I don't know if I've seen this document before.**

***MS. BERNSTEIN:*** Okay. We'll show you 2032.

***BY MS. BERNSTEIN:***

***Q.*** Have you seen this document before?

***A.*** **I don't believe I've seen these two documents before.**

***Q.*** So Sheida's coursework or teaching in electronics is not a part of your investigation; correct?

***A.*** **Those actually didn't say that she was teaching the courses.**

***MS. BERNSTEIN:*** We can pull them back up.

***THE WITNESS:*** I don't see her name on here.

***THE COURT:*** Wait for a question.

***THE WITNESS:*** I'm sorry.

***BY MS. BERNSTEIN:***

***Q.*** Did your investigation into Ms. Alan include wondering where she has taught electronics courses?

***A.*** **It did not.**

***Q.*** Okay.

***MS. BERNSTEIN:*** Would now be a good time for a break, Your Honor?

***THE COURT:*** Sure. Let's take a 15-minute recess, ladies and gentlemen. You're reminded you're not to discuss the case. You're not to do any research about the case. And we'll see you back in 15 minutes.

***(Jury out at 10:33 a.m.)***

***THE COURT:*** Okay. We're now outside the presence of the jury.

Any issues we need to take up?

***MS. CHOPRA:*** No, Your Honor. Thank you.

***THE COURT:*** I'm assuming no, since there does not appear to be any from the Defense.

***MS. ROBERTS:*** No, we're good.

***THE COURT:*** Okay. We'll take a 15-minute recess.

***(Recess taken.)***

***THE COURT:*** Okay. We are back on the record. We raided all our first-aid kits and discovered that we're in great shape if anyone has broken every limb in their body and needs a

blanket. So Band-Aids, we're in short supply.

Anyway, we are back on the record. And you are reminded you are still under oath to tell the truth.

***THE WITNESS:*** Yes, Your Honor.

***BY MS. BERNSTEIN:***

*Q.* Agent Chambers, I think we were talking about courses that Sheida's teaching now.

Is that where we left off? Is that your memory?

***A.* We were.**

*Q.* Okay. Then I want to talk for a moment about some other things in your -- your investigation.

Your investigation showed evidence that Sheida was working in Dr. Kaminska's lab in the spring and summer of 2014?

***A.* I'm not sure that it did.**

*Q.* Okay. Your investigation showed you that there -- that they had bounced ideas off of each other and that Dr. Kaminska thought that those ideas were patentable?

***A.* I don't recall that.**

*Q.* Do you recall that one of your colleagues spoke with Dr. Kaminska for close to three hours?

***A.* I do recall that.**

*Q.* And you've spoken with him about his investigation?

***A.* I have.**

*Q.* And you've reviewed a transcript of that, as well; correct?

***A.* I have.**

*Q.* And that was early on in this case, in August of 2022; correct?

***A.* Yes.**

*Q.* And you did follow-up investigation after that; correct?

***A.* Our investigation continued after that, yes.**

*Q.* And your investigation -- you pursued evidence of the notion that they had bounced ideas off of each other and that Dr. Kaminska thought things were patentable?

***MS. CHOPRA:*** Objection. Hearsay. And asked and answered.

***THE COURT:*** Asked and answered. Sustained.

***BY MS. BERNSTEIN:***

*Q.* Your investigation -- you investigated into Sheida's continued reading and exploring of DFT technology even after the acquisition in this case?

***A.* There was some evidence that she tried to pursue further education on this topic that she had already mastered, supposedly.**

*Q.* In 2016, I think you talked about her application to a Ph.D. program in this topic.

***A.* Yes.**

*Q.* And you also investigated her nanomedia inkjet printing and your investigation was into evidence that that was the funding that Dr. Kaminska had received?

***A.* That was the program under which she participated under**

**Dr. Kaminska, yes.**

***Q.*** And you learned that that program had been recently funded for Dr. Kaminska?

***A.*** **That appeared to be what was the case, yes.**

***Q.*** Your investigation into Sheida also showed that she lacked industry experience.

***A.*** **I can't speak knowledgeably about what -- I guess, yes, she was an intern, it appeared, from her résumé. She had just been an intern at several places.**

***Q.*** You didn't learn that she had put together any startups; correct?

***A.*** **Not that I recall.**

***Q.*** Or had any other experience that would give her sort of that business acumen?

***A.*** **Correct.**

***MS. BERNSTEIN:*** I want to look for a moment at Exhibits 621 and 622. Let's start with 621. I think we looked at these yesterday or at some point. They're admitted?

***THE COURT:*** They are in evidence.

***MS. BERNSTEIN:*** I'm sorry?

***THE COURT:*** They are.

***MS. BERNSTEIN:*** Yes. Thank you, Your Honor. Messed up for my colleague.

***BY MS. BERNSTEIN:***

***Q.*** This is Exhibit 621.

Do you remember, though, this email?

**A. I do.**

*Q.* And this is about Ms. Alan getting a document notarized; correct?

**A. It is.**

***MS. BERNSTEIN:*** Okay. And I want to look at 622, the last page, please.

***BY MS. BERNSTEIN:***

*Q.* This is the document that was notarized?

**A. Yes.**

*Q.* And is this by a notary public in Burnaby, B.C., which is British Columbia; correct?

**A. Yes.**

***MS. BERNSTEIN:*** Can we go back to 621?

***BY MS. BERNSTEIN:***

*Q.* And the email address that this is sent from is Sheida.Alan@gmail.com; correct?

**A. It is.**

*Q.* And is that one of the email accounts that the Government claims was exclusively used by Dr. Arabi?

**A. Yes.**

*Q.* So it's not exclusively used by Dr. Arabi.

Would you agree?

**A. I can't say that from this document.**

*Q.* Do you believe that Dr. Arabi was the person communicating

with the notary who notarized the signature we just saw on 622?

***A.*** **From this document, it looks to me like Sheida was -- got the document notarized. But then the email address that she probably then provided was Sheida.Alan@gmail.com. It doesn't tell me whether Sheida was the one who then accessed that email account or if it was Dr. Arabi.**

***MS. BERNSTEIN:*** And let's go to 622. Last page, please.

***BY MS. BERNSTEIN:***

***Q.*** You have no reason to doubt that Ms. Alan was the person who Alex Luk notarized; correct?

***A.*** **Correct.**

***MS. BERNSTEIN:*** No further questions.

***THE COURT:*** Redirect?

***MS. CHOPRA:*** Yes, Your Honor.

***REDIRECT EXAMINATION***

***BY MS. CHOPRA:***

***Q.*** Agent Chambers, on cross-examination, you were asked about subpoenas and search warrants issued in this case.

Do you recall that?

***A.*** **I do, yes.**

***Q.*** As an agent, have you issued numerous subpoenas across your various investigations to phone carriers?

***A.*** **Yes.**

*Q.* Including AT&T?
***A.* Correct.**
*Q.* And Verizon?
***A.* Yes.**
*Q.* And other phone carriers?
***A.* Yes.**
*Q.* Okay. Pursuant to any of those subpoenas that you served on phone carriers, have you, in your investigations, ever received content in terms of content of text messages from any phone carrier?
***A.* No, I have not.**
*Q.* What do you usually get pursuant to a subpoena to a phone carrier?
***A.* Well, you get the subscriber information, the toll records that show the calls, that sort of information, but no content.**
*Q.* What do you always use in your investigations to get content?
***A.* That requires a search warrant.**
*Q.* Including text message content?
***A.* Correct.**
*Q.* All right. We talked a little bit about Mr. Taneja's text messages, including on cross-examination.
Do you recall that?
***A.* Yes.**
*Q.* And you said, I believe -- and correct me if I'm wrong --

that you did try to obtain those text messages from Mr. Taneja during your investigation.

**A. We did, yes.**

*Q.* But you couldn't get them; right?

**A. He no longer had the device in his possession that had those messages on them.**

*Q.* So during your investigation, did you review the text messages that you received from Qualcomm that they got from the civil litigation?

**A. I did, yes.**

*Q.* Okay. During your investigation, were you able to corroborate at least some of the information in those text messages from Mr. Taneja through other evidence that you collected or saw?

**A. Yes.**

*Q.* Can you explain to the jury how you did such corroboration?

**A. Well, both -- well, Mr. Shokouhi also cooperated in the investigation, and he acknowledged that those were text messages that he recalled being on and receiving.**

**There are also different meetings that were set up, like the conference calls, and when the conference call is set up via the text message, you can see that the call occurred through the toll records. So that was another way we could corroborate them.**

*Q.* And whenever you had the chance to corroborate those text

messages through other evidence, did you take that step?
*A.* **We did.**
*Q.* Why did you take that step as part of your investigation?
*A.* **Because we wanted to be able -- because the text messages did not come to us in the perfect form that we would have liked to have had them, we wanted to take these extra steps to make sure that they were true and correct.**
*Q.* In terms of the timing of the Taneja text messages, if you know, did Mr. Taneja turn over his phone and laptop in the civil case before or after he started cooperating?
*A.* **After.**
*Q.* Did he turn over anything before?
*A.* **No, not that I'm aware of.**
*Q.* All right. Turning to Mr. Ziad Mansour.
On cross-examination, I believe you testified -- and, again, correct me if I'm wrong -- that you did not see in your investigation any actual payment being made to Mr. Mansour; is that right?
*A.* **Correct.**
*Q.* Okay. Based on your investigation, was it your understanding that Dr. Arabi had promised a payment to be made or that a payment was, in fact, made?
***MS. BERNSTEIN:*** Objection. Leading.
***THE COURT:*** Overruled.
***THE WITNESS:*** It was the promise of a payment.

***BY MS. CHOPRA:***

***Q.*** Not the actual payment?

***A.*** **Dr. Arabi did not tell Mr. Taneja that he had actually made a payment, but that he had to pay Mr. Mansour.**

***Q.*** All right. You also testified on direct and cross about Dr. Arabi's Invention Assignment Agreement.

Do you recall that?

***A.*** **Yes.**

***Q.*** Okay. And on cross, do you recall being asked about the Agreement potentially lasting for a year after Dr. Arabi left Qualcomm?

***A.*** **Yes.**

***Q.*** Did any of the evidence that you reviewed in this case suggest that Dr. Arabi invented the technology after he left Qualcomm?

***A.*** **It did not.**

***Q.*** Okay. Did it suggest that he invented it while he was at Qualcomm?

***A.*** **That's how it appeared.**

***Q.*** All right. Let's turn to Sheida Arabi.

First, you were asked a little bit on cross-examination about whether you followed up with a professor in Iran, I believe.

Do you recall that?

***A.*** **I do.**

*Q.* How easy is it for you to interview someone who is in a different country, such as Iran, specifically?

***A.*** **It's not easy, depending on the U.S. -- U.S. -- the United States' relations with that country, it can be difficult to reach out.**

*Q.* And, in fact, when you did do interviews in Canada in this case, what kind of steps did you have to take to even do interviews with Canada?

***A.*** **We had to -- I'm not sure of all the steps that were taken. But we coordinated at great length with the RCMP, the Royal Canadian Mounted Police, to work with them. And I'm sure that was approved at a much higher level than I'm aware of. And they accompanied us on any interviews that we conducted in Canada.**

*Q.* Is it fair to say that you had to go through diplomatic channels to conduct those interviews in Canada?

***A.*** **That's a better way to say it.**

*Q.* In your time as an agent, have you conducted any interviews or investigation within the country of Iran?

***A.*** **I have not.**

*Q.* On cross-examination, you were also asked about Sheida's transcript.

Do you recall that?

***A.*** **Yes.**

*Q.* Okay. And her course of studies at her various universities?

***A.*** **Correct.**
***Q.*** And you were asked about the VLSI course.
Do you recall that?
***A.*** **Yes.**
***Q.*** Did she take -- based on your review of her résumé and transcript, did she take one course or more than one course in VLSI?
***A.*** **I'd have to look at it again to be sure, but I think it was just one course.**
***MS. CHOPRA:*** And if we can pull up Exhibit 196, I believe.
***BY MS. CHOPRA:***
***Q.*** Is this one of the Sheida résumés that we looked at yesterday?
***A.*** **It is. It's the first one.**
***Q.*** It's the first one, the one sent on October 21st of 2015?
***A.*** **Yes.**
***Q.*** Where in this résumé does it say "VLSI"?
***A.*** **I don't see that on the résumé.**
***MS. CHOPRA:*** Can we please turn to 663?
***BY MS. CHOPRA:***
***Q.*** Is this the other Sheida résumé that we looked at yesterday?
***A.*** **Yes, the one that was sent to Mr. Taneja.**
***Q.*** And is this the one that was ultimately flipped over to Qualcomm?

***A.*** **Yes.**
***Q.*** Right during the due diligence?
***A.*** **Yes.**
***Q.*** Does this one have "VLSI" in it?
***A.*** **It does.**
***Q.*** The one that was sent to Qualcomm does have it.
***A.*** **Correct.**
***Q.*** But the one from one day prior does not.
***A.*** **That's right.**
***MS. CHOPRA:*** We can take that down. Thank you.
***BY MS. CHOPRA:***
***Q.*** On cross-examination, you were also asked about five to six professors that Sheida apparently reached out to, to further her studies in Canada.
Do you recall that?
***A.*** **Yes.**
***Q.*** Okay. Did she end up working, as far as you know, with any of those five or six professors that you were asked about on cross-examination?
***A.*** **Not that I'm aware of.**
***Q.*** As far as you know, is the only professor she worked with in Canada Professor Kaminska?
***A.*** **Yes.**
***Q.*** Okay. Is that the same professor that also knew Dr. Arabi?
***A.*** **Correct.**

***Q.*** I think -- on cross-examination, you were asked about when Sheida Arabi started her studies or started reaching out to Professor Kaminska, and I want to just solidify the timeframe for that.

What is your understanding of what term Sheida entered into SFU during?

***A.*** **It was the fall 2014 term.**

***Q.*** And to be fair, she was trying to get admission before that; right?

***A.*** **I think it was initially in January of 2014.**

***Q.*** But based on the records that you saw, when exactly did she enter SFU?

***A.*** **It would have been August or September 2014.**

***Q.*** And you were also shown several research papers that Sheida was on during your cross-examination.

Do you recall that?

***A.*** **Yes.**

***Q.*** Was every one of the papers that you saw about inkjet printing?

***A.*** **I think that they were. Again, they're not topics I'm familiar with, but, yes.**

***Q.*** At least today during your testimony.

***A.*** **Yes.**

***Q.*** In your investigation, as far as you can recall, have you seen a paper authored by Sheida in DFT?

***A.*** **No.**

***Q.*** What about microchips?

***A.*** **No, I have not.**

***Q.*** Do you know if Sheida ever got her Ph.D.?

***A.*** **I'm not sure.**

***MS. CHOPRA:*** No further questions, Your Honor.

***THE COURT:*** Anything further?

***MS. BERNSTEIN:*** Just one moment, Your Honor. I'm sorry.

***RECROSS-EXAMINATION***

***BY MS. BERNSTEIN:***

***Q.*** Hi, Agent Chambers.

***A.*** **Hello.**

***Q.*** I just want to briefly go over some of those things that Ms. Chopra just talked to you about.

I think you testified that you got Mr. Taneja's phone records -- they were the same phone records that he provided Qualcomm in the civil case after he started cooperating?

***A.*** **Are you talking about the text messages?**

***Q.*** Yes.

***A.*** **Yes.**

***Q.*** And those are text messages provided to Qualcomm by someone who told us for the first time when confronted, that, in fact, he had lied to Qualcomm throughout those proceedings?

**A. I believe Mr. Taneja had provided his laptop to his attorneys, and they were able to somehow -- I'm not sure how they downloaded those text messages, but -- and then they were provided to Qualcomm, yes.**

*Q.* And, in fact, when you guys first met with him in August of 2023, you met with him I think the testimony was two full-day meetings on the 14th of August of 2023 and on the 24th of August of 2023?

**A. That sounds right.**

*Q.* And do you recall that you guys asked him where the text messages were from for the forensic copy, that you wanted to know what -- all that information?

**A. Yes. I think we were hoping that he still had the devices so that we could get them.**

*Q.* Do you recall that he told you he would get you all of that information?

**A. I think he said he would look for it and ask his attorneys. He was unsure what had happened.**

*Q.* His attorneys were at these meetings, of course.

**A. He had different attorneys initially for the civil case.**

*Q.* I'm talking about August of 2023 when you guys met with him.

**A. Yes. So his attorneys that were at that meeting were not the same ones that he had for the civil case.**

*Q.* Same law firm; right?

**A. I actually don't -- I'm not sure.**

*Q.* Okay. You testified that you had cross -- you corroborated it to other pieces of evidence?
**A. If we could.**
*Q.* You cross-checked with Akbar Shokouhi's text messages?
**A. We did not have Mr. Shokouhi's text messages.**
*Q.* Mr. Shokouhi was cooperating with you as well; correct?
**A. He was, yes.**
*Q.* And you do have search warrants; correct?
**A. We do have search warrants, yes.**
*Q.* And subpoenas?
**A. We do have those available to us.**
*Q.* So you got those for Mr. Shokouhi's phone records?
**A. When we interviewed Mr. Shokouhi, he advised us that his text messages were set to automatically delete after one year, which is, I think, fairly common. So he never had those text messages in his possession.**
*Q.* And but you checked his iCloud; right?
**A. I don't know that we did. If they were deleted -- they're typically then also deleted off the iCloud.**
*Q.* So you checked?
**A. I don't believe that we did.**
*Q.* Okay. What about Mr. Abdi's text messages?
**A. We had gotten a 2703(d) order for Mr. Abdi's -- well, that was just for his emails, actually. So, no, we did not receive Mr. Abdi's text messages.**

***Q.*** And you didn't issue search warrants to Akbar's carrier -- phone carrier?
***A.*** **The carrier wouldn't have had the content of his messages.**
***Q.*** That's your testimony; correct?
***A.*** **Correct. We would have needed to go through Apple, I believe. He had an iPhone.**
***Q.*** You didn't issue search warrants to Akbar's carrier; correct?
***A.*** **We did not.**
***Q.*** And you didn't issue search warrants to Mr. Abdi's carrier; correct?
***A.*** **For his text messages?**
***Q.*** A search warrant to his phone carrier.
***A.*** **We did not.**
***Q.*** And just to clarify, nor did you subpoena them in a different format; correct? Because I think you've drawn a distinction between a search warrant and a subpoena, so I just want to be clear?
***A.*** **So we subpoenaed Mr. Abdi's toll records, which doesn't provide content. And at the time that these were being done, it was quite a while after the investigation, so we didn't have probable cause to get a search warrant. We couldn't just assume the text messages would still be there.**
***Q.*** I'm sorry, you couldn't apply for a search warrant when you started this investigation in 2020, is your testimony?

**A. We would have needed probable cause to know that those text messages still existed.**

Q. And you didn't have probable cause to pursue what you believed to be evidence of a crime for Mr. Abdi?

**A. We did not at that time.**

Q. You also testified that Karim promised to pay Ziad.

Do you remember saying that when Ms. Chopra asked you?

**A. That's what Mr. Taneja said.**

Q. That's what Mr. Taneja said.

**A. Correct.**

Q. You have no corroboration or evidence of that; correct?

**A. I don't believe that we do.**

Q. You've talked about your inability to communicate with some of the professors that I had asked you about.

Do you remember that a few moments ago?

**A. Yes.**

Q. You never emailed them; right?

**A. I did not.**

Q. You never called them.

**A. I did not. I don't think Sheida studied under them, so I didn't reach out to them.**

Q. You never took the steps that would have -- Ms. Chopra painted some difficult steps for you to do things outside the United States; correct?

**A. Oh, to the professors in Iran?**

*Q.* Correct.
***A.* Correct, we never reached out to them.**
*Q.* And you could, but you didn't; correct.
***A.* I'm actually not sure how that would work. I've never attempted to interview somebody in that country, so I don't know if we can or cannot.**
*Q.* So we don't know if these are insurmountable burdens because you never undertook.
***A.* That's correct.**
*Q.* Even though this was a COVID case and the Government took the case when they had the time to pursue Qualcomm's request?
***A.* I wasn't on the case during the, like, high-COVID time, I guess, so...**
*Q.* But you've been here for the testimony. You know that's what Mr. Roberts explained.
***A.* I do know that that's how he described it, yes.**
*Q.* When you investigate a case, it's a bunch of judgment calls; correct?
***A.* Yes, yes.**
*Q.* You look at what you decide to look at.
***A.* We try to gather as much evidence as we can.**
*Q.* No one prohibited you from seeking further search warrants or subpoenas of any of the text messages we've talked about; correct?
***A.* I can only get a search warrant for information if I can get**

**probable cause to obtain that search warrant. I can't just ask the judge for a search warrant on a whim.**

***Q.*** Would you agree that you -- but the case that's been put on, you have probable cause to obtain Mr. Taneja's text records?

***A.*** **The time period is relevant. If Mr. Taneja's text records still existed, yes, I think we would have sought a search warrant for those records.**

***Q.*** And we don't know because you never subpoenaed the carriers; right?

***A.*** **The carrier does not maintain the content of the text messages.**

***Q.*** And you got a non-return from the carrier, that's what's underscoring that answer?

***A.*** **No. None of the carriers, as far as I'm aware, would maintain the content of these text messages. We obtained toll records. We sent a subpoena for the toll records and the subscriber information, but we could not get content of text messages through that method.**

***Q.*** You sent subpoenas to Apple for the iCloud.

***A.*** **We did not subpoena Apple.**

***MS. BERNSTEIN:*** No further questions.

***THE COURT:*** May this witness be excused?

***MS. BERNSTEIN:*** Thank you, Agent Chambers.

***THE WITNESS:*** Thank you.

***MS. CHOPRA:*** I have one quick question.

***THE COURT:*** Okay.

***RE-REDIRECT EXAMINATION***

***BY MS. CHOPRA:***

***Q.*** Agent Chambers, apart -- setting aside Professor Kaminska, does the name Andre Ivanov mean anything to you?

***A.*** **It does.**

***Q.*** Who is that person?

***A.*** **He was also somebody, a Canadian, I believe, professor, who was an expert in DFT. And he was somebody -- a name that was floated to be on the Advisory Board, the Technical Advisory Board of Abreezio by both Brad Quinton and Dr. Arabi.**

***Q.*** Was he also someone that Sheida Arabi reached out to?

***A.*** **She did reach out to him. I think it was sometime in 2017.**

***Q.*** Did she study under him, as far as you know?

***A.*** **She did not.**

***Q.*** And you said he's Canadian?

***A.*** **He is.**

***Q.*** Did you take the steps to interview him, although he is Canadian?

***A.*** **I did.**

***Q.*** What did you do?

***A.*** **I obtained -- he travels frequently to the United States, so we were able to learn that he was going to arrive in the San Francisco Airport at one particular day. So we traveled up**

**there and interviewed him at the airport after he departed -- deplaned.**

***Q.*** So is it fair to say when you had the opportunity to interview international witnesses, you took that opportunity?

***A.*** **I did, yes.**

***MS. CHOPRA:*** No further questions, Your Honor.

***THE COURT:*** That was a very strange single question.

***MS. CHOPRA:*** I'm sorry.

***THE COURT:*** Your math isn't great.

***MS. CHOPRA:*** Series of questions.

***THE COURT:*** Anything further?

***MS. BERNSTEIN:*** I think I have three, Your Honor.

***THE COURT:*** You're on re-recross now, Counsel.

## ***RE-RECROSS-EXAMINATION***

***BY MS. BERNSTEIN:***

***Q.*** And, Agent Chambers you, you know that Sheida had applied to professor Ivanov twice?

***A.*** **I think that she reached out to him in 2017. I don't recall a second -- I think she was introduced to him -- oh, yes. Yes, that does sound familiar. Yes.**

***Q.*** Once in November of 2013?

***A.*** **That sounds right.**

***Q.*** And you've said '17, but I think previously in your conversation with me, you had acknowledged that it was

November of 2016?

**A. I can't remember the exact -- because now 2017 sounds --**

***Q.*** Sometime post-acquisition.

**A. It was post-acquisition.**

***Q.*** And he is a DFT expert.

**A. I think I remember she was supposed to meet with him in October, and she canceled the meeting, but I can't remember what the year was, if it was 2016 or 2017.**

***Q.*** And he is a DFT expert?

**A. He is.**

***MS. BERNSTEIN:*** I think that was six questions, but no more, Your Honor.

***THE COURT:*** Okay. May this witness be excused?

***MS. CHOPRA:*** Yes, Your Honor.

***THE COURT:*** Thank you.

***THE WITNESS:*** Thank you.

***THE COURT:*** You may call your next witness.

***MR. PILCHAK:*** Thank you, Your Honor.

The United States calls Mohamed Allam.

***THE CLERK:*** Good morning. Please stand here and raise your right hand.

***(Witness duly sworn.)***

***THE CLERK:*** Thank you. You may lower your hand. Please take the stand.

Please state and spell your first and last name for the

record.

***THE WITNESS:*** Mohamed Allam, M-o-h-a-m-e-d, A-l-l-a-m.

***THE CLERK:*** And scoot a little bit closer to the microphone.

***THE COURT:*** Or you can move the microphone closer to you, either way, whatever is more comfortable.

***THE WITNESS:*** Okay.

***THE COURT:*** Thank you.

***DIRECT EXAMINATION***

***BY MR. PILCHAK:***

***Q.*** Good morning, Mr. Allam.

***A.*** **Good morning.**

***Q.*** What do you do for a living, please?

***A.*** **I am an Engineering Manager at Apple.**

***Q.*** And how long have you worked at Apple?

***A.*** **Five and a half years.**

***Q.*** Very generally speaking, what do you do for Apple as an Engineering Manager?

***A.*** **I manage chip design.**

***Q.*** And can you just briefly describe your education to the jury?

***A.*** **So I have a degree in Electronics and Communication, a Master's degree in Computer Science, and a Ph.D. in Computer Engineering, specifically in Low Power Design.**

*Q.* And when you say your Ph.D. specifically is in Low Power Design, what does that mean to you, in a sentence or two?

***A.*** **It's mainly how we can reduce the power being consumed by electronic circuits so it can extend the battery life of the device. Your phone will last longer, your phone battery would last longer.**

*Q.* Okay. It sounds like maybe you haven't worked at Apple for your whole career.

***A.*** **That's correct.**

*Q.* I want to ask about a couple of the different places that you've worked.

Have you worked at a company called PMC Sierra?

***A.*** **Yes.**

*Q.* When was that?

***A.*** **So I started on January 31st, 2000, and left there in end of February 2005.**

*Q.* Where physically did you work when you were there?

***A.*** **Burnaby, British Columbia, Canada.**

*Q.* Is that B-u-r-n-a-b-y?

***A.*** **Yes.**

*Q.* Burnaby, is that part of the metro area of a bigger city?

***A.*** **Yes, Vancouver.**

*Q.* Thank you.

Did you know someone named Dr. Karim Arabi when you were at PMC?

**A. Yes.**
Q. How did you meet Dr. Arabi?
**A. So there were a couple of scenarios. One was I was needing some chips and Dr. Karim was the expert in DFT. So he was helping our team with all the methodology and flows that we need to use for our chips on our projects.**
**And the other thing was when we -- at PMC Sierra design, some issues started showing related to power. And because of my background from before, I started a forum for low power design and how we can optimize the power for the chips. And Dr. Karim was part of this forum, and essentially he was covering the part related to the DFT.**
Q. Got it.
And when you say DFT, is that Design For Test?
**A. Yes.**
Q. Did you consider Dr. Arabi to have any particular expertise or experience in DFT?
**A. Yeah. He did that huge contribution at PMC Sierra at the time. The company was having many quality issues, and he made a big difference where essentially our -- RMA, which stands for the Return Method Approval, drove up significantly, and that's quite important.**
Q. All right. And did you consider him to be an expert in the DFT field?
**A. Yes.**

*Q.* I want to ask you about DFT specifically.

Are you familiar with that kind of subspecialty yourself from your own work?

***A.*** **I'm familiar, but I can't say I'm an expert in it.**

*Q.* Okay. So you're not an expert in DFT.

***A.*** **No.**

*Q.* But in your experience with it from your own career, do you consider it to be related to inkjet printing in any way?

***A.*** **Okay. When we talk about inkjet -- the inkjet printer has so many different components. DFT is going to be relevant to the chip that controls its operating. But it depends on which part of the inkjet you're talking about. There are hundreds of components in it.**

*Q.* Fair enough.

And so if I'm understanding your testimony, inkjet printers might have microchips?

***A.*** **Yes.**

***MR. FRASER:*** Objection. Foundation. 701, 702.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

*Q.* Do you know whether inkjet printers have microchips?

***A.*** **Yes, they do.**

*Q.* And you're saying DFT could be relevant to those chips because there might be DFT on the chips, is that your testimony?

***A.*** **Yes. They must have DFT, otherwise the chip can fail and**

**now the manufacturer have to pay a big cost to return or replace the whole printer.**

***Q.*** Other than that, if we put the microchips inside the printer to the side, is there anything else about inkjet printing that you're familiar with that relates to the DFT field in any way?

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** Overruled.

***THE WITNESS:*** I can't think of any.

***BY MR. PILCHAK:***

***Q.*** You also mentioned Dr. Arabi participated in a low power forum; is that right?

***A.*** **Yes.**

***Q.*** Did his experience qualify or enable him to participate in a forum about low power?

***A.*** **Okay. I can't -- at the time, I didn't know his previous experience. But his DFT experience was quite relevant, because one of the biggest issues that we were having was related to power when we are running the DFT, when they are conducting the actual test.**

***Q.*** Okay. How would you describe your relationship with Dr. Arabi at PMC Sierra? Were you just coworkers? Were you friendly? Were you social friends?

***A.*** **Co-worker and friendly. We'd chat sometimes at the office.**

***Q.*** Later in your career, did you become more friendly or friends with Dr. Arabi?

**A. Yes.**
Q. And when was that?
**A. In 2011, I -- I'm trying to remember if it was initiated by Dr. Karim. I think, yeah, Dr. Karim contacted me at the time about joining his team at Qualcomm.**
Q. So he was no longer at PMC Sierra in 2011.
**A. Yes, yeah.**
Q. He was at Qualcomm?
**A. Yes.**
Q. What was he doing at Qualcomm, if you know?
**A. He was managing multiple teams, the DFT team for the whole company. And just a couple of months before he contacted me, he was -- he took responsibility for a new team called Low Power Implementation Team.**
Q. Okay. And why did he contact you in 2011?
**A. So it's mainly for the low power team, to come and join this team.**
Q. So he was recruiting you?
**A. Yes.**
Q. Did you move over to Qualcomm at that time?
**A. Yes.**
Q. And when you came to Qualcomm, who was your supervisor?
**A. Dr. Karim.**
Q. What kind of work did you do under Dr. Arabi at Qualcomm?
**A. So I started as a -- in the video at first, and then within**

**a few months, I was assigned management of the Low Power Implementation Team.**

***Q.*** So am I following, were you assigned to manage the same team that Dr. Arabi had just been leading?

***A.* Yes. So essentially, he asked me to manage the team because management of the team moved to Austin, which made it difficult to manage the team in San Diego.**

***Q.*** Okay. So you took over at that point.

***A.* Yes.**

***Q.*** How long did you stay at Qualcomm?

***A.* About six years, maybe a bit less. I started in July 23rd, 2011, and left on February -- February 4 -- February 6th, 2017. So about five-years-and-a-half.**

***Q.*** Okay. Did Dr. Arabi himself stay at Qualcomm that whole time that you were there?

***A.* No. I think in September 2012, he left the company, went to work for a multinational company called Dialog Semiconductor. But then he came back to PMC -- to Qualcomm in mid-2013.**

***Q.*** Do you remember how many months he was away from Qualcomm?

***A.* Not exactly.**

***Q.*** And it sounds like you're pretty firm on the dates when you started and ended at different employers; is that right?

***A.* Yeah. I just --**

***Q.*** Okay. Let me ask you about Dr. Arabi's dates, though, at Qualcomm.

Are you confident that he left in '12 and came back in '13, or could he have left in '13 and come back in '14?

**A. No, I think it was '12, because at the time, I remember I was buying a house. So, yeah, I was -- yeah.**

*Q.* Fair enough.

**A. It happened around this time, yes.**

*Q.* Okay. And so he went to a different company for -- I apologize if I lost the thread here -- how long was he outside of Qualcomm?

**A. Probably eight, nine months. I -- I didn't know exactly when he came back, but it wasn't more than a year. It was around nine months.**

*Q.* Okay. When he came back, did Dr. Arabi come back to the same position?

**A. No.**

*Q.* What did he come back to do at Qualcomm?

**A. So he came back to another organization, that Qualcomm Research group, which is abbreviated at QRC.**

*Q.* And QRC stands for what?

**A. Qualcomm Research Center.**

*Q.* Do you know what kinds of things he was in charge of researching or overseeing the research of at that group?

**A. He was responsible for the chip development technology, so all aspects related to optimizing the chip. That can be -- whether DFT architecture, implementation details, power.**

***Q.*** When you say "power," would that include low power as well?

***A.*** **Yes.**

***Q.*** Nobody's trying to make the power on a microchip go up, right?

***A.*** **No.**

***Q.*** I mean, could you need that sometimes for performance?

***A.*** **So you want the performance, because the power is going to go up as a consequence, but we never increase the power to increase the performance.**

***Q.*** Because then your phone might die.

***A.*** **Yeah.**

***Q.*** Okay. By the way, when you worked at Qualcomm, if you invented something while you worked there, who would own the rights to that thing?

***A.*** **Qualcomm.**

***Q.*** Why is that?

***A.*** **Because of the NDAs that we sign when we start. Actually, before we start even, to accept the offer, we have to sign the NDA.**

***Q.*** And when you say "NDA," do you mean a legal agreement with the company?

***A.*** **Yes, nondisclosure agreement.**

***MR. FRASER:*** Objection. 701, 702. And I would move to strike his legal opinion.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** I just want to ask you about your experience at Qualcomm, and then maybe I'll have a few more questions.

When you were at Qualcomm, your understanding was that you signed such an agreement?

***A.*** **Yes.**

***Q.*** Do you know if it was just you, they just singled you out for that?

***A.*** **No. All companies do the same. Every employee has to sign this before they start.**

***Q.*** Do you have an agreement like that at Apple right now?

***A.*** **Yes.**

***Q.*** Do you remember whether you had an agreement like that at PMC Sierra?

***A.*** **Yes.**

***Q.*** Have you ever worked at a tech company that didn't have an agreement sort of like that?

***A.*** **I can't think of any.**

***Q.*** All right. Now I want to ask you about a company called Abreezio.

Have you heard of that company?

***A.*** **Yes.**

***Q.*** How did Abreezio first come to your attention?

***A.*** **So in early 2015, probably around April timeframe, I was having a meeting at one of Qualcomm buildings. And after I left**

**the meeting, going out, I met a couple of ex-colleagues that I knew from Canada, from PMC Sierra and the companies that I worked at afterwards, which was called Teradici.**

**So I was surprised because I know them. And if they are coming, they would have told me in advance. I would have already introduced them to Qualcomm before. So I think it was a bit strange that they were at the time, was talking with the Senior VP, Ziad Mansour, which I knew as well. So it looked a bit strange. I know both sides, but neither of them told me about this meeting.**

**So --**

***Q.*** Let me break that down if I can, because there's a bit to unpack there.

Who did you bump into in April of 2015?

***A.*** **It was Brad Quinton. Dr. Brad is an ex-colleague at PMC Sierra and also at the Teradici in Canada.**

***Q.*** Okay.

***A.*** **And Ziad Mansour, who was a Senior VP and responsible for the whole chip design group at Qualcomm. And Farsheed Mahmoudi, who was one -- a member of my team. He was reporting to a manager that reports to me.**

***Q.*** Okay. So Farsheed reported to someone who reported to you?

***A.*** **Yes.**

***Q.*** So he's two levels under you.

***A.*** **Yes.**

*Q.* Do you know someone named Esin Terzioglu?
***A.* Yes. Esin was my manager.**
*Q.* Do you know whether Esin was in this meeting that you ran into as well?
***A.* I can't remember.**
*Q.* Fair enough.
And so I think you said it was strange that you ran into these people.
Why would it be strange to see these people for a meeting at Qualcomm?
***A.* So first of all, Dr. Brad, I already introduced him to Qualcomm before. I got him in contact with the team. He got a contract for his company. So I thought that if he came back at Qualcomm, as a matter of courtesy, he would tell me about it.**
**For Farsheed, yeah, that was surprising, because someone from my team is having a meeting with the Senior VP without telling me, and I just couldn't link how he has a connection with Dr. Brad or with Ziad.**
**So, yeah, it didn't seem right. It just didn't add up. This is why I asked Mr. Ziad Mansour at the time, and he said that is he going to talk to me after about more details.**
*Q.* About what?
***A.* More details about the meeting. I was just asking him, like, should I be in this meeting? And he said no, no, he is going to tell me more details after.**

***Q.*** Okay. And I think I failed to ask, what was your relationship with Ziad at this time? Was he on your chain of command?

***A.*** **Yes. He -- at this time, he was Esin's manager, so he is two steps up.**

***Q.*** Okay. So it goes Ziad, Esin, you, and then someone who we haven't named, and Farsheed?

***A.*** **Yes.**

***Q.*** Who is that link in the chain between you and Farsheed, if we head down the org chart?

***A.*** **His name is difficult. Sassan Shahrokhinia.**

***THE COURT:*** Better spell it.

***BY MR. PILCHAK:***

***Q.*** Spell that last one for us, or just take a stab at it. I don't know.

***A.*** **Okay. So the last name is S-h-a-r-a-k-h-o-n-i-a [sic].**

***THE COURT REPORTER:*** One more time.

***THE WITNESS:*** S-h-a-r-a-k-h-o-n-i-m-a -- i-a, i-a is the one I meant.

***MR. PILCHAK:*** All right. I'm confident we got that. Thank you, Mr. Allam.

***BY MR. PILCHAK:***

***Q.*** Let me ask you this: I asked you about your kind of relationship with Mr. Mansour, and it sounds like he's your boss' boss; right?

***A.*** **Yes.**
***Q.*** Do you know whether there's any relationship between Mr. Mansour and Dr. Arabi?
***A.*** **He was his manager at some time.**
***Q.*** Ziad --
***A.*** **At this time, he wasn't, but then before, Mr. -- or Dr. Karim left, he was reporting to Mr. Ziad.**
***Q.*** Okay. So previously, Ziad was Dr. Arabi's boss?
***A.*** **Yes.**
***Q.*** Okay. How would you describe their relationship?
***A.*** **I think it was a good relationship. My understanding is that Mr. Mansour was the one that --**

***MR. FRASER:*** Objection. Foundation.

***THE COURT:*** Overruled.

***THE WITNESS:*** My understanding is that Mr. Mansour was the one that brought Dr. Karim back to Qualcomm in 2013.

***BY MR. PILCHAK:***
***Q.*** Okay. And I think you said before you had this run-in at Qualcomm, you already knew Brad Quinton from PMC; is that right?
***A.*** **PMC and Teradici, both of them.**
***Q.*** And Teradici.
Where was Dr. Quinton working at this time? Was he still at either of those companies?
***A.*** **No. He had a startup that he created after he left Teradici. It was called Invionics.**

***Q.*** What did Invionics do?

***A.*** **They were doing a methodology -- chip development methodology and flows. And essentially, this is how I got him connected with the corresponding team at Qualcomm in 2012. And at the time, he was able to get a contract to do some of the development for Qualcomm.**

***Q.*** So you had previously provided an in at Qualcomm for Mr. Quinton.

***A.*** **Yes.**

***Q.*** Gotcha.

If I understood your testimony a minute ago, you said, I think, that you asked Mr. Mansour what was that meeting about; is that right?

***A.*** **Yes.**

***Q.*** What did he say when you said that?

***MR. FRASER:*** Objection. 802.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** Why did you want to know what the meeting was about?

***A.*** **So essentially, having people -- people that I know all of them and I couldn't understand the context of the meeting, it just seemed awkward. So I was asking what it is about it, if there is something that's relevant to me that I should be in there.**

***Q.*** Okay. And without saying what Mr. Mansour told you, did you

learn anything from your conversation with him that suggested you were going to become a part of that conversation?

***MR. FRASER:*** Objection. 602. 802.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** After your conversation with Mr. Mansour, did you become a part of some larger conversation about Abreezio right away?

***A.*** **No, not right away.**

***Q.*** What kind of company was Abreezio, if you know?

***A.*** **So basically, my later knowledge, it's a company that offered two technologies, one in DFT and one in low power design.**

***Q.*** Do you remember what those products were called?

***A.*** **One is TruSens, and another was CoolBreez, or maybe they are the same. I don't remember which is which, to be honest.**

***Q.*** Is it hard to keep track of them sometimes?

***A.*** **Yes. Just, yeah, the names can relate to either, so...**

***Q.*** Let me ask you this: Did you say one of the products was a low power product?

***A.*** **Yes.**

***Q.*** Do you also think of that as a sensor product?

***A.*** **Yes, that's the TruSens one.**

***Q.*** And so TruSens is that sensor product?

***A.*** **Yeah, yes.**

***Q.*** Okay. What was the other product? What field was that in?

**A. It was in DFT.**
Q. All right. Have you heard of a product called TruTest?
**A. Yeah, yes. That's the other one, yes.**
Q. All right. TruTest DFT?
**A. Yes.**
Q. Okay. I want to focus on the low power technology first.
At a general or very high level, if that product worked, could it have been valuable to Qualcomm?
**A. Yes.**
Q. Could it have been very valuable to Qualcomm?
**A. Yes.**
Q. Why?
**A. So the way it works is that when you use power, it means that you have different way to take advantage of this. Either you say, okay, I'm going to extend the battery life, or you can say, no, I'm -- keep that battery life the same, but I'm going to use this power to reduce my area, my chip area. So this would save the cost.**
Q. Okay. When you first heard about TruSens and how it worked, were you skeptical about that at all?
**A. Yes.**
Q. Why?
**A. Based on my previous experience, it just -- the scheme has been there for a long time. And I know that I attended many conferences where it was being discounted for technical reasons.**

**And even when I checked some of the papers online, I found that, yes, in 2007, I think, there was a similar patent that was showing all of the different sensor techniques that focused on them and why they don't work.**

***Q.*** And so you had some questions about Abreezio's TruSens product?

***A.*** **Yes.**

***Q.*** And I think you said you knew about that scheme already.

Is that the word you used?

***A.*** **Exactly, yeah.**

***Q.*** I just want to be very precise, with my language, at least.

When you say "scheme," you just mean that technique for solving a specific problem?

***A.*** **Yeah, the sensor kind of architecture, that's a known scheme that has been there for some time.**

***Q.*** Okay. Sometimes -- you don't mean say scheme if there's any --

***A.*** **No, sorry. Architecture. Sensor architecture, not scheme.**

***Q.*** You do have to wait until I finish any question, though, before you answer; otherwise, we're not going to be able to make a good record.

***A.*** **Sure.**

***Q.*** Thank you.

***A.*** **Okay.**

***Q.*** I want to ask you about some of the people who are

associated with Abreezio.

Okay?

***A.*** **Yes.**

***Q.*** It sounds like Mr. Quinton was associated with Abreezio, from this meeting that you just mentioned; right?

***A.*** **Yes.**

***Q.*** Do you know or did you ever learn how he became to be associated with Abreezio?

***A.*** **Yes. Later on --**

***MR. FRASER:*** Objection. Foundation.

***THE COURT:*** Sustained. At this point, he answered the question. The answer "yes" may stand.

***MR. FRASER:*** I agree. Thank you, Your Honor.

***BY MS. CHOPRA:***

***Q.*** Okay. Without asking what anybody told you, who did you learn that information from?

***A.*** **From Dr. Karim.**

***Q.*** Did you have one or more conversations with him about Abreezio?

***A.*** **Yes. That was in June 2015.**

***Q.*** So we might be getting ahead of ourselves a little bit, and I'll come back to that.

But for purposes of this question right now, you learned from Dr. Arabi about how Mr. Quinton came to be involved in Abreezio?

***A.*** **Yes.**

***Q.*** What did Dr. Arabi tell you?

***A.*** **He said that someone from Cadence, which is another company, left Cadence, started a startup called Abreezio, and he had some ideas that he wanted a team of engineers to help him develop these ideas.**

***Q.*** Let me stop you there.

The "he" in that sentence who had some ideas, according to Dr. Arabi, who was that person?

***A.*** **His name is Sanjiv.**

***Q.*** Is he the guy from Cadence?

***A.*** **Yes.**

***Q.*** And so according to Dr. Arabi, the ideas in Abreezio came from this Sanjiv?

***A.*** **Yes.**

***Q.*** Okay. We still haven't got to the part where Mr. Quinton comes in, though.

How did that happen, according to Dr. Arabi's statement?

***A.*** **So, yeah, as -- so Dr. Karim mentioned that Mr. Sanjiv contacted him about -- Dr. Karim was well-known in the industry. He had many connections. So Sanjiv knew him from the industry, and he contacted him about having some engineers that can help bring these ideas to reality.**

***Q.*** And is Mr. Quinton one of those engineers?

***A.*** **Exactly. So Dr. Karim introduced them to Dr. Quinton.**

*Q.* Okay. Besides Mr. Quinton, who else worked at Abreezio, as far as you knew?

***A.*** **So I know a few people in there because they were on my team at Teradici. So there was Andrew Hughes. There was Trent McClements. Michael Smith. And there was another guy, but I forgot the name.**

*Q.* Fair enough.

But those three you just named used to work with you at Teradici?

***A.*** **Yes.**

*Q.* And then this person, Sanjiv Taneja, who you mentioned -- well, first of all -- sorry.

Did you just call him Sanjiv?

***A.*** **Yes.**

*Q.* Did you know Mr. Sanjiv's last name? I blew it.

***A.*** **I didn't know it at the time. I knew it when he came for a meeting later on --**

*Q.* Okay.

***A.*** **-- at Qualcomm.**

*Q.* And what's his last name.

***A.*** **Taneja.**

*Q.* Who -- actually, let me withdraw that and ask a different question.

Do you know someone named Behrooz Abdi?

***A.*** **Yes.**

***Q.*** Who is that?
***A.*** **So at the time, he had the -- he was a CEO of a company called InvenSense. But I also heard about him before at Qualcomm as one of the Executive VPs. He was there in the 2007 timeframe, but he left before I joined Qualcomm.**
***Q.*** So he's a former Qualcomm guy?
***A.*** **Yes.**
***Q.*** Mr. Abdi, was he kind of a big deal in the industry?
***A.*** **Yes. His company was a billion dollar company.**
***Q.*** What about Akbar Shokouhi? At the time, meaning in 2015, did you ever learn that Akbar Shokouhi was involved in Abreezio?
***A.*** **No.**
***Q.*** Do you know who Mr. Shokouhi is?
***A.*** **Yes.**
***Q.*** Who is that?
***A.*** **He was Vice President of Operations for the chip team. He was reporting to Ziad Mansour.**
***Q.*** When he was at Qualcomm?
***A.*** **Yes.**
***Q.*** Was he still at Qualcomm in 2015?
***A.*** **No.**
***Q.*** Why not?
***MR. FRASER:*** Objection. Foundation.
***THE COURT:*** If you know.
***THE WITNESS:*** Yeah. I -- just rumors.

***MR. FRASER:*** Hearsay.

***MR. PILCHAK:*** I'll withdraw the question at this point.

***THE WITNESS:*** Yeah.

***BY MR. PILCHAK:***

***Q.*** If someone had told you this outside company that's shopping itself to Qualcomm involves Akbar Shokouhi, would that have raised any concerns on your part?

***A.*** **Yes.**

***Q.*** Why?

***A.*** **Again, it's based on what was said around when he left. And normally, no one would ever give an official statement, so it's rumor, I should say.**

***Q.*** Okay. If that's the basis for that, again, let me stop you there.

Do you know what due diligence is?

***A.*** **Yes.**

***Q.*** What does that phrase mean to you?

***A.*** **It's the process where you evaluate any product or a company before you move to the next step.**

***Q.*** Have you participated in due diligence, just focusing on the time when you were at Qualcomm?

***A.*** **Yes.**

***Q.*** Had you participated in that process for other companies besides Abreezio?

***A.*** **Yes.**

*Q.* How many times would you say you did that, just at Qualcomm?
***A.*** **Probably five or six times.**
*Q.* If I ask you about that experience at Qualcomm compared to Abreezio, and Abreezio's experience at Qualcomm, can you focus on that?
***A.*** **Sorry, can you repeat?**
*Q.* The questions are going to be comparing what happened in your other experience of five or six due diligences with what you know of the Abreezio diligence.
So first of all, I should ask you, do you know whether Abreezio went through a due diligence process at Qualcomm?
***A.*** **Yes, it did.**
*Q.* And sitting here today, are you familiar with the timing of that process, meaning when it unfolded?
***A.*** **Yes, mostly. I can't say when it started. I -- but I know when it ended.**
*Q.* Okay. When did it end?
***A.*** **The official acquisition was declared in October of 2015.**
*Q.* Okay. In October 2015, you said?
***A.*** **Yes.**
*Q.* Do you know whether the diligence was underway in this April 2015 meeting that you stumbled on?
***A.*** **It seemed so. This was my first time to know about it, but I don't know if it started before that.**
*Q.* Okay. If we just measure from that time, though, for the

sake of your testimony, from April of 2015 to October of 2015, how did that time period compare with the time period of other diligence that you'd been involved in at Qualcomm?

***MR. FRASER:*** Objection. Foundation. 701. 702.

***THE COURT:*** Overruled.

***THE WITNESS:*** So for our chip development, normally there are many concepts that can show up well on paper, but when you try to implement them, they don't work as expected.

And normally, what we do is we try to work with the team of the companies that we are doing the due diligence for, and try to manufacture and implement it in an actual chip to ensure that it's going to do what it claims to.

***BY MR. PILCHAK:***

***Q.*** And what do you mean, manufacture it in an actual chip, if that's not obvious?

***A.*** **So send it to manufacturing in Taiwan, and then when it comes back, we can test it and ensure that it did what it's supposed to do.**

***Q.*** And so build an actual physical chip?

***A.*** **Yes.**

***Q.*** Would you build -- it sounds like Qualcomm makes a lot of chips; is that right?

***A.*** **Yes.**

***Q.*** Would you build millions of the chip on the first try?

***A.*** **Not really. Normally, what we do, there are special kind of**

**arrangements that the manufacturing place does, which they can give you few hundred to few thousands of the chip for very cheap price. Doing millions is just going to be a waste. You want handful, tens, maybe hundreds, that you can test in the lab and say, yes, this worked as expected.**

***Q.*** Okay. And you said it's not that costly to do a test chip; right?

***A.*** **Not really, yeah.**

***Q.*** But is there a downside to doing a test chip, to be fair, maybe in terms of something else?

***A.*** **It takes time.**

***Q.*** And is time an important factor in the microchip industry?

***MR. FRASER:*** Objection. The prior objections, plus Federal Rule of Procedure 16(a)(1)(g).

***THE COURT:*** Overruled.

***THE WITNESS:*** Yes. Time to call up Qualcomm is quite important. And when you have an idea that you are concerned that others can use, you want to be as -- get it to top product.

***BY MR. PILCHAK:***

***Q.*** Okay. Let me ask you about Abreezio specifically.

Did anybody ever build a test chip for Abreezio, as far as you know, before the company was acquired?

***A.*** **Not that I know of.**

***Q.*** I want to ask you about the people who were involved in the diligence for Abreezio on the Qualcomm side.

You mentioned Mr. Mahmoudi was at this meeting; right?

**A.** **Yes.**

***Q.*** Did he have a role in the Abreezio diligence, as far as you know?

**A.** **Yes.**

***Q.*** Do you know -- it sounds like Mr. Mahmoudi was a level -- well, two levels under you in the org chart; right?

**A.** **Yes.**

***Q.*** Do you know who picked Mr. Mahmoudi to be on the diligence team?

**A.** **Ziad Mansour said that he's the one that asked him to join the team.**

***MR. FRASER:*** Objection. 602. 802. Move to strike.

***THE COURT:*** Sustained. And it will be stricken under 802.

***BY MR. PILCHAK:***

***Q.*** All right. Let me ask some different questions.

In your view, was Mr. Mahmoudi a good choice for the diligence of the specific kind of product that Abreezio was offering?

**A.** **No.**

***MR. FRASER:*** Objection. 701.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** Why not, sir?

**A. His area of expertise was completely irrelevant to the technology being evaluated.**

Q. What do you mean by that?

**A. So Mr. Mahmoudi was -- or Dr. Mahmoudi was an expert in analog [ph] design, RF. This area doesn't have anything to do with low power digital design. It's complete different areas.**

Q. And when you say "this area," we should try not to get confused between the two products, because there were two products Abreezio was offering; right? Which -- you just nodded?

**A. Yes.**

Q. Which product was Mr. Mahmoudi focused on, if you know?

**A. He was focused on the TruSens.**

Q. Okay. And the jury's heard some testimony about digital versus analog in this field.

Are you familiar with that?

**A. Yes.**

Q. Which side of that distinction was Mr. Mahmoudi focused on?

**A. He was focused in the evaluation or in --**

Q. In his personal background or his experience, as far as you knew it.

**A. His experience was in the analog part.**

Q. And did you think that analog was a good fit for evaluating Abreezio's product?

**A. No.**

***Q.*** Why not? Is it what you just said? I don't mean to make you --
**A. Yes. So Abreezio's product was mainly for the digital. It has nothing to do with the analog part. And the experience in digital design is required -- required before a person can assess such technology.**
***Q.*** All right. If you had some concerns about Mr. Mahmoudi's fit for the diligence and you were his boss's boss, did you ever reassign anybody else to take over in his place?
**A. I can't, because his assignment was not for me. It was for Mr. Ziad.**
***Q.*** You said you cannot.
**A. Yeah, yeah. It was -- I wasn't in charge of the evaluation to assign people to it.**
***Q.*** All right. During the diligence, in your experience and awareness of it, was there anyone at Qualcomm who was enthusiastic about Abreezio and its products?
**A. Mr. Ziad was quite interested in the technology.**
***Q.*** Why do you say that?
**A. He was pushing for it because he thought that this is going to make a big difference, and if he comes up with something that makes a big contribution for the company, it can help with his position and moving to the next step.**
***Q.*** Why would it help with his position?
**A. People get promoted based on their achievements. If he came**

**up with a technology that's going to be saving hundreds of millions a year, that's important. And that essentially expands his stature or position at the company.**

*Q.* So it could be, like, a feather in his cap?

***A.*** **Yes.**

*Q.* All right. We started to talk about, a few minutes ago, a conversation about Abreezio with Dr. Arabi.

Do you remember that?

***A.*** **Yes.**

*Q.* I want to ask some more questions about that now.

When did that conversation happen?

***A.*** **It was sometime in June 2015.**

*Q.* And how did it come up? Set the scene. Where were you and what was going on?

***A.*** **So used to have many meetings with Dr. Karim, friendly discussions talking about different aspects of our work, and even we are talking that maybe in the future we would be creating our own startup.**

**And as part of one of these discussions that I remember, it was in a weekend, so I mentioned to him that this evaluation that's going on and the -- he mentioned the --**

***MR. FRASER:*** Objection. Narrative.

***THE COURT:*** Overruled.

***THE WITNESS:*** He mentioned that the meetings that I saw and then the people that were involved in the evaluation. And

since this happened, like, almost two months after the original meeting where I saw Dr. Brad, Dr. Farsheed, and Mr. Ziad, I already got some ideas about the technology from Dr. Farsheed. He wasn't experienced in that area, so he was asking me questions about it.

And by a percent of his questions, I sort of knew what the technology is, what is TruSens trying to do.

***MR. FRASER:*** Objection. Hearsay. And 701 problems because there's no question.

***THE COURT:*** Okay. At this point, I will sustain the objection on narrative. Why don't you ask your next question.

***MR. PILCHAK:*** Thank you, Your Honor.

***BY MR. PILCHAK:***

***Q.*** Mr. Allam, where did this meeting take place?

***A.*** **At a Starbucks.**

***Q.*** And who was there?

***A.*** **Dr. Karim and myself.**

***Q.*** And I mean, the Starbucks wasn't empty, right, but you two were the only one in this conversation?

***A.*** **Yes.**

***Q.*** Okay. Maybe the Starbucks was empty.

Was the Starbucks empty?

***A.*** **No.**

***Q.*** Okay. Sorry.

And so it sounds like you brought Abreezio up first; is that

right?

***A.*** **Yes.**

***Q.*** And how would you characterize the way that you brought it up? Were you gushing about it? Were you upset about it? Were you neutral? What was that context?

***A.*** **Yeah, I was upset about it. Part of it is mainly that an evaluation in my area is being done without taking my views. And the other part was I already -- by this time, I knew the concept they are trying to advertise to Qualcomm, and the news that this is not going to work.**

***Q.*** So when you say you were upset about it or you had some feelings, No. 1, did you have some feelings about being excluded from the diligence yourself?

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** I'll allow it.

***THE WITNESS:*** Yeah. I have been involved, as I mentioned, in many other evaluations or due diligence for other companies. And for this one, it just felt a bit strange that I wasn't even asked for any feedback or even for assigning live people from my team to assist.

***BY MR. PILCHAK:***

***Q.*** And did you also mention in this conversation with Dr. Arabi any concerns about the technology itself?

***A.*** **Yes.**

***Q.*** Can you be any more specific?

***MR. FRASER:*** Objection. Hearsay.

***THE COURT:*** Overruled.

***THE WITNESS:*** So at the time, I started talking about the concept itself and that this concept is not going to work. And I don't remember if it was in this meeting or a separate one where I had the papers that were showing that this concept is not going to work.

***BY MR. PILCHAK:***

***Q.*** When you say "had the papers," you mean you actually brought papers to this meeting?

***A.*** **Yes.**

***Q.*** What did do you?

***A.*** **It's mainly I was trying to show why it's not going to work. And, yeah, at the time when -- yeah. And so I don't remember why I had them with me, but these are the papers that I found that refute the concept.**

***Q.*** Okay. And did you discuss that with Dr. Arabi?

***A.*** **So when I tried to discuss this, he said that he didn't want to discuss the details.**

***Q.*** Why did he say he didn't want to discuss the details?

***A.*** **Because it can be a contamination, because he doesn't want to be involved with any information related to the company.**

***Q.*** What did you understand him to mean when he said "contamination"?

***A.*** **It's mainly that -- contamination, mainly when someone gets**

**information about a company that can affect what they are doing. So if they took an idea that belongs to an external company and used it in their work, that can be considered contamination, and the company would be liable, the company, Qualcomm in this case, would be liable if this happens.**

***Q.*** Did you notice in your conversation with Dr. Arabi whether he seemed knowledgeable about Abreezio and its technology?

***A.*** **I can't say about the technology. He knew about the company, but I don't know if he knew about the technology details at the time.**

***Q.*** All right.

***MR. PILCHAK:*** Your Honor, I apologize, what time are we looking at for lunch today?

***THE COURT:*** Let's have lunch now if now is okay.

***MR. PILCHAK:*** All right. Sure.

***THE COURT:*** All right. Let's take a lunch break. Ladies and gentlemen, we'll take a one-hour break. If you could be back at 1:00 o'clock. You're reminded you're not to discuss the case or do any research about the case. And you, sir, are ordered to be back at 1:00 o'clock.

***THE WITNESS:*** Okay.

***THE COURT:*** Thank you.

***(Jury out at 12:01 p.m.)***

***THE COURT:*** Okay. We're now outside the presence of the jury.

Any issues we need to take up?

***MR. PILCHAK:*** Not for us, Your Honor.

***MS. BERNSTEIN:*** No, Your Honor.

***THE COURT:*** Okay. One-hour break. Thank you.

***(Lunch recess taken.)***

***THE COURT:*** Okay. We are outside the presence of the jury. Dr. Arabi and the lawyers are present.

Counsel?

***MR. PILCHAK:*** Defense, did you have one first or did you want me to go first?

***MS. BERNSTEIN:*** Yes, your Honor. It sounds just from speaking with the Government and conferring, it sounds like the Government's case will still be going on or just about to close at the end of today. I'm not sure. It doesn't sound like we're going to reach defense witnesses today.

We do have witnesses waiting outside that are with Qualcomm's counsel, in-house counsel and Heuston Hennigan. If they're not going to testify today, we'd like to be --

***THE COURT:*** You can let them come back tomorrow.

***MS. BERNSTEIN:*** Thank you, your Honor.

***MR. PILCHAK:*** The other one is just quickly, your Honor, moments before Mr. Allam took the stand, he made a statement in the hallway that he had been having a conversation with one of the defense attorneys who asked him to sign a declaration kind of on the fly, I guess, based on a conversation

we were. I just wanted to put that on the record. We haven't had a chance to memorialize it in any way or provide anything to the defense about our understanding of that. I just wanted to say that that happened.

And if it becomes relevant during cross, I may inquire into it on redirect. But I didn't want to surprise anyone.

***THE COURT:*** Okay.

***MR. PILCHAK:*** Thank you.

***THE COURT:*** Can we bring the jury in?

***MR. PILCHAK:*** Yes, for us.

***THE COURT:*** Okay.

***(Jury in at 1:02 p.m.)***

***THE COURT:*** Okay. We are back on the record. All jurors are present. Dr. Arabi is present. The lawyers are present.

And you, sir, are reminded that you're still under oath to tell the truth.

Mr. Pilchak.

***MR. PILCHAK:*** Thank you, your Honor.

***BY MR. PILCHAK:***

***Q.*** Good afternoon, Mr. Allam.

***A.*** **Good afternoon.**

***Q.*** Before we broke for lunch, I think you were testifying about a June 2015 conversation that you had with Dr. Arabi.

Do you remember that?

**A. Yes.**
Q. And if I understood, it was at a coffee shop?
**A. Yes.**
Q. I want to ask a few more questions about that conversation if I can. Okay?
During that conversation, did Dr. Arabi ever explain how he came to be involved in Abreezio?
**A. Yes. As I mentioned, he explained that Mr. Taneja contacted him about referring some engineers that can help implement the technologies that he came up with, Mr. Taneja came up with.**
Q. Did Dr. Arabi ever mention during that conversation that he, meaning Dr. Arabi, had been offered anything in connection with Abreezio?
**A. Yeah. That came later in that discussion.**
Q. The same conversation?
**A. So to be clear, I don't remember if it was one or two conversations that we had. But in one of them when we were talking about that issue, yes, that came up.**
Q. And if it was two conversations, were they both at coffee shops?
**A. Yes.**
Q. Were they both between just you and Dr. Arabi, or was anybody else present?
**A. No, just me and Dr. Arabi.**
Q. And when he mentioned this concept of something being

offered in connection with Abreezio, what did he say?

**A. It was mainly just to help them with guidance on how to approach Qualcomm.**

Q. About Abreezio?

**A. Yeah. The company that the -- I don't remember at the time if I -- yeah, that was Abreezio, yeah. I knew the name at the time, yes.**

Q. Okay. And what did he say about the help?

**A. It's mainly just to guide them how to introduce themselves or what items they need to look at. But he -- I remember also he said that he's not asking to do anything illegal -- or they are not asked him to do anything illegal, just how to approach Qualcomm and how to consolidated points that would make sense for Qualcomm.**

Q. Okay. And did he mention that Abreezio had offered anything in connection with that request?

**A. Yes.**

Q. What was that?

**A. So he offered -- he said that they offered him a percentage, about 1.5 percent.**

Q. 1.5 percent of what?

**A. Of the company value if it gets acquired.**

Q. So those would be like shares?

**A. I didn't ask about the details at time. If a company gets acquired, shares are useless. It's money. It's a -- the**

**company gets acquired for money normally. It's small companies.**

*Q.* When Dr. Arabi made that statement to you, did it sound like he had accepted that offer or no?

***A.* No. He -- I remember at the time he said that he's not sure if he is going to accept such a thing.**

*Q.* Did he mention anything about the possibility of a similar offer for anybody else?

***A.* Yes. So he said that he would think that they would offer me something similar if I can help them.**

*Q.* Help them do what?

***A.* With the same like how they can approach Qualcomm, how they can get the right points in there and put more of the key aspects that would make the technology more favorable to Qualcomm.**

*Q.* Did you say a similar offer? What did you mean by that?

***A.* We never discussed numbers. It just came up that they probably can do the same for you.**

*Q.* All right. How did you react when Dr. Arabi said that?

***A.* Nothing specific. I didn't think that this is like serious talk at the time. But I was interested in knowing more about the company. So we didn't say anything specific, didn't accept or reject.**

*Q.* So you didn't say yes or no?

***A.* No, because -- exactly. I didn't say yes or no because I didn't think that it's something real.**

***Q.*** Okay. Why didn't you think it was something real?

***A.*** **It just -- it was a bit strange. At the same time it -- yeah, I didn't expect that this would happen. Being that Qualcomm, with our background, and I didn't think that this was something real.**

***Q.*** Did it catch you off guard a little?

***A.*** **Yes.**

***Q.*** Did you think more about it after that conversation with Dr. Arabi?

***A.*** **Actually, I talked with my wife at the time, and she agreed that it's just -- it just doesn't make much sense.**

***MR. FRASER:*** Objection. Hearsay.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** I don't want to ask about any private conversations you had with your wife.

Let me go back to Abreezio. So you had this conversation or possibly two conversations with Dr. Arabi; right?

***A.*** **Yes.**

***Q.*** How did you leave it with him -- bless you -- vis-a-vis Abreezio?

***A.*** **That at the time, like I said, knowing more about the company. And yeah, I think this was the main part, that, yeah, I wanted to understand more about the -- specifically about the technology, not the company itself.**

*Q.* And did you have more conversations about Abreezio later on?
***A.* Yes, about a week later.**
*Q.* And who did you speak with about a week later?
***A.* So the technical part, there was a meeting that was arranged in July 2015 where I met Mr. Taneja, Dr. Brad Quinton, and the -- yes, that's it.**
*Q.* Before we get to that meeting, was there any kind of a conversation with that Mr. Abdi, who you had mentioned?
***A.* Yes.**
*Q.* When did that happen?
***A.* So that was also on a Saturday at a different Starbucks.**
*Q.* Okay. So you met with Mr. Abdi in person?
***A.* Yes.**
*Q.* Did anyone arrange that meeting?
***A.* Yes.**
*Q.* Who was that?
***A.* Dr. Arabi arranged the meeting.**
*Q.* Do you remember whether he was also there?
***A.* I think he introduced us and left after.**
*Q.* All right. So he wasn't present for the whole meeting?
***A.* No.**
*Q.* Was it a long meeting or a short meeting?
***A.* No, a short meeting. Probably half an hour or less.**
*Q.* And what was the purpose of that meeting?
***A.* So it was more an introduction networking. The idea was**

**Mr. Abdi is -- was known in the industry. He has his own networking and having such kind of introduction may help in the future. We can switch companies, or if you start a new company, he can help with the funding or connect us to the VCs or venture capitalists that can fund account.**

***Q.*** So Mr. Abdi is a good guy to know?

***A.*** **Yes. He's quite famous.**

***Q.*** Were you meeting him for the first time at this July 2015 sitdown?

***A.*** **Yes.**

***Q.*** And during your conversation with Mr. Abdi, did Abreezio come up?

***A.*** **Yes.**

***Q.*** And let me jump in there. At the part of the conversation where you started talking about Abreezio with Mr. Abdi, was Dr. Arabi still there?

***A.*** **No.**

***Q.*** He had left?

***A.*** **Yes.**

***Q.*** All right. How did Abreezio come up?

***A.*** **So the way it came up --**

***MR. FRASER:*** Objection. Hearsay.

***THE COURT:*** Overruled.

***THE WITNESS:*** So our discussion was mostly about what I'm doing at Qualcomm and Mr. Arabi mentioned his achievements

at Qualcomm. And then close to the end, he mentioned that he is aware of what Karim mentioned to me and that he would support us -- I can't remember the exact wordings. But it was something like we help people that help us.

***MR. FRASER:*** Objection. Hearsay. Move to strike.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** And what did you understand Mr. Abdi to mean when he said we help people who help us?

***A.*** **So what I thought is that this is more for confirmation for what mentioned by Dr. Karim at the time that they -- this company can offer something like this 1.5 percent or something similar.**

***Q.*** I want to be as clear as we can be.

Mr. Abdi, did he mention any specific numbers?

***A.*** **No.**

***Q.*** Did he talk about shares?

***A.*** **No.**

***Q.*** Did he have an agreement for you to sign?

***A.*** **No.**

***Q.*** But what did you perceive him to be talking about when he said I know about the offer?

***MR. FRASER:*** Objection. 701. Asked and answered.

***THE COURT:*** Sustained.

///

***BY MR. PILCHAK:***

***Q.*** You had talked with Dr. Arabi about a potential offer from Abreezio before?

***A.*** **Not before the meeting at Starbucks. This was --**

***Q.*** What I meant was at your Starbucks meeting with Dr. Arabi, the concept of an offer from Abreezio came up; right?

***A.*** **Yes.**

***Q.*** Is that the context for this remark from Dr. -- from Mr. Abdi in your mind?

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** I'll allow it.

***THE WITNESS:*** Yes, that was my understanding.

***BY MR. PILCHAK:***

***Q.*** All right. What did you say when Mr. Abdi mentioned that?

***A.*** **I didn't say yes or no. At the time I was still quite keen on understanding if there's something more about the technology that I didn't know. So I wanted to see how can I get access to more details just to understand if this is something really new or it is what I understood.**

***Q.*** And when you say you wanted more details about the technology, were you participating hands on in the diligence at that time?

***A.*** **No.**

***Q.*** After -- was that the end of your conversation about Abreezio with Mr. Abdi?

**A. Yes. He gave me his business card and mentioned something about staying in touch. But that was it.**

***Q.*** All right. You mentioned a meeting with Mr. Quinton and Mr. Taneja; right?

***A.*** **Yes.**

***Q.*** Did that happen after your meeting with Mr. Abdi?

***A.*** **Yes.**

***Q.*** What was the purpose of that meeting?

***A.*** **So it was mainly to give me an idea about --**

***MR. FRASER:*** Objection. Hearsay.

***THE COURT:*** Overruled.

***MR. FRASER:*** 602.

***THE WITNESS:*** It was mainly to give me an idea about the technology itself and get my feedback on this technology.

***BY MR. PILCHAK:***

***Q.*** Who arranged that meeting?

***A.*** **It was Mr. Ziad Mansour.**

***Q.*** And who was present for it?

***A.*** **It was Dr. Brad Quinton and Mr. Sanjiv Taneja.**

***Q.*** They were there for Abreezio?

***A.*** **Yes.**

***Q.*** Who was there on the Qualcomm side?

***A.*** **I don't remember anyone else from Qualcomm side. Ziad introduced us because I didn't know Mr. Sanjiv before. But he was not part of the meeting. He didn't attend the meeting.**

***Q.*** Meaning Mr. Mansour didn't attend the full meeting?
***A.*** **Exactly.**
***Q.*** Do you remember how long that meeting was?
***A.*** **About one hour.**
***Q.*** And who did the technical presentation on the Abreezio side?
***A.*** **It was Dr. Brad Quinton.**
***Q.*** Did anything about that seem odd to you based on what you knew about Abreezio?
***A.*** **Yes. Mr. Taneja didn't get involved in any technical details, which seemed awkward. Normally, as engineers, we like to brag about anything that we did, but he wasn't involved at all. And even when I asked question, right away Dr. Brad would respond instead.**
***Q.*** And coming into this meeting with Mr. Quinton and Mr. Taneja, who did you think had invented Abreezio's technology?
***A.*** **My understanding was it was Mr. Taneja. He is the one that came up with the concepts and Dr. Brad was implementing them.**
***Q.*** And why did you have that understanding?
***A.*** **So that was based on the discussions that I had with Dr. Arabi earlier on.**
***Q.*** All right. Did there come a time at the end of this meeting where you spoke to Mr. Taneja by himself?
***A.*** **Yes.**
***Q.*** Did he say anything to you that sticks out in your mind?

**A. Yes. So after we were done with the meeting, I was preparing to. Leave, so he came to me in the room -- in the conference room, and he mentioned he thought it was Mr. Abdi and he knows about arrangement of the agreement. I think that's it, yes.**

*Q.* All right. And I want to ask some similar questions as I did with Mr. Abdi.

Did Mr. Taneja say I know about the one and a half percent?

**A. No. He didn't say a percentage or any more details. He just said he is aware of the discussion.**

*Q.* He's aware of what discussion?

**A. The discussion with Mr. Abdi.**

*Q.* And what did you understand him to mean when he said that?

**A. That he is affirming the same idea is that is something in turn for helping the company.**

*Q.* All right. But he didn't say that explicitly. That's just your understanding?

**A. Exactly. He didn't say it explicit.**

*Q.* After that meeting with Mr. Taneja and Mr. Quinton, did you call Behrooz again?

**A. Yes.**

*Q.* And tell us about that conversation.

**A. So on the same day, as soon as I went home, 4:00 or 5:00 p.m., I was quite concerned that my silence or that I didn't say vocally that I'm going to be implicated in a**

**situation where I'm being looked at that I'm taking money from a company that we are evaluating. So I called Mr. Abdi and told him that I will help evaluate the technical merits, and I'll be really happy to help with the acquisition itself if this will make sense to Qualcomm, but I'm not expecting anything in return for that.**

***Q.*** You weren't expecting what?

***A.*** **Any return for that.**

***Q.*** In your mind was that you saying no to any offer that had been made?

***A.*** **Yes.**

***Q.*** Why did you do that?

***A.*** **I didn't want -- because it was a discussion first with Dr. Karim, and then Mr. Abdi, and then Taneja. And it's just a matter of time everyone is going to think that I'm really taking money or taking something in return for helping. So I wanted to clarify as early as I can that that's not the case.**

***Q.*** And just to be clear, without focusing on any specific period of time, did you ever take anything in connection with Abreezio?

***A.*** **No, never.**

***Q.*** All right. After your meeting with Mr. Quinton and Mr. Taneja, it sounds like there was a technical presentation; right?

***A.*** **Yes.**

*Q.* Did that address all of your concerns about the technology?
**A. It confirmed what I understood from before about the technology.**
*Q.* What do you mean?
**A. So based on the discussions I had earlier with Dr. Mahmoudi and -- I understood what technologies they are promising, what kind of sensors they are proposing to Qualcomm and it seems it's the same as I found in papers, that it doesn't work.**
*Q.* So you still had concern or reason to be skeptical even after this meeting?
**A. Exactly, yeah.**
*Q.* Did you send some kind of a follow-up email at Qualcomm after that meeting with Quinton and Taneja?
**A. That's correct, yes.**
*Q.* Do you remember in that email whether you said TruSens is a viable AVS solution?
**A. I said it's a viable AVS solution, yes.**
*Q.* Why would you say that the product that Abreezio was shopping to Qualcomm was a viable solution if you had these concerns?
**A. Okay. In engineering and technology in general, some ideas come up and they don't work right away. And then people can come up with a different way to implement the same idea later on, but with some tuning that makes it achieve something better.**
*Q.* I'm sorry, some what that make it's better?

**A. To achieve something better or to make it more -- to make the technology itself better.**
Q. Okay. And so were you saying in this email it's possible that this could be improved? I don't understand what viable means.
**A. So the technical presentation that I had was -- with Dr. Brad and Mr. Taneja was a PowerPoint presentation. I didn't see the details of the circuits itself, simulations. I didn't test it myself --**
Q. Fair enough.
**A. -- so I wanted to get more details about this. And they were saying that they got more -- or more power savings than what I was expecting.**
Q. Who was saying that specifically?
**A. Dr. Brad Quinton.**
Q. All right. Was anyone Inside Qualcomm encouraging you to send an email after your meeting with Mr. Quinton and Mr. Taneja?
**A. Yes. Mr. Ziad asked me to send an email so we can move forward with the assessment.**
Q. Did he provide any other context for your email?
**A. Not really. It just -- yeah. My understanding is that I need -- I needed to say that this is something that is promising. But I didn't want to say anything to make it like a full approval that this is -- should be acquired. So this is**

**what I tried to do in the email.**
*Q.* All right. You were trying not to give a full approval?
***A.* Exactly.**
*Q.* But without maybe being at the other end of the spectrum?
***A.* Yes, sir.**
*Q.* After that point were you involved in the Abreezio diligence in any meaningful way?
***A.* Not really. After I sent the email, there was only one review after, and that was in probably late July. And it was in the -- it was with Mr. Ziad, Dr. Terzioglu, and Dr. Farsheed.**
*Q.* All right. What was your position on the tech at that meeting?
***A.* It was quite pessimistic. I didn't get any more details after the technical presentation from Dr. Brad. So I was still having the same views that this is not going to work. It can have minor gain but not justifying the acquisition of the technology.**
*Q.* Okay. To be fair, though, it sounds like you had not maybe been read into the latest developments with Abreezio by the time of that later meeting?
***A.* That the correct, yes.**
*Q.* All right. After that meeting, what did you think was happening with Abreezio as far as you knew?
***A.* So things --**
***MR. FRASER:*** Objection. 602. Vague.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** Did you think it was making its way through the diligence process towards a successful conclusion, or what was your view?

***A.*** **Not really things --**

***Q.*** As far as you could tell.

***A.*** **Yes. I didn't get involved in any other discussions or anything about the technology or the company itself. So I thought that it -- it stopped.**

***Q.*** You thought that it had stopped?

***A.*** **Yes.**

***Q.*** Did you learn that that was incorrect eventually?

***A.*** **Yeah. In September time frame, I was having a one-to-one meeting with my manager, Dr. Terzioglu, and in the meeting I just brought it up if -- how things went with this company because I didn't hear about it for some time. And this is where he said that the -- it's already being acquired and I voiced my concerns that this is not a viable technology.**

**I think I showed him the papers at the time that shows that this is an existing technology, nothing new in it. But he said it's too late. It's already gone --**

***MR. FRASER:*** Objection. Hearsay. 701.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** Let me stop you there, then, Mr. Allam.

The concept that you just testified to, that you had a conversation with Dr. Arabi in June of 2015 about an offer that he'd been made by Abreezio, do you remember that testimony?

**A. Yes.**

***Q.*** And then he suggested that perhaps there could be a similar offer; right?

**A. Yes.**

***Q.*** Potentially in your case?

**A. Yes.**

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** Did you ever mention that concept to anyone else at Qualcomm?

**A. Yes. That was in 2016.**

***Q.*** Let me stop you there.

Did you mention it to anybody else before the Abreezio deal closed?

**A. No.**

***Q.*** Why not?

**A. Again, it wasn't something formal. There was -- it's just that it was just some side talk or something. I didn't take it seriously myself.**

***Q.*** So at the time you didn't think it was serious enough to pass it on to anybody else?

***A.*** **Yeah.**

***Q.*** Did you mention it later in another conversation?

***A.*** **Yes.**

***Q.*** How did that come about?

***A.*** **So around mid-2016, I had a meeting with Mr. Kevork Kechichian.**

***Q.*** Who was he to you at that moment in time?

***A.*** **So he was a manager to my manager. So he was one level up. He was managing a big team at Qualcomm responsible for the chip design.**

***Q.*** And why were you meeting with him at that time in 2016?

***A.*** **So earlier in 2016, my manager decided that -- okay. I just need to give a bit of feedback. So I will --**

***MR. FRASER:*** Objection.

***THE COURT:*** Yeah, just the question is, why were you meeting with him at that time in 2016?

***THE WITNESS:*** Sure. So I was looking to -- for positions on his team.

***BY MR. PILCHAK:***

***Q.*** So you were looking to make a move inside of Qualcomm?

***A.*** **Yes.**

***Q.*** And specifically, you were discussing positions inside of Kevork's team?

***A.*** **Yes.**

***Q.*** How did Abreezio come up in that context?

**A. So after we had the discussion and he recommended to talk with certain people in the team about opportunities, he started complaining about Abreezio technology, specifically about the TruSens. And he mentioned that it's not working as expected.**

***MR. FRASER:*** Objection. Hearsay. 701.

***THE COURT:*** Sustained.

***MR. FRASER:*** Move to strike.

***THE COURT:*** It will be stricken.

***MR. FRASER:*** Thank you.

***BY MR. PILCHAK:***

***Q.*** I don't want to ask any questions about what Mr. Kechichian said about the outcome of the technology.

But was it his -- so he mentioned Abreezio first?

***A.*** **Yes.**

***Q.*** In response to that, did you say anything about this concept you'd been talking about before concerning offers?

**A. So Mr. Kechichian started saying that he heard that people got paid for this assessment.**

***MR. FRASER:*** Objection. Hearsay. Move to strike.

***THE COURT:*** Sustained. And it will be stricken.

***BY MR. PILCHAK:***

***Q.*** Without asking what Mr. Kechichian said to you, did you perceive that he was accusing you of anything?

***A.*** **Yes.**

***Q.*** Did you say anything in response to that?

**A. Exactly, yes.**

*Q.* What did you say?

**A. So I told him that yes, I got offered something, but I never got anything. And also that I wasn't part of the teams that approved this acquisition.**

*Q.* So sorry, what did you say about the offer specifically?

**A. I mentioned that I got offer -- I didn't say percentage. Just that I got offered money to help with acquisition, but knowing the technology, I didn't think it was going to work.**

*Q.* Was that the first time that you had told anybody at Qualcomm about this offer, whether it was serious or not, in connection with Abreezio?

**A. Yes.**

*Q.* Do you know whether anything happened with that information that you shared with Mr. Kechichian?

**A. Not at the time.**

***MR. FRASER:*** Objection.

***THE COURT:*** Sustained.

***MR. PILCHAK:*** Let me stop you there.

***BY MR. PILCHAK:***

*Q.* I want to ask now about what you did after that meeting.

Did you ever take that information and provide it to anybody else?

**A. No.**

*Q.* Did you ever call an ethics hotline or meet with a company

lawyer for Qualcomm about that?
**A. No.**
*Q.* Why not? Same reasons as before?
***MR. FRASER:*** Objection. Leading.
***THE COURT:*** Sustained.
***BY MR. PILCHAK:***
*Q.* Why not, sir?
**A. Again, nothing official. It just side discussions that happened here and there. And also, a concern about the things backfiring.**
*Q.* What do you mean by "backfiring"?
**A. I just -- there were examples in the past where when people were talking to management they got sided -- or put aside and essentially lost all of their scope and responsibilities. And I didn't want to be in that situation.**
*Q.* Have you ever heard of a company called Atlazo?
**A. Yes.**
*Q.* What is that?
**A. So this is a startup that Karim started, and I was the CTO of the company.**
*Q.* You were the CTO?
**A. Yes.**
*Q.* Let's talk about Dr. Arabi first.
Did he leave Qualcomm after the Abreezio acquisition?
**A. Yes. Sometime early 2016.**

***Q.*** And did he -- where did go?

***A.*** **He started two new companies. Actually, he started investing in companies and created two new companies.**

***Q.*** Was one of them this Atlazo?

***A.*** **Yes.**

***Q.*** What was the other one?

***MR. FRASER:*** Objection. Foundation.

***THE COURT:*** If you know. Overruled.

***THE WITNESS:*** Avior Power.

***MR. FRASER:*** Hearsay and lack of personal knowledge.

***THE COURT:*** Overruled.

You may answer.

***THE WITNESS:*** So Avior Power. And the way it was I was working on both of them when I started before they got merged into one.

***BY MR. PILCHAK:***

***Q.*** I see. And is that A-v-i-o-r?

***A.*** **Yes.**

***Q.*** P-o-w-e-r?

***A.*** **Yes.**

***Q.*** All one word?

***A.*** **I think they were two.**

***Q.*** Oh, strike that. All right.

So Dr. Arabi left Qualcomm and founded these two companies; right?

**A. Yes.**
*Q.* When -- first of all, was that a surprise to you when Dr. Arabi left Qualcomm?
**A. No. I know that --**
***MR. FRASER:*** Objection. 701. 403.
***THE COURT:*** Sustained.
***BY MR. PILCHAK:***
*Q.* From your conversations with Dr. Arabi, had you ever had any reason to think he was planning to leave Qualcomm?
***MR. FRASER:*** Objection. 602. 403. 701.
***THE COURT:*** I'll allow it. It's close to 403 but I'll allow it at this point.
***MR. PILCHAK:*** That's fine, your Honor. I'll withdraw that question. I don't want it too close to the line.
***BY MR. PILCHAK:***
*Q.* Let me ask you this, Mr. Allam: What did Atlazo do?
**A. So when we started in there, it was mainly doing other low power designs for biomedical devices like hearing aids and implants.**
*Q.* All right. Hearing aids and implants, not microchips in cell phones?
**A. No, not for cell phones.**
*Q.* Was it directly competing with Qualcomm in your view?
**A. Not really. That's too small.**
*Q.* Sorry?

**A. It's too small, and it wasn't time to create components that competes with Qualcomm.**
Q. How big was the company when you say it was too small?
**A. When I joined we were about six in the engineering, and the biggest it had been was about 20.**
Q. Geographically, where did Atlazo's staff do their work?
**A. In La Jolla in EvoNexus incubation office.**
Q. Just real quick, what's an incubation office?
**A. It's when a company helps startups by giving them office space, networking, just to be able to implement the technology.**
Q. Did Atlazo ever have any staff in Canada?
**A. Yes.**
Q. Where?
**A. In Burnaby in the Greater Vancouver area BC.**
Q. Why there?
**A. So --**
***MR. FRASER:*** 401. 701.
***THE COURT:*** Overruled.
***THE WITNESS:*** Based on the previous experience or knowing people in Vancouver, it happened by chance that as we started working at Atlazo, we were trying to help people in the U.S. -- hire people in the U.S., especially in San Diego. It was quite difficult because everyone can get much better offers from Qualcomm.
So we -- sorry. It happened at this time that the

company in Canada, Teradici --

***MR. FRASER:*** Objection. 802.

***THE COURT:*** Sustained. I think it's beyond the question at this point.

***BY MR. PILCHAK:***

***Q.*** Let me ask a question in a different area, Mr. Allam.

I think you said you yourself eventually left Qualcomm; right?

***A.*** **Yes.**

***Q.*** When was that?

***A.*** **February 6, 2017.**

***Q.*** Why did you leave?

***A.*** **So after -- it just progress in -- my career seemed to be slowing down significantly. And at the same time, the idea of creating a startup and seeing the acquisitions that were happening for tens of millions, maybe hundreds of millions, it made a lot of sense to do it at this time. Otherwise, it would be too late.**

***Q.*** Where did you go?

***A.*** **So I joined Atlazo and Avior Power.**

***Q.*** And why did you go to those companies?

***A.*** **So I knew Dr. Karim before. We have been discussing this for a long time. And I trusted his judgment also. He had good connections in the industry.**

***Q.*** What was your position at Atlazo?

**A. I was a CTO.**
*Q.* Chief technology officer?
**A. Yes.**
*Q.* Is that one of the top guys?
**A. Yes.**
***MR. FRASER:*** Objection. Leading.
***THE COURT:*** I'll allow it.
***BY MR. PILCHAK:***
*Q.* Who did you report to at Atlazo?
**A. Dr. Karim.**
*Q.* And who reported to you?
**A. The engineering team.**
*Q.* Was anyone on your engineering team at Atlazo who we've already discussed in your testimony?
**A. So Dr. Farsheed Mahmoudi was there. He wasn't reporting to me. His title was almost parallel.**
*Q.* What was his title?
**A. Chief architect.**
*Q.* Just very generally, what did he do as chief architect?
**A. He was responsible for all the analog design team.**
*Q.* And that's the thing that he specialized in you said earlier?
**A. Yes.**
***MR. FRASER:*** Objection. Leading.
***THE COURT:*** I'll allow it.

***BY MR. PILCHAK:***
***Q.*** I think you said yes. Is that right?
***A.*** **Yes.**
***Q.*** Let me ask you about this: Where did Atlazo get its funding?
***MR. FRASER:*** Objection. 602.
***THE COURT:*** Overruled.
If you know.
***MR. FRASER:*** And 802.
***THE COURT:*** Overruled.
***THE WITNESS:*** So based on the discussions I had with Dr. Karim, he mentioned that it was an angel fund, which is a group of investors that created the company in San Diego and they are the ones funding the company.
***BY MR. PILCHAK:***
***Q.*** And so Dr. Arabi told you that?
***A.*** **Yes.**
***Q.*** Did he mention anything about a family contribution?
***A.*** **Not at this time.**
***MR. FRASER:*** Objection. Leading.
***THE COURT:*** Overruled.
***BY MR. PILCHAK:***
***Q.*** Not at that time, sir?
***A.*** **Not at this time, yeah.**
***Q.*** Did you later learn that this business about angel VCs might

not be quite right?

***A.*** **Yes.**

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** How did you come to find that out?

***A.*** **So later on, in 2017, Avior Power and -- Avior Power and Atlazo got merged into one company, Atlazo. And this was the first time that we saw the name of the investing company, because I -- part of the agreement itself for all the employees was mainly that we had to sign this new merger agreement. We had share in the company so we had to agree on this merger. And this was the first time to see the names of the company that owns the majority share in Atlazo.**

***Q.*** Do you remember the name of that company?

***A.*** **Not really.**

***Q.*** Did you ask anyone at the company about what is this funder?

***A.*** **We tried. All of us had the same issue. We tried to understand what this company is. But there wasn't that much details about it.**

***Q.*** Let me --

***MR. FRASER:*** Objection. 401. 403. Move to strike.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** Let me be more direct.

Did you ever ask Dr. Arabi about it?

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** Overruled.

***THE WITNESS:*** Yes. I asked about the company and he said something similar, that it was a group of investors that created this company in San Diego to invest in startups.

***BY MR. PILCHAK:***

***Q.*** And just to be as clear as we can, the company that you learned that owned most of Atlazo, Dr. Arabi said was created by a group of investors?

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** Overruled.

***THE WITNESS:*** Yes.

***BY MR. PILCHAK:***

***Q.*** Did you ever meet someone named Sheida Alan?

***A.*** **Yes. One time in 2017.**

***Q.*** Who is that person?

***A.*** **She is the sister of Dr. Arabi.**

***Q.*** How did you first learn that she even existed?

***A.*** **The first time I heard her name -- actually, no. I didn't hear the name. When I was talking with Mr. Kechichian in 2016, he mentioned --**

***Q.*** Let me stop you there. Let me put that conversation to the side.

When is the next time that you heard about Sheida Alan,

leaving aside the conversation with Mr. Kechichian?

***A.*** **So that was in 2017, probably in July time frame. It was somewhere around midyear. We were starting the office in Canada.**

***Q.*** That's for Atlazo?

***A.*** **Yes.**

***Q.*** And how did Sheida come up in connection with that?

***A.*** **So at the time we still didn't have all the registrations and paperwork done in Canada, so we couldn't get the bank account and all of these details so we can transfer from the U.S. to Canada.**

**And because we had to pay for the office that we rented, so Dr. Karim mentioned that his sister will be giving me a check that I can use for paying the down payment for the office rent.**

***Q.*** And so did you get that check from Ms. Alan?

***A.*** **Yes.**

***Q.*** Did you have any understanding of why Ms. Alan would be supplying money to Dr. Arabi's business?

***MR. FRASER:*** Objection. 602.

***THE COURT:*** Overruled.

***THE WITNESS:*** At the time we were just starting, and it was too quick to get investors or funding in Canada.

***BY MR. PILCHAK:***

***Q.*** Let me ask a different question.

Did Dr. Arabi ever tell you where Ms. Alan got that money?

**A. He mentioned that the family would be helping fund us until the Government can -- or we get a grant from the Government.**

***MR. FRASER:*** Objection.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** And just to clarify, when you say "grant from the Government," is that Canada?

***A.* Yes.**

***Q.*** Okay. Just to be clear, Mr. Allam, were you hired at Atlazo as some kind of secret reward for helping Abreezio get through the Qualcomm diligence?

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** Overruled.

***THE WITNESS:*** Not at all. Actually, I lost almost 70 percent of my annual pay when I joined Atlazo. So it -- I joined Atlazo on the premise that this is going to be something big, and it will make millions.

***BY MR. PILCHAK:***

***Q.*** I want to ask you about a specific time if I can, the fall of 2017.

Did you become aware of a civil suit involving Qualcomm around that time?

***A.* Yes. In November, I got a subpoena for all of my records with Karim and Mr. Ziad Mansour and Ms. Sheida.**

***Q.*** Was the subpoena from Qualcomm's lawyers?

**A. Yes.**
*Q.* What was your reaction to getting that subpoena?
***MR. FRASER:*** Objection. 401. 403.
***THE COURT:*** Sustained.
***BY MR. PILCHAK:***
*Q.* Did you speak with Dr. Arabi after you received the subpoena?
**A. Yes.**
*Q.* Did he talk about that lawsuit?
**A. Yes.**
*Q.* What did he tell you?
**A. He said that it's bogus and there's no merit whatsoever for this and that they are trying to set him up for something that's not real.**
*Q.* Did he mention anything about his sister?
**A. Yeah. He was upset why they are dragging his sister into this.**
*Q.* Did he mention anything about his sister's connection to Abreezio?
**A. No.**
***MR. PILCHAK:*** One moment, please, your Honor.
***THE COURT:*** Okay.
***MR. PILCHAK:*** No further questions at this time, your Honor.
***THE COURT:*** Cross-exam.

***CROSS-EXAMINATION***

***BY MR. FRASER:***

***Q.*** Good afternoon, Mr. Allam.

***A.*** **Good afternoon.**

***Q.*** Qualcomm engineers can be jealous, can they not?

***A.*** **Yes.**

***Q.*** This is sometimes called the NIH phenomenon; right?

***A.*** **That's correct, yes.**

***Q.*** NIH stands for not invented here?

***A.*** **Yes.**

***Q.*** And this dynamic comes up all the time at Qualcomm?

***A.*** **Yes.**

***Q.*** Engineers can be defensive of their ideas?

***A.*** **That's correct, yes.**

***Q.*** They don't want someone to come in and say we're better than you; right?

***A.*** **Yes.**

***Q.*** So this -- this social dynamic comes up frequently at Qualcomm. It's called not invented here; correct?

***A.*** **Yes.**

***Q.*** Qualcomm, as you mentioned I believe on direct, Qualcomm of course conducted due diligence on Abreezio; right?

***A.*** **Yes.**

***Q.*** You were less involved in that due diligence process than some others at Qualcomm; correct?

**A. Yes.**
*Q.* Nevertheless, you were privy to some of the Abreezio due diligence information?
**A. Yes.**
*Q.* And you formed opinions about the viability of Abreezio's technology?
**A. Yes.**
*Q.* Abreezio was offering a low power technology and a DFT technology; correct?
**A. Yes.**
*Q.* And broadly speaking, these are two different kinds of technology?
**A. Yes.**
*Q.* The low power technology was an alternative to what you were working on at Qualcomm, wasn't it?
**A. It wasn't -- it was complimentary. It's a different technology that can work with what we have.**
*Q.* Okay. You were responsible -- coming into 2015, Qualcomm had low power technology called CPR; correct?
**A. Yes.**
*Q.* And you -- you were responsible for CPR, were you not?
**A. Yes.**
*Q.* CPR was like your baby at Qualcomm, wasn't it?
**A. Not really. That was an acquisition from another company. I didn't come up with it.**

*Q.* You didn't come up with it?
**A. No.**
*Q.* Oh, good point. So it's not your baby in the sense that you came up with it?
**A. No.**
*Q.* But it was something -- would you agree, it's fair to say, that was -- something that was one of your main responsibilities in your work was developing and advancing CPR at Qualcomm?
**A. It wasn't -- okay. Explain -- my team was quite diverse. This was probably less than 10 percent of the team.**
*Q.* I'm asking about your responsibilities.
**A. I was responsible for CPR.**
*Q.* You were, weren't you?
**A. Yes, but it wasn't that big part.**
*Q.* Thank you. That wasn't my question.
**A. Sure.**
*Q.* Even so, you acknowledged that Abreezio's DFT technology was useful?
**A. Again, I'm not an expert in DFT. But based on the numbers that Mr. Brad mentioned in our review or our meeting in July 2015, the numbers looked quite promising in how much it saves money.**
*Q.* My question is, DFT's -- excuse me.
Abreezio's DFT technology was useful to Qualcomm, wasn't it?
**A. Again, I am not a DFT expert. My assessment of the --**

*Q.* Nevertheless, you have stated, you yourself have stated that Abreezio's DFT technology was useful to Qualcomm.

You've stated that, have you not?

***A.*** **When did I state it?**

*Q.* You've spoken with the Government a number of times in this case; correct?

***A.*** **Yes. What I mentioned is that --**

*Q.* That's my question.

You've spoken to the Government a number of times; true or not?

***A.*** **Yes.**

*Q.* And when you spoke to the Government, you tried to tell them the truth; correct?

***A.*** **Yes.**

*Q.* And likewise, you've spoken to me; correct?

***A.*** **Yes.**

*Q.* And likewise you've spoken to members of my team defending Karim Arabi; correct?

***A.*** **Yes.**

*Q.* And you made a similar effort to be truthful to us; correct?

***A.*** **Yes.**

*Q.* And you've previously testified to a grand jury in this case; correct?

***A.*** **Yeah.**

*Q.* And you tried to be truthful to them; correct?

**A. Yes.**
Q. Okay. And you -- when you spoke to my team, you acknowledged that Abreezio's DFT technology was useful to Qualcomm.
Do you admit that?
**A. Can I give the background for --**
Q. No, you can only answer my question.
Did you say that?
**A. Yes.**
Q. Thank you.
We'll come back to the low power technology.
Ziad Mansour was more involved than you in the Abreezio due diligence, isn't that true?
**A. Yes.**
Q. And based on Ziad Mansour's experience with past acquisitions, his involvement wasn't surprising, was it?
**A. No, it was.**
Q. Okay. Let's clarify.
Ziad Mansour had extensive experience with past acquisitions, didn't he not?
**A. Yes.**
Q. Including Rapid Bridge?
**A. Yes.**
Q. That's the origin of the CPR technology that you worked on?
**A. Yes.**

*Q.* And then Ziad Mansour -- so Rapid Bridge, successful acquisition for Qualcomm; true?

***A.* Yes.**

*Q.* And so it made sense for Ziad Mansour to continue evaluating other acquisition prospects at Qualcomm; true?

***A.* True, yeah.**

*Q.* Okay. And it made sense also because of the potential impact of the Abreezio acquisition for him to evaluate Abreezio, didn't it?

***A.* Yes.**

*Q.* Let's talk about others who were more heavily involved in the due diligence at Qualcomm for Abreezio than you were.

That would include Hiten Somwal; correct?

***A.* For you?**

*Q.* I apologize, I didn't understand what you said. I'll repeat my question. And I'm asking about other people involved in Qualcomm's due diligence with regard to Abreezio.

Qualcomm's due diligence team for Abreezio included Hiten Somwal. Is that correct?

***A.* I'm not getting the name. Probably I misspelled it or something, but I'm not getting the name correctly.**

*Q.* Okay. Maybe I'm mispronouncing it. It's possible. I'll spell it. Last name Somwal, S-o-m-w-a-l. First name, I believe is pronounced Hiten, H-i-t-e-n.

Do you recognize that name?

**A.** **No.**
**Q.** You don't recognize the name, however it's pronounced, a name with that spelling?
**A.** **I can't think of anything even close. Sorry.**
**Q.** Okay. Esin Terzioglu was your boss?
**A.** **Yes.**
**Q.** And he was more involved in the due diligence of Abreezio at Qualcomm than you; correct?
**A.** **Yes.**
**Q.** And Ziad Mansour was Esin's boss; correct?
**A.** **Yes.**
**Q.** He was also involved in the due diligence; correct?
**A.** **Yes.**
**Q.** Michael Campbell also; right?
**A.** **Yes.**
**Q.** Saad Elhosni as well; correct?
**A.** **Yes.**
**Q.** And Farsheed Mahmoudi, you mentioned him.
He was more involved in the Abreezio due diligence than you, sir?
**A.** **Yes.**
**Q.** Isn't that true?
**A.** **Yes.**
**Q.** All these folks?
**A.** **Yes.**

**Q.** Let's talk about, again, how you found out that Qualcomm was considering Abreezio.

The way you found out was a bit awkward, wasn't it?

**A. Yes.**

**Q.** It happened when you walked into a conference room?

**A. Yes.**

**Q.** In it, you found Brad Quinton, Esin Terzioglu, Ziad Mansour, and Farsheed Mahmoudi; correct?

**A. Yes.**

**Q.** So that includes a former colleague of yours; correct?

**A. Yes.**

**Q.** And two of your then superiors at Qualcomm; true?

**A. Yes.**

**Q.** Two people above you in the org chart; correct?

**A. Yes.**

**Q.** And Farsheed Mahmoudi, who was two levels below you in the org chart; correct?

**A. Yes.**

**Q.** And Qualcomm has a chain of seniority?

**A. Yes.**

**Q.** It's important to everyone at Qualcomm; right?

**A. Yes.**

**Q.** And it was important to you in 2015 when this happened, wasn't it?

**A. Yes.**

***Q.*** You saw that your spot in the chain had been skipped over in this meeting? You saw that?
***A.*** **Yes.**
***Q.*** That was awkward?
***A.*** **Yes.**
***Q.*** It was awkward, right, for you?
***A.*** **Yes.**
***Q.*** And that's how you first learned about Abreezio?
***A.*** **Yes.**
***Q.*** Now let's talk about what happened in your career in 2016.
In 2016, half of your work got taken away --
***A.*** **Yes.**
***Q.*** -- at Qualcomm?
***A.*** **Yeah.**
***Q.*** You said one can imagine when half your work gets taken away, you have a lot of free time. Isn't that true?
***A.*** **Yes.**
***Q.*** It looked really bad for you in front of your team, didn't it?
***A.*** **Yes.**
***Q.*** You could feel this was a problem?
***A.*** **Yes.**
***Q.*** You were hoping Esin would promote you in 2016?
***A.*** **Yes.**
***Q.*** Instead, someone else came in and took half your team?

**A.** **Yes.**
**Q.** Just going back to the due diligence for a moment.
You mentioned a number of people, we covered them, at least four people who were more involved in Qualcomm's due diligence for Abreezio than you yourself.
**A.** **Yes.**
**Q.** Do you recall?
You never claimed that any of them offered you anything to get you to support Abreezio, did you?
**A.** **No, I didn't.**
**Q.** And you never saw any evidence that any of them took any kind of personal benefit to themselves to support Abreezio?
**A.** **No.**
**Q.** But you've told the story today that Karim indicated you could get some kind of benefit for supporting Abreezio?
***MR. PILCHAK:*** Objection. Argumentative.
***BY MR. FRASER:***
**Q.** That's your story on direct?
***THE COURT:*** Overruled.
***THE WITNESS:*** Yes.
***BY MR. FRASER:***
**Q.** And your story is that Behrooz Abdi also indicated this to you?
**A.** **Yes.**
**Q.** And your story is also that Bradley Quinton offered this to

you?

***MR. PILCHAK:*** Objection. Misstates the evidence.

***THE WITNESS:*** No.

***THE COURT:*** Overruled. The answer "No" may stand.

***BY MR. FRASER:***

***Q.*** And your story is that Sanjiv Taneja indicated there could be a benefit to you personally for supporting Abreezio. That's your testimony?

***A.*** **Yes.**

***Q.*** Your tale is that three different people referred to some kind of personal benefit to you for supporting Abreezio?

***A.*** **Yes.**

***Q.*** And you say that happened in about July of 2015?

***A.*** **Yes.**

***Q.*** And you have zero corroborating evidence for that?

***A.*** **Yes.**

***Q.*** You have no text message that shows it?

***A.*** **No.**

***Q.*** You have no voicemail showing it?

***A.*** **No.**

***Q.*** You have no email showing it?

***A.*** **No.**

***Q.*** You didn't make a memo to yourself when it happened?

***A.*** **No.**

***Q.*** You have none of that?

***A.*** **Yes.**
***Q.*** And you understand that offering a bribe would be a crime, do you not?
***A.*** **Yes.**
***Q.*** You took a conflict of interest training at Qualcomm?
***A.*** **Yes.**
***Q.*** And apart from that training, did you believe that employer loyalty was a virtue in 2015?
***A.*** **Yes.**
***Q.*** And you didn't report any of the offers that you've claimed happened in 2015.
You didn't report them in 2015 to Qualcomm, did you?
***A.*** **Yes, I didn't.**
***Q.*** You did not tell any Qualcomm official in 2015?
***A.*** **Yes.**
***Q.*** You did tell a Qualcomm official in 2015?
***THE COURT:*** You've got to ask your question correctly.
***MR. FRASER:*** That's why I asked it the way I did.
***THE COURT:*** Okay.
***BY MR. FRASER:***
***Q.*** Did you tell a Qualcomm official in 2015?
***A.*** **No.**
***Q.*** Did you call the ethics hotline in 2015?
***A.*** **No.**
***THE COURT:*** I'm laughing because I warned the attorneys

about doing this, so that's why I was teasing Mr. Fraser about it.

***MR. FRASER:*** Thank you. I'll return to my cross.

***BY MR. FRASER:***

***Q.*** Did you tell law enforcement in 2015?
***A.*** **No.**
***Q.*** Did you write yourself a memo while it was fresh in mind?
***A.*** **No.**
***Q.*** Did you send yourself an email about it?
***A.*** **I'm not sure why, but no.**
***Q.*** You didn't do that in early 2016, either, did you?
***A.*** **No.**
***Q.*** Ultimately, you made a report to someone at Qualcomm?
***A.*** **It wasn't a report. I was defending myself against blame.**
***Q.*** Ultimately, you reported it to someone at Qualcomm. True or false?
***A.*** **Yes.**
***Q.*** And that was in late 2016?
***A.*** **Around mid-2016, early July.**
***Q.*** Again, let's talk about what happened between -- you claim that these offers were conveyed to you in the summer of 2015; correct?
***A.*** **Yes.**
***Q.*** And you claim that -- I mean, you reported them to Qualcomm, and you're saying that happened in mid or late 2016. Correct?

**A. That was not reporting. If I were to report --**

Q. Well, the first time that you told someone at Qualcomm about what you've testified today happened, that was in mid or late 2016; correct?

**A. Yes.**

Q. And I want to talk about what happened between the offer that you say happened and the time that you reported it at Qualcomm.

There was an at least eight-month due diligence process on Abreezio that concluded; correct?

**A. Three months after.**

Q. The -- so the length of the due diligence was at least about eight months, was it not?

**A. I don't know when it started. I don't.**

Q. You attended a meeting about it in April of 2015; correct?

**A. No. I saw them -- the people coming from the meeting.**

Q. Thank you.

So there was a meeting happening about Abreezio in April of 2015; correct?

**A. Yes.**

Q. And you know that the acquisition closed on October 30th, 2015; correct?

**A. Yes.**

Q. Okay. And not only that, not only did a due diligence process conclude, but you had awkwardly been left mostly out of

the Abreezio discussions. Isn't that true?

**A. Yes.**

*Q.* And your manager, Esin, he had left you out of those discussions --

**A. Yes.**

*Q.* -- isn't that true?

And someone else from outside your team came in and took half your team. Isn't that true?

**A. Yes.**

*Q.* And after all that happened, that's the first time that you told someone at Qualcomm about the story that you've testified to today. Isn't that right?

**A. Yes.**

*Q.* And you didn't tell that story to just anyone at Qualcomm, did you?

**A. Yes. I did not.**

*Q.* You told it to Kevork Kechichian in particular?

**A. Yes.**

*Q.* You knew that Kevork Kechichian was an opponent of Abreezio, didn't you, or a sceptic of Abreezio's technology?

**A. Yes.**

*Q.* That's the person you made your report to?

**A. Yes.**

*Q.* And you know that Kevork Kechichian is vindictive?

**A. Yes.**

***Q.*** And you know that Kevork Kechichian is a liar?
***A.*** **I can't say that.**
***Q.*** You're not sure if he's a liar?
***A.*** **I don't know.**
***Q.*** You know that he lied about inappropriate workplace relationships, don't you?
***MR. PILCHAK:*** Objection. Foundation.
***THE COURT:*** Overruled. I'm allowing it.
If you know.
***THE WITNESS:*** I just heard rumors, nothing official.
***BY MR. FRASER:***
***Q.*** You heard rumors about it?
***A.*** **Yes.**
***Q.*** And he didn't tell you that he lied about it?
***A.*** **No.**
***Q.*** One of his rumored girlfriends got a good promotion, didn't she?
***MR. PILCHAK:*** Objection. 602.
***THE COURT:*** Sustained.
***BY MR. FRASER:***
***Q.*** Were you aware of Kevork Kechichian's history at Qualcomm?
***A.*** **Partially, yes.**
***Q.*** You knew who Kevork Kechichian was at Qualcomm in 2016; correct?
***A.*** **Yes.**

***Q.*** And you'd heard the rumors about his relationships with other women at work --

***A.*** **Yes.**

***Q.*** -- correct?

And you knew that people had seen that one of the women that he was --

***MR. PILCHAK:*** Objection. 602, 403.

***THE COURT:*** Sustained. He said he didn't know. All he'd heard were rumors, Counsel.

***BY MR. FRASER:***

***Q.*** And one of the women with whom he was rumored to have an unreported relationship received --

***MR. PILCHAK:*** Same objection.

***THE COURT:*** Same ruling.

***BY MR. FRASER:***

***Q.*** -- a promotion?

***MR. PILCHAK:*** Same objection.

***THE COURT:*** Mr. Fraser, you're asking the exact same question.

***MR. FRASER:*** I didn't get to finish the question.

***THE COURT:*** Because you are asking the exact same question you already asked. Ask a new question.

***BY MR. FRASER:***

***Q.*** After you talked to -- after you told Kevork Kechichian -- first of all, he's the only person at Qualcomm that you conveyed

this information to at that time. Isn't that true?
**A. Yes.**
*Q.* You still didn't call the ethics hotline?
**A. Yes.**
*Q.* You still didn't call law enforcement?
**A. Yes.**
*Q.* Okay. And you have claimed that -- that the TruSens technology didn't work as well as planned; correct?
**A. Yes.**
*Q.* And Kechichian was a sceptic about that?
**A. Yes.**
*Q.* But Qualcomm itself disagreed as of March 2017.

***MR. PILCHAK:*** Objection. Foundation.

***THE WITNESS:*** I can't -- I wasn't at Qualcomm in 2017.

***THE COURT:*** Sustained.

***BY MR. FRASER:***

*Q.* You participated in trying to integrate low power technology after the acquisition; correct?
**A. No.**
*Q.* Okay. Would it surprise you to know that Qualcomm found power savings in line with its original expectations after the acquisition?

***MR. PILCHAK:*** Objection. Relevance. 403.

***THE COURT:*** Sustained.

///

***BY MR. FRASER:***

***Q.*** I would like to show you Defense Exhibit 3276. This is an email in the middle from Kevork Kechichian to Duane Nelles, Esin Terzioglu, Hiten Somwal, and Geoffrey Shippee; correct?

***A.*** **Yes.**

***Q.*** Okay. And moving ahead to the PowerPoint.

***THE COURT:*** And just for the record, it is in evidence.

***MR. FRASER:*** Thank you.

***BY MR. FRASER:***

***Q.*** This is a preliminary results report from Qualcomm for Abreezio; correct?

***A.*** **Yes. Sorry. Can you go back to the email?**

***Q.*** Sure. Actually, let's just go ahead to the executive summary --

***THE CLERK:*** There's a question. Lindsey said she had only the email, not the attachment, and I didn't know one way or the other.

***MR. FRASER:*** Okay. This is part of the same exhibit.

***THE COURT:*** It's all 3276?

***MR. FRASER:*** Correct.

***THE COURT:*** Okay. So the entire 3276 is both an email and an attachment, Lindsey.

***BY MR. FRASER:***

***Q.*** Let's show you the executive summary that's -- go ahead to the next page.

This is an executive summary --

**MR. PILCHAK:** Your Honor, I apologize. At this time, our notes say that the email only was admitted.

**THE COURT:** That's what Lindsey had as well, Mr. Fraser.

**BY MR. FRASER:**

**Q.** Okay. Nevertheless, I would like to show you and you only the executive summary. And directing your attention to the middle of the slide --

**MR. FRASER:** Can you do a call-out for the fourth major bullet point, please.

**THE WITNESS:** Do you want me to read it?

**BY MR. FRASER:**

**Q.** I'll ask you a question.

**A.** **Okay.**

**Q.** It states --

**MR. PILCHAK:** Objection. Foundation, hearsay and 403.

**THE COURT:** Wait, let me see. Let me read it.

Sustained. Hearsay, foundation, 403.

**BY MR. FRASER:**

**Q.** Okay. Do you see that this states that there was a --

**MR. PILCHAK:** Same objection.

**MR. FRASER:** Foundational question.

**THE COURT:** Mr. Fraser, I was ruling that you cannot read this into the -- if you didn't understand my ruling.

***MR. FRASER:*** Okay.

***BY MR. FRASER:***

***Q.*** You would expect that Qualcomm would do testing of technology in silicon after an acquisition; correct?

***A.*** **So after an acquisition, we use the technology.**

***Q.*** You use the technology?

***A.*** **Yes.**

***Q.*** In silicon of course; right?

***A.*** **Yes.**

***Q.*** Okay. And there would be an assessment of its effectiveness; correct?

***A.*** **Yes.**

***Q.*** Okay. And --

***MR. FRASER:*** We can take this down. Thank you.

***BY MR. FRASER:***

***Q.*** Shifting gears. You testified on direct about the concept of invention assignment.

Do you recall that?

***A.*** **Maybe I'm understanding it a different way. What is invention assignment?**

***Q.*** I think you testified that -- to the idea that basically an employer will sometimes own ideas of their employees --

***A.*** **Yes.**

***Q.*** -- created during their employment.

***A.*** **Yes.**

***Q.*** This -- this concept can be called invention assignment; correct?

***A.*** **Okay. Yes.**

***Q.*** Okay. And there can be a written agreement that covers invention assignment; correct?

***A.*** **Yes.**

***Q.*** And not every invention assignment agreement is the same; true?

***A.*** **Yes.**

***Q.*** Some of them cover -- some of them are limited to ideas created by the employee during the term of employment; correct?

***A.*** **Yes.**

***Q.*** Others are not so limited?

***A.*** **Yes.**

***Q.*** Some purport to extend to ideas that a former employee has created after departing the former employer; true?

***A.*** **I heard about this, but I've never had one myself.**

***Q.*** You've heard about this but you were not aware of having one yourself?

***A.*** **Yes.**

***Q.*** Am I understanding correctly?

***A.*** **Exactly. At Qualcomm, we didn't have this.**

***Q.*** At Qualcomm it was your understanding that it didn't extend to post-employment --

***A.*** **Yes.**

***Q.*** -- ideas?

An agreement that does purport to extend to post employment ideas would be significantly broader?

***A.*** **Yes.**

***Q.*** You agree.

Significantly more restrictive --

***A.*** **Yes.**

***Q.*** -- correct?

And the enforceability of a contract could depend on its language; correct?

***MR. PILCHAK:*** Objection. 403 and foundation.

***THE COURT:*** Sustained.

***BY MR. FRASER:***

***Q.*** You didn't -- you didn't litigate invention assignment with Qualcomm?

***A.*** **No.**

***Q.*** Qualcomm is a powerful company?

***A.*** **Yes.**

***Q.*** It has extensive financial resources?

***A.*** **Yes.**

***Q.*** In-house counsel?

***A.*** **Yes.**

***Q.*** Transactional outside counsel?

***A.*** **Yes.**

***Q.*** And litigation counsel as needed; correct?

**A.** **Yep.**
***Q.*** People don't tend to litigate with Qualcomm; correct?
***MR. PILCHAK:*** Objection.
***THE COURT:*** Sustained.
***BY MR. FRASER:***
***Q.*** On a new topic, you mentioned Teradici.
**A.** **Yes.**
***Q.*** You worked there?
**A.** **Yes.**
***Q.*** You worked with Andrew Hughes at Teradici?
**A.** **Yes.**
***Q.*** Trent McClements?
**A.** **Yes.**
***Q.*** Brad Quinton?
**A.** **Yes.**
***Q.*** Teradici developed integrated circuits?
**A.** **Yes.**
***Q.*** And Qualcomm develops integrated circuits?
**A.** **Yes.**
***Q.*** And when you worked with Trent, Andrew and Brad, they were developing new hardware designs for Teradici?
**A.** **Yes.**
***Q.*** So they have a lot of experience with IC design?
**A.** **Yes.**
***Q.*** IC meaning integrated circuits?

**A. Yes.**
Q. They were capable IC engineers?
**A. Yes.**
Q. They were experienced with EDA tools as well; correct?
**A. Yes.**
Q. And EDA stands for?
**A. Engineering --**
Q. Is it electronic design automation?
**A. Yeah, yeah.**
Q. Okay. And Abreezio's product was an EDA product as well; correct?
**A. The DFT part, yes.**
Q. And so these same guys, Trent, Andrew, and Brad, they had a business together called Invionics; correct?
**A. Yes.**
Q. Invionics had a platform called Invio?
**A. Yes.**
Q. And Invio was a platform for building EDA tools; correct?
**A. Yes.**
Q. And they were capable of developing new EDA software tools?
**A. Yes.**
Q. And they were experienced with that?
**A. Yeah.**
Q. I think you mentioned on direct when you first heard about Abreezio, you did some research in its area; correct?

***A.*** **Yes.**
***Q.*** And you found published research papers that you believed covered the same concept as you believed Abreezio was proposing --
***A.*** **Yes.**
***Q.*** -- correct?
And these were papers from around 2007 or 2008. Is that right?
***A.*** **Yes.**
***Q.*** And did these papers from 2007 or 2008 also show that in situ sensors could not be made to work?
***A.*** **Yes.**
***Q.*** In situ means in place; right?
***A.*** **Yes.**
***Q.*** And you printed these papers?
***A.*** **Yes.**
***Q.*** And did you explain these papers to anyone at Qualcomm?
***A.*** **I showed them to Dr. Terzioglu.**
***Q.*** Okay. And Ziad Mansour as well?
***A.*** **Yes. I mentioned it to him. I'm not sure if I gave him the actual papers.**
***Q.*** Okay. So Ziad and Esin were aware of your concern that Abreezio's technology was not novel and might not work?
***A.*** **Yes.**
***Q.*** After you raised these concerns with Ziad and Esin, was a

deep dive review arranged for you?
**A. Not -- no.**
***Q.*** I would like to show you exhibit -- Government Exhibit 56. In the middle of the page --
***THE COURT:*** This is not in evidence, just for the record.
***MR. FRASER:*** Thank you.
***BY MR. FRASER:***
***Q.*** You see in the middle of the page an email from yourself dated July 8th, 2015; correct?
**A. Yes.**
***Q.*** The title of the email is "Abreezio TruSens deep dive review"; correct?
**A. Yes.**
***Q.*** And you sent this to Ziad Mansour and Farsheed Mahmoudi; correct?
**A. Yes.**
***Q.*** And you copied Esin Terzioglu; correct?
**A. Yes.**
***Q.*** He was your boss?
**A. Yes.**
***MR. FRASER:*** I move this into evidence.
***THE COURT:*** Any objection?
***MR. PILCHAK:*** No, your Honor.
***THE COURT:*** It may be admitted.

***(Exhibit 56 admitted.)***

***BY MR. FRASER:***

***Q.*** Do you see that you were referring to a deep dive review that had been -- that you had had an opportunity to conduct; correct?

***A.*** **Yes.**

***Q.*** And you sent an email that was titled "Deep Dive Review"; correct?

***A.*** **Yes.**

***Q.*** And here it is; yes?

***A.*** **Yeah.**

***Q.*** This is your email?

***A.*** **Yes.**

***Q.*** After that review, you concluded that Abreezio was using a replica of critical path; correct?

***A.*** **Yes.**

***Q.*** And you concluded that this was a -- or you wrote in this email that that was a viable AVS solution; correct?

***A.*** **Yes.**

***Q.*** And critical -- replica critical paths are viable AVS solutions, are they not?

***A.*** **No.**

***Q.*** You wrote that in this email, however?

***A.*** **If you read the first part of the executive summary, I was saying it has minimal.**

***Q.*** Okay. The first bullet point -- again, this is an email that you wrote; correct?

***A.*** **Yes.**

***Q.*** You sent it to your boss two levels above you; correct?

***A.*** **Yes.**

***Q.*** You sent it to someone who was two levels below you on your team; correct?

***A.*** **Yes.**

***Q.*** And you copied your direct boss who was right above you; correct?

***A.*** **Yes.**

***THE COURT:*** I'm going to stop you for a minute. It's hard for our court reporter to take down what you're saying if you say it at the same time as Mr. Fraser is asking the question. So even if you know where he is going with the question, you need to wait until he is done with the question before you say yes.

***THE WITNESS:*** Okay.

***THE COURT:*** Otherwise she might miss the answer.

***THE WITNESS:*** Sorry about that. Sorry.

***BY MR. FRASER:***

***Q.*** You were sending this to two of your bosses and one of your subordinates; correct?

***A.*** **Yes.**

***Q.*** And in your very first bullet point you wrote "TruSens

technology is a viable AVS solution."
**A. Yes.**
*Q.* Okay. Replica -- a replica critical path is different from an in situ sensor, isn't it?
**A. No. It is a type of in situ.**
*Q.* A replica critical path?
**A. Yes. Yes.**
*Q.* In your email you explained that replica critical paths could potentially save ten to 20 millivolts compared to CPR; correct?
**A. No. I didn't refer to CPR in this email.**
*Q.* Okay. You wrote in this email that the effect on margin reduction would be ten to 20 millivolts; correct?
**A. Yes.**
*Q.* And you believed this was important information for them to understand in their due diligence; correct?
**A. Yes.**
***MR. FRASER:*** Okay. We can take that down.
***BY MR. FRASER:***
*Q.* You got no money from Abreezio for yourself; correct?
**A. Yes.**
*Q.* And ultimately, you left Qualcomm?
**A. Yes.**
*Q.* You left Qualcomm to work at Atlazo?
**A. Yes.**

***Q.*** Even taking a pay cut?
***A.*** **Yes.**
***Q.*** That was Karim's business?
***A.*** **I didn't know that it was Karim's business at the time.**
***Q.*** Okay. You joined because it was a promising company?
***A.*** **Yes.**
***Q.*** But ultimately, you lost money because you joined Abreezio *[sic]* compared with what you could have earned if you hadn't?
***A.*** **Yes.**

***(Pause.)***

***BY MR. FRASER:***

***Q.*** Mr. Allam, just to confirm, Atlazo, it was angel funded; correct?
***A.*** **Yes.**

***MR. FRASER:*** Thank you. No further questions.

***THE COURT:*** Anything further?

***MR. PILCHAK:*** Yes, your Honor.

***REDIRECT EXAMINATION***

***BY MR. PILCHAK:***

***Q.*** Mr. Allam, I'm not sure what you mean by "angel funded" in that last answer.
What do you mean by that?
***A.*** **It's people that give money to the company earlier on before initial offering.**

***Q.*** Apart from Dr. Arabi's family?

***A.*** **Yes.**

***Q.*** Do you know who contributed more money to Atlazo?

***A.*** **No, at the time when I discussed this with Dr. Arabi, he said that people didn't want to mention their names.**

***Q.*** The funders didn't want to mention?

***A.*** **Yes.**

***Q.*** One other thing you were asked just at the tail end of your testimony with Mr. Fraser I want to clarify.

You never worked at Abreezio; right?

***A.*** **That's correct.**

***Q.*** The company that you went to work for was called Atlazo?

***A.*** **Yes.**

***Q.*** There's a lot of companies that begin with A, but the one that you worked for --

***MR. FRASER:*** Objection. Leading and just --

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** -- was Atlazo?

***A.*** **Yes.**

***Q.*** All right. While we're talking about Atlazo, do you know whether Sheida Alan ever worked with Atlazo?

***A.*** **No.**

***Q.*** Do you know whether she did any technical work or advising for the company?

**A. No, never when I was there.**

**Q.** Did you ever have a role as the CTO in hiring people?

***MR. FRASER:*** Objection. 602. Move to strike. He said he didn't know.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

**Q.** As CTO at Atlazo, did you ever have a role in hiring people or reviewing applicants?

**A. Yes.**

**Q.** How many would you say that you reviewed in the time you were at the company?

**A. Maybe 30, 40.**

**Q.** Thirty or 40 people?

**A. Yes.**

**Q.** Was one of them ever Sheida Alan?

***MR. FRASER:*** Objection. Outside the scope of cross.

***THE COURT:*** Sustained.

***MR. PILCHAK:*** I'll withdraw that question.

***BY MR. PILCHAK:***

**Q.** You were asked on cross-examination about a statement that you made to the defense team about whether DFT's product was useful to Qualcomm.

Do you remember that?

**A. Yes.**

**Q.** It seemed like there might have been some more context for

that statement to the defense team.

Is there more context to that statement?

**A. Yes.**

*Q.* What is that context?

***MR. FRASER:*** Objection. Vague.

***THE COURT:*** Overruled.

***THE WITNESS:*** Based on the discussions with the DFT team at Qualcomm later in 2016, they explained that they tested the technology and, yes, it's saving time and cost.

***BY MR. PILCHAK:***

*Q.* So based on the statements of others?

**A. Yes.**

*Q.* All right. You were asked some questions on cross-examination about people who were more involved in the Abreezio diligence than you; right?

**A. Yes.**

*Q.* Again, you have to wait until I get the end of my question, just like Mr. Fraser.

**A. Sorry.**

*Q.* It's all right.

And you said there were a number of people; right?

**A. Yes.**

*Q.* And you listed some of them on cross?

**A. Yes.**

*Q.* Is that because you were not invited to the due diligence

party?

**A. My concern was -- with the due diligence was that it wasn't the right people doing it. And --**

***Q.*** I'm trying to ask a more basic question.

**A. Yeah.**

***Q.*** There were other people who were more involved in the diligence than you?

**A. Yes.**

***Q.*** Is that because you were not invited to participate in the diligence?

**A. Yes.**

***Q.*** And who was handing out the invitations as far as you could tell?

***MR. FRASER:*** Objection. 602.

***THE COURT:*** Overruled.

***THE WITNESS:*** Mr. Ziad Mansour was the one driving the whole assessment or evaluation.

***BY MR. PILCHAK:***

***Q.*** All right. Then you were asked a number of questions about your testimony about the concept of an offer in exchange for helping with Abreezio.

Do you remember that?

**A. Yes.**

***Q.*** It was called your story a couple of times.

Do you remember that?

**A. Yes.**

***Q.*** I think the word "tale" was used.

And then you were asked if there's any corroborating evidence that that happened.

And you know what corroborating evidence is; right?

**A. Yes.**

***Q.*** One of the questions was "Did you ever write a memo to yourself about that?"

**A. I never do this.**

***Q.*** I was going to ask, are you in the habit of writing memos to yourself?

**A. No.**

***Q.*** Does that sound like something that a lawyer would do?

**A. Probably.**

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** Did you take that information about the offer and communicate it to someone else at Qualcomm at one point?

**A. No.**

***Q.*** Well, did you tell --

***MR. FRASER:*** Objection. Asked and answered.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** Did you tell Mr. Kechichian about it in that meeting you

talked about on direct?

***MR. FRASER:*** Objection. Asked and answered.

***THE COURT:*** Overruled.

***THE WITNESS:*** Yes.

***BY MR. PILCHAK:***

***Q.*** Do you know if that conversation with Mr. Kechichian sparked a whole series of events inside Qualcomm?

***A.*** **No.**

***Q.*** You were asked about your own conflict of interest training at Qualcomm.

Do you remember that?

***A.*** **Yes.**

***Q.*** Did you take such a training?

***A.*** **Yes.**

***Q.*** How many times did you take it?

***A.*** **I think almost every year we had to take it.**

***Q.*** Can you tell the jury about some of the things that are in that training?

***A.*** **So you should never make a decision based on something that would benefit you personally. You should never take a bribe or any kind of gifts that can be understood as a way to enforce decisions from whoever is giving this gift.**

***Q.*** And were you the only employee at Qualcomm that was singled out to take that training?

***A.*** **No. Every employee has to go -- go through it, especially**

**managers.**

*Q.* And that training that you had received, is that one of the reasons why you refused any offer of anything as part of the Abreezio deal?

***A.*** **It was the training and basic beliefs.**

*Q.* Basic what?

***A.*** **Beliefs. I should never take a bribe.**

*Q.* You were also asked a series of questions on cross about the series of events that leaded -- sorry -- that led up to your conversation with Mr. Kechichian.

Do you remember that?

***A.*** **Yes.**

*Q.* Between when the offer was discussed in your presence by Dr. Arabi and others and then when you mentioned it to Mr. Kechichian; right?

***A.*** **Yes.**

*Q.* And there are some things that happened in that space on the calendar?

***A.*** **Yes.**

*Q.* And then you were asked only at the end of that, after losing part of your team and being left out of the discussions, did you make this statement to Mr. Kechichian; right?

***A.*** **Yes.**

*Q.* When you said what you said to Mr. Kechichian, were you trying to harm someone?

**A. No.**

*Q.* Were you trying to harm Dr. Arabi, for example?

**A. No.**

*Q.* Did you later take a big gamble with your career and go work at Dr. Arabi's company?

**A. Yes.**

*Q.* You also got asked a few more questions on cross about those papers from 2007 and 2008 that I think you said in part led to you being skeptical about Abreezio.

Do you remember those papers?

**A. Yes.**

*Q.* And I think if I understood your testimony, you said I probably showed the papers to Mr. Terzioglu; right?

**A. Yes.**

*Q.* And you mentioned the ideas or the reasons for skepticism to Mr. Mansour; right?

**A. Yes.**

*Q.* Despite those conversations, did Qualcomm pay $180 million to acquire Abreezio?

**A. Yes.**

***MR. FRASER:*** Objection. Misleading.

***THE COURT:*** Overruled.

***MR. PILCHAK:*** Can we get Exhibit 56 on the screen, please. This came up during cross. And let's just zoom in on the bottom two-thirds starting with from Mohamed Allam -- yep,

from there to the bottom, Mr. Reyes. That made it a little bigger anyway. Can we cut out the Ziad Mansour part at the bottom there, see if that helps. There we go.

***BY MR. PILCHAK:***

***Q.*** All right. Do you see that there, Mr. Allam?

***A.*** **Yes.**

***Q.*** Is this the email that you were testifying about on direct examination where there's a mention of a viable AVS solution?

***A.*** **Yes.**

***Q.*** Did you -- when you sent this email, did you consider this a ringing endorsement of Abreezio's technology?

***A.*** **No.**

***Q.*** Why not?

***A.*** **So a good number would be 50, 60 millivolt.**

***Q.*** When you say "a good number would be 50 or 60 millivolt," that's down in the details section here in the first bullet?

***A.*** **Yeah.**

***Q.*** What's your number in this email?

***A.*** **Ten to 20.**

***Q.*** Is that a lot that someone should get excited about, if it's ten to 20?

***A.*** **No. This is why I referred to it as minimal in the second statement in the executive summary.**

***Q.*** All right. I maybe circled the wrong thing.

You're talking about the second bullet in the executive

summary?

**A. Yes.**

*Q.* Thank you.

And so ten to 20 millivolts I guess is in here twice.

Did you consider that to be a meaningful reduction if that's what this product could do?

**A. Not really. This can be considered in the noise range where if we spent a bit more time, we can get that close.**

***MR. PILCHAK:*** One moment, please, your Honor.

No further questions.

***THE COURT:*** Anything further?

***MR. FRASER:*** Yes, your Honor.

***RECROSS-EXAMINATION***

***BY MR. FRASER:***

*Q.* You were just testifying about the fourth bullet point in Government Exhibit 56.

Do you recall that?

**A. Is it possible to show it?**

*Q.* Yeah. Let's put it up there.

***MR. FRASER:*** Government Exhibit 56. It's 56; right?

***MR. PILCHAK:*** Yeah.

***MR. FRASER:*** Right.

***BY MR. FRASER:***

*Q.* Your last bullet point under the executive summary, would

you please read that?

***A.*** **Also went over quickly -- okay.**

**"Went over quickly over true DFT. It is a neat idea to avoid the complexity of launch on shift implementation. It should reduce the ^TDF time, test time, significantly. My understanding is that the actual numbers are being assessed by DFT and PTE teams."**

***Q.*** Thank you.

This is addressing a DFT or a test-related issue; correct?

***A.*** **Yes.**

***Q.*** And you were also discussing the impact on low power, and on redirect you said part of what you would it compare to is what you could develop within Qualcomm if you would spend more time; correct?

***A.*** **No, that's not what I meant.**

***Q.*** Okay. When you're at a company like Qualcomm and you're thinking about an acquisition, you compare what the target offers to what you could create on your own; correct?

***A.*** **No. That's --**

***Q.*** You don't do that?

***A.*** **Okay. This is not the context of what I put in here.**

***Q.*** I just -- I'm asking you a question.

Do you deny that a company like Qualcomm would compare a target's technology to what the acquirer, Qualcomm in this case, could achieve on its own?

**A. Sure. A company would compare.**
*Q.* That's what they do?
**A. Yes.**
*Q.* And so they're -- when they assess whether an acquisition is worth undertaking, they have to make estimates about what they can achieve on their own; correct?
**A. Yes.**
*Q.* And you were responsible for the technology within Qualcomm that tried to come up with a low power solution?
**A. Yes.**
*Q.* That was something you owned in your job at Qualcomm in 2015?
**A. I was considered the expert in low power at Qualcomm, yes.**
*Q.* And not for no reason.
**A. Yes.**
*Q.* Okay. You also -- you addressed the conflict of interest training.
A conflict of interest can be a form of disloyalty; correct?
**A. Yes.**
*Q.* Sometimes a disloyalty could be criminal, and sometimes it could be not criminal. Isn't that true?
***MR. PILCHAK:*** Objection. Foundation.
***THE COURT:*** Sustained.
***BY MR. FRASER:***
*Q.* Returning to the due diligence team that Qualcomm had.

You confirmed that you knew that Mike Campbell was part of Qualcomm's due diligence team for Abreezio.

Do you recall?

**A.** **Yes.**

***Q.*** And he had his own people who would assist him with this; correct?

**A.** **Yes.**

***Q.*** And that would be somebody named Tim, for example?

***MR. PILCHAK:*** Objection. Beyond the scope.

***THE COURT:*** Sustained.

***BY MR. FRASER:***

***Q.*** Ultimately, Duane Nelles, III would be assessing the information in the due diligence; correct?

**A.** **Sorry, who?**

***Q.*** Duane Nelles, III.

**A.** **It's a different organization. I don't know all the people in there.**

***MR. FRASER:*** Okay. No further questions. Thank you.

***THE COURT:*** Anything further?

***MR. PILCHAK:*** No, your Honor.

***THE COURT:*** Thank you. Okay. Thank you, sir. You're excused.

Ladies and gentlemen, we'll take a 15-minute recess. I think there are cookies out there for you if you would like some around the corner there. We'll take 15 minutes.

***THE CLERK:*** And coffee.

***THE COURT:*** And coffee. I was planning on saying we've got cookies because we're celebrating the fact that the Government's case-in-chief is over with, but it's not quite over with yet. We still get cookies today, though. So I think we're close.

***THE CLERK:*** As a reminder, it's for the jurors.

***THE COURT:*** For the jurors, yes.

***(Jury out at 2:31 p.m.)***

***THE COURT:*** Any issues we need to take up outside the presence of the jury?

***MR. PILCHAK:*** To for us.

***MS. BERNSTEIN:*** Not for the defense, your Honor.

***THE COURT:*** Mr. Fraser, I strongly recommend you read the transcript. It's just my pet peeve again.

"You still didn't call the ethics hotline?

"Answer: Yes.

"Yes, I still didn't call the --

"You have none of that?

"Answer: Yes.

"Do you deny that a company like Qualcomm would compare technology?

"Answer: Sure."

Sure I deny it? If you look at the record, you'll see that there are a lot of questions that are very unclear.

***MR. FRASER:*** I appreciate that sincerely, your Honor. Thank you.

***THE COURT:*** Yeah. And it's a very specific thing. It's making a negative statement and then saying "Correct."

***MR. FRASER:*** Believe me, I intellectually understand a hundred percent.

***THE COURT:*** It's just hard when you're doing it.

***MR. PILCHAK:*** I sure I'm going to hit that same tripwire.

***THE COURT:*** All lawyers do it. All lawyers do it.

***MR. PILCHAK:*** Thank you, your Honor.

***THE COURT:*** All right. Fifteen minutes.

***(Recess taken.)***

***THE COURT:*** Okay. We are back on the record. Dr. Arabi is present. The lawyers are present. We're outside the presence of the jury.

***MR. FRASER:*** Thank you, your Honor.

I thought it would be helpful to know the Government will next call Marshals Inspector Shindledecker, who will -- I understand the Government will use his testimony to introduce some charts. And I thought there are some points under 403 and 1006 that are better to take a look at in advance.

***THE COURT:*** Okay.

***MR. FRASER:*** And so does the Court have the set handy?

***THE COURT:*** I don't have them set up. I could, but it

would take me a while.

**MR. OLAH:** One other thing I can do is the binder that's on the witness stand is Inspector Shindledecker's. I can direct you to where the summary charts begin. And I can even bring it to you.

**THE COURT:** Sure. I can't get over there. They blocked me here. I have a little stool here. I can hurl myself over the top.

**MR. OLAH:** Within that binder, I think the series that you're looking for is around 489.

**MR. FRASER:** I think this will actually be pretty quick even though there's several.

**THE COURT:** Okay.

**MR. FRASER:** Starting with 491 --

**THE COURT:** Okay.

**MR. FRASER:** -- this is really minor. I'm not starting with the most important.

**THE COURT:** Okay.

**MR. FRASER:** It says under "Beneficiaries", it says, "Irell and Manell." It should be Irell and Manella. Maybe that is an easy fix.

**THE COURT:** Okay.

**MR. OLAH:** The response to that, by the way, your Honor, is Inspector Shindledecker is summarizing financial records and that's actually how the firm appears within the

financial records. So it's an intentional typo, if you will.

***THE COURT:*** Okay.

***MR. FRASER:*** Okay. Flipping ahead to 495. And then this becomes a recurring issue --

***THE COURT:*** Okay.

***MR. FRASER:*** -- so maybe it helps to look at each of them before deciding in general. But 495 has the heading "Sheida sends $4 million USD to Karim via Abacus Machines, LLC."

And you can see Qualcomm has -- it's just Qualcomm's logo. That's neutral enough.

And then in gray, Sheida Alan accounts, and then Avante in gray, and then at the bottom it's red. It says Abacus Machines and Karim Arabi.

And so just scanning ahead to the next exhibit, 496, similarly it's in red, Abacus Machines, Karim Arabi. And you can see the pattern of using red for Karim Arabi and businesses that the Government associates with him.

For example, Exhibit 516, you can see a chain of -- you know, this is another flowchart, and you have kind of non-dramatic colors used until it gets to the end. Karim Arabi in red.

***THE COURT:*** So it's the fact that it's in red that you are objecting to?

***MR. FRASER:*** Yeah. I think that that's an appeal to emotion. I think that it's -- and you can see similarly on 527,

same deal. Red is -- you know, it's a color that communicates emotion and communicates something wrong. And I think that's pedagogical and 403.

***THE COURT:*** I don't see it that way. He is the defendant in the case, and so I think they're highlighting who the defendant is in the case. The rest doesn't really matter. What they care about is where it ends up. So overruled.

***MR. FRASER:*** Okay. Another point on Government Exhibit 497. This is -- it has purchase prices.

So we've got transactions from the United States, Canada, and Norway that are discussed throughout these charts. And you know, of course we use the dollar. Canada's currency is the Canadian dollar. Norway's currency is the Norwegian krone. And a dollar sign is not used for Norwegian krone. The krone trade is ten krone to a U.S. dollar at this point. So it's incorrect and it's very misleading.

***THE COURT:*** So let me ask the Government. When it says 17,600,000, is that 17,600,000 kroner, or is that $17,600,000 once you translate it from krone into dollars?

***MR. OLAH:*** The former, your Honor. These are summarizing Norwegian bank records, and I believe Inspector Shindledecker will testify consistent with that header row, which makes clear that it's in NOK. These are in Norwegian currency.

***THE COURT:*** Then you should take out the dollar sign.

***MR. OLAH:*** We can do that.

***THE COURT:*** Dollar sign implies that it's dollars.

***MR. OLAH:*** That was 497.

***THE COURT:*** On 497 in says dollars in front of the numbers even though it has NOK at the top. I think it's a little bit confusing if it's not signaling dollars to put a dollar sign in front of it.

***MR. OLAH:*** We'll get that fixed, your Honor. Thank you.

***THE COURT:*** Okay. Anything else, Mr. Fraser?

***MR. FRASER:*** I think that's -- as far as like categorical ones, I think that's the only ones we could deal with real efficiently together like that. Thank you.

***THE COURT:*** Okay. Let's bring the jury in.

***(Jury in at 2:50 p.m.)***

***THE COURT:*** Okay. We are back on the record. All jurors are present. The lawyers and Dr. Arabi are present.

Mr. Olah.

***MR. OLAH:*** Thank you, your Honor. The United States calls John Shindledecker.

***THE CLERK:*** Please stand here and raise your right hand.

***(Witness duly sworn.)***

***THE CLERK:*** Thank you. You may lower your hand. Please take the stand.

Please state and spell your first and last name for the record.

***THE WITNESS:*** John Shindledecker, J-o-h-n S-h-i-n-d-l-e-d-e-c-k-e-r.

***THE COURT:*** Thank you.

Counsel?

***DIRECT EXAMINATION***

***BY MR. PILCHAK:***

***Q.*** That's it? No more letters?
***A.*** **That's it.**
***Q.*** Where do you work?
***A.*** **I work for the United States Marshals Service.**
***Q.*** And what's your title at the United States Marshals Service.
***A.*** **I'm a senior inspector.**
***Q.*** What did you do prior to joining the Marshals Service?
***A.*** **I worked at an accounting firm briefly.**
***Q.*** How many years?
***A.*** **Two years.**
***Q.*** And did you go to college?
***A.*** **Yes. I went to NC State in North Carolina and got a degree in managerial accounting.**
***Q.*** And how long now have you been with the Marshals Service?
***A.*** **Since August of 2010. Approximately 15 years.**
***Q.*** Were you part of the team investigating the Abreezio acquisition?

***A.*** **Yes, I was.**

***Q.*** And can you describe for the jury what your role in that investigation was?

***A.*** **Sure.**

**My role was as a financial investigator. In my current position, I'm detailed to the U.S. Attorney's Office assisting in financial investigates, asset forfeiture, and money laundering cases. So my role in this case was mostly finding out where the money that Qualcomm paid for Abreezio went to.**

***Q.*** Are you familiar with the money laundering statutes?

***A.*** **Yes, I am.**

***Q.*** Including 1957?

***A.*** **Yes.**

***Q.*** And by "1957," I mean 18 USC Section 1957. Is that right?

***MR. FRASER:*** Objection. 403.

***THE COURT:*** Sustained.

***MR. OLAH:*** I was just trying to provide some context for the stipulation. If I could read the stipulation for the Court now, your Honor.

***THE COURT:*** Sure.

***MR. OLAH:*** Thank you.

"The parties stipulate that Karim Arabi is an United States person within the meaning of 18 United States Code Section 1957."

Does your Honor want to give the cautionary instruction

or revisit that later?

***THE COURT:*** Is that the extent of the stipulation?

***MR. OLAH:*** That's the whole of it. I think that's the last of them.

***THE COURT:*** Then you must accept that stipulation as true, ladies and gentlemen.

***BY MR. OLAH:***

***Q.*** Inspector Shindledecker, as part of this investigation, did you seek bank records from Canada?

***A.* I did.**

***Q.*** Why?

***A.* During the acquisition of Abreezio, Qualcomm paid approximately $150 million --**

***MR. FRASER:*** Objection. 701, 702, 16(a)(1)(g).

***THE COURT:*** Overruled.

***BY MR. OLAH:***

***Q.*** So Inspector Shindledecker, I think the question is: Why did you seek records from Canada?

***A.* Out of the $150 million that Qualcomm paid for Abreezio, the largest portion went there, around 92 million to Sheida Alan. And then another 20 million went to Brad Quinton's company, both in Canada.**

***Q.*** Did you obtain financial records from Canada?

***A.* Yes, we did.**

***Q.*** Including from the Canadian Imperial Bank of Commerce?

***A.*** **Correct.**

***Q.*** So that we don't have to say that a thousand times today, can we call that CIBC?

***A.*** **Yes, that would be great.**

***Q.*** Did you want records specifically from CIBC?

***A.*** **Yes.**

***Q.*** Why?

***A.*** **We had the wire details from Qualcomm so we could see the account that benefited from the 92 million, and that was an account at CIBC.**

***Q.*** So --

***MR. FRASER:*** I would ask for a standing objection to that kind of testimony under 701, 702, and Federal Rule of Criminal Procedure 16(a)(1)(g).

***THE COURT:*** Overruled.

***MR. FRASER:*** May I have the standing objection?

***THE COURT:*** You may have a standing objection.

***MR. FRASER:*** Thank you, your Honor.

***BY MR. OLAH:***

***Q.*** At the start of the investigation, investigators knew to which bank some money was wired. Is that right?

***A.*** **That is correct.**

***Q.*** And was that the reason you were interested in CIBC records?

***A.*** **Yes.**

***Q.*** Did investigators have not only the bank but the account

number at CIBC?

**A. Correct. They had the account number.**

***Q.*** And did you review records that CIBC produced?

**A. Yes, I did.**

***Q.*** Generally speaking, did the records come with different certificates --

**A. Yes.**

***Q.*** -- laying out that the records were made at or near the time of the occurrence of the matters documented in the records?

**A. Correct.**

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** I'll allow it.

***BY MR. OLAH:***

***Q.*** Did those certificates state that they were made by someone with knowledge of the matters recorded?

**A. Yes.**

***Q.*** And that the records were kept in the course of regularly conducted business activity?

***MR. FRASER:*** Objection. Leading.

I sense the Court may be willing to allow this, and if that's -- I don't want to interrupt constantly.

May I have a standing objection as to leading questions like that?

***THE COURT:*** Those -- these right now, you may have a standing objection if there something further on you need to

remake it.

**MR. FRASER:** Thank you, your Honor.

**THE COURT:** You may have a standing objection.

**MR. OLAH:** For the benefit of the Court, that's the last time I intend to --

***(Reporter interruption.)***

**THE COURT:** The Defense did not get that. The jury didn't hear it either.

**MR. FRASER:** I honestly could not hear what Mr. Olah said, it was so fast.

**MR. OLAH:** I did not touch the coffee or cookies.

**THE COURT:** This always happens at the end of the day if you didn't notice. Everyone gets a little punchy.

Go ahead, Mr. Olah.

**BY MR. OLAH:**

**Q.** Final question on the certificate that CIBC produced with the records.

Did it state that the records were made as a regular practice of the bank?

**A. Yes.**

**MR. OLAH:** Okay. Can we show the witness and the witness only Exhibit 471.

And calling out the left side for Inspector Shindledecker.

**BY MR. OLAH:**

**Q.** Sir, what are we looking at in Exhibit 471?

**A. A CIBC signature card.**

*Q.* What's a signature card?

**A. A signature card is who has signing authority over a bank account. So who's authorized to make withdrawals or make deposits. Basically who owns the account, whose account it is.**

*Q.* Is this a record that CIBC produced in this case?

**A. Yes, it is.**

*Q.* Is it a fair and accurate copy of such a record?

**A. Yes.**

***MR. OLAH:*** Your Honor, the United States would move to admit and publish 471.

***THE COURT:*** Any objection?

***MR. FRASER:*** No objection, your Honor.

***THE COURT:*** 471 may be admitted and published.

***(Exhibit 471 admitted.)***

***MR. OLAH:*** If we could call out that left side again now that the jury can see it.

***BY MR. OLAH:***

*Q.* You indicate this was a signature card; is that right?

**A. That is correct.**

*Q.* Is that specified within the call out here?

**A. Yes.**

*Q.* And is there an account number -- that looks like it's been redacted, but is there an account number provided?

**A. Correct. The account number ends in 3899.**

***Q.*** Do you recognize that account number?
***A.*** **I do.**
***Q.*** What's the significance of that account number?
***A.*** **That's the account that received approximately $91.8 million from the acquisition of Abreezio.**
***Q.*** What's the account status according to this record?
***A.*** **The account was closed on January 13th, 2016.**
***Q.*** Are you familiar with the Abreezio acquisition closing date?
***A.*** **I am. The closing date was October 30th of 2015. So approximately two and a half months prior.**
***MR. OLAH:*** And if we could close out of the enhancement and then focus in on the text on the right. Thank you.
***BY MR. OLAH:***
***Q.*** Sir, who is the account holder for this 3899 account?
***A.*** **Sheida Alan.**
***Q.*** And is there a signature at the bottom of the call out here?
***A.*** **Yes, on the bottom right.**
***Q.*** Is the signature somewhat dated?
***A.*** **Oh, yes, it's dated August 21st, 2015. That's the date that the account was opened.**
***Q.*** This 3899 account was opened in August of 2015?
***A.*** **Correct.**
***Q.*** And closed in January of 2016?
***A.*** **Yes.**
***Q.*** Less than four months later; is that right?

**A. Yes.**

***MR. OLAH:*** If we could show the witness and the witness only Exhibit 472, please, calling out that middle text.

***BY MR. OLAH:***

***Q.*** Sir, what are we looking at in Exhibit 472?

***A.*** **These are CIBC wire details reflecting the incoming wire from Qualcomm.**

***Q.*** Is this a true and correct copy of a CIBC record that you received and reviewed?

***A.*** **Yes.**

***MR. OLAH:*** Your Honor, I'd move to admit and publish 472.

***THE COURT:*** Any objection?

***MR. FRASER:*** No, your Honor.

***THE COURT:*** 472 may be admitted and published.

***(Exhibit 472 admitted.)***

***BY MR. OLAH:***

***Q.*** Now that the jury can see it, can you explain to the jury what they're looking at with this record?

***A.*** **Sure. So it's a copy of the wire details which shows an incoming wire. For source, you'll see the account that received the wire and the last four of those are 3899.**

**Right below that is the remitter, or the sender of the wire, which is Qualcomm Technologies with an address here in San Diego.**

**Again, below that is the account number that received it and the beneficiary of the account, who is Sheida Alan.**

**And then on several places on the wire are the amount. The one right in the middle, the current amount, that's what was actually sent. What posted to the account was $15 less after a wire fee charge.**

***Q.*** And is there an entry date noted towards the bottom here?

***A.*** **I see date received, which is November 2nd, 2015.**

***Q.*** And is that the date that this amount was received by the CIBC account?

***A.*** **That's correct.**

***Q.*** Did you confirm that this nearly $92 million was in fact, wired to Canada?

***MR. FRASER:*** Just confirming the standing objection applies to this segment, of course.

***THE COURT:*** Overruled.

You may answer.

***THE WITNESS:*** I did.

***MR. OLAH:*** We can take that down. Thank you, Dorian.

***BY MR. OLAH:***

***Q.*** Did the investigation team seize emails pursuant to search warrants?

***A.*** **Yes, we did.**

***Q.*** And did you review some of those emails?

***A.*** **I did.**

***Q.*** Did you identify any concerning the CIBC 3899 account we were just looking at?

***A.*** **Yes.**

***Q.*** There's a binder in front of you.

Did you previously review the exhibits in that binder?

***A.*** **I did.**

***Q.*** Can you please flip to Exhibits 274 through 281.

***MR. OLAH:*** Your Honor, I believe these were previously identified but not admitted.

***THE COURT:*** You're correct.

***BY MR. OLAH:***

***Q.*** Were you able to review those exhibits where?

***A.*** **Yes.**

***Q.*** Are those -- generally, what are they?

***A.*** **They're emails with attached documents to them.**

***Q.*** Were they emails and attachments that were seized pursuant to those search warrants?

***A.*** **Correct.**

***MR. OLAH:*** Your Honor, at this time, I'd move to admit and publish 274 to 281.

***THE COURT:*** Any objection?

***MR. FRASER:*** One moment, please, your Honor. 401, 403 to all of them.

***THE COURT:*** Overruled.

They may be admitted.

*(Exhibits admitted.)*

***BY MR. OLAH:***

***Q.*** Starting with Exhibit 274, if we could call out just all the text that's available, please.

Sir, who is the sender of this email?

***A.*** **Arabisheida@gmail.com.**

***Q.*** And the recipient?

***A.*** **Karim Arabi, or Karim_arabi@hotmail.com.**

***Q.*** Is there a date on this email?

***A.*** **Yes. October 27th, 2015.**

***Q.*** How many days is that before the Abreezio closing?

***A.*** **It's three days prior to the closing date.**

***Q.*** Are there any attachments to this email?

***A.*** **A few.**

***Q.*** And what's the -- does the body reference attachments?

***A.*** **Yes. It says "Please find attached pics."**

***Q.*** If we could please turn to Exhibit 275.

Is this one of the attachments to the email we were just looking at?

***A.*** **Yes, it is.**

***MR. OLAH:*** If we could call out I guess the top half would be great. Thank you, Dorian.

***BY MR. OLAH:***

***Q.*** What does this attachment appear to be?

***A.*** **Account details for the CIBC 3899 account that was opened in**

**August 2015. It has the account number along with a debit card number associated with the account on it.**

***Q.*** Does it indicate the holder of the account?

***A.*** **Yes. Ms. Sheida Alan.**

***Q.*** Just so the jury is clear, this is the 3899 account that we were looking at a few exhibits back?

***A.*** **Correct. The account that received the 91.8 million from Qualcomm.**

***Q.*** If we could turn to Exhibits 276 and then 277.

Sir, what are we looking at in those two exhibits?

***A.*** **A picture of the front and back of a debit card for the account.**

***Q.*** And this -- were these also attachments to the email we were looking at from October 27th, 2015?

***A.*** **Yes, they were.**

***Q.*** Did you identify additional emails in which a Sheida account is sending attachments to Dr. Arabi or a Karim Arabi Hotmail account?

***A.*** **Yes, there were two additional emails on the same day with attached photos.**

***MR. OLAH:*** Let's see if we can at 3:00 o'clock pull off a side by side of Exhibits 278 and 280, please.

***BY MR. OLAH:***

***Q.*** What are we looking at with 278 and 280?

***A.*** **Two additional emails from the Arabisheida@gmail.com email**

**address to Dr. Arabi, both with attachments.**

***Q.*** Based on your review, is it the same sender, same recipient, same date?

***A.*** **Correct.**

***Q.*** If we could look at exhibits, individually, 279, please.

Is this one of the attachments to those emails?

***A.*** **It is.**

***Q.*** Okay. What's it appear to be?

***A.*** **A letter from CIBC to Sheida Alan.**

***Q.*** What's the date on this letter?

***A.*** **August 21st, 2015, the date the account was opened.**

***Q.*** And then quickly, Exhibit 281, please.

What are we looking at here?

***A.*** **Yeah, I believe this is the same attachment that was in the earlier email, but it's the account details of the account opened at CIBC.**

***MR. OLAH:*** You can take that down. Thank you.

***BY MR. OLAH:***

***Q.*** Inspector Shindledecker, what happened to the money in the 3899 account?

***MR. FRASER:*** Same objections.

***THE COURT:*** Same ruling.

***THE WITNESS:*** Approximately two and a half months later, the account was emptied out, and it was transferred to a different CIBC account controlled by Sheida Alan.

***BY MR. OLAH:***

***Q.*** Did CIBC provide records documenting that transfer you just referred to?

***A.*** **They did.**

***MR. OLAH:*** If we could pull up for the witness and the witness only Exhibit 475, calling out all available text.

***BY MR. OLAH:***

***Q.*** Sir, what are we looking at in Exhibit 475 on a general level?

***A.*** **It's a credit slip showing the credit of funds from one account to another.**

***Q.*** Is this -- where did you get this record?

***A.*** **From CIBC.**

***Q.*** Was it accompanied by a certificate like we marched through earlier?

***A.*** **Correct, it was.**

***MR. OLAH:*** Your Honor, at this time I'd move to admit and publish Exhibit 475 to the jury?

***THE COURT:*** Any objection?

***MR. FRASER:*** No, your Honor.

***THE COURT:*** 475 may be admitted and published.

***(Exhibit 475 admitted.)***

***BY MR. OLAH:***

***Q.*** The jury can now see the exhibit with you. You actually have a touchscreen. I'd like to you put that to use, if you

don't mind, if you're up for it.

First off, what accounts are identified on this slip?

***A.*** **So there's two accounts. First, the 3899, the account that received the funds. This is a credit slip debiting funds from 3899 and then crediting them into 31 -- the account ending in 3134 on the top right that I just circled.**

***Q.*** And is there a date of this transaction indicated on this slip?

***A.*** **There is. On the far right, October -- sorry -- January 13th, 2016.**

***Q.*** And can you circle the amount that's being transferred here?

***A.*** **Yeah. It's in a few different slots, but there's the total *(indicating)*.**

***Q.*** You circled the date January 13th, 2016. Is that right?

***A.*** **That's correct.**

***Q.*** What happened with the 3899 account that day?

***A.*** **It was closed that day. That's also reflected on the account slip. Account transfer from -- I'm assuming that's from closed account 3899. But the account was closed that day as we saw on the signature card at the beginning.**

***Q.*** Have you prepared a host of summary charts in anticipation of your testimony?

***A.*** **I have.**

***Q.*** Some resembling March Madness brackets?

***A.*** **Some.**

***MR. FRASER:*** Vague.

***BY MR. OLAH:***

***Q.*** Did you prepare two demonstratives summarizing these events on the 3899 CIBC account?

***A.*** **I did.**

***MR. OLAH:*** Your Honor, at this time I'd move to -- well, are Exhibits 489 and 490, two such demonstrative exhibits.

Can we show the witness and the witness only 489 and 490, please.

And then 490, please.

***BY MR. OLAH:***

***Q.*** Are those two demonstrative devices you prepared in anticipation of your testimony?

***A.*** **They are.**

***MR. OLAH:*** Your Honor, request to publish but not admit those to the jury, please.

***THE COURT:*** Other than any previously mentioned objections?

***MR. FRASER:*** No objection to publishing and not admitting.

***THE COURT:*** Again, these will be just demonstrative. They won't go back into the jury room with you. They're to help you understand the testimony.

***BY MR. OLAH:***

***Q.*** We're going to begin with 490, which the jury can now see.

Can you walk us through what's documented here?

**A. Sure.**

**It's just a timeline of the CIBC 3899 account of which we already saw all the records for. It was opened on August 21st, 2015, three days prior to the acquisition by Qualcomm. Sheida sends the account information to Dr. Arabi. A few days after that, the wire posts to the account in 91.8 million. And then around two and a half months later, the account is closed, and the entire balance of the account is transferred to another account controlled by Sheida Alan.**

***MR. FRASER:*** We're going to need more questions I think going forward. Narrative objection. Late but -- I just want to say it.

***THE COURT:*** Okay. Overruled.

***BY MR. OLAH:***

***Q.*** And following up on the last part of your answer, the money was moved to a 3134 account. Is that right?

**A. That is correct.**

***Q.*** If we could now transition to Exhibit 489.

Sir, what did you document in 489?

**A. I documented just the initial wire from Qualcomm posting in the account and then being transferred two and a half months later to the separate account. I like to do this -- just I think it's easier than looking through bank records to look at a chart to see where the money went. So it's just a simple**

**example of that.**

*Q.* You mentioned simple example.

Will the jury see this in subsequent summary charts that you prepared of the movement of money?

***A.*** **Several.**

***MR. OLAH:*** We can take that down. Thank you.

***BY MR. OLAH:***

*Q.* So as of, what, January 13th, 2016, the money Sheida received was in that 3134 account?

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** Sustained.

***THE WITNESS:*** Correct.

***BY MR. OLAH:***

*Q.* I'll re-ask the question.

***A.*** **Oh.**

*Q.* As of January 13th, 2016, what account was the money in?

***A.*** **CIBC 3134.**

*Q.* Did the investigation team seek records related to that account?

***A.*** **We did.**

*Q.* Did they receive records related to that account?

***A.*** **We did.**

*Q.* Did those records include a certificate like we talked about, I don't know, 15 minutes ago?

***A.*** **Yes, they did.**

*Q.* Were the bank records that you reviewed in this case voluminous?

***A.* They were. We received over 10,000 pages from CIBC alone.**

*Q.* And did you prepare summary charts related to transactions therein?

***A.* We did. Or I did, sorry.**

*Q.* And we've been talking about CIBC records.

Were there other bank records received as well?

***A.* Yes, there were.**

*Q.* Did you prepare the summary charts to the best of your ability?

***A.* I did.**

*Q.* If we could -- in fact let's use the binder here. If you could please look at Exhibits 491, 495, and 496.

Did you have time to review those three exhibits?

***A.* Yes.**

*Q.* Is each a summary chart you prepared summarizing voluminous data?

***A.* Yes.**

***MR. OLAH:*** Your Honor, at this time the United States would move to admit 491, 495, and 496.

***THE COURT:*** Other than previously mentioned --

***MR. FRASER:*** None other than those previously mentioned. Thank you, your Honor.

***THE COURT:*** It may be admitted.

*(Exhibits admitted.)*

***MR. OLAH:*** Thank you, your Honor.

***THE COURT:*** 491, 495, and 496.

***MR. OLAH:*** And let's begin with 491, please, Dorian.

***BY MR. OLAH:***

***Q.*** What are we looking at generally in Exhibit 491, sir?

***A.*** **Generally, this is just an overview of the outflows or what happened to the money that Qualcomm sent, categories that it was sent in. It's a total of around $86 million.**

***Q.*** And outflows refers to what set of accounts?

***A.*** **These are the -- it refers to several different accounts. It's really just the end destination of funds that got paid. They got transferred around to multiple accounts, but these are more when it got spent on these category of items.**

***Q.*** So a moment ago you testified that the 3134 had $91 million in it as of January 2016. Is that right?

***A.*** **Correct. 91.8 million.**

***Q.*** Did dollars from that account then make its way to several other accounts?

***A.*** **Correct.**

***Q.*** And this is a summary of your following of these dollars. Is that right?

***A.*** **That's right.**

***Q.*** On the left side we see beneficiary. Can you -- I don't need to go through all of this.

But what is Abacus Machines, the top entry there?

***MR. FRASER:*** Invoking the standing objection.

***THE COURT:*** Overruled.

You may answer.

***THE WITNESS:*** Abacus Machines is a company controlled by Dr. Arabi, and $4 million was paid from the Qualcomm money down to that account.

***BY MR. OLAH:***

***Q.*** Was that an aggregate amount over several transactions or a single transaction?

***A.*** **That was a single transaction.**

***Q.*** Looking at next line, what is Atlazo?

***A.*** **Atlazo is also a company that Dr. Arabi created and worked at. And it received around $2.9 million in multiple transactions from Sheida Alan.**

***Q.*** Do you recognize Atlazo Canada LTD?

***A.*** **Yes, I do.**

***Q.*** How do you recognize it?

***A.*** **That's also a company -- it's in Canada, but it's registered to -- when it was registered, the address is the address of Karim -- or Dr. Arabi's condo. That account was controlled by Sheida Alan as well. That received around $1.5 million.**

***Q.*** And did you total these outflows at the bottom there?

***A.*** **I did.**

***Q.*** And what was the total outflows that you saw?

**A. Just under 87 million.**

*Q.* If we could now turn to Exhibit 495.

Generally, what are we looking at here?

**A. Generally, it's a flowchart showing money sent from Sheida Alan to Abacus Machines, which is a company owned by Dr. Arabi.**

*Q.* And can you walk us through quickly -- I don't think we need to get down to the cents, but what's happening at that top row from Qualcomm to Sheida Alan?

**A. Sure. The top --**

***MR. FRASER:*** Objection. Calls for narrative testimony.

***THE COURT:*** Overruled. But I think it's been asked and answered as far as the top row goes.

***BY MR. OLAH:***

*Q.* So let's skip that question.

Have we already looked at what's happening on that top row?

**A. Yes, we have.**

*Q.* So it ends with -- that top row ends at least with $91 million in the 3134 account. Is that right?

**A. Yes.**

*Q.* What happened with some of that money afterwards?

**A. So in September 19th of that year, 6 million was wired from the 3134 account to another account created by Sheida Alan, held in the name Avante North Ventures.**

*Q.* And what happened thereafter?

**A. The 6 million that went into that account was the very first**

**deposit in the account. And then the very next day, $4 million was wired to Abacus Machines, which is a company that Dr. Arabi controlled in San Diego.**

***Q.*** Just so I understand that, when you say the first deposit, was that into this first deposit into that 1316 account?

***A.*** **Correct.**

***Q.*** And the following day, what happened?

***A.*** **The following day, $4 million was wired from the 1316 account to Abacus Machines.**

***Q.*** Do you know where Abacus Machines, LLC banks?

***A.*** **Bank of America. So that's indicated on the bottom, BOA, ending in 5964. That's a Bank of America account.**

***Q.*** I'll have more questions about that account in a moment.

***MR. OLAH:*** I want to jump now to Exhibit 259. And that should be for the witness only. I apologize.

***BY MR. OLAH:***

***Q.*** Inspector Shindledecker, do you recognize the exhibit that is on the screen?

***A.*** **I do.**

***Q.*** What is it?

***A.*** **It's a promissory note.**

***Q.*** What's the -- what is a promissory note?

***A.*** **Like a loan, a promise to pay back money.**

***Q.*** Is there an amount specified on this note?

***A.*** **There is. $4 million.**

***Q.*** Is this a note that the investigation team obtained in the course of the investigation?

***A.*** **Yes.**

***Q.*** Is this a fair and accurate copy of the note it obtained?

***A.*** **Yes.**

***MR. OLAH:*** Your Honor, I'd move to admit and publish 259 to the jury.

***THE COURT:*** Any objection?

***MR. FRASER:*** Not to 259.

***THE COURT:*** It may be admitted and published.

***MR. OLAH:*** If we could please call out from the text promissory note down to, I don't know, midway of paragraph No. 2.

***(Exhibit 259 admitted.)***

***BY MR. OLAH:***

***Q.*** A moment ago we were looking at a $4 million transfer from an Avante entity to an Abacus account. Is that right?

***A.*** **That's correct.**

***Q.*** Is it your understanding that is this a note related to that transaction?

***A.*** **Yes.**

***Q.*** Is that based on the information in this note?

***A.*** **Yes.**

***Q.*** What's the amount?

***A.*** **$4 million.**

*Q.* Is there a date?
**A. There is, September 20th, 2016.**
*Q.* Is there a city specified beneath that date?
**A. San Diego, California.**
*Q.* And without getting too in the weeds here, what are the general terms of this note?
**A. General terms is 4 percent interest and no payment is due for five years.**
*Q.* 4 percent interest but no payment is due for five years?
**A. Correct.**
*Q.* If we could turn to page 2.
Is this promissory note signed?
**A. It is.**
*Q.* By both parties or just one party?
***MR. FRASER:*** Objection. Leading and all the prior objections. And I would note this is referenced in Docket 321 starting at page 23.
***THE COURT:*** Overruled.
***BY MR. OLAH:***
*Q.* How many parties signed this note?
**A. Just one.**
***MR. OLAH:*** And if we could call out that signature block, please.
***BY MR. OLAH:***
*Q.* What's the company specified in the signature block?

***A.*** **Abacus Machines LLC.**
***Q.*** Is that the company that received the $4 million we're looking at?
***A.*** **Yes, it is.**
***Q.*** Who signed on behalf of Abacus Machines?
***A.*** **Karim Arabi.**
***Q.*** Did anyone sign on behalf of Avante?
***A.*** **No.**
***Q.*** Even though it was lending $4 million?
***A.*** **Correct.**
***MR. OLAH:*** We can take that down. Thank you, Dorian.
***BY MR. OLAH:***
***Q.*** Did you going back to the Abacus Machines Bank of America account, did you obtain records related to that account?
***A.*** **I did.**
***Q.*** Did you review those records?
***A.*** **Yes.**
***MR. OLAH:*** If we could show the witness and the witness only Exhibit 458, please. Let's go to page 2.
***BY MR. OLAH:***
***Q.*** Are you able to see page 2 of that exhibit?
***A.*** **Yes.**
***Q.*** Generally, what are we looking at in this Exhibit 458?
***A.*** **It's a signature card for the Bank of America account held by Abacus Machines.**

***Q.*** Did Bank of America produce with this record a certificate like I asked you about earlier?
***A.*** **They did.**
***MR. OLAH:*** Your Honor, I'd move to admit 458 into evidence.
***THE COURT:*** Any objection?
***MR. FRASER:*** No, your Honor.
***THE COURT:*** 458 may be admitted.
***(Exhibit 458 admitted.)***
***BY MR. OLAH:***
***Q.*** You described a signature card at CIBC earlier.
What are we looking at here?
***A.*** **A signature card from Bank of America.**
***Q.*** Different bank, same concept?
***A.*** **Correct.**
***Q.*** If we could call out at the top.
Is there an account number specified in this document?
***A.*** **There is, ending in 5964. And I forgot I can draw on this.**
***Q.*** Is that the account that received the $4 million from Avante North?
***A.*** **It is.**
***MR. OLAH:*** And if we could call out the signature at the bottom, please.
***BY MR. OLAH:***
***Q.*** Whose name is on this signature card?

***A.*** **Karim Arabi.**

***Q.*** Are there any other names on this signature card?

***A.*** **No.**

***Q.*** In addition to this signature card, did Bank of America produce other records related to this account?

***A.*** **They did.**

***Q.*** And did you review those records?

***A.*** **Yes.**

***Q.*** Did you prepare a summary of charts of transfers from this account?

***A.*** **I did.**

***MR. OLAH:*** If we could please show the witness and the witness only Exhibit 496.

***BY MR. OLAH:***

***Q.*** Is this the summary chart you prepared related to the account we were just looking at?

***A.*** **It is.**

***MR. OLAH:*** Your Honor, move to admit and publish Exhibit 496.

***THE COURT:*** Other than previously noted objections, any other objections?

***MR. FRASER:*** Just renew those objections and confirm that the recent testimony is subject to the standing objection and filing that I referenced.

***THE COURT:*** Okay. It may be admitted.

*(Exhibit 496 admitted.)*

***BY MR. OLAH:***

***Q.*** So nice I've moved to admit it twice. My apologies.
What is the jury looking at in Exhibit 496 at a high level, sir?

***A.*** **What happened to some of the $4 million that went into Abacus Machines?**

***Q.*** Are these transfers that came out of Abacus Machines?

***A.*** **They are.**

***Q.*** That went into a single account.

***A.*** **It went into another account at Bank of America, specifically an Atlazo account, Bank of America ending in 6028.**

***Q.*** I'll have questions on that account in a moment.
But what are the range -- date range, that is, of the account transfers specified in Exhibit 496?

***A.*** **It's from the end of 2016 to the end of 2018, approximately two years.**

***Q.*** And did you total the dollars being transferred from the Abacus Machines account to the Atlazo account?

***A.*** **I did. A little over $2.7 million of the 4 million was transferred directly to the Atlazo account.**

***Q.*** You can guess the next question.
Did you obtain records related to the 6028 account?

***A.*** **I did.**

***Q.*** Did Bank of America provide such records?

**A. Yes.**

***MR. OLAH:*** I'd like to admit and -- I'd like to show the witness only Exhibit 459.

***BY MR. OLAH:***

***Q.*** Generally, what is Exhibit 459?

**A. A signature card for the Bank of America Atlazo account.**

***Q.*** Was it also accompanied by a certificate like we talked about earlier?

**A. It was.**

***MR. OLAH:*** Your Honor, move to admit and publish 459.

***THE COURT:*** Any objection?

***MR. FRASER:*** No, your Honor.

***THE COURT:*** 459 may be admitted.

***(Exhibit 459 admitted.)***

***MR. OLAH:*** If we could call out the top just to specify the account title and account number. Thank you, Dorian.

***BY MR. OLAH:***

***Q.*** Is this the 6028 account that we were just looking at in the summary chart?

**A. It is.**

***Q.*** Turning to the bottom, who is the sole signator on the account?

**A. Karim Arabi.**

***MR. OLAH:*** If we could go back to Exhibit 496, please.

///

***BY MR. OLAH:***

***Q.*** Did Bank of America also produce monthly account statements?

***A.*** **They did.**

***Q.*** And documents related to the opening of the account?

***A.*** **Yes.**

***Q.*** How many dollars did the Atlazo account ending in 6028 have before this first transfer?

***A.*** **I think it had approximately $40 in the account. When it was opened, there was a $100 account deposit and account fees ate it down to $40 until the 999,000 was transferred from Abacus Machines.**

***Q.*** Aside from the transfers that are specified from the Abacus Machines account in this exhibit, did the Atlazo 6028 have any significant money inflows?

***A.*** **It did have some other inflows. This is the bulk of the seed money in 2017 and 2018. But I think in 2018, it did start to get other inflows.**

***Q.*** And taking a step back to that $4 million transfer to Abacus Machines that we were looking at a few summary charts ago, did you identify emails between -- around that time of that transfer?

***A.*** **I did.**

***Q.*** If you could please in that binder review Exhibits 442 and 443.

Do you recognize those exhibits?

*A.* **I do.**
*Q.* Generally, what are they?
*A.* **Emails.**
*Q.* Emails seized by the investigation team pursuant to warrants?
*A.* **Correct.**
***MR. OLAH:*** Your Honor, at this time the United States moves to admit Exhibits 442 and 443.
***THE COURT:*** Any objection?
***MR. FRASER:*** 401, 403, hearsay.
***THE COURT:*** Overruled.
442 and 443 may be admitted.
***MR. OLAH:*** If we could please start with 442. Calling out the bottom half of this email to start.
***(Exhibits admitted.)***
***BY MR. OLAH:***
*Q.* Sir, what's the date of the email we're looking at here?
*A.* **Friday, September 16th, 2016.**
*Q.* Sorry. I cut you off.
Who appears to be the sender of this email?
*A.* **Sheida at the -- I believe Sheida Alan, but the email address is S_7295@yahoo.ca.**
*Q.* And having reviewed this email, who do you understand her to be emailing?
I'm not asking you to attempt to pronounce that name, but

who do you understand this to be sent to?

**A. A CIBC banker who was handling Sheida's accounts.**

*Q.* And what does Sheida request in this email that we're looking at?

**A. She requests four different things. First, transferring 250,000 Canadian to Nassar Hendi's account, including the account number. Nassar Hendi is someone who was doing real estate business with Sheida.**

**She also requests to convert 3 million United States dollars to Canadian dollars at a certain rate.**

**And then Item Number 3 was transfer 6 million to my Avante North Ventures business account that she wants to use to invest in private companies.**

*Q.* And as with that Entry No. 1 for the $4 million transfer, did she specify what account she wanted it sent to?

**A. Yes, she did.**

*Q.* Did she provide even a Bank of America branch address?

**A. Yes.**

*Q.* In what city?

**A. San Diego.**

***MR. OLAH:*** If we could call out the top half of this email, please.

***BY MR. OLAH:***

*Q.* What are we looking at in the top half of this exhibit?

**A. She responds to the banker with a little more information**

**for the wire down to Abacus Machines.**

***Q.*** And she provides updated wire info. Is that right?

***A.*** **Correct, she does.**

***Q.*** Does the amount that she's requesting be transferred change?

***A.*** **No. It's still $4 million.**

***MR. OLAH:*** If we could turn now to -- pull that down and go to Exhibit 443. Let's call out that bottom email, just the very -- thank you.

***BY MR. OLAH:***

***Q.*** Sir, what is the jury looking at in Exhibit 443, generally, before we break down the one that's called out?

***A.*** **An email from a CIBC portfolio manager to Sheida Alan.**

***Q.*** CIBC being the bank we've been talking about this afternoon?

***A.*** **Correct.**

***Q.*** What question does Mr. Fahy pose to Sheida?

***A.*** **"Would you and Karim be able to do 1:00 p.m.?"**

***Q.*** And what's the date of this email?

***A.*** **September 21st, 2016.**

***MR. OLAH:*** If we could pull -- drop the call out, keep the exhibit up. Thank you.

And going to the second email -- actually, third. I'm sorry. I missed the one line. Thank you. Let's go up.

***BY MR. OLAH:***

***Q.*** What are we looking at in the called out text here?

First off, what's the date of the email?

**A. The date is September 21st, 2016.**
Q. And looking at that last sentence, what does Mr. Fahy request here?
**A. Could you provide me Karim's phone number so I can dial him in?**
Q. And this is an email to what account?
**A. To S_7295@yahoo.ca.**
***MR. OLAH:*** Okay. If we could close out. And then let's call out the very top email, including the signature block.
***BY MR. OLAH:***
Q. Does it appear that a conference call was scheduled?
**A. It does.**
Q. Did you review toll records for Dr. Arabi's phone number in this case?
**A. I did.**
Q. And did you identify in those records a call on September 22nd of 2016?
**A. Yes. There was approximately a 90-minute call from the CIBC banker from that phone number *(indicating)* to Karim Arabi on that date, or I believe on the day after that, September 22nd.**
Q. And we can pull up the whole email, but are they discussing a phone call to be scheduled the following day?
**A. Yes.**
***MR. OLAH:*** Pull that down. Thank you.

If we could show the witness and the witness only Exhibit 246.

***BY MR. OLAH:***

***Q.*** Generally, what are we looking at here?

***A.*** **An email from a portfolio manager at CIBC to the S_7295 email address.**

***MR. OLAH:*** And if we could call out the top text for the witness, just the header information. Thank you.

***BY MR. OLAH:***

***Q.*** What happens with that email from the bank?

***A.*** **So that email is forwarded from the S_7295 email address to the Sheida.alan@gmail.com email address.**

***Q.*** Is this yet another email that was seized pursuant to a search warrant?

***A.*** **Correct.**

***MR. OLAH:*** Your Honor, at this time I'd move to admit and publish Exhibit 246.

***THE COURT:*** Any objection?

***MR. FRASER:*** 401, 403, 802.

***THE COURT:*** Overruled.

***(Exhibit 246 admitted.)***

***MR. OLAH:*** Let's keep that call out if we could.

***BY MR. OLAH:***

***Q.*** What's the date of this email?

***A.*** **March 3rd, 2016.**

***Q.*** And who's the sender?
***A.*** **The S_7295 email address.**
***Q.*** And who does -- who is the recipient of the email?
***A.*** **Sheida.alan@gmail.com.**
***Q.*** Did you -- so this appears to be a Yahoo account forwarding it to a Sheida.Alan Gmail account?
***A.*** **Correct.**
***Q.*** And generally speaking, what's being forwarded?
***A.*** **An investment proposal, bank documents, going over options to invest in.**
***Q.*** Did you, in reviewing seized emails, find other instances of this Yahoo account forwarding emails to Sheida.alan@gmail.com?
***A.*** **Yes. There was at least over 30 that I found where it was forwarded directly to the Sheida.alan@gmail.com email address.**
***Q.*** And including as of March of 2016?
***A.*** **Yes.**

***MR. OLAH:*** Pull that down. Thank you.

***MR. FRASER:*** Your Honor, I would ask for an instruction under the Ninth Circuit model. May we have a sidebar?

***THE COURT:*** No. We'll discuss it at the end of the day.

***MR. FRASER:*** Thank you.

***BY MR. OLAH:***

***Q.*** Inspector Shindledecker, are you familiar with the civil suit between Qualcomm and certain parties related to this

acquisition?

**A. Yes.**

*Q.* The jury's -- excuse me.

The jury's heard a stipulation about it.

Have you reviewed some of the -- excuse me. The water did the opposite effect.

Have you reviewed some of the civil discovery responses that were exchanged?

**A. I have.**

***MR. OLAH:*** Can we show the witness and the witness only 789?

For the record, this an eight-page exhibit.

***BY MR. OLAH:***

*Q.* And if it's easier, it might be faster, if you look in your binder. 789 should be in there. If you could thumb through the eight pages of that exhibit.

**A. Yes. I'm familiar with this exhibit.**

*Q.* Generally, what is it?

**A. It's responses, interrogatory responses, in the civil case.**

*Q.* Are they responses from Dr. Arabi?

**A. Yes.**

*Q.* Are they verified?

**A. Yes.**

*Q.* Is it a true and correct copy of those responses?

**A. Yes.**

***MR. OLAH:*** Your Honor, I'd move to admit and publish 789.

***THE COURT:*** Any objection?

***MR. FRASER:*** No, your Honor.

***THE COURT:*** It may be admitted.

***(Exhibit 789 admitted.)***

***BY MR. OLAH:***

***Q.*** If we could start on page 1, please.

Does the caption specify who's responding to the discovery request?

***A.*** **Yes.**

***Q.*** Who --

***A.*** **Dr. Karim Arabi's responses.**

***Q.*** If we could go to page 2.

Are there a set of objections to the requests, or the questions being asked?

***A.*** **Yes. Several.**

***Q.*** I'm sorry. Do those continue on to page 3?

***A.*** **Yes.**

***Q.*** If we could skip to page 7.

Is there a signature on page 7?

***A.*** **There is.**

***Q.*** Is that a verification page?

***A.*** **Yes.**

***Q.*** Regarding the truth of the statements in the preceding

interrogatory responses?
**A. Correct.**
*Q.* What's the date of the signature?
**A. May 21st, 2018.**
*Q.* And let's look at the substance here.
***MR. OLAH:*** If we could go to page 4 of the exhibit. And I'll note for the record there are different page numbers within the exhibit. This is only a selection of eight of the pages from these responses.
***BY MR. OLAH:***
*Q.* Generally, looking at Special Interrogatory No. 27, without re-reading it, what was Dr. Arabi asked in this question?
**A. He was asked about the loan between Avante North Ventures and Abacus Machines.**
*Q.* The loan being the $4 million loan that we looked at a few moments ago?
**A. Correct.**
*Q.* And did Dr. Arabi provide a response to this question?
**A. He did.**
*Q.* Did his response start with a series of objections?
**A. Yes.**
*Q.* If we could turn to page 5 of the exhibit.
After those objections did he provide a response?
**A. Yes, he did.**
***MR. OLAH:*** If we could please call out lines 9 through

20.

***BY MS. CHOPRA:***

***Q.*** Again, without reading the exhibit to the jury, what did Dr. Arabi state about that $4 million loan?

***A.*** **He gives the terms of the promissory note. Again, 4 percent per year, outstanding balance is due five years from the date that it was signed, and that the purpose of the loan was to facilitate investments by Abacus Machines in other startup companies.**

***Q.*** And, again, Abacus Machines was the recipient of that loan?

***A.*** **Correct.**

***Q.*** And where did the -- what did Abacus Machines do with that money?

***A.*** **The bulk of the money was transferred to Atlazo.**

***Q.*** Did you see money being sent to other accounts beyond that one?

***A.*** **There was money sent to another account that was then later sent to Atlazo. That wasn't reflected on the earlier chart.**

***Q.*** So Dr. Arabi in these responses is acknowledging that $4 million loan. Is that right?

***A.*** **Correct.**

***Q.*** If we could turn to the bottom of page 5, please. Again, without reading from the exhibit, what -- what's being asked in Question 28?

***A.*** **Are there any other loans made to Dr. Arabi or his companies**

**by Sheida Alan?**

*Q.* Any other beyond the $4 million loan just inquired about in the preceding question?

***A.*** **Correct.**

*Q.* Did Dr. Arabi assert a set of objections to this question?

***A.*** **Yes, he did.**

*Q.* Did he nonetheless provide an answer?

***A.*** **Yes.**

***MR. FRASER:*** Objection. Leading.

***THE COURT:*** I'll allow it.

***MR. OLAH:*** If we could turn to page 6, calling out lines 12 through 15.

***BY MR. OLAH:***

*Q.* Generally, what did Dr. Arabi say in response to the question about whether there are other loans?

***A.*** **He is not aware of any other loans involving Sheida Alan.**

*Q.* Notwithstanding this response, did you identify another purported loan between Sheida and Dr. Arabi?

***A.*** **Possibly.**

*Q.* Did that exist as of May 21st, 2018?

***A.*** **Yes.**

***MR. OLAH:*** If we could show the witness and the witness only Exhibits 298, 299, and 295, please.

***BY MR. OLAH:***

*Q.* And why don't you look in your binder just to facilitate the

review. You should have 298, 299, and 295.

**A. Yes, I have those.**

***Q.*** Generally speaking, what are those three exhibits?

**A. Two are emails, and one is an attachment included in the email.**

***Q.*** Were those seized pursuant to the search warrants I've asked you about earlier?

**A. They were.**

***MR. OLAH:*** Your Honor, I'd move to admit 298, 299, and 295.

***THE COURT:*** Any objection?

***MR. FRASER:*** 298?

***THE COURT:*** 299 and 295.

***MR. FRASER:*** No objection, your Honor.

***THE COURT:*** They may be admitted.

***(Exhibits admitted.)***

***BY MR. OLAH:***

***Q.*** Two -- excuse me.

298 is on the screen. Let's start with it looks like there's a few exchanges in this email thread. Is that right?

**A. That's correct.**

***Q.*** What's the subject line of the email exchange?

**A. 2205-233 Robson Street.**

***Q.*** Do you recognize that?

**A. Yes.**

***Q.*** What is it?
***A.*** **It's the address to a condo that Dr. Arabi owned in Vancouver, Canada.**
***Q.*** Did he own that condo in his name?
***A.*** **Yes, he did.**
***Q.*** And starting with this bottom email, not a whole lot of header information. Is that right?
***A.*** **That's correct.**
***Q.*** Was there a response to that email right above it?
***A.*** **Yes, there was.**
***Q.*** What was -- first off, who responded?
***A.*** **It was the Sheida.alan@yahoo.com email address.**
***Q.*** Is that different from the Sheida Alan Gmail address we saw a few exhibits back?
***A.*** **Yes. It's a different address.**
***Q.*** And not a lot of context, but does the body say "Sure, no problem"?
***A.*** **Yes, it does.**
***MR. OLAH:*** If we could look at some of the higher up emails.
Actually, the one just before it, let's call that out.
***BY MR. OLAH:***
***Q.*** Who is the sender of this called out email?
***A.*** **Dr. Arabi.**
***Q.*** From what email address?

**A. Karim_arabi@hotmail.com.**
*Q.* Is there a dollar figure specified?
**A. There is.**
*Q.* It looks like -- in what currency?
**A. Canadian dollar, CAD.**
*Q.* What does Dr. Arabi request of Ms. Alan?
**A. That Sheida write a check in that amount to pay off what's owed on his condo in Vancouver.**
*Q.* The condo that's in the subject line?
***MR. FRASER:*** Objection. Speaks for itself.
***THE COURT:*** Sustained.
***MR. OLAH:*** If we could call out the very top email, please.
***BY MR. OLAH:***
*Q.* Who is the sender of -- what account sends this email?
**A. Karim_arabi@hotmail.com.**
*Q.* To what account?
**A. Sheida.alan@yahoo.com.**
*Q.* Are there any attachments?
**A. There is. A payout letter.**
*Q.* Does the body of the attachment -- excuse me -- the body of the email reference the attachment?
**A. It does.**
*Q.* If we could go to 299.
Is this the attachment to that email?

**A. Yes, it is.**
*Q.* Again, without getting into the text of the document, what's -- what is this?
**A. It's showing the amount owed on Karim Arabi's condo plus fees to pay it off.**
*Q.* We've been looking at an email exchange.
In a separate file, did Ms. Alan respond to the request to issue this check?
**A. Yes. She responded saying "Done" --**
*Q.* Let's look at --
**A. -- or something to that effect.**
*Q.* Let's look at Exhibit 295, please.
What does Sheida.Alan@yahoo.com convey in this email?
**A. That she made the payment.**
*Q.* Did you identify bank records relevant to the exchange in the emails we're looking at in 298 and 295?
**A. I did.**
*Q.* Did you prepare a summary chart of those records?
**A. Yes.**
*Q.* If we could show -- actually, why don't you just look at the exhibit in your binder, Exhibit 518, please.
**A. Yes.**
*Q.* Is that the summary chart you prepared?
**A. It is.**
***MR. OLAH:*** Your Honor, I'd move to admit and publish

Exhibit 518.

***THE COURT:*** Any objection?

***MR. FRASER:*** 403 and 1006.

***THE COURT:*** Are you moving to use it as a demonstrative?

***MR. OLAH:*** I was hoping to admit it, your Honor. I can ask one additional question.

***THE COURT:*** Okay. Why don't you.

***BY MR. OLAH:***

***Q.*** Does this summary chart summarize transactions on -- from multiple bank accounts?

***A.*** **It does.**

***Q.*** Spanning multiple years?

***A.*** **Yes, several years.**

***Q.*** And specifically four different counts at least?

***MR. FRASER:*** Objection. Federal Rule of Criminal Procedure 16(a)(1)(g), 701, 702, 602, 403, and I would request a limiting instruction.

***THE COURT:*** Overruled, and we can discuss that when we let the jury go at the end of the day.

***MR. FRASER:*** Thank you.

***BY MR. OLAH:***

***Q.*** So the question is: Did your summary chart summarize voluminous records?

***A.*** **Yes.**

***MR. OLAH:*** Your Honor, move to admit --

***THE COURT:*** 518 may be admitted.

***(Exhibit 518 admitted.)***

***MR. OLAH:*** Thank you.

***BY MR. OLAH:***

***Q.*** Do you see it on your screen?

***A.*** **I do.**

***Q.*** The jury is now following along with us. We're going to skip over that top line because you've already testified to what happened in those first couple of transactions. Is that right?

***A.*** **That's correct.**

***Q.*** All right. What happens here (*indicating*)?

***A.*** **So in 2016 there was a series of transfers from the CIBC 3134 account to another account controlled by Sheida Alan ending in 0990, which is a Canadian dollar account. The total transferred was 31.5 million United States dollars, or around 42.6 million Canadian dollars.**

***Q.*** And does the date range suggest that that was a series of transactions totaling that amount?

***A.*** **Yes.**

***Q.*** As opposed to like a one swoop like we see on the line above; is that right?

***A.*** **Correct. It was multiple transactions.**

***Q.*** And then what happens on March 14th of 2017?

***A.*** **That is the 322,000 Canadian check that we saw in the**

**previous emails paying off what was owed on the Robson Street condo in Vancouver.**

*Q.* That payment came from a Sheida Alan CIBC account; is that right?

*A.* **That's correct.**

*Q.* There's an additional part of your chart in the bottom right corner.

Can you explain what happens there?

*A.* **Sure.**

**In 2023 the condo was sold, and the proceeds of that sale were transferred to a San Diego County Credit Union account here in San Diego controlled by Dr. Arabi. So those are the two proceeds of the sale on the May 17th and November 24th, 2023, that posted to the San Diego County Credit Union account.**

***MR. OLAH:*** We can take that down. Thank you.

***BY MR. OLAH:***

*Q.* In reviewing records, the financial records, did you identify purchases of real estate?

*A.* **Yes.**

*Q.* In what countries did you see real estate being purchased?

*A.* **Canada and Norway.**

*Q.* I'd like to talk about the Canadian purchases first if that's all right.

Were those documented in Canadian bank records belonging to Ms. Alan?

***A.*** **They were documented in Canadian bank records along with some emails.**
***Q.*** Were those records voluminous?
***A.*** **Yes.**
***Q.*** Did they continue to occur over multiple bank accounts?
***A.*** **Yes.**
***Q.*** Did you prepare summary charts related to the purchase and sale of Canadian real estate from Sheida's money?
***A.*** **I did.**
***Q.*** Okay. Can you please review Exhibits 509 through 516.
***A.*** **Through 516?**
***Q.*** Yes, please.
***A.*** **Okay. I have.**
***Q.*** Are those summary charts you prepared?
***A.*** **Yes.**
***Q.*** Did you prepare them to the best of your ability?
***A.*** **I did.**

***MR. OLAH:*** Your Honor, the United States would move to admit 509 through 516.

***MR. FRASER:*** 403, 1006 objection to Exhibit 516.

***THE COURT:*** Overruled on 403. I'm not sure I heard the -- where these came from. You may have asked that, but I -- I'm not sure I caught that.

***MR. OLAH:*** Okay.

///

***BY MR. OLAH:***

***Q.*** Are these summaries of financial records related to bank accounts and Canadian real estate transactions?

***A.*** **Correct.**

***MR. OLAH:*** And I can lay further foundation when we get to 516 since that's the limited objection?

***THE COURT:*** Okay. They may be admitted.

***(Exhibits admitted.)***

***BY MR. OLAH:***

***Q.*** Let's begin with Exhibit 509, please. We're going to again skip that top row. And I think we can even skip this middle one.

Have we already discussed what's happening with this transaction or this set of transactions?

***A.*** **So we have. The number's going to be slightly different on the charts depending on the time frame. For example, this chart, I only put the deposits that went into 0990 prior to April 12th, 2016, because obviously money transferred after that date couldn't have been used to fund that purchase.**

***MR. FRASER:*** Your Honor, I would request the limiting instruction be given before the end of the day because it's coming up often.

***THE COURT:*** We'll discuss it at the end of the day.

Overruled.

///

***BY MR. OLAH:***
***Q.*** You mentioned April 12, 2016.
What's the significance of that date?
**A. That's the date that money from 0990 was used to purchase real property at -- located at 1421 Chartwell Drive, Vancouver, Canada.**
***Q.*** Did you identify and review emails related to 1421 Chartwell Drive?
**A. I believe so, yes.**
***MR. OLAH:*** If we could show the witness and the witness only Exhibit 335, previously identified but not admitted.
Yeah, 335. Thank you.
***BY MR. OLAH:***
***Q.*** Can you see Exhibit 335 on your monitor?
**A. I can.**
***Q.*** Is this yet another email that was seized pursuant to a search warrant?
**A. It was.**
***MR. OLAH:*** Your Honor, move to admit Exhibit 335.
***THE COURT:*** Any objection?
***MR. FRASER:*** 401, 403, 802.
***THE COURT:*** Overruled.
***MR. OLAH:*** Let's just call out the header information to orient the jury as to what we're looking at.
///

***BY MR. OLAH:***

***Q.*** Who is the sender of this email, sir?

***A.*** **Nassar Hendi.**

***Q.*** And who is the recipient?

***A.*** **It's the Sheida.alan@gmail.com email address.**

***Q.*** As opposed to the Sheida Alan Yahoo account we've been looking at on some of these slides?

***A.*** **Correct.**

***Q.*** What's the date of this email?

***A.*** **March 20th, 2016.**

***Q.*** And what's the apparent subject line?

***A.*** **1421 Chartwell Drive report.**

***MR. OLAH:*** Okay. We've got some sub-bullets to call out. If we could start with Point 4 on the top, please. Just Point 4, tiny font.

***BY MR. OLAH:***

***Q.*** What does Nassar Hendi communicate in this sentence?

***A.*** **Putting the house in the name of a person to make it easier to get a bank loan, but in the agreement will write that the house belongs to the company.**

***Q.*** Okay. Did Sheida Alan purchase some Canadian real estate in her actual name?

***A.*** **Yes, she did.**

***Q.*** Did she purchase others using company names, her business entities?

**A. Correct.**

***MR. OLAH:*** If we could call out Point 6 in that same set.

***BY MR. OLAH:***

***Q.*** This purports to be an email from Nassar Hendi to Sheida.alan@gmail.com; correct?

**A. Correct.**

***Q.*** What's the clause beginning with "But" in Sentence 6.

**A. "But I believe as long as her account is strong, it is better we proceed with her name."**

***Q.*** Based on this and other statements, does it appear that Nassar and Sheida Alan are referring to Sheida as a separate party here?

***MR. FRASER:*** Renewing the standing objection to this segment of testimony.

***THE COURT:*** Overruled.

***THE WITNESS:*** That's correct.

***MR. OLAH:*** And if we could call out Bullet Points 2 through 4 in the bottom half. One email, two sets of lists.

***BY MR. OLAH:***

***Q.*** What's the request at the end of Bullet Point 2?

**A. "Since they have limited time, please ask her to start with her bank."**

***Q.*** And in Point 4?

**A. "If you could arrange to be here in the first week of April,**

**we can finalize everything."**

***Q.*** Where was Ms. Alan living, to your knowledge, in April of 2016?

***A.*** **Vancouver, Canada.**

***MR. FRASER:*** Objection. 602.

***THE COURT:*** Overruled.

***THE WITNESS:*** Vancouver, Canada.

***BY MR. OLAH:***

***Q.*** Where was Dr. Arabi living at that time?

***A.*** **San Diego, California.**

***Q.*** And is Nassar Hendi located in San Diego, Canada, or elsewhere?

***A.*** **He is located in Vancouver, Canada.**

***Q.*** Whose name was the Chartwell Drive property ultimately purchased in?

***A.*** **Sheida Alan's.**

***Q.*** Did you identify additional emails related to this 1421 Chartwell Drive?

***A.*** **I did.**

***MR. OLAH:*** If we could show the witness and the witness only Exhibit 347.

***BY MR. OLAH:***

***Q.*** Is this yet another email that was seized in the investigation?

***A.*** **That's correct.**

***Q.*** Is it a true and correct copy of such an email?
***A.*** **Yes.**
***MR. OLAH:*** Your Honor, move to admit and publish Exhibit 347.
***THE COURT:*** Any objection?
***MR. FRASER:*** 401, 403, 802.
***THE COURT:*** Overruled.
It may be admitted.
***MR. OLAH:*** Let's call out the bottom half, please.
***(Exhibit 347 admitted.)***
***BY MR. OLAH:***
***Q.*** Briefly, who is the sender, recipient, and subject line?
***A.*** **The sender is the Sheida.alan@gmail.com email address, sent to Nassar Hendi regarding project 1421 Chartwell drive.**
***Q.*** And in Point No. 4, is there a reference to Sheida?
***A.*** **Yes. It says "Sheida to assign the existing land to the partnership through a Bare trust agreement."**
***Q.*** Even though she's the purported author of this email?
***A.*** **That's correct.**
***Q.*** Is there another reference to, quote, Sheida in Bullet Point 6?
***A.*** **Yes, there is.**
**"The percentage of the partnership is set at 50 percent between Nassar Hendi and Sheida through their corporations, equally benefit or lose money at an equal rate."**

***MR. OLAH:*** If we could turn to page 2, please. Who signs -- calling out all available text.

***BY MR. OLAH:***

***Q.*** Whose name appears at the end of this email?

***A.*** **Sheida's.**

***Q.*** Is there a postscript?

***A.*** **There is.**

***Q.*** What's communicated in the postscript?

***A.*** **Suggesting names for their partnerships.**

***Q.*** Do four of the five suggestions begin with the letter A?

***A.*** **They do.**

***Q.*** And is one of those Avante Development Group?

***A.*** **Yes.**

***Q.*** Did you obtain or identify an Avante entity in reviewing these Canadian financial records?

***A.*** **I did.**

***MR. OLAH:*** Your Honor, are we going to 4:30 or 4:00?

***THE COURT:*** 4:00 o'clock. Is now a good breaking point?

***MR. OLAH:*** We're there now.

***THE COURT:*** Okay. Ladies and gentlemen, you're reminded you're not to do any research about the case. You're not to discuss the case.

And we'll see you tomorrow morning at 9:00 o'clock.

And we'll see you, sir, tomorrow morning at

9:00 o'clock.

***THE WITNESS:*** Thank you.

***(Jury out at 4:00 p.m.)***

***THE COURT:*** Okay. We're now outside the presence of the jury.

Mr. Fraser, go ahead. I'm sorry, but you had all these exhibits. We discussed everything. I've given you time at every break. If you wanted a limiting instruction it should have been raised.

***MR. FRASER:*** It was raised in our opposition to the Government's motion *in limine*.

***THE COURT:*** Tell me what you want the limiting instruction to be.

***MR. FRASER:*** Ninth Circuit Model Instruction 3.15, Option 3.

***THE COURT:*** What does that say?

***MR. FRASER:*** It says -- well, in this case it would be "You have heard testimony from John Shindledecker, who testified to both facts and two types of opinions and the reasons for those" --

***THE COURT:*** I'll give those at the end of the case. I don't think we need to give it mid testimony.

***MR. FRASER:*** Your Honor, I think it's very important, because -- and there's circuit authority on the importance of the jury being able to differentiate between these three types

of testimony, particularly when it comes from someone who is like a case agent, which Inspector Shindledecker is basically summarizing the Government's money laundering case and other important aspects of its case.

It has a -- it gives the imprimatur of the Government to facts and opinions that really do call for specialized knowledge. That's why the fact that he has the accounting degree was brought out and his background in accounting and his experience with financial transactions.

There's no reason to mention any of that if not to bolster his testimony and give that --

***THE COURT:*** I will give the instruction. I think it's important. But I think singling out one instruction when there are many instructions that I'm going to give at the end of the case -- and then, you know, do you want me to then say it again at the end of the case? I don't know.

Does the Government have a position on this?

***MR. OLAH:*** Yes, your Honor.

He has not offered any opinions. I think our expert notice was very clear. It was an abundance of caution, but we've always viewed him as summarizing records. That's what all the summary charts are. I don't think rendered any sort of opinion yet, and I don't intend to elicit one. So I don't think a dual role instruction is appropriate here based on the testimony so far and that I anticipate.

***THE COURT:*** We can take that argument at the end of the case. I don't know that it needs to be done now. And that's what closing argument -- I'll instruct before closing argument. If I give the dual instruction, you can jump up and down and say Shindledecker's, you shouldn't pay attention to it for these reasons and you can emphasize it. But I don't think I need to give the instruction in the middle of the case.

Okay. Anything else?

***MR. OLAH:*** No for the Government, your Honor. Thank you.

***MS. BERNSTEIN:*** Nothing further from us, your Honor.

***THE COURT:*** Okay. See you tomorrow morning at 9:00.

***(Proceedings adjourned at 4:03 p.m.)***

***

*REPORTER'S CERTIFICATE*

I, Anne Roldan, certify that I am a duly qualified and acting Official Court Reporter for the United States District Court, that the foregoing is a true and accurate transcript of the proceedings as taken by me in the above-entitled matter on March 26, 2025; and that the format used complies with the rules and requirements of the United States Judicial Conference.

Date: March 26, 2025



*Anne Roldan, RMR, CRR, CSR 13095*