UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, Plaintiff, vs. KARIM ARABI, Defendant.

Case No. 22-cr-1152-BAS

March 24, 2025

Trial Testimony of Sanjiv Taneja

REPORTER'S TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CYNTHIA A. BASHANT
CHIEF DISTRICT JUDGE

VOLUME 2, PAGES 206 - 421

APPEARANCES:

FOR PLAINTIFF: UNITED STATES ATTORNEY'S OFFICE
880 Front Street, Suite 6293
San Diego, California 92101
*By: NICHOLAS W. PILCHAK, AUSA*
*JANAKI G. CHOPRA, AUSA*
*ERIC R. OLAH, AUSA*

FOR DEFENDANT: BIENERT KATZMAN LITTRELL WILLIAMS, LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
*By: WHITNEY Z. BERNSTEIN, Esq.*
*REBECCA S. ROBERTS, Esq.*
*RYAN V. FRASER, Esq.*

REPORTED BY:

ANNE MARIE ROLDAN, RMR, CRR, CSR 13095
U.S. OFFICIAL COURT REPORTER
U.S. District Court Clerk's Office
333 West Broadway, Suite 420
San Diego, California 92101

Reported stenographically; transcribed with CAT software.

# I N D E X

***

## E X A M I N A T I O N S

| WITNESS | VOL. | PAGE | LINE |
|---|---|---|---|
| *FOR THE GOVERNMENT:* | | | |
| SANJIV TANEJA | | | |
| Direct by Mr. Pilchak | 2 | 208 | 11 |
| Cross by Ms. Bernstein | 2 | 321 | 20 |

## E X H I B I T S

| ADMITTED | VOL. | PAGE | LINE |
|---|---|---|---|
| Ex. 72 | 2 | 261 | 7 |
| Ex. 106 | 2 | 220 | 2 |
| Ex. 544 | 2 | 222 | 19 |
| Ex. 545 | 2 | 222 | 19 |
| Ex. 549 | 2 | 305 | 3 |
| Ex. 612 | 2 | 309 | 13 |
| Ex. 615 | 2 | 252 | 20 |
| Ex. 615A | 2 | 252 | 20 |
| Ex. 615B | 2 | 252 | 20 |
| Ex. 617 | 2 | 257 | 22 |
| Ex. 618 | 2 | 259 | 15 |
| Ex. 619 | 2 | 262 | 20 |
| Ex. 620 | 2 | 262 | 21 |
| Ex. 621 | 2 | 266 | 13 |
| Ex. 622 | 2 | 266 | 13 |
| Ex. 627 | 2 | 272 | 24 |
| Ex. 628 | 2 | 270 | 11 |
| Ex. 679 | 2 | 210 | 3 |
| Ex. 681A | 2 | 221 | 22 |
| Ex. 682 | 2 | 216 | 20 |
| Ex. 687 | 2 | 213 | 15 |
| Ex. 699 | 2 | 235 | 5 |
| Ex. 881 | 2 | 292 | 12 |
| Ex. 2281 | 2 | 349 | 2 |
| Ex. 3317 | 2 | 378 | 25 |

***MONDAY, MARCH 24, 2025, 9:00 A.M.***

***

***MR. PILCHAK:*** The United States recalls Sanjiv Taneja.

***THE COURT:*** Okay. Mr. Taneja, if you could come up and retake the witness stand. You are reminded you are still under oath to tell the truth.

***THE WITNESS:*** Yes.

***THE COURT:*** Government?

***MR. PILCHAK:*** Thank you, Your Honor.

***DIRECT EXAMINATION (CONT.)***

***BY MR. PILCHAK:***

***Q.*** Good morning, Mr. Taneja.

***A.*** **Good morning, Mr. Pilchak.**

***Q.*** When we were last speaking, I think it was Wednesday afternoon, and you were talking a little bit about Abreezio's marketing, including its efforts to pitch itself to other customers; is that right?

***A.*** **That's correct.**

***Q.*** I asked you whether Abreezio actually had any other paying customers besides Qualcomm.

***A.*** **No.**

***Q.*** I also asked you whether Abreezio licensed its technology to anyone but Qualcomm.

***A.*** **No.**

***Q.*** That's no, it didn't do those things, not I didn't ask you those questions?

**A. Oh, sorry, yes. No, it didn't do those things. I'm sorry.**

***Q.*** And did Abreezio ever make a dollar of revenue outside of its relationship with Qualcomm?

**A. It did not.**

***Q.*** But I want to ask you about some of the efforts with other companies.

Okay?

**A. Sure.**

***MR. PILCHAK:*** First, let's show the witness and the witness only Exhibit 679.

***BY MR. PILCHAK:***

***Q.*** Do you see that there?

**A. Yes, I do.**

***MR. PILCHAK:*** Zoom in on the top half please, down to "Action Plan."

***BY MR. PILCHAK:***

***Q.*** Is this an email from you, sir?

**A. Yes, it is.**

***Q.*** To three people -- well, I guess you were one of them; right?

**A. Correct.**

***MR. PILCHAK:*** All right. Move to admit 679.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No objection, Your Honor.

***THE COURT:*** 679 may be admitted.

***(Exhibit 679 admitted.)***

***BY MR. PILCHAK:***

***Q.*** All right. Mr. Taneja, what is the jury looking at here?

***A.*** **So it's a summary of a strategy to demonstrate the value Abreezio technology will provide to Qualcomm.**

***Q.*** And so to demonstrate the value to Qualcomm specifically?

***A.*** **To Qualcomm specifically.**

***Q.*** Who were you sending this email to?

***A.*** **I was sending it to Dr. Karim Arabi, Brad Quinton, and I CC'd myself.**

***Q.*** When did you send this email?

***A.*** **On March 24th, 2015.**

***Q.*** And just to refresh the jury's memory, had you already had at least your meeting with Ziad Mansour on site at Qualcomm by this time?

***A.*** **Yes, I did.**

***Q.*** So if you'd already met with Qualcomm once, what were you doing, generally speaking, in this email?

***A.*** **So this was more to refine the specific strategy and a tactical plan on how we are going to demonstrate the value of the different components of the technology.**

***Q.*** And at the beginning of this email, it says, "Based on our multiple discussions yesterday."

Who had you been talking with the day before you sent this email?

***A.*** **This is referring to the people on the distribution list, which is Dr. Karim Arabi and Brad Quinton.**

***Q.*** Not Sheida Arabi?

***A.*** **Not Sheida Arabi.**

***Q.*** Okay. Did you ever speak with the real Sheida about this plan for Qualcomm?

***A.*** **I never spoke to Sheida Arabi on any topic.**

***Q.*** And let me ask you about, do you see the four bullets under "Proposed Strategy" there?

***A.*** **Yes, I do.**

***Q.*** What were you trying to say in the third bullet, "Create a compelling business event"? What does that mean?

***A.*** **So basically what it means is while our primary target is Qualcomm, we also want to engage with at least another major customer so that Qualcomm will see even more value, that there are other customers who want to -- who have an interest in this technology.**

***Q.*** And this might be obvious, but why would that help Qualcomm see more value?

***A.*** **It could be a competitor of Qualcomm. And if there was interest from one of the competitors, Qualcomm would be more motivated to move forward with Abreezio.**

***Q.*** And to pay a higher price?

***A.*** **Pay a higher price as well.**

***Q.*** In fact, this email explicitly says "Preferably a direct competitor;" right? Do you see that at the end there?

***A.*** **It does, yes.**

***Q.*** It's hard to get the highlighting to go right under the text.

Why would a direct competitor be better?

***A.*** **Again, for the same reasons. If a direct competitor of Qualcomm was also interested, Qualcomm would both be motivated to move forward as well as pay a much higher valuation, much higher price.**

***Q.*** And did Abreezio move forward with this plan to do pitches with some other customers?

***A.*** **We did.**

***Q.*** Or potential customers, I should say.

***A.*** **Prospective, yes, potential customers.**

***Q.*** And did those prospective customers include Qualcomm's direct competition?

***A.*** **It did.**

***MR. PILCHAK:*** Let's take that down, please. And if we could show the witness Exhibit 687, which -- I don't recall if is this in evidence.

***THE COURT:*** I do not have it in evidence.

***MR. PILCHAK:*** I don't think it is. Thank you, Your Honor.

And zoom in on the text, please.

***BY MR. PILCHAK:***

***Q.*** What is this, sir?

***A.*** **This is an email that I wrote to Mr. Hiten Somwal at Qualcomm.**

***Q.*** And as a reminder, who was Hiten Somwal?

***A.*** **He was responsible for business development, I believe, as a Director or a Senior Director.**

***Q.*** Okay. And is this email dated August 13th of 2015?

***A.*** **Yes, it is.**

***MR. PILCHAK:*** Move to admit 687.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** I think foundation, Your Honor.

***THE COURT:*** Overruled. It may be admitted.

***(Exhibit 687 admitted.)***

***BY MR. PILCHAK:***

***Q.*** All right. What is the subject of this email, Mr. Taneja?

***A.*** **The subject matter is "Regarding Qualcomm, a quick update."**

***Q.*** And around this time, August the 13th of 2015, what was going on in the life cycle of Abreezio's dance with Qualcomm?

***A.*** **So we had started responding to the due diligence that Qualcomm started, I believe in the first week of July. And we were at a point where we were also demonstrating on real designs, the value of the technology.**

**So there were several things geared towards completing the**

**evaluation that was in progress, as well as the ongoing discussions on the negotiation side, which included Behrooz Abdi, Chairman of Abreezio, talking to Duane Nelles, the Senior Vice President of Qualcomm, Hiten's boss. And, yeah, several activities.**

***Q.*** Understood. Let me ask about the first sentence of this email.

What were you trying to convey to Mr. Somwal in that first sentence?

***A.*** **It's a negotiation tactic to demonstrate that the other parties, meaning other customers, including direct competitors, are interested in moving forward.**

***Q.*** What was your expectation of what that information would do to Mr. Somwal?

***A.*** **It would further motivate them to take -- to speed things up.**

***Q.*** And was that why you wrote that sentence?

***A.*** **Yes.**

***Q.*** Are you familiar with something called a bidding war?

***A.*** **I am.**

***Q.*** What is that?

***A.*** **So that basically means if you bring multiple buyers to whatever it is that you are trying to sell, that will help in increasing the price that you eventually get.**

***Q.*** And is a bidding war then better for the seller?

**A. Absolutely.**

***MR. PILCHAK:*** We can take that down, I think.

***BY MR. PILCHAK:***

***Q.*** Let me ask a related question.

Did you ever have a conversation with Dr. Arabi about this concept of using negotiations with competitors as leverage with Qualcomm?

***A.*** **Yes.**

***Q.*** Can you describe that for the jury?

***A.*** **So Dr. Karim Arabi was very particular about Apple. And I recall there were a couple of instances when he asked Mr. Akbar Shokouhi, who was the investor, and he had a relationship with one of the engineering directors or a senior director at Apple, and he was going to make the introduction. And that was not happening, so Dr. Karim Arabi was very much persistent in asking Mr. Akbar to make that introduction.**

***Q.*** Did you have a sense from conversations with Dr. Arabi that he believed it would be a benefit to use the Apple negotiations to move along the Qualcomm negotiations?

***A.*** **Yes.**

***Q.*** Did you ever talk with Dr. Arabi about pretending to leave something behind when you'd met with Qualcomm? When you had a meeting with Qualcomm on site at their offices, did you ever discuss with Dr. Arabi pretending to accidentally forget something in one of the meeting rooms?

**A. Is this referring -- if there's a document that could trigger the memory -- trigger my memory.**
*Q.* I tell you what, we'll come back to that.
**A. Okay.**
*Q.* Let me show you a different document.
**A. Okay.**
***MR. PILCHAK:*** I'd like to show the witness Exhibit 682, please. And zoom in on the top half, if you would.
***BY MR. PILCHAK:***
*Q.* Is this another email from you, sir?
**A. Yes, it is.**
*Q.* And who is it to?
**A. It is to Brad Quinton.**
*Q.* And is there a message from Mr. Quinton on the bottom there?
**A. Yes, it is.**
*Q.* ***(MR. PILCHAK) :*** Move to admit 682, please.
***THE COURT:*** Any objection?
***MS. BERNSTEIN:*** No objection to 682.
***THE COURT:*** 682 may be admitted.
***(Exhibit 682 admitted.)***
***MR. PILCHAK:*** All right. Let's take that zoom down please, and if we zoom in on Mr. Quinton's message, which is the bottom two-thirds of the page, please.
Thank you, Mr. Maybury.
///

***BY MR. PILCHAK:***

***Q.*** Do you see that there, Mr. Taneja?

***A.*** **Yes.**

***Q.*** This zoom is a little cut off at the top, but do you see where it starts, "Sanjiv, can't talk now"?

***A.*** **I can see it, yes.**

***Q.*** Who wrote that message, based on your review of this document a minute ago?

***A.*** **Brad Quinton.**

***Q.*** Was he writing to you?

***A.*** **Yes, he was.**

***Q.*** And is the date of this --

***MR. PILCHAK:*** Well, can we move that zoom down a little? I've lost the date of this.

***BY MR. PILCHAK:***

***Q.*** Is the date of this May 17th of 2015?

***A.*** **Yes.**

***MR. PILCHAK:*** All right. Thank you, Mr. Maybury.

***BY MR. PILCHAK:***

***Q.*** If I can direct your attention -- do you see a numbered list there from Mr. Quinton; right?

***A.*** **I do.**

***Q.*** Did he sometimes send you numbers listed in his emails?

***A.*** **To the best of my recollection, yeah.**

***Q.*** Here, what does the first bullet say?

**A. It says, "We have put everything we have done into being ready for QCOM" -- meaning Qualcomm -- "evaluation, and we are ready."**

*Q.* In that second bullet, does he go on to say something about rethinking if Qualcomm is not the customer?

**A. Yes, it does.**

*Q.* What did you understand him to mean when Mr. Quinton said, "We have not done any work outside of thinking about QCOM?"

**A. So my understanding was that the way the product has been architected and designed, it has been customized specifically to work in the Qualcomm chip design flow.**

*Q.* And what does that mean, architected to work in the Qualcomm chip design flow, without getting too specific, if you can?

**A. So at a very high level, every chip design company, semiconductor company, will have a different design process. Think of it as a sequence of steps that you have to take before you can start with the design and take it all the way into manufacturing.**

*Q.* And are you saying that products can be built to hit that sequence of steps better or worse?

**A. At a high level, yes.**

*Q.* And I'm asking high-level general questions because I'm not an engineer, so I appreciate that.

**A. Okay.**

*Q.* But it's your understanding that's what had been done with

Abreezio's products.

***A.*** **That's the way I understood Bullet No. 2 to mean, correct.**

***Q.*** Okay. And just to ask you, do you see No. 7 there?

***A.*** **I do.**

***Q.*** And that's about DFTBreez-PCR; right?

***A.*** **That's right.**

***Q.*** What did you understand Mr. Quinton to mean when he said, "That product does not have a clear value proposition for the general market without further study"?

***A.*** **That aside from Qualcomm, the -- this specific product, the general market would not see any benefit.**

***Q.*** Okay.

***MR. PILCHAK:*** Let's take that down, and let's show the witness Exhibit 681. And zoom in on the available text, please. Thank you, Mr. Maybury.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, Mr. Taneja?

***A.*** **Yes, I do.**

***Q.*** Is this another email chain between you and Mr. Quinton?

***A.*** **It is.**

***Q.*** This time on May the 13th; right?

***A.*** **Correct.**

***MR. PILCHAK:*** Move to admit 681.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** 106 if it doesn't have the attachment.

***THE COURT:*** Overruled.

***(Exhibit 106 admitted.)***

***BY MR. PILCHAK:***

***Q.*** I'll come back to the attachment, perhaps, Mr. Taneja, but this is an email here.

Do you see that?

***A.*** **I do.**

***Q.*** All right. Once again, is the original message from Mr. Quinton on the bottom?

***A.*** **Yes, it is.**

***Q.*** I'd like to direct your attention to the sentence that begins "We need to project strength."

Do you see that?

***A.*** **Yes, I do.**

***Q.*** What did you understand Mr. Quinton's concern to be when he said, "We can't look like Qualcomm is the only customer" and that "We are quick to pander to them"?

***A.*** **Yeah. So my understanding was that would seem like we are very desperate, Qualcomm is the only customer we can go to, it would considerably weaken our position.**

***Q.*** Does that make it harder to be a seller if your buyer thinks they're the only buyer in the market?

***A.*** **Absolutely.**

***Q.*** Did you understand that from your experience in the business side of engineering companies?

***A.*** **Yes.**
***Q.*** All right. Was that one of the purposes in marketing to other companies like Apple?
***A.*** **Yes.**
***MR. PILCHAK:*** Let's take that down. And if we can remove the annotation. Just to cure the objection and complete the record, can we show the witness and the witness only 681A, please?
***BY MR. PILCHAK:***
***Q.*** Do you see that there, sir?
***A.*** **I do.**
***Q.*** When the prior email said "technology roadmap" was one of the attachments or was the attachment, do you understand this to be the attachment to that email?
***A.*** **Correct.**
***MR. PILCHAK:*** And can we just page through to the last page, please, in this? Thank you.
Move to admit 681A, a two-page document.
***THE COURT:*** I assume there's no objection?
***MS. BERNSTEIN:*** No objection. Thank you.
***THE COURT:*** 681A may be admitted.
***(Exhibit 681A admitted.)***
***MR. PILCHAK:*** And I think we can take that down.
All right. Mr. Taneja, I'd like to show you two more documents, if I can. It's Exhibits 554 and 545. What did I

say? 544 and 545. Sorry. Let's do '44 first.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, sir? It's just an email with limited text.

***A.*** **I do.**

***Q.*** Is that from you, sir?

***A.*** **It is.**

***MR. PILCHAK:*** And let's see 545 if we can. Okay.

***BY MR. PILCHAK:***

***Q.*** Is this a slide presentation?

***A.*** **It is.**

***Q.*** Do you understand this to be the attachment to that email that we were just looking at?

***A.*** **Yes, I do.**

***MR. PILCHAK:*** Move to admit 544 and 545.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No objection.

***THE COURT:*** They both may be admitted.

***(Exhibits 544 and 545 admitted.)***

***MR. PILCHAK:*** Thank you, Mr. Maybury. If we could zoom in on the text.

***BY MR. PILCHAK:***

***Q.*** Who wrote this email, sir?

***A.*** **I did.**

***Q.*** And who were you sending it to?

***A.*** **Dr. Karim Arabi.**
***Q.*** The date of this email is March 11th, 2015; right?
***A.*** **That's right.**
***Q.*** And what it says, "Planning for the Qualcomm engagement," is that the same thing we were talking about a few minutes ago, the strategy for approaching Qualcomm?
***A.*** **Yes, it is.**
***Q.*** When you say, "Per our discussion this morning," who were you discussing this with?
***A.*** **Dr. Karim Arabi.**
***Q.*** And then the attachment is those slides that we were just looking at; right?
***A.*** **Yes.**
***MR. PILCHAK:*** Can we go to 545?
***BY MR. PILCHAK:***
***Q.*** Is this the first page of that draft slide deck?
***A.*** **Yes, it is.**
***MR. PILCHAK:*** And let's go to page 14, please, which I think is the last one.
***BY MR. PILCHAK:***
***Q.*** Do you see that there, sir?
***A.*** **I do.**
***Q.*** When you say in the second group of bullets, "These are not gating to engagement," I don't understand what that means.
What does that mean?

**A. I'm just reading. Sorry.**

**So "not gating" means they are not required to be completed and to be in place before we start the engagement.**

Q. Okay. So perhaps they're good ideas to do, but you don't have to have them done before you engage with Qualcomm.

**A. That's correct.**

Q. All right. I want to ask about that first bullet under that section.

Do you see that?

**A. Yes.**

Q. What did you mean when you said, "Identify new Abreezio IP that builds upon Sheida's original IP"?

**A. So this is in the context of the discussion on the sensor architecture that we had on Wednesday.**

Q. OldSensor and NewSensor?

**A. Yes.**

Q. Okay.

**A. So as part of that discussion that was with Dr. Karim Arabi, Brad Quinton, and myself, it is referring to the ideas that came out of that.**

Q. And so when you wrote, "The new IP will build upon Sheida's original IP," what did you mean, "build upon"?

**A. So the original idea that was outlined in the provisional patent. By "build upon," it means we will enhance the idea using that original idea as the starting point.**

***Q.*** Got it.

***MR. PILCHAK:*** Let's take that down.

***BY MR. PILCHAK:***

***Q.*** Sitting here today, do you have a general memory about what time the due diligence with Mr. Somwal started?

***A.*** **I believe the first documented due diligence set of questions was the first week of July.**

***Q.*** All right. Leading up to that, was there a meeting with the Qualcomm guys in Sunnyvale?

***A.*** **There was.**

***Q.*** Was it about June 24th of 2015?

***A.*** **Thereabouts, yes.**

***Q.*** Who was at that meeting, first on the Abreezio side?

***A.*** **Brad Quinton, Trent McClellan *[sic]*, myself, at the initial portion of the meeting, which was followed by a lunch in which Abreezio Chairman Behrooz also joined.**

***Q.*** Where was the initial part of the meeting?

***A.*** **Initial part of the meeting was in the Abreezio office in Sunnyvale.**

***Q.*** And when you say "the Abreezio office," did Abreezio build its own office in Sunnyvale?

***A.*** **No. They were just renting a shared workspace, Regus.**

***Q.*** Regus, R-e-g-u-s?

***A.*** **Yes.**

***Q.*** Who physically worked out of that space?

**A. I did.**
*Q.* Anybody else?
**A. No.**
*Q.* So was the meeting inside your one-person office?
**A. No, no. There was a conference room. And just to give you the context, the plan was to hire additional application engineers who would work from Sunnyvale.**
*Q.* But did that ever come to pass?
**A. That never came to pass.**
*Q.* Why not?
**A. We did not have any local customer. So the idea was to have the locality of customer support, and we did not have any customers in that -- in the Silicon Valley area at that time.**
*Q.* Because where was your customer?
**A. In San Diego, Qualcomm.**
*Q.* And so when you moved forward to hire applicants, where did you hire applicants?
**A. In San Diego.**
*Q.* Who came up to this Sunnyvale meeting on the Qualcomm side?
**A. So to the best of my recollection, Ziad Mansour, Hiten Somwal, Farsheed -- I forget -- if I don't pronounce the last name properly, but Farsheed Mahmoudi.**
*Q.* That's fine.
**A. Jim Willmore. I think Gaurav Bhargava.**
***THE COURT REPORTER:*** What was that name?

***THE WITNESS:*** Gaurav, G-a-u-r-a-v. Again, this is to the best of my recollection, the last name is Bhargava, B-h-a-r-g-a-v-a.

I may be missing out a person or two, but --

***BY MR. PILCHAK:***

***Q.*** Fair enough. So it was a multi-man crew from Qualcomm.

***A.*** **Excuse me, can I just add, Mr. Duane Nelles. The -- whether he was only at the lunch part of the meeting or he was also -- to the best of my recollection, he was there for some part of this meeting also. But he was there at the lunch for sure.**

***Q.*** What was the purpose of that meeting?

***A.*** **So the agenda of the meeting was outlined by Mr. Hiten Somwal, and there were multiple goals. First and foremost, to get a deep dive on the Abreezio technology.**

***Q.*** For the Qualcomm team to get a --

***A.*** **For the Qualcomm team, yes.**

***Q.*** All right.

***A.*** **For the Qualcomm team.**

***Q.*** Who led the technical discussion?

***A.*** **Ziad Mansour. Jim Willmore. Jim Willmore was also a very key player in that meeting.**

***Q.*** And what about on the Abreezio side of the tech discussion? Was it you?

***A.*** **No, no. I wasn't the technical. Brad Quinton was the CTO, and supported by Trent.**

*Q.* Did you lead any part of the discussion?
**A. I led the business model part of the discussion. So as I was saying, there were multiple goals. One was on the technology deep dive. The other was on the business model, how do we plan to license the IP, what are the plans for the general market, *et cetera*. So I led that part of the presentation.**
*Q.* Which part of the presentation did Dr. Arabi lead? Was he present for the meeting?
**A. No, he was not.**
*Q.* Why was he not present for the meeting?
**A. He didn't want to be known to Qualcomm.**
*Q.* How did the meeting go, in your view?
**A. So the meeting went well. And the way we could tell was at the lunch meeting, we heard from Duane Nelles, through Behrooz Abdi, that Qualcomm is interested in an acquisition of the company.**
*Q.* Was that good news for you?
**A. Yes, it was.**
*Q.* Did it suggest a certain seriousness on the Qualcomm side?
**A. It absolutely did, yeah.**
*Q.* What about just the fact that Duane was there for the meeting, did that in itself convey anything to your team?
***MS. BERNSTEIN:*** Objection. Leading.
***THE COURT:*** I'll allow it.
***THE WITNESS:*** I may answer?

***MR. PILCHAK:*** You can answer.

***THE WITNESS:*** So it was very symbolic of Qualcomm is taking this very seriously, the fact that they have a Senior VP who is overseeing Mergers and Acquisitions is at the meeting.

***BY MR. PILCHAK:***

***Q.*** What was the fallout or kind of the next steps after that meeting in Sunnyvale?

***A.*** **So on the Qualcomm side, we had a list of due diligence questions from Hiten roughly about a week later. On the Abreezio side, Dr. Karim Arabi asked that I reach out to Professor Bozena Kaminska and extend her an offer for an advisory.**

***Q.*** And remind us who Bozena Kaminska is.

***A.*** **She is a professor by -- was a professor by profession. And she was on the Advisory Board of -- Technical Advisory Board of Abreezio.**

***Q.*** Why did you invite her to be on the Technical Advisory Board?

***A.*** **So as per instructions from Dr. Karim Arabi.**

***Q.*** Did you have a sense of how that might be helpful to Abreezio, though?

***A.*** **So Dr. Arabi communicated to me that she is very good in handling questions that may come up during the due diligence and that she was a mentor for his sister.**

***Q.*** A mentor?

***A.*** **Mentor for his sister.**
***Q.*** Okay. And that would be Sheida.
***A.*** **That's right.**
***Q.*** So what kind of due diligence questions did Professor Kaminska end up fielding?
***A.*** **To the best of my recollection, there weren't any.**
***Q.*** Well, what kind of technical advising did she do for Abreezio?
***A.*** **None.**
***Q.*** Did she participate in any calls where she could help Abreezio develop its products?
***A.*** **She did not, to the best of my knowledge, at least. I wasn't in any meetings.**
***Q.*** Did she weigh in on any of your demos that you were doing at Qualcomm?
***A.*** **No.**
***Q.*** Ever?
***A.*** **Not that I was in any discussion with her.**
***Q.*** And you were the CEO.
***A.*** **I was the CEO.**
***Q.*** What did Professor Kaminska do for Abreezio, as far as you know?
***A.*** **Nothing.**
***Q.*** So should the jury assume that she didn't receive any money when Abreezio was purchased?

***MS. BERNSTEIN:*** Objection. Argumentative.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** Was Professor Kaminska paid when Abreezio was acquired?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Overruled.

***THE WITNESS:*** Yes. She had an equity compensation in the company.

***BY MR. PILCHAK:***

***Q.*** And sitting here today, do you remember what her share of the equity entitled her to when Abreezio was sold?

***A.*** **Best of my recollection, it was less than half a percent, maybe .25 percent. I'm not exactly -- somewhere in that range.**

***Q.*** Okay. Let me change subjects now, and I want to ask you about patent filings.

Okay?

***A.*** **Excuse me, Mr. Pilchak, can I answer that question in terms of the dollar number? Because that's what I do remember.**

***Q.*** Yes, that would be fair.

***A.*** **So the dollar number -- again, to the best of my recollection -- it is somewhere between $250,000 to $300,000 is what she received, based on the value of the company and the share that she had.**

***Q.*** That's the amount that Professor Kaminska received?

***A.*** **Correct.**

*Q.* All right. Now let me ask you about non-provisional patent applications.
Okay?
***A.* Sure.**
*Q.* Did Abreezio file a set of non-provisional patent applications in the summer of 2015?
***A.* Yes, it did.**
*Q.* Do you remember about when that was?
***A.* Could you please repeat the question?**
*Q.* When were the non-provisional patent applications filed for Abreezio, if you remember?
***A.* To the best of my recollection, they were in the July timeframe, early July.**
*Q.* July of 2015?
***A.* July 2015, yeah.**
*Q.* Was Sheida's name on any of those applications?
***A.* It was on two of the non-provisional applications.**
*Q.* And do you know whether either of those two applications resulted in an issued patent?
***A.* One of them did.**
*Q.* Okay. By the way, if we take a step back from just the Abreezio patents for a second, is your name on any issued patents?
***A.* Yes, it is.**
*Q.* How many, do you know?

**A. It's either six or seven.**
*Q.* Are most of them from Abreezio, which we've been talking about during your testimony here?
**A. Yes.**
*Q.* Are there any others?
**A. There is one when I was working at Bell Laboratories. So including that, it is seven, I believe.**
*Q.* Okay. And that Bell Labs patent, who owns the rights to that patent?
**A. Bell Laboratories.**
*Q.* Why?
**A. The assignment -- Invention Assignment Agreement, which binds employees to assign any invention back to the employer.**
*Q.* Okay. Do you own the rights to the Abreezio patents, at least?
**A. No.**
*Q.* Why not?
**A. Abreezio was acquired by Qualcomm, so Qualcomm owns all the rights to the Abreezio patents.**
*Q.* Fair enough.
So let's go back now to these non-provisional patent applications that were filed for Abreezio, I think you said in early July of 2015.
**A. Correct. To the best of my recollection, early July.**
*Q.* Did --

***A.*** **And maybe a week later, July, mid-July timeframe, within that.**

***Q.*** Okay. Did you prepare all those filings yourself or did you engage a patent attorney to help with that?

***A.*** **We had two different patent firms, along with the Brad -- the CTO, Brad Quinton, and his team.**

***Q.*** So they worked on the patent papers as well?

***A.*** **They did.**

***Q.*** All right. Did you also review drafts of the patent papers?

***A.*** **Yes, I did.**

***MR. PILCHAK:*** Let's show the witness and the witness only Exhibit 699, please. And just zoom in.

***BY MR. PILCHAK:***

***Q.*** What is this, Mr. Taneja?

***A.*** **So this is a message from the patent attorney, Stuart Auvinen, and it's a text message from him to me.**

***Q.*** Great.

Is it dated June 25th of 2015?

***A.*** **Yes, it is.**

***Q.*** Do you remember receiving this text?

***A.*** **Sorry, do I remember --**

***Q.*** Receiving this text?

***A.*** **Oh, yes, yes.**

***MR. PILCHAK:*** Move to admit 699, Your Honor.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** 602, 802, 902, 1003, and motion *in limine* 4.

***MR. PILCHAK:*** Not for the truth, Your Honor.

***THE COURT:*** Overruled.

***(Exhibit 699 admitted.)***

***BY MR. PILCHAK:***

***Q.*** All right. So I think the jury can see it there, Mr. Taneja.

Again, who is Stuart, Patent Attorney?

***A.*** **That's the way I had stored his name in my database on the phone, so that's why it appears as that. So Stuart is a patent attorney. His law firm was called G Patent, LLC, if I remember correctly.**

***Q.*** And what is he asking you here?

***A.*** **So he asking was I able to get Sheida's legal name.**

***Q.*** What did you understand him to mean, "Sheida's legal name"?

***A.*** **Her full name, first name and last name.**

***Q.*** What did you understand her legal name to be as of June 25th, 2015?

***A.*** **So as of that date, I understood her legal name to be Sheida Arabi.**

***Q.*** All right. When you -- well, do you know why Stuart, the patent attorney, needed Sheida's full legal name?

***MS. BERNSTEIN:*** Objection. 602.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** What did you do when you got this text message?

***MS. BERNSTEIN:*** Objection. 802.

***THE COURT:*** Overruled.

***THE WITNESS:*** I reached out to Dr. Karim Arabi letting him know that Stuart has asked this question.

***BY MR. PILCHAK:***

***Q.*** What was Dr. Arabi's reaction to that question?

***MS. BERNSTEIN:*** Objection. 602.

***THE COURT:*** Overruled.

***THE WITNESS:*** It wasn't a pleasant one. He was upset that -- why the application can't be considered complete with a signature that does not include the last name.

***BY MR. PILCHAK:***

***Q.*** Why do you say he was upset?

***A.*** **Just the way that conversation went in terms of the tone.**

***MR. PILCHAK:*** So if we could get -- I think we lost it there -- 699 back on the screen.

***BY MR. PILCHAK:***

***Q.*** What is the date of this text message again, sir?

***A.*** **June 25th, 2015.**

***MR. PILCHAK:*** And then if we could show the witness Exhibit 818, which I believe is in evidence already. And zoom in on that certificate.

///

***BY MR. PILCHAK:***

***Q.*** So this is in evidence, Mr. Taneja.

Do you see the registration date down here?

***A.*** **Yes, I do.**

***Q.*** What date is that?

***A.*** **July 14th, 2015.**

***Q.*** Is that about two-and-a-half weeks after that text message from Stuart, Patent Attorney?

***A.*** **Roughly, yeah.**

***MR. PILCHAK:*** Let's take that down. And if we can remove the annotation. Thank you, Ms. Fincher.

Let's show the witness and the witness only Exhibit 731, please. And just kind of zoom in on the top half there.

***BY MR. PILCHAK:***

***Q.*** Is this a series of texts between you and that same telephone number we were just looking at for Stuart, Patent Attorney?

***A.*** **Yes, it is.**

***Q.*** What's the date of these messages?

***A.*** **July 3rd, 2015.**

***THE COURT:*** I believe this is in evidence.

***MR. PILCHAK:*** Oh, 731 is in. Thank you, Your Honor. Very good.

///

***BY MR. PILCHAK:***

***Q.*** All right. So the jury should be able to see that there, Mr. Taneja.

What did you understand Stuart to be asking in that top message?

***A.*** **So he was compiling the complete documents for submission to the Patent Office. And there is an oath that is part of that application process, and so he is pointing out that the -- in the very first message on the first line, he is pointing out that the oath files from Trent, Brad, Andrew, and Sheida are missing.**

**And he's also saying, "Were you going to re-sign using Adobe"?**

***Q.*** What did that mean?

***A.*** **That means using the online electronic signature.**

***Q.*** Okay.

***MR. PILCHAK:*** Let's take the down, just the zoom, please. And if we can zoom in on the bottom half.

***BY MR. PILCHAK:***

***Q.*** Do you see the second message here where you're reporting that you forwarded some for Trent and Sheida?

***A.*** **I do.**

***Q.*** Was Stuart satisfied with those, according to the next text message?

***MS. BERNSTEIN:*** Objection. 602.

***THE COURT:*** Overruled.

***THE WITNESS:*** He was not.

***BY MR. PILCHAK:***

***Q.*** What was the problem, as far as you understood it?

***A.*** **As it says in the following text, he is saying, "I need Sheida to sign again because she did not sign her last name."**

***Q.*** Over the course of Abreezio's life span, did you see more than one document that was supposed to be signed by Sheida where the only signature, electronic or handwritten, was just the word "Sheida"?

***A.*** **Yeah.**

***Q.*** With no last name?

***A.*** **I think if you could trigger my memory by the documents which she signed for the Operating Agreement, the Unit Issuance Document, the Employment Offer, to the best of my recollection, it's only "Sheida." But it would be helpful if...**

***Q.*** We may come back to that as well.

Those were those set of initial legal documents from February of 2015 that you testified about last week?

***A.*** **Yeah, yeah. Those have the signatures.**

***MR. PILCHAK:*** Let's take this down.

***BY MR. PILCHAK:***

***Q.*** Did you spend some time and effort trying to chase down the right signatures for the patent attorney?

***A.*** **Yes.**

***Q.*** And did the applications ultimately get filed?
***A.*** **Yes, they did.**
***MR. PILCHAK:*** Let's show the witness Exhibit 874. I apologize, I didn't note whether this is already in evidence. Very good. I think we can publish because it's in. And if we can zoom in on the top half of this first page.
***BY MR. PILCHAK:***
***Q.*** Do you understand this to be a Patent and Trademark document, Mr. Taneja?
***A.*** **I do.**
***Q.*** And do you see both an application number and a patent number at the top center there?
***A.*** **Yes, I do.**
***Q.*** The fact that there's a number under the patent number, what does that mean to you?
***A.*** **That it is identified with that unique number, and the issued patent has that specific identifier, the number.**
***Q.*** So does that mean that a patent issued on this application?
***A.*** **Yes.**
***Q.*** All right.
***MR. PILCHAK:*** And if we could go to page 42 of this document, please, and zoom in on the top half of this page.
***BY MR. PILCHAK:***
***Q.*** Do you see a list of inventors there, sir?
***A.*** **I do.**

*Q.* Who's the first name?
***A.* That's me.**
*Q.* And who are the last two names, please?
***A.* Sheida Alan, Bozena Kaminska.**
*Q.* That last one is the same Professor Kaminska you were just testifying about; right?
***A.* It is.**
*Q.* Did she provide any specific input, as far as you know, to this application?
***A.* Not to the best of my knowledge.**
*Q.* Do you have any understanding of why her name is on this document?
***A.* Dr. Karim Arabi said she was mentoring Sheida when she was coming up with these provisional patents.**
*Q.* Okay. And then let's turn to Sheida, similar questions for her.
Did you receive any direct input from Sheida on this application?
***A.* I did not.**
*Q.* Did she provide any technical advice to the ideas that are in this application, as far as you know?
***A.* No.**
*Q.* So why is her name on here?
***A.* It is referring to the ideas from the provisional patent.**
*Q.* And so in your view -- you're not a patent lawyer; right?

**A. I'm not.**
Q. But in your view as the CEO of Abreezio, does this application and issued patent kind of piggyback on the original provisionals that had Sheida's name on them?
***MS. BERNSTEIN:*** Objection. Leading.
***THE COURT:*** Overruled.
***THE WITNESS:*** Yes, it does.
***BY MR. PILCHAK:***
Q. Is that why Sheida's name is on here?
**A. Yes. That's -- again, I'm not a patent lawyer, but that's my...**
Q. And why is your name first?
**A. Dr. Karim Arabi wanted my name to go first.**
Q. Do you have any idea why?
**A. Brad Quinton, Trent, Andrew, these folks had a Statement of Work arrangement with Abreezio. So it's not like they were direct employees of Abreezio, though Brad had an offer as a CTO of Abreezio. So it just was a way to make the ownership of the patent an Abreezio patent.**
Q. To kind of solidify its connection --
**A. Solidify, yes, yes.**
Q. You have to wait until I finish my question before you answer.
***MR. PILCHAK:*** All right. I think we can take that down.

***BY MR. PILCHAK:***

***Q.*** You were testifying a minute ago about a June 2015 meeting up at Abreezio's offices in Sunnyvale; right?

***A.*** **June 24th, yes.**

***Q.*** Was there also a meeting at Qualcomm the first week of July 2015?

***A.*** **There was.**

***Q.*** What was the purpose of that meeting, if you remember?

***A.*** **So if this meeting is referring to the meeting that Brad and I had with Mohamed Allam.**

***Q.*** Who is Mohamed Allam?

***A.*** **Mohamed Allam was a Senior Technical Engineer at Qualcomm.**

***Q.*** Okay. And why did you need to meet with Mr. Allam?

***A.*** **So I got a call from Abreezio Chairman, Behrooz Abdi, saying that he met with Mohamed Allam. He pointed out that his time when he was at Qualcomm -- Behrooz is a former SVP of Qualcomm at that time -- and he had an overlap with Mohamed Allam, so he knows him back from those days.**

**He met with him, and Mohamed Allam had key concerns about the viability of the Abreezio technology. In response to that, he asked me that Brad and I need to fly out and have a very deep technical discussion with Mohamed Allam to address his concerns.**

***Q.*** So Mr. Allam had concerns about the technology?

***A.*** **Correct, according to Behrooz.**

***Q.*** And you were trying to allay those concerns?

***A.*** **That's correct.**

***Q.*** By the way, do you know -- you mentioned Mr. Abdi already knew Mr. Allam from the old days at Qualcomm; right?

***A.*** **That's what he told me.**

***Q.*** Do you know whether there was any relationship between Mr. Quinton and Mr. Allam?

***A.*** **Yes.**

***Q.*** What is that?

***A.*** **So I believe they both worked at PMC, PMC Sierra, that's another semiconductor company -- or was a semiconductor company. And second linkage point they had was when Brad started the company Invionics, of which he was the CEO, he had reached out to Mohamed Allam to help him with getting Qualcomm to listen to their Invionics pitch, eventually, Qualcomm becoming a customer of his product called Invio.**

***Q.*** And so that bit of the story had nothing to do with Abreezio; right?

***A.*** **No.**

***Q.*** That was before Abreezio.

***A.*** **This is before Abreezio.**

***Q.*** And so if we can turn, then, to the Abreezio part of the story for this meeting that you mentioned with Mr. Allam.

***A.*** **Yeah.**

***Q.*** What were Mr. Allam's concerns about Abreezio, just at a high level?

***MS. BERNSTEIN:*** Objection. 802.

***THE COURT:*** Overruled.

***THE WITNESS:*** So at a very high level, he was concerned that the technology will not be very practical. And once the sensor technology specifically was implemented, the overhead, the cost of implementing that, versus the benefit would not materialize. That's the way I understood his concerns to be.

***BY MR. PILCHAK:***

***Q.*** According to what Mr. Abdi told you?

***A.*** **Mr. Abdi's was a very high-level description, saying he has key technical concerns.**

***Q.*** Fair enough.

***A.*** **Yeah.**

***Q.*** And so as Abreezio's CEO, did you go into this meeting with Mr. Allam and say, You're right, it's a bad product, we should shut our company down?

***A.*** **No, absolutely not.**

***Q.*** What did you do?

***A.*** **So Brad and I went. I started the introduction to Abreezio, giving a high-level overview of what Abreezio was all about. And then we turned over to Brad Quinton, who went into a very deep technical description.**

***Q.*** And so for the technical discussion with Mr. Allam, fair to say Brad led that part of the conversation?

***A.*** **Absolutely, yes.**

***Q.*** During or at the end of the meeting, was there ever a time that you told Mr. Allam that you were aware of his prior meeting with Mr. Abdi?

***MS. BERNSTEIN:*** Objection. 802.

***THE COURT:*** Just one minute. Sustained.

***BY MR. PILCHAK:***

***Q.*** The question, to be precise, is did you tell Mr. Allam that you were aware of his meeting with Mr. Abdi?

***MS. BERNSTEIN:*** Objection, 802.

***THE COURT:*** I'll allow that.

***THE WITNESS:*** Yes.

***BY MR. PILCHAK:***

***Q.*** To the best of your recollection, what did you tell Mr. Allam?

***MS. BERNSTEIN:*** Objection. 802.

***THE COURT:*** I'll allow it.

***THE WITNESS:*** I told Mr. Allam that -- I was trying to give the context of how this meeting came about, and mentioned that to him, made a callback to the meeting that Behrooz had with him, and I mentioned that -- something along the lines that Behrooz has briefed me about his meeting with you, and we are here to address your technical concerns.

***BY MR. PILCHAK:***

***Q.*** By the way, a couple of months before this meeting, was there ever a time when you told Mr. Quinton not to share

anything about Sheida with Mr. Allam?

**A. Yes, upon receiving a phone call from Dr. Karim Arabi.**

***MR. PILCHAK:*** Let's show the witness Exhibit 703, which I think is in evidence. And we can zoom in on all the available text, please. Well, maybe let's just do the top half. Sorry. It's still a little small.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, sir?

**A. I do.**

***Q.*** Is this another text string between you and someone else?

**A. Yes, correct.**

***Q.*** Who's the other party here?

**A. Brad Quinton.**

***Q.*** When you say you "Confirmed with SA," who are you talking about?

**A. Dr. Karim Arabi.**

***Q.*** And when you say "Not to share anything with Mohamed," who is Mohamed?

**A. Mohamed Allam.**

***Q.*** And then you mention, "Qualcomm's keeping the engagement highly confidential to avoid IP contamination."

What is "IP contamination"?

**A. So basically what it means is, let's say Qualcomm is working on a technology to solve the same problem. Abreezio's also working on a different technology to solve the same problem.**

**And large companies, in particular in the tech industry that I am familiar with, tend to be very cautious, that they don't want to face the risk that a small company presents their ideas to them, what we are working on, and later comes back saying that you have copied their ideas. That's what it means by "contamination."**

***Q.*** Because that can be a liability risk.

***A.*** **Correct.**

***Q.*** In this case, though, you go on to reiterate to Mr. Quinton, "Do not mention Sheida's name," right?

***MS. BERNSTEIN:*** Objection. Leading.

***MR. PILCHAK:*** I withdraw the question, Your Honor.

***THE COURT:*** I'll allow it.

***MR. PILCHAK:*** Sorry, Your Honor.

***BY MR. PILCHAK:***

***Q.*** What do you mean by "Sheida's name"?

***A.*** **Dr. Karim Arabi's name.**

***Q.*** Why would Mr. Quinton mentioning Karim Arabi's name to Mohamed Allam cause an IP contamination?

***A.*** **So the way the text is stated does not accurately describe what the intent was. So I was at -- Brad and I were both in San Diego, visiting Qualcomm, I believe. And I got a call from Dr. Karim Arabi saying that he's been trying to get hold of Brad and he has not been answering his phone, can you reach out to him and text him.**

**And he mentioned that all three of them were contemporaries at PMC Sierra, so he is going to go meet with him, most likely for Invionics discussion. And he did not want his name to come up, and that he should not even mention Abreezio on the grounds of this IP contamination.**

***Q.*** And so are you testifying this business about withholding Dr. Arabi's name has nothing to do with IP contamination?

***A.*** **Yes.**

***Q.*** And --

***A.*** **I am. What I'm saying is the real reason was, as Dr. Arabi had told me, that his name should not come up with Mohamed Allam, and shield his involvement.**

***Q.*** Then why did you use the words "highly confidential to avoid IP contamination"?

***A.*** **This was the excuse, I should say, not the reason. This is the excuse that Dr. Arabi had asked when I communicated with Mr. Brad Quinton.**

***MR. PILCHAK:*** All right. Let's take that down, please. And if we could remove the annotation, please.

Can we show the witness and the witness only Exhibit 615? And then we have two attachments.

***BY MR. PILCHAK:***

***Q.*** But if you can see that there, Mr. Taneja, look at that.

Is this an email from the email address Sheida.Alan@gmail.com?

**A. Yes, it is. Mr. Pilchak, I can just go back to your previous question real quick?**
*Q.* Do you have more to say?
**A. I just want to clarify.**
*Q.* Well, hang on. I have to ask questions here.
**A. Okay.**
*Q.* Are you trying to clarify the concept of IP contamination or the purpose for your writing that text message?
**A. I think it's probably -- I think it's articulated well enough. That's fine.**
*Q.* Let's focus on Exhibit 615, then.
Do you see this email here?
**A. Yes, I do.**
*Q.* Who is the recipient of this email?
**A. Myself.**
*Q.* And how many attachments does it have?
**A. Two attachments.**
***MR. PILCHAK:*** If we could take that down. And let's show the witness maybe Exhibit 616A. Nope. Well, let's try 615A. I apologize, Your Honor.
***THE COURT:*** Actually, while we're doing that, maybe we should take a break at this time.
***MR. PILCHAK:*** Oh, that's fine.
***THE COURT:*** Is that all right?
***MR. PILCHAK:*** Thank you.

**THE COURT:** Okay. Ladies and gentlemen, let's take a 15-minute recess. You're reminded you're not to discuss the case or do any research about the case. If you could be back in 15 minutes.

**(Jury out at 10:24 a.m.)**

**THE COURT:** Okay. We're now outside the presence of the jury.

Any issues we need to take up?

**MR. PILCHAK:** No, Your Honor.

**MS. BERNSTEIN:** No, Your Honor.

**THE COURT:** Fifteen minutes. Fifteen minutes, sir. Thank you.

**(Recess taken.)**

**THE COURT:** Okay. We are back on the record. All jurors are present. Dr. Arabi and the lawyers are present. And you, sir, are reminded you're still under oath to tell the truth.

Mr. Pilchak?

**MR. PILCHAK:** Thank you, Your Honor.

Mr. Taneja, before the break, we were looking at a couple of documents on the monitor. Maybe we could get for the witness only Exhibit 615 back up. And zoom in on the email there.

**BY MR. PILCHAK:**

**Q.** Do you recall this email from right before the break,

Mr. Taneja?

**A. Yes, I do.**

***MR. PILCHAK:*** And then let's look at 615A and B.

***BY MR. PILCHAK:***

***Q.*** Is this a one-page document, sir?

**A. Correct.**

***Q.*** I'm sorry, a two-page document. My bad.

***MR. PILCHAK:*** Thank you, Mr. Maybury. Can we see the second page? All right. And then 615B, please.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, sir?

**A. I do.**

***Q.*** Do you understand these to be the attachments to that email we were just looking at, at Exhibit 615?

**A. Correct.**

***MR. PILCHAK:*** Move to admit 615, 615A, and 615B.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No objection.

***THE COURT:*** They may be admitted.

***(Exhibits 615, 615A, and 615B admitted.)***

***MR. PILCHAK:*** Let's have the email back, Mr. Maybury, Exhibit 615 with a zoom on the text.

***BY MR. PILCHAK:***

***Q.*** So where did this email come from, Mr. Taneja?

**A. Dr. Karim Arabi.**

***Q.*** From the Sheida.Alan@gmail.com address?
***A.*** **That's right.**
***Q.*** By September the 21st of 2015, what did you understand Sheida's legal name to be?
***A.*** **Sheida Alan.**
***Q.*** All right. And where it says in the subject line, "Provisional Acks," do you know what an "ack" is?
***A.*** **Acknowledgement.**
***Q.*** Acknowledgment of what?
***A.*** **Acknowledgement that the patent -- the U.S. Patent and Trademark Office is acknowledging that the application has been filed.**

***MR. PILCHAK:*** All right. Let's take that down and look at 615A, please.

***BY MR. PILCHAK:***
***Q.*** Do you see that there, sir?
***A.*** **Yes, I do.**
***Q.*** Is this one of the two acks that was attached to that email?
***A.*** **Correct.**
***Q.*** And if we zoom in on the center there, where it says "correspondence address and first named inventor," who is listed here?
***A.*** **Sheida Alan.**
***Q.*** With the same Sheida.Alan Gmail address that we just saw sending that email?

**A. Correct.**

***MR. PILCHAK:*** And if we take that down and look at 615B, and the same zoom, please.

***BY MR. PILCHAK:***

***Q.*** Is it the same information here in this document?

**A. Yes.**

***MR. PILCHAK:*** Now, if I can, I'd like to show you a different document on the document camera here that I believe is already admitted in evidence. This is Exhibit 830.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, sir?

**A. I do.**

***Q.*** Do you understand this to be a provisional patent application with this number here ending in '072?

**A. Yes.**

***Q.*** And who's the listed name for the filer or the inventor there in the upper left?

**A. Sheida Arabi.**

***Q.*** And if I turn your attention to page 14 of Exhibit 830, do you see a similar document to what we were just looking at?

**A. Yes, I do.**

***Q.*** Is this also an ack, or acknowledgment receipt?

**A. It is.**

***Q.*** And if we look again at the first page, which I'll just hold up here, where it says "U.S. Patent and Trademark Office," does

that mean to you that is this the official copy of the submitted application?

***MS. BERNSTEIN:*** Objection. 602.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** All right. Are you familiar with the U.S. Patent and Trademark Office?

***A.*** **At a high level.**

***Q.*** Okay. And let me direct your attention again to page 14.

Does this appear to have the same kind of information as the ack that we were just looking at that was emailed to you by Dr. Arabi?

***A.*** **Yes, it does.**

***Q.*** But what about when we get down to the first named inventor part, do you see that?

***A.*** **Yeah.**

***Q.*** Who's listed at the first named inventor here?

***A.*** **Sheida Arabi.**

***Q.*** And what is Ms. Arabi's email address?

***A.*** **Sheida.Arabi1@gmail.com.**

***Q.*** And that's in Exhibit 830. If I hold up on the same screen Exhibit 615A, which we were just looking at, and I'm just going to kind of fold it through the center of the exhibit here so that it has two columns; right? And I'm going to fold off that left-hand column.

***A.*** **Okay.**

***Q.*** And I'm going to hold it up next to Exhibit 830.

Do you see that there?

***A.*** **I do.**

***Q.*** Do those names look the same to you?

***A.*** **They do not.**

***Q.*** Do the email addresses look the same to you?

***A.*** **They do not.**

***Q.*** All right. And this one in 615A was under this email in Exhibit 615.

***MR. PILCHAK:*** Can we show the witness 615 one last time?

***BY MR. PILCHAK:***

***Q.*** And who did you receive this email from, sir?

***MS. BERNSTEIN:*** Objection. Asked and answered.

***THE COURT:*** Sustained.

***MR. PILCHAK:*** All right. Let's take that down, please.

***BY MR. PILCHAK:***

***Q.*** During the due diligence process, did Qualcomm ask some questions about Sheida's experience?

***A.*** **Yes.**

***Q.*** Did they ask about her employment history?

***MS. BERNSTEIN:*** Objection. 802.

***THE COURT:*** Overruled.

***THE WITNESS:*** Yes.

***MR. PILCHAK:*** Let's show the witness Exhibits 617 and 618, please.

***BY MR. PILCHAK:***

***Q.*** First 617, is this an email exchange between you and that same Sheida address that we were just looking at?

***A.*** **It is.**

***MR. PILCHAK:*** And then let's take that down and just show the witness 618 quickly, please.

***BY MR. PILCHAK:***

***Q.*** Is this a different email exchange with that same email address?

***A.*** **You mean the contents of this versus the other one?**

***Q.*** Yes.

***A.*** **Could I request you to quickly flash that one more time? I'm sorry.**

***Q.*** Yeah. Let me ask about Exhibit 617 first, if that's an email between you and the same address.

***MR. PILCHAK:*** We would move to admit 617, please.

***THE COURT:*** Any objection to 617?

***MS. BERNSTEIN:*** No objection, Your Honor.

***THE COURT:*** 617 may be admitted.

***(Exhibit 617 admitted.)***

***MR. PILCHAK:*** Thank you, Your Honor.

***BY MR. PILCHAK:***

***Q.*** All right. The date of this email is October the 7th;

right, Mr. Taneja?
**A. Yes, it is.**
*Q.* And in substance -- well, before I ask you in substance, look at the bottom message.
Who wrote that?
**A. I did.**
*Q.* Where did you get these two questions that are numbered in your email to this Sheida email account?
**A. From Qualcomm due diligence.**
*Q.* So Qualcomm asked you those questions?
**A. Correct.**
*Q.* And then you turned around and sent them where?
**A. To this -- to Dr. Karim Arabi.**
*Q.* At this Sheida email account?
**A. At the Sheida email account.**
*Q.* And if we look at the top there, on October the 7th, did you get a response back from that account?
**A. I did.**
*Q.* And what did that email account tell you in response to those questions?
**A. So there were two questions being asked. And this response says that the answer to both the questions is no.**
*Q.* Does it go on to say, "I did not want to work with any employer"?
**A. That's right.**

***MR. PILCHAK:*** All right. Let's take that down. And if you could remove the annotation, please, Ms. Fincher.

Let's show the witness and the witness only Exhibit 618.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, sir?

***A.*** **I do.**

***Q.*** The last email was dated October 7th, but this one is dated what?

***A.*** **It is dated October 8th.**

***MR. PILCHAK:*** Move to admit 618.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** 403, cumulative.

***THE COURT:*** Overruled.

***(Exhibit 618 admitted.)***

***BY MR. PILCHAK:***

***Q.*** And do you see that on there your screen, Mr. Taneja?

***A.*** **Yes.**

***Q.*** Is this the same message from you on the bottom of this email with the questions from Qualcomm?

***A.*** **It is.**

***Q.*** And did you receive a very similar response from the Sheida email account on top?

***A.*** **I did.**

***Q.*** But is there a difference in the second sentence of this

email?

**A. There is.**

*Q.* What is the difference?

**A. This one says, "I did not work with any employer." The previous one said, "I did not want to work with any employer."**

*Q.* All right. Did you forward some version of this response on to the due diligence team at Qualcomm?

**A. I believe so.**

*Q.* In response to their questions?

**A. In response to their questions.**

***MR. PILCHAK:*** All right. Let's look at Exhibit 72, please, just for the witness. Thank you, Ms. Fincher.

***BY MR. PILCHAK:***

*Q.* And can you read that on your screen?

**A. If you can zoom in. I'll just put my other glasses.**

*Q.* That's all right.

***MR. PILCHAK:*** Let's zoom in on the bottom half, please.

***THE WITNESS:*** I can read it now, yeah.

***BY MR. PILCHAK:***

*Q.* Is that the same -- well, one of the two versions of the message chain with the Sheida box?

**A. Correct.**

***MR. PILCHAK:*** And if we take that down and zoom in on the top.

///

***BY MR. PILCHAK:***

***Q.*** Do you then forward this email?

***A.*** **I did.**

***MR. PILCHAK:*** Move to admit 72.

***MS. BERNSTEIN:*** No objection, Your Honor.

***THE COURT:*** 72 may be admitted.

***(Exhibit 72 admitted.)***

***MR. PILCHAK:*** All right. Let's take that zoom down. And if we can zoom from the top down to where it says, "Regards, Sheida."

Thank you, Mr. Maybury.

***BY MR. PILCHAK:***

***Q.*** All right. Mr. Taneja, on the bottom, do you see that message coming in from Sheida.Alan?

***A.*** **I do.**

***Q.*** Which version of the two emails is that?

***A.*** **The second version.**

***Q.*** And then what do you do with that email?

***A.*** **I forwarded it to Hiten Somwal at Qualcomm.**

***Q.*** And Mr. Somwal was your point person for the diligence?

***A.*** **He was.**

***MR. PILCHAK:*** All right. Can we show the witness and the witness only Exhibit 619, please?

***BY MR. PILCHAK:***

***Q.*** After the name change, did Sheida have to re-sign some other

documents?

**A. She had to.**

***Q.*** Do you see this email chain here?

**A. Yes.**

***Q.*** Is this between you and that same email box?

**A. Correct.**

***Q.*** And you see there's an attachment there; right?

***MR. PILCHAK:*** Can we show the witness Exhibit 620?

***BY MR. PILCHAK:***

***Q.*** Do you --

**A. I --**

***Q.*** Sorry.

**A. I see it.**

***Q.*** Do you understand that to be the attachment to this email?

**A. I do.**

***MR. PILCHAK:*** Move to admit 619 and 620.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No objection to either.

***THE COURT:*** 619 and 620 may be admitted.

***(Exhibits 619 and 620 admitted.)***

***MR. PILCHAK:*** Let's go back to the email, please, Mr. Maybury, and zoom in on the text.

***BY MR. PILCHAK:***

***Q.*** All right, Mr. Taneja. First I want to ask you about the email on the bottom.

Do you see that?
**A. I do.**
Q. What's the date of that email?
**A. October 22nd, 2015.**
Q. What happened eight days after that email?
**A. Abreezio got acquired by Qualcomm.**
Q. And so is this a little over a week before the acquisition date?
**A. That's correct.**
Q. What are you asking the Sheida email box in substance here?
**A. Essentially, change the signature to correspond to her new legal name.**
Q. And so you're asking for a re-signature on that same document?
**A. Re-signature on the same document, yeah.**
Q. When was the original document signed?
**A. 17th February 2015.**
Q. How can you tell?
**A. It says in the email.**
Q. It says in the email three times, doesn't it?
**A. Right.**
Q. If we count the response on top?
**A. Yeah.**
Q. So did you get a response back from this email box?
**A. To the best of my recollection, I did, yes.**

*Q.* Well, are we looking at it right here?

**A. Yes, at the attachment.**

*Q.* All right. And before we go to the attachment, what did you understand the sender of this email to mean when they said, "The intended effective date is February 17th"?

***MS. BERNSTEIN:*** Objection. 701, 702.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

*Q.* Why was it important to you to ask this email box on the bottom that by signing, you acknowledge the effective date is the same?

**A. Because in the absence of the effective date going back to February 17th, the assignment of the patent to Abreezio by Sheida would not be valid if it was not effective this date.**

*Q.* And so you wanted to create a clear record that the rights in that patent went back as far as possible in Abreezio's favor?

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** I'll allow it.

***THE WITNESS:*** Correct.

***BY MR. PILCHAK:***

*Q.* Why was that important to you, as the CEO of Abreezio?

**A. To protect Abreezio's intellectual property.**

***MR. PILCHAK:*** All right. And if we look at Exhibit 620, the attachment to that email, and just zoom in on the top half.

***BY MR. PILCHAK:***

***Q.*** Is this that re-signed Patent Assignment Agreement?

***A.*** **That's right.**

***Q.*** And do you see on the second line there it now says "Sheida Alan"?

***A.*** **It does.**

***Q.*** And if we go to the second page, do you see a signature there purportedly for Ms. Alan?

***A.*** **I do.**

***Q.*** All right. This document is not notarized; right?

***A.*** **Correct.**

***Q.*** Did you later get a notarized version of this Patent Assignment?

***A.*** **I don't exactly recall, but if is there a document that you could help trigger my memory.**

***MR. PILCHAK:*** Let's show the witness and the witness only Exhibit 621. And zoom in on kind of the tap half there down where it says "Alex Luk, Notary Public."

***BY MR. PILCHAK:***

***Q.*** Is this an email chain involving you, sir?

***A.*** **Yes, it is.**

***Q.*** And where it says "Subject assignment of patent," does it look like that's what this is about?

***A.*** **That's right.**

***MR. PILCHAK:*** And then if we can just show the

witness 622 quickly. And if we could go to page 2.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, sir?

***A.*** **I do.**

***Q.*** All right. What is that?

***A.*** **That's a signature of the -- that's notarized with the notary signing the --**

***Q.*** Okay.

***MR. PILCHAK:*** Move to admit 621 and 622.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No objection.

***THE COURT:*** They both may be admitted.

***(Exhibits 621 and 622 admitted.)***

***MR. PILCHAK:*** All right. Let's look at 621 first.

***BY MR. PILCHAK:***

***Q.*** Is this the cover email for that notarized Assignment?

***A.*** **Yes.**

***MR. PILCHAK:*** And if we zoom in on the top half down to the Alex Luk signature.

***BY MR. PILCHAK:***

***Q.*** Who did you understand Alex Luk to be?

***A.*** **Based on the context of the email I received, a notary.**

***Q.*** But have you ever met that guy?

***A.*** **No.**

***Q.*** Okay. You're just reading the email?

**A. Yeah, based on this email.**
***Q.*** And it's forwarded to you from which email account at the top here?
**A. Sheida.Alan@gmail.com.**
***MR. PILCHAK:*** And Mr. Maybury, let's do the same thing. Take this down, and go to 622, page 2, please. And just zoom in on all the available text here.
***BY MR. PILCHAK:***
***Q.*** What did you understand this to be, Mr. Taneja?
**A. This is the notarized version of that document.**
***Q.*** So the same signed document we saw two exhibits ago?
**A. That's right.**
***Q.*** But now it has all this extra language underneath?
**A. Correct.**
***Q.*** And when you say "notarized," what does it mean to get something notarized?
***MS. BERNSTEIN:*** Objection. 701, 702, 602.
***THE COURT:*** Sustained.
***BY MR. PILCHAK:***
***Q.*** Have you ever gotten anything notarized before?
**A. I have.**
***Q.*** Once or more than once?
**A. More than once.**
***Q.*** And when you get something notarized, what is your understanding of what that means?

**A. That's authenticating the identity, as you're required to show a valid government-issued ID.**
***Q.*** Okay. In this case, why did anyone have Sheida Alan go to the trouble of getting this notarized?
***MS. BERNSTEIN:*** Objection. 602, 701, 702.
***THE COURT:*** Sustained.
***BY MR. PILCHAK:***
***Q.*** Do you know why Sheida Alan got this notarized, yes or no?
**A. I do not.**
***Q.*** Did you ask her to get it notarized?
***MS. BERNSTEIN:*** Objection. 602.
***THE COURT:*** Overruled.
***THE WITNESS:*** I don't recall.
***MS. BERNSTEIN:*** Objection. 602.
***THE COURT:*** Overruled.
***BY MR. PILCHAK:***
***Q.*** Did Qualcomm ask for a notarized copy of this document?
***MS. BERNSTEIN:*** Objection. 602.
***THE COURT:*** Overruled. If you know.
***THE WITNESS:*** Very possible. Though if there is a document that can help trigger my memory to be definite.
***MR. PILCHAK:*** All right. Let's take that down.
***BY MR. PILCHAK:***
***Q.*** Do you recall a discussion around insurance for Abreezio?
**A. Yes, I do.**

***Q.*** And was it a condition of the deal, meaning the acquisition by Qualcomm, that Abreezio had to have certain kinds of insurance?
***A.*** **Yes.**
***Q.*** What kind of insurance?
***A.*** **So I first learned about it from Abreezio Chairman Behrooz Abdi. There is something called a Director and Officers Insurance.**
***Q.*** And what is that?
***A.*** **So that is to protect the directors and the officers of the company against any personal liability in case there was a subsequent claim made by the buyer of Abreezio.**
***Q.*** The buyer in this case being Qualcomm?
***A.*** **Being Qualcomm.**
***Q.*** Okay. And did you say that kind of insurance was required by the terms of the deal?
***A.*** **There was a specific requirement on the minimum liability insurance that Abreezio had to have. As far as the original idea about the D&O insurance, whether it was Qualcomm that mandated it or it was my Chairman who said we need to get that, that part, I don't remember.**

***MR. PILCHAK:*** All right. Let's show the witness and the witness only Exhibit 628. And zoom in on the top half, please.

///

***BY MR. PILCHAK:***

***Q.*** Is this a discussion between you and three people on October the 19th of 2015?

***A.*** **Yes, it is.**

***Q.*** Who is the top message from?

***A.*** **From myself.**

***MR. PILCHAK:*** Move to admit 628.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No objection.

***THE COURT:*** 628 may be admitted.

***(Exhibit 628 admitted.)***

***MR. PILCHAK:*** All right. And let's take that down, just the zoom, please, and zoom in on the bottom half.

***BY MR. PILCHAK:***

***Q.*** Do you see that message from you on the bottom there, sir?

***A.*** **I do.**

***Q.*** When you write at 11:12 a.m. you spoke with Alliant, who is Alliant?

***A.*** **Alliant was the name of the -- one of the insurance carriers, the primary one.**

***Q.*** For the same kind of insurance that you were just talking about?

***A.*** **Yes.**

***Q.*** And when you were writing, "Stick with 15M or up it to 20M," is that 15 or 20 million?

**A. Yes.**
*Q.* And on that question, what did Mr. Abdi say?
**A. To go for 20 million.**
***MR. PILCHAK:*** All right. Let's take that down and zoom in on the top half, please.
***BY MR. PILCHAK:***
*Q.* Do you see the message from you on top?
**A. I do.**
*Q.* What did you write in that first sentence?
**A. That I spoke with Sheida. What I meant was Dr. Karim Arabi. And it goes on to say, "He is also of the view that we go with $20 million. I will instruct Alliant accordingly and get the paperwork started."**
*Q.* Why did you write "He is also of the view"?
**A. Referring to Dr. Karim Arabi.**
*Q.* But if you're calling Dr. Karim Arabi "Sheida," shouldn't you have written "she"?
**A. Like we said the other day, on Wednesday, it's hard to keep that straight.**
*Q.* Okay. Let me ask you this: When it says, "Spoke with Sheida," did you actually have a conversation with Dr. Arabi about this insurance question?
**A. Yes.**
***MR. PILCHAK:*** Okay. Let's take that down.
///

***BY MR. PILCHAK:***

***Q.*** Let me zoom out from that specific question about the insurance and ask you about the diligence process more generally.

Did Qualcomm ask a whole series of questions to Abreezio?

***A.*** **Yes.**

***Q.*** Were you the point person for most of those questions?

***A.*** **For those questions, yes.**

***Q.*** Did you discuss any of those questions with Dr. Arabi?

***A.*** **Yes.**

***Q.*** One or more than one?

***A.*** **More than one.**

***MR. PILCHAK:*** Let's show the witness Exhibit 627, please. And zoom in on the top half.

***BY MR. PILCHAK:***

***Q.*** Is this another email from you, sir?

***A.*** **Yes, it is.**

***Q.*** Around about exactly the same time?

***A.*** **Correct.**

***MR. PILCHAK:*** Move to admit 627.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** No objection, Your Honor.

***THE COURT:*** 627 may be admitted.

***(Exhibit 627 admitted.)***

***MR. PILCHAK:*** Take down the zoom, please. If we could

go to the bottom of that first -- no, we need to go to page 2. I apologize. All right. And zoom in on that text, please, Mr. Maybury.

***BY MR. PILCHAK:***

***Q.*** Do you see the original message here, sir?

***A.*** **I do.**

***Q.*** Who is that from?

***A.*** **From Hiten Somwal.**

***Q.*** And what did you understand -- the subject line of the email is "Investors;" right?

***A.*** **That's right.**

***Q.*** What did you understand Mr. Somwal to be asking about Abreezio's investors?

***A.*** **So he wanted to get a better understanding of this investment firm, and specifically, are there any connections of the investor, this investment firm, to any of the employees or management.**

***Q.*** And then he asked whether they have a website?

***A.*** **Oh, yes, and they do ask in the next sentence that they were not able to see anything online, so they were asking for a website.**

***MS. BERNSTEIN:*** Objection. 802. Move to strike.

***THE COURT:*** Overruled?

***BY MR. PILCHAK:***

***Q.*** Did TechVC have a website?

**A. Not to the best of my knowledge.**

*Q.* Before we look at the emails on the prior page, which like many of the chains we've seen, this is the beginning of the chain; right?

**A. That's right.**

*Q.* So the other emails are replies or forwards or whatever?

**A. Correct.**

*Q.* Before we look at those, do you have a memory of ever answering Mr. Somwal's question by saying, "Oh, TechVC is Akbar Shokouhi"?

***MS. BERNSTEIN:*** Objection. Argumentative.

***THE COURT:*** Overruled.

***THE WITNESS:*** I never said that. I don't have any memory of saying that.

***BY MR. PILCHAK:***

*Q.* Any particular reason why you wouldn't put this to bed by saying TechVC is mostly Akbar Shokouhi?

**A. So about September timeframe, roughly, as part of the due diligence, I was creating an email for an individual by the name Angeline Trang, who worked at Akbar's company, Encore Semiconductor. And she was going to serve as the contact for handling all the finance-related queries about Abreezio.**

**So I asked Akbar Shokouhi that I'll create an account for Angeline on the Abreezio domain, just like the other folks, like, Angeline@Abreezio.com.**

*Q.* And what did Mr. Shokouhi say in response to that suggestion?

***A.*** **So Mr. Shokouhi said that Qualcomm cannot know about Encore Semiconductor.**

*Q.* Did you have any understanding as to why?

***A.*** **That was the first time I learned about the attempt to do a concealment of Encore Semi from Qualcomm. And as I said, it was roughly around September timeframe, maybe August, roughly in that range.**

*Q.* And Encore Semi, whose company is that?

***A.*** **I understood it to be Mr. Akbar Shokouhi's company.**

*Q.* Did you later learn of the reason why Mr. Shokouhi didn't want Qualcomm to find out about Encore Semi's involvement in Abreezio?

***A.*** **Yes.**

*Q.* What was that reason?

***A.*** **Akbar had left Qualcomm on very unfriendly terms.**

*Q.* Do you know why?

***A.*** **It was not shared with me at that time.**

*Q.* All right. Then I'll pause my question.

Let me direct your attention back to 627, which is on the screen here.

So this is Mr. Somwal's question; right?

***A.*** **Correct.**

*Q.* And specifically, at the end of that first paragraph, he

says, "Are there any connections to any of the employees or management;" right?

***A.*** **Correct.**

***Q.*** Does he identify which company's employees or management?

***A.*** **He does not identify.**

***MR. PILCHAK:*** Let's take that down and go to page 1. And zoom in on the bottom half, please.

***BY MR. PILCHAK:***

***Q.*** This little squib message at the bottom, it just says "thanks."

Do you see that?

***A.*** **Yeah.**

***Q.*** What were you doing in that message, if you remember?

***A.*** **I was getting guidance and input from Behrooz, and I believe Akbar and Dr. Karim Arabi.**

***Q.*** Okay. And is there a response from Mr. Abdi there?

***A.*** **There is.**

***Q.*** What did you understand his response to be suggesting?

***A.*** **So he was suggesting that there is -- he interpreted the question about connection to employees/management to be connection of TechVC or the investors to anyone at Qualcomm management or Qualcomm employees. And that's where he says, "Absolutely no connection to anyone at Qualcomm."**

***Q.*** Did you understand this to be a sort of suggested response from Mr. Abdi?

**A. He was the Chairman, yes.**

*Q.* Sorry. There was an objection.

***MS. BERNSTEIN:*** Objection. Leading. Withdrawn.

***BY MR. PILCHAK:***

*Q.* Where Mr. Abdi says, "A bunch of private money, including Behrooz and other friends," do you see that?

**A. I do.**

*Q.* Where in that sentence does he call out that Akbar is one of the other friends?

**A. He does not.**

*Q.* And then in the next sentence where he says, "Absolutely no connection to anyone at Qualcomm," does he ever suggest to tell Qualcomm that there were a number of connections to people at Qualcomm?

**A. On the contrary, he says, "Absolutely no connection."**

*Q.* And where he says, "It's more like Angel money than a VC," what is a VC?

**A. A venture capital firm. My understanding of the key distinction is that they would be writing, relatively speaking, a larger-sized check when they fund a company compared to an Angel investor, who would be writing a smaller-sized investment in the earlier stages. And there may be other differences also, but at the very high level, that's my understanding.**

*Q.* Okay. So "VC" means Venture Capital?

**A. Yes.**

***Q.*** And when it says "Angel money," is that consistent with the early marketing materials that Abreezio presented to Qualcomm?

***A.*** **Correct.**

***MR. PILCHAK:*** Let's take down that zoom and pick up the top half of the conversation, please. A little farther if you could, Mr. Maybury. Thank you, sir.

***BY MR. PILCHAK:***

***Q.*** All right. Do you see that bottom message in the zoom at 10:14 a.m.?

***A.*** **I do.**

***Q.*** Who did you understand that you were receiving that email from?

***A.*** **Dr. Karim Arabi.**

***Q.*** And does he suggest that Mr. Somwal might be asking about a different connection?

***A.*** **Yes.**

***Q.*** What connection is he focused on?

***A.*** **With Abreezio management and employees.**

***Q.*** So a connection between TechVC and Abreezio?

***A.*** **Correct.**

***Q.*** Okay.

***MR. PILCHAK:*** I think we can take that down.

***BY MR. PILCHAK:***

***Q.*** Did anyone at Qualcomm ever ask to speak with Sheida?

***A.*** **They ask me for a phone number.**

***Q.*** And did you arrange a three-way call with Sheida that you participated in?
***A.*** **No.**
***Q.*** Did you set up a meeting with Sheida in person?
***A.*** **No.**
***Q.*** But did you send them a phone number for Sheida?
***A.*** **I provided the phone number to Hiten.**
***Q.*** Where did you get -- I think if I understood your testimony right, you've never had a phone call with Sheida; right?
***A.*** **Correct.**
***Q.*** So where did you get Sheida's phone number to send it to Mr. Somwal?
***A.*** **Dr. Karim Arabi.**
***Q.*** And do you know, sitting here today, whether Mr. Somwal ever reached out to Sheida?
***A.*** **Not to the best of my knowledge.**
***Q.*** Did Qualcomm also ask for Sheida's résumé or a curriculum vitae?
***A.*** **Yes, it did.**
***Q.*** Curriculum vitae, is that one of those annoying Latin words?
***A.*** **Yeah.**
***Q.*** Do people call it "CV" sometimes?
***A.*** **Yes.**
***Q.*** If I say "résumé" instead of "CV," will you know what I'm talking about?

**A. Yes.**
*Q.* Are they the same thing, in your mind?
**A. In my mind, they are the same thing.**
*Q.* Okay. Do you know why they wanted Sheida's résumé?
**A. I think it was only natural for a buyer --**
***MS. BERNSTEIN:*** Objection. 602.
***THE COURT:*** Sustained.
***BY MR. PILCHAK:***
*Q.* Let me ask a different question.
What did you do when Qualcomm asked you for Sheida's résumé?
**A. I reached out to Dr. Karim Arabi.**
*Q.* Did you use that same Sheida.Alan@gmail.com address we've been looking at?
**A. Yes. Either that or the Sheida Arabi one. Most likely this one.**
***MR. PILCHAK:*** Let's show the witness Exhibit 662, which I believe is previously in evidence. Zoom in on the text, please.
***BY MR. PILCHAK:***
*Q.* Do you see that there, Mr. Taneja?
**A. I do.**
*Q.* This one actually says résumé and CV, if you look at the subject and the attachment; right?
**A. Yeah.**
*Q.* Okay. So do you understand Sheida's CV to be attached to

this email?
***A.*** **Yes.**
***Q.*** And then there's some other text in this email in the center there; right?
***A.*** **Correct.**
***Q.*** Do you have an understanding of why this email includes that information?
***A.*** **Yes.**
***Q.*** What is that?
***A.*** **That is to clear the IP of any encumbrances of some other third party claiming ownership on it, which would be a concern for Qualcomm.**
***Q.*** And what is an encumbrance?
***A.*** **More like a -- in a layman word, I meant more -- it will be an additional challenge for Qualcomm to worry about.**
***Q.*** Okay. And so when this email writes, "I haven't signed any work contract with any company," do you see that?
***A.*** **I do.**
***Q.*** Does that suggest a clean IP trail?
***A.*** **Correct.**
***Q.*** No encumbrances?
***A.*** **No encumbrances.**
***Q.*** And then when it says, "I haven't signed any assignments of IP rights documents;" right?
***A.*** **Correct.**

***Q.*** Is that the same idea?
***A.*** **Same idea.**
***Q.*** And then the last sentence there, "My current field of research," can you read that, please?
***A.*** **"My current field of research at SFU is related to nanotechnology for nanomedia, which is quite distinct and does not overlap with Abreezio's business or field of interest."**
***Q.*** You testified last week that nanotech and inkjet printing are not related to Abreezio's tech and products; right?
***A.*** **I did.**
***Q.*** Does this sentence seem consistent with that?
***A.*** **It is consistent with that.**
***Q.*** And as the CEO of Abreezio, why would it be important to tell or show Qualcomm that what Sheida was working on at SFU is different from the products that Abreezio has?
***A.*** **Conflict of interest.**
***Q.*** What about the clean IP trail that we were just talking about?
***A.*** **Clean IP trail, yes.**
***Q.*** Why would it be helpful for that?
***A.*** **So if there was an ongoing research in an area which was having an overlap with the Abreezio's business, it could potentially bring up questions of IP contamination and not make it very clean.**
***MR. PILCHAK:*** All right. Let's look at 663, please.

And if we could take down those annotations. Thank you.

***BY MR. PILCHAK:***

***Q.*** Is this the résumé that was attached to that email?

***A.*** **Yes.**

***MR. PILCHAK:*** Let's zoom in on the top half.

***BY MR. PILCHAK:***

***Q.*** There's an address there, right, for Ms. Alan?

***A.*** **There is.**

***Q.*** What is the phone number that this document lists for her?

***A.*** **Sorry, I don't see a phone number on this one.**

***Q.*** So no phone number?

***A.*** **No.**

***Q.*** What does it list for a way for someone to contact Ms. Alan?

***A.*** **An email, Sheida.Alan@gmail.com.**

***Q.*** Other than physically going to Erickson Drive in Burnaby, British Columbia, is that the only way to contact Ms. Alan at the top of this résumé?

***A.*** **That's right.**

***Q.*** All right. And I don't want to ask you about every piece of information on this page, but let me ask you this: Do you know whether the information in this résumé is accurate or inaccurate?

***MS. BERNSTEIN:*** Objection. 602.

***THE COURT:*** Overruled.

***MR. PILCHAK:*** If you know.

***THE WITNESS:*** I do not.

***BY MR. PILCHAK:***

***Q.*** Did you do anything to investigate it?

***A.*** **I did not.**

***Q.*** But did you nevertheless flip this résumé to the good people at Qualcomm?

***A.*** **I did.**

***Q.*** If we take that down, Mr. Taneja, and we consider the entire course of Abreezio's lifespan, did you ever mislead Qualcomm about Abreezio?

***A.*** **Yes, I did.**

***Q.*** How did you do that?

***A.*** **By concealing Dr. Karim Arabi's involvement.**

***Q.*** What about the history of the company? Did you also make some statements that weren't quite right about that?

***A.*** **That is correct.**

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Overruled.

***MR. PILCHAK:*** Let's show the witness Exhibit 64, which I think is previously admitted. All right. And zoom in on the bottom half there, please, from the July 1 message from Mr. Somwal.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, Mr. Taneja?

***A.*** **I do.**

***Q.*** What is this, in summary?

***A.*** **These are simple questions about the background of the company, how many people, who are the investors, and the -- not specifically just the investors, but also the shareholders, which is what it's referring to by the cap table.**

***Q.*** Okay.

***A.*** **And the total invested capital.**

***Q.*** Did you understand that Mr. Somwal was asking these questions as part of the Qualcomm due diligence?

***MS. BERNSTEIN:*** Objection. 602, 802, 701, 702.

***THE COURT:*** Overruled.

***THE WITNESS:*** I did.

***BY MR. PILCHAK:***

***Q.*** And did you provide responses to these questions?

***A.*** **I did.**

***MR. PILCHAK:*** Let's take that down and zoom in on the top half.

***BY MR. PILCHAK:***

***Q.*** There's a number of documents that you attach to your top message here; right? Looks like two?

***A.*** **That's right.**

***Q.*** Is there a PowerPoint is the first one?

***A.*** **It's referring to a response to the questions and a copy of the business slides, not sure in what order, but...**

***Q.*** Yeah. Okay. But the first one says PPTX is the file name.

Does that sound like slides to you?

***A.*** **Yes.**

***Q.*** And then the second one that ends in docx, what is the file name for that?

***A.*** **"Abreezio response to Qualcomm questions."**

***MR. PILCHAK:*** And if we could look at Exhibit 66, please, which is already in evidence, I believe.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, sir?

***A.*** **I do.**

***Q.*** What is this document?

***A.*** **So this is a response to the questions that Hiten had asked. And if I may just give a little bit more context to this?**

***Q.*** Did you prepare this document?

***A.*** **I drafted the document at Dr. Arabi's specific instructions. So receiving these questions, there was an email from Brad Quinton and Dr. Karim Arabi, also using the Sheida address, suggesting that we need to meet to discuss the post-acquisition strategy, *et cetera.***

**So when that discussion happened, Dr. Karim Arabi was concerned that Qualcomm would do a very rigorous scrutiny as part of the due diligence if the company is very new. So he wanted Brad and I to structure a certain response and both of us be on the same page.**

**And the second thing had to do with who were the founders of**

**the company, how did Brad and I meet, because Brad and I had not met until Dr. Arabi had introduced us. So that is the context leading up to this -- that discussion had already happened.**

*Q.* And from your conversation with Dr. Arabi, did it seem to you like he was eager for Qualcomm to know that he had introduced you to Brad Quinton?

*A.* **No, not at all.**

***MR. PILCHAK:*** All right. Let's zoom in on the top half of this page, from No. 1 to No. 2. Perfect.

***BY MR. PILCHAK:***

*Q.* Do you see that there, Mr. Taneja?

*A.* **I do.**

*Q.* First you provide two different year-founded answers; right?

*A.* **Correct.**

*Q.* Why did you tell, in response to a question about Abreezio, when Invionics was founded?

*A.* **So this goes back to the context I was just describing, because of the concern I mentioned about the relative newness of the company. So Dr. Karim Arabi wanted us to convey that Abreezio and Invionics already have a verbal agreement to come together as a single company. And, therefore, instead of simply saying Abreezio was formed in February 2015, that we could also add on to it that the Invionics company was formed in September 2013.**

*Q.* And you're answering these questions in July of 2015; right?

***A.*** **That's right.**
***Q.*** So if you had said, We just created Abreezio in February of 2015, that would be, like, five months ago?
***A.*** **Correct.**
***Q.*** In your experience working with companies in the tech space, is it easier or harder to get $180 million for your company if it was just founded five months ago?
***A.*** **Harder.**
***Q.*** Why?
***A.*** **The value of the company is both a function of the development of the technology and a validation of the value by customers.**
***Q.*** And did Abreezio have any customers?
***A.*** **No. So five months would be a very short time. I just wanted to complete me -- yeah. So five months would be a very short time to make those happen.**
***Q.*** All right. And let me ask you about some of the specific language here.
Where it says in No. 1, "Basic technology development started with the formation of Invionics in 2013," do you see that?
***A.*** **I do.**
***Q.*** Had you even heard of Abreezio in 2013?
***A.*** **No.**
***Q.*** Do you have any way of knowing whether Abreezio's technology

development started when Invionics was formed in 2013?
**A. No.**
*Q.* The next sentence says, In September of 2014, Behrooz Abdi and you recognized the huge potential of Abreezio's two products; right?
**A. It says that.**
*Q.* Did you meet with Behrooz Abdi and talk about Abreezio in September of 2014?
**A. The first time I met Behrooz Abdi was in February of 2015.**
*Q.* The same month that Abreezio was created.
**A. Correct.**
*Q.* So why does this paragraph that you emailed, right, why does it say, in September of '14, you and Abdi recognized the potential of Abreezio's products?
**A. So it was part of the narrative that Dr. Arabi had instructed Brad Quinton and I to outline to Qualcomm as part of justifying that Invionics 2013 date is a reflection of Abreezio not being that old, and the fact that this would have kind of bridged the -- that -- that the two of us had met and that it would make sense to combine the companies.**
*Q.* Okay. Then there's a reference in paragraph 2 to "Abreezio and Invionics having a signed, legally binding definitive agreement."
Do you see that?
**A. Yes.**

*Q.* Can you tell the jury what that signed, legally binding definitive agreement looked like in July of 2015?
***A.* So a signed, legally binding definitive agreement would mean that both the parties, Abreezio and Invionics, have a contract with each other officially signed whereby all Invionics employees will transfer to Abreezio.**
*Q.* Yes.
And my question is, did that agreement exist in July of 2015?
***A.* No, it did not.**
*Q.* So why did you write that in this paragraph?
***A.* So Dr. Karim Arabi told me that he had reached a verbal agreement with Mr. Brad Quinton to have this combination, including the price.**
*Q.* The price for Abreezio's services?
***A.* Price for -- that would be paid to Invionics to become part of Abreezio.**
*Q.* That's what I meant to say. Thank you.
But this doesn't talk about a verbal agreement, does it?
***A.* It does not.**
*Q.* So just to be clear, the signed, legally binding definitive agreement referenced here did not exist at this time.
***A.* Correct. To the best of my knowledge, it did not.**
*Q.* All right. Second-to-last sentence in that paragraph, "Abreezio solely owns full IP rights for its entire technology

and product portfolio," right?

***A.*** **Right.**

***Q.*** Why is it important to make that claim?

***A.*** **Again, for the same reason. The buyer doesn't want any encumbrances related to the IP ownership so that it is clean.**

***MR. PILCHAK:*** Okay. I think we can take that down. And if you could remove the annotations. Thank you, Ms. Fincher.

***BY MR. PILCHAK:***

***Q.*** Do you recall Mr. Somwal also asking for a cap table?

***A.*** **I do.**

***Q.*** And sorry if you've already said it, what is a cap table?

***A.*** **A cap table essentially will list out the individuals or companies who have a share in this specific company, Abreezio, for that -- Abreezio's cap table.**

***Q.*** All right.

***A.*** **And the percentage of their ownership.**

***Q.*** Did you give him a cap table the first week of July 2015?

***A.*** **Don't remember the exact date, but I think we had given them two different versions of the cap table. One was further refined to have more details later on.**

***MR. PILCHAK:*** Let's show the witness and the witness only Exhibit 881. I don't think this one is in. Just zoom in on the top half, Mr. Maybury.

///

***BY MR. PILCHAK:***

***Q.*** Do you see that there, sir?

***A.*** **Yes.**

***Q.*** Is this a text chain that you were on?

***A.*** **Yes.**

***Q.*** And who are you corresponding with?

***A.*** **Behrooz Abdi.**

***MR. PILCHAK:*** All right. Move to admit 881.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** 902, 1003, Motion *In Limine* 4.

***THE COURT:*** Overruled.

***(Exhibit 881 admitted.)***

***BY MR. PILCHAK:***

***Q.*** All right. First of all, what's the date of this text string, Mr. Taneja?

***A.*** **September 9, 2015.**

***Q.*** So was that a little less than two months before the deal closed?

***A.*** **Yes.**

***Q.*** Why are you texting to Mr. Abdi, "S is on board with 196 and not breaking into two components"?

***A.*** **I was relaying to him Dr. Karim Arabi's position on the acquisition price that we may receive eventually.**

***Q.*** So this is about the price negotiation for Abreezio?

***A.*** **This is -- yes.**

*Q.* And so "S" equals who?

***A.* "S" equals Dr. Karim Arabi.**

*Q.* And what does "196" mean?

***A.* $196 million.**

*Q.* All right. What about, "Not breaking into two components"?

***A.* To the best of my recollection, it's referring to a cash component at the time of signing, plus deferred earnouts, as they call it.**

*Q.* All right. When the deal actually closed, do you remember whether Abreezio was paid a full 180 million on Day 1 of closing?

***A.* No. It was not paid.**

*Q.* Was some money held back?

***A.* Some money was held back.**

*Q.* All right. Let me ask you about this second-to-bottom message in the zoom here.

Do you see that?

***A.* I do.**

*Q.* Who wrote that message?

***A.* Mr. Behrooz Abdi.**

*Q.* And where he writes, "BTW, please scrub the file," do you know what file he's talking about?

***A.* Yes. He is talking about the cap table.**

*Q.* The cap table that we were just mentioning a moment ago?

***A.* That's right.**

***Q.*** What did you understand -- well, why did you understand that the cap table should be scrubbed in this text message?
***A.*** **So the cap table had been edited by Behrooz Abdi, Dr. Karim Arabi, and there could have been others. So he wanted to conceal that and was instructing me --**
***MS. BERNSTEIN:*** Objection. 602, 802.
***THE COURT:*** Overruled.
***THE WITNESS:*** -- he was instructing me to change the file properties so that they point only to me and possibly the lawyer.
***BY MR. PILCHAK:***
***Q.*** What lawyer?
***A.*** **The law firm that we had engaged, Procopio, to represent us in the transaction.**
***Q.*** So Abreezio hired its own law firm in the transaction?
***A.*** **That's right.**
***Q.*** Got it.
And without asking you about what Mr. Abdi intended, would it have been a concern for you if Qualcomm got a cap table, opened it up, and saw Dr. Arabi's been editing this cap table?
***A.*** **Yes.**
***Q.*** Why would that have concerned you?
***A.*** **Qualcomm would have found out about Dr. Arabi's involvement and possibly pulled the plug.**
***MR. PILCHAK:*** All right. Let's take that down, please,

and we can remove the annotation.

Let's show the witness Exhibit 73, which I think is already in. And zoom in on the top half, please.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, sir?

***A.*** **I do.**

***Q.*** Is this an email from you to Mr. Somwal?

***A.*** **Yes, it is.**

***Q.*** And where the subject says, "Project Windansea cap table," what do you understand that to mean?

***A.*** **So Qualcomm had sort of a project name so that it doesn't become common knowledge within the company. It's very common. Most company do that. So it's a cap table of Abreezio.**

***Q.*** Got it.

And did you attach a cap table here?

***A.*** **Yes.**

***MR. PILCHAK:*** Let's look at Exhibit 74, please. There we go. Thank you, Mr. Maybury.

***BY MR. PILCHAK:***

***Q.*** So Exhibit 74 looks like an Excel file to me.

Is that what it looks like to you, sir?

***A.*** **Yes, it does.**

***Q.*** And does it list in Column A, B, and C -- well, forget about the columns.

Does it list a number of people who are invested in the

company?

***A.*** **It does.**

***Q.*** Is that, like, the purpose of a cap table?

***A.*** **That is.**

***Q.*** I want to ask about some of these lines here.

Do you see line 8?

***A.*** **I do.**

***Q.*** Is that you?

***A.*** **That's me.**

***Q.*** And what is your title, according to this cap table?

***A.*** **Founder/CEO.**

***Q.*** And I know you've testified a number of times, you were the CEO of Abreezio; right?

***A.*** **Correct.**

***Q.*** Did you also consider yourself a founder of Abreezio?

***A.*** **Not in -- depends on how you define what a founder is.**

***Q.*** Why does it say "founder" right here, if you know?

***A.*** **In this case, it is intended to conceal from Qualcomm who the true founder is.**

***Q.*** Who's the true founder?

***A.*** **As we have talked, Dr. Karim Arabi has been involved from the very idea inception through the eventual exit.**

***Q.*** All right. I want to ask about another person who's listed on here as the founder.

***MR. PILCHAK:*** Can we highlight line 15, please,

Mr. Maybury?

***BY MR. PILCHAK:***

***Q.*** Whose line is line 15?

***A.*** **Sheida Alan.**

***Q.*** What percentage of Abreezio does Sheida own, according to this cap table?

***A.*** **64 percent.**

***Q.*** Now, there's kind of a description there in Column E; right? What is that?

***A.*** **It says, "Seed investment. Parted ways, not employed with the company due to lack of vision alignment. Contributed to initial idea. Assigned all IP rights and full ownership to Abreezio. Additional units equal to the unallocated future employee pool to be granted upon COC."**

***Q.*** What is "COC"?

***A.*** **COC refers to change of control; in other words, company being bought.**

***Q.*** Mr. Taneja, where did this language come from?

***A.*** **From Dr. Karim Arabi.**

***Q.*** And where it says "seed investment" for Sheida, do you see that?

***A.*** **I do.**

***Q.*** What does that even mean?

***A.*** **Seed investment would typically refer to --**

***MS. BERNSTEIN:*** Objection. 702, 701.

***THE COURT:*** I'll allow it.

***THE WITNESS:*** Seed investment would typically refer to the capital that is provided in the very beginning when the company is being formed, like a seed being planted.

***BY MR. PILCHAK:***

***Q.*** Capital, like money?

***A.*** **Capital. In some cases, it could be money. In some cases, it could be the opportunity cost for foregoing a paid amount. But typically it means money.**

***Q.*** All right. You were the CEO of Abreezio.

***A.*** **Yeah.**

***Q.*** Are you aware of Sheida Arabi or Alan ever contributing any capital to Abreezio?

***A.*** **I'm not aware of any direct capital investment other than the half a million dollars from TechVC.**

***Q.*** Which was not Sheida's money?

***A.*** **Which was not Sheida's money.**

***Q.*** Okay.

***A.*** **Not Sheida's money.**

***Q.*** To be fair, though, this description goes on to say, "Contributed to initial idea, assigned all IP rights and full ownership to Abreezio;" right?

***A.*** **That's right.**

***Q.*** But let me ask you about the part before that. Where it says, "Parted ways, not employed with the company due to lack of

vision alignment," what does that even mean?

***A.*** **So the direction that she wanted to go versus the direction the company was going.**

***Q.*** What was the direction that she wanted to go?

***A.*** **This was -- this is just a made-up statement that doesn't really reflect anything real.**

***Q.*** Let me ask you about things that were real.

Did you ever take a decision at Abreezio that Sheida disagreed with?

***A.*** **Sheida had no input on any decision.**

***Q.*** Okay. And I think we went over this before, but if you can, just in one sentence, what did she do to justify this 64 percent that she received?

***MS. BERNSTEIN:*** Objection. Asked and answered.

***THE COURT:*** I'll allow it.

***MR. PILCHAK:*** Thank you.

***THE WITNESS:*** Contributed to the initial idea, assigned all IP rights and full ownership to Abreezio.

***MR. PILCHAK:*** And then if we could scooch over to the left there, Mr. Maybury. Thank you, sir. And just scroll up a little bit. I want to highlight lines 9 through 11.

***BY MR. PILCHAK:***

***Q.*** Do you see those there, Mr. Taneja?

***A.*** **I do.**

***Q.*** It looks like each of those people received .02 percent in

the company.

Is that your memory?

**A. That's correct.**

**Q.** Who are those three people?

**A. These were hired engineers who were hired in San Diego to support the Qualcomm engagement.**

**Q.** And did they actually work on the Qualcomm engagement?

**A. They did.**

**Q.** So they did hands-on work with the tech and the software?

**A. Not necessarily being on site. To the best of my recollection, none of them were on site at Qualcomm, unlike Dan Hoggar. But they were doing support work.**

**Q.** But they were real engineers who did real engineer stuff.

**A. That's right.**

**Q.** And they got .02 percent.

**A. That's right.**

***MR. PILCHAK:*** All right. Let's take that down.

***BY MR. PILCHAK:***

**Q.** At the beginning of your testimony, sir, you testified about having pled guilty in this case; right?

**A. I did.**

**Q.** Did you sign something called a Plea Agreement?

**A. I did.**

**Q.** Does your Plea Agreement promise certain benefits to you?

**A. It does.**

*Q.* What are those benefits, in your own words?
**A. So provided I live up to the -- my end of the Plea Agreement, which is to tell the truth, the -- there are -- No. 1, the wire fraud charge will be dismissed. And the max statute time will be reduced to 10.**
**And upon completion of the cooperation, the Government will make an evaluation whether to file a substantial motion -- whether to file a motion for substantial assistance. And it is up to the judge to decide what my final fate is going to be.**
*Q.* This judge right here?
**A. Yes.**
*Q.* And I want to ask you, you said something about 10 years.
The crimes that you were charged with carried a maximum penalty of as much as 20 years; right?
**A. Correct.**
*Q.* The charge that you pled guilty to, is it your understanding that's a 10-year statutory maximum?
**A. That's right.**
*Q.* So that's one benefit.
**A. That's right.**
*Q.* The other thing that you mentioned a substantial assistance motion.
Has anybody promised you a specific reduction that you will receive based on your cooperation in this case?
**A. Not at all.**

***Q.*** But are you hoping for such a motion?
***A.*** **I definitely am hoping for leniency.**
***Q.*** And so as part of this Agreement, what are the promises that you made?
***A.*** **To tell the truth.**
***Q.*** Did you also agree to forfeit some money?
***A.*** **I did.**
***Q.*** Specifically, does that include $7.2 million that was seized from you?
***A.*** **That's right.**
***Q.*** And did you agree to pay something called restitution up to $10 million?
***A.*** **I did.**
***Q.*** What is restitution, in your own words?
***A.*** **To compensate for the loss to Qualcomm.**
***Q.*** I think you already said it, but the Government's promises in this case, do they depend on you doing something?
***A.*** **Yes.**
***Q.*** And what is that?
***A.*** **Just tell the truth.**
***Q.*** What happens to your Agreement if you don't tell the truth, as far as you know?
***A.*** **The Agreement will be null and void. You could literally tear the Agreement apart.**
***THE COURT:*** We have a request for a quick break, so why

don't we take a quick recess.

**MR. PILCHAK:** All right.

**THE COURT:** If anybody has to go to the bathroom, now would be a good time to go. The rest of you can stay here. We'll just take a quick recess for anyone who has to take a bathroom break.

***(Recess taken.)***

**THE COURT:** Okay. We are back on the record. All jurors are present. Dr. Arabi and the attorneys are present. And you are still under oath to tell the truth.

Mr. Pilchak?

**MR. PILCHAK:** Thank you, Your Honor.

***BY MR. PILCHAK:***

***Q.*** Mr. Taneja, right before that short break, you were testifying about some money that you'd agreed to forfeit.

Do you remember that?

***A.*** **Yes.**

***Q.*** And I think you said you'd agreed to forfeit $7.2 million; right?

***A.*** **That's right.**

***Q.*** Does the Government seize some money from you in this case?

***A.*** **Yes.**

***Q.*** Was it over $7.2 million?

***A.*** **Yes.**

***Q.*** And I want to ask, were certain funds returned to you after

they were seized from you?
**A. Yes.**
*Q.* Do you remember about how much that was?
**A. About a million dollars.**
*Q.* And do you know why that money was returned to you?
**A. They were not related to the Abreezio transaction.**
*Q.* Meaning it was money from something else?
**A. Money from others, yes.**
*Q.* All right. I'm going to put that to the side and ask you about the closing of the deal in Abreezio.
Okay?
**A. Yes.**
*Q.* Was there ultimately a final agreement with Qualcomm to buy Abreezio?
**A. Yes.**
*Q.* Do you remember what that document was called?
**A. The Unit Purchase Agreement.**
***MR. PILCHAK:*** And can we show the witness and the witness only Exhibit 549, please? And zoom in on the text.
***BY MR. PILCHAK:***
*Q.* Is this an email that you sent?
**A. Yes.**
*Q.* On October 23rd, 2015?
**A. Correct.**
***MR. PILCHAK:*** Move to admit 549.

***MS. BERNSTEIN:*** No objection, Your Honor.

***THE COURT:*** It may be admitted.

***(Exhibit 549 admitted.)***

***BY MR. PILCHAK:***

***Q.*** So how close to the closing is this email?

***A.*** **Just about a week.**

***Q.*** And who did you intend to contact with you sent this message?

***A.*** **Dr. Karim Arabi.**

***Q.*** What was the good news?

***A.*** **I don't recall anything specific, what this good news was.**

***MS. BERNSTEIN:*** Objection. 602.

***THE COURT:*** The answer may stand.

***BY MR. PILCHAK:***

***Q.*** All right. Let me stop you there, Mr. Taneja.

Under the Unit Purchase Agreement, how much did Qualcomm agree to pay?

***A.*** **Roughly around $180 million.**

***Q.*** And you've already testified that some amount of it was held back; right?

***A.*** **As an indemnity holdback, correct.**

***Q.*** Can you remind us how much that was?

***A.*** **About 24, $25 million. The net payment to Abreezio was around $150 million.**

***Q.*** So 150 million out the door on October 30th?

*A.* **Correct.**
*Q.* And then somewhere between 25 and 30 held back off of that?
*A.* **I think there was some transaction expenses, like, the $4 million that was owed to Invionics for the acquisition of Invionics by Abreezio. So excluding those expenses, about 25 million is to the best of my recollection what was held back.**
*Q.* Okay. And without getting all into the legalese with you, you called it an indemnity holdback?
*A.* **That's right.**
*Q.* I just want to ask, do you know if there's any circumstances under which Qualcomm wouldn't have to pay the rest of the money that it had held back?
*A.* **Yes.**
*Q.* What's one of those circumstances?
*A.* **Fraud.**
*Q.* So if Qualcomm determined that it had been defrauded, what would it do with the rest of the money?
*A.* **It didn't have to pay back.**
*Q.* And do you remember how long the holdback period was?
*A.* **Close to 24 months, I think.**
*Q.* About two years?
*A.* **Two years, yeah.**
***MR. PILCHAK:*** We can take that down. Thank you, Mr. Maybury.

**BY MR. PILCHAK:**

**Q.** So you were the CEO of Abreezio.

**A. Yes.**

**Q.** On paper, who had actual management control of that company?

**A. Dr. Karim Arabi.**

**Q.** No, I mean on paper, if you look at the legal documents.

**A. Sorry. I misunderstood.**

**The Board of Managers of Abreezio, which included Behrooz Abdi, Brad Quinton, and myself.**

**Q.** And who owned most of the shares in Abreezio?

**A. On paper, Sheida Alan.**

**Q.** In practice, though, did it seem to you like Abreezio was Sheida's company?

***MS. BERNSTEIN:*** Objection. Asked and answered.

***THE COURT:*** Overruled.

***THE WITNESS:*** Not the real Sheida's company.

**BY MR. PILCHAK:**

**Q.** And you've testified you never met the real Sheida; right?

**A. Correct.**

**Q.** Who picked Abreezio's name?

**A. Dr. Karim Arabi.**

**Q.** Who hired you as CEO?

**A. Dr. Karim Arabi.**

**Q.** Who brought in Akbar Shokouhi and TechVC?

**A. Dr. Karim Arabi.**

***Q.*** Who brought in Behrooz Abdi?
***A.*** **Dr. Karim Arabi.**
***Q.*** Who found Bozena Kaminska to serve on the Advisory Board?
***A.*** **Dr. Karim Arabi.**
***Q.*** Who decided where Abreezio would incorporate?
***A.*** **Dr. Karim Arabi.**
***Q.*** Who hired Invionics to do engineering work for Abreezio?
***A.*** **Dr. Karim Arabi.**
***Q.*** Who hired Brad Quinton as the CTO?
***A.*** **Dr. Karim Arabi.**
***Q.*** Who set the share allocation for who was going to get what shares in Abreezio?
***A.*** **Dr. Karim Arabi.**
***Q.*** Was there any major decision at Abreezio that you're aware of that Dr. Arabi was not involved in?
***A.*** **None that I am aware of.**
***Q.*** And for all those decisions that Dr. Arabi was involved in, can you remember any time that Abreezio decided to do something that Dr. Arabi disagreed with?
***A.*** **I do not remember any such happening.**
***Q.*** When the deal closed on October 30th of 2015, how much were you paid?
***A.*** **Roughly around $10 million.**

***MR. PILCHAK:*** I would like to show the witness and the witness only Exhibit 712, please, as redacted. Did I say 612?

Sorry. I meant 612. Thank you, Mr. Maybury. And zoom in on the text we can see there.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, Mr. Taneja?

***A.*** **I do.**

***Q.*** Is this an email that you sent on November 1st of 2015?

***A.*** **Correct.**

***MR. PILCHAK:*** Move to admit 612.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** Excuse me, Your Honor. No objection to this exhibit.

***THE COURT:*** 612 may be admitted.

***(Exhibit 612 admitted.)***

***BY MR. PILCHAK:***

***Q.*** All right. What had happened the day before you sent this email, Mr. Taneja?

***A.*** **The acquisition of Abreezio by Qualcomm.**

***Q.*** And so you're sending this email to that same Sheida.Alan email box that you've testified about at some length this morning?

***A.*** **That's right.**

***Q.*** Why did you write to that email account addressed to Sheida, thanking Sheida again for her breakthrough technology contributions?

***A.*** **Dr. Karim Arabi had asked me to send such an email.**

***Q.*** Why did you believe it might be helpful to send such an email?

***A.*** **To continue the fictional narrative that Dr. -- that Sheida Alan was the founder of the company. And --**

***Q.*** Sorry. I cut you off.

***A.*** **And the inventor of the provisional patents.**

***Q.*** And do you see at the bottom here where you say you will look Sheida up if you ever travel to British Columbia?

***A.*** **Yes.**

***Q.*** Did you ever do that?

***A.*** **No.**

***MR. PILCHAK:*** I think we can take that down, and remove the annotations, please.

***BY MR. PILCHAK:***

***Q.*** Mr. Taneja, did you get invited to a dinner to celebrate the deal closing?

***A.*** **No, I did not.**

***Q.*** Are you aware whether there was such a dinner?

***A.*** **There was.**

***Q.*** Who was at the dinner?

***A.*** **I learned --**

***MS. BERNSTEIN:*** Objection. 602.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** Did you ever talk to Dr. Arabi about the dinner?

**A. It came up in a coffee sync-up Dr. Arabi and I were having.**

*Q.* And what did Dr. Arabi tell you?

**A. So the context was Dr. Arabi was sharing with me that Akbar was upset that he had not made enough money. And in that context, he described that Akbar, Ziad, and himself, along with their spouses, had a closing dinner.**

*Q.* And did Dr. Arabi describe to you Dr. Arabi's response to Akbar's complaint about not being paid enough?

**A. Yes.**

*Q.* What did he say that he'd said?

**A. He said, Akbar doesn't realize that he has to pay Ziad millions.**

*Q.* Akbar doesn't realize that who had to pay Ziad millions?

**A. Dr. Karim Arabi.**

*Q.* Did it sound to you like Dr. Arabi was joking when he said that?

**A. No.**

*Q.* What was your reaction to Dr. Arabi saying that?

**A. As I mentioned -- or perhaps this hasn't come up yet. But later in the stages of the acquisition, maybe at a September timeframe, I had learned that Ziad was being addressed by Karim and --**

***MS. BERNSTEIN:*** Objection, Your Honor. This is narrative and nonresponsive.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** I don't want to ask you about that piece of the story.
I wanted to ask, at this moment, after the deal closed, when Dr. Arabi made that statement to you, what was your reaction?

***A.*** **Somewhat of a surprise, not at all a surprise.**

***Q.*** Did you say anything to Dr. Arabi when he said that?

***A.*** **I did not.**

***Q.*** All right. Were there any other signals to you or clues to you during the Abreezio deal that maybe Mr. Mansour was more involved than you knew about?

***A.*** **Yeah.**

***Q.*** And what was one of those?

***A.*** **So I learned -- timeframe, I'm not sure whether it was September, October, August, somewhere in that timeframe -- that Ziad was being addressed by the pseudonym "Mitch."**

***Q.*** Mitch.
Was that Ziad's middle name?

***A.*** **No.**

***Q.*** Who was addressing him as "Mitch"?

***A.*** **Karim and Akbar. When it first came up -- when I first heard a reference to Mitch.**

***Q.*** Did you at one point address Mr. Mansour as Mitch in some correspondence?

***A.*** **Not to the best of my understanding on -- maybe is there a document that might help clarify my -- trigger my memory a**

**little bit.**

***Q.*** All right. Let me ask you this: Did you have an understanding as to why anyone would refer to Mr. Mansour as Mitch?

***A.*** **I believed it was for the same reason as using the alias "Sheida" for Dr. Karim Arabi.**

***Q.*** All right. But to be fair, nobody explicitly told you that.

***A.*** **Correct.**

***Q.*** All right. After the acquisition of Abreezio by Qualcomm, did you get hired by Qualcomm yourself?

***A.*** **So as part of the agreement, yes, for a six-month period.**

***Q.*** And is that how long you were at Qualcomm?

***A.*** **That's right.**

***Q.*** Why did you leave at the end?

***A.*** **It was a six-month contractual assignment.**

***Q.*** So you didn't get fired; you just reached the end of your term?

***A.*** **That's right.**

***Q.*** Did you later learn that there was some kind of internal investigation at Qualcomm about the Abreezio deal?

***A.*** **Yes.**

***Q.*** When was that?

***A.*** **May 2017.**

***Q.*** And how did you first learn of it?

***A.*** **Phone call from Dr. Karim Arabi.**

***Q.*** What did Dr. Arabi tell you?

***A.*** **He said that Qualcomm had initiated an internal investigation, and that they were being very aggressive. They have gotten this completely wrong. They have confused his involvement with my earlier request for him to serve as an advisor for a startup that I was contemplating forming with a Stanford professor.**

***Q.*** So in Dr. Arabi's explanation, Qualcomm was barking up the wrong tree?

***A.*** **Correct.**

***Q.*** How did he sound when he said that to you, meaning what was his tone or demeanor like?

***A.*** **Very, very upset.**

***Q.*** And did he deny -- well, let me withdraw that.

What was your reaction?

***A.*** **Honestly, I was a little nervous.**

***Q.*** Did Dr. Arabi want you to do anything?

***A.*** **Nothing specifically that I remember.**

***Q.*** In that phone call.

***A.*** **On that phone call.**

***Q.*** Did you -- how did you leave things with Dr. Arabi on that phone call?

***A.*** **I don't recall.**

***Q.*** Did you travel to San Diego sometime thereafter?

***A.*** **Yes.**

*Q.* How long after that phone call, if you remember?
**A. It may have been within a week or two.**
*Q.* And why were you in San Diego?
**A. I was at that time advising a company called FemtoDX. And I had facilitated a meeting with the CEO of that company with Ziad Mansour to see if Qualcomm could be a potential investor in FemtoDX.**
*Q.* And so you were coming to town to meet with Mr. Mansour?
**A. Correct.**
*Q.* Did it come about that you also met with Mr. -- I'm sorry -- Dr. Arabi on that visit?
**A. Yes. I got a phone call from Dr. Arabi. He had found out that I was going to be in town and he wanted to meet with me.**
*Q.* Do you know how he found out?
**A. The only other person I had communicated with was Ziad.**
***MS. BERNSTEIN:*** Objection. 602.
***THE COURT:*** Overruled. You may answer.
***THE WITNESS:*** The only person I had communicated my travel plans was Ziad and the CEO of my company.
***BY MR. PILCHAK:***
*Q.* Okay. Did the CEO of your company know Dr. Arabi?
**A. No, he did not.**
*Q.* All right. What did Dr. Arabi tell you when he called you on the phone before you met with him?
**A. Before we met, he just wanted to have a lunch get-together.**

***Q.*** And did you meet him for lunch?
***A.*** **I did.**
***Q.*** Where was it?
***A.*** **I don't specifically remember the name of the restaurant.**
***Q.*** And what happened at that meeting?
***A.*** **So as we were going through the lunch, he asked me if I had my laptop with me.**
***Q.*** Did you?
***A.*** **I did have it.**
***Q.*** And so --
***A.*** **It was in the car.**
***Q.*** What happened?
***A.*** **So then I went and got it, because had he told me he wanted to look at the emails on my personal account that I had sent to him during the course of Abreezio.**
***Q.*** Did you allow him to look at those emails in your personal account?
***A.*** **Yes.**
***Q.*** How did that happen? Just walk the jury through that.
***A.*** **So we were seated on the -- across from each other, like, a high-top stool and a circular table. And I opened up my laptop, and Dr. Arabi wanted me to delete the emails. And he walked over and watched me over my shoulder, asking me to delete the emails.**
***Q.*** What was your reaction to his request?

**A. I initially resisted. But I could see he was getting very upset, and so I acquiesced.**
*Q.* And I just want to be clear, when you say "resisted," you guys didn't arm wrestle or anything; right?
**A. No.**
*Q.* Okay. But you declined at first.
**A. I declined.**
*Q.* But did you eventually agree?
**A. I did.**
*Q.* Why?
**A. He was insisting. And the right thing would have been to not to succumb to that pressure, but I unfortunately did. But I later recovered them after I left the venue and got back -- flew back home.**
*Q.* I'll get to that in a minute, but I want to focus on the meeting right now.
So he's standing next to you while you're doing what?
**A. While I'm -- I've searched through all the emails, correspondence with him. And Dr. Arabi is over my shoulder looking and asking me to delete. So I delete the emails.**
**And that was the...**
*Q.* Did he do anything to verify whether you deleted the emails?
**A. Yes.**
*Q.* What?
**A. So he asked me to search if there are any more emails that**

**refer him. And the trash email box came up, so he wanted me to delete those as well.**

*Q.* So first the deleted emails go to your trash?

***A.*** **Right.**

*Q.* And that's your trash folder in Gmail or whatever?

***A.*** **Correct.**

*Q.* And then Dr. Arabi directed to you do what with those emails in the trash?

***A.*** **Delete them from the trash.**

*Q.* All right. Was that the end of your meeting with Dr. Arabi?

***A.*** **Pretty much. I was headed to a subsequent meeting, which was with Ziad Mansour and the CEO of my -- the company I was advising.**

*Q.* Did you keep the meeting with Ziad?

***A.*** **I did.**

*Q.* And then what happened after the meeting with Ziad?

***A.*** **After the meeting with Ziad was over, the formal three-way meeting, Ziad and I talked for a while. And Ziad also shared with me that he was nervous about the ongoing internal investigation.**

*Q.* So as far as you could tell, Mr. Mansour was also aware of Qualcomm's investigation into Abreezio?

***A.*** **Absolutely.**

*Q.* Did you receive a call from anybody else before you left town who's relevant to the Abreezio testimony that you've given?

**A. On that day?**
*Q.* Or shortly thereafter.
**A. I think on that day, I got a call from Akbar.**
*Q.* And what was the call with Akbar about?
**A. Akbar wanted to meet, along with Dr. Karim Arabi.**
*Q.* Did you take that meeting?
**A. I did not.**
*Q.* Why not?
**A. I was just very shaken by the whole event, and after the meeting with Ziad and the short conversation I had with him, I headed back to the airport to head back home.**
*Q.* How did you feel after you'd deleted those emails?
**A. Terrible.**
*Q.* Why?
**A. There was an ongoing investigation and this was evidence.**
*Q.* Did they stay deleted? I think you already mentioned.
**A. I restored them.**
*Q.* If you had deleted them from your trash, how could you have restored them?
**A. At that time, the way the Gmail on Google, you have 30 days to recover it from trash.**
*Q.* Even if you've deleted it from your trash?
**A. Correct, from the server.**
*Q.* You mentioned an internal investigation by Qualcomm.
Did Qualcomm ever contact you directly as part of their

internal investigation?

***A.*** **No.**

***MR. PILCHAK:*** One moment, please, Your Honor.

No further questions. Thank you.

***THE COURT:*** Cross-exam? Or should we go ahead and take a break at this point?

***MS. BERNSTEIN:*** Whatever the Court prefers.

***THE COURT:*** Okay. Why don't we take a -- sorry, is there something else you wanted to --

***THE WITNESS:*** Can I -- Mr. Pilchak, on that --

***MS. BERNSTEIN:*** Objection.

***THE WITNESS:*** -- IP contamination, can I explain?

***MR. PILCHAK:*** No.

***THE COURT:*** Ladies and gentlemen, we're going to go ahead and take a recess at this time. Let's take a recess until 1:30. If you can be back at 1:30, we will resume at that time.

You're reminded you're not to discuss the case or do any research about the case. I should also tell you that we had a request to end early on Thursday at 3:00. So we will end at 3:00 at Thursday, just so you have that advanced notice. Okay. We will see you back at 1:30. Thank you. And we'll see you back at 1:30, sir. Thank you.

***(Jury out at 12:11 p.m.)***

***THE COURT:*** Okay. We're now outside the presence of

the jury.

Any issues we need to take up?

***MR. PILCHAK:*** Not for us, Your Honor.

***MS. BERNSTEIN:*** No, thank you, Your Honor.

***THE COURT:*** Okay. We'll break until 1:30. I'll see you back at 1:30. Thank you. And you're ordered to be back at 1:30 as well, Mr. Taneja.

***THE WITNESS:*** Yes.

***THE COURT:*** Okay. Thank you.

***(Lunch recess taken.)***

***THE COURT:*** Okay. Good afternoon, ladies and gentlemen. We are back on the record. All jurors are present. Dr. Arabi is present. The lawyers are present.

And sir, you are reminded you are still under oath to tell the truth.

***THE WITNESS:*** Yes.

***THE COURT:*** Ms. Bernstein.

***MS. BERNSTEIN:*** Thank you, your Honor.

***CROSS-EXAMINATION***

***BY MS. BERNSTEIN:***

***Q.*** Good afternoon, Mr. Taneja.

***A.*** **Good afternoon, Ms. Bernstein.**

***Q.*** You've testified across the course of two days; correct?

***A.*** **Correct.**

*Q.* And you say that you've engaged in an elaborate false story to steal million of dollars; correct?
**A. Could you repeat the question?**
*Q.* You say that you have engaged in an elaborate scheme to steal millions of dollars; correct?
**A. To fraud Qualcomm, yes.**
*Q.* And you say that you've lied about many things; correct?
**A. Yes.**
*Q.* You've lied about concealing Karim's involvement in Abreezio?
**A. Yes.**
*Q.* You've lied about the history of Abreezio?
**A. Yes.**
*Q.* About the year the company was founded?
**A. Yes.**
*Q.* About Karim's involvement in its operations?
**A. Yes.**
*Q.* You did not give accurate information about the company to Qualcomm?
**A. Yes.**
*Q.* And you also say that you wrote and said false things dozens of times?
**A. Please repeat.**
*Q.* You say that you have written and said false things dozen of times; correct?

**A. I don't know the count, but there were several examples we saw earlier today.**

*Q.* You've called Karim different names that you claim are not accurate; correct?

**A. Correct.**

*Q.* You claim that you had emailed Ziad Mansour pretending to have never met him before; correct?

**A. Ziad Mansour?**

*Q.* You claim that you had emailed him and pretended to have never met him before?

**A. I never claimed that I never met Ziad Mansour. In fact, on the very first day of the testimony, we talked about the lunch meeting that had been arranged by Dr. Arabi with Mr. Ziad Mansour on January 24th or thereabout.**

*Q.* And you claim that thereafter you followed up with him in an email where you pretended you had never met him before; correct?

**A. That's correct. In the email, the follow-up email that went about requesting a month later for a formal meeting, there was no reference to the lunch meeting that had happened prior. That's correct.**

*Q.* So that was correct, yes?

**A. That was correct, yeah.**

*Q.* You claim that you also said and wrote false things about the titles of the participants in Abreezio; correct?

**A. Please clarify the question, Ms. Bernstein.**

*Q.* You claim that you said and wrote false things about the titles of the participants in Abreezio.

Do you remember that testimony?

***A.*** **About the parties of the participants?**

*Q.* The titles of the participants in Abreezio.

***A.*** **Can you be a little more specific?**

*Q.* Sure.

When Mr. Pilchak was questioning you, you had a whole exchange with about the cap table, the titles, who was listed as a founder, and you said that those things were false; correct?

***A.*** **Not all of them. There were specific things in response to the question was I a founder of the company. And I asked for clarification from Mr. Pilchak what did he mean by a "founder." Was it referring to someone who was --**

*Q.* Excuse me, sir.

You have said and wrote false things about the titles of the people in the company?

***A.*** **As I explained, there is some context to it. It's not a blank yes-or-no answer. So if you would allow me to give the context.**

*Q.* Well, have -- let's start with a yes or no.

Have you written false things about the titles of people in the Abreezio company as you testified to just before the lunch break?

***A.*** **The founder title as I mentioned.**

*Q.* Is that a "yes"?
**A. Yes. For that specific question, correct.**
*Q.* You claim you also wrote false things about the company's vision in alignment in that cap table. Yes or no?
**A. I did not say I wrote them. This cap table was edited by Dr. Karim Arabi, Behrooz Abdi, and Akbar as well, I suppose.**
*Q.* Did you send false things that you knew to be false to Qualcomm?
**A. Yes.**
*Q.* And you did this, sending Qualcomm false and inaccurate information, over a long period of time; correct?
**A. How do you define a long period?**
*Q.* Did you start in February of 2015 at least?
**A. February of 2015 was the first email correspondence with Ziad Mansour.**
*Q.* So is that a yes or a no, sir?
**A. So if the long period means February to October, the February email was not false in that I was omitting a reference. If you want to consider that false as a characterization, that's fine. But over the period of the Abreezio journey, the answer is yes.**
*Q.* Do you consider that false?
**A. I think it's splitting hairs really. What I am saying is that I intentionally omitted a reference to the lunch meeting that was held prior.**

*Q.* Okay. So you've intentionally omitted information; correct?
**A. At the direction of Dr. Karim Arabi, yes.**
*Q.* You've intentionally omitted information; correct?
**A. At the direction of Dr. Karim Arabi, I intentionally omitted the reference to that meeting and the draft was reviewed by Dr. Karim Arabi.**
*Q.* You've written and said false things dozen of times. You think you yourself have lost count; correct?
**A. I think we covered several of those during the testimony today.**
*Q.* These are yes-or-no questions, sir.
Have you written and said things, false things, dozens of times so much so that you've even lost track? Is what you said? Yes or no?
**A. If you were to ask me a number, I could probably give you a number.**
*Q.* I'm not asking you a number. I'm asking you whether you have said and written false things dozen of times.
**A. At the instruction of Dr. Arabi, yes, and have forwarded them to Qualcomm.**
*Q.* Is that a "yes," sir?
**A. I think I explained the context, yes.**
*Q.* And I assure you, you will have a chance to explain context. Mr. Pilchak is going to ask you whatever questions you guys have prepared, but I'm asking for answers to my questions at this

point.

Is that fair?

**A. Okay. Thank you.**

*Q.* Based on the elaborate set of lies, you received over $10 million; correct?

**A. Correct.**

*Q.* And this wasn't an off-the-cuff, spontaneous lie or two, was it?

**A. "Off-the-cuff, spontaneous lie" means?**

*Q.* Well, you engaged in carefully thought out and planned lies; correct?

**A. All the directions were coming from Dr. Arabi. And in some cases Behrooz.**

*Q.* And you yourself engaged in carefully thought out and planned lies; correct?

**A. I accept responsibility for my actions.**

*Q.* It doesn't sound like it.

**A. I do. I do accept responsibility for my actions.**

*Q.* Have you yourself engaged in carefully thought out and planned lies?

**A. I participated in the concealment scheme, yes. So that's what --**

*Q.* That is not the question.

The question is whether you have participated and engaged in carefully thought out and planned lies.

**A. Correct.**

Q. And you've spent a lot of time thinking and crafting the pitch that you would make to people at Qualcomm; correct?

**A. Yes.**

Q. And your goal was to sell the lies and sell Abreezio as best you could; correct?

**A. To position the company for maximum value, yes.**

Q. Was that to sell it?

**A. To sell it.**

Q. And are you able to give an estimate of how many times you wrote or said false things about Abreezio in the year leading up to Qualcomm's acquisition?

**A. I can take an attempt at it, Ms. Bernstein. So if you group it into themes, it probably would be easier to come up with a count.**

**The first one was around the marketing presentation.**

**The second one, not necessarily in that order, was the response to due diligence questions.**

**And there were -- yes, so I would break it in -- basically into two main categories. One about the due diligence and after, and we saw several examples of that today. And one prior to that, for example, communicating to Brad that he should go by -- he should not mention Dr. Arabi's involvement in Qualcomm. So there are multiple categories. It's hard for me to give you the count.**

*Q.* So are you able to give an approximation of how many false statements and written statements and oral statements and lies you made in the year leading up to Abreezio?

You can take your time to think in your head. The question is just how many, if you know.

***A.*** **I think the best answer I can give is the examples that we saw over the two days of my testimony. They may not be totally comprehensive or exhaustive. There might be a few more. But that should be a good qualitative sense of --**

*Q.* And I myself lost track of tallying.

So do you have a numeric value?

***A.*** **I do not have a numeric value.**

*Q.* How many different people did you lie to in the year leading up to Qualcomm's acquisition of Abreezio?

***A.*** **So most of this communication was with people at Qualcomm, specifically with Hiten Somwal.**

*Q.* So is it just Hiten, or are there more people? The question is, how many?

***A.*** **So my correspondence with Qualcomm during the due diligence phase --**

*Q.* Sir, can you please give a number? And then we can dive into it, if necessary.

How many people did you lie to in the year leading up to Qualcomm's acquisition of Abreezio?

***A.*** **What I can say for definitively that the person that**

**mattered the most from the Qualcomm side --**

*Q.* That is not the question.

***A.*** **-- is Hiten Somwal.**

*Q.* Sir, that is not the question.

Do you understand the question?

***A.*** **Yes, Ms. Bernstein, I understand the question.**

*Q.* So are you able to give a number? Yes or no?

***A.*** **I cannot give you an exact count. But it is a few to several.**

*Q.* And what does "few to several" mean to you? Does that mean three to five, or what does that number mean to you?

***A.*** **Possibly in that range.**

*Q.* Possibly in that range.

Possibly a great deal more?

***A.*** **Sorry?**

*Q.* Possibly a great deal more?

***A.*** **So I don't know who Hiten was communicating my information back to.**

*Q.* And that doesn't matter.

***A.*** **The person I was --**

*Q.* That does not matter for the question. The question is -- and we can have a read back if you need it.

The question is, how many different people did you lie to in the year leading up to Qualcomm's acquisition of Abreezio?

You said three to five after much back and forth. And I'm

asking if it's possible that there were a great deal more than five people that you lied to in the year leading up to Qualcomm's acquisition of Abreezio.

***A.*** **Based on my interactions, I would say that's an approximate range of the different people I interacted with at Qualcomm.**

***Q.*** Because anyone you interacting with at Qualcomm, you were lying to?

***A.*** **I was concealing Karim's, Dr. Karim Arabi's, identity, yes.**

***Q.*** Is it a lie or is it not a lie?

***A.*** **It is a lie.**

***Q.*** So anyone you interacting with at Qualcomm, you were lying to?

***A.*** **I didn't say that.**

***Q.*** That's my question.

***A.*** **What I'm saying is in the course of the Abreezio interactions, I concealed Dr. Karim Arabi's identity.**

***Q.*** My question again, sir, is did you lie to everyone you interacted with at Qualcomm. Yes or no?

***A.*** **No.**

***Q.*** No? So just three to five people at Qualcomm are the ones you lied to?

***A.*** **To the best of my recollection, yes. My direct interface with Qualcomm.**

***Q.*** And you did those lies to get money; correct? That was your incentive?

**A. Correct.**
Q. And you didn't just use sophisticated lies to get money. You also moved a lot of things around to disperse your money to make it harder for anyone to know what you did with it; correct?
**A. Is the question my personal money? Or --**
Q. Do you think I'm asking you about someone else's money, sir?
**A. Yeah, so my personal money was at --**
Q. Let me repeat the question.
**A. Yeah, please.**
Q. You did a lot of moving things around to disperse your money to make it harder for people to know what you were doing with it; correct?
**A. Absolutely not right.**
***MS. BERNSTEIN:*** Okay. I want to show you what's been marked as Defense Exhibit 3282. Just to the witness, please.
***BY MS. BERNSTEIN:***
Q. Have you ever seen this before?
**A. I don't recall seeing this.**
Q. Would you agree that this is a Department of Justice report tracing about Taneja financial analysis?
**A. Yes.**
Q. Would you agree that between October 30th of 2015, when Qualcomm wired you your $10 million --
**A. Yes.**
Q. -- through June 7th of 2016, you made a series of transfers

stemming from your Bank of America account ending in 1027? Correct?

**A. Yes.**

*Q.* You moved money to an Ally account?

**A. Yes.**

*Q.* You moved money to a Goldman Sachs account.

**A. Yes. And the purpose --**

*Q.* That's okay.

Did you or did you not move money; yes or no?

**A. I moved money.**

*Q.* Did you move money into a Barclay's account?

**A. Yes.**

*Q.* Did you move money to a Charles Schwab account?

**A. Move is not actually capturing. I have multiple accounts to maximize returns.**

*Q.* Did you move money to a Charles Schwab account, yes or no?

**A. Yes, I had an account at Charles Schwab as well.**

*Q.* And between October 30th -- sorry.

You had an account at Charles Schwab in which you put some proceeds in; correct?

**A. Correct.**

*Q.* And between October 30th of 2015 and June 7th of 2016, you made at least seven transfers from your Bank of America account to five different accounts in a matter of seven months; yes or no?

**A. Correct.**
Q. But your Bank of America account isn't the only account that you made transfers from, is it?
**A. Correct.**
Q. In fact, the Government reviewed records for 21 of your accounts; correct?
**A. Yeah.**
Q. Fidelity Investments?
**A. Yes.**
Q. Vanguard?
**A. Yeah.**
Q. Charles Schwab?
**A. Yes.**
Q. Bank of America?
**A. Yes.**
Q. Wells Fargo?
**A. Yeah.**
Q. And nine of those accounts were considered target accounts by the Government in its financial analysis; correct?
**A. Correct.**
Q. And the Government found that in each of those nine target accounts, you had put what the Government claims were proceeds derived from the fraud on Qualcomm; correct?
**A. Correct.**
**And let me just explain the context.**

***Q.*** That's okay. There's no question pending.
***A.*** **It was to maximize --**
***THE COURT:*** Wait. Wait for the question.
***BY MS. BERNSTEIN:***
***Q.*** And by the way, when Abreezio was sold, you know of course that $0 were transferred from Qualcomm to Dr. Arabi; correct?
***A.*** **Yeah.**
***Q.*** And over $10 million was transferred to you?
***A.*** **Yes.**
***Q.*** And you agree that you lied to get this $10 million; correct?
***A.*** **Yes.**
***Q.*** And now as you sit here today, you have a different incentive; correct?
***A.*** **No.**
***Q.*** Well, there's something far more important than money on the line right now; correct?
***A.*** **It's to tell the truth.**
***Q.*** The truth is on the line? Is that your testimony?
***A.*** **It is to tell the truth. As I mentioned earlier, my plea agreement is null and void if I don't tell the truth.**
***Q.*** You have something far more important at stake today; correct?
***A.*** **Absolutely.**
***Q.*** Your liberty; correct?

**A. Correct.**
Q. You don't want to spend years in prison?
**A. That's right.**
Q. You're hoping for leniency at sentencing from Mr. Pilchak and from Her Honor?
**A. From the judge.**
Q. You don't care what Mr. Pilchak recommends to the judge?
**A. Of course I care about the recommendation.**
Q. And you're hoping for leniency in his recommendation?
**A. Yes.**
Q. And you --
**A. The final decision --**
Q. Excuse me, sir. This is a question-and-answer forum. Okay?
**A. Okay.**
Q. And you don't want to go to prison; correct?
**A. Correct.**
Q. And you said this, in fact, the Saturday before this trial started when you were preparing for a meeting with the Government; correct?
You told them that you did not want to go to prison and you were hoping for leniency at sentencing?
**A. I think there was a timeline attached to it.**
Q. You're aware that this trial commenced on March 10th?
**A. Yes.**
Q. And on March 7th and March 8th when you were meeting with

the Government, you told them just before trial started that you were hoping for leniency and did not want to go to prison as well; correct?

**A. I don't recall the exact statement. But it is true that I am -- as I mentioned in my testimony earlier, I am hoping for leniency. And telling the truth to keep my end of the bargain to get the leniency.**

Q. To avoid prison.

**A. To avoid the prison, yes.**

Q. That's your hope?

**A. Yes. And it's also the right thing to do. In part, that is the reason. It's also the right thing to do to take full accountability.**

Q. So you're testifying because it's the right thing to do?

**A. No, I did not say that. I said freedom is very important. And in addition, it is also the right thing to do.**

Q. And are you testifying because it's the right thing to do?

**A. I am motivated by what I mentioned earlier. I'm hoping for leniency.**

Q. Are you testifying because it's the right thing to do?

**A. It's both.**

Q. Is it -- yes or no, are you testifying because it's the right thing to do?

**A. It is both, yes. That, and the leniency. It's not a yes-or-no answer. It's both.**

*Q.* And the leniency that you told these prosecutors and their agents, far more than are sitting right here, that you hope to get at the end of your testimony; correct?

***A.*** **Yes.**

*Q.* You've already gotten a lot of benefits from the Government; correct?

***A.*** **Which benefits?**

*Q.* Have you gotten a lot of benefits from the Government already?

***A.*** **As I mentioned, the benefits are contingent upon my telling the truth. And at the end of the cooperation, the Government will make an assessment on whether to file a motion for substantial assistance.**

*Q.* So is it your testimony that you have not received any benefits to date from the Government and from your cooperation? Is that your testimony?

***A.*** **Correct.**

*Q.* And you're convicted of a felony, as you sit here today; correct?

***A.*** **Yes.**

*Q.* And when you were arrested, your travel was restricted; correct?

***A.*** **Yes.**

*Q.* And after you started cooperating, you asked for your travel restrictions to be modified; correct?

**A. I did.**
Q. And they were in fact, modified, weren't they?
**A. Yes.**
Q. You don't think that's a benefit you've gotten?
**A. I don't think that's a benefit.**
Q. Is it a detriment?
**A. It's not a detriment. There was a motion that was filed and the motion was approved.**
Q. And the benefit you got from the motion that was approved after you started cooperating is that you have free travel throughout the United States; correct?
**A. Yes. We did file a motion for that, and it was approved.**
Q. And is that a benefit to you, or is that not a benefit to you, sir?
**A. Depends on how you -- the way you were asking the question was more in the context of --**
Q. No, the question is, is it a benefit to you that your travel is now free throughout the United States. Yes or no?
**A. It allows me to do my work-related travel, yes.**
Q. So is that a benefit?
**A. Yes, you can characterize like that.**
Q. I'm not trying to characterize as anything. I'm just trying to ask the questions.
Is that a benefit?
**A. Yeah, I suppose.**

*Q.* You're also allowed to travel to India; correct?
***A.*** **As of one time.**
*Q.* Is that a benefit?
***A.*** **Yeah.**
*Q.* You weren't allowed to do those things before you started cooperating with the Government, were you?
***A.*** **I didn't ask for it.**
*Q.* And in fact, your conditions of release explicitly prohibited it; correct?
***A.*** **Correct.**
*Q.* And despite being convicted and awaiting sentencing, the Government hasn't actually taken from you all of the money that they claim you illegally obtained, have they?
***A.*** **It has been seized.**
*Q.* And has it been forfeited from you?
***A.*** **Based on the agreement I have signed, yes.**
*Q.* So there's a final determination about forfeiture? Is that your testimony today?
***A.*** **Based on the agreement I've signed, I've forfeited the $7.2 million.**
*Q.* And is it your testimony today that it's your understanding that that is a final judgment?
***A.*** **Look, I'm giving you my understanding of the plea agreement.**
*Q.* But is --
***MS. BERNSTEIN:*** Can we have a readback of the question,

please?

***THE COURT:*** "And it is your testimony today that it's your understanding that it is a final judgment?"

***BY MS. BERNSTEIN:***

***Q.*** Yes or no, sir?

***A.*** **The final judgment comes at the end, at the time of sentencing.**

***Q.*** So is it not a final judgment?

***A.*** **I think it's getting more into the legalese aspect. As a lay understanding, I don't have access to those funds. Those have been forfeited.**

***Q.*** And it's your understanding that you will never again have access to those funds.

Is that your testimony?

***A.*** **The final judgment comes at the end, and I don't expect anything to change by the final judgment, as far as the 7.2 is concerned.**

***Q.*** And how much did you get from the sale of Abreezio?

***A.*** **A little over 10 million.**

***Q.*** And you've also been allowed to plead to only one of the three charges that were filed against you; correct?

***A.*** **Correct.**

***Q.*** You were charged with conspiracy to commit wire fraud?

***A.*** **That's right.**

***Q.*** And you were charged with wire fraud?

**A. Yes.**
*Q.* Would you like to see a copy of the charging document?
**A. No.**
*Q.* You were also charged with money laundering?
**A. Yes.**
*Q.* And the wire fraud and the money laundering related to your receipt of over $10 million?
**A. That's right.**
*Q.* And in fact, you've pled guilty only to money laundering; correct?
**A. Correct.**
*Q.* Not to wire fraud?
**A. Correct.**
*Q.* And not to conspiracy to commit wire fraud?
**A. Correct.**
*Q.* You've agreed that you committed money laundering by transferring what you say are ill-gotten gains; correct?
**A. That's right.**
*Q.* And you say that you participated in this scheme to defraud Qualcomm?
**A. Correct.**
*Q.* But another benefit that you have already received is that you are not being held accountable for the alleged wire fraud or conspiracy to commit wire fraud that got you that money; correct?

**A. The Government will dismiss the charge at the end, provided, as I said earlier, I tell the truth at this testimony.**

*Q.* And who decides whether you tell the truth at this testimony? What's your understanding of that?

**A. The final decision is of the judge.**

*Q.* The judge is the one who's going to decide whether you told the truth in this testimony, or the Government is going to decide whether you told the truth in this testimony?

**A. So let me ask -- break it down into two parts. As I said earlier, the final sentencing, my fate, rests in the hands of the judge --**

*Q.* Sure.

**A. -- while the inputs to that is the Government filing a motion of substantial assistance.**

*Q.* Another benefit that you have received, as you sit here today, is that are you not being held accountable for the alleged wire fraud or the conspiracy to commit wire fraud that got you $10 million; correct?

**A. The Government will dismiss this charge provided I keep my end of the bargain.**

*Q.* And your end of the bargain is that -- is up to the Government to decide. They decide whether you kept your end of the bargain; correct?

**A. My end of the bargain is to tell the truth.**

*Q.* And who decides if you tell the truth such that the

Government will make a motion for substantial assistance? Who is that?

**A. That's the Government's assessment.**

*Q.* The Government's assessment? Mr. Pilchak?

**A. Yes.**

*Q.* Mr. Olah?

**A. Yeah.**

*Q.* Ms. Chopra?

**A. Yeah.**

*Q.* They're the ones who are going to decide if you kept your end of the bargain?

**A. They are going to evaluate whether I -- whether they file a motion or not based on my truthfulness.**

*Q.* And you get the motion if you, in your own words, keep the end of the bargain; correct, sir?

**A. They will make that determination.**

*Q.* And they will make that determination, the people sitting right here in this room to whom you are talking; correct?

**A. Yes. And they will --**

*Q.* Thank you.

You've also had your sentence, the maximum sentencing, dramatically reduced; correct?

**A. Correct.**

*Q.* With the plea you're looking at, I think you testified to Mr. Pilchak a ten-year statutory maximum; correct?

**A. Correct.**
*Q.* And that's before the substantial assistance motion you're hoping for?
**A. That's right.**
*Q.* If they decide to give it to you?
**A. Correct.**
*Q.* And you were charged with wire fraud, conspiracy to commit wire fraud, and money laundering.
And that had a 50-year statutory maximum; correct?
**A. My understanding is that the max of the wire fraud is 20 years.**
*Q.* What's your understanding of the max of the conspiracy to commit wire fraud?
**A. I do not know.**
*Q.* Twenty years? You understood that?
**A. I do not know the -- specifically that. What I can tell you very definitively is that the wire fraud max statute is 20 years.**
*Q.* What's 20 plus ten, sir?
**A. Thirty.**
*Q.* So even before we get to the conspiracy to commit wire fraud, you went from a 30-year statutory maximum to a ten-year statutory maximum; correct?
**A. My understanding, as I said, I related --**
*Q.* Is that a yes or a no?

***A.*** **No.**

***Q.*** You don't understand that you have moved from a 30-year statute maximum minimum to a ten-year?

***MR. PILCHAK:*** I'd object as to foundation at this point, your Honor.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** What's your understanding of the maximum statutory count for wire fraud?

***A.*** **Twenty years.**

***Q.*** And what's your understanding of the maximum statutory penalty for money laundering?

***A.*** **Ten years.**

***Q.*** What's your understanding of 20 plus 10?

***A.*** **Thirty.**

***Q.*** Do you have an understanding that you had faced at least 30 years before we factor in conspiracy to commit wire fraud before you were allowed to plea to just one charge?

***A.*** **You said "at least." We are talking about maximum.**

***Q.*** Do you understand that you were facing at least a maximum of 30 years before you were allowed to plead to just one charge?

***A.*** **Ms. Bernstein, what exactly does it mean "at least maximum"?**

***Q.*** Each count has a statutory maximum; correct?

***A.*** **Correct.**

***Q.*** And you don't know what the statutory maximum was for one of

your counts; correct?
**A. I gave you the count for --**
*Q.* Yes or no?
**A. -- the wire fraud, which is a max of 20 years. For money laundering, which is a max of 20 years. What I don't understand is "at least maximum."**
**What does that mean?**
*Q.* What did you understand your statutory maximum to be before you signed up to cooperate and tell the Government all the information you claim is truthful that it's going to decide today?
What was your understanding before that of your statutory maximum?
**A. Twenty years.**
*Q.* Just 20 years. That's your understanding?
**A. That my understanding.**
*Q.* Okay.
**A. You can refresh my memory through the plea agreement. I'm happy to take another look, if I misunderstood that.**
*Q.* Sure.
And even if that understanding isn't accurate, you would agree that 20 is far more than 10; correct?
**A. Absolutely.**
*Q.* Another perk to what you're claiming now is that you are hoping the Government will significantly lower your Guideline

Range; correct?
**A. As I said, yeah. The short answer is yes.**
*Q.* And I think the short answers will help this move along, but do you have more to add to that?
**A. It's all outlined in the plea agreement. And when it comes to questions of a more legal flavor, I'm not necessarily maybe interpreting it correctly, like this max 20 plus 10 and so on. So it's all outlined. It's in the plea agreement.**
*Q.* And you understand that one perk is that you're getting the Government to lower its Guideline recommendation; correct?
**A. If it indeed files a motion. There is no commitment. There is no definitive expectation that that is bound to happen. It's up to the Government to make a determination and file a motion on what they think is fair.**
*Q.* And so if they don't do that, what do you understand your exposure to be?
**A. Twenty years.**
*Q.* And is there a Guideline Range in your plea agreement that you understand cabins the Government's recommendation?
**A. Can you please share the document so that I can be more precise about what the question is?**
***MS. BERNSTEIN:*** We'll show you 2281.
Move to admit.
***THE COURT:*** Any objection?
***MR. PILCHAK:*** No objection, your Honor.

***THE COURT:*** 2281 may be admitted.

***(Exhibit 2281 admitted.)***

***BY MS. BERNSTEIN:***

***Q.*** So we can publish this and walk through it together.
This is your plea agreement?

***A.*** **Yes.**

***Q.*** And this is one of two documents that you signed on this day; correct?

***A.*** **Correct.**

***Q.*** The other one is your under-seal cooperation agreement; correct?

***A.*** **That's right.**

***Q.*** So this is the plea agreement. We're going to go to page 10.
Well, before we get there, you do know that you are facing prison time for the money laundering; correct?

***A.*** **I do.**

***Q.*** And that the Government has agreed to recommend the low end of the Guideline Range even before a substantial assistance motion; correct?

***A.*** **Now that we are at the agreement, can you please refer to the specific clause?**

***Q.*** We can go to page 10.
Do you see Part F there?

***A.*** **Oh, thank you. Yes.**

***Q.*** You understand that the United States will recommend that you be sentenced at the low end of the advisory Guideline Range as calculated by the United States at the time of your sentencing; correct?
***A.*** **Correct.**
***Q.*** And this is irrespective of the motion you're hoping for; correct?
***A.*** **Correct.**
***Q.*** So before your cooperation credit, you understand that these prosecutors are going to recommend a 41-month sentence; correct?
***A.*** **Correct. Again, if you can just -- if you don't mind, just highlighting that section. I don't have the numbers right off the top.**
***Q.*** Do you remember that 41 months is the number you're working down from, or you don't remember that?
***A.*** **Honestly, I don't remember that number.**
***Q.*** Okay.
***MS. BERNSTEIN:*** You can take that down. Thank you.
***BY MS. BERNSTEIN:***
***Q.*** You know that on the Indictment, the Guideline Range you were facing was 14 to 17 and a half years in prison?
***A.*** **Okay.**
***Q.*** Do you remember that?
***A.*** **As I said, if you are asking for specific numbers, it is too much data for me to remember. If you can highlight it, it will**

**just be -- it will make sure that I'm answering the question correctly.**

***Q.*** Well, the question is really about your memory. It's not even about whether -- it's about your memory.

Do you remember that on the Indictment, when you had the wire fraud, the conspiracy to commit wire fraud, and the money laundering, that you were facing -- your Guideline Range was 14 to 17 and a half years?

***MR. PILCHAK:*** Your Honor, I'd object to foundation and 403 at this point.

***THE COURT:*** Overruled.

Do you remember that?

***THE WITNESS:*** It was some big number. I just don't remember the exact specific number.

***BY MS. BERNSTEIN:***

***Q.*** You also signed a written cooperation agreement with the Government; correct?

***A.*** **Yes, I did.**

***Q.*** Where you're agreeing to help prosecute Dr. Arabi; correct?

***A.*** **I'm helping with the investigation.**

***Q.*** And you're testifying in a trial; correct?

***A.*** **Correct.**

***Q.*** Are we still investigating things or are they prosecuting it at this point at trial?

***A.*** **Prosecuting it. Sorry.**

*Q.* And you agreed to do that; correct?
***A.* Yes.**
*Q.* And you signed this contract?
***A.* Yes.**
*Q.* And Mr. Pilchak signed the contract?
***A.* Yes.**
*Q.* And Mr. Pilchak is sitting right here.
***A.* Yes.**
*Q.* And he's the one who judges whether you live up to your end of the bargain under that contract?
***A.* Collectively, yes, the Government judges that.**
*Q.* And if you don't live up to your end of the bargain, if they decide that you did not, I think you said they can literally tear the agreement up; correct?
***A.* Correct.**
*Q.* And this cooperation agreement means that your sentence, that the recommendation you'd get from the Government, could go all the way down to 0; correct?
***A.* I'm certainly hoping that there would be leniency. Where it will end up, I do not know. But certainly, I will be hoping for leniency.**
*Q.* And leniency means zero; correct?
***A.* Leniency could mean several things, yes. Best guess outcome would be zero, yes.**
*Q.* Is that the leniency outcome you're hoping for, or is there

a different one you're hoping for?

**A. Absolutely, I'm hoping for that.**

*Q.* But the Government hasn't committed that to you now, have they?

**A. Absolutely not.**

*Q.* They want to see how you do?

**A. They want me to tell the truth.**

*Q.* Do they have any reason to believe you won't tell the truth?

**A. I don't know what they think. I am here to tell the truth.**

*Q.* And the Government has not promised you anything because they have to, in fact, see how you do first; right?

**A. Correct.**

*Q.* And you know that the degree to which the Government goes to bat for you is going to be impacted by what they think of what you're doing last week and today; correct?

**A. It's not what they think. It's about my telling the truth. And if they come to that judgment.**

*Q.* So what they think about whether or not you've told the truth?

**A. Yes. Their assessment of what they think.**

*Q.* And you want them to make a good assessment of you; right?

**A. I'm here to tell the truth. It's up to them what assessment they make. I am here to tell the truth.**

*Q.* Do you want them to make a good assessment of you?

**A. I would certainly hope that they do, because I am telling**

**the truth.**

*Q.* And because without their determination that you've done a decent job, you're not looking at that leniency you so desperately want; correct?

***A.*** **I am here, Ms. Bernstein, to tell the truth, because my expectation is if I tell the truth, I can hope for these benefits that we outlined at the beginning.**

*Q.* And who decides whether or not you've told the truth?

***MR. PILCHAK:*** Objection. Asked and answered.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

*Q.* You are hoping that the Government makes a positive determination of your performance last week and today so that you can get leniency; correct?

***A.*** **I am not here to impress the Government. I'm not here to impress anyone. I'm here to tell the truth, Ms. Bernstein.**

*Q.* But if the Government thinks you didn't tell the truth, you don't get your leniency; right?

***A.*** **So be it.**

*Q.* So is that what you hope for?

***A.*** **No. As I said, I am hoping for leniency based on the fact that I am being totally truthful.**

*Q.* You want them to accept what you say in this courtroom as true; correct?

***A.*** **Look, I am here, Ms. Bernstein, to tell the truth. How**

**people are interpreting it is totally outside my control. I am telling the truth. I can say that for sure. I am under oath. I take the plea agreement very, very seriously.**

*Q.* And you want the Government to decide that you, in fact, told the truth so that you can get the leniency you hope for; correct?

***A.* As I said before, yes, I am certainly hoping for leniency.**

*Q.* And are you hoping that the Government decides that you told the truth; correct?

***A.* The irony of that is yes.**

*Q.* I'm sorry?

***A.* Since I'm saying that I'm hoping for leniency, and they are going to evaluate whether they file a motion for substantial assistance based on my truthfulness, I'm certainly hoping that they file a motion. The final determination is going to be done by the judge.**

*Q.* And you are hoping that the Government decides that you are telling the truth so that you can get the leniency that you want; correct?

***A.* Correct.**

*Q.* You were first indicted in August 2022; correct?

***A.* Correct.**

*Q.* And you spent 12 months claiming that you were not guilty; correct?

***A.* Yes.**

*Q.* And you later decided to cooperate with the Government?
***A.*** **I did.**
*Q.* And when did you start your cooperation with the Government?
***A.*** **I don't recall exactly when we started. But we signed the agreement, as you saw, the dated agreement.**
*Q.* And that was in August of 2023?
***A.*** **I notice it says filed August '23. But I think on my signature line if you can just go back, I think it may be July. I'm not a hundred percent positive.**
*Q.* So your memory is that you've been cooperating with the Government since July or August of 2023?
***A.*** **No, no, no. I was referring to the signature, Ms. Bernstein. You said when was the agreement signed.**
*Q.* No. When did you start cooperating with the --
***A.*** **That, I do not recall.**
*Q.* Is it your memory that you started cooperating with the Government in July or August of 2023?
***A.*** **No. I didn't say that.**
*Q.* I'm asking you if it is your memory that you started cooperating with the Government in July or August of 2023.
***A.*** **No, it's not my memory. I signed the agreement in July or August of 2023. That's what I said.**
*Q.* And so when did you start cooperating with the Government?
***A.*** **That, I do not recall the exact time frame.**
*Q.* Do you have an approximation?

**A. I mean, a crude approximation would be a few months maybe. I don't remember.**
Q. A few months after signing the agreement?
**A. Before signing the agreement. Oh, you are referring to -- sorry, sorry. I'm totally -- I took your question incorrectly.**
**You are talking about the cooperation interviews and so on? Is that what you mentioned, when did I start those?**
Q. When did you start cooperating with the Government has been the question that has been pending here.
**A. I'm so sorry, Ms. Bernstein. I thought you were saying when did you start discussing that you were going to cooperate with the Government, like negotiate with the Government. I apologize for the incorrect interpretation. So my first meeting for -- as a cooperation interview was held in the early part of August 2023.**
Q. How many meetings total have you had with the Government?
**A. Somewhere in the range of five-plus, maybe five to ten.**
Q. Since August 2023?
**A. Since August 2023.**
Q. Was your first meeting on August 14th of 2023?
**A. I don't have the exact date in mind. But it was in the early part of August, the first one.**
Q. And was your second meeting ten days later?
**A. There was a second meeting in August as well.**
Q. And your third meeting was in September of 2023?

**A. That may very well be the case. I don't have those -- the first two meetings I distinctly remember.**

Q. Do you remember having a third meeting with the Government?

**A. Absolutely.**

Q. And do you remember that it was in August -- excuse me -- in September of 2023?

**A. Can I request you to flash a document that might trigger my memory?**

Q. I'm just asking what you remember.

**A. I don't remember the exact time frame.**

Q. Do you remember an approximate time frame?

**A. I do not.**

Q. Do you remember a fourth meeting with the Government?

**A. No. I don't have the timeline etched in my mind. What I can say is there were a total of five to ten meetings with the Government. And that's an approximate range to the best of my recollection.**

Q. Do you remember when your fifth meeting was with the Government?

**A. No.**

Q. Do you remember when your sixth meeting was?

**A. If you'd show me a document that can help trigger the memory, then I can say yes --**

Q. Okay.

**A. -- it was in that time frame. But I don't remember the**

**specific dates, beyond the first two months, which I'm very definitive.**

***Q.*** Do you remember when your seventh meeting with the Government was?

***A.*** **No.**

***Q.*** Do you remember when your eighth meeting with the Government was?

***A.*** **Same answer. No, I don't remember the exact timeline.**

***Q.*** Okay. Let's start with your first meeting on August 14th of 2023.

***A.*** **Sure.**

***Q.*** I'm going to show you Exhibit 1035.

***MS. BERNSTEIN:*** Just to the witness, please.

***BY MS. BERNSTEIN:***

***Q.*** Does this refresh your memory that your first meeting was on August 14th of 2023?

***A.*** **Yes.**

***Q.*** And how long was that meeting?

***A.*** **I think it was several hours.**

***Q.*** Two? Three? Four? What's your best guess?

***A.*** **Maybe close to six hours or so, or more. Six-plus, probably.**

***Q.*** Okay. I'm going to show you what's been marked as 1037.

***MS. BERNSTEIN:*** Just to the witness, please. Same call-out. I'm going to show you a document on the ELMO. Just

to the witness, please.

***BY MS. BERNSTEIN:***

***Q.*** Does this refresh your memory that your second meeting with the Government was on August 24th of 2023?

***A.*** **Yes. It says investigation on 8/24/2023, yes.**

***Q.*** Does it refresh your memory that that's in fact when you met with the Government for the second time?

***A.*** **Yes.**

***Q.*** And how long was that meeting?

***A.*** **This one was maybe similar duration.**

***Q.*** Six, six-plus hours?

***A.*** **Let's say maybe -- yeah, plus/minus when I signed.**

***Q.*** And now I want to show you another document.

***THE COURT:*** Is this marked?

***MS. BERNSTEIN:*** I'm not sure what the marking is, your Honor.

***THE COURT:*** For the record, we should probably mark it.

***MS. BERNSTEIN:*** This is 1037.

***THE COURT:*** 1037 you've already just mentioned.

***MS. BERNSTEIN:*** We pulled 1037 down and put it back up. Our numbering was off.

***MR. PILCHAK:*** Just for the record I think the last one on the ELMO was 1036.

***MS. BERNSTEIN:*** Thank you very much.

///

***BY MS. BERNSTEIN:***

***Q.*** So I'm showing you what's been marked as 1037.

Does this refresh your memory that your third meeting with the Government was on September 22nd of 2023?

**A. It does say investigation on September 22nd, yes.**

***THE COURT:*** I'm confused, because I thought that the last exhibit was 1037, and you said it refreshed his recollection that the second meeting was September 22nd.

Are we now doing a third meeting?

***MS. BERNSTEIN:*** No. The last --

***THE COURT:*** Maybe I wrote that down wrong.

***MS. BERNSTEIN:*** My understanding is that this is Exhibit 1036.

***MR. PILCHAK:*** I'm sorry, your Honor. I screwed that up.

***THE COURT:*** So 1035, you asked him was his first meeting on August 16th of 2023, and he said yes. Then he said on 1037 his second meeting was September 22nd of 2023.

***MS. BERNSTEIN:*** That's not accurate, so we're going to correct the timeline.

***THE COURT:*** Okay.

***BY MS. BERNSTEIN:***

***Q.*** So your first meeting was August 14th of 2023?

**A. Yes.**

***THE COURT:*** Fourteenth or 16th?

***MS. BERNSTEIN:*** Fourteenth.

***BY MS. BERNSTEIN:***

***Q.*** Is that your memory?

***A.*** **Yes.**

***Q.*** Your second meeting was August 24th of 2023; correct?

***A.*** **Yes.**

***Q.*** Your third meeting was September 22nd of 2023; correct?

***A.*** **Yes, based -- yes.**

***Q.*** How long was your third meeting with the Government on September 22nd of 2023?

***A.*** **That one, I do not recall. I can say with high likelihood that it was shorter than the previous two.**

***Q.*** Can you give me an approximation?

***A.*** **Can you just remind me from the document? Was it in-person in San Diego? Right? That meeting?**

***Q.*** You don't remember?

***A.*** **That particular one, just confirming, that was in San Diego, that meeting?**

***Q.*** I'm asking you, sir, whether you do or do not remember the third meeting with the Government. It sounds like you don't.

***A.*** **That's why I was asking for confirmation from the document. Yeah, I don't have an exact recollection as I have for the first two meetings.**

***MR. PILCHAK:*** Just for the record, I think this is 1037.

***THE COURT:*** Really? I thought we had 1037 was dated September 22nd.

***MR. PILCHAK:*** I thought that's what we were talking about, your Honor.

***THE COURT:*** So you're showing 1037 again? Thank you. Makes me happy to have exhibits labeled.

***MR. PILCHAK:*** I'm sorry, your Honor. I blew it on 1036. That's wrong. We're trying to figure out what the mark is for the 8/24 interview. We don't have that yet. We're working on it.

***MS. BERNSTEIN:*** I'm going to go back for a moment just to keep things clear.

***THE COURT:*** That would be helpful.

***BY MS. BERNSTEIN:***

***Q.*** This is your second interview with the Government; correct?

***A.*** **Correct.**

***MS. BERNSTEIN:*** I don't know what number we're on, so I'm marking this 4000.

***THE COURT:*** Okay.

***BY MS. BERNSTEIN:***

***Q.*** Okay. Correct, the 8/24/2023?

***A.*** **Yes, Ms. Bernstein.**

***Q.*** When I show you Exhibit 4000, that's what helps you remember it; correct?

***A.*** **Sure.**

*Q.* And now we're looking at Exhibit 1037?
**A. Yes.**
*Q.* And does this refresh your memory as to how long your third meeting the Government was on September 22nd of 2023?
**A. This is date of entry -- I'm sorry. This is referring to the September 23rd meeting, okay.**
*Q.* Does this refresh your memory?
**A. So --**
***THE COURT:*** The question is just how long it lasted, if you can remember.
***THE WITNESS:*** Maybe less than an hour or less than two hours at most. I would say one to two hours.
***BY MS. BERNSTEIN:***
*Q.* One to two hours?
**A. That's my recollection. Some video calls, I don't recall being on the call for a very long time. So again, I'm just --**
*Q.* It's hard to keep track of all this; right?
**A. Not easy, yes.**
*Q.* And these things were in 2023; correct?
**A. That's right.**
*Q.* Do you remember that your fourth meeting with the Government was on November 24th, 2024?
**A. I'm sure you're referring to the report. So it's accurate.**
*Q.* Well, but the question is whether you remember it.
**A. All I can say is yes, the meeting, of course, happened. But**

**specifics about the exact date and how long it was, other than the first two, I'm taking more or less a rough approximate --**
***Q.*** Okay.
***A.*** **-- estimate.**
***Q.*** Okay. We're going to show you Exhibit 3315.
***MS. BERNSTEIN:*** Can you call out the bottom, please.
***THE WITNESS:*** Yeah. This one I distinctly remember because it's at a different location.
***BY MS. BERNSTEIN:***
***Q.*** And how long do you recall that this fourth meeting with the Government in November of 2024 was?
***A.*** **Also six-plus hours.**
***Q.*** Do you remember meeting with the Government on January 7th of 2025?
We'll show you what's been marked as 1038.
***A.*** **Please.**
***MS. BERNSTEIN:*** Call out the bottom, please.
***BY MS. BERNSTEIN:***
***Q.*** Does this refresh your memory that your fifth meeting with the Government was on November -- excuse me -- January 7th of 2025?
***A.*** **Okay.**
***Q.*** Is that a "yes"?
***A.*** **Yes. Yes, Ms. Bernstein.**
***Q.*** And how long was that meeting?

**A. Maybe a little over half a day, or same, similar number of the order of six hours.**
*Q.* The six, plus or minus?
**A. Yeah.**
*Q.* Do you remember meeting with the Government on February 6th and February 7th of 2025?
**A. Oh, I'm so sorry. I remember this -- it just came back. I was traveling that day, January 7th. This is actually a phone call and this lasted half an hour.**
*Q.* Half an hour?
**A. I'm so sorry. Yeah. Yeah, it's coming back. When I just saw the Teams call that, triggered my memory. Yes, January 7th. And I was out of town. I was traveling. I called into this meeting. It was in the afternoon. I had to go find a quiet corner because I was at a conference. So that completely recall.**
*Q.* Because it's hard to recall things even that occurred a few months ago; correct?
**A. It's not easy, yeah.**
*Q.* Do you remember meeting with the Government on February 6th and February 7th of 2025?
**A. Yeah. There were meetings following this.**
*Q.* And do you remember how long those meetings were on the 6th and the 7th of February in 2025?
**A. Again, can you please clarify just bring up that --**

***Q.*** Sure. We're going to show you Exhibit 3316.
Does this refresh your memory that you met with the Government on February 6th and February 7th of 2025?
***A.*** **Yes, it does.**
***Q.*** And how long were those meetings?
***A.*** **So the meeting on the 6th was an all-day meeting. The meeting on the 7th was half a day.**
***Q.*** And is all day six hours or eight hours or ten hours?
***A.*** **So we started at 9:00, broke for lunch for an hour, and maybe we were done around 4:00-ish, 4:30 or so, somewhere like that.**
***Q.*** So about six hours. Is that fair?
***A.*** **Yeah.**
***Q.*** And the meeting on the 7th was a half day.
Does that mean about three hours?
***A.*** **Yeah, three-plus, yeah.**
***Q.*** And do you remember meeting with the Government on March 7th of 2025?
***A.*** **Yes.**
***Q.*** And how long was that meeting?
***A.*** **Again, can you please flash that?**
***Q.*** Sure. We'll show you Exhibit 3284.
I'm sorry. Before we do that, do you not remember March 7th of 2025?
***A.*** **No, I do remember. I just want to be sure because, as I**

**said, I'm able to recall whenever is there a document to back it up. It serves as a trigger.**
*Q.* Okay. And today is March 24th of 2025; correct?
***A.*** **Yeah.**
*Q.* March 7th was just over two weeks ago?
***A.*** **Correct.**
*Q.* But you need a document to remember what happened on March 7th?
***A.*** **I'm just trying to be absolutely precise about my answer. So just confirming it. That's all.**
*Q.* And so you need a document to be precise about an answer for something that was two and a half weeks ago?
***A.*** **Not necessarily in this case, but I just wanted to make sure I provide the right answer. Because of the combination of video calls and in-person meetings, that's a part that I wanted to...**
*Q.* Was your meeting on the 7th, two days before trial started, in person or by video?
***A.*** **That was in person.**
*Q.* And do you remember how long it was?
***A.*** **That was an all-day meeting.**
*Q.* Is all day again six, plus or minus, hours?
***A.*** **Yeah.**
*Q.* And before each one of these eight meetings, you spent time preparing; correct?
***A.*** **Yes.**

***Q.*** For each hour that you spent with the Government, you spent hours beforehand preparing for it; correct?

***A.*** **I reviewed documents so that the documents can refresh my memory.**

***Q.*** And I'm not asking about the substance of anything that was discussed, but you would also meet with your attorney before all of these meetings with the Government; correct?

***A.*** **Yeah.**

***Q.*** About how long would you spend before each meeting preparing, looking at documents, meeting with your attorneys?

***A.*** **I think it varied. I would say the most time that I put in was in the first two meetings. And that served as a good sort of refresh mechanism because I reviewed the previous documents. And then the subsequent ones, it was more a matter of refresher if I wanted to re-look at some documents, put in some incremental effort for the subsequent months.**

***Q.*** So how many hours would you say you put in for those first two meetings?

***A.*** **For the first two meetings on my own preparing for it, myself studying?**

***Q.*** Sure.

***A.*** **Maybe close to about 20 hours or so, somewhere in that range, just going through on the documents that I had access to.**

***Q.*** Is that 20 hours for each meeting? 20 hours total for the first two?

**A. For the first two.**
Q. And then thereafter, about how long would you say you spent preparing?
**A. That really varied. Maybe it would have been half an hour to a couple of hours.**
Q. And your third meeting with the Government was in September of 2023; right?
**A. Yes.**
Q. And your fourth meeting with the Government was in November of 2024?
**A. Mm-hmm.**
Q. So about 14 months apart; correct?
**A. Yeah.**
Q. Prior to your fourth meeting, did you spend more time preparing?
**A. I don't think so.**
Q. Okay. So you spent about 20 hours preparing for the first two meetings combined, and thereafter about a half hour to a couple of hours before each meeting?
**A. Yeah.**
Q. And separate and apart from the time you spent preparing, you'd also think about these upcoming meetings for a while; correct?
**A. It is all included in the estimate that I gave you.**
Q. All of your non-preparatory work, just thinking about it,

worrying about it, wondering about it is included in that estimate?
**A. As I said, most of my prep time was to make sure that I had read through the previous emails, the text messages so that I could have a good recall as I was heading into the meeting.**
*Q.* And when you had in-person meetings you also had to travel here; correct?
**A. Yes.**
*Q.* And about how long would that travel take?
Well, let me withdraw.
Would you fly or would you drive, or how would you get here?
**A. I was flying.**
*Q.* About how long would it take you to travel when you'd come in for these in-person meetings?
**A. I'd fly from San Jose. It's an hour and a half long flight. But if you look at the total time in door to door, so as to speak, it will be close to -- by the time I check into the hotel, close to, let's say, six hours or so.**
*Q.* How many total hours -- well, here, let's do this.
Do you know how many total hours you've spent meeting with the Government?
**A. Maybe we can do a quick math here, Ms. Bernstein. We went through each individual meeting, so I wasn't really tabulating it.**
*Q.* I think you said the first meeting was August 14th of 2023.

***A.*** **Correct.**
***Q.*** And I believe you testified that that meeting was six hours, give or take; correct?
***A.*** **Correct.**
***Q.*** The second meeting was August 24th of 2023?
***A.*** **Correct.**
***MS. BERNSTEIN:*** And can we publish this demonstrative so the jury can follow along?
***THE COURT:*** Any objection?
***MR. PILCHAK:*** No, your Honor.
***THE COURT:*** Should we take a break first?
***MS. BERNSTEIN:*** Sure that's fine, your Honor.
***THE COURT:*** How about 15 minutes.
Ladies and gentlemen, you're reminded you're not to discuss the case or research the case. We'll see you back in 15 minutes.
***(Jury out at 2:39 p.m.)***
***THE COURT:*** Thank you, Mr. Olah.
We're now outside the presence of the jury. Any issues we need to take up?
***MR. PILCHAK:*** No for us, your Honor.
***MS. BERNSTEIN:*** No, your Honor.
***THE COURT:*** Okay. Fifteen minutes.
***(Recess taken.)***
***THE COURT:*** Okay. We are back on the record. All

jurors are present. Dr. Arabi and the lawyers are present. And you're reminded you're still under oath to tell the truth.

Ms. Bernstein.

***MS. BERNSTEIN:*** Thank you, your Honor.

***BY MS. BERNSTEIN:***

***Q.*** So Mr. Taneja, I think we were going through this math exercise that you requested; correct?

***A.*** **Yes, Ms. Bernstein.**

***Q.*** Okay. So your second meeting with the Government was August 24th of 2023, as refreshed by Exhibit 4000; correct?

***A.*** **Correct.**

***Q.*** And that one was also six, plus or minus, hours?

***A.*** **That's right.**

***Q.*** Your third meeting was November *[sic]* 22nd of 2023; correct?

***A.*** **Correct.**

**Did you say November or September?**

***Q.*** I'm sorry, I intended to say September.

***A.*** **Okay.**

***Q.*** And that meeting was, I think you said, one to two hours; correct?

***A.*** **Yeah.**

***Q.*** Fair if I just do 1.5?

***A.*** **That's fine, yeah.**

***Q.*** Your fourth meeting was November 24th -- excuse me -- November 21st of 2024; correct?

**A. Correct.**

*Q.* And you testified that that one was six, give or take; correct?

**A. Correct.**

*Q.* Your fifth meeting was January 7th of 2025; correct?

**A. That's right.**

*Q.* And that's the one that you remembered was about a half hour; correct?

**A. Correct.**

*Q.* Your sixth meeting was February 6th of 2025; correct?

**A. Correct.**

*Q.* And that one was six, give or take?

**A. Right.**

*Q.* Your seventh meeting was February 7th of 2025; correct?

**A. That's right.**

*Q.* And that was a half day; correct?

**A. Half day.**

*Q.* Your eighth meeting was March 7th of 2025?

**A. That's right.**

*Q.* And that was all day; correct?

**A. That was all day.**

*Q.* You'll have to bear with me.

**A. Surely.**

*Q.* So 6 plus 6 plus 1.5 --

***MR. PILCHAK:*** Objection. Math.

***THE COURT:*** I think we can add it up. Looks like it adds up to 35 if you multiply the sixes together and the three and two.

***BY MS. BERNSTEIN:***

***Q.*** Is the judge correct, it's 35? Does that math look right to you, sir?

***A.*** **Yes, Ms. Bernstein, it does.**

***Q.*** So that's about 35 hours, give or take, with the Government preparing for today; correct?

***A.*** **Correct.**

***Q.*** And I think you also testified that prior to these meetings, you prepared; correct?

***A.*** **Yes.**

***Q.*** And so for the first two meetings I think your approximation was 20 hours; correct?

***A.*** **Correct.**

***Q.*** And thereafter, you said a half hour to a couple of hours; correct?

***A.*** **That's right.**

***Q.*** Should I ballpark that at one hour, one and a half?

***A.*** **Sure.**

***Q.*** We'll just call it one hour for each, conservative estimate.

Would you agree that that is 26 hours of time you've also spent preparing for your testimony with the Government?

***A.*** **Yes, I agree.**

***Q.*** So the total time that you've spent preparing for today is at least 61 hours.

Is my math right?

***A.*** **Correct.**

***MS. BERNSTEIN:*** I'm going to mark this Defendant's Exhibit 4001.

***BY MS. BERNSTEIN:***

***Q.*** You spent a lot of time preparing for your testimony last week and today; correct?

***A.*** **Sixty-one hours on a very voluminous set of documents.**

***THE COURT:*** The testimony last week and today, not the preparation. Got it.

***THE WITNESS:*** Oh, I'm so sorry.

***THE COURT:*** It was unclear from the question.

***BY MS. BERNSTEIN:***

***Q.*** Let me rephrase that.

Your preparation for your testimony between last Wednesday and today was at least 61 hours; correct?

***A.*** **Correct.**

***Q.*** Because there's a lot of things to remember, and you want to be sure to get it right?

***A.*** **That's right.**

***Q.*** Your cooperation in this case wasn't just with the Government; right?

***A.*** **Sorry, Ms. Bernstein? What do you mean by "not just with**

**the Government"?**

*Q.* Your cooperation in this case started several years ago when you cooperated with Qualcomm and its investigators and lawyers?

***A.* Correct.**

*Q.* And those meetings were independent of the eight meetings that you've had here with the Government; correct?

***A.* That's absolutely right.**

*Q.* I'm going to show you Exhibit 3326.

In 2017 -- let me ask this first. In 2017, Qualcomm sued you, Dr. Arabi, and Ms. Alan; correct?

***A.* Correct.**

*Q.* Over the exact same allegations that are at issue in this case; correct?

***A.* That's right, similar.**

*Q.* And you agreed to cooperate with Qualcomm?

***A.* I did.**

*Q.* You signed an agreement with them just like you signed an agreement here with Mr. Pilchak?

***A.* Yes.**

*Q.* And is this that agreement on the screen at 3326?

***A.* It is.**

*Q.* And can we go to the -- well, let me stop for a moment.

This document indicates that it's 60 pages long. Do you see that in the bottom?

***A.* It does say that, yeah.**

*Q.* Can we go to the last page of this exhibit, please. Oh, I'm sorry. Let me take this down.

This is a 60-page document; correct?

***A.*** **That's what it says, yes.**

*Q.* And to spare all of us, we're going to just enter the first 15 pages of that. So I'm going to show you a different exhibit that's marked 3317.

Does this look like the exact same first page?

***A.*** **Correct.**

*Q.* And can we jump to the last page of this 15-page document, please.

And this is your signature?

***A.*** **Yes.**

*Q.* Can we go to the page just before it.

This is the signatures of Qualcomm; correct?

***A.*** **Correct.**

*Q.* And the page just before it, please.

And this is the signature of the attorney had you in that case; correct?

***A.*** **That's right.**

***MS. BERNSTEIN:*** Move to admit 3317.

***THE COURT:*** Any objection?

***MR. PILCHAK:*** No, your Honor.

***THE COURT:*** 3317 may be admitted.

***(Exhibit 3317 admitted.)***

***BY MS. BERNSTEIN:***

***Q.*** I want to go to page 2 of this, please.

And in the civil case, when you agreed to cooperate with Qualcomm, it was to help them obtain information documents and assistance in their lawsuit against Karim and Sheida; correct?

***A.*** **Correct.**

***Q.*** Go to page 7, please.

And you agreed to help them in any legal proceeding related to those allegations; correct?

***A.*** **Correct.**

***Q.*** And in exchange for cooperating with them, you got a number of benefits there as well; correct?

***A.*** **Yes.**

***Q.*** Qualcomm dismissed its case against you?

***A.*** **It did.**

***MS. BERNSTEIN:*** Can we go to page 3, please.

***BY MS. BERNSTEIN:***

***Q.*** Within three days after signing the agreement, Qualcomm requested dismissal of its case against you?

***A.*** **That's right.**

***Q.*** And do you know what the phrase "without prejudice" means on that third line?

***A.*** **Yes. I think it's a legal phrase. My understanding is that the case can be reopened if it is without prejudice at a later time.**

***Q.*** And so if you didn't hold up your end of the cooperation bargain there as determined by Qualcomm, they could reopen the case against you?

***A.*** **Correct.**

***Q.*** And as part of your cooperation -- well, we've established that you received 10 million plus in the sale of Abreezio; correct?

***A.*** **That's right.**

***Q.*** And as part of your cooperation, you never returned any of that money; correct?

***A.*** **Correct.**

***Q.*** The 10 million that you say was fraudulently obtained?

***A.*** **That's right.**

***Q.*** They let you keep it once you started cooperating?

***A.*** **As part of this agreement, yes.**

***Q.*** And in your agreement with Qualcomm, you agreed to answer just about anything that their attorneys asked you; correct?

***A.*** **That's right.**

***Q.*** You agreed to sit -- sorry.

***MS. BERNSTEIN:*** Let's actually put that exhibit back up, please, and go to page 5, Section H.

***BY MS. BERNSTEIN:***

***Q.*** You agreed to sit for up to 50 hours of interviews, exclusive of breaks; correct?

***A.*** **That was the provision for the maximum that they could**

**interview me for.**

*Q.* Meaning if you went to the bathroom, that didn't even count toward the 50 hours. Is that your understanding?

***A.* It says "exclusive of breaks."**

*Q.* And failure to participate in this would have let them reinstate the case against you; right?

***A.* It will be considered a breach of agreement, whatever the real consequences may be of that.**

*Q.* I think you just said your understanding of what that prejudice meant, that the case could come back?

***A.* That's my understanding, yeah.**

*Q.* And so failure to participate in these 50 hours of interviews exclusive of breaks would mean that the case could come back?

***A.* Yes. Qualcomm was entitled to a total of 50 hours, no more than 50 hours.**

*Q.* And in those interviews with them for no more than 50 hours, exclusive of breaks, you agreed to be honest of course; right?

***A.* Yes.**

*Q.* And you agreed to answer all of their questions?

***A.* I did.**

*Q.* Let's go to page 9, paragraph 9, please.

And if you knowingly or intentionally provided false or misleading information to Qualcomm, or testimony, or refuse to answer an interview -- excuse me -- refuse to answer a question

during interview or during testimony, Qualcomm could reinstate its case against you; correct?

***A.*** **Correct.**

***Q.*** And in fact --

***MS. BERNSTEIN:*** Thank you. You can take that down.

***BY MS. BERNSTEIN:***

***Q.*** In fact, you did sit for multiple interviews with Qualcomm; right?

***A.*** **I did.**

***Q.*** How many hours would you say you spoke with Qualcomm's attorneys?

***A.*** **Roughly, I would say, my first interview was half a day or so, less -- actually, half a day plus. We had a lunch break and then some more.**

**And there was a phone interview and an in-person interview. The in-person interview was, I believe, in May of 2018 for roughly about six-plus hours, like a day.**

***Q.*** And that was held in L.A.?

***A.*** **That was held in L.A., yes.**

***Q.*** At the law offices of Qualcomm's counsel?

***A.*** **Correct.**

***Q.*** And your first meeting, the half day, that was held in San Diego?

***A.*** **That was in San Diego.**

***Q.*** At Qualcomm?

***A.*** **Yes.**
***Q.*** In person?
***A.*** **In person.**
***Q.*** And the phone interview, how long would you say that one was?
***A.*** **That, I don't have a recollection how long the phone interview was.**
***Q.*** And you prepared for those meetings as well; correct?
***A.*** **I was, yeah.**
***Q.*** You reviewed documents?
***A.*** **Yes, I reviewed documents.**
***Q.*** You met with your attorneys?
***A.*** **Yes.**
***Q.*** You thought about them. You thought about what you were going to say?
***A.*** **Yes.**
***Q.*** How many hours would you say you reviewed documents or met with your attorneys and thought about what you were going to say before each interview?
***A.*** **I don't recall how long I spent.**
***Q.*** I just want to go back to this for a moment. I'm showing Exhibit 4001.
You had three meetings with Qualcomm?
***A.*** **To the best of my recollection, yeah, three.**
***Q.*** When was the first one?

**A. The first one was -- the case was dismissed in January 2018, and it was very shortly thereafter. Could have been late January, could have been early February.**
Q. It was February 8th of 2014.
Does that sound right?
**A. 2014 you said? 2018.**
Q. 2018.
**A. Yes.**
Q. Thank you.
**A. Yes.**
Q. And that was a half day; correct?
**A. A little over.**
Q. Is four hours a fair --
**A. Yeah, four would be.**
Q. When was your phone interview?
**A. To the best of my recollection, it was the same month, I think.**
Q. And what's your guess for how long that one was?
**A. That, I really don't have a good recollection how long that was.**
Q. And then you also met with them in May of 2018, you said?
**A. Correct.**
Q. And do you remember what day in May?
**A. I don't remember the day.**
Q. And that was six hours; correct?

**A. Yeah. It was all day.**
*Q.* And you spent time preparing for all of these meetings?
**A. Yes.**
*Q.* So there's at least another ten hours that you've spent going over the same exact things; correct?
**A. I wouldn't say exactly same things. Similar things.**
*Q.* You've spent a lot more time crafting what you were going to say in this courtroom than you did crafting what you would say in Abreezio to get $10 million; correct?
**A. What exactly do you mean by "crafting"?**
*Q.* How many hours did you spend thinking about all of the -- thinking about, preparing for, and delivering all of the lies to all of the people that you testified you did in the course of Abreezio's acquisition by Qualcomm?
**A. Are you referring to 2015?**
*Q.* Correct.
**A. And please how many hours? What was the question?**
*Q.* How many hours did you spend preparing all of your lies, orally or written, in the ten months that you lied leading up to Abreezio's acquisition of Qualcomm?
**A. Not very long. All the direction was coming from Dr. Karim Arabi, as you saw in the supporting documents, about what to say, what to say in the responses, *et cetera*.**
*Q.* So you've spent at least 71 hours preparing for testimony in this trial; correct?

**A. Preparing for testimony, if that's what you want to call it. Part of my plea agreement required a cooperation agreement, Ms. Bernstein, so I lived up to my obligations. I did that. And then when I was asked to appear in the testimony, I agreed to that.**

*Q.* And you've spent over 71 hours reviewing documents, talking to Qualcomm's lawyers, talking to Qualcomm's investigators, talking to the Government, talking to the FBI, talking to the IRS, talking to the Marshals Service, talking to your lawyers preparing for what you would say here today; correct?

**A. I've spent this number of hours as part of a diverse set of responsibilities I had. It was not specifically I've spent 71 hours for testimony. I'm just trying to make that distinction.**

*Q.* You've spent 71 hours talking to Qualcomm's lawyers, Qualcomm's investigators, your lawyers, the Government, the FBI, the Marshals Service, the IRS. Correct?

**A. Cumulatively, yes.**

*Q.* And that's a conservative estimate; correct?

**A. I'm not sure if it's conservative or realistic or optimistic. But based on the best of my recollection, this is close enough.**

*Q.* And you're good at understanding how to connect with your audience; correct?

**A. What do you mean, Ms. Bernstein?**

*Q.* Well, you've previously said that you like to put yourself

in the position of the customer and think through the problems that they're trying to solve; correct?

***A.*** **Yes.**

***Q.*** That that's the guiding principle throughout your career; correct?

***A.*** **Mm-hmm.**

***Q.*** And you're good, in fact, at understanding how to best connect with your audience?

***A.*** **I -- I'm -- when I'm going for a customer meeting, I like to understand, put myself in the shoes of the customer, and what are their current challenges and the future challenges, so that I can relate with their problem statement and how the technology is going to help them deliver value in solving those problems.**

***Q.*** And here, you've spent over 71 hours understanding the current challenges and the future challenges of Qualcomm and the Government's prosecutions of Karim and how to best relate with them and help them solve anticipated problems; correct?

***A.*** **I disagree with that characterization, with all due respect, Ms. Bernstein. As I said, as part of the plea agreement, I entered into a cooperation agreement and I took this responsibility very seriously. I wanted to be precise. I wanted to be totally truthful. And that required me to do a detailed study of all the past documents. And I think it was absolutely my obligation to do that, which I did.**

***Q.*** How much time have you spent reviewing documents to be

precise and to be totally truthful with me?
**A. I've not reviewed any documents with you other than the testimony we are just doing.**
*Q.* You've never met with me, have you?
**A. I have not.**
*Q.* How much time have you spent wanting to be precise and totally truthful meeting with other people on my team?
**A. No one.**
*Q.* You've never met with anyone on my team?
**A. No.**
*Q.* What about my law firm? Have you met with anyone from my law firm?
**A. No.**
*Q.* So you're here talking with us to be precise and truthful, but for the first and only time ever right here in court in front of the jury; correct?
**A. Yeah.**
*Q.* The first interview you ever had about these allegations was in February of 2018; correct?
**A. Correct.**
*Q.* And you wanted to be precise?
**A. Yes.**
*Q.* And you wanted to be detailed?
**A. Mm-hmm.**
*Q.* And you wanted to be truthful?

***A.*** **Yes.**
***Q.*** And accurate?
***A.*** **Yes.**
***Q.*** And complete; correct?
***A.*** **Yes.**
***Q.*** Because failure to provide truthful, accurate, detailed complete information could have meant that Qualcomm would reinstate the lawsuit against you?
***A.*** **Yes.**
***Q.*** They could rescind your cooperation agreement?
***A.*** **That's right.**
***Q.*** If they decided that you were not truthful, accurate, and complete?
***A.*** **Yes.**
***Q.*** And on February 8th of 2018, you said a lot of different things than what you testified to last week and today, didn't you?
***A.*** **Can you give me examples?**
***Q.*** Happily.
In 2018, these events occurred in 2015; correct?
***A.*** **Yeah.**
***Q.*** And 2018 was a lot closer to 2015 --
***A.*** **Correct.**
***Q.*** -- than 2025 is to 2015?
***A.*** **Right.**

**Q.** And the facts from 2015 were a lot fresher in your mind in 2018; correct?
**A. Correct.**
**Q.** Now it's been over ten years?
**A. Yeah.**
**Q.** And in fact, as we saw, sometimes you have trouble remembering even what happened a few weeks ago; right?
**A. The March reference, in my mind, I thought it was 2024. So when you made it clear that it was only a few weeks ago, that was different, yeah.**
**Q.** You also asked to look at documents about January of 2025.
**A. Yes, I did.**
**Q.** So it's human nature to have some trouble to recall things.
**A. Yes, yes. The documents help trigger it.**
**Q.** It's human nature to have a hard time recalling things that occurred over ten years ago?
**A. That's right.**
**Q.** Even things that occurred a few weeks ago?
**A. Yes.**
**Q.** Even a few months ago?
**A. Yes.**
**Q.** You first met with Karim in 2014, October of 2014, to discuss your QED project; correct?
**A. You said when I first met Karim or in the context of QED, my project.**

**Q.** Is the first time you met with Karim to discuss your QED project in October of 2014?

**A. For discussion of the project, yes, the first time.**

**Q.** And during that conversation, Karim mentioned to you that he was looking at a startup venture with design IP technology; correct?

**A. Correct.**

**Q.** He said that he had a team in mind?

**A. Yes.**

**Q.** And the next time that you saw him was over coffee in San Jose in December of 2014; correct?

**A. That's right.**

**Q.** And you learned that his sister had preliminarily developed some technology ideas; correct?

**A. That's right.**

**Q.** That she was a very bright student pursuing a master's degree in Canada?

**A. Correct.**

**Q.** That a team in Canada was working on her ideas?

**A. Right.**

**Q.** And that one of the technical ideas that his sister had developed was in DFT; correct?

**A. That's right.**

**Q.** And because of your background in DFT, that perhaps you could be involved in the company that Karim was putting

together?
**A. That's right.**
*Q.* Last week, Mr. Pilchak asked you if you knew Karim's sister before this meeting.
Remember that?
**A. Yeah.**
*Q.* And you did not know her; correct?
**A. Correct.**
*Q.* You're not friends with Karim, are you?
**A. Business acquaintance.**
*Q.* And you never had a personal relationship with him?
**A. How would you characterize a personal relationship?**
*Q.* Have you said that you've never had a personal relationship with him?
**A. Business acquaintance.**
*Q.* And did you have a personal relationship with him?
**A. Can you define that a little bit more? Because that would mean different things.**
*Q.* What does it mean to you?
**A. To me it means someone that you socialize with versus business acquaintance where it is business meetings.**
*Q.* And you never socialized with Karim?
**A. It's all -- only on business-related topics.**
*Q.* So have you, in fact, said that you had no personal relationship with Karim; yes or no?

**A. No personal relationship. For example, the reason I'm being a little -- so I'll give you an example. I wrote a letter for him to recommend him for his green card. Would you consider that a personal relationship or would you consider that a business acquaintance?**

*Q.* Sir, I'm asking you if you have said that you have no personal relationship with Karim; yes or no?

**A. So in the context of the way I defined it, it's a business acquaintance.**

*Q.* Have you said that you had no personal relationship with Karim?

**A. To whom?**

*Q.* Have you said this?

**A. I may have had. I don't remember.**

*Q.* Because in fact, you did not have any personal relationship where you socialized or however else you define it; correct?

**A. Correct.**

*Q.* You don't know anything about his family; correct?

**A. Correct.**

*Q.* You don't know anything about him; correct?

**A. Mainly on the professional side.**

*Q.* On Wednesday you testified that you had seen Karim again sometime before the holidays.

Do you remember that?

**A. That's right.**

***Q.*** But in February of 2018, you said the next time you heard from Karim was in January 2015; right?

***A.*** **In the February interview?**

***Q.*** Yes.

***A.*** **Possibly.**

***Q.*** And in the February 2018 interview, which was a lot closer in time to 2015, you explained that in your January of 2015 meeting with Karim, he described what would later become Abreezio by saying that there were two provisional patents that his sister had filed?

***A.*** **Correct.**

***Q.*** Correct?

***A.*** **Correct.**

***Q.*** And that his sister was getting advice from Bozena Kaminska?

***A.*** **Correct.**

***Q.*** Who had been Karim's Ph.D. advisor?

***A.*** **Which I did not know at the time when Karim shared with me in 2014.**

***Q.*** And you also said back in February of 2018, about this January of 2015 meeting, that Karim told you that the Canadian engineering team who was developing his sister's technology was okay with an outside CEO?

***A.*** **Yes.**

***Q.*** And he invited you to come to San Diego to discuss the potential role?

**A. That's right.**
*Q.* And in February of 2018, you said that this invitation to come to San Diego to discuss the role came as a total surprise.
Do you remember that?
**A. Yeah. At that meeting, I'll be very candid, I was minimizing my own role.**
*Q.* You were lying?
**A. Yes. I lied at the Qualcomm interview. Either I didn't disclose all the facts, or I lied about the knowledge of when I got -- the alias was being used by Karim. I remember having made that statement, which is not true.**
*Q.* And not more than ten minutes ago, you just told me that when you answered Qualcomm's questions, you were precise and detailed and truthful and accurate and complete?
**A. You said -- the question was you wanted to be precise, you wanted to be this. That's the way I understood the question. And these are the two areas of inconsistencies or where I was not truthful.**
**The first one, not acknowledging that I had knowledge about the alias early on instead of saying it was late in the game. And frankly, I was just trying to put myself in the best light.**
**And secondly, it was about Ziad's involvement.**
*Q.* And sir, when I asked you not less than ten minutes ago, you feel very comfortable providing whatever answer you would like regardless of the question I've asked; correct?

***MR. PILCHAK:*** Objection. Argumentative.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** When I asked you ten minutes ago, you didn't volunteer this, did you?

***A.*** **I did not volunteer it, but I'm volunteering it now.**

***Q.*** And is this the first time that you've ever told Qualcomm's counsel that, in fact, you were not truthful and honest in February of 2018?

***A.*** **Is there a Qualcomm counsel? I have not shared with the Qualcomm counsel about this, no.**

***Q.*** You have shared with them before or today's the first time you're ever saying this?

***A.*** **It is the first time I'm saying this.**

***Q.*** And it's your testimony today that in your meeting in February of 2018, you were not truthful?

***A.*** **In the interviews with Qualcomm, yes, I was not totally truthful. There was -- I did not disclose all the facts, for example, that Ziad had an alias. And I was not truthful about when I found out about the alias being used by Karim, the email being used by Karim. That knowledge came towards the end of February, and my statement at the interviews were that it was much later.**

***Q.*** So you fixed those comments before you met with them again in May?

**A. I don't recall. I'm saying collectively during the interviews, those are the two areas where either I did not disclose the fact or I was not truthful.**

*Q.* So in the February of 2018 interview, you were not truthful about two areas; correct?

**A. I was not singling out just the February 1. I was saying collectively during the three interviews. It's hard for me to tell what was the subject matter of each interview. But collectively over the three interviews.**

*Q.* You were dishonest three separate times in three separate interviews despite having a cooperation agreement and signing a contract to be truthful; correct?

**A. If the same question got asked, the two that I just pointed out, in all three interviews, then yes, the answer is yes.**

*Q.* So you were dishonest despite signing a contract to be truthful on three separate days in three separate interviews; correct?

**A. If the same set of questions were asked during the three, yes.**

*Q.* So what is your testimony? I want to try and understand.

You were only dishonest about what?

**A. It doesn't matter. I am acknowledging I was dishonest about these two areas that I remember with my interviews at Qualcomm. Whether it was at the first interview and repeated and repeated in the second and the third, it's the same thing.**

*Q.* You just couldn't help yourself and be honest, could you?
**A. I mentioned earlier, yes, I did not disclose all the facts. And I was trying to put myself in the best light, compared to here where I have pled guilty to the wrongdoing.**
*Q.* What's the difference in your mind between these two?
**A. I am under oath. I take the oath very seriously.**
*Q.* So when you're not under oath you're free to lie, but when you are under oath, no more lies? Is that your testimony?
**A. I acknowledged that during the civil interview, I made statements which were either not true, or I did not disclose all the facts.**
*Q.* You've made a lot of statements that were not true where you didn't disclose all the facts outside of the civil interviews. Right?
**A. I don't understand what your question is.**
*Q.* Have you made a lot of statements that were not true or where you did not disclose all of the facts outside of the three interviews you gave with Qualcomm after signing a contract to be truthful, accurate, and complete?
**A. The only other statements I have given are in the context of my cooperation agreement and the testimony that I am doing here today. And that is absolutely truthful.**
*Q.* Were you under oath? Did someone swear you in under oath for all the eight meetings you had with the Government?
**A. I was not under oath, but I understood the consequences of**

**not being truthful.**

*Q.* What were the consequences of not being truthful as you understood them in the civil case?

***A.*** **In the civil case, the agreement will be rescinded.**

*Q.* You'd lose your 10 million; right?

***A.*** **And lose the 10 million, yes.**

*Q.* So you understood that there were consequences there in your words as well?

***A.*** **That's right.**

*Q.* But you were not truthful in three separate interviews if certain questions were asked?

***A.*** **That's right.**

*Q.* But you were truthful for these eight interviews?

***A.*** **Yes.**

*Q.* And you were truthful for your testimony?

***A.*** **Correct.**

*Q.* But you were also not truthful for the ten months leading up to Qualcomm's acquisition of Abreezio in 2015; correct?

***A.*** **Correct.**

*Q.* Okay. And I'm sorry, so there were two areas.

Your testimony is that for the first time there were only two areas you were dishonest about in your interviews with Qualcomm?

***A.*** **Those are the two that I remember.**

*Q.* But as I ask you more questions, you might remember more

areas --
**A. There might be others --**
*Q.* -- where you were not truthful?
**A. -- sure.**
*Q.* Have you in fact reviewed the memos that Qualcomm's attorneys wrote of these interviews?
**A. I have not.**
*Q.* You've not looked at those?
**A. I have not at those.**
*Q.* You've not prepared for that today?
**A. I have not prepared for that.**
*Q.* Are you aware that those interviews were recently disclosed?
**A. I am aware that they were disclosed.**
*Q.* And you don't know what's in them?
**A. I do not know what's in them. I do not have a copy of them, have no idea what's in them.**
*Q.* And so as we sit here in this moment, there's only two areas that you recall lying about in those interviews?
**A. Those are the ones from my memory, correct.**
*Q.* Do you understand there to be a statute of limitations on your civil case?
**A. Yes.**
*Q.* So there's no consequence to saying now that you lied; correct?
**A. I don't understand. There might be some legal consequences.**

**I'm not sure.**

***Q.*** Well, are you going to lose the 10 million? Is Qualcomm going to come back for it right now since this is the first time you've ever admitted to lying in those interviews with them?

***A.*** **I suppose that might be the legal inference from that.**

***Q.*** That's your concern, that that could happen to you seven years later, or do you understand that nothing will happen to you as a result of admitting that you just lied in those interviews with Qualcomm?

***A.*** **Are you suggesting that the statute of limitation period is past?**

***Q.*** I'm not suggesting anything, sir. I'm just trying to make sense of the fact that you just admitted to lying in those interviews with Qualcomm. You testified that the consequence of that could have been at the time, that if Qualcomm knew this, they would rescind your agreement and continue to prosecute you; correct?

***A.*** **So Ms. Bernstein, as I mentioned earlier, as I sit on this witness stand, I am being absolutely truthful. I've taken an oath to tell the truth. That's all that I know.**

***Q.*** What did you tell Qualcomm in 2018 when you signed that contract? Did you tell them I'm not under oath so I'm not going to be totally truthful, or did you not say that?

***A.*** **I am a human. I was trying to put myself in the best light in the civil interview.**

*Q.* So you didn't tell them that because you weren't under oath you were going to be dishonest; correct?
***A.* I didn't tell them anything like that.**
*Q.* And I want to make sure I have it.
The two areas that you claim you lied about are Mr. Ziad Mansour's alias, and what was the other one?
***A.* So that is -- I did not disclose that Ziad had an alias, which I had learned, as we mentioned in the -- earlier in the testimony toward the August/September/October time frame. And the second one was when did I have the knowledge that this alias email was being used by Dr. Karim Arabi.**
*Q.* Did anyone ask you to lie to Qualcomm in 2018 in those interviews?
***A.* No one asked me.**
*Q.* And you said in those interviews in 2018 -- and we're going to have to probably go through a lot. You'll have to let me know if it was a lie or if it wasn't a lie.
But you had said that it came as a total surprise to you when in January of 2015, Dr. Arabi invited you to come to San Diego to discuss the potential CEO role of Abreezio; correct?
***A.* If that's what the interview say, I don't remember. But if that's what the document says.**
*Q.* Well, sir, I have no idea when you were lying and when you were not lying.

So is that true or is that not true?

**A. I don't recall that statement. It may very well be true. I have not seen the document. I didn't transcribe that document. I don't recall.**

*Q.* Do you have any reason to think that they wrote false things in that document?

**A. I have no reason to believe that.**

*Q.* Did they tell you they were going to lie?

**A. No.**

*Q.* So if the document says that you said it came as a total surprise, you have no reason to doubt that that's in fact what you said?

**A. Yeah, I have no reason to believe that Qualcomm lawyers would be making it up.**

*Q.* Were you making it up, though?

**A. If that's what the statement says, that's a made-up statement, yes.**

*Q.* So that's another thing you lied about. It didn't come as a total surprise to you?

**A. It did not. The conversation started October 2014.**

*Q.* Okay. So I think we're at three lies in the Qualcomm interviews; correct?

**A. Yes.**

*Q.* Okay. In February of 2018, when no one asked you to lie to Qualcomm, you said that you understood that Sheida was very

lucky to have Bozena Kaminska as a mentor; correct?
**A. Okay.**
Q. Yes or no?
**A. I don't recall the specifics of what I said in an interview that happened seven years ago without looking at any document that triggers my memory.**
Q. You didn't write these memos, you're saying; right?
**A. I didn't write these memos.**
Q. So why would the memos trigger your memory?
**A. Just like you were showing me the January 7th meeting with the Government, I saw something that said a Teams call and that immediately triggered my memory that it was -- I was traveling, I was at a conference. So there could be some triggers in the document that might help me.**
Q. Okay. So if the document said that in February of 2018 you said that you understood that Sheida was very lucky to have Bozena Kaminska as a mentor, does that trigger your memory?
**A. I'm not going to argue about it, Ms. Bernstein.**
Q. It's a yes or no, sir.
Does that trigger your memory?
**A. Yes.**
Q. It does trigger your memory?
**A. I will take the statement on its face value. It doesn't necessarily something come up and trigger my memory, but I will just take that on its face value.**

*Q.* Okay. So you said it, but now the big question is: Was it -- is that true, or were you lying about that to Qualcomm as well?
***A.*** **Professor Kaminska is a well-known researcher in our field.**
*Q.* Okay.
***A.*** **So that's what that comment -- that's what I meant by that comment.**
*Q.* You said in February of 2018 that even though Dr. Kaminska had moved into a new field, brilliant professors can somehow spit out an idea that a student works with and turns into a patent; correct?
***A.*** **Yeah.**
*Q.* Is that true or was that a lie?
***A.*** **Yeah. This graduate student that will combine with a professor, that is my general observation, yeah.**
*Q.* So that one's true?
***A.*** **Yes.**
*Q.* In 2018, February of 2018, you said that you concluded that Sheida got lucky and stumbled on these great insights working with Dr. Kaminska; correct?
***A.*** **Okay.**
*Q.* Is that true or is that a lie?
***A.*** **She -- could you please repeat that?**
*Q.* You said that Sheida got -- you had concluded that Sheida got lucky and stumbled on these great insights working with

Dr. Kaminska.

Is that true, or is that a lie?

**A. That's a lie.**

**Q.** So I think we're up to at least four lies, if I'm keeping track; correct?

**A. Yeah.**

**Q.** In February of 2018, you explained that you were told that Sheida was shy and introverted.

Do you remember that?

**A. Yes.**

**Q.** You've said that one a few times; right?

**A. Correct.**

**Q.** Is that true or is that a lie?

**A. Absolutely truthful.**

**Q.** You explained that you understood that Sheida did not have experience with business; correct?

**A. Correct.**

**Q.** Is that true or is that a lie?

**A. That's true.**

**Q.** That Karim was getting involved to help her with the operational stuff.

Do you remember saying that?

**A. Yes.**

**Q.** Is that true or is that a lie?

**A. Initially, he had indicated that he would be helping with**

**the operational stuff because his sister doesn't have the business background. But as things unfolded, it was in every aspect of the company.**

*Q.* So when you said that Karim was getting involved only to help her with the operational stuff, in February of 2018, when you had signed a contract pursuant to a cooperation agreement to be truthful, accurate and complete, that was another lie?

***A.*** **It depends on how the operational aspect was interpreted. Operations --**

*Q.* So the question is not about someone else's interpretation. It's about your statements and whether your statements were a lie or were not a lie.

***A.*** **I will need to look at the document to see if there is reminder on text and how Karim's involvement got into each and everything. Does it talk about that in the document? I haven't seen the document. So you cannot look at that just that statement alone without the remaining context.**

*Q.* And we haven't spent 70 hours preparing to have a seamless testimony today, have we?

***A.*** **We haven't.**

*Q.* In February of 2018, pursuant to a signed contract to be truthful, accurate, and complete, you said that Karim had disclosed to someone at Qualcomm that he was working on operational components of Abreezio; correct?

***A.*** **Operational components of Abreezio. Okay. Can you**

**repeat -- can you read the rest of the sentence?**

*Q.* Is it true or is it a lie that in February 2018, when you said pursuant to a signed agreement to be truthful, accurate, and complete, that Karim was working on operational components of Abreezio, was that true or was that a lie?

***A.* So that document is saying I made that statement to someone at Qualcomm?**

*Q.* I'm asking you if you told anyone at Qualcomm when you were interviewed pursuant to an agreement to be truthful, accurate, and complete that Karim had disclosed to someone at Qualcomm that he was working on operational components at Abreezio.

Did you say that?

***A.* I don't fully recall that.**

*Q.* Is it true that Karim had disclosed -- that you knew that Karim disclosed to someone that he was working on operational components at Abreezio?

***A.* Unless, of course, I was referring to Ziad, Ziad Mansour.**

*Q.* Unless, of course, you were referring to Ziad Mansour?

***A.* Yeah.**

*Q.* So is it true that Karim had disclosed to someone at Qualcomm that he was working on operational components at Abreezio?

***A.* If that someone is Ziad, yes.**

*Q.* Okay. So Karim had disclosed to Ziad that he was working on operational components at Abreezio?

**A. So if you go to the testimony on the first day, as I mentioned, January 24th, 2015, Karim had arranged a meeting, a lunch meeting, with Ziad and Akbar. And at that meeting, there was a discussion around the technology that was coming from Karim's sister, and that was that I was excited to come on board as the CEO of the company.**

***Q.*** Do you remember telling Qualcomm that Karim explained that Sheida had no interest or experience in business so he was helping her assemble the team, find the right people, and come up with the operational plan?

**A. This was -- just repeat the question. Just read the sentence slowly one time.**

***Q.*** Do you remember telling Qualcomm that Karim explained that Sheida had no interest or experience in business, so he was going to help her assemble the team, find the right people, and come up with the operational team?

**A. Yeah. Essentially, I was maintaining the fiction that he had put down in the cap table.**

***Q.*** But this is in May of 2018; right?

**A. That's right.**

***Q.*** And you've already been sued; right?

**A. Yeah.**

***Q.*** And you've cooperated; right?

**A. Yeah.**

***Q.*** And you agreed to be truthful?

**A. Yes.**
*Q.* And accurate and complete and precise in detail, because a failure to do so would have had repercussions for you, one of which would have been you'd lose the $10 million you claim you fraudulently obtained; correct?
**A. Correct. As I mentioned --**
*Q.* No one is asking to you lie; correct?
**A. No one is asking me to lie.**
*Q.* And you explain this, but is this another lie?
**A. Yes.**
*Q.* And I have genuinely lost track.
Are we at five or six lies that we've identified so far?
**A. Possibly six, I think.**
*Q.* Do you remember telling Qualcomm that Karim always referred to Abreezio and its products as -- that Karim did not refer to Abreezio and its products as "our company," that you remember Karim always suggesting that he would say, quote, you guys should do X, Y, and Z, not we should do X, Y, and Z? Do you remember that?
**A. Yeah.**
*Q.* Was that truthful, or was that a lie?
**A. In fact, there was a text that was displayed on the first day of the testimony where it says these names for your product. So that's a true statement.**
*Q.* So this one's true?

**A.** **Yes.**

**Q.** In February of 2018, when you were asked about a conflict of interest, you said that Karim was only helping with the operational aspects of Abreezio; correct?

**A.** **Correct.**

**Q.** Was that one -- that comment to Qualcomm true or a lie?

**A.** **That was not true.**

**Q.** That was not true. So are we at seven now? Are we at seven lies --

**A.** **Yes.**

**Q.** -- for your count?

**A.** **Yes.**

**Q.** And in February of 2018, you explained to Qualcomm that you understood operational aspects to be things like finding office space, finding investors, incorporating, et cetera; correct?

**A.** **Yes.**

**Q.** And did Karim help with those things?

**A.** **Yes.**

**Q.** So that one's true?

**A.** **Yeah.**

**Q.** You explained to Qualcomm that you understood operational aspects to be basically everything other than the intellectual property or technological development; correct?

**A.** **Correct.**

**Q.** You explained that operational aspects means being involved

in the equity decisions; correct?

**A. Again, I don't specifically remember, but that sounds about right, operational aspects.**

Q. And was Karim involved in the equity decisions?

**A. Absolutely.**

Q. So that one's true?

**A. Yes.**

Q. You had a meeting with Karim and Brad Quinton in San Jose; correct?

**A. In what time frame? February 2015?**

Q. You tell me.

Did you have a meeting with Brad and --

**A. Yes.**

Q. -- Karim in San Jose?

**A. Yeah. We covered this on the day one of the testimony.**

Q. In February of 2014?

**A. 2015.**

Q. 2015. Where you talked about the company formation and the related issues?

**A. That's right.**

Q. Where you talked about the company name?

**A. Company name discussion had already happened around the same time. It was happening via email.**

Q. You talked about the Invionics contract and hourly rates and equity and some terms around contract-related items?

**A. Yes.**
*Q.* You said a lot of energy was devoted to the Invionics contract; correct?
**A. Yes.**
*Q.* That Invionics was going to receive both equity in the company and an hourly rate pursuant to a statement of work; correct?
**A. Correct.**
*Q.* And because of the hourly payment, they were also getting some shares; correct?
**A. Because of the hourly payment they were also getting shares?**
*Q.* Well, they were also getting some shares; correct?
**A. Correct, correct.**
*Q.* And it was less than if they had not had any hourly payment; correct?
**A. If they had not had the hourly payment, they would have had more equity? That's what you're trying to say?**
*Q.* I'm asking what you meant.
**A. Yeah. So the compensation to Invionics was a combination of an equity stake in Abreezio and a cash compensation.**
*Q.* And at this meeting with Karim and Brad in San Jose, you talked about lining up customers; correct?
**A. We focused on strategy for Qualcomm plus others.**
*Q.* You said that there a lot of companies in this space -- Intel, MediaTek, and others and that you were targeting all of

them; correct?
***A.*** **Yes.**
***Q.*** In February of 2018, you explained that you had agreed that as long as Karim wasn't doing the technology, everything was okay with Qualcomm.
Do you remember saying that?
***A.*** **Possibly, yes.**
***Q.*** That Karim did not want to give Qualcomm the false impression that he was doing something wrong when he actually wasn't; correct?
***A.*** **I made that statement. If I made that statement in the interview, I was, again, not being truthful.**
***Q.*** Okay. So that's another lie?
***A.*** **Yes.**
***Q.*** And this one is actually in May of -- oh, no, excuse me. This is still the February interview you're lying in.
And in February of 2018, you confirmed that that was exactly right, that Karim shouldn't give Qualcomm the false impression that he was doing something wrong when he wasn't; correct?
***A.*** **Correct.**
***Q.*** And is your testimony today that that was another lie?
***A.*** **Yes.**
***Q.*** So I think we're up to nine that we've identified; is that right?
***A.*** **Okay.**

***Q.*** You agree, of course, that coming up with a company name is not making an invention; correct?

***A.*** **Correct.**

***Q.*** Bringing people together to run a company is not inventing technology or a product?

***A.*** **Correct.**

***Q.*** Soliciting people to invest or serve on the board of a company is not developing an invention; correct?

***A.*** **Correct.**

***Q.*** Registering a domain name is not inventorship; correct?

***A.*** **Correct.**

***Q.*** Suggesting where to incorporate a company is not inventing technology or products; correct?

***A.*** **Correct.**

***Q.*** Finding, even hiring engineers to build technology and products is not the same as inventing that technology or products; correct?

***A.*** **Correct.**

***Q.*** Setting a cap table is not making an invention?

***A.*** **Correct.**

***Q.*** Weighing in about how to respond to questions about the company is not inventing technology or products; correct?

***A.*** **Correct.**

***Q.*** And do you remember Mr. Pilchak asked you that you testified that Karim picked the name of the company; correct?

***A.*** **Yes.**
***Q.*** And that's not an invention; correct?
***A.*** **Yeah.**
***Q.*** That Karim hired the employees.
And that's not an invention; correct?
***A.*** **It's not an invention of the technology, correct.**
***Q.*** That Karim brought on Akbar Shokouhi; correct?
***A.*** **That's not the same as inventing a product, yes.**
***Q.*** That Karim brought Mr. Abdi on to the board; correct?
***A.*** **Yeah.**
***Q.*** And that's not inventing a product, is it?
***A.*** **Correct.**
***Q.*** Or technology?
***A.*** **Correct.**
***Q.*** That Karim brought Bozena Kaminska to the board; correct?
***A.*** **Correct.**
***Q.*** And that's not inventing a product or technology?
***A.*** **Correct.**
***Q.*** That Karim decided where to incorporate; correct?
***A.*** **Correct.**
***Q.*** And that's not inventing a product or technology?
***A.*** **Correct.**
***Q.*** That Karim engaged Invionics; correct?
***A.*** **Engaged it?**
***Q.*** Engaged Invionics.

**A. Invionics?**
Q. The engineers.
**A. Yeah.**
Q. And that's not inventing a product or technology?
**A. That's not clear. When he engaged in Invionics, he was talking to technical people. And what went on behind the scenes that I didn't have visibility into, I do not know.**
Q. Do you believe that making a hiring decision is creating an invention?
**A. No. I didn't say that.**
Q. Okay. You said that --
**A. I was talking about the Invionics arrangement.**
Q. Well, the question was whether Karim engaged Invionics.
**A. Yes, he did.**
Q. Do you remember Mr. Pilchak asked you that?
**A. Yes, he did.**
Q. He said who engaged Invionics, and you said Dr. Karim Arabi.
Do you remember that?
**A. Correct, correct.**
Q. And engaging Invionics is not creating or inventing technology or products; correct?
**A. Just the act of engaging is not.**
Q. Okay. And that Karim brought Brad Quinton on as a CTO.
Remember, he asked you that?
**A. Yes.**

***Q.*** And you said yes?
***A.*** **Yes.**
***Q.*** That Karim did this?
***A.*** **Correct.**
***Q.*** And that's not creating or inventing technology, is it?
***A.*** **It is not.**
***Q.*** That Karim set the share allocation, do you remember that Mr. Pilchak asked you that?
***A.*** **Yes.**
***Q.*** And that's not creating or inventing technology or products, is it?
***A.*** **It's not.**
***Q.*** You told Qualcomm that during the first few weeks that Abreezio was forming, Karim dialed into calls and then his participation dropped off.
Do you remember that?
***A.*** **Yes.**
***Q.*** Is that true or is that a lie?
***A.*** **It's true.**
***Q.*** But he declined one meeting invite and said you guys should go ahead?
***A.*** **That's right.**
***Q.*** CEO of Abreezio was your full-time job; correct?
***A.*** **It was.**
***Q.*** And there were regular meetings; correct?

**A. Actually, the operations meeting that we were just referring to, the weekly operations meeting in which Dr. Karim Arabi was calling, the meetings themselves, the meeting themselves tapered off after a while.**

Q. And Abreezio had regular other meetings; correct?

**A. Not necessarily on a scheduled interval, like a regular recurring meetings, meetings as needed.**

Q. And those were frequent?

**A. Maybe -- again, like, for example, when we were focused on Qualcomm, which is where we spent majority of our effort of the entire Abreezio team throughout the course of Abreezio, the meetings would be done in response to specific engagement, specific benchmark and things like that. So that's what I meant. A recurring meeting, which were what we had in the beginning, versus meeting on an as-needed basis, as frequent as dictated by the customer needs.**

Q. How frequently was that?

**A. I would say once the Qualcomm activity picked up, a lot of focus, a lot of interest from Qualcomm as well. Maybe at least a couple of times a week.**

***THE COURT:*** How much more do you think you have, Ms. Bernstein?

***MS. BERNSTEIN:*** Quite a bit, your Honor.

***THE COURT:*** What's your estimate?

***MS. BERNSTEIN:*** I'm a third of the way through my

outline.

***THE COURT:*** Okay. All right.

Ladies and gentlemen, I guess we'll break for the day. You're reminded you're not to discuss the case with anyone. You're not to do any research about the case. And we'll see you tomorrow morning at 9:00 o'clock.

***(Jury out at 4:02 p.m.)***

***THE COURT:*** Okay. We'll see you tomorrow morning at 9:00 o'clock, sir. Thank you.

***(Witness out at 4:03 p.m.)***

***THE COURT:*** Okay. We're now outside the presence of the jury.

Any issues we need to take up?

***MS. BERNSTEIN:*** Not for us, your Honor, but I would say that the pace at which this is going leads me to believe we will not necessarily need to address the Nick Cole motion to quash tomorrow, if that changes what the Court would like to do.

***THE COURT:*** Well, we have him coming back already.

***MR. PILCHAK:*** Nothing from us, your Honor. Thank you.

***THE COURT:*** Okay. We'll see you tomorrow morning at 9:00.

***(Proceedings adjourned at 4:03 p.m.)***

***

///

///

*REPORTER'S CERTIFICATE*

I, Anne Roldan, certify that I am a duly qualified and acting Official Court Reporter for the United States District Court, that the foregoing is a true and accurate transcript of the proceedings as taken by me in the above-entitled matter on March 24, 2025; and that the format used complies with the rules and requirements of the United States Judicial Conference.

Date: March 24, 2025

*Anne Roldan, RMR, CRR, CSR 13095*