UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. KARIM ARABI, Defendant. | Case No. 22-cr-1152-BAS<br>March 25, 2025<br>Trial Testimony of Sanjiv Taneja |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CYNTHIA A. BASHANT
CHIEF DISTRICT JUDGE

VOLUME 3, PAGES 422 - 607

APPEARANCES:

FOR PLAINTIFF: UNITED STATES ATTORNEY'S OFFICE
880 Front Street, Suite 6293
San Diego, California 92101
*By: NICHOLAS W. PILCHAK, AUSA*
*JANAKI G. CHOPRA, AUSA*
*ERIC R. OLAH, AUSA*

FOR DEFENDANT: BIENERT KATZMAN LITTRELL WILLIAMS, LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
*By: WHITNEY Z. BERNSTEIN, Esq.*
*REBECCA S. ROBERTS, Esq.*
*RYAN V. FRASER, Esq.*

REPORTED BY:

ANNE MARIE ROLDAN, RMR, CRR, CSR 13095
U.S. OFFICIAL COURT REPORTER
U.S. District Court Clerk's Office
333 West Broadway, Suite 420
San Diego, California 92101

Reported stenographically; transcribed with CAT software.

# I N D E X

***

## E X A M I N A T I O N S


| WITNESS | VOL. | PAGE | LINE |
|---|---|---|---|
| *FOR THE GOVERNMENT:* | | | |
| SANJIV TANEJA | | | |
| Cross by Ms. Bernstein | 10 | 424 | 9 |
| Redirect by Mr. Pilchak | 10 | 549 | 9 |
| Recross by Ms. Bernstein | 10 | 593 | 18 |


## E X H I B I T S


| ADMITTED | VOL. | PAGE | LINE |
|---|---|---|---|
| Ex. 45 | 10 | 493 | 4 |
| Ex. 888 | 10 | 578 | 3 |
| Ex. 890 | 10 | 578 | 3 |
| Ex. 891 | 10 | 578 | 3 |
| Ex. 898 | 10 | 578 | 3 |
| Ex. 2107 | 10 | 444 | 9 |
| Ex. 2131 | 10 | 429 | 10 |
| Ex. 2212 | 10 | 508 | 14 |
| Ex. 2327 | 10 | 432 | 23 |
| Ex. 2362 | 10 | 494 | 12 |
| Ex. 2436 | 10 | 503 | 8 |
| Ex. 2455 | 10 | 428 | 12 |
| Ex. 2595 | 10 | 478 | 17 |
| Ex. 2598 | 10 | 442 | 11 |
| Ex. 2650 | 10 | 431 | 17 |
| Ex. 2673 | 10 | 430 | 17 |
| Ex. 2735 | 10 | 505 | 16 |
| Ex. 2791 | 10 | 476 | 5 |
| Ex. 2893 | 10 | 502 | 22 |
| Ex. 3219 | 10 | 580 | 13 |
| Ex. 3281 | 10 | 479 | 15 |
| Ex. 3295 | 10 | 463 | 10 |
| Ex. 3310 | 10 | 440 | 24 |
| Ex. 3321 | 10 | 465 | 18 |

***TUESDAY, MARCH 25, 2025, 9:00 A.M.***

***

***THE COURT:*** We are back on the record. All jurors are present. Dr. Arabi is present. The lawyers are present. You, sir, are reminded you're still under oath to tell the truth.

Ms. Bernstein?

***MS. BERNSTEIN:*** Good morning.

***CROSS-EXAMINATION***

***BY MS. BERNSTEIN:***

***Q.*** Good morning, Mr. Taneja.

***A.*** **Good morning, Ms. Bernstein.**

***Q.*** I want to start off today by talking to you about the technical development by -- of Abreezio's products by Brad Quinton and his team.

Okay?

***A.*** **Surely.**

***Q.*** Okay. You thought that Brad Quinton was an awesome technical genius; is that right?

***A.*** **Yes.**

***Q.*** And that his team included very, very smart people?

***A.*** **His team of engineers included smart -- very smart, people, yes.**

***Q.*** That concludes Trent McClements?

***A.*** **Correct.**

*Q.* Andrew Hughes?
**A. Yes.**
*Q.* Mike Lee?
**A. That's right.**
*Q.* Mike Smith?
**A. Mike Smith may have joined later.**
*Q.* There were other engineers that joined later; correct?
**A. Yes.**
*Q.* Because you hired many others for the San Diego office?
**A. Yes. Those were application engineers. There were three of them in the San Diego office.**
*Q.* Well, there was Daniel Hoggar at some point; correct?
**A. Correct.**
*Q.* There was a man whose first name was Abbas; correct?
**A. Correct.**
*Q.* Masoud Sadeghian?
**A. That's right.**
*Q.* Bahar Salehpour?
**A. Yes.**
*Q.* Massoud Sammak?
**A. Massoud, first name, yes.**
*Q.* There were two Masouds; right? Do you remember that?
**A. I remember only one Masoud, if I'm not mistaken.**
*Q.* Do you know if you recall Masoud Sadeghian or Massoud Sammak?

**A. Sadeghian.**
Q. Okay. You don't remember Massoud Sammak?
**A. Unless he was in the Vancouver office. Not in the San Diego office.**
Q. Do you remember Santanu Sarma?
**A. Yes.**
Q. And when you were considering leaving your QED startup pursuit to join Abreezio, the fact that Brad Quinton and others were behind the technology was a huge factor for you; right?
**A. My QED startup with the Stanford professor did not take off because I could not get the funding for it, so it was not an option.**
Q. And so joining -- one of the things that helped you join Abreezio was the fact that Quinton and others were behind the Abreezio technology.
That was a huge factor for you?
**A. It was one of the factors, that Brad Quinton had vetted the technology.**
Q. Because you have so much respect for his technical skills?
**A. Based on what Dr. Karim Arabi had described and based on his LinkedIn background, yes.**
Q. Well, you worked with him for a long period of time; correct?
**A. Yes, I did.**
Q. And you still find him to be a technical genius with a very,

very smart team of people?
**A. Technically very smart, yes.**
*Q.* You said you'd never seen a team like Brad's before; correct?
**A. In the context of comparing it with other teams? Or -- it may very well be that I characterized it like that. Is there a specific reference you are talking about?**
*Q.* Have you ever seen a team like Brad's before?
**A. It was a very smart team and I may have characterized it like that, yeah, possible.**
*Q.* Not only super smart but also super efficient?
**A. Yes, super efficient.**
*Q.* And, in fact, as the Abreezio CEO, you entered into various Statements of Work with Invionics; correct?
**A. Correct.**
*Q.* Invionics is Brad Quinton's company and engineers; correct?
**A. That's right.**
***MS. BERNSTEIN:*** I want to show you what's been marked as Exhibit 2455.
***THE WITNESS:*** I see it, yeah.
***BY MS. BERNSTEIN:***
*Q.* This is an email from Mr. Quinton to yourself; correct?
**A. That's right.**
***MS. BERNSTEIN:*** And can we go to the next page, please, and maybe the next page, please?

***BY MS. BERNSTEIN:***

***Q.*** Do you recognize this as a February Statement of Work?

***A.*** **I do.**

***MS. BERNSTEIN:*** If we go to page 7 of this, I believe.

***BY MS. BERNSTEIN:***

***Q.*** And that's your signature?

***A.*** **Yes, it is.**

***MS. BERNSTEIN:*** Okay. Move to admit 2455.

***THE COURT:*** Any objection?

***MR. PILCHAK:*** No, Your Honor.

***THE COURT:*** 2455 may be admitted.

***(Exhibit 2455 admitted.)***

***MS. BERNSTEIN:*** And can you go back to page 3, please?

***BY MS. BERNSTEIN:***

***Q.*** And so this is a Statement of Work covering roughly February 23rd of 2015 through March 2nd of 2015?

***A.*** **Correct.**

***Q.*** Okay. And, in fact, the work continued beyond March 2nd; correct?

***A.*** **Yes.**

***MS. BERNSTEIN:*** I want to show you Exhibit 2131.

***THE WITNESS:*** I see it.

***MS. BERNSTEIN:*** We can make that bigger. It's kind of small font.

///

***BY MS. BERNSTEIN:***

***Q.*** Do you recognize this as an email from Mr. Quinton to yourself with a weekly status update, the week of March 13th, it looks like?

***A.*** **Yes, I do.**

***MS. BERNSTEIN:*** Move to admit 2131.

***THE COURT:*** Any objection?

***MR. PILCHAK:*** No, Your Honor.

***THE COURT:*** 2131 may be admitted.

***(Exhibit 2131 admitted.)***

***BY MS. BERNSTEIN:***

***Q.*** And the tasks that Mr. Quinton is referring to here, do you recall that those correspond to some tasks in the Statement of Work that we just looked at?

***A.*** **Yes, they do.**

***Q.*** There was another Statement of Work that was executed with Brad Quinton and his team in May; is that right?

***A.*** **There was several, yes.**

***MS. BERNSTEIN:*** We'll show you 2673, please.

***BY MS. BERNSTEIN:***

***Q.*** And does this look like, if you read the subject and the attachments, that it's about "Abreezio/Invionics Addendum to SOW"?

SOW is Statement of Work?

***A.*** **Correct.**

*Q.* And is this a May 9th -- excuse me -- a May 9th addendum?
**A. May 13th.**
*Q.* Sorry. We can blow that up.
**A. It says May 13th here.**
*Q.* The email is from May 13th. The attachment looks like it's from May 9th.

***MS. BERNSTEIN:*** But we can go to the next page.

***THE WITNESS:*** Okay.

***BY MS. BERNSTEIN:***

*Q.* And this reminds you it's a Statement of Work Addendum?
**A. Yes.**

***MS. BERNSTEIN:*** We can go to the next page, please. Move to publish -- admit and publish 2673.

***THE COURT:*** Any objection to 2673?

***MR. PILCHAK:*** No, Your Honor.

***THE COURT:*** It may be admitted.

***(Exhibit 2673 admitted.)***

***MS. BERNSTEIN:*** And can we go to the next page, please?

***BY MS. BERNSTEIN:***

*Q.* And so this is an addendum to the ongoing statements of work, the original one that was dated February 23rd?
**A. Correct.**
*Q.* Okay. And, again, this goes through various tasks?
**A. Yes, it does.**
*Q.* Okay. There was another one in June; correct?

**A. Yes. There was -- there were several.**

***Q.*** I think we'll just go over a handful more for now.

***MS. BERNSTEIN:*** Can we please look at 2650?

***BY MS. BERNSTEIN:***

***Q.*** And you recognize this email from Mr. Quinton to yourself about another Statement of Work Addendum.

**A. I do.**

***MS. BERNSTEIN:*** Can we look at -- move to admit 2650.

***THE COURT:*** Any objection?

***MR. PILCHAK:*** And the attachment?

***MS. BERNSTEIN:*** And the attachment. I'll go to that in a moment.

***MR. PILCHAK:*** No objection.

***THE COURT:*** 2650 may be admitted. And the attachment is part of 2650?

***MS. BERNSTEIN:*** Correct, Your Honor.

***(Exhibit 2650 admitted.)***

***MS. BERNSTEIN:*** Can we go to the next page?

***BY MS. BERNSTEIN:***

***Q.*** And this attachment is another addendum of the Statement of Work?

**A. Correct.**

***MS. BERNSTEIN:*** Can we go to the next page, please?

***BY MS. BERNSTEIN:***

***Q.*** And, again, it's outlining a number of tasks and

supplementing the February 2015 Statement of Work?
**A. That's right.**
*Q.* I'll show you one more.
***MS. BERNSTEIN:*** Can we please go to 2327?
***BY MS. BERNSTEIN:***
*Q.* And this is a Project proposal, Trementa for Abreezio; is that right?
**A. Yes.**
*Q.* And do you remember --
***MS. BERNSTEIN:*** Let's go to the next page of this, please. Let's go to the last page of this, please. I'm sorry, back one.
***BY MS. BERNSTEIN:***
*Q.* So this one looks like it was signed on September 1st; is that right, by Mr. Quinton?
**A. Correct.**
***MS. BERNSTEIN:*** Okay. And if we go back to the first page of this.
Move to admit 2327 first, please.
***THE COURT:*** Any objection?
***MR. PILCHAK:*** No, Your Honor.
***THE COURT:*** 2327 may be admitted.
***(Exhibit 2327 admitted.)***
***BY MS. BERNSTEIN:***
*Q.* So this is a Statement of Work that is for Trementa for

Abreezio; correct?
**A. That's right.**
*Q.* And do you recall that by September of 2015, that the Invionics team had wanted to move -- they wanted to keep the Invionics platform so that they could continue to license the Invio product and move the people and employees into Trementa?
**A. Yes.**
*Q.* Okay. And does this --
***MS. BERNSTEIN:*** We can go to the next page.
***BY MS. BERNSTEIN:***
*Q.* But is this Project Proposal tracking that?
**A. It is.**
*Q.* Thank you.
I want to go back to January of 2015.
As part of forming Abreezio, you testified that you met with Karim, Mr. Akbar Shokouhi, and Ziad Mansour in January of 2015 in San Diego; right?
**A. That's right.**
*Q.* And this was, I think you said, in Del Mar by a golf course?
**A. That's right.**
*Q.* And you spent the meeting pitching yourself to Akbar so that he would invest in Abreezio?
**A. To Ziad.**
*Q.* To Ziad?
**A. Not to -- not pitching to invest. Telling Ziad about the**

**technology, how it could have value for Qualcomm, to assess the fit between what Abreezio was providing and Qualcomm's requirements.**

***Q.*** Yeah. I think you've explained that Ziad was there to prove the customer valuation perspective and respond as a potential customer from a chip company?

***A.*** **Correct.**

***Q.*** And that such customer feedback meetings are common to try to gauge potential customer interest?

***A.*** **Yeah.**

***Q.*** Was this the first meeting where you met Mr. Shokouhi?

***A.*** **That's right.**

***Q.*** And you had said that you spent the meeting speaking about your background more so than the products; correct?

***A.*** **Correct.**

***Q.*** And you've also explained that this meeting was separate in your mind to a later meeting at Qualcomm; correct?

***A.*** **Yes.**

***Q.*** That this January meeting was more like a market study; correct?

***A.*** **It was to get the customer feedback. And the conclusion at the end of the meeting was that we will revisit this in about a month's time to have a formal visit to Qualcomm along with the Abreezio team.**

***Q.*** And you've described the January meeting as more like a

market study; correct?

**A. I don't think I characterized it as a market study. Market in order to -- reaching out to several customers with a specific question or survey kind of a thing, that would be a market study. It was an input to understand what the market requirements are, what are the inputs.**

***Q.*** Would you agree that you've previously said that the first meeting with Ziad had seemed more like a market study, Abreezio didn't even have a name during the first meeting? Once you got to the February meeting, it seemed like a new presentation and idea and issue?

***MR. PILCHAK:*** Objection. Compound.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** Would you agree that you've referred to it previously as a market study?

**A. As I said, market study is generally referring to where you are trying to get a broad spectrum of customers.**

***Q.*** I understand, sir, that you, in this moment, do not think that the meeting was a market study, but would you agree that you have described it as such?

**A. As a specific customer needs assessment and the match with what Abreezio had to offer.**

***Q.*** Okay. Have you previously said that the first meeting with Ziad seemed more like a market study?

**A. I don't recall. I may have used it in the context of -- as one of the inputs to study what the broader market needs.**

*Q.* You also testified that you sent an introductory email to Mr. Mansour that -- that Dr. Arabi required you to.

Is that your testimony, or what was your testimony on that point?

**A. Dr. Arabi asked me about a month later to send an email, and specifically instructed me not to make a reference to the lunch meeting. And the draft of that email was reviewed by Dr. Arabi, and then the email was sent without any reference to the lunch meeting that was held a month earlier.**

*Q.* And you also sent an introductory email to Mike Campbell; is that right?

**A. Yes, I did.**

*Q.* And you met with Mike Campbell in November of 2005; correct?

**A. November of 2005?**

*Q.* Yes.

Is that when you first met Mike Campbell?

**A. At a conference, possibly, yes. At the International Test Conference.**

*Q.* And then in September of 2014, you also spoke with him about your QED pursuit?

**A. Yes.**

*Q.* And he was still at Qualcomm for all those years?

**A. Correct.**

*Q.* He was, in fact, later a part of the team -- the test team that did some due diligence on Abreezio; correct?

***A.* To the best of my understanding, Jim Willmore, who was at the June meeting in Sunnyvale office, worked for Mike Campbell. So, yes, Mike Campbell's team was involved in the due diligence.**

*Q.* And on February 5th of 2015, you reached out to him to introduce Abreezio in a similar-sounding email as the one you had composed for Mr. Mansour?

***A.* Very similar, yeah. The dates, I don't remember. If you flash the document. But it was a very similar email.**

***MS. BERNSTEIN:*** Okay. We'll show you 2956. Oh, no, I'm sorry. Let's go on to --

***BY MS. BERNSTEIN:***

*Q.* You'd agree that it was about February 25th of 2015?

***A.* Can we please --**

*Q.* Yeah. We'll come back to that.

***A.* -- flash the document?**

*Q.* Sure. We'll come back to it.

Is it not unusual to go through multiple entry points at an organization?

***A.* It really depends. There could be different use models of the same technology.**

*Q.* Have you yourself explained that it is not unusual to go through multiple entry points at an organization?

***A.* It's not unusual.**

***Q.*** That it's common to get feedback on an idea to make sure that there is real industry interest?
***A.*** **Absolutely, yes.**
***Q.*** And, in fact, you've explained that it was your personal network with Mike Campbell that was part of the reason that you engaged Qualcomm as a customer; correct?
***A.*** **With Mike Campbell, yes. I had been a panelist on a conference along with him and met him at several test conferences, industry conferences.**
***Q.*** But there was nothing unusual about engaging with Qualcomm as a customer.
***A.*** **Nothing unusual.**
***Q.*** You agree?
***A.*** **Yeah.**
***Q.*** I want to talk about the first March Qualcomm meeting.
There were two meetings with Qualcomm in March; is that right?
***A.*** **Correct.**
***Q.*** And one was before the NDA and one was after the NDA was signed?
***A.*** **That's right.**
***Q.*** And an NDA is, again, a Nondisclosure Agreement; correct?
***A.*** **Correct.**
***Q.*** And so the meeting before the NDA was a little more high level than generalized; correct?

**A. That's probably a good characterization.**

Q. You weren't sharing specific -- you weren't sharing specific details without an NDA in place; correct?

**A. Yeah. It's -- yeah.**

Q. And the presentation that was prepared for the March Qualcomm meeting, you prepared the first draft of that?

**A. I did.**

Q. And you focused on a high-level technological value proposition?

**A. Yes.**

Q. And then you forwarded this to Mr. Quinton; correct?

**A. Yes.**

Q. And he did the technical work?

**A. I'm sorry?**

Q. And he did the technical work?

**A. Yes.**

Q. And after that March meeting, you -- well, excuse me.

***MS. BERNSTEIN:*** We'll show you what's been marked as 3310. Let's keep these straight.

***BY MS. BERNSTEIN:***

Q. Do you recognize this as an email from yourself to Mr. Quinton on March 4th?

**A. Correct.**

Q. With what looks like the final company overview slides?

**A. That's right.**

***MS. BERNSTEIN:*** I move to admit.

***THE COURT:*** Any objection?

***MR. PILCHAK:*** Does it include the attachment, Your Honor?

***MS. BERNSTEIN:*** It does.

***MR. PILCHAK:*** May we show the witness the attachment?

***MS. BERNSTEIN:*** Can we go to the next page, please?

***BY MS. BERNSTEIN:***

***Q.*** Is this the PowerPoint that you attached to that email we just looked at?

***A.*** **Yes.**

***Q.*** And this is dated March 4th of 2015?

***A.*** **Correct.**

***Q.*** This is before the NDA was executed?

***A.*** **This is -- yeah. My recollection is NDA was executed around the second week of March.**

***Q.*** Okay. So this would be before that?

***A.*** **This is before that.**

***Q.*** Okay.

***MS. BERNSTEIN:*** Move to admit.

***THE COURT:*** Any objection?

***MR. PILCHAK:*** No, Your Honor.

***THE COURT:*** 3310 may be admitted.

***(Exhibit 3310 admitted.)***

***MS. BERNSTEIN:*** And then I also want to show you

Exhibit 2598. Well, let me pause for a moment.

***BY MS. BERNSTEIN:***

***Q.*** So you have -- that's a March 4th of 2015, presentation; correct?

***A.*** **Yes.**

***Q.*** And then it's your memory that there was an NDA executed.

***A.*** **Correct.**

***Q.*** And then there was a subsequent meeting with Qualcomm on March 20th of 2015; correct?

***A.*** **That's right.**

***Q.*** And there was a different slide deck for the second meeting because the NDA had been executed; right?

***A.*** **Yes.**

***Q.*** And this Exhibit 2598 that we're looking at, do you recognize this as an email from yourself to Mr. Mansour, Saad Elhosni, Farsheed -- we can blow up the top for you -- Farsheed Mahmoudi, and Joseph Fang?

***A.*** **Yes. Thank you for -- yes.**

***Q.*** And you're attaching the final March 20 PowerPoint?

***A.*** **Correct.**

***Q.*** And it's saying that attached, they can find yesterday's -- the presentation deck from the meeting that was held yesterday, on March 20?

***A.*** **Exactly right.**

***MS. BERNSTEIN:*** We'll go to the next page.

***BY MS. BERNSTEIN:***
***Q.*** And is this that slide deck that you attached to your email?
***A.*** **Yeah. Can we just look at the next slide, the first slide after the title slide?**
***Q.*** Of course.
***A.*** **Yes.**
***MS. BERNSTEIN:*** Move to admit.
***THE COURT:*** Any objection?
***MR. PILCHAK:*** No, Your Honor.
***THE COURT:*** 2598 may be admitted.
***(Exhibit 2598 admitted.)***
***MS. BERNSTEIN:*** And let's just go back to that first page, because the jury didn't have the benefit of seeing that email. Can we make it a little bit bigger, please?
***BY MS. BERNSTEIN:***
***Q.*** And so, again, this is you sending four individuals at Qualcomm the presentation deck from the meeting that you had; correct?
***A.*** **That's right.**
***Q.*** And you also indicate to Mr. Elhosni at the bottom there, that you're going to call him on Monday to get feedback on the proposed framework for a DFT study?
***A.*** **Correct.**
***Q.*** And does this also show that it was your understanding that Farsheed -- Farsheed Mahmoudi was going to do the technical deep

dive into the TruSens sensor side, and that Joseph -- Joseph Fang was going to be responsible for DFT?

***A.*** **Yes.**

***Q.*** And as of March 21st of 2015, there was already a contemplated on-site visit as needed; correct?

***A.*** **Sorry, Ms. Bernstein, as of March 21st, there was?**

***Q.*** There was already a contemplated on-site visit as needed; correct?

***A.*** **Yes, correct, follow up with an on-site visit as needed. Absolutely, yeah.**

***Q.*** And, in fact, there was a hands-on technological demonstration at Qualcomm in April; is that right?

***A.*** **Absolutely, yes.**

***MS. BERNSTEIN:*** Let's go to Exhibit 2107, please. We can make that bigger.

***THE WITNESS:*** Thank you.

***BY MS. BERNSTEIN:***

***Q.*** Do you recognize this as an email from April 16th of 2015, from yourself to Ziad Mansour, Saad Elhosni, Farsheed Mahmoudi, Joseph Fang, and you copied Brad Quinton and yourself again?

***A.*** **Yes.**

***MS. BERNSTEIN:*** Let's go to the next page, please.

***BY MS. BERNSTEIN:***

***Q.*** I'm sorry, and you're attaching this slide deck.

Did you see that attachment line in the email or do you want

us to go back?
**A. No, this is fine.**
Q. And this is the PowerPoint that you attached?
**A. Correct.**
***MS. BERNSTEIN:*** Move to admit.
***THE COURT:*** Any objection?
***MR. PILCHAK:*** No, Your Honor.
***THE COURT:*** 2107 may be admitted.
***(Exhibit 2107 admitted.)***
***MS. BERNSTEIN:*** And let's go to the email, please. Can you make that bigger, please? Thank you.
***BY MS. BERNSTEIN:***
Q. So on April 15th, you had presented a technology demo and results to Qualcomm; right?
**A. Yes.**
Q. Who had you -- who was present at that from Abreezio?
**A. Brad Quinton, Trent McClements, myself, and to the best of my recollection, Dan Hoggar.**
Q. Okay. So Mr. Hoggar was engaged by then?
**A. As I said, to the best of my recollection. If there is a further detailed notes from the meeting, that might help establish that. This is -- I definitely remember Brad, Trent, and myself. I'm not sure -- to the best of my recollection, I think Dan was there, but I cannot be positive.**
Q. Is it also your memory that Mr. Hoggar was present at most

of the involved technology presentations to Qualcomm?
**A. Once we started the on-site evaluations, yes. He was the primary support engineer.**
***Q.*** And the on-site evaluations lasted for over 20 days; correct?
**A. That roughly sounds right.**
***Q.*** Okay. And so this is sending a copy of the presentation that you had all presented to Qualcomm; correct?
**A. That's correct.**
***Q.*** And you're thanking them for their time and engaging discussion.
**A. Yes.**
***MS. BERNSTEIN:*** Okay. We can take that down.
***BY MS. BERNSTEIN:***
***Q.*** I want to talk for a moment about Karim and Sheida.
And you understood that the connection between Sheida and Karim, as brother and sister, was known to Qualcomm's diligence team prior to the acquisition?
**A. Not everyone in the due diligence team knew about it.**
***Q.*** But some of them did; right?
**A. Specifically, it was my understanding that Joseph Fang, Farsheed Mahmoudi, and Saad, and Ziad.**
***Q.*** And have you also said that it was your understanding that Mohamed Allam was aware of the connection?
**A. Mohamed Allam may have been aware, based on the -- there was**

**a text that was shown in yesterday's testimony where Brad responds that Trent understands, and he will conceal -- he understands that he will not reveal Karim's identity. Not sure if he had already revealed it or if had he not. So, yes, that's the difference between the first three, the first four that I outlined versus Mohamed Allam. He may have known it.**

***Q.*** And we'll come back to that, because the text doesn't actually say that Trent is going to conceal Karim's identity; right? That's -- that's your --

***A.*** **It doesn't explicitly say that, yes.**

***Q.*** In fact, when you were sued in 2017 and you read the Civil Complaint, you explained that the claim that no one at Qualcomm knew about the Karim/Sheida connection came as a big surprise to you.

***A.*** **I think I acknowledged yesterday, Ms. Bernstein, that I did not disclose all the facts in this context. Specifically, Hiten Somwal, who was a primary business contact for conducting the due diligence, was not aware of Karim Arabi's involvement.**

***Q.*** Okay. So had it come as a big surprise to you when you read the Civil Complaint?

***A.*** **No. What I said in the civil interview was not truthful. I acknowledged this yesterday.**

***Q.*** Okay. One moment, please. I'll come back to this.

Leaving aside for a moment -- well, I'm sorry.

So just going back to what you said, you acknowledge that

what you said to Qualcomm was untruthful; correct?
**A. I did not disclose that Ziad was being called by an alias.**
*Q.* You didn't disclose a number of things; correct?
**A. Correct. So in this specific context, this was one of the facts that I had not disclosed, which I had learned about August, September, October timeframe, that Ziad also had an alias.**
*Q.* Okay. And there were a number of other things that you also didn't disclose; correct? We talked about at least nine of them yesterday; correct? We can go through them, but would you agree that there's a number of things that you did not disclose to Qualcomm, that you lied about in that interview, as we went through yesterday?
**A. I did.**
*Q.* Okay. And so one of them, another one of them, is that it, in fact, did not come as a surprise to you that Qualcomm was unaware of the Karim/Sheida connection? Let me phrase that differently.
When you read the Civil Complaint, were you surprised that they claimed to have not known about the connection, or were you not surprised?
**A. I was not surprised.**
*Q.* Okay. But you told them, in fact, that it came as a big surprise to you; correct?
**A. Correct.**

*Q.* Okay. But you were not being truthful to them.
**A. Correct.**
*Q.* Okay. But you did believe that Joseph Fang, Saad Elhosni, Ziad Mansour, and Farsheed Mahmoudi, at least, were aware that Sheida was part of Abreezio and Karim's sister; correct?
**A. Correct.**
*Q.* Okay. And you told that both to Qualcomm; correct?
**A. Yes.**
*Q.* And that's true; correct?
**A. That's my understanding, yes.**
*Q.* It's -- that particular statement --
**A. Yes.**
*Q.* -- was accurate and truthful?
**A. Right.**
*Q.* Okay. And you told it to the Government.
**A. That's right.**
*Q.* And you're not lying to them or to us; right?
**A. Correct.**
*Q.* Okay. And do you know if the Government ever investigated this, since they were claiming in their Indictment, much like Qualcomm claimed in their Complaint, that that connection had been hidden?
**A. I believe is there a 302 that I read about interviews with these individuals.**
*Q.* And a 302, for the jury's benefit, that's a report that the

FBI writes after they speak with a witness in a case?
**A. That's right.**
*Q.* Okay. And so your understanding is that the Government did investigate --
**A. Correct.**
*Q.* -- that?
**A. Correct.**
*Q.* I'm going to jump around for a moment here.
But how many meetings do you remember having with Qualcomm? Let's leave the on-sites aside for a moment, since we've agreed it's roughly 20.
How many other meetings do you recall having with Qualcomm?
**A. Starting from -- total number, you're saying?**
*Q.* Total number.
**A. Starting from January 2015 through October?**
*Q.* Yes.
**A. And with anyone at Qualcomm?**
*Q.* Yes.
**A. The best of my recollection, it's probably in the order of 15 to 20, perhaps. This is a rough ballpark number.**
*Q.* And that's between January to October, so roughly 10 months?
**A. Yeah. It's a very close approximation.**
*Q.* And to be clear, that's leaving aside the month-long of Monday through Friday on-site testing that was done with Mr. Hoggar?

***A.*** **Yeah. I was excluding that. I was in personally the meetings that I attended.**

***Q.*** You weren't at those meetings with Mr. Hoggar, the intensive on-sites?

***A.*** **There was -- no, not on those on-sites. It was the initial meeting where we were discussing the evaluation study, the benchmark study.**

***Q.*** Okay. So roughly 10 to -- excuse me.

Roughly 15 to 20 meetings about the implementation of Abreezio's technology and Abreezio as a company, correct, that you attended?

***A.*** **Presentation and so on, yeah.**

***Q.*** Including modeling the age of the chips and the sensors; correct?

***A.*** **There was a specific meeting you're talking about here, modeling the age of chips? Is that what your question was?**

***Q.*** I believe you've said that one of these meetings focused on detailed questions about the implementation of Abreezio's technology, such as how to model the age of the chip and the sensor.

***A.*** **Sure.**

***Q.*** And did a meeting like that, in fact, occur?

***A.*** **Yes. It is probably referring to the meeting with Mohamed Allam. It was a very detailed meeting.**

***Q.*** Okay. And over 15 to 20 meetings that you yourself attended

with Qualcomm as the CEO of Abreezio, about Abreezio's technology and the implementation of that, no one ever asked to look at the provisional patent applications, did they?

***A.*** **No.**

***Q.*** No one ever asked to look at any of the other patent applications, did they?

***A.*** **No.**

***Q.*** I want to talk about Invionics for a moment.

Invionics also had its own customers and potential customers separate and apart from Abreezio; correct?

***A.*** **Correct.**

***Q.*** And they also had meetings with its target customers independent of Abreezio, but sometimes at the same time; correct?

***A.*** **Yes.**

***Q.*** Where they would pitch their Invio platform; correct?

***A.*** **Mm-hmm, that's right.**

***Q.*** And that was the platform that Abreezio used; right?

***A.*** **Yes.**

***Q.*** But it was Invionics' platform that they licensed to others as well; correct?

***A.*** **That's correct.**

***Q.*** In fact, they ended up licensing it to Qualcomm in this deal; correct?

***A.*** **It was already -- if my recollection is right, Qualcomm may**

**already have been a customer of the Invio platform of Invionics.**

*Q.* And so when Invionics was pitching to license its own product at separate meetings, sometimes the customers would be the same company, like, Apple, for example.

***A.* Definitely.**

*Q.* And you've talked about this concept of IP contamination; correct?

***A.* Yes.**

*Q.* And keeping -- roughly the idea of keeping things separate so that you can avoid litigation over things; correct?

***A.* That's right. That's right.**

*Q.* And, in fact, because of that confidentiality, and to prevent any inadvertent IP contamination, because that was important, it was important that Invionics did not discuss Abreezio with mutual potential customers; right?

***A.* Yeah. Invionics, just like when we discussed Abreezio with Qualcomm, it was an NDA between Qualcomm and Abreezio. Invionics could not go to a customer and start discussing Abreezio without formally entering into an Abreezio NDA, Abreezio and the customer NDA.**

*Q.* And so it was important, for example, when Brad and Trent met with Qualcomm, that they not reveal any of Abreezio's confidential information.

***A.* Correct.**

*Q.* And you expected that Brad and Trent, being experienced in

the tech industry, would know those boundaries; correct?
**A. Yes.**
*Q.* But it didn't hurt to remind them.
**A. That text -- if you are referring to the text about IP contamination?**
*Q.* Well, first I'm asking if it would hurt to remind them, even though you would expect them to know this.
**A. This definitely would not hurt.**
*Q.* And you, in fact, did remind them.
**A. And I also added more color to that text that we discussed yesterday. The actual reason for sending that text with the IP contamination as the stated reason was hiding the fact that the real reason was not to share the identity of Dr. Karim Arabi -- involvement of Dr. Karim Arabi, not identity. Sorry.**
***MS. BERNSTEIN:*** Okay. I want to show you real quick Exhibit 704 that you looked at. Can we make that bigger, please?
***BY MS. BERNSTEIN:***
*Q.* And so on the face of this, it's about reminding them about confidentiality and to not discuss things; correct?
**A. On the face of it, it's -- it can imply many things. But I am very clear --**
*Q.* But it's your truthful testimony in this instance that it applied to what you claim it applied to; correct?
**A. That's right.**

*Q.* Okay. But, in fact, there also was a risk of IP contamination with Invionics and Abreezio, because Invionics had their own products; correct?
**A. This text had nothing to do with it.**
*Q.* Okay. But that's what you say; right?
**A. Yes.**
*Q.* But you've also said that there was a risk of IP contamination; correct?
**A. I made it clear in my testimony yesterday that was the stated reason, but that was not the real reason.**
*Q.* And that -- that testimony was truthful; correct?
**A. Yes.**
*Q.* Okay. In February of 2018, you were asked about referring -- speaking to Akbar about referring to Karim as Sheida in your text messages.
Do you remember that?
**A. Can you please refresh my memory with a text message?**
*Q.* Well, even last week, on Wednesday, you testified that you experienced Dr. Arabi getting -- I think in your words -- upset because someone texted him directly about Abreezio's business.
Do you remember saying that last Wednesday?
**A. Please restate.**
*Q.* You've testified that Dr. Arabi got upset when someone texted him about Abreezio's business; correct?
**A. Correct.**

*Q.* Okay. And, in fact, you've also claimed that you had a call with Akbar Shokouhi, a conversation with Akbar Shokouhi, where you had told him to not call -- to not call Dr. Arabi -- to call Dr. Arabi "Sheida;" correct?

***A.*** **We had conversations about this on at least a few occasions, yes. So that topic could have definitely come up. There is one particular text where Akbar is referring to Karim as Sheida -- referring to him not with the alias Sheida, and that's probably the text you are referring to.**

*Q.* And when you spoke about this in 2016 -- excuse me -- 2018, when you spoke about this, you said you didn't remember if you had ever even spoken to Akbar about that; correct?

***A.*** **I don't remember.**

*Q.* If you said you had never -- you don't recall if you ever spoke to Akbar about that, would that have been a truthful statement or an untruthful statement?

***A.*** **Can you show me the notes you are referring to? Because I don't understand what question was asked in the civil interview, what is the context before and after.**

*Q.* Sure.

You talked about speaking with Mr. Shokouhi about not referring to Dr. Arabi as Dr. Arabi or as Karim, but as calling him "Sheida;" correct?

***A.*** **Yes, in the context of the text where Akbar is referring to him as Karim, and Karim is responding with the question marks,**

**why is he getting that text.**

*Q.* And in 2018, when you were asked about that, you said that you don't know if you talked to Akbar about it. You don't know if that conversation even occurred.

***A.* Can we look at those notes just to get the proper context?**

*Q.* I'm just wondering if that was a true statement or an untrue statement when you made it in 2018.

***A.* I don't recall. If you show me the notes, Ms. Bernstein, it will help me understand the full context and the question that was being asked.**

*Q.* Because the facts that we're talking about happened a long time ago; right?

***A.* Yes.**

*Q.* And there's a lot of facts that you don't clearly recall; right?

***A.* Documents have been my way to corroborate and trigger my memory.**

*Q.* It's hard for you to differentiate between what really happened from what you may have said happened, even what you said happened most recently; correct?

***A.* No. As I said, by referring to a document, it helps trigger my memory so that I can have a much clearer reflection -- clearer recollection.**

*Q.* Would you agree that your story has changed over time?

***A.* I have acknowledged, Ms. Bernstein --**

*Q.* Is that a yes?
**A. It's not a simple yes or no answer. I'm just being -- adding some context to it. As I explained yesterday, at the civil interview, I was not truthful about when the knowledge of the use of the alias came.**
*Q.* You were not truthful about many, many things. And we can take the time to go through each and every one of them if you would like.
But can you acknowledge that your story has changed over time or would you like to do that exercise?
**A. No, I acknowledge.**
*Q.* Thank you.
I want to talk to you about something hopefully a little less controversial.
You worked for Bell Labs; correct?
**A. Yes.**
*Q.* And that's a highly regarded R&D institution.
**A. That's right.**
*Q.* And you were the VP of DFT and Design at Cadence?
**A. At Cadence, yes.**
*Q.* And Cadence provided DFT and designed EDA solutions to the entire industry; correct?
**A. Correct.**
*Q.* And your position there was a top position in the industry.
**A. I was a Vice President. That's a key position.**

*Q.* You were also the GM at one point?

**A. Yes. The same business unit. At one time, we had an organizational structure where the VP of R&D also has responsibility as the General Manager for the business. And then we had a reorganization. R&D was split separately, business was separately.**

*Q.* And at some point, you were responsible, I think you described, for managing numbers and a sales team and an engineering team?

**A. Yes. As the GM role, I was responsible -- even though sales was not reporting to me, I was responsible for the profit and loss of my business unit.**

*Q.* And your positions at Cadence gave you an opportunity to be familiar with industry DFT issues?

**A. Yes, it did.**

*Q.* You visited many customers and you got to know their issues and their pain points?

**A. Correct.**

*Q.* Including Qualcomm?

**A. Yes.**

*Q.* It was one of your key accounts?

**A. Yes.**

*Q.* You often visited Qualcomm and discussed their DFT issues?

**A. Yes.**

*Q.* And you would pitch the Cadence products to Qualcomm.

**A. Yes.**

Q. You've given at least 10 keynote speeches and primary talks as a key industry executive on DFT topics?

**A. I don't remember the exact number. There are several. Yeah, that may be about right.**

Q. And people offering keynotes and invited speeches are normally the top experts in the field; correct?

**A. I would say generally speaking, yes. It's also business leaders who would not be technical experts who were also invited.**

Q. And you would agree that you were considered a trusted industry expert in DFT and design, referred to as a visionary?

**A. As one of the key players, Cadence is a key player in the industry. And being the Vice President, that platform sort of provides with you that kind of a recognition.**

Q. You've been invited to speak at the IEEE International Online Testing Symposium?

**A. Yes.**

Q. Is that kind of, like, the Super Bowl for DFT?

**A. I think that one is ITC, International Test Conference. What you were saying was IOTC. I think that may have been the online -- that's a different one.**

Q. There's a lot that goes on at the IEEE?

**A. IEEE is the industry body that conducts many conferences. So IEEE doesn't identify a specific conference. ITC conference,**

**International Test Conference, is the premier conference for the DFT industry. That's correct.**

***Q.*** And IEEE is prestigious; correct?

***A.*** **Yes.**

***Q.*** And you've been invited to speak there, amongst many other places; correct?

***A.*** **Yes.**

***MS. BERNSTEIN:*** We can show you Exhibit 2066. We can make some of this bigger if this helps to refresh your memory.

***THE COURT:*** I don't know if there's anything that needs to be refreshed at this point.

***BY MS. BERNSTEIN:***

***Q.*** You would agree that you're a top expert in this area?

***A.*** **I wouldn't call myself a top expert. If you look at the titles, "Business Constraints Drive Test Decisions."**

***MS. BERNSTEIN:*** We can go to the next page.

***THE WITNESS:*** The first one is "Accelerating Yield Ramp." It's more focused around how the technology can address specific business challenges in the -- the technical challenges in the context of the business.

***BY MS. BERNSTEIN:***

***Q.*** Okay. And do you want to look at some of these titles?

***A.*** **Yeah.**

***Q.*** You would agree that you've been offered keynotes and invited speeches because you were viewed as a trusted industry

expert, considered a visionary.

***A.*** **I definitely had a good standing in the industry, absolutely did, and that's why I got these invitations.**

***Q.*** Okay. And, in fact, you were more seasoned than Dr. Arabi, especially in the field of EDA; correct?

***A.*** **Yeah. My -- most of my professional career was spent in the Electronic Design Automation industry.**

***Q.*** And that's what EDA stands for?

***A.*** **That's right.**

***Q.*** And you had even, at one point, coached Dr. Arabi for a keynote that he gave in 2014; correct?

***A.*** **I provided him input on a presentation that he had. I wouldn't consider that coaching** *per se*, **but I did provide him input on specific topics to include from an EDA perspective.**

***Q.*** Okay. I want to go back and talk about some of the Abreezio technology.

***A.*** **Yeah.**

***Q.*** By early March of 2015, the Invionics engineers had identified problems with Ms. Alan's provisional patent applications; correct?

***A.*** **Yes.**

***MS. BERNSTEIN:*** And I want to show you -- because I'm going to come back to it, so this is a good point to show you Exhibit 846, which is in evidence. And really, 846A, please.

If you can just give us a moment.

Okay. We will come back to that in a moment.

***BY MS. BERNSTEIN:***

***Q.*** So the problems that the Invionics engineers identified were put forth in a paper.

Do you remember that?

***A.*** **I do.**

***Q.*** Okay. And we've looked at this paper before; correct?

***A.*** **Yes.**

***Q.*** What I would like to show you when we can come back to it is a color version of that, just to facilitate better conversation.

Invionics noticed these issues upon their initial review of the provisional patent applications by Ms. Alan; correct?

***A.*** **Correct.**

***Q.*** And that was in February of 2015?

***A.*** **Yes, towards late February 2015.**

***Q.*** That was in late February of 2015?

***A.*** **Roughly around there. The first meeting on that topic amongst Brad Quinton, Dr. Karim Arabi, and myself was held in the first week of March.**

***MS. BERNSTEIN:*** Okay. I'm showing you what's been marked as 3295.

***THE WITNESS:*** Yes.

***MS. BERNSTEIN:*** And if we can just go into the top, please, the first email, or the top email.

///

***BY MS. BERNSTEIN:***

***Q.*** And this is on February 23rd of 2015; correct?

***A.*** **Yes.**

***Q.*** From Mr. Quinton to yourself?

***A.*** **Right.**

***MS. BERNSTEIN:*** Move to admit.

***THE COURT:*** Any objection to 3295?

***MR. PILCHAK:*** No, Your Honor.

***THE COURT:*** 3295 may be admitted.

***(Exhibit 3295 admitted.)***

***BY MS. BERNSTEIN:***

***Q.*** And here, Mr. Quinton is saying that he's going to present the review of the patents; correct?

***A.*** **Correct.**

***Q.*** And that syncs with what you said, that they had identified problems with Ms. Alan's patents early -- early in the process in -- as of at least February 23rd of 2015.

***A.*** **Correct.**

***MS. BERNSTEIN:*** Can we show 2624? And can we clear the mark, please?

***BY MS. BERNSTEIN:***

***Q.*** So this is Exhibit 2624.

Do you recognize this as the color version of one of the Government's exhibits?

***A.*** **Yes.**

***MS. BERNSTEIN:*** Okay. Move to admit 2624. Oh, it's already admitted?

***THE COURT:*** It's already admitted.

***MS. BERNSTEIN:*** Thank you.

***BY MS. BERNSTEIN:***

***Q.*** This is an 18-page document; correct?

***A.*** **Yes.**

***Q.*** And this is where the Invionics engineers identify problems with Sheida's provisional patent applications and conclude that the critical path wouldn't work, that the critical path was needed? We can go to the conclusion if that helps you.

***A.*** **There were issues identified with the sensor patents, yes.**

***Q.*** Okay. And Mr. Quinton and his team had explained and documented the issues that they noticed upon the initial review and detail; correct?

***A.*** **Correct.**

***Q.*** In this document; correct?

***A.*** **Yes.**

***Q.*** And others; right?

***A.*** **I think on the sensor patent, there may have been other documents. Are you referring to emails also as documents?**

***Q.*** Yeah.

***MS. BERNSTEIN:*** We're going to show you 3321.

***THE WITNESS:*** Okay.

***MS. BERNSTEIN:*** And we can zoom in on that.

***BY MS. BERNSTEIN:***

***Q.*** Do you recognize this as an email from Mr. Quinton to yourself on March 2nd of 2015?

***A.*** **Correct.**

***Q.*** With an attachment of the initial value prop and refinement fixed PowerPoint.

***A.*** **That's right.**

***Q.*** And he explains --

***MS. BERNSTEIN:*** Well, we can go to the first page so you can see the PowerPoint, please.

***BY MS. BERNSTEIN:***

***Q.*** And is this that attachment?

***A.*** **Yes.**

***MS. BERNSTEIN:*** Okay. Move to admit 3321.

***THE COURT:*** Any objection?

***MR. PILCHAK:*** No objection, Your Honor.

***THE COURT:*** It may be admitted.

***(Exhibit 3321 admitted.)***

***MS. BERNSTEIN:*** Can we please go back to the first email?

***BY MS. BERNSTEIN:***

***Q.*** And so Mr. Quinton is explaining that there were an error in the slides that he sent you on Friday; correct?

***A.*** **Correct.**

***Q.*** Do you remember, if you remember, what day Friday was in

February of 2015, or would it help to you see a calendar from that time?

**A. It definitely will help. Oh, it's -- sorry. You were saying Monday is right here, so March 2nd. Okay. February 28th, yeah.**

***Q.*** I'm going to show you -- you were right, it was not a leap year.

**A. Yeah.**

***MS. BERNSTEIN:*** I'm going to show you Exhibit 3320.

***BY MS. BERNSTEIN:***

***Q.*** Can you see that?

**A. Yeah.**

***Q.*** Okay. So if Mr. Quinton is speaking on the 2nd about slides that were sent on Friday, he's referring to Friday the 27th; correct?

**A. Yeah.**

***Q.*** Okay. I want to go back to this.

***THE COURT:*** "This" meaning 3321?

***MS. BERNSTEIN:*** Thank you, 3321.

And let's go to page 7 of this PowerPoint, please.

***BY MS. BERNSTEIN:***

***Q.*** And this is identifying some of the issues in the patent -- that Mr. Quinton and the Invionics team found in Sheida's provisional patent applications?

**A. Yes, it is.**

***Q.*** And this looks like there's four issues here?
***A.*** **That's correct.**
***MS. BERNSTEIN:*** And let's go to the next page.
***BY MS. BERNSTEIN:***
***Q.*** Looks like there's three more issues here; correct?
***A.*** **Right.**
***Q.*** And they didn't just identify issues with Sheida's patents, they suggested new sensor designs; correct?
***A.*** **That's right.**
***MS. BERNSTEIN:*** Let's go to page 9, please.
***BY MS. BERNSTEIN:***
***Q.*** And this is a new circuit design that's being proposed by the Invionics team as of February 27th of 2015?
***A.*** **Correct.**
***MS. BERNSTEIN:*** Let's go to page 13.
***BY MS. BERNSTEIN:***
***Q.*** And it's identifying a number of new sensor -- new circuit benefits; correct?
***A.*** **Correct.**
***Q.*** And these are benefits that that design we just looked at would enable.
***A.*** **Correct.**
***Q.*** And the first line here says, "An area reduction of one flop sensor;" correct?
***A.*** **Correct.**

***Q.*** Do you remember how many flop sensors Sheida's provisional patent had suggested?

***A.*** **If could you flash the figure, that would definitely help.**

***Q.*** Sure.

***MS. BERNSTEIN:*** Let's go to Exhibit 830 at page 9, Figure 2.

***BY MS. BERNSTEIN:***

***Q.*** Each one of these boxes with a triangle, that's a sensor flop; correct?

***A.*** **Not all of the boxes, so --**

***Q.*** Well, these ones I'm referring to, these are the sensor flops?

***A.*** **No. The ones down there, to the best of my understanding, these are not sensor flops. These are the actual flops in the circuit.**

***Q.*** I'm sorry.

These are the flip-flops; correct?

***A.*** **Same thing, flops, flip-flops, yeah.**

***Q.*** Okay.

***A.*** **But they are not the ones -- I thought the question was, are these the flops in the sensor circuit.**

***MR. PILCHAK:*** Your Honor, I just object for the record to make sure we make a clear record of which boxes we're circling or talking about.

***THE COURT:*** For the record, she's circled all the

boxes.

***THE WITNESS:*** Yeah.

***MS. BERNSTEIN:*** I'll be very clear.

***BY MS. BERNSTEIN:***

***Q.*** We're looking at Sheida's provisional patent application; correct?

***A.*** **Yes, we are.**

***Q.*** And there are five boxes that say "DQ" with a little triangle on the bottom; correct?

***A.*** **Correct.**

***Q.*** And those are flip-flops, or flops, as you just said; correct?

***A.*** **Correct.**

***Q.*** Okay. So this -- Sheida's provisional patent application had five flops; correct?

***A.*** **I'm just trying to make a distinction between the sensor flops, if your question was -- if you could refer back to Brad Quinton's slides, it talks about the implementation of sensor requiring so many flops, and it talked about area reduction, reduction of one flop per sensor --**

***MS. BERNSTEIN:*** We'll go back -- we'll go back to slide -- to page 13 of 3321, please.

***THE WITNESS:*** Yeah. So please notice the overhead. That's what the flop for realization of the sensor circuit is.

///

***BY MS. BERNSTEIN:***

***Q.*** Okay. We'll go back --

***A.*** **The rest are part of the circuit itself.**

***Q.*** Okay. We will go back between those. Right now, I want to focus on those boxes and those flops.

So here, the new circuit benefits are reduction of one -- area reduction of one flop sensor; correct?

***A.*** **One flop per sensor, yeah. That's the way I read it.**

***Q.*** And so this new sensor design used fewer flip-flops than Sheida's?

***A.*** **Correct.**

***Q.*** And this new sensor design that was proposed by Invionics on February 27th of 2015 says, "No DLL or delay on clock network required."

Do you remember that?

***A.*** **Yeah.**

***Q.*** And Ms. Alan's provisional patent did require a DLL or delay clock, correct?

***A.*** **Yeah.**

***MS. BERNSTEIN:*** And can we also look at Exhibit 685, please? And can we clear my marking? Thank you.

***BY MS. BERNSTEIN:***

***Q.*** This is a sketch that you sent to Mr. Quinton on March 3rd of 2015?

***A.*** **I forwarded this sketch, which I received from Sheida**

**Arabi -- Sheida.Arabi1@gmail, which I believe to have come from Dr. Karim Arabi, forwarded it over to Brad Quinton.**

***Q.*** Sure.

***MS. BERNSTEIN:*** Let's go to Exhibit 684, please.

***BY MS. BERNSTEIN:***

***Q.*** This is you forwarding it to Mr. Quinton; right?

***A.*** **Yes.**

***Q.*** And this is on March 3rd of 2015?

***A.*** **Correct.**

***MS. BERNSTEIN:*** Okay. And let's go back to 685.

***BY MS. BERNSTEIN:***

***Q.*** And this design that we're looking at, it doesn't use a DLL or delay clock network, does it?

***A.*** **It -- this is a different issue it is addressing. If you can see down in the labels, the last two lines, FCP, functional critical path, and TCP, toggling critical path.**

**The thrust of this sensor architecture is -- again, I may be oversimplifying since I'm explaining it at a very high level.**

***Q.*** No, that's okay. We appreciate oversimplification.

***A.*** **So the idea is that the sensor is supposed to measure how fast the circuit is running. How fast the circuit is running, it's a function of how much loading is there on the critical path. If the path is not being stressed enough, it could give you a false indication that the circuit is running at a higher speed than it actually is.**

**So the new idea proposed in this circuit -- in this sensor diagram, sensor architecture, was to introduce a notion of -- it's called toggling critical path. In other words, you create a replica of the critical path, but this path is being stressed at every clock cycle so that you can really understand how fast the circuit is running.**

***Q.*** Okay. And what we're looking at on the screen does not have a DLL or delay clock network, correct? There's no DLL or delay clock network in what we're looking at on the screen; is that right?

***A.*** **Correct.**

***MS. BERNSTEIN:*** Okay. Let's go back, please, to 3321, page 13 -- or I'm sorry, 3321, page 9.

***BY MS. BERNSTEIN:***

***Q.*** And this sensor uses a variable delay in the input to the flip-flop; correct?

***A.*** **Yes.**

***Q.*** Labeled "delay capture"?

***A.*** **Right.**

***MS. BERNSTEIN:*** And let's go back to 685, please. Can we please clear my marking?

***BY MS. BERNSTEIN:***

***Q.*** And this sensor also has a variable delay in the input of the flip-flop; correct? Where it says "margin delay"?

***A.*** **Yeah. I -- yes.**

***MR. PILCHAK:*** And, Your Honor, again, I just object for the record that we make a record of which things we're circling in these --

***THE COURT:*** She circled "margin delay" when she said "margin delay."

***MR. PILCHAK:*** There's two margin delays. I apologize.

***MS. BERNSTEIN:*** I can circle both.

***BY MS. BERNSTEIN:***

***Q.*** Are those the same thing?

***A.*** **I don't see the variable part on the lower margin delay.**

***Q.*** Okay. So it is just the top margin delay.

***A.*** **Okay.**

***Q.*** Yes?

***A.*** **Well, they are both labeled "margin delay," but there is a slight difference in the iconic representation. That's okay.**

***MS. BERNSTEIN:*** Here, let's do this. Let's go to a demonstrative at 3319, please. And can we clear my markings?

***BY MS. BERNSTEIN:***

***Q.*** So up top, are we looking at Exhibit 3321 at page 9, the design we had just put up?

***A.*** **Yes.**

***Q.*** And at the bottom, we're looking at the design that had the margin delay variable you just identified?

***A.*** **That's right.**

***MS. BERNSTEIN:*** Move to publish 3319.

***THE COURT:*** As a demonstrative?

***MS. BERNSTEIN:*** Yes, Your Honor.

***THE COURT:*** Any objection?

***MR. PILCHAK:*** No, Your Honor.

***THE COURT:*** Okay. So, again, I'm going to allow her to use it, but it won't be back in the jury room with you. It's just to show -- to demonstrate something for you.

***(Exhibit 3319 published.)***

***BY MS. BERNSTEIN:***

***Q.*** The top -- excuse me.

The top here was proposed by Invionics on February 27th of 2015; correct?

***A.*** **Yes.**

***Q.*** And the bottom is what you received on March 3rd; correct?

***A.*** **Correct.**

***Q.*** After --

***MS. BERNSTEIN:*** Let's go back to 3321, the first page, please.

***BY MS. BERNSTEIN:***

***Q.*** After receiving this from Invionics on February 27th of 2015, you sent this to Sheida -- to Sheida's email address; correct?

***MS. BERNSTEIN:*** We'll go to Exhibit 2791.

***THE WITNESS:*** What I'm seeing here is from Brad to myself, 3321.

***MS. BERNSTEIN:*** And we can go back to --

***BY MS. BERNSTEIN:***

***Q.*** 3321 is Brad sending you an update of slides that he had previously sent you on February 27th; correct?

***A.*** **That's exactly right, yes.**

***Q.*** And after you received it from Brad on February 27th, you had sent it to the Sheida email address; correct? Are you looking at 2791?

***A.*** **I'm looking at 2791, yeah.**

***Q.*** Is this you sending that initial value prop and refinement, the first version of that PowerPoint, to Sheida on Friday, February 27th?

***A.*** **Correct.**

***MS. BERNSTEIN:*** Move to admit.

***THE COURT:*** Any objection to 2791?

***MR. PILCHAK:*** Does it include the attachment?

***MS. BERNSTEIN:*** It does. We can go to the next page if you'd like.

***BY MS. BERNSTEIN:***

***Q.*** Is this that PowerPoint?

***A.*** **Yes.**

***Q.*** And this is the same PowerPoint that we just looked at with the exception that the one we looked at in 3321 is fixed by Invionics to correct a couple of things?

***A.*** **Correct.**

***Q.*** Okay.

***MS. BERNSTEIN:*** Move to admit 2791.

***MR. PILCHAK:*** No objection.

***THE COURT:*** 2791 may be admitted.

***(Exhibit 2791 admitted.)***

***MS. BERNSTEIN:*** Okay. We can go to the first page so the jury can see that.

***BY MS. BERNSTEIN:***

***Q.*** And, again, this is you sending the PowerPoint to Sheida's email addresses?

***A.*** **That's right.**

***Q.*** On February 27th, 2015, after receiving it from Invionics; correct?

***A.*** **Correct.**

***MS. BERNSTEIN:*** Thank you. We can take that down.

***BY MS. BERNSTEIN:***

***Q.*** So Invionics undertook that review of Sheida's provisional patent applications at the start of their contract with Abreezio and identified problems; correct?

***A.*** **Correct.**

***Q.*** And we looked at, I think, seven issues; correct?

***A.*** **Yes.**

***MS. BERNSTEIN:*** And can we actually go to 3321, page 8, please? Can we make that bigger? Thank you.

///

***BY MS. BERNSTEIN:***

***Q.*** And one of the issues that they identified with the patents is a serious design issue; correct?

***A.*** **That's right.**

***Q.*** "SW will not be able to trust passing detections, only failing ones;" correct?

***A.*** **Correct.**

***Q.*** And in the context of this, "SW" means software; correct?

***A.*** **That's right.**

***Q.*** So this presentation, created by at least February 27th of 2015, identified a serious design issue, and as the CEO, that was explained to you; correct?

***A.*** **Yes.**

***Q.*** And in your view as an engineer, would a sensor that software cannot trust be a very good sensor?

***A.*** **No. That issue had to be addressed.**

***Q.*** That was a big concern; right?

***A.*** **Yes.**

***Q.*** And, in fact, Invionics did not think that the provisional patent applications could be made to work; correct?

***A.*** **Correct. The sensor provisional application had the serious issue. It had to be addressed to make it work, yes.**

***Q.*** And a replica of critical path solved that serious design issue; right?

***A.*** **Yes.**

***MS. BERNSTEIN:*** Let's go to Exhibit 2595, please.

***THE WITNESS:*** Just to be complete on that replica with the toggling critical path, just to be a replica will not solve it. It has to be fed with a toggle every clock cycle, meaning it has to be stressed to the maximum.

***MS. BERNSTEIN:*** Can we clear my marking, please?

***BY MS. BERNSTEIN:***

***Q.*** And do you see 2595 on your screen?

***A.*** **I do.**

***Q.*** And this is a March 2nd email from Sanjiv to -- excuse me -- from you to Mr. Quinton?

***A.*** **Correct.**

***MS. BERNSTEIN:*** Move to admit.

***THE COURT:*** Any objection to 2595?

***MR. PILCHAK:*** No, Your Honor.

***THE COURT:*** It may be admitted.

***(Exhibit 2595 admitted.)***

***BY MS. BERNSTEIN:***

***Q.*** And Qualcomm was also interested in a critical path replica-based solution; correct?

***A.*** **Correct.**

***Q.*** And as you were just describing, Abreezio's term for a replica of critical path was Toggling Critical Path or TCP?

***A.*** **Yeah. Actually, to be very precise, we called it a Toggling Functional Critical Path, DFCP. There is a whole terminology**

**document that lists that out, in fact, in the same -- one of the documents.**

***MS. BERNSTEIN:*** Let's go to 3281, please. Can we blow up that email, please?

***BY MS. BERNSTEIN:***

***Q.*** And you recognize this as an email from yourself to Brad Quinton and the Sheida@Abreezio email address?

***A.*** **Correct.**

***MS. BERNSTEIN:*** Move to admit 3281.

***THE COURT:*** Any objection?

***MR. PILCHAK:*** Does it include the attachment?

***MS. BERNSTEIN:*** It does. It's 11 pages.

***MR. PILCHAK:*** No objection.

***THE COURT:*** It may be admitted.

***(Exhibit 3281 admitted.)***

***BY MS. BERNSTEIN:***

***Q.*** And in this email, you had edited a document and said, "Replaced critical path replica with toggling critical path;" correct?

***A.*** **So we had agreed on the terminology, and the terminology was documented. And in this patent application, it was not consistent with the terminology that we had agreed upon, so that's what that's referring to.**

***Q.*** Okay. And there were also some FPGA demos; correct?

***A.*** **Right.**

***Q.*** Can you give a very high-level explanation of what an FPGA demo was?

***A.*** **Sure. If you are building something in a circuit that is going to be implemented on a chip in silicon, it's a very time-consuming and expensive way to do that. A faster way to do this is a technology called -- the full name doesn't really matter, Field Programmable Gate Array. But think of it as a quick and dirty way of prototyping the idea that you would have taken a lot of effort and cost to implement on an actual piece of silicon.**

***Q.*** And it was the toggling critical path that was used in the FPGA demos; correct?

***A.*** **To the best of my recollection, yes. If we can refer back to the SOW real quick, on the FPGA -- there is a section on FPGA demo that will have a very explicit statement of that.**

***MS. BERNSTEIN:*** We can show you 2107, which I think is admitted. We can go to page 5 of this.

***BY MS. BERNSTEIN:***

***Q.*** And, I'm sorry, this -- I should clarify -- this is the April 15th of 2015 hands-on demonstration; correct?

***A.*** **Yes.**

***MS. BERNSTEIN:*** Okay. And at page 5, if we can make that slide bigger, please. Thank you.

***BY MS. BERNSTEIN:***

***Q.*** And right here, it is says that, "The accuracy is maintained

independent of the switching activity, FCP vs. TCP"?

***A.*** **Correct.**

***Q.*** So it was the TCP that was in the FPGA demos, that was the solution that Invionics had to that serious design flaw?

***A.*** **Correct.**

***Q.*** Okay. Thank you.

***THE COURT:*** Would now be a good time for a break?

***MS. BERNSTEIN:*** Sure, Your Honor.

***THE COURT:*** Okay. Let's take 15 minutes, ladies and gentlemen. You're reminded you're not to discuss the case with anyone and you're not to do any research. And we'll see you back in 15 minutes.

***(Jury out at 10:18 a.m.)***

***THE COURT:*** Thank you. You're excused as well, sir. We're outside the presence of the jury.

Any issues we need to take up?

***MR. PILCHAK:*** I just had one quick one.

***THE COURT:*** Sure.

***MR. PILCHAK:*** The Court heard me ask a couple of times whether the Defense exhibits for cross here had attachments. There were a number of exhibits that were used today just that we didn't have before the cross. We've done extensive disclosures back and forth. We've received about 1200 exhibits from the Defense. But they will -- and I don't fault them for this -- sometimes use exhibits on cross that they haven't

pre-disclosed to us, which makes it a bit tricky for us to know whether we have an objection to, for example, a 30-page slide deck.

We've raised this a couple of times with the Defense in our correspondence. Again, I don't fault them for it. I just note it for the record. Because now here we are near the end of the Government's case-in-chief. I just wanted to point out that sword cuts both ways, and so we'll follow the same protocol during the Defense case with our exhibits for cross, and I hope that will be fine for the Court and the parties. But that's where we are with that issue.

***MS. BERNSTEIN:*** And I didn't realize that the Government didn't have these. These are all Government discovery. Of course, we have no obligation to pre-mark and pre-share our impeachment so they can spend more than 71 hours with their witness going over it. And I'm not sure that it cuts both ways, given Rule 16 and materiality, but we do understand they will be --

***THE COURT:*** If it's been produced, they can use it even if it's not on their list if they need it for rebuttal, if that's what you're asking.

***MR. PILCHAK:*** Yes, Your Honor. Thank you.

***THE COURT:*** Okay. I have a pet peeve. This is -- I'm a one-woman crusade. Every lawyer I've ever seen in front of me does this on cross-exam, so it's not unique to you. But don't

make a negative statement and then say "correct" or "right," because it makes for a very muddied record.

So when you say, "You weren't sharing details about something; correct?" And the answer is no, you don't know whether that means no, that's not correct, or no, you weren't sharing details.

Or when you say, "You did not give accurate information about the company to Qualcomm; correct?" If the answer is yes, you don't know if you mean yes, I did give accurate information, if the answer is no, you don't mean it doesn't. So don't make a negative statement and then say "correct," because it's basically a worthless answer. So just a point of --

***MS. BERNSTEIN:*** Thank you, Your Honor. I understand. Although I'm not sure that last point is unclear to anyone who's been here, but I do understand.

***MR. PILCHAK:*** Thank you, Your Honor.

***THE COURT:*** Thank you.

***(Recess taken.)***

***THE COURT:*** We are back on the record. All jurors are present. Dr. Arabi is present. The lawyers are present. And you, sir, are still under oath to tell the truth.

Ms. Bernstein?

***MS. BERNSTEIN:*** Thank you.

***BY MS. BERNSTEIN:***

***Q.*** Mr. Taneja, you testified that this was the first time you

were a CEO; correct?
**A. Correct.**
Q. You had never been a CEO before?
**A. No.**
Q. You do have an MBA.
**A. Yes.**
Q. From NYU's Stern?
**A. That's right.**
Q. And Karim had put the company together; correct?
**A. Yes.**
Q. And you were running everything by him.
**A. Yes.**
Q. Not because he ordered to you.
**A. He clearly expected that.**
Q. And where was that expectation communicated?
**A. Through emails, through texts, through phone conversations.**
Q. That he expects you to run every single thing by him.
**A. We saw examples of that in my testimony over the last two days.**
Q. We saw examples of you running things by him; right?
**A. I'm sorry.**
Q. We saw examples of you running things by him; correct?
**A. Correct.**
Q. But it's your testimony that that was -- he ordered and expected that?

**A. Yes.**
Q. Okay. It's also in your nature to do that as a first-time CEO; correct?
**A. As a first-time CEO, yes.**
Q. You didn't know the people that had come together as Abreezio; correct?
**A. No -- do you mean the people -- Invionics and so on?**
Q. Let me phrase that differently.
Prior to starting Abreezio, you didn't have preexisting relationships with those people.
**A. Correct.**
Q. And I think you testified that you were also traumatized, having been let go from a long-time job before this.
**A. I was, yeah. My confidence was shattered.**
Q. There were times throughout the 10 months of Abreezio that you were often at odds with Mr. Quinton as well; correct?
**A. We had disagreements.**
Q. And so you reached out to Dr. Arabi a lot with questions.
**A. Yes. And so did he.**
Q. I'm sorry?
**A. And he reached out to me on lots of occasions as well with specific guidance what to do.**
Q. Did we go through that in your testimony?
**A. Yeah.**
Q. Okay. And you claim that you sent a text to Karim asking

for the numbers that Qualcomm was showing on the designs where it worked?

***A.*** **Yes.**

***Q.*** To know the thresholds across at Qualcomm and to calibrate your positioning?

***A.*** **Correct.**

***Q.*** You asked for information regarding data on area and perf gains.

***A.*** **That's right.**

***Q.*** And you had found information about this on publicly available websites related to TI; yes?

***A.*** **For TI, yes.**

***Q.*** But you testified that you were texting Karim to save you the trouble of researching that?

***A.*** **If you remember my response, I mentioned it was partially derivable from the information that was available on the Qualcomm website. And I can elaborate on what that really means.**

***MS. BERNSTEIN:*** Well, let's pull up 723, please.

***THE WITNESS:*** May I explain the partial --

***THE COURT:*** No, you can't. We're trying to get you off the stand, Mr. Taneja. You're going to be on the stand for two weeks if you volunteer more.

***THE WITNESS:*** Okay.

***THE COURT:*** So answer the question that's asked.

***BY MS. BERNSTEIN:***
***Q.*** This is the text message; correct?
***A.*** **That's right.**
***Q.*** You never got a response to this, did you?
***A.*** **We spoke on the phone.**
***Q.*** You spoke on the phone about this, is your testimony?
***A.*** **Correct.**
***Q.*** And that one's true or not true?
***A.*** **Absolutely true.**
***Q.*** Okay. You claim that --
***MS. BERNSTEIN:*** Let's go to Exhibit 651, please. Slide 8, please.
***BY MS. BERNSTEIN:***
***Q.*** And this is the March 4th presentation to Qualcomm before the NDA was signed?
***A.*** **That's right.**
***Q.*** And you claim that this 50 percent number for Canary circuits was provided by Dr. Arabi?
***A.*** **No. It was one of the inputs that led to the 50 percent number. The number that Dr. Arabi provided was a different number.**
***Q.*** Oh, what number did he provide?
***A.*** **My recollection is it was 65 percent.**
***Q.*** Oh, but you didn't put that there?
***A.*** **I looked at TI, I looked at Broadcom, whatever information**

**was available, and arrived at an average across the industry based on synthesizing all these viewpoints, data points.**

***Q.*** So is it's your testimony that you asked him for information to specifically calibrate to Qualcomm, but you didn't use that information?

***A.* I used it as one of the data points, as I said in my testimony the other day. It was one of the data points that went in to come up with this 50 percent number.**

***Q.*** And it's your testimony today that he provided you with the number 65 percent?

***A.* That's my recollection.**

***Q.*** Have you ever told anyone that before?

***A.* I don't remember.**

***Q.*** Not in your 71 hours of prior interviews have you shared that Dr. Arabi gave you a 65 percent number you later did not, in fact, even use?

***A.* I used the number as one of the inputs, and it was more of an industry average across the board, not just very specific.**

***Q.*** Okay. We'll come back to the number in a moment, but my question for now is about whether you've ever shared that with anyone before this moment in time.

***A.* I don't recall that specific question being asked. The question was, Did you reach out to Dr. Arabi with this information?**

***Q.*** And you didn't think that a truthful, accurate, complete

answer should include, Yeah, and he gave me an answer and this is the answer he gave me? You don't think that was asked?
**A. I may have shared that with the Government as well, if you go back to the 302.**
**Q.** I've referred to your 302s.
Are you able to point me to where that is?
**A. I haven't seen the 302s myself.**
**Q.** Fair to say you never told anyone this before this moment in time?
**A. I don't recall.**
**Q.** So it's your testimony now that Dr. Arabi gave you a 65 percent number; correct?
**A. That's my recollection, to the best of my recollection.**
***MS. BERNSTEIN:*** Let's go back to this text message, 723.
***BY MS. BERNSTEIN:***
**Q.** Was TI at 64?
**A. Yes.**
**Q.** So is it your testimony that this number, even if provided to you, which we're learning about right now, was proprietary?
**A. The 65 percent is referring to the Qualcomm number.**
**Q.** Right, so you say.
**A. Yes.**
**Q.** Which is one percentage above the publicly available information you yourself were able to find on TI's website?

**A. That's right.**
Q. And, in fact --
**MS. BERNSTEIN:** If we go back to 651, page 8, please.
**BY MS. BERNSTEIN:**
Q. -- you didn't use that number.
You used 50; right?
**A. Yes.**
**MS. BERNSTEIN:** Let's go to Exhibit 45, please, page 8.
**BY MS. BERNSTEIN:**
Q. This is a June 2015 presentation?
**A. Yes.**
Q. And, in fact, here, the number is 35; right?
**A. Correct.**
Q. And that's reasonable for a Canary to replica in line with the industry?
**A. So understanding -- our understanding -- my understanding of what the state of the art, like we saw in the previous slide, evolved as we gathered more input from the course of our customer engagements. So it evolved.**
Q. Because 35 percent is a reasonable number for Canary to replica and in line with the industry; correct?
**A. Yes.**
Q. It's even on some patents by Professor Dennis Sylvester, the Government's expert; correct?
**A. I don't recall seeing that number.**

*Q.* So this number that you put in the slide is independent of the information you claim Dr. Arabi gave you.

***A.*** **From the first time that I put the slides together where I had 50 percent, that 50 percent was the right based on a collective understanding of what other customers were experiencing as the benefit. And the important point on this slide really is how much would our technology be able to demonstrate, which you see on the upper right, the plus 95 percent.**

*Q.* That's the 95 percent.

***A.*** **That's right.**

*Q.* Sure.

***MS. BERNSTEIN:*** Let's actually go back to 2598, page 10, please. I'm sorry. Let's go to the first page of this. Is this the March -- the next page, please, for the March -- the date of the PowerPoint.

***BY MS. BERNSTEIN:***

*Q.* This one was March of 2015?

***A.*** **Yeah.**

*Q.* This is March 20th of 2015, once the NDA was signed with Qualcomm and you could get more specific?

***A.*** **This is the March 20th one.**

***MS. BERNSTEIN:*** Okay. Let's go to page 10.

***BY MS. BERNSTEIN:***

*Q.* And as you said, this is the important number; right?

**A. Correct.**
*Q.* And that was 90 to 95 percent.
**A. Yeah. We have to keep in mind that the actual gain that you get is going to vary from design to design.**
*Q.* Of course.
**A. It's not a single number. It's going to vary from company to company.**
*Q.* Of course.
And what you were proposing to Qualcomm in March of 2015 is 90 to 95 percent benefits of TruSens against a 30 to 50 percent range for Canary; correct?
**A. Correct.**
*Q.* And that is the same -- well, the 30 and the 95 are the same as what you proposed to Qualcomm in June of 2015?
**A. Yes. I think it said 50 percent, right, the June --**
***MS. BERNSTEIN:*** We'll go to Exhibit 45, page 8.
***BY MS. BERNSTEIN:***
*Q.* This is June of 2015?
**A. Okay, the June one.**
*Q.* And you're proposing 95 percent for TruSens and approximately 35 percent for Canary?
**A. That's right.**
***MS. BERNSTEIN:*** Move to admit Exhibit 45 if it's not already in evidence.
***THE COURT:*** It's not.

Is there any objection to 45 coming into evidence?

***MR. PILCHAK:*** No, Your Honor.

***THE COURT:*** 45 may be admitted.

***(Exhibit 45 admitted.)***

***MS. BERNSTEIN:*** And I'm sorry, just for a moment because I hadn't realized that the jury hadn't seen this.

***BY MS. BERNSTEIN:***

***Q.*** This is June of 2015; correct?

**A. That's right.**

***Q.*** And the same numbers we just talked about, 35 percent approximately for Canary, and 95 percent benefits of TruSens?

**A. Right.**

***Q.*** Okay. I want to go back for a moment to February/March of 2015.

The Invionics engineers wrote provisional patent applications for Abreezio?

**A. Yes.**

***MS. BERNSTEIN:*** We'll show you 2362. Can you make that larger, please?

***BY MS. BERNSTEIN:***

***Q.*** And this is a March 19th email from Mr. Quinton to yourself, "Finalized Provisionals;" correct?

**A. Correct.**

***Q.*** Can we -- and there's four document attachments to this email?

**A. That's right.**

***Q.*** Okay. And those are 32 -- 31 pages long and attached to this email?

**A. The number of pages --**

***MS. BERNSTEIN:*** Can we go click through those real quick?

***THE WITNESS:*** Yeah, to 32, correct.

***MS. BERNSTEIN:*** Can we move to admit 2362?

***THE COURT:*** Any objection?

***MR. PILCHAK:*** No, Your Honor.

***THE COURT:*** It may be admitted.

***(Exhibit 2362 admitted.)***

***MS. BERNSTEIN:*** Can we go back to the first page, please? And make that larger again, please.

***BY MS. BERNSTEIN:***

***Q.*** And this is Mr. Quinton saying to you, "Hot off the presses"?

**A. Yes.**

***Q.*** "I would have liked to clean these up more, but I think these are sufficient to show the fundamentals of each critical invention, remembering that provisional patents are not meant to have exhaustive claims, just to demonstrate the timeline of the core invention"?

**A. Correct.**

***Q.*** And he refers to these as some "very key pieces of IP"?

**A. That's right.**
**Q.** And there's four provisional patent applications?
**A. That's right.**
**Q.** And it was Mr. Quinton who took the first step in advancing these patents?
**A. Yes.**
**Q.** You also understood that in Brad's previous startup, he wrote his own patents as well?
**A. Yes.**
**Q.** And creating new IP and writing provisional and non-provisional patent applications was, in fact, part of the contract work that Invionics was supposed to do for Abreezio.
**A. Correct.**
**Q.** And this is March 19th; correct?
**A. It is.**
**Q.** And do you recall --
***MS. BERNSTEIN:*** Well, let's pull up Exhibit 3219, please.
***BY MS. BERNSTEIN:***
**Q.** And do you recall that you had, on March 13th --
***MS. BERNSTEIN:*** Can we just zoom in on this part up here?
***BY MS. BERNSTEIN:***
**Q.** On March 13th, you had received Invionics -- one of Invionics' explanations that Sheida's provisional patent

applications wouldn't work?

**A. Can we zoom in onto the lower section?**

***Q.*** Sure.

**A. I'm looking only at the -- that's right, yeah.**

***MS. BERNSTEIN:*** And let's go to 2624.

***BY MS. BERNSTEIN:***

***Q.*** This is one of the documents that Abreezio -- that Invionics prepared identifying the fatal flaws of Sheida's provisional patent applications?

**A. Correct.**

***Q.*** And you had received this before Invionics sent four new provisional patent applications.

**A. That's right.**

***Q.*** Okay. And you had the second March meeting with Qualcomm on March 20th of 2015; correct?

**A. That's right.**

***Q.*** And that was after Invionics had thrown out Sheida's provisional patent applications and created four new provisional patent applications; correct?

**A. I wouldn't call it thrown out. It was addressing the issues that were identified, the seven issues that we talked about in that document.**

***Q.*** The critical flaws that caused them to write four new provisional patent applications?

**A. That's right.**

*Q.* On March 19th.
***A.* Correct.**
*Q.* In fact, it was Brad Quinton and his team who created the core technology that Qualcomm wanted to buy.
***A.* Building off the original idea that was outlined in the TruSens -- in the TruSensor provisional patent, all these extensions, enhancements were made to address the issues as outlined in the document. And, yes, then they took the implementation forward.**
*Q.* Sheida's provisional patent applications and what Abreezio created had a common goal; correct?
***A.* Correct.**
*Q.* But different ways of going about doing things; correct?
***A.* Well, I guess the point I'm making is there is a core --**
*Q.* Do you mind answering my question first?
They had different ways of going about doing it. We just took a lot of everyone's time to identify the issues that they corrected.
***A.* Yes.**
*Q.* You would agree that while they were targeted to the same problem, they were different approaches?
***A.* There were some commonalities in the core basic idea of instrumenting the critical path.**
*Q.* And they were different approaches.
***A.* Some of the elements stayed the same; the others changed,**

**correct.**

***Q.*** And so what Invionics made was different than Sheida's provisional patent applications; correct?

***A.*** **Different and some commonalities.**

***Q.*** Okay. But they're not the same.

Would you agree?

***A.*** **Yes.**

***Q.*** Okay. You've even explained that Brad and his team were good at prototyping, and the majority of the 50 percent reduction in test cost and time was due to the scan chain partitioning; correct?

***A.*** **Correct.**

***Q.*** And at first, when this idea was had by Invionics, the reaction was that it was too good to be true, because surely someone would have thought of this; correct?

***A.*** **Correct.**

***Q.*** But Andrew worked on it.

***A.*** **That's right. That was my understanding.**

***Q.*** And that's Andrew Hughes?

***A.*** **Andrew Hughes.**

***Q.*** And you've also acknowledged to the Government prior to this trial that the DFT technique in Sheida's provisional patent applications did not work.

***A.*** **Correct.**

***Q.*** And as we went through, the sensor did not work, either;

correct?
**A. Correct.**
*Q.* When Abreezio was acquired by Qualcomm in October of 2015, it was a tech and team acquisition; correct?
**A. I'm sorry, it was a --**
*Q.* Tech and team acquisition.
**A. Yes, yes.**
*Q.* And so Qualcomm acquired some key employees.
**A. Correct.**
*Q.* You were not one of those key employees.
**A. I had a contract for six months. I was not identified as a key employee.**
*Q.* And Sheida was not identified as a key employee.
**A. Correct.**
*Q.* I want to talk for a moment about source code. That's the metadata for this technology.
Are you familiar with it?
**A. Metadata for this technology?**
*Q.* Source code, are you familiar with that concept?
**A. I'm familiar with the source code.**
*Q.* And there was, in fact, source code for Abreezio's products as well; correct?
**A. Correct.**
*Q.* And it was given by hand to Qualcomm on a thumb drive; correct?

***A.*** **Correct.**

***Q.*** And you would expect that those contents were archived and retained for several years; correct?

***A.*** **I would think so.**

***Q.*** Especially where they're still using the technology; correct?

***A.*** **Yes.**

***Q.*** Abreezio's technology would have made chip manufacturing less expensive and more efficient for anyone that manufactured chips; correct?

***A.*** **Correct.**

***Q.*** The specific products would need to be implemented differently across different platforms, but the boost would inure to anyone who had acquired Abreezio; correct?

***A.*** **The applicability of the core technology, yes.**

***Q.*** And Abreezio did pitch to other companies; right?

***A.*** **Yes.**

***Q.*** And you testified on direct examination that engaging the other companies was just part of this ruse to drive the price up at Qualcomm; right?

***A.*** **I didn't quite use those words, what you just said. What I said was our primary target was Qualcomm. If you look at the majority of the effort that the Abreezio team spent, majority of team -- team effort was spent on Qualcomm.**

**The small effort that was spent with eight other customers**

**in a way helped reinforce the implementation of the primary target, because if other customers are interested, it can drive the value up. It can further build confidence in Qualcomm about the value of the technology.**

***Q.*** So it's your testimony, as you said yesterday, that you were pursuing eight other customers to drive the Qualcomm value up, not because you were actually pursuing potentially those eight other customers?

***A.* The eight other customers that we were pursuing were in the very initial stages. And in no way did it detract the focus from our primary target.**

***Q.*** Those were real pursuits, were they not?

***A.* Yeah, they were real pursuits. And any pursuit that we did there helped us with our goal of maximizing our success with the primary target.**

***Q.*** So I guess that's what I'm trying to ask you.

Were you pursuing eight other companies because you weren't interested in them and you were just trying to drive a bidding war, as you told Mr. Pilchak, with Qualcomm? Or were you pursuing eight other companies because this technology was applicable to semiconductor companies?

***A.* Again, I will restate what I said in my testimony. Our primary target was Qualcomm. Look at the majority of the effort spent at Qualcomm versus the eight other customers. At best, it was initial topic, initial engagement. And whatever effort was**

**spent there, it helped reinforce our goal of achieving success with our primary target.**

***Q.*** So the goal was always Qualcomm, is that your testimony?

***A.*** **The primary target was Qualcomm. That's my testimony.**

***MS. BERNSTEIN:*** Okay. Let's go to 2893. This is an email from the Sheida email address to you with a chain. We can go to the last page, please, so you can see the first email.

***BY MS. BERNSTEIN:***

***Q.*** And this is to someone named Sunil?

***A.*** **Yes.**

***Q.*** And where did Sunil work?

***A.*** **Broadcom at that time.**

***MS. BERNSTEIN:*** Let's go to the second page, please.

***BY MS. BERNSTEIN:***

***Q.*** And Sunil engaged several key people to move the engagement forward?

***A.*** **Yes.**

***MS. BERNSTEIN:*** Okay. Move to admit.

***THE COURT:*** Any objection to 2893?

***MR. PILCHAK:*** No, Your Honor.

***THE COURT:*** 2893 may be admitted.

***(Exhibit 2893 admitted.)***

***MS. BERNSTEIN:*** Let's go to 2436.

***BY MS. BERNSTEIN:***

***Q.*** Do you remember pitching to Intel?

**A. Yes.**
Q. And this is March 12th?
**A. That's right.**
***MS. BERNSTEIN:*** Move to admit.
***THE COURT:*** Any objection?
***MR. PILCHAK:*** No, Your Honor.
***THE COURT:*** 2436 may be admitted.
***(Exhibit 2436 admitted.)***
***BY MS. BERNSTEIN:***
Q. You have a fully executed NDA with Intel; correct?
**A. Yes.**
Q. As of March 12th?
**A. Correct.**
Q. And that was just to drive the Qualcomm price up?
**A. As I said, the -- any effort with a company like Intel, which is a competitor of Qualcomm, would help realize our goal of our primary target.**
Q. Did you engage with Intel and execute an NDA as of March 12th of 2015 just to drive the Qualcomm price up or because you were, in fact, pursuing Intel?
**A. We were, in fact, pursuing Intel. And what I said yesterday was it had -- it further reinforced what we were doing with the primary target. Our focus, the primary target, was Qualcomm.**
Q. So why did you execute an NDA with Intel?
**A. To get them interested, to further validate that this**

**technology is being viewed with a lot of interest from other customers, including their direct competitors.**

***Q.*** So it was just to drive things up?

***MR. PILCHAK:*** Objection. Asked and answered.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** You engaged with Intel; correct?

***A.*** **Yes.**

***MS. BERNSTEIN:*** Okay. Let's go to 2893. And I think we just admitted this.

***BY MS. BERNSTEIN:***

***Q.*** This is on March 13th of 2015.

You reported that you were making progress with Broadcom?

***A.*** **Yes.**

***MS. BERNSTEIN:*** Let's go to 2652. Can we go to the next page, please? Can we go to the first page?

***BY MS. BERNSTEIN:***

***Q.*** Do you recall whether this was for Intel or Broadcom?

***A.*** **Can you please zoom?**

***Q.*** Yes.

***A.*** **This is for Broadcom -- sorry -- Qualcomm. This is a Qualcomm custom eval.**

***Q.*** And this is April 10th of 2015?

***A.*** **Correct.**

***MS. BERNSTEIN:*** Let's go to 2735.

***BY MS. BERNSTEIN:***

***Q.*** And this is April 1st of 2015?

***A.*** **April 7th, it shows on mine, the one I'm looking at.**

***Q.*** Well, is this an April 7 email up top with a PowerPoint about the Intel Abreezio meeting?

***A.*** **Right.**

***MS. BERNSTEIN:*** And can we go to the next page?

***BY MS. BERNSTEIN:***

***Q.*** This is the PowerPoint that was attached to that email for the Intel meeting?

***A.*** **Correct.**

***MS. BERNSTEIN:*** Move to admit.

***THE COURT:*** Any objection to 2735?

***MR. PILCHAK:*** No, Your Honor.

***THE COURT:*** 2735 may be admitted.

***(Exhibit 2735 admitted.)***

***MS. BERNSTEIN:*** Can we go to the first page, please?

***BY MS. BERNSTEIN:***

***Q.*** In the bottom email, this is April 1st of 2015, you sent a slide deck to Akbar Shokouhi for Abreezio's pitch to Intel?

***A.*** **Correct.**

***Q.*** And in this deck, did you change that 30 to 50 percent margin reduction for replica sensors?

***A.*** **I don't recall. Can I request you to show me the document?**

***Q.*** Sure.

***MS. BERNSTEIN:*** Let's go to the deck and click through.

***BY MS. BERNSTEIN:***

***Q.*** You're still showing 50 percent for Canary and a hundred percent for TruSens?

***A.*** **That's right.**

***Q.*** That range was applicable to Intel as well?

***A.*** **As I indicated earlier, it was a broad across multiple customers, how I arrived at the 50 percent number.**

***Q.*** Would you agree that you also had that number for Broadcom?

***A.*** **Yes.**

***Q.*** Would you agree that you also had that number for Apple?

***A.*** **Probably, yes. And this is, of course, the customer would do the evaluation and validate the value for themselves. These are more like giving a sense of what --**

***Q.*** And -- I'm sorry. Finish.

***A.*** **No, that's fine. I think I made my point.**

***Q.*** And the numbers that you're giving a sense of, you agree, applied to everyone you pitched to and were not targeted or calibrated specifically to Qualcomm, particularly not off information you claim Karim gave you.

***A.*** **Right. As I said, this is across multiple customers is how I arrived at the 50 percent number.**

***Q.*** And in April of 2015, you were pitching to Apple?

***A.*** **April 2015, no, I don't believe so. It was much later, if I remember correctly. It was --**

***MS. BERNSTEIN:*** Let's go to Exhibit 20. Can you go to the first email here? Can you make that larger, please?

Move to admit Exhibit 20.

***THE COURT:*** Any objection?

***MR. PILCHAK:*** I would just object as to foundation through this witness, Your Honor.

***MS. BERNSTEIN:*** Go back to the first page, please.

***THE COURT:*** Sustained at this point.

***BY MS. BERNSTEIN:***

***Q.*** Were you aware that Akbar was pitching to Apple on April 16th of 2015?

***A.*** **Yes. Akbar was pitching, but the meeting that Brad, Trent, myself, we had with Apple, the very first meeting that I was part of was much later.**

***Q.*** July 28th of 2015?

***A.*** **Yeah, probably. Yes.**

***Q.*** So the Apple pitch was at least two-and-a-half months, engagements with Apple back and forth?

***A.*** **So the background of the Apple engagement is Akbar had a relationship --**

***Q.*** Sir, did you spend at least two-and-a-half months, between April 16th of 2015 and July 29th of 2015, discussing Apple with Alan Gilchrist?

***A.*** **I did not.**

***Q.*** Did Abreezio?

**A. Akbar did. I don't know how long he spent, but he was constantly reminded by Dr. Karim Arabi, Why are we not able to get a meeting with Apple?**

***MS. BERNSTEIN:*** Let's go to 2212.

***BY MS. BERNSTEIN:***

***Q.*** Is this an email from you to Dan Hoggar and Brad Quinton?

***A.*** **Yes.**

***Q.*** About additional customer engagements?

***A.*** **Right.**

***MS. BERNSTEIN:*** Move to admit.

***THE COURT:*** Any objection to 2212?

***MR. PILCHAK:*** No, Your Honor.

***THE COURT:*** 2212 may be admitted.

***(Exhibit 2212 admitted.)***

***MS. BERNSTEIN:*** Can we make that larger, please?

***BY MS. BERNSTEIN:***

***Q.*** So in May of 2015, you're talking about -- Sunil was with Intel or Broadcom?

***A.*** **Broadcom.**

***Q.*** Broadcom.

***A.*** **Broadcom, yes.**

***Q.*** I'm sorry. Yes, it says it right there.

You're talking about Broadcom, Intel, Apple, Nvidia, and Cisco?

***A.*** **That's right.**

*Q.* Okay. And at this point, were you also struggling for resources to ramp up quickly, as all of these engagements would require R&D application engineering support?
**A. Exactly right.**
*Q.* You even worked with a -- you were so determined to pitch this to other companies that you even worked with a consultant to help give you a strategy, didn't you?
**A. To refine the marketing pitch, yes.**
***MS. BERNSTEIN:*** Can we go to 2213? Can we go to the next page, please?
***BY MS. BERNSTEIN:***
*Q.* And this was to help you plan for mobile and data center suppliers like Apple, Intel, Qualcomm, Nvidia, Samsung, MediaTek, Broadcom, Cisco?
**A. This presentation that I'm looking at says, "Investor Introduction."**
*Q.* And wasn't the point of you engaging a consultant to help put this together?
**A. Yes.**
*Q.* So that you could address the general industry?
**A. I also approached a venture capital firm in the May timeframe. And I had engaged --**
***THE COURT:*** I don't think the question has to do with investor capital firm.
***MS. BERNSTEIN:*** It did not, Your Honor.

***THE COURT:*** Wasn't the point of you engaging a consultant to help put this together?

***THE WITNESS:*** Yes.

***THE COURT:*** So you could address the general industry?

***THE WITNESS:*** Yes.

***BY MS. BERNSTEIN:***

***Q.*** You also talked to Xilinx, is that how you pronounce that name?

***A.*** **Xilinx.**

***Q.*** Xilinx.

***A.*** **Yeah.**

***Q.*** And that's a leading FPGA company?

***A.*** **That's right.**

***Q.*** That was in --

***MS. BERNSTEIN:*** Well, before we move on from this, can we go back to the first page of this?

Move to admit.

***THE COURT:*** Any objection to 2213?

***MR. PILCHAK:*** Hearsay, Your Honor.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** But you engaged this expert as of June 21st of 2015?

***A.*** **Yes.**

***Q.*** So that's after a number of meetings with Qualcomm; correct? You're engaging an expert for the general industry?

***A.*** **Correct.**

***MS. BERNSTEIN:*** Okay. I want to go to 2231, please.

***BY MS. BERNSTEIN:***

***Q.*** And is this in August of 2015, you're engaging Xilinx; is that it?

***A.*** **That's right.**

***Q.*** Sorry, let's clarify.

Is Xilinx how you pronounce it?

***A.*** **That's right.**

***Q.*** And as of -- and for the record, it's X-i-l-i-n-x.

***A.*** **That's right.**

***Q.*** And as of August of 2015, you're engaging with them.

***A.*** **Correct.**

***Q.*** And these other companies were interested.

Broadcom was interested; correct?

***A.*** **Yes.**

***Q.*** The Abreezio Board of Directors, in August of 2015, had a resolution to discuss the acquisition offer; correct?

***A.*** **Yes.**

***Q.*** And at that time, there was interest from Apple and Intel and others.

***A.*** **There were indications of interest. Apple, we had had only one meeting without any specific action outline in terms of the next steps, whether they have an interest to license the technology. It would have most likely been a benchmark.**

***MS. BERNSTEIN:*** Let's go to 2702.

***BY MS. BERNSTEIN:***

***Q.*** What do you mean, "It would have most likely been a benchmark"?

***A.*** **Apple would have asked to demonstrate the value on their design, would have been a likely next step. And we had to write to them that we have to disengage because we have a term sheet from another company.**

***Q.*** Because you had a bird on the hand; right?

***A.*** **That's right.**

***Q.*** Okay. And, in fact --

***MS. BERNSTEIN:*** Thank you. You can take that down.

***BY MS. BERNSTEIN:***

***Q.*** The Board of Directors discussed these varying interests from other companies throughout Abreezio's tenure; correct?

***A.*** **Correct.**

***Q.*** And who was on the Board of Directors?

***A.*** **Behrooz Abdi, and Brad Quinton, and myself.**

***Q.*** And Behrooz Abdi was the Chairman?

***A.*** **He was the Chairman.**

***Q.*** And he was calling a lot of the shots in terms of where Abreezio should focus its energy on an acquisition?

***A.*** **Yes.**

***Q.*** And you had said that he didn't seem focused on an acquisition by Qualcomm, but by any company; right?

**A. He wanted to -- as the Chairman of Abreezio, he was looking to maximize value for the shareholders.**

*Q.* Over the 60 or 61 hours that you've spent meeting with the Government since 2022 and preparing for your testimony, you've come to better learn what their theory of prosecution is; correct?

**A. Please explain the theory of prosecution. What do you mean?**

*Q.* Do you have a better understanding as you sit here today than 2020 as to what the Government is claiming Karim did?

**A. I have a better understanding of the case, yeah.**

*Q.* And when you first sat down with them in August of 2023, you said that the provisional patent technology worked; correct?

**A. The -- there were two provisionals. I said the DFT technology did not work.**

**Can you show me the notes?**

*Q.* What did you say?

**A. My recollection is we talked about the DFT technology, that the original idea did not work, Brad and his team, specifically Andrew, came up with a new insight on the DFT side.**

*Q.* Did you tell them that the DFT technology did not work, that Ms. Alan's DFT provisional patent did not work?

**A. My recollection is yes. As I just said, the original DFT idea did not work, and Brad and his team came up with the new insight.**

*Q.* Did you tell them in your first meeting that the -- that

Sheida's sensor also did not work, and that Brad and his team created the working version that was demoed and sold to Qualcomm?

**A. I don't think so. As I said earlier today, the core idea in the sensor circuit was maintained. And issues that were identified by Brad and team were then implemented by Brad and his team.**

***Q.*** Did you tell them that?

**A. I -- that's been my position all along. I -- whether it was in the first meeting or if this question was asked, I don't specifically remember, but I've been consistently sharing this.**

***Q.*** You've been consistently sharing the truth, that neither Sheida's DFT provisional patent application or low power sensor application worked as conceived in the provisional patent applications from December of 2014?

**A. That's not exactly what I said. Let me just --**

***THE COURT:*** Don't -- just -- that answer is sufficient. Thank you.

***THE WITNESS:*** Okay.

***BY MS. BERNSTEIN:***

***Q.*** In September of 2023, you met with the Government; right?

**A. Yes.**

***Q.*** And you reviewed -- well, let me back up.

You know who Dr. Bozena Kaminska is?

**A. Yes.**

*Q.* And you have researched her DFT work?
**A. I've looked at her DFT work, yes.**
*Q.* You said you researched this during the holidays of 2014.
**A. 2014, yeah. Seven years ago.**
*Q.* Before Abreezio even formed?
**A. Yeah. When I was first informed about who Sheida's sister's advisor -- Karim's sister's advisor was, yeah.**
*Q.* And you testified yesterday, I think, that the first time you talked to her was August of 2015?
***THE COURT:*** "Her" meaning Sheida or --
***BY MS. BERNSTEIN:***
*Q.* I'm sorry. "Her" meaning Dr. Bozena Kaminska.
**A. July or August. I don't recall. One of those. After Dr. Arabi had instructed me to extend her an offer as a technical advisor -- a Technical Advisory Board.**
*Q.* You've spoken with her a few times.
**A. Yes.**
*Q.* At what point, you complimented her on the amazing work she helped mentor out of Sheida?
**A. Yes.**
*Q.* Meaning the provisional patent applications?
**A. Yes.**
*Q.* The ones that didn't work but sparked the tech and team acquisition that Qualcomm got?
**A. Again, the TruSens patent, the core idea is the same. And**

**the extensions, like the new sensor architecture, the hand-drawn scheme that we saw to address one of the issues, plus other enhancements from Brad's team to address the concerns.**

***Q.*** Well, and the hand-drawn sensor, as we saw -- we can bring up 3319 -- it's the same as what Invionics sent you days earlier; right? I mean, we went through all of this.

Do you remember that, when you -- when we counted the boxes, and the flip-flops, and the arrows, and the margin delay, and the delay clock, and you told the jury that these were the same?

***A.*** **I thought we talked about whether it has the DLL; right? You said the --**

***Q.*** We've talked about a lot of things. But you just said that the sensor is what changed it. And I'm just asking you if, in fact, there's a difference between what we're looking at on the screen in the green boxes.

***MS. BERNSTEIN:*** And for the record, we're looking at 3319.

***THE COURT:*** So the question is, is there a difference between the two green boxes in 3319?

***THE WITNESS:*** Yeah, so those are the same.

***BY MS. BERNSTEIN:***

***Q.*** Okay. Getting back to Dr. Kaminska, she accepted the compliment when you complimented her on the amazing work she helped to mentor out of Sheida?

***A.*** **Yeah.**

***Q.*** And you know that the FBI went to Canada and spoke with Dr. Kaminska for close to three hours?
***A.*** **Yes. I've read the interviews.**
***Q.*** You read the transcript?
***A.*** **Transcript.**
***Q.*** The Government gave that transcript to you?
***A.*** **Yes.**
***Q.*** And you drew conclusions that you shared with the Government based on your review of the interview with Dr. Kaminska and the FBI?
***A.*** **No.**
***Q.*** No?
***A.*** **No.**
***Q.*** Based on your review of the interview, you didn't give them ideas about -- and opinions that you had?
***A.*** **Can you be more specific, please?**
***Q.*** Yeah. On September 22nd of 2023, you met with Mr. Pilchak, Mr. Olah, and Special Agent Chambers; correct?
***A.*** **Right.**
***Q.*** And your attorney was there.
***A.*** **Yes.**
***Q.*** And you talked about your review of Dr. Kaminska's -- of the three-hour-long interview that the FBI had with Dr. Kaminska; correct?
***A.*** **Correct.**

***Q.*** And you told them that based on your review of the interview, you had some opinions; right?

***A.*** **Can you please flash the document?**

***Q.*** Do you not recall telling them that?

***A.*** **It would really help trigger my memory if you could share that.**

***Q.*** Okay. I'm actually going to ask you some questions about the transcript you reviewed.

You know that Dr. Kaminska told the FBI --

***MR. PILCHAK:*** Objection. Hearsay.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** Would you agree that you learned that Sheida was working in Dr. Kaminska's lab in the spring and the summer of 2014?

***MR. PILCHAK:*** Same objection, and 403.

***THE COURT:*** Same ruling.

***BY MS. BERNSTEIN:***

***Q.*** What do you remember about your review of the transcript with Dr. Kaminska?

***MR. PILCHAK:*** Same objections.

***THE COURT:*** Same ruling. It's hearsay, Counsel.

***BY MS. BERNSTEIN:***

***Q.*** I want to talk about your phone for a moment.

You never imaged your phone from 2014 to 2025, as you sit here today; is that correct?

***A.*** **To the best of my recollection, it was my laptop that was imaged.**

***Q.*** So you never imaged your phone; correct?

***A.*** **That's my recollection.**

***Q.*** You did claim that your text messages were forensically downloaded; correct?

***A.*** **Yes.**

***Q.*** You also claimed that they were directly from the phone company; correct?

***A.*** **I claimed they were -- I turned over my laptop to the law firm, which did the forensic downloading through a third party.**

***Q.*** Okay. You told the Government that your text messages were forensically downloaded and from the phone company; correct?

***A.*** **I don't think I said the phone company. I turned my laptop over to the -- to my law firm, and they had it forensically downloaded with a third-party company that they work with.**

***Q.*** You told the agents that you had determined the origin of your text messages?

***A.*** **Sorry, determined the origin of the text message?**

***Q.*** Correct.

***A.*** **What do you mean by that? I'm sorry.**

***Q.*** That you didn't remember where the text messages came from but you would attempt to determine their origin.

***A.*** **It was the -- if it's in the context of your question is were they downloaded from my phone or from my laptop?**

***Q.*** Not my question. My question is whether you told the Government and the agents that you did not know where your text messages came from but you would attempt to determine their origin.

***A.*** **I don't recall, unless you are referring to whether they were downloaded from the laptop or from the phone. In that context, I had this conversation with the Government, yes.**

***Q.*** Do you know where your text messages that we've seen in evidence are from?

***A.*** **Forensic download of my laptop.**

***Q.*** From a forensic download of your laptop?

***A.*** **That's to the best of my recollection.**

***Q.*** We haven't seen a full set of your text messages, have we?

***A.*** **I don't believe that's the case.**

***Q.*** We don't know what's been deleted?

***A.*** **I do not.**

***Q.*** We don't know what's been changed.

***A.*** **I have not changed them.**

***Q.*** Have you ever given the Government a complete and full set of your text messages from this timeframe?

***A.*** **The same what I -- I gave to the law firm. They got it forensically downloaded. And at the time of the civil suit, I was asked to provide an extensive set of documentary evidence, which was all done forensically by the law firm.**

***Q.*** In the 71 hours that you have spent being interviewed by

various people who are prosecuting Dr. Arabi, have you ever been shown a complete and full set of your text messages from this timeframe?

**A. I have been shown several text messages. Does that constitute a complete list? I don't know.**

***MS. BERNSTEIN:*** Let's go, for example, to Exhibit 699.

***BY MS. BERNSTEIN:***

***Q.*** This is one text message that you claim was sent to Stuart, patent attorney; correct?

**A. Correct.**

***MS. BERNSTEIN:*** Let's go to Exhibit 731. And I'm sorry. This is on June 25th of 2015.

***THE COURT:*** Both of these are in evidence.

***BY MS. BERNSTEIN:***

***Q.*** And this is -- yeah -- more text messages with Stuart, patent attorney, on July 3rd of 2015; correct?

**A. Correct.**

***Q.*** And these are in separate documents; correct?

**A. They are not.**

***Q.*** Are they in separate documents?

**A. It shows as a single document, the screen that I'm looking at, different -- the times are --**

***Q.*** Sir, have we looked at cherry-picked text messages from you?

**A. Whichever text messages were shown to me, I answered the questions on those text messages.**

***Q.*** You would agree that we have not seen a full and complete set, and we have not shown this jury a full and complete set of your text messages?

***THE COURT:*** That's two questions.

***BY MS. BERNSTEIN:***

***Q.*** Would you agree that we have not seen a full and complete set of your text messages?

***THE COURT:*** Who meaning "we"? You mean, you?

***MS. BERNSTEIN:*** Myself.

***THE WITNESS:*** I don't know what you have received.

***BY MS. BERNSTEIN:***

***Q.*** The Government.

***A.*** **I don't --**

***Q.*** Do you know whether the Government has ever received or seen a full and complete set of your text messages?

***A.*** **My understanding is what I had turned over to Qualcomm --**

***Q.*** Do you know, yes or no?

***A.*** **My understanding is yes, because I have turned over my laptop for imaging, forensic downloading, to my law firm at the time of the civil interview. Qualcomm had those. And it's an assumption on my part that those were turned over to the Government by Qualcomm.**

***Q.*** Okay. And at no point in the 61 hours that you have spent preparing for and meeting with the Government have you reviewed a full and complete set of your text messages with them.

**A. No. If you are saying go page by page the entire set of text messages, no. If that's what you meant.**

***Q.*** And as far as you know in the testimony that you've sat through for now day three, we've not shown the jury a full and complete set of your text messages, have we?

**A. Correct.**

***Q.*** Do you know if the Government ever subpoenaed your phone carrier?

**A. I believe they did.**

***MS. BERNSTEIN:*** Actually, let's bring up 731, for example.

***BY MS. BERNSTEIN:***

***Q.*** Are we able to discern from what we've seen put into evidence whether this is simply a text between you and Stuart, patent attorney, or if there's other people on this thread?

**A. From looking at this, it looks -- it says between myself and Stuart, patent attorney.**

***Q.*** You're able to look at this from July of 2015, and you're able to know that there was not someone else in this text thread whose messages are simply not captured on screen?

**A. I'm comparing it with the format that I have seen when multiple people are on the text. And since there are multiple text messages for the same date combined in the same document, it doesn't start with all the people listed on the very first line.**

**So, for example, if there was a conversation that happened on the same day between -- let's say in this case, there was a third individual involved, that name will appear down somewhere in the middle of the text.**

***Q.*** Oh, even if they never responded, even if they're just a passive person in the conversation?

***A.*** **That's a good question. I'm comparing it to the format that I have seen where the third individual was also responding to it and that name appears, not on the front, but only when they start responding to it. Because my understanding is that it is all the text messages for that specific date that are combined into a single document. As you can see, there are different times. They are not contiguous, consecutive times; right? It is all --**

***Q.*** So can we agree that the text messages we have seen don't even tell us who all the participants in a conversation are? Can we agree on that or do you want to go through the text messages?

***A.*** **In the case where the third person was not a party to the conversation, yes, it can happen.**

***Q.*** Or the fourth person or the fifth person.

We have no idea who is a participant in the text thread if they have not said something; correct?

***A.*** **According to this format, yes.**

***Q.*** And you've not provided any other format, have you?

**A. I had provided, as per the requirement of the civil lawsuit, full extensive documentary evidence.**

Q. Did you provide a different format than what we're looking at?

**A. I did not provide any format. I gave them my laptop from where --**

Q. And your text messages were on your laptop or your phone?

**A. On the iMessages.**

Q. So we don't even have text messages? We only have iMessages?

**A. That's the way I understand the Apple --**

Q. So if you were communicating with someone in this timeframe who didn't have an Apple phone, we don't even have those messages?

**A. I don't know exactly how that would work. But this is the format that -- this is the protocol that we had used. I had turned it over to my law firm. They had turned it over to a third party for the forensic downloading.**

Q. And in your 60-plus hours of preparing for this testimony, you've never said to the Government, Hey, let's show the jury a different -- a different version that might be more complete, have you?

**A. No.**

Q. This text message with Stuart, patent attorney, talks about needing oaths; correct?

**A. Correct.**
Q. And oaths accompany the applications that go to the USPTO.
**A. Correct.**
Q. You have been on patents before, as you testified; correct?
**A. Correct.**
Q. And what Stuart, patent attorney, needs these oaths, they can be updated -- the applications to the USPTO can be updated as needed; correct?
**A. Correct.**
Q. And Abreezio acquired -- Qualcomm acquired Abreezio and acquired its patent portfolio; correct?
**A. Correct.**
Q. And they were just applications at that point.
**A. They were just applications, yeah.**
Q. And so then it was up to Qualcomm to continue to -- the term is prosecute them with the USPTO; correct?
**A. Correct.**
Q. And Qualcomm, in fact, did make some changes over time; correct?
**A. Correct.**

***MS. BERNSTEIN:*** Let's look at Exhibit 2863.

***BY MS. BERNSTEIN:***

Q. And this, for example, is a petition by Qualcomm to correct inventorship; correct?
**A. Yes.**

*Q.* Pursuant to a bunch of statutes and laws?
***A.*** **That's right.**
*Q.* Have you ever seen a document where Qualcomm corrects the patent that has Sheida Alan's name on it to replace it with Karim Arabi?
***A.*** **I have not.**
*Q.* I want to talk for a moment about Akbar Shokouhi and Encore Semi.

When Abreezio was first being formed, there was discussion about -- withdrawn.

What's your understanding of Encore Semi?
***A.*** **It's a company that offers design services, and Mr. Akbar Shokouhi is the majority owner.**
*Q.* And contract engineers; correct?
***A.*** **Contract engineers, yeah.**
*Q.* And when Abreezio was first being formed, there was discussion about using engineers from Encore Semi to service -- to do Abreezio's validations and build-outs.
***A.*** **That's a conversation that Dr. Karim Arabi and Akbar had had.**
*Q.* You participated in this?
***A.*** **That agreement was already made.**
*Q.* You were aware of the agreement.
***A.*** **I was aware of the agreement.**
*Q.* And that wasn't hidden from Qualcomm; correct?

**A. I made no attempt to hide it. I, in fact, had a presentation in which Encore Semiconductor was labeled --**

***MS. BERNSTEIN:*** Yeah, let's go to 33 --

***THE WITNESS:*** -- as a partner who would provide us with the application engineer customer deployment help.

***MS. BERNSTEIN:*** Let's go to 3310, page 4.

***BY MS. BERNSTEIN:***

***Q.*** Do you recall that is this the March 4th presentation to Qualcomm?

**A. Correct.**

***MS. BERNSTEIN:*** Let's go to page 4, please.

***BY MS. BERNSTEIN:***

***Q.*** Is this what you're talking about when you say that Encore Semi was shown to Qualcomm?

***THE COURT:*** And this is in evidence, just for the record.

***MS. BERNSTEIN:*** Yes.

***THE WITNESS:*** And the answer is yes.

***MS. BERNSTEIN:*** And let's go to 2598, page 5.

***BY MS. BERNSTEIN:***

***Q.*** This is the subsequent presentation to Qualcomm; correct?

**A. Yes.**

***THE COURT:*** And this is in evidence.

***BY MS. BERNSTEIN:***

***Q.*** And Encore Semi is also being presented as a strategic

partner?
**A. Correct.**
***Q.*** You testified that Dr. Arabi made you delete emails.
Do you remember that testimony?
**A. I absolutely do.**
***MS. BERNSTEIN:*** We can take this down. Thank you.
***BY MS. BERNSTEIN:***
***Q.*** That you deleted them from your inbox.
**A. Correct.**
***Q.*** Off of your laptop.
**A. Correct.**
***Q.*** Using Gmail, essentially.
**A. Exactly.**
***Q.*** And then you went into your Gmail trash folder.
**A. Yeah.**
***Q.*** And you deleted them out of there as well.
**A. Right.**
***Q.*** You did a double delete.
**A. Right.**
***Q.*** And it's your testimony that that did not permanently delete the messages; correct?
**A. Correct.**
***Q.*** And that you, in fact, produced many emails to Qualcomm and the Government; correct?
**A. I turned over the entire laptop, which was imaged, including**

**the email contents.**

*Q.* And you've seen whatever emails someone has shown you; correct?

***A.*** **Yeah.**

*Q.* Have you seen others that you think are relevant that someone hasn't shown you?

***THE COURT:*** Ever or during court or --

***BY MS. BERNSTEIN:***

*Q.* From 2014 to 2025, when you have been cooperating with Qualcomm and its law firms and its investigators and the FBI and the Marshall Service and the IRS and the Government and the DOJ.

***A.*** **So is the question, during all this time, are there other relevant emails that I have not been shown or I have seen?**

*Q.* Yeah. Your testimony is that you gave everyone everything; right?

***A.*** **Yes.**

*Q.* Okay. And so you've not been shown everything, have you?

***A.*** **No.**

*Q.* Are there other emails that you think are relevant that someone has not shown you in the past 10 years?

***A.*** **It could be possible.**

*Q.* You've said that when you joined Qualcomm after the acquisition in 2015, in that first week or two, you emailed Mr. Mansour and Dr. Arabi at their Qualcomm email addresses; correct?

**A. Following the acquisition; correct? Or did you say after joining Qualcomm --**
*Q.* When did you join Qualcomm?
**A. The day after the acquisition.**
*Q.* And so after the acquisition, in the first week or two that you were at Qualcomm --
**A. That's right.**
*Q.* -- you emailed Dr. Arabi and Mr. Mansour?
**A. I emailed Dr. Mansour, and Dr. Arabi on his Qualcomm email was on CC.**
*Q.* On their Qualcomm email addresses?
**A. Correct.**
*Q.* You testified yesterday about Mr. Shokouhi, Mr. Mansour, and Dr. Arabi having a dinner.
Do you remember that?
**A. Yes.**
*Q.* And you never told that to Qualcomm, did you?
**A. In the civil interview, no, I don't recall.**
*Q.* You didn't say that to them in any of your civil interviews, did you?
**A. I don't -- to the best of my recollection, I did not.**
*Q.* And, of course, you were under an obligation to be fully truthful and not misleading; correct?
**A. And I don't know if the question was asked that was pertinent to it, or if you see in the notes there was an actual**

**way to provide that information, I don't remember.**

*Q.* Well, they were investigating Abreezio and Dr. Arabi; correct?

***A.*** **Yes.**

*Q.* And they had a lot of questions for you about who was involved in this; correct?

***A.*** **Correct.**

*Q.* And you didn't tell them what you told us yesterday, that there was a dinner, and that Dr. Arabi was telling you about this and that he was going to pay Ziad millions; right?

***A.*** **I did not.**

*Q.* And that's obviously relevant to what Qualcomm was investigating; correct?

***A.*** **Correct.**

*Q.* And is it your testimony that Dr. Arabi told that to Akbar?

***A.*** **He told me that Akbar does not realize, like I said yesterday, that he, meaning Dr. Karim Arabi, has to pay Ziad millions.**

*Q.* Not that he told this to Akbar. He was just sharing this information with you for some reason.

***A.*** **That's right.**

*Q.* And you know that the Government investigated that claim?

***A.*** **I do not know.**

*Q.* You know that the Government subpoenaed his emails, both Dr. Arabi and Mr. Mansour's emails; correct?

**A. Mr. Mansour's, I do not know. Dr. Arabi's was in the Indictment.**
*Q.* Do you know whether the Government ever met with Ziad?
**A. I do not know.**
*Q.* Do you know whether the Government ever charged Ziad?
**A. I do not know.**
*Q.* You've also testified -- you've also explained that you never offered Mohamed Allam anything; correct?
**A. Absolutely right.**
*Q.* You have said that before; correct?
**A. Yes.**
*Q.* And that's a true statement of yours?
**A. It is.**
*Q.* You have never offered Mohamed Allam anything?
**A. Correct.**
*Q.* And you are not aware of any offer that has ever been made to Mohamed Allam.
**A. Correct.**
*Q.* And you've never had a conversation with Mohamed Allam about an offer someone made to him.
**A. Yes, that's correct.**
*Q.* You've testified that Abreezio had an Invention Assignment Agreement; correct?
**A. Yes.**
*Q.* Do you know whether that Invention Assignment Agreement that

Abreezio had is legally enforceable?
***A.*** **I'm not a lawyer, but I believe it is legally enforceable. It's outside my legal expertise, but I do believe that it is a standard.**
***Q.*** You're not a lawyer; correct?
***A.*** **I'm not a lawyer.**
***Q.*** But you understand that Abreezio's Invention Assignment Agreement does not have a tail?
***A.*** **Does not have a tail?**
***Q.*** A tail.
***A.*** **And, sorry, what does that mean?**
***Q.*** Do you know what a "tail" means?
***A.*** **No, not in this context.**
***Q.*** Do you understand whether Abreezio's Invention Assignment Agreement pertains to things that someone invents while at Abreezio or after they leave Abreezio? Do you have an understanding of which it is?
***A.*** **My understanding would be the standard that I am most familiar with, is while you are at the employer, Abreezio in this case, what you invent there.**
***Q.*** Not once you leave?
***A.*** **Not once you leave. Some agreements may have -- and I don't know if ours had that or not -- so if you leave and join a direct competitor, there might be some restrictions, but -- about residual IP, *et cetera*.**

***Q.*** I think you also testified that you had an Invention Assignment Agreement at Bell Labs; correct?

***A.*** **Yes.**

***Q.*** And do you know whether that one had a tail that presumptively covered inventions after you left Bell Labs?

***A.*** **I don't think it covers it. That's what I'm saying, I don't -- I don't think it's -- my understanding as a layman is after you have left, unless you were directly in -- immediately after joining Bell Labs, if I were to join a direct competitor, there may be special clauses around that. I'm not familiar with that.**

***Q.*** Do you know that whether having a tail to cover employment after you leave Bell Labs or Abreezio would render the entire Invention Assignment Agreement null and void?

***MR. PILCHAK:*** Objection. Foundation. 403.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** Do you know?

***MR. PILCHAK:*** Objection.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** You testified yesterday that your meeting with Ziad Mansour in January of 2015 was to -- and you testified to this today as well -- that that was to pitch Abreezio; correct?

***A.*** **That was the purpose, to assess the fit between what**

**Abreezio offers and Qualcomm's needs, yes.**
*Q.* And is that inappropriate to have done?
***A.*** **No.**
*Q.* Behrooz Abdi was the Chairman of Abreezio?
***A.*** **That's correct.**
*Q.* And you and him discussed whether there was any issue with Qualcomm, with presenting to Qualcomm, given Dr. Arabi's involvement; correct?
***A.*** **Can you be a little bit more specific?**
*Q.* Have you spoken with Chairman Behrooz Abdi about whether pitching Abreezio to Qualcomm was fine to do despite Dr. Arabi's involvement in Abreezio?
***A.*** **I think the conversation was more around talking to an employee of Qualcomm about their requirements, would that be appropriate or not.**
*Q.* Would that be appropriate or not?
***A.*** **That was -- yes, to understand the requirements.**
*Q.* Is that the text message that we've looked at that you claim there was an oral response to about the Canary circuit percentages? Is that understanding Qualcomm's requirements?
***A.*** **It's a technical detail about the requirements, yeah.**
*Q.* And that you just said was appropriate?
***A.*** **That was the Chairman's opinion.**
*Q.* Is that not your opinion?
***A.*** **It really depends. If it's a technical detail versus -- a**

**technical provider detail versus stating information that is available in the public domain.**

*Q.* So you think it was or was not appropriate to have been discussing Qualcomm's requirements with a Qualcomm employee?

***A.* No, I don't think it was appropriate. And that's why I have pled one of the things I have pled guilty as part of my Plea Agreement -- the basis of facts, one of them is exactly this, the technical details.**

*Q.* And, in fact, back in 2017, you saw no problem with that; correct?

***A.* I got opinion of my Chairman.**

*Q.* And he thought --

***A.* It was his opinion, yes.**

*Q.* -- saw no problem with it?

***A.* He didn't see any issue with it.**

*Q.* But you did.

***A.* Well, I was a first-time CEO learning on the job, so I was asking my formal boss what he thought about that.**

*Q.* And he saw no problem with it.

***A.* Well, he also guided me to do things which were not on board, so, yeah. That's why I'm saying his opinion versus mine.**

*Q.* Okay. So in 2017, it was your opinion that this was wrong?

***A.* Yes, it was wrong.**

*Q.* And that was your opinion as of 2017?

***A.* Yes.**

***Q.*** Sir, you've been on the stand for a while; correct?
***A.*** **Yes, Ms. Bernstein.**
***Q.*** And you testified yesterday that you lied throughout your interviews with Qualcomm in 2018?
***A.*** **Yes, I did.**
***Q.*** Despite signing the agreements you have with them to be truthful.
***A.*** **Correct.**
***Q.*** And that those lies in 2018 were things that you came up with on your own.
***A.*** **Yes.**
***Q.*** No one told you to say them.
***A.*** **Yeah.**
***Q.*** Karim certainly didn't tell you to say them.
***A.*** **Correct.**
***Q.*** And in 2018, there was nothing to be gained from lying; correct?
***A.*** **As I mentioned yesterday, I was trying to put myself in the best possible light diminishing my role.**
***Q.*** Diminishing your role and outright lying as well.
***A.*** **Yes.**
***Q.*** The case against you by Qualcomm was being dismissed; right?
***A.*** **Yes.**
***Q.*** And if you were untruthful, you had things to lose.
***A.*** **Yes.**

***Q.*** But you had nothing to lose by telling them the truth at that point.
***A.*** **As I said yesterday, I can repeat the same --**
***Q.*** What did you have to lose by telling them the truth at that point?
***A.*** **I think I have said this enough times. I was trying to put myself in the best possible light --**
***Q.*** Well, what were you going to lose by being truthful?
***A.*** **I think I've answered the question, that I was trying to put myself in the best possible light, didn't disclose all the facts and made false statements.**
***Q.*** And until yesterday, March 24th of 2025, you had never told anyone that you lied across at least 10 hours and three interviews with Qualcomm.
***A.*** **Correct.**
***Q.*** And yesterday, when I asked you about some of those inconsistent statements, that was the first any of us ever got to find out that those statements were not true.
***A.*** **Correct.**
***Q.*** And so it takes a while to sift through things when there is no way for someone to know if what you've said is a lie or the truth.
Would you agree?
***A.*** **Yes, in this instance?**
***Q.*** And where you didn't spend 60 hours syncing up with me for

your testimony for the questions that I was going to ask you.
***A.*** **Correct.**
***Q.*** You never once had the courtesy to meet with me or my team.
***MR. PILCHAK:*** Objection. Argumentative.
***THE COURT:*** Sustained.
***BY MS. BERNSTEIN:***
***Q.*** You'd agree that what's important for this case for this jury to hear are the facts and the details and the truth so that they can fairly judge the case?
***A.*** **Absolutely.**
***Q.*** And that we don't want to waste their time.
***A.*** **Correct.**
***Q.*** And you never once met up with me or anyone from my team.
***A.*** **Correct.**
***Q.*** And despite lying to Qualcomm in 2018, you are not lying now.
***A.*** **Correct.**
***Q.*** You've been fully truthful with these guys sitting right here who are going to decide whether or not to recommend leniency.
***A.*** **Correct.**
***Q.*** So I want to talk about a few other things.
There were various Board members that were considered for Abreezio?
***A.*** **Sure.**

*Q.* Is that true or not true?

***A.*** **Dr. Karim Arabi mentioned to me that he was going to approach at least one name that I recall. And that was prior to the final selection of asking me to send the letter to Behrooz Abdi.**

*Q.* And what name do you recall?

***A.*** **Mr. Lip-Bu Tan.**

***THE COURT:*** Can you spell that?

***THE WITNESS:*** Sure. It's L-i-p, hyphen, B-u, last name T-a-n.

***THE COURT:*** Thank you.

***BY MS. BERNSTEIN:***

*Q.* And when did you begin to refer to Ziad Mansour as a code name to conceal things?

***A.*** **I did not. I learned from -- not a planned communications from Dr. Arabi or from Dr. -- from Mr. Akbar Shokouhi. It was -- I picked it up in a conversation we were having, and between Dr. Karim Arabi and Akbar, they referred to some statement in which Mitch was mentioned. And then I asked, Who is Mitch? That's how I learned about it.**

*Q.* And you learned about it in September of 2015?

***A.*** **I think I said August, September, October, somewhere in that timeframe, very late.**

*Q.* You hadn't heard people referring to Ziad as Mitch prior to that to conceal Ziad's involvement?

**A. I had not heard that.**

*Q.* And Dr. Arabi at no point in time asked to you stop text messaging him; correct?

**A. Correct.**

*Q.* Let me phrase that differently.

At any point in time, did Dr. Arabi ask you to stop text messaging him?

**A. I would say that the exception of the March 21st text message that we saw when I was complimenting him after the March 20th meeting, Thank you for your technical prowess, helping us with the Qualcomm meeting preparation, it was a big success. After that, he had called and ask me not to send such messages.**

***MS. BERNSTEIN:*** Your Honor, would now be a good time for a lunch break?

***THE COURT:*** Yeah. How much more do you think you have?

***MS. BERNSTEIN:*** Not too much more.

***THE COURT:*** Can't finish now?

***MS. BERNSTEIN:*** I wouldn't be able to finish now, but I can keep going if you'd like.

***THE COURT:*** Okay. No, we'll take a lunch recess. Hour break, ladies and gentlemen. You're reminded you're not to discuss the case or do any research about the case. And we'll see you back at 1:00 o'clock. Thank you. And you're excused as well, sir. Thank you.

***(Jury out at 12:00 p.m.)***

***THE COURT:*** Okay. We are now outside the presence of the jury.

Any issues we need to take up?

***MS. BERNSTEIN:*** Do we understand that the Court is going to hear the -- take argument on the motion to quash at 4:00 o'clock?

***THE COURT:*** Yes.

***MS. BERNSTEIN:*** Okay.

***MR. PILCHAK:*** No, Your Honor. Thank you.

***THE COURT:*** Okay.

***(Lunch recess taken.)***

***THE COURT:*** Okay. We are back on the record. Dr. Arabi and the lawyers are present. We're outside the presence of the jury.

Counsel?

***MS. CHOPRA:*** We had just one issue, your Honor. We anticipate that after Mr. Taneja is down and excused, that Agent Chambers will be on the stand.

***THE COURT:*** Okay.

***MS. CHOPRA:*** And we wanted to, I guess for the record, reiterate the Court's prior ruling in the motion *in limine* that anything from her prior case, the *Pru [ph]* case, will not be coming into the record on cross.

***THE COURT:*** It will not.

***MS. CHOPRA:*** Thank you.

***THE COURT:*** Anything else?

***MS. CHOPRA:*** No, your Honor. Thank you.

***(Jury in at 1:01 p.m.)***

***THE COURT:*** Okay. While you're settling in, before we put Mr. Taneja back on the witness stand, while you're settling in, I wanted to tell you we are going to be in session on Monday. Monday is Cesar Chavez Day, so it's a relatively -- there will be not that many people in the courthouse that day other than us.

However, because of that, the marshals service is going to be doing active shooter training in the lobby and around the courthouse. And so I just wanted to remember to alert you it is not real, it is a test. So don't panic if you see them playing games around the courthouse. That's what they do on the days off.

All right. Have a seat. Mr. Taneja, you are reminded you are still under oath to tell the truth.

***THE WITNESS:*** Yes.

***BY MS. BERNSTEIN:***

***Q.*** Mr. Taneja, did the Government ever ask you about what you told Qualcomm in your civil cooperation?

**A. No, not to the best of my recollection.**

***Q.*** And you never volunteered what you told Qualcomm?

**A. The topic never came up.**

*Q.* In 2017, you described Qualcomm's pursuit of Karim as a witch hunt?
**A. You are referring to a document which is --**
*Q.* I'm asking you if in 2017 you described Qualcomm's pursuit of Karim as a witch hunt.
**A. It was an idea for a defense strategy. It was not a position statement.**
*Q.* In 2017, did you describe Qualcomm's pursuit of Karim as a witch hunt?
**A. It was an idea for a defense strategy.**
*Q.* Is that a "yes"?
**A. Can I give some context?**
*Q.* In 2017, did you describe Karim's pursuit -- Qualcomm's pursuit of Karim as a witch hunt?
**A. It was an idea for a defense strategy that I was going to discuss with my lawyer.**
*Q.* So did you do it or -- did you describe Qualcomm's pursuit of Karim as a witch hunt or did you not?
**A. If you consider writing down an idea for a defense strategy as a characterization, then yes. As I mentioned --**
*Q.* Without any of these qualifiers, my question to you is simply: Did you in 2017 describe Qualcomm's pursuit of Karim as a witch hunt? It's a yes or a no.
**A. In the context I just gave you in the email that I had composed of the points I was going to discuss with my lawyer,**

**along with a summary of my recollection of what I had discussed with the attorney back in May 2017 when I first learned about the internal investigation, which was characterized by Dr. Karim Arabi as being very aggressive, Qualcomm is doing the wrong thing, *et cetera*, then the answer would be yes.**

***Q.*** Yes, you described Qualcomm's pursuit of Karim as a witch hunt?

***A.*** **I sound like a broken record.**

***Q.*** Is there a reason you can't give me a direct answer? Is the reason --

***THE COURT:*** Ask your question, Counsel.

***BY MS. BERNSTEIN:***

***Q.*** In 2017, did you describe Qualcomm's pursuit of Karim as a witch hunt?

***A.*** **If defense strategy idea, then the answer is yes.**

***Q.*** What if defense strategy is not an idea?

In 2017 did you describe Qualcomm's pursuit of Karim as a witch hunt? Did you or did you not say that, sir? Did you or did you not write that, sir?

***A.*** **I wrote it in an email as a defense idea. If you want to consider that as I made a position statement --**

***Q.*** I don't even know what you consider a position statement to be.

***THE COURT:*** Ask your question, Counsel.

///

***BY MS. BERNSTEIN:***
***Q.*** Is the reason you can't give me direct answers because you're afraid they'll show more lies?
***MR. PILCHAK:*** Objection. Argumentative.
***THE COURT:*** Sustained.
***BY MS. BERNSTEIN:***
***Q.*** Did you understand from someone you respected who used to work at Qualcomm that if Qualcomm goes on a witch hunt, they will see it through to the end?
***A.* I don't recall the exact -- is there a document that you could please share?**
***Q.*** So you recall in 2017 thinking that Qualcomm was characterizing Qualcomm's pursuit of Karim as a witch hunt; right?
***A.* May I see the document you're referring to?**
***Q.*** I'm not referring to a document. I'm asking you a question.
Do you remember in 2017 characterizing Qualcomm's pursuit of Karim as a witch hunt?
***A.* Describing the civil lawsuit as a defense idea, I, yes, listed that down as an idea to discuss with my attorney.**
***Q.*** That was just an idea you had?
***A.* Can a case be made, yeah, exploring my defense after -- days after I learned about the civil lawsuit.**
***Q.*** So when you -- before you signed up to cooperate and beg for leniency from everyone, you characterized it as a witch hunt;

correct?

***THE COURT:*** I think it's been asked and answered at this point, Counsel.

***BY MS. BERNSTEIN:***

***Q.*** And someone who used to work at Qualcomm, Mr. Abdi, did he used to work at Qualcomm?

***A.*** **Yes.**

***Q.*** What was his role at Qualcomm as you understood it?

***A.*** **Senior Vice President.**

***Q.*** And he was well respected?

***A.*** **He was very well respected.**

***Q.*** In fact, his presence in Abreezio was one of -- one of the things that legitimized it for you?

***A.*** **No. He came in later after I already joined Abreezio in May of 2015.**

***Q.*** And his presence there gave gravitas to the company?

***A.*** **That's what I thought initially. But subsequently, the kind of guidance I received from him, I started doubting my own respect -- the basis for respect for him.**

***Q.*** Okay. Well, Mr. Abdi was well respected in the community; correct?

***A.*** **He was.**

***Q.*** And how long had he been a Senior Vice President at Qualcomm?

***A.*** **That, I do not know.**

*Q.* For a long time?

***A.* Probably.**

*Q.* And did you say that Mr. Abdi said if Qualcomm goes on a witch hunt, they will see it through to the end?

***A.* He may have said that. But I lost -- he may have said that.**

***MS. BERNSTEIN:*** Thank you. No further questions.

***THE COURT:*** Redirect?

***MR. PILCHAK:*** Yes, your Honor. Thank you.

***REDIRECT EXAMINATION***

***BY MR. PILCHAK:***

*Q.* Good afternoon, Mr. Taneja.

***A.* Good afternoon, Mr. Pilchak.**

*Q.* You were asked some questions on that cross-examination about your civil settlement and agreement.

Do you remember that?

***A.* Yes.**

*Q.* And you did sign a written document to settle your civil case; right?

***A.* Correct.**

***MR. PILCHAK:*** Can we get that on the screen, please? I think it's in evidence now. It's 3326.

***BY MR. PILCHAK:***

*Q.* Ms. Bernstein called it a cooperation agreement. But that's not what it's called, is it?

**A. It's called a confidential settlement agreement.**
*Q.* Was this a private agreement?
***THE COURT:*** Just for the record, I don't have it in evidence.
***MR. PILCHAK:*** Oh, I apologize. 3317. Let's take that down. I think there's an alternate version of the same document. Thank you, your Honor.
***THE COURT:*** Okay.
***MR. PILCHAK:*** I apologize for the imprecision.
***THE COURT:*** Okay. 3317 is in evidence.
***MR. PILCHAK:*** Thank you, your Honor. Bear with us just moment, Mr. Taneja.
***THE WITNESS:*** Surely.
***BY MR. PILCHAK:***
*Q.* Let me ask you while we're waiting, did you understand this agreement to be something called a cooperation agreement?
**A. It was a settlement agreement encompassing several obligations on each party's part.**
*Q.* Okay. And was it a private agreement?
**A. It was a private agreement.**
*Q.* Between you and a private party, specifically Qualcomm?
**A. That's right.**
*Q.* In this private lawsuit with Qualcomm?
**A. Correct.**
*Q.* Did you make any detailed factual admissions in this

confidential settlement agreement?
**A. Yes.**
*Q.* You remember your plea agreement with the Government in this case; right?
**A. Yes.**
*Q.* And I'll get to that in a moment.
I want to ask you, there are paragraphs of factual admissions in the plea agreement; right?
**A. Correct.**
*Q.* Let's look at page 10 of this document, and paragraph 11. I don't think you were asked about this on cross-examination.
This paragraph says representation by Taneja, doesn't it?
**A. Correct.**
*Q.* That's you?
**A. That's me.**
*Q.* And here, what are you representing in this agreement with Qualcomm?
**A. That there are two parts to this. The first part says "Based on information he is -- that I've been made aware of after the execution of the UPA, I believe that the UPA contains fundamental representations that were false at the time the UPA was executed."**
*Q.* And so does that mean that you're admitting that there were false representations in that contract with Qualcomm?
**A. Yes.**

***Q.*** But where you say based on information you were made aware of after the execution, there's also information you were aware of before you signed that contract that made it false; right?
***A.*** **Correct.**
***Q.*** So is this another example of being --
***MR. PILCHAK:*** I apologize, your Honor. We'll deal with that at the end of the court day today.
***BY MR. PILCHAK:***
***Q.*** Is this another example of making a statement to Qualcomm that is true in part but maybe not entirely true?
***A.*** **That's right.**
***MR. PILCHAK:*** All right. Let's take that down, the zoom, please.
***BY MR. PILCHAK:***
***Q.*** Other than that, there's no detailed admission of a bunch of facts that made that representation false in this agreement, is there?
***A.*** **In this agreement, yes, correct. That's correct.**
***Q.*** So there are none?
***A.*** **In this agreement, yeah.**
***Q.*** Right.
And now I want to ask you -- so in the civil case you settled, but you didn't admit detailed facts?
***A.*** **Yes.**
***Q.*** Your agreement with the Government in this case is a

different kind of agreement, isn't it?
**A. It is.**
Q. First of all, it's not confidential, is it?
**A. It's not.**
Q. It's a public document?
**A. Correct.**
***MR. PILCHAK:*** That's Exhibit 2281, which I believe is in evidence now. We can show the witness that document.
***BY MR. PILCHAK:***
Q. This is just the first page of your plea agreement; right?
**A. Yes.**
Q. If we look at the footer there, it looks like it's a number of pages; right?
**A. Correct.**
Q. Let's go to page 3.
You weren't asked about this on cross-examination. But there are a whole series of facts that you admitted to in this agreement with the Government; right?
**A. Correct.**
***MR. PILCHAK:*** Let's blow up paragraph 1, please.
***BY MR. PILCHAK:***
Q. Do you see paragraph 1 there, Mr. Taneja?
**A. I do.**
Q. Take a minute to read that to yourself.
**A. Yes.**

***Q.*** Did you swear to that under oath at your guilty plea hearing in this case?

***A.*** **Yes.**

***Q.*** Is that true and accurate?

***A.*** **It is.**

***MR. PILCHAK:*** Let's take that down, please.

Let's show the witness paragraph 7 on the next page, please.

***BY MR. PILCHAK:***

***Q.*** Do you see paragraph 7 there, Mr. Taneja?

***A.*** **I do.**

***Q.*** And I want to focus on the last clause there where it says you acted with the intent to defraud in concealing Dr. Arabi's role from Qualcomm.

Is that another fact that you admitted under oath at your plea hearing?

***A.*** **I did.**

***Q.*** Is that true and accurate as you sit here today?

***A.*** **Absolutely.**

***Q.*** Did you make all of the admissions in this document under oath, the same oath that you just took on the witness stand?

***A.*** **Yes.**

***Q.*** When I say "just," I mean last week when you started.

***A.*** **Yeah.**

***MR. PILCHAK:*** All right. Let's take that zoom down and

go to page 7 of the agreement.

***BY MR. PILCHAK:***

***Q.*** Mr. Taneja, you were asked a whole series of questions about what you understand the consequences of this agreement to be; right?

***A.*** **Yes.**

***MR. PILCHAK:*** And Ms. Fincher if we could take down the annotation, please.

***BY MR. PILCHAK:***

***Q.*** You were asked about the sentencing guidelines; right?

***A.*** **I was.**

***Q.*** And I think one of the questions was do you understand that you have some 41-month sentence that you're working down from?

***A.*** **That was one of the questions.**

***MR. PILCHAK:*** And can we zoom in on paragraph 8 here, "Applicability of Sentencing Guidelines."

***BY MR. PILCHAK:***

***Q.*** Do you understand this paragraph to mean that the sentencing guidelines, whatever they are in your case, don't bind the judge at your sentencing?

***A.*** **Yes.**

***Q.*** What does that mean to you in terms of the consequences that you can face when you are sentenced by this Court?

***A.*** **It's up to the judge. These are just guidelines.**

***Q.*** Do you know whether the judge has the power to sentence you

up to ten years based on the statutory maximum for the crime that you've pled guilty to?

**A. I do know that.**

***Q.*** Do you have any understanding of whether the judge is going to make her own assessment of your credibility during your testimony over these several days regardless of whether the Government does or doesn't file a motion?

**A. Absolutely.**

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** Sustained.

***BY MR. PILCHAK:***

***Q.*** What is your understanding of what evaluation, if any, the judge will make of your credibility?

**A. She'll make her own independent assessment.**

***Q.*** The last thing that I want to ask you about -- and we can take that zoom down -- in this area of my questions is you were asked about the time that you spent preparing for this trial.

Do you remember that?

**A. Yes.**

***Q.*** And you have met with the Government a number of times; right?

**A. Correct.**

***Q.*** As part of your cooperation?

**A. Correct.**

***Q.*** Was every meeting specifically to prepare for this very

trial that we're at right now?

**A. No. And I think I made it clear I had a series of obligations under the agreement, which included cooperating with the Government to establish the facts and series of interviews, and that's all included in the 71 hours.**

***Q.*** And your cooperation in this case, is it just to get Dr. Arabi or have some particular outcome with Dr. Arabi? Or are you trying to cooperate with the Government's investigation in this case wherever that leads?

**A. Whatever the outcome is. I have no vested interest in that.**

***Q.*** So you were asked some questions about Mr. Shokouhi; right?

**A. Yes.**

***Q.*** Mr. Shokouhi had not pled guilty in this case, would you have testified at his trial if you were asked to?

***MS. BERNSTEIN:*** Objection. Foundation.

***THE COURT:*** Overruled.

***THE WITNESS:*** Absolutely.

***BY MR. PILCHAK:***

***Q.*** All right. We can take that down.

You were asked a lot of questions on cross-examination about statements that you made when you met with Qualcomm's lawyers.

Do you remember all those questions?

**A. I do remember.**

***Q.*** In 2018 you met with Qualcomm's lawyers twice, if I'm understanding?

**A. I think it was three times.**

*Q.* Well, was it two meetings and then like a phone call?

**A. Phone call, yeah.**

*Q.* All right. And across those meetings, did you do your best here today, seven years later, to remember what you did or didn't tell Qualcomm's lawyers?

**A. I tried to the best of recollection, though I didn't have access to any documents to trigger my memory.**

*Q.* And my memory is during your testimony you asked a number of times if you could see something to jog your memory.

Is that your memory of your testimony?

**A. Yes. And I wanted to see that for several reasons. Number 1 --**

***THE COURT:*** The question isn't why. The question is did you say that.

***THE WITNESS:*** Yes, I asked for it.

***BY MR. PILCHAK:***

*Q.* And so I think many of the questions on cross-examination -- and tell me if you agree with this -- were about things that were either different than you said in 2018 or things that you admit now that you said in 2018 were false.

Is that fair?

**A. Correct.**

*Q.* And there were a number of things that you told Qualcomm's attorneys in 2018 that were not true; right?

**A. Correct.**

Q. But did you also tell Qualcomm's lawyers in 2018 many of the same things that you told this jury in your testimony over the course of this trial?

**A. During the civil interview --**

Q. Yes.

**A. -- what I told Qualcomm versus what I told here at the jury?**

Q. Yeah. Are there many things that match between those two statements?

**A. Yes.**

Q. For example, in 2018, when Qualcomm's attorneys were interviewing you, did you tell them that Karim told you to call him Sheida?

**A. I did.**

Q. Did you tell Qualcomm's lawyers in 2018 that you were suspicious of the idea that Sheida could have invented the technology that founded Abreezio?

**A. Absolutely.**

Q. Did you tell Qualcomm's lawyers in 2018 that you considered Dr. Arabi your boss at Abreezio?

**A. Yes.**

Q. Did you tell them that that impression just increased as time went on?

**A. Absolutely, yes.**

Q. Did you tell -- did you tell Qualcomm's lawyers in these

2018 interviews that Dr. Arabi fed Abreezio information about Qualcomm's pain points?

**A. Yes.**

**Q.** Did you even tell Qualcomm's lawyers in 2018 that nothing in your long narrative response about Abreezio's corporate history that you sent to Mr. Somwal -- do you remember that document?

**A. I do remember the document.**

**Q.** Did you tell Qualcomm's lawyers in 2018 that pretty much nothing in that summary was accurate?

**A. Yes.**

**Q.** And both of the times that you sat down with Qualcomm's lawyers, in February and in May of 2018, did you provide them with a detailed account of how Dr. Arabi told you to destroy emails after Abreezio started to come to light?

**A. Yes.**

**Q.** Now I want to shift gears a little bit and ask you about some of the questions you were asked on cross-examination about differences between your 2018 statement to Qualcomm's lawyers and your testimony today. Okay?

**A. Okay.**

**Q.** I think one of the things that you were asked about on cross-examination is whether you told Qualcomm's lawyers whether a brilliant professor can sometimes spit out an idea that a student picks up and runs with; right?

**A. Yeah.**

***Q.*** Do you remember making that statement or some version of it to Qualcomm's lawyers in 2018?
***A.*** **Some version thereof, yeah.**
***Q.*** Would it help you to see any of the context for that statement from any record of that interview?
***A.*** **It definitely will.**
***Q.*** Let me ask a different question first.
Did you -- do you remember the entire context of that statement sitting here today?
***A.*** **I do not.**
***Q.*** Do you remember the sequence of questions that you were asked and the sequence of answers that you gave?
***A.*** **Absolutely not.**
***Q.*** Do you think it would help you remember where that statement came from if you looked at any of those records?
***A.*** **Please. It will definitely be a big help.**
***MR. PILCHAK:*** I'd like to show the witness and the witness only Exhibit 1088, which we've premarked. Bear with me one moment. I was going to do it, Mr. Maybury, is that okay?
***MR. MAYBURY:*** Sure.
***MR. PILCHAK:*** All right. Thank you.
***BY MR. PILCHAK:***
***Q.*** So 1088 -- and I'm going to flip, for the record, to page 7. All right. Bear with me here, Mr. Taneja.
***A.*** **Okay.**

***Q.*** Now, on the screen you should see a document here.
Do you see that?
***A.*** **I do.**
***Q.*** Have you ever seen this document before?
***A.*** **Never.**
***Q.*** Did you -- as far as can you tell from what I'm showing you, did you write this document?
***A.*** **I did not.**
***Q.*** All right. And you haven't seen it before?
***A.*** **I've not seen it before.**
***Q.*** All right. If you look where I'm placing my finger, where it says he had two conversations --
***MR. OLAH:*** Your finger's not showing.
***THE WITNESS:*** I see it now.
***MR. PILCHAK:*** Thank you, Mr. Olah. It's a team effort today.
***BY MR. PILCHAK:***
***Q.*** Actually, start up here where I placed my finger where it says "Marshall asked Sanjiv."
Do you see that?
***A.*** **I do.**
***Q.*** Take a moment to read that paragraph and the next paragraph.
***A.*** **To myself or aloud?**
***Q.*** Not out loud. Just to yourself, sir.
Does that refresh your memory on the context for that

statement?
**A. It does. Thank you, yeah.**
***Q.*** If I take that down so that you can't see it any longer, was the beginning part of that statement -- were you answering a question about whether you thought it was suspicious that Sheida could have come up with the technology?
**A. Exactly.**
***Q.*** Do you think it was suspicious?
**A. As that document says, absolutely is what I said.**
***Q.*** So that's what you told Qualcomm's lawyers all the way back in 2018?
**A. Yes.**
***Q.*** And were there any other reasons that were set out in your statement to Qualcomm in 2018 for why you could be suspicious about that?
**A. Yes.**
***MS. BERNSTEIN:*** Objection under 801(d)(B)(i).
***THE COURT:*** Overruled.
***THE WITNESS:*** Yes.
***BY MR. PILCHAK:***
***Q.*** Does it refresh your memory about any other things that you told Qualcomm's lawyers about why you were suspicious of Sheida inventing this technology?
**A. Yes.**
***Q.*** What were some of those things that you told Qualcomm seven

years ago?

**A. So --**

***MS. BERNSTEIN:*** And for the record, 801(d)(B)(i).

***THE COURT:*** Overruled.

***THE WITNESS:*** One of the reasons was that having an invention in two disparate areas is too much of a coincidence for a master's student to have, similar to what I mentioned in my testimony here also, which is what this document also mentioned.

***BY MR. PILCHAK:***

***Q.*** All right. And this takes a bit of time so I just want to do one other example.

On cross-examination, were you asked about this idea that it might be okay with Qualcomm if Dr. Arabi were involved in Abreezio as long as he was only involved in operational matters?

**A. I was asked, yes.**

***Q.*** Do you remember making some version of that statement to Qualcomm's lawyers back in 2018?

**A. I didn't have the full context. The question was asked yesterday.**

***Q.*** Okay. Let me ask you about this, before I show you anything.

If you told that to Qualcomm's lawyers back in 2018, where did you get that idea from? Was that something you cooked up yourself?

**A. No.**

***MS. BERNSTEIN:*** Objection. Leading. 6002.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** Where did you get that idea that it might be okay for Dr. Arabi to be involved in Abreezio as long as he was only involved in operational matters?

**A. Dr. Karim Arabi.**

***Q.*** So he told you that?

**A. Yes.**

***Q.*** And then you relayed that Qualcomm's lawyers in 2018?

**A. Yes.**

***MS. BERNSTEIN:*** Objection. Leading.

***THE COURT:*** I'll allow it.

***MR. PILCHAK:*** I'll withdraw that question.

***BY MR. PILCHAK:***

***Q.*** Let me just get to it. Do you remember the context for that statement?

**A. I do not.**

***Q.*** Let me ask you, first of all, before I get to any more context, sitting here today, do you feel that Dr. Arabi only worked on operational matters for Abreezio or that he crossed over whatever that threshold is?

***MS. BERNSTEIN:*** Objection. 701, 702.

***THE COURT:*** Overruled.

***BY MR. PILCHAK:***

***Q.*** Based on your experience, sir.

***A.*** **Crossed over the threshold.**

***Q.*** Did you feel that he was involved in technical matters?

***A.*** **Yes.**

***Q.*** Did you feel that he was involved in technical discussions?

***A.*** **Absolutely.**

***Q.*** Do you feel that he reviewed draft IP documents, meaning intellectual property documents, for Abreezio?

***A.*** **Yes.**

***Q.*** And we might see an example of that in just a moment.

So all that out of the way, do you remember the context for this statement about operational matters to Qualcomm's attorneys?

***A.*** **It would definitely help if you could please refresh my memory with a document.**

***Q.*** So this is Exhibit 1088 again. And this is going to be page 8 of that document. So bear with me, Mr. Taneja. I'm going to place this on the document monitor in one moment.

***A.*** **Okay.**

***Q.*** And if you look -- here we go.

Can you see that there, sir?

***A.*** **I do.**

***Q.*** Is this the same document that you've not seen before today?

***A.*** **I have not seen this before today.**

*Q.* Maybe you don't know whether it's the same document. But you haven't seen this page before today, either?

***A.* Correct.**

*Q.* All right. And if I place my finger here by the paragraph beginning "Early on," can you read that paragraph and the next paragraph to yourself?

***A.* I've got it. Thank you.**

*Q.* Now does that provide you with more context for that statement?

***A.* It does.**

*Q.* And I guess the specific question is: Does that remind you or refresh your memory of things that you said during this interview seven years ago with Qualcomm's lawyers?

***A.* It does help.**

*Q.* Do you remember whether you told Qualcomm's lawyers all the way back then that there was a wide divergence between this idea that Karim was only going to do operational things and what actually happened at Abreezio?

***A.* I do.**

*Q.* You made that statement?

***A.* I did, yes.**

*Q.* Is that true?

***A.* Absolutely true.**

*Q.* I want to ask you about a few other statements from 2018 if I can. Bear with me one moment, please.

*A.* **Okay.**
*Q.* Do you remember talking to Qualcomm's lawyers about a conversation you had with Dr. Arabi about metadata?
*A.* **Most likely, yes.**
*Q.* When you say "most likely, yes," would it refresh your memory to see anything from your conversation -- anything memorializing your conversation with Qualcomm's lawyers about that?
*A.* **Please, definitely, it will help.**
*Q.* This is Exhibit 1088 one more time. This is page 11 now. Bear with me.
All right. I'll place this on the screen there, sir. And I think I'll just assume that your testimony continues to be you've not seen this document before unless you see something that triggers a memory.
Will you let us know?
*A.* **Absolutely I will.**
**I've not seen this before.**
*Q.* All right. When I place my finger next to this paragraph beginning "Instead" --
*A.* **Yes.**
*Q.* -- can you read that to yourself?
*A.* **Yes.**
*Q.* Did you have a chance to read that paragraph?
*A.* **I did read that paragraph.**

***Q.*** Does that refresh your memory about statements you made to Qualcomm's lawyers in February of 2018?
***A.*** **Yes.**
***Q.*** Specifically about that bit about holiday travel at the end, do you remember making that statement?
***A.*** **Yes.**
***Q.*** What did you tell Qualcomm's lawyers about Karim's statement to you about metadata and a visit over the holidays?
***A.*** **Karim said that his sister was visiting her over the holidays and used his laptop to document her patent -- provisional patent application. And that was his explanation as to why the metadata was showing Karim as the author.**
***Q.*** Dr. Arabi's explanation to you?
***A.*** **Yeah.**
***Q.*** Was that his sister Sheida was visiting him over the holidays?
***A.*** **Correct.**
***Q.*** All right. You were asked on cross-examination whether you had difficulty remembering things that happened a couple weeks ago in March of this year, which is the month we're in right now.
Do you remember that?
***A.*** **I do remember. I somehow thought it was March 2024 as I mentioned in the cross-exam also.**
***Q.*** Fair enough.

Did you respond that it can help you when documents refresh your memory?

**A. I did.**

Q. Has it refreshed your memory to look at documents in this case?

**A. It has.**

Q. Did you look at a number of documents on direct examination?

**A. Yes.**

Q. I have shown you several documents just now.

**A. Yes.**

Q. Have any of the documents that you've seen during the investigation, including your meetings with the Government, appeared to you to be counterfeit or altered since the time that they were produced?

***MS. BERNSTEIN:*** Objection. 701, 702.

***THE COURT:*** Overruled.

***THE WITNESS:*** Absolutely not.

***BY MR. PILCHAK:***

Q. So for example, your text messages -- and we might come back to this -- have you seen any of your text messages where you looked at it and your reaction is this text message is wrong?

**A. Not at all.**

Q. Let me ask you this: You were testifying on cross about getting information from customers as part of a marketing pitch; right?

***A.*** **Right.**

***Q.*** And if I understood your testimony, you said under some circumstances it's not unusual to know about what a customer's needs are when you're trying to sell a product to them.

Is that fair?

***A.*** **Yeah.**

***Q.*** And I think you were asked about whether, for example, when you worked at Cadence, you had made pitches to Qualcomm; right?

***A.*** **Yes.**

***Q.*** Did you make pitches to Qualcomm when you were at Cadence?

***A.*** **Yes.**

***Q.*** As part of those pitches before you became involved in Abreezio, did you ever have a secret senior vice president inside Qualcomm that you had met with before the pitches?

***A.*** **No.**

***Q.*** Did you ever have to conceal any meetings that you had with Qualcomm personnel from other personnel at Qualcomm that you met with?

***A.*** **Never.**

***Q.*** Did you ever work with anyone who had an alias or a fake email account that they would use to correspond with you as part of those pitches?

***A.*** **Never.**

***Q.*** After any of those pitches did anybody at Cadence sit down with you and say, Mr. Taneja, I need you to delete your emails

from that series of pitches?
**A. No.**
*Q.* You were asked a series of questions about statements of work with Invionics. Is that right?
**A. Correct.**
*Q.* And there were a number of contracts between Abreezio and Invionics. Is that fair?
**A. That's right.**
*Q.* I think you said this on direct examination, but how much was Abreezio supposed to pay Invionics per hour as part of those statements of work? Do you remember?
**A. One hundred dollars an hour.**
*Q.* I'm not going to get my calculator out.
But do you know how many hours one would have to work at $100 an hour to run up a $180 million bill?
***MS. BERNSTEIN:*** Objection. 403.
***THE COURT:*** Sustained.
***BY MR. PILCHAK:***
*Q.* I should have asked you about this a minute ago, but you were also testifying about Mike Campbell.
Do you remember that?
**A. Yes.**
*Q.* And some emails that you might have exchanged with Mr. Campbell?
**A. Correct.**

***Q.*** Did you send an email to Mike Campbell at about the same time that you emailed to Ziad Mansour?
***A.*** **Either the same time or within a short gap of each other.**
***Q.*** Okay. In the meeting -- in the email to Mr. Campbell, did you have to pretend like you hadn't had an earlier meeting with him on the same subject?
***A.*** **Absolutely not.**
***Q.*** Is that because there was no --
***A.*** **There was no meeting, yeah.**
***Q.*** You also testified on cross about the number of meetings that Abreezio, especially you, ultimately had with Qualcomm; right?
***A.*** **Correct.**
***Q.*** Where did you put that number at, if you remember?
***A.*** **To the best of my recollection, what I answered was that to the best of my recollection, it may have been ten to 20. Twenty was the upper bound I was kind of saying.**
***Q.*** Okay. So 10 or 15 to 20?
***A.*** **Maybe, or 15 to 20, yes.**
***Q.*** Got it.
If we put Qualcomm to the side --
***A.*** **Yeah.**
***Q.*** -- you mentioned as many as eight other customers that Abreezio approached.
***A.*** **Correct.**

***Q.*** Besides Qualcomm, what other customer did Abreezio meet with the most?

**A. Aside from Qualcomm, I would say it's probably Cisco where we had multiple meetings and they had an interest to start an evaluation.**

***Q.*** And when you say "multiple meetings," you mean 12 or 14 meetings?

**A. No, not at all. Maybe three.**

***Q.*** Maybe three.

***MR. PILCHAK:*** Can we show the witness 704 if I switch over here.

***BY MR. PILCHAK:***

***Q.*** You were asked about this on cross, probably direct. It's been a while.

***MR. PILCHAK:*** And zoom in on the text, please, Mr. Maybury. Thank you.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, sir?

**A. I do.**

***Q.*** And you were asked about IP contamination on cross; right?

**A. Correct.**

***Q.*** Is there a companion text message to this from about the same time?

**A. There is.**

***MR. PILCHAK:*** If we show the witness 703, this is also

in evidence, and just kind of zoom in on the top half there.

***BY MR. PILCHAK:***

***Q.*** Now, you were asked about this on direct. But because you were asked about it on cross, let me ask: Do you see IP contamination in the top there?

***A.*** **I do.**

***Q.*** But where you say two text messages down "Please do not mention Sheida's name," how could Sheida's name cause IP contamination?

***A.*** **As I mentioned, the real reason was not the IP contamination. That may have been a valid concern, but the real reason was to conceal Dr. Karim Arabi's identity or involvement.**

***MR. PILCHAK:*** All right. I think we can take that down. And if you could remove the -- thank you.

Let's show the witness 2632, please. I think this was admitted on direct.

***THE COURT:*** I do not have 2632.

***MR. PILCHAK:*** Oh, sorry. 2362. I did it again.

***THE COURT:*** Twenty-three --

***MR. PILCHAK:*** First I break the podium, now this.

***THE COURT:*** It is admitted.

***MR. PILCHAK:*** Thank you, your Honor.

If we could zoom in on the text there.

***BY MR. PILCHAK:***

***Q.*** Do you see that, sir?

**A. Yes, I do.**

*Q.* Do you remember being asked about this on cross?

**A. Yes.**

*Q.* I think your testimony was that these are draft provisional patent applications in the attachment line.

Do you see those?

**A. Correct.**

*Q.* Sitting here today, this message is just between you and Mr. Quinton; right?

**A. Yes.**

*Q.* Sitting here today, do you have a memory of flipping draft provisional patent applications to the Sheida email box very shortly after you received them?

**A. Yes, I do.**

***MR. PILCHAK:*** Let's show the witness and the witness only Exhibit 888. Zoom in on the available text, please.

***BY MR. PILCHAK:***

*Q.* Is this an email from you, sir?

**A. It is.**

*Q.* Who is it to?

**A. The email address, there are two email addresses with -- the intended recipient is Dr. Karim Arabi.**

*Q.* And the subject is "Finalize Provisionals." Is that right?

**A. That's right.**

*Q.* Does it look like it has the same four documents attached to

it that were attached to Mr. Quinton's original message at 10:34 p.m.?

**A. It is exactly the same.**

***MR. PILCHAK:*** All right. I will move to admit 888.

***THE COURT:*** Any objection?

***MS. BERNSTEIN:*** I'm sorry, how many pages is this exhibit?

***MR. PILCHAK:*** This is just the email. The trick is we have the attachments, but we didn't tag one of them in the sequence. So the sequence would be a little weird.

Oh, we have it now.

***THE COURT:*** Okay.

***MR. PILCHAK:*** So in that case I would move to admit the four attachments as well. Those are -- bear with me -- 889, 890, 891, and 898.

***THE COURT:*** Any objection to those exhibits?

***MS. BERNSTEIN:*** I'm sorry. Would you mind reading the numbers one more time?

***MR. PILCHAK:*** Not at all. The email is 888. The attachments are 889, 890, 891, and 898.

***MS. BERNSTEIN:*** No objection to 888.

***THE COURT:*** Do you want the attachments or not?

***MS. BERNSTEIN:*** No objection to any of those. Thank you, your Honor.

***THE COURT:*** Okay. They may be admitted.

***MS. BERNSTEIN:*** 888, 890, 891, 898?

***THE COURT:*** Yes.

***(Exhibits admitted.)***

***MS. BERNSTEIN:*** Thank you.

***BY MR. PILCHAK:***

***Q.*** All right. In a moment here, Mr. Taneja, it looks like the jury can see what we're looking at. Let me ask you about the bottom message from Mr. Quinton.

Do you see that?

***A.*** **I do.**

***Q.*** Do you understand that to be the same email that you were shown on cross-examination?

***A.*** **It is the same.**

***Q.*** Where it says "Hot off the presses," did it attach those four draft provisional patent applications?

***A.*** **Yes.**

***Q.*** And less than an hour later, what did you do with those draft provisional patent applications?

***A.*** **I forwarded them over to Dr. Karim Arabi.**

***Q.*** Why would you do that?

***A.*** **To get his input, to have him review it.**

***Q.*** Do you remember, sitting here today, whether he did provide any kind of input on these?

***A.*** **Yes.**

***Q.*** Yes, you remember or yes, he did?

**A. He did provide the input. Specific input, I don't remember.**

*Q.* Fair enough.

So this is March 18th of 2015; right?

**A. Correct.**

***MR. PILCHAK:*** Let's take that down and show the witness -- I will try really hard this time -- 3219. I think that's admitted on cross.

***THE COURT:*** 3219, I do not have admitted. It was mentioned, but I do not believe it was admitted into evidence.

***MR. PILCHAK:*** All right. Let's just show the witness 3219, then. I apologize. I'll get there.

***(The Court and Clerk conferred sotto voce.)***

***MR. PILCHAK:*** Shown but not admitted.

***THE COURT:*** Shown but not admitted.

***MS. BERNSTEIN:*** Sorry, what number are we on?

***THE COURT:*** 3219.

***MR. PILCHAK:*** Hopefully, I didn't object to this. I think we'll have it in one moment, Mr. Taneja.

***THE WITNESS:*** Okay.

***BY MR. PILCHAK:***

*Q.* There we go. Do you see that there, sir?

**A. I do.**

*Q.* Is the top email a message from you? Maybe we can zoom in on top.

**A. Yes.**

***Q.*** To Mr. Quinton and a Sheida email address?
**A. Correct.**
***Q.*** Dated March 13th of 2015?
**A. That's right.**
***MR. PILCHAK:*** Move to admit 3219.
***THE COURT:*** Any objection?
***MS. BERNSTEIN:*** I apologize. This is how many pages?
***MR. PILCHAK:*** I don't know.
***THE COURT:*** It's something you showed the witness.
***MR. PILCHAK:*** It looks like three pages.
***MS. BERNSTEIN:*** No objection. Thank you.
***THE COURT:*** 3219 may be admitted.
***(Exhibit 3219 admitted.)***
***MR. PILCHAK:*** Thank you.
And let's zoom in on the bottom half there starting on March 11, 2015, at 7:35.
***BY MR. PILCHAK:***
***Q.*** Do you see starting here where I've made a mark at 4:14 p.m., there's a message from Mr. Quinton underneath that --
**A. Yes.**
***Q.*** -- where he is thanking you for the terminology review?
Can you just remind the jury what the terminology review was?
**A. So given that there were different kinds of architectures for the sensor circuit, we had to agree on a terminology what**

**each approach actually meant. So this means, for example --**
*Q.* I don't want an example. Thank you.
***A.* Oh.**
*Q.* Let me just ask: Is this the same sequence of events or the same time that there are the issues with the sensor architecture in the original provisional patent?
***A.* That's right.**
*Q.* And the group of people on this email, maybe including others, are you trying to work through those issues?
***A.* Yeah.**
*Q.* Let me ask you specifically about this.
You see the last paragraph from Mr. Quinton here --
***A.* Yeah.**
*Q.* -- where he says "I would suggest that we meet early Friday morning and I'll walk you through it" -- skip the middle -- "or I may have to make a trip down to San Diego to discuss in person."
Did you live in San Diego in March of 2015?
***A.* I did not.**
*Q.* Based on the people who were participating in this discussion, who did you understand Dr. Quinton to be suggesting a meeting with?
***A.* Dr. Karim Arabi.**
*Q.* Did he live in San Diego at that time?
***A.* He did.**

***MR. PILCHAK:*** All right. Let's take that down.

***BY MR. PILCHAK:***

***Q.*** You were asked about a series of emails involving other customers of Abreezio on cross.

Do you remember that?

***A.*** **I do.**

***MR. PILCHAK:*** I'll just ask at this point. Is 2893 in evidence? I think my team is saying yes, your Honor.

***THE COURT:*** Okay.

***MR. PILCHAK:*** All right. Okay. So let's --

***THE COURT:*** I have it also.

***BY MR. PILCHAK:***

***Q.*** Can we go to the third page just quickly. The root message here is addressed -- it's from you; right, sir?

***A.*** **Yes, it is.**

***Q.*** And it's to someone named Sunil.

Who is that?

***A.*** **He was a director or a senior director at Broadcom.**

***Q.*** All right. So this is about Broadcom?

***A.*** **Correct.**

***MR. PILCHAK:*** Let's take that down and go to page 1. And then just zoom in on the top half.

***BY MR. PILCHAK:***

***Q.*** And we can't really tell who the 9:10 p.m. message is addressed to the way this format is set up; right?

**A. Yeah.**
Q. But if you look at the top message, who did you send this email to?
**A. Dr. Karim Arabi.**
Q. And then who's the reply? Who did you understand this reply to be coming from?
**A. Dr. Karim Arabi.**
Q. And then let me ask you some questions about Sunil who you just mentioned.
Was Sunil Dr. Arabi's former supervisor?
**A. No.**
Q. Did he have any kind of a relationship with Dr. Arabi that you know of?
**A. No.**
Q. Had you had a secret meeting with him that you couldn't reference in the email chain here?
**A. No.**
Q. How many meetings did you have with Broadcom, all told?
**A. All total, two or possibly three.**
***MR. PILCHAK:*** All right. Let's take that down. You were shown an email, which I believe was admitted, 2212.
***BY MR. PILCHAK:***
Q. This is kind of a list of different customers that you were approaching on Abreezio's behalf; right?
**A. Correct.**

***Q.*** And this is May 1st, 2015?
***A.*** **That's right.**
***MR. PILCHAK:*** If this is in, I'd ask permission to publish. I believe it is, your Honor.
***BY MR. PILCHAK:***
***Q.*** And Mr. Taneja, from A through E, there's a number of different customers listed here; right?
***A.*** **That's right.**
***THE COURT:*** It is.
***MR. PILCHAK:*** Thank you, your Honor.
***BY MR. PILCHAK:***
***Q.*** In the last paragraph, under the lettered list, you mention staggering these; right?
***A.*** **Correct.**
***Q.*** And one of the reasons for staggering them is AE bandwidth.
Do you see that there?
***A.*** **I do.**
***Q.*** What was your AE bandwidth busy with at the time you were talking to these other customers?
***A.*** **Qualcomm.**
***Q.*** Is that what that last sentence means, "Based on the existing Qualcomm engagement"?
***A.*** **That's right.**
***Q.*** All right. Let me ask a different question.
How many Dan Hoggars did you send to Intel?

**A. Zero.**
**Q.** How many Dan Hoggars did an on-site evaluation at Broadcom?
**A. Zero.**
**Q.** Did you send Dan Hoggars or his equivalent -- I don't mean to be rude to Mr. Hoggar -- anyone who worked in his position out to any of these other customers?
**A. None.**
***MR. PILCHAK:*** All right. Let's take that down.
***BY MR. PILCHAK:***
**Q.** You were shown some text messages on cross-examination.
Do you remember that?
**A. Yes.**
**Q.** If memory serves, the first two were with Stuart patent attorney.
Do you recall those?
**A. Correct.**
**Q.** And I think some of the questioning was about how can we know whether there was anyone else on this text string with you and Stuart patent attorney; right?
**A. Yeah.**
**Q.** And to be fair, is it your testimony that if someone was on one of those text strings and didn't reply, we might not know it from the format that you've seen them now?
**A. That's -- yeah, that's my testimony.**
**Q.** It's a possibility?

**A. It's a possibility, yeah.**

***MR. PILCHAK:*** Let me show you as just an example Exhibit 727, which is in evidence. All right. If we can zoom in down to the part with the sidebar there which is two-thirds of the way down.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, sir?

**A. I do.**

***Q.*** Is this a text string between you and who?

**A. Dr. Karim Arabi.**

***Q.*** And the date of this is what?

**A. March 20th.**

***Q.*** Of 2015?

**A. 2015.**

***Q.*** And just to situate us, can you remind us what was happening on March 20th, 2015, in Abreezio/Qualcomm land?

**A. We were having a in-person meeting at Qualcomm.**

***Q.*** And did you rendezvous with Dr. Arabi after that meeting was over?

**A. Yes.**

***Q.*** Where did rendezvous with Dr. Arabi?

**A. As the text reminds me, it was can you come to Morehouse Drive. And sure enough, I did that.**

***Q.*** And where specifically on Morehouse Drive did you pick up Dr. Arabi?

***A.*** **He specifically instructed, as the text shows, that he will be on the sidewalk.**
***Q.*** Is that where you picked him up?
***A.*** **This -- I don't recall entering the Qualcomm building to pick him up.**
***Q.*** Fair enough.
So my question for you, though, is: On this text string, I think you just testified theoretically it's possible that there were other people on this conversation who don't appear here; right?
***A.*** **Theoretically, it's possible, yeah.**
***Q.*** Sitting here today, though, do you have any memory of anybody else lurking on this text string where you're arranging to pick up Dr. Arabi on the sidewalk who is not on here?
***A.*** **No.**
***Q.*** Who we don't see right now?
***A.*** **No one. No one else.**
***Q.*** Do you think there's any realistic chance that Jim Thompson was on this text string?
***A.*** **Not at all.**
***Q.*** Or Duane Nelles?
***A.*** **No.**
***MR. PILCHAK:*** All right. Let's take that down.
***BY MR. PILCHAK:***
***Q.*** Still sort of on the subject of text messages, I'll just ask

you straight out: Did you ever create counterfeit text messages as part of your cooperation?

**A. Never.**

***Q.*** Did you create fake emails as part of your cooperation?

**A. Never.**

***MR. PILCHAK:*** Let's show the witness Exhibit 221, which is an email that was previously admitted. Zoom in on the email on the top there, sir.

***BY MR. PILCHAK:***

***Q.*** Do you see that, Mr. Taneja?

**A. I do.**

***Q.*** Is this a real email that you really received on or about March 3rd of 2015?

**A. Yes.**

***Q.*** And it's March 3rd of 2015 at what time?

**A. 1:55 p.m. without the adjustment of the time zone that you alluded to last time.**

***MR. PILCHAK:*** Okay. Let's take that down. Hold that time in your mind, 1:55 p.m. And let's look at Exhibit 113 which is previously admitted. And zoom in on the top here.

***BY MR. PILCHAK:***

***Q.*** Do you see that there, sir?

**A. I do.**

***Q.*** Now, you're not on this email; right?

**A. I'm not on this email.**

*Q.* This is from an email address.
Whose email address do you believe this to be on top?
*A.* **Dr. Karim Arabi.**
*Q.* And where is he sending this OldSensor file to?
*A.* **Sheida.arabi1@gmail.com.**
*Q.* And what time is he sending that email?
*A.* **1:55 p.m. on the same day.**
*Q.* So right about the same time that that email account then forwards it to you?
*A.* **Correct.**
*Q.* So here's my question for you: As part of your cooperation in the civil suit or the criminal case, did you hack into Dr. Arabi's email account and send this email?
*A.* **Absolutely not.**
***MR. PILCHAK:*** Let's take that down. And I think we can remove the annotations.
***BY MR. PILCHAK:***
*Q.* You were also asked on cross about statements that you made to Qualcomm's lawyers back in 2018 about when you knew that Karim was using the Sheida alias; right?
*A.* **Yes.**
*Q.* Do you remember also talking with Qualcomm's lawyers about when you knew that Dr. Arabi was using some of these Sheida email accounts that we've seen?
*A.* **Yes.**

***Q.*** And I know there were some questions on cross about whether you were or weren't entirely truthful with Qualcomm's lawyers seven years ago; right?
***A.*** **Correct.**
***Q.*** When you testified today, is your testimony based on your freewheeling memory or based on some of the documents that you've seen as part of this investigation?
***A.*** **For the -- you're referring to the civil interview?**
***Q.*** No, no. I'm asking you -- let me show you, for example, Exhibit 636, which is already in evidence.
***A.*** **Okay.**
***MR. PILCHAK:*** And zoom in on the text.
***BY MR. PILCHAK:***
***Q.*** This is an email that you testified about on direct examination; right?
***A.*** **Correct.**
***Q.*** And can you remind us what is your testimony about who you thought was using this Sheida email account as of February 28th of 2015?
***A.*** **Dr. Karim Arabi.**
***Q.*** Why do you say that for this email specifically?
***A.*** **There is a reference to a meeting that happens immediately following a day or two or a few days following this email referring to Brad, Sheida, and myself, who are going to be at the call, at the conference call, not an in-person meeting. And**

**the people who attend are Dr. Karim Arabi, Brad Quinton, and myself. There is no Sheida.**

***Q.*** So leaving aside whatever you did or didn't tell Qualcomm's lawyers in 2018, when you look at this email, are you confident that by February 28th you knew Dr. Arabi was using this email account?

***A.*** **Hundred percent.**

***Q.*** Did you create this email for purposes of your cooperation with Qualcomm or anyone else?

***A.*** **Absolutely not.**

***Q.*** You may be an engineer, but have you ever invented a time machine?

***A.*** **No.**

***MS. BERNSTEIN:*** Objection, your Honor. Argumentative and move to strike.

***THE COURT:*** Sustained.

***MR. PILCHAK:*** That testimony can be stricken.

***BY MR. PILCHAK:***

***Q.*** Last question or last couple of questions.

You testified on direct about conference calls that you had about Abreezio; right?

***A.*** **Yes.**

***Q.*** One of the things I asked is whether Dr. Arabi ever dialed into those conference calls.

Do you remember that?

***A.*** **Yes.**
***Q.*** On cross examination, I think you were asked about statements to Qualcomm's lawyers in 2018 that Dr. Arabi's participation in those calls tapered off over time.
Do you remember those questions?
***A.*** **That specific question was the weekly operational meeting, is what I interpreted the question to be.**
***Q.*** So you understood that question in 2018 to be about a very specific kind of conference call?
***A.*** **Correct.**
***Q.*** Not any call about Abreezio ever?
***A.*** **Correct.**
***Q.*** All right. Let me ask a related question. I'm sure you have a phone yourself.
***A.*** **Yes.**
***Q.*** We've seen evidence of your text messages in this case.
Are you familiar with the phone company keeping its own records of who makes calls at what time?
***A.*** **Yes.**
***Q.*** And the duration of those calls?
***A.*** **Yes.**
***Q.*** Would you expect that those kinds of records would also reflect whether Dr. Arabi dialed into any of these calls?
***A.*** **Absolutely.**
***Q.*** Do you have the power to change the phone company's records

about who called whom at what times?

**A. Absolutely not.**

***MR. PILCHAK:*** One moment, please, your Honor.

***THE COURT:*** Okay.

***MR. PILCHAK:*** Nothing further at this time.

***MS. BERNSTEIN:*** May I just have one moment, your Honor?

***THE COURT:*** Sure.

***(Pause.)***

***THE COURT:*** While she's talking, we just got a notification from the marshals that there is going to be a protest tomorrow out in front of the federal courthouse from noon to 1:00. If you want to bring your lunch and store it down in the jury room or store it so you don't have to go outside, feel free to do that. But I just wanted to alert you to the fact that there may be something going on out in front of the courthouse. Always exciting around here.

***RECROSS-EXAMINATION***

***BY MS. BERNSTEIN:***

***Q.*** Mr. Taneja, I want to ask you something.

Was Abreezio's technology scan chain or test point insertion?

**A. Initial idea was test point. Later, the idea was refined to include scan chain, hierarchical partitioning, and that would minimize the number of test points that you would insert. So**

**it's not an exclusive either/or answer. It's both. Original idea requiring a lot of test points. The new idea reducing the need to add too many test points.**

***Q.*** And was it scan chain or test point that was ultimately demoed to Qualcomm and purchased by Qualcomm?

***MR. PILCHAK:*** Your Honor, I would just object as beyond the scope.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** Well, let's look at Exhibit 888 that I think Mr. Pilchak just showed you in redirect.

This is about scan chain; right?

***A.*** **This is a sensor patent. It's not a DFT patent. Scan chain patents are -- scan chain is in the context of DFT.**

***Q.*** And TTP is what? Test point insertion?

***A.*** **TTP is test point, transition test points.**

***Q.*** And so we're talking about transition test points and scan chain reorder in this email?

***A.*** **If you look at the attachments, it says hybrid sensor, enhanced -- okay. So there is enhanced transition fault. Okay. So yes, enhanced transition fault. I see that.**

***Q.*** Okay. So in 888 that Mr. Pilchak just showed you on redirect, we're talking about TTP which stands for what again?

***A.*** **Transition test point.**

***Q.*** Okay. Test point.

With scan chain reordering and partitioning?

**A. Yes.**

*Q.* Okay. And in 2023 when you first met with the Government, did you tell them that it was exclusively point insertion that was used?

**A. Exclusively test point insertion, there could be designs where there was no need of inserting the test point based on the partitioning and the reordering. There could be designs where you would still immediate the test points.**

*Q.* And so you --

**A. The test point alone would not work. That was proved to be a non-viable idea.**

*Q.* I want to show you your August 14th of 2023 interview with the Government, the 302. And I -- August 14th.

***THE COURT:*** Is this marked?

***MS. BERNSTEIN:*** And this is Exhibit 1035. I want to go to page 19, please.

***THE COURT:*** And it's not shown to the jury.

***MS. BERNSTEIN:*** Correct, your Honor.

***JUROR:*** We are looking at it.

***THE COURT:*** It should not be shown to the jury. Thank you.

***MS. BERNSTEIN:*** Can we show this just to the witness?

***THE COURT:*** Yes.

///

***BY MS. BERNSTEIN:***

***Q.*** Do you see that paragraph, sir?

***A.*** **Yeah.**

***Q.*** So you just explained to us that it was scan chain partitioning as shown in 888, that test point insertion didn't work, and that you told the Government that; right?

***MR. PILCHAK:*** Objection. Compound.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** You told us that it was scan chain partitioning; correct? We're going to go one by one with my questions.

***THE COURT:*** When you say "it," I'm a little confused, Counsel.

***BY MS. BERNSTEIN:***

***Q.*** Let's go back to 888.

***A.*** **Yes. I see that.**

***Q.*** Okay. So in 888, you explain that it was scan chain reordering and partitioning; correct?

***A.*** **Correct. One of the techniques.**

***Q.*** This is -- I'm just focusing on this right now. I understand that there was a lot more going on at the time.

***A.*** **The sentence says "One of the techniques they have used is a smarter version of enhanced scan by scan chain reordering and partitioning into launch and capture."**

**That's what L and C stands for.**

***Q.*** Okay. And test point insertion didn't work. That's what you said?

**A. By itself does not work, yes.**

***Q.*** Okay. And was test point insertion logic ultimately sold to Qualcomm?

**A. No.**

***Q.*** But you told the Government that it was.

**A. Test point insertion logic combination with this. Please refresh my memory. Please show me the document.**

***MS. BERNSTEIN:*** Let's go to 135.

***THE COURT:*** 135 or 1035?

***MS. BERNSTEIN:*** 1035. 1035.

***THE COURT:*** Not shown to the jury.

***MS. BERNSTEIN:*** Not shown to the jury. And can we please go to page 19.

***BY MS. BERNSTEIN:***

***Q.*** And do you see here, sir? Did you tell the Government that the test point insertion logic was included in what was sold to Qualcomm?

**A. Yes. That's exactly what I'm saying here, too. Combination of the two. It's not either/or. If you use only the original appropriate, it will not be --**

***THE COURT:*** There's no question pending. Wait for the question.

///

***BY MS. BERNSTEIN:***

***Q.*** Do you say that it was a combination of two that was sold to Qualcomm when you spoke to the Government in August of 2023?

***A.*** **"The software and test point insertion logic was included in what was sold to Qualcomm."**

***Q.*** So it's your testimony that that's scan chain as well?

***A.*** **Yeah. The software -- if you look at the previous sentence, "Sometime in the March 2015 time frame, Quinton mentioned changing the logic for the software-based approach."**

**So if you are increasing the testability of the circuit, there is a software that you are running which is doing some stuff.**

***Q.*** And is that scan chain?

***A.*** **Yes.**

***Q.*** So software and scan chain, it's your testimony, are used interchangeably, and you explained that to the Government in August of 2023?

***A.*** **This is not my transcription, obviously. The software is referring to the scan chain partition.**

***Q.*** Sir, this isn't a quiz about what's written. I'm asking about your memory.

And you asked to see this; correct?

***A.*** **Yes.**

***Q.*** So in August of 2023, you told the Government that it was both -- that test point insertion logic was included in what was

sold to Qualcomm?

**A. Correct.**

*Q.* Okay. Mr. Pilchak asked you -- he showed you a couple of exhibits and he asked you about this March 3rd, 2015, email. He asked you whether you had hacked into Dr. Arabi's email account; correct?

**A. Right.**

*Q.* And no one thinks that you hacked into Dr. Arabi's account, do you?

**A. No.**

***MR. PILCHAK:*** Objection. Foundation.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

*Q.* I want to look at 3321 again, please, because March 3rd is a pretty important day.

We've seen a lot of things about that; right?

***THE COURT:*** Are you asking him if we've seen a lot of exhibits with the date March 3rd on it?

***THE WITNESS:*** Yes, yes.

***BY MS. BERNSTEIN:***

*Q.* You just went over two with Mr. Pilchak?

**A. Yes, yes.**

*Q.* So is this a March 2nd email again from Mr. Quinton to you with the updated slides; correct?

**A. That's right.**

***Q.*** And he is referring to Friday when he initially sent you the slides; correct?

***A.*** **Correct.**

***Q.*** Saying that it was a small error; correct?

***A.*** **That's right.**

***Q.*** And Friday, I think we established, was February 27th; correct?

***A.*** **Correct.**

***MS. BERNSTEIN:*** And let's go to 685 -- 684, please.

***BY MS. BERNSTEIN:***

***Q.*** And this is a March 3rd email; correct?

***A.*** **Yeah.**

***Q.*** And this included the hand-drawn sketch; correct?

***A.*** **Correct.**

***Q.*** And you still agree that the hand-drawn sketch is what was included in Invionics' February 27th PowerPoint?

We can pull up 3319.

***A.*** **When you were comparing the two, the piece that is missing from -- see it says FCP, there is no mention of TCP, which you have shown here.**

***Q.*** Sir, do you recall that the top one initially --

***A.*** **Yes.**

***Q.*** -- was sent to you --

***THE COURT:*** Wait for the question because we don't know what the question is going to be.

What's the question?

***BY MS. BERNSTEIN:***

***Q.*** Do you recall that the top one was initially sent to you on February 27 of 2015?

***A.*** **Yes.**

***Q.*** And do you recall that the bottom one was first sent to you on March 3rd of 2015?

***A.*** **Yeah. Is it February 28th or March 3rd, the bottom one?**

***Q.*** We can go back to 684, which attached 685.

Does this remind that you that was sent to you on March 3rd?

***A.*** **March 3rd. Was there a --**

***Q.*** Mr. Pilchak asked you a lot of questions about 2018 just now; right?

***A.*** **Yes.**

***Q.*** And you recalled everything he asked you; right?

***A.*** **He trigger my memory by sharing the documents.**

***Q.*** Well, we have over 60 pages of documents; right?

***A.*** **The specific -- it provides me the context in which a statement I made in that interview document summary, and that certainly helped me get the full context.**

***Q.*** Okay. So now you do remember the full context of 2018?

***A.*** **For those specific instances.**

***Q.*** Okay. And yesterday I think we got up to nine different specific lies; correct?

***A.*** **Without the benefit of the context, without looking at the**

**notes.**

*Q.* Did we get up to nine different lies yesterday?

*A.* **Yes.**

*Q.* And one thing Mr. Pilchak asked you about today was whether you had to hide a secret meeting with an SVP; correct?

*A.* **Yes.**

*Q.* And I think this was in the context of you reaching out to Mike Campbell. Is that right?

*A.* **Correct. When I was at Cadence.**

*Q.* You reached out to Mike Campbell at Cadence?

*A.* **I think the question was when I was having meetings with Qualcomm when I was at Cadence, did I have to hide. That's what my understanding of the question was.**

*Q.* Okay. And here, you reached out to two SVPs at Qualcomm; correct?

*A.* **Yes.**

*Q.* Mr. Mansour and Mr. Campbell?

*A.* **Yes.**

*Q.* And you've testified a few times that there was nothing abnormal about that; correct?

*A.* **Nothing abnormal about reaching out to an SVP for a meeting.**

*Q.* Okay. Mr. Pilchak asked you if one of your text messages might have secretly had Jim Thompson on it.

Do you remember that?

*A.* **Yes.**

*Q.* Did you text with Jim Thompson?
**A. No.**
*Q.* He asked you if one of your text messages would have secretly had Duane Nelles on it.
Do you remember that question?
**A. Yes.**
*Q.* Have you ever texted with Duane Nelles?
**A. Duane Nelles, I don't believe so. I had email exchanges with him.**
*Q.* Okay. And you would still agree that we're not able to tell the participants of your text conversations based on the format that they've been shown to us and the jury?
**A. Theoretically it's possible.**
*Q.* Theoretically what's possible?
**A. There may be additional people who have not participated in that.**
*Q.* Mr. Pilchak showed you the settlement agreement with Qualcomm; correct?
**A. Yes.**
*Q.* And this was a signed agreement?
**A. Yes.**
*Q.* And he asked you a lot of questions about whether it was under oath or not; correct?
**A. Yes.**
*Q.* Because that's your guiding principle for truth, whether

you're under oath or not?

**A. I have made my statement yesterday, and I can repeat it. I am under oath and I take my plea agreement very seriously. I'm telling the truth.**

***MS. BERNSTEIN:*** I want to show you 3317.

***THE COURT:*** Which has been admitted.

***BY MS. BERNSTEIN:***

***Q.*** I want to go to the Clause 4.3(e).

Do you see that?

***A.*** **It shows -- yeah, I see that.**

***Q.*** This is, again, a signed agreement. And I'm sorry, on the first page, it does say "Settlement Agreement"; correct?

***A.*** **That's right.**

***Q.*** And is this the agreement through which you agreed to cooperate with Qualcomm in suing Dr. Arabi; correct?

***A.*** **Cooperate in suing Dr. Arabi?**

***Q.*** To assist Qualcomm in its lawsuit against Dr. Arabi.

***A.*** **Yes.**

***Q.*** To cooperate with them. That's the language in this agreement? Not in the clause we have on the screen.

Do you remember that the language of your settlement agreement was to help cooperate?

***A.*** **Yes.**

***Q.*** Okay. And this is a signed agreement?

***A.*** **Yes.**

***Q.*** And the clause we're looking at, you signed and said that you would provide full and truthful answers to all questions posed by Qualcomm; correct?

***A.*** **Correct.**

***Q.*** I want to look at 6.2, please. And let's look at (c).

You also agreed that you would be truthful to the best of your knowledge and belief; correct?

***A.*** **Correct.**

***Q.*** You were none of those things; correct?

***A.*** **Could you repeat that?**

***Q.*** Mr. Pilchak made a big distinction between your plea agreement in this case and this agreement that you signed.

This agreement that you signed, you agreed to be truthful?

***A.*** **Yes.**

***Q.*** And you would agree that no one had notes of your Qualcomm interviews until very recently?

***MR. PILCHAK:*** Objection. Asked and answered.

***THE COURT:*** Sustained.

***BY MS. BERNSTEIN:***

***Q.*** No one learned until yesterday about your untruths because no one asked the right questions?

***MR. PILCHAK:*** Same objection.

***THE COURT:*** Same ruling.

***BY MS. BERNSTEIN:***

***Q.*** You also told Mr. Pilchak that you had no vested interest in

what happens here; correct?

**A. Yes.**

*Q.* And you don't have an interest in what happens here. That doesn't affect you; correct?

**A. I have no vested interest in the outcome, that's right.**

*Q.* Your vested interest is in making sure that the Government thinks that what you're saying is true; correct?

**A. I'm here to tell the truth.**

*Q.* I know, sir.

And you have an interest in making sure that the Government believes your testimony is true?

**A. Yes.**

*Q.* And Mr. Pilchak asked you who the final arbitrator of your sentence is, and you said that was the judge; correct?

**A. Correct.**

*Q.* And you have an understanding that a substantial assistance motion to help you get your leniency can only be made by the Government; correct?

**A. Correct.**

***MS. BERNSTEIN:*** No further questions.

***MR. PILCHAK:*** Nothing for us, your Honor.

***THE COURT:*** Thank you, sir. You're excused.

***THE WITNESS:*** Thank you.

***(End of requested testimony.)***

***

*REPORTER'S CERTIFICATE*

I, Anne Roldan, certify that I am a duly qualified and acting Official Court Reporter for the United States District Court, that the foregoing is a true and accurate transcript of the proceedings as taken by me in the above-entitled matter on March 25, 2025; and that the format used complies with the rules and requirements of the United States Judicial Conference.

Date: March 25, 2025

*Anne Roldan, RMR, CRR, CSR 13095*