UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. KARIM ARABI, Defendant. | Case No. 22-cr-1152-BAS<br>March 31, 2025<br>Trial Testimony of Trent McClements |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CYNTHIA A. BASHANT
CHIEF DISTRICT JUDGE

VOLUME 1, PAGES 1 - 63

APPEARANCES:

FOR PLAINTIFF: UNITED STATES ATTORNEY'S OFFICE
880 Front Street, Suite 6293
San Diego, California 92101
*By: NICHOLAS W. PILCHAK, AUSA*
*JANAKI G. CHOPRA, AUSA*
*ERIC R. OLAH, AUSA*

FOR DEFENDANT: BIENERT KATZMAN LITTRELL WILLIAMS, LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
*By: WHITNEY Z. BERNSTEIN, Esq.*
*REBECCA S. ROBERTS, Esq.*
*RYAN V. FRASER, Esq.*

REPORTED BY:

ANNE MARIE ROLDAN, RMR, CRR, CSR 13095
U.S. OFFICIAL COURT REPORTER
U.S. District Court Clerk's Office
333 West Broadway, Suite 420
San Diego, California 92101

Reported stenographically; transcribed with CAT software.

# I N D E X

***

## E X A M I N A T I O N S


| WITNESS | VOL. | PAGE | LINE |
|---|---|---|---|
| *FOR THE DEFENSE:* | | | |
| TRENT MCCLEMENTS | | | |
| Direct by Ms. Roberts | 1 | 3 | 20 |


## E X H I B I T S


| ADMITTED | VOL. | PAGE | LINE |
|---|---|---|---|
| Ex. 2091 | 1 | 24 | 5 |
| Ex. 2310 | 1 | 33 | 5 |
| Ex. 2336 | 1 | 33 | 25 |

***MONDAY, MARCH 31, 2025, 2:28 P.M.***

***

***THE COURT:*** We are back on the record. All jurors are present. Dr. Arabi is present. The lawyers are present.

Counsel.

***MS. ROBERTS:*** Good afternoon, your Honor. The defense calls Trent McClements.

***THE COURT:*** Come on in, sir.

***THE CLERK:*** Good afternoon. Please stand here and raise your right hand.

***(Witness duly sworn.)***

***THE CLERK:*** Thank you. You can take the stand.

Please state and spell first and last name for the record.

***THE WITNESS:*** My name is Trent McClements. T-r-e-n-t M-c-C-l-e-m-e-n-t-s.

***THE COURT:*** Thank you.

Counsel?

***DIRECT EXAMINATION***

***BY MS. ROBERTS:***

***Q.*** Good afternoon, Mr. McClements.

***A.*** **Hello.**

***Q.*** Have you ever testified before?

***A.*** **I have not.**

*Q.* Have you ever been deposed before?
***A.* I have not.**
*Q.* It's a bit nerve-racking, would you say?
***A.* Yeah. I'm a bit of an anxious person in general. So it's a bit daunting. Yeah.**
*Q.* Where do you currently live?
***A.* I currently live in Burnaby, British Columbia, Canada.**
*Q.* You're here pursuant to a subpoena?
***A.* I am, yes.**
*Q.* Have you previously met with me?
***A.* I have.**
*Q.* About how many times would you say?
***A.* I have met with you twice remotely and twice in person.**
*Q.* Okay. How many hours would you say that we've talked?
***A.* I would say 14.**
*Q.* Okay. Yeah, we've had a lot to cover.
***A.* Yeah.**
*Q.* Have you previously met with the Government?
***A.* I have not.**
*Q.* And why is that?
***A.* Well, I was contacted by the Royal Canadian Mounted Police, the RCMP, but I was away on vacation and so an officer phoned me. I directed him to call my lawyer because I was away. And my lawyer reached out, after he was contacted, to the DOJ asking what they wanted to know about, and I never heard back.**

*Q.* So there was no follow-up?
**A. There was no follow-up, no.**
*Q.* Have you -- did you file a declaration in the criminal case?
**A. I did, yes.**
*Q.* Did you receive any follow-up from the Government after you filed the declaration?
**A. I did not, no.**
*Q.* Where did you go to school?
**A. I went to school in my hometown of Saskatoon, Saskatchewan up in Canada, and attended the University of Saskatchewan.**
*Q.* And what degrees did you get?
**A. I got a degree in computer science with a minor in economics. And simultaneously, I did a degree in engineering, in electrical engineering.**
*Q.* Did you graduate with distinction?
**A. I graduated both with great distinction.**
*Q.* And what is great distinction?
**A. Yeah, in Canada it -- you graduate and then you can graduate with distinction and then great distinction. That's --**
*Q.* It's the top?
**A. Yeah.**
*Q.* Like of like a *summa cum laude* in the States?
**A. From my understanding in the States, yeah.**
*Q.* After you graduated from school, where did you work?
**A. After school I worked in -- in Saskatoon at a remote office**

**for a company called PMC Sierra. And I spent about five years there.**

*Q.* What was your job title there?

***A.*** **I was a product design engineer, if I recall correctly.**

*Q.* Did you meet Brad Quinton there?

***A.*** **I did, yes.**

*Q.* Okay. And how about Andrew Hughes?

***A.*** **I met Andrew as well, yeah.**

*Q.* And Mike Lee?

***A.*** **I did, yep.**

*Q.* And were you aware that Dr. Arabi worked there as well?

***A.*** **I recall his name from my time at PMC. But I was in -- I mainly was in the remote office in Saskatoon. That was where most of my time was. And my understanding is Dr. Arabi worked in the main office in Burnaby. And so I only recall his name.**

*Q.* Okay. You didn't meet him at the time?

***A.*** **I have no recollection of ever meeting him, no.**

*Q.* Okay. Where did you work after PMC Sierra?

***A.*** **So after PMC Sierra I moved out to the West Coast to Burnaby to join a startup called Teradici. And I worked there for about another five years.**

*Q.* What did this company do?

***A.*** **Teradici was a -- was different than PMC. So Teradici did semiconductor products. Well, one product, it was a startup for a remote desktop protocol. So that allows you -- well, remote**

**work is pretty common now, post pandemic. It was intended to allow you to kind of have your station in one spot and then your actual workstation, your computer in another remote location. So it allowed to you work remotely.**

***Q.*** Okay. Sound goods.

Did you work a lot with integrated circuits?

***A.*** **Yes, at both PMC and Teradici, I was designing semiconductor products, yeah.**

***Q.*** On the hardware side or software?

***A.*** **Well, mainly hardware. I was really lucky, to be honest, in my career. So I got to experience a lot of different areas of semiconductor design. Our manager at PMC and, frankly, the one at Turnpike, both highly valued that.**

**So as a young engineer, I got a wide exposure to a bunch of different areas of semiconductor design. So like the actual core design of it, what's known as static timing and synthesis and DFT and even the post-production validation of the chips and the manufacturing test and then helping the firmware and software teams bring up the chips and validate them. So I kind of got to see it all.**

***Q.*** Wow.

***A.*** **So I was really, really lucky. A lot of young engineers don't get that type of exposure.**

***Q.*** It's good experience.

Did you work with Andrew Hughes and Brad Quinton at

Teradici?

**A. I did, yeah. So I was the first to end up at Teradici from PMC, and then Andrew came soon after. And then Brad was out doing his Ph.D., I think up at UBC, and he worked at Turnpike as well.**

Q. And at some point did you leave Teradici and join a startup company?

**A. I did. So Brad and Andrew went and started a company called Veriday Systems and Veriday was doing what's known as embedded instrumentation. And so I joined that company a little ways into their -- their journey.**

Q. Okay. And what is embedded instrumentation?

**A. Yeah, so embedded instrumentation is -- it's a field where colloquially you can kind of think of it as design for debug. So there's design for test, which is designing infrastructure inside of semiconductor products mainly for manufacturing tests. So to find out if -- when they are fabricating the device, if there's a mistake.**

**So inside of a device you've got all these different wires. There could be a wire that's too thin or a piece of sand in the wrong spot. So -- design for debug or embedded instrumentation was more inserting infrastructure into semiconductor products that would allow you to debug the functionality of them, which is a bit different than the manufacturing flaws.**

**So the functionality is -- inside a semiconductor device is,**

**generally you can think of them as having a bunch of ones and zeros. And so design for debug and that sort of instrumentation would allow you to direct when a zero should have been a one when the chip is running, and then you can figure out what went wrong. So that's a really interesting area because it's a hard problem without it.**

*Q.* So you had actual products?

***A.*** **At Veriday?**

*Q.* Yeah, at Veriday.

***A.*** **Yes.**

*Q.* Were you also licensing the product?

***A.*** **Yes, yeah.**

*Q.* And was Veriday eventually acquired by another company?

***A.*** **Yeah, Veriday was acquired by a company called Tektronix and that happened about a year after I started. And so we ended up going to work for Tektronix.**

*Q.* What type of deal was the acquisition, if you recall? Was it a tech and team deal?

***A.*** **Yeah. So they acquired both the technology of Veriday, the intellectual property, and the team itself.**

*Q.* And who was on that team that was acquired?

***A.*** **It was Andrew Hughes and Brad Quinton, myself, Dr. Scott Chin, and I believe there was one other employee, Julian Lambero.**

*Q.* And were they considered to be like the key employees as

part of the terms of the deal?
**A. I don't know the details of that. Almost certainly Brad and Andrew would have been. But I don't recall who was and wasn't considered key at that point.**
*Q.* And then how long were you all at Tektronix?
**A. We were at Tektronix for a couple of years. And then following that we -- well, Brad, Andrew, myself, and our colleague from back in PMC, Mike Lee, and Jim Derbyshire, who was also involved when Veriday, started Invionics.**
*Q.* And were you able to successfully deploy Veriday's products at Tektronix?
**A. Yeah. Well, Tektronix eventually divested of the products to a company called Mentor Graphics. And Mentor Graphics has seen the products out into the field.**
*Q.* So it was successful --
**A. Yeah, yeah.**
*Q.* Okay. And then after it was complete, you went on to start a new venture?
**A. That's right, yeah.**
*Q.* Okay. And so when approximately was Invionics formed, if you recall?
**A. It was in September-ish time frame of 2013, if I recall correctly.**
*Q.* And does it have a core group of founders?
**A. Yeah. So the core group of founders would have been myself,**

**Mike Lee, Andrew Hughes, and Brad Quinton. Jim Derbyshire kind of stepped back after a little while.**

***Q.*** And how was the equity distributed amongst the founders?

***A.*** **Yeah, so myself, Andrew Hughes, Brad Quinton, and Mike Lee all have 23 percent. Jim had about five. And then the rest were amongst the other shareholders, the minor shareholders.**

***Q.*** But mainly it was divided equally amongst the main founders.

***A.*** **Yes, yeah.**

***Q.*** And then what product did Invionics develop?

***A.*** **So Invionics developed a product called Invio. And Invio was targeting the ability to rapidly -- enable people to rapidly develop new software tools for an industry called electronic design automation. So these are software tools and flows that semiconductor engineers would use to build the actual chips and products.**

***Q.*** Okay. And what type of companies would this Invio tool appeal to, like large companies? Startups?

***A.*** **Everybody under the sun in the semiconductor design kind of area. So large companies would want it because they want to enhance their flows, internal flows, and build new software to support their products, and startups would be interested because they would also want to do that.**

**But Invio was designed for kind of rapid development and -- rapid software development for AVA tools so that would allow startups to get up and running fairly quickly and start to**

**progress on their product development.**

*Q.* So in about 2014, did Invionics have any customers, if you recall?

***A.*** **Yes, yeah. We had about six or seven.**

*Q.* They were licensing the tool?

***A.*** **Licensing. We also did supply engineering services, too.**

*Q.* Did your team also form a company called Trementa around the same time?

***A.*** **Around the same time as Invionics?**

*Q.* Yeah.

***A.*** **Yeah, yeah.**

*Q.* And so why did your group form Trementa?

***A.*** **Yeah, so Trementa was set up as a company structurally because of -- really based a bit on Andrew and Brad and Jim's experience at Veriday.**

**So at Invionics we were developing this software that would allow, as I said, for rapid tool development and rapid innovation, and we were also providing contract services and engineering services. And so we're going to get exposed to a lot of pain points and customers and, frankly, sometimes we just come up with ideas ourself.**

**So when that happens, we didn't want any of those innovations that we would come up with to be encumbered with any of the licenses or contract service contracts or anything else associated with Invionics.**

**And so we set up Trementa so that we could -- if we came up with a new idea like that we could shift it over into Trementa, and then it would be kind of clean of all the contracts associated with Invionics.**

**And that is really just -- makes an acquisition a lot simpler purchase by another company, a lot simpler for that new intellectual property. So kind of IP development would go into a company like Trementa, and then the Invio licensing and contract services would stay inside of Invionics.**

***Q.*** That makes sense.

Were there -- so Trementa was a fully owned Canadian corporation. Is that right?

***A.*** **You're asking about -- yes.**

***Q.*** And it was set up under a certain rule for tax benefits?

***A.*** **A Canadian controlled private corporation.**

***Q.*** Yes.

***A.*** **Yeah. So in Canada there's a concept of a Canadian controlled private corporation, a CCPC, and those companies have certain tax advantages.**

**So when, say, a CCPC gets acquired, there's a lifetime capital gain exemption you can tap into, so you don't get taxed on the first X amount of gains and stuff. And all of that is associated to you have to be a CCPC or a Canadian controlled private corporation.**

***Q.*** You can't have a non-citizen on any kind of equity in the

company to benefit from the taxes?
**A. Yeah, yeah. There's restrictions on the amount of foreign ownership. I don't know the numbers, but I understand it's got to be Canadian controlled.**
*Q.* Yeah.
Where did you work after Invionics?
**A. After Invionics, I worked at Qualcomm.**
*Q.* For how many years?
**A. I worked there from kind of November 2015 to, I think, May 2018. So two and a half.**
*Q.* Okay. And then what did you do after Qualcomm?
**A. After Qualcomm, I started a new company called Singulos Research. And that new company I founded with Brad Quinton, Mike Lee, and Dr. Scott Chin, who worked with us at Veriday and Invionics, actually.**
**And so, yeah, we started Singulos Research. And Singulos Research is -- we moved into computer vision field, and so we're using machine learning and A.I. to do what we've kind of described as dynamic object detection.**
**So we're -- in the computer vision field we're locating objects spatially in three dimensions, along with kind of pose estimation. So not only where the object is in space, but how it's positioned and how it is relative.**
*Q.* Wow.
**A. And all of that targeted to work on -- I feel a bit like I'm**

**pitching the company here. All of that targeted a bit to -- well, not even a bit, to work on a -- like a mobile platform. So either on a cell phone or on like the Vision Pro headset or something like that.**

*Q.* What's your title at Singulos.

***A.* I am chief A.I. architect.**

*Q.* And what do you do as a chief A.I. architect?

***A.* Yeah. I -- I train the machine-learning models to detect these objects and position them in space and orientation. So I'm architecting and developing flows and training the models and analyzing their performance and all that.**

*Q.* Wow. That's cool stuff.

***A.* It is kind of cool.**

*Q.* Going back to Invionics, can you just generally describe the office layout and how it was, like, set up?

***A.* Yeah. So Invionics had -- I guess you'd call it an open office layout. We had -- it's kind of one big room with a bunch of tables, and we'd all sit at the tables and kind of click away at the keyboard.**

**And then there was a small meeting room that kind of was half windowed with drywall on the bottom.**

*Q.* Did you have a lot of whiteboards?

***A.* Yeah, yeah.**

*Q.* How would you use the whiteboards?

***A.* Oh, we would always sketch out ideas and brainstorm and**

**describe concepts and things on the whiteboard.**
*Q.* And it was a pretty collaborative process with your team as far as coming up with ideas?
***A.*** **Always.**
*Q.* And inventions?
***A.*** **Yeah.**
*Q.* I want to go forward into 2014.
***A.*** **Okay.**
*Q.* Did you at some point meet Dr. Arabi?
***A.*** **I did, yeah.**
*Q.* Had you met him before?
***A.*** **I had not, no.**
*Q.* And you said you didn't interact with him at PMC Sierra?
***A.*** **Not to my knowledge, no. I did spend a few months in PMC working with the product validation team, so -- and that was in the Burnaby office. So we may have kind of passed like ships in the night in the hallway, but I don't recall ever meeting him.**
*Q.* Did you know where he was working at the time in 2014?
***A.*** **Yes, yeah. I knew he worked at Qualcomm.**
*Q.* Did you know what his position was or what he was working on?
***A.*** **My understanding was he was VP, vice president, or senior vice president level, like kind of high up level at Qualcomm. And his role was kind of to evangelizes for technology direction in areas that Qualcomm would be interested in.**

*Q.* So at some point in 2014, you had a virtual call with Dr. Arabi and other members of your Invionics team. Is that right?
*A.* **That's correct. That was the first time I met Dr. Arabi, yeah.**
*Q.* Before that call, did you have an understanding of what Dr. Arabi was interested in doing?
*A.* **Yes, I did, actually. So Brad Quinton and Dr. Arabi met at -- what's called DAC, the Design Automation Conference, where Brad was pitching our Invio platform.**
**And so Brad connected and met with Dr. Arabi and showed him Invio. And Dr. Arabi said that he knew of a startup that he thought we would be a potential good fit for. And so he kind of left it at that.**
**And then before that virtual meeting, Dr. Arabi and Brad Quinton met at a local coffee shop in Vancouver, Cafe Artigiano -- I always mispronounce that -- where further discussions on the startup were had. And that is where we -- Brad first learned and reported back to us that the startup was related actually to Dr. Arabi's sister.**
*Q.* Okay. So during -- so the initial conversations with the ideas for the startups, you recall that the discussions were about Dr. Arabi's sister's ideas?
*A.* **That's correct, yes.**
*Q.* Okay. I'm going to pull up Exhibit 120. If you could take

a look at this email. It's already been admitted.
**A. Mm-hmm.**
*Q.* And it's from Brad to Andrew and you, Mike Lee?
**A. Yes, it is, yeah.**
*Q.* So these are all the attendants for the first initial meeting?
**A. Yes, that's correct.**
*Q.* Okay. And in the text, Brad writes -- if you can read that -- that first line?
**A. Sure. So subject is "Meeting with Karim, Thursday, December 4th, at 4:30 p.m." It says "Hi, guys, I have an online meeting with Karim scheduled for 4:30 p.m. on December 4th. I'd like you guys to attend as Karim will be going over his idea/patent application."**
*Q.* So he refers to his ideas/patent application.
Did you understand that to be shorthand or an error?
**A. Yeah. Frankly, I probably didn't read past the subject. So meeting with Karim to me was meeting with Karim about his sister's startup company.**
*Q.* Before the meeting had even been scheduled, you had understood the ideas to be his sister's?
**A. Absolutely.**
*Q.* So you attended this meeting?
**A. I did, yeah.**
*Q.* And where -- from where did you attend it?

**A. I attended from the Invionics office in Vancouver.**
*Q.* And who else was on the meeting?
**A. It was myself, Brad Quinton, and Mike Lee in the office, in the Invionics office. And then Andrew Hughes dialed in remotely from -- he was in the Okanagan in BC.**
*Q.* What do you recall about the meeting?
**A. The meeting started with some introductions. Kind of went around the horn and gave a brief introduction of everybody. And then Dr. Arabi started to talk about the application space and -- of kind of his sister's concept.**
**He also informed us that, you know, he was allowed to do this, to assist his sister, that he had assisted other startups before, and that he discloses his involvement. So -- yeah. So anyways, he -- the high level domain space was described being for power management and low power.**
*Q.* Mm-hmm.
**A. Power optimization I guess is the best way to think about it. And then we saw quickly a circuit diagram.**
*Q.* Did you see a patent application, or was it just a slide?
**A. It was just a slide. It was just a slide of a circuit.**
*Q.* Did you have an initial impression of the slide that you saw?
**A. Yes. It was kind of -- you know, I don't know, but okay. These things -- there's not a lot of boxes and squiggles, but they can be a little bit subtle sometimes. So I don't know**

**about it, but okay. I don't have a lot of time to think and analyze it. That wasn't really the point.**

**But given the objective, which was to use the sensor to instrument semiconductor products to monitor kind of performance for voltage savings, it seemed like we would be a good fit to do that.**

*Q.* Mm-hmm.

***A.* We had just done an embedded instrumentation startup. We had a platform. We had a lot of domain knowledge. So --**

*Q.* That makes sense.

***A.* Yeah, it didn't seem off-off.**

*Q.* Did you discuss DFT at all, or was it all just in the AVS space?

***A.* It was all AVS, yeah.**

*Q.* Okay. So after that call did you have further discussions with your team?

***A.* Yes, yes. So Brad, Andrew, Mike Lee, and myself, we all kind of discussed the proposal and the objective.**

*Q.* Mm-hmm.

***A.* We were clearly a good fit --**

*Q.* Right.

***A.* -- to productize the idea and the concept. And so it seemed like a good opportunity for us to use Invio, which was our own product, for a -- with a startup, and hopefully get them to be successful.**

**So yeah, we talked over it. We thought we were a good fit. We thought we could add value. And we told Brad that he should pursue the opportunity.**

***Q.*** Okay. Did you learn in, like, December 2015 that Mr. Quinton had discussions about him being the CEO of Abreezio?

***A.*** **I did, yeah.**

***Q.*** And do you know if he was offered any equity for that role?

***A.*** **Yes, he was.**

***Q.*** How much?

***A.*** **He was offered 15 percent of Abreezio.**

***Q.*** And was there an equity offer for Invionics as well?

***A.*** **Yes. My recollection is Invionics would have been offered 10 percent.**

***Q.*** Okay. And did he accept that offer or he rejected it?

***A.*** **He rejected.**

***Q.*** Now, why did he reject it?

***A.*** **Well, for two reasons. The first one was that kind of, as part of Invionics, we all agreed that regardless of title, we were equal contributors, and so the proceeds of our work and Invio and all the benefits should be equally distributed. So the uneven equity distribution to Brad went against that principle.**

**And then further, you know, Invio was -- or Invionics was a business. Right? It was running. It was -- we had customers and clients and Brad did not feel he could do justice as CEO of**

**both companies.**
*Q.* Because startups are kind of risky; right? You are never know if they're going to pan out or not?
***A.*** **Oh, God yeah. Yeah.**
*Q.* So after Brad decided not to be CEO of Abreezio, or the startup company, what did -- did Invionics enter into a statement work with Abreezio?
***A.*** **Yes.**
*Q.* What do you recall about the terms of that agreement?
***A.*** **I recall the terms of the agreement were Invionics would get a ten-percent stake in Abreezio, what became Abreezio.**
*Q.* Right.
***A.*** **And we would also be paid hourly for our engineering services at $100 U.S. an hour. And then Abreezio would get an Invionics Invio license.**
*Q.* So there was a statement of work and also a licensing agreement?
***A.*** **That's my recollection, correct.**
*Q.* And do you recall who prepared those documents?
***A.*** **Brad Quinton prepared the statement of work for Sanjiv Taneja.**
*Q.* Okay. And Mr. Taneja signed on behalf of Abreezio?
***A.*** **That's my understanding, yeah.**
*Q.* Was the statement of work later amended over the course of the lifetime of Abreezio before it was acquired?

**A. Yes, yep.**

*Q.* And why would it have been amended?

**A. Because we were rapidly innovating inside the Invionics team new ideas and new intellectual property for Abreezio. And so you're not going to get the direction right the first time. New things pup up and you've got to do your things and new patents need to be -- or new ideas need to have the patents written. So you've got to kind of update it as you go.**

*Q.* So after the statement of work between Abreezio and Invionics was executed, what did you do?

**A. Yeah, so that would have been around February 23rd, I believe, was the statement of work. So that day, Brad emailed and asked Andrew and I to start a review of the two provisional patent applications that Sheida Arabi had filed in regards to those -- the two concepts for Abreezio.**

*Q.* Mm-hmm.

**A. And so Andrew and I started working on those and reviewing the patent applications and the related concepts I would call them.**

***MS. ROBERTS:*** Can you pull up Exhibit 2091.

Is this admitted or no?

***THE COURT:*** I do not have this admitted.

***MS. ROBERTS:*** Okay.

***BY MS. ROBERTS:***

*Q.* Mr. McClements, are you on this email?

**A. I am, yes.**

***MS. BERNSTEIN:*** Move to admit.

***MS. CHOPRA:*** Hearsay, your Honor.

***THE COURT:*** Overruled.

***(Exhibit 2091 admitted.)***

***BY MS. ROBERTS:***

***Q.*** Mr. McClements --

***MS. ROBERTS:*** Or move to admit. I'm sorry.

***THE COURT:*** You moved to admit, she objected, I overruled it. That means you may admit it.

***BY MS. ROBERTS:***

***Q.*** Mr. McClements, can you read this email?

**A. Sure. So the subject is "At SFU this morning" in at approximately 10:30.**

**"Hi, guys, I am at SFU this morning, so I will be a bit late. Andrew and Trent, please start working for Abreezio by reviewing the provisional patents and presentations in operations/clients/Abreezio/Abreezio IP. See you guys later this morning. Brad."**

***Q.*** When do you recall receiving this email? Was it in the morning or the afternoon?

**A. It was in the morning.**

***Q.*** So the time stamp seems to be off here; right?

**A. I would say that's true, yes.**

***Q.*** Okay. Let's talk about the first provisional patent that

you reviewed. Can you pull up 830.
We can call this one PPA 1, or low power?
***A.*** **Yes.**
***Q.*** Is that one of Sheida's provisional patents that you reviewed?
***A.*** **I believe so, yeah. If you could scroll down a bit, it might help.**
***Q.*** And when do you think you reviewed it? Do you think you reviewed it the morning of February 23rd?
***A.*** **Yes, yep.**
***Q.*** Okay. Who is the listed inventor in this document?
***A.*** **Can you scroll up for me, please. I think it's up here.**
**Sheida Arabi in Burnaby, Canada.**
***Q.*** And that was consistent with your understanding that Sheida was the inventor of the two provisionals?
***A.*** **That is correct.**
***Q.*** What problem was this patent application trying to solve?
***A.*** **This one was trying to solve the AVS problem. So it was trying to use *in situ*-style sensors to measure silicon device performance. And once you know the performance you can adjust the voltage to save the power.**
***Q.*** And what did you think of this idea?
***A.*** **Yeah. So it wasn't good. I would call it extremely naïve, fundamentally flawed, poorly conceived. Bad.**
***Q.*** All right.

A. Yeah.
Q. Can you explain why that is? Why is it -- why did you find it naïve?
A. Yeah, so the concept just misunderstood actual silicon, kind of, reality. So there are certain things it was attempting to do that it just is impossible to do in any sort of reliable or practical or usable fashion.
So there really were two core problems like that, that I would say were, like, five-alarm fires. The first one is related to the measuring of the path. So the best analogy I can think of to describe this is a marathon.
So a marathon generally runs through the city. San Diego marathon, I assume, is run through the city. So it's similar for semiconductor products, too. They have what are known as paths, and they kind of go through structures in the logic. So you can think of those, like, paths, like street paths through a city.
So Sheida's idea was that you could run a marathon, you could organize a marathon, and you could find out how fast people ran the marathon, and all you needed was a stopwatch. Right? You just set somebody up with a stopwatch at the finish line, and they'll sit there, and they will watch somebody cross it, and they will stop the stopwatch and say, ah-ha, you started this -- you started the marathon at 2:30 and you ended at 4:55, so everybody knew you've run it this fast.

**So what that misunderstood is that the stopwatch isn't the problem with the marathon. The problem with the marathon is actually setting up the course; right? You've got to have it be 42 kilometers or 26 miles long. You've got to block off all the streets so that, you know, only the runners run -- they can only run down the streets. You've got to set up people to make sure nobody's cutting corners and taking shortcuts and all of these things. That's the hard part of the marathon.**

**And she just did not realize you need to do that in her conception. She just really thought you could just sit at the finish line and stop your stopwatch and track when people are crossing it.**

**And the problem is you don't know where in the city they started. So they could have run ten kilometers, they could have 136 kilometers, they could have run 12 kilometers. And even if you knew they started from the right point, you didn't know which path they took to get to your finish line. So there may have been a shortcut and so they only ran, you know, 35 kilometers. So you are saying, wow, they are running really fast, but they aren't. So that -- that was just fundamentally flawed; right?**

**Then the second problem was that --**

***MS. CHOPRA:*** Objection. Narrative at this point, your Honor.

***THE COURT:*** Overruled.

***BY MS. ROBERTS:***

***Q.*** Was there a second problem you identified.

***A.*** **I thought I said that. That's okay.**

***THE COURT:*** It's okay. Ask your question.

***BY MS. ROBERTS:***

***Q.*** Was there a second problem at least initially that you identified?

***A.*** **Yes, yes. Well, so yeah, there's two problems, two fundamental problems.**

**So the second one is -- and I'll continue the marathon analogy. Hopefully it's kind of clear.**

**Her stopwatch, you can only stop it once. Right? And so in a marathon, you have -- even in the controlled state where you've got people running down the right path, you've got multiple people crossing the finish line. And she was like, oh, I only have to stop it once and that person ran the marathon this fast, so I guess everybody is running that fast.**

**The same problem happens in semiconductor products. You have what are known as transitions. And those transitions are just -- honestly, it's just the voltage going from zero to one and one to zero.**

**So when the functionality propagates through a semiconductor device, even from one path, start point to the endpoint, it's not just a single one to zero that happens, or a zero to one. It can be one, zero, one, zero and then stop for a bit, one,**

**zero, one, zero, and then it finally settles on its final value of, I don't know, one in this; case. Right?**

**So you can't just select points. You don't know which transition is happening. You can get the wrong value. Like it -- it just doesn't work. So those were the two main problems.**

***Q.*** Right. And so based on your views that this was a fairly naïve and sort of misunderstood rendering, would you think that would be the work of a claimed mechanical engineer like Dr. Arabi?

***MR. PILCHAK:*** Calls for speculation.

***THE COURT:*** Sustained.

***BY MS. ROBERTS:***

***Q.*** So after your team determined that the patents were fraud, or the concepts in the provisional patents were -- had problems, was your team concerned?

***A.*** **Yes.**

***Q.*** And why were they concerned?

***A.*** **Well, honestly, we couldn't fulfill the contract to deploy a product like that, a concept like that. And, you know, we wanted Abreezio to succeed. We wanted to make our clients successful. Right?**

**But we couldn't just take that -- that concept and make a successful product out of it.**

***Q.*** So after you made that determination, what did -- what did

you do?
***A.*** **Well, we started -- I started writing a set of PowerPoint slides itemizing some of the flaws that we had discovered to try to educate Sanjiv as to the issues. And we also, frankly, that very same day, came up with a new -- that day being the February 23rd, came up with a new *in situ* styled sensor that addressed some of the other concerns that we had with Sheida's concept.**
***Q.*** Okay. Did you also think of a critical replica sensor or critical replica solution?
***A.*** **Yeah. Critical path replica, yeah. So while we were discussing this, it became very clear because of those fundamental problems I described, the *in situ* just -- you just can't use it; right?**
**Now, there are ways you can kind of hand wavy academically say, you know, maybe, so we discussed those. Like there's a concept called buffering up, or at least that's what we called it.**
**So that would be like making every path in San Diego all 40 kilometers or 26 miles long so they're all the same length so in theory it doesn't matter where you start. But that's not a usable methodology because it's just disruptive and it will almost certainly cost you more power than it will save you, if you could even pull it off.**
**And so then the other alternative is -- there's another**

**alternative, which is to replicate. And so that was what we determined you had to do. And so a replica path, or a critical path replica, was deemed to be required.**

*Q.* This was at the same time that your team was contemplating a different type of *in situ* sensor?

*A.* **Yep.**

*Q.* Okay. And did you memorialize these ideas in writing?

*A.* **The new sensor, we did, yeah. We put that -- I put that into the slide deck I had created. And we decided to proceed with a description of the problems in that slide deck and this new sensor. And Brad was going to present those to Sanjiv and then get him aligned on that there is a problem --**

*Q.* Right.

*A.* **-- and kind of get him there, get him there, get him there, and then talk to him about the replica path. Because the replica path was something Sheida was trying -- well, her conception was that her *in situ*-style sensor was superior to that.**

*Q.* Right.

And did Sheida's provisional patent actually reject replica critical path?

*A.* **Yeah, yeah. That's what I mean. It was -- yeah, sorry. Fair enough. In her patent it does reject that.**

***MS. ROBERTS:*** Why don't we go back to that provisional patent, '830. And if you'll scroll down. Right here, go back.

***BY MS. ROBERTS:***

***Q.*** If you go down to the third paragraph, and the last three sentences, can you read those, starting "Also, independent sensors."

***A.*** **Oh, yeah. "Also, independent sensors age differently than functional paths over time. Another type of process sensor is canary critical path replica. These sensors suffer from inaccuracy due to differences in non-robust paths and cross-talk. They also differ from the actual critical path in process correlation, voltage drop, and temperature, but overall behave better than canary circuits."**

***THE COURT:*** You'll have to wait. Let her catch up.
Go ahead.

***BY MS. ROBERTS:***

***Q.*** What is your understanding of that paragraph or those sentences?

***A.*** **That she deemed replicas insufficient and she was trying to reject them as a solution.**

***MS. ROBERTS:*** Can you go to Exhibit 2310.

***BY MS. ROBERTS:***

***Q.*** And this is an email addressed to you -- or that you sent?

***A.*** **That's -- yes. It is, yeah.**

***Q.*** And if you scroll down, this is the initial PowerPoint you prepared?

***A.*** **That's correct, yeah.**

***MS. ROBERTS:*** Move to admit.

***THE COURT:*** Any objection?

***MS. CHOPRA:*** No objection.

***THE COURT:*** It may be admitted.

***(Exhibit 2310 admitted.)***

***BY MS. ROBERTS:***

***Q.*** So this is the first version of the PowerPoint presentation that you circulated to Brad?

**A. I believe so, yes. Yeah.**

***Q.*** Is it your understanding that he forwarded it to Mr. Taneja the same day?

**A. Yes.**

***Q.*** Okay.

***MS. ROBERTS:*** Can you pull up Exhibit 2336.

***BY MS. ROBERTS:***

***Q.*** So this is another version of the slide deck that you sent to Brad?

**A. Yes.**

***Q.*** And attaches the same slide deck, somewhat updated?

**A. I believe so, yeah.**

***MS. ROBERTS:*** Move to admit.

***THE COURT:*** Any objection?

***MS. CHOPRA:*** No objection.

***THE COURT:*** 2336 may be admitted.

***(Exhibit 2336 admitted.)***

***MS. ROBERTS:*** And can we look at Exhibit 3321.

Is that one already admitted? Yes. Okay.

***BY MS. ROBERTS:***

***Q.*** This is an email from Brad to Taneja forwarding your slide deck?

***A.*** **Yes. This was -- yep, yeah. This is indicating that there -- and there was a small issue with the slides we sent on Friday, and so this was a fixed version of that. He just fixed that issue.**

***Q.*** Okay. So the text of the email confirms that the earlier deck of the slides had been sent to Mr. Taneja on the previous Friday --

***A.*** **Yes.**

***Q.*** -- which would have been the 27th --

***A.*** **That's correct.**

***Q.*** -- of February?

***A.*** **Yep.**

***Q.*** Okay. Now let's look at the deck.

***THE COURT:*** Which one are we looking at?

***MS. ROBERTS:*** We'll look at the one that we're on, that one that was sent to Mr. Taneja, 3321.

***THE COURT:*** Okay.

***MS. ROBERTS:*** And can we look at page 7. And then also go to the next page, 8.

***THE CLERK:*** Sorry, what's the exhibit?

***THE COURT:*** 3321.

***MS. ROBERTS:*** 3321.

***BY MS. ROBERTS:***

***Q.*** Okay. So if we go back to the first one on 7, what is this slide talking about?

***A.*** **This slide is a listing of the issues and concerns we -- flaws we had found with Sheida's concept.**

***Q.*** Okay. Can you just generally describe these problems kind of at a high level?

***A.*** **Sure.**

**The first one was area overhead. So the way she had conceived of doing an *in situ* sensor was very inefficient. It was very expensive.**

**STA complexity -- so STA is static timing analysis. So that is what determines before you fabricate your device whether it will run fast enough. So if your CPU will run at 4 gigahertz or something. So that -- her sensor would have been extremely complicated to get that analysis done.**

**The complicated clock trees. Clock trees are a very fundamental structure within a semiconductor device. They're very critical. So her conception highly complicated those and added logic and structure on there that is generally frowned upon. You just don't want to do it.**

**So rise/fall path skew was something she had not contemplated. So what rise/fall path skew is, is as -- it's --**

**I find it kind of interesting. But as signals propagate through a semiconductor device, and they go through different transistors, they can go from zero to one, they can transition faster than they fall from one to zero.**

**And so that propagation time is different. So you need to know in a sense which transition's happening and she just hadn't contemplated that.**

***Q.*** So these are four problems just on this one slide?

***A.*** **Yeah, yeah, yeah.**

***Q.*** Can we switch to the next page.

So it looks like there are three more problems?

***A.*** **Yes.**

***Q.*** Okay. Can you just generally describe what these three problems were?

***A.*** **Sure.**

**So timing-related short path. Her sensor had a very complicated -- complicatedly described what was known as a hold-time constraint. But it just had this is structural constraint that said you have to make sure your short paths are so much closer to your long paths.**

**Anyways, it -- it was a -- because of how it was architected, it needlessly included that complication. It just made it hard to select appropriate paths to put this on in any efficient manner and made it just a less general -- generally deployable solution.**

**Functional timing short path. This was the marathon problem. Not knowing -- not setting up a path or a marathon course through the city and having everybody running helter-skelter to the finish line.**

*Q.* Mm-hmm. Can you read the second column just to the right of that that starts with "Serious design issue"?

*A.* **Yeah. "Serious design issue" -- "SW" is software -- "will not be able to trust passing detections, only failing ones."**

*Q.* So basically, the sensor wouldn't work in actual silicon or software that was built?

*A.* **Yeah, yeah. It -- I mean, in a low power solution, it would only tell you when you should consume more power. It could never tell you, you could go lower. So it's like you'd always end up with high power.**

**So variable sampling delay. Yeah, so her conception required the clock, so that's like the timing circuit within a semiconductor device, to be tuneable. And so based on how they had conceived it, that tuning may not converge, and so it just may not work.**

*Q.* So a total of seven problems here just in this initial evaluation?

*A.* **Yeah. Those are the ones we listed. We didn't even list the transition problem in the single -- in a certain point. There's -- it's just done --**

*Q.* Yeah.

***A.*** **-- so yeah.**
***Q.*** Can we look at Slide 9.
So what is this?
***A.*** **Yeah. So on February 23rd, Andrew and I were working on this analysis, and we came up with this new sensor circuit that addressed some of the seven problems that we had addressed earlier.**
**And this is -- it doesn't address the functional -- the functional timing path problem. That is just an *in situ* sensor problem. But is this a much more practical new circuit that would do *in situ* style analysis.**
***Q.*** Okay. So it's an entirely new *in situ* sensor idea?
***A.*** **Yep.**
***Q.*** Totally different from Sheida's. It solves for the problems that Sheida's had?
***A.*** **Yes, yeah. It addressed the ones that we can address, yeah.**
***Q.*** Okay. And so after -- and so this sensor, this idea was invented by you?
***A.*** **Honestly, I recall it was Andrew Hughes who put pen to paper, but we were talking back and forth at that time. So it would be me and Andrew probably.**
***Q.*** Okay. And this new idea was shared with Mr. Taneja on the 27th?
***A.*** **Yes.**
***Q.*** And again on the 3rd?

**A. I think the 2nd.**
Q. Can we have -- the date of the email is the 3rd. I'm sorry. The 2nd?
**A. The 2nd.**
Q. The 2nd.
Do you recall that there was a call with Mr. Taneja at this point?
**A. On -- I believe was on Friday the 27th.**
Q. Okay.
**A. And that was the plan. We were describing the problems. We presented the new *in situ* sensor, and then Brad discussed with Sanjiv that we need to replicate.**
Q. So at that initial call on the 27th, Brad broached the conversation of a critical replica path solution?
**A. Yes, yes.**
Q. Okay. Did you have other terms for replica of critical path at Abreezio?
**A. Yes, yes.**
Q. What were they?
**A. Toggling critical path was one. And then we also talked about a hybrid sensor, which was a toggling critical path cobbled to zero or more functional critical path sensors, which were the *in situ* style.**
Q. So what is a -- can you explain what a toggling -- sorry -- a toggling critical path is?

***A.*** **A toggling critical path is a replica, a replica critical path circuit. We called it a toggling critical path because you -- the point is to toggle the input all the time.**

**So -- and so toggling I guess is -- you can think of it in a digital world it's toggling between one and zero and zero and one. So you're just sending a test pulse down the path. And then the next -- so in the one clock cycle or one marathon race, you send a zero to one down the path. And then on the next marathon race, you send over one to zero, but only one. So that's toggling up and down, up and down.**

***Q.*** Did you discuss the toggling critical path option with Taneja at the February 27th call?

***A.*** **Yes. Toggling critical path replica, that was -- that was synonymous to me.**

***Q.*** They're the same?

***A.*** **Yeah.**

***Q.*** And what is a hybrid?

***A.*** **Yeah. A hybrid sensor is a toggling critical path sensor, and then you can have zero or more functional -- we call them functional critical path sensors. So those are the *in situ* style.**

***Q.*** So it was kind of a combination of the -- like the new *in situ* sensor --

***A.*** **Yeah.**

***Q.*** -- that your team came up with in combination of a replica

critical path?

***A.*** **Yes, yeah.**

***Q.*** And you considered a hybrid to be a replica as well?

***A.*** **Oh, yeah. The hybrid is a replica. You can -- you can just put some functional critical path sensors in there, in the device, too, and those might be informative.**

**Because the toggling critical path is behaving like a proxy, it's behaving a bit like an estimate, as to what actually the real functional paths are doing. And so if -- if one of your functional critical path -- one of your *in situ* sensors goes off and your toggling critical path doesn't, so your *in situ* says yeah, there's a problem, but your toggling critical path doesn't, then the house is on fire a bit. Like you've drifted apart. Right? So that was kind of the rough concept.**

***Q.*** A second safety check.

***A.*** **Yeah. But the thing is a hybrid sensor can work without functioning critical path, can work without *in situ*. It still performs the AVS function properly. But the *in situs* do not work without the replica or the toggling critical path.**

***Q.*** Okay. So you can't use an *in situ* sensor by itself?

***A.*** **Nope, nope, nope.**

***Q.*** And that's what PPA 1 called for?

***A.*** **Yes.**

***THE COURT REPORTER:*** I'm sorry?

***MS. ROBERTS:*** PPA 1 or Sheida's AVS provisional power

application.

***THE COURT REPORTER:*** I just didn't hear what you said. Thank you.

***BY MS. ROBERTS:***

***Q.*** Okay. So after your team circulated that February analysis, did you think you were all on the same page, that the way forward was using a replica critical path?

***A.*** **Yeah, no, that was my understanding, was Sanjiv was aligned and they were going to replica based and off we go.**

***Q.*** And that was as of February, end of February?

***A.*** **After that meeting, the February 27th meeting with Brad, yeah.**

***Q.*** And at some point in May, did you learn that Mr. Taneja wasn't actually on the same page?

***A.*** **In March?**

***Q.*** I'm sorry, in March, yes.

***A.*** **Yeah. So eventually Sanjiv came back, I think it was relatively -- a couple weeks later, maybe around March 13th or so. I can't remember the exact timeline. Sorry. And he seemed to indicate that there was, you know, a terminology problem and, you know, kind of we can go back to the *in situ* and stuff.**

**And so yeah, it seemed like he -- he drifted off of the replica for some reason.**

***Q.*** Okay. And what did you think of Mr. Taneja's technical capabilities? Do you think he --

***A.*** **Weak at best, yeah.**

***Q.*** So he struggled to understand the concepts that you were discussing?

***A.*** **That's correct, yes.**

***Q.*** Okay. And so once you realized that Mr. Taneja didn't really quite understand your proposal, what did you do?

***A.*** **Yeah, so at that point Brad tasked me with writing a detailed document describing the problems with *in situ* sensors and kind of really deep diving into what's wrong and why we can't and why we have to replicate. And so I created that document.**

***MS. ROBERTS:*** Okay. Can you pull up 2624.

***BY MS. ROBERTS:***

***Q.*** Did anybody else work on this document with you?

***A.*** **Well, I mean with the typing and the drawing in the diagrams. But both Andrew Hughes, I believe, and Brad Quinton would have reviewed it and given feedback.**

***Q.*** And then Brad sent this on -- oh, let's go to page 15.

***THE COURT:*** And it is in evidence.

***BY MS. ROBERTS:***

***Q.*** Can you just like generally summarize what your conclusion was in the report?

***A.*** **Yeah, that *in situ* sensors are insufficient, that you have to replicate.**

***Q.*** Again, consistent with your prior --

**A. Yeah, yeah.**
Q. -- recommendation?
**A. We hadn't changed our view. This was trying to get Sanjiv back aligned and understanding fundamentally what was wrong.**
Q. Is your understanding there was another call with Mr. Taneja after this was circulated?
**A. Yes.**
Q. And after that call, everybody was on the same page?
**A. Yep.**
Q. And so the team was going to go forward with a replica critical path --
**A. Yes.**
Q. -- resolution?
**A. Yeah.**
Q. Okay. I just want to talk about generally how general tech discussions worked at Abreezio.
Who typically participated in the tech meetings at Abreezio? Was it you and Andrew?
**A. Yeah, sorry. It was -- the technology was all driven by Andrew, Brad, and I for the most part, yeah.**
Q. How often would you meet?
**A. Every day.**
Q. Yeah?
**A. Yeah.**
Q. Did Mr. Taneja participate at all in these meetings?

**A. No.**
*Q.* And after that first December 14th meeting with Dr. Arabi, did he participate in any other meetings?
**A. December -- the December 4th?**
*Q.* The go-to meeting.
**A. Yeah. I recall one meeting where Dr. Arabi was there.**
*Q.* Okay. We can talk about that later.
**A. Sure.**
*Q.* Did Ms. Alan ever participate?
**A. Not in any meeting I was in, no.**
*Q.* So all the tech meetings for Abreezio were really your team?
**A. Yes. Yeah.**
*Q.* Okay. Let's talk about the second provisional patent application.
Because Ms. Alan had two, or Ms. Arabi had two?
**A. Yes.**
***MS. ROBERTS:*** Let's pull up Exhibit 831.
***BY MS. ROBERTS:***
*Q.* So did you review this patent as well on February 23rd?
**A. I did but only very briefly. This patent application uses the same sensor that doesn't work in the first patent application. And so -- yeah, it -- beyond that, it was like -- it doesn't work, it doesn't work.**
*Q.* Right.
Was it even more like nonsensical to use it for DFT?

*A.* **Yes. Yeah. I mean, DFT -- use of sensors for DFT, specifically for the TTP and PDF testing, makes no sense.**

*Q.* And why is that?

*A.* **Because TTP and PDF style testing has what's known as almost perfect observability. So what that means is that you can kind of see the result of the test all the time perfectly; right? It's constraint and its limitation is actually on the control side. So it really is -- I'm sorry, I'm getting a bit lost in my head.**

**So Sheida's sensor is meant to enhance observability. So her conception was that you could get better than -- you could get an increase in observability on a perfectly observable structure.**

*Q.* So it didn't need to do it. It was redundant.

*A.* **It didn't help. As a matter of fact, it just wastes cost. It just costs for no benefit.**

*Q.* And so what problem did you think needed to be solved for with DFT? Is it an idea that's observability versus controllability?

*A.* **Yeah. So the problem -- and we didn't -- I didn't think through this right in this instance. That happened a bit later --**

*Q.* Mm-hmm.

*A.* **-- with Brad and Andrew.**

**Yeah, the problem -- the limiting factor on the DFT was a**

**controllability problem, so the imbalance was off. You had really, really, really good observability and bad, bad, bad, bad, bad controllability. So that was the constraint. You wanted to make the control easier.**

*Q.* Right.

So around March 3rd of 2015, were you aware that there was a PowerPoint presentation or initial meeting between Abreezio and Qualcomm?

***A.*** **Yes.**

*Q.* Okay.

***A.*** **Yep.**

*Q.* Do you recall if there was a non-disclosure agreement in place at the time between the two?

***A.*** **I do not believe there was, no. The initial meeting, if I recall correctly, I think it was March 4th. But I'm not -- don't -- I'm not perfect with dates -- was a very high level meeting.**

*Q.* Right.

So they weren't discussing detailed tech. It was just kind of general ideas?

***A.*** **Yep, yeah.**

*Q.* Did you attend this meeting?

***A.*** **I did not.**

*Q.* Who did?

***A.*** **Brad Quinton and Sanjiv.**

***Q.*** And after that meeting occurred, did Brad report back to you?
***A.*** **Yes.**
***Q.*** And what did he tell you?
***MS. CHOPRA:*** Objection. Hearsay.
***THE COURT:*** Sustained.
***BY MS. ROBERTS:***
***Q.*** Did you -- what did you learn from Brad as to what Qualcomm's concerns were after the meeting?
***A.*** **What I recall from that meeting was --**
***MS. CHOPRA:*** Objection. Hearsay.
***THE COURT:*** Sustained.
***BY MS. ROBERTS:***
***Q.*** Did you get a sense of what Qualcomm's concerns were with DFT?
***A.*** **Yes. Qualcomm questioned --**
***MS. CHOPRA:*** Objection. Hearsay.
***THE COURT:*** Sustained.
***BY MS. ROBERTS:***
***Q.*** Did -- after that meeting did Brad ask you to look into DFT further?
***A.*** **Yes.**
***Q.*** And what did he ask you to do?
***A.*** **Brad came out and said that --**
***MS. CHOPRA:*** Objection. Hearsay.

***THE COURT:*** Well, the question is: What did he ask you to do?

And I'll overrule hearsay if you just tell us what he asked you to do. Not why or what he learned at the meeting, but what did he ask you to do?

***THE WITNESS:*** Sorry. I'm a bit -- the problem is that I wasn't really asked to do something.

***THE COURT:*** Okay, then that's your answer.

***THE WITNESS:*** Okay.

***THE COURT:*** Thank you.

***BY MS. ROBERTS:***

***Q.*** What did you do -- did you look into DFT further?

***A.*** **Yes.**

***Q.*** Okay. What did your team do to look into DFT further?

***A.*** **We started to analyze whether *in situ* sensors were at all useful for TDF. And to do so, we started to break down -- we started with a quick -- not even a quick.**

**We started with an analysis of what TDF-style testing was because we wanted to make really sure that we really understood that we hadn't made a mistake; right? People make mistakes. We could have made a mistake when I say observability sensors, *in situ* sensors, or any sensors don't help with a TDF problem because they already have perfect observability.**

**So we started to break TDF down to kind of first principle analysis, saying what is it, what's happening, where is the test**

input coming from, where is the test output being stored, what's going on. Right?

And so we broke that down. And this is where we kind of stood back and said, okay, for sure, *in situ* sensors don't help with TDF for sure. We were -- the perfect observability is true. Adding additional observability doesn't help.

And then we started to think it through and say, okay, yep, especially for TDF, it's a controllability problem. It is complicated to get the right pattern in to perform the right test. So the right input settings are hard to make happen to test the -- for the defect you're looking for.

And so then we started to think about how you could address that problem. Is there something you could do to make controllability easier? And so we discussed a few things like, well, you know, you could take control off of existing DFT structures, not functional structures, which TDF traditionally does. So use what's known as a scan chain to get additional controllability. And we discussed, you know, test points and all these other sorts of things.

But the end of that meeting was pretty much, to the best of my recollection, that really, really, really the insight there was there's this imbalance that exists. And it's this -- there's too much observability and not enough controllability.

And so that started the kind of process of thinking, you know, like I said, where can you get better controllability,

**what can you do. And so that was kind of the end of that after -- after the Qualcomm meeting brainstorming meeting.**

*Q.* Yeah.

So after that initial brainstorm meeting, did Andrew Hughes come up with a grand idea?

***A.*** **Oh, did he ever.**

*Q.* Yeah.

***A.*** **Sorry. Is somebody objecting? Sorry.**

*Q.* Okay. So tell us --

***A.*** **Sorry. No, no.**

**Within a few days, Andrew came in and he started -- he kind of went up to the whiteboard and worked with Brad and I, and he described this idea he had. And I -- I love this idea. It is -- it is DFTBreez. I'll reveal it upfront. And it is -- it is elegant, and it is beautiful, and it -- I just absolutely adore this solution.**

**And so the idea was that you could segment the DFT structure into partitions and use those partitions to rebalance the observability and controllability trade-off through the reuse of existing scan chain infrastructure. And it's just one of those ideas where somebody describes it to you and you see it and it's like yeah. Yeah.**

**And you don't know it's going to work, but you're like, yeah, that's -- that's something. We should chase that. And I honestly, I'm -- I'm really jealous of Andrew on that one. It**

**was -- it was an amazing thing. I look back at DFTBreez, I look back at that moment in my semiconductor career, that -- that was a great. That was like wow. That's cool to be a part of. And I contributed a little.**

***Q.*** Right, right.

So in, like, your career of being a very accomplished engineer over decades, I mean, how would you rate this as the level of importance of an idea? The top three?

***A.* Oh, it's -- honestly, yeah, easily the top three. It's the top. I would have to be honest. It's the top. I just -- I'm just glad I was a part of it.**

***Q.*** Did you think this idea would have universal appeal to all semiconductor companies?

***MS. CHOPRA:*** Objection. Foundation.

***THE COURT:*** Sustained.

***BY MS. ROBERTS:***

***Q.*** As of -- was Abreezio intended to -- what kind of companies did Abreezio intend to pitch?

***A.* Oh, pretty much -- they could pitch to pretty much any semiconductor company that did manufacturing tests on advanced process nodes. But companies with -- that did TDF would want DFTBreez.**

**Effectively, what DFTBreez does is it allows --**

***THE COURT:*** I think the question is -- just because we're going to try and keep you off the stand for days and days

on end, limit your answer to the question that's asked.
So the question at this point was -- I think you've answered it.
***THE WITNESS:*** Okay. Sure. Sorry.
***THE COURT:*** No, that's okay.
***BY MS. ROBERTS:***
***Q.*** Did you think DFT would have real value?
***A.*** **DFTBreez?**
***Q.*** DFTBreez, yeah.
***A.*** **Yes. Yeah.**
***Q.*** Who did you think it would have value for?
***A.*** **Apple, Broadcom, Intel, Nvidia, Xylinx, Cisco. You name the big semiconductor company with high volume, and they're going to be interested, yep.**
***Q.*** And why is that? Why would it have such universal appeal?
***A.*** **Because it made -- is making your device cost less. A test cost is a cost. And DFTBreez made tests more efficient.**
***Q.*** So after this initial March 3rd meeting with Qualcomm and Andrew had his breakthrough idea, did you start drafting provisional patent applications?
***A.*** **Yes.**
***Q.*** And who assisted you with drafting these applications?
***A.*** **Who assisted myself?**
***Q.*** Yeah.
***A.*** **Well, the people drafting the applications were myself and**

**Andrew Hughes as far as I recall.**

***MS. ROBERTS:*** Can we pull up 2362.

Is it in evidence?

***THE COURT:*** It is.

***MS. ROBERTS:*** Okay.

***BY MS. ROBERTS:***

***Q.*** So this is an email from Brad to Mr. Taneja?

***A.*** **Yes.**

***Q.*** Can you read the text?

***A.*** **"Subject finalized provisionals."**

***THE COURT:*** You know, it's in evidence, Counsel. I'm not sure having him read it is necessary.

***BY MS. ROBERTS:***

***Q.*** Okay. If you could scroll down.

There's -- so there's four provisionals that are attached here?

***A.*** **Yes.**

***Q.*** Can you just describe in sort of very general terms what these four provisionals cover?

***A.*** **Sure.**

***Q.*** How about this first one.

***A.*** **So this would be the hybrid sensor concept that uses the toggling critical path or replica path along with potentially functional critical path or *in situ* style sensors.**

***Q.*** Okay. And this was based on the *in situ* sensor idea that

you came up with in February?
***A.*** **Yeah, yeah.**
***Q.*** In combination with the replica?
***A.*** **Yes. Sheida's sensor was kind of DOA. We had thrown it out and moved on.**
***Q.*** Okay. Can you scroll down to the second provisional application.
Or the second -- yeah. What is this one about?
***A.*** **This is DFTBreez.**
***Q.*** Okay. Andrew's idea?
***A.*** **Yeah.**
***Q.*** Okay. How about the third?
***A.*** **Ah, yes. Should I wait for a question? Sorry.**
***Q.*** What is this one about?
***A.*** **Oh. This is what's known as a windowed transition detection sensor. So this was our attempt to solve the *in situ* problem of only stopping the stopwatch once. This allowed for more stop-watching.**
***Q.*** So this is another Invionics idea in?
***A.*** **Oh, yeah, yeah.**
***Q.*** Okay. And then how about the next one.
What's this one about?
***A.*** **This, I believe, is the application that covered the new sensor idea from February 23rd.**
***Q.*** Okay.

**A. That was the one in the PowerPoint slide.**
*Q.* And the one from the February 27th PowerPoint?
**A. Yes, yes. Sorry. The one we came up with on the 23rd, that very first day, yeah, it was in the 27th PowerPoint.**
*Q.* Okay. Can you go back to the email.
And look at the date on this. So it's March 19th at 5:34 a.m.?
**A. Yes.**
*Q.* Okay.
**A. Yep.**
*Q.* And why are you circulating these draft provisional patent applications on the 19th? Was there a big meeting coming up?
**A. There was a meeting on March 20th with Qualcomm. And it was going to go more deeply into the technology. And so we wanted to get these to Sanjiv so he could file them and have patent protection on those ideas before we talked to Qualcomm.**
*Q.* And why did you need to have them filed before the meeting?
**A. Because if you don't, you don't -- you haven't claimed your IP rights to the technology by that point. And so in theory, Qualcomm could go and take your ideas which you've talked to them about and go file patents on their own them and claim the IP rights.**
*Q.* Okay. Let's talk about the application process you used to draft these applications.
**A. Mm-hmm.**

*Q.* Can you tell us generally how you would draft these provisional applications? Did you start with a template?
**A. Yeah, yeah. I would start with an existing document and create a copy of it. So I believe for these ones I started with what we're referring to as PPA 1, Sheida's patent application.**
**So I would take that document, make a copy of it, open it up, and then kind of hack it and put in the new stuff and leave in any descriptive stuff that didn't matter.**
*Q.* And that was pretty standard from what you had done in your prior employments too?
**A. Oh, yeah. That's my standard practice.**
*Q.* Just use an existing template to create a new document?
**A. Not even a template. I would just use an existing document that had the formatting I wanted and open it up and cut out the text I didn't want and add my own text in.**
*Q.* Okay. So what happens -- so would the metadata of the original template that you used transfer to these new provisional patent applications?
**A. Yes. I believe so, yeah.**
*Q.* Just because you used the initial provisional patent application as a template?
**A. Yeah.**
*Q.* Okay. Does this impact the claim, the new claim ideas and any of the new ideas?
**A. No.**

***Q.*** Why not?
***A.*** **Well, it's just metadata on a document. But further to that and deeper to that is that the inventor doesn't have to author the patent application or the patent or the non-provisional patent. Authorship is not inventorship.**
***Q.*** Can you explain that in more detail?
***A.*** **Yeah.**
***MS. CHOPRA:*** Objection, your Honor. Unnoticed expert testimony.
***THE COURT:*** Sustained.
***BY MS. ROBERTS:***
***Q.*** Would it surprise you if there was text in the provisional patents that Invionics drafted that was similar to what had been in Ms. Alan's first patent applications?
***A.*** **No, no, no, not at all.**
***Q.*** Why not?
***A.*** **Because I was lazy and I just reused sections. Like the background section, I would just reuse it. It's describing the space and whatever and it doesn't matter.**
***Q.*** The background section is just -- what is the purpose of the background sections?
***A.*** **It will -- well, I'm saying that a bit loosely, I suppose, and I should be careful. Provisional patents have no real required structure. But in general in those applications, the background section was just kind of describing the space and the**

**background to the problem you're trying to address. Right?**

**So for the new -- take, for example, the new *in situ* sensor. I would just reuse that description and then put the new sensor in later where we're kind of describing what --**

***Q.*** And what part of the application would the new ideas be in?

***A.*** **Oh, again, in these ones it would be kind of in the claims section.**

***Q.*** Okay. Do you know how many total non-provisional patent applications Abreezio filed?

***A.*** **I don't off the top of my head. But it would -- non-provisionals?**

***Q.*** Let's start with provisionals.

***A.*** **I don't know that number either. But I'm guessing around ten or so.**

***Q.*** Okay.

***A.*** **I can't remember the exact number. Sorry.**

***Q.*** And Ms. Alan was only on two of those?

***A.*** **Yes.**

***Q.*** And the rest of the provisional patents were drafted by do you know who?

***A.*** **The Invionics team.**

***THE COURT:*** I'm sorry?

***THE WITNESS:*** The Invionics team.

***THE COURT:*** Okay.

///

***BY MS. ROBERTS:***

***Q.*** And do you know how many non-provisional patent applications would have been drafted by Abreezio?

***A.*** **Again, I don't know that number.**

***Q.*** Was it close to a dozen?

***A.*** **It going to be -- I would guess it's ten-ish, yeah, ten or so.**

***Q.*** Okay. When you were drafting the applications, do you -- so you personally did some of the work; right?

***A.*** **Yes.**

***Q.*** But lawyers also helped you draft up the applications?

***A.*** **For the non-provisionals, yeah, there, was a patent attorney involved, I believe.**

***Q.*** Was there a patent attorney that was involved for the provisionals?

***A.*** **I don't recall a patent attorney being involved. We did that work at Invionics.**

***Q.*** Okay. And how do you determine who is an inventor on a listed provisional or non-provisional?

***MS. CHOPRA:*** Objection. Unnoticed expert testimony.

***THE COURT:*** Sustained.

***BY MS. ROBERTS:***

***Q.*** Was Ms. Alan listed as an inventor on any of the new provisional patent applications --

***A.*** **No.**

*Q.* -- that you prepared?
**A. No.**
*Q.* And why not?
**A. Because she did not contribute.**
*Q.* Was Dr. Arabi listed as an inventor on any of the provisional patent applications that you drafted?
**A. No.**
*Q.* And why not?
**A. Because he did not contribute.**
*Q.* Okay. Is Sanjiv Taneja listed as an inventor on some of the applications?
**A. Yes.**
*Q.* And why is that?
**A. Well, Sanjiv was CEO of Abreezio, and he was talking to customers and interacting with them and then talking to Brad. And Brad spent a bunch of time explaining the technology to him. There was a lot of conversations there. So I don't know of any contribution Sanjiv made, but I can't say he didn't. Right?**
**And then in the end, in that event, I think it's better to be a bit conservative and say, well, you don't want to deny someone their rights by leaving them off the patent application. And so you would -- I would generally put them on.**
**And it's a fixable thing. If it's wrong, you can go and address it. In fact, Qualcomm did so for one of our patents. They left off Mike Lee and later added him after it had been**

**granted. So it's a fixable problem.**

**And all of us were assigning our IP rights to Abreezio. So there was no contention there.**

***Q.*** So who did you understand owned the inventions that your team came up with?

***A.*** **Oh, Abreezio.**

***Q.*** And why was that?

***A.*** **Well, we were being paid to innovate on behalf of Abreezio. And my understanding is we had an invention assignment agreement in place. So we worked, we did our job and created the IP for Abreezio.**

***MS. ROBERTS:*** This would be a good place to stop.

***THE COURT:*** Okay. Ladies and gentlemen, if you could be back tomorrow morning at 9:00 o'clock. You're reminded not to discuss the case with anyone, not to look up anything about the case. And we'll see you tomorrow morning at 9:00 o'clock.

***(End of requested testimony.)***

***

*REPORTER'S CERTIFICATE*

I, Anne Roldan, certify that I am a duly qualified and acting Official Court Reporter for the United States District Court, that the foregoing is a true and accurate transcript of the proceedings as taken by me in the above-entitled matter on March 31, 2025; and that the format used complies with the rules and requirements of the United States Judicial Conference.

Date: April 3, 2025

*Anne Roldan, RMR, CRR, CSR 13095*