UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, Plaintiff, vs. KARIM ARABI, Defendant.

Case No. 22-cr-1152-BAS

April 1, 2025

Trial Testimony of Trent McClements

REPORTER'S TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CYNTHIA A. BASHANT
CHIEF DISTRICT JUDGE

VOLUME 2, PAGES 64 - 201

APPEARANCES:

FOR PLAINTIFF: UNITED STATES ATTORNEY'S OFFICE
880 Front Street, Suite 6293
San Diego, California 92101
*By: NICHOLAS W. PILCHAK, AUSA*
*JANAKI G. CHOPRA, AUSA*
*ERIC R. OLAH, AUSA*

FOR DEFENDANT: BIENERT KATZMAN LITTRELL WILLIAMS, LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
*By: WHITNEY Z. BERNSTEIN, Esq.*
*REBECCA S. ROBERTS, Esq.*
*RYAN V. FRASER, Esq.*

REPORTED BY:

ANNE MARIE ROLDAN, RMR, CRR, CSR 13095
U.S. OFFICIAL COURT REPORTER
U.S. District Court Clerk's Office
333 West Broadway, Suite 420
San Diego, California 92101

Reported stenographically; transcribed with CAT software.

# I N D E X

***

## E X A M I N A T I O N S


| WITNESS | VOL. | PAGE | LINE |
|---|---|---|---|
| *FOR THE DEFENSE:* | | | |
| TRENT MCCLEMENTS | | | |
| Direct by Ms. Roberts | 2 | 66 | 13 |
| Cross by Ms. Chopra | 2 | 123 | 23 |
| Redirect by Ms. Roberts | 2 | 197 | 6 |


## E X H I B I T S


| ADMITTED | VOL. | PAGE | LINE |
|---|---|---|---|
| Ex. 234 | 2 | 72 | 11 |
| Ex. 903A | 2 | 155 | 22 |
| Ex. 2010 | 2 | 103 | 11 |
| Ex. 2010A | 2 | 103 | 11 |
| Ex. 2044 | 2 | 110 | 11 |
| Ex. 2057 | 2 | 90 | 13 |
| Ex. 2097 | 2 | 111 | 11 |
| Ex. 2165 | 2 | 106 | 10 |
| Ex. 2273 | 2 | 98 | 13 |
| Ex. 2329 | 2 | 112 | 22 |
| Ex. 3351 | 2 | 69 | 24 |

***<u>TUESDAY, APRIL 1, 2025, 9:03 A.M.</u>***

***

***THE COURT:*** Okay. Let's bring the jury in.

***(Jury in at 9:00 a.m.)***

***THE COURT:*** Okay. You may come back on the witness stand. You are reminded you are still under oath to tell the truth.

All the jurors are present. Dr. Arabi is present. The attorneys are present. Have a seat. You can adjust that microphone again.

***THE WITNESS:*** Okay. Thanks.

***DIRECT EXAMINATION***

***BY MS. ROBERTS:***

***Q.*** Good morning, Mr. McClements.

***A.*** **Good morning.**

***Q.*** You and I have not spoken since yesterday.

***A.*** **That's correct, yeah.**

***Q.*** I want to go back to the early provisional patent applications you drafted in March.

***MS. ROBERTS:*** If you could please pull up Exhibit 2362.

***BY MS. ROBERTS:***

***Q.*** We looked at this email that Mr. Quinton sends to Mr. Taneja.

What is the time?

**A. It is March 19th, 2015, at 5:34 a.m.**

***Q.*** Okay. And then in the email, he writes, "These provisional patents are not meant to have exhaustive claims, just to demonstrate the timeline of the core invention."

What did you understand him to mean by that?

***A.* Well, with the provisional, you don't need to have the complete invention completely fleshed out with exhaustive claims covering everything.**

***THE COURT:*** I'm going to ask you to bring that microphone a little bit closer. You're kind of quiet. It's a big courtroom.

***THE WITNESS:*** Fair enough.

And so what we were doing was getting the patents, kind of the core idea of the patent -- or the core idea of the invention into the provisional so we can get the stake in the ground and get the priority date.

***MS. ROBERTS:*** Sound goods.

Can you scroll down to the hybrid sensor attachment?

***BY MS. ROBERTS:***

***Q.*** Can you just generally explain what this patent -- provisional patent application was about again?

***A.* The hybrid sensor was the use of the toggling critical path replica along with the functional critical path sensors. You could use some or none along with it.**

***MS. ROBERTS:*** Okay. If you could scroll down to

pages 9 and 10.

***BY MS. ROBERTS:***

***Q.*** So these appear to be figures.

***A.*** **Yes.**

***Q.*** And I see three on this page.

***MS. ROBERTS:*** And can you go to the next page?

***BY MS. ROBERTS:***

***Q.*** And I see two on these pages.

What are these figures?

***A.*** **Well, these are just different embodiments of types of replica paths with toggling inputs.**

***Q.*** So they're already known concept of toggling?

***A.*** **Toggling, oh, yes.**

***Q.*** Yeah.

***A.*** **Yeah, yes.**

***Q.*** So there's nothing really novel about these figures?

***A.*** **Not particularly novel. It's -- they're embodiments of replica paths with a toggling input. We use some different structures, like LFSRs instead of just a standard kind of flop with a single loop back to do different types of pattern generation into the input logic. I mean, they're just embodiments of a replica, different ways you can do it.**

***MS. ROBERTS:*** Okay. And then can you go up to the claims section of this document?

///

***BY MS. ROBERTS:***

***Q.*** Okay. So on this page, you can see Summary of Claims. What is this section about?

***A.*** **Well, it's just an attempt to describe some of the claims we would potentially make in the non-provisional. A provisional doesn't really have any fixed format. But we kind of just listed out the claims that we believe might be novel.**

***Q.*** Okay.

***A.*** **And you're just kind of throwing them in there and describing the invention that way.**

***Q.*** So this is where the description of the invention would be?

***A.*** **Yeah, yeah, yeah.**

***Q.*** Okay. After you sent these provisional patent applications to Brad, and he forwarded them on to Taneja on the 19th, do you recall receiving a handwritten drawing at some point after that?

***A.*** **I do, yeah.**

***MS. ROBERTS:*** Okay. Let's pull up 3351.

***BY MS. ROBERTS:***

***Q.*** Is this email addressed to you at the top?

***A.*** **Yes, it is.**

***MS. ROBERTS:*** Move to admit.

***MS. CHOPRA:*** No objection.

***THE COURT:*** 3351 may be admitted.

***(Exhibit 3351 admitted.)***

***MS. ROBERTS:*** Okay. So now, let's scroll all the way

down to the bottom of this chain. We'll go back. One more. The next page, right here.

***BY MS. ROBERTS:***

***Q.*** So if you look at the bottom of this email chain, it looks like Mr. Taneja forward this drawing to Mr. Quinton on the 3rd.

***A.*** **That looks correct, yeah.**

***Q.*** You never received a copy of the drawing around the 3rd?

***A.*** **No, I did not.**

***Q.*** Okay. So, then, if you look at the top, you go to the next paragraph, it looks like Mr. Taneja is again forwarding the same drawing to Mr. Quinton and Mr. Hughes.

Can you read the date and time?

***A.*** **March 19th, 2015, at 10:51 a.m.**

***Q.*** So this is after your provisional patent application drafts have already been circulated?

***A.*** **That's correct, yes.**

***MS. ROBERTS:*** Okay. Let's go down to the drawing.

***BY MS. ROBERTS:***

***Q.*** What do you think of this drawing?

***A.*** **The replica?**

***Q.*** Yeah. So if you'd look at the first part, the top part of the drawing, have you seen that before?

***A.*** **Yeah. That's our sensor that we came up with on February 23rd.**

***Q.*** Okay. The one that you circulated in the PowerPoint?

***A.*** **Yes, that's correct.**
***Q.*** So it's essentially an echo of what was circulated then?
***A.*** **Yeah.**
***Q.*** And then what do you think of the drawing that's below it?
***A.*** **That is another embodiment of a replica path. And, I mean, there's nothing there. I wouldn't do it that way, but you could. So it's, like, yeah.**
***Q.*** Okay. But you don't see anything new or novel in that drawing?
***A.*** **Oh, no, no.**
***Q.*** Okay.
***MS. ROBERTS:*** So go back up to the top of the email.
***BY MS. ROBERTS:***
***Q.*** So after Mr. Taneja sends this drawing to Mr. Quinton and Mr. Hughes, Brad forwards it to you.
***A.*** **Mm-hmm.**
***Q.*** And what does he ask you to do?
***A.*** **He asked me to make the edit that Sanjiv is requesting because Andrew is working on a different application.**
***Q.*** Probably another one of the provisional patent applications?
***A.*** **Yes, yes. Remember, at this point, we're trying to get these in so Sanjiv can file them before the meeting with Qualcomm the next day. So we're kind of rushing to get this done.**
***Q.*** Okay. So if you look at the time stamp of that email, when

Brad sends it to you, can you read that time?

**A. It's March 19th, 2015, at 11:06 a.m.**

***MS. ROBERTS:*** Okay. So let's look at Government Exhibit 234.

***BY MS. ROBERTS:***

***Q.*** If you look at the bottom of this email --

***THE COURT:*** 234 is not in evidence, just so you know.

***MS. ROBERTS:*** Okay. Move to admit.

***MS. CHOPRA:*** No objection.

***THE COURT:*** 234 may be admitted.

***(Exhibit 234 admitted.)***

***BY MS. ROBERTS:***

***Q.*** So can you read the bottom of that email?

**A. Yes. "Document update attached and on Google Drive. Sorry for the miss on this one."**

***Q.*** Okay. I'll back up a second.

When you received that handwritten drawing, how did you feel?

**A. A bit annoyed.**

***Q.*** Why --

***THE COURT:*** I can't hear what you're saying. Talk into the microphone.

***THE WITNESS:*** I was a bit annoyed, to be honest, because it's obviously superfluous. And then I was also a little frustrated because the client had come back and deemed my

work kind of incomplete. And that -- I don't know. It wasn't. But I felt a little bit bad about that, because just another back and forth with Sanjiv that -- yeah, so that was a bit frustrating.

So I kind of did an eye roll and put the diagram in because it was faster to do that than to argue it doesn't need to be added.

***BY MS. ROBERTS:***

***Q.*** But you didn't see that it contributed anything more to the application?

***A.*** **No, no.**

***Q.*** Okay. And can you look at the time stamp on that?

***A.*** **It's March 19th, 2015, at 12:02.**

***Q.*** So within an hour of receiving Brad's -- Brad Quinton's request that you make that edit to the hybrid, you implemented the change.

***A.*** **Yes, yes. As I said, my recollection is we were in a rush to get these done; right? And so we wanted to get the patents to Sanjiv so he could file them in preparation for the meeting tomorrow -- or the next day. Sorry.**

***Q.*** And that edit wasn't made to any of the claims in the patent.

***A.*** **Not that I recall, no.**

***Q.*** It was just another figure.

***A.*** **Just another figure, yeah.**

***Q.*** One of -- in addition to the five that you had already had in the draft.
***A.*** **Yes, as far as I recall.**
***Q.*** I'm going to jump a little bit.
***MS. ROBERTS:*** Can you pull up Exhibit 864? I think I'm going to use the ELMO for part of this.
***BY MS. ROBERTS:***
***Q.*** Okay. So those four provisional patent applications weren't the only ones that your team put together; right?
***A.*** **That's correct, yes.**
***Q.*** You guys went on to file a whole bunch more provisional and non-provisional patents.
***A.*** **Yep.**
***Q.*** I'm going to show you what is Exhibit 864, which is the Unit Purchase Agreement.
***A.*** **Okay.**
***Q.*** Okay. And then I'm going to show on the ELMO the list of all the various applications in -- the provisional and non-provisional applications that were listed in the acquisition.
***A.*** **Okay.**
***Q.*** Okay. So here is the first one.
***THE CLERK:*** Is this a page out of 864?
***MS. ROBERTS:*** Yes.
***THE COURT:*** Is that a yes? I didn't --

***MS. ROBERTS:*** Oh, I'm sorry. Yes.

***THE COURT:*** Thank you.

***MR. PILCHAK:*** It's page 159.

***THE COURT:*** I just wanted to make sure there was an answer.

***MS. ROBERTS:*** Yes. It's Section 3.9 of the UPA, which outlines all the --

***THE COURT:*** It's all right. I just wanted to know whether you answered the question.

***MS. CHOPRA:*** It should be page 159, for the record.

***THE COURT:*** Okay. Thanks.

***BY MS. ROBERTS:***

***Q.*** Okay. So the first part of this document lists all the non-provisional patent applications, the ones that are applications for actual patents; is that right?

***MS. CHOPRA:*** Objection. Leading.

***THE COURT:*** Sustained.

***BY MS. ROBERTS:***

***Q.*** Okay. What is listed on this page, as far as you understand?

***A.*** **There is a list of patent applications. I believe these are the non-provisionals.**

***Q.*** Okay. And what is a non-provisional patent application?

***A.*** **A non-provisional patent application is the application that gets reviewed by the Patent Office and leads to the actual**

**granted patent.**

***Q.*** Okay. Let's count the number that's in here. One, two, three, four, five, six, seven, eight, nine, ten, 11, 12, 13.

So would you agree that within the portfolio of provisional and non-provisional patent applications that Abreezio sold to Qualcomm, there were 13 non-provisional patent applications?

***A.*** **Yes.**

***Q.*** Okay. Now, let's count the provisional applications. So one, two, three, four, five, six, seven, eight,
nine, ten, 11, 12, 13.

Would you agree there was also 13 non-provisional patent applications?

***THE COURT:*** Non-provisional or provisional?

***MS. ROBERTS:*** I'm sorry, provisional.

***THE WITNESS:*** Yes.

***BY MS. ROBERTS:***

***Q.*** Okay. So within the portfolio, there was a total of 26?

***A.*** **Provisional and non-provisional applications, yes.**

***Q.*** Okay. And so the two provisionals that listed Sheida Alan as the inventor, or Sheida Arabi, they are the ones that were filed in December; right?

***MS. CHOPRA:*** Objection. Leading.

***THE COURT:*** Sustained.

***BY MS. ROBERTS:***

***Q.*** Okay. If you look at Number 1 and Number 2 --

***THE COURT:*** Number 1 and Number 2 of the provisional applications?

***MS. ROBERTS:*** Of the provisionals, yeah.

***BY MS. ROBERTS:***

***Q.*** Do you see the "Circuitry and method for critical path timing speculation to enable process variation compensation via voltage scaling"?

And that was filed on December 22nd, 2014?

***A.*** **Sorry, what was the question?**

***Q.*** What is that provisional patent application?

***A.*** **That is the provisional patent application that Sheida filed --**

***Q.*** Okay.

***A.*** **-- for AVS.**

***Q.*** And if you look at the one below, the one that says, "Timing fault coverage enhancement through test point insertion," which provisional application is that?

***A.*** **That is Sheida -- Sheida's second.**

***Q.*** So of the 13 provisional, only two list Sheida Alan as the coinventor?

***A.*** **That's correct, yes.**

***Q.*** Okay. Now, if you look at all the provisionals that are listed below that, what dates were these all filed on?

***A.*** **Various dates in 2015.**

***Q.*** Okay. So if we count -- if we look at the April 13th date,

we can count one, two, three -- oh, sorry -- one, two, three, four, five that were filed in April.

**A. That's right.**

*Q.* Okay. And then we can count -- in June, we can count one, two, three -- three more that were filed in June.

**A. Yes.**

*Q.* Were those three that were filed in June prepared by the Invionics team?

**A. Yes.**

*Q.* Not Ms. Alan?

**A. That's correct.**

*Q.* Okay. And then you have another two that were filed in July; right?

**A. Yes.**

*Q.* July 19th, one, two, and then also this guy *(indicating)*, Number 5?

**A. That's correct.**

*Q.* So you had another three provisional patent applications, and these were all prepared by the Invionics team?

**A. Yes.**

*Q.* Okay. Now let's go to the non-provisionals.

Do you recall how many non-provisional patent applications Sheida's provisionals were referenced in?

**A. My recollection is one.**

*Q.* Okay. If I said that there were two, would that also

potentially be accurate?

***A.*** **That's possible, yes.**

***Q.*** Okay. If you look at the first, Number 1 here, the "Circuitry and method for critical path timing speculation to enable process variation compensation via voltage scaling," do you remember whether Sheida's provisional would have been referenced in that?

***A.*** **Yes. I believe that would have been -- it would have included Sheida's provisional.**

***Q.*** Okay. If you thought that Sheida's ideas were so terrible, why would you reference her provisional patent in the non-provisional application?

***A.*** **Because you want to pull -- it's called pulling through the application date. So you want as early a date as possible to claim your invention. And so you can kind of pull through these patent applications into other applications, and then when they actually get analyzed and kind of utilized or contested, the claims get -- as far as I understand it, the claims get drawn back to try and -- sorry. I'm a little off today.**

**So it seems a bit weird, but you can pull through the date from a provisional into a non-provisional. And there will be multiple potential provisionals attached to a non-provisional. And so as long as they're kind of related, and you can -- you can pull through that provisional application into the non-provisional, and then potentially utilize the filing date --**

***Q.*** Okay.

**A. -- when the patent itself gets contested. So the examiner doesn't actually look at the provisionals. They only examine the non-provisionals.**

***Q.*** Okay.

**A. And so then the non-provisional goes through, and the patent is either granted or rejected, and the claims get analyzed by the patent examiner. And some are removed and some go through.**

**And then whenever the patent gets contested, you can then open up the non-provisional and see if the claims relate back to that one. So there's no harm in doing them. It just opens up the possibility of getting the earlier date.**

***Q.*** Okay. Makes sense.

So this non-provisional patent would have also referenced other provisionals that the Invionics team did?

**A. Yes.**

***Q.*** Okay. So it wasn't just based on Sheida's invention.

**A. No.**

***Q.*** Okay. I want to look at another page. This is just the following page from the provisional -- the listing of the provisional patent applications.

Will you tell me what this section is on 6?

**A. So I believe those are our patent application assignment agreements. So we're assigning our IP rights --**

***MS. CHOPRA:*** Your Honor, objection. Foundation.

***THE COURT:*** Sustained.

***BY MS. ROBERTS:***

***Q.*** Did you review -- did you sign the UPA Agreement?

***A.*** **I did not.**

***Q.*** Have you seen the UPA Agreement before?

***A.*** **I believe I have, yeah.**

***Q.*** Do you recall reviewing the assignment -- this section of the Assignment Agreement?

***A.*** **Review it? No.**

***Q.*** Okay. All right. So based on what we just discussed on this listing, it's fair to say that Invionics was behind -- or drafted and conceptualized at least 11 of the provisional patents -- applications that were part of Abreezio's portfolio?

***A.*** **Yes.**

***Q.*** And 13 of the non-provisional patent applications that were part of Abreezio's portfolio?

***A.*** **Yes. We drafted the 13 with the assistance of a patent attorney, I believe.**

***Q.*** Okay. So after you had drafted the first four -- the next four provisional patent applications, was there another presentation to Qualcomm?

***A.*** **Yes. There was a presentation to Qualcomm on April 15th.**

***Q.*** Okay. Was there one on March 21st, do you recall?

***A.*** **March 21st -- oh, sorry. Yes. I skipped ahead in time.**

**After the four provisional patents were written and passed**

**off to Sanjiv, on March 20th, there was a -- there was a meeting, a presentation to Qualcomm.**

***Q.*** Okay. Did you attend this meeting?

***A.*** **No, I did not.**

***Q.*** Did you help prepare the pitch deck or the PowerPoint?

***A.*** **I believe so, yeah.**

***Q.*** Okay.

***MS. ROBERTS:*** Okay. Can we pull up 2598? And scroll down to the deck.

***BY MS. ROBERTS:***

***Q.*** Is this the deck that you worked on?

***A.*** **I believe that is, yeah.**

***MS. ROBERTS:*** Move to admit.

***THE COURT:*** It's in already.

***MS. ROBERTS:*** Oh, it's in already. Okay.

***BY MS. ROBERTS:***

***Q.*** If you look at Slide 4 of this deck.

***MS. ROBERTS:*** Would you go back one? Oh, you can go forward.

***BY MS. ROBERTS:***

***Q.*** What do you understand this slide to be talking about?

***A.*** **Actually, I'm really sorry. I thought this was a different slide deck. I don't think I helped with this one.**

***Q.*** Okay. That's fine. We can move on.

So after the March 21st presentation to Qualcomm, did your

team work on a demo?

**A. Yes. Yeah, we worked.**

*Q.* And was it a demo that's called a Field Programmable Gate Array?

**A. Yes, it was an FPGA demo.**

*Q.* Okay. Can you describe what an FPGA demo is?

**A. Well, an FPGA is -- so silicon semiconductor products are typically fixed function. So an FPGA allows you to change the function of a chip and what it does.**

**And so to show the TruSens technology, we conceived of the idea to create an FPGA demo, which would allow us to create a circuit that would -- we could control. And we would know when it is starting to show timing failures in normal mode, and then we could put in Abreezio technology and show how you could adapt the voltage, and the Abreezio sensors would detect the change and anticipate any potential timing failures.**

**And so we used an FPGA platform because we didn't have time to fabricate a whole chip. So this -- FPGAs allow to you really quickly prototype and demonstrate stuff like that.**

*Q.* Can you generally describe what an FPGA demo looks like?

**A. Sure. It's really -- it looks like the circuit board inside a computer. This one in particular, it was a board about this big *(indicating)* and it had little tiny feet on it.**

**And it was a circuit board that had an FPGA and a bunch of electronic components and some connectors. And that was about**

**it.**

*Q.* Did you build it?

***A.*** **Yes. I architected the concept of the demo, and I did the initial implementation of it, got it kind of up and running, designed the software drivers, and the software stack.**

**And then eventually, I passed that off to my colleague at Invionics, Mike Smith. And Mike took that and made it -- enhanced it and made it robust, and created the user interface, and kind of packaged the whole thing.**

*Q.* And what version of the TruSens concepts did you implement into that FPGA demo?

***A.*** **It was the replica.**

*Q.* So your idea of the replica critical path?

***A.*** **Yes, yeah.**

*Q.* Not the *in situ* sensor idea.

***A.*** **Well, not -- so it would have been the hybrid. So you would potentially have the functional critical path, too, right, but the core, the thing you have to have, the thing that's there is the toggling critical path. It doesn't work without it; right? So yeah.**

**So we wanted to compare and contrast the two and show that an FCP would fail in an event where there wasn't any switching activity, so then the toggling critical path would hold.**

**So I believe -- I mean, it was 10 years ago that I wrote that code, and so that's my recollection of what was in there.**

**There's a bunch of different ways to show a functional critical path failure. So yeah.**

**But the concept that was being displayed and shown and demonstrated was the toggling critical path is what you use.**

***Q.*** Okay. And so the FPGA demo would have had source code?

***A.*** **Oh, yes, yeah.**

***Q.*** So if we had had access to the source code of the FPGA demo, we could have seen who -- what ideas were implemented in it?

***MS. CHOPRA:*** Objection. Leading.

***THE COURT:*** Sustained.

***BY MS. ROBERTS:***

***Q.*** What would the source code of the FPGA demo have shown?

***A.*** **It would have shown the structures within the FPGA that were utilized to show the TCP concept, the toggling critical path concept, as well as the software driver stack that was controlling the power voltage, and all those sorts of things.**

***Q.*** Would it also have shown the user name of the person that wrote it?

***A.*** **The Git repository would have shown that. I believe that was checked into Git, so, yeah, it would have tracked the user, yeah.**

***Q.*** Okay. So before you gave the pitch to Qualcomm, did you have a trial run?

***A.*** **Yes, we did.**

***Q.*** And where did you do that trial run?

**A. We did that trial run at the Encore Semi building in San Diego.**

*Q.* All right. And what was your understanding of what Encore Semi was?

**A. It was a semiconductor contracting company, if I recall correctly.**

*Q.* Do you recall if there was ever any idea that Abreezio would use engineers hired through Encore Semi to do some engineering work?

**A. My recollection is that they would eventually take over the deployment phase of Abreezio technology. So Invionics would do the development of the tech, and then we would pass it off to Encore to supply the engineers who would manage the deployments and the clients and the customers and all that. So that was my understanding of the model for the company.**

*Q.* Okay. So -- and when you did the trial run, you had already prepared the board?

**A. Oh, yeah. No, the demo was ready to go. And we were going to present it the next day at Qualcomm, so it was done. It was going to go, yep.**

*Q.* Okay. And so when you did the trial run, did anybody attend that trial run meeting?

**A. Yes. Yeah, it was myself. I was there to run the demo. Brad Quinton was there. Sanjiv Taneja, Akbar Shokouhi, I think is how you say his last name. And then Dr. Arabi came in to see**

**the FPGA demo, too.**

***Q.*** Okay. And so Mr. Shokouhi is kind of on the operational side of the company; is that right?

***A.*** **That's my understanding, yeah.**

***Q.*** Yeah. Okay. And so was Mr. Taneja.

***A.*** **Taneja was the CEO. So, yeah, yeah.**

***Q.*** But he was not really involved with the tech development.

***MS. CHOPRA:*** Objection. Leading.

***THE CLERK:*** Sustained.

***BY MS. ROBERTS:***

***Q.*** Was Taneja really involved in the tech at all?

***A.*** **No, no.**

***Q.*** So did it seem odd to you that Dr. Arabi was at this meeting?

***A.*** **No, no.**

***Q.*** Okay. Did anybody at the meeting tell you to keep his presence secret?

***A.*** **No.**

***Q.*** Okay. Did he provide any insight on the demonstration?

***A.*** **No.**

***Q.*** Okay. Did he give any kind of feedback?

***A.*** **Oh, well, I mean, there was questions. The demo was designed to show how things without TCP would fail and stuff like that. So there was classic questions of what's going on; right?**

**So we're not -- the demo had kind of these red, green, and yellow traffic stop-type lights. And you're going along and if it was green, everything was okay; and then yellow, it was getting close to fail; and then red, it failed.**

**So there was talk back and forth about what was happening in the demo; right? But nothing, like, you know, technical directive or anything.**

*Q.* Right.

***A.*** **Yeah.**

*Q.* So you didn't change the demo at all?

***A.*** **No, no, no.**

*Q.* Because it was already designed and ready to go.

***A.*** **It was designed and I was showing that thing the next day. So, no, there was no -- no change, no.**

*Q.* What did you do after the initial trial run?

***A.*** **We ended up going for dinner.**

*Q.* Okay. And where did you guys go?

***A.*** **As far as I recall, we went to some nearby Thai restaurant.**

*Q.* And who went to that dinner?

***A.*** **All of us. I remember Brad and myself, and Sanjiv, and Akbar, and Dr. Arabi going too.**

*Q.* And there was no effort to, like, hide Dr. Arabi in a back corner of the restaurant or anything?

***A.*** **No. From what I remember, we sat kind of at a table in the middle of the restaurant, yeah.**

*Q.* So after the trial run, did you, in fact, give the demo to Qualcomm?
**A. Yeah, we did. Brad, Sanjiv, and I went on the 15th of April, yeah.**
*Q.* Okay. And how did it go?
**A. It was a little bit rough, actually. I remember this distinctly, because the demo didn't work initially. When I tried to bring it up, it failed. And so I had to try and debug that FPGA board on the fly.**
**And so fortunately, Brad's pretty adaptable, so he reorganized the presentation to talk about the DFT stuff first. And then I was in there trying to figure out what had gone wrong. It turned out I just connected the connectors in -- in the wrong order.**
**Apparently, on this particular board, one had to go in first. So I got it back up and running and was extremely relieved. And then when the TruSens section of the presentation went on, we did the demo, and it was well-received.**
*Q.* And did you also demonstrate DFTBreez?
**A. There were results, DFTBreez results, but there was no, like, demo. Like, live demo of them, no.**
*Q.* Okay. How was it received by Qualcomm, if you know?
**A. I -- honestly, I was pretty exhausted from the on-site, the debug, so I don't remember a ton from that meeting. But I remember that everything was -- the DFTBreez and the FPGA demo**

**was well-received. There was some questions, I think. But, yeah, it went well.**

***MS. ROBERTS:*** Can you pull up Exhibit 2057?

***BY MS. ROBERTS:***

***Q.*** And you're on this email --

***THE COURT:*** It is not in evidence.

***BY MS. ROBERTS:***

***Q.*** You're on this email?

***A.*** **I am, yes.**

***MS. ROBERTS:*** Move to admit.

***MS. CHOPRA:*** No objection.

***THE COURT:*** 2057 may be admitted.

***(Exhibit 2057 admitted.)***

***BY MS. ROBERTS:***

***Q.*** Okay. So -- and this email is from Brad Quinton?

***A.*** **Yes, it is.**

***Q.*** And addressed to all your Invionics engineers?

***A.*** **That's correct, yeah.**

***Q.*** And did you read the title?

***A.*** **"Abreezio demo success."**

***Q.*** Okay. Can you read the text of this email?

***THE COURT:*** It's in evidence, Counsel.

***BY MS. ROBERTS:***

***Q.*** Okay. Is this an example of Brad reporting back about how happy Qualcomm was with the demonstration?

**A. Yes.**
*Q.* Okay. And he was basically thanking you guys for all the great work you had done?
**A. Yep.**
*Q.* Okay. I want to talk a little bit about software.
Is there generally, like, a one-to-one mapping between, like, patent ideas and products?
**A. No, no.**
*Q.* Okay. So not all, like, patent claims in, like, the provisional patent applications actually end up in the software tools that --
**A. That's correct.**
*Q.* -- that you ultimately build.
So it's possible to create software without having a patent.
***MS. CHOPRA:*** Objection. Leading.
***THE COURT:*** Sustained.
***BY MS. ROBERTS:***
*Q.* Does software -- software doesn't -- what is software?
**A. Well, software is the human-readable description of the functionality you want a computer program to perform.**
*Q.* Okay. Is it -- in your experience, can developing EDA tools be created without patents?
***MS. CHOPRA:*** Objection. Unnoticed expert testimony.
***THE COURT:*** Sustained.
///

***BY MS. ROBERTS:***
***Q.*** You've built a lot of software tools in your career; correct?
***A.*** **Yes, a lot, yeah.**
***Q.*** So you know what goes into building software.
***A.*** **Yes. I have a pretty -- I have a good idea, yup.**
***Q.*** So when you design software, it doesn't necessarily include the IP concepts written in patent applications?
***MS. CHOPRA:*** Same objection.
***THE COURT:*** Same ruling.
***BY MS. ROBERTS:***
***Q.*** Is software itself IP?
***MS. CHOPRA:*** Same objection.
***THE COURT:*** Same ruling.
***BY MS. ROBERTS:***
***Q.*** Do you know if software is entitled to IP protection --
***MS. CHOPRA:*** Same objection.
***BY MR. FRASER:***
***Q.*** -- copyright?
***THE COURT:*** Same ruling.
***BY MS. ROBERTS:***
***Q.*** Software has other -- oh, hold on.
So around the time that you -- your team was drafting the provisional patent applications, were you also working on designing software?

**A. Yes.**

*Q.* Okay. And what software was that?

**A. Well, we developed a number of different things, but certainly DFTBreez was developed. We were working on the TruSens software, too. So the Abreezio software products were being developed in parallel with the patent applications.**

*Q.* Okay. So now on the DFTBreez, the version of the software that you were building, that was based on Andrew's concept?

**A. That's correct.**

*Q.* The partitioning and scan chain?

**A. Yes.**

*Q.* Okay. And who designed the software?

**A. The DFTBreez software?**

*Q.* Yeah.

**A. That was Andrew Hughes.**

*Q.* Okay. And how would he have done that?

***MS. CHOPRA:*** Objection. Foundation.

***THE COURT:*** If you know.

***THE WITNESS:*** How would he have done that?

***MS. ROBERTS:*** Yeah.

***BY MS. ROBERTS:***

*Q.* Would he have written the source code?

**A. Yeah. I mean, he would have written what's known as Python code, and used that to describe the functionality he was attempting to achieve at a computer.**

*Q.* So the source code -- so source code -- can you describe what a Git and control repository are?

**A. Yeah. So a Git repo, or repository, is a means of tracking the progression of source code through time. So the idea is that -- well, certainly, just in time, you can also have multiple users connected to a single source repository.**

**But what it's attempting to do is allow to you track your changes and the progression of the code as you -- as you develop the functionality.**

**And it's really, really handy, because sometimes you start to branch and add additional functionality, but that doesn't work out, and so then you can go back in time and look and check out that version of the code and start forward from there. And then you can also merge -- there's lots of different things you can do.**

**So what effectively happens is every time you feel you have a change that you want to kind of -- we call it checking in to the repository, you submit it into the repo, and it kind of tracks the time of the change. There's a check-in and commit comment you can add. You can write a little comment to yourself, this is what changed. And then it will create a little hash that allows you to identify the -- that change.**

**So then if you want to go back, you can go and do commands, like Git log, and that will just dump out a bunch of commands -- or a bunch of the change history through time. And then it will**

**also show you who did the change. And then you can -- different versions of the change to show -- and it will show you exactly the code lines that it changed, so that you can see what bug you introduced or didn't introduce.**

***Q.*** And so who had administrative rights for the Git control repository at Abreezio?

***A.*** **My understanding, it was Andrew Hughes.**

***Q.*** And who -- do you recall who were named users, who had user IDs to edit?

***A.*** **I don't know that for sure.**

***Q.*** Would you have had been a user?

***A.*** **I believe, yes.**

***Q.*** Would Mike Lee have had a user ID?

***A.*** **I think so, yeah, probably. Maybe. I honestly don't know on that one.**

***Q.*** When you have the user ID, what does that mean?

***A.*** **It means you're allowed to check in to the repository and check out of the repository. So the other thing with a Git repository is they allow to you control who's -- which users can use it; right? So sometimes in projects, you don't want people to get access to one repo for some reason or another, and so you don't give them access through a user account.**

***Q.*** So if you don't have a user ID, you can't access the source code.

***A.*** **That's the intention, yeah.**

***Q.*** So do you recall if Ms. Alan had a user ID?

***MS. CHOPRA:*** Objection. Foundation.

***THE COURT:*** Sustained.

***BY MS. ROBERTS:***

***Q.*** Do you have any knowledge whether she would have had access to it?

***MS. CHOPRA:*** Same objection.

***THE COURT:*** Same ruling.

***BY MS. ROBERTS:***

***Q.*** Do you know who had user ID?

***MS. CHOPRA:*** Objection. Foundation. Asked and answered.

***THE COURT:*** Sustained. He already said he didn't know.

***BY MS. ROBERTS:***

***Q.*** So if we had had the actual soft -- the source code for the DFTBreez software, would we have been able to determine who authored it?

***A.*** **Yes.**

***Q.*** And would we have been able to see what ideas were implemented in it?

***A.*** **That's correct.**

***Q.*** And what do you think it would have shown?

***MS. CHOPRA:*** Objection. Speculation.

***THE COURT:*** Sustained.

///

***BY MS. ROBERTS:***
***Q.*** It's your understanding that the ideas that were implemented in the software for DFTBreez originated from Andrew Hughes's scan chain and partitioning idea?
***A.*** **Yes.**
***Q.*** At some point, did Qualcomm evaluate the DFT software on site?
***A.*** **They did, yes.**
***Q.*** Do you remember when this was?
***A.*** **It was August of 2015 into September.**
***Q.*** Okay. So it was over a month-long time period, would you say?
***A.*** **It was about six weeks.**
***Q.*** Okay. And do you recall if Abreezio and Qualcomm entered into a Statement of Work?
***A.*** **I don't -- I don't know.**
***Q.*** Okay. And so what product was demonstrated to Qualcomm at this on-site evaluation?
***A.*** **We did the eval of DFTBreez. And that was the extensive -- we did an extensive eval of DFTBreez. We spent six weeks there on that. And then at the very end, we did a little bit of TruSens sensor insertion. But it was, like, right at the very end, really fast, and it was kind of, like, I don't know, I guess we should do this; right?**
***Q.*** So who participated in the on-site evaluation?

**A. It was Dan Hoggar was there for the whole six weeks on site. And I came for the last three weeks. So we were there on site at Qualcomm, and then Andrew Hughes was updating the DFTBreez software in Canada.**

***MS. ROBERTS:*** Okay. Can you look at 2273?

***BY MS. ROBERTS:***

***Q.*** So you're on this email?

***A.*** **Yes, I am.**

***MS. ROBERTS:*** Move to admit.

***THE COURT:*** Any objection to 2273?

***MS. CHOPRA:*** No objection.

***THE COURT:*** 2273 may be admitted.

***(Exhibit 2273 admitted.)***

***BY MS. ROBERTS:***

***Q.*** Have you seen this email before?

***A.*** **Yes, I have.**

***Q.*** Okay. What is this email about?

***A.*** **This is Dan on site at Qualcomm working with Saad and Joseph to create a plan for the email.**

***Q.*** Okay. And who is Saad?

***A.*** **Saad is Saad Elhosni, I believe his last name. And he was the DFT kind of lead that oversaw the DFTBreez evaluation.**

***Q.*** Okay. And who is Joseph?

***A.*** **That's Joseph Fang. He was the technical go-to guy for Qualcomm on the DFTBreez eval.**

*Q.* Okay. So you were working together with the Qualcomm employees to put together a plan?

**A. Yes. That's what's -- that's what Dan was doing there, yeah.**

*Q.* Okay. Do you recall if there were any other Qualcomm employees on site while you guys were doing the eval?

**A. No. I don't recall seeing anybody there.**

*Q.* In the second sentence there, they say, "They are keen to see QOR impact with respect to area overhead coverage improvement and pattern can reduction."

What does that mean?

**A. Yeah. So QOR is Quality of Results. And so that is -- sorry. So, yeah, this it -- it is what it is; right? It's they want to see the quality of the results achieved.**

**So with respect to area overhead, that's the cost of inserting DFTBreez infrastructure into a design. And then there's two improvements. So coverage improvement -- well, stepping back a big, there was two ways you could use DFTBreez depending on how you wanted -- what you wanted to achieve.**

**So you could use it, its efficiency, to get effectively more manufacturing test coverage for the same test cost. And then there's the -- so that would be coverage improvement.**

**And then there's the inverse of that, in that you can get the same test coverage that you got without DFTBreez but for less cost. So that's what they're looking for. And it's**

**basically how much can we save for how much cost.**

*Q.* Right. That makes sense.

Going back to the on-site evaluation, did the software work perfectly during the demo?

***A.*** **No, no, no. We ran into multiple speed bumps, yeah.**

*Q.* Okay. So what happened?

***A.*** **Oh, there were numerous issues, but that's not unexpected; right?**

*Q.* Okay.

***A.*** **So this was our first eval. We're putting it into a big company's production environment, at least emulating that. So it's not surprising that we would hit speed bumps. There were a few that stood out that were really scary.**

**The first one was Qualcomm uses a concept called a flop tray, or a tray flop. And what that is, is -- that is a set of flip-flops that share a scan-enabled pin. So one scan enable goes to, say, four flip-flops.**

**So the whole concept of DFTBreez was that we would take the scan enable from each flip-flop and partition those; right? So what happened was we show up at Qualcomm, and they use these tray flops that break that kind of tradeoff; right?**

**And so when we got there and saw that, I was worried when I found out about that, because it doesn't allow us to do the core thing that we were trying to do at the granularity we had tried it previously; right?**

So the other thing about DFTBreez was you could reorder flops on a scan chain. So a scan chain is exactly what it sounds like. It's a chain of flops tied together. So a tray flop, you can't reorder those flops within it. So that broke the algorithm, too, so that wasn't great.

But fortunately, Andrew could manage to adapt the algorithm to account for those two constraints and enable the DFTBreez software to work well again.

*Q.* So Andrew was modifying the software kind of in realtime during the eval --

*A.* Yeah.

*Q.* -- to make it compatible with --

*A.* Yeah.

*Q.* -- Qualcomm's design?

*A.* For sure. And, I mean, there were other issues, too; right? There was the size of Qualcomm's designs. Qualcomm is a big company. They make big chips. And the macros they run on were big.

And so we ran into memory and run-time issues. So there had to be efficiency optimizations on both of those fronts. They had funky kind of logic on their scan chain that we needed to work with. There was weird cell models that we weren't unexpected -- that we weren't expecting. There was a whole list of them.

At the end, I did a flow integration report that kind of

**summarizes and goes through everything we ran into and overcame.**

***MS. ROBERTS:*** Will you pull up Exhibit 2010?

***THE COURT:*** I'm sorry?

***MS. ROBERTS:*** 2010. Sorry.

***THE COURT:*** 2010?

***MS. ROBERTS:*** Yeah.

***THE COURT:*** Thank you. Not in evidence currently.

***BY MS. ROBERTS:***

***Q.*** Is this the Flow Integration Report?

***MS. ROBERTS:*** Pull up 2010A.

***THE WITNESS:*** So this is not the flow results, the Flow Integration Report. This is a report on the DFTBreez effectiveness and efficacy.

***BY MS. ROBERTS:***

***Q.*** Can you just generally summarize what this report would have --

***A.*** **Yeah. So we had a number of test macros, so test designs that Qualcomm wanted us to run DFTBreez on.**

***MS. CHOPRA:*** This is not in evidence; right?

***THE COURT:*** Correct.

***BY MS. ROBERTS:***

***Q.*** Is this a document you created?

***A.*** **I can't really read it.**

***MS. ROBERTS:*** Do we have an Excel on it?

***FEMALE SPEAKER:*** I can blow it up.

***THE WITNESS:*** Thanks.

Yeah, I believe so. Both Dan and I would have entered numbers on this as we were progressing with different -- different runs at Qualcomm.

***MS. ROBERTS:*** Move to admit.

***MS. CHOPRA:*** Relevance.

***THE COURT:*** Both 2010 and 2010A, or just -- this is --

***MS. ROBERTS:*** Both. Yeah, the email and then the attachment with the results.

***THE COURT:*** Overruled.

***(Exhibits 2010 and 2010A admitted.)***

***BY MS. ROBERTS:***

***Q.*** You can talk about it.

***A.*** **Okay. Yeah, so like I said, it's tracking the efficacy of DFTBreez. So on the first -- the first column, you can see there's a column called "Partitions." And so we were trying different numbers of scan partitions and seeing the effectiveness of using different numbers of partitions on the total coverage and the efficient -- the efficiency of coverage with DFTBreez.**

**And so the -- so the green table, it's showing DFTBreez results with tray flops. And that's the -- like, the four flops kind of smushed together with the single scan enable.**

**And then to kind of track the impact of our improvements to the algorithm, we were also running -- and we called it**

**flattening those tray flops. And so what we did was we flattened them and give them each their own scan enable so you'd have the proper control that we were anticipating originally.**

**And so can you kind of see the numbers are a bit worse with the tray flops than without. And the total coverage column of the green table as compared to the purple one.**

**And so, yeah, kind of going down the line here, total patterns is the --**

***THE COURT:*** I'm going to stop you for a minute because I think we're getting a little far afield from the question. Why don't you ask your next question.

***THE WITNESS:*** Sorry.

***BY MS. ROBERTS:***

***Q.*** So this does show that there was significant -- good results on pattern count reduction?

***MS. CHOPRA:*** Objection. Leading.

***THE COURT:*** Sustained.

***BY MS. ROBERTS:***

***Q.*** What does this conclude about pattern count reduction?

***A.*** **Yeah. So on the right, you can see the reduction from baseline, and for each run we were calling them baseline low, medium, and high. And then the reduction from baseline percent would have been the test cost reduction for using DFTBreez.**

***Q.*** Can you circle where that's shown on the --

***A.*** **Sure.**

***MS. ROBERTS:*** He's circled the middle column on the far right-hand column.

***THE WITNESS:*** Yeah. And then so the next column, I suppose, of interest, so that would have been -- would be the reduction from baseline percent number two. And so -- so this is showing the DFTBreez cost reduction to get to the same pattern coverage that you got without it.

***BY MS. ROBERTS:***

***Q.*** Okay. So how it would benefit Qualcomm on its designs?

***A.* Yeah, yeah. Effectively, it's showing that tests would be cheaper.**

***Q.*** Yeah.

Do you remember how many Qualcomm designs you ran DFTBreez against on -- during the on-site eval?

***A.* I believe it was five.**

***Q.*** And they're all -- the results against all were -- concerning all five designs were generally positive?

***A.* Yes, yeah. I believe one didn't show too much improvement, but that's a bit normal. The results varied from macro to macro depending on the logic structures inside.**

***Q.*** Okay.

***MS. ROBERTS:*** Oh, Lindsey, can you remove the annotations? Thanks.

I want to show you just one more of these.

Can you pull up 2165?

***BY MS. ROBERTS:***
***Q.*** So you're on this email.
Do you recall receiving it?
***A.*** **I am on the email, yep.**
***MS. ROBERTS:*** Okay. Move to admit.
***MS. CHOPRA:*** No objection.
***THE COURT:*** I'm sorry?
***MS. CHOPRA:*** No objection. Sorry.
***THE COURT:*** 2165 may be admitted.
***(Exhibit 2165 admitted.)***
***BY MS. ROBERTS:***
***Q.*** Okay. Can you generally describe what this email is about?
***A.*** **Sure. So this is a general update on the progression of the evaluation, and kind of some of the steps Dan had done internally to move through a few hiccups.**
***Q.*** Did Dan send these status reports pretty regularly?
***A.*** **Yes. Every day, I believe, yeah.**
***MS. ROBERTS:*** So if you'd scroll down on this document. And keep going -- oh, there's no -- okay.
***BY MS. ROBERTS:***
***Q.*** So if you go back to the top of the email, it says "Day 22."
***A.*** **Yes.**
***Q.*** Does that mean it was day 22 of the on-site eval?
***A.*** **Yes.**
***Q.*** Do you recall that Dan would send pretty much daily updates?

**A. Yeah. I believe it was working dates, yeah.**

*Q.* Okay. And so ultimately, you guys got to a point where the software was working well with Qualcomm's designs?

**A. Yes, yeah. Yeah. No, it was a big effort, but we got it there.**

*Q.* Okay. I'm going to back up again. One thing I didn't cover with you.

***MS. ROBERTS:*** Can you pull up Exhibit 704?

***BY MS. ROBERTS:***

*Q.* You're not on this text thread, but it's in evidence. And it -- take a look and you can read it.

**A. Okay.**

*Q.* Okay. And so it's dated April 17th, 2015?

**A. Yes.**

*Q.* Do you recall having a conversation with Brad Quinton around this time, where he told you to be very careful? If you do, if you recall.

**A. Yeah, I'm just trying to put this in time. So this is April 17th. So April 15th was the on-site demo at Qualcomm.**

**Around that time, I remember -- because when we left the April demo at Qualcomm, we ran into Mohamed Allam. And I had known Mohamed from Teradici. I worked with him at Teradici, and so I chitchatted. And I remember at some point, we had to be a bit careful because Mohamed wasn't part of the technical team evaluating the Abreezio technology.**

**And so we didn't want to accidentally expose him to Abreezio technology; right? So I believe at some point, Brad mentioned to me that I should not talk about --**

***MS. CHOPRA:*** Objection. Hearsay.

***THE COURT:*** Sustained.

***BY MS. ROBERTS:***

***Q.*** Did you understand that Mr. Allam was working on CPR at Qualcomm?

***A.*** **Yeah. I believe -- I believe he was the CPR lead, if I remember right, yeah.**

***Q.*** So the concern was you didn't want to be, like, cross-IP contamination with Mohamed Allam based on the TruSens technology that Abreezio was working on?

***A.*** **Yeah. In general, you know, companies, they want to insulate who gets to see another company's intellectual property. And so Mohamed, being involved with the CPR, wasn't part of that team that got to see Abreezio's AVS-related technology.**

**And so, you know, Qualcomm did that for a reason; right? And so it gets a bit dangerous if I am chitchatting with Mohamed and accidentally say something; right? Then he's suddenly contaminated with Abreezio IP.**

**And that's a problem for Qualcomm, because say Qualcomm didn't want to buy Abreezio, but then Mohamed independently comes up with an idea for something that was seen in the**

**Abreezio technical due diligence. You lose the kind of blanket of independent discovery; right?**

**And you -- if Abreezio -- in this case, they had patent protection on that, then the damages possibly become triple in any lawsuit; right? So patent infringement is -- you get damages. But if it turns out it was --**

***MS. CHOPRA:*** Objection. Foundation.

***THE COURT:*** Sustained.

***THE WITNESS:*** Sorry.

***BY MS. ROBERTS:***

***Q.*** That's fine. That's a good answer.

But you don't recall that there was any kind of discussion about Dr. Arabi around this time, or keeping his identity secret?

***A.*** **No. I mean, it would be weird to tell me two days after I was on site at Qualcomm to not mention Dr. Arabi to Qualcomm people.**

***Q.*** Okay. Did you ever attend sales calls for other companies, other pitch calls to other companies, on behalf of Abreezio?

***A.*** **Yes, I did.**

***Q.*** What other companies do you recall Abreezio engaging in -- with?

***A.*** **Engaging with? There was Apple, Nvidia, Cisco, Broadcom, Xilinx, and Intel, I believe.**

***MS. ROBERTS:*** Okay. Can I show you Exhibit 2044?

***BY MS. ROBERTS:***

***Q.*** And are you on this --

***THE COURT:*** Not in evidence.

***BY MS. ROBERTS:***

***Q.*** Are you on this email?

***A.*** **Yes.**

***MS. ROBERTS:*** Okay. Move to admit.

***THE COURT:*** Any objection?

***MS. CHOPRA:*** No objection.

***THE COURT:*** 2044 may be admitted.

***(Exhibit 2044 admitted.)***

***BY MS. ROBERTS:***

***Q.*** So this is an email from Taneja to Brad, you, and Mr. Hoggar.

What do you remember about this email?

***A.*** **That a Broadcom eval of the Abreezio technology was being set up.**

***Q.*** Did you go to the eval?

***A.*** **No, no. It was canceled.**

***Q.*** Okay. But it was -- there were discussions about setting up the eval?

***A.*** **Mm-hmm, yep.**

***Q.*** Okay. Did you have any meetings with Apple?

***A.*** **We did, yeah.**

***Q.*** Okay. When was -- do you recall when the meeting with Apple

was?
**A. I don't recall the date, no.**
***MS. ROBERTS:*** Okay. If we pull up 2097.
***BY MS. ROBERTS:***
***Q.*** Is this another email that you're on?
**A. It is.**
***MS. ROBERTS:*** Move to admit.
***THE COURT:*** Any objection to 2097?
***MS. CHOPRA:*** No objection.
***THE COURT:*** It may be admitted.
***(Exhibit 2097 admitted.)***
***BY MS. ROBERTS:***
***Q.*** Is this an email confirming your meeting with Apple?
**A. Yes, it is. Yeah.**
***Q.*** Okay. And along with Mr. Taneja and Mr. Quinton?
**A. That's correct.**
***Q.*** And who do you understand -- who is Brian?
**A. I don't know.**
***Q.*** Do you think he was from Apple?
***MS. CHOPRA:*** Objection. Foundation.
***THE COURT:*** Sustained.
***BY MS. ROBERTS:***
***Q.*** Do you remember going on this meeting?
**A. I do.**
***Q.*** Okay. What do you recall about it?

**A. I recall going into an Apple building, and we pitched TruSens and DFTBreez.**
*Q.* How was it received by Apple?
**A. I would say kind of lukewarm on the TruSens. They didn't seem overly interested. But they did seem interested in DFTBreez.**
*Q.* Okay. Were you -- did you have another pitch with Apple around that same day for Invionics?
**A. Yeah, yeah. Brad and I went back -- we had an Invionics pitch where we were pitching Invio. We went back to Apple, and it turned out that meeting was in the exact same building, so it was a little bit weird. We had to leave and then come back in the afternoon, and here we are again for a different company.**
***MS. ROBERTS:*** And if you go to 2329. Oh, wait, that's not it -- 2329.
***BY MS. ROBERTS:***
*Q.* And you're on this email?
**A. Yes, I am.**
***MS. ROBERTS:*** Move to admit.
***MS. CHOPRA:*** No objection, Your Honor.
***THE COURT:*** 2329 may be admitted.
***(Exhibit 2329 admitted.)***
***BY MS. ROBERTS:***
*Q.* Okay. If you want to take a minute just to read through this email.

**A. Okay.**
*Q.* Okay. And so what do you recall this email being about?
**A. It's basically brief descriptions of DFTBreez and TruSens.**
*Q.* Okay. If you look at the bottom part of the chain, Mr. Taneja writes, "I will take up Brian on his DFT offer to help intro TruSens."
So this is about introducing TruSens to Apple?
***MS. CHOPRA:*** Objection. Foundation.
***THE COURT:*** If you know.
***BY MS. ROBERTS:***
*Q.* If you look at the title of the email, it says --
***THE COURT:*** Not whether he can read it, whether he knows.
***THE WITNESS:*** Sorry. Can you say the question again?
***BY MS. ROBERTS:***
*Q.* To refresh your recollection, if you look at the subject matter of the email --
**A. Yep.**
*Q.* -- does that refresh your recollection that it was related to a meeting with Apple?
**A. Oh, sorry, yeah. I misunderstood. Yeah, no, this was related to the Apple meeting, yeah.**
*Q.* Okay. So it's -- so the first part of the chain is Mr. Taneja checking in with Brad about doing a DFT demonstration with somebody named Brian at Apple?

**A. Yes.**

*Q.* And then the middle part of the chain, Brad is summarizing kind of how to describe the technology to Apple?

**A. That's correct.**

*Q.* And this was prior to your pitch at Apple?

**A. I believe so, yeah.**

*Q.* Do you recall if there was any follow-up with Apple after your initial meeting?

**A. I don't recall anything.**

*Q.* I think you said that Cisco was also interested?

**A. Yes, yeah.**

*Q.* Okay.

***MS. ROBERTS:*** Can you pull up 2408? Actually, can you pull up 2264?

***THE COURT:*** What's the number again?

***MS. ROBERTS:*** 2264.

***BY MS. ROBERTS:***

*Q.* And you're on this email?

**A. I am, yeah.**

***MS. ROBERTS:*** Move to admit.

***MS. CHOPRA:*** It's already in.

***THE COURT:*** Any objection to two -- I think it's already in. It's already in.

***MS. ROBERTS:*** Okay.

***MS. CHOPRA:*** I think it is, Your Honor.

***BY MS. ROBERTS:***

***Q.*** So this email is entitled "Cisco;" correct?

***A.*** **Yes, it is.**

***Q.*** So it sounds like they wanted to move forward with a presentation on Abreezio with Cisco?

***MS. CHOPRA:*** Objection. Leading.

***THE COURT:*** Sustained.

***BY MS. ROBERTS:***

***Q.*** What do you recall about this email?

***A.*** **This is -- actually, I don't recall it being for a presentation. It's for an on-site eval, if I recollect. He wants a start date for the evaluation. "Eval" is evaluation.**

***Q.*** So there was discussions to do an on-site eval with Cisco?

***A.*** **Yes.**

***Q.*** Like the on-site eval you did with Qualcomm?

***A.*** **That's correct.**

***Q.*** Okay. Do you know if that ever went forward?

***A.*** **It did not.**

***Q.*** And why didn't it?

***A.*** **Because Qualcomm came in with an offer for Abreezio.**

***Q.*** What about Nvidia?

***A.*** **Nvidia?**

***Q.*** Yeah. Nvidia, sorry.

***A.*** **Yes, I was -- I went to a Nvidia pitch, as far as I can remember, yes.**

***Q.*** Do you recall whether they were interested in Abreezio's products?
***A.*** **My recollection is they weren't, really.**
***Q.*** So there was no further follow-up?
***A.*** **I don't know. That would have been Sanjiv. I just don't recall the meeting getting much traction. So that's all I would know.**
***Q.*** So at some point, you learned that Qualcomm wanted to purchase Abreezio; right?
***A.*** **Yes.**
***Q.*** And what was your understanding of the acquisition? What type of acquisition would it be?
***A.*** **They wanted the technology and the team.**
***Q.*** Kind of like the Veriday acquisition?
***A.*** **Yes.**
***Q.*** And so did you understand that the team was an important part of the acquisition?
***A.*** **Yes. They required Brad, Andrew, myself, and Mike to join Qualcomm as a condition of the purchase.**
***Q.*** Okay. And were you designated as key employees?
***A.*** **Yes.**
***Q.*** Okay. And what is your understanding of why you were designated as key employees?
***MS. CHOPRA:*** Objection. Foundation.
***THE COURT:*** Sustained.

***BY MS. ROBERTS:***

***Q.*** But you were the key employees that Qualcomm identified?

***A.*** **Yes.**

***Q.*** Okay. They didn't identify Ms. Alan?

***A.*** **No.**

***Q.*** Okay. During the negotiations, did an issue come up with Abreezio being able to acquire Invionics?

***A.*** **I believe so, yeah. I wasn't deeply involved in the back and forth of the negotiations, so...**

***Q.*** Okay. Did -- at some point, did Trementa come back into the picture?

***A.*** **Yes.**

***Q.*** Do you remember why?

***A.*** **There was a lot going on then. I -- I couldn't recall the fine details. I wouldn't be comfortable accurately --**

***Q.*** That's fine.

***A.*** **-- describing that. Yeah.**

***Q.*** That's fine.

How much did -- do you recall how much Invionics received due to the Abreezio acquisition?

***A.*** **I don't recall exactly the final number, but --**

***Q.*** An approximate.

***A.*** **-- we had 10 percent, so I think it was around 18 or so million.**

***Q.*** Do you recall how much Ms. Alan received?

**A. Again, I don't have the exact percentages and numbers, but doing some quick math, I believe it's around 90 million or so.**
Q. Okay. Did it bother you that Ms. Alan received 90 million and Invionics only received 10 million when you contributed to all the tech?
**A. No.**
Q. Why not?
**A. Because we entered into a contract with Abreezio in good faith that assigned us 10 percent of the company. And we were paid by the hour to develop and productize the IP that was part of Abreezio. We executed that contract in good faith. I personally think we did a really good job. And we were compensated as per the terms of that contract, so...**
Q. Okay. So after the -- Abreezio was acquired by Qualcomm, did you go work for Qualcomm?
**A. I did.**
Q. Okay. And what did you do when you worked at Qualcomm?
**A. I was Director of Engineering, so I oversaw the DFTBreez, which became known as QBreez. At Qualcomm, they like to start their stuff with a Q. So we -- I oversaw the kind of integration and deployment of DFTBreez is the main thing. And then we also did some TruSens-related deployments, too. Yeah.**
Q. Okay. And where -- where did you work out of Qualcomm?
**A. Oh, in the Vancouver office. So Qualcomm set up a Vancouver office for us there.**

***Q.*** Okay. Does that division still exist today?
***A.*** **It does, yeah.**
***Q.*** Okay. And were you able to successfully deploy QBreez across Qualcomm's designs?
***A.*** **Yes, yeah.**
***Q.*** Do you know how long it took to do that?
***A.*** **It took a while, because Qualcomm has a very tight timeline and a very particular design flow. So you have to kind of do an initial experiment and prove it out on real silicon.**
**The interesting thing with DFTBreez is --**
***THE COURT:*** I'm going to stop you. The question was, do you know how long it took?
***THE WITNESS:*** Oh, fair enough. Sorry.
To get to full deployment, I think it was a year or so.
***BY MS. ROBERTS:***
***Q.*** Okay. But it was successfully deployed?
***A.*** **Oh, yeah, yeah.**
***Q.*** And it was across all the chip -- do you know if it was deployed across all the chip lines or a vast majority of them?
***A.*** **It was on the big ones. Qualcomm has a lot of different chip lines, so it was kind of crackling out, as it goes.**
***Q.*** Do you know if they still use QBreez today?
***MS. CHOPRA:*** Objection. 403.
***THE COURT:*** Sustained.
///

***BY MS. ROBERTS:***

***Q.*** Is Mike Smith still at Qualcomm?

***A.*** **Yes.**

***Q.*** Are you still in touch with Mike Smith?

***A.*** **I see him occasionally, yeah.**

***Q.*** Do you know if he still works on QBreez?

***MS. CHOPRA:*** Objection. 403.

***THE COURT:*** Sustained.

***BY MS. ROBERTS:***

***Q.*** How about TruSens, were you able to successfully deploy TruSens?

***A.*** **When we arrived, TruSens wasn't really the focus. We kind of showed up and it was, like, well, get DFTBreez going, QBreez going, and then kind of -- I don't know, see what you want with TruSens.**

**So we pitched it to the design teams, and they pushed back pretty hard. And then Jason Hu, who was in charge of CPR, wanted us to investigate using TruSens technology and ideas to do better CPR characterization, which that's where we put our focus.**

***Q.*** Okay. But eventually, there was a TruBreez [sic] product released?

***THE COURT:*** A TruBreez?

***BY MS. ROBERTS:***

***Q.*** I'm sorry, TruSens.

**A. Product release?**

*Q.* Like, the TruSens was a tool that was deployed.

**A. Yeah. We were using it on test chips and things like that to help characterize it.**

*Q.* Okay. While you were at Qualcomm, who did your team internally report to at Qualcomm?

**A. Initially, it was Esin. And then eventually, Paul Penzes.**

*Q.* And how was your relationship with Esin and Paul?

**A. Esin and Paul, I thought they were both good.**

*Q.* And they liked your work?

**A. Yeah, yeah, yeah.**

*Q.* At some point, did you learn that Qualcomm had started an internal investigation about Abreezio?

**A. I did, yes.**

*Q.* How did you learn about it?

**A. I was on vacation in London, and I can't remember how I found out. Somebody must have called me. And then I came home.**

*Q.* Were you ever interviewed by anyone from HR during their internal investigation?

**A. No.**

*Q.* Do you think that's kind of odd, since you were on 13 of the non-provisional patent applications and 11 of the provisional patent applications?

***MS. CHOPRA:*** Objection. 403.

***THE COURT:*** Sustained.

***BY MS. ROBERTS:***

***Q.*** You don't have to answer that.

How was your team treated by Qualcomm during that investigation, would you say?

If you don't want to talk about it, we don't have to.

***A.*** ***(No audible response.)***

***Q.*** So after that investigation, did your team decide to leave Qualcomm?

***A.*** **Yeah.**

***Q.*** And were you the last Invionics employee to leave?

***A.*** **No.**

***Q.*** But you were one -- did they offer you a retention bonus to stay?

***A.*** **Yes, they did.**

***Q.*** And do you remember what the retention bonus was?

***A.*** **It was somewhere around a hundred thousand dollars or so, paid in two chunks. One immediately, and then I would pay it back if -- proportionately, I believe -- honestly, I can't remember the details.**

***Q.*** Yeah, we --

***A.*** **And then the second one came a year later.**

***Q.*** But you declined that -- you declined to stay at Qualcomm.

***A.*** **I did.**

***Q.*** Yeah. Your team moved on to other things.

***A.*** **That's correct.**

***Q.*** Okay.

***MS. ROBERTS:*** No further questions.

***THE COURT:*** Okay. Let's go ahead and take our morning recess, ladies and gentlemen, 15 minutes. You're reminded you're not to discuss the case with anyone. You're not to do any research about the case. And you are excused for 15 minutes as well, sir. Thank you.

***(Jury out at 10:26 a.m.)***

***THE COURT:*** We're now outside the presence of the jury.

Any issues we need to take up?

***MS. CHOPRA:*** No, Your Honor.

***MS. BERNSTEIN:*** No, Your Honor.

***THE COURT:*** Okay. Thank you. Fifteen minutes.

***(Recess taken.)***

***THE COURT:*** Okay. We are back on the record. All jurors are present. Dr. Arabi is present. And all the lawyers are present.

You are reminded you are still under oath to tell the truth.

***THE WITNESS:*** Thank you.

***THE COURT:*** Ms. Chopra?

***CROSS-EXAMINATION***

***BY MS. CHOPRA:***

***Q.*** Good morning, Mr. McClements.

***A.*** **Hello.**
***Q.*** You testified yesterday that you had spent about 14 hours meeting with the Defense; is that right?
***A.*** **Yes, that's right.**
***Q.*** And that was across various meetings; right?
***A.*** **That's correct.**
***Q.*** You never met with the United States; right?
***A.*** **That is correct.**
***Q.*** I'll follow up on that.
***A.*** **Sure.**
***Q.*** But you are aware that the United States law enforcement, with Canadian law enforcement, did try to interview you; right?
***A.*** **Yeah.**
***Q.*** Before we were able to interview you, you got a lawyer; is that right?
***A.*** **That's correct. I directed them to contact my lawyer.**
***Q.*** And do you know that your lawyer then asked the United States to proffer scope and information before you would talk to us?
***MS. ROBERTS:*** Objection. 602.
***THE COURT:*** Overruled.
***THE WITNESS:*** I'm not sure what that means. Sorry, proffer, scope, and--
***BY MS. CHOPRA:***
***Q.*** Do you know that your lawyer asked the United States to

provide information about its investigation before you would talk to us?

***MS. ROBERTS:*** Objection. Attorney-client privilege.

***THE COURT:*** Overruled.

***THE WITNESS:*** If my understanding was that Ms. Cane asked factually what they wanted to know about, yeah.

***BY MS. CHOPRA:***

***Q.*** And then in the end, you didn't talk with us; right?

***A.*** **Nobody responded, so I did not, yeah.**

***Q.*** You testified that you, at some point, learned about the Qualcomm investigation into the Abreezio acquisition; right?

***A.*** **Yes, I did, yeah.**

***Q.*** At the time, I think you were vacationing in London?

***A.*** **That's correct.**

***Q.*** And that was after Invionics received, I think you said, about 10 percent of the acquisition amount; is that right?

***A.*** **That's correct, yeah.**

***Q.*** And you received how much of that 10 percent?

***A.*** **23 percent of that.**

***Q.*** Okay. And in dollars, whether it's Canadian or U.S. dollars, how much did that equate to?

***A.*** **I believe around -- between 4 and 5 million.**

***Q.*** So you personally received 4 to $5 million from the Abreezio acquisition.

***A.*** **There's a bit of a subtlety there. So Invionics received**

**the money from the Abreezio acquisition, and then Invionics dividended that money out to the shareholders.**

*Q.* That was money from the acquisition, though; right?

***A.* Yes.**

*Q.* And so you got, what was it, between 4 and 5 million?

***A.* I believe so, yeah.**

*Q.* Let's talk about Brad Quinton.

You testified that your relationship with Brad Quinton started at your time -- or during your time at PMC Sierra; is that right?

***A.* That's correct.**

*Q.* When was that exactly?

***A.* I started at PMC Sierra in May of 2000, so it would have been around then.**

*Q.* 2000?

***A.* Yeah.**

*Q.* About 25 years ago.

***A.* Yes.**

*Q.* And over those past 25 years, it sounds like, more or less, you've worked with Brad, amongst other people, for about 25 years.

***A.* More or less. He took a bit of time -- we separated a bit when he was doing his Ph.D.**

*Q.* And over those 25 years, we'll talk about the professional relationship, but have you also developed a personal

relationship with Brad?

**A. Yes, yes.**

Q. How close?

**A. Very close, I would say. We're good friends.**

Q. How often do you see each other outside of work?

**A. Not really that often, to be honest. I enjoy spending time with him at work.**

Q. So you're very close because you're at work a lot with him.

**A. Well, we're close because I respect him and I think he's a wonderful person. But I spend -- well, I think maybe what you're asking is I spend the majority of my time with Brad at work.**

Q. And that's how you're close friends with him, too?

**A. I --**

Q. I'm trying to understand. You said you're close personal friends.

How are you close personal friends? Do you spend a lot of time together?

**A. Yes. We work together every day.**

Q. How many hours together do you work every day?

**A. Oh, I would say probably eight, but we work four days a week, so...**

Q. Okay. And you also worked with him at Invionics; right? As we've been talking about?

**A. I did, yes.**

*Q.* In fact, you cofounded Invionics with Brad; is that right?
**A. That's correct.**
*Q.* Okay. That was in about 2013?
**A. Correct, yeah.**
*Q.* Okay. Your role at Invionics was the Vice President of Products and Applications?
**A. Yes.**
*Q.* And are you currently the CEO?
**A. I am, yeah.**
*Q.* Before you, was Mr. Quinton the CEO?
**A. No.**
*Q.* Who was?
**A. Jim Derbyshire.**
*Q.* Okay. What was Brad's role at CEO -- I'm sorry -- at Invionics?
**A. At what point in time?**
*Q.* Around 2013.
**A. In founding, he was CTO, I think. So I can't exactly remember the titles, but he was driving the technology, kind of doing the technology management.**
*Q.* And you would say that Brad is a pretty talented engineer; right?
**A. Oh, yeah, yeah.**
*Q.* And you said he was driving the technology at Invionics?
**A. Well, I mean, he was managing the team. He was the,**

**quote/unquote, Manager, yeah.**
*Q.* And as the, quote/unquote, Manager at Invionics, at least around the 2013 time period, was he then your boss, since you were the Vice President?
***A.* Yeah, I would say. I mean, we're collaborative. But in the morning meeting, he would assign tasks and things to do. So I would say he was the lead, yeah.**
*Q.* Okay. He would assign you tasks?
***A.* Oh, yeah, yeah.**
*Q.* Was his role pretty central to Invionics?
***A.* Yes, yeah.**
*Q.* And was that role pretty important to the success of the company, Invionics?
***A.* Yes, I believe -- can you repeat the question?**
*Q.* I can repeat it.
***A.* Yeah.**
*Q.* Was Brad Quinton's role at Invionics important to the success of that company?
***A.* As all of ours were, yeah. I believe so, yeah.**
*Q.* And Brad's was, too?
***A.* Brad's and every -- all of -- myself and Andrew and Mike Lee, yeah. We were all important, yeah.**
*Q.* And now you work at Singulos; is that right?
***A.* I do, yeah.**
*Q.* You founded that company?

**A. I did, along with Brad, and Mike Lee, and Scott Chin.**
*Q.* And you're currently the Chief AI Architect at Singulos?
**A. That's correct.**
*Q.* What are some of your duties as Chief Architect?
**A. I -- sorry. I'm just thinking of a nice way to explain this.**
*Q.* Bullet points is fine.
**A. Bullet points, okay. Yeah.**
**So I have architected and implemented the machine-learning flow for our computer vision models. I have done development, research and development, I guess you would call it, on pose estimation and 3D object position. I've set up the validation flows for those design -- for those models, and set up and implemented -- architected and implemented, I would say. And then I've overseen some of the post-deployment results and the debug and optimization feedback.**
*Q.* It's a pretty important role, sounds like; is that right?
**A. I like to think so.**
*Q.* Okay. And I think you said you founded Singulos with Mr. Quinton.
What does he do at Singulos?
**A. Currently, he's stepped back and he's not working day-to-day.**
*Q.* Okay. Now, between the two roles, Invionics and Singulos, you also worked at Qualcomm; right?

**A. Yes.**

*Q.* Okay. And were you also there with Mr. Quinton?

**A. I was.**

*Q.* All right. So for the past 25 or so years, has Mr. Quinton been an important colleague to you?

***MS. ROBERTS:*** Asked and answered.

***THE COURT:*** Sustained.

***BY MS. CHOPRA:***

*Q.* Has he been a type of mentor towards you? You mentioned that you respect him; right?

**A. Oh, I deeply respect him, yeah.**

*Q.* Have you learned from him?

**A. Absolutely.**

*Q.* And, in fact, you created two startups with him; right? Invionics and Singulos?

**A. Yes, yeah.**

*Q.* And you already said that you worked closely with him.

**A. Yes.**

*Q.* Have you enjoyed career successes with him?

**A. I'm sorry, I didn't hear that.**

*Q.* Have you enjoyed career successes with him?

**A. Career -- yeah, yeah. I would say so, yes, yeah.**

*Q.* And because you both worked together at a startup, or more than one startup, has his success helped you be successful over time, too, over the last 25 years?

**A. As much as mine has his, I think. The way we work together is very -- all -- like, Andrew, myself, Brad, Mike, we're all very collaborative, so it's very much a team approach. So, yes, he has helped my career, and I'd like to think I've helped his.**

***Q.*** It's kind of like a symbiotic relationship; right? If you succeed, he succeeds; he succeeds, you succeed kind of think?

***MS. ROBERTS:*** Objection. Vague.

***THE COURT:*** Sustained.

***MS. CHOPRA:*** I'll withdraw that.

***BY MS. CHOPRA:***

***Q.*** You're aware that Mr. Quinton's been indicted in this case; right?

**A. I am, yeah.**

***Q.*** For conspiring with Dr. Arabi?

**A. I believe so, yeah.**

***Q.*** To commit a fraud on Qualcomm?

**A. I believe that's what the Indictment says, yeah.**

***Q.*** His pending criminal case is probably not very good for his career; right?

**A. That's correct, yeah.**

***Q.*** It might get in the way of some of that success that we were talking about?

**A. Yes. I would say the reputational damage has already been incurred, yeah.**

***Q.*** And that damage, as someone who is part of a startup, could

extend to the startup that he's a part of, too; right?
**A. Yes, it could, yeah.**
*Q.* And you're a part of that startup, too?
**A. I am, yeah.**
*Q.* All right. Turning more to Invionics.
What was your level of visibility into what Mr. Quinton did on a day-to-day basis at Invionics in the 2014, 2015 timeframe?
**A. My level of visibility? Pretty good. Our office didn't really have anywhere to hide. The meeting room had windows. We all were sitting around tables. So yeah, pretty good, I would say.**
*Q.* Did you have visibility into -- and, again, I'm talking the 2014/2015 timeframe -- who he texted with?
**A. No.**
*Q.* No? No or yes? Sorry.
**A. No.**
*Q.* How about who he spoke with over the phone?
**A. No.**
*Q.* How about who he emailed with?
**A. Unless I was CC'd.**
*Q.* Not unless you were CC'ed?
**A. Yeah, yeah.**
*Q.* Okay. And you're aware that in 2014, while you were at Invionics with Mr. Quinton, he communicated with Dr. Arabi; right?

**A. In 2014?**
*Q.* 2014.
**A. Yes.**
*Q.* And you're aware that they spoke specifically about a plan that later became Abreezio; right?
**A. I'm aware -- I don't think that I would call it a plan necessarily, but I was aware of an opportunity that later become Abreezio, yeah.**
*Q.* You mentioned on direct a meeting that you were either aware of or part of in December of 2014; is that right?
**A. The remote meeting?**
*Q.* Yes.
**A. Yes, yeah.**
*Q.* Were you aware of meetings between Mr. Quinton and Dr. Arabi before December of 2014?
**A. Yes, yeah.**
*Q.* How many?
**A. I know of two.**
*Q.* When were those?
**A. I don't know the exact dates. One was at the Design Automation Conference in 2014. I believe I testified to this, but I'll go through it again.**
**That was the DAC Conference where Brad was there to pitch Invio.**
*Q.* When was that? So I'm asking for the dates.

***A.*** **I don't know. Sorry.**
***Q.*** Okay. What was the other one, then?
***A.*** **The other one was after that, but before the December meeting. And that was in -- again, I don't know the date of that.**
***Q.*** Do you know the location of either of those?
***A.*** **The location of the second meeting was at a local coffee shop called -- I always mispronounce this -- Caffe Artigiano.**
***Q.*** When you say local, local to what locality?
***A.*** **Oh, I'm sorry. Vancouver.**
***Q.*** And what about the one for the Design Automation Conference? Was that the one in -- was that the local one? I don't know which one is which now.
***MS. ROBERTS:*** Objection. Vague.
***THE COURT:*** Overruled.
***THE WITNESS:*** No. The DAC Conference, I believe, was in California. I don't actually know where it was, but it wasn't local.
***BY MS. CHOPRA:***
***Q.*** So one somewhere in California and one in Vancouver.
***A.*** **Yeah. Sorry. I can't say it was in California. It wasn't in Vancouver.**
***Q.*** Okay. That's okay.
***A.*** **Yeah.**
***Q.*** All right. Did you know about any meetings that Mr. Quinton

and Dr. Arabi had in October of 2014?
**A. Yes. I believe that was the DAC meeting, I believe.**
*Q.* The DAC Conference was in the Bay Area; right?
**A. I don't know. I don't know. Sorry.**
*Q.* Do you recall a meeting between Dr. Arabi and Mr. Quinton in San Diego on October 9th of 2014?
**A. I don't know, because I don't know which one is the DAC meeting.**
***MS. CHOPRA:*** Can we pull up Exhibit 869, please? This is already in evidence.
***BY MS. CHOPRA:***
*Q.* Looking at this email, you're not on this email chain; right? As far as you can see at the top half?
**A. I am not, as far as I can see.**
***MS. ROBERTS:*** Objection. 602.
***THE COURT:*** Overruled. She hasn't asked a question yet.
***BY MS. CHOPRA:***
*Q.* This email is between Karim Arabi and Brad Quinton, right, at the top?
**A. Yes.**
*Q.* And do you see the subject line is "Travel to California, October 6 through 10"?
***THE COURT:*** Are you asking him to read an email that's already in evidence, Counsel?

***MS. CHOPRA:*** I can rephrase.
***THE COURT:*** Why don't you ask your question?
***MS. CHOPRA:*** Okay.
***BY MS. CHOPRA:***
***Q.*** Do you see this is about a meeting in October of 2014?
***MS. ROBERTS:*** Objection. 602.
***THE COURT:*** Sustained.
***BY MS. CHOPRA:***
***Q.*** Were you at a meeting with Dr. Arabi and Mr. Quinton in October of 2014?
***A.*** **Not that I recall.**
***Q.*** You didn't meet at a Sammy's on Genesee Avenue in the Costa Verde Shopping Center?
***MS. ROBERTS:*** Objection. Asked and answered.
***THE COURT:*** Sustained.
***MS. CHOPRA:*** And so if we can turn to Exhibit 870.
***BY MS. CHOPRA:***
***Q.*** Now, do you see this email one day after that meeting on October 9th?
***A.*** **I do.**
***MS. ROBERTS:*** Objection. 602.
***THE COURT:*** Overruled.
***BY MS. CHOPRA:***
***Q.*** You're not on this email chain; right?
***A.*** **I am not.**

***Q.*** And this email chain outlines a to-do list for Dr. Arabi following that meeting?

***MS. ROBERTS:*** Objection. 602.

***THE COURT:*** Sustained.

***BY MS. CHOPRA:***

***Q.*** You don't recall being a part of any to-do list or plan that Dr. Arabi and Quinton were a part of in October of 2014, do you?

***A.*** **No.**

***MS. CHOPRA:*** Okay. Now if we can turn to Exhibit 122.

***BY MS. CHOPRA:***

***Q.*** Do you see this email?

***A.*** **I do, yes.**

***Q.*** You're not on this email, either; right?

***A.*** **I am not.**

***Q.*** Okay. Did Mr. Quinton ever talk to you in the 2014 timeframe about how he was planning to use Trementa? Without reading this email exactly, do you recall?

***A.*** **I don't recall.**

***Q.*** Okay. He didn't tell you that he had talked to Dr. Arabi about potentially using a family member as a shareholder in Trementa?

***A.*** **I don't recall, no.**

***Q.*** And specifically using one of Dr. Arabi's --

***MS. ROBERTS:*** 602.

***THE COURT:*** Sustained.

**MS. CHOPRA:** And we can zoom out.

**BY MS. CHOPRA:**

**Q.** Did he tell you that he spoke with Dr. Arabi about developing new technology, and potentially using Trementa for that new technology?

**MS. ROBERTS:** 802.

**THE COURT:** Overruled. Did he tell you that?

**THE WITNESS:** I don't recall that, no.

**BY MS. CHOPRA:**

**Q.** You don't recall that in October of 2014?

**A. No.**

**Q.** Do you recall Mr. Quinton, who you worked with every day, telling you about any of these 10 points in this email that you see before you that he planned out with Dr. Arabi?

**A. Can I read them?**

**Q.** Sure.

**A. I don't specifically remember this, no.**

**Q.** This was never conveyed to you?

**A. Not that I can recall, no.**

**MS. CHOPRA:** Can we turn to Exhibit 123, please?

**BY MS. CHOPRA:**

**Q.** While we pull that up, did Dr. -- or did Mr. Quinton ever talk to you about a cap table that he had set up with Dr. Arabi around this time in October of 2014?

**A. A cap table being a capital allocation table?**

***Q.*** Yes.
***A.*** **No, I don't recall that.**
***Q.*** So did you --
***MS. CHOPRA:*** Here it is. This is previously admitted as Exhibit 123.
***BY MS. CHOPRA:***
***Q.*** Have you seen this before?
***A.*** **I have not.**
***Q.*** Okay. So you've never seen the shares that were allocated, or at least proposed to be allocated, between Dr. --
***MS. ROBERTS:*** Objection. 602.
***THE COURT:*** Overruled.
***BY MS. CHOPRA:***
***Q.*** You've never seen the shares that were proposed to be allocated between Dr. Arabi and Invionics back in October of 2014?
***A.*** **No.**
***Q.*** So you didn't know that Dr. Arabi, at least at this point, was supposed to have 66 percent of the shares of Trementa or any other company that they were setting up?
***A.*** **No.**
***Q.*** Do you know who ended up getting about 64 percent of the Abreezio acquisition price?
***A.*** **That, I presume, would be Sheida.**
***MS. CHOPRA:*** Can we turn to Exhibit 120, please? This

is also in evidence already.

***BY MS. CHOPRA:***

***Q.*** You reviewed this yesterday.

Do you recall that?

***A.*** **Yes, I do.**

***Q.*** And, in fact, you're on this email chain; right?

***A.*** **I am.**

***Q.*** Okay. Yesterday, when this was put in front of you, I believe you testified -- correct me if I'm wrong -- that when you got this email, you didn't even read it initially; is that right?

***A.*** **I said I probably didn't because I understood the intention from the subject.**

***Q.*** And then you testified yesterday that you thought "his" in the "We'll be going over his idea and patent application," was a typo; is that right?

***A.*** **A typo or shorthand, yeah.**

***Q.*** Shorthand for what?

***A.*** **His sister.**

***Q.*** So should that "his" be "her"?

***A.*** **Potentially, yeah.**

***Q.*** So that sentence should read, "I'd like you guys to attend as Karim will be going over her idea/patent application"?

***A.*** **For the grammatically correct shorthand? Sorry.**

***Q.*** I'm asking you, is that what it should read?

**A. If I'm -- I'm still not quite clear.**

*Q.* I'm asking you what the typo is that you saw that you said yesterday.

**A. Oh, the typo. Fair enough. Fair enough. Yeah, I assumed his sister, sister's.**

*Q.* So you think it should say "his sister's"?

**A. Yeah, I suppose you're right. It could say "her," too.**

*Q.* So if it was "her," it would read, "I'd like you guys to attend as Karim will be going over her idea/patent application;" right?

**A. In that scenario, yeah.**

*Q.* Does it say "Sheida" anywhere in this email. As far as you can see?

**A. No, no.**

*Q.* In fact, does it say Dr. Arabi's first name?

**A. It does.**

*Q.* Does it say his first name at least three times in this email?

**A. It does.**

*Q.* And it never says "Sheida's technology;" right?

**A. No. But the meeting was with Karim. It was scheduled with Karim. And Karim would be going over the idea. So I think the only place that would have been appropriate was on what I said was potentially a typo.**

*Q.* The place where it says "his"?

**A. That's right, yeah.**

***MS. CHOPRA:*** Okay. We can take that down.

***BY MS. CHOPRA:***

***Q.*** You mentioned a 20 -- sorry -- a December 2014 meeting, or a remote meeting; is that right?

**A. Yes, yeah.**

***Q.*** And you attended that by phone; is that right?

**A. No. Well, the meeting was a conference call, so it was the go-to meeting. And so from my perspective, I attended the meeting in Vancouver at the Invionics office with Brad and Mike Lee present.**

***Q.*** Who all was present at that meeting?

**A. Present in person was Brad and myself and Mike Lee. Andrew Hughes was remote. He dialed -- he was the one who dialed in, or phoned in. And then Dr. Arabi.**

***Q.*** And Dr. Arabi dialed in?

**A. Yes.**

***Q.*** Sheida was not on that call?

**A. Not as far as I know. I don't actually know everybody who dialed in, so I don't even know who ran the meeting or set up the conference. But I don't -- I have no knowledge that she dialed in. Let's put it that way.**

***Q.*** At any point during that call -- let me back up.

How long was this meeting/call?

**A. I think it was around 30 or so minutes, yeah.**

*Q.* At any point in those 30 minutes, did you hear a female voice speaking?
**A. No. And you know, I think I was a bit pedantic there. So it's my understanding that Sheida did not attend that meeting, if that's where you're going.**
*Q.* That's okay. Thank you.
And what date in December 2014 was that meeting?
**A. December 4th. I think that was the email we just looked at.**
*Q.* And I'm sorry if I forgot from the email, what time of day?
**A. I forgot from the email, too. I don't remember --**
*Q.* Okay.
**A. -- exactly when.**
*Q.* We can pull it up.
***MS. CHOPRA:*** Can we pull up 120 again?
***THE WITNESS:*** Oh, 4:30 p.m.
***BY MS. CHOPRA:***
*Q.* 4:30. Okay. All right.
***MS. CHOPRA:*** I'd like to show you what's already been admitted as Exhibit 5.
***BY MS. CHOPRA:***
*Q.* Have you ever seen this slide deck before, at least with this title, this first page?
**A. Not that I recall, no.**
*Q.* Do you know who Shadi Arabi is?
**A. I only know of a Sheida Arabi, so I don't think that's the**

**same. So, sorry, to answer your question, sorry, no, I don't know who that is.**
***Q.*** Would it surprise you to know that Dr. Arabi authored this slide deck?
***A.*** **I guess, yes.**
***MS. CHOPRA:*** Could we go to Exhibit 5A, which has already been admitted? Can we call out -- thank you.
***BY MS. CHOPRA:***
***Q.*** All right. This is the metadata for that slide deck that's been admitted previously.
***A.*** **Mm-hmm.**
***Q.*** Do you see Dr. Arabi's name next to "author"?
***A.*** **I do, yeah.**
***Q.*** And the date of the meeting that we just discussed was December 4th of 2014; is that right?
***A.*** **Yes.**
***Q.*** And according to this in front of you, this slide deck was created on December 3rd of 2014; is that right?
***A.*** **Yep.**
***Q.*** At about 11:50 p.m.?
***A.*** **Yes, yes.**
***Q.*** So less than 24 hours before you had that meeting in December of 2014 about the technology?
***A.*** **Yes.**
***MS. CHOPRA:*** All right. We can take that down. Thank

you.

***BY MS. CHOPRA:***

***Q.*** Ultimately, Abreezio was formed in the early part of 2015; is that right?

***A.*** **I don't actually know the date it was formed. I only know the date of the Statement of Work that was signed with Invionics, and that was February 23rd.**

***Q.*** You weren't involved in founding Abreezio, were you?

***A.*** **No, I was not.**

***Q.*** It wasn't your company; right?

***A.*** **No, no.**

***Q.*** You were with Invionics.

***A.*** **Correct.**

***Q.*** And Sanjiv Taneja was the CEO of Abreezio, as far as you knew?

***A.*** **Yes.**

***Q.*** Okay. Do you know who brought Mr. Taneja on board?

***A.*** **I believe it was Dr. Arabi, but I -- I don't know, so...**

***Q.*** And you know that Brad Quinton was the CTO of Abreezio; right?

***A.*** **Yes.**

***Q.*** Do you know who brought Mr. Quinton on board?

***A.*** **I believe Brad was interacting with Dr. Arabi.**

***Q.*** So Dr. Arabi likely brought him on board?

***A.*** **I'm guess I'm a bit -- I'm just pausing because I'm trying**

**to think about founding of a company and what it means to bring somebody on board; right? So the connection to Abreezio came from a connection between Dr. Arabi and Brad, so I -- yeah.**

***Q.*** And beyond bringing on board Mr. Quinton and Mr. Taneja, are you aware that Dr. Arabi did many other things for Abreezio?

***A.*** **I was aware that he was an advisor to his sister.**

***Q.*** We'll get back to his sister in a second.

But in terms of his involvement otherwise, are you aware that he set up the cap tables for the shares that would be divided up for Abreezio?

***A.*** **No.**

***Q.*** You weren't told that?

***A.*** **That Dr. Arabi set up the cap table?**

***Q.*** Yes.

***A.*** **It's not really a big deal. I'm not sure why I would need to know -- why I would know that. So, no, I didn't know that.**

***Q.*** Is it your testimony that the cap table is not a big deal?

***A.*** **It depends on what you mean by setting up, I guess. Are you talking about negotiating?**

***Q.*** I should be more clear. I apologize.

Are you aware that Dr. Arabi decided which percentage share Mr. Taneja, Mr. Quinton, and Akbar Shokouhi received in Abreezio?

***MS. ROBERTS:*** Objection. Compound.

***THE COURT:*** Sustained.

***BY MS. CHOPRA:***
***Q.*** Are you aware that Dr. Arabi decided which percentage share Mr. Taneja would receive in Abreezio?
***A.*** **That's not really how this works. One person doesn't decide who gets what portion of a company. There's a negotiation process, and you come to an agreement.**
***Q.*** Would you be surprised in this case if one person, being Dr. Arabi, did decide that?
***A.*** **Yes, because I don't know how that could happen. But, okay.**
***Q.*** Were you aware that he also decided what percentage share Mr. Quinton received in Abreezio?
***A.*** **Dr. Quinton did not receive shares in Abreezio. Invionics did.**
***Q.*** What about Invionics?
***A.*** **Yes, Invionics did, yeah.**
***Q.*** Were you aware that Dr. Arabi decided what percentage share Invionics received?
***A.*** **I don't believe he did.**
***Q.*** You don't believe that he decided?
***A.*** **I believe that was a negotiation.**
***Q.*** Were you aware that Dr. Arabi decided what percentage share Mr. Shokouhi received in Abreezio?
***MS. ROBERTS:*** 602.
***THE COURT:*** Overruled.
***THE WITNESS:*** Sorry, am I supposed to answer?

***THE COURT:*** You may answer.

***THE WITNESS:*** Oh --

***MS. CHOPRA:*** Sorry.

***THE WITNESS:*** What was the question?

***BY MS. CHOPRA:***

***Q.*** I can repeat it.

***A.*** **Yeah.**

***Q.*** Were you aware that Dr. Arabi decided what percentage share Mr. Shokouhi would receive in Abreezio?

***A.*** **I am not aware of that, no.**

***Q.*** Were you aware that Dr. Arabi picked the name Abreezio?

***A.*** **I believe I heard that at some point, but that may have been through court filings. So I guess in that case, I'm not aware. I don't know that that's proven.**

***Q.*** You talked a lot about the technology that you worked on for Abreezio; right?

***A.*** **Yes.**

***Q.*** And you worked on it, right, as you've testified?

***A.*** **Yes.**

***Q.*** And Mr. Hughes worked on it?

***A.*** **Yes.**

***Q.*** And Brad Quinton worked on it as well?

***A.*** **Yes.**

***Q.*** Okay. And some of the others in the Invionics team; right?

***A.*** **Yes, yeah.**

**Q.** Did Sheida ever work on it?
**A. No.**
**Q.** Do you know what Sheida's title was at Abreezio?
**A. I believe I heard this at some point, but I can't remember what it was.**
**Q.** You don't remember?
**A. I can't remember, yeah.**
**Q.** Would you be surprised to know that her title was Chief Architect?
**A. It doesn't fit the role, but, okay.**
**Q.** Right.
So you're currently Chief Architect at your company right now; right?
**A. That's right.**
**Q.** Okay. And you mentioned earlier some of the tasks that you do as Chief Architect.
**A. Correct.**
**Q.** Okay. And so looking at those tasks, for Abreezio, did Sheida implement any of the products or tools?
**A. No.**
**Q.** Did Sheida conduct any research and design at Abreezio?
**A. No.**
**Q.** Did Sheida oversee any validation of the products or designs?
**A. No.**

***Q.*** Did Sheida oversee any of the post-deployment of any of the Abreezio technology?
***A.*** **No.**
***Q.*** Okay. In terms of the Abreezio technology, aside from the people that you just listed who worked on it, are you aware of Dr. Arabi working on the Abreezio technology?
***A.*** **No.**
***Q.*** Not at all?
***A.*** **No. I have no recollection of Dr. Arabi working on the technology.**
***Q.*** Well, we've just pulled up --
***MS. CHOPRA:*** Can we pull up Exhibit 5 again?
***BY MS. CHOPRA:***
***Q.*** We just pulled up this slide deck.
***A.*** **Mm-hmm.**
***Q.*** Do you recognize the title of that slide deck?
***MS. ROBERTS:*** Asked and answered.
***THE COURT:*** Overruled.
***THE WITNESS:*** Yes, I recognize it. It's very similar to the provisional patent application, I believe, of Sheida's.
***BY MS. CHOPRA:***
***Q.*** Of Sheida's?
***A.*** **I believe so, yeah.**
***Q.*** And this is a slide deck that Dr. Arabi authored?
***A.*** **Well, I can't really speak to that. The metadata on the**

**document has his name, but I don't know -- in my career, I've never considered the metadata of a Word or PowerPoint document as indicative of anything. So I don't know necessarily.**

***Q.*** You would agree that the metadata you saw shows his name on it, though; right?

***A.*** **The metadata did show Dr. Arabi's name, yeah.**

***Q.*** And you were aware that Dr. Arabi was involved in filing the provisional patent applications?

***MS. ROBERTS:*** 602.

***THE COURT:*** Sustained.

***BY MS. CHOPRA:***

***Q.*** Do you know whether he filed any of the provisional patent applications?

***A.*** **I believe he assisted with the filing.**

***Q.*** Do you know whether he edited any of the documents that were circulated between the Invionics people about the technology?

***A.*** **I believe -- I don't know that he did, no. I believe there are some track changes that have -- indicate his name, yeah.**

***Q.*** There are track changes?

***A.*** **I think so, yeah. I think there was one. If you have it, I can take a look.**

***MS. CHOPRA:*** Can we pull up Exhibit 902? This is not in evidence.

***BY MS. CHOPRA:***

***Q.*** Mr. McClements, is not in evidence. I won't ask you about

the content necessarily.
But do you see this email in front of you?
**A. I do, I see it.**
***Q.*** Is it an email between Mr. Taneja and Mr. Quinton?
**A. Yes.**
***Q.*** And you're not on this email chain; right?
**A. Correct.**
***Q.*** Is it from May of 2015?
**A. Yes.**
***MS. CHOPRA:*** Can we please turn to what's been marked as 903 --
***BY MS. CHOPRA:***
***Q.*** Well, before we go there, are there attachments to this email? Without reading what the names are.
**A. Yes, yeah.**
***MS. ROBERTS:*** 602.
***THE COURT:*** Well, I need to hear the question. Overruled.
***MS. CHOPRA:*** Can we go to Exhibit 903A, please?
***BY MS. CHOPRA:***
***Q.*** There's 903A in front of you. This is not in evidence.
**A. Okay.**
***Q.*** Have you seen a document like this before, or this -- let me clarify.
Have you seen this document before?

***A.*** **I do not recall seeing this document, no.**
***Q.*** You just testified that you had seen at least one document that had track changes by Mr. -- by Dr. Arabi; right?
***A.*** **I believe I have seen that, yeah.**
***Q.*** And were those track changes related to one of the Abreezio technology?
***A.*** **Yes.**
***Q.*** Was it around May of 2015 that a document with track changes was circulated?
***A.*** **Oh, I have no idea.**
***Q.*** Was it a document that was about the invention of a time delay fault coverage?
***A.*** **I'm not a hundred percent sure. Probably. Yeah, I feel maybe I've stepped outside my bounds here. Because I can vaguely see it in my head. So I'm struggling. Maybe I shouldn't say this is true. If you can show me the document, I can talk to it if you have it.**
***Q.*** I'm showing you a document.
***A.*** **Okay. Yep.**
***Q.*** And so I guess I wasn't sure of your last answer.
Have you seen Dr. Arabi's track changes on a document about an invention for timing delay fault from May of 2014 -- 2015? I apologize.
***A.*** **I don't know about the date. Related to DFT, what I remember the change being was the addition -- I think it was the**

**addition of an acronym for a phrase. It was, like, initialization vector was IV or something like that. That's what I remember.**

***Q.*** Okay.

***MS. CHOPRA:*** Can we call out -- yes, exactly that paragraph.

***THE WITNESS:*** There it is.

***BY MS. CHOPRA:***

***Q.*** Okay. It's not in evidence, so don't read it out loud, but can you look at that to yourself, please.

***A.* Yes.**

***Q.*** So is this what you were just talking about in terms of initialization vector?

***A.* Yes, yeah.**

***Q.*** Is this one of the track-change documents by Dr. Arabi that you have seen, then, before?

***A.* This -- I believe this is the one, yeah.**

***MS. CHOPRA:*** Move to admit 903A, Your Honor.

***THE COURT:*** Any objection?

***MS. ROBERTS:*** 902.

***THE COURT:*** Overruled. 903A may be admitted.

***(Exhibit 903A admitted.)***

***MS. CHOPRA:*** Can we zoom out from that, Dorian? Thank you.

///

***BY MS. CHOPRA:***
***Q.*** So, Mr. McClements, at the top of this, I see "Title of Invention."
Is this one of the inventions that Invionics worked on?
***A.*** **Yes.**
***Q.*** And is it one that you personally worked on?
***A.*** **Yes.**
***MS. CHOPRA:*** Okay. And then if we can zoom back in on the -- that and the one below, the two paragraphs. Thank you, Dorian.
***BY MS. CHOPRA:***
***Q.*** All right. And, again, is this from May of 2015?
***A.*** **I believe so.**
***Q.*** And maybe we can -- I can show you here what I'm talking about, I can circle here *(indicating)*.
Is this what you're talking about when you say Karim Arabi did track changes on this document?
***A.*** **Yes. That's the initialization vector, in brackets, IV, yes.**
***Q.*** Okay. And then what about the transition vector, the one below that that I've circled?
***A.*** **Yes. There is a -- an acronym associated with that, too.**
***Q.*** Okay. And then I'm circling again a third Dr. Arabi edit; is that right?
***A.*** **Yes.**

*Q.* And then now I'm circling a fourth; is that right? Are you following?

***A.*** **I am following.**

*Q.* Okay. Good.

***A.*** **We can --**

*Q.* I'm just circling.

***A.*** **Fair.**

*Q.* And then down below, there are several more in the second paragraph, right, by Dr. Arabi?

***A.*** **Yep, more acronyms. You betcha.**

*Q.* So here's another one I'm circling for the record. And tell me if I've miscircled something, Mr. McClements.

***A.*** **Nope.**

*Q.* Does it look to you that I've circled all the ones with Dr. Arabi, at least in these two paragraphs?

***A.*** **Yes.**

*Q.* Okay. And so at least in this document, Dr. Arabi has access to the document; right? Because he is doing track changes?

***A.*** **Assuming this is Dr. Arabi, yes.**

*Q.* Right, assuming it's him.

***A.*** **Yep.**

*Q.* And assuming it's him, he's reviewing it; right?

***A.*** **He's, yeah, certainly reading it, yeah.**

*Q.* And assuming it's him, he's offering edits to the language,

at least in these two paragraphs?

**A. Edits, sure. But this is just putting in shorthand acronyms for initialization of transition vector. Frankly, anybody can edit and author a patent application, and it doesn't imply any inventorship; right? Patent attorneys do this all the time. You don't list the patent attorney as an inventor. So reviewing and modifying the language of a patent --**

***THE COURT:*** I'm going to stop you again because I think the question was, is he offering edits to the language, at least in these two paragraphs.

***THE WITNESS:*** I'm sorry. Yes, he's offering edits to the language in those two paragraphs, yeah.

***BY MS. CHOPRA:***

***Q.*** And to your knowledge, Dr. Arabi is not a patent attorney; right?

**A. No.**

***Q.*** And he's not a patent agent?

**A. No.**

***Q.*** He's an engineer.

**A. Sure. Well, yes, I believe so.**

***Q.*** And you understand him to be a pretty good engineer; right?

**A. I've never worked with the man, but I assume so, yeah.**

***Q.*** Okay. And he wasn't paid by Abreezio or Invionics to do patent writing or patent review; right?

**A. He was advising his sister, who we had taken complete**

**control of the technology -- technological direction from, yes. So it does not surprise me that she would have asked him to review some of this work. It's possible she didn't even understand it.**

***Q.*** Oh.

Why would you say she wouldn't understand it?

***A.*** **I -- I don't know. I've never worked with her, either. She may be wanting clarity. I have no idea. I'm just saying it's a possibility.**

***Q.*** This is from May of 2015; right?

***A.*** **Sure, yeah. Yeah.**

***Q.*** The Sheida provisional patents were all the way back in December of 2014; right?

***A.*** **Yes.**

***Q.*** So are you saying at this point, when Mr. Arabi is editing this, he's still helping his sister?

***A.*** **I would assume he was assisting his sister throughout the tenure of Abreezio. I have no idea, but I wouldn't find it untoward.**

***Q.*** Well, does she have any edits in this document?

***A.*** **I don't know.**

***Q.*** Was she on any of the emails that we've looked at so far?

***A.*** **I would have to go back. Which email? This one *(indicating)*?**

***MS. CHOPRA:*** We can go back to 902. That's what we

were looking at, which is not in evidence.

***THE WITNESS:*** This is Sanjiv to Brad.

***BY MS. CHOPRA:***

***Q.*** Without reading it, do you see Sheida on here?

***A.*** **I do not.**

***Q.*** Was she part of any of the conversations that you were having around this time, in May of 2015, regarding Abreezio's technology and provisional patents?

***A.*** **No.**

***MS. CHOPRA:*** I'd like to move on to Exhibit 220, please, which I do believe is in evidence.

***BY MS. CHOPRA:***

***Q.*** Have you ever seen this before?

***A.*** **Have I seen it before? Yes.**

***Q.*** Did you draw this?

***A.*** **No, I did not.**

***Q.*** Do you know who drew it?

***A.*** **My understanding is it came from a Sheida email account. But I don't -- fair enough, I'll answer your question. Sorry. I don't know who drew it.**

***Q.*** Which Sheida email account did it come from?

***A.*** **I have no idea.**

***Q.*** Did you know that there are multiple Sheida email accounts?

***A.*** **I have learned that, yeah.**

***Q.*** Okay. Do you know who used at least some of those Sheida

accounts?

***MS. ROBERTS:*** Objection. 602.

***THE COURT:*** Sustained.

***BY MS. CHOPRA:***

***Q.*** Did you ever receive emails from any of those Sheida accounts?

***A.*** **A direct -- this is the only one I recall ever being forwarded to me. It was the one I believe this was attached to.**

***Q.*** Have you, if you remember, been on any emails with one of those Sheida accounts, like, in the same "CC" line or the same "to" line?

***MS. ROBERTS:*** Objection. Vague.

***THE COURT:*** Overruled.

***THE WITNESS:*** I do not recall that, no.

***MS. CHOPRA:*** Can we pull up Exhibit 3351, which has been admitted?

***BY MS. CHOPRA:***

***Q.*** Mr. McClements, do you recall reviewing this email earlier this morning?

***A.*** **Yes, I do, yeah.**

***MS. CHOPRA:*** I'm sorry, can we zoom out just real quick? Sorry.

***BY MS. CHOPRA:***

***Q.*** The topmost email, are you on that "to" line?

***A.*** **I am.**

***MS. CHOPRA:*** Okay. And then now we can zoom in on the next one. Thank you. Sorry, Dorian.

***BY MS. CHOPRA:***

***Q.*** This was right below the email that you're on.

Do you see this in front of you?

***A.*** **I do.**

***Q.*** Okay. So right below the email you were on, do you see this email? It's between Mr. Taneja, Mr. Quinton, Mr. Hughes, and a Sheida Arabi; is that right?

***A.*** **That's right.**

***Q.*** Is that one of the Sheida email addresses that you've seen on emails before?

***A.*** **As I kind of stated, I think this is the only one I've ever been on a forwarded thread from. So I believe this may be the one I've seen before, yep.**

***Q.*** This is the only one?

***A.*** **As far as I can recall, yeah.**

***Q.*** So Sheida.Arabi1@gmail.com is the only one that you think that you've seen before?

***A.*** **I believe so, yeah.**

***Q.*** Okay. Were you -- and looking at the body of this email, it says, "Per discussion with SA."

Do you see that?

***A.*** **I do.**

***Q.*** Who do you understand SA to be, if you know?

**A. I would assume it's Sheida Arabi.**

***Q.*** So you believe that Sheida Arabi was involved in these conversations in March of 2015?

**A. I don't know, but that seems to be what the email indicates.**

***Q.*** Were you ever involved in a conversation with her in March of 2015?

**A. I don't recall ever being in a conversation with Sheida Arabi.**

***Q.*** Not once?

**A. Not that I can recall, no. I do not recall that.**

***MS. CHOPRA:*** We can zoom out from that. Thank you.

***BY MS. CHOPRA:***

***Q.*** All right. So apart from editing some of the Abreezio technology paperwork, were you aware that Dr. Arabi was also on some key calls relating to the Abreezio technology?

**A. I believe Brad mentioned that he had dialed in to a few calls over a period. I don't know what you mean by "key," I guess.**

***Q.*** But a few calls you think he was on.

**A. I believe Brad mentioned that, yeah.**

***Q.*** Yesterday you mentioned a meeting that was important, or a call, around February 27th; is that right?

**A. Yes.**

***Q.*** Okay. What was that meeting or call about?

**A. That was about the fact that Sheida's technology wasn't**

**working, or wasn't going to work.**

***Q.*** Wasn't going to work?

***A.*** **Yeah. It didn't work.**

***Q.*** And, I'm sorry, was it a meeting or a phone call? I forgot.

***A.*** **An in-person meeting or a phone call?**

***Q.*** Yes.

***A.*** **A phone call, as far as I recall.**

***Q.*** Who was on that phone call, as far as you can recall?

***MS. ROBERTS:*** Objection. 602.

***THE COURT:*** Overruled.

***THE WITNESS:*** I believe it was Brad and Sanjiv. I don't really remember who else would have been on there, but I remember more the result rather than the call itself.

***BY MS. CHOPRA:***

***Q.*** And you were on that call?

***A.*** **No, no, no, I was not.**

***Q.*** You just remember what happened afterwards?

***A.*** **Yes.**

***Q.*** Okay. In this case, have you had a chance to look at Dr. Arabi's phone records?

***A.*** **No.**

***Q.*** What about Mr. Taneja's phone records?

***A.*** **No.**

***Q.*** Do you have any idea of how often they would communicate between 2014 to the acquisition in 2015?

***A.*** **No.**
***Q.*** Okay. So we were just talking about an important call on February 27th.
***A.*** **Mm-hmm.**
***Q.*** Did you know that Dr. Arabi and Mr. Taneja had a 58-minute call on February 26th?
***A.*** **No.**
***Q.*** Did you know --
***MS. ROBERTS:*** I'm sorry. 602.
***THE COURT:*** Overruled.
***MS. ROBERTS:*** 401.
***THE COURT:*** Overruled.
***BY MS. CHOPRA:***
***Q.*** Did you know that they had a 55-minute call on February 27th, the day of that important phone call between Brad and Mr. Taneja?
***A.*** **No.**
***Q.*** Turning to the Abreezio patents, yesterday during your direct testimony, I believe you mentioned you were talking about Mr. Taneja being on at least one of the Abreezio patents; is that right?
***A.*** **Sorry, can you say that again?**
***Q.*** Yeah, I'm sorry. Maybe I didn't say that clearly.
Do you recall saying that Mr. Taneja is named on at least one of the Abreezio patents or patent applications?

**A. Sanjiv, yes.**
*Q.* Is it just one or is it more than one?
**A. I believe he's on more than one.**
*Q.* And when asked why he was named, specifically, Mr. Taneja, I believe you said that he didn't provide much technical help, but he was involved in conversations; is that right?
**A. Yeah. So -- sorry. Maybe I shouldn't extrapolate. Yeah, that's roughly right. Sorry.**
*Q.* Was there more you wanted to say?
**A. Well, yeah. I was just going to probably restate what I said yesterday.**
*Q.* And when you say -- I want to clarify a little bit.
When you say he was involved in conversations which then led him to be on the patents, what do you mean by "conversations"?
**A. Oh, just Brad -- like, the conversation where Brad would have explained why the sensors don't work. There was multiple ones of those. So those sorts of kind of us educating Sanjiv as to what's happening. Sanjiv would ask presumably on those conversations.**
*Q.* And you included -- and maybe not you personally -- but overall, the team conclude him, Mr. Taneja, on the patents because you wanted to be conservative; right?
**A. Well, I guess maybe conservative is a weird word in that phrase. Expansive, I suppose.**
*Q.* Inclusive?

**A. Inclusive. That's a better word. Thank you.**
*Q.* Why is it important to be inclusive?
**A. Because you don't want to deny someone their IP rights.**
*Q.* Because if you did that, you could end up in patent litigation?
**A. No -- well, it's fixable. You can fix it. Sorry.**
*Q.* Well, if someone is left off of a patent that they contributed to, could it end up in litigation?
**A. Yes. If they contested that they contributed, yeah.**
*Q.* So that's at least one of the reasons to be inclusive; right?
**A. Yes. Yeah, yeah, yeah.**
*Q.* So apart from Mr. Taneja, if someone else working with you in Invionics and Abreezio had contributed in similar ways as Mr. Taneja, they might also want to be on the patent or have a right to be on the patent; right?
**A. I suppose, yeah.**
*Q.* For example, if someone had a hand in drafting some of the original technology, they might have a claim to the patent.
**A. If they were -- I'm sorry, what do you mean by drafting the original technology, like, creating and inventing?**
*Q.* Yes. Perhaps drafting, inventing the schematics, for example.
**A. Well, drafting and inventing are very, very different. So this gets a bit back to the difference between authorship and**

**inventorship. So I could verbally describe a circuit to you right now, and you could draw it, but that doesn't make you the inventor of it. It was conceived by me in my head.**

***Q.*** Well, thank you. And let me ask you a follow-up question. I should have been more precise.

Did Mr. Taneja draft any of the patents or patent applications?

***A.*** **I don't believe he drafted them. He reviewed them.**

***Q.*** He reviewed them?

***A.*** **I believe so, yeah, yeah.**

***Q.*** And did he -- I think you've answered this when you said he wasn't technically involved, but did he invent them alongside you guys, you guys being Invionics?

***A.*** **Invent the actual intellectual property? No. Well, no, no.**

***Q.*** No. But yet he was still named on the patent.

***A.*** **Yeah. Well, fair enough. So he was involved in, as I say, kind of discussions and explanations. And so it's one of those things where we're all assigning our rights to Abreezio. I can't think of what he would have contributed, but it doesn't hurt to include him, yeah.**

***Q.*** And so during your cross-examination just now, we've seen an example where Dr. Arabi was the author on some metadata; right?

***A.*** **Yes.**

***Q.*** Okay. And we've talked about Dr. Arabi editing some of the language for the technology; right?

**A. Yes.**
*Q.* And we've talked about Dr. Arabi being on the phone with Mr. Taneja; right?
**A. Yes.**
*Q.* Around a key time, which is February 27th; right?
**A. Yes.**
*Q.* And you've seen emails with at least the Sheida.Arabi1@gmail.com email address; right?
**A. That's right.**
*Q.* Okay. And those emails pertain to Abreezio and its technology; right?
**A. They're related to, yeah.**
*Q.* Yet despite all of that involvement by Dr. Arabi, he was not named on any of the patents or patent applications.
**A. Well, I can't speak to what Dr. Arabi and Sanjiv talked about on those phone calls.**
*Q.* But at least based on what we've talked about today.
**A. So the email thread, the Sheida email? That's what we're down to, I guess?**
***THE COURT:*** The question is, was -- that Dr. Arabi was not named on any of the patents or patent applications.
***THE WITNESS:*** Sorry. Thank you. No, he was not.
***BY MS. CHOPRA:***
*Q.* Okay. Did you ever see Sanjiv Taneja's metadata on any of the Abreezio patent documents that you saw?

**A. Metadata, as in, like, author --**
*Q.* Yes.
**A. -- metadata? I never looked at that. Track changes?**
*Q.* Well, and I can follow up.
Did Mr. Taneja ever use track changes to edit any of the patent language like Dr. Arabi did?
**A. Oh, I can't -- I can't remember.**
*Q.* Yet he was still on the patent applications.
**A. Yes.**
*Q.* All right. So on direct, you talked about Sheida being on the patent applications -- the patent applications that Qualcomm bought; right?
**A. She was on two of the provisionals, yep.**
*Q.* Two. Okay.
**A. Yep.**
*Q.* And I believe you testified that you would work off some of the written work perhaps that Sheida did and scrap it and then write over it; is that right?
***MS. ROBERTS:*** Misstates testimony.
***BY MS. CHOPRA:***
*Q.* And you can correct me.
***THE COURT:*** Overruled. You can answer. Is that what you --
***THE WITNESS:*** That's not quite correct.
///

***BY MS. CHOPRA:***

***Q.*** Go ahead.

**A. So I would take a document and copy it, and then open it up, and then I wouldn't wipe all the text away and overwrite. I would reuse some of it, like I said, like, the background kind of this is where it is. But so I just want to be clear that I wasn't wiping and writing new stuff; right?**

***Q.*** No, that was my fault. Thank you for clarifying.

So which parts -- at least we're talking about the Abreezio paperwork, which parts would you scrap? What would you keep?

**A. Kind of varied. Whatever I wanted here and there.**

***Q.*** Whatever you wanted. Okay.

**A. Yeah, whatever I needed or -- yep.**

***Q.*** When you were scrapping or keeping, were you changing the entire technology? What were you doing as you were drafting and editing?

**A. I was just reusing text conveniently as needed.**

***Q.*** You were reusing text that Sheida had?

**A. That was in Sheida's provisional patent applications, yep.**

***Q.*** And you said you reused some, but not all.

**A. Yes. Yep.**

***Q.*** And I think you -- we're going to come back to that.

You testified that at least the two that Sheida did early on were not workable; is that right?

**A. Yes.**

***MS. CHOPRA:*** Can we pull up Exhibit 874?

***THE COURT:*** This is in evidence?

***MS. CHOPRA:*** Yes, Your Honor, it is.

***BY MS. CHOPRA:***

***Q.*** Mr. McClements, do you see this document in front of you, first?

***A.*** **I do, yeah.**

***Q.*** Okay. This is the '672 patent.

Do you see that patent number at the top? I'm sorry, there we go.

***A.*** **'0672, yes.**

***MS. CHOPRA:*** And if you look at the names on the bottom of the page, Dorian, please.

***BY MS. CHOPRA:***

***Q.*** Are you on this as an applicant?

***A.*** **Yes.**

***Q.*** And is Sheida Alan also on this as an applicant?

***A.*** **Yes.**

***MS. CHOPRA:*** We can zoom out from that.

***BY MS. CHOPRA:***

***Q.*** Do you recall -- and this is just the first page, obviously, but sitting here, do you recall which patent this is, just looking at this right now? We can scroll if you want us to.

***A.*** **I don't. Sorry.**

***Q.*** Is that the title in front of you?

***A.*** **Yep.**

***Q.*** Okay. Is this one of the Abreezio patents that you worked on that was eventually sold to Qualcomm?

***A.*** **Yes.**

***Q.*** Okay. Do you stand by your contribution to this patent application?

***A.*** **I believe, yeah, yeah.**

***Q.*** Okay.

***A.*** **I'm trying to remember exactly which one it is.**

***Q.*** Do you want to us scroll more?

***A.*** **Yeah. I wouldn't mind, yeah.**

***Q.*** Okay. It is a very long document. This is scrolling in front of you right now.

This is a patent application in which you worked on the invention, along with others; right?

***A.*** **I believe so, yeah.**

***Q.*** And in submitting a patent application, you try to be candid, at least to the USPTO, when you submit a patent application; right?

***A.*** **Yes.**

***Q.*** You, at least yourself, speaking for you, wouldn't submit a patent application that wasn't worthy of being patentable; right?

***A.*** **I don't believe so, no.**

***Q.*** And sitting here, at least looking at this, you believe that

this patent that was issued that you're on was valid.
***A.*** **I haven't seen much of it.**
***Q.*** We can keep scrolling. I'm sorry.
We can come back to that. Okay.
***MS. CHOPRA:*** I'm sorry, Your Honor.
***THE COURT:*** Why don't you wait until he gets to see what it is that we're talking about. You're showing a lot of things very quickly, most of which are not a description of the patent.
***MS. CHOPRA:*** Thank you for your patience. We're getting there.
***THE COURT:*** There we go.
***MS. CHOPRA:*** Okay.
***BY MS. CHOPRA:***
***Q.*** Take a moment to review it.
***A.*** **The figures would be the best. Those are the easiest for me to parse. Oh, okay, so I think I do remember this. This is -- yeah, edge sensitive sampling. Yes.**
***Q.*** Okay. You recall it now. There are some figures. Thank you.
***A.*** **Mm-hmm.**
***Q.*** Does this jog your memory?
***A.*** **It's getting there, yep.**
***Q.*** Okay. Now, at least sitting here today and looking at this, do you believe that this patent is valid?

**A. As part of a portfolio, this is the -- effectively the FCP sensor of the hybrid, so...**

*Q.* Do you still stand by this patent that you applied for? And please take your time. I don't want to rush your testimony.

Is there more you want to see? I'm sorry.

**A. Yes, please.**

***MS. CHOPRA:*** Thank you, Dorian.

***THE WITNESS:*** Keep going, please. Keep going, please. And keep going. I just want to make sure. Keep going.

Yeah, so like I said, this is describing, and it includes the fixed version of the *in situ*-style sensor. Yeah.

***BY MS. CHOPRA:***

*Q.* Okay. So sitting here -- I'll go back to the question I had asked -- do you still believe this patent is valid?

**A. Yeah. I think there are -- sorry, I'm just looking at this diagram now. Yeah. Like I said, it was part of the patent portfolio, because the hybrid also uses the FCP. So you're really protection -- and you can use the style of sensor, the FCP sensor, in that sort of scenario. So this is kind of patenting that; right? That FCP part.**

*Q.* In reviewing what you have reviewed today, and you're one of the listed applicants here, you don't believe that this patent is nothing more than prior art, do you?

**A. Sorry, can you say that again?**

*Q.* You don't believe that this patent and the application you

submitted to get it is nothing more than prior art, do you?

***A.*** **That's really hard to say without going fully through the claims. But if you're saying that the *in situ* sensors described are covered by prior art, I couldn't speak to that. The body of prior art is vast; right? And that sort of thing is only -- only if you kind of looked and done extensive research could you determine that.**

***Q.*** Well, you wouldn't have submitted a patent application that was based almost entirely on prior art, would you?

***A.*** **I couldn't say if I would, because I might not know.**

***Q.*** You might not know.

***A.*** **No, no, no. The prior art -- the universe of prior art, like I say, it's vast. There could be -- and it takes, like, just one publication in one article in one journal, and that's prior art. And you lose your coverage; right?**

**So you kind of submit these patents, and they get reviewed, and then the universe of prior art kind of collapses them when they get contested; right?**

***Q.*** And this one has not been contested; right?

***A.*** **Well, I believe Qualcomm let all of these patents expire, so I don't know that anybody would contest it. So -- and honestly, I wouldn't know if it has been contested. That would be done by -- handled by Qualcomm legal counsel.**

***Q.*** But no one has told that you it's been contested; right?

***A.*** **Not that I know of, no. But people generally don't -- are**

**you asking if somebody's found prior art and contested my patent?**

*Q.* Just this one.

***A.* Okay.**

*Q.* I'm sure you've done many more.

And so if someone, if a witness had said that this patent is invalid due to prior art, would you know that, sitting here?

***A.* Would I --**

*Q.* Would you know that, if it was invalid due to prior art?

***A.* Would I be surprise by that? It's possible.**

*Q.* But you don't know.

***A.* Well, I have done some prior art searches since this started, just kind of here and there.**

*Q.* Right. I'm talking about this patent specifically.

***A.* Oh, yeah. No, I couldn't say that every claim has been invalidated. But I wouldn't be surprised. Like I say, that happens.**

*Q.* So going back to kind of working off of Sheida's applications, I believe you testified that you sometimes would -- well, would you sometimes keep the background part of the applications as you were working on them, if you worked off of Sheida's?

***A.* Yep, yeah.**

*Q.* Is there any other part that you would keep?

***A.* Yeah. Any sort of text that I didn't think was novel but**

**useful, I would keep and put in.**

***MS. CHOPRA:*** Can you take this down and go to Exhibit 830? This is in evidence.

***BY MS. CHOPRA:***

***Q.*** And here, the name on the first page says Sheida Arabi; is that right?

***A.*** **That's correct, yeah.**

***Q.*** Okay. Do you recognize this as one of the Sheida Arabi patent applications?

***A.*** **The number looks familiar, yeah.**

***MS. CHOPRA:*** Okay. And then if we could look at the title right up towards the bottom, please. Okay.

***BY MS. CHOPRA:***

***Q.*** Do you see that title right there?

***A.*** **Yes, I do.**

***MS. CHOPRA:*** Okay. Can we go to pages 4 to 5 of this patent application, this '072 patent application?

***BY MS. CHOPRA:***

***Q.*** All right. At the very bottom, Mr. McClements, do you see the "Summary of the Current Invention"?

***A.*** **Yep.**

***Q.*** And then if you can review that.

***MS. CHOPRA:*** And then we can go to page 5 for the rest of it, please. Go ahead, Dorian. Thank you.

///

***BY MS. CHOPRA:***
***Q.*** Do you see it continues on page 5 there, Mr. McClements?
***A.*** **I do.**
***Q.*** So keep this summary of invention from Sheida Arabi's in mind.
***MS. CHOPRA:*** And I'd like to turn now to Exhibit 871, please. This is in evidence.
***BY MS. CHOPRA:***
***Q.*** Mr. McClements, do you see this '412 patent application in front of you?
***A.*** **I do.**
***MS. CHOPRA:*** Now, if we can go, please, to page 26 of this document, and zoom in on the summary.
***BY MS. CHOPRA:***
***Q.*** Do you see that summary right there?
***A.*** **I do.**
***Q.*** Okay. Now, this is a patent, '871, that we're looking at right now, that had Brad Quinton's name on it; right?
***A.*** **I'd have to go back and look, but I believe so, yeah.**
***MS. CHOPRA:*** Can we go back to the first page? I'm sorry, yes, at the top.
***BY MS. CHOPRA:***
***Q.*** Brad Quinton's the first name at the top?
***A.*** **Yep.**
***Q.*** Is this one that you worked on as well?

**A. I believe so, yeah.**
**Q.** Now, when you say worked on, is this one that you would have edited and helped draft as well?
**A. Yes, yeah.**
***MS. CHOPRA:*** And if we can go back to page 26, please, of this document.
***BY MS. CHOPRA:***
**Q.** Do you see the "Summary of the Current Invention" right there?
**A. I do.**
**Q.** Now, having just looked at Sheida's '072 patent application, do you see the similarity between that and this one that you worked on?
**A. I do, yeah.**
***MS. CHOPRA:*** In fact, let's go to 1076.
It was a demonstrative only before, Your Honor, if I can show it to this witness.
***BY MS. CHOPRA:***
**Q.** Here's a side-by-side comparison of what we just saw, Mr. McClements, Exhibit 830, which was Sheida's application, and 871, which was one that you worked on.
Do you recall seeing both of those just now?
**A. I do, yeah.**
**Q.** So in copying and pasting between Sheida's and what you worked on, at least in this instance, the copy and paste was

between the summary of the actual invention itself; is that right?

**A. Yes.**

*Q.* So it wasn't just the background that you sometimes left in.

**A. I never said I just used the background.**

*Q.* Of course. No, you said other things, too.

**A. Mm-hmm.**

*Q.* But here, at least, the actual invention is copied and pasted between the two; is that right?

**A. Sure, yeah. The summary of the invention. But, again, it was -- it was quick and dirty, and really, it was more the claims and the figures in these that matter, so...**

*Q.* Well, the summary of the invention provides what it says; right? What the invention you are proposing is; is that right?

**A. No. It's more in the claims section that describe actually what the invention is. The summary is just like an -- sorry -- is more of an overview.**

*Q.* The summary is an overview?

**A. Yeah, yeah.**

*Q.* Okay. But an overview of the invention that you're proposing to the Patent Office; is that right?

**A. Yes.**

*Q.* Okay. And so here, these are nearly identical.

And you can take your time, but is that correct?

**A. Yeah. So I'm going to step back onto the last question. I**

**think I need to clarify that.**

*Q.* Sure.

***A.*** **So the Patent Office -- these are just the provisionals; right? These are getting into the -- into the space; right? And so it's the non-provisionals that the Patent Office looks at and reviews.**

**So with provisionals, you can be really loose and sloppy; right? And it just has to be connectible when you -- when you're going kind of to your non-provisional; right?**

*Q.* So were you being loose and sloppy in this one in 871?

***A.*** **Yeah.**

*Q.* Loose and sloppy enough that you copied or at least kept what Sheida had done?

***A.*** **A summary, yeah, because it was the claims that really mattered, and the figures; right?**

*Q.* But you're summarizing nearly the same invention, if not the same invention.

***MS. ROBERTS:*** Asked and answered.

***THE COURT:*** Sustained.

***MS. CHOPRA:*** I'd like to turn to another example. Can we please look at 877?

***BY MS. CHOPRA:***

*Q.* Okay. Do you see this in front of you, Mr. McClements?

***A.*** **I do.**

***MS. CHOPRA:*** This is in evidence.

And at the top -- if we can call out the top real quick.

***BY MS. CHOPRA:***

***Q.*** This is Patent No. '038, at least the last three digits.

Do you see that?

***A.*** **I do.**

***MS. CHOPRA:*** Now, if we can call out the bottom part with the names, Dorian.

***BY MS. CHOPRA:***

***Q.*** Do you see your name there?

***A.*** **I do.**

***Q.*** Okay. Sheida is not on this patent; right?

***A.*** **She is not.**

***MS. CHOPRA:*** Okay. I'd like to turn to page 97 of this document.

***BY MS. CHOPRA:***

***Q.*** This is one of the figures in this patent; right?

***A.*** **Yep.**

***Q.*** Have you seen this before?

***A.*** **I have.**

***Q.*** Okay. Is this one that you worked on?

***A.*** **I did, I believe, yeah.**

***Q.*** Okay. So I'd like to keep this in mind, please, if you can.

***MS. CHOPRA:*** And I'd like to go back to Exhibit 830. And then 830, back to pages 4 to 5, please.

***BY MS. CHOPRA:***

***Q.*** Now, this is what we looked at just previously; right? The summary of the current invention, Mr. McClements?

***A.*** **Mm-hmm, yeah.**

***MS. CHOPRA:*** Okay. Now I'd like to turn to Exhibit 1077, which we previously used as a demonstrative.

***BY MS. CHOPRA:***

***Q.*** Do you see this, Mr. McClements?

***A.*** **I do.**

***Q.*** Okay. This was a demonstrative used with a prior witness.

On the left, the very left here (*indicating*), do you see that Figure 7 that matches the patent that you were on?

***A.*** **Yes.**

***Q.*** Now, on the right, do you see all the color coding?

***A.*** **I do.**

***Q.*** Okay. Do you recognize that as the text from the application that Sheida did in Exhibit 830?

***A.*** **Yes.**

***Q.*** Okay. Do you see that most of the language there matches?

***A.*** **It does, yep.**

***Q.*** And to be clear, the one that you did that's in Figure 7, that patent Sheida was not listed on; right?

***A.*** **That's correct, yep.**

***Q.*** Even though that language somewhat mirrors the language in Sheida's patent application that's on the right. That was in

Exhibit 830; right?

**A. Yes. That is -- yeah, that's right.**

***THE COURT:*** Would now be a good time to break for lunch?

***MS. CHOPRA:*** Yes, Your Honor.

***THE COURT:*** Okay. Let's take an hour break for lunch, ladies and gentlemen. We'll see you back in an hour. You're reminded not to discuss the case or do any research about the case. And you too, sir, are excused for an hour.

***(Jury out at 12:10 p.m.)***

***THE COURT:*** Okay. We're now outside the presence of the jury.

Any issues we need to take up?

***MS. CHOPRA:*** No, Your Honor.

***THE COURT:*** Okay. One-hour break. Thank you.

***(Lunch recess taken.)***

***THE COURT:*** We are back on the record. All jurors are present. Dr. Arabi and the lawyers are present.

And you are reminded you're still under oath to tell the truth.

***THE WITNESS:*** Thanks.

***THE COURT:*** Ms. Chopra.

***MS. CHOPRA:*** Thank you.

***BY MS. CHOPRA:***

***Q.*** Mr. McClements, I'd like to start off on the demonstrative

at Exhibit 1077, which is where we left off.

***A.*** **Oh, sure, yep.**

***Q.*** Do you remember seeing this before the lunch break?

***A.*** **Yes, I do, yep.**

***Q.*** Now, before the lunch break, I had shown you another example. We were comparing two summaries of invention.

Do you recall that?

***A.*** **Yes.**

***Q.*** And when we were comparing that, you said that the important part is actually the figures; right?

***A.*** **Well, the patent, the novel claims define the invention. The figures do not. What I was speaking to was the patent application. And so for me the important part was the circuits that were defined as that was kind of putting the stake in the ground as to what the invention was.**

***Q.*** I believe you specifically said figures a couple times as being the important part, not necessarily the summaries; is that right?

***A.*** **But we were talking about patent applications.**

***Q.*** Okay.

***A.*** **And there's no structure or required format for a patent application. But in patents, the claims define the invention.**

***Q.*** Okay. So here in 1077, the figure, Figure 7 --

***A.*** **Yes.**

***Q.*** -- on the far left side is from one of your patents; right?

**A. I believe so, yes.**
Q. And that was the issued '038 patent as Exhibit 877 that we saw earlier; right?
**A. I believe so, yes.**
Q. And on the right side, what we have just been talking about before the lunch break is text from a Sheida patent application; right?
**A. I believe so.**
Q. And that's -- if you see it on the far right side, it's the 095,072 right here -- I'll circle it --
**A. Okay.**
Q. -- Sheida application.
Do you see that?
**A. I do.**
Q. Okay. So at least some of the words between your Figure 7 in your patent that Sheida's not on and the one application that Sheida is on are similar, if not in some ways identical; right?
**A. Yes.**
Q. So, again, were you just working off a template here, or how did one become the same as the other?
**A. Well, the final patents and the non-provisionals, I don't believe I authored those necessarily.**
Q. Your name is on it, though; right?
**A. My name is on it as an inventor. But that doesn't mean I was the author.**

*Q.* So they're not the same because you didn't author it.
Is that your testimony?
Or they are the same because you didn't author? I'm sorry. Let me rephrase. I messed that up myself. I apologize. It's after lunch.
You don't know because you didn't author it. Is that what you're saying?
***A.* So right now I'm --**
*Q.* You don't know why they're the same?
***A.* I'm totally lost track of this. I'm sorry.**
*Q.* Let me start over.
***A.* Yep.**
*Q.* The language between these is similar if not the same; right?
***A.* Yes.**
*Q.* Okay. Were you copying from a template that Ms. Alan had written to then create Figure 7 in the patent that you're on?
***A.* Sorry, I'm really struggling with this question.**
*Q.* Okay.
***A.* So I just need a second to think it through.**
*Q.* Take your time.
***A.* I believe, if we can gain kind of convergence on this --**
*Q.* Well, first it's a yes-or-no question, if you can answer it that way. Then I'm happy to ask further questions.
But were you copying from a template that Sheida had made to

make your own Figure 7 in the patent that you were on?
**A. Again, I didn't author the patent; right? I was copying on the provisionals, I was reusing text for sure. But I believe the non-provisionals were written by a patent attorney. And so I think maybe I'm just being hyper pedantic.**
**And you're asking does it appear that this text from the provisional was used in the figure on a patent that my name is on?**
***Q.*** Yes.
**A. Okay. Sorry.**
***Q.*** That's okay.
**A. I just wanted to make that clear.**
**Yes, that looks to be the case here.**
***Q.*** In any case, you're at least a named inventor for the Figure 7 patent; right?
**A. I am a named inventor, and the invention defined by the claims of this patent that has Figure 7 in it as a figure, yes.**
***Q.*** Thank you.
***MS. CHOPRA:*** We can take that down. Thank you, Alex.
***BY MS. CHOPRA:***
***Q.*** Earlier on your cross, before lunch, you mentioned a few times in response to my questions that you believe that Dr. Arabi was mentoring Sheida Arabi.
**A. Advising.**
***Q.*** You're saying advising now?

**A. No, I think that's what I said.**
*Q.* Okay. I'm sorry. Maybe I said mentoring, you said advising?
**A. Yeah. Sorry if I caused some confusion. My understanding, so everybody is clear, is that Dr. Arabi was acting as Sheida's advisor. And that's how it was presented to the Invionics team in that December go-to meeting.**
*Q.* I apologize, I probably messed up that. So advising.
How did that become your understanding? Who told you that?
**A. Dr. Arabi did.**
*Q.* Dr. Arabi told you that he was advising his little sister?
**A. Yeah. He was -- he was -- well, advising or helping. Advising his sister. He was allowed to do that. He's done this before. And he discloses, yeah, in that discussion.**
*Q.* And again, that's all -- your understanding is all based on what Dr. Arabi has told you?
**A. Yes.**
*Q.* Not something that you've independently seen?
***MS. ROBERTS:*** Asked and answered.
***THE COURT:*** Sustained.
***BY MS. CHOPRA:***
*Q.* You haven't seen any other documentation or had any other conversation apart from -- with Dr. Arabi about his advising his sister; right?
**A. No.**

*Q.* Okay. I'd like to turn to the pitches that were made to other companies besides Qualcomm.
You testified that there was a pitch made to Broadcom? Is that right?
*A.* **I believe I understood there to be engagement, and there was a process where an evaluation was being set up.**
*Q.* And that was cancelled eventually.
*A.* **Yeah.**
*Q.* And there was a pitch made to Apple; right?
*A.* **Yes.**
*Q.* And then there was also a pitch made to Broadcom and -- I always say it wrong -- Nvidia. I apologize. Thank you.
And those didn't go very far, either; right?
*A.* **I don't know about the Broadcom one. The Nvidia meeting, I don't know what the follow-up was. But I didn't get a sense that they were super-duper interested, yeah.**
*Q.* And then eventually, with Qualcomm, you testified that later on in 2015, there was on site -- well, there's on site presence at Qualcomm through Abreezio for about six weeks? Is that right?
*A.* **Yeah, an on-site evaluation.**
*Q.* You were there for about three weeks of those six weeks; right?
*A.* **That's correct.**
*Q.* Did you spend three weeks at any other tech company doing

on-site evaluations?

***A.*** **No. This was our first one. But I was scheduled to go to Cisco, I can't remember exactly, but shortly after.**

***Q.*** But that one didn't happen?

***A.*** **No, because the offer came in from Qualcomm.**

***Q.*** Qualcomm came in first.

***A.*** **Well, we didn't have the bandwidth to do multiple evaluations at once. And Qualcomm was the first one. And the first one is always bumpy no matter what, just because the real world is messy; right?**

***Q.*** And as far as you know, no one else on the Invionics team or the Abreezio's team spent six weeks at any other company besides Qualcomm doing on-site evaluations; right?

***A.*** **I have no knowledge of that, yeah.**

***Q.*** Finally, I want to turn to something else you mentioned on direct, I believe it was yesterday.

And correct me if I'm wrong, but yesterday you testified that at the December 2014, whether it was a meeting, phone call, Dr. Arabi had ensured the Invionics team that he was okay to work on Abreezio and he discloses his projects.

Is that a fair summary of what you testified to yesterday?

***A.*** **I would say, yeah, he's advised startups before. He's allowed to do it and he discloses. So I would say that's fair.**

***Q.*** So he informed you and other members of the team in that December 2014 meeting?

**A. Yes.**
*Q.* Okay. And because of that, at least you -- I can't speak for anyone else -- but you thought that it was okay for Dr. Arabi as a VP at Qualcomm to go ahead and proceed with whatever his involvement was with Abreezio?
**A. Yes, yeah.**
*Q.* As part of that disclosure, did he tell you that he would create fake email addresses to impersonate his sister?
**A. No.**
*Q.* Including an Abreezio.com email address in his sister's name?
**A. No.**
*Q.* And not just one email address that he used but more than one to impersonate his sister.
Did you know that?
**A. I -- did I know that he did it or did --**
*Q.* Did -- exactly.
Did you know that he did that?
**A. At what point time are you asking?**
*Q.* During the acquisition process in 2015 as part of the disclosures that we're talking about.
**A. No. I never -- well, I never knew that, but I'm just trying to be clear about what we're talking. So maybe I'm just being silly. No, I didn't know -- I had no knowledge of any multiple email addresses or anything like that.**

**Q.** Okay. Did you know or did he tell you that he informed people to call him Sheida during communications in the Abreezio acquisition process?
**A. No.**
**Q.** That wasn't disclosed either?
**A. No.**
**Q.** How about his involvement in editing or manufacturing Sheida's résumé that was sent to Qualcomm during the due diligence, did you know about that?
**A. No.**
**Q.** You had no awareness of that?
**A. No.**
**Q.** What about -- what about Dr. Arabi's connections with someone inside Qualcomm assisting in the Qualcomm acquisition?
**A. No.**
**Q.** You didn't know anything about that?
**A. No.**
**Q.** You weren't told about his connections with Ziad Mansour at Qualcomm?
**A. Not that I recall. I mean, I have to think about that one. I don't recall anything specifically, no. No, no.**
**Q.** So none of these disclosures were made to you in the time that you were working with Abreezio in 2015.
**A. No.**
**Q.** And finally I'd like to turn to the FPGA demo that you had

talked about.
**A. Okay.**
*Q.* That was in April of 2015; is that right?
**A. Yes.**
*Q.* And that occurred not at Qualcomm; right?
**A. Sorry, which one are we talking? Sorry, the Encore Semi? There was two FPGA demos.**
*Q.* Thank you. The Encore Semi one. I'm sorry.
**A. Yeah.**
*Q.* Was that in April 2015?
**A. Yeah. That was the day before the Qualcomm Encore Semi -- sorry. Now I'm getting confused. That was the day before the Qualcomm FPGA demo, yeah.**
*Q.* Okay. I apologize. I probably mixed that up.
So first let's focus on the Encore Semi one, the one that happened first.
**A. Okay.**
*Q.* That was April 2014?
**A. That was the day before.**
*Q.* And it was at Encore Semi?
**A. That's correct.**
*Q.* Not at Qualcomm?
**A. No.**
*Q.* And Encore Semi is a company associated with Akbar Shokouhi; right?

**A. That's my knowledge, yeah.**
Q. And he was present at that demo?
**A. Yes. Yeah.**
Q. And so was Sanjiv Taneja?
**A. Yes.**
Q. And Dr. Arabi was there?
**A. Dr. Arabi came, yeah.**
Q. And then it was the day after that that you had -- or the team had a meeting at Qualcomm; right?
**A. Correct, yeah.**
Q. So that meeting was not at Encore Semi; right?
**A. Sorry.**
Q. The second one.
**A. It was not at Encore Semi.**
Q. Yeah.
**A. No, it was at Qualcomm, yeah.**
Q. And Mr. Shokouhi, although he was at the first one the day before, he was not at the one at Qualcomm; right?
**A. That's correct, yeah.**
Q. And Dr. Arabi wasn't at the one at Qualcomm; right?
**A. That's correct.**
Q. You were there at Qualcomm, though?
**A. I was at both, yeah.**
Q. You were at both?
**A. Yeah.**

*Q.* At the one at Qualcomm, was Ziad Mansour there?
**A. Yes. I believe so, yeah.**
***MS. CHOPRA:*** No further questions, your Honor.
***THE COURT:*** Any redirect?
***MS. ROBERTS:*** Yeah, real short.

***REDIRECT EXAMINATION***

***BY MS. ROBERTS:***
*Q.* All right, Mr. McClements. So the Government asked about your relationship with Brad Quinton.
**A. Mm-hmm.**
*Q.* Brad Quinton is not on trial here, is he?
**A. He is not.**
*Q.* Okay. Would you lie for him to help him out?
**A. No.**
*Q.* You submitted the patent applications in good faith and to the best of your knowledge at the time?
**A. Yes.**
*Q.* And you worked with IP attorneys to draft those non-provisional applications?
**A. I did a little bit, but my recollection is it was more Andrew Hughes.**
*Q.* Had you done a prior art analysis or a novelty assessment on the patent applications?
**A. No, I do not recall doing that.**

***Q.*** And why don't you do that?

***A.*** **Well, you don't want to become polluted with prior art. So again, it's kind of similar to the issue of contaminating somebody else.**

**So generally speaking, I've been -- my practice has been to avoid prior art. Like I said, you don't want to get exposed to patents because of the increase in the damages should you be found to infringe on someone's patents.**

**And so typically, in an acquisition scenario, you're asked, you know -- I'm sorry. I'm answering the wrong question I think.**

***Q.*** That's my next question.

Who usually does the prior art analysis in an acquisition?

***MS. CHOPRA:*** Objection. Foundation.

***THE COURT:*** If you know.

***BY MS. ROBERTS:***

***Q.*** If you know.

***A.*** **Typically, in an acquisition, the acquirer would do the prior art analysis. And there's a couple ways you can do it. You can get a third party to do it, and they would hire people to do the prior art analysis. And then the report goes out kind of to both sides and they can argue about the validity of it.**

**But, generally speaking, you want to keep your engineers clear of prior art just to keep them from being contaminated or exposed to others' ideas. So I mean, Qualcomm maybe did it**

**in-house. I don't know what they did with the prior art review, but yeah.**

*Q.* But it's not your responsibility?

***A.*** **Yeah. I can't speak -- I wasn't part of those negotiations. But generally, my understanding is that the acquirer drives that. And when you think about it, it kind of makes sense. They want to be the ones driving the prior art review and not just having the target hire somebody and have them paid by them; right? You want to be in charge.**

*Q.* Makes sense.

Let's talk about the -- Sheida's provisional patent applications just for a moment. I think you said they were DOA in your prior testimony.

***A.*** **Yep.**

*Q.* What did you mean by DOA?

***A.*** **Oh, sorry. That's a bit -- dead on arrival.**

*Q.* So you didn't really use them?

***A.*** **No, no.**

*Q.* And you set them aside?

***A.*** **We did, yeah.**

*Q.* And you and Andrew and others at Invionics invented the core tech that was demoed to Qualcomm?

***A.*** **That's correct, yeah.**

*Q.* And sold to Qualcomm?

***A.*** **That's correct.**

***Q.*** Okay. And Dr. Arabi wasn't involved?

***MS. CHOPRA:*** Objection. Leading.

***THE COURT:*** Sustained.

***BY MS. ROBERTS:***

***Q.*** Was Dr. Arabi at all involved in the development of this tech?

**A. No, not to my knowledge. He had no -- he had no involvement.**

***Q.*** Okay. And if Dr. Arabi had authored a PowerPoint, would that change that you and Andrew and others created the tech that was demoed and sold to Qualcomm?

**A. No, no.**

***Q.*** The Government showed you a number of acronyms which they called edits?

**A. Mm-hmm.**

***Q.*** There were like two.

Does inserting acronyms in a document impact who invented it?

**A. No. As I mentioned, you can have someone other than the inventor write the entire patent, and it doesn't matter, they're not the inventor. So adding a few acronyms in a patent application is inconsequential, yeah.**

***MS. ROBERTS:*** No further questions.

***THE COURT:*** Anything further?

***MS. CHOPRA:*** No, your Honor. Thank you.

**THE COURT:** Thank you, sir. You're excused.

***(End of requested testimony.)***

***

*REPORTER'S CERTIFICATE*

I, Anne Roldan, certify that I am a duly qualified and acting Official Court Reporter for the United States District Court, that the foregoing is a true and accurate transcript of the proceedings as taken by me in the above-entitled matter on April 1, 2025; and that the format used complies with the rules and requirements of the United States Judicial Conference.

Date: April 3, 2025

*Anne Roldan, RMR, CRR, CSR 13095*