UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 22-cr-1152-BAS |
| | ) | |
| Plaintiff, | ) | April 1, 2025 |
| vs. | ) | |
| | ) | Trial Testimony of |
| KARIM ARABI, | ) | Andrew Hughes |
| | ) | |
| Defendant. | ) | |
| | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CYNTHIA A. BASHANT
CHIEF DISTRICT JUDGE

VOLUME 1, PAGES 1 - 77

APPEARANCES:

FOR PLAINTIFF: UNITED STATES ATTORNEY'S OFFICE
880 Front Street, Suite 6293
San Diego, California 92101
*By: NICHOLAS W. PILCHAK, AUSA*
*JANAKI G. CHOPRA, AUSA*
*ERIC R. OLAH, AUSA*

FOR DEFENDANT: BIENERT KATZMAN LITTRELL WILLIAMS, LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
*By: WHITNEY Z. BERNSTEIN, Esq.*
*REBECCA S. ROBERTS, Esq.*
*RYAN V. FRASER, Esq.*

REPORTED BY:

ANNE MARIE ROLDAN, RMR, CRR, CSR 13095
U.S. OFFICIAL COURT REPORTER
U.S. District Court Clerk's Office
333 West Broadway, Suite 420
San Diego, California 92101

Reported stenographically; transcribed with CAT software.

# I N D E X

***

## E X A M I N A T I O N S


| WITNESS | VOL. | PAGE | LINE |
|---|---|---|---|
| *FOR THE DEFENSE:* | | | |
| ANDREW HUGES | | | |
| Direct by Mr. Fraser | 1 | 3 | 18 |
| Cross by Mr. Olah | 1 | 37 | 21 |


## E X H I B I T S


| ADMITTED | VOL. | PAGE | LINE |
|---|---|---|---|
| Ex. 2370 | 1 | 25 | 24 |

***TUESDAY, APRIL 1, 2025, 2:11 P.M.***

***

***MS. BERNSTEIN:*** The defense calls Andrew Hughes.

***THE CLERK:*** Please stand here and raise your right hand.

***(Witness duly sworn.)***

***THE CLERK:*** Thank you. You may lower your hand. Please take the stand.

Please state and spell your first and last name for the record.

***THE WITNESS:*** My name is Andrew Hughes. A-n-d-r-e-w H-u-g-h-e-s.

***THE COURT:*** Thank you. And if you'd just pull that microphone a little closer to you. It's a big courtroom.

***THE WITNESS:*** How's that sound?

***THE COURT:*** Better.

***DIRECT EXAMINATION***

***BY MR. FRASER:***

***Q.*** Good afternoon, Mr. Hughes.

Did you do semiconductor engineering work for Abreezio in 2015?

**A. I did.**

***Q.*** Before it was acquired by Qualcomm?

**A. I did.**

*Q.* And after the acquisition, did you come on board at Qualcomm?
**A. I did as a key employee.**
*Q.* And was that to implement Abreezio technology at Qualcomm?
**A. It was.**
*Q.* What made those of you who were key employees key?
**A. Without the key employees transitioning to Qualcomm, the deal would have been utterly void. It would not have occurred.**
*Q.* Where are you from, Mr. Hughes?
**A. I'm from Canada. Vancouver, Canada.**
*Q.* Are you familiar with a saying that is attributed to Texas that "It ain't bragging if it's true"?
**A. I'm actually not familiar with that phrase, but I can easily believe it, based on what I know.**
*Q.* Is that part of Canadian culture?
**A. No, I don't think so, I'm sorry to say.**
*Q.* Canadian culture is a little different.
So this is not to force to you brag, but did you invent any important Abreezio products?
**A. I did. All of the patents at Abreezio were written with my input, and specifically the very valuable DFTBreez application and patent was created by me.**
*Q.* Did anyone else contribute to DFTBreez?
**A. Other members of the Invionics engineering team, specifically Dr. Quinton and Trent McClements.**

*Q.* Did anyone -- and you mentioned Brad Quinton and Trent McClements.
Did they work at Invionics?
***A.*** **Yes. They were cofounders of Invionics with me.**
*Q.* Did anyone outside Invionics contribute a new and helpful idea to DFTBreez?
***A.*** **No.**
*Q.* Or any of the other products developed for Abreezio?
***A.*** **No.**
*Q.* Did anyone -- and so, again, not to put pressure on you here, but did anyone else have a greater role in inventing DFTBreez than you personally did?
***A.*** **No, they did not.**
*Q.* I'll come back to ask you some more about your time with Abreezio and Qualcomm, but I wanted to give a little more context on your background.
How far did you go in school?
***A.*** **I started my engineering degree in chemical engineering in 1986. I achieved my undergraduate degree in 1990. And I went on to start a doctoral degree in chemical engineering, which I worked at for three years. I did not write my dissertation because I started having severe doubts about my topic. I was sort of thinking I was making buggy whips, so I dropped out of that. I went back to school and completed a master's degree in computer science finishing in 1998.**

*Q.* From what institution did you obtain your bachelor's degree?

***A.*** **University of Saskatchewan and that was also the institute for my master's degree.**

*Q.* And where is the university of Saskatchewan? Apologies. We're Americans.

***A.*** **The university of Saskatchewan is located in Saskatoon, Saskatchewan. It's sort of right in the middle of the continent.**

*Q.* Have you applied those studies in your professional career?

***A.*** **I have. My thesis topic was on the application of A.I. to a specific EDA problem. It wasn't A.I. like we know it now, but there is nothing new under the sun.**

*Q.* How with you describe your area of specialty in your working life as an engineer?

***A.*** **I have spent approximately half of my career as an actual microchip designer designing and implementing semiconductor circuits. And half of that -- and including, of course, the necessary DFT and test infrastructure. And half of it writing EDA software to aid in the construction of semiconductor chips.**

*Q.* And about how many years total is it, of professional experience?

***A.*** **Twenty-one years. Twenty-one years -- 1998 to 2018, 20 years.**

*Q.* So as of 2015, how many would it have been?

***A.*** **In 2015 it would have been three years less, 17 years.**

*Q.* You mentioned EDA software.
**A. Yes.**
*Q.* What is that?
**A. EDA stands for electronic design automation. It is software that assists engineers in making microchips. Chips these days have billions and billions of transistors. Nobody can hope to do that all by themselves. That's a job for a computer.**
*Q.* And are you currently working?
**A. I am not. I am retired, although I do a little consulting on the side.**
*Q.* When you look back on your career to date, what professional accomplishments are you proudest of?
***MR. OLAH:*** 401, your Honor.
***THE COURT:*** Sustained.
***BY MR. FRASER:***
*Q.* Was your invention of DFTBreez significant for you personally?
**A. Yes. It was a significant capstone in my career.**
*Q.* What made it significant for you personally?
**A. It was a technology that I could see would make a transformative change in the kind of tests that we were doing at the time. I could easily see that.**
**Certainly we were using it to reduce test time, but there were many other applications I could see going forward, which, given the enhanced controllability it gave us over actual test**

**time control of the chip, I believed we could make more applications. And having created a product that could reduce test times by, you know, 20, 30, even 50 percent, if need be, seemed very significant to me for a certain class of tests, of course.**

***Q.*** It ended up being -- did it end up being profitable for you personally?

***A.*** **Yes, it did.**

***Q.*** Is it also significant for you setting aside the money?

***A.*** **Yes. Actually, quite a bit more so.**

***Q.*** How close is your relationship with Bradley Quinton?

***A.*** **Brad and I have been colleagues and close friends since late 1999. So 26 years. 26 years. And a moment, please. Close good friends as well.**

***Q.*** You understand he is charged in this case?

***A.*** **I do.**

***Q.*** How has that charge affected you?

***MR. OLAH:*** 401, your Honor.

***THE COURT:*** Sustained.

***BY MR. FRASER:***

***Q.*** Would you lie to help your friend Brad Quinton?

***A.*** **I would not.**

***Q.*** How much money did you net approximately from Abreezio?

***A.*** **Our company, Invionics, which is the actual contractor, received about $19 million of which after a while through**

**dividending out, I personally received around $4 million.**
*Q.* And did you offer -- did you ever speak with the FBI in this case?
***A.* No.**
*Q.* Are you represented by an attorney?
***A.* I am.**
*Q.* Did your counsel offer for you to be interviewed by United States law enforcement about this case?
***A.* At my direction, yes.**
*Q.* Did they take you up on that offer?
***A.* They did not.**
*Q.* Going back in time a bit, where were you working as of the time you first heard of Abreezio?
***A.* I was working at Invionics, the company that I had founded with Brad, Trent, and Mike Lee.**
*Q.* When was it that you founded Invionics together?
***A.* Invionics was founded in late 2013. So December 2013 to be more accurate.**
*Q.* And about when did you start working on anything Abreezio-related?
***A.* February 23rd of 2015.**
*Q.* And from that time until the acquisition, approximately what percentage of your time was dedicated to Abreezio, your working time?
***A.* I was essentially working on Abreezio contract, the contract**

**we'd signed with Abreezio, full time.**

*Q.* In what physical location did you do that work?

***A.*** **At our office in Vancouver, the Invionics office.**

*Q.* Can you describe the layout of that office?

***A.*** **It was about a 700 square foot building or room, of which I would guess -- measuring in my mind -- maybe 300 square feet was devoted to a boardroom. The actual working circumstances were three parallel tables. It was an open office where we -- our desks sat, I would say, within maybe 6 feet of each other.**

*Q.* Was it helpful to have that sort of layout?

***A.*** **It was very much so. It allowed you to interact with each other and -- and if someone was having a problem or wanted to ask about something, they could easily just turn around and talk to the fellow behind you. And maybe you'd overhear someone talking about something and you'd be able to offer assistance at that time.**

**It's worth thinking that large companies also use such a layout where you end up with cubicles arranged in a set of four with lower walls between them so that you can get those kinds of interactions.**

*Q.* And Invionics took advantage of the benefits of this layout?

***A.*** **We did.**

*Q.* Meaning -- and let's clarify. Who would it have been that you would have had -- it sounds like you're describing you would have spontaneous conversations with your colleagues at

Invionics?
**A. I would.**
*Q.* In the office?
**A. I did.**
*Q.* Who would have been the people present with whom you would have had those interactions?
**A. They would have been Trent McClements, Mike Lee. We had hired a new engineer called Mike Smith. Dr. Chin, Dr. Scott Chin, also sat to my right. And we had an intern, Bahar Salawar as well. I don't know if I said the last name right. It's been a while.**
*Q.* Were you in frequent contact with Dr. Quinton as well?
**A. Yes. Yes, of course.**
*Q.* And what was the first work that you did for Abreezio?
**A. The first work I did for Abreezio was to evaluate the utility of two provisional patents that had been filed by them.**
*Q.* What do you mean by "utility"?
**A. Whether they were useful, whether they could be used to accomplish the goals set out in the patents, and of course within our statement of work.**
*Q.* Two particular provisional patent applications?
**A. Yes.**
*Q.* Do you recall when they were dated from?
**A. I believe they were filed on December 22nd of 2014.**
*Q.* Okay. I didn't mean it as a memory test. I'm sorry.

**A. That's okay.**
Q. Let's show Government Exhibit 830. This is in evidence. I'll give you a moment to look at this document.
**A. Oh, I was right. I thought I was close. Yes.**
Q. Is this one of them?
**A. It is.**
Q. Is it the earlier or later?
Well, let's show Government Exhibit 831.
Do you recognize this as well?
Let's go to the next page.
**A. Oh, yes. This one, I recognize. The cover page seemed sort of a generic patent. I wasn't clear on that one.**
***MR. FRASER:*** Okay. Let's go back to Government Exhibit 830. And the next page.
***BY MR. FRASER:***
Q. And do you recognize this?
**A. I do.**
Q. So Government Exhibit 830, is that the earlier of the two provisional patent applications?
**A. I'm not sure I knew which one was earlier and which ones were later. I evaluated them both at exactly the same time. And I --**
Q. Okay.
**A. -- think from my recollection that they were perhaps filed with the PTO at the same time.**

*Q.* Okay. Did you -- is it convenient to call one of them PPA 1 and the other PPA 2?
***A.*** **Yes. Certainly one of them depended on the other in the sense that it incorporated a circuit from one.**
*Q.* Okay. Is it convenient to call Government Exhibit 830 "PPA 1"? That's --
***A.*** **Is the exhibit you're speaking of this, the one that's on the screen?**
*Q.* Yes.
***A.*** **Yes, it is.**
*Q.* Okay. So we'll call the other one "PPA 2."
Is that all right?
***A.*** **Yes.**
*Q.* Okay. How, if at all, did your initial Abreezio work relate to PPA 1 and PPA 2?
***A.*** **More so to PPA 1, of course. But PPA 1 we looked at quite carefully to see if the goals and objectives set out within the patent could be accomplished by this. That was to say an in situ at run time sensor to try and observe and control the performance of a circuit to determine if you could reduce the voltage and thus optimize power consumption.**
*Q.* Did this relate to a statement of work? Did you have a statement of work?
***A.*** **Yes, we did.**
*Q.* Okay. And what did the statement of work call for you to

do?

**A. It called for us to evaluate these patents and then create tools surrounding them to deploy them.**

Q. What kind of tool?

**A. That would have been an EDA tool, an electronic design automation time.**

Q. EDA, again, is electronic design automation; correct?

**A. Yes, yes.**

Q. When you tried to do that work called for by the statement of work, based on PPA 1 and PPA 2, how did it go?

**A. Well, it didn't get very far. We evaluated the patent and realized relatively quickly -- we had a very good look -- realized relatively quickly it could not be used for the purpose of AVS, which is automatic power reduction, AVS, automatic voltage control.**

Q. Why not?

**A. It couldn't be trusted. The results it returned were -- well, I assume we're all familiar with false positives and false negatives. It returned a great many false positives where the circuit would, say yes, all is well, but things were not well because it did not involve switching activity of the circuit.**

**And so you might reduce the voltage based on the input from the sensor to a point that the circuit actually failed, and the sensor would never tell you.**

Q. Did you discuss the problems with others at Invionics?

***A.*** **I did.**
***Q.*** Did anyone write a description of those problems?
***A.*** **We did. We created a PowerPoint slide that we could send to Abreezio so as to document this. We very much wanted to complete the statement of work, but it was not possible with these proposed patents.**
***Q.*** Was that documentation of the problems completed by March 2nd, 2015?
***A.*** **Yes, it was.**
***Q.*** What did Invionics do next?
***A.*** **We proposed and set out to create inventions that could complete the statement of work.**
***MR. FRASER:*** Let's show Defense Exhibit 3321 to the witness only. We can take this down. You can take it off the screen. Thank you.
***BY MR. FRASER:***
***Q.*** Invionics needed to pivot at that point in time; correct?
***A.*** **We did, yes.**
***Q.*** What did that lead to?
***A.*** **It led to us creating, over time -- it didn't happen immediately -- but new sensors and new circuits and new patents for Abreezio.**
***THE COURT:*** Would now be an okay time for a break?
***MR. FRASER:*** Yes, your Honor.
***THE COURT:*** Okay. Let's take a 15-minute recess.

Ladies and gentlemen, you're reminded you're not to discuss the case with anyone, and you're not to do any research about the case. And we'll see you back in 15 minutes.

And you're excused for 15 minutes as well.

***THE WITNESS:*** I can go too?

***THE COURT:*** You are excused for 15 minutes. You may step down.

***(Jury out at 2:30 p.m.)***

***THE COURT:*** Okay. We're now outside the presence of the jury.

Any issues?

You may step down.

Any issues? You can go wherever you'd like.

***THE WITNESS:*** Would it be best for me to leave or stay?

***THE COURT:*** It doesn't matter unless we have issues. Any issues?

Okay. Fifteen minutes. You may stay in the courtroom or walk around or stretch. Fifteen minutes.

***(Recess taken.)***

***THE COURT:*** We are back on the record. All jurors are present. Dr. Arabi is present. The lawyers are present.

You are reminded you're still under oath to tell the truth.

Mr. Fraser?

///

***BY MR. FRASER:***

***Q.*** Mr. Hughes, before the break you were describing that you found PPA 1 and PPA 2 were not helpful, and you went in a different direction.

Do you recall?

***A.*** **We did.**

***Q.*** Did that lead to the development of new technologies?

***A.*** **It did.**

***Q.*** And the technologies, did they take the form of particular products?

***A.*** **They did.**

***Q.*** Do you recall some of the names of those products?

***A.*** **I do.**

**Should I list them now?**

***Q.*** Please.

***A.*** **We developed a DFT product called DFTBreez that I was very much involved with. There were a few demonstration products, one called CoolBreez. And I think there was an overall sort of umbrella project called TruTest as well. And there might have been some products called TruSens. But the product that I remember the most, of course, was DFTBreez.**

***Q.*** That being the one that you were the primary mind behind?

***A.*** **Yes.**

***Q.*** Did -- and PPA 1, that had ideas related to low power?

***A.*** **Yes.**

***Q.*** Did PPA 1 or PPA 2 contain any ideas that were foundational to the products that you developed for Abreezio?
***A.*** **PPA 1 and 2 were entirely discarded before we invented anything. They had no effect on any of our products or inventions.**
***Q.*** I'd like to show you Government Exhibit 232.
***A.*** **Yes.**
***Q.*** Do you see this? Have you had a moment to take a look at the top of it?
***A.*** **I have.**
***Q.*** Is it an email?
***A.*** **It is.**
***THE COURT:*** And it is in evidence, just for the record.
***MR. FRASER:*** Thank you, your Honor.
***BY MR. FRASER:***
***Q.*** When did you receive this email?
***A.*** **March 9th -- or March 19th.**
***Q.*** Do you see a time?
***A.*** **I do.**
***Q.*** What is it?
***A.*** **Ten to 11:00 a.m.**
***Q.*** And what -- do you recall when you received this -- do you recall the -- do you recall the experience of receiving this on that date?
***A.*** **It was ten years ago, but I do remember it somewhat,**

**certainly.**

***Q.*** Okay. Did it have importance for you at that time?

***A.*** **No.**

***Q.*** Why not?

***A.*** **It seemed entirely replicative. It added no particular value as far as I could tell.**

***Q.*** Okay. And would that pertain also to any attachment?

***A.*** **Yes.**

***Q.*** And let's show 233, Government Exhibit 233.

May this have been the attachment to that?

***A.*** **Yes, it is.**

***Q.*** And it still wasn't new information for you --

***A.*** **Not for me any rate, that's for sure.**

***Q.*** Was it related to DFTBreez?

***A.*** **No.**

***MR. FRASER:*** Okay. Let's take that down.

***BY MR. FRASER:***

***Q.*** And how did this idea come to you for DFTBreez?

***A.*** **Dr. Quinton had been on a marketing meeting, and I got a message from him saying that he was quite surprised that Sanjiv Taneja had said that these technologies in Abreezio would help with TDF tests. And he was like is that true? And I said I don't think so. I was pretty clear it wouldn't.**

**A consequence of that is he asked me could I please have a look and see if it would indeed help? Because he knew I had**

**some experience with this particular style of test, TDF test, a particular DFT test. So I indeed did have a good look at it. I thought about it a great deal. My opinion did not change.**

***Q.*** Could we pause just a moment to clarify?

***A.*** **I didn't mean to give a speech there. Sorry.**

***Q.*** So it sounded like you had a conversation in which you heard what Sanjiv had related to Brad.

***A.*** **Brad reported to me that Sanjiv had told one of the customers, I believe now that it was indeed Qualcomm, that their technology would help TDF tests, make it faster.**

***Q.*** And did that sound right to you, as of that time when you heard it?

***A.*** **That it would help or that --**

***Q.*** With TDF testing.

***A.*** **Oh, it sounded like it would not help at all.**

***Q.*** And just to clarify, not to get bogged down, but what is TDF testing?

***A.*** **Transition delay fault. It's a specific type of fault that occurs on a chip, which results in a circuit not meeting its necessary timing budget.**

***Q.*** When, to the best of your memory, did you have this information relayed to you about Sanjiv -- Sanjiv was conveying an unrealistic expectation for the preexisting technology; right?

***A.*** **I believe it was the day after the meeting. So about on or**

**about March 5th, I should say.**
*Q.* Okay. And that prompted action on your part?
***A.*** **It did.**
*Q.* Please carry on from there. What did you do?
***A.*** **I investigated TDF. I looked at carefully current industry standard practices to see if there was any way whatsoever that the proposed patent circuit could help in any way. I could find no way whatsoever.**
*Q.* How did that feel?
***A.*** **And I told Brad about that. Well, I wasn't surprised, not to put too fine a point on it. It didn't surprise me a bit. And then of course I went to Brad and said I don't think so, and then he asked me if I could look into it. Is there any way, is there any thing that could be done. So I took some time to go and think about that as well.**
*Q.* What, in particular, did you do to think about it?
***A.*** **Well, number one, as I said, I had a good look at industry standards and all the details and where are the troubles and what are the problems and all that kind of stuff.**
**And having thought about it overnight, in the morning -- I go running every Monday, Wednesday, Friday. I went out for my run in the morning, and in the middle of my run a great idea came to me that, although we can't do anything on the observation side, there may be a means by which we could partition the circuit, such that one part of it could be used to**

**control during one phase of the test and another part in the other phase, so that we would gain enough control so that we could indeed observe the timing effects at that time.**

**And then when I went back to the office -- because I go for a run in the morning -- I sketched this out on the whiteboard for when Dr. Quinton and Trent would come in so we could have a discussion around it to see if it wasn't just a pie in the sky idea, which it might have been.**

***Q.*** So as of -- at first you felt it might be a pie in the sky idea?

***A.*** **Until you test something, you cannot know.**

***Q.*** Were you excited about the possibilities of it?

***A.*** **I was. It seemed -- it was the first thing I'd seen that might give some help, might address this issue. But again, no promises at this early stage. You have to test and have a good look.**

***Q.*** And what did you -- so you wanted to test to see whether your idea would work?

***A.*** **Yes.**

***Q.*** What --

***A.*** **I also wanted to run it by my colleagues. They also have useful insights certainly.**

***Q.*** And just at a high level, what was their reaction to the idea at first?

***A.*** **They seemed quite pleased with the idea. It seemed quite**

plausible to them. We did talk it over and see is there a problem here, could you do it like this or that. It seemed very plausible. They didn't see any obvious flaws which made me feel pretty good.

*Q.* Did you all go fishing next?

***A.* No, we did not. We immediately went to work.**

*Q.* And what did that work entail?

***A.* The work entailed setting up a demonstration platform for myself, of course. That is, I obtained a small circuit that I understood very well. I instrumented it using industry standard tools. I believe the tool we used was the DFTAdvisor from mentor, and then ran an industry standard TDF to see what a baseline result would be for our industry standard TDF.**

**I then took that same circuit and instrumented it with a known optimal solution. There's a known optimal solution where you replace all the flip-flops with two flip-flops, which is obviously untenable, makes everything twice as big. But with two of them, you can hold twice as much data and, thus, stimulate the circuit whichever way you want. Running that, again, with DFTAdvisor gave me the other end of the spectrum, the best possible value could you to.**

**Then I ran our circuit with the same circuit again -- instrumented by hand. I didn't have a tool at this time -- with the essentials of our idea to see where it would fall on that spectrum.**

***Q.*** In general terms, did that mean you were testing out the idea?
***A.*** **Yes.**
***Q.*** Did you use software to test it out?
***A.*** **I did.**
***Q.*** Did you write up a provisional patent application?
***A.*** **I did.**
***Q.*** When was that, approximately?
***A.*** **The provisional patent application was completed by March 18th.**
***Q.*** Okay. And so this process of testing out the new idea involved some process of writing?
***A.*** **Yes, yes, certainly. Also running EDA tools and DFT and all that sort of stuff.**
***Q.*** What did you do with the provisional patent applications that you wrote?
***A.*** **We forwarded them to Brad, Dr. Quinton, who then forwarded them on to Abreezio management.**
***Q.*** Okay. I would like to show you Defense Exhibit 2362.
***A.*** **I know this email.**
***Q.*** You know this email.
Do you recognize the names of the attachments?
***A.*** **I do.**
***Q.*** Are they provisional patents you wrote with Trent?
***A.*** **Yes, they are.**

***THE COURT:*** For the record, it is in evidence.
***MR. FRASER:*** Oh, thank you.
***BY MR. FRASER:***
***Q.*** And what is the date and what is the time of this email?
***A.*** **This email was sent on March 19th at 5:37 a.m.**
***Q.*** And 5:37 a.m., is that before or after 10:00 a.m.?
***A.*** **Before, yeah, 10:00 a.m.**
***Q.*** Yeah. Do you see -- does one of these attachments relate to the partitioning idea you referenced?
***A.*** **Yes, it does. That's the enhanced transition fault.**
***Q.*** You wrote that?
***A.*** **I did.**
***Q.*** Showing you -- let's show you Defense Exhibit 2370.
Do you recognize this?
***A.*** **I do.**
***Q.*** Is this enhanced transition fault document --
***THE COURT:*** This is not in evidence, just so you know.
***BY MR. FRASER:***
***Q.*** Is this the attachment that you just mentioned?
***A.*** **Yes.**
***MR. FRASER:*** Move to admit.
***MR. OLAH:*** No objection, your Honor.
***THE COURT:*** 2370 may be admitted.
***(Exhibit 2370 admitted.)***
///

***BY MR. FRASER:***

***Q.*** Would you please look -- let's go to page 7.

***A.*** **I worked hard on this diagram.**

***Q.*** What are we looking at in this diagram? There's a -- excuse me.

Do we have any hope of understanding this at a high level?

***A.*** **We can certainly try.**

***Q.*** Okay. Take your best shot.

***A.*** **This circuit, the upper part shows a -- an overall circuit on a microchip, the arrows leading into the cloud shape. The actual cloud itself is the circuit with no state attached to it. It's a combination. It's the actual circuit itself.**

**The arrows with the outputs are the outputs where the output of the circuit will be captured. The small boxes are state-holding elements that either hold data or transmit it on.**

**The lower circuit shows a data flow diagram showing where the data comes and where the data goes in a combined fashion so as to show both scan mode, which is a mode that we use to load data in to test the chip, and also normal operation. And it shows how we are altering the existing scan structure to partition them into two partitions, alpha and beta, which are leftovers from my academic career. That's neither here nor there.**

**And the diagram shows that if you trace through with a pen where the data goes, that you can get two tranches of data, two**

**vectors presented to the same circuit without having to add any extra flip-flops to the design and without increasing the cost, simply by creating a different arrangement of the flip-flops and DFT structures that already exist on the device.**

***Q.*** Does this describe part of your partitioning idea?

***A.*** **It does.**

***Q.*** Does it capture the idea completely?

***A.*** **No.**

***Q.*** And in the provisional patent application, where would the invention itself be defined?

***A.*** **In any patent application, the inventions reside within the claims.**

***Q.*** Let's look at page 5.

Is this where the claims are located in this document?

***A.*** **Yes.**

***Q.*** Did you participate in writing this?

***A.*** **I did.**

***Q.*** Does it describe your invention?

***A.*** **It does.**

***Q.*** Was this done before a particular meeting with Qualcomm?

***A.*** **It was.**

***MR. FRASER:*** We can take this down. Thank you.

***BY MR. FRASER:***

***Q.*** The partitioning idea connects back to DFTBreez; is that right?

**A. It does.**

*Q.* What made DFTBreez an important innovation in semiconductor design?

**A. It allowed for effective testing of a problem that has bedeviled semiconductor tests for, well, most of my career, although we only really started doing TDF testing in the last half of it, which is timing test and how to present enough data to a circuit to actually effectively test the timing characteristics of a circuit.**

**In my career, this was, again, the only time I've seen a real good solution to this problem. It's partial, it's not perfect by any stretch, but it was something and it seemed like it would work very effectively. I don't know if I answered your question there, Ryan. I'm sorry.**

*Q.* Well, I feel like you did. The question -- I mean, I'll ask it again just in case if I -- I was asking what made DFTBreez an important innovation in semiconductor design.

I mean, just to kind of circle back, make it big picture, does it help a semiconductor company save money?

**A. It does.**

*Q.* How so?

**A. It will reduce test time and/or increase the quality of the test. A great deal of money is spent on testing individual chips. And if you can reduce the test time, that makes them cheaper.**

*Q.* Does it give an advantage as against other semiconductor chip companies?

***A.*** **Well, if you deploy DFTBreez as a semiconductor company, you'd be able to make your chips more cheaply than anybody else. Or conversely, if you wanted to spend a little bit more, your chips would be significantly more reliable than other people's. Either one I think is a pretty compelling competitive advantage.**

*Q.* Is it possible in some ways to quantify the advantage?

***A.*** **Yes, yes, you certainly can. Reduced test time is exactly the thing. A lower vector count. Vector counts are -- say you load the patterns in and load them out, each pattern is a single vector. Reducing the number of those vectors corresponds directly to a reduction in test time and, thus, a reduction in cost.**

*Q.* What do you mean by "directly"?

***A.*** **Directly. One for one. Every single vector that you add is one more. If you have twice as many vectors, it costs twice as much and, therefore, takes twice as long, pardon me, and, therefore, costs twice as much to test.**

*Q.* You're extremely smart and you're providing dense information, so I'll just ask you to take your time. But I appreciate your answer. Thank you.

So did you quantify pattern count reduction in this process?

***A.*** **I'm not sure I understand. Could you ask it again?**

*Q.* Perhaps I can better communicate by showing you Defense

Exhibit 2107.

***MR. FRASER:*** And let's go to page 21 of the attachment. No, let's -- sorry. Let's try the prior page.

***BY MR. FRASER:***

***Q.*** Do you recognize this?

***A.*** **I do.**

***Q.*** What is this?

***A.*** **This is a figure showing the deployment of DFTBreez on a sample circuit. I believe it's the OR1200. I remember creating this data. The OR1200, which is an open source readily available on microprocessor design. And it shows that for the same coverage, you can get that coverage with 70 percent less patterns.**

**And if you want to have a little more coverage -- and there's a couple varieties in how we did it. I said, oh, we'll do it all with two partitions. Well, of course, you could have more and there's more details along those lines of course. But it shows that you can flat out get the same results with a lot fewer patterns.**

***Q.*** How much less?

***A.*** **Diagram says 71 and a half percent less patterns.**

***Q.*** And setting aside the diagram, is that the amount that you calculated it could save?

***A.*** **Yes. Yes, for this case. Different circuits will have different exact numbers, of course.**

***Q.*** I would like to -- does this particular slide illustrate the testimony you've just given?

***A.*** **Yes, it does.**

***MR. FRASER:*** I would ask to publish this slide to the jury.

***THE COURT:*** I think the entire exhibit is in evidence.

***MR. FRASER:*** Okay. That's easy.

***BY MR. FRASER:***

***Q.*** What does -- so the 71 percent, does that -- how much money does that indicate that a company that owns this technology could save?

***A.*** **It will very much depend on the details of their manufacturing, what chips they're making and this sort of thing.**

**I can go out on a limb and say a very large semiconductor company could easily --**

***MR. OLAH:*** Your Honor, objection. 701.

***THE WITNESS:*** That means I have to stop?

***THE COURT:*** Overruled. Wait for the ruling. I'm a ref blowing the whistle.

Overruled. You may answer.

***THE WITNESS:*** I would guess for a very large semiconductor company -- I did a few estimates as I was going along back in 2015 -- they could easily save hundreds of millions of dollars a year.

///

***BY MR. FRASER:***

***Q.*** Did it matter to you to create a realistic estimate when you calculated hundreds of millions of dollars per year?

***A.*** **It had to be, at the very least, representative. Yes, it needed to be accurate. It didn't have to be accurate to the last digit, all the significant figures and all that kind of stuff, but I needed to have at least a good ballpark figure. You needed to know whether it was worthwhile pursuing.**

***Q.*** And the savings would depend on the volume of chips produced by --

***A.*** **Yes. Test time -- and this is another DFT thing. Test time is paid per chip. If you make more chips, you save more with better technology.**

***Q.*** Would the hundreds of millions of dollars have applied to an acquirer like Qualcomm?

***A.*** **If they successfully deployed it, certainly.**

***Q.*** Did you have any role in deploying that technology at Qualcomm after the acquisition?

***A.*** **I did.**

***Q.*** Please describe that role.

***A.*** **I was a key employee. And afterwards I went and adapted and worked on DFTBreez to make it apply widely across every chip that -- well, as far as I know, every chip that Qualcomm made. Certainly by 2018.**

***Q.*** And how many years were you involved in helping Qualcomm

deploy that technology?
**A. Three years. Yes, three years almost to the day. Three years, 20 -- October 31st, 2015, until September 21st of 2018.**
*Q.* Is --
**A. Three years.**
*Q.* Was DFTBreez technology useful to any products that consumers would recognize today?
**A. It is, actually. Qualcomm products are all around. Just if you have an Android phone, almost certainly it's in that. If you have an iPhone, most of their modems are indeed still Qualcomm modems. It's in that. This display in front of me which probably has wireless connectivity almost certainly has a Qualcomm chip. It's probably in there, too.**
*Q.* I have an iPhone 13.
Would the DFTBreez technology have been useful for making this phone?
**A. The iPhone 13, I believe, came out in 2020. Yes, it would be.**
*Q.* So you worked at Qualcomm for three years?
**A. I think probably two years and about ten months.**
*Q.* When you left, did Qualcomm offer you anything to entice to you stay at Qualcomm?
**A. There was a retention offer.**
*Q.* Did you accept it?
**A. I did not.**

*Q.* How much -- shifting topics.
How much of your pre-acquisition work on Abreezio's technology involved creating or editing software?
***A.*** **A great deal of my time was certainly used up writing patents and creating patents and all of that. But -- and of course it varied over time. I would say between March and September, the start of September, I would say I was certainly working on DFTBreez, which was the only software that I really wrote. It was the only software we really created. I was working easily 75 percent of my time. Well, maybe 50. There was a lot of patents being written.**
*Q.* Did that involve editing source code?
***A.*** **It did.**
*Q.* What is source code?
***A.*** **Source code are instructions to the computer on what to do.**
*Q.* And were you keeping track of those edits to source code?
***A.*** **Certainly. We used a source code control management system called Git, which allowed us to track very carefully edits and who did what and all this sort of stuff. So you can track it back to find bugs and fix errors and that sort of stuff. Industry standard stuff, certainly.**
*Q.* Did you say Git?
***A.*** **I did.**
*Q.* How do you spell that?
***A.*** **G-i-t.**

***Q.*** Why is it useful to keep track of edits to source code using something like Git?
***A.*** **It's a system that allows -- if you've used track changes and written a Word document, it's like that except of course multi-threaded so you can come at it from all directions. It allows to you rewind an edit. It allows you to see who created an edit. It allows you to track back and see if one particular edit would have introduced a problem or not.**
***Q.*** Is it important to -- for the Git to reflect all of those changes? Is that what makes Git useful?
***A.*** **Yes, yes, of course.**
***Q.*** And the Git repository, would that have been acquired by Qualcomm when it bought Abreezio?
***A.*** **Certainly, yes.**
***Q.*** Who had -- do you know who had the ability to edit that source code before the acquisition?
***A.*** **I do. I do know who had that ability.**
***Q.*** How many people?
***A.*** **Abreezio was a startup company, so it didn't have a whole lot of money. So the plan they bought from a cloud provider allowed five different people to edit it. I was the administrator of the account, so I had to hand out those keys. And I allocated one to myself, to Trent, to Brad, to Dr. Scott Chin, and I believe one to Mike Lee as well. Five.**
***Q.*** That's five that you just named?

***A.*** **That's five. That's all.**
***Q.*** No one else?
***A.*** **No one else.**
***Q.*** And the Git -- so -- and the Git would show who made the changes?
***A.*** **Certainly.**
***Q.*** Does it also show what ideas are in the source code?
***A.*** **The source code itself embodies the idea, but I can certainly see who changed what and who modified this and any alterations to it. I don't know if that quite answers your question, either.**
***Q.*** Yes, thank you.
***A.*** **Okay.**
***Q.*** Do you have a general idea of what was in the source code as of the end of October 2015 when the acquisition happened?
***A.*** **I do.**
***Q.*** Did it contain any manifestation of an idea that didn't come from Invionics?
***A.*** **No.**
***Q.*** Why not?
***A.*** **I created them all, and also the vast, vast bulk of all the software was created by me. And I worked for Invionics.**
***Q.*** If some idea had come from someone other than Invionics into that software, would it have been in the source code?
***A.*** **Yes.**

***(Pause.)***

***BY MR. FRASER:***

***Q.*** Mr. Hughes, did you tell Qualcomm or a representative of Qualcomm that Invionics had created Abreezio's useful technology? Somebody named Schmidt?

***A.*** **Oh, Anthony, yes.**

***Q.*** And you told -- you're familiar with the indictment in this case?

***A.*** **I am.**

***Q.*** You told Schmidt that before the Indictment?

***A.*** **Yes.**

***Q.*** And your attorney offered for you to meet with the Government?

***A.*** **She did.**

***Q.*** But they never took you up on it?

***A.*** **No.**

***MR. FRASER:*** No further questions.

***THE COURT:*** Cross-exam?

***MR. OLAH:*** Thank you, your Honor.

***CROSS-EXAMINATION***

***BY MR. OLAH:***

***Q.*** Mr. Hughes, congrats on your retirement.

***A.*** **Thank you. But I wasn't sure I really wanted to retire. This whole litigation thing really put a damper on stuff. It**

**kind of got pushed back.**
*Q.* Sorry to hear that. You've also bucked the trend of Canadians canceling their flights to the States, didn't you?
***A.*** **I did.**
*Q.* We didn't subpoena you; the defense did.
Just so I have your timeline right, you received $4 million in the fall of 2014; right?
***A.*** **Yes, I did.**
*Q.* And that was your share of -- from the money that Qualcomm paid to Invionics; right?
***A.*** **Yes, it is.**
*Q.* And then you worked for two years and ten months -- I appreciate your fine-tuning that -- not quite three years for Qualcomm. Is that right?
***A.*** **It is.**
*Q.* And the money they paid you was entirely separate from the $4 million you got in the fall of 2014; right?
***A.*** **I believe there was a small holdback, was there not?**
*Q.* I think we're talking about separate things.
***A.*** **Okay. Sorry about that. I want to make sure I'm right about this. My salary was a salary.**
*Q.* Great. So let's just be clear.
Fall of 2014, you get $4 million wired to your account from Invionics; right?
***A.*** **Yes, I did. Approximately four.**

***Q.*** And thereafter, you got paid, what, biweekly or monthly from Qualcomm?
***A.*** **Biweekly. My salary was calculated -- do you want to know the number?**
***Q.*** I don't want to know.
***A.*** **Okay.**
***Q.*** I'm just asking the simple fact that your salary from Qualcomm was entirely separate from whatever was owed to you under the UPA.
***A.*** **Yes.**
***Q.*** And then after two years and ten months, you ride off into the sunset and retire. Is that right?
***A.*** **A little under duress, but yes, yes.**
***Q.*** You and I have never met?
***A.*** **No, never.**
***Q.*** You've not met any of my colleagues or any of these members of the FBI or the Marshals Service. Is that right?
***A.*** **Is everybody on this side from the FBI?**
***Q.*** Or the U.S. Attorney's Office.
***THE COURT:*** Have you met anybody on that side of the courtroom?
***THE WITNESS:*** I have. My attorney.
***BY MR. OLAH:***
***Q.*** Your attorney who also represents Trent McClements; right?
***A.*** **Of course.**

*Q.* And Brad Quinton?
***A.* Dr. Quinton, yes.**
*Q.* And when the RCMP came to interview folks like you, Trent McClements lawyered up; right?
***A.* Did he?**
*Q.* Are you -- I'm asking the questions. You're answering them.
***A.* Oh, I see, I see. Yes, I assume so.**
*Q.* Yeah. And you're really good with dates, it sounds like; right?
***A.* With somewhat practice, yes, not bad. I have a fair memory. Not for everything. The perfect memory is totally a myth. But a fair memory.**
*Q.* I apologize for interrupting.
***A.* It's okay.**
*Q.* You knew the date that Ms. Arabi had filed a provisional patent; right?
***A.* I've looked at them a lot.**
*Q.* What was the date that your attorney offered your -- you to interview at the FBI?
***A.* I don't recall.**
*Q.* Yeah. Did she email that offer?
***A.* I don't recall. I believe she asked on the phone but that's a vague memory. I'm not totally sure. I think it was a phone call.**
*Q.* But your sworn testimony was that Ms. Cane made you

available to Canadian and United States authorities?
**A. Yes, it is.**
Q. You just don't know the date?
**A. I don't.**
Q. Was it an email she sent?
**A. I don't recall.**
Q. And to be clear, you have not met with the RCMP?
**A. I have not.**
Q. Which is the Royal Canadian Mounted Police; right?
**A. It is.**
Q. And you've not met with the FBI?
**A. I have not.**
Q. Or the Marshals Service, United States Marshals Service?
**A. I'm not sure what Marshals are.**
Q. That was going to be my follow-up question.
**A. No, no, that's fine.**
Q. How many times have you met with the defense in this case?
**A. I met with them twice on a video conference, and let's see, twice in person. Once in Vancouver and of course just recently here in San Diego.**
Q. Four meetings total?
**A. Yes.**
Q. You said recently in San Diego.
Would that have been this Sunday that you met with them?
**A. Yes, it would.**

*Q.* Three, four attorneys there?
***A.*** **I met with attorneys one at a time. I saw three. I don't know, they might have been hiding some, but I don't think. So but yes, three.**
*Q.* Three attorneys is too much for any one room. Let's be real.
That was on Sunday you met with them again?
***A.*** **Yes, it is.**
*Q.* Okay. You were one of Invionics' four founders; right?
***A.*** **I am or was. Am still, I guess.**
*Q.* So a question on that, does Invionics still exist?
***A.*** **As a -- in a sense. Invionics sort of split and divided and we spun a part off. But yes, it still does.**
*Q.* Exists on paper, it sounds like?
***A.*** **There are some small operational things. But yes, yes.**
*Q.* And you mentioned a split off.
Did that split off into Singulos Research?
***A.*** **No.**
*Q.* That's a separate entity?
***A.*** **Yes, entirely.**
*Q.* But with common membership as Invionics; right?
***A.*** **Some of them, yeah. Some of them, yeah. I didn't -- I am not a part of Singulos.**
*Q.* You're unhappily retired, it sounds like?
***A.*** **Unhappy to have had to retire a little bit, or maybe not**

**even have to -- retirement is not so bad. Let me tell you, it's not so bad.**

*Q.* You're making the most of it. That's good.

Brad Quinton is an advisor at Singulos Research; right?

***A.*** **I'm not entirely privy to the structure of Singulos, so I don't know. But I'm -- I won't disagree with you.**

*Q.* Are you an advisor to Singulos Research?

***A.*** **A consultant. And I think actually that is an advisor because I signed an advisor agreement. So I think of it as consulting, but, yes, advising.**

*Q.* Might Singulos's website list you as an advisor?

***A.*** **I bet it does, yes.**

*Q.* And Mr. Quinton too?

***A.*** **It might now. I think he left. One time when it was first started he was a founder and now of course he is an advisor.**

*Q.* And sticking with Singulos, Trent McClements, he is the chief A.I. architect; right?

***A.*** **I haven't looked at their website in a long time. But yes, sure. I mean, I haven't seen it, so I don't know for sure. But I'm not going to disagree with you on there.**

*Q.* The website is not on trial here.

***A.*** **I'm just saying I don't want to mislead anyone.**

*Q.* Who was the chief architect of Abreezio?

***A.*** **Abreezio? As far as I know, the only thing that Abreezio had were these patents and they came from Sheida Arabi.**

*Q.* Sheida Arabi, Arabi being the last name?
**A. That's what it says on the patent, yes.**
*Q.* Thank you.
Before Invionics, you worked at PMC Sierra. Is that right?
**A. It is.**
*Q.* Along with Mohamed Allam?
**A. I think our tenures did overlap. I don't know if we had exactly the same time frame. Probably towards the end we overlapped. And that would be somewhere post-2000, perhaps. I'm a little older than he is.**
*Q.* You worked at PMC Sierra with Brad Quinton, though; right?
**A. Oh, yes, I did.**
*Q.* And did you have a work history even before PMC Sierra with Mr. Quinton?
**A. I did not.**
*Q.* That was the first?
**A. Yes, yes.**
*Q.* And that's also where you met Dr. Karim Arabi; right?
**A. I never met him. I knew of him as a guy that was involved with the RAM test side back in Burnaby. I was of course in Saskatoon at the time. So I'd seen his name on a document but I never met him.**
*Q.* Fair point.
So same company, different locations?
**A. Oh, yes, very much so. Different divisions really. I was**

**doing semiconductor design and he was on the RAM test side. So that would be DFT.**

***Q.*** What about Mr. Quinton, were you guys at the same work site?

***A.*** **Yes, we were in Saskatoon.**

***Q.*** And you and I are both very fast talkers. That makes her job very hard. So slow it down a fair bit.

***THE COURT:*** The second thing is you can't talk at the same time. Even though you know where he's going with the question, if you jump in and talk on top, she has to pick one side or the other to report, and it may not be you.

***THE WITNESS:*** I'll be more cautious.

***MR. OLAH:*** I'll try my best as well.

***THE WITNESS:*** Okay.

***BY MR. OLAH:***

***Q.*** All to say, you've at least heard of Dr. Arabi for over 20 years; right?

***A.*** **Yes.**

***Q.*** And your friendship with Mr. Quinton goes back 25 years?

***A.*** **Twenty-five or 26, yes.**

***Q.*** It was in May of 2017 that folks from Qualcomm's employee relations department reached out to you; right?

***A.*** **They showed up at our office, yes.**

***Q.*** Your office being Brad Quinton's office?

***A.*** **The Qualcomm office in downtown Vancouver.**

***Q.*** You worked out of that office; right?

***A.*** **I sure did. And Brad worked out of it as well.**
***Q.*** That's what I'm getting to.
Trent McClements worked there as well; right?
***A.*** **Yes, he did.**
***Q.*** But he, when the Qualcomm folks showed up, was vacationing in England, we heard. Is that right?
***A.*** **I think it was England. I don't keep track. Yes. I'll be careful.**
***Q.*** You were there at the office?
***A.*** **I was.**
***Q.*** Mr. McClements was not?
***A.*** **Yes.**
***Q.*** And Anthony Schmidt was there on behalf of employee relations?
***A.*** **Yes.**
***Q.*** Do you remember the other individual he was with?
***A.*** **I've got a picture of him. In my mind he had blond hair and not that tall. He looked like a sort of tough guy.**
***Q.*** Short, tough, blond dude?
***A.*** **I would say so.**
***Q.*** Got it.
***A.*** **I can't remember. I'm sorry.**
***Q.*** It's fine. Don't worry about it. We don't want you guessing as to these answers.
My question for you now is, Mr. Quinton was furious about

these guys showing up at the Vancouver offices of Qualcomm; right?

***A.*** **I believe so, yes.**

***Q.*** He was swearing?

***A.*** **I didn't hear that, and I don't recall it. But it wouldn't surprise me a bit.**

***Q.*** Knowing the guy.

***A.*** **Yeah. He's a passionate fellow.**

***Q.*** He was panicking, wasn't he?

***A.*** **No, I wouldn't say panicking. He's not a panicky guy.**

***Q.*** Was he happy the employee relations was there asking questions?

***A.*** **I would think not, no.**

***Q.*** Let's clarify that.

***A.*** **Okay, sure. No, he was not happy.**

***Q.*** Okay. But your testimony is that he was not panicking.

***A.*** **No.**

***Q.*** Employee relations wanted to speak with you; is that right?

***A.*** **They did, yes.**

***Q.*** And you talked to them for nearly an hour; right?

***A.*** **I believe it was 55 minutes.**

***Q.*** Yeah. Can we call it an hour?

***A.*** **We can.**

***Q.*** You answered their questions; right?

***A.*** **I did.**

*Q.* You didn't say, hey, guys, I'm really busy, can you just email these questions and I'll email you responses back?
**A. HR works as a company. You do what they say.**
*Q.* My question is --
**A. Oh, I did not prevaricate and try to postpone things.**
*Q.* You sat down and talked with them for 55 minutes?
**A. Fifty-five minutes.**
*Q.* Did you lie to them?
**A. No.**
*Q.* You told the truth?
**A. I did.**
*Q.* You had nothing to hide?
**A. I had nothing to hide. And I like telling the truth.**
*Q.* You're in the right place.
They took notes on the interview; right?
**A. Yes.**
*Q.* Mr. Schmidt took notes?
**A. Yes.**
*Q.* Did the other unidentified -- was he a short, muscular, blond guy?
**A. You could give me his name. It would be nicer, wouldn't it?**
*Q.* I would feed you the name, if I knew it.
**A. Oh, okay. No, he didn't sit in on the meeting.**
*Q.* Okay. But they did take notes; right?
**A. Anthony did, yes.**

*Q.* Have you reviewed those notes in your four meetings with the defense attorneys in this case?
**A. I've reviewed a transcript of those notes, not the physical notes themselves, of course.**
*Q.* Typed out notes, is that what you're saying?
**A. Yes.**
*Q.* And when I think "transcript," I think like what Ms. Roldan is doing right now and getting every word.
You're not talking about that; right?
**A. Well, there's no transcriber other than Anthony, so no.**
*Q.* Okay. If I call those notes, will you know what I'm talking about?
**A. I will, I will, I will. I'm just saying there might have been inaccuracies in the transcripts that I know nothing about.**
*Q.* But you have reviewed those notes; right?
**A. I have.**
*Q.* And having reviewed those notes, you'll recall that the folks from employee relations asked you about the name Sheida; right?
**A. I don't have it in front of me, but yes.**
*Q.* Your independent recollection is that they asked you about Sheida; right?
**A. Yes.**
*Q.* And your answer was that name doesn't ring a bell?
**A. So it didn't.**

**Q.** You did not recognize the name Sheida?
**A. I did not. Well, no, no, not that moment.**
**Q.** Did you also state that you didn't remember that name or know who that is?
**A. I don't recall. I'm sorry. But I'm sure it's in the notes.**
**Q.** You don't recall --
**A. Don't recall if I did say that. But I'm sure it's in the notes.**
**Q.** But you do recall saying the name Sheida doesn't ring a bell; right?
**A. Yes, indeed.**
**Q.** Okay. As you sit here today, have you ever met Sheida?
**A. I have not.**
**Q.** Not once?
**A. Not once. Except, you know, email and stuff like that. Never in person.**
**Q.** You have exchanged emails with Sheida?
**A. I haven't exchanged emails, but there was an email exhibit that came around and I remember it well and she was on it. I think that's the only email, too, by the way.**
**Q.** And if you say she was on it, what does that mean that there's an email address bearing her name?
**A. Yes.**
**Q.** So it might not even have been her; right?
**A. I tend to take things at their face value. I think it was**

**her.**

***Q.*** You think it was Sheida Alan on the --

***A.*** **I had -- Alan or Arabi?**

***THE COURT:*** You don't know what the question is because he hasn't finished the question yet.

***THE WITNESS:*** Oh, we're doing it again.

***THE COURT:*** So wait for the question and then you can answer it. So let him finish his question and then you'll see. Otherwise, you're going to say yes and you might find that the question takes a turn in a different direction.

***THE WITNESS:*** I'm very sorry about that.

***MR. OLAH:*** You're doing just fine. Just relax, we're good.

***THE WITNESS:*** I don't know if that's good or not.

***BY MR. OLAH:***

***Q.*** And when we say "Sheida," are you familiar with the name Sheida Arabi?

***A.*** **I am.**

***Q.*** That's the name you recognized from the provisional patents; right?

***A.*** **It is.**

***Q.*** And are you also familiar with the name Sheida Alan?

***A.*** **Yes.**

***Q.*** Okay. And for the sake of testimony today, I'm just going to refer to Sheida if that's all right with you.

*A.* **Yeah. That would be easier.**
*Q.* You've never met Sheida, whatever her last name is; right?
*A.* **Correct.**
*Q.* Have you ever talked to her on the phone?
*A.* **Nope.**
*Q.* Did she contribute to Abreezio aside from those two provisional patent applications?
*A.* **No.**
*Q.* You're an inventor on not one, but several issued patents; right?
*A.* **Yes.**
*Q.* Including one that also listed Sanjiv Taneja as a coinventor?
*A.* **Yes.**
*Q.* That same application would list Brad Quinton as an inventor as well; right?
*A.* **It would.**
*Q.* And Sheida Alan as an inventor; right?
*A.* **Yes.**
*Q.* Coinventor that you've never met in your life?
*A.* **Correct.**
*Q.* And that same application would list Bozena Kaminska as an inventor; right?
*A.* **Yes.**
*Q.* Have you ever met Ms. Kaminska?

***A.*** **I haven't.**
***Q.*** So two coinventors you've never met?
***A.*** **Yep.**
***MR. OLAH:*** I'd like to show Exhibit 874 which has already been admitted. And if we could call out that top. Thank you.
***THE WITNESS:*** Thank you.
***BY MR. OLAH:***
***Q.*** Can you see that patent number all right?
***A.*** **9,760,672?**
***Q.*** Yes.
***A.*** **Yes, I can.**
***Q.*** Based on the information that's been called out on the screen, this would be an issued patent; right?
Did you answer that? I'm sorry?
***A.*** **Was it for me?**
***Q.*** Yeah.
***A.*** **Oh, yeah. Yes, it is.**
***Q.*** Issued in September of 2017; correct?
***A.*** **Yes.**
***MR. OLAH:*** If we could call out in the bottom half the applicants that are listed on this patent.
***BY MR. OLAH:***
***Q.*** You are Andrew Hughes of Vancouver, Canada; right?
***A.*** **I am.**

***Q.*** And the two names below you, you've never met?
***A.*** **Right.**
***Q.*** If we could turn to page 9 -- excuse me -- page 8 of this exhibit.
That was the issued patent that we were just looking at; right?
***A.*** **Yes.**
***Q.*** And now that we're on page 8, is this part of the application?
***A.*** **Is this page 8? It says page 1 of 4.**
***Q.*** That's a fair question. This is a very lengthy exhibit that has many pages. We are on page 8 of this exhibit.
***A.*** **Okay. Okay.**
***Q.*** But don't testify to anything you're not comfortable with, sir.
***A.*** **Oh --**
***Q.*** Looking at this document, this is a part of the patent; correct?
***A.*** **Yes, yes.**
***Q.*** And a moment ago we saw the issued patent number; right?
***A.*** **Yes, yes.**
***Q.*** And now we can see the application number; correct?
***A.*** **Yes.**
***Q.*** Along with what filing date is listed here?
***A.*** **I would say that that is July the 4th. I'm not really great**

**with the month, day, year/day, month, year. Is it -- yeah, I think it must be July 4th of 2015.**

***Q.*** Very well.

Because sometimes you see dates and it actually goes day, month, year?

***A.*** **Yeah. I was pretty sure it wasn't April 7th, but I think it must be the other.**

***Q.*** Fair enough.

***MR. OLAH:*** If we could please call out the bottom half here.

***BY MR. OLAH:***

***Q.*** Again, same applicants -- excuse me -- same inventors listed here; right?

***A.*** **It is.**

***Q.*** I've already highlighted Ms. Alan and Ms. Kaminska. Again, two folks you've never met in your life?

***A.*** **Correct.**

***Q.*** But you have met Mr. Taneja?

***A.*** **I have.**

**Is there a question of time frame here? I met him by video conference when I was working for Invionics. I don't think he ever came to the Vancouver office face-to-face.**

***Q.*** Okay.

***A.*** **And I certainly didn't leave it then either. I don't know if that matters.**

***Q.*** Separate from whether you've met him in person, have you had phone calls with Mr. Taneja?

***A.* I have.**

***Q.*** Okay. And you certainly recognize the two names beneath him; right?

***A.* Dr. Quinton and Trent, certainly.**

***Q.*** Dr. Quinton is a close friend.

Is that what you testified to?

***A.* Very close friend.**

***Q.*** Is Trent McClements also a close friend of yours?

***A.* Yes, he is.**

***Q.*** And they're -- unlike some of the other inventors, you actually know them; right?

***A.* Very, very well.**

***Q.*** And you know that they helped invent the technology that was patented here; right?

***A.* I do.**

***MR. OLAH:*** If we could turn to page 9. Calling out in the top half there the title, Alex.

***BY MR. OLAH:***

***Q.*** Do you see the title in the call out here?

***A.* This is the circuitry and method for critical path timing speculation to enable process variation compensation via voltage scaling.**

***Q.*** You recognize that title, right?

***THE COURT:*** Wait, wait, wait. She got it.

***THE WITNESS:*** Yes, I do recognize it.

***BY MR. OLAH:***

***Q.*** This patent was not just prior art; right?

***A.*** **I'm not -- could you ask again, please? I'm not sure I understand --**

***Q.*** Sure.

***A.*** **-- what you mean there in the sense that --**

***Q.*** I'll even skip over some questions.

***A.*** **Just as you'd like.**

***Q.*** Are you aware that Dr. Arabi retained an expert that testified in this courtroom yesterday that this patent is nothing more than prior art and should not have been issued by the patent and trademark office?

***MR. FRASER:*** Objection. Misstates testimony.

***THE COURT:*** Overruled.

***BY MR. OLAH:***

***Q.*** So the question is -- you look very confused.

***A.*** **I am a little. And may I explain why?**

***Q.*** No, let me ask the question.

***A.*** **Okay.**

***Q.*** The question is, are you aware that Dr. Arabi had an expert testify to that in this courtroom?

***A.*** **I'm aware that Dr. Arabi had an expert testify.**

***MR. FRASER:*** Objection. 602.

***THE COURT:*** Overruled.

***BY MR. OLAH:***

***Q.*** Can you state your answer again? I'm sorry.

***A.*** **I'm aware that Dr. Arabi had an expert testify. I don't know what to.**

***Q.*** Do you know that it was Dr. Manoj Sachdev?

***A.*** **Yes.**

***Q.*** Would you disagree with Mr. Sachdev that this patent is nothing more than prior art and should not have been issued by the patent and trademark office?

***A.*** **Superseded by prior art. It's not art in and of itself.**

***Q.*** So if you could give a yes or no to that question and then if you need to follow up, please do. But the question is yes or no.

Would you disagree with Mr. Sachdev's conclusion?

***A.*** **No.**

***Q.*** You would agree with him?

***A.*** **I would.**

***Q.*** Okay. You testified on direct that you reviewed the two provisional patents that are in Sheida's name; correct?

***A.*** **Yes.**

***Q.*** And I -- a lot of witnesses have been loose with this. When I say "provisional patents," we mean the provisional patent application; right?

***A.*** **Yes.**

*Q.* There's no -- there's no such thing as a provisional patent; right? The PTO doesn't give those out?
**A. No.**
*Q.* It's just application?
**A. Yes, just a shorthand.**
*Q.* And you reviewed those two applications that were filed in December of 2014; correct?
**A. Yes, I did.**
*Q.* And if I heard you correctly on direct exam, you said that the ideas in those patent applications are related?
**A. Yes, I did.**
*Q.* Can you explain what you mean by those two patents being related?
**A. What we've been referring to as PPA No. 2 refers to a circuit from PPA No. 1. They're similar diagrams. Identical, I think, really, but hard to say.**
*Q.* Are the -- is there overlap in the ideas beyond the common diagrams?
**A. No.**
*Q.* Okay. How many diagrams do they share?
**A. My recollection is one. But without looking closely, I can't say for sure.**
*Q.* And based on that one common diagram, your testimony is those two ideas in the two different provisional patent applications are, in fact, related; right?

***A.*** **They have a common diagram.**
***Q.*** So do you stand by your testimony that they're related?
***A.*** **I do. I do.**
***Q.*** Mr. Quinton emailed you and others on December 1st of 2014. Is that right?
***A.*** **Yes. I don't recall precisely if it was December 1st. It was before December 4th, if that's where you're going.**
***Q.*** I will help you out.
***A.*** **Okay.**
***MR. OLAH:*** If we could please show the witness what has been admitted as Exhibit 120. Calling out the top half.
***THE WITNESS:*** Yes. Yes, December 1st.
***BY MR. OLAH:***
***Q.*** Just breaking down the header, Brad Q at Invionics, that is Dr. Quinton; right?
***A.*** **It is.**
***Q.*** And you are Andrewh@invionics.com; right?
***A.*** **I am.**
***Q.*** And you recognize these other two email addresses as well?
***A.*** **I do.**
***MR. OLAH:*** If we could call out all available text, please.
***BY MR. OLAH:***
***Q.*** You recall getting this email from Mr. Quinton?
***A.*** **I do.**

***Q.*** And it was -- it's very clear that it's a meeting with Karim; right?
***A.*** **Yes.**
***Q.*** Can you -- you can actually touch that monitor.
Can you circle all the references to the first name Karim?
***A.*** ***(Complies.)***
**There's one there and there, one there.**
**This isn't a zoomed in part. This is everything; right?**
***Q.*** Correct. We called out all available text, sir.
And you've for the record circled Karim three times; right?
***A.*** **Yes.**
***Q.*** Which is --
***A.*** **Yeah.**
***Q.*** -- Dr. Arabi's first name?
***A.*** **It is.**
***Q.*** Can you circle all the references to Sheida in this email?
***A.*** **I can't because there aren't any.**
***Q.*** No circles to be had; right?
***A.*** **None to be had or even ovals.**
***Q.*** And I won't make you do the exercise, but any reference to "his sister"?
***A.*** **I don't see one in here.**
***Q.*** To the contrary, he would be going over "his idea/patent application." Is that right?
***A.*** **That's what it says, yeah.**

***Q.*** But the provisional patent applications that you reviewed didn't say Karim Arabi on them, did they?
***A.*** **They did not.**
***Q.*** They said Sheida Arabi?
***A.*** **They did.**
***Q.*** Nowhere mentioned in Brad's -- excuse me -- Dr. Quinton's December 1 email; right?
***A.*** **Not in this email.**
***MR. OLAH:*** We can take that down. Thank you.
***BY MR. OLAH:***
***Q.*** That email was dated December 1st, 2014. Is that right?
***A.*** **It was.**
***Q.*** And proposing a meeting with Dr. Arabi on December 4th?
***A.*** **Yes.**
***Q.*** Do you recall having that online meeting with Dr. Arabi?
***A.*** **I do.**
***Q.*** Who else attended that online meeting?
***A.*** **There was Brad, Dr. Kaminska; Trent McClements, myself meeting remotely, and Trent McClements.**
***Q.*** You mentioned Mr. McClements twice?
***A.*** **Pardon me. Mike Lee. Sorry about that. I was running the list.**
***Q.*** That's fine. And I think you missed someone else.
***A.*** **And of course Dr. Arabi.**
***Q.*** The star of the show.

**A. I guess. Yes, yes, the star.**
*Q.* Did the email invite say meeting with Brad Quinton?
**A. We were all invited. No. It said Dr. Arabi as you say.**
*Q.* That's right.
I think I know the answer. But did Sheida attend that online meeting?
**A. She did not. Although I've never met her, so I guess I wouldn't know. Sorry about that. That was wrong.**
*Q.* You -- we've got similar sense of humor. I think we both got to do a better job of suppressing it here, though.
**A. We do.**
*Q.* How long was that meeting?
**A. I cannot recall precise hours and minutes. I believe it was less than an hour as I recall.**
*Q.* Could it have been a full hour?
**A. You know, I just can't recall.**
*Q.* Sometimes I let witnesses get away with just "I can't recall."
But was it longer than five minutes?
**A. Oh, yes, quite a bit longer than five minutes.**
*Q.* Longer than 20 minutes?
**A. I think probably -- I think probably more than 20 minutes. I think so.**
*Q.* Okay. But certainly not longer than an hour?
**A. I can't recall, but I don't think so. But I can't recall**

**precisely how long it was. It didn't take up my whole day.**
*Q.* Did Dr. Arabi address you and the other Invionics folks on that online meeting?
***A.*** **Dr. Arabi did not address me, certainly. I don't recall if he addressed the other people by name or not.**
*Q.* I guess what I'm asking is did Dr. Arabi speak during this meeting.
***A.*** **Oh, yes, yes. He did, yes.**
*Q.* He talked about his idea, his idea/patent; right?
***A.*** **He talked about -- and I don't recall super well -- about an idea.**
*Q.* Okay.
***A.*** **There was no one else. But he talked about an idea that was being presented to us.**
*Q.* He didn't say anything about his sister on this call, did he?
***A.*** **Not that I remember.**
*Q.* No recollection of him saying --
***A.*** **None whatsoever, not that I recall.**
*Q.* You have no recollection of him saying I'm just here pitching my sister Sheida's idea?
***A.*** **I have no recollection of him mentioning his sister's name.**
*Q.* Did he present a PowerPoint presentation during this meeting?
***A.*** **He must have done, but I don't recall it very well.**

***Q.*** Well, I was able to help you out with an email a minute ago. Maybe I can help you out with a PowerPoint.

***MR. OLAH:*** If we could pull up Exhibit 5, please. Previously admitted, your Honor.

***BY MR. OLAH:***

***Q.*** Is this the PowerPoint presentation that Dr. Arabi gave to you and your Invionics team on December 4th of 2014?

***A.*** **It could well be, but as I said, I don't recall it very well. It wasn't super familiar to me.**

***Q.*** Would it be helpful if we clicked through a few of these slides?

***A.*** **It wouldn't hurt.**

***Q.*** Let's go one page at a time. Just tilt your neck.

***A.*** **I'm not that young. Oh, that's better.**

***Q.*** Mr. Hughes, we can click through all of these. But we've gone through five of the 20 slides here.

Does this refresh your recollection as to whether this was the PowerPoint presentation on December 4th?

***A.*** **It doesn't look very familiar to me. I mean, I don't recall it well at all. I mean, I just don't.**

***Q.*** Okay. And that's fair. I'm not trying to pin you to that. I guess my follow-up question would be, is this the same subject matter that Dr. Arabi was discussing?

***A.*** **Certainly. That, I do recall.**

***Q.*** You're sharp on that point?

***A.*** **Yeah. I remember -- I remember the discussion.**
***Q.*** Okay. If we could go back to page 1, please.
You certainly recall this title; right?
***A.*** **I do.**
***Q.*** That's the very title of an issued patent that you are on?
***A.*** **Yes.**
***Q.*** Along with a name that you've never met; right?
***A.*** **Yep.**
***Q.*** Ms. Sheida Alan?
***A.*** **One thing. It is spelled differently here.**
***Q.*** Well, this is an entirely different name, isn't it?
***A.*** **Well, I don't know about that. It could well be. But it's spelled differently if this is what it is.**
***Q.*** Let's be clear for the record. You're looking at page 1 of Exhibit 5, and you see the name S-h-a-d-i, last name Arabi; right?
***A.*** **Yes.**
***Q.*** That is not how you know to spell Sheida; correct?
***A.*** **That's not as I have seen it in the past on the patents.**
***Q.*** Are you aware that Shadi Arabi is the name of Dr. Arabi's wife?
***A.*** **No.**
***Q.*** Was there a Shadi Arabi on the online call on December 4th of 2014?
***A.*** **Not that I was aware of.**

***MR. OLAH:*** If we could pull up Exhibit 5A, previously admitted, your Honor. Calling out the right side.

***BY MR. OLAH:***

***Q.*** Mr. Hughes, the testimony in this case is that we're looking at -- we're looking at metadata for the PowerPoint presentation that we were just looking at.

And I think I heard you reference metadata in your testimony on direct exam; right?

***A.*** **I don't think I mentioned metadata, did I?**

***Q.*** You certainly mentioned track changes.

***A.*** **Track changes certainly. But I don't think I used the word "metadata," did I? I mean, if I did, I did.**

***Q.*** It's besides the point.

Are you familiar with metadata?

***A.*** **Yes.**

***Q.*** Particularly within office tools?

***A.*** **Yes.**

***Q.*** The metadata can, for some documents, indicate who the author is; correct?

***A.*** **It can indicate a person who has edited the document.**

***Q.*** Correct. That would be indicated by last modified by; right?

***A.*** **Yes.**

***Q.*** And it can sometimes show you when that specific file was not only modified but also created; right?

**A. Yes.**
Q. And you would agree that Exhibit 5A is showing this document to have been created the day before your online meeting with Dr. Arabi?
**A. Yes.**
Q. A meeting that Sheida, to your knowledge, was not on?
**A. Yes.**
Q. And your recollection is that, at that meeting, Dr. Arabi said nothing about this being his sister's technology?
**A. I certainly don't recall it.**
Q. We will come back to that online meeting shortly.
Prior to the December 4th meeting, had you talked with Brad -- Mr. Quinton -- I appreciate by the way that we've both interchanged --
**A. It matters none.**
Q. Have you talked to Dr. Quinton about Dr. Arabi's idea?
**A. Before December 4th?**
Q. Yeah.
**A. Yes.**
Q. Mr. Quinton told you that he had met with Dr. Arabi at a design conference in San Francisco?
**A. San Francisco, not San Diego?**
Q. You're testifying.
**A. Oh, I'm sorry.**
Q. That's fair. You're allowed to ask for clarification.

What did Dr. Arabi tell you about how many times he met with Dr. Arabi that year?

***THE COURT:*** You said what did -- Dr. Arabi met with Dr. Arabi.

***BY MR. OLAH:***

***Q.*** What did Mr. -- or Dr. Quinton tell you about his meetings with Dr. Arabi prior to your December 4th call?

***A.*** **That he had ran into Dr. Arabi at DAC, which is the Design Automation Conference and was presenting Invio to him and that he had some ideas that he was interested in.**

***Q.*** And just to clarify the "he," Dr. Quinton was telling Dr. Arabi about Invio?

***A.*** **Yes. Yes, of course, yes.**

***Q.*** Because Invio is Invionics and Dr. Quinton's baby; right?

***A.*** **Yes, our product.**

***Q.*** That was by coincidence they bumped into the conference?

***A.*** **Yeah.**

***Q.*** Is that the DAC, D-A-C, conference?

***A.*** **It is that was my confusion because it's normally held in San Diego.**

***Q.*** You don't know where it was held in 2014?

***A.*** **No, I don't.**

***Q.*** Do you know about what month that conference is held?

***A.*** **October -- end of the year, October, I believe.**

***Q.*** Okay. And Mr. Quinton or Dr. Quinton suggested this was

just a coincidence that he ran into Dr. Arabi?
**A. That's how I read it, yes.**
***Q.*** You're a very smart guy.
**A. You're flattering me. This is going to be bad news.**
***Q.*** You are not, however, all knowing; right?
**A. Certainly not. Certainly not.**
***Q.*** And you certainly don't know about the emails and text messages that Dr. Arabi exchanged with Dr. Quinton; right?
***MR. FRASER:*** Objection. Is counsel testifying?
***THE COURT:*** Overruled.
***MR. OLAH:*** You can answer the question.
***THE WITNESS:*** Okay. No, not all of them for sure.
***BY MR. OLAH:***
***Q.*** Have you seen some of the emails between Dr. Quinton and Dr. Arabi?
***MR. FRASER:*** Objection. 401.
***THE COURT:*** Overruled.
***THE WITNESS:*** I don't think so. I don't recall them very well. That's probably better to say.
***BY MR. OLAH:***
***Q.*** You didn't cover any of those emails between Dr. Quinton and Dr. Arabi in your four meetings with defense counsel?
**A. I don't think so, no.**
***Q.*** If we could pull up what's been admitted as Exhibit 122. Starting with the header information, do you recognize the

sender of this email?
**A. I do.**
*Q.* What about the recipient? Do you recognize that email address?
**A. I recognize the name in front of the at sign. But I have not seen this specific email address in my recollection.**
*Q.* That's fine.
To your knowledge, you've never exchanged emails with Karim_arabi@hotmail.com; right?
**A. Yes, yes, I have never exchanged emails with that email address.**
*Q.* Connecting that with your testimony a moment ago, you trust people?
**A. I certainly do. Well, certainly trust my friends.**
*Q.* You see this and you assume it's Karim Arabi using karim_arabi@hotmail.com; right?
**A. I would now since this is the first time I've seen it.**
*Q.* And the date on this one is a little easier because there's no 20th month; right?
**A. Yes. That one is easier.**
*Q.* So you can confidently say that Mr. Quinton sent this email on October 20th, 2014; right?
**A. Yes.**
*Q.* A full six weeks before your online meeting with Dr. Arabi; right?

**A. Yes. Yes, six weeks.**

***MR. OLAH:*** If we could call out the first three bullet points of Dr. Quinton's email, please.

***BY MR. OLAH:***

***Q.*** Take a moment to read that email or the call out to yourself.

**A. Do you want me to read it out loud?**

***Q.*** No, silently.

**A. Oh, okay.**

**Okay.**

***Q.*** You're one of the fastest readers this jury has seen in this trial. Thank you.

The first bullet point mentions Trementa; right?

**A. Yes, yes.**

***Q.*** You recognize it?

**A. I do.**

***Q.*** It was then a dormant company; right?

**A. Yes.**

***Q.*** In the second bullet point Mr. Quinton proposes to use Trementa to make you, paren, or your family members, significant shareholders; right?

**A. That's what it says, sure enough.**

***Q.*** And the sentence continues to make another reference to you or your family members; right?

**A. Correct.**

***Q.*** That's what happened with Invionics; right?
***A.*** **Invionics?**
***Q.*** I'm sorry. With Abreezio. Thank you.
***A.*** **I don't know what happened with Abreezio. I wasn't involved with it at all.**
***Q.*** You weren't involved with Abreezio at all?
***A.*** **Not the corporation, not setting it up, not the corporate structure, none of the equity, none of that.**
***Q.*** You just created their valuable technology for them?
***A.*** **Under contract.**
***Q.*** Under contract?
***A.*** **Under contract.**
***Q.*** Yep.
Point 3 here talks about making the current Invionics shareholders Trementa shareholders.
Do you see that poorly underlined phrase?
***MR. FRASER:*** Objection. Outside the scope of direct.
***THE COURT:*** Overruled.
***THE WITNESS:*** Yes, I do.
***BY MR. OLAH:***
***Q.*** You were then a current Invionics shareholder; correct?
***A.*** **I was.**
***Q.*** And as such, Invionics got a percentage of Abreezio; right?
***A.*** **As specified in our contract in February.**
***Q.*** That's what led to your $4 million payout in November of

2015?
***A.*** **Yes.**
***Q.*** Exactly as is discussed in this email between Mr. Quinton -- or Dr. Quinton and Dr. Arabi; right?
***A.*** **No.**
***Q.*** No?
***A.*** **No. This discusses a different thing entirely.**
***Q.*** Because it's talking about Trementa?
***A.*** **Well, and it's structured differently as well.**
***Q.*** Let's pull up --
***A.*** **It's saying current Invionics shareholders -- that's not how we did it with Abreezio at all. We got paid for doing work.**
***Q.*** In addition to your $4 million payout --
***A.*** **Yes.**
***Q.*** -- you got $100 an hour for your contract work; right?
***A.*** **Yes. I'm not sure of the exact numbers but that sounds plausible.**
***Q.*** Is that ballpark right?
***A.*** **Yeah, for sure.**
***Q.*** And that was an hourly rate set out in a statement of work; correct?
***A.*** **It was indeed.**
***Q.*** So you get not only your 100-dollars an hour --
***A.*** **Yep.**
***Q.*** You -- excuse me -- Invionics got a share of Abreezio;

correct?

***A.*** **It was staged over time as we completed the contract.**

***Q.*** The answer is "yes"; right?

***A.*** **The answer is it was staged over time as we completed the contract.**

***Q.*** But you --

***A.*** **If we stopped at any time, we would have got less.**

***Q.*** But you didn't stop.

***A.*** **Of course not.**

***Q.*** Yeah. Because there was a lot riding on it?

***A.*** **Correct.**

***Q.*** There was a $180 million acquisition to be had; right?

***A.*** **When it happened. At time I had no knowledge of that, of course.**

***Q.*** Going back to your December 1 meeting -- or excuse me -- your December 4th meeting, was there any mention of Qualcomm?

***A.*** **Not that I recall.**

***Q.*** So there could have been?

***A.*** **Not that I recall.**

***Q.*** Was there any discussion of a quick exit?

***A.*** **Not that I recall.**

***Q.*** You recall some parts of that December 4th meeting but not all?

***A.*** **Yes, certainly.**

***Q.*** If we could call --

*A.* **Like the presentation.**
*Q.* I didn't mean to interrupt.
What was that last part?
*A.* **Like the presentation. I don't recall it well at all.**
*Q.* Got it.
But you do remember the ideas being discussed?
*A.* **Oh, yes, very much so.**
*Q.* Can we call out Bullet Point 9 in this email, please. Can you please to yourself, Mr. Hughes, read silently Bullet Point 9?
*A.* **Okay.**
*Q.* There's a reference -- well, first off, it sets out what the primary goal of Trementa is; right?
*A.* **It's what it says Trementa's primary goal will be, yes.**
*Q.* To develop new technology; correct?
*A.* **Yes, yes.**
*Q.* And to demonstrate the value of that technology to large semiconductor companies like QCOM.
*A.* **Which, I assume, refers to Qualcomm.**
*Q.* That's its --
*A.* **Yes, yes. But of course like means there's lots of others.**
*Q.* Yeah. But what company ended up buying Abreezio for $180 million?
*A.* **Qualcomm of course.**
*Q.* What was the only location that Invionics and Abreezio did

an on-site six-week demo at?

***A.*** **San Diego here with Qualcomm, of course.**

***Q.*** Yeah. Only one; right?

***A.*** **Yep.**

***MR. OLAH:*** Your Honor, is now a good time to break?

***THE COURT:*** It is.

***MR. OLAH:*** Thank you, your Honor.

***(End of requested testimony.)***

***

*REPORTER'S CERTIFICATE*

I, Anne Roldan, certify that I am a duly qualified and acting Official Court Reporter for the United States District Court, that the foregoing is a true and accurate transcript of the proceedings as taken by me in the above-entitled matter on April 1, 2025; and that the format used complies with the rules and requirements of the United States Judicial Conference.

Date: April 3, 2025



*Anne Roldan, RMR, CRR, CSR 13095*