UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. KARIM ARABI, Defendant. | Case No. 22-cr-1152-BAS<br>April 2, 2025<br>Trial Testimony of Andrew Hughes |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CYNTHIA A. BASHANT
CHIEF DISTRICT JUDGE

VOLUME 2, PAGES 78 - 130

APPEARANCES:

FOR PLAINTIFF: UNITED STATES ATTORNEY'S OFFICE
880 Front Street, Suite 6293
San Diego, California 92101
By: *NICHOLAS W. PILCHAK, AUSA*
*JANAKI G. CHOPRA, AUSA*
*ERIC R. OLAH, AUSA*

FOR DEFENDANT: BIENERT KATZMAN LITTRELL WILLIAMS, LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
By: *WHITNEY Z. BERNSTEIN, Esq.*
*REBECCA S. ROBERTS, Esq.*
*RYAN V. FRASER, Esq.*

REPORTED BY:

ANNE MARIE ROLDAN, RMR, CRR, CSR 13095
U.S. OFFICIAL COURT REPORTER
U.S. District Court Clerk's Office
333 West Broadway, Suite 420
San Diego, California 92101

Reported stenographically; transcribed with CAT software.

# I N D E X

***

## E X A M I N A T I O N S


| WITNESS | VOL. | PAGE | LINE |
|---|---|---|---|
| *FOR THE DEFENSE:* | | | |
| ANDREW HUGHES | | | |
| Cross by Mr. Olah | 2 | 80 | 12 |
| Redirect by Mr. Fraser | 2 | 122 | 6 |
| Recross by Mr. Olah | 2 | 128 | 11 |
| Redirect by Mr. Fraser | 2 | 129 | 9 |

***WEDNESDAY, APRIL 2, 2025, 9:04 A.M.***

***

***THE COURT:*** Okay. We are back on the record. All jurors are present. Dr. Arabi and the lawyers are present. And you, sir, are reminded you're still under oath to tell the truth.

***THE WITNESS:*** And I'll speak a little slower.

***THE COURT:*** Okay. Great. Pull that microphone up close to you there.

Mr. Olah?

***MR. OLAH:*** Thank you, your Honor.

***CROSS-EXAMINATION (CONT.)***

***BY MR. OLAH:***

***Q.*** Mr. Hughes, good morning.

***A.*** **Good morning.**

***Q.*** When we left off yesterday, we were looking at Exhibit 122.

***MR. OLAH:*** I'd like to pull that up just to get on the same page for a minute.

***THE WITNESS:*** Thank you.

***BY MR. OLAH:***

***Q.*** And I think we left off on paragraph 9.

Do you recall that sentence or set of sentences there?

***A.*** **From yesterday, yes.**

***Q.*** And your testimony is that QCOM, as referenced in this email, refers to Qualcomm; right?

**A. I would assume so.**
***Q.*** And I -- we were talking yesterday about your online meeting with Dr. Arabi and others on December 4th; correct?
***THE COURT:*** Is that a yes?
***THE WITNESS:*** Sorry, yes.
***BY MR. OLAH:***
***Q.*** And your testimony is that on that -- in that online meeting on December 4th, there was no reference to Qualcomm; right?
**A. I don't recall one, no.**
***MR. OLAH:*** If we could look at another email exchange. Exhibit 240 is already admitted, Your Honor. And I'd like to start with page 3, calling out all available text.
***BY MR. OLAH:***
***Q.*** Mr. Hughes, can you see this email all right?
**A. Can I have a minute to read? Thank you.**
***Q.*** And you can take more time. This isn't a surprise. If you want to read the email, please do.
**A. I'll take a few more minutes, and I won't just skim. Thank you.**
***Q.*** Who's the sender of this email?
**A. This is Dr. Quinton.**
***Q.*** Dr. Quinton had an Invionics email address at the time; right?
**A. Yes.**
***Q.*** But he used a Gmail account.

*Q.* **A.** **Seems like, yeah.**

*Q.* And the date of this email is December 14th, 2014; is that right?

**A.** **It is.**

*Q.* Just 10 days after your online meeting with Dr. Quinton, Dr. Arabi, and other folks; right?

**A.** **Yes.**

*Q.* You got a chance to read that second paragraph? If not, I'm happy to give you another minute to read it.

**A.** **Do you mean the point labeled two or the --**

*Q.* I'm going to just --

**A.** **There we are, yes. Thank you, thank you.**

**Yes.**

*Q.* You pointed out, when we were looking at Exhibit 122 yesterday, that it stated semiconductor companies as a potential target; right?

**A.** **Can you refresh my memory on which one was 122.**

*Q.* The same one we were looking at --

**A.** **Oh, the one we were just looking at. Yes.**

*Q.* And the only reference in that email was to QCOM; correct?

**A.** **That's the only one I saw, yes.**

*Q.* And in this paragraph here, which semiconductor company is referenced?

**A.** **The same name, QCOM.**

*Q.* And you understand that to be Qualcomm; correct?

**A. I do now, yes.**
Q. And not only is it QCOM, Mr. Quinton's exact email references, "During due diligence in a QCOM acquisition scenario," right?
**A. That's what it says.**
Q. And that's exactly what played out for Abreezio; correct?
**A. Yes.**
Q. And, again, going back to that meeting that was 10 days before this email, your testimony is neither Dr. Quinton nor Dr. Arabi nor anyone mentioned Qualcomm in that online meeting.
**A. I do not recall that they did.**
Q. In the next sentence --
**A. The one starting with "one solution"?**
Q. Yeah. Can you read that to yourself for a moment?
Dr. Quinton's proposing that Invionics take more equity in this entity that's to be formed; right?
**A. Yes.**
Q. What does that mean, to have more equity?
**A. More shares.**
Q. Perhaps a greater percentage of the company, as well?
**A. In this context, I would think so. Although greater than what, I cannot see.**
Q. Sure.
Whatever the thing is, he says perhaps maybe Invionics should take more; is that right?

***A.*** **Yes.**
***Q.*** I'm going to come back to the concept of equity before we're done.
Looking to this penultimate paragraph, do you see the red bracketing I've added?
***A.*** **I do.**
***Q.*** Can you please read that paragraph to yourself?
***A.*** **I can.**
***Q.*** You've had a chance to read it?
***A.*** **I have.**
***Q.*** There's a reference to, quote, "Twelve man-weeks of work from Invionics."
***A.*** **Yes.**
***Q.*** I won't ask what a man-week is, but --
***A.*** **Much like a person-week, I should think.**
***Q.*** Got it.
But Invionics did more than 12 weeks of work for Abreezio; right?
***A.*** **I would have to check for sure, but my recollection is certainly.**
***Q.*** You started working on Abreezio's technology in February of 2015; correct?
***A.*** **Yes.**
***Q.*** And you worked on it all the way up until Qualcomm bought it in October of 20 --

*A.* **I did.**
*Q.* And you're really good at math.
That's 10 months; right?
*A.* **Four days a week, yes. I'd say yes, close, close. Ten months -- February, March, April, May, June -- I don't think it's quite 10.**
*Q.* You want it call it nine?
*A.* **March, April, May, June, July, August, maybe six, seven -- I'd say six or seven.**
*Q.* Would you at least agree that even the low end of that, six months that you and Invionics spent working on Abreezio is more than the 12 man-weeks referenced in this email?
*A.* **Yes, I would.**
*Q.* Okay. But the rest of this sentence, that played out exactly as Dr. Quinton proposed; right?
*A.* **A different company, of course.**
*Q.* A different named company.
*A.* **A different company.**
*Q.* Yeah. Are you aware that Abreezio acquired Trementa?
*A.* **Yes.**
*Q.* Okay.
*A.* **And they also acquired Abreezio -- pardon me -- Qualcomm and all that.**
*Q.* Right.
*A.* **So they're different companies.**

***Q.*** I understand.

***A.*** **Okay.**

***Q.*** But my question for you is, what's being proposed here is that Trementa get all the company infrastructure in place; right?

***A.*** **That's what he's saying, yes.**

***Q.*** You were not involved in that; right?

***A.*** **I was not.**

***Q.*** You didn't set cap tables.

***A.*** **I did not.**

***Q.*** You didn't set shareholdings; right?

***A.*** **I did not.**

***Q.*** But that did happen; correct?

***A.*** **For Trementa or for Abreezio?**

***Q.*** For Abreezio.

***MR. FRASER:*** Objection. 602.

***THE COURT:*** Overruled.

***THE WITNESS:*** I don't know what Abreezio did.

***BY MR. OLAH:***

***Q.*** You don't know that Invionics became a major shareholder of Abreezio?

***A.*** **We --**

***MR. FRASER:*** Objection. 602.

***THE COURT:*** Overruled.

***THE WITNESS:*** We signed a contract for 10 percent.

***BY MR. OLAH:***

***Q.*** And when Qualcomm acquired Abreezio, you personally got $4 million; correct?

***A.*** **Approximately, yes.**

***Q.*** Solely because Invionics was a shareholder of Abreezio.

***A.*** **Precisely so.**

***Q.*** Thank you.

The next sentence here says. "Trementa's going to file provisional patents" -- which, again, I think means provisional patent applications; correct?

***A.*** **It does.**

***Q.*** And that's exactly what Abreezio did; correct?

***A.*** **Yes.**

***Q.*** With the help of you?

***A.*** **Yes.**

***Q.*** And Trent McClements?

***A.*** **Yes.**

***Q.*** And Sanjiv Taneja; correct?

***A.*** **Yes, yes.**

***Q.*** We'll come back to that hesitation in a minute.

And then the next clause, "Create everything necessary to pitch to potential customers," right?

***A.*** **Yes.**

***Q.*** Abreezio did that.

***A.*** **Yes.**

*Q.* Do I have to keep underlining or are you following where we're at?
*A.* **I'm following along just fine now.**
*Q.* I'm crossing it out more than I'm underlining it.
*A.* **Well, so it goes.**
*Q.* The next clause is, "Do on-site customer visits," right?
*A.* **Yes.**
*Q.* Abreezio did that.
*A.* **They did with quite a few people.**
*Q.* And especially Qualcomm; right?
*A.* **Qualcomm, certainly.**
*Q.* Yeah. Qualcomm was the first place they went to.
*A.* **March 4th, yes, it was.**
*Q.* Qualcomm was being pitched on Abreezio's technology before you identified the problems in the provisional patent applications; is that right?
*A.* **No.**
*Q.* They waited until you identified those problems?
*A.* **Yes.**
*Q.* Okay. Qualcomm is the only place that Abreezio did, what, a six-week on-site eval at?
*A.* **Sorry, I thought you weren't quite done. Yes, certainly.**
*Q.* Yeah. And that's the only place that you guys ever set up shop and did the multi-week eval.
*A.* **The in-depth technical evaluation of DFTBreez.**

***Q.*** Yes. And I'm sorry for using the shorthand.
***A.*** **No, that's okay. That's okay.**
***MR. OLAH:*** If we can pull this email down staying with the exhibit, please. Going up to page 2, calling out -- we've called out the bottom half of this email.
***BY MR. OLAH:***
***Q.*** Can you see that all right?
***A.*** **I can.**
***Q.*** And, Mr. Hughes, take another minute to read this email. I want you to be familiar with it.
***A.*** **Thank you.**
***Q.*** You've had a chance to read that?
***A.*** **I have.**
***Q.*** Who's the sender of this email?
***A.*** **Dr. Arabi.**
***Q.*** And what's the date of his email?
***A.*** **It appears to be January the 6th, 2015.**
***Q.*** So we're now -- I apologize.
***A.*** **No, no, no.**
***Q.*** We're now a month removed from your online meeting with Dr. Arabi.
***A.*** **A month and a bit, yes.**
***Q.*** The online meeting at which you don't recall if there was any mention of his sister.
***A.*** **Right, correct.**

*Q.* And in this email, Dr. Arabi references two provisional patent applications; is that right?
**A. Yes.**
*Q.* And he describes those as "the main ideas," correct?
**A. From 2014, yes.**
*Q.* And that -- if you could explain to the jury the concept of a provisional patent is, like, stake your claim as early as possible; right?
**A. We are looking to get a prior date as early as possible, yes.**
*Q.* So you get that provisional application filed so that if you develop that tech, you can say, Ah, we can tag back to that initial date; right?
**A. And there's some questions about disclosing as well and talking to people and all that.**
*Q.* After that introductory paragraph, does Dr. Arabi propose a share proceed split?
**A. It appears he does.**
*Q.* Including Invionics; right?
**A. Yes.**
*Q.* Is that you? You were Invionics?
**A. Our company was, yes.**
*Q.* You were one of four founders; correct?
**A. Yes, I was. Well, one of four main founders. There were some minor guys.**

***Q.*** Fair enough.

One of those cofounders was --

***A.*** **Yes, yes, certainly.**

***THE COURT:*** You don't know he where he's going with that question.

***THE WITNESS:*** I haven't got a clue. I'm sorry. I thought it was a continuation of the last one. I'm very sorry.

***BY MR. OLAH:***

***Q.*** One of those cofounders was Brad Quinton; correct?

***A.*** **Yes, he was.**

***Q.*** Okay. There is also not only a reference to what share or stake Invionics should get, there's a specific reference to "If Invionics shareholders."

Do you see that paragraph?

***A.*** **I do.**

***Q.*** Dr. Arabi was not a part of Invionics; correct?

***A.*** **No, he was not.**

***Q.*** Invionics was you, Brad Quinton, and two other gentlemen; correct?

***A.*** **Correct.**

***Q.*** Did Mr. -- or Dr. Quinton take this proposal to you, Mr. Hughes?

***A.*** **Not that I recall.**

***Q.*** But Invionics did end up with a share of Abreezio; correct?

***A.*** **In return for work.**

*Q.* You didn't have any negotiation in that?
***A.*** **In the Statement of Work?**
*Q.* No, in what percentage Invionics would get of Abreezio. You had no say in that?
***A.*** **In the statement -- I did have a say in that.**
*Q.* What was your say?
***A.*** **I said that we should indeed proceed with our Statement of Work back in February. Well, further on, at this point.**
*Q.* And I'm not asking about the terms of the Statement of Work. I'm asking about, who decided how much percentage stake Invionics should get in Abreezio?
***A.*** **We made a Board decision. Well, the shareholders, of course.**
*Q.* Well, now I think I'm confused, because you just said a moment ago that that wasn't something you were involved in; right?
***A.*** **I had nothing to do with this email.**
*Q.* You never saw the email.
***A.*** **Correct.**
*Q.* Okay. You did discuss with Dr. Quinton what the appropriate percentage is; correct?
***A.*** **In the negotiation for the Statement of Work.**
*Q.* That's all you negotiated?
***A.*** **Yes.**
*Q.* Did the Statement of Work give Invionics a share of

Abreezio?
**A. Part of the contract, it did.**
*Q.* Okay. That's the overarching contract that you're aware of.
**A. Correct.**
*Q.* Fair enough.
That said, you never saw Dr. Arabi's split here -- proposed split; correct?
**A. I did not.**
***MR. OLAH:*** Sticking with this exhibit, if we could go to the bottom of page 1.
***BY MR. OLAH:***
*Q.* Mr. Hughes, this email spans two pages.
**A. It's all --**
*Q.* So bear with us.
**A. It's all pieced together as a thread, as well.**
*Q.* Thank you.
So take a minute to read this call-out to yourself. We're on the bottom of page 1 of Exhibit 240.
**A. Specifically the line that starts with the Bullet (a)?**
*Q.* All called-out text, please.
**A. Oh, okay. Thank you.**
*Q.* Does this appear to be another exchange between Dr. Arabi and Dr. Quinton?
**A. Yes, it does.**
*Q.* And, again, a little over a month after your online meeting;

correct?
**A. Correct.**
*Q.* Does it appear that Dr. Arabi added some comments to Dr. Quinton's email below?
**A. That's what he's saying he's doing.**
*Q.* Are you familiar with that concept of taking someone's prior email and then adding your thoughts?
**A. I am, I am. Bad practice, but yes. It's hard to read, as you can see.**
***MR. OLAH:*** Okay. And if we can turn to page 2, please, calling out the top half, please. Thank you, Alex.
***BY MR. OLAH:***
*Q.* Can you please, first off, read the whole email. But I'm going to have some questions about paragraph (b) here.
**A. It is challenging to know who is writing which part. Man.**
*Q.* And I'm not going to ask you about that.
**A. Okay. Thank you.**
*Q.* Looking at paragraph (b), is there yet another reference to QCOM?
**A. Yes.**
*Q.* And, again, your testimony is that there was no mention of Qualcomm in your online meeting with Dr. Arabi.
**A. I don't recall one, that's for sure.**
*Q.* In the paragraph after (b), there's a reference to "a quick exit," and specifically that "it is still desired."

Do you see that all right?
**A. I do.**
Q. What's a quick exit?
**A. A relatively rapid sale of a company.**
Q. Have you ever been involved in a quick exit?
**A. Yes, I think so. I mean, it's -- what's quick; right? Is it two years? Is it five years? Is it one year? I've been involved in a relatively quick exit.**
Q. Abreezio was formed in February of 2015; is that right?
**A. I believe so, yes.**
Q. And you know it was sold to Qualcomm in October of 2015; right?
**A. I do know that.**
Q. Would you consider that a quick exit?
**A. I would.**
Q. Very quick.
**A. I don't know about very quick. Quick, though. Quick.**
Q. Your testimony is that in the December 4th meeting with Dr. Arabi, there was no reference to a quick exit; correct?
**A. I do not recall one, no.**
Q. Was there any discussion of what the plan for Abreezio was?
**A. I do not recall any.**
Q. Your recollection is that Dr. Arabi was just talking about his technology ideas; correct?
**A. Correct.**

*Q.* And how Invionics could advance or develop those ideas into real products.
*A.* **Correct.**
*Q.* Because that's what Invionics does.
*A.* **Yes. And that's what I did.**
***MR. OLAH:*** If we could go same exhibit, back to page 1. Bear with us, Mr. Hughes.
***THE WITNESS:*** It's okay.
***MR. OLAH:*** Calling out the email second from the top.
***THE WITNESS:*** With the single indent?
***BY MR. OLAH:***
*Q.* It should be the only call-out.
*A.* **Yes, it is. Yes, it is. Thank you.**
*Q.* Take a minute to review this email.
*A.* **I've read it.**
*Q.* Who's the sender?
*A.* **Dr. Quinton.**
*Q.* Who's the recipient?
*A.* **Dr. Arabi.**
*Q.* What's the date?
*A.* **January 9th.**
*Q.* And in that introductory sentence, does Mr. Quinton applaud Dr. Arabi for having a, quote, "very solid vision forming for the company"?
***MR. FRASER:*** Objection. The document speaks for

itself.

***THE COURT:*** Sustained.

***BY MR. OLAH:***

***Q.*** Okay. Is there yet again another reference to Qualcomm?

***MR. FRASER:*** Same objection.

***THE COURT:*** Overruled.

***THE WITNESS:*** Yes.

***BY MR. OLAH:***

***Q.*** And, again, a very specific reference to Qualcomm; correct?

***A.*** **It's the same word. I'm not sure that's what you were asking; right?**

***Q.*** It's not.

***A.*** **Okay. Sorry.**

***Q.*** Dr. Quinton is offering to be the guy who makes the technical pitch to Qualcomm.

***A.*** **Yes.**

***Q.*** Which is exactly what he ended up doing just weeks after this email; right?

***MR. FRASER:*** Objection. 602.

***THE COURT:*** Overruled. If you know.

***THE WITNESS:*** I think so. I'm not as clear on that, whether it was precisely six weeks, you said?

***BY MR. OLAH:***

***Q.*** Let's take some baby steps. I'm not worried so much about the timing.

**A. Oh, in that case, yes.**
Q. Who ended up being the Chief Technology Officer of Invionics -- of Abreezio? Thank you. Thanks to the witness.
**A. Dr. Quinton.**
Q. Dr. Quinton. Also a cofounder of Invionics; correct?
**A. Correct.**
Q. And the sender of all these emails we've looked at referencing Qualcomm; correct?
**A. Now, a sender -- there is an interleaf in here. Some of these messages were sent by Dr. Arabi. I mean, you'd have to stitch through to see if it was all.**
Q. Okay.
**A. But many.**
Q. Thank you. Just to keep on with those baby steps because I don't want to lose you on this point.
**A. Sure, sure.**
Q. Dr. Quinton ends up being the CTO of Abreezio; right?
**A. Yes.**
Q. Sanjiv Taneja ends up being the CEO of Abreezio; right?
**A. He did.**
***THE COURT:*** You answered on top of him again. Just wait for the question before you answer.
***THE WITNESS:*** I'll wait. I'll wait. I'm very sorry.
***BY MR. OLAH:***
Q. Those two gentlemen are the ones who go and pitch Qualcomm

on Abreezio's technology; correct?

***A.*** **Correct.**

***Q.*** And that's the case throughout the year of 2015 from February -- or at least March of 2015 through October; correct?

***MR. FRASER:*** Objection. Vague.

***THE COURT:*** Sustained.

***BY MR. OLAH:***

***Q.*** Did you pitch Qualcomm on Abreezio's technology?

***A.*** **I did not.**

***Q.*** As he said he would do in this email, Dr. Quinton did, didn't he?

***A.*** **Certainly sometimes.**

***Q.*** Sticking with the paragraph that references Qualcomm, there's another -- "all the guys here at Invionics really want to help." Is that right?

***A.*** **That's what it says.**

***Q.*** You are one of the guys at Invionics.

***A.*** **I am.**

***Q.*** Were you very excited about working on this emerging technology?

***MR. FRASER:*** Objection. 403.

***THE COURT:*** Overruled.

***MR. OLAH:*** You can answer the question.

***THE COURT:*** You may answer. Sorry.

***THE WITNESS:*** So sorry. I didn't quite hear.

I would not say so. I was not very excited, really. I mean, I didn't know what was going on here, and all I'd seen so far was the presentation from December the 4th.

***BY MR. OLAH:***

***Q.*** Meaning Dr. Quinton wasn't sharing these email exchanges between he and Dr. Arabi with you.

***A.*** **Not text-for-text, certainly.**

***Q.*** What was he sharing?

***A.*** **That he was in negotiations with other startup companies to license Invio technology.**

***Q.*** What was he sharing with respect to his communications with Dr. Arabi?

***MR. FRASER:*** Objection. 802.

***THE COURT:*** Overruled.

***THE WITNESS:*** He was saying that -- I'm a little vague specifically on what. What I really recall is that he was in negotiations with other companies to license Invio technology. The last guy we talked to was, indeed, Dr. Arabi --

***BY MR. OLAH:***

***Q.*** I'm going to stop you there --

***A.*** **Okay.**

***Q.*** -- because those discussions about other companies would not have been with Dr. Arabi; correct?

***A.*** **No, I don't think so.**

***Q.*** Dr. Arabi was a Vice President at Qualcomm; right?

***A.*** **Correct.**
***Q.*** The same Qualcomm we have seen referenced repeatedly in the emails we've reviewed this morning; right?
***A.*** **I believe so, yes. That's what QCOM means, I think.**
***Q.*** Do you think or do you know?
***A.*** **It could be something else. I don't know. I've not seen these before; right?**
***Q.*** Your testimony is that you don't know Q-C-O-M equals Qualcomm.
***A.*** **I'm saying it's a possibility.**
***Q.*** You worked there for three years?
***A.*** **I did. Well...**
***Q.*** Did you acquire any Qualcomm stock while you worked there?
***A.*** **Restricted share units, yes.**
***Q.*** Do you know what their stock ticker is?
***A.*** **I do.**
***Q.*** And your testimony is still that Q-C-O-M might not mean Qualcomm?
***A.*** **Who knows for sure? It seems likely, though.**
***MR. OLAH:*** We can take that down. Thank you.
***BY MR. OLAH:***
***Q.*** I want to ask you a few more questions about the December 2014 meeting, again with Dr. Arabi.
***A.*** **Okay.**
***Q.*** Your testimony is that all that was discussed was what is

Dr. Arabi's idea, first.
**A. That's what I recall.**
*Q.* And how can Invionics, including yourself, develop that technology.
**A. That's what I recall.**
*Q.* Your testimony is there was no mention of a quick exit.
**A. That's what I recall.**
*Q.* There was no mention of Qualcomm.
**A. That's what I recall.**
*Q.* Was there mention of Q-C-O-M?
**A. I don't recall any.**
*Q.* There was no mention of Sheida.
**A. I don't recall her name at all.**
*Q.* There was no mention of Dr. Arabi's sister.
**A. I don't recall it at all.**
*Q.* And there was no Sheida in this online meeting; correct?
**A. No. I mean -- who can tell spying and stuff like that -- but, no.**
***THE COURT REPORTER:*** I didn't hear you.
***THE WITNESS:*** That's -- no.
***BY MR. OLAH:***
*Q.* Let's drill down on that.
You log into this online meeting; correct?
**A. I did remotely.**
*Q.* And there were other people appearing on the monitor that

you were looking at; correct?
**A. Yes.**
*Q.* Was Dr. Arabi one of those people?
**A. He was.**
*Q.* Do you see Dr. Arabi in the courtroom today?
**A. Yes. I don't know what he looks like very well.**
*Q.* Okay. Well, let me ask you this:
When you met with all of his attorneys last weekend, was Dr. Arabi present?
**A. No.**
*Q.* He was not present?
**A. He was not present.**
*Q.* Okay. So you couldn't confidently say if Dr. Arabi is in this courtroom right now.
**A. I mean, I know he must be. And I see -- so, yes, he is here.**
*Q.* I don't want --
**A. He is here.**
*Q.* Are you guessing, are you inferring, or are you confidently testifying under oath that Dr. Arabi is in the courtroom?
**A. I don't know the man.**
*Q.* Was Dr. Arabi on this online meeting?
**A. Yes.**
*Q.* You saw a man resembling Dr. Arabi.
**A. I didn't know what he looked like then, either. His name**

**said Dr. Arabi. I'm going to say yes.**

*Q.* Was Sheida appearing on your monitor?

***A.*** **I didn't see anyone else.**

*Q.* Were there any women appearing on the monitor?

***A.*** **I didn't see any at all.**

*Q.* I appreciate that you recall certain things that were said and your memory is not so clear on other things. That's fair. We're talking about a meeting that was over 10 years ago.

***A.*** **Indeed.**

*Q.* Did Dr. Arabi say on this online meeting that he was going to create and use fake email addresses?

***A.*** **Not that I recall.**

*Q.* For the record, there was a surprise response to that question; is that right?

***A.*** **I was a little surprised. Yes, I was surprised that you would say such a thing.**

*Q.* Even 10 years after this meeting, you would recall if Dr. Arabi said, This is the technology I have developed. I want you guys to develop it. And by the way, I'm going to create and use some fake email addresses.

***A.*** **No. I don't know what I would recall on a hypothetical thing that I don't recall. So, no.**

*Q.* Well, did he say -- this was in December of 2014; right?

***A.*** **December 4th, yes.**

*Q.* Did he say that his 2015 New Year's resolution was to

impersonate his sister for a year?
**A. I sure don't recall that.**
*Q.* Did he say he was going to impersonate her at all?
**A. I don't recall anything like that.**
*Q.* Did he say he was going to create multiple email addresses bearing her name and then use those for the next 10 months?
***MR. FRASER:*** Objection. 602. 403.
***THE COURT:*** Overruled.
***MR. OLAH:*** You can answer the question.
***THE WITNESS:*** I don't recall that, either.
***BY MR. OLAH:***
*Q.* And your testimony to this jury is that you wouldn't recall if he told you that?
**A. I'm saying I don't.**
*Q.* Did he say that going forward, you and everyone else on that call should refer to him as Sheida?
**A. I don't recall that.**
*Q.* Did he say that you guys should refer to him as "S.A."?
**A. I don't recall that.**
*Q.* And your testimony is that even if he had made those statements, those wouldn't have been noteworthy to you such that you -- those wouldn't have stood out to you?
**A. I don't recall any such hypothetical.**
*Q.* You do recall that Dr. Arabi assured you he was allowed to work on this project.

**A. I don't recall that real well, either. But I know it did happen. Somehow there's a very vague recollection.**
*Q.* Was it on the call that he gave you those assurances or was that a separate?
**A. I don't recall real well. It's a very vague impression.**
*Q.* Would you have wanted some assurances from Dr. Arabi that he was allowed to work on this project?
**A. Me personally?**
*Q.* Yes.
**A. No.**
*Q.* You didn't care that he worked at Qualcomm?
**A. He says he can do it, he can do it. I'm not going to worry about it too much.**
*Q.* Well, now I'm confused, because that assumes that he did give you the assurance.
**A. Yeah, I don't recall him giving me any such assurance, and I didn't look for it.**
*Q.* Then how do you explain the last answer? You said he told you he could do it.
When did he tell you that?
**A. I said if.**
*Q.* You have no recollection of Dr. Arabi giving you assurances?
**A. None whatsoever. But I have an impression that I seem to recall it. You know what I'm saying? It's pretty vague.**
*Q.* Did you know that he was high up at Qualcomm at the time?

***A.*** **I knew he was a Vice President at Qualcomm.**
***Q.*** And you have no recollection of him in this online meeting saying it was okay for him to work on this side project?
***A.*** **No recollection. Like, if you put two versions of the word in front of me, I couldn't tell you which one was which.**
***Q.*** I feel like you're getting too granular.
I'm asking you the general question of did Dr. Arabi make any assurances or representations on this online call about it being okay for him to work on this side project?
***MR. FRASER:*** Objection. Asked and answered.
***THE COURT:*** I'm not -- overruled.
***THE WITNESS:*** I don't recall.
***BY MR. OLAH:***
***Q.*** Okay.
***A.*** **Yeah.**
***Q.*** Trent McClements was on this call; correct?
***A.*** **Yes, he was.**
***Q.*** Was Jim Derbyshire on this call?
***A.*** **I don't think so. I don't recall.**
***Q.*** He is the Chairman of Invionics; correct?
***A.*** **Yes.**
***Q.*** And maybe the hesitancy there was back in 2015, was he the Chairman?
***A.*** **Yes, I believe so. It was 10 years ago. But, yeah, I believe so. I would think so.**

*Q.* You would have talked to him about whether Invionics should work on this project.

***A.* I don't recall a meeting with Jim -- James Derbyshire.**

*Q.* You don't recall the Chairman coming by and asking you if you were comfortable with the assurances Dr. Arabi gave you on this online meeting?

***A.* I don't recall a meeting with Jim.**

*Q.* After that December meeting, eventually there's a Statement of Work that's hammered out; right?

***A.* Yes, there is.**

*Q.* And your testimony is that you were involved in some of those negotiations.

***A.* Yes, what to do, that sort of thing.**

*Q.* And then it's pursuant to one of those -- probably the first Statement of Work, that you get to work; right?

***A.* Yes, it is.**

*Q.* And when you started working on Abreezio's technology, you were surprised that Abreezio didn't have any engineers.

***A.* I'm not so sure of when my surprise started coming about, but certainly in the spring sometime.**

*Q.* Okay. So maybe not on day one.

***A.* Maybe not.**

*Q.* Okay. But then your suspicions get aroused.

***A.* I don't think suspicions. "Surprise" maybe is a good word. "Surprise" is a good word.**

*Q.* What's the cause of the surprise?
**A. Startup companies, the other startup companies that Invionics contracted with had engineers.**
*Q.* And Abreezio, in your opinion, did not have engineers?
**A. It had Sanjiv.**
*Q.* Who is an engineer by trade?
**A. I don't really know his qualifications, I'm sorry to say.**
*Q.* Okay.
**A. I don't know.**
*Q.* You're aware Dr. Arabi's an engineer; right?
**A. Yes.**
*Q.* You just didn't consider Dr. Arabi to be an Abreezio engineer?
**A. As far as I know, he didn't have a whole lot to do with Abreezio.**
*Q.* You also felt that Invionics's equity stake in Abreezio seemed way too high.
**A. No.**
*Q.* Well, let me ask you this:
Yesterday, we talked about Anthony Schmidt from Qualcomm traveling to Vancouver and interviewing you for 55 minutes in May of 2017.
**A. Yes.**
*Q.* Do you recall that interview?
**A. I recall the interview and the notes, of course.**

*Q.* And the notes that you reviewed prior to testifying?
**A. Yes.**
*Q.* And in that interview, you said that you felt Invionics' equity stake in Abreezio seemed way too high.
**A. Perhaps Anthony misunderstood me.**
*Q.* So that would be an inaccurate transcription of what you said, huh?
**A. Or -- that one seems a little -- it seems not something I would say.**
*Q.* Let's set aside what was said.
**A. Okay.**
*Q.* Is your opinion today that Abreezio or -- excuse me -- Invionics had too high of an equity stake in Abreezio?
***MR. FRASER:*** Objection. 403.
***THE COURT:*** Overruled.
***THE WITNESS:*** No.
***BY MR. OLAH:***
*Q.* Do you feel it had too low of one?
**A. No.**
*Q.* It was just right?
**A. We signed a contract. We completed the contract. It seemed quite reasonable to me, 10 percent, about right.**
*Q.* You, I believe yesterday, testified to the Unit Purchase Agreement.
Do you recall being shown that document?

***A.*** **Yes.**
***Q.*** Okay. And that -- that's the one -- there's at least -- well, big picture, that's the agreement between Abreezio and Qualcomm; correct?
***A.*** **Essentially, yes, yes.**
***Q.*** By which Qualcomm acquired Abreezio.
***A.*** **Yes.**
***Q.*** With a schedule that specifically set forth all the provisional patents and non-provisional patents, both applications --
***MR. FRASER:*** Objection. 602.
***THE COURT:*** Overruled. If you know.
***THE WITNESS:*** Yes.
***BY MR. OLAH:***
***Q.*** And it also had the different -- it had a payout schedule; correct?
***MR. FRASER:*** Objection. Foundation.
***THE COURT:*** Overruled.
***BY MR. OLAH:***
***Q.*** Just to be clear, you testified to the UPA during Mr. Fraser's direct examination yesterday; right?
***A.*** **I did.**
***Q.*** And you've reviewed that document prior to testifying.
***A.*** **I have. I'm not sure I know what you mean by -- can you clarify payout schedule?**

***Q.*** The amount of money that Qualcomm was paying to the different stakeholders of Abreezio.
***A.*** **Yes, I was aware of that.**
***Q.*** And that schedule says that Sheida Alan is to receive $108 million.
***A.*** **Yes.**
***Q.*** And your testimony is that her ideas, as set forth in the provisional patent applications, were entirely worthless.
***A.*** **Yes, unfortunately.**
***Q.*** Worthless contributions netted her $108 million, at least under the UPA.
***A.*** **A stroke of luck, yes.**
***Q.*** A stroke of luck.
***A.*** **It seems like that to me.**
***MR. OLAH:*** You got that down?
***MR. FRASER:*** Objection. Improper comment on testimony.
***THE COURT:*** Overruled.
***BY MR. OLAH:***
***Q.*** There's nothing to say.
***THE COURT:*** Just wait for the question.
***MR. OLAH:*** Hang tight. Hang tight.
***BY MR. OLAH:***
***Q.*** Sheida Alan, by a stroke of luck, gets $108 million from Qualcomm.
***MR. FRASER:*** Objection. Misstates the record.

Vouching.

***THE COURT:*** Overruled.

***THE WITNESS:*** She got $108 million, just like it said -- I assume she did. I don't see the money; right?

***BY MR. OLAH:***

***Q.*** I'm not try to glue you to that higher number. Let's be clear and be fair here.

There's an amount of money that's owed to the different shareholders of Abreezio; right?

***A.*** **Yes.**

***Q.*** But there's also some money that was held back.

***A.*** **Oh, yes.**

***Q.*** So some money was paid in October 2015; correct?

***A.*** **Yes.**

***Q.*** With additional money due later?

***A.*** **Yes.**

***Q.*** And you individually, I think, were owed a million dollars even after your initial payout; is that right?

***A.*** **I'd have to look at the right numbers, but it's ballpark. Certainly ballpark.**

***Q.*** But you're with me conceptually, that $108 million may be the number in the UPA, but not the number Sheida got on day one of the payouts?

***A.*** **Yes.**

***Q.*** Okay. And my ultimate question is, Sheida gets 108 million

under the contract; right? Or is owed 108 million?

***A.*** **Yes.**

***Q.*** And Invionics, which allegedly did all the work on this technology, got or was owed $27 million; correct?

***A.*** **Yes. That's what the schedule says, yes.**

***Q.*** And that's fair to you, because you guys entered a Statement of Work -- "you guys" being Invionics --

***A.*** **Yes.**

***Q.*** -- to develop the technology that Abreezio had.

***A.*** **Yes. We signed the contract, completed it.**

***Q.*** And specifically, you developed Abreezio's main two ideas.

***A.*** **I believe I developed the main -- one main one is what I was working on. If you individually specify which of the two you're referring to, I could probably get in.**

***Q.*** I just want to be clear that you consider the provisional patent applications, the two that you reviewed bearing Sheida's name, those were Abreezio's main ideas; correct?

***A.*** **Yes.**

***Q.*** And Invionics took those main ideas and developed them into the amazing products that Qualcomm purchased.

***A.*** **No.**

***Q.*** They didn't develop the technology? Isn't that the whole Statement of Work?

***A.*** **We discarded those two provisionals.**

***Q.*** And that word, "discarded," did you mention that in your

interview with Anthony Schmidt?
**A. No, I don't think I did.**
*Q.* You didn't, did you?
**A. No.**
*Q.* And that was very close in time -- that was in May of 2017, wasn't it?
**A. Yes, two years later.**
*Q.* You didn't say "entirely discarded," but you did say the two main ideas were in the provisional patent applications; correct?
**A. Perhaps, yes. I, you know, reviewed the thing, but my memory is not all perfect.**
*Q.* Let's talk about Mr. Taneja briefly.
**A. I'm sorry.**
*Q.* You're fine.
**A. I was muttering away to myself thinking the notes and all.**
***THE COURT:*** Wait for the next question.
***BY MR. OLAH:***
*Q.* New topic.
Sanjiv Taneja, you recognize that name?
**A. I do.**
*Q.* You're unsure whether he's an engineer or not; right?
**A. Well, yeah, unsure.**
*Q.* Let's dig deeper into that uncertainty.
**A. Okay.**
*Q.* He does not strike you as a skilled engineer; correct?

***A.*** **Personally, no.**

***Q.*** And your personal experience is based entirely on working with him on Abreezio; correct?

***A.*** **Correct.**

***Q.*** And you do not think highly of his skills as an engineer.

***A.*** **I did not see them demonstrated.**

***Q.*** Very, very diplomatic of you.

***A.*** **Thank you.**

***Q.*** Did he contribute to Abreezio's technology based on your position within Invionics?

***A.*** **He contributed to the writing of the patents.**

***Q.*** Yeah. Is that it? Is he just the author?

***A.*** **He did the demos and stuff, too.**

***Q.*** Did he author the provisional patent applications?

***A.*** **He contributed to the writing of the patents. And, of course, you know, how we're going to put them together and all that sort of stuff.**

***Q.*** So we may not be understanding each other.

***A.*** **I think we're not.**

***Q.*** Did he put pen to paper -- did he generate these documents that became the applications?

***A.*** **He did not.**

***Q.*** He did not.

Someone else did that?

***A.*** **Yes.**

***Q.*** How would you describe Mr. Taneja's contributions to those patent applications?

***A.*** **He directed us as to various parts to include in the overall patent strategy.**

***Q.*** He directed you guys?

***A.*** **Directed, yes.**

***Q.*** Yesterday, there were some questions about Invionics's office layout; is that right?

***A.*** **Yes.**

***Q.*** Very communal, you guys share ideas?

***A.*** **Yes.**

***Q.*** You take one idea and you guys develop it together; correct?

***A.*** **Yes.**

***Q.*** Mr. Taneja didn't do that with this technology, from your perspective?

***A.*** **He wasn't there at the office.**

***Q.*** Okay. He was just the one directing what was going on.

***A.*** **In conjunction, you know, in conjunction. Not exclusively.**

***Q.*** When you say -- what do you mean by "in conjunction"? Were there other people calling the shots?

***MR. FRASER:*** Objection. Vague as to "calling the shots."

***THE COURT:*** Sustained.

***BY MR. OLAH:***

***Q.*** You seem to know what I'm asking.

**A. I don't really.**
Q. Well, then, let's get there. We'll get there together.
**A. Okay.**
Q. Mr. Taneja was providing direction as to these patent applications; correct?
**A. Certainly some, yes.**
Q. It sounds like he had some broad vision of, like, we're going to attack this area and go for these patents over here.
That's his job; right?
**A. That's his job.**
Q. Big-picture stuff.
If I hear your testimony correctly, it sounds like there were other people also involved in those big-picture decisions; is that right?
**A. Yes.**
Q. Who were they?
**A. Dr. Quinton, actually.**
Q. What about Dr. Arabi?
**A. I never, ever saw him.**
Q. Well, that's not true.
**A. After December the 4th.**
Q. You did see him on December the 4th.
**A. I certainly did. I assume it was him, but yeah.**
Q. And never again.
**A. Well, like, yesterday, probably.**

***Q.*** Let's focus on 2015.
***A.*** **Okay, yes. 2015, never again in 2015.**
***Q.*** Did you visit Qualcomm's campus as part of the --
***A.*** **I did.**
***THE COURT:*** Wait for the question.
***THE WITNESS:*** Sorry.
***BY MR. OLAH:***
***Q.*** Did you visit Qualcomm's campus as part of the demos?
***A.*** **Demos. Oh, sorry. No.**
***Q.*** As part of the evaluations?
***A.*** **No.**
***Q.*** You never went to Qualcomm's campus?
***A.*** **I did go to Qualcomm's campus.**
***Q.*** In relation to Abreezio?
***A.*** **Like, October 31st at the on-boarding.**
***Q.*** Oh, to sign the papers and whatnot?
***A.*** **I believe we signed them before. You know, you become an employee and they do the stuff.**
***Q.*** "Do the stuff," like have you sign --
***A.*** **Give you a laptop, you get all the stuff. I think all the signing had been done in Vancouver.**
***Q.*** Oh, including the Invention Disclosure Agreement; right?
***A.*** **Disclosure and probably an Invention Assignment Agreement, too.**
***Q.*** Meaning technology that you develop while working at

Qualcomm belongs to who?
**A. Do you mean Qualcomm or Invionics?**
*Q.* I'm asking -- well, you've taken us to your on-boarding at Qualcomm.
My question is simply, while you were working at Qualcomm, if you created technology --
**A. Oh, at Qualcomm, yes.**
*Q.* -- who owned that technology?
**A. Qualcomm.**
***MR. FRASER:*** Objection. Vague. 701, 702.
***THE COURT:*** Overruled. Overruled.
***THE WITNESS:*** Yes. The Patent Invention Agreements and all that, yes. Yes.
***BY MR. OLAH:***
*Q.* Qualcomm was very clear about that rule; correct?
**A. Very clear.**
*Q.* Very clear.
Going back to Mr. Taneja, your view is that he did not contribute substantively to the technology or the ideas in the patent applications; correct?
**A. Not in a technical sense, which is the only thing I can evaluate.**
*Q.* And yet he is listed on every one of those patent applications; correct?
**A. He is.**

*Q.* Every single one of them.
**A. Every one of them.**
*Q.* And that's because you should be over-inclusive when identifying inventors and coinventors of technology; correct?
**A. Yes.**
*Q.* Yesterday, Mr. Fraser asked you a quote, something to do with Texas. I wasn't really listening.
Do you remember the question?
**A. No, not well.**
*Q.* I want to ask you about an entirely different quote.
**A. Oh, okay.**
*Q.* And you tell me if you recognize it.
"I was a contract employee. Do the job, move along, don't ask too many questions."
Is that what you told Anthony Schmidt in your interview in May of 2017?
**A. That's in the notes, and I do recall.**
*Q.* You told him, "Don't ask too many questions."
**A. Correct.**
*Q.* You didn't ask questions about Dr. Arabi's involvement with Abreezio?
**A. Nope.**
*Q.* You didn't ask if he had any -- if he had any assurances to give about his work on the project?
**A. I did not ask that.**

***Q.*** And you got, what, $4 million as a result?
***A.*** **Approximately.**
***MR. OLAH:*** No further questions, Your Honor.
***THE COURT:*** Redirect?
***MR. FRASER:*** Yes, Your Honor.

***REDIRECT EXAMINATION***

***BY MR. FRASER:***
***Q.*** Good morning, Mr. Hughes.
***A.*** **Good morning.**
***Q.*** Mr. Olah was asking you on cross-examination about your interview with Anthony Schmidt.
***A.*** **Yes.**
***Q.*** You spoke to Anthony Schmidt for 55 minutes.
***A.*** **I did.**
***Q.*** You told him that Sanjiv brought some ideas over.
***MR. OLAH:*** I would object on leading grounds, Your Honor.
***THE COURT:*** Sustained.
***BY MR. FRASER:***
***Q.*** Do you recall referring to ideas that Sanjiv brought over in your interview with Anthony Schmidt?
***A.*** **I believe so, yes. Yes, I think so.**
***Q.*** And did you advise about patents from Invionics?
***A.*** **I think so, yes.**

***Q.*** The ideas that Sanjiv brought over, were you going to try to make them work?

***A.*** **Yes.**

***Q.*** And you so advised Anthony Schmidt in your interview.

***A.*** **Yes.**

***Q.*** Mr. Olah also asked you a number of questions about Brad Quinton.

Who was the CEO at Invionics?

***A.*** **Brad Quinton, Dr. Quinton.**

***Q.*** Were you the CEO at Invionics?

***A.*** **I was not.**

***Q.*** Mr. Olah also asked you yesterday about lawyering up.

Do you recall?

***A.*** **Rings a bell.**

***Q.*** Was he pacing with his arms crossed at that time?

***MR. OLAH:*** I'll stipulate to probably, Your Honor.

***THE WITNESS:*** Perhaps.

***BY MR. FRASER:***

***Q.*** What is the name of the attorney who has represented you on matters related to Abreezio?

***A.*** **Heather Cane.**

***Q.*** Did she advise you as your attorney dating back to before the acquisition of Abreezio closed?

***A.*** **Yes.**

***Q.*** If you know, has she also represented other clients over

that same time period, meaning going back to before the Abreezio acquisition closed?

***A.*** **She has.**

***Q.*** Was Abreezio an important transaction for you and Invionics in which it seemed useful to have an attorney's help regardless of possible litigation?

***A.*** **Yes.**

***MR. FRASER:*** Let's go to Government Exhibit 120 and put that up, please.

***BY MR. FRASER:***

***Q.*** Mr. Olah asked you a number of questions about this document.

This is -- well, what's the date of this email?

***A.*** **December the 1st of 2014.**

***Q.*** And does this email concern setting a meeting?

***A.*** **It does.**

***Q.*** And did you have reason at that time to pay close attention to whether an idea/patent application was Karim's or his sister's?

***A.*** **No.**

***Q.*** And you mentioned that you never met Sheida.

***A.*** **I did correctly say I didn't do that, yeah.**

***Q.*** Did you ever meet Sheida?

***A.*** **I did not.**

***THE COURT:*** There you go.

***BY MR. FRASER:***
***Q.*** Did you ever feel a need to meet Sheida?
***A.*** **No.**
***Q.*** Why not?
***A.*** **Her name was on the patents, and that was sufficient for me.**
***Q.*** And how useful were those?
***A.*** **Patents; right?**
***Q.*** The ones -- yes.
***A.*** **The provisional patent applications?**
***Q.*** Yes.
***A.*** **Not useful at all, unfortunately.**
***MR. FRASER:*** I would like to show you Government Exhibit 874.
***BY MR. FRASER:***
***Q.*** Do you recognize this?
***A.*** **I do.**
***MR. FRASER:*** And let's go to page 8.
***BY MR. FRASER:***
***Q.*** Does this have a corrected filing receipt of July 2017? Directing your attention to the upper right portion of the document.
***A.*** **Ah, there it is. Yes. The date mailed one?**
***Q.*** Yes.
***A.*** **Yes. Yes, it is.**
***Q.*** That's after the acquisition of Abreezio; correct?

**A. Yes, it is.**
*Q.* Was Qualcomm capable of updating patents after the acquisition, correcting them?
**A. Yes.**
*Q.* Do you know whether Qualcomm added Karim Arabi to any Abreezio patents?
**A. He did not -- or they did not.**
***MR. FRASER:*** We can take that down. Thanks.
***BY MR. FRASER:***
*Q.* Let's go back to the subject of writing provisional and non-provisional patent applications.
Do non-provisionals involve attorneys?
**A. Yes.**
*Q.* And, now, provisionals or non-provisionals, can it happen that they may contain some prior art?
**A. Oh, yes.**
*Q.* If it's not in the claims section, how much reason is there to care?
**A. None whatsoever.**
*Q.* Could you explain why?
**A. The validity of a patent is determined solely by the content of the claims. And, therefore, if it's not in the claims, it is essentially irrelevant.**
*Q.* Okay. And, now, if there is prior art in the claims section, is there any possible explanation for that other than

intentional plagiarism or fraud?

**A. Certainly, certainly.**

*Q.* Can you explain?

**A. I can. When you're writing a patent, you really aren't supposed to go and look up other patents. And, therefore, you're quite likely to miss out on prior art if there does happen to be any.**

**And, therefore, claims may well have prior art attached -- well, that supersede them. It's entirely plausible.**

*Q.* What would you have to know to be certain that there isn't prior art in the document?

**A. You would have to do a very large patent search, the same sort of work that a patent examiner is supposed to do, or a patent attorney in a litigation.**

*Q.* Is there sometimes a hurry to submit a provisional patent application?

**A. I didn't hear the first few words, I'm sorry.**

*Q.* Is there sometimes urgency in submitting a provisional patent application?

**A. Yes, there is.**

*Q.* Why?

**A. You need to get a priority date before you disclose any sort of invention that might be covered, if you're going to do a demo or something of that sort, so that you have the priority date for your patent.**

***Q.*** Referring to the claims, did Sheida's ideas contribute value to those claims?

***A.*** **In which patents, may I ask?**

***Q.*** The patents that you worked on after you came on at Abreezio.

***A.*** **No, they didn't.**

***MR. FRASER:*** No further questions.

***MR. OLAH:*** Very briefly, Your Honor.

***THE COURT:*** Okay.

***RECROSS-EXAMINATION***

***BY MR. OLAH:***

***Q.*** Mr. Fraser was just asking you about an instance apparently when Qualcomm updated an inventor list on a patent it acquired from Abreezio.

***A.*** **Yes.**

***Q.*** Would they update to add an inventor someone who's disavowing any involvement in inventing the technology?

***A.*** **You'd really have to ask Qualcomm that one.**

***Q.*** Well, let me ask you. You're on the stand.

Have you ever heard of someone adding an inventor against their will?

***A.*** **I haven't.**

***Q.*** If someone says, "I had no say in that technology," have you ever heard of a company saying, "We're going to add you as an

inventor anyways"?

**A. I have heard of no such thing.**

***Q.*** That would be absurd; right?

***MR. FRASER:*** Objection. Argumentative.

***THE COURT:*** Sustained.

***MR. OLAH:*** No further questions, Your Honor.

***THE COURT:*** Anything further?

***MR. FRASER:*** One moment, Your Honor.

***RE-REDIRECT EXAMINATION***

***BY MR. FRASER:***

***Q.*** Mr. Hughes, if Qualcomm has a patent, and Qualcomm believes that it doesn't include someone who's an inventor, is it Qualcomm's responsibility to correct that?

**A. Yes.**

***MR. FRASER:*** No further questions.

***THE COURT:*** May this witness be excused?

***MR. OLAH:*** Yes, for the Government, Your Honor.

***THE COURT:*** Thank you, sir.

***(End of requested testimony.)***

***

///

///

///

///

///

*REPORTER'S CERTIFICATE*

I, Anne Roldan, certify that I am a duly qualified and acting Official Court Reporter for the United States District Court, that the foregoing is a true and accurate transcript of the proceedings as taken by me in the above-entitled matter on April 2, 2025; and that the format used complies with the rules and requirements of the United States Judicial Conference.

Date: April 2, 2025

*Anne Roldan, RMR, CRR, CSR 13095*